Ronald J. Wronko, Esq. (RW 1859)
RONALD J. WRONKO, LLC
134 Columbia Turnpike
Florham Park, New Jersey 07932
(973) 360-1001
Attorneys for Plaintiff
Leena Varughese, M.D.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEENA VARUGHESE, M.D., | Civil Action No. 12 cv 8812 (CM/JCF) |
| Plaintiff, | ECF CASE |
| v. | CIVIL ACTION |
| MOUNT SINAI MEDICAL CENTER, PATRICK LENTO, M.D., CARLOS CORDON-CARDO, M.D., ADOLFO FIRPO, M.D., IRA J. BLEIWEISS, M.D. and ABC Corp. 1-10, and JOHN DOES 1-10, Defendants. | **COMPLAINT AND JURY DEMAND** |

Plaintiff Leena Varughese ("plaintiff"), by way of this Complaint against the defendants Mount Sinai Medical Center, Patrick Lento, M.D., Carlos Condon-Cardo, M.D., Adolfo Firpo, M.D., and Ira J. Bleiwess, M.D., ("defendants") says:

### I. Nature of Action, Jurisdiction and Venue

1.    This is an action seeking legal relief for (1) a violation of Title VII of the Civil Rights Act (gender discrimination); (2) a violation of Title VII of the Civil Rights Act

(race and national origin discrimination); (3) a violation of Title VII of the Civil Rights Act
(hostile work environment); (4) a violation of Title VII of the Civil Rights Act (retaliation);
(5) a violation of the New York State Human Rights Law (gender discrimination); (6) a
violation of the New York State Human Rights Law (race and national origin
discrimination); (7) a violation of the New York State Human Rights Law (hostile work
environment); (8) a violation of the New York State Human Rights Law (retaliation); (9) a
violation of the New York City Human Rights Act (gender discrimination); (10) a violation
of the New York City Human Rights Act (race and national origin discrimination); (11) a
violation of the New York City Human Rights Act (hostile work environment); (12) a
violation of the New York City Human Rights Act (retaliation); (13) tortious interference
with prospective economic advantage; (14) defamation and defamation per se; (15) breach
of contract; (16) breach of the covenant of good faith and fair dealing; (17) violation of
whistleblower law; (18) violation of Section 1981 of the Civil Rights Act; (19) violation of
the Family Medical Leave Act ("FMLA"); (20) intentional infliction of emotional distress;
and (21) aiding and abetting liability against the individual defendants.

      2.      This court has jurisdiction due arising out of federal question jurisdiction 28
U.S.C. § 1331.

      3.      Venue is proper pursuant to 28 U.S.C. § 1391, as the acts or omissions
giving rise to the claims alleged herein occurred within this judicial district, and the
defendant is subject to the personal jurisdiction in this district.

## II. Factual Allegations

### A. The Parties

      4.      Plaintiff, Dr. Varughese is a thirty one (31) year old female, who resides in

Union County, New Jersey.

5.     The Mount Sinai Medical Center ("defendant" or "the Hospital") is a hospital and school of medicine, with a principle place of business located at One Gustave L. Levy Place, Box 1099, New York, New York 10029-6574.   Upon information and belief, the Mount Sinai Medical Center encompasses the Mount Sinai Hospital and the Mount Sinai School of Medicine.

6.     At all times relevant to this charge of discrimination, the respondent maintained an employment relationship with 20 or more individuals and is an "employer" within the meaning of applicable Federal, New York state and New York City statutes.

7.     At all times relevant to this charge of discrimination, Dr. Varughese served in the Department of Pathology for respondent, and was an "employee" of the respondent within the meaning of federal and local statutes, and was entitled to protection under Title VII of the Civil Rights Act of 1964 and Section 1981 of the Civil Rights Act of 1991.

8.     Throughout the relevant portions of this charge of discrimination, Dr. Patrick Lento ("Dr. Lento") served as Residency Program Director, and as such, served in a supervisory and/or managerial capacity for the respondent over the complainant and had authority to undertake or recommend tangible employment decisions and/or control the terms and conditions of complainant's employment.

9.     Throughout the relevant portions of this charge of discrimination, Dr. Carlos Cordon-Cardo ("Dr. Cordon-Cardo") served as Chair of the Department of Pathology, and as such, served in a supervisory and/or managerial capacity for the

3

respondent over the complainant and had authority to undertake or recommend tangible employment decisions and/or control the terms and conditions of the complainant's employment.

10.    Throughout the relevant portions of this charge of discrimination, Dr. Adolfo Firpo ("Dr. Firpo") served as Director of Educational Activities for the Department of Pathology, and as such, served in a supervisory and/or managerial capacity for the respondent over the complainant and had authority to undertake or recommend tangible employment decisions and/or control the terms and conditions of the complainant's employment.

11.    Throughout the relevant portions of this charge of discrimination, Dr. Ira J. Bleiweiss ("Dr. Bleiweiss") was the former Chairman of the Department of Pathology, and served in a supervisory and/or managerial capacity for the respondent over the complainant and had authority to undertake or recommend tangible employment decisions and/or control the terms and conditions of the complainant's employment.

**B.   Background Facts and Discrimination and Harassment based upon Gender, Race, and National Origin as well as Retaliation based upon protected activity**

12.    Dr. Varughese began her employment tenure at the Hospital in or about late June of 2008, as a Medical Doctor in the Department of Pathology.  Dr. Varughese was eminently qualified for her position, having esteemed academic and professional qualifications.

13.    Dr. Varughese enjoyed significant achievements and overwhelmingly positive feedback from numerous supervisors regarding her professional

4

accomplishments with renewals of her employment contract.

14.     In each of her years as an employee, Dr. Varughese and the Hospital were parties to an ACGME Resident employment contract (the "Contract") governing their relationship.  The Contract incorporated by reference the Mount Sinai Medical Center House Staff Manual, including a Section entitled, "Job Retention".

15.     Through her date of termination, Dr. Varughese did not commit any acts defined under the "Job Retention" section for her to have been suspended or terminated from her position in the pathology residency program.  Dr. Varughese's contracted employment to Mount Sinai Medical Center could be terminated only if the 'house staff' failed to abide by the By-laws, Rules and Regulations, or policies of the Hospital or of the medical staff, falsified a Hospital document, threatened the safety or welfare of a patient, employee, or other physician or for any action that may be detrimental to the Hospital operations.

16.     In or around mid-to-late 2010, Dr. Samuel McCash, who served as Chief Resident for the Department of Pathology, engaged in a series of inappropriate acts against Dr. Varughese based on Dr. Varughese's gender, and not her qualifications.  In fact, upon information and belief, Dr. McCash regularly harassed and directed hostile treatment towards not only Dr. Varughese, but other female staff, as well, while treating male staff at all times with professionalism and courtesy.

17.     On or around September 14, 2010, Dr. McCash physically and verbally intimidated and humiliated Dr. Varughese for no justifiable reason, screaming and lurching at her to "shut up, shut up, shut your mouth Leena."  In a most demeaning manner, Dr. McCash told Dr. Varughese that his aggressive and threatening tone was,

"for her own good," and that she was, "unfit professionally," by stating that she was "not qualified" that for her position, "no one was teaching you (Dr. Varughese)", she would "never get a job", "no one will hire you (Dr. Varughese)", and that she was lucky to be 'here'.

18.     Dr. McCash's loud and threatening tone, aggressive physical gestures, and derogatory comments caused Dr. Varughese to feel physically threatened, publically humiliated, demeaned; and concerned for her professional development.   Upon information and belief, Dr. McCash never treated Dr. Varughese's male colleagues in a similar manner.  In fact, Dr. McCash would go out of his way to cover for male staff, often at the expense of Dr. Varughese.

19.     Dr. Varughese immediately complained to Dr. Lento and requested a transfer away from Dr. McCash as well as intervention and mediation to prevent future or further harassment.  Dr. Varughese's requests were ignored. Instead, Dr. Lento began falsely accusing Dr. Varughese of having mismanaged patient care without any supporting evidence, of being deserving of being 'yelled' at, of negatively evaluating her experience during an assignment, and of having a negative perception of her work environment.   In contrast to his retaliatory treatment of Dr. Varughese, Dr. Lento made excuses for Dr. McCash's behavior despite confirmation from other house staff of Dr. McCash's action towards Dr. Varughese.

20.     On or about December 8, 2010, Dr. Varughese suffered another incident at the hands of Dr. McCash, prompted by Dr. McCash's discriminatory views of  Dr. Varughese based on her gender.  Dr. McCash approached Dr. Varughese in a physically intimidating and threatening manner while Dr. Varughese was performing critical

patient care related work.  Dr. Varughese was the sole senior resident on assignment on the surgical pathology service and was responsible for managing patient care duties, including managing the utilization and role performed by per diem ancillary staff known as moonlighters.

21.   During that second altercation initiated by Dr. McCash against Dr. Varughese, Dr. McCash's actions were so threatening to Dr. Varughese that Dr. Varughese immediately attempted to leave the lab to seek help.   Meanwhile, Dr. McCash continued to follow Dr.Varughese around the lab in an aggressive manner, rushed at Dr. Varughese, pointed at Dr. Varughese, and invaded Dr. Varughese's personal space.  Finally, when Dr. Varughese managed to exit the lab, she immediately informed Dr. Ira J. Bleiweiss of Dr. McCash's highly inappropriate and hostile behavior. Dr. Bleiweiss ignored Dr. Varughese's complaint.

22.   Dr. Varughese requested transfer away from Dr. McCash for the remainder of her assignment on surgical pathology because of the harassment, disruption of her work environment, and continued obstruction of her performance of her work duties by Dr. Bleiweiss.  For example, Dr. Varughese was inappropriately forced to meet with the former chairman of the department, Dr. Schiller.  Dr. Schiller immediately showed his intention to protect Dr. McCash at the expense of Dr. Varughese merely because she complained of discrimination.

23.   At that time, Dr. Schiller stated that there was, <u>something wrong with [Dr. Varughese's] DNA,</u> and that she should seek therapy.  Dr. Schiller's remark was a direct reference to Dr. Varughese's race as an Indian and national origin from India.  Prior to the "DNA comment," Dr. Schiller remarked to Dr. Varughese during a conference

presentation in random fashion and without any benefit to the presentation), "you don't know the crazy things you find in India." At this time, Dr. Schiller defended McCash and Dr. Jordan who are Caucasian doctors.

24.    On or around December 9, 2010, Dr. Varughese filed formal complaints regarding the discrimination and harassment she was suffering at the hands of Dr. McCash and the subsequent derogatory statements and disparate treatment from Drs. Bleiweiss and Schiller to the ombudsman Dr. Barry Stimmel, and Dr. Pessin-Minsley (the interim Chair of the Pathology Department).

25.    Only about four (4) days after her official complaint of discrimination, Dr. Varughese received a hostile and threatening letter from Drs. Pessin-Minsley and Lento. Rather than properly responding to Dr. Varughese's protected complaints, the Hospital began engaging in an institutional practice of retaliation against Dr. Varughese for her complaints. In the letter, Dr. Varughese was told by Dr. Pessin-Minsley and Dr. Lento that they were in the 'process' of investigating her complaints, but that should she confront anyone regarding her discrimination complaint, that *she* would suffer, "removal from service, possibly including termination." Meanwhile, Dr. Varughese continued to experience increased obstruction such as missing materials necessary to perform Dr. Varughese's duties.

26.    On December 21, 2010, only *eight (8) days* after this threatening and retaliatory letter and *twelve (12) days* after Dr. Varughese's formal complaint of discrimination, Dr. Varughese received a Notice of Academic Advisement from Dr. Lento. The letter, akin to a disciplinary action, was the first such letter Dr. Varughese received during her employment tenure and contained no legitimate accusations. Dr.

Varughese was told that she could not contest the Academic Advisement that was clearly in retaliation and for reporting the second incident of harassment perpetuated by Dr. McCash against Dr. Varughese.

27.     Up until this point Dr. Varughese had received good reviews for her job performance and was never targeted for discipline.  The concerns that Dr. Varughese reported to the respective individuals regarding the events that occurred on December 8, 2010, were not addressed. Instead, the Academic Advisement outlined how a Caucasian female, Dr. Adrienne Christine Jordan (formerly Hackman) and Caucasian male Dr. McCash were allegedly wronged.

28.     In or around late December of 2010, Dr. Pessin-Minsley, a Caucasian female, contacted the Physician Wellness Committee ("PWC") to report Dr. Varughese in order to provoke the PWC to take negative action against Dr. Varughese in retaliation for her complaints.  The PWC, at that time, refused to take any action at the urging of Dr. Pessin-Minsley, as the PWC's role was not disciplinary, and the PWC had no authority to take such action.

29.     Soon thereafter, Dr. Bleiwiess' gave Dr.Varughese a negative evaluation for her performance during the surgical pathology assignment during the course of which Dr. Varughese had been harassed and assaulted by Dr. McCash.  It was the only negative evaluation that she received for the period during which she was attacked by Dr. McCash.  Dr. Bleiweiss also reported Dr. Varughese to the former chair, Dr. Schiller even though he was no longer chairman and did not have any oversight over the department, the residency program, or Dr. Varughese.  The Hospital was clearly engaging in systematic and institutional retaliation against Dr. Varughese for her

protected complaints, in favor of Dr. McCash and Dr. Jordan.

30.     Following her report of harassment, Dr. Varughese continued to be subjected to a hostile work environment, including by the department's refusal to provide work materials and support required for Dr. Varughese to perform her work in pathology. Often, the slides, paperwork, and necessary follow-up studies would not be available to Dr. Varughese. Such instances during her training period were distressful to Dr. Varughese and concerned Dr. Varughese regarding her own professional development and the lack of fair and good faith treatment. Dr. Varughese reported these instances to hospital administration and appropriate individuals but no assistance was ever provided to Dr. Varughese. Dr. Varughese was repeatedly humiliated on several instances with comments made regarding her intelligence, and asked if she was "special needs" when she made the same requests that were routinely made by other residents.

31.     On February 15, 2011, only Dr.Varughese was required to leave her assigned work post despite the fact that both she and her male colleague did not have the requisite clearance known as a mask fit test. Immediately following this incident, Dr. Lento reported Dr. Varughese to the PWC to take actions against her because of her request that she be treated the same as male colleague, and not prevented from attending to duties.

32.     Dr. Varughese was treated differently by the Hospital than her similarly-situated peers and in retaliatory fashion. As per her work in the pathology department, much of Dr. Varughese's work entailed the analysis of slides. Dr. Varughese would often, for no reason, be delayed by the hospital in receiving slides, and additional studies necessary to perform her work. Also, Dr. Varughese would oftentimes order special

stains which were critical to her research and work. For no justification, the Hospital would refuse to provide the necessary stains, intrinsic to making a final diagnosis in pathology. When Dr. Varughese reported the issues and level of obstruction that she was experiencing on a daily basis to her colleagues, the colleagues denied having similar problems on similar assignments.

33.    Later, in or around the end of February, 2011, Dr. Varughese was forced to meet with the PWC, or else be subject to disciplinary action. Such threat is highly irregular, as the PWC had no disciplinary authority and was instituted to be a resource for physicians, not to be used against physicians in such a manner, as per JCAHO now known as The Joint Commission, and New York State Medical Societies (MSSNY) and the State of New York, Office of Professional guidelines, and Hospital practice.

34.    The Hospital's actions were clearly retaliatory. For instance, Dr. Jordan is a Caucasian female, similarly situated co-worker/resident of plaintiff. Dr. Jordan was promoted to chief resident status, even though plaintiff had accurately reported in an act of whistleblowing that Dr. Jordan had brought alcohol to and consumed it at work. This was not the first time that drinking had occurred at the workplace during working hours. In the months leading up to this incident, Dr. McCash solicited by e-mail other residents to participate in "dementia" rounds, during which residents would drink hard alcohol and beer during work hours on Hospital premises. He even admitted to taking a "break" from grossing specimens to drink alcohol.

35.    Dr. Varughese's complaint about Dr. Jordan was verified. The bottle of Captain Morgan's Rum that Dr. Jordan brought to work and was drinking on the job was discovered. Rather than suffer any disciplinary action, Dr. Jordan was promoted to chief

11

resident status over plaintiff and four other qualified co-workers with seniority over Dr. Jordan.

36. Dr. Jordan was given further preferential treatment such as a being permitted to take an elective in Pennsylvania even though she had the duty of being a chief resident at the New York City based hospital. During which time, Dr. Jordan did not carry a working pager and admitted to phone reception and email access issues. In contrast, plaintiff did not receive comparable treatment and, instead, was the subject of repeated discipline over the course of a period of year and termination for alleged offenses that were commonplace for other coworkers including Drs. Jordan and McCash and offenses that were less significant than drinking on the job when patient care is at risk. When plaintiff complained to Dr. Schiller regarding Dr. Jordan, he defended Dr. Jordan. In fact, many of Dr. Varughese's reports of problems were ignored in favor of Dr. McCash's and Dr. Jordan's advancement reflecting disparate treatment against Dr. Varughese.

37. The Hospital sought every opportunity to harass Dr. Varughese subsequent to her discrimination and whistleblowing complaints. One of the conditions of the Academic Advisement which Dr. Varughese received in retaliation for her complaint was that Dr. Varughese had to write a 'self-reflection.' The self reflection was to be "your account of the situation" which led to her complaint about Dr. McCash, and a description of how *she*, not the Hospital or her harasser, could have approached things "in a better fashion".

38. The Hospital also imposed disparate requirements upon Dr. Varughese subsequent to her discrimination complaint. The hospital imposed upon her numerous

12

meetings with Dr. Lento, Dr. Cordon-Cardo and department administrator Mr. Castaldi without informing Dr. Varughese of the nature or reason for the meetings. After the hiring of Dr. Firpo as Director of Educational Activities in July 2011, Dr. Firpo "reviewed" Dr. Varughese's 'professionalism.' The tone of many of these meetings was unprofessional and threatening to Dr. Varughese. The attitudes and comments made to Dr. Varughese were demeaning and unprofessional, and reflected a continuation of the institutional practice of retaliation against Dr. Varughese for reporting several incidents of harassment by Dr. McCash and the inaction of her supervisor, Dr. Lento.

39.    Dr. Varughese complied with the Hospital's request that she write a 'reflection', though she was forced to write the reflection under the threat of disciplinary action and in clear retaliation for her complaints of discrimination.

40.    When Dr. Varughese submitted the reflection, it was vastly and unjustifiably criticized, even though it was a self-reflection, and in an act of further harassment on or about May, 2011, the Hospital forced her to write a second reflection, by threatening immediate termination. This was in clear violation of Mt. Sinai's Hospital's contractual obligations and policies.

41.    At a follow-up meeting relating to the self-reflection exercise, Dr. Cordon-Condo explicitly requested that Dr. Varughese refrain from making complaints about doctors drinking on the job.

42.    For months subsequent to her complaints to human resources and the ombudsman, Dr. Varughese received no response from the Hospital regarding her complaints of discrimination. During that time period, disciplinary action against Dr. Varughese by the Hospital continued unabated. Additional actions taken against Dr.

Varughese included refusal to credit Dr. Varughese for the work she performed, and removal of and tampering with Dr. Varughese's data from the residency management software known as New Innovations.

43. In or around April, 2011, Dr. Varughese followed up her initial complaint of discrimination, in December 2010, by reiterating her complaint to the Director of Human Resources, Caryn Tiger-Paillex ("Paillex"), that she felt as if she was discriminated against based upon her gender.

44. Very soon thereafter, Ms. Tiger-Paillex followed up Dr. Varughese's protected complaint with a letter to Dr. Varughese, dated April 11, 2011. The letter, dated four months after Dr. Varughese's initial official complaint, was wholly dismissive of Dr. Varughese's claims. Very simply, the letter which took four months to produce and which was only prompted by Dr. Varughese's continued inquiry into her complaints, stated, "I was not able to confirm your version of events, or to substantiate your claims of harassment, abusive behavior or abuse of power."

45. The very same day, the PWC followed-up with Dr. Varughese by presenting completely new claims and accusations against Dr. Varughese that were never even discussed with Dr. Varughese. The hospital's actions were a continuation of retaliatory practices against Dr. Varughese.

46. Since the submission of the self-reflection, the following months included continued report to Human Resources and Graduate Medical Education by Dr. Bleiweiss, even though, he was not supervising Dr. Varughese, confrontation of Dr. Varughese's superiors by Dr. Bleiweiss and requests to write negative evaluation of her performance, which effectively created an extremely hostile and disparate work

environment for Dr. Varughese, especially, when compared to Dr. McCash and Dr. Jordan, who enjoyed various and numerous promotions that were overseen by Drs. Lento, Cordon-Cardo, and Firpo.

47.     Recognizing that the Hospital lacked diligence in their treatment of Dr. Varughese's discrimination complaints and, more importantly that the Hospital had begun retaliating against Dr. Varughese subsequent to her engagement in protected activities, Dr. Varughese had her attorneys contact the Hospital by letter on or about June 10, 2011.  In the letter, Dr. Varughese's attorneys reiterated Dr. Varughese's complaints of discrimination, highlighted the hospital's failure to act diligently subsequent to her complaints, and outlined potential retaliatory acts committed by the hospital.  The letter explicitly requested that Dr. Varughese' attorneys be contacted, but the hospital never responded to the June 10, 2011 letter.

48.     Approximately *only one month* after the letter from Dr. Varughese's attorneys, on July 14, 2011, Dr. Cordon-Cardo issued to Dr. Varughese a trumped up final warning.  The 'final' warning letter, dated July 1, 2011, articulated no performance related issues whatsoever, and merely harped on alleged issues of professionalism, no doubt related to Dr. Varughese's unwelcome harassment and discrimination complaints. In criticism of Dr. Varughese and in 'justification' of the final warning, the letter admonished Dr. Varughese for bringing up, "the events that led to the Academic Advisement and various ways in which you [Dr. Varughese] feel that you were wronged." This particular statement was a clear acknowledgement by the hospital that the Academic Advisement discipline that Dr. Varughese received in December, 2010, was clearly in retaliation for her complaints, including the June 10, 2011 letter of

15

counsel, of discrimination.  And, it clearly acknowledged that this final warning was for the same.

49.    The 'final' warning letter also criticized the 'Self-Reflection' essay that Dr. Varughese was required to submit, as per her December, 2010, Academic Advisement.  Because Dr. Varughese maintained her discrimination complaints in the self-reflection, the hospital determined that the essay, "did not meet the Advisement's requirements."  In clear condemnation of Dr. Varughese's complaints, the letter also criticized Dr. Varughese for her, "failure to appreciate the need to function within a hierarchy."  The hospital's continued retaliation against Dr. Varughese for her complaint of discrimination was relentless.  Dr. Varughese always remained professional and functioned well within the hierarchy and was not accused of being unprofessional until the report of harassment by McCash.

50.    Following the 'final warning', Dr. Varughese was tasked with meeting with Dr. Fipro, a new hire who began his work in July 2011 as Director of Educational Activities, a newly created position.  During the first meeting on August 2, 2011, Dr. Varughese was told by Dr. Firpo, in the most unprofessional manner, that he has to figure out the politics of the institution before he assists Dr. Varughese.  Dr. Varughese provided Dr. Firpo with the 'self-reflections' of which he claimed to not have had any prior knowledge.

51.    During the second meeting on August 17, 2011, Dr. Varughese raised concerns of abusive treatment on a two week assignment with Dr. Najfeld and concerns regarding timely scheduling to assignments required for Anatomic Pathology board exam requirement. In the most unprofessional manner, Dr. Firpo offered to pay out of

16

his own pocket for late fees rather than accommodate reasonable change in schedule. In addition, over the course of the next month, Dr. Firpo would appear at Dr. Varughese's desk at random times and hours without any purpose. On occasions where Dr. Varughese was not present at the desk, it would lead to accusatory emails to Dr. Varughese, despite the fact that Dr. Varughese was attending to her duties which required leaving the desk for numerous reasons over the course of the work day.

52.     On September 12, 2011, Dr. Varughese met with Associate Dean for Graduate Education, Dr. Scott Barnett, to voice concerns regarding continued disparate treatment by the department leadership and malignant behavior directed at Dr. Varughese.

53.     During this period, on September 13, 2011, Dr. Firpo sent an email to Dr. Varughese stating it would be most desirable to "rewrite your reflection recasting your experiences".   The intimidation of and retaliation against Dr. Varughese was unrelenting. No such demands were made to Dr. McCash. In fact, none of the meetings that took place were professional, much less, the actions and the demands being made of Dr. Varughese for one incident described previously where Dr. Varughese was allegedly unprofessional.

54.     In or about September 14, 2011, Dr. Varughese was notified that she was scheduled as a presenter on September 15. Dr. Varughese was scheduled to present because another doctor, who was scheduled to present for over at least one month, had cancelled his presentation at the last minute. The doctor who cancelled his presentation at the last minute was not disciplined for doing so. Though Dr. Varughese was scheduled at the last minute, when Dr. Varughese acted to reschedule her presentation,

17

the Hospital threatened serious disciplinary action and referred her to the Physician Wellness Committee.

55.     In or about September 2011, Dr. Varughese requested leave under the Family Medical Leave Act ("FMLA") to attend to Dr. Varughese's own health. She was advised that she would have to provide a doctor's certification in support of such request for leave.

56.     Before Dr. Varughese even had a chance to submit the doctor's certification and before she had been advised that her FMLA leave was approved or was commencing, defendants barred her from the workplace. To return to work, she would have to provide a doctor's note. Such request for a Fit for Duty certification was entirely premature as Dr. Varughese had not even taken FMLA leave yet. Such negative action was taken to interfere with Dr. Varughese's attempts to exercise her rights under FMLA. As a result of the immediate action taken by defendants to discourage her attempted exercise of her rights under FMLA, Dr. Varughese and her physician decided not to proceed forward on the request.

57.     On September 20, 2011, Dr. Varughese obtained the note from her treating physician permitting her to return to work as insisted on by the Hospital. In addition, Dr. Varughese provided the information to Human Resources and Graduate Medical Education as instructed to do so by the director human resources, Ms. Tiger-Paillex.

58.     Dr. Varughese attended work on September 21, 2011, and now was officially cleared by her physician as explicitly requested by MSMC. However, while Dr. Varughese was at her work desk, the Hospital security was called to her desk and Dr. Varughese was accosted in front of her colleagues for several hours. Defendants

illegally used Dr. Varughese's communications to exercise rights under FMLA as a negative factor justifying a summary suspension termination in violation of 29 C.F.R. § 825.220.

59.     On September 21, 2011, Dr. Firpo and Dr. Cordon-Cardo issued a letter of summary suspension termination from the Pathology Residency Program to Dr. Varughese. Though no previous restrictions were placed on Dr. Varughese's privileges and responsibilities, the letter deemed her a 'risk' to the hospital and her patients. The letter summarized numerous pretextual or fabricated reasons purporting to support the summary suspension and termination and again harped on Dr. Varughese's professionalism and failure to provide the hospital an adequate 'self-reflection.' Dr. Varughese's failure to drop her protected discrimination complaints and take blame for the incidents ultimately led to her retaliatory termination.

60.     The Hospital breached the employment Contract with Dr. Varughese by terminating her. The Hospital did not have any of the grounds under the Job Retention section of the Manual to terminate the Contract. Dr. Varughese's contract was guided by the non-profit organization concerned with overseeing the quality of residency programs known as Accreditation Council of Graduate Medical Education, ACGME. As such, Dr. Varughese is to be given notice of any and each failure in a timely manner, not in a final write-up or after termination. During the numerous meetings during which Dr. Varughese met with superiors, Dr. Varughese was not informed of the numerous claims that were ultimately made against her in support of summary suspension and termination.

61.     Defendant's reasons for terminating Dr. Varughese's employment were

entirely pretextual and were a continuation of retaliation that had occurred since she engaged in protected activities including report of repeat instances of harassment to her superiors, who regularly blamed Dr. Varughese or insisted that Dr. Varughese deserved to be subjected to harassment and humiliation.

62.     The discriminatory and retaliatory treatment that Dr. Varughese endured during her employment has caused great stress and anxiety for her, and has had a negative effect on her health, as well as a severe effect on her personal finances both in the present and future.  The stated reasons for Dr. Varughese's termination are a pretext for the respondent's unlawful discrimination and retaliation against Dr. Varughese.  The complainant's professional goals and growth have been implicated, and personal finances have been impacted, by respondent's unlawful conduct, which demonstrates a reckless indifference to her state and local protected rights under the New York Human Rights Act and the New York City Human Rights Act.

### C.     Post-termination acts of Retaliation and Defamation

63.     Dr. Varughese had already satisfactorily completed 95 percent of the assignments in Anatomic Pathology with only the assignment at the Medical Examiner remaining and the Clinical Pathology assignments remained were to be completed during the final year. For that matter, the respondents have insisted that Dr. Varughese will not be assigned the requisite rotations for Clinical Pathology and follow up by Dr. Varughese did not yield any change by respondents.

64.     When a potential employer requested that Mount Sinai Medical Center and Dr. Firpo forward the record of the years of work that Dr. Varughese had completed

satisfactorily, they refused. After the Medical Center denied verification of employment record to the requesting institution, the Mount Sinai Medical Center created a punitive record known as a "summative evaluation" that would prevent Dr. Varughese from obtaining appropriate employment anywhere that would reference her medical career from 2008-2012. The summative evaluation notes new issues related to Dr. Varughese that were completely contrary and never brought to Dr. Varughese's attention. Mount Sinai Medical Center and Dr. Firpo took such action after claimant's termination in further retaliation, continued spite, and in malice against claimant and to prevent Dr. Varughese from obtaining qualified work and ruining Dr. Varughese employment prospects in pathology.   In sharp contrast, Dr. McCash and Dr. Jordan have enjoyed significant advancements in their careers with full support of the respondents.

### D.    Administrative Prerequisites

65.    At the commencement of this action, notice thereof was provided to the Attorney General of the State of New York, as provided by N.Y. Civ. Rights Laws, § 40-d.

66.    At the commencement of this action, a copy of the Complaint was served upon the New York City Commission on Human Rights and the New York City Corporation Counsel, as provided by the New York City Human Rights Law, N.Y.C. Admin. Code § 8-502(c).

67.    Plaintiff has also received a Right to Sue letter from the EEOC. This action has been filed prior to expiration of the ninety (90) day period for suit to be filed

## COUNT I
### (Gender Discrimination under Title VII of the Civil Rights Act of 1964)

68.     Plaintiff realleges and incorporates herein the above paragraphs.

69.     Plaintiff is in a gender protected class (female), performed her duties satisfactorily, was subject to adverse employment actions, and the adverse employment actions occurred under circumstances giving rise to an inference of unlawful discrimination.

70.     The foregoing facts and circumstances demonstrate that defendant has violated Title VII of the Civil Rights Act of 1964, by treating plaintiff in a disparate fashion and discriminating against plaintiff based upon plaintiff's gender.

71.     As a direct and proximate result of the actions of defendant, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and embarrassment.  Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life.  Moreover, plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care . Plaintiff's damages have been experienced in the past, and they will continue into the future.

72.     Furthermore, plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.

## COUNT II
### (Race/National Origin Discrimination under Title VII of the Civil Rights Act of 1964)

73.     Plaintiff realleges and incorporates herein the above paragraphs.

74.     Plaintiff is in a race/national origin protected class (Indian), performed her duties satisfactorily, was subject to adverse employment actions, and the adverse employment actions occurred under circumstances giving rise to an inference of unlawful discrimination.

75.    The foregoing facts and circumstances demonstrate that defendant has violated Title VII of the Civil Rights Act of 1964, by treating plaintiff in a disparate fashion and discriminating against plaintiff based upon plaintiff's race/national origin as Indian.

76.    As a direct and proximate result of the actions of defendant, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and embarrassment. Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life. Moreover, plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care Plaintiff's damages have been experienced in the past, and they will continue into the future.

77.    Furthermore, plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.

## COUNT III
### (Hostile Work Environment under Title VII of the Civil Rights Act of 1964)

78.    Plaintiff realleges and incorporates herein the above paragraphs.

79.    Plaintiff was subjected to a hostile work environment on account of her gender, race and/or national origin. The harassing conduct to which plaintiff was subjected would not have occurred but for plaintiff's gender, race and/or national origin.

80.    The harassing actions and statements directed at plaintiff were severe and pervasive.

81.     The sexually harassing actions and statements directed at plaintiff altered the conditions of plaintiff's employment and created an intimidating, hostile, offensive and abusive working environment because of plaintiff's gender, race and/or national origin.

82.     A reasonable woman of plaintiff's race and national origin and a reasonable person would consider the actions and statements directed toward plaintiff to have created an intimidating, hostile, offensive and abusive working environment because of gender, race and/or national origin.

83.     As a direct and proximate result of the actions of defendant, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and embarrassment.  Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life.  Moreover, plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care . Plaintiff's damages have been experienced in the past, and they will continue into the future.

84.     Furthermore, plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.

## COUNT IV
### (Retaliation under Title VII of the Civil Rights Act of 1964)

85.     Plaintiff realleges and incorporates herein the above paragraphs.

86.     Plaintiff engaged in protected activity under Title VII of the Civil Rights Act of 1964, by reporting her good faith belief that she was the subject of a hostile work environment and the victim of gender discrimination.

87.     Plaintiff suffered adverse employment actions that materially change the terms and conditions of employment in a way that was adverse to plaintiff.

88.    The adverse employment actions were causally related to plaintiff's protected activity.

89.    The foregoing facts and circumstances demonstrate that defendant has violated Title VII of the Civil Rights Act of 1964 by retaliating against plaintiff for engaging in protected activity.

90.    As a direct and proximate result of the actions of defendant, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and embarrassment. Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life. Moreover, plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care . Plaintiff's damages have been experienced in the past, and they will continue into the future.

91.    Furthermore, plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.

## COUNT V
### (Gender Discrimination under the New York Human Rights Law)

92.    Plaintiff realleges and incorporates herein the above paragraphs.

93.    Plaintiff is in a gender protected class (female), performed her duties satisfactorily, was subject to adverse employment actions, and the adverse employment actions occurred under circumstances giving rise to an inference of unlawful discrimination.

94.    The foregoing facts and circumstances demonstrate that defendant has violated the New York Human Rights Law, by treating plaintiff in a disparate fashion and discriminating against plaintiff based upon plaintiff's gender.

95.     As a direct and proximate result of the actions of defendant, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and embarrassment.  Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life.  Moreover, plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care . Plaintiff's damages have been experienced in the past, and they will continue into the future.

96.     Furthermore, plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.

## COUNT VI
### (Race/National Origin Discrimination under the New York Human Rights Law)

97.     Plaintiff realleges and incorporates herein the above paragraphs.

98.     Plaintiff is in a race/national origin protected class (Indian), performed her duties satisfactorily, was subject to adverse employment actions, and the adverse employment actions occurred under circumstances giving rise to an inference of unlawful discrimination.

99.     The foregoing facts and circumstances demonstrate that defendant has violated the New York Human Rights Law, by treating plaintiff in a disparate fashion and discriminating against plaintiff based upon plaintiff's race/national origin as Indian.

100.     As a direct and proximate result of the actions of defendant, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and embarrassment.  Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life.  Moreover, plaintiff has and/or

may have to incur expenses for medical, psychiatric, and/or psychological counseling care .
Plaintiff's damages have been experienced in the past, and they will continue into the future.

101.   Furthermore, plaintiff has been required to retain an attorney to assist
Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.

## COUNT VII
### (Hostile Work Environment under the New York Human Rights Law)

102.   Plaintiff realleges and incorporates herein the above paragraphs.

103.   Plaintiff was subjected to a hostile work environment on account of her
gender, race and/or national origin.  The harassing conduct to which plaintiff was subjected
would not have occurred but for plaintiff's gender, race and/or national origin.

104.   The harassing actions and statements directed at plaintiff were severe and
pervasive.

105.   The sexually harassing actions and statements directed at plaintiff altered the
conditions of plaintiff's employment and created an intimidating, hostile, offensive and
abusive working environment because of plaintiff's gender, race and/or national origin.

106.   A reasonable woman of plaintiff's race and national origin and a reasonable
person would consider the actions and statements directed toward plaintiff to have created
an intimidating, hostile, offensive and abusive working environment because of gender, race
and/or national origin.

107.   As a direct and proximate result of the actions of defendant, plaintiff has
suffered mental anguish, physical discomfort, pain and suffering, and shame and
embarrassment.  Furthermore, plaintiff has suffered lost wages, a diminished ability to earn
a living, and a diminished capacity to enjoy plaintiff's life.  Moreover, plaintiff has and/or

may have to incur expenses for medical, psychiatric, and/or psychological counseling care . Plaintiff's damages have been experienced in the past, and they will continue into the future.

108.    Furthermore, plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.

**COUNT VIII**
**(Retaliation under the New York Human Rights Law)**

109.    Plaintiff realleges and incorporates herein the above paragraphs.

110.    Plaintiff engaged in protected activity under the New York Human Rights Law, by reporting her good faith belief that she was the subject of a hostile work environment and the victim of gender discrimination.

111.    Plaintiff suffered adverse employment actions that materially change the terms and conditions of employment in a way that was adverse to plaintiff.

112.    The adverse employment actions were causally related to plaintiff's protected activity.

113.    The foregoing facts and circumstances demonstrate that defendant has violated the New York Human Rights Law by retaliating against plaintiff for engaging in protected activity.

114.    As a direct and proximate result of the actions of defendant, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and embarrassment.  Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life.  Moreover, plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care . Plaintiff's damages have been experienced in the past, and they will continue into the future.

115.    Furthermore, plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.

## COUNT IX
### (Gender Discrimination under the New York City Human Rights Law)

116.    Plaintiff realleges and incorporates herein the above paragraphs.

117.    Plaintiff is in a gender protected class (female), performed her duties satisfactorily, was subject to adverse employment actions, and the adverse employment actions occurred under circumstances giving rise to an inference of unlawful discrimination.

118.    The foregoing facts and circumstances demonstrate that defendant has violated the New York City Human Rights Law, N.Y. Admin. Code § 8-107, et seq., by treating plaintiff in a disparate fashion and discriminating against plaintiff based upon plaintiff's gender as a woman.

119.    As a direct and proximate result of hostile work environment created by defendant, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and embarrassment. Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life. Moreover, plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care . Plaintiff's damages have been experienced in the past, and they will continue into the future.

120.    Furthermore, plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.


## COUNT X

**(Race/National Origin Discrimination under the New York City Human Rights Law)**

121.    Plaintiff realleges and incorporates herein the above paragraphs.

122.    Plaintiff is in a race/national origin protected class (Indian), performed her duties satisfactorily, was subject to adverse employment actions, and the adverse employment actions occurred under circumstances giving rise to an inference of unlawful discrimination.

123.    The foregoing facts and circumstances demonstrate that defendant has violated the New York City Human Rights Law, N.Y. Admin. Code § 8-107, et seq., by treating plaintiff in a disparate fashion and discriminating against plaintiff based upon plaintiff's race/national origin as a person of Indian race and of national origin of India.

124.    As a direct and proximate result of hostile work environment created by defendant, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and embarrassment.  Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life.   Moreover, plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care .  Plaintiff's damages have been experienced in the past, and they will continue into the future.

125.    Furthermore, plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.

**COUNT XI**
**(Hostile Work Environment under the New York City Human Rights Law)**

126.    Plaintiff realleges and incorporates herein the above paragraphs.

127.    The foregoing facts and circumstances demonstrate that defendant subjected plaintiff to a workplace where unwanted gender-based and/or race-based and/or national origin-based offensive conduct existed in violation of New York City Human Rights Law, N.Y. Admin. Code § 8-107, et seq.

128.    As a direct and proximate result of hostile work environment created by defendant, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and embarrassment.  Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life.  Moreover, plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care .  Plaintiff's damages have been experienced in the past, and they will continue into the future.

129.    Furthermore, plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.

### COUNT XII
### (Retaliation under the New York City Human Rights Law)

130.    Plaintiff realleges and incorporates herein the above paragraphs.

131.    Plaintiff engaged in protected activity under the New York City Human Rights Law, N.Y. Admin. Code § 8-107, et seq., by reporting her good faith belief that she was the subject of a hostile work environment and the victim of gender discrimination.

132.    Plaintiff suffered adverse employment actions that materially change the terms and conditions of employment in a way that was adverse to plaintiff.

133.    The adverse employment actions were causally related to plaintiff's protected activity.

31

134.    The foregoing facts and circumstances demonstrate that defendant has violated the New York City Human Rights Law, N.Y. Admin. Code § 8-107, et seq., by retaliating against plaintiff for engaging in protected activity.

135.    As a direct and proximate result of the retaliation engaged in by defendant, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and embarrassment.  Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life.  Moreover, plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care .  Plaintiff's damages have been experienced in the past, and they will continue into the future.

136.    Furthermore, plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.


## COUNT XIII
### (Interference with Business Relations)

137.    Plaintiff realleges and incorporates herein the paragraphs set forth in this Complaint.

138.    The actions of Defendant give rise to a violation of interference with business relations.

139.    As a direct and proximate result of the actions of Defendants, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment, emotional distress injuries, the physical manifestation of emotional distress injuries, and/or physical injury.  Furthermore, Plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiff's life.  Moreover, Plaintiff has and/or

32

may have to incur expenses for medical, psychiatric, and/or psychological counseling care .
Plaintiff's damages have been experienced in the past, and they will continue into the future.

140.    Further, Plaintiff has been required to retain an attorney to assist Plaintiff in
asserting Plaintiff's claims and protecting Plaintiff's rights.

## COUNT XIV
### (Defamation and Defamation Per Se)

141.    Plaintiff realleges and incorporates herein the paragraphs set forth in this
Complaint.

142.    Defendant has made false and defamatory statements about plaintiff of a
nature that would negatively impact plaintiff's reputation in her chosen profession.

143.     Defendant made and published the false statements with malice and/or with
reckless disregard for the falsity of the statements made.

144.    Plaintiff has been damaged as a result of the defamatory statement(s) made
by defendant.  Moreover, as defendant's false and defamatory statements have been made
for purposes of harming plaintiff's reputation in her chosen profession, defendant's
defamatory statements amount to defamation per se for which no damages need be shown.

## COUNT XV
### (Breach of Contract)

145.    Plaintiff realleges and incorporates herein the paragraphs set forth in this
Complaint.

146.    The Hospital breached the Contract between the parties.

147.    Plaintiff has been damaged as a result of the Hospital's breach of contract.
Plaintiff's damages include compensatory damages and foreseeable consequential damages.

33

## COUNT XVI
### (Breach of Covenant of Good Faith and Fair Dealing)

148.   Plaintiff realleges and incorporates herein the paragraphs set forth in this Complaint.

149.   There is a covenant of good faith and fair dealing in each contract in the State of New York.

150.   The Hospital breached the covenant of good faith and fair dealing in the parties' Contract.

151.   Plaintiff has been damaged as a result of the breach of the covenant of good faith and fair dealing.  Plaintiff's damages include compensatory damages and foreseeable consequential damages.

## COUNT XVII
### (Whistleblower Law)

152.   Plaintiff realleges and incorporates herein the paragraphs set forth in this Complaint.

153.   Plaintiff disclosed to her superiors that the Chief Resident was drinking alcohol on the job.

154.   Plaintiff disclosed such violation of law and/or public policy in good faith, and such complaint was substantiated.

155.   The actions of the Chief Resident created a substantial and specific danger to public health.

156.   Plaintiff was the subject of retaliation because of her disclosure of this issue.

157.   Plaintiff has been damaged as a result of the retaliation and is subject to recovery under McKinney's Labor Law § 740(4).

34

## COUNT XVIII
### (42 USC § 1981)

158.   Plaintiff realleges and incorporates herein the paragraphs set forth in this Complaint.

159.   Plaintiff is a member of a racial minority (Indian) and a gender minority (female).

160.   Defendant has demonstrated an intent to discriminate on the basis of race and gender.

161.   Defendant terminated plaintiff in discriminatory fashion.

162.   As a direct and proximate result of the actions of Defendants, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment, emotional distress injuries, the physical manifestation of emotional distress injuries, and/or physical injury.  Furthermore, Plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiff's life.  Moreover, Plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care .  Plaintiff's damages have been experienced in the past, and they will continue into the future.

163.   Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting Plaintiff's claims and protecting Plaintiff's rights.

## COUNT XIX
### (Family Medical Leave Act "FMLA")

164.   Plaintiff realleges and incorporates herein the paragraphs set forth in this Complaint.

165.   Plaintiff attempted to exercise rights under the Family Medical Leave Act.

35

166. Defendants interfered with plaintiff's attempts to exercise rights.

167. Defendants took plaintiff's attempts to exercise rights under FMLA into account in taking an adverse employment action against plaintiff.

168. Plaintiff has suffered damages, including lost wages, front pay, and attorneys fees and costs, as a result of interference and retaliation arising out of her attempts to exercise rights under the FMLA.

## COUNT XX
### (Intentional Infliction of Emotional Distress)

169. Plaintiff realleges and incorporates herein the paragraphs set forth in this Complaint.

170. Defendant has engaged in extreme and outrageous conduct with the intent to cause or disregard of a substantial probability of causing severe emotional distress to plaintiff.

171. Defendant's conduct caused plaintiff's harm in the form of severe emotional distress.

## COUNT XXI
### (Individual Liability)

172. Plaintiff realleges and incorporates herein the paragraphs set forth in this Complaint.

173. The foregoing facts and circumstances demonstrate that defendants Cordon-Cardo, Firpo, and Lento have violated the above-referenced federal, state, and local discrimination and whistleblower statutes by aiding and abetting or otherwise assisting the commission of or attempting to commit acts of disparate treatment, discrimination, and retaliation against plaintiff based upon the above-referenced protected traits and activity.

174.    As a direct and proximate result of the actions of these individual defendants, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and embarrassment. Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life. Moreover, plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care. Plaintiff's damages have been experienced in the past, and they will continue into the future.

175.    Furthermore, plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.

WHEREFORE, as to each and every count, plaintiff demands judgment on each and all of these counts against the defendants jointly and severally, as follows:

A.    Compensatory and/or consequential damages in excess of $1,000,000.00;.

B.    Damages for lost wages and benefits, back pay and front pay;

C.    Damages for humiliation, mental and emotional distress;

D.    Statutory damages, if applicable;

E.    Punitive damages and or liquidated damages where permitted by law;

F.    Attorneys' fees and costs of suit;

G.    Lawful interest – including pre-judgment interest on lost wages;

H.    Lawful interest – including pre-judgment interest on any wages not paid in a timely manner; and

I.    Such other, further and different relief as the Court deems fitting, just and proper.

37

Plaintiff hereby reserves the right to amend this Complaint to supplement or modify the factual obligations and claims contained herein, based upon information received from the defendant, witnesses, experts, and others in the course of discovery in this matter.

## DEMAND FOR TRIAL BY JURY

Plaintiff respectfully demands a trial by jury on all issues in the within action so triable.

## DESIGNATION OF TRIAL COUNSEL

RONALD J. WRONKO is hereby designated as trial counsel on behalf of plaintiff.

RONALD J. WRONKO, LLC
Attorney for plaintiff

By

Ronald J. Wronko

Dated: December 3, 2012

## CERTIFICATION

The undersigned hereby certifies that to the best of his knowledge he knows of no other actions or arbitration hearings pending in connection with the within action now being filed with the Court.

Dated:   December 3, 2012

Ronald J. Wronko, Esq. (RW 1859)

Ronald J. Wronko, LLC
134 Columbia Turnpike
Florham Park, NJ 07932
(973) 360-1001
(973) 360-1881 (facsimile)
ron@ronwronkolaw.com