

EDWARDS WILDMAN PALMER LLP
750 LEXINGTON AVENUE
NEW YORK, NY 10022
+1 212 308 4411 main  +1 212 308 4844 fax
edwardswildman.com

Rory J. McEvoy
Partner
+1 212 912 2787
*fax* +1 212 308 4844
rmcevoy@edwardswildman.com

November 12, 2013

**VIA ECF**

The Honorable James C. Francis
United States Magistrate Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

> Re:   Varughese v. Mount Sinai Medical Center, et al.
>         Docket No.: 12 Civ. 8812 (CM) (JCF)

Dear Judge Francis:

After Defendants filed their motion to quash and for a protective order, I received an e-mail from Plaintiff's counsel rejecting my request to withdraw the deposition notices and subpoenas for the individuals who are the subject of the motion. (A copy of Mr. Wronko's November 8, 2013 e-mail is Exhibit 1 hereto). In his e-mail, Mr. Wronko asserts many of the same and some additional reasons for Plaintiff's insistence that she be permitted to conduct the seven depositions that Defendants oppose. In response to that e-mail, Defendants submit this letter to set forth the reasons why the Court should not permit each of these individuals to be deposed by Plaintiff.

As a preliminary matter, Mr. Wronko incorrectly states that "Judge Francis previously ruled that there would be no limitation on the number of depositions." (*See* Exhibit 1). In fact, in the Court's July 11, 2013 Order, the Court stated that "The Court will not impose a rigid limit on the number of depositions of defendants' witnesses, nor an inflexible schedule for those deposition." There simply is no basis for Mr. Wronko's assertion that the Court gave Plaintiff permission to take as many depositions as she wants of whomever she wants without limitation. Plaintiff also appears to have forgotten the Court cautioning her not to come to the Court and claim that the twelfth and thirteenth deposition were critical to her case. Plaintiff has ignored that admonishing by claiming that the seventeenth, eighteenth and nineteenth depositions are "very relevant." (*See* Exhibit 1).

**Dr. Elizabeth Morency:**

Plaintiff noticed Dr. Morency's deposition on June 6, 2013. However, more than five months later and more than three months after the completion of Varughese's deposition, Plaintiff has made no effort to schedule this deposition, even though Dr. Morency works and lives in Chicago. The fact that Plaintiff has failed to make any effort to take this deposition combined with the fact



The Honorable James C. Francis
November 12, 2013
Page 2

that the discovery cutoff is less than three weeks away (including the Thanksgiving holiday) compels the conclusion that Plaintiff does not need to take Dr. Morency's deposition.

Plaintiff's course of conduct is hardly surprising given that Varughese never articulated any reason for the need to take this deposition. The only rationale for taking Dr. Morency's deposition is contained in the e-mail that I received from Plaintiff's counsel, Ronald J. Wronko, after Defendants filed their motion, in which he asserts that "Morency was actively involved with administering discipline that likely may have led to Dr. Varughese's termination. Again, I have never had an issue such as this with an adversary attempting to bar very relevant depositions of individual supervisors who administered discipline." (*See* Exhibit 1). There are several false statements in Mr. Wronko's assertion. First, Dr. Morency was the co-Chief Resident during Academic year 2011-2012 which ran from July 1, 2011 to June 30, 2012. During that time, Dr. Morency had limited supervisor authority over the other Pathology residents for things such as scheduling and the like but had no authority to decide to impose discipline on residents.[1] That authority resides exclusively with the Graduate Medical Education Office ("GME") and the Chair, Program Director and Director of Education in consultation with the Director of Human Resources. Thus, the stated reasons for taking Dr. Morency's deposition are false.

**Dr. Adrienne Jordan:**

As with Dr. Morency, Plaintiff noticed Dr. Jordan's deposition on June 6, 2013 but has made no effort to schedule it, even though Dr. Jordan works and lives in Pennsylvania. On October 11, 2013, more than four months after Plaintiff noticed Dr. Jordan's deposition, I sent an e-mail to Mr. Wronko stating in part, "You need to let me know if you plan to travel to Pennsylvania to take [Jordan's] deposition or whether you intend to take it by some other means." Later that same day, Mr. Wronko sent me e-mail saying, in relevant part, that "I will let you know regarding Dr. Jordan early next week." (Copies of my October 11 e-mail to Mr. Wronko and his October 11 e-mail to me are Exhibit 2 hereto). It is now one month later and I have not heard from Mr. Wronko regarding Dr. Jordan's deposition. As a result, Plaintiff's claim that Dr. Jordan's deposition is "very relevant" rings hollow at best. (*See* Exhibit 1).

Plaintiff's claim that Dr. Jordan, like Dr. Morency, was her supervisor for purposes of discipline and that she had the authority to impose discipline is incorrect. Dr. Jordan was the other co-Chief Resident during Academic Year 2011-2012 and had the same authority, and limits on her authority, as Dr. Morency. Put simply, Dr. Jordan had no authority to impose discipline on

---

[1] Plaintiff either confuses or intentionally misrepresents the concept of discipline at the SOM. To be sure, a variety of steps could be, and were, taken to correct a behavior or performance problem with a resident but none of these steps amounted to formal discipline. The only formal discipline to which a resident is subject (and from which they had a right of appeal) is a Final Warning and a Termination.



The Honorable James C. Francis
November 12, 2013
Page 3

Plaintiff. Plaintiff's additional claim that Dr. Jordan's deposition is essential because "Dr. Pessin-Minsley remembered virtually nothing of her investigation or of what she wrote in e-mails. The suggestion that I cannot now depose . . . Jordan about [her] interactions with Dr. Pessin-Minsley amounts to stonewalling." (*See* Exhibit 1). This statement is patently false. A review of Dr. Pessin's deposition testimony does not show that she recalled virtually nothing of her investigation or the content of her e-mail. (Copies of the 24 transcript pages from Dr. Pessin's deposition where she mentions Dr. Jordan are Exhibit 3 hereto).

**Dr. Robert Guarino:**

Plaintiff's justification for seeking the deposition of Dr. Guarino is that he is a "similarly situated co-worker[] of Plaintiff. Plaintiff has identified Dr. Guarino as being held to a different standard than she was." (A copy of an e-mail from Mr. Wronko to me, dated October 11, 2013 is Exhibit 4 hereto). First, Plaintiff never identified Dr. Guarino as being a similarly situated individual who was treated better than she was because of her gender/national origin. *See* Plaintiff's Responses to Defendants First Set of Interrogatories (A copy of Plaintiff's response to Defendants' Interrogatory No. 16 is Exhibit 5 hereto).

In any event, Dr. Guarino is not similarly situated to Plaintiff because, during Academic Year 2011-2012, he was a fellow not a resident. (A copy of an attendance sheet from August 2011 showing that Dr. Guarino was a fellow is Exhibit 6 hereto). While fellows could, and often did attend morning conferences, they were not subject to the 80% attendance requirement that Plaintiff, as a resident, was required, but failed, to meet. The Policy for Morning Conference Attendance expressly states that "This policy outlines the responsibilities of residents with regard to attendance at scheduled training conferences" and "This policy applies to all Pathology residents . . .." (A copy of the Policy is Exhibit 7 hereto). Thus, whether or not Dr. Guarino cancelled a presentation at the 8 a.m. morning conference on September 15, 2011 (the same day that Plaintiff was scheduled, but failed, to make a presentation at the same conference) has no bearing on Plaintiffs' claims because Dr. Guarino and Varughese held different position at Mount Sinai and were subject to different work requirements regarding conference attendance. Accordingly, Dr. Guarino is not similarly-situated to Plaintiff and there is no legitimate reason for Plaintiff to take his deposition.

**Mr. Renato Valentin:**

The only reason that Plaintiff articulated for deposing Mr. Valentin , a per diem Pathology Assistant, is that he was "present for the [December 2010] incident between Dr. McCash and plaintiff." (*See* Exhibit 4). For the reasons set forth in Defendants' Main Letter Brief, the testimony of witnesses to this incident, including Mr. Valentin, is cumulative and unduly burdensome.



The Honorable James C. Francis
November 12, 2013
Page 4

**Dr. Shabnam Jaffer**:

Plaintiff's seeks to compel Dr. Jaffer, who is an Attending Physician in the Pathology Department, to appear for deposition for the same reason that she wants to depose Mr. Valentin – she was "present for the incident between Dr. McCash and plaintiff." (*See* Exhibit 4). In addition to the fact that Defendants have shown that testimony by witnesses to the incident is cumulative and unduly burdensome, Dr. Jaffer did not witness the December 2010 incident between Dr. McCash and Plaintiff. In fact, Dr. Jaffer was asked by Dr. Bleiweiss to go and see what happened, after Plaintiff burst into his office after the incident took place. (A copy of Plaintiff's deposition testimony confirming this fact is Exhibit 8 hereto). At her deposition, Plaintiff testified that Dr. Blieweiss sent Dr. Jaffer after the incident to find out what happened. According to Plaintiff, she and Dr. McCash proceeded to tell Dr. Jaffer their version of the earlier incident, the discussion became a "heated debate" between them and, at some point, Plaintiff and Dr. McCash "both walked away." This short, after the fact event, is insufficient to require Dr. Jaffer to testify at deposition.

**Dr. Paul Azar**:

Plaintiff seeks to depose Dr. Azar, a resident in the Pathology Department because (i) he was present during the December 2010 incident between Plaintiff and Dr. McCash; and (ii) because he fell below the 80% attendance requirements at morning conference. The reasons why the Court should not permit Plaintiff to depose Dr. Azar are set forth in Defendants' Main Letter Brief and Plaintiff has failed to show any other legitimate basis take this deposition. It also is significant that, although Plaintiff has known about Dr. Azar since before the case began (*see* Exhibit 5), Plaintiff did not notice his deposition until October 2013.

**Dr. Samuel McCash**:

As the Court can see from Mr. Wronko's November 8 e-mail (Exhibit 1), Plaintiff is particularly exorcised about Defendants' reconsideration of their earlier decision to produce Dr. McCash for deposition. In that regard, Plaintiff's counsel makes a number of wild, baseless allegations speculating about the reasons for Defendants' decision to oppose this deposition. In fact, even though they never though that Dr. McCash's deposition was appropriate, Defendants agreed to produce him to avoid the time and expense of opposing a motion to compel or for a protective order. However, as discovery progressed it became increasingly apparent that not only was Dr. McCash's deposition unnecessary but the pursuit of that deposition was part of a pattern of abuse of the discovery process by Plaintiff that will be addressed at the appropriate time.

Turning to the merits (or lack thereof) of Plaintiff's desire to depose Dr. McCash, Varughese has articulated the following reason – he is the alleged harasser and discriminator in a hostile work



The Honorable James C. Francis
November 12, 2013
Page 5

environment/discrimination case. (*See* Exhibit 1). This justification for Dr. McCash's deposition is dependent, once again, on a misrepresentation of the facts. First, Dr. McCash is mentioned in only 18 Paragraphs of the 176 Paragraph Second Amended Complaint. In Paragraphs 16-22, Plaintiff makes allegations regarding the September and December 2010 incidents with Dr. McCash and expresses her belief in the most general non-specific terms that Dr. McCash treated male residents better than he treated female ones. In Paragraph 34, Plaintiff makes allegations regarding Dr. McCash consuming alcohol on Hospital premises and, finally, in Paragraphs 26, 27, 29, 36, 38, 46, 49, 53 and 64, she makes allegations referring to the incidents with Dr. McCash and that Dr. McCash was treated more favorably than she was by Defendants. Nowhere in the Second Amended Complaint (or in the two previous versions) does Plaintiff allege that Dr. McCash created a hostile work environment for her. Although Plaintiff does have causes of action for a hostile work environment (*see* causes of action 3, 7 and 11), all of those causes of action make reference to the actions of conduct of the Defendants. Dr. McCash is not a Defendant in this action. Therefore, the allegations of a hostile work environment are not directed toward him but only to Mount Sinai and the individual Defendants.

Nor could Plaintiff have made any such allegations against Dr. McCash. According to Plaintiff's own version of events, the first time that Plaintiff had a problem with Dr. McCash was in September 2010 (Pl. Tr. 20-21). After that the next time that she had a problem with Dr. McCash was three months later in December 2010 (Pl. Tr. 56). Tellingly, Plaintiff admits in Paragraph 26 that the December 2010 incident was only "the second incident of harassment perpetuated by Dr. McCash against Dr. Varughese." Following the December 2010 incident, Dr. Pessin told Plaintiff to bring any concerns to the attention of the other Chief Resident, Kruti Maniar, (Pl. Tr. 112-13) and, in April 2011, Caryn Tiger-Paillex, Director of Human Resources for the School of Medicine, reiterated that going forward she should deal with Dr. Maniar and not Dr. McCash. (Pl. Tr. 123-25). Although Plaintiff claimed that Dr. McCash would "stomp his feet" close a door "forceably" when he was going out of a room that was next to her desk, she could not describe any other incident with Dr. McCash that could remotely be described as creating a hostile work environment. (Pl. Tr. 125-27). Indeed, Plaintiff admitted that Dr. Lento told her that he had told Dr. McCash not to be in the same work space as Plaintiff. (Pl. Tr. 127-28). Based on the foregoing, there is no reason to require that Dr. McCash sit for his deposition so that Plaintiff can explore the demonstrably false claim that he created a hostile work environment. (Copies of these pages from the transcript of Plaintiff's deposition are Exhibit 9 hereto).

No more soundly grounded is Plaintiff's claim that she is entitled to take Dr. McCash's deposition because he is a "discriminator" in a "discrimination case." (*See* Exhibit 1). As discussed above, Dr. McCash had no authority to impose discipline and he played no role in the decision to place Plaintiff on Academic Advisement (which, in any event, is not disciplinary). Plaintiff also conveniently ignores the fact that Dr. McCash graduated from the residency



The Honorable James C. Francis
November 12, 2013
Page 6

program and left Mount Sinai at the end of June 2011.  And again, Dr. McCash played no role in the decision to place Varughese on Final Warning in July 2011 because that decision was made by others and the basis for the Final Warning was Plaintiff's failure to satisfy the terms of her Academic Advisement and her behavior at two meetings in May 2011 with the Chair of the Pathology Department, the Program Director and the Department Administrator.  (A copy of Plaintiff's Final Warning is Exhibit 10 hereto).  An even more compelling reason not to require Dr. McCash to appear for deposition is the indisputable fact that every incident that resulted in the decision to terminate Plaintiff from the residency program took place after Dr. McCash graduated and left Mount Sinai.  (A copy of Plaintiff's Termination letter is Exhibit 11 hereto).  Dr. McCash has no of any knowledge of these incidents and he did not participate in the decision to terminate Plaintiff three months after his graduation

In sum, Plaintiff has failed to articulate any legitimate reason (because there is none) to take any of these individuals depositions and Defendants' motion to quash and for a protective order should be granted.

Respectfully submitted,

Rory J. McEvoy

cc:    Ronald J. Wronko, Esq. (via ECF and facsimile)
       Attorney for Plaintiff

Exhibit 1

**McEvoy, Rory**

| | |
|---|---|
| **From:** | ronald j. wronko <ron@ronwronkolaw.com> |
| **Sent:** | Friday, November 08, 2013 10:51 AM |
| **To:** | McEvoy, Rory |
| **Subject:** | Re: Motion to Quash |

Judge Francis previously ruled that there would be no limitation on the number of depositions.

The fact witnesses whose subpoenas you seek to quash are depositions that pose no undue burden. The three of them would have been deposed in half a day on the fact issues that they personally witnessed. I am entitled to speak directly to Jaffer and Valentin about what they told the various investigators.

As for Dr. McCash, it is bad faith to initially say you are producing a witness, presumably prepare that witness, and then renege late in discovery to producing him. I suppose you will still try to assert the attorney-client privilege for any preparatory efforts with that witness. I will object to such assertion and will address that on a cross-motion. Moreover, I have *never* had an adversary oppose producing the alleged harasser and discriminator in a hostile work environment /discrimination case or alleged witnesses to the harassment/discrimination. I appreciate that you would like to pretend that this is just a retaliation case, but it is not.

Additionally, defendants' witnesses have consistently had the worst memories of witnesses that I have ever seen at a deposition. In particular, Dr. Pessin-Minsely remembered virtually nothing of her investigation or of what she wrote in e-mails. The suggestion that I cannot now depose McCash and Jordan about their interactions with Dr. Pessin-Minsely amounts to stonewalling.

Moreover, as Dr. Firpo readily admitted, Dr. Jordan and Morency were actively involved with administering discipline that likely may have led to Dr. Varughese's termination. Again, I have never had an issue such as this with an adversary attempting to bar very relevant depositions of individual supervisors who administered discipline.

Finally, Dr. Guarino is apparently not the first to cancel a presentation and not suffer any discipline. According to Dr. Firpo, there were multiple residents who had such issues. It is not surprising that defendants do not want to go beyond the date of plaintiff's termination, even though the same decision-makers were administering discipline according to Dr. Firpo. It is also not surprising that defendants are slow to respond to my correspondence.

I agree that Judge Francis needs to be brought up to speed with developments. I will be happy to do so.

Ronald J. Wronko, Esq.
Ronald J. Wronko, LLC
134 Columbia Turnpike
Florham Park, NJ 07932
(973) 360-1001
(973) 360-1881 (facsimile)

Exhibit 2

**McEvoy, Rory**

| | |
|---|---|
| **From:** | ronald j. wronko <ron@ronwronkolaw.com> |
| **Sent:** | Friday, October 11, 2013 3:48 PM |
| **To:** | McEvoy, Rory |
| **Subject:** | Re: Varughese; Privilege Log and Deposition Issues |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Ok as to Johnson.

Please advise of last known addresses of those witnesses that you are refusing to produce so that Subpoenas can issue.

I will let you know regarding Dr. Jordan early next week.

My inquiry regarding the privilege log is straight forward.  I would like to move forward with modification to the Stipulation without delay if defendants agree that produced documents are not subject to recall.

Ronald J. Wronko, Esq.
Ronald J. Wronko, LLC
134 Columbia Turnpike
Florham Park, NJ 07932
(973) 360-1001
(973) 360-1881 (facsimile)
ron@ronwronkolaw.com

**From:** "McEvoy, Rory" <RMcEvoy@edwardswildman.com>
**To:** 'ronald j. wronko' <ron@ronwronkolaw.com>
**Sent:** Friday, October 11, 2013 2:47 PM
**Subject:** RE: Varughese; Privilege Log and Deposition Issues

Paul Johnson is available to be deposed on October 18 in the afternoon.   So, the schedule will be Dr. Cardon-Cardo at 10 a.m. and Mr. Johnson at 2 p.m.  Please confirm.

I will get back to you on Tuesday about the remaining issues in your e-mail but it is very unlikely that I will agree to produce the witnesses to whom I object.  With regard to Dr. Jordan, I told you months ago that she would appear voluntarily.   You need to let me know if you plan to travel to Pennsylvania to take her deposition or whether you intend to take it by some other means.

**From:** ronald j. wronko [mailto:ron@ronwronkolaw.com]
**Sent:** Friday, October 11, 2013 12:26 PM
**To:** McEvoy, Rory
**Subject:** Varughese; Privilege Log and Deposition Issues

Mr. McEvoy,

I have reviewed your proposed Stipulation. From your letter, it appears that you are prepared to produce materials appearing on the privilege log but do not want that production to constitute a waiver as to the assertion of privilege for the remaining items on the log. I do not have a problem with that concept.

However, the Stipulation gives defendants the opportunity to reassert privilege and to call for produced documents to be returned and to be marked as privileged again. This is problematic because if I use documents that are produced from the privilege log at depositions, it would then raise an issue of whether such testimony is valid if there is a battle over a reassertion of privilege. If the defendants produce documents from the log, they have to remain produced for the entirety of the litigation without retraction.

Please advise whether the Stipulation, which appears to be a form Stip., can be modified to accomplish what I believe the intent is here.

An urgent issue is whether you are going to be able to slot anyone else into deposition for next Friday. I need to know that ASAP, so that I can properly prepare for any other witness who would be produced.

As for the witnesses for whom you are objecting, Dr. Jaffer, Mr. Valentin, and Dr. Azar were present for the incident between Dr. McCash and plaintiff. They were the subject of interviews during investigations of the incident. The interview notes are hearsay, and I obtaining direct testimony from these witnesses is essential to have admissible testimony on what they witnessed. Their testimony is not duplicative of depositions of members of the Hospital hierarchy/Litigation Control Group and of Dr. McCash, who are all parties aligned with the hospital against plaintiff. Defendants' objection to production of these individuals amounts to cherry-picking of witnesses who are favorable to the Hospital versus witnesses who may provide adverse testimony.

Likewise, Dr. Guarino and Dr. Azar are similarly-situated co-workers of plaintiff. Plaintiff has identified Dr. Guarino as being held to a different standard than she was. There is no duplication in the testimony that would be obtained from these co-workers versus the testimony of Hospital hierarchy/Litigation Control Group witnesses.

As to these witnesses, if defendants are unwilling to reconsider their position of non-production, plaintiff will file an appropriate motion to compel.

You have not advised whether you will produce Dr. Jordan.

Finally, plaintiff will abide the testimony of other witnesses before pressing the issue of Dr. Schiller.

I will communicate with plaintiff's experts to determine their availability and will advise accordingly.

Plaintiff was served authorizations when her IIED claim was pending. This claim has been withdrawn. When it was withdrawn, Judge Francis explicitly stated that she would not have to appear for an IME or produce medical records. Please provide what the basis is for your continuing request that such records be obtained. As I previously advised, I submitted the authorizations to the providers who have not complied with the authorizations. I have served the only medical records I received, which were from Mt. Sinai.

Ronald J. Wronko, Esq.
Ronald J. Wronko, LLC
134 Columbia Turnpike
Florham Park, NJ 07932
(973) 360-1001
(973) 360-1881 (facsimile)
ron@ronwronkolaw.com

_____

Edwards Wildman Palmer LLP has offices in Boston, Chicago, Hartford, Hong Kong, Istanbul, London, Los Angeles, Miami, Morristown NJ, New York, Orange County, Providence, Stamford, Tokyo, Washington DC and West Palm Beach. For more information visit edwardswildman.com.

CONFIDENTIALITY NOTICE

This e-mail message from Edwards Wildman Palmer LLP, Edwards Wildman Palmer UK LLP, Edwards Wildman Palmer, a Hong Kong firm of solicitors, and Edwards Wildman Danismanlik Hizmetleri Avukatlik Ortakligi, a registered foreign attorney partnership, is intended only for the individual or entity to which it is addressed. This e-mail may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you received this e-mail by accident, please notify the sender immediately and destroy this e-mail and all copies of it. We take steps to protect against viruses but advise you to carry out your own checks and precautions as we accept no liability for any which remain. We may monitor emails sent to and from our server(s) to ensure regulatory compliance to protect our clients and business. Edwards Wildman Palmer UK LLP is a limited liability partnership registered in England (registered number OC333092) and is authorised and regulated by the Solicitors Regulation Authority (SRA) and operates an SRA standard complaints procedure (see here). A list of members' names and their professional qualifications may be inspected at our registered office, Dashwood, 69 Old Broad Street, London EC2M 1QS, UK, telephone +44 207 583 4055.

Disclosure Under U.S. IRS Circular 230: Edwards Wildman Palmer LLP informs you that any tax advice contained in this communication, including any attachments, was not intended or written to be used, and cannot be used, for the purpose of avoiding federal tax related penalties or promoting, marketing or recommending to another party any transaction or matter addressed herein.

Exhibit 3

Page 42

1           M. Pessin, Ph.D.

2      A    I don't remember.

3           MR. WRONKO:  Let's mark this

4      Pessin-1.

5           [The document was hereby marked

6      as Pessin Exhibit 1, for

7      identification, as of this date.]

8      Q    Doctor, I'm showing you what's

9  been marked as Pessin-1.  The focus of my

10 questioning is going to be on the e-mail

11 that appears on pages 2 to 4, even though

12 there is a follow-up e-mail from Kruti

13 Maniar.

14          With that, I'll give you a

15 moment to review the e-mail and then tell

16 me when you are ready.

17     A    Okay.

18     Q    Doctor, have you ever seen

19 what's been marked as Pessin-1 before?

20     A    No.

21     Q    On the second page of the

22 document, there is an e-mail from

23 Adrienne Jordan, dated August 13, 2010.

24 And in the body of that e-mail, she

25 appears to make various complaints about

Page 43

1              M. Pessin, Ph.D.

2      conduct of other residents, as well as of

3      PAs.  In particular, she complains about

4      a Jess, who left early at 5:30 and didn't

5      communicate properly, so Adrienne Jordan

6      was left to have to gross a number of

7      samples and she felt that it was improper

8      for Jess, in the way that she

9      communicated.

10             Were these issues ever brought

11     to your attention?

12             MR. GREENBERG:  Objection to

13        form.  You can answer.

14     A     No.

15     Q     Were any of issues highlighted

16     in this e-mail, ever brought to your

17     attention?

18     A     No.

19     Q     Would you have expected that

20     any of these issues would have been

21     brought to your attention?

22     A     No.

23     Q     Why not?

24     A     I had no authority over this

25     area at that time.

Page 44

1              M. Pessin, Ph.D.

2       Q      Did you know at that time, and

3   I understand you were just the vice

4   chair, whether or not there were problems

5   in the gross room, similar to what Dr.

6   Jordan was complaining about then?

7       A      I didn't know.

8       Q      When you later became the

9   interim or acting chair, did you come to

10  learn of similar complaints, to the one

11  that Dr. Jordan had expressed in this

12  e-mail?

13      A      I don't remember.

14      Q      Do you know whether or not

15  there were any problems with residents

16  leaving work for moonlighters or for

17  other residents, in the gross room when

18  you were acting as the acting chair?

19      A      Yes.

20      Q      How did that come to your

21  attention?

22      A      That was part of the complaint

23  against Dr. Varughese, that was

24  investigated.

25      Q      So excluding the complaint as

```
 1              M. Pessin, Ph.D.
 2    or me.
 3         Q    Do you have any knowledge as to
 4    what his national origin is?
 5         A    No.
 6         Q    I would assume he's part Irish,
 7    given his last name?
 8              MR. GREENBERG:  Not
 9         necessarily.
10         Q    What do you think?
11         A    I have no idea.
12         Q    Can you describe Adrienne
13    Jordan to me, please?
14         A    Approximately my height, blond,
15    straight hair.  I don't remember eye
16    color.
17         Q    Is she Caucasian?
18         A    Yes.
19         Q    When you were acting chair, how
20    many other women of Indian descent were
21    there in the residency program, besides
22    Dr. Varughese?
23         A    Did you say when I was acting
24    chair?
25         Q    When you were acting chair.
```

1          M. Pessin, Ph.D.

2     Jordan.

3          At that point, was Dr. Jordan

4     chief resident?

5     A     No.

6     Q     Was she merely a PGY-2?

7     A     I don't remember.

8     Q     Do you think it was appropriate

9     for Dr. McCash to forward his e-mail to

10    Dr. Jordan?

11    A     I don't remember the

12    circumstances.

13    Q     Would you perceive this e-mail,

14    as Dr. McCash campaigning to get his

15    version of events out about the

16    confrontation about Dr. Varughese?

17    A     No.

18    Q     Why wouldn't you view it that

19    way?

20    A     He was stating the facts as he

21    saw them.

22    Q     When you were initially

23    notified about the confrontation between

24    Dr. Varughese and Dr. McCash, did you

25    immediately believe Dr. McCash's version

1              M. Pessin, Ph.D.

2    work on that day.

3        Q      Had you already met with Dr.

4    Varughese at that point?

5        A      I don't remember.

6        Q      Do you know how you came to

7    have that knowledge, that Dr. Varughese

8    was claiming that she had too much work?

9        A      It was in one of the e-mails.

10       Q      How many cases at that point in

11   time, would it have been -- would have

12   been a heavy workload for a resident for

13   grossing?

14       A      I don't know.

15       Q      I'm going to show you what was

16   previously marked as Defendant's 14.

17   I'll give you a moment to review that and

18   tell me when you're ready.

19       A      Okay.

20       Q      Do you know whether or not this

21   was an accurate listing of the cases that

22   were grossed by Dr. Varughese, as well as

23   the two moonlighters, Paul Azar and

24   Adrienne Jordan and the attending Guarino

25   on December 8, 2010?

```
 1              M. Pessin, Ph.D.
 2    particular incident?
 3         A    I have no recollection.
 4         Q    Did you know at the time that
 5    Adrienne Jordan was good friends with Dr.
 6    McCash?
 7         A    No, I did not.
 8         Q    Did you know at the time that
 9    Paul Azar was good friends with both
10    Adrienne Jordan and Samuel McCash?
11         A    No, I did not.
12         Q    Is there a reason why your
13    investigation was only limited to the
14    circles of friends of Samuel McCash?
15         A    They were the persons who were
16    present at the time the event had
17    happened.  I also talked to Dr. Bleiweiss
18    and those notes are there.  We did not
19    involve the medical student.
20         Q    Or Dr. Jaffer, for that matter?
21         A    I don't remember.  I may have
22    talked to her as well, verbally.
23         Q    Did you support Dr. Jordan, in
24    her making of accusations as of Dr.
25    Varughese?
```

Page 115

1              M. Pessin, Ph.D.

2        A    No.

3        Q    Did you make any prejudgments

4   as to whether or not Dr. Jordan was in

5   the right, as opposed to Dr. Varughese,

6   in connection with their interaction,

7   either during the incident on the 8th or

8   afterwards?

9        A    No.

10             MR. WRONKO:  Let's mark this as

11        Pessin-10.

12             [The document was hereby marked

13        as Pessin Exhibit 10, for

14        identification, as of this date.]

15        Q    I'm showing you what's been

16   marked as Pessin-10.  I'll give you a

17   moment to review that.

18        A    Okay.

19        Q    Have you had a moment to review

20   that exhibit?

21        A    Yes.

22        Q    In this exhibit on the second

23   page, there is an e-mail from Dr. Jordan

24   on December 10, 2010, at 5:35 p.m., in

25   which Dr. Jordan reports an incident that

1          M. Pessin, Ph.D.

2     she had with Dr. Varughese.  And then you

3     respond on December 10, 2010, at

4     7:04 p.m.

5          In that e-mail you write,

6     "Thank you, Adrienne.  It sounds like you

7     handled it well.  Have a good weekend."

8          At that point, did you believe

9     Dr. Jordan's account?

10     A     I believed that Dr. Jordan left

11    and that's what she handled well, that

12    they did not both have another

13    interaction and that's what I was

14    responding to.

15     Q     Why is it if this was the

16    subject of an investigation, that you

17    would be giving her any comment

18    whatsoever about her version of events?

19     A     I wasn't giving her any comment

20    about her version of events.  I was

21    giving her a comment that she left.

22     Q     How do you know she in fact

23    left and that was the version of events?

24     A     I don't -- because I didn't

25    have a complaint to the latter.

Page 124

1          M. Pessin, Ph.D.

2    any responsibility or any part of it

3    could have been her fault or she could

4    have mitigated the situation.

5          Q    What, if any, responsibility

6    did Dr. McCash take for the situation

7    that had developed on December 8th?

8          A    He felt that when it got to

9    where it was, he should have probably

10   gotten an attending quicker.

11         Q    Well, didn't Dr. Varughese in

12   fact try to get an attending?

13         A    I don't know that.

14         Q    You don't know that.  Didn't

15   you find out during your investigation

16   and criticize her, for going to Dr.

17   Bleiweiss' office while this situation

18   was erupting?

19         A    I don't remember that.

20         Q    So what other responsibilities

21   did Dr. McCash take, if any?

22         A    I don't remember.

23         Q    How about Dr. Jordan, did she

24   take any responsibility for what

25   occurred?

Page 125

1                M. Pessin, Ph.D.

2        A      I don't remember.

3        Q      Did you perceive the

4     confrontation that occurred on

5     December 8th, to be entirely Dr.

6     Varughese's fault?

7        A      No, I just said that.

8        Q      So according to you, Dr. McCash

9     should have gone and spoke with an

10    attending; correct?

11       A      Correct.

12       Q      Is there anything else that Dr.

13    McCash should or should not have done?

14       A      I can't remember exactly.

15              MR. WRONKO:   Let's mark this as

16       Pessin-11.

17              [The document was hereby marked

18       as Pessin Exhibit 11, for

19       identification, as of this date.]

20       Q      Doctor, do you know whether or

21    not Dr. Jordan, like Dr. McCash, also

22    distributed e-mails about her views of

23    Dr. Varughese to more people than she

24    should have?

25       A      I don't remember.

1               M. Pessin, Ph.D.

2        Q      Let me show you what's been

3    marked as Pessin-11.

4               Have you had a moment to review

5    Pessin-11?

6        A      Yes.

7        Q      Do you recall receiving this

8    e-mail?

9        A      No.

10       Q      Looking at this e-mail, Dr.

11   Jordan makes reference to again her views

12   of incidences that she alleges occurred

13   with Dr. Varughese.

14              Do you believe that it was

15   appropriate for her to have disseminated

16   this e-mail to everybody on this

17   distribution list?

18       A      No.

19       Q      Who should have been excluded?

20       A      Again, Jaffer, Hauptman and

21   Truong.

22       Q      Do you know why they were

23   included?

24       A      I certainly don't.

25       Q      In this e-mail, at the very

1              M. Pessin, Ph.D.

2    bottom, Dr. Jordan, who at that point was

3    not a chief resident, states, "I will

4    leave the follow-up to these incidents in

5    all of your capable hands, as you all

6    have much more experience than myself in

7    dealing with situations like this.  But

8    if my opinion counts, I agree with Sam,

9    in that very serious punitive

10   consequences are called for in this

11   situation.  Thank you all for listening

12   to yet another long e-mail."

13            Do you have any knowledge as to

14   why Dr. Jordan felt comfortable sending

15   an e-mail to all of those people on the

16   distribution list, including you,

17   suggesting that another resident should

18   be terminated?

19            MR. GREENBERG:  Objection to

20       form.  You can answer.

21       A    No.

22       Q    What was your relationship with

23   Dr. Jordan like as of December 9, 2010?

24       A    What do you mean?

25       Q    Well, did you trust Dr. Jordan?

Page 128

1              M. Pessin, Ph.D.

2      A      As much as I trust all the

3    residents.

4      Q      Not more so?

5      A      No, sir.

6      Q      Did you instruct Dr. Jordan

7    that having a larger distribution list

8    than necessary was inappropriate?

9      A      I don't remember.

10      Q      Did you threaten her with

11    termination for talking to people outside

12    of those who were involved in the

13    investigation about Dr. Varughese?

14      A      I don't remember.

15      Q      Did you have a meeting with Dr.

16    Varughese about her interaction with

17    other residents, following the

18    December 8, 2010 incident?

19      A      No -- yes, I think I might

20    have, not by myself.

21      Q      Who was there?

22      A      Probably Dr. Lento.

23      Q      What do you recall of that

24    meeting?

25      A      Very little.

1            M. Pessin, Ph.D.

2    about or complaints about Dr. Varughese?

3        A    I don't know.

4        Q    Is there a reason why a similar

5    letter was not sent to Adrienne Jordan,

6    to tell her to stop making various

7    accusations to people who were outside of

8    the scope of the investigation?

9            MR. GREENBERG:  Note my

10        objection.  You may answer.

11       A    I don't know.

12       Q    Given the fact that in her

13   e-mail dated December 9, 2010, at

14   8:18 p.m., Dr. Jordan, in essence,

15   lobbies for Dr. Varughese to be

16   terminated, don't you think it would have

17   been warranted for her to receive a

18   letter similar to Defendant's 7?

19       A    No.

20       Q    Why not?

21       A    Because there was physical

22   confrontation, as opposed to something

23   put in an e-mail to senior people of a

24   department.  Even though, I would not

25   have put all of those people in the

```
1              M. Pessin, Ph.D.
2    e-mail, they were still senior people in
3    the department.
4         Q    But wasn't Dr. Jordan making
5    accusations in the e-mail?
6         A    She was stating an e-mail.  It
7    doesn't mean anybody was listening to it.
8         Q    When Dr. Varughese spoke with
9    Dr. Jordan, isn't it in fact true that
10   Dr. Jordan entertained the conversation?
11        A    I don't know.  I wasn't there.
12        Q    But isn't that in fact what Dr.
13   Jordan stated, that she did in fact have
14   an exchange with Dr. Varughese, rather
15   than extracting herself from the
16   situation?
17        A    Yes, that's what she stated.
18        Q    Was that appropriate for her to
19   have done that?
20        MR. GREENBERG:  Done what?
21        MR. WRONKO:  To have
22   entertained the confrontation.
23        A    I don't know that she did that.
24   I wasn't there.
25        Q    Let's go back to what was
```

Page 133

1                M. Pessin, Ph.D.

2    marked as Pessin-10 and I'll give you a

3    moment to review Dr. Jordan's e-mail

4    there.

5                Tell me when you're ready.

6        A    Okay.

7        Q    In that e-mail, Dr. Jordan

8    first states that she advised Dr.

9    Varughese that there was an ongoing

10   investigation.

11               Had you, prior to that e-mail

12   of Dr. Jordan, apprised Dr. Varughese

13   that there was in fact an investigation

14   going on?

15       A    I believe that I met with her

16   earlier that day.  I think there are

17   dates on it.

18       Q    Now, Dr. Jordan states that she

19   was instructed not to speak with Dr.

20   Varughese about the incident, but then

21   she proceeds, she admits, that she did in

22   fact then proceed to speak with Dr.

23   Varughese about the incident, did she

24   not?

25               MR. GREENBERG:  Objection to

Page 134

1          M. Pessin, Ph.D.

2      the form.  You can answer.

3      A     I only know what's in her

4   e-mail.

5      Q     So she admits to it, doesn't

6   she?

7          MR. GREENBERG:  Objection to

8      the form.  You can answer.

9      A     That's what she states.

10     Q     So why didn't she receive a

11  letter similar to Defendant's 7?

12     A     Because the people mentioned in

13  this e-mail and others, documented or

14  verified Dr. Jordan's version of events.

15     Q     By December 13, 2010?

16     A     Yes.

17     Q     So was the investigation

18  already concluded by December 13, 2010?

19     A     No.

20     Q     So what was still outstanding

21  in the investigation?

22     A     The investigation was to

23  professional activities regarding the

24  breast samples and what had gone on that

25  evening and had the work been done.

Page 137

1          M. Pessin, Ph.D.

2    (indicating).

3          Q     In reference to what was

4    forwarded, you had forwarded first the

5    December 10, 2010 e-mail on January 3,

6    2011, at 11:16 a.m. and then with regard

7    to Pessin-10 that is a forward a little

8    later on at 11:35 a.m., same day;

9    correct?

10          Here, you can take a look at

11    Pessin-10, so it's two forwards that I

12    can see there?

13          A     Yes.

14          Q     And at that point on January 3,

15    2011, had you corroborated every factual

16    observation that Dr. Jordan had made in

17    the e-mails?

18          A     I don't remember.

19          Q     Why is it you felt it was

20    appropriate to simply forward e-mails by

21    a resident making accusations, as opposed

22    to supplying to Dr. Figur, the actual

23    results of an investigation?

24          A     I don't remember.

25          Q     Let's talk for a moment about

Page 146

1           M. Pessin, Ph.D.

2   friends with other residents?

3       A    Yes.

4       Q    Did you explore the nature of

5   any personal friendships or relationships

6   in and amongst these witnesses?

7       A    No, I did not.

8       Q    Why didn't you?

9       A    Because I just did the

10  preliminary investigation and then handed

11  it off to Dr. Lento.

12      Q    Wouldn't it go to the issue of

13  bias, as whether or not any of the

14  witnesses, even if they are giving a

15  seemingly similar story, may be just

16  trying to corroborate each other because

17  they're friends with each other?

18      A    I don't know at that time.

19      Q    Did it ever occur to you that

20  in essence, Dr. Jordan and Dr. McCash

21  were to use a high school term, a clique?

22      A    No, I would not have known

23  that.

24      Q    Would you agree with me it was

25  your obligation to try to ferret that

Page 151

1                M. Pessin, Ph.D.

2     investigation had shown.

3          Q     So who, amongst the people who

4     you had interviewed, had led you to

5     believe that Dr. McCash had not intruded

6     upon Dr. Varughese's physical space?

7          A     Dr. Azar and Dr. Jordan, who

8     were there.

9          Q     Is there a reason why you view

10    Dr. Azar and Dr. Jordan to be more

11    credible than Dr. Varughese?

12         A     We also had Dr. McCash, so it

13    was three people said something else; Dr.

14    Bleiweiss said something else.

15         Q     Did Dr. Bleiweiss comment on

16    whether --

17         A     No.

18         Q     -- on having seen whether or

19    not Dr. McCash in the gross room, was

20    intruding upon Dr. Varughese's personal

21    space?

22         A     No, he was talking about

23    another part of the story.

24         Q     So why is it that you viewed

25    those three as being more credible than

```
 1              M. Pessin, Ph.D.
 2    Dr. Varughese?
 3        A     Because the accounts and the
 4    data supported their story and not Dr.
 5    Varughese.
 6        Q     What do you mean by data?
 7        A     The delay in the specimens,
 8    that time thing, at the time.
 9        Q     But my question is simply
10    focused to Dr. McCash intruding Dr.
11    Varughese's physical space?
12        A     I can't answer to that.
13        Q     Wouldn't you agree that Dr.
14    McCash, Dr. Azar, Dr. Jordan, Dr.
15    Varughese were all residents in the
16    residency program?
17        A     Correct.
18        Q     Dr. Jaffer was an attending;
19    correct?
20        A     Correct.
21        Q     So why wouldn't you go to your
22    attending, to interview the attending to
23    get an unbiased viewpoint on this, as
24    opposed to going to other residents?
25              MR. GREENBERG:  Note my
```

1               M. Pessin, Ph.D.

2      this e-mail and identify it for me,

3      please?

4         A      It's an e-mail to Caryn Tiger

5      from me.

6         Q      What brought about this e-mail?

7         A      I don't know.

8         Q      Sitting here today, do you

9      recall any of your communications with

10     Caryn Tiger-Paillex?

11        A      No, I don't.

12        Q      Do you know how Samuel McCash

13     found out there was a Human Resources

14     investigation?

15        A      No, I don't.

16        Q      Did you advise him?

17        A      No, not that I remember.

18        Q      Did you ever go out socially

19     with Samuel McCash or Dr. Jordan, for

20     drinks or dinner at any point?

21        A       No, the only time, we would

22     have gone to the residency end of the

23     year alumni dinner.  They and most of the

24     residents would have been there.  And I

25     would have been there with a lot of the

Page 170

1            M. Pessin, Ph.D.

2     negative evaluation?

3            MR. GREENBERG:  Objection to

4        foundation.  Go ahead.

5        A      No.

6            MR. WRONKO:  Let's mark this

7        Pessin-16.

8            [The document was hereby marked

9        as Pessin Exhibit 16, for

10        identification, as of this date.]

11        Q      Doctor, I'm showing what's been

12     marked as Pessin-16.  I know you were not

13     copied on this e-mail dated August 16,

14     2010, but I do ask that you review it.

15            In this e-mail, Dr. Jordan

16     makes reference to how she had gone

17     through the contents of Dr. Varughese's

18     desk and makes various observations.

19            In reading this e-mail, based

20     upon what is stated here, do you believe

21     that Dr. Jordan's conduct at that point,

22     when she was a second-year resident, was

23     appropriate?

24            MR. GREENBERG:  Note my

25        objection.  The witness is here as a

Exhibit 4

**From:** ronald j. wronko [mailto:ron@ronwronkolaw.com]
**Sent:** Friday, October 11, 2013 12:26 PM
**To:** McEvoy, Rory
**Subject:** Varughese; Privilege Log and Deposition Issues

Mr. McEvoy,

I have reviewed your proposed Stipulation. From your letter, it appears that you are prepared to produce materials appearing on the privilege log but do not want that production to constitute a waiver as to the assertion of privilege for the remaining items on the log. I do not have a problem with that concept.

However, the Stipulation gives defendants the opportunity to reassert privilege and to call for produced documents to be returned and to be marked as privileged again. This is problematic because if I use documents that are produced from the privilege log at depositions, it would then raise an issue of whether such testimony is valid if there is a battle over a reassertion of privilege. If the defendants produce documents from the log, they have to remain produced for the entirety of the litigation without retraction.

Please advise whether the Stipulation, which appears to be a form Stip., can be modified to accomplish what I believe the intent is here.

An urgent issue is whether you are going to be able to slot anyone else into deposition for next Friday. I need to know that ASAP, so that I can properly prepare for any other witness who would be produced.

As for the witnesses for whom you are objecting, Dr. Jaffer, Mr. Valentin, and Dr. Azar were present for the incident between Dr. McCash and plaintiff. They were the subject of interviews during investigations of the incident. The interview notes are hearsay, and I obtaining direct testimony from these witnesses is essential to have admissible testimony on what they witnessed. Their testimony is not duplicative of depositions of members of the Hospital hierarchy/Litigation Control Group and of Dr. McCash, who are all parties aligned with the hospital against plaintiff. Defendants' objection to production of these individuals amounts to cherry-picking of witnesses who are favorable to the Hospital versus witnesses who may provide adverse testimony.

Likewise, Dr. Guarino and Dr. Azar are similarly-situated co-workers of plaintiff. Plaintiff has identified Dr. Guarino as being held to a different standard than she was. There is no duplication in the testimony that would be obtained from these co-workers versus the testimony of Hospital hierarchy/Litigation Control Group witnesses.

As to these witnesses, if defendants are unwilling to reconsider their position of non-production, plaintiff will file an appropriate motion to compel.

You have not advised whether you will produce Dr. Jordan.

Finally, plaintiff will abide the testimony of other witnesses before pressing the issue of Dr. Schiller.

I will communicate with plaintiff's experts to determine their availability and will advise accordingly.

Plaintiff was served authorizations when her IIED claim was pending. This claim has been withdrawn. When it was withdrawn, Judge Francis explicitly stated that she would not have to appear for an IME or produce medical records. Please provide what the basis is for your continuing request that such records be obtained. As I previously advised, I submitted the authorizations to the providers who have not complied with the authorizations. I have served the only medical records I received, which were from Mt. Sinai.

Ronald J. Wronko, Esq.
Ronald J. Wronko, LLC
134 Columbia Turnpike
Florham Park, NJ 07932
(973) 360-1001
(973) 360-1881 (facsimile)
ron@ronwronkolaw.com

Edwards Wildman Palmer LLP has offices in Boston, Chicago, Hartford, Hong Kong, Istanbul, London, Los Angeles, Miami, Morristown NJ, New York, Orange County, Providence, Stamford, Tokyo, Washington DC and West Palm Beach. For more information visit edwardswildman.com.
CONFIDENTIALITY NOTICE
This e-mail message from Edwards Wildman Palmer LLP, Edwards Wildman Palmer UK LLP, Edwards Wildman Palmer, a Hong Kong firm of solicitors, and Edwards Wildman Danismanlik Hizmetleri Avukatlik Ortakligi, a registered foreign attorney partnership, is intended only for the individual or entity to which it is addressed. This e-mail may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you received this e-mail by accident, please notify the sender immediately and destroy this e-mail and all copies of it. We take steps to protect against viruses but advise you to carry out your own checks and precautions as we accept no liability for any which remain. We may monitor emails sent to and from our server(s) to ensure regulatory compliance to protect our clients and business. Edwards Wildman Palmer UK LLP is a limited liability partnership registered in England (registered number OC333092) and is authorised and regulated by the Solicitors Regulation Authority (SRA) and operates an SRA standard complaints procedure (see here). A list of members' names and their professional qualifications may be inspected at our registered office, Dashwood, 69 Old Broad Street, London EC2M 1QS, UK, telephone +44 207 583 4055.
Disclosure Under U.S. IRS Circular 230: Edwards Wildman Palmer LLP informs you that any tax advice contained in this communication, including any attachments, was not intended or written to be used, and cannot be used, for the purpose of avoiding federal tax related penalties or promoting, marketing or recommending to another party any transaction or matter addressed herein.

Exhibit 5

EDWARDS WILDMAN PALMER LLP
Rory J. McEvoy
Rachel B. Jacobson
Attorneys for Defendants
The Mount Sinai Hospital, Patrick Lento, M.D.,
Carlos Cordon-Cardo, M.D., Adolfo Firpo, M.D.,
and Ira J. Bleiweiss, M.D.
750 Lexington Avenue
New York, New York 10022
212.308.4411
rmcevoy@edwardswildman.com
rjacobson@edwardswildman.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

LEENA VARUGHESE, M.D.,

            Plaintiff,

      -against-

MOUNT SINAI MEDICAL CENTER, PATRICK
LENTO, M.D., CARLOS CORDON-CARDO,
M.D., ADOLFO FIRPO, M.D., IRA J. BLEIWEISS,
M.D., and ABC Corp. 1-10, and JOHN DOES 1-10,

           Defendants.
_____

12 Civ. 8812 (CM)(JCF)

**DEFENDANTS' FIRST SET OF
INTERROGATORIES TO
PLAINTIFF**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and Local Civil

Rules 26.2, 26.3, 33.1 and 33.3 of the Southern District of New York, Defendants The Mount

Sinai Hospital (named herein as "Mount Sinai Medical Center") ("Mount Sinai" or the

"Hospital"), Patrick Lento, M.D. ("Dr. Lento"), Carlos Cordon-Cardo, M.D. ("Dr. Cordon-

Cardo"), Adolfo Firpo, M.D. ("Dr. Firpo"), and Ira J. Bleiweiss, M.D. ("Dr. Bleiweiss")

(collectively "Defendants") , hereby request that Plaintiff Leena Varughese ("Varughese" or

"Plaintiff") within thirty days after the service of these Interrogatories, answer each Interrogatory

separately and fully in writing under oath.

16.     Identify the "similarly situated peers" and "colleagues" referred to in paragraph 32 of the Complaint.

17.     Identify the "four other qualified co-workers with seniority over Dr. Jordan" referred to in paragraph 35 of the Complaint.

18.     Identify the "co-workers" referred to in paragraph 36 of the Complaint.

19.     Identify the "superiors" who Dr. Bleiweiss requested to write negative evaluations about you referred to in paragraph 46 of the Complaint.

20.     Identify the "physician" who "decided not to proceed forward on [Plaintiff's] FMLA request" and the "treating physician" referred to in paragraphs 56 and 57 of the Complaint.

21.     Identify the "colleagues" referred to in paragraph 58 of the Complaint.

22.     Identify the "potential employer" referred to in paragraph 64 of the Complaint.

23.     Identify any witness to, or any person with knowledge of, facts confirming the occurrences that form the basis of Plaintiff's claims.

24.     Identify each person, hospital, or other health care facility from whom Plaintiff sought treatment, or who provided treatment to Plaintiff for any injury, illness, or condition she allegedly suffered as a result of Mount Sinai's alleged conduct.

Ronald J. Wronko, Esq. (RW 1859)
RONALD J. WRONKO, LLC
134 Columbia Turnpike
Florham Park, New Jersey 07932
(973) 360-1001
Attorneys for Plaintiff
Leena Varughese, M.D.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEENA VARUGHESE, M.D., : | Civil Action No.: 12 CIV 8812 |
| Plaintiff, : | CIVIL ACTION |
| v. : | **PLAINTIFF'S ANSWERS TO** |
| : | **INTERROGATORIES** |
| MOUNT SINAI MEDICAL CENTER, : | |
| PATRICK LENTO, M.D., CARLOS : | |
| CORDON-CARDO, M.D., ADOLFO : | |
| FIRPO, M.D., IRA J. BLEIWESS, : | |
| M.D., and ABC Corp. 1-10, and : | |
| JOHN DOES 1-10, : | |
| Defendants. : | |

TO:     Rory J. McEvoy, Esq.
        Edwards Wildman Palmer LLP
        750 Lexington Avenue
        New York, New York 10022

COUNSEL:

PLEASE TAKE NOTICE THAT plaintiff hereby responds to Defendant's First Set of

Interrogatories, pursuant to the Federal Rule of Civil Procedure 33 as follows:

                        Ronald J. Wronko, Esq.
                        Attorneys for plaintiff
                        BY: _____
                            Ronald J. Wronko

15.     Plaintiff objects to this Interrogatory on the grounds that it is overly broad and burdensome, vague and ambiguous, and not calculated to lead to the discovery of admissible evidence.  Subject to and without waiving the foregoing objection, plaintiff responds:  Dr. Kalir advised plaintiff that "people are saying you are 'special needs.'"

16.     Plaintiff objects to this Interrogatory on the grounds that it is overly broad and burdensome, vague and ambiguous, and not calculated to lead to the discovery of admissible evidence.  Subject to and without waiving the foregoing objection, plaintiff responds:   Jonathan Chow, M.D., Alicia Martinez, M.D., Paul Azar, M.D., Taisha Roman, M.D., Elizabeth Morency, M.D., Adrienne Jordan, M.D., and Samuel McCash, M.D.

17.     Plaintiff objects to this Interrogatory on the grounds that it is overly broad and burdensome, vague and ambiguous, and not calculated to lead to the discovery of admissible evidence.  Subject to and without waiving the foregoing objection, plaintiff responds: Jonathan Chow, M.D., Alicia Martinez, M.D., Paul Azar, M.D., and Taisha Roman, M.D.

18.     Plaintiff objects to this Interrogatory on the grounds that it is overly broad and burdensome, vague and ambiguous, and not calculated to lead to the discovery of admissible evidence.  Subject to and without waiving the foregoing objection, plaintiff responds:  Adrienne Jordan, M.D., Samuel McCash, M.D.,  Robert Guarino, M.D., and others.

19.     Plaintiff objects to this Interrogatory on the grounds that it is overly broad and burdensome, vague and ambiguous, and not calculated to lead to the discovery of admissible evidence.  Subject to and without waiving the foregoing objection, plaintiff responds: Dr. Kalir, Dr. Peterson, and others.

20.     Plaintiff responds:  Dr. Jose Barbazan-Silva, 1111 Park Avenue, New York, New York 10128.

21.     Plaintiff objects to this Interrogatory on the grounds that it is overly broad and burdensome, vague and ambiguous, and not calculated to lead to the discovery of admissible evidence.  Subject to and without waiving the foregoing objection, plaintiff responds:  Jonathan Chow, M.D., AdrienneAdrienne Jordan, M.D., Mabel Ko, M.D., Jonathan Yao, M.D., Jaclyn Hechtman, M.D., Justin Fender, M.D., Seby Jacob, M.D. Natalie Ciomek, M.D., Sarah Blowe, M.D., Noam Harpaz, M.D., and Dr. Peterson, and others

22.     Plaintiff responds:  Robert Wood Johnson University Hospital.

23.     Plaintiff objects to this Interrogatory on the grounds that it is overly broad and burdensome, vague and ambiguous, and not calculated to lead to the discovery of

Exhibit 6



8AM LECTURE ATTENDANCE SHEET: 2011-2012

| Date | Monday 8/15 | Tuesday 8/16 | Wed 8/17 | Thurs 8/18 | Fri 8/19 |
|---|---|---|---|---|---|
| Topic: | AP: Cardiac dia. | CP: Ecog Ifwd(R) | Cyto: Dolglo/sia | Surg: Prelimlatns | Autopsy |
| Lecturer: | Dr. Lento | Dr. E. Peoriska | Dr. Selegean | Flind WICkP | |
| **PGY1** | | | 59 | | |
| Jacob, Seby | | | | | |
| Clomek, Natalie | | | | | |
| Khachaturov, Vadim | EXCWEP | | | | |
| Li, Zonghua | | | | | |
| Rosario-Quinones, Frances | | | | | |
| Blowe, Sarah | | | | | |
| Hernandez-Prera, Juan | | NOT REQUIRED | | | |
| Groh, Darren | | | | | |
| **PGY2** | | | | | |
| Blouin, Amanda | | | | | |
| Fender, Justin | | | | | |
| Grunes, Dianne | | MKO | MKO | MKO | MKO |
| Ko, Mabel | | | | | |
| Yao, Jonathan | | | | | |
| **PGY3** | | RAC | RAC | | MK |
| Chepovetsky, Julie | | NOT REQUIRED | rotation | | |
| Hechtman, Jaclyn | | away | rotation | | |
| Jordan, Adrienne | | | | | |
| Kazi, Sofia | | | | | |
| **PGY4** | | TO | | | |
| Azar, Paul | | EXCUSED | | | |
| Chow, Jonathan | | EGM | E.GM | EGM | EGM |
| Martinez, Alicia | | | | EXCUSED | FOR RESEARCH |
| Morency, Elizabeth | | | | | |
| Roman, Taisha | | U | LV | | |
| Varughese, Leena | | | | | |
| **Fellows** | TK | | TK | TK | |
| Klepper, Jeremy | | | AS | | |
| Schubeck, Andrew | | | | | |
| Guerino, Robert | | | SS | | |
| Selegean, Sorin | | | | | |
| Kadire, Buhalgem | | | | | |
| Sidhu, Harleen | | | | | |
| Zhang, Xuchen | | | | | |
| Iuga, Alina | | | | | |
| Suarez, Yvelisse | | | | | |
| Smelhurst, Mark | | | | | |
| Shibata, Robert | | | | | |

CONFIDENTIAL

D02509

Exhibit 7

## Policy for Morning Conference Attendance

I. **Purpose:** This policy outlines the responsibilities of the resident with regard to attendance at scheduled training experiences. This policy applies to all Pathology residents in accordance with the *ACGME Program Requirements for Graduate Medical Education in Anatomic and Clinical Pathology Common Program Requirements (IV.A.3).* The purpose of morning conference is to enhance general knowledge and decision-making skills, and to help prepare for the ABP boards.

II. **Policy:** The goal of the Department of Pathology is to provide a full and varied training experience for the resident training in Pathology. It is the expectation of the department that each resident will attend all scheduled didactic presentations. The minimum requirement for successful completion of training requirements in Pathology will include, but are not limited to, the resident's participation in at least eighty percent (80%) of all required 8:00 am didactic presentations, average over a 4 week period (hereafter referred to as a "block"). When a resident fails to meet the minimal attendance requirements of the department, he/she will be notified of the following actions:

   a. 80-100% Attendance: No action
   b. 60-80% Attendance: Resident will prepare one lecture on a topic covered at a lecture they missed
   c. 40-60% Attendance: Resident will prepare one lecture on a topic covered at a lecture they missed and will be assigned 1 extra weekday AP call
   d. < 40% Attendance: Resident will prepare one lecture on a topic covered at a lecture they missed and will be assigned 1 extra weekday AP call and a letter signed by the program director will be placed in the resident's permanent file

**Note:** If resident attendance falls below 80% for two blocks within an academic year, a letter of reprimand will be placed in the chief resident files.

**Note:** If resident attendance falls below 80% for three blocks within an academic year, a letter of reprimand signed by the program director will be placed in the resident's permanent file.

**Note:** If resident attendance falls below 80% for four blocks within an academic year, the resident can be placed on probation, at the discretion of the residency program director and the department chairman.

**Note:** If resident attendance falls below 80% for five or more blocks during an academic year, the resident can be dismissed from the program, at the discretion of the residency program director and the department chairman.

**Note:** The resident is expected to review the material and power point presentation for any lecture that they miss. Lectures will be available on the G drive.

Updated on July 27, 2011

D01185

Exhibit 8

85

Varughese

anyone.  Perhaps I called my sister or something.

Q.   No, I don't mean family.
Do you know who Dr. Jaffer is?

A.   Yes.

Q.   Who is Dr. Jaffer?

A.   She's an attending pathologist.

Q.   Did you speak to Dr. Jaffer at around the time that you were trying to go in to see Dr. Bleiweiss?

A.   No, I did not.

Q.   So you go to see Dr. Bleiweiss.  You say what you say you said.  He's on the phone.

A.   Right.

Q.   He shoos you away.  You go back to the grossing room to finish the work that you described.

A.   Right.

Q.   Then what happens?

A.   And I had a minute to gown up again, put on just a plastic apron and put on my gloves and sort of figure out with the dictation, headphone and get back to my station when Dr. Jaffer and I believe it was Dr. Jaffer and McCash appeared.  And I believe Dr. Jaffer just

86

Varughese

showed up first and McCash followed soon after.

Q.   Did Dr. Jaffer say anything to you?

A.   She said, Hey, like what's going on?  Is everything OK?

Q.   What did you say?

A.   I was like, Well, you know, something happened.  I was beginning to getting into explaining what happened when McCash interrupted.

Q.   What did Dr. McCash say then?

A.   I think he was saying that I wasn't doing my work.  I was putting off my work.  I was trying to avoid doing my work, and so on.  And I said, Well, that's not true.  I'm doing my work right now.

Q.   And did you say anything else?  During this conversation that took place between you and Dr. Jaffer and Dr. McCash.

A.   Well, I said, you know, just stop lying and saying that I'm not doing my work when I am and I'm managing all my responsibility.  So I just asked him to stop saying what he was saying.

Q.   What else, if anything, did Dr. McCash say?

A.   Dr. McCash just kept badgering me even

87

Varughese

though the attending was there.  I felt that he was badgering me.

Q.   What did he say?

A.   Insisting that I wasn't doing my work and me insisting that no, I am doing my work.  I have this number of cases still remaining to gross, to -- some things I had grossed which I had to take sections from for histology, that I had to wait until it was in Formalin for about a few hours because it made the tissue more firm.  So I had to wait for that.

So I pointed out I have so many cases here that still need to be cut because it takes some hours to process.

Q.   And during this conversation that Dr. Jaffer was part of did you raise your voice?

A.   I don't remember raising my voice.

Q.   Did Dr. McCash raise his voice?

A.   I believe the conversation may have gotten, in this course of back and forth, the conversation perhaps had gotten heated.

Q.   What did Dr. Jaffer say while you and Dr. McCash were going back and forth as you described it?

88

Varughese

A.   Dr. Jaffer was just, you know, like no, no, no.  She didn't want the argument.  So she was just like -- she was saying, you know, don't argue.

Q.   Do you know how Dr. Jaffer came to see you?  You said Dr. Jaffer came into the grossing room and asked you what was going on.

A.   She told me that Dr. Bleiweiss had asked her.

Q.   How did the conversation between you and Dr. McCash and Dr. Jaffer end?

A.   You know, I was still in the middle of doing the work and I got very frustrated and then I told him to back off, and he was like, No, I'm the chief, and so on.  I said, Well, I'm trying to do my work here.  This is my career and this is important to me as well.  So please back off.  And he insisted on not backing off.  I may have used -- I'm not sure if I had cursed now, but I may have.

Q.   So that's when you may have told him to "fuck off"?

A.   I may have.

Q.   So again, how did this, I mean, you're

89

Varughese

2 saying go away and leave me alone. He's saying,
3 I'm not going anywhere. This battle you describe.
4 I'm assuming at some point this
5 conversation came to an end, since you're not
6 still there arguing with Dr. McCash. So how did
7 it come to an end? Did Dr. Jaffer put an end to
8 it? Did Dr. McCash finally walk away? What
9 happened?
10    A.    It was equally heated, a heated debate
11 or argument about, you know, the work I'm doing
12 versus the work I wasn't doing. Finally I was
13 like just leave me alone and go away. And then,
14 you know, he said something and he just I think --
15 I don't know. I mean, this is like a very painful
16 event and --
17    Q.    I understand. So if you don't
18 remember how it ended, you can just tell me you
19 don't remember how it ended.
20    Did he walk away at some point?
21    A.    I believe I just -- I believe he and I
22 both walked away. I just left.
23    Q.    Was Dr. Jaffer there for this whole
24 conversation up until the point that it ended?
25    A.    I believe this event, yes. I believe

*Computer Reporting NYC Inc.*
*(212) 986-1344*

90

Varughese

1 she was there. Or she was there, I'm pretty sure.
2    Q.    So then you said you finished the work
3 that you still had to do. Yes?
4    A.    Yes.
5    Q.    What happened next in terms of this
6 incident? You said you spoke to Dr. Bleiweiss
7 that evening.
8    A.    Right.
9    Q.    Did you talk to anybody other than
10 family, friends, et cetera? Did you talk to
11 anybody at Mount Sinai about the incident between
12 the end, your completing the end of your work and
13 when you saw Dr. Bleiweiss that evening?
14    A.    No. I believe I just left the floor
15 and I went downstairs.
16    Q.    Where did you go downstairs?
17    A.    There's like a cafe area. So I just
18 wanted to take myself out of the situation. I
19 just left there for a minute.
20    Q.    So then the next thing that happened
21 regarding this incident is you spoke to
22 Dr. Bleiweiss that you recall.
23    A.    Right. Then I eventually came back.
24 I may have been on the phone with someone

*Computer Reporting NYC Inc.*
*(212) 986-1344*

91

Varughese

1 discussing the issue, the incident.
2    Q.    When you say talking to somebody, is
3 that like somebody a friend or family member as
4 opposed to somebody at Mount Sinai?
5    A.    Right.
6    Q.    So when did you see Dr. Bleiweiss?
7 That day, but what time?
8    A.    I saw Dr. Bleiweiss when -- I went
9 back to the gross room and this was perhaps like
10 40 minutes or 45 minutes later. And I was just
11 trying to wrap everything up for the evening,
12 because it was already -- it was already rather
13 late, and he just approached me to see what had
14 happened or what was going on.
15    Q.    Was anyone else present other than you
16 and Dr. Bleiweiss when you had this conversation?
17    A.    I don't remember, but I believe --
18 well, actually, the PA, Renato. Renato was there
19 though the entire time.
20    Q.    So you had a conversation with
21 Dr. Bleiweiss in the grossing room.
22    A.    Right, very brief conversation.
23    Q.    So tell me what he said and you said.
24    A.    He just said, What happened? And I

*Computer Reporting NYC Inc.*
*(212) 986-1344*

92

Varughese

1 said, Well, you know, McCash was harassing me. I
2 find this is a pattern of his behavior. I find it
3 is unacceptable. You need to talk to him. I
4 cannot be treated this way. That's what I said to
5 him.
6    Q.    And what did he say?
7    A.    He said, Yeah, OK, I'll talk to him.
8 I'm going to go talk to him right now. And he
9 walked out and he said he was going to go talk to
10 him.
11    Q.    Do you know whether he did?
12    A.    No, I did not witness him discussing
13 anything with McCash.
14    Q.    So what is the next thing that
15 happened regarding this incident? What did you do
16 next, if anything?
17    A.    The same evening?
18    Q.    The same evening, next day, whenever.
19 Whenever the next event was.
20    A.    Oh, no, I just finished up my work and
21 I remained there and the other residents appeared
22 again. It was Paul Azar, Adrienne Jordan and
23 McCash and they -- apparently they were told to
24 get involved with grossing anything that I needed

*Computer Reporting NYC Inc.*
*(212) 986-1344*

Exhibit 9

## 17

Varughese

in that group assignment?

A.    I believe there was a constant change of method of approaching grossing there.  So it changed frequently.

Q.    What role, if any, did the chief residents play in assigning grossing specimens to other residents?

MR. WRONKO:  Form objection.  You can answer.

A.    They did not play any role as far as I knew.

Q.    Now, when you completed grossing the specimen what was your responsibility then?  What did you do after you were finished?

A.    After finishing grossing just, you know, submitting the blocks, the tissue blocks, you submitted the specimen back into Formalin and in the properly labeled container and just put it for storage.

Q.    Was there any report that you were supposed to generate or other paperwork that you were supposed to generate?

A.    You're supposed to enter the blocks and enter the gross description.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

## 18

Varughese

Q.    What could the gross description be?  What were the possible descriptions?  Or give me examples of what the descriptions might be.

MR. WRONKO:  Form objection.  You can answer.

A.    Gross description just is the measurement, like I mentioned before, weight, lesions, and the block submitted.

Q.    And I think you said that you looked at the specimens visually.

A.    Yes.

Q.    Did you look at them under a microscope?

A.    Usually we did have a magnifying glass we used on occasion if there was a -- for certain types of lesions we would use it and examine it under the microscope to see where the lesion was, and, um, but other than that, no.  Gross specimens are not examined under microscope.

Q.    And the magnifying glass is not a microscope, correct?

A.    No.

Q.    During your PGY-3 year who was or were the chief residents?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

## 19

Varughese

A.    During the PGY-3 year it was Kruti Maniar, Samuel McCash.  Later in the year it was transitioned into Elizabeth Morency and Adrienne Jordan.

Q.    Were Drs. Jordan and Morency the chief residents in your PGY-4 year?

A.    Right, Morency was the PGY-4 year resident.

Q.    Was Dr. Jordan a PGY-4 year as well?

A.    Dr. Jordan was a PGY-3 year.

Q.    She was a PGY-3.

A.    Right.

Q.    When was she the co-chief resident?  What year of your residency was she the co-chief resident?

A.    Well, I wasn't sure if she was co-chief resident until she has been referred to as such now.  But OK, I was a fourth-year resident when she was one of the chief residents.

Q.    When you were a third-year resident it was Dr. McCash and Kruti Maniar.

A.    For the majority of that year.

Q.    When did that change?  And by your third year I assume we're talking about from July

*Computer Reporting NYC Inc.*
*(212) 986-1344*

## 20

Varughese

1st of 2010 to June 30th of 2011.  That's your third year.

A.    Correct.

Q.    When did either Dr. McCash or Dr. Maniar stop being the chief resident during that period of time if you know?

A.    I can't recall off the top of my head.

Q.    OK.  Did you know Dr. McCash prior to his becoming the chief resident in your third year?

A.    Yes.  He was a fellow resident in the program.

Q.    I think we all know that at a certain point in time you had problems with Dr. McCash.

A.    Right.

Q.    And we'll get to that in a minute.  And the first of them I understand was in -- are you OK?

A.    Oh, yes.

Q.    And the first of them I believe was in September of 2010; is that correct?

A.    Yes.  I believe that's correct.

Q.    So before September 2010 during the, I guess the two years that you were both

*Computer Reporting NYC Inc.*
*(212) 986-1344*

21

Varughese

2  co-residents and prior to 2010 did you have any
3  problems with Dr. McCash?
4      A.   Not particularly.
5      Q.   So tell me what happened in September
6  2010 with you and Dr. McCash.
7      A.   Well, September 2010 he, um, started
8  shouting at me in a conference room in a very
9  loud, with a very loud voice and with sort of an
10  intimidating demeanor.
11          I'm sorry, can I correct that?  Not
12  sort of, with an intimidating demeanor.  Can we go
13  off the record for a second?
14      Q.   Sure.
15          MR. McEVOY:  Off the record.
16          (Discussion off the record.)
17          MR. McEVOY:  So during an
18  off-the-record discussion Dr. Varughese
19  indicated she wanted to supplement her
20  answer to my question of prior to September
21  2010 did you have any problems with
22  Dr. McCash.
23      Q.   Go ahead.
24      A.   Well, there were issues which I
25  thought were minor ones at that time where he

*Computer Reporting NYC Inc.*
*(212) 986-1344*

22

Varughese

1  wanted to dictate to me how I should answer call
2  and why it was in my best interest as opposed to
3  what I had suggested.  And I believe that was a
4  freedom that was allowed other residents in making
5  their schedules and call schedules.
6      Q.   Did you raise those issues with
7  anybody in the program, the program director or
8  one of your attendings?
9      A.   At that time, I am not sure, I'm not
10  sure if I did.  Because I already had -- actually,
11  I had multiple other issues with McCash before
12  which I recall now.  Can I supplement?
13      Q.   Absolutely.
14      A.   Well, in terms of my end of my second
15  year going into third year there were some issues
16  with the scheduling and I actually had to involve
17  the former program director to ask him that my
18  rotations and assignments be comparable to the
19  remainder of my class and my peers because I was
20  not being assigned to the correct rotations.
21      Q.   Who made the scheduling assignments?
22      A.   That's -- I'm not a hundred percent
23  certain.
24      Q.   So I understand, and I'll ask you in a

*Computer Reporting NYC Inc.*
*(212) 986-1344*

23

Varughese

2  minute about the scheduling issues, but how is
3  Dr. McCash involved in your scheduling problems?
4      A.   Oh, because --
5      Q.   At the end of your PGY-2 year which
6  what we're talking about.
7      A.   Well, I'm not sure if he is completely
8  involved or if both chief residents or somebody
9  else was making the schedules, because the
10  schedules were made I believe originally by
11  someone else and that person changed.  So I wasn't
12  sure what was happening that year in terms of the
13  schedule making.
14      Q.   So you're talking about the schedule
15  made at the end of your PGY-2 year for the
16  beginning of your PGY-3 year; is that right?
17      A.   Correct.
18      Q.   And who did you raise the scheduling
19  issues with?
20      A.   Well, I raised that with the former
21  program director, Dr. Strauchen.
22      Q.   What was the issue that you raised
23  with Dr. Strauchen?
24      A.   I simply informed Dr. Strauchen that
25  my schedule was not up to par for the year of

*Computer Reporting NYC Inc.*
*(212) 986-1344*

24

Varughese

1  training that I was going to go into and I would
2  require exposure to particular fields to be
3  relatively competent at the end of my four years
4  of training.
5      Q.   And was your schedule adjusted?
6      A.   Yes.
7      Q.   And was it adjusted to your
8  satisfaction?
9      A.   Yes, I believe it became more
10  equitable.
11      Q.   So going back to September 2010, you
12  had started telling me that in a conference room
13  Dr. McCash was shouting at you in a loud voice and
14  with intimidating demeanor; is that right?
15      A.   That's correct.
16      Q.   What else happened during this
17  September 2010 incident with Dr. McCash?  And to
18  put a finer point on it, what did he say -- let me
19  take a step back.
20          Who was in this conference room?  Was
21  it just you and Dr. McCash?
22      A.   No.
23      Q.   Were there other people present?
24      A.   There were other people present.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

Varughese

his office that we just talked about?

A.    Yes, I had met with him several times and I just -- because I wanted to transfer with the surgical pathology rotation, so I had met with him just to request that.  He had allowed me to transfer to another institution for that time in December because I didn't want to be at Sinai.

Q.    So why did you want to transfer to surgical pathology to get away from Dr. McCash?

A.    Yes, essentially the rotations at Elmhurst and Mount Sinai Medical Center are essentially similar.  They're both surgical pathology and they all involve specimens removed from surgery.

Q.    So at the time you were in the surgical pathology rotation at Mount Sinai.

A.    Right.

Q.    And McCash was one of your chiefs.

A.    Right.

Q.    And you went to Dr. Lento to request a transfer to the surgical pathology rotation at Elmhurst?

A.    Yes.  It was a rather -- it involved two different -- that was essentially the idea.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

Varughese

Q.    And if I understood you correctly, but I want to be sure that I do, you wanted that transfer to Elmhurst so that you would basically not have to have contact with Dr. McCash.

A.    Yes.  That was my motivation.

Q.    When did you ask Dr. Lento to allow you to transfer or to transfer you?

A.    I believe I requested that from the chief resident.  So I wrote an e-mail to Kruti Maniar, and it was myself and Jacqueline Hecthman as well.  So we both wanted to do this transfer, because we both thought it would work for both of us.

Q.    And who had to approve the transfer?

A.    Dr. Lento.

Q.    Did you ever speak to Dr. Lento directly or communicate with him directly about the transfer and the reasons for the transfer?

A.    Right, in one of the meetings where I met with him I did speak to him.

Q.    And what did you tell him?  About the transfer obviously.

A.    Right, I just told him if I could transfer and, I mean, at that point he had not

*Computer Reporting NYC Inc.*
*(212) 986-1344*

Varughese

intervened with the McCash issue and he had not stated what he had done to prevent such incident from occurring ever again.

And so I requested that I allowed, I be allowed to transfer, and he felt that he couldn't do it, he couldn't allow me to transfer, and that was because he didn't have the power to do so, one, and, two -- I'm not sure actually, I am not sure actually if he said that, but he definitely did say that there were some financial reasons that he did not want us to transfer.

Q.    Did you transfer or not?

A.    No, I did not transfer.

Q.    So the request to transfer was denied basically.

A.    Well, right.  That request to transfer to Elmhurst for this big period was denied.

Q.    What about Dr. Hecthman?

A.    Yes, we had arranged it as a transfer that would work between us, our two schedules.

Q.    So your request and Dr. Hechtman's request was denied; is that right?

A.    Correct.

Q.    Do you know if Dr. Lento ever spoke to

*Computer Reporting NYC Inc.*
*(212) 986-1344*

Varughese

Dr. McCash about the September incident?

A.    No.

Q.    Did you have discussions, and I'm not talking about family or friends, did you have discussions with anyone else at Mount Sinai about the September incident with Dr. McCash?

A.    I cannot recall at this point.  If I remember I'll correct that.

Q.    Now, directing your attention to the second incident with Dr. McCash, the one that took place in December of 2010 -- there was another incident with Dr. McCash, correct?

A.    Correct.

Q.    And that took place when?

A.    That took place in December of 2010.

Q.    So before we get to the actual incident, I want to ask you some questions about the context in which the incident occurred.

Where did this incident take place?

A.    The incident took place in the gross room.

Q.    And was that during the day, during the evening?  What time of day did it take place?

A.    It was in the evening.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

109

Varughese

Q.   When Dr. Schiller said you seem to be upset, maybe you should go see someone, did he mean you were upset then at the meeting or you were upset during the discussion with Dr. Bleiweiss and Dr. Schiller?

MR. WRONKO:   Form objection.  You can answer.

A.   Do mean what he thinks?

Q.   Well, not what he thinks.  But he said, you seem to be upset, you should go see someone.  Did you interpret that to mean that he thought you were upset at the time?

A.   I mean, I don't think so, because I feel like he had planned to say that, because he had called me in and I feel like it's a tactic that he has used with me before.  I just thought he's doing that again, which was even more upsetting to me.

Q.   When you said "before," you're referring to the incident you told me about with Dr. Schiller earlier today?

A.   Right.

Q.   So what Dr. Bleiweiss saying during this meeting, if anything?

110

Varughese

A.   He didn't say anything.  I think he was also slightly shocked.  At least that was my impression.  But, I mean, he didn't say much.

Q.   Did he say anything other than hello and goodbye?

A.   He just said, you know, We can't have people taking on work.  You need to work.  You can't just not come in and, you know, you just need to be here and work.  So that's what he said.  Along those lines.  That's what he said along those lines.

Q.   Had there been some issue about you not coming into work?

A.   No, not that period.

Q.   So then did you ask Dr. Bleiweiss what he was referring to?

A.   No.  I don't think I did.

Q.   So after you met with Dr. Bleiweiss and Dr. Schiller on the 9th -- well, when you met with Schiller and Bleiweiss did you ask them to do anything?

A.   Well, I mean, they weren't asking me what had happened even.  They were sort of saying what they wanted to say.

111

Varughese

Q.   I understand.  Did you ask them to do anything?

A.   I believe I asked them to intervene in some way.

Q.   Do you recall what you said?  Are you sure that you asked them that?

A.   I can't -- I mean, I don't recall.

Q.   When you met with Dr. Petersen, I mean, other than your telling him what happened and him giving you a perspective, did you ask him to do anything regarding this incident?

A.   Yes.

Q.   What did you ask Dr. Petersen?

A.   Well, Dr. Petersen said, Well, let me speak to him.  I can talk to him.

Q.   Him being?

A.   I think he wanted to talk to Dr. Lento at that time and he wanted to say something.

Q.   Do you know whether he spoke to Dr. Lento?

A.   I don't know.

Q.   When you met with Dr. Stimmel, did you ask him to do anything?

A.   Yes.

112

Varughese

Q.   And again, about the incident.

A.   Yes, I -- I gave him permission to speak to Dr. Pessin.  If she talked to him again or just present, you know, sort of my side as well.  So I asked him to speak to her.

Q.   Do you know if he did?

A.   I'm pretty certain that they spoke at some point just based on people saying that they did.

Q.   So after December 14th what's the next communication that you had with someone at Mount Sinai about this December 8th incident?

A.   Well, the following day on December 10th, 2010, I spoke to Dr. Pessin and she said that this incident had occurred, had come to her attention, and she wanted to know what happened.  She wanted to know my side.  And she said, Well, I want to know what happened.  Why don't you tell me what happened.  Elaborate.

So I just recollected the incident and what had happened that evening.  And then she told me that, you know, Sam is no longer the chief for the next week and Kruti is officially in charge as of now.  So, you know, like if I have any concerns

113

Varughese

regarding my work I should delegate it to -- well, I should bring it to her attention.

Q.   Her being Kruti?

A.   Kruti Maniar, yes, bring it to her attention, and she just asked me if I'm OK to work.

Q.   Where did that meeting take place?

A.   That was in Dr. Pessin's office.

Q.   Did you ask Dr. Pessin to do anything about the incident?

A.   Yes.  I asked her to have McCash step down as chief resident or take some actions against him, because he was making it difficult for me to perform my work and actually interfering with me when I was performing work.

Q.   As far as you know, did Dr. McCash's tenure as chief resident end sooner than it should have?

A.   No.

Q.   So he was chief resident until the end of his year.

A.   Correct.  He was, I mean, they transitioned the chief residency over to the, um, the chief residents will be chief the following

*Computer Reporting NYC Inc.*
*(212) 986-1344*

114

Varughese

year in the middle of the year.

Q.   That's the normal procedure.

A.   That's the normal procedure, but essentially yes, he served out his full term.

Q.   Well, putting it a different way, your request that he step down as chief resident didn't happen.

A.   Yes, I asked that some action be taken against him.

Q.   You told me that, but you also told me you wanted him to step down as chief resident.

A.   I believe I asked her that he should be removed as chief resident.

Q.   And he was not removed as chief resident.

A.   No.  Only for a short period, but never officially.  No, he wasn't removed.  He wasn't removed as chief.

Q.   Who was the next person you spoke to at Mount Sinai about the December 8th incident?

A.   Actually, I forgot to add Dr. Stimmel. I did speak to Dr. Stimmel on December 9th right after I spoke with Dr. Schiller and Dr. Bleiweiss, and that was on December 9th as well and I just

*Computer Reporting NYC Inc.*
*(212) 986-1344*

115

Varughese

reiterated what had happened and how I remember Dr. Schiller and this is what he said to me.

I mean, the majority of my conversation with Dr. Stimmel concerned what Dr. Schiller said.

Q.   On the 9th.

A.   And me briefly mentioning the McCash incident.

Q.   When you spoke to Dr. Stimmel on the 9th did that take place in his office?

A.   Yes.

Q.   The purpose of you seeing Dr. Stimmel on that day was to talk about the conversation you had with Schiller and Bleiweiss?

A.   Well, I was going to inform him about what had happened anyway, but it was just so that -- but since the Schiller incident occurred it became about me reporting about McCash and then the Schiller and Bleiweiss meeting.

Q.   On the 14th when you met with Dr. Stimmel it was more about the letter that you had received on the 13th from Lento and Pessin.

A.   Right.  After I received the letter my discussion with Dr. Stimmel was about the letter.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

116

Varughese

Q.   So who's the next person you spoke to at Mount Sinai about the December 8th incident?

A.   After that I didn't -- I don't think I spoke to anyone.

Q.   Do you know Caryn Tiger-Paillex?

A.   Yes.

Q.   Who is Ms. Paillex?

A.   She is the director of human resources.

Q.   Did there come a time when you communicated with her about this incident?

A.   Yes.

Q.   When did you do that?

A.   December 23rd.

Q.   I will show you a document.

MR. McEVOY:  Let's have it marked as Exhibit 8.

(Defendants' Exhibit 8, e-mail dated December 23, 2010 from Leena Varughese to Ms. Tiger-Paillex with attachment, Bates Nos. D-856 and 857, marked for identification, this date.)

Q.   Have you had a chance to look that over, Dr. Varughese?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

121

Varughese

2    Q.   Tell me what happened at that meeting
and what you said to her, what she said to you.
   A.   I just recounted the events as had
occurred to Tiger-Paillex and she asked me some
questions and I responded honestly to her and --
   Q.   So to make it a little easier, did you
tell Ms. Tiger-Paillex about what had happened on
8   December 8th?
   A.   Yes.
11   Q.   Did you tell her about the meetings
you had had with, putting it a different way, what
had occurred after the actual incident took place?
14   Did you tell her about the conversation between
you and Dr. Jaffer and Dr. McCash?
   A.   Yes.  I believe she asked me who was
17   there and what happened and she wanted the full
sequence of events.  So I believe I would have
told her.
20   Q.   Did you also tell her about your
conversations with Dr. Petersen and Dr. Stimmel
and Dr. Schiller and Bleiweiss?
23   A.   I believe I told her about speaking to
Dr. Stimmel already.  And I'm not certain if I
talked about Dr. Schiller and Dr. Bleiweiss,

*Computer Reporting NYC Inc.*
*(212) 986-1344*

122

Varughese

meeting, but I did -- I talked about meeting with
Dr. Pessin and, you know, how I reported the
4   incident and then I also discussed academic
advisement and just what has ensued and my concern
that I was being singled out and targeted for
7   discipline while McCash was not.
   Q.   What, if anything, did
Ms. Tiger-Paillex tell you what happened next as a
10   result of your filing this grievance?
   A.   Well, she said that she will speak to
the different parties involved and she would -- I
13   believe she -- I'm not sure if she said that, but
she definitely did say she will follow up with me
and she will investigate.
16   Q.   Do you know whether Ms. Tiger-Paillex
or someone at her request conducted an
investigation into the incident between you and
19   Dr. McCash?
   A.   Um, I wasn't sure if she was
conducting an investigation, but I was requested
22   to meet with Dr. Figur and Paul Johnson at some
point in January after I met with Caryn
Tiger-Paillex.
25   Q.   And we'll come back to that, but other

*Computer Reporting NYC Inc.*
*(212) 986-1344*

123

Varughese

2    than being asked to meet with Dr. Figur, which is
figure without the E, Dr. Figur and Paul Johnson
who is not a doctor, do you know what, if
anything, else Ms. Tiger did to investigate your
6    grievance?
   A.   I do not know what she did.
   Q.   Do you know whether anybody else
9    participated in the investigation of your
complaint?
11   A.   Well, other than Dr. Figur and --
   Q.   Other than the meeting you had with
13   Dr. Figur and Paul Johnson.
   A.   No.
15   Q.   After the incident with Dr. McCash,
and the incident I'm referring to is the
17   December 8th incident, was any effort made or were
you ever told about who you should deal with going
19   forward?
       And by that I mean, was there some
21   decision made that you were informed of to have
you report as your chief more to Kruti than to
23   Sam?
   A.   Yes.
25   Q.   How did that come about?  How did you

*Computer Reporting NYC Inc.*
*(212) 986-1344*

124

Varughese

learn about that?
   A.   I spoke to Caryn Tiger-Paillex and she
told me that I can talk to, instead of talking to
4    Dr. Lento and Sam, just talk to Kruti and have,
you know, go through her instead of going through
6    Sam and Dr. Lento for your requests or problems.
   Q.   So what Ms. Tiger-Paillex told you was
going forward.  Was this at the meeting that took
9    place sometime in January?
   A.   No.
11   Q.   It was later?
   A.   It was in April.
13   Q.   So in April of 2011 now, I guess,
Caryn Tiger said to you that going forward you
15   could deal with her instead of with Dr. Lento as
the program director.
17   A.   Yes.
   Q.   Right?
19   A.   Yes.
   Q.   And in terms of your day-to-day work
21   you could deal with Kruti Megier (phon) instead of
Sam McCash, right?
23   A.   It's Maniar, M-a-n-i-a-r.
   Q.   I'll have it right by the time we're

*Computer Reporting NYC Inc.*
*(212) 986-1344*

125

Varughese

1  done.  And the question is, going forward you
2  dealt with Dr. Maniar, not with Dr. McCash.
3      A.    Right.  After April at some point
4  that's what she wanted me to do.
5      Q.    Is that what you did?
6      A.    Well, that's not really an option
7  available to me, because the program director is
8  Patrick Lento.
9      Q.    But in terms of Dr. McCash, did you
10  then deal with Dr. Maniar?
11      A.    I tried my best not to interact with
12  him.
13      Q.    After the December 8th incident were
14  there any other incidents with Dr. McCash?
15      A.    Any other incidents with Dr. McCash?
16      Q.    And by any other incidents, I mean any
17  other incidents in which he yelled at you or in
18  your view harassed you or mistreated you in some
19  way.
20      A.    As far as I recall, he became more
21  aggressive around me.  He would always stomp his
22  feet when he was walking around me.  He would just
23  close the door really, you know, forceably when he
24  was going out of the room that was right next to

126

Varughese

1  my desk.  He would, you know, stomp his feet and
2  make shows of disapproval.
3      Q.    Other than stomping his feet and
4  closing the door in the manner you described, how
5  else, if at all, did he manifest his disapproval?
6      A.    He, when I was on GYN pathology, he
7  was assigned for moonlighting duties for two days
8  and he would not assist me or he would not assist
9  me with my specimens that were, that could have
10  been grossed by the moonlighter, and he was on
11  moonlighting duty and he refused to do any of
12  those, gross any of those cases.
13      Q.    When you say he refused, did you ask
14  him?
15      A.    No, because I was afraid of him.
16      Q.    So did anyone else ask him?
17      A.    No.  I left a note saying this is for
18  moonlighter.  So I just put the specimens to the
19  side and I left a note saying this was for
20  moonlighter.
21      Q.    So he didn't do them.
22      A.    Yes, he did not do them.
23      Q.    Do you know whether Dr. McCash was
24  told anything about how he should interact with

127

Varughese

1  you going forward after the incident?
2      A.    No, I have no idea.
3      Q.    So other than stomping the feet and
4  closing of doors and what you just described about
5  the specimens, any other way in which Dr. McCash
6  expressed disapproval of you?
7      A.    Right.  So while I was at the veterans
8  administrative affairs hospital and he was also
9  assigned there, he was not allowed to be in the
10  same work space as me.
11      Q.    How do you know that?
12      A.    Well, because Dr. Lento said he is not
13  allowed to be in the same work station as you.
14      Q.    When did Dr. Lento tell you that?
15      A.    Well, he didn't say that exactly.  He
16  said, I'll talk to Sam.  Again, that's what he
17  said and they said they won't be sharing an
18  office.
19      Q.    When did Dr. Lento tell you that?
20      A.    Sometime in May.
21      Q.    Of 2011?
22      A.    Uh-huh.
23      Q.    So you're saying you're both at the
24  VA's office.

128

Varughese

1      A.    Uh-huh.
2      Q.    You can't do uh-huh.  You've got to --
3      A.    Yes.
4      Q.    So you started to tell me that you
5  were at the VA.
6      A.    Uh-huh.
7          MR. WRONKO:  You've got to verbalize.
8      A.    Yes, yes, yes.
9          THE WITNESS:  Do you mind if I get
10  something for my --
11          MR. McEVOY:  Be my guest.  Off the
12  record.
13          (A very brief recess was taken.)
14      Q.    So tell me what happened at the VA
15  with Dr. McCash.
16      A.    He was not allowed to be in the same
17  work space as me, but he would often leave his
18  things next to me in my, you know, that work area.
19      Q.    Anything else that Dr. McCash did that
20  you interpreted as being disapproving of you or --
21      A.    No, just glaring, the usual stomping.
22      Q.    Did you complain to anybody about the
23  stomping, the door closing, the specimens or
24  leaving his stuff near your work site?

Exhibit 10

 

Carlos Cordon-Cardo, MD, PhD
Professor and Chairman
Department of Pathology

Tel: (212) ---
Fax: (212) ---
E-mail: carlos.cordon-cardo@mssm.edu

MOUNT SINAI
SCHOOL OF
MEDICINE

July 1, 2011

Dr. Leena Varughese
Department of Pathology
Mount Sinai Medical Center

Dear Leena:

I am writing as Director of the Pathology Residency Program to inform you of the Department's decision to issue this final warning to you. This decision stems from your failure to fulfill the requirements of your December 21, 2010 Academic Advisement and your behavior at the follow up meeting on May 24, 2011.

The Academic Advisement required you:

    (1) to prepare a written self-reflection by January 18, 2011
    (2) to meet with me periodically to assess your progress.
    (3) to read Practicing excellence: A physician's manual to exceptional healthcare.

Throughout the period of Academic Advisement you showed a pattern of lack of professionalism. First, you submitted your self-reflection – a critically important aspect of the Advisement – long after it was due, and, once submitted, the essay did not meet the Advisement's requirements. When I asked you on March 22, 2011 when you would be submitting the essay, you responded that you were "really swamped" that week, did not know when you would have time to write the reflection, and asked to submit it the following week. You did not hand in the essay until March 30, 2011.

Although the Academic Advisement required a self-reflection on "how you could have approached things in a better fashion, including commentary on physician professionalism and its role in this circumstance," your essay contains nothing resembling self-reflection. Instead, it is a lengthy recitation of the events that led to the Academic Advisement and various ways in which you feel that you were wronged. Remarkably, it ends with a wish for mediation and an apology regarding these long-past events. There is no discussion of physician professionalism or its relevance to the situation. Your essay reflects a lack of insight into your own behavior; a

D00878

failure to understand the role of physician professionalism – regardless of how others behave – or the impact of your behavior on those around you. You have utterly failed this exercise.

Second, you failed to meet with me as required by the Advisement. On February 17, 2011, I emailed you that we "need" to meet on the following day and asked that you propose potential times. Your email response to me indicated you could meet at 5:30 p.m. on February 18, 2011. On the day in question, you did not show up to the meeting or contact me to let me know that you would not be coming. When I questioned this, you said that I did not confirm the time. Despite this purported "miscommunication," you made no effort to contact me – your supervisor – to clarify any misunderstanding regarding whether we were meeting.

Dr. Carlos Cordon Cardo, who was appointed Department Chair on April 1, 2011, was new to the Department and had not been involved in the earlier discussions with you. After reviewing the self-reflection you submitted and also determining that it did not meet expectations, Dr. Cordon Cardo decided to give you a second chance to fulfill the requirements of the Academic Advisement. On Tuesday, May 24, 2011, you attended a scheduled follow-up meeting regarding the Academic Advisement with me, Dr. Cordon Cardo, and Mr. Andrew Castaldi, Pathology Administrator. When the meeting was confirmed by email on May 9, 2011, you were instructed to submit a revised reflection prior to the meeting and no later than May 23, 2011. The purpose of this meeting was, in part, to give you the opportunity to meet your new Department Chair and to establish that you were able to meet the Department's professionalism expectations. Despite being given this fresh opportunity, you did not provide a revised reflection before the meeting as requested. Rather, you submitted it a day late, at the start of the meeting. When Dr. Cordon Cardo asked if you read the book assigned to you, you cavalierly tossed the book on the table at him, and continued to be flippant and disrespectful throughout this meeting.

During the Academic Advisement period and again at the follow up meeting, your behavior reflected a lack of insight and a failure to appreciate the need to function within a hierarchy. We are, therefore, compelled to issue this formal notice of disciplinary warning that any recurrence of unprofessional behavior may result in further disciplinary action, up to and including your dismissal from the Program. You are expected to act at all times in a manner appropriate to your position as a house staff officer. If you have issues of concern, you may utilize any of the many mechanisms available to house staff to bring complaints, but you must behave in a professional manner.

You will be required to meet biweekly for three months with Dr. Adolfo Firpo, Director for Educational Activities, to review your performance. The purpose of this review is to provide guidance and to assess your improvement. These meetings will include discussion of feedback received from faculty, residents, and staff.

D00879

You have a right to appeal this disciplinary action by requesting, in writing, a hearing before the House Staff Affairs Committee of the Medical Board within ten days of receiving this notice. Requests should be directed to Michael Harris, MD, President of The Mount Sinai Hospital Medical Board, in care of the Medical Staff Office at Box 1116. If you do not appeal this action, it will become final at the end of the appeal period.

Sincerely,

Carlos Cordon-Cardo, M.D. PhD
Chair, Department of Pathology

Please sign below to attest that you read and understood the above content and consequences.

Resident Signature:

_____

D00880

Exhibit 11



MOUNT SINAI
SCHOOL OF
MEDICINE

September 21, 2011

To:    Leena Varughese, MD

We are writing to you as the Chair and the Director of Educational Activities of the Department of Pathology to inform you of your summary suspension termination from the Pathology Residency Program. We are taking this action because your performance and conduct have been unacceptable and your continued presence in the Program is a risk to the Hospital and its patients.

On December 21, 2010, you were placed on Academic Advisement by Patrick Lento, MD, the Residency Program Director, to address serious deficiencies in your level of professionalism. The Advisement required you to prepare a written self-reflection; to meet with Dr. Lento to assess your progress; and to read a textbook on professionalism.

When Dr. Cordon-Cardo arrived at Mount Sinai as the new Department Chair, he met with you on May 24, 2011, to review your performance under the Advisement. It was evident that you had not satisfied the expectations for your performance during this period. Further, not only was your behavior at this meeting unprofessional, it showed a lack of insight and understanding of your role in the department.

On July 15, Dr. Cordon-Cardo met with you to deliver a final warning, which was a disciplinary action based on your failure to meet professionalism expectations. At that time, you were notified that you would be required to meet biweekly for three months with Dr. Adolfo Firpo, who had recently been appointed as Director of Educational Activities. The purpose of the meetings was to provide you with guidance and to assess your performance using established mechanisms for obtaining feedback from faculty, residents and staff. While Dr. Cordon-Cardo notified you verbally and in writing regarding your right to a hearing, you did not appeal the final warning. On August 1, the Program arranged for you to begin meeting with Dr. Firpo as provided in the final warning letter.

Since the final warning was issued, you have continued to demonstrate unprofessional behavior. Below is a summary of events in this most recent period, including both your actions and the program's response (where applicable).

D00710

Leena Varughese, MD
September 21, 2011
Page 2

I.    Duty and Professionalism Concerns during Tumor Cytogenetics Rotation

From August 1 to August 12, you were assigned to the Tumor Cytogenetics Rotation under the supervision of Dr. Vesna Najfeld. Dr. Najfeld reported that you did not satisfactorily complete the rotation, noting the following issues:

- Your scheduled clinical case conference presentation on August 9 was inadequately prepared even though you were given ample time to complete it. You responded late to Dr. Najfeld's pages and emails communicating the need for you to improve the presentation. As a result, the presentation had to be postponed until the following week. You failed to notify attendees of the cancellation, even though Dr. Najfeld asked you to do so.

- You were absent from the Cytogenetics laboratory numerous times, often without authorization or explanation. For example, on August 10, 2011, Dr. Najfeld noted that you were 90 minutes late; returned 30 minutes late from lunch; and left 60 minutes early. In addition, you did not fulfill your work responsibilities that day.

- You were unprofessional in your interactions with faculty and staff. For example, you repeatedly used your handheld device while staff members were instructing you, and you continued to use it even after you were asked not to do so. You also told a laboratory supervisor that she was "wasting your time."

The Program made its best efforts to help you succeed on this rotation while ensuring that the service continued to function properly. Dr. Najfeld repeatedly attempted to contact you on August 8, 2011, to schedule time to work with you on your presentation. After your late response, Dr. Najfeld worked with you for two hours to improve the presentation. You were allowed to postpone the presentation by one week. During your absences, your work was reassigned to others. Dr. Najfeld and others role-modeled professional behavior and provided guidance to you in this regard. Finally, Dr. Firpo provided feedback from the rotation to you on August 17.

II.   Duty Concerns Regarding Coverage

A.    Frozen Section Coverage on August 5

On August 4, Dr. Adrienne Jordan, Chief Resident, assigned you to cover the frozen section room on the afternoon of August 5 for a resident who was out sick. In making this assignment, the chief resident followed current departmental policy regarding coverage for sick calls. You refused this assignment, stating that you had an injury that prevented you from taking the assignment, even though you reported to work in the Tumor Cytogenetics laboratory on the same day (August 5). The Program was forced to deviate from its policy of arranging alternate coverage after your refusal. You were asked on multiple occasions by one of the chief residents (Dr. Jordan) to provide proof of the stated injury that prevented you from taking the

D00711

Leena Varughese, MD
September 21, 2011
Page 3

assignment, yet you failed to comply with—or even to acknowledge—this request. You then changed your rationale for refusing the assignment, stating that you thought it was unfair for the department to pull you from a Clinical Pathology rotation to cover an Anatomic Pathology service. This claim shows a continued lack of insight or an understanding of your role in the department. Your behavior in this instance can only be considered as both dishonest and insubordinate.

B. Surgical Coverage on August 12

On the morning of August 12, Dr. Jordan informed you by email that you would be assigned to cover the Surgical Pathology service that afternoon for a resident who was out sick. Dr. Jordan informed Dr. Najfeld of the need to excuse you for this coverage, but Dr. Najfeld responded that you were significantly late that day (You arrived 75 minutes late, arriving at 10:15am.) You did not respond to Dr. Jordan's email or to a page from Dr. Lento. Ultimately, Dr. Lento was able to reach you by calling Dr. Najfeld and asking her to bring you to the phone so he could speak with you. Dr. Lento confirmed your coverage assignment and instructed you to contact Dr. Jordan, which you failed to do. While you proceeded to provide the required coverage, your behavior in dealing with this incident demonstrates your unresponsiveness and failure to follow instructions.

III. Unprofessional Response to Request for Change of Elective Rotation

On August 2, you asked Dr. Firpo if you could change your elective rotation from your original choice of GI Pathology to Dermatopathology. After careful consideration by the chief residents, Dr. Lento and Dr. Firpo, the request was denied on September 7 because (1) it was not timely, as the annual schedule had been established before the beginning of the academic year; (2) your elective rotation coincided with necessary coverage of the GI Pathology service; and (3) alternate coverage could not be identified. You raised several concerns about your rotations, all of which have been addressed by Dr. Lento and Dr. Firpo, who have confirmed that your schedule meets all training requirements. You also claimed that you were being singled out in denying this request, which is not the case; the Program has denied 8 of 10 residents' requests for schedule changes since July 1.

You refused to accept that your request had been denied and on September 7, you arrived at Dr. Firpo's office and addressed him in an accusatory manner, stating that he had made a commitment to you to change the rotation, which was untrue. You claimed that another resident, Dr. Mabel Ko, had agreed to cover the GI rotation; yet Dr. Ko later informed Dr. Firpo that she had not agreed to cover the rotation. Your email to Dr. Firpo on September 7—in which you requested reconsideration to avoid, in your words, "elevating this issue to some colossal problem"—shows your unwillingness to accept or to respect the Program's decisions regarding your education. As recently as September 20, you complained to Dr. Firpo about the GI assignment even though it was made

D00712

Leena Varughese, MD
September 21, 2011
Page 4

clear that the decision was final. Your behavior related to the Program's handling of the
request has been unprofessional and unacceptable.

## IV. Poor Conference Attendance and Adherence to Departmental Policy

On August 29, Dr. Morency (Chief Resident) notified you that your attendance at
educational conferences provided by the Program for the preceding block had fallen
below the 80% threshold required by the Department. Consistent with Departmental
policy, you were required to present a lecture on September 14 on a topic of your
choice selected from material missed by your absences. You did not respond to this
email or to two follow-up emails from Dr. Jordan and Dr. Morency. You called out sick
on September 13 and 14, the day prior to and the day of your expected block presentation. As
a result, your presentation was rescheduled for September 15. On September 15, you
arrived 15 minutes late to the weekly, 8am Thursday morning conference while one of
your colleagues was giving a presentation and then left after only 15 minutes without
presenting your own talk or addressing anyone at the conference. The program
requested proof of illness for your absences on September 13 and 14, and such proof
was not provided. Your inability to acknowledge or fulfill your obligations reinforces
the Program's concerns about your professionalism.

## V. Poor Communication Regarding Leave of Absence

After the above-mentioned conference on September 15, Dr. Firpo met with you to
discuss your early departure from the conference without giving your expected
presentation. At that time, you indicated that you did not make your presentation
because you were unwell and unable to fulfill your duties, and you requested a leave of
absence due to a serious medical condition. Dr. Firpo then consulted the GME Office
and the Human Resources Department for assistance regarding the handling of a leave
of absence. On the afternoon of September 15, Dr. Firpo and Ms. Shema Patel, the
Department Administrator, met with you again to express their concern for your health
and well-being, and to inform you of the procedures for requesting a leave of absence.
Later that day, Ms. Patel provided you with materials related to the Family and Medical
Leave Act (FMLA), including written instructions and a blank certification of health
care provider form. (Ms. Patel provided you with a completed designation notice on
September 19.) Ms. Patel offered her assistance in helping you obtain the earliest
possible doctor's appointment. Dr. Firpo excused you from work until you were able to
obtain a medical assessment. However, at the end of the day on September 15, you
informed Dr. Firpo that you wanted to continue working until you could be assessed.
You informed the program that your doctor's appointment would occur the next day
(Friday, September 16).

On the morning of September 16, Dr. Firpo observed that you were not at the scheduled
core Autopsy conference and that you were not in the residents' room or at work on
your scheduled Hematopathology rotation. He sent a follow-up email to you stating that
you should not return to work until your request for leave could be resolved. The GME

D00713

Leena Varughese, MD
September 21, 2011
Page 5

Office asked Dr. Daniel Hughes of the Physician Wellness Committee to contact you to coordinate an assessment.

On September 16 and Monday, September 19, Dr. Hughes, Dr. Firpo and Ms. Patel attempted to contact you by phone and email out of concern for your well-being and to follow-up on your request for leave. You did not respond to any attempts to contact you. At the end of the day on September 19, the Program learned that you had reported to your Hematopathology rotation on September 16 and 19 despite your having been directed not to report to duty until you undergo a physician's assessment.

On the morning of Tuesday, September 20, you approached Ms. Patel at Starbucks (off-campus) to discuss your intention to defer your leave of absence and to continue working in the meantime. When you mentioned that you were on your way to the scheduled morning conference, Ms. Patel asked you not to go to Annenberg and instead to accompany her to her office so she could arrange for Ms. Caryn Tiger-Paillex, Director of Human Resources, to meet with you.

After initially refusing, you met with Ms. Tiger-Paillex and Mr. Paul Johnson, Director of Graduate Medical Education, on September 20. At this meeting, you confirmed that your doctor's appointment had been scheduled for September 16, but that the psychiatrist you saw initially referred to an internist for certification of your need for a leave of absence. Your appointment with the second physician was scheduled for the afternoon of September 20. When asked why you reported back to work for two days without following up with Dr. Firpo or Ms. Patel, you responded that you did not feel the need to respond to emails that "only stated facts," and that you would have responded if they had asked if you were working. You confirmed that Dr. Hughes contacted you, but claimed that you did not want to reply because you found the Physician Wellness Committee to be unhelpful in your previous interactions. Mr. Johnson reminded you that cooperation with the Physician Wellness Committee was mandatory, to which you responded that you might be able to respond to Dr. Hughes "at your convenience." During the meeting, Ms. Tiger-Paillex reached Dr. Hughes by phone and you were able to arrange an appointment for September 22.

You were insubordinate and unprofessional in your refusal to follow Dr. Firpo's instructions—which were given in response to your statements regarding your inability to work due to a medical condition—or to respond to the Program's and Dr. Hughes' attempts to contact you.

## VI. Incident in Ms. Patel's Office

On September 20, after Ms. Patel brought you to her office and contacted Ms. Tiger-Paillex, Ms. Patel stepped out momentarily to assist a visitor. When she returned, she observed that you were looking through the contents of one of her files on her desk (The file was labeled "Pathology"). Ms. Patel explained that her files are confidential and asked you why you opened the Pathology file. At first you provided no reason, but

Leena Varughese, MD
September 21, 2011
Page 6

you ultimately said that you saw the label and wanted to know about Pathology. Ms.
Patel continued to question you, asking how you would feel if someone went through
your workspace and looked at your files. You replied that Ms. Patel "just had it there,"
and asked Ms. Patel, "What's the big deal?" You also told Ms. Patel to "chill out."
Later, when Ms. Tiger-Paillex and Mr. Johnson asked you about looking at the file in
Ms. Patel's office, you initially said, "I don't have anything to say about that." You
then denied looking through the file, saying that your coffee was resting close to some
documents on her desk, resulting in a misperception. Ms. Tiger-Paillex informed you
that Ms. Patel's files were confidential, and you replied that Ms. Patel should not have
left someone alone in her office if there are confidential files there. You not only
exercised extremely poor judgment in accessing Ms. Patel's file but lied several times
when questioned about it. Such behavior is unacceptable and raises serious questions
about your professional character.

You are summarily suspended from the Program pending your termination. Your summary
suspension is not subject to a hearing.

You have a right to appeal your summary suspension and termination by requesting, in writing, a
hearing before the House Staff Affairs Committee of the Medical Board within ten days of
receiving this notice. Requests should be directed to Michael Harris, MD, President of the
Medical Board, in care of the Medical Staff Office at Box 1116. The summary suspension is
without pay and will take effect immediately pending termination. If you do not appeal this
disciplinary action it will become final at the end of the appeal period. For your convenience,
relevant portions of the House Staff Manual are enclosed.

Sincerely,

Carlos Cordon-Cardo, MD, PhD
Chair, Department of Pathology

Adolfo Firpo, MD
Professor and Director of Educational Activities
Department of Pathology

D00715