Ronald J. Wronko •O

**LAW OFFICES OF**
**RONALD J. WRONKO, LLC**
*134 COLUMBIA TURNPIKE*
*FLORHAM PARK, NJ 07932*
(973) 360-1001
FAX (973) 360-1881

315 Madison Avenue,
Suite 901
New York, New York
10165
(212) 886-9057
(212) 957-1912

Member of New Jersey Bar •
Member of New York Bar O

**Reply to New Jersey**

ron@ronwronkolaw.com
www.ronwronkolaw.com

November 14, 2013

**VIA ECF AND OVERNIGHT MAIL**

Hon. James C. Francis, U.S.M.J.
United States District Court
Southern District of New York
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

      Re:    Leena Varughese, M.D. v. Mount Sinai Medical Center, et al.
              Civil Action No. 12 Civ. 8812 (CM)

Dear Judge Francis:

      I represent Leena Varughese, M.D., in the above-referenced matter. Please accept this letter as plaintiff's opposition to defendants' Motion to Quash.

      As a preliminary matter, defendants took five (5) days to complete plaintiff's deposition on the grounds that the case involved extensive documentation, a long chronology, and numerous causes of action to address. Five (5) days is a very long time for one witness to be deposed, yet the Court deemed it acceptable in light of all of the circumstances at the July 2013 Conference.

      At that Conference, the Court was advised explicitly of the number of depositions that plaintiff wished to take, which exceeded 10 depositions. In response, the Court issued the July 11, 2013 Order stating that the Court would not apply a rigid limit to the number of defense depositions. In fact, the large number of defense depositions is a by-product of defendants' own bloated decision-making.

      In Answers to Interrogatories, defendants identified five (5) witnesses who placed plaintiff on Academic Advisement, and six (6) individuals who terminated plaintiff. See Ex.

Hon. James C. Francis, U.S.M.J.
November 14, 2013

A, Answers to Interrogatory Nos. 22 and 23. Adolfo Firpo, M.D., current Program Director and former Director of Educational Activities, testified that Patrick Lento, M.D. also made the decision to terminate in conjunction with others. See Ex. B, T302:22-23, Firpo Dep. Dr. Lento, who was involved with plaintiff from the beginning of the chronology, was omitted from Defendants' Answer to Interrogatory No. 23 in an apparent effort to make it appear that he had no involvement in the termination. In sum, defendants admit in blatantly inconsistent fashion that seven (7) depositions are needed to be taken *just as a preliminary matter* to hear from all of the supposed decision-makers. The end result is that this is a case where a larger than ordinary number of depositions needs to be taken, not because plaintiff is doing anything to abuse the discovery process but because defendants have strategically made it so.

Thus far, current Chair of the Department of Pathology, Carlos Cordon-Cardo and former Chair Melissa Pessin-Minsely, former Program Director Patrick Lento, Dr. Firpo, and Dr. Ira Bleiweiss have appeared for deposition. Paul Johnson of the GME Office, Scott Barnett, M.D., and Ms. Shema Patel are scheduled within the next week. Defendants have agreed to produce Human Resources Representative Caryn Tiger-Paillex and Arthur Figur, M.D. as well as Dr. Firpo for an additional two hours. These depositions are not yet scheduled. Defendants seek to stop plaintiff's discovery efforts at the preliminary stage of just hearing from their decision-makers.

Defendants initially agreed to produce Dr. McCash, who was the individual who plaintiff alleges helped to create a Hostile Work Environment and who was reported by plaintiff to her supervisors on numerous occasions for harassment and discrimination. They also initially agreed to produce former Chief Residents Adrienne Jordan and Elizabeth Morency who were both involved in advocating for and administering discipline to plaintiff. Defendants now advance a patently frivolous argument that these witnesses are "minor" or "cumulative."

The other witnesses that defendants now seek to quash are key fact witnesses. Their depositions are likely to be substantially shorter than other witnesses but that does not diminish their relevance. The Court has never concluded, as Mr. McEvoy disingenuously argues now, that the "seventeenth, eighteenth and nineteenth" depositions are irrelevant, as the relevance of any particular witness was not before the Court in July.

As is described herein, defense witnesses have repeatedly claimed lack of memory and/or knowledge in response to material areas of inquiry. In the absence of memory or knowledge by defenses witnesses produced to date, defendants cannot fairly withhold other witnesses from deposition who could fill in the blanks. Additionally, the witnesses who defendants seek to protect from deposition possess knowledge of treatment of and performance by comparators of plaintiff and/or relevant facts for causes of action/affirmative defenses that defendants have gone out of their way to avoid highlighting.

Hon. James C. Francis, U.S.M.J.
November 14, 2013

Defendants' motion to quash is devoid of any merit. Defendants' motion should be denied.

## I. **RELEVANT FACTS**

Plaintiff Dr. Leena Varughese ("Plaintiff" or "Dr. Varughese") was a Resident in the Four Year Pathology Residency Program at Mount Sinai Medical Center until her termination during her fourth year in September 2011. Dr. Varughese, who is an Indian woman, was initially harassed by a white male Chief Resident, Samuel McCash, M.D., in September 2010. Even though other Residents had patient care issues, rejected requests for coverage, and pushed work off on other residents, Dr. McCash singled Dr. Varughese out for scrutiny and unprofessional, harassing attacks. As is described herein, the Program Director, Patrick Lento, M.D., testified at deposition that Dr. McCash's improper behavior directed at Dr. Varughese in September 2010 resulted in him informally speaking to Dr. McCash, even though Dr. Lento now does not recall the substance of the conversation.

Dr. McCash continued his pattern in December 2010 by attacking Dr. Varughese when she was in the middle of rendering patient care. Dr. McCash invaded Dr. Varughese's personal space in a physically intimidating way, followed her around the lab, and used profanity with her in front of Attending Physician Shabnam Jaffer, M.D. Following the incident, Dr. Varughese became the entire focus of the sham investigation by the Program Director and Interim Director of Pathology. Rather than treat this female Indian physician and this white male physician the same way, Dr. McCash received no scrutiny in the investigation and no discipline. In contrast, it has been discovered during discovery that another Resident [**name redacted**], M.D.1, was placed on Academic Advisement for cursing out a staff member. Unlike Dr. McCash, Dr. [**name redacted**] is Asian, not Caucasian. The issue of whether a Resident receives Academic Advisement appears to be decided along lines of membership in protected classes rather than even-handed dealings with Residents.

Dr. Varughese alleges that Dr. McCash's actions followed by the response of the administration to validate his actions and to further harass and discriminate again her created an ongoing Hostile Work Environment through the date of her termination.

After Dr. Varughese was placed on Academic Advisement, she was referred to the Physician Wellness Committee, compelled to undergo a toxicology screen and psychiatric assessment, and placed under intense scrutiny, while the white male Chief Resident suffered no repercussions. Likewise, discovery has now disclosed numerous other residents who were challenged with issues of professionalism who did not receive the level of scrutiny or the

---

1 Redactions appear to preserve Confidentiality. The document submitted to Chambers is unredacted.

3

Hon. James C. Francis, U.S.M.J.
November 14, 2013

discipline administered to Dr. Varughese.

Dr. Varughese repeatedly reported that she was the victim of gender discrimination. She initially indicated that Dr. McCash was motivated by gender to Human Resources. She subsequently made a more detailed report to Human Resources and also reported discrimination to the new Chair of the Department of Pathology. In June 2010, after she had an attorney issue a letter threatening to sue the Hospital under Title VII of the Civil Rights Act, the Chairman of the Department, Carlos Cordon-Cardo, M.D., confirmed in writing that he was looking for any sham excuse to terminate her, including her non-confirmation of Resident Meeting Minutes. A long list of Residents had failed to confirm Meeting Minutes.

She was subsequently placed on Final Written Warning for supposed reasons that had occurred months earlier and prior to the issuance of her attorney's letter. She was given the Final Written Warning in a rush right before she left for a vacation. When she later, again, claimed she was being discriminated against to the new Director of Educational Affairs, Adolfo Firpo, M.D., she was then subjected to brand new requirements, by his own admissions at deposition. She was subsequently terminated for a hodgepodge of minor incidents that are brushed aside when committed by other Residents.

For instance, one of the reasons for termination was poor performance in a single two week rotation. Dr. Lento admitted that poor performance in a single rotation is not a basis for termination but a learning opportunity. Dr. Firpo agreed and testified that poor performance in a rotation is addressed through repeating the rotation.

Defendants argue that plaintiff was terminated because she cancelled a make-up presentation. It has now been disclosed that numerous other residents failed to initially give make-up presentations without being fired for it. Dr. Firpo labeled the occurrences of other residents as "minor." Unlike other residents who were given 2-3 weeks to prepare make-up conferences, plaintiff had her topic rejected and was given 2 days to give her presentation.

When favored white Chief Resident Adrienne Jordan claimed in hysterical fashion that she felt threatened by Dr. Varughese in response to the claim by Dr. Varughese that Dr. Jordan was creating a Hostile Work Environment, the decision-makers viewed her complaint seriously. In contrast, when the non-favored Indian plaintiff claimed that a white male was harassing her, her complaints were dismissed without a second thought, even though the white male physically invaded Dr. Varughese's personal space in threatening fashion.

These are non-exhaustive examples of the sham that is defendants' defense of their termination of Dr. Varughese in this case.

II. **LEGAL STANDARD**

Hon. James C. Francis, U.S.M.J.
November 14, 2013

Plaintiff does not dispute the standard on this motion. However, plaintiff objects to defendants' attempts to conveniently cherry-pick those causes of action that suit its needs and to ignore other causes of action that are at issue in this case. Defendants highlight plaintiff's discrimination and retaliation claims. The witnesses who plaintiff seeks to depose have valuable information relevant to such claims.

However, defendants noticeably distance themselves from plaintiff's Hostile Work Environment claim. The Court should note that plaintiff's Hostile Work Environment claim appears three times in Counts III, VII, and XI in her Second Amended Complaint.

A hostile work environment claim requires a showing [1] that the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and [2] that a specific basis exists for imputing the objectionable conduct to the employer. Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997). The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered. See Leibovitz v. N.Y. City Transit Auth., 252 F.3d 179, 188 (2d Cir. 2001). This test has objective and subjective elements: the misconduct shown must be "severe or pervasive enough to create an objectively hostile or abusive work environment," and the victim must also subjectively perceive that environment to be abusive. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

As is discussed below, several of the witnesses who plaintiff seeks to depose are vital to the issue of whether a Hostile Work Environment existed.

Defendants have also asserted Affirmative Defenses in their Answer based on the efficacy of their various investigations. Defendants assert their policies and procedures as Affirmative Defenses three (3) times in their Fourth, Fifth, and Sixth Affirmative Defenses. Such Affirmative Defenses put into play the doctrine set forth in Faragher v. City of Boca Raton, 524 U.S. 775 (1998) and Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998). Unless defendants' wish to waive these Affirmative Defenses, then they have absolutely no basis to oppose depositions of witnesses that go to the efficacy of their policies, procedures, and internal investigations. Almost all remaining witnesses test these Affirmative Defenses.

The witnesses who have been identified for deposition possess vital information on the issues of: (a) disparate and retaliatory treatment of plaintiff; (b) the incidents comprising the Hostile Work Environment; and (c) the efficacy of defendants' Affirmative Defense of proper investigations.

Hon. James C. Francis, U.S.M.J.
November 14, 2013

### A. Shabnam Jaffer, M.D. and Renato Valentin Possess Vital Information Relating to the Hostile Work Environment Claim and to Defendants' Claim of Thorough Investigations

There were at least three (3) investigations conducted relating to the incident between plaintiff and Chief Resident Samuel McCash. The first investigation was conducted by Interim Chairman of the Department of Pathology Pessin-Minsley and Program Director Lento. It is this investigation that resulted in plaintiff being placed on Academic Advisement, while Dr. McCash received no discipline. Plaintiff contends in this lawsuit that she is the victim of disparate treatment on account of the fact that she is an Indian woman because Dr. McCash, who is a white male, acted inappropriately, used profanity, screamed at her, physically threatened her, and should have been disciplined. At the heart of this issue is whether Drs. Pessin-Minsley and Lento conducted a sham investigation of the incident to indict Dr. Varughese while allowing Dr. McCash to escape unscathed. There were two (2) subsequent investigations conducted by Human Resources and the Graduate Medical Education Office ("GME") that also protected McCash. Plaintiff also alleges that her incidents with Dr. McCash commenced a Hostile Work Environment, which places the exact occurrences directly at issue.

Dr. Jaffer was a witness to part of the exchange between Drs. Varughese and McCash. Written notes reflect that she stated to the GME office in a later interview that Dr. McCash used profanity. See Ex. C. Dr. Lento claims to have interviewed Dr. Jaffer but has no notes from the interview and conveniently does not recall what Dr. Jaffer said about Dr. McCash's conduct. See Ex. D, T113:15-17, T113:21-23, T114:8 to T115:7, Deposition of Patrick Lento ("Lento Dep"). In light of the fact that Dr. Lento has absolutely no recollection or notes about key portions of his alleged interview with Dr. Jaffer, then a deposition of Dr. Jaffer is essential. Defendants' argument that a deposition of Dr. Jaffer would be duplicative and cumulative is baseless in light of Dr. Lento's lack of recollection.

Defendants' own motion substantiates the need for the Jaffer deposition. Defendants make the argument that the second incident on December 8, 2010, between Dr. Varughese and Dr. McCash was irrelevant. In contrast, Dr. Jaffer was viewed ***by defendants themselves*** as a key enough fact witness to be interviewed in their own internal investigations. Defendants are now "spinning" the incident to make the second confrontation between Dr. Varughese and Dr. McCash out to be completely innocuous. In fact, another resident, [**name redacted**], M.D., was placed on Academic Advisement for cursing out a member of the staff. Any time a Resident uses profanity as to another resident, it is a significant event, despite defendants' attempt to now downplay the importance of this occurrence.

Hon. James C. Francis, U.S.M.J.
November 14, 2013

       The "heated debate" is central to the issue of whether Dr. McCash should have been a subject of the internal investigation and punished had there not been disparate treatment of Dr. Varughese. It is also central to the issue of whether this "heated debate" was a severe enough incident to give rise to a Hostile Work Environment.

       Dr. Jaffer would be deposed about the incident in question and her participation in any of the subsequent investigations. Her deposition would likely last around one (1) hour. This is neither burdensome nor overly costly. Instead, defendants seek to oppose this deposition in an effort to stonewall because an outright admission by a sworn witness that Dr. McCash used profanity would be devastating to their defense.

       Pathology Assistant Renato Valentin was also present during the confrontation between plaintiff and Dr. McCash. Incredibly, Dr. Lento testified that he did not even know if Mr. Valentin was present. See Ex. D, T145:21 to T146:2, Lento Dep. Interim Chair of the Department of Pathology, Melissa Pessin-Minsley, M.D., could not recall whether Mr. Valentin was interviewed during the investigation. See Ex. E, T113:21-23, Deposition of Melissa Pessin-Minsley Dep. A deposition cannot be considered duplicative and cumulative if the decision-makers already deposed have testified that *they do not remember key facts.*

       It is important for Mr. Valentin to be deposed to know exactly what he witnessed. His presence during the incident was known to defendants, so it becomes a pivotal question as to why he may not have been interviewed in favor of witnesses whose allegiance was squarely with Dr. McCash. This, again, goes to issues of disparate treatment, Hostile Work Environment and defendants' affirmative defenses.

       Defendants argue that plaintiff should simply be satisfied with Dr. Pessin-Minsley's half-hearted recollection of her investigation and should not take depositions of those people who were there and who were subsequently interviewed. Neither Dr. Pessin-Minsley nor Dr. Lento were actually present for any of the McCash incidents. Defendants' argument is a narrow and obstructionist view of discovery designed, not to elicit the truth, but merely to substantiate defendants' defense. The Court should reject this invitation to error.

      **B.**      **Samuel McCash, M.D.**

       It is almost comical that defendants' list Dr. McCash last in their November 12, 2013 letter. Dr. McCash is specifically alleged to have created a Hostile Work Environment that defendants' perpetuated through plaintiff's termination. It is a rare case where a defendant argues against the alleged harasser being deposed. This is stonewalling at its worst.

       Plaintiff alleges that she was subjected to a Hostile Work Environment that commenced with two incidents with Dr. McCash. She also alleges that she was singled out

7

Hon. James C. Francis, U.S.M.J.
November 14, 2013

by Dr. McCash because of her protected traits. The identification of the incidents as an integral part of her Hostile Work Environment claim makes Dr. McCash a material fact witness. Moreover, Dr. McCash has material knowledge of his own involvement in the administrations' investigation into the incidents. Defendants even voluntarily agreed to schedule his deposition only to later renege when they went into stonewalling mode.

With regard to Dr. McCash's September 2010 incident with Dr. Varughese, Dr. Lento met with Dr. McCash. However, Dr. Lento could not recall what McCash said at the meeting. See Ex. D, T87:12-16; T88:4-7, Lento Dep. Despite not recalling what McCash said at the meeting to justify his actions during the first incident, Dr. Lento concludes that Dr. McCash was not wrong. See id. at T90:6-12. Plaintiff should be entitled to depose Dr. McCash, not just about the incident, but about Dr. Lento's supposed investigatory meeting with him.

Likewise, Dr. Lento claims that he spoke with Dr. McCash after the second incident but does not recall the substance of the conversation. See id. at T163:3-5, Lento Dep. Dr. Lento could not recall whether any informal discipline was administered to Dr. McCash after the second incident with Dr. Varughese. See id. at T114:25 to T115:7, Lento Dep.

In contrast, Dr. Pessin-Minsely claims that Dr. McCash was asked to reflect after the second incident. See Ex. E, T165:10-14. However, when pressed for details, Dr. Pessin-Minsely had no recollection to support the assertion that Dr. McCash had to reflect. See id. at T165:18 to T166:4. Defendants have produced no corroborative documents that any action was taken as to Dr. McCash.

Again, defendants' argument about duplication is absolutely baseless in light of such substantive gaps in recollection by the witnesses who have testified to date.

Additionally, Dr. McCash participated in both a Human Resources and GME investigation on the December 2010 incident and forwarded numerous e-mails attacking plaintiff. His involvement in the various investigations makes him a material fact witness who should be deposed as to defendants' Affirmative Defenses.

Finally, even though plaintiff's self-reflection was supposed to be confidential, Dr. McCash somehow was made aware of its contents. Dr. Lento did not know how Dr. McCash got access to it. See Ex. D, T149:4-17.

Defendants resort to counting the number of allegations in the Complaint to suggest, just based on the number of paragraphs, that Dr. McCash is irrelevant. A witness could be mentioned once in a Complaint and still be relevant. This is nothing short of an inane argument.

8

Hon. James C. Francis, U.S.M.J.
November 14, 2013

They also claim that plaintiff's Hostile Work Environment is "demonstrably false." This is not a motion for summary judgment. This is a discovery motion. If the claim were "demonstrably false," defendants should have moved to dismiss it at the outset, *which they did not*. Plaintiff's discovery efforts should not be unfairly abridged because a defendant has a jaundiced view of a claim that is pending against them. The point of pretrial discovery is for a full and fair hearing on the facts, not for a defendant to win a case by default through obstruction.

Defendants argue that Dr. McCash was not a supervisor with power to discipline plaintiff. Plaintiff is entitled to explore the issue of "cat's paw" with Dr. McCash and witnesses such as former Chief Residents Drs. Jordan and Morency.

"[U]nder the so-called 'cat's paw' theory of liability, 'the impermissible bias of a single individual can infect the entire group of collective decisionmakers,' ... at least when the decisionmakers are overly deferential to the biased individual's recommendations." Fullard v. City of N.Y., 274 F.Supp. 2d 347, 357 (S.D.N.Y. 2003); Bickerstaff v. Vassar Coll., 196 F.3d 435, 450 (2d Cir. 1999). See also Hogan v. J.P. Morgan Chase Bank, 402 Fed. Appx. 590, 593 (2d Cir. 2010).

The Chief Residents played a very active role in this case attempting to lobby for discipline of Dr. Varughese. The mere fact that they could not themselves administer discipline is irrelevant under the "cat's paw" theory adopted by this Judicial Circuit.

### C.     Adrienne Jordan, M.D.

As with Dr. McCash, defendant previously agreed to voluntarily produce Dr. Jordan and then reneged when depositions of the witnesses they have produced have not gone well for them. Dr. Jordan was good friends with Dr. McCash and ultimately became a Co-Chief Resident who actively lobbied for plaintiff to be disciplined and terminated.

Dr. Jordan was actively involved in administering discipline to plaintiff. See Ex. B, T189:24 to T190:5, T230:25 to T231:4, Firpo Dep. In fact, Dr. Jordan was apparently asked to spend a weekend just before plaintiff was terminated gathering information and/or materials to justify plaintiff's termination. See Ex. F. Dr. Jordan's repeated actions to call for plaintiff to be terminated and her participation in the termination decision makes her a key witness who should be deposed.

She also possesses key facts about discipline or the lack of discipline as to other similarly-situated residents. Dr. Lento does not recall the details of issues with Dr. **[name redacted]** allegedly failing to properly communicate with colleagues when she left early, as

9

detailed by Dr. Jordan. See Ex. G; Ex. D, T43:9-12. Dr. Pessin-Minsely testified that she did not know about the issue either since she was not in a position to know when the issues occurred. See Ex. E, T43:23-25.

Dr. Lento testified that plaintiff should depose Jordan about why Dr. [**name redacted**] was given the chance to review and revise her own written warning about insubordinate behavior. See Ex. H; Ex. D, T236:23 to T237:4, Jordan Dep. Dr. Lento also did not know why Dr. Jordan felt it significant for purposes of discipline that Dr. [**name redacted**] had left a sample sitting in the frozen room. See Ex. I; Ex. D, T278:15-18, Lento Dep.

Dr. Jordan had rejected plaintiff's topic for a morning conference. Dr. Firpo did not know whether Dr. Jordan gave problems to other residents, such as Drs. [**name redacted**] and [**name redacted**] who had to give make-up conferences as well. See Ex. B, T99:10-14, Firpo Dep. Dr. Firpo was not sure whether there were other residents who had to give make-up conferences. See Ex. B, T99:20-25, Firpo. Dep. Dr. Jordan presumably would know the answers to these questions.

### D.    Elizabeth Morency, M.D.

Dr. Morency was a co-chief resident with Dr. Jordan. Dr. Morency wrote e-mails about issues with plaintiff on two occasions. Dr. Morency wrote her first e-mail on the evening of plaintiff's second meeting for her Academic Advisement. On its face, it appears that the Program Director or Department Chair solicited the e-mail. Dr. Lento testified that he does not recall if he asked Dr. Morency to keep tabs on Dr. Varughese. See Ex. D, T225:3-13, Ex. J. When Dr. Lento was asked whether it was just coincidence that the first e-mail that Dr. Morency wrote came on the same day as the Academic Advisement, he testified that plaintiff should depose Dr. Morency and ask her. See Ex. D, T227:6-13. Defendants need to explain how a deposition of Dr. Morency is duplicative with deposition testimony like that from Dr. Lento.

Similarly, the second e-mail from Dr. Morency also appears to have been solicited from the Director of Educational Activities, Adolfo Firpo. See Ex. K. Dr. Firpo readily admits that he asked Dr. Morency to follow-up regarding plaintiff. See Ex. B T228:23 to T229:12. However, he later testified that he does not know if he solicited the second Morency e-mail. See id. at T234:24 to T235:1.

Finally, like Dr. Jordan, Dr. Morency lobbied for plaintiff's termination. See Ex. F. The question becomes whether the lobbying effort was solicited by Drs. Lento and Firpo to help justify the termination, pursuant to a Cat's Paw analysis.

Hon. James C. Francis, U.S.M.J.
November 14, 2013

### E.   Robert Guarino, M.D.

Dr. Guarino was a fellow in the residency program. Dr. Guarino cancelled a presentation and was permitted to reschedule it without any disciplinary action being taken against him. Dr. Varughese was terminated, in part, for failing to give a presentation on the first pass. Dr. Lento testified that he was unaware of Dr. Guarino's cancellation. See Ex. D, T286:20-24, Lento Dep. Plaintiff should be permitted to have a brief deposition with Dr. Guarino to explore issues relating to morning conference attendance of himself and of those similarly-situated colleagues of whom is familar.

### F.   Robert Wood Johnson Subpoena

Plaintiff has asserted a tortious interference claim on the grounds that Mount Sinai refused to release her records to enable her to take a position in the Pathology Residency program of Robert Wood Johnson Hospital after her termination. Plaintiff will be taking the depositions of two representatives of RWJ on their communications with Mount Sinai Medical Center. Records produced by Robert Wood Johnson reflect that both Drs. Lento and Firpo may have spoken with RWJ officials and stonewalled plaintiff's efforts to move on with her medical career. There has been no testimony adduced to date from any defense witness about the RWJ issue.

### Conclusion

Defendants' motion to quash is a baseless effort at stonewalling. Plaintiff is not taking an excessive number of depositions but is taking only those depositions that are absolutely necessary. Plaintiff should not be prohibited from taking the above referenced depositions or arbitrarily limited in the number of depositions she may take.

We thank the Court for its consideration of this matter.

Respectfully submitted,

Ronald J. Wronko

Encl.
cc:   Rory J. McEvoy, Esq. (via ecf)