

EDWARDS WILDMAN PALMER LLP
750 LEXINGTON AVENUE
NEW YORK, NY 10022
+1 212 308 4411 main  +1 212 308 4844 fax
edwardswildman.com

Rory J. McEvoy
Partner
+1 212 912 2787
*fax* +1 212 308 4844
rmcevoy@edwardswildman.com

November 21, 2013

**VIA ECF**

The Honorable James C. Francis
United States Magistrate Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

   Re: Varughese v. Mount Sinai Medical Center, et al.
     Docket No.: 12 Civ. 8812 (CM) (JCF)

Dear Judge Francis:

In her opposing papers, Plaintiff's efforts to depose the seven individuals who are the subject of this motion is exposed as having no legitimate basis. Plaintiff continues to offer ever shifting (but still meritless) factual and legal bases to avoid the fact that the proposed depositions are cumulative, duplicative and unduly burdensome.

As an initial matter, Plaintiff makes the nonsensical argument that the depositions of the seven key decision makers somehow needed to be taken as a "preliminary matter." (Pl. Br. p. 2). As Plaintiff and her counsel should know, the depositions of the decision makers are the key depositions, not preliminary ones. In addition, throughout her opposing papers, Plaintiff seeks to rely on Defendants' Fourth, Fifth and Sixth Affirmative Defenses to justify her efforts to depose the seven individuals about their involvement and knowledge of the investigations that were conducted on the December 8, 2010 incident between Plaintiff and Dr. McCash.[1] The most frequent issue that arises regarding the waiver of these defenses is in the context of the assertion of the attorney/client privilege. The basic principle established by the case law is that where an employer invokes the adequacy of its investigation as a defense to a claim of discrimination or harassment, it waives the privilege with respect to communications between counsel and the client regarding the investigation. *See Brownell v. Roadway Package Sys., Inc.,* 185 F.R.D. 19

---

[1] Plaintiff appears not to understand these affirmative defenses. The Sixth Affirmative Defense has nothing to do with any investigative process. This is a defense to the imposition of punitive damages under the New York City Human Rights Law after liability has been found under that statute. *See* New York City Admin. Code, §8-107(13)(d)(2). Similarly, the Fourth Affirmative Defense merely alleges that Defendants have policies that prohibit retaliation, discrimination and harassment and that there is a complaint procedure. Again, this defense has nothing to do with any investigative process. Only the Fifth Affirmative Defense talks about a procedure for investigating claims of retaliation, discrimination and harassment but, as discussed below, Defendants do not assert that the adequacy of the investigations insulates them from liability.



The Honorable James C. Francis
November 21, 2013
Page 2

(N.D.N.Y 1999); *Abdus-Sabur v. The Port Auth. Of N.Y. and N.J.,* 2001 U.S. Dist. LEXIS 14745 (S.D.N.Y. Sept. 18, 2001); *McGrath v. Nassau Cnty. Health Care Corp.*, 204 F.R.D. 240, * (E.D.N.Y. 2001). However, in *Robinson v. Time Warner*, 187 F.R.D. 144, 146-47 (S.D.N.Y. 1999), the Court found that Time Warner did not waive the attorney client privilege because, even though it described its investigation as "thorough," "Time Warner's position throughout has been that [Plaintiff] has not been the victim of any discrimination whatsoever, not that Time Warner is somehow insulated from liability due to the investigative process it initiated." Similarly, Defendants' position is not that the adequacy of the investigations insulates them from liability, but rather, that Plaintiff was not the victim of retaliation, discrimination or a hostile work environment. Accordingly, any attempt to justify the following depositions based on the adequacy of the investigations into the December 2010 incident is unavailing.

**Dr. Paul Azar**

Plaintiff has abandoned her desire to take Dr. Azar's ("Azar") deposition by not opposing Defendants' motion for a protective order regarding that deposition.

**Dr. Robert Guarino**

In her opposing papers, Plaintiff does not dispute (nor could she) that Dr. Guarino ("Guarino") is not similarly-situated to Plaintiff because he was a fellow and not a resident. Plaintiff also does not dispute that the Policy for Morning Conference Attendance (the "Policy") applies only to residents and not to fellows. Thus, whether Guarino cancelled a presentation, the circumstances surrounding the rescheduling of that presentation, and whether he was disciplined is wholly irrelevant for the simple reason that he is not similarly-situated to Plaintiff and the Policy did not apply to him.

In any event, the deposition of Guarino would be cumulative and duplicative because there is no dispute that Guarino cancelled a presentation, it was rescheduled and he was not disciplined. In her opposing papers, Plaintiff misleads the Court by relying on Dr. Lento's testimony that he was unaware of Guarino's cancellation to justify the deposition. Plaintiff ignores the testimony of Dr. Firpo that Guarino cancelled a presentation and was allowed to make it up. (Firpo Tr. 290-92) (A copy of these pages from Dr. Firpo's deposition transcript is Exhibit 1 hereto). In addition, Guarino could not possibly testify as to why he was or was not disciplined.



The Honorable James C. Francis
November 21, 2013
Page 3

**Dr. Samuel McCash**

Plaintiff's arguments in support of her need to take Dr. McCash's ("McCash") deposition are
that it is necessary to support her claim that McCash created a hostile work environment, that
McCash was interviewed as part of the investigation into the September and December 2010
incidents and that she is entitled to explore a "cat's paw" theory of liability (discussed separately
below regarding McCash, Dr. Jordan and Dr. Morency). Plaintiff has abandoned her earlier
claims that she is entitled to take McCash's deposition because he is the discriminator in a
discrimination case. (*See* Exhibit 1 to Defendants' November 12, 2013 letter to the Court).

While Plaintiff is correct that this is not a motion for summary judgment, this does not diminish
the fact that there is no basis to take McCash's deposition regarding her hostile environment
claim. Even assuming that everything Plaintiff says about McCash is true, it is insufficient, as a
matter of law, to support a hostile environment claim based on McCash's conduct.[2] (*See*
Defendants' November 12 letter, pp. 4-6). Although Plaintiff states the correct legal standard for
a hostile work environment claim, she fails to discuss its application within the context of this
case. In *Nugent v. St. Luke's/Roosevelt Hospital Center, et al.*, 2007 U.S. Dist. LEXIS 28274, at
* 7-10, 57-61, (S.D.N.Y. Apr. 18, 2007) (Francis, M.J.), *aff'd* 303 Fed. Appx. 943 (2d Cir.
2008). Plaintiff alleged that her supervisor (who unlike McCash was named as an individual
defendant) subjected her to a hostile work environment based on her gender. The supervisor
admitted to referring to a female patient as a "cunt" on one occasion and to referring to the
opinion of a female hospital administrator as "just her radical lesbian bullshit." Plaintiff testified
that her supervisor referred to female patients as "cunts" and "whore[s]" on other occasions. In
rejecting Plaintiff's gender-based hostile work environment claim, the Court said:

> Ms. Nugent contends that Mr. Heaney created a hostile work environment
> by using misogynistic language and behaving abusively toward women.
> In addition to his admitted use of misogynistic language, it is also
> undisputed that on a at least one occasion Mr. Heaney slammed his fist
> down on a chair during a meeting with several nurses, and that he was
> subsequently issued a written warning. Ms. Nugent testified that she saw
> him slam his fists on a table on another occasion when a staff member was

---

[2] Plaintiff makes the nonsensical suggestion that Defendants should have moved to dismiss if they thought that
Plaintiff's hostile work environment claim was legally insufficient. (Pl. Br. p. 9). First, and as shown in
Defendants' moving brief, the hostile work environment claims are asserted only against the Defendants and not
against McCash. (*See* Defendants' November 12, 2013 letter to the Court, p. 5). Second, while Plaintiff is correct
that the number of paragraphs in the Complaint is not dispositive of the issue of whether McCash should be deposed
regarding the hostile environment claim, the content of those paragraphs is important. As Defendants have shown,
there is nothing in the allegations regarding McCash that come close to supporting a claim for hostile environment
against him. *Id.* Third, it was necessary to take the Plaintiff's deposition in order to confirm the lack of any merit to
hostile work environment claim against McCash.



The Honorable James C. Francis
November 21, 2013
Page 4

> late to a meeting.  Ms. Nugent has also submitted affidavits from two
> nurses who testify that Mr. Heaney 'spoke loudly and in an intimidating
> manner to the nursing staff' and that his intimidating behavior included
> 'shouting, insults and slamming furniture and objects.'  One affidavit
> states that the affiant does not recall witnessing Mr. Heany raising his
> voice to male employees.  The other states that the affiant never observed
> Mr. Heaney behaving abusively toward men.  (citations omitted).

Despite all this, which far exceeds anything the Plaintiff alleges against McCash, the Court
rejected Nugent's claims that Heaney created a hostile work environment.

> Mr. Heaney's use of derogatory language to refer to patients and staff is
> plainly inappropriate.  However, as a matter of law, a supervisor's
> occasional use of sexist language does not create a hostile work
> environment.  (citations omitted).

> Even when taken together with Mr. Heaney's occasional use of sexist
> language, the remainder of Ms. Nugent's claims also fail to establish a
> hostile work environment.  'The fact that [a supervisor has] an
> authoritative management style . . . does not transform the occasional off
> color remark into harassment or strict managerial decision into
> chauvinism.' (citation omitted). * * * Finally, using a loud and
> intimidating voice and slamming furniture, without more, does not create a
> hostile work environment.  'The law does not require an employer to like
> his employees, or to conduct himself in a mature or professional manner,
> or unfortunately, even to behave reasonably and justly when he is
> peeved." (citation omitted).

Measured against this standard, there is no legitimate basis to take McCash's deposition
regarding Plaintiff's claim that he created a hostile work environment based on her gender or
national origin.

Plaintiff's additional claim that she needs to depose McCash in order to find out his role in the
investigation into the September and December 2010 incidents also is meritless.  Plaintiff claims
that the individuals she deposed have no recollection of McCash's involvement in those
investigations and that she needs to depose McCash to find this out.  This simply untrue.  First,
the notes of the interviews conducted with McCash by Paul Johnson ("Johnson"), Director of
Graduate Medical Education ("GME"), and Caryn Tiger-Paillex, Director of Human Resources
for Mount Sinai School of Medicine, have been produced in discovery.  (*See* Exhibit C to
Plaintiff's opposing papers).  In addition, Johnson testified about his interview of McCash as



The Honorable James C. Francis
November 21, 2013
Page 5

well as the reasons why McCash was not placed on Academic Advisement and Ms. Tiger-Paillex will do the same at her deposition. (Johnson Tr. pp. 108-10). (Copies of these transcript pages are Exhibit 2 hereto). Given the indisputable fact that McCash's participation in the investigations is well-known to Plaintiff combined with the fact that he cannot possibly testify as to the reasons why he was not placed on Academic Advisement, there is no legitimate reason to depose McCash regarding the investigations of Plaintiff's complaints. There is no avoiding the fact that the deposition of Dr. McCash on this issue would be cumulative and duplicative.

### Dr. Adrienne Jordan

Plaintiff offers no explanation (because there is none) for her abject failure to attempt to schedule Dr. Jordan's ("Jordan") until more than five months after it was noticed. As previously stated, this fact alone completely undermines the claim that this deposition is somehow essential.

Plaintiff also creates alleged facts out of whole cloth to justify taking Jordan's deposition. First, she simply asserts that Jordan and McCash were "good friends." (Pl. Br. p. 9). While there is no evidence to support this claim (other than Plaintiff's idle speculation), even if true, it hardly justifies compelling Jordan to sit for a deposition. Plaintiff's remaining reasons for seeking Jordan's deposition fare no better. Essentially, Plaintiff claims that Jordan's deposition is necessary because she (i) was involved in administering discipline to Plaintiff; (ii) supplied information to the Pathology Department (the "Department") leadership about Plaintiff; (iii) sought to have Plaintiff terminated from the residency program (the "Program"); and (iv) has knowledge of the treatment of other residents.

Plaintiff's intimation that Jordan played a decision-making role in Plaintiff's Final Warning and termination is not true. As Plaintiff knows, these decisions were made by the Department Chair, the Director of Education and the Program Director in consultation with the GME Office and Human Resources. To be sure, Jordan provided information regarding Plaintiff to the Department's leadership in a number of e-mails (all of which have been produced to Plaintiff). There is nothing unusual or sinister (except in Plaintiff's own mind) about a Chief Resident being asked to, or providing on her own, information about a problematic resident. There also is no dispute that, at a certain point in time, Jordan believed that Plaintiff should be terminated from the Program. E-mails from Jordan to Department leadership to this effect have been produced to Plaintiff. In sum, the deposition of Jordan would be cumulative and duplicative of discovery that Plaintiff has already obtained through the testimony of other witnesses and from the documents previously produced. It is bears mention, that Plaintiff seeks to take this, and other depositions, by claiming that witnesses already deposed have no memory of important events. This selective use of those occasions when some witnesses could not recall in detail a particular event is misleading because in almost all cases the details of that event were testified



The Honorable James C. Francis
November 21, 2013
Page 6

to by another witness or are contained in a document. *See* Plaintiff's misleading statements about whether Guarino *supra.*

Finally, Plaintiff seeks to depose Jordan about any disciplinary action taken against other residents. Again, there is no dispute about the unremarkable fact that several other residents had various problems during their residencies. These problems are set forth in a number of e-mails that were produced to Plaintiff and that were shown to various witnesses during their deposition. (*See, e.g.*, Cordon-Cardo Exhibits 4, 5, 6, 7, 8, 21 and Pessin Exhibit 1 some or all of which were shown to Cordon-Cardo, Firpo, Lento and Pessin). (Copies of these e-mails are Exhibit 3 hereto) There also is no dispute that none of these residents were placed on Academic Advisement (other than Dr. Yao) or formally disciplined (other than Azar). Thus, there is no need for Plaintiff to depose Jordan regarding other residents' problems or the disciplinary action taken against them. In addition, Jordan cannot testify about the reasons why any resident was or was not formally disciplined because she did not make that decision.

**Dr. Elizabeth Morency**

As with Jordan, Plaintiff offers no explanation for her failure to attempt to schedule Dr. Morency's deposition for more than five months. Again, this fact alone negates any claim that this deposition is important or even relevant.

The lack of any real need to depose Morency is borne out by Plaintiff's assertion that she should be permitted to take Morency's deposition regarding two e-mails – one that she sent to Dr. Cordon-Cardo ("Cardon-Cardo") on May 24, 2011, and the other that she sent to Dr. Firpo ("Firpo") and Dr. Lento ("Lento") on August 15, 2011. (*See* Exhibits J and K to Pl. Br.). Both e-mails discuss issues regarding the ongoing problems with Plaintiff. Even if they were solicited by Cordon-Cardo, Firpo or Lento, there is nothing surprising or relevant about that fact. As previously stated, one would expect the Department leadership to ask the Chief Residents to report to them about problems with Plaintiff, particularly after Plaintiff's behavior at the May 24, 2011 meeting with Cardon-Cardo. (A copy of Plaintiff's Final Warning recounting that behavior is Exhibit 4 hereto).

Finally, and as discussed below, Plaintiff's claim that she needs to depose Morency to find out whether the Department solicited Morency to ask that Plaintiff be terminated to help justify the termination pursuant to a "cat's paw" analysis demonstrates a fundamental lack of understanding of that theory of liability. Needless to say, Morency cannot possibly testify as to the reason that Firpo or Lento asked her for any information about Plaintiff; only they can answer that question. Plaintiff has the e-mails in question and they speak for themselves. There is no legitimate reason to depose Morency.



The Honorable James C. Francis
November 21, 2013
Page 7

## The Newly Hatched Cat's Paw Theory of Liability

For the first time in this year old litigation, Plaintiff asserts the so-called "cat's paw" theory of liability in a last ditch effort to justify the depositions of McCash, Jordan and Morency. To pursue liability under the "cat's paw" theory, Plaintiff must demonstrate that: (i) McCash, Jordan and Morency performed an act that was motivated by an impermissible bias; (ii) they intended that act to cause an adverse employment action; and (iii) the act was the proximate cause of the adverse employment action. *See Staub v. Proctor Hosp.*, 131 S.Ct. 1186, 1194 (2011); *Abdelhadi v. City of New York*, 2011 WL 3422832, at *4-5 (E.D.N.Y. Aug. 4, 2011). Plaintiff cannot even begin to show that this theory justifies the taking of the depositions of these individuals.

First, there is no support for the notion that McCash, Jordan and Morency had an impermissible bias against Plaintiff based on her gender and/or national origin. With respect to McCash, there is no allegation, in the amended complaints or elsewhere, that any conduct by McCash was motivated by an impermissible bias against Plaintiff. Instead, Plaintiff relies on vague allegations of preferential treatment towards male co-workers, but fails to offer a single example of conduct, comments or behavior that is specifically biased, including during the incidents in September 2010 and December 2010. McCash was critical of Plaintiff's performance, but there is nothing that Plaintiff can point to, other than her own musings, which supports the idea that he was critical of her because she is a woman of Indian descent.

Similarly, there is nothing to show that Jordan or Morency had a bias against Plaintiff based on her gender and national origin. Plaintiff attempts to argue that these witnesses sent various emails and prepared documents that demonstrate a bias. However, these documents speak for themselves and a plain reading of them fails to show even the slightest indication of gender or national origin bias. While the emails and documents are admittedly critical of Plaintiff's performance and overall lack of professionalism and at some point both Jordan and Morency believed that Plaintiff should be terminated from the Program, no inference of bias can be inferred from these purely neutral facts. *See, e.g., Bickerstaff v. Vassar College*, 196 F.3d 435, 451 (2d. Cir. 1999) (in holding that plaintiff failed to demonstrate an impermissible bias under the "cat's paw" theory, the Second Circuit noted that while plaintiff objected to the "critical tone" of a report submitted to the committee granting professorships, "Title VII does not insulate an individual from criticism that is not based on an impermissible reason"). "[A]s the Supreme Court noted, however, the information relied upon by the decision maker under the cat's paw theory must still be given with discriminatory animus. In this case, Plaintiff has provided no proof that Dunston made his statements about Taddeo in order to have her terminated based on gender. The statements Plaintiff provides to support her claims are either conclusory or unsupportive of her argument" *Taddeo v. L.M. Berry and Co.*, 2012 WL 3535873, at *5 (W.D.N.Y. Aug. 15, 2012). Here too, Plaintiff cannot point to a single statement by Jordan or



The Honorable James C. Francis
November 21, 2013
Page 8

Morency (or McCash) that raises even the inference of impermissible bias and, for this reason, Plaintiff should not be permitted to depose these individuals because the only basis for Plaintiff's claim of bias exists in her own belief, speculation and conclusory statements.

Second, there is nothing to suggest that these individuals intended to cause an adverse employment action to be taken against Plaintiff because she is a woman of Indian descent.[3]  With respect to McCash, Plaintiff attempts to argue that he "played a very active role...attempting to lobby for the discipline of [Plaintiff]." This argument again misstates the record.  McCash had no role in the decision to place Plaintiff on Final Warning in July 2011, or to terminate her in September 2011, because he had already left the program by that point.  While Jordan and Morency admittedly desired that Plaintiff be terminated from the Program, this desire arose from her demonstrated lack of professionalism and poor performance and not because of her gender and/or national origin.

Third, there is no support for the last prong of the "cat's paw" theory because McCash, Jordan and Morency cannot testify about the proximate cause of the decisions to place Plaintiff on Final Warning and to terminate her from the Program.  This is especially true of McCash, who graduated from the Program and left Mount Sinai months before Plaintiff was terminated.  Only the individuals who made those decisions can testify to what role, if any, the opinions of, and information received from, these individuals played in the decisions.  Put simply, Jordan and Morency have no ability to testify regarding whether their emails or opinions played any meaningful role in the decision making process.  Plaintiff makes much ado about the fact that the emails appear to have been solicited.  Focusing on whether or not the emails were solicited misses the point.  Plaintiff had the opportunity to ask the decision makers at Mount Sinai whether or not the emails sent by Jordan and Morency were the reason for the termination, but failed to do so.

**Renato Valentin**

Plaintiff continues to argue that she should be permitted to depose Renato Valentin ("Valentin") because he was present during the incident between Plaintiff and McCash on December 8, 2010. Plaintiff claims that "it is important for Mr. Valentin to be deposed to know exactly what he witnessed." (Pl. Br. p. 7).  In fact, it is completely unimportant.  As Defendants have shown, the details of the incident between McCash and Plaintiff on December 8, 2010 are wholly irrelevant to her retaliation, discrimination and hostile environment claims.

---

[3] *See Staub*, 131 S.Ct. at 1194 n. 3 ("Under traditional tort law, 'intent'...denote[s] that the actor desires to cause the consequences of his act, or that he believes that the consequences are substantially certain to result from it." (citations omitted).



The Honorable James C. Francis
November 21, 2013
Page 9

**Dr. Shabnam Jaffer**

Plaintiff seeks to depose Dr. Jaffer ("Jaffer") not because she witnessed the December 2010 incident (which she did not) but because she spoke to McCash and Plaintiff, at Dr. Ira Bleiweiss's request, after Plaintiff burst into his office. Plaintiff makes numerous misrepresentations regarding Defendants' position regarding this deposition. First, Plaintiff claims that Defendants view the December 2010 incident as "irrelevant" and "completely innocuous." (Pl. Br. pp. 6). In fact, while the details of what occurred are irrelevant to an adjudication of Plaintiff's claims, the incident was not viewed as innocuous at the time, as evidenced by the fact that the incident was investigated by the Department, the GME office and Human Resources. Second, Plaintiff fails to tell the Court that the notes attached to her opposing papers as Exhibit C were taken by Johnson during his January 11, 2011 interview of Jaffer. Instead, Plaintiff seeks to mislead the Court by claiming that the deposition of Jaffer is necessary because "[i]n light of the fact that Dr. Lento has absolutely no recollection or notes about key portions of his alleged interview with Dr. Jaffer, then a deposition of Dr. Jaffer is essential." (Pl. Br. p. 6).[4] This stated reason is demonstrably false because Mr. Johnson's notes provide an account of what Jaffer told Johnson and Johnson testified about his recollection of the interview with Jaffer. While Mr. Johnson's recollection of this nearly three year old event is understandably limited, he did recall what Jaffer told him about the use of foul language by Plaintiff and by McCash. (Johnson Tr. pp. 73-75). (A copy of these transcript pages is Exhibit 5 hereto).[5] As with Valentin, requiring Jaffer to be deposed would be duplicative and cumulative and is, in any event, irrelevant to Plaintiff's claims.

---

[4] The Court should not be beguiled by Plaintiff's claim that she should be permitted to take the depositions of Jaffer and Valentin because they would only last about an hour. (Pl. Br. p. 7). Plaintiff has consistently miscalculated the length of virtually every deposition taken to date. Plaintiff said that Dr. Firpo could be deposed in half a day but the deposition lasted a full day and is not finished. Plaintiff said that Mr. Johnson could be deposed in half a day but the deposition lasted a full day. Plaintiff said that Dr. Cordon-Cardo could be deposed in half a day but the deposition lasted until 3:30 p.m. Plaintiff originally said that Ms. Tiger-Paillex could be deposed in half a day but now wants her to appear for a full day.

[5] Plaintiff's subpoenas directed to Robert Wood Johnson Medical Center are not the subject of Defendants' motion.



The Honorable James C. Francis
November 21, 2013
Page 10

## CONCLUSION

For all the foregoing reasons and for the reasons set forth in their Main Brief, Defendants' motion to quash the three subpoenas pursuant FED. R. CIV. P. 45(c)(3) and for a protective order limiting the number of depositions pursuant to FED. R. CIV. P. 26(b)(2)(C) and 26(c) should be granted.

Respectfully submitted,

Rory J. McEvoy

cc:     Ronald J. Wronko, Esq. (via ECF and facsimile)
        Attorney for Plaintiff

Exhibit 1

Page 290

1  had canceled this presentation?
2      A   No.
3      Q   Were there any ramifications to an
4  attending for canceling one of these
5  presentations, these morning conferences?
6      A   No.
7      Q   Why not?
8      A   Sometimes an attending has to perform
9  an emergency intervention, or attend frozens or
10  do something else.
11     Q   I'm sorry, not an attending.
12  Wasn't it a fellow, Robert Guarino, who
13  had canceled his presentation on the 15th of
14  September 2011?
15     A   Oh, yes.
16     Q   Okay.  And did anything happen to
17  this fellow, Robert Guarino, for canceling his
18  presentation?
19     A   Fellows are not residents.
20     Q   But answer my question.
21  Was anything done to Robert Guarino for
22  canceling the presentation?
23     A   He was asked to make it up.
24     Q   Okay.  Did he give a reason why he
25  canceled?

Page 291

1      A   I don't know.
2      Q   When was he required to make it up?
3      A   As soon as it was appropriate.
4      Q   Well, when was he rescheduled?
5      A   I think the next slot became
6  available November 12th or 15th.
7      Q   So he then had two months with which
8  to make up his presentation?
9      A   The next slot became available on
10  that date, yes.
11     Q   All right.  Now, why is it that he
12  was given a full two months and Dr. Varughese
13  was given two days in order to do her
14  presentation?
15     A   That was the time the slots were
16  open.
17     Q   And there was nothing punitive about
18  that decision?
19     A   Not at all.
20     Q   Do you know of any other resident
21  under this conference attendance policy who
22  wound up having to present a presentation on
23  only two or three days' notice?
24     A   I don't remember.
25     Q   Do you know whether or not Robert

Page 292

1  Guarino attended the conference on the morning
2  of September the 15th?
3      A   I don't know.
4      Q   Would it have raised any of your
5  eyebrows if, in fact, he had attended even
6  though he had canceled his presentation for
7  that particular morning?
8      A   No, I was unaware of what the
9  schedule was.
10     Q   Did there come a point when
11  Dr. Varughese requested a leave of absence?
12     A   Yes.
13     Q   When did she initially request a
14  leave of absence?
15     A   I don't remember exactly the date.
16     Q   Did you believe that it would have
17  been justified to suspend her because she had
18  requested a leave of absence?
19     A   Of course not.
20     Q   Okay.  Do you know whether any of the
21  other people making decisions over
22  Dr. Varughese felt it would have been
23  appropriate to suspend her?
24     A   No.
25         MR. WRONKO:  Okay, let's mark this.

Page 293

1         (Exhibit 20 marked for
2  identification.)
3      Q   I'm showing you what's been marked as
4  Firpo 20.
5      A   (Reviewing document.)  Yes.
6      Q   Do you recognize this email?
7      A   Yes.
8      Q   Is it, in fact, the case that Paul
9  Johnson had considered suspension of
10  Dr. Varughese upon her request of a leave of
11  absence?
12     A   No.
13     Q   Didn't Paul Johnson say, "Shouldn't
14  we consider suspension"?
15     A   He was referring to her inability to
16  fulfill the requirements of the final notice.
17  That's totally independent of this.
18     Q   So it was independent of her request
19  for a leave of absence?
20     A   Yes.
21     Q   And what was the -- was there any
22  response to your email comments from the
23  veterans in the system?
24     A   Yes.
25     Q   What was the response?

74 (Pages 290 - 293)

Exhibit 2

111913.txt

18    Q    Okay and what is that?

19    A    That he I mean he himself

20    acknowledged that he shouldn't have raised his

21    voice and that was the that was the concern

22    that we had with him.

23    Q    Why is it that Dr. McCash was not

24    placed on academic advisement?

25    A    Because he was able to reflect on

ROUGH DRAFT-JOHNSON-11/19/13                109

1    what had happened and move on.

2    Q    When you say he was able to reflect

3    on what had happened, had he done that formally

4    informally when?

5    A    He did it informally.

6    Q    When did he do it informally?

7    A    He showed that he reflected when we

8    were interviewing him.

9    Q    How did he show that?

10    A    That he acknowledged that he

11    shouldn't have raised his voice.

12    Q    So his mere acknowledgement did you

13    accept his mere acknowledgment as indication

14    that he never do that again?

15        MR. MCEVOY:  Object to the form.

16        You can answer. it?

17    A    No.

18    Q    So isn't the point the self

19    reflection or being placed on academic

20    advisement to teach the residents so that they

21    do not have a recurrence of such behavior?

Page 95

111913.txt

22       A     Yes.

23       Q     So why is it that Dr. McCash's mere

24   acknowledgment would satisfy any concerns of

25   GME about recurrence of such behavior by

♀

ROUGH DRAFT-JOHNSON-11/19/13          110

1    Dr. max?

2        A     Because he showed insight.

3        Q     And what words did he use that showed

4    insight?

5        A     That he realized he shouldn't have

6    done that and he you know was sorry about it.

7        Q     Now with regard to Dr. Varughese,

8    when was your next -- well, strike that.

9        Dr. Varughese was referred to the

10   Physician Wellness Committee correct?

11       A     Yes.

12       Q     Would you kept apprised by Dr. Figur

13   about what was going on in the PWC as to

14   Dr. Varughese?

15       A     No.

16       Q     Did you receive any results from

17   Varughese's toxicology screening?

18       A     No.

19       Q     Were you ever made privy to the

20   results of Dr. Firsh's meeting with

21   Dr. Varughese?

22       A     No.

23       Q     Did you know that Dr. fish had met

24   with Varughese?

25       A     No.

Page 96

Exhibit 3

**DOCUMENTS MARKED CONFIDENTIAL**

**SUBMITTED TO CHAMBERS ONLY – NOT ELECTRONICALLY FILED**

Exhibit 4

 

MOUNT SINAI
SCHOOL OF
MEDICINE

Carlos Cordon-Cardo, MD, PhD
Professor and Chairman
Department of Pathology

[illegible]
[illegible]
[illegible]

Tel: [illegible]
Fax: (212) 426-5129
E-mail: carlos.cordon-cardo@mssm.edu

July 1, 2011

Dr. Leena Varughese
Department of Pathology
Mount Sinai Medical Center

Dear Leena:

I am writing as Director of the Pathology Residency Program to inform you of the Department's decision to issue this final warning to you. This decision stems from your failure to fulfill the requirements of your December 21, 2010 Academic Advisement and your behavior at the follow up meeting on May 24, 2011.

The Academic Advisement required you:

(1) to prepare a written self-reflection by January 18, 2011

(2) to meet with me periodically to assess your progress.

(3) to read Practicing excellence: A physician's manual to exceptional healthcare.

Throughout the period of Academic Advisement you showed a pattern of lack of professionalism. First, you submitted your self-reflection – a critically important aspect of the Advisement – long after it was due, and, once submitted, the essay did not meet the Advisement's requirements. When I asked you on March 22, 2011 when you would be submitting the essay, you responded that you were "really swamped" that week, did not know when you would have time to write the reflection, and asked to submit it the following week. You did not hand in the essay until March 30, 2011.

Although the Academic Advisement required a self-reflection on "how you could have approached things in a better fashion, including commentary on physician professionalism and its role in this circumstance," your essay contains nothing resembling self-reflection. Instead, it is a lengthy recitation of the events that led to the Academic Advisement and various ways in which you feel that you were wronged. Remarkably, it ends with a wish for mediation and an apology regarding these long-past events. There is no discussion of physician professionalism or its relevance to the situation. Your essay reflects a lack of insight into your own behavior, a

D00878

failure to understand the role of physician professionalism – regardless of how others behave – or the impact of your behavior on those around you. You have utterly failed this exercise.

Second, you failed to meet with me as required by the Advisement. On February 17, 2011, I emailed you that we "need" to meet on the following day and asked that you propose potential times. Your email response to me indicated you could meet at 5:30 p.m. on February 18, 2011. On the day in question, you did not show up to the meeting or contact me to let me know that you would not be coming. When I questioned this, you said that I did not confirm the time. Despite this purported "miscommunication," you made no effort to contact me – your supervisor – to clarify any misunderstanding regarding whether we were meeting.

Dr. Carlos Cordon Cardo, who was appointed Department Chair on April 1, 2011, was new to the Department and had not been involved in the earlier discussions with you. After reviewing the self-reflection you submitted and also determining that it did not meet expectations, Dr. Cordon Cardo decided to give you a second chance to fulfill the requirements of the Academic Advisement. On Tuesday, May 24, 2011, you attended a scheduled follow-up meeting regarding the Academic Advisement with me, Dr. Cordon Cardo, and Mr. Andrew Castaldi, Pathology Administrator. When the meeting was confirmed by email on May 9, 2011, you were instructed to submit a revised reflection prior to the meeting and no later than May 23, 2011. The purpose of this meeting was, in part, to give you the opportunity to meet your new Department Chair and to establish that you were able to meet the Department's professionalism expectations. Despite being given this fresh opportunity, you did not provide a revised reflection before the meeting as requested. Rather, you submitted it a day late, at the start of the meeting. When Dr. Cordon Cardo asked if you read the book assigned to you, you cavalierly tossed the book on the table at him, and continued to be flippant and disrespectful throughout this meeting.

During the Academic Advisement period and again at the follow up meeting, your behavior reflected a lack of insight and a failure to appreciate the need to function within a hierarchy. We are, therefore, compelled to issue this formal notice of disciplinary warning that any recurrence of unprofessional behavior may result in further disciplinary action, up to and including your dismissal from the Program. You are expected to act at all times in a manner appropriate to your position as a house staff officer. If you have issues of concern, you may utilize any of the many mechanisms available to house staff to bring complaints, but you must behave in a professional manner.

You will be required to meet biweekly for three months with Dr. Adolfo Firpo, Director for Educational Activities, to review your performance. The purpose of this review is to provide guidance and to assess your improvement. These meetings will include discussion of feedback received from faculty, residents, and staff.

D00879

You have a right to appeal this disciplinary action by requesting, in writing, a hearing before the House Staff Affairs Committee of the Medical Board within ten days of receiving this notice. Requests should be directed to Michael Harris, MD, President of The Mount Sinai Hospital Medical Board, in care of the Medical Staff Office at Box 1116. If you do not appeal this action, it will become final at the end of the appeal period.

Sincerely,

Carlos Cordon-Cardo, M.D. PhD
Chair, Department of Pathology

Please sign below to attest that you read and understood the above content and consequences.

Resident Signature:

D00880

Exhibit 5

111913.txt

ROUGH DRAFT-JOHNSON-11/19/13          72
1      were conducting investigation whether he was

2      present for any of the events in question?

3          A    Nobody mentioned that he was present.

4          Q    What was the scope of this

5      investigation?

6          A    Of this investigation?  It was to

7      establish the facts and to determine whether

8      you know whether patient care was compromised

9      and, you know, whether basically, you know,

10     what happened in this fight between

11     Dr. Varughese and Dr. McCash.

12         Q    Did it in any way go beyond that

13     scope?

14         A    No.

15         Q    Why was Kruti Maniar interviewed?

16         A    Because she was the other chief

17     resident in the program and we wanted to you

18     know sort of compare her perspective with that

19     of Dr. McCash.  Because he was more closely

20     involved in this incident, we thought helpful

21     as a frame of reference.

22         Q    Isn't it, in fact, the case that you

23     were investigating whether or not Dr. Varughese

24     was the subject of other complaints within the

25     department prior to the December 10 or the

♀

ROUGH DRAFT-JOHNSON-11/19/13          73
1      December 8th incident?

2          A    I mean we were focused on the

3      December eight incident you know other as

Page 63

111913.txt

4       background issues did come up in the course of

5       interviewing, but the focus was December 8.

6           Q     Why was Allene Carter interviewed?

7           A     I think there was some question if I

8       just look at her -- the notes related to her.

9       (Reviewing documents.)  We asked her about the

10      process for signing moonlighters and we for

11      some technical reasons that escape me, we

12      needed to know some more information about the

13      accessioning of the specimens.

14          Q     When Dr. Jaffer was interviewed did

15      Jaffer advise both you and Dr. Figur that both

16      Dr. Varughese and Sam McCash had used foul

17      language?

18          A     Yes.

19          Q     And what did she say to you in that

20      regard?

21          A     That was the extent of what she said

22      in that regard.

23          Q     Did you ask her any questions?

24          A     I can't -- it was, you know, nearing

25      three years ago I can't remember all of the

♀

                ROUGH DRAFT-JOHNSON-11/19/13          74
1       questions I asked her.

2           Q     Did Dr. Figur ask her any questions

3       in that regard delving deeper what exactly was

4       going on when foul language was used?

5           A     He may have but I can't recall.

6           Q     What was the foul language used as

7       reported by Dr. Jaffer?

111913.txt

8       A    I don't remember her reporting any

9    specific foul language that was used.

10      Q    Well, do you know whether or not she

11   used the phrase "foul language" with you?

12      A    Yes, she did use the phrase foul

13   language but nothing more specific than that

14   that I can recall.

15      Q    Was there any concern in this

16   investigation that the chief resident was using

17   foul language?

18      A    Can you repeat that.

19      Q    Sure.  Was there any concern on your

20   part or as expressed to you by Figur about the

21   chief resident using foul language?

22      A    Yes, there was concern.

23      Q    But you don't recall any followup

24   questions on that point?

25      A    Any followup questions about

ROUGH_DRAFT-JOHNSON-11/19/13          75

1    precisely what language was used?

2       Q    Right or extent to which foul

3    language was used or any of the circumstances

4    of that?

5       A    I mean, we did look into, you know

6    what the -- I can't recall if it was with her

7    actually, so.  I don't know about specifically

8    the conversation with Dr. Jaffer.

9       Q    Is there ever an occasion where foul

10   language is appropriate in and amongst

11   residents in their interaction?

Page 65

111913.txt

12      A    I can't -- I can't answer that.  I
13   don't know.
14      Q    You don't know whether or not foul
15   language was appropriate in the workplace?
16      A    In the hypothetical situation.
17      Q    Well let me rephrase how about foul
18   language directed from one resident to another
19   actually directed at a resident as pope as to
20   exclamation upon dropping a pen on something.
21      A    Right that's an appropriate.
22      Q    Do you know whether or from Figur
23   strike that.
24      Did you ask followup questions to any of
25   the witnesses?

♀

ROUGH DRAFT-JOHNSON-11/19/13        76
1   MR. MCEVOY:  Objection to form.
2      You can answer.
3      THE WITNESS:  Yes.
4      Q    So when Dr. Figur was asking you
5   questions and you asked followup questions, did
6   you explore with any other witnesses whether or
7   not Sam McCash had used foul language?
8      A    Yes.
9      Q    Who did you explore that with?
10      A    I believe that we explored it with
11   every witness who was present in the room.
12      Q    And did anybody else corroborate
13   Dr. Jaffer that foul language had been used by
14   the chief resident?
15      A    I think that the other witnesses

Page 66

EDWARDS WILDMAN PALMER LLP
Rory J. McEvoy
Julie L. Sauer
Attorneys for Defendants
750 Lexington Avenue
New York, New York 10022
212.308.4411
rmcevoy@edwardswildman.com
jsauer@edwardswildman.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LEENA VARUGHESE, M.D.,

               Plaintiff,

   - against -

MOUNT SINAI MEDICAL CENTER, PATRICK
LENTO, M.D., CARLOS CORDON-CARDO, M.D.,
ADOLFO FIRPO, M.D., IRA J. BLEIWEISS, M.D. and
ABC Corp. 1-10, and JOHN DOES 1-10,

               Defendants.

12 Civ. 8812 (CM) (JCF)

**AFFIDAVIT OF SERVICE**

---

STATE OF NEW YORK   )
                     )   ss.:
COUNTY OF NEW YORK )

Madeline M. Ranum, being duly sworn, deposes and says that she is over the age of eighteen; is not a party to this action; and that on the 21st day of November 2013, she caused a true and correct copy of the foregoing LETTER REPLY IN FURTHER SUPPORT OF MOTION TO QUASH AND/OR FOR A PROTECTIVE ORDER to be served upon:

Ronald J. Wronko, Esq.
Law Offices of Ronald J. Wronko, LLC
Attorneys for Plaintiff
134 Columbia Turnpike
Florham Park, New Jersey 07932
973.360.1001

by facsimile and by filing same on the United States District Court, Southern District of New York's electronic court filing system.

Sworn to before me this
21st day of November 2013

Notary Public

JEAN W. McLOUGHLIN
Notary Public, State of New York
No. 01MC6184463
Qualified in Queens County
Commission Expires April 7, 20 _16_

Madeline M. Ranum