Leena Varughese, M.D.
904 River Road
Piscataway, NJ 08854


The Honorable Colleen McMahon
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, NY 10007


October 29, 2014

Re: Varughese v. Mount Sinai Medical Center et al. (12 civ. 8812 (CM) (JCF))


Honorable McMahon:

I am the pro se plaintiff (Leena Varughese) in the above referenced lawsuit against Mount Sinai Medical Center, Carlos Cordon-Cardo, Ira Bleiweiss, Adolfo Firpo-Betancourt, and Patrick Lento, collectively known as "Defendants".

Mr. Wronko was dismissed as my attorney after his filing the motion to be dismissed, but then, he panicked, called me and emailed me non-stop for several days to demand that I simply "switch him (Mr. Wronko) out" with another attorney. I also spent thousands of dollars, countless hours, and energy educating my attorney about my situation. I did not subpoena witnesses or dispute every quashed request not because I did not want to as a Plaintiff but the fact that my attorney did not do so. The court has been hostile towards a number of my requests and then, quashed my subpoenas, on basis of the 'marginal value' to Defendants. It's also quite a difficult matter for Plaintiffs to obtain attorneys for employment discrimination cases. In addition, I was actually cursed out by one attorney after I informed him that my complaint would be filed against Mount Sinai Medical Center, Mr. Martin Silberman (I was referred to him by New York

1

City Bar Association Legal Referral Service where he specifically listed himself to receive calls about employment issues related to medical professionals) who advised me to state that I was crazy, another lawyer (also a referral from New York City Bar Association Legal Referral Service) kept quoting me higher retainer costs when I agreed to pay the initial cost for retainer that was quoted to me, and so on. These unethical and unprofessional attorneys are Caucasian males who had/have privileges at the U.S. Federal court S.D.N.Y. I am skeptical of the professionalism of any of these attorneys and that goes for Mr. McEvoy and his law firm, as well, as they all seem to act without any fear of discipline or reprimand from the court.

Dr. Jaffer's deposition was quashed by Magistrate Francis at the request of Defendants, yet they have utilized her for declarations, and not only her, they found several Indian woman, some of whom I do not even know. When I pointed out that many of Dr. Jaffer's key statements supported me to my former attorney Mr. Wronko, he said those statements were hearsay. If that was the case, why were the statements of Caucasian decision makers not considered hearsay by Mr. Wronko? Admittedly, the dispute was also not whether Dr. Jaffer was a decision maker or not. Now, the Defendants are using Dr. Jaffer for "extremely limited declaration that cannot possibly justify Dr. Jaffer to become embroiled in Dr. Varughese's lawsuit against the Defendants" but her initial reports that were supportive of me were discounted by this very Caucasian Institution and the Caucasian supervisors to justify retaliation and hostile work environment and discrimination against me, another woman physician of Indian descent. I am at a loss to understand this sort of poor logic utilized to sustain a discriminatory agenda against me, a woman of Indian descent, other than in the context of racism and sexism, there is no explanation.

To my knowledge, the only declarant who currently works for Mount Sinai Medical Center is also Dr. Jaffer, which calls into question how the defendants obtained the declaration from the remaining declarants, if not for subpoenas by Defendants or on quid pro quo terms, either of which with the exception of subpoenas granted to me to serve to respective parties by the court, are for me, as a pro se litigant, out of question. Please reconsider the issuance of subpoenas of Drs. Maniar and Jaffer or any of the other declarants or relevant parties who fear retaliation against them for assisting me or are afraid of "being embroiled" in my lawsuit, especially when the Defendants, after discovery had ended for them too, are coyly utilizing witnesses and declarants to make the false disparate impact argument in what is obviously a disparate treatment case. For that matter, the Defendants had not sought to depose any of their declarants during

normal discovery process either. I think that the court should consider a manner in which I could question Drs. Maniar and Jaffer about material issues relating to my civil lawsuit to restore my reputation and repair the damages, in some way if not through a subpoena, because I cannot compel a former colleague and a former supervisor to discuss my case or their declarations with me, since I do not have the same privileges to do so as I am not an attorney.

Magistrate Francis had also expressed disapproval of the Defendants only on the fact of disparate resources between the Defendants and myself, yet Mr. McEvoy continues to tout the false argument of burdensome expenses for the Defendants. As per Mr. McEvoy, the Institution promised over 2 million dollars to Mr. McEvoy to litigate this case against me, but they won't even pay for depositions of witnesses or even provide the voice recording of depositions or pay for the lengthy depositions of me that they demanded or provide me with these recordings. While I was employed with Mount Sinai Medical Center, the Institution didn't reimburse to me the basic Metrocard costs amounting to a total of several of hundred dollars or even cab fare costs related to work and call coverage for the Institution that amounted to about $30 at most, to what is millions of dollars they will spent to litigate a case against me, unbelievable! Dr. Patrick Lento stated that my attending one Osler Pathology review course, the only conference in 4 years that would have been paid by the Institution was my "gaming" them, while Dr. Adrienne Jordan, a Caucasian counterpart, was scheduled in advance for innumerable national conferences paid for by the Institution and with his express approval as per discovery!

Edwards Wildman and Palmer, LLC and Mount Sinai Medical Center's bigoted racist sexist retaliatory hostile agenda against me, that has been ongoing for many years, has cost me my financial stability, as a young woman it has had severe detrimental effects on my personal life, and their malevolence is demoralizing, as it would be to anyone else, especially myself, who is targeted for such rampant discrimination ruining my employability, career options, and future earnings, despite 4 years of college education, 4 years of medical school, and another 3+ years of grueling residency with satisfactory completion of all my work to my knowledge, including covering for various sick residents and staff routinely. Meanwhile, Mr. McEvoy and company have profited enormously, they have earned millions of dollars by attacking me without any basis for the termination of my employment, because as far as I know, the competent delivery of patient care on over 10,000 or more patient cases would normally be valued and rewarded, except that it so happens that I am woman of Indian descent so other terms apply at the whim of these bigots, the Defendants, but also my reports of discrimination and hostile work environment

would not have been considered unprofessional, nor should my national origin and gender and race as a woman of Indian descent deemed a 'risk to the hospital'.

In July 2013, at the first meet and confer regarding discovery, Mr. McEvoy informed Magistrate Francis that there "were no performance issues", to which Magistrate Francis asked, 'what are we doing here?'. Instead of having an impartial arbitrator on discovery issues in the court, Magistrate Francis actually went on to allow the removal of over 5000 responsive electronic documents about performance of other comparators, limited discovery on moonlighting activities and records, quashed the deposition of Dr. Jaffer and other non-hostile witnesses, allowed for performance evaluations of key comparators to not be produced despite numerous requests, attendance records of comparators have not been produced, the emails and documents surrounding the key dates have been redacted and not produced, limited my time deposing Dr. Jordan, ignored Mr. McEvoy's admission of guilt of the Defendants, allowed the Defendants' to not produce records of attendance and absences of comparators and so on, all of which are important in this case of disparate treatment. Magistrate Francis also limited my accessibility to my own employment records that would have allowed me to pursue my career in spite of this litigation during the past several years, despite numerous requests, letters, and reconsideration requests to the court, which have also included at least one meet and confer with the defense lawyers, and the earlier efforts at the court ordered mediation in April/May 2013. Magistrate Francis is selectively learned as per Mr. McEvoy's discretion, not mine, given his unjustified and unfair stance towards me during the course of this litigation.

The production of most of the documents were of minimal costs to the Defendants, except that the Defense lawyers have to comb every word and ascertain every angle to prevent my access to information that documented the discrimination against me. Documents were not produced in this litigation, most certainly, it's not because a few emails by lawyers and supervisors add up to 'industry secrets' and should lawyers keen on fabricating their own versions of events really have access to so-called 'privilege' to break the law and engage in torts against a professional. Perhaps, the fact that discrimination is in fact very lucrative for lawyers and law firms, with a protectionist approach towards bad lawyers and employers, is the real problem. I had the expectation of fair treatment, but it just so happened that the system wants to encourage and enable systemic discrimination to sustain the current effects of discriminatory actions against me, rather than enable a 'broad' discovery process as called for with my lawsuit. As of late, Mr. McEvoy, an officer of the court, has also taken to mocking me by stating that I am alleging a

4

"conspiracy", which was, in fact, a claim Mr. McEvoy had invented all by himself since February 2012. I reviewed my complaint again, and for that matter, and I would like the ever delusional Mr. McEvoy to point out the charge of conspiracy contained therein or to point out a single claim they have actually managed to refute even remotely with their motion for summary judgement. (Exhibit 1). Mr. McEvoy and the Defendants' conduct are so deeply rooted in their illegal discrimination and their entitled discriminatory anger and rage against me for engaging in legally protected activities and for my national origin, race, and gender, which are disturbing and they have also crossed over into criminal activity, as Mr. McEvoy himself has identified the "conspiracy" by the Defendants against me.


Sincerely,



Dr. Varughese

EXHIBIT 1

Ronald J. Wronko, Esq. (RW 1859)
RONALD J. WRONKO, LLC
134 Columbia Turnpike
Florham Park, New Jersey 07932
(973) 360-1001
Attorneys for Plaintiff
Leena Varughese, M.D.

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| LEENA VARUGHESE, M.D., | : | Civil Action No. 12 cv 8812 (CM/JCF) |
| Plaintiff, | : | ECF CASE |
| v. | : | CIVIL ACTION |
| MOUNT SINAI MEDICAL CENTER, PATRICK LENTO, M.D., CARLOS CORDON-CARDO, M.D., ADOLFO FIRPO, M.D., IRA J. BLEIWEISS, M.D. and ABC Corp. 1-10, and JOHN DOES 1 -10, Defendants. | : | **SECOND AMENDED COMPLAINT AND JURY DEMAND** |

Plaintiff Leena Varughese ("plaintiff"), by way of this Second Amended Complaint against the defendants Mount Sinai Medical Center, Patrick Lento, M.D., Carlos Condon-Cardo, M.D., Adolfo Firpo, M.D., and Ira J. Bleiwess, M.D., ("defendants") says:

### I. Nature of Action, Jurisdiction and Venue

1

1.      This is an action seeking legal and equitable relief for (1) a violation of Title VII of the Civil Rights Act (gender discrimination); (2) a violation of Title VII of the Civil Rights Act (race and national origin discrimination); (3) a violation of Title VII of the Civil Rights Act (hostile work environment); (4) a violation of Title VII of the Civil Rights Act (retaliation); (5) a violation of the New York State Human Rights Law (gender discrimination); (6) a violation of the New York State Human Rights Law (race and national origin discrimination); (7) a violation of the New York State Human Rights Law (hostile work environment); (8) a violation of the New York State Human Rights Law (retaliation); (9) a violation of the New York City Human Rights Act (gender discrimination); (10) a violation of the New York City Human Rights Act (race and national origin discrimination); (11) a violation of the New York City Human Rights Act (hostile work environment); (12) a violation of the New York City Human Rights Act (retaliation); (13) tortious interference with prospective economic advantage; (14) defamation and defamation per se; (15) breach of contract; (16) breach of the covenant of good faith and fair dealing; (17) violation of whistleblower law; (18) violation of Section 1981 of the Civil Rights Act; (19) violation of the Family Medical Leave Act ("FMLA"); (20) intentional infliction of emotional distress; (21) aiding and abetting liability against the individual defendants; and (22) injunctive relief.

2.      This court has jurisdiction due arising out of federal question jurisdiction 28 U.S.C. § 1331.

3.      Venue is proper pursuant to 28 U.S.C. § 1391, as the acts or omissions giving rise to the claims alleged herein occurred within this judicial district, and the defendant is subject to the personal jurisdiction in this district.

## II. Factual Allegations

### A. The Parties

4.     Plaintiff, Dr. Varughese is a thirty one (31) year old female, who resides in Union County, New Jersey.

5.     The Mount Sinai Medical Center ("defendant" or "the Hospital") is a hospital and school of medicine, with a principle place of business located at One Gustave L. Levy Place, Box 1099, New York, New York 10029-6574.   Upon information and belief, the Mount Sinai Medical Center encompasses the Mount Sinai Hospital and the Mount Sinai School of Medicine.

6.     At all times relevant to this charge of discrimination, the respondent maintained an employment relationship with 20 or more individuals and is an "employer" within the meaning of applicable Federal, New York state and New York City statutes.

7.     At all times relevant to this charge of discrimination, Dr. Varughese served in the Department of Pathology for respondent, and was an "employee" of the respondent within the meaning of federal and local statutes, and was entitled to protection under Title VII of the Civil Rights Act of 1964 and Section 1981 of the Civil Rights Act of 1991.

8.     Throughout the relevant portions of this charge of discrimination, Dr. Patrick Lento ("Dr. Lento") served as Residency Program Director, and as such, served in a supervisory and/or managerial capacity for the respondent over the complainant and had authority to undertake or recommend tangible employment decisions and/or control the terms and conditions of complainant's employment.

3

9.     Throughout the relevant portions of this charge of discrimination, Dr. Carlos Cordon-Cardo ("Dr. Cordon-Cardo") served as Chair of the Department of Pathology, and as such, served in a supervisory and/or managerial capacity for the respondent over the complainant and had authority to undertake or recommend tangible employment decisions and/or control the terms and conditions of the complainant's employment.

10.     Throughout the relevant portions of this charge of discrimination, Dr. Adolfo Firpo ("Dr. Firpo") served as Director of Educational Activities for the Department of Pathology, and as such, served in a supervisory and/or managerial capacity for the respondent over the complainant and had authority to undertake or recommend tangible employment decisions and/or control the terms and conditions of the complainant's employment.

11.     Throughout the relevant portions of this charge of discrimination, Dr. Ira J. Bleiweiss ("Dr. Bleiweiss") was the former Chairman of the Department of Pathology, and served in a supervisory and/or managerial capacity for the respondent over the complainant and had authority to undertake or recommend tangible employment decisions and/or control the terms and conditions of the complainant's employment.

**B. Background Facts and Discrimination and Harassment based upon Gender, Race, and National Origin as well as Retaliation based upon protected activity**

12.     Dr. Varughese began her employment tenure at the Hospital in or about late June of 2008, as a Medical Doctor in the Department of Pathology. Dr. Varughese was eminently qualified for her position, having esteemed academic and professional

4

qualifications.

13.    Dr. Varughese enjoyed significant achievements and overwhelmingly positive feedback from numerous supervisors regarding her professional accomplishments with renewals of her employment contract.

14.    In each of her years as an employee, Dr. Varughese and the Hospital were parties to an ACGME Resident employment contract (the "Contract") governing their relationship.  The Contract incorporated by reference the Mount Sinai Medical Center House Staff Manual, including a Section entitled, "Job Retention".

15.    Through her date of termination, Dr. Varughese did not commit any acts defined under the "Job Retention" section for her to have been suspended or terminated from her position in the pathology residency program.  Dr. Varughese's contracted employment to Mount Sinai Medical Center could be terminated only if the 'house staff' failed to abide by the By-laws, Rules and Regulations, or policies of the Hospital or of the medical staff, falsified a Hospital document, threatened the safety or welfare of a patient, employee, or other physician or for any action that may be detrimental to the Hospital operations.

16.    In or around mid-to-late 2010, Dr. Samuel McCash, who served as Chief Resident for the Department of Pathology, engaged in a series of inappropriate acts against Dr. Varughese based on Dr. Varughese's gender, and not her qualifications.  In fact, upon information and belief, Dr. McCash regularly harassed and directed hostile treatment towards not only Dr. Varughese, but other female staff, as well, while treating male staff at all times with professionalism and courtesy.

17.    On or around September 14, 2010, Dr. McCash physically and verbally

5

intimidated and humiliated Dr. Varughese for no justifiable reason, screaming and lurching at her to "shut up, shut up, shut your mouth Leena." In a most demeaning manner, Dr. McCash told Dr. Varughese that his aggressive and threatening tone was, "for her own good," and that she was, "unfit professionally," by stating that she was "not qualified" that for her position, "no one was teaching you (Dr. Varughese)", she would "never get a job", "no one will hire you (Dr. Varughese)", and that she was lucky to be 'here'.

18.     Dr. McCash's loud and threatening tone, aggressive physical gestures, and derogatory comments caused Dr. Varughese to feel physically threatened, publically humiliated, demeaned; and concerned for her professional development. Upon information and belief, Dr. McCash never treated Dr. Varughese's male colleagues in a similar manner. In fact, Dr. McCash would go out of his way to cover for male staff, often at the expense of Dr. Varughese.

19.     Dr. Varughese immediately complained to Dr. Lento and requested a transfer away from Dr. McCash as well as intervention and mediation to prevent future or further harassment. Dr. Varughese's requests were ignored. Instead, Dr. Lento began falsely accusing Dr. Varughese of having mismanaged patient care without any supporting evidence, of being deserving of being 'yelled' at, of negatively evaluating her experience during an assignment, and of having a negative perception of her work environment. In contrast to his retaliatory treatment of Dr. Varughese, Dr. Lento made excuses for Dr. McCash's behavior despite confirmation from other house staff of Dr. McCash's action towards Dr. Varughese.

20.     On or about December 8, 2010, Dr. Varughese suffered another incident at

the hands of Dr. McCash, prompted by Dr. McCash's discriminatory views of Dr. Varughese based on her gender. Dr. McCash approached Dr. Varughese in a physically intimidating and threatening manner while Dr. Varughese was performing critical patient care related work. Dr. Varughese was the sole senior resident on assignment on the surgical pathology service and was responsible for managing patient care duties, including managing the utilization and role performed by per diem ancillary staff known as moonlighters.

21.     During that second altercation initiated by Dr. McCash against Dr. Varughese, Dr. McCash's actions were so threatening to Dr. Varughese that Dr. Varughese immediately attempted to leave the lab to seek help. Meanwhile, Dr. McCash continued to follow Dr.Varughese around the lab in an aggressive manner, rushed at Dr. Varughese, pointed at Dr. Varughese, and invaded Dr. Varughese's personal space. Finally, when Dr. Varughese managed to exit the lab, she immediately informed Dr. Ira J. Bleiweiss of Dr. McCash's highly inappropriate and hostile behavior. Dr. Bleiweiss ignored Dr. Varughese's complaint.

22.     Dr. Varughese requested transfer away from Dr. McCash for the remainder of her assignment on surgical pathology because of the harassment, disruption of her work environment, and continued obstruction of her performance of her work duties by Dr. Bleiweiss. For example, Dr. Varughese was inappropriately forced to meet with the former chairman of the department, Dr. Schiller. Dr. Schiller immediately showed his intention to protect Dr. McCash at the expense of Dr. Varughese merely because she complained of discrimination.

23.     At that time, Dr. Schiller stated that there was, <u>something wrong with [Dr.</u>

7

Varughese's] DNA, and that she should seek therapy.  Dr. Schiller's remark was a direct reference to Dr. Varughese's race as an Indian and national origin from India.  Prior to the "DNA comment," Dr. Schiller remarked to Dr. Varughese during a conference presentation in random fashion and without any benefit to the presentation), "you don't know the crazy things you find in India."  At this time, Dr. Schiller defended McCash and Dr. Jordan who are Caucasian doctors.

24.     On or around December 9, 2010, Dr. Varughese filed formal complaints regarding the discrimination and harassment she was suffering at the hands of Dr. McCash and the subsequent derogatory statements and disparate treatment from Drs. Bleiweiss and Schiller to the ombudsman Dr. Barry Stimmel, and Dr. Pessin-Minsley (the interim Chair of the Pathology Department).

25.     Only about four (4) days after her official complaint of discrimination, Dr. Varughese received a hostile and threatening letter from Drs. Pessin-Minsley and Lento. Rather than properly responding to Dr. Varughese's protected complaints, the Hospital began engaging in an institutional practice of retaliation against Dr. Varughese for her complaints.  In the letter, Dr. Varughese was told by Dr. Pessin-Minsley and Dr. Lento that they were in the 'process' of investigating her complaints, but that should she confront anyone regarding her discrimination complaint, that *she* would suffer, "removal from service, possibly including termination."  Meanwhile, Dr. Varughese continued to experience increased obstruction such as missing materials necessary to perform Dr. Varughese's duties.

26.     On December 21, 2010, only *eight* (8) *days* after this threatening and retaliatory letter and *twelve* (12) *days* after Dr. Varughese's formal complaint of

8

discrimination, Dr. Varughese received a Notice of Academic Advisement from Dr. Lento. The letter, akin to a disciplinary action, was the first such letter Dr. Varughese received during her employment tenure and contained no legitimate accusations. Dr. Varughese was told that she could not contest the Academic Advisement that was clearly in retaliation and for reporting the second incident of harassment perpetuated by Dr. McCash against Dr. Varughese.

27.    Up until this point Dr. Varughese had received good reviews for her job performance and was never targeted for discipline. The concerns that Dr. Varughese reported to the respective individuals regarding the events that occurred on December 8, 2010, were not addressed. Instead, the Academic Advisement outlined how a Caucasian female, Dr. Adrienne Christine Jordan (formerly Hackman) and Caucasian male Dr. McCash were allegedly wronged.

28.    In or around late December of 2010, Dr. Pessin-Minsley, a Caucasian female, contacted the Physician Wellness Committee ("PWC") to report Dr. Varughese in order to provoke the PWC to take negative action against Dr. Varughese in retaliation for her complaints. The PWC, at that time, refused to take any action at the urging of Dr. Pessin-Minsley, as the PWC's role was not disciplinary, and the PWC had no authority to take such action.

29.    Soon thereafter, Dr. Bleiwiess' gave Dr.Varughese a negative evaluation for her performance during the surgical pathology assignment during the course of which Dr. Varughese had been harassed and assaulted by Dr. McCash. It was the only negative evaluation that she received for the period during which she was attacked by Dr. McCash. Dr. Bleiweiss also reported Dr. Varughese to the former chair, Dr. Schiller

9

even though he was no longer chairman and did not have any oversight over the department, the residency program, or Dr. Varughese. The Hospital was clearly engaging in systematic and institutional retaliation against Dr. Varughese for her protected complaints, in favor of Dr. McCash and Dr. Jordan.

30.     Following her report of harassment, Dr. Varughese continued to be subjected to a hostile work environment, including by the department's refusal to provide work materials and support required for Dr. Varughese to perform her work in pathology. Often, the slides, paperwork, and necessary follow-up studies would not be available to Dr. Varughese. Such instances during her training period were distressful to Dr. Varughese and concerned Dr. Varughese regarding her own professional development and the lack of fair and good faith treatment. Dr. Varughese reported these instances to hospital administration and appropriate individuals but no assistance was ever provided to Dr. Varughese. Dr. Varughese was repeatedly humiliated on several instances with comments made regarding her intelligence, and asked if she was "special needs" when she made the same requests that were routinely made by other residents.

31.     On February 15, 2011, only Dr. Varughese was required to leave her assigned work post despite the fact that both she and her male colleague did not have the requisite clearance known as a mask fit test. Immediately following this incident, Dr. Lento reported Dr. Varughese to the PWC to take actions against her because of her request that she be treated the same as male colleague, and not prevented from attending to duties.

32.     Dr. Varughese was treated differently by the Hospital than her similarly-situated peers and in retaliatory fashion. As per her work in the pathology department,

much of Dr. Varughese's work entailed the analysis of slides.  Dr. Varughese would often, for no reason, be delayed by the hospital in receiving slides, and additional studies necessary to perform her work.  Also, Dr. Varughese would oftentimes order special stains which were critical to her research and work.  For no justification, the Hospital would refuse to provide the necessary stains, intrinsic to making a final diagnosis in pathology.  When Dr. Varughese reported the issues and level of obstruction that she was experiencing on a daily basis to her colleagues, the colleagues denied having similar problems on similar assignments.

33.     Later, in or around the end of February, 2011, Dr. Varughese was forced to meet with the PWC, or else be subject to disciplinary action.  Such threat is highly irregular, as the PWC had no disciplinary authority and was instituted to be a resource for physicians, not to be used against physicians in such a manner, as per JCAHO now known as The Joint Commission, and New York State Medical Societies (MSSNY) and the State of New York, Office of Professional guidelines, and Hospital practice.

34.     The Hospital's actions were clearly retaliatory.  For instance, Dr. Jordan is a Caucasian female, similarly situated co-worker/resident of plaintiff.  Dr. Jordan was promoted to chief resident status, even though plaintiff had accurately reported in an act of whistleblowing that Dr. Jordan had brought alcohol to and consumed it at work.  This was not the first time that drinking had occurred at the workplace during working hours.  In the months leading up to this incident, Dr. McCash solicited by e-mail other residents to participate in "dementia" rounds, during which residents would drink hard alcohol and beer during work hours on Hospital premises.  He even admitted to taking a "break" from grossing specimens to drink alcohol.

35.     Dr. Varughese's complaint about Dr. Jordan was verified.  The bottle of Captain Morgan's Rum that Dr. Jordan brought to work and was drinking on the job was discovered. Rather than suffer any disciplinary action, Dr. Jordan was promoted to chief resident status over plaintiff and four other qualified co-workers with seniority over Dr. Jordan.

36.     Dr. Jordan was given further preferential treatment such as a being permitted to take an elective in Pennsylvania even though she had the duty of being a chief resident at the New York City based hospital.  During which time, Dr. Jordan did not carry a working pager and admitted to phone reception and email access issues.  In contrast, plaintiff did not receive comparable treatment and, instead, was the subject of repeated discipline over the course of a period of year and termination for alleged offenses that were commonplace for other coworkers including Drs. Jordan and McCash and offenses that were less significant than drinking on the job when patient care is at risk.  When plaintiff complained to Dr. Schiller regarding Dr. Jordan, he defended Dr. Jordan.  In fact, many of Dr. Varughese's reports of problems were ignored in favor of Dr. McCash's and Dr. Jordan's advancement reflecting disparate treatment against Dr. Varughese.

37.     The Hospital sought every opportunity to harass Dr. Varughese subsequent to her discrimination and whistleblowing complaints.  One of the conditions of the Academic Advisement which Dr. Varughese received in retaliation for her complaint was that Dr. Varughese had to write a 'self-reflection.'  The self reflection was to be "your account of the situation" which led to her complaint about Dr. McCash, and a description of how *she*, not the Hospital or her harasser, could have approached

things "in a better fashion".

38.     The Hospital also imposed disparate requirements upon Dr. Varughese subsequent to her discrimination complaint.  The hospital imposed upon her numerous meetings with Dr. Lento, Dr. Cordon-Cardo and department administrator Mr. Castaldi without informing Dr. Varughese of the nature or reason for the meetings.  After the hiring of Dr. Firpo as Director of Educational Activities in July 2011, Dr. Firpo "reviewed" Dr. Varughese's 'professionalism.'  The tone of many of these meetings was unprofessional and threatening to Dr. Varughese.  The attitudes and comments made to Dr. Varughese were demeaning and unprofessional, and reflected a continuation of the institutional practice of retaliation against Dr. Varughese for reporting several incidents of harassment by Dr. McCash and the inaction of her supervisor, Dr. Lento.

39.     Dr. Varughese complied with the Hospital's request that she write a 'reflection', though she was forced to write the reflection under the threat of disciplinary action and in clear retaliation for her complaints of discrimination.

40.     When Dr. Varughese submitted the reflection, it was vastly and unjustifiably criticized, even though it was a self-reflection, and in an act of further harassment on or about May, 2011, the Hospital forced her to write a second reflection, by threatening immediate termination.  This was in clear violation of Mt. Sinai's Hospital's contractual obligations and policies.

41.     At a follow-up meeting relating to the self-reflection exercise, Dr. Cordon-Condo explicitly requested that Dr. Varughese refrain from making complaints about doctors drinking on the job.

42.     For months subsequent to her complaints to human resources and the

ombudsman, Dr. Varughese received no response from the Hospital regarding her complaints of discrimination. During that time period, disciplinary action against Dr. Varughese by the Hospital continued unabated. Additional actions taken against Dr. Varughese included refusal to credit Dr. Varughese for the work she performed, and removal of and tampering with Dr. Varughese's data from the residency management software known as New Innovations.

43. In or around April, 2011, Dr. Varughese followed up her initial complaint of discrimination, in December 2010, by reiterating her complaint to the Director of Human Resources, Caryn Tiger-Paillex ("Paillex"), that she felt as if she was discriminated against based upon her gender.

44. Very soon thereafter, Ms. Tiger-Paillex followed up Dr. Varughese's protected complaint with a letter to Dr. Varughese, dated April 11, 2011. The letter, dated four months after Dr. Varughese's initial official complaint, was wholly dismissive of Dr. Varughese's claims. Very simply, the letter which took four months to produce and which was only prompted by Dr. Varughese's continued inquiry into her complaints, stated, "I was not able to confirm your version of events, or to substantiate your claims of harassment, abusive behavior or abuse of power."

45. The very same day, the PWC followed-up with Dr. Varughese by presenting completely new claims and accusations against Dr. Varughese that were never even discussed with Dr. Varughese. The hospital's actions were a continuation of retaliatory practices against Dr. Varughese.

46. Since the submission of the self-reflection, the following months included continued report to Human Resources and Graduate Medical Education by Dr.

14

Bleiweiss, even though, he was not supervising Dr. Varughese, confrontation of Dr. Varughese's superiors by Dr. Bleiweiss and requests to write negative evaluation of her performance, which effectively created an extremely hostile and disparate work environment for Dr. Varughese, especially, when compared to Dr. McCash and Dr. Jordan, who enjoyed various and numerous promotions that were overseen by Drs. Lento, Cordon-Cardo, and Firpo.

47. Recognizing that the Hospital lacked diligence in their treatment of Dr. Varughese's discrimination complaints and, more importantly that the Hospital had begun retaliating against Dr. Varughese subsequent to her engagement in protected activities, Dr. Varughese had her attorneys contact the Hospital by letter on or about June 10, 2011. In the letter, Dr. Varughese's attorneys reiterated Dr. Varughese's complaints of discrimination, highlighted the hospital's failure to act diligently subsequent to her complaints, and outlined potential retaliatory acts committed by the hospital. The letter explicitly requested that Dr. Varughese' attorneys be contacted, but the hospital never responded to the June 10, 2011 letter.

48. Approximately *only one month* after the letter from Dr. Varughese's attorneys, on July 14, 2011, Dr. Cordon-Cardo issued to Dr. Varughese a trumped up final warning. The 'final' warning letter, dated July 1, 2011, articulated no performance related issues whatsoever, and merely harped on alleged issues of professionalism, no doubt related to Dr. Varughese's unwelcome harassment and discrimination complaints. In criticism of Dr. Varughese and in 'justification' of the final warning, the letter admonished Dr. Varughese for bringing up, "the events that led to the Academic Advisement and various ways in which you [Dr. Varughese] feel that you were

15

wronged." This particular statement was a clear acknowledgement by the hospital that the Academic Advisement discipline that Dr. Varughese received in December, 2010, was clearly in retaliation for her complaints, including the June 10, 2011 letter of counsel, of discrimination. And, it clearly acknowledged that this final warning was for the same.

49.     The 'final' warning letter also criticized the 'Self-Reflection' essay that Dr. Varughese was required to submit, as per her December, 2010, Academic Advisement. Because Dr. Varughese maintained her discrimination complaints in the self-reflection, the hospital determined that the essay, "did not meet the Advisement's requirements." In clear condemnation of Dr. Varughese's complaints, the letter also criticized Dr. Varughese for her, "failure to appreciate the need to function within a hierarchy." The hospital's continued retaliation against Dr. Varughese for her complaint of discrimination was relentless. Dr. Varughese always remained professional and functioned well within the hierarchy and was not accused of being unprofessional until the report of harassment by McCash.

50.     Following the 'final warning', Dr. Varughese was tasked with meeting with Dr. Fipro, a new hire who began his work in July 2011 as Director of Educational Activities, a newly created position. During the first meeting on August 2, 2011, Dr. Varughese was told by Dr. Firpo, in the most unprofessional manner, that he has to figure out the politics of the institution before he assists Dr. Varughese. Dr. Varughese provided Dr. Firpo with the 'self-reflections' of which he claimed to not have had any prior knowledge.

51.     During the second meeting on August 17, 2011, Dr. Varughese raised

16

concerns of abusive treatment on a two week assignment with Dr. Najfeld and concerns regarding timely scheduling to assignments required for Anatomic Pathology board exam requirement. In the most unprofessional manner, Dr. Firpo offered to pay out of his own pocket for late fees rather than accommodate reasonable change in schedule.  In addition, over the course of the next month, Dr. Firpo would appear at Dr. Varughese's desk at random times and hours without any purpose. On occasions where Dr. Varughese was not present at the desk, it would lead to accusatory emails to Dr. Varughese, despite the fact that Dr. Varughese was attending to her duties which required leaving the desk for numerous reasons over the course of the work day.

52.     On September 12, 2011, Dr. Varughese met with Associate Dean for Graduate Education, Dr. Scott Barnett, to voice concerns regarding continued disparate treatment by the department leadership and malignant behavior directed at Dr. Varughese.

53.     During this period, on September 13, 2011, Dr. Firpo sent an email to Dr. Varughese stating it would be most desirable to "rewrite your reflection recasting your experiences".   The intimidation of and retaliation against Dr. Varughese was unrelenting. No such demands were made to Dr. McCash. In fact, none of the meetings that took place were professional, much less, the actions and the demands being made of Dr. Varughese for one incident described previously where Dr. Varughese was allegedly unprofessional.

54.     In or about September 14, 2011, Dr. Varughese was notified that she was scheduled as a presenter on September 15.  Dr. Varughese was scheduled to present because another doctor, who was scheduled to present for over at least one month, had

17

cancelled his presentation at the last minute. The doctor who cancelled his presentation at the last minute was not disciplined for doing so. Though Dr. Varughese was scheduled at the last minute, when Dr. Varughese acted to reschedule her presentation, the Hospital threatened serious disciplinary action and referred her to the Physician Wellness Committee.

55.    In or about September 2011, Dr. Varughese requested leave under the Family Medical Leave Act ("FMLA") to attend to Dr. Varughese's own health. She was advised that she would have to provide a doctor's certification in support of such request for leave.

56.    Before Dr. Varughese even had a chance to submit the doctor's certification and before she had been advised that her FMLA leave was approved or was commencing, defendants barred her from the workplace. To return to work, she would have to provide a doctor's note. Such request for a Fit for Duty certification was entirely premature as Dr. Varughese had not even taken FMLA leave yet. Such negative action was taken to interfere with Dr. Varughese's attempts to exercise her rights under FMLA. As a result of the immediate action taken by defendants to discourage her attempted exercise of her rights under FMLA, Dr. Varughese and her physician decided not to proceed forward on the request.

57.    On September 20, 2011, Dr. Varughese obtained the note from her treating physician permitting her to return to work as insisted on by the Hospital. In addition, Dr. Varughese provided the information to Human Resources and Graduate Medical Education as instructed to do so by the director human resources, Ms. Tiger-Paillex.

58.    Dr. Varughese attended work on September 21, 2011, and now was

18

officially cleared by her physician as explicitly requested by MSMC. However, while Dr. Varughese was at her work desk, the Hospital security was called to her desk and Dr. Varughese was accosted in front of her colleagues for several hours. Defendants illegally used Dr. Varughese's communications to exercise rights under FMLA as a negative factor justifying a summary suspension termination in violation of 29 C.F.R. § 825.220.

59.     On September 21, 2011, Dr. Firpo and Dr. Cordon-Cardo issued a letter of summary suspension termination from the Pathology Residency Program to Dr. Varughese. Though no previous restrictions were placed on Dr. Varughese's privileges and responsibilities, the letter deemed her a 'risk' to the hospital and her patients. The letter summarized numerous pretextual or fabricated reasons purporting to support the summary suspension and termination and again harped on Dr. Varughese's professionalism and failure to provide the hospital an adequate 'self-reflection.' Dr. Varughese's failure to drop her protected discrimination complaints and take blame for the incidents ultimately led to her retaliatory termination.

60.     The Hospital breached the employment Contract with Dr. Varughese by terminating her. The Hospital did not have any of the grounds under the Job Retention section of the Manual to terminate the Contract. Dr. Varughese's contract was guided by the non-profit organization concerned with overseeing the quality of residency programs known as Accreditation Council of Graduate Medical Education, ACGME. As such, Dr. Varughese is to be given notice of any and each failure in a timely manner, not in a final write-up or after termination. During the numerous meetings during which Dr. Varughese met with superiors, Dr. Varughese was not informed of the numerous

19

claims that were ultimately made against her in support of summary suspension and termination.

61.     Defendant's reasons for terminating Dr. Varughese's employment were entirely pretextual and were a continuation of retaliation that had occurred since she engaged in protected activities including report of repeat instances of harassment to her superiors, who regularly blamed Dr. Varughese or insisted that Dr. Varughese deserved to be subjected to harassment and humiliation.

62.     The discriminatory and retaliatory treatment that Dr. Varughese endured during her employment has caused great stress and anxiety for her, and has had a negative effect on her health, as well as a severe effect on her personal finances both in the present and future.  The stated reasons for Dr. Varughese's termination are a pretext for the respondent's unlawful discrimination and retaliation against Dr. Varughese.  The complainant's professional goals and growth have been implicated, and personal finances have been impacted, by respondent's unlawful conduct, which demonstrates a reckless indifference to her state and local protected rights under the New York Human Rights Act and the New York City Human Rights Act.


**C.     Post-termination acts of Retaliation and Defamation**

63.     Dr. Varughese had already satisfactorily completed 95 percent of the assignments in Anatomic Pathology with only the assignment at the Medical Examiner remaining and the Clinical Pathology assignments remained were to be completed during the final year. For that matter, the respondents have insisted that Dr. Varughese will not be assigned the requisite rotations for Clinical Pathology and follow up by Dr.

Varughese did not yield any change by respondents.

64.     When a potential employer requested that Mount Sinai Medical Center and Dr. Firpo forward the record of the years of work that Dr. Varughese had completed satisfactorily, they refused.  After the Medical Center denied verification of employment record to the requesting institution, the Mount Sinai Medical Center  created a punitive record known as a "summative evaluation" that would prevent Dr. Varughese from obtaining appropriate employment anywhere that would reference her medical career from 2008-2012.  The summative evaluation notes new issues related to Dr. Varughese that were completely contrary and never brought to Dr. Varughese's attention.  Mount Sinai Medical Center and Dr. Firpo took such action after claimant's termination in further retaliation, continued spite, and in malice against claimant and to prevent Dr. Varughese from obtaining qualified work and ruining Dr. Varughese employment prospects in pathology.   In sharp contrast, Dr. McCash and Dr. Jordan have enjoyed significant advancements in their careers with full support of the respondents.

### D.     Administrative Prerequisites

65.     At the commencement of this action, notice thereof was provided to the Attorney General of the State of New York, as provided by N.Y. Civ. Rights Laws, § 40-d.

66.     At the commencement of this action, a copy of the Complaint was served upon the New York City Commission on Human Rights and the New York City Corporation Counsel, as provided by the New York City Human Rights Law, N.Y.C. Admin. Code § 8-502(c).

67.     Plaintiff has also received a Right to Sue letter from the EEOC.  This

action has been filed prior to expiration of the ninety (90) day period for suit to be filed

## COUNT I
### (Gender Discrimination under Title VII of the Civil Rights Act of 1964)

68.     Plaintiff realleges and incorporates herein the above paragraphs.

69.     Plaintiff is in a gender protected class (female), performed her duties satisfactorily, was subject to adverse employment actions, and the adverse employment actions occurred under circumstances giving rise to an inference of unlawful discrimination.

70.     The foregoing facts and circumstances demonstrate that defendant has violated Title VII of the Civil Rights Act of 1964, by treating plaintiff in a disparate fashion and discriminating against plaintiff based upon plaintiff's gender.

71.     As a direct and proximate result of the actions of defendant, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and embarrassment.  Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life.  Moreover, plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care . Plaintiff's damages have been experienced in the past, and they will continue into the future.

72.     Furthermore, plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.

## COUNT II
### (Race/National Origin Discrimination under Title VII of the Civil Rights Act of 1964)

73. ·   Plaintiff realleges and incorporates herein the above paragraphs.

22

74.     Plaintiff is in a race/national origin protected class (Indian), performed her duties satisfactorily, was subject to adverse employment actions, and the adverse employment actions occurred under circumstances giving rise to an inference of unlawful discrimination.

75.     The foregoing facts and circumstances demonstrate that defendant has violated Title VII of the Civil Rights Act of 1964, by treating plaintiff in a disparate fashion and discriminating against plaintiff based upon plaintiff's race/national origin as Indian.

76.     As a direct and proximate result of the actions of defendant, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and embarrassment.  Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life.  Moreover, plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care Plaintiff's damages have been experienced in the past, and they will continue into the future.

77.     Furthermore, plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.

## COUNT III
### (Hostile Work Environment under Title VII of the Civil Rights Act of 1964)

78.     Plaintiff realleges and incorporates herein the above paragraphs.

79.     Plaintiff was subjected to a hostile work environment on account of her gender, race and/or national origin.  The harassing conduct to which plaintiff was subjected would not have occurred but for plaintiff's gender, race and/or national origin.

23

80.     The harassing actions and statements directed at plaintiff were severe and pervasive.

81.     The sexually harassing actions and statements directed at plaintiff altered the conditions of plaintiff's employment and created an intimidating, hostile, offensive and abusive working environment because of plaintiff's gender, race and/or national origin.

82.     A reasonable woman of plaintiff's race and national origin and a reasonable person would consider the actions and statements directed toward plaintiff to have created an intimidating, hostile, offensive and abusive working environment because of gender, race and/or national origin.

83.     As a direct and proximate result of the actions of defendant, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and embarrassment. Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life. Moreover, plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care . Plaintiff's damages have been experienced in the past, and they will continue into the future.

84.     Furthermore, plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.

## COUNT IV
## (Retaliation under Title VII of the Civil Rights Act of 1964)

85.     Plaintiff realleges and incorporates herein the above paragraphs.

86.     Plaintiff engaged in protected activity under Title VII of the Civil Rights Act of 1964, by reporting her good faith belief that she was the subject of a hostile work environment and the victim of gender discrimination.

24

87.     Plaintiff suffered adverse employment actions that materially change the terms and conditions of employment in a way that was adverse to plaintiff.

88.     The adverse employment actions were causally related to plaintiff's protected activity.

89.     The foregoing facts and circumstances demonstrate that defendant has violated Title VII of the Civil Rights Act of 1964 by retaliating against plaintiff for engaging in protected activity.

90.     As a direct and proximate result of the actions of defendant, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and embarrassment.  Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life.  Moreover, plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care . Plaintiff's damages have been experienced in the past, and they will continue into the future.

91.     Furthermore, plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.


## COUNT V
### (Gender Discrimination under the New York Human Rights Law)

92.     Plaintiff realleges and incorporates herein the above paragraphs.

93.     Plaintiff is in a gender protected class (female), performed her duties satisfactorily, was subject to adverse employment actions, and the adverse employment actions occurred under circumstances giving rise to an inference of unlawful discrimination.

25

94.     The foregoing facts and circumstances demonstrate that defendant has violated the New York Human Rights Law, by treating plaintiff in a disparate fashion and discriminating against plaintiff based upon plaintiff's gender.

95.     As a direct and proximate result of the actions of defendant, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and embarrassment.  Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life.  Moreover, plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care .  Plaintiff's damages have been experienced in the past, and they will continue into the future.

96.     Furthermore, plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.

### COUNT VI
### (Race/National Origin Discrimination under the New York Human Rights Law)

97.     Plaintiff realleges and incorporates herein the above paragraphs.

98.     Plaintiff is in a race/national origin protected class (Indian), performed her duties satisfactorily, was subject to adverse employment actions, and the adverse employment actions occurred under circumstances giving rise to an inference of unlawful discrimination.

99.     The foregoing facts and circumstances demonstrate that defendant has violated the New York Human Rights Law, by treating plaintiff in a disparate fashion and discriminating against plaintiff based upon plaintiff's race/national origin as Indian.

100.     As a direct and proximate result of the actions of defendant, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and

embarrassment. Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life. Moreover, plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care . Plaintiff's damages have been experienced in the past, and they will continue into the future.

101. Furthermore, plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.

## COUNT VII
### (Hostile Work Environment under the New York Human Rights Law)

102. Plaintiff realleges and incorporates herein the above paragraphs.

103. Plaintiff was subjected to a hostile work environment on account of her gender, race and/or national origin. The harassing conduct to which plaintiff was subjected would not have occurred but for plaintiff's gender, race and/or national origin.

104. The harassing actions and statements directed at plaintiff were severe and pervasive.

105. The sexually harassing actions and statements directed at plaintiff altered the conditions of plaintiff's employment and created an intimidating, hostile, offensive and abusive working environment because of plaintiff's gender, race and/or national origin.

106. A reasonable woman of plaintiff's race and national origin and a reasonable person would consider the actions and statements directed toward plaintiff to have created an intimidating, hostile, offensive and abusive working environment because of gender, race and/or national origin.

107. As a direct and proximate result of the actions of defendant, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and

embarrassment. Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life. Moreover, plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care . Plaintiff's damages have been experienced in the past, and they will continue into the future.

108.    Furthermore, plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.

### COUNT VIII
### (Retaliation under the New York Human Rights Law)

109.    Plaintiff realleges and incorporates herein the above paragraphs.

110.    Plaintiff engaged in protected activity under the New York Human Rights Law, by reporting her good faith belief that she was the subject of a hostile work environment and the victim of gender discrimination.

111.    Plaintiff suffered adverse employment actions that materially change the terms and conditions of employment in a way that was adverse to plaintiff.

112.    The adverse employment actions were causally related to plaintiff's protected activity.

113.    The foregoing facts and circumstances demonstrate that defendant has violated the New York Human Rights Law by retaliating against plaintiff for engaging in protected activity.

114.    As a direct and proximate result of the actions of defendant, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and embarrassment. Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life. Moreover, plaintiff has and/or

may have to incur expenses for medical, psychiatric, and/or psychological counseling care . Plaintiff's damages have been experienced in the past, and they will continue into the future.

115.   Furthermore, plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.

**COUNT IX**
**(Gender Discrimination under the New York City Human Rights Law)**

116.   Plaintiff realleges and incorporates herein the above paragraphs.

117.   Plaintiff is in a gender protected class (female), performed her duties satisfactorily, was subject to adverse employment actions, and the adverse employment actions occurred under circumstances giving rise to an inference of unlawful discrimination.

118.   The foregoing facts and circumstances demonstrate that defendant has violated the New York City Human Rights Law, N.Y. Admin. Code § 8-107, et seq., by treating plaintiff in a disparate fashion and discriminating against plaintiff based upon plaintiff's gender as a woman.

119.   As a direct and proximate result of hostile work environment created by defendant, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and embarrassment. Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life. Moreover, plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care . Plaintiff's damages have been experienced in the past, and they will continue into the future.

120.   Furthermore, plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.

**COUNT X**
**(Race/National Origin Discrimination under the New York City Human Rights Law)**

121.    Plaintiff realleges and incorporates herein the above paragraphs.

122.    Plaintiff is in a race/national origin protected class (Indian), performed her duties satisfactorily, was subject to adverse employment actions, and the adverse employment actions occurred under circumstances giving rise to an inference of unlawful discrimination.

123.    The foregoing facts and circumstances demonstrate that defendant has violated the New York City Human Rights Law, N.Y. Admin. Code § 8-107, et seq., by treating plaintiff in a disparate fashion and discriminating against plaintiff based upon plaintiff's race/national origin as a person of Indian race and of national origin of India.

124.    As a direct and proximate result of hostile work environment created by defendant, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and embarrassment. Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life. Moreover, plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care . Plaintiff's damages have been experienced in the past, and they will continue into the future.

125.    Furthermore, plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.

**COUNT XI**
**(Hostile Work Environment under the New York City Human Rights Law)**

30

126.    Plaintiff realleges and incorporates herein the above paragraphs.

127.    The foregoing facts and circumstances demonstrate that defendant subjected plaintiff to a workplace where unwanted gender-based and/or race-based and/or national origin-based offensive conduct existed in violation of New York City Human Rights Law, N.Y. Admin. Code § 8-107, et seq.

128.    As a direct and proximate result of hostile work environment created by defendant, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and embarrassment. Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life. Moreover, plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care . Plaintiff's damages have been experienced in the past, and they will continue into the future.

129.    Furthermore, plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.

## COUNT XII
### (Retaliation under the New York City Human Rights Law)

130.    Plaintiff realleges and incorporates herein the above paragraphs.

131.    Plaintiff engaged in protected activity under the New York City Human Rights Law, N.Y. Admin. Code § 8-107, et seq., by reporting her good faith belief that she was the subject of a hostile work environment and the victim of gender discrimination.

132.    Plaintiff suffered adverse employment actions that materially change the terms and conditions of employment in a way that was adverse to plaintiff.

31

133.    The adverse employment actions were causally related to plaintiff's protected activity.

134.    The foregoing facts and circumstances demonstrate that defendant has violated the New York City Human Rights Law, N.Y. Admin. Code § 8-107, et seq., by retaliating against plaintiff for engaging in protected activity.

135.    As a direct and proximate result of the retaliation engaged in by defendant, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and embarrassment.  Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life.  Moreover, plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care .  Plaintiff's damages have been experienced in the past, and they will continue into the future.

136.    Furthermore, plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.

## COUNT XIII
### (Interference with Business Relations)

137.    Plaintiff realleges and incorporates herein the paragraphs set forth in this Complaint.

138.    The actions of Defendant give rise to a violation of interference with business relations.

139.    As a direct and proximate result of the actions of Defendants, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment, emotional distress injuries, the physical manifestation of emotional distress injuries, and/or

32

physical injury.  Furthermore, Plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiff's life.  Moreover, Plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care .  Plaintiff's damages have been experienced in the past, and they will continue into the future.

140.    Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting Plaintiff's claims and protecting Plaintiff's rights.

## COUNT XIV
### (Defamation and Defamation Per Se)

141.    Plaintiff realleges and incorporates herein the paragraphs set forth in this Complaint.

142.    Defendant has made false and defamatory statements about plaintiff of a nature that would negatively impact plaintiff's reputation in her chosen profession.

143.    In particular, Defendants Mt. Sinai and Adolfo Firpo, M.D., prepared a Verification and Summative Evaluation of Graduate Medical Education/Training as of March 8, 2012 ("Summative Evaluation").  The Summative Evaluation marked plaintiff as being "unsatisfactory" in three (3) categories:  (a) patient care; (b) professionalism; and (c) interpersonal and communication skills.  Dr. Firpo stated that plaintiff did not demonstrate sufficient competence to enter practice without direct supervision.  The Summative Evaluation is false in part or in whole.

144.    Defendant made and published the false statements with malice and/or with reckless disregard for the falsity of the statements made.

145.    Plaintiff has been damaged as a result of the defamatory statement(s) made by defendant.  Moreover, as defendant's false and defamatory statements have been made

33

for purposes of harming plaintiff's reputation in her chosen profession, defendant's defamatory statements amount to defamation per se for which no damages need be shown.

## COUNT XV
### (Breach of Contract)

146. Plaintiff realleges and incorporates herein the paragraphs set forth in this Complaint.

147. The Hospital breached the Contract between the parties.

148. Plaintiff has been damaged as a result of the Hospital's breach of contract. Plaintiff's damages include compensatory damages and foreseeable consequential damages.

## COUNT XVI
### (Breach of Covenant of Good Faith and Fair Dealing)

149. Plaintiff realleges and incorporates herein the paragraphs set forth in this Complaint.

150. There is a covenant of good faith and fair dealing in each contract in the State of New York.

151. The Hospital breached the covenant of good faith and fair dealing in the parties' Contract.

152. Plaintiff has been damaged as a result of the breach of the covenant of good faith and fair dealing. Plaintiff's damages include compensatory damages and foreseeable consequential damages.

## COUNT XVII
### (Whistleblower Law)

153. Plaintiff realleges and incorporates herein the paragraphs set forth in this Complaint.

154.   Plaintiff disclosed to her superiors that the Chief Resident was drinking alcohol on the job.

155.   Plaintiff disclosed such violation of law and/or public policy in good faith, and such complaint was substantiated.

156.   The actions of the Chief Resident created a substantial and specific danger to public health.

157.   Plaintiff was the subject of retaliation because of her disclosure of this issue.

158.   Plaintiff has been damaged as a result of the retaliation and is subject to recovery under McKinney's Labor Law § 740(4).

## COUNT XVIII
### (42 USC § 1981)

159.   Plaintiff realleges and incorporates herein the paragraphs set forth in this Complaint.

160.   Plaintiff is a member of a racial minority (Indian) and a gender minority (female).

161.   Defendant has demonstrated an intent to discriminate on the basis of race and gender.

162.   Defendant terminated plaintiff in discriminatory fashion.

163.   As a direct and proximate result of the actions of Defendants, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment, emotional distress injuries, the physical manifestation of emotional distress injuries, and/or physical injury.  Furthermore, Plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiff's life.  Moreover, Plaintiff has and/or

may have to incur expenses for medical, psychiatric, and/or psychological counseling care . Plaintiff's damages have been experienced in the past, and they will continue into the future.

164.     Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting Plaintiff's claims and protecting Plaintiff's rights.

## COUNT XIX
## (Family Medical Leave Act "FMLA")

165.     Plaintiff realleges and incorporates herein the paragraphs set forth in this Complaint.

166.     Plaintiff attempted to exercise rights under the Family Medical Leave Act.

167.     Defendants interfered with plaintiff's attempts to exercise rights.

168.     Defendants took plaintiff's attempts to exercise rights under FMLA into account in taking an adverse employment action against plaintiff.

169.     Plaintiff has suffered damages, including lost wages, front pay, and attorneys fees and costs, as a result of interference and retaliation arising out of her attempts to exercise rights under the FMLA.

## COUNT XX
## (Intentional Infliction of Emotional Distress)

170.     Plaintiff realleges and incorporates herein the paragraphs set forth in this Complaint.

171.     Defendant has engaged in extreme and outrageous conduct with the intent to cause or disregard of a substantial probability of causing severe emotional distress to plaintiff.

172.     Defendant's conduct caused plaintiff's harm in the form of severe emotional distress.

## COUNT XXI
### (Individual Liability)

173.     Plaintiff realleges and incorporates herein the paragraphs set forth in this Complaint.

174.     The foregoing facts and circumstances demonstrate that defendants Cordon-Cardo, Firpo, and Lento have violated the above-referenced federal, state, and local discrimination and whistleblower statutes by aiding and abetting or otherwise assisting the commission of or attempting to commit acts of disparate treatment, discrimination, and retaliation against plaintiff based upon the above-referenced protected traits and activity.

175.     As a direct and proximate result of the actions of these individual defendants, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and embarrassment.  Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life.  Moreover, plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care .  Plaintiff's damages have been experienced in the past, and they will continue into the future.

176.     Furthermore, plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.

WHEREFORE, as to each and every count, plaintiff demands judgment on each and all of these counts against the defendants jointly and severally, as follows:

A.     Compensatory and/or consequential damages in excess of $1,000,000.00;.

B.     Damages for lost wages and benefits, back pay and front pay;

C.      Damages for humiliation, mental and emotional distress;

D.      Statutory damages, if applicable;

E.      Punitive damages and or liquidated damages where permitted by law;

F.      Attorneys' fees and costs of suit;

G.      Lawful interest – including pre-judgment interest on lost wages;

H.      Lawful interest – including pre-judgment interest on any wages not paid in a

timely manner;

I.      Injunctive Relief, including but not limited to, an Order for the following:

1.      Restraining defendants from any further dissemination of the

Summative Evaluation and/or Compelling defendants to retract the

Summative Evaluation and/or to issue a new Summative Evaluation that will

permit plaintiff to proceed with acceptance, enrollment, and/or transfer into a

different Residency program and to take the American Board of Pathology

examination;

2.      Requiring defendants to take all appropriate steps to fully certify

plaintiff's three (3) completed years of residency and signing off on her

taking the American Board of Pathology examination.

J.      Such other, further and different relief as the Court deems fitting, just and

proper.

Plaintiff hereby reserves the right to amend this Complaint to supplement or modify

the factual obligations and claims contained herein, based upon information received from

the defendant, witnesses, experts, and others in the course of discovery in this matter.

38

## DEMAND FOR TRIAL BY JURY

Plaintiff respectfully demands a trial by jury on all issues in the within action so triable.

## DESIGNATION OF TRIAL COUNSEL

RONALD J. WRONKO is hereby designated as trial counsel on behalf of plaintiff.

RONALD J. WRONKO, LLC
Attorney for plaintiff

By _____
Ronald J. Wronko

Dated: November 5, 2013

39

## CERTIFICATION

The undersigned hereby certifies that to the best of his knowledge he knows of no other actions or arbitration hearings pending in connection with the within action now being filed with the Court.

Dated:   November 5, 2013

_____

Ronald J. Wronko, Esq. (RW 1859)

Ronald J. Wronko, LLC
134 Columbia Turnpike
Florham Park, NJ 07932
(973) 360-1001
(973) 360-1881 (facsimile)
ron@ronwronkolaw.com