## <u>Response to the Defendants' Rule 56.1 Statement</u>

1.   Additional material facts

1.1.   I, Leena Varughese M.D., the Plaintiff, herein referred to as "I" or "Varughese" was employed by Mount Sinai Medical Center, referred to herein as "Institution" located in New York City, NY from June 23, 2008 onwards with yearly employment offer letters from the Board of Trustees and employment contracts, including the final contract on March 16, 2010 for employment in the fourth and final year of the 4 year Anatomic and Clinical Pathology (AP & CP) medical residency. (Ex. 1, 2, 3, 4, Varughese tr. 424-432).

1.2.   The Institution supplied an employee manual specifically designed to address the Residents and Fellows at the Institution, which was known as the House Staff Manual. (Ex. 2, 5).

1.3.   I, Varughese was eminently qualified for my employment, having esteemed academic and professional qualifications, and a diverse positive consensus on my employment performance on professionalism, patient care skills, and interpersonal skills and communication. (Varughese Tr. 889-898, 911-919, 928-991, 1032-1040, Ex. 5, 7, 8, 9)[1].

1.4.   Immediately after the termination of my employment, I began a new search for employment to complete the final year of my Anatomic and Clinical Pathology residency, with several interviews, discussions with residency programs, fellowships programs, most of whom expressed an interest in interviewing me or hiring me, of which Robert Wood Johnson Hospital in New Jersey was the best option for myself. On January 31, 2012, at the job interview, an employment offer was made to me by the residency program but Mount Sinai Medical Center and Defendants did not comply with requests for verification of my employment records and thus, Defendants engaged in tortious activity with prospective business relations. (Fyfe Tr.

---

[1] References to "Varughese Tr.", "Fyfe Tr.", "Cadoff Tr", "Lento Tr.", "Pessin Tr.", "Bleiweiss Tr.", "Barnett Tr.", "Figur Tr.", "Cordon-Cardo Tr.", "Firpo-Betancourt Tr.", "McCash Tr.", "Jordan Tr.", "Morency Tr.", "Johnson Tr.", "Patel Tr.", "Tiger-Paillex" are to deposition transcripts of Drs. Leena Varughese, Billie Fyfe, Evan Cadoff, Patrick Lento, Melissa Pessin, Ira Bleiweiss, Scott Barnett, Arthur Figur, Carlos Cordon-Cardo, Adolfo Firpo-Betancourt, Samuel McCash, Adrienne Jordan, Elizabeth Morency, Mr. Paul Johnson, Ms. Shema Patel, Ms. Caryn Tiger-Paillex respectively, which are labeled as such for the Plaintiffs' Response to "Defendants' Rule 56.1 Statement".

5-55, Cadoff Tr. 6-34, Varughese Tr. 992-1031, Johnson Tr. 230-232, 228-229, 235-236, 252-253, Ex. 10-18).

1.5.    The Defendants engaged in further retaliatory conduct, defamation and defamation per se with creation of "summative evaluation" as the reference of my employment and the Defendants have also engaged in tortious interferences with all employment opportunities, obstruction with licensing, and Board Certification in Pathology. (Varughese Tr. 991-1031, 1041-1065, Ex. 19-23).

2.   Dispute with and Additional material facts

2.1.    In July 2010, Program Director (PD), defined role as per ACGME[2] was given to Dr. Patrick Lento by the Institution until the termination of his employment. Lento describe his responsibilities as "[s]chedules, organization of educational conferences, oversight of evaluation process". (Lento Tr. 13-15, Ex. 24).

2.2.    Lento did not recall seeing anti-harassment policy of the Defendant Institution. (Lento Tr. 22-25).

2.3.    ACGME explicitly provided a standardized employment terms to be met by Pathology residencies for meeting accreditation standards as a satisfactory residency program training future pathologists of United States to provide quality medical care to patients. The ACGME and the American Board of Pathology[3] provide standards to be met by Anatomic and Clinical Pathology residencies but I was not even assigned to the basic Clinical Pathology components for the Board Certification for Clinical Pathology by the time of my employment termination indicating premeditated bad faith and breach of contract. (Ex. 25, 26, Varughese Tr. 451-453).

2.4.    Mount Sinai Medical Center's Department of Pathology was the subject of ACGME review and site visit in February 2011 after a direct complaint by a resident physician in the Anatomic and Clinical Pathology residency program who completed the residency program in 2011, as per Dr. Harpaz who was able to obtain the specific

---

[2] Accreditation Council of Graduate Medical Education abbreviated to ACGME.  The ACGME defined roles in residency were: Program Director abbreviated to PD, Program Coordinator abbreviated to PC,  Designated Institutional Official abbreviated to DIO.

[3] American Board of Pathology provides the Board Certification in Anatomic and Clinical Pathology, the information relating to the requirements are found on their website at www.abp.org

identification of the individual in June to July 2011. Following the site visit by ACGME, from which I was excluded intentionally as per Maniar, the resident survey for 2010-2011 period remained was abysmal, ACGME submitted extensive citations that threatened the accreditation of the residency with ACGME, and hence, the continued funding from Medicare funds. (Ex. 27, 28).

2.5.   The Department of Pathology had a "crazy DOH inspection" of the laboratory by New York State Department of Health. (Ex. 153, 154).

2.6.   Scott Barnett, M.D. is the Designated Institutional Official (DIO), an ACGME designated role and he is responsible for handling resident concerns and complaints regarding any number of workplace issues including discrimination, hostile work environment, harassment, and retaliation, as well as complaints about access to material, adequate staffing, and other work environment issues, to ensure accreditation of a residency training program for the Defendant Institution to remain in good standing for funding by Medicare and for physician. Barnett failed miserably at his job as the DIO. (Varughese Tr. 777-781, 876-877, Barnett Tr. 7-12, 117-118, Ex. 28).

2.7.   Paul Johnson is an administrative secretary who work for and assists Barnett with his duties and Johnson's title changed to "Director of GME" without any change in essential job responsibilities. Johnson, an English major, a "communist" and a "poet", who is not in any way qualified to oversee physician matters on any level, including with taking part in composing disciplinary warnings and advisements. (Varughese Tr. 258-259, Johnson Tr. 15-25, 168, Barnett Tr. 107-108).

2.8.   Barnett claimed that "professionalism" is subjective to his own opinion and perception, with an ever disparate standard that is applied in a disparate manner, the Defendants subjected me to disparate treatment, and created a hostile work place where I felt segregated, threatened, and left me without access to resources, due process, arbitrary standards, capricious actions, that were in violation of my civil rights and my employment contract. (Varughese Tr. 700-781, 876-877, Barnett Tr. 138-142, Lento Tr. 27, Morency Tr. 137, 149-154, Bleiweiss Tr. 54, 56, 51-52).

3.   Dispute with and additional material facts

3.1.   Dr. Alan Schiller, referred herein as "Schiller" claimed to be the "[y]our Chairman" of the Department of Pathology on December 9, 2010, and Schiller continued his employment well past the termination of my employment on September 21, 2011. (Bleiweiss Tr. 69-70, Ex. 29, 30, Declaration # 11, 13, 15-19).

3.2.   Dr. Melissa Pessin-Minsely, referred to herein as "Pessin" assumed the responsibility of Acting Chair  or Interim-Chair of the Department of Pathology in or about late 2010. (Pessin Tr. 16-22).

3.3.   Pessin committed criminal perjury during her deposition to appear less racist and sexist when she invented a "white male" comparator, a neuropathology resident, whose employment she terminated sometime in 2010 with Lento. (Pessin Tr. 22-28, Lento Tr. 146)

3.4.   Pessin hired McCash to work with her at Memorial Sloan Kettering Medical Center in New York, New York, and they continue to work together. (McCash Tr. 91-93).

3.5.   Dr. Ira Bleiweiss was the Director of Surgical Pathology and he had supervisory responsibilities over residents and fellows and Attending Pathologists, and he is the Program Director for Surgical Pathology Fellowships program, but he has no training in anti-discrimination or anti-harassment policies.  (Varughese Tr. 737-746, 840, 1080-1081, Bleiweiss Tr. 16-18, 99-111).

3.6.   Throughout relevant portion of hostile work environment, discrimination, and retaliatory conduct, John Fallon, M.D. was employed by Mount Sinai Medical Center in supervisory and/or managerial capacity over resident physicians and fellows. (Pessin Tr. 153, Varughese Tr. 37-46, 962-964)

4.   Dispute with and Additional material facts

4.1.   Cordon-Cardo is untrained and unskilled in Anatomic and Clinical Pathology, he is not a licensed medical doctor, he never completed a Pathology residency, and he had no experience directly supervising resident physicians in Anatomic and Clinical Pathology residency programs.   (Varughese Tr. 728-729, Cordon Tr. 7-17, 18, 22-27, 32-47, 111-122).

4.2.    Cordon-Cardo is alleging now that he had indirect supervisory responsibilities over residents and he had no direct authority to discipline of residents, yet he terminated my employment and issued disciplinary action to me based on false allegations, and he repeatedly threatened my employment, even complaining about me after stalking me at another Institution, the Bronx-VA. (Cordon-Cardo Tr. 46-47, 56-72, Ex. 83b, 83c, 194).

4.3.    Cordon-Cardo hired his former employees from the bankrupt Aureon Biosciences, a company that marketed clinically useless tests to patients, as staff at Mount Sinai Medical Center's Department of pathology such as Michael Donovan, M.D., Olivier Saidi, and Cordon-Cardo also hired some cronies like his girlfriend Julide Celebi, M.D., as vice chair and a full professor in both Department of Pathology and Dermatology over several women doctors with far more professional experience in both specialities, and Adolfo Firpo-Betancourt, M.D., for a newly created position, while also at Exosome. (Ex. 31-33).

5.  Dispute with and additional material facts

5.1.    The Administrative Secretary for Residents and Fellows is known as the Program Coordinator (PC) is a defined ACGME role, which was held by Ms. Allene Carter during the entire period of my employment.  Carter was exclusively responsible for handling all of mine personnel matters during my employment from 2008-2011, not the random revolving door of personnel assignments such as Shema Patel, Freda Burstyn, or Andrew Castaldi as per the Defendants discretion. (Lento Tr. 21, Patel Tr. 18, 25-41, Varughese Tr. 318, Johnson Tr. 66-67).

5.2.    Patel was assigned as an administrator to the Pathology Department by Defendant Institution from her role job as an administrative assistant to Dr. Dennis Charney, referred herein as "Charney" and Dr. Kenneth L. Davis, referred herein as "Davis". (Patel Tr. 10-49, Tiger-paillex Tr. 14, Varughese Tr. 905-909, 876-887, 892-894).

5.3.    Caryn Tiger-Paillex is the Director of Human Resources at Mount Sinai Medical Center, and I reported discrimination, hostile work environment, and retaliatory conduct against me to her in December 2010, January 2011, March 2011, April 2011,

June 2011, and September 2011 against me, in favor of those who are not in my protected class, not engaging in protected civil rights activity of documenting instances of discrimination and hostile workplace, and for ongoing attacks on my character and reputation without any basis. (Tiger-Paillex Tr. 10-18, 32-42, 85-89, Ex. 89).

5.4.    Arthur Figur, M.D. is a Caucasian retired medical doctor who introduced himself as a member of the Physician Wellness Committee (PWC).   PWC is tool to retaliate against employees, and it's entirely unnecessary, the sole purpose is to defraud, retaliate against, threaten, and discriminate against subordinate employees which is coordinated with Human Resources, Barnett, Charney, lay persons from Board of Trustees, legal counsels, and Department leadership such as Schiller, Cordon-Cardo, Pessin, and Lento.  (Figur Tr. 8-23, 70-87, Ex. 34, Ex. 5 p. 35).

6.   Additional material facts

6.1.    Dr. Adolfo Firpo-Betancourt, referred herein as "Firpo-Betancourt" or "Firpo-Betancourt" was hired for an unadvertised employment position because of an happenstance visit to the Institution to converse with Cordon-Cardo, his "friend" to "Director of Education" not "Director of Pathology Program" or as the Program Director. (Firpo-Betancourt Tr. 14-29, Cordon-Cardo Tr. 27-29, 32, Barnett Tr. 93-94).

6.2.    On April 29, 2011, Fipro met with me specifically, not other coworkers, during his interview process because he informed me that he was asked by Cordon-Cardo to speak to me, following which he met with Barnett, Johnson, Cordon-Cardo, and Charney.  (Firpo-Betancourt Tr. 29-32, 34-37, Varughese Tr. 328-335, Ex. 35).

6.3.    Firpo-Betancourt was not a skilled pathologist and he was not practicing at the time of his hiring, he was retired from 'academic medicine' as of 1999, and his role in the Department of Pathology has lead to ongoing complaints about exploitation of race gender politics, which he has stated is the "politics of the Institution" that he also uses to intimidate physicians by directing explicitly racist sexist commentary, threats to minorities, and engaging in demoralization actions towards young woman and

minority physicians. The Defendants are actively hiding this evidence from litigation. (Varughese Tr. 329-367, 1070-1078, Firpo-Betancourt Tr. 34-47, 41-67, 102-117, Barnett Tr. 113-116, Declaration #1-3, Ex. 36, 37).

6.4.    During Firpo-Betancourt's deposition, I observed Ira Greenberg sitting very close to this witness, coach him by kicking him and nudging him during his responses. (Declaration #4).

7.    Additional material facts

7.1.    McCash did not complete his work routinely during Surgical Pathology, instead he took "break from grossing" and he attended "dementia rounds" to consume alcohol and socialize, and he drank alcohol at work routinely, yet he was promoted to Chief Resident, rather than me (2nd year of residency) for July 2010 - June 2011 period, and McCash was never investigated or referred to PWC for his conduct nor was he placed on any academic advisement or his employment terminated for the violation of code of conduct. McCash admitted to alcohol use at the Institution against the hospital code of conduct that prohibited alcohol consumption at work, McCash admitted to his own unsolicited anger, harassment, assault on me while delivering critical patient care services, and McCash admitted to anger problems over my direction to a Moonlighter to gross small specimens, and to his delusional and inappropriate directives to me to perform menial tasks against hospital policy but McCash was not targeted for PWC at the direction of Pessin and Lento or by Figur despite confirmation of these behaviors. (Varughese Tr. 241-279, 658-668, 694-701, 747-753, 783-784, 785-791, McCash Tr. 94-95, 84-88, 99-100, Pessin Tr. 34-35, 62-63, Figur Tr. 10-25, 81-87, Tiger-Paillex Tr. 120-122, Ex. 38-43, 127).

8.    Additional material facts

8.1.    In January 2011, Jordan was given the Chief Resident position during the 2nd year of her 4 years of residency without a medical license or any other certification or expertise that lead to complaints and concerns by her supervising Attending Pathologists and other residents, who had far more experience. (Jordan Tr. 17-18,

32-34, 87-90, 134-136, 171-172, Varughese Tr. 659-662, 669-687, Ex. 44, 47, 48, 49, 93, 94).

8.2.   Jordan's role was further increased beyond the usual chief resident duties to act as proxy supervisor for the Defendant Institution and Jordan worked directly with Marina Lowy, general legal counsel of the Institution to coordinate various false allegations against me. (Varughese Tr. 964-966, Pessin Tr. 32-34, Morency Tr. 8-11, McCash Tr. 9-11, Jordan Tr. 19, 24-26, 130, Ex. 45-46, 50).

8.3.   Jordan had previously written derisive emails targeting me, called me "lazy", "how does she function", in August 2010 onwards, she constantly and inappropriately disrupted my patient care duties and those of other coworkers in a detrimental manner, and she harassed staff to warrant concerns of "union grievance" against the Defendants, which the Defendants were all aware of when they promoted her to Chief Resident. (Ex. 44, 52-55).

9.   Dispute with and Additional material facts

9.1.   On December 8, 2010, McCash began the altercation where he eventually charged at me, he threatened me by intruding into my personal space, he disrupted my patients' cases, and stalked me, in addition, he shouted at me since the start of the altercation. (Varughese Tr. 259-261, 56-75, 701-730, 747-791, 802-803, Bleiweiss Tr. 26-42, 100-101, 106-112, Pessin Tr. 35-46, Ex. 51).

10.   Dispute with and Additional material facts

10.1.   On December 8, 2010, my professional judgement as a fully licensed New York State Medical Doctor, as per updates from November 2010 by Kruti Maniar, M.D. the Chief Resident on Surgical Pathology rotation, and based on my own professional experience working on surgical pathology for countless months, I was to assign small specimens to Moonlighters. The specimens assigned to Moonlighters[4] included 'margins' with minimal complexity and minimal teaching value for grossing from several breast lumpectomy surgeries, so as to decrease my workload as I deemed

---

[4] Moonlighters - resident physicians within the Department of Pathology who did per diem work to complete excess cases and workload of the resident physician involved in taking care of complicated specimens from the surgery patients. (Varughese Tr. 208-211 p.210 line 210: "I" corrected to "they")

appropriate for myself, whereby I could complete the more complex cases in a reasonable time period, if possible. (Tiger-Paillex Tr. 33-37, Varughese Tr. 57-75, 80-82, 208-211, 857-859, McCash Tr. 55-57, 62-63, Jordan Tr. 113-115, Bleiweiss Tr. 35-37, Morency Tr. 12- 16, 125-134. Ex. 56-60).

10.2.   Residents on assignment on Surgical Pathology rotations such as Jordan and Azar routinely assigned very complicated patient cases to Moonlighters. (Ex. 59-61, Jordan Tr. 91-95, Morency Tr. 132-134).

11.  Dispute and Additional material facts

11.1.   On December 8, 2010, McCash initially engaged in actions, while I was delivering critical patient care, he cursed at me, McCash "was angry", he charged at me, and then he came into my personal space as I was trying to leave the work area, and my response was to leave the work area to seek assistance. (Varughese Tr. 14-92, 762-781, Tiger-Paillex Tr. 52-54, McCash Tr. 32-68, 101-102, Morency Tr. 126-132, Lento Tr. 170-171, Ex. 41, 51, 84, 85).

11.2.   During the initial altercation that McCash initiated, only I, McCash, Dr. Paul Azar, and Mr. Renato Valentin were present throughout the entire incident. (Varughese Tr. 75-76, Pessin Tr. 93-117, Figur tr. 28-33, McCash tr. 43, 32-57, 66-68, 105-106).

11.3.   On December 8, 2010, McCash engaged in a second altercation where he became increasingly agitated and angry as he disrupted my discussion with Jaffer, and he caused another unacceptable interruption of critical patient-care, and McCash refused to follow Jaffer's instruction that he leave the work area known as the "grossing room" so that she could complete her discussion with me, and then, Jaffer removed McCash after his increasingly erratic behavior and conduct towards me by cutting short her conversation with me, to remove McCash from my vicinity because I could not leave the grossing room, due to the fact that I was wearing a bulky voice transcription device and a complete infectious disease protective gear with gloves, masks, and aprons which were stained with blood from the specimens that were being processed by myself as part of my patient care duties. (Varughese Tr. 53-92, Lento Tr. 115-123, Ex. 84, 85).

11.4.  On September 14, 2010, I was asked to cover for a resident, a Caucasian female
Sofia Kazi, M.D., two weeks in advance of her absence, while I had my own patient
care duties and assignments at the Defendant Institution covering the Institution's
Autopsy service, which I explained to Maniar and our agreement was that it would
be resolved with Lento since Lento was the Director of the Autopsy Service, and it
was a service that required coverage.  However, McCash intervened at this juncture,
in this conversation to shout "Shut up" followed by various defamatory false
allegations against me about my professional qualifications, and he later threatened
me directly informing me that I am not going to be a successful pathologist, that the
Attending Pathologists were specifically not teaching me any pathology, and that I
was lucky to have my job. (Varughese Tr. 813-839, 19-56, Lento Tr. 64-84, Ex. 43,
63-67, Declaration #5).

11.5.  On September 15, 2010, Maniar informed Lento that McCash had earlier in the day
admitted to both Lento and Maniar that McCash also identified that he had engaged
in harassment against me, and Lento was visibly hostile towards Maniar following
this admission by Maniar, after which Maniar was excluded from discussions
pertaining to their ongoing derisive allegations about my performance and the
December 2010 incidents. (Varughese Tr. 31-36, 112-113, 140-141, 160-161,
declaration # 6, 7).

11.6.  From September 16, 2010 onwards to November 2010, I followed up with Lento on
three more occasion to specifically address the incident with McCash as McCash
became more aggressive in the work areas in order to change my schedule to avoid
any further workplace harassment that threatened me, the response from my
supervisor Lento was more verbal threats directed to me, a critical report about my
experience on Surgical Pathology was labeled a "diatribe", my schedule changes
were denied without any legitimate reason as exactly same changes were approved
for other residents (Drs. Sofia Kazi and Jonathan Chow) only about 2 months later.
(Varughese Tr. 813-839, 19-56, 112-113, 140-141, 160-161, Lento Tr. 64-84, Ex.
64-67).

11.7.    In September 2010, Pessin in response to my complaint about McCash's threats, screaming, derisive verbal berating, and abusive conduct was to claim that it was deserved, and she undertook an extensive search to find me at fault for anything, that included the malicious attempt to point the finger at me over an "irate clinician". (Pessin Tr. 56-63, 37-46, Ex. 8, Lento Tr. 48-51, McCash Tr. 25-29, Ex. 43, 68).

11.8.    On September 13, 2010, one day prior to McCash berating me, shouting at me, threatening my career, stating that I am not going to be successful, and informing me that no one is teaching me, Morotti had already informed Lento and Pessin that I properly handled all the specimens from a pediatric patient with a large chest mass (later diagnosed with an aggressive Lymphoma, not Hodgkin's lymphoma, from these same specimens), as the diagnosis was available by early afternoon, from the specimens submitted by Dr. Brite Westinghausen, a pediatric hematologist/ oncologist. (Varughese Tr. 783-784, 895-896, Pessin Tr. 56-61, Ex. 66, 68) .

11.9.    Morotti also informed me that she spoke to Lento and Pessin to inform them that the case was handled appropriately, so she did not want them retaliating against me or creating a false issue to blame me.  I also spoke to the flow cytometry lab who informed me that they had become a 24/7 operation some months back, but I and other clinicians, i.e. Westinghausen, were not informed by Pessin, which was a significant failure of Pessin's duty and the real reason for alleged irateness of the clinician and as, I myself  was also irate after learning this information.  For nearly all my cases, I directly followed up with the patient cases to ensure the appropriate delivery of patient care, making me a valuable team player and member of the Department of Pathology with all my supervisors except for Lento, Pessin, Schiller, Bleiweiss, Cordon-Cardo, and Firpo-Betancourt, although I only worked with Lento and Bleiweiss in delivering patient care. (Varughese Tr. 783-784, 895-896, Pessin Tr. 56-61, Ex. 68).

11.10.  In December 2010, there were actual misplaced flow cytometry specimens that became too old for diagnostic usage, and these sorts of incidents were commonplace

within the Pathology laboratory per my personal knowledge from meeting minutes and the similar emails. (Ex. 69).

11.11.  On October 25, 2013, Lento made additional excuses for McCash at his deposition such as "relatively new to the position", he "educate[d] Dr. McCash" while Lento fabricated some issue with a "cytology" specimen, different from a "flow cytometry" specimen, because this is typical conduct of the Defendants to make out of whole cloth such defamatory allegations with which to attack me when their Caucasian physicians break the law, act out, assault me, a woman of Indian National Origin, to create hostile workplaces for me (a woman of Indian descent), meanwhile, providing preferential treatment to Caucasian coworkers with their obstinate objection to application of their own definitions of "professional" standards to Caucasians doctors and their performance.  (Lento Tr. 84-91, 160-163, Varughese Tr. 21-36, 45-56, 762-764, 827-833).

11.12.  In September to November 2010, McCash harassed and shouted at Morotti when she asked McCash to email out information regarding a lecture change.  I observed McCash behaving erratically, storming around the shared resident's office space, and stating that he was 'not her secretary' and other colorful language. (Varughese Tr. 783-784, Declaration #10).

11.13.  In April or May 2010, I reported to Dr. James Strauchen that my schedule did not include Hematopathology and Blood Banking, so Strauchen changed the schedule. Following this incident, McCash cursed me and ranted about me in a derisive manner in the hallway and he loudly complained about me.  Following this incident, Strauchen, the Program Director stated that I only work with Maniar, shortly after which Strauchen was kicked out as the Program Director. (Varughese Tr. 21-24, 117-135).

11.14.  In April 2010, Pessin had been informed of my reports of workplace problems with regards to access to resources, regards to time to work on cases, menial tasks, and the workplace disorganization in a volume driven pathology department in delivering patient care services at the professional level. (Ex. 42).

11.15.  In April 2010, shortly after this complaint, I was promptly accused of not signing out biopsies by Michael Mikulosovich, M.D., even though, I preferred to sign out biopsies as these are often with which the initial diagnosis are made and the most interesting diagnostic cases in pathology practice.  I reviewed the assignments for the biopsies that were alleged to not have signed been out by me, and these cases were signed out by one of the other residents covering the surgical pathology rotation, because the slides were forwarded to one of them, rather than me, as there was no system to sign in to receive pathology slides and cases to ensure a chain of custody at the Defendant Institution.  All other Institutions and the Pathologists that I worked at and with, respectively, practiced a sensible and firm chain of custody with specimen slides and diagnostic specimen material that was far superior to the Defendant Institution's crazy practices with Schiller, Pessin, and Bleiweiss running the pathology lab. (Declaration #12, 13).

12.  Dispute with and additional material facts

12.1.  On December 8, 2010, I sought the assistance of Dr. Ira Bleiweiss, referred herein as "Bleiweiss" who was the Director of Surgical Pathology.  (Bleiweiss Tr. 61-65, 101-101, Lento Tr. 111-138,  Varughese Tr. 79-93, 737-746, 850-852, Ex. 51).

13.  Dispute with and Additional material facts

13.1.  On December 8 - 9, 2010, McCash admitted to stalking me throughout the work day to Bleiweiss, Pessin, Lento, Schiller, etc. "...every time that I went into the gross room that day, Leena was no where to be found. I saw her more in the residents room all day rather than the gross room which makes me question her work ethnic (which is nothing new to me)", and apparently, McCash forwarded this and other emails alleging specimen was "undone under her workstation" but "hidden" etc. to Jordan, Bleiweiss, Hauptman, among about 5-10 different people, to collaborate his story, noticeably, I and Maniar (the other Chief Resident) were excluded from these emails, so I could not contradict these falsified farcical and illogical allegations nor was I aware of them until this litigation. (Bleiweiss Tr. 59-61, Varughese Tr. 56-135, 857-859, Ex. 71-75, 77-79).

13.2.  The name of the surgeon who performed the surgery, i.e. "Goldfarb" or "Weltz" or "Port" etc.. were impossible to gauge from the specimen bottles nor were there strict delineation of the breast cases to moonlighters or surgical pathology residents to my knowledge, Adrienne Jordan being the secondary moonlighter, she was not needed to moonlight, contrary to McCash allegations, all sorts of cases are grossed by moonlighters, and in December 2010, all the patient cases that I worked on were completed satisfactorily in a timely manner to my knowledge, and prior to December 8, 2010, I was efficient enough to not require moonlighters regularly, hence I did not request them to work as they were per diem, on an as needed basis only. (Ex. 56-61, 71-80, Declaration #14).

13.3.  On December 8, 2010, I worked on a large number of cases but they were not registered within the system, likely due to sabotage by McCash, Jordan, and Bleiweiss to give an appearance of lighter workload, and the credit for some of my cases were given to other residents. (Ex. 76-79)

13.4.  On December 9, 2010, McCash admitted to continuing to harass me the next day, and my request that he stop his conduct, and he also admitted, as follows, "She then told me that I messed up one of her gross descriptions from the night before which I had actually fixed for her because it wasn't up to my standards", which is professional misconduct, the illegal activity of changing the medical document containing gross description of the surgical specimen that was already done according to the standard of care as per the Attending Pathologist and myself, a licensed medical doctor, not McCash's so-called standards based on his less qualified opinion as a limited and not board certified resident.  (Varughese Tr. 53-135, 858-859, Bleiweiss Tr. 59-61, 110, Johnson Tr. 110-111, McCash tr. 46-68, Ex. 72, 77, 79, Ex 5 pp. 29-40).

14.  Dispute with and Additional material facts

14.1.  The Defendants engaged in a premeditated assassination of my reputation, my character, and my career through discrimination, hostile workplace, and retaliation, to which I "wasn't behaving in the way that most people would have behaved in that situation" and at Pessin's deposition, she specifically references my "interacting with

Dr. Lento and herself during this investigation was not appropriate" and Pessin shows no remorse for her creation of a hostile workplace, for her discriminatory conduct against me, rather than reprimand McCash and Jordan, or for the retaliation against me with untrue and criminally false accusations that created the pretext with which to terminate my medical career. (Varughese Tr. 775-776, 76-78, 61-70, 143-146, 157-168, Bleiweiss Tr. 43-50, 66-72, Pessin Tr. 120, 122-157, 160-168, McCash Tr. 32-53, 101-102, Johnson Tr. 67-71, Lento tr. 138-144, Ex. 75, 45 items #116, 121, 124).

14.2.   On December 9, 2010, Bleiweiss and Schiller who were already in receipt of McCash's emails met with me, Schiller stated that it "doesn't matter what happened" when I attempted to explain the incidents, meanwhile, the same day, Schiller asked Jordan to write emails that were entirely focused on various false allegations against me that were untrue, and these were not addressed to me directly by the Defendants, although, it was widely disseminated to one another, which was malicious reckless behavior and conduct against me.  (Varughese Tr. 106-118, 37-47, 265-268, 765-776, 804-813 850-852, 855, Bleiweiss Tr. 14-19, 66-77, Lento Tr. 96-102, Pessin Tr. 86-88, Correction p. 87 line 3: "Maria Lowry" to "Marina Lowy", Ex. 52, 53, 54, 55, 75, 45 items #116, 121, 124, Declaration # 20a-j, 22a-d)

14.3.   On December 10, 2010, I met with Pessin around 10 am, she was already in receipt of emails from McCash and Jordan, made excuses for McCash's conduct such as "different personality style", for McCash "We will train him. We need to work together." rather than address McCash's ongoing erratic and disparaging behavior including physical intimidation of me and stalking of me at work, because Pessin was preoccupied with her concerns that it "would be unfair" to McCash and his "style", nor did she address Schiller's derisive discriminatory conduct, hostility, and retaliatory conduct towards me, including derisive commentary about my "DNA", the actions to single me out in a disparate manner to my caucasian coworkers, blame me for the McCash and Jordan's unprofessional conduct and for casting aspersions against me with demands for me to leave work, not McCash for his ongoing

harassment.  Pessin did not address Jordan's extensive allegations from the previous evening, at the direction of Schiller with me. (Varughese Tr. 265-268, 775-776, 850-852, Lento Tr. 96-102, Pessin Tr. 86-88, Correction p. 87 line 3: "Maria Lowry" to "Marina Lowy", Ex. 54, 55, 71-75).

14.4.    On December 10, 2010, Pessin's email, around 3pm, to Lento was that she "was working with Legal on this situation... This is actually a very big deal from a number of perspectives and I need to provide you with all of the implications of the situation", which also indicates that I had made protected complaints to her that registered with her.  (Varughese Tr. 265-268, 775-776, 850-852, Lento Tr. 96-102, Transcript or declaration, Pessin Tr. 86-88, Correction p. 87 line 3: "Maria Lowry" to "Marina Lowy", Ex. 75, Declaration # 23 a-k).

14.5.    On December 13, 2010, Lento and Pessin told me to not to report my complaints to Human Resources and she threatened to terminate my employment for speaking to Jordan, specifically, which was on Friday evening around 5 pm, even though, I was never informed that I should not speak to Jordan, but Jordan was informed that she was not to speak to me.  Here again, Jordan is insubordinate, she engaged in a discussion that she should not have as per the instruction by Pessin, yet she was not threatened with termination of employment on December 13, 2010, because as a Caucasian female Jordan was given preferential treatment compared to me.  Lento identified Jordan's derisive deluded commentary about me as just "her opinion", but any complaint from me about Jordan and/or McCash were deemed as threatening and unfair to them by Lento and Pessin. (Lento Tr. 129-131, Pessin Tr. 88-93, 155, Varughese Tr. 95-105,  Ex. 82, 54, Declaration # 24 a-c).

14.6.    Pessin's only complaint was that Jaffer was included in the emails, not that McCash kept derisive lists against me, changed the medical records, harassed on me several days, and Pessin and Lento never informed me about the allegations of McCash until the Academic Advisement nor did they remove McCash from his Chief Resident duties in a timely manner, or restrict Jordan from disrupting my patient care duties, they blamed me as "disruptive to Department's operations" even though I was on

assignment to perform the work for the hospital, unlike Jordan and McCash, and the altercation was "upsetting" to me more than anyone else because it disrupted my duties. (Pessin Tr. 67-83, 93-117, 152-153, 162-163, 122-125, McCash Tr. 54-59, 62-63, Ex. 83).

14.7.   Maniar, while uninformed about the December 2010 incidents, was nonetheless interviewed to substantiate McCash's derisive list against me.  I had a very professional and cordial relationship with Maniar, as with all of my coworkers, other than McCash and Jordan, who were actively harassing me and terrorizing me at work at the direction of the Defendants for which they were rewarded. (Johnson Tr. 66-132, Varughese tr. 118-135, Maniar Declaration # 9, Ex. 91).

14.8.   For the period of November 16, 2010 to December 19, 2010, my work performance was deemed satisfactory by all my supervisors, with the exception of Bleiweiss, who was prone to "sloppiness", submitted a punitive and retaliatory negative evaluation that targeted me, not McCash or Jordan for interfering and disrupting the workflow and patient care delivery.  During this period, Barnett and/or Bleiweiss approached my direct supervisors to negatively evaluate me because Barnett said that he thought they were insubordinate on January 19, 2011 when I met with him.  (Varughese Tr. 737-746, Bleiweiss Tr. 102-112, 74-81, Ex. 81a, 81b, Declaration #29, 30).

15.  Dispute and Additional with material facts

15.1.   On December 21, 2010, the Academic Advisement, "a very clever invention", which was an act of discrimination, retaliation, and further hostile workplace.  Pessin, Lento, Schiller, Stimmel, and Bleiweiss in cahoots with Barnett and Lowy fabricated criminally false claims of "patient care lapse" and "unprofessionalism" to justify the discriminatory and retaliatory disciplinary action/ adverse employment action against me, that also created a segregated and discriminatory hostile work environment for me on the basis of my national origin and gender. (Varughese Tr. 20-135, 180-183, 702-714, 739, 746, 775-781, 783-803, 827-833, 850-863, 868-870, 876-877, 1054, 1070, Johnson Tr. 66-132, Lento 39-47, 129-144, 158-161, 168-171, Barnett Tr. 34-46,  Ex. 76-79, 82, 83a, 84, 85).

15.2.   In addition to my verbal reports of discrimination, harassment, and retaliation to Pessin, Lento, Schiller, Stimmel, and Lento, and I also submitted written protected complaints on December 23, 2010 to Tiger-Paillex that outlined ongoing hostile workplace, retaliation, and illegal discriminatory activities by my supervisors. (Ex. 86, 87).

15.3.   On December 23, 2010, a protected complaint was also submitted in writing to Pessin and Lento because of their discriminatory animus, hostile conduct, and retaliation against me with several adverse employment actions against me since December 8, 2010. (Ex. 86, 88).

15.4.   The house staff manual with it's limited information on discrimination stated "Discrimination is defined as actions on the part of an individual, group, or institution that treats another individual or group differently because of race, color, national origin, gender, ...or any other characteristics protected by law. Discrimination or harassment on the basis of these characteristics violated federal, state, and city laws and is prohibited and covered by this policy." but it did not specifically reference the appropriate laws and statues, as required by the anti-discrimination statues and laws. (Lento Tr. 140-144, Ex.5 p. 38-39, ex. 38).

16. Dispute with and Additional material facts

16.1.   The Academic Advisement was retaliatory, it was an adverse employment action, it changed the terms of my employment to impossible standards that were not expected of anyone else in the residency program on falsified and patently false allegations against me of "patient care lapse" and "unprofessionalism". The adverse employment actions against me were concerted premeditated plan to destroy my career and economic security by an all Caucasian group consisting of Pessin, Lento, Schiller, Bleiweiss, Jordan, McCash, Barnett, etc, in a very hostile discriminatory workplace. (Varughese Tr. 187-192, 268-269, 984-991, 703-714, 762-781, 804-839, 1050-1070, Bleiweiss Tr. 58, 46-49, Jordan Tr. 26-29, Ex. 34, 45, 46, 65, 88, 89, Declaration # 11, 12, 22a-d).

16.2.    McCash was not subject to Academic Advisement for his assault against me during patient care delivery in December 2010, and he was not reprimanded for the continued disruption of my work or for his repeat misconduct from September 2010 onwards towards me, his publishing derisive lists about me to my supervisors, the restriction of resources available to me with assaulting condcut, and his defamatory and delusional allegations about my performance after attacking me again, and his not attending to his actual assignments on other hospital services. (Varughese Tr. 802-803, 850-852, Ex. 71-79, 84-85).

16.3.    Jordan was not subject to Academic Advisement, reprimand, psychological evaluation, and referred to the PWC for her disruptive, threatening, and unprofessional conduct towards me with defamatory allegations made against me such as "flight of ideas", called me "lazy", she went through my desk at 10 pm at night to make false allegations based on her equally false assumptions, and then, she interfered during my patient care duties that was ongoing such as on December 8, 9, 10, 2010, which created a hostile work environment for me as woman physician of Indian National origin with direct negative effect on my employment, while she was also not attending to her duties on several hospital services, which she was supposed to be covering at least until 5pm, rather than disrupting my work by soliciting moonlighting hours without my request.  Moonlighting was not to interfere with other duties or services but Jordan routinely disregarded her work to moonlight. (Varughese Tr. 791-801, 976-981, Figur Tr. 70-87, Ex. 52, 55-60).

16.4.    Delays of cases or "patient care lapse" as defined by the Defendants were commonplace and residents such as Jordan, McCash, Chepovetsky, Kazi, and other residents, but also the pathology assistants, who did not suffer any disciplinary action or even a negative evaluation by the Defendants for poor performance or ongoing patient care lapse. (Ex. 62, 102a, 102b, 130, 136).

16.5.    Cordon-Cardo "the Chairman of the department, ... don't step in each of the nuances" against Caucasian doctors, so my coworkers were not targeted for any discipline, despite ongoing and extensively documented issues of unprofessionalism, significant

and repetitive substandard provision of patient care, lack of medical knowledge, poor communications and interpersonal skill, involvement with drinking on the job, and so on. (Cordon-Cardo Tr. 91, 81-111, Ex. 102a, 102b, 106, 110a, 111-118, 125-126, 132-135)

17. Dispute with and Additional material facts

17.1.   On December 21, 2010, Pessin and Lento told me that I would not be informed of any actions taken against McCash as I immediately contested the Academic advisement verbally to both Pessin and Lento, and then to Stimmel, the Ombudsman. (Varughese Tr. 259-283, Ex. 83, 87, 88).

17.2.   In or about late December 2010, I spoke to several attorneys in good standing in multiple federal jurisdictions with extensive experience in Plaintiff side employment law regarding the incidents at the Defendant Institution and the Defendants conduct towards me, and the consensus was that it was prima facie discrimination and retaliation, especially given the lack of any premise for patient care lapse or unprofessionalism. (Declaration).

17.3.   In December 2010 onwards,  Pessin, Bleiweiss, McCash, Jordan, Schiller, and Lento were emailing one another to corroborate their stories via email discussions that also included Jordan and Azar, with extensive meetings with Barnett, Figur, Marina Lowy, and Figur, from all of which communications, I was excluded entirely. (Varughese Tr. 184-187, Pessin Tr. 84-88, Ex. 34, 54-55,  71-75, 82, 83, 88-89a).

18. Dispute with and Additional material facts

18.1.   McCash and Jordan continued to harass me and disrupt my cases without any intervention by Pessin, Lento, Bleiweiss, and Schiller on the days following December 8, 2010 until the termination of my employment. (Varughese Tr. 9-192, 42-44, (include errata sheet for day 1), 259-283, Ex. 54-55, 71-75).

18.2.   Jordan's conduct was rewarded with an undeserved promotion to Chief Resident position by Lento and Pessin, despite her incompetencies, unprofessional conduct, and constant absences with the increasingly dramatic excuses that continued well

into her final year of residency. (Jordan Tr. 176-189, Ex. 44, 47, 48, 52, 53, 104, 151, 209b, 209c, 217, 216, 230).

18.3.   I worked directly with Lento for a 4 week period, where he was erratic and threatening towards me. (Varughese Tr. 872-874).

18.4.   Dr. Paul Azar, despite his ongoing absences and the complaints directed at him for not performing his work and being absent from work, Lento never targeted Azar for Academic Advisement, and Azar did not have a medical license into the fourth year of residency in violation of hospital policy. (Ex. 105-110, Johnson Tr. 49-52, ex. 105-109, 110a)

18.5.   Azar did not attend 8am conferences, yet Lento did not remove his moonlighting 'privileges', although, I was informed that I could no longer moonlight even though my attendance at the 8am conferences had increased during this period, that later became Jordan and Lento's attempt to appease Azar about Jordan's selection as Chief Resident by promoting him to moonlighting coordinator. (Ex. 106, 109).

18.6.   Dr. Jaclyn Hechtman was in violation of professionalism standards, poor patient care skills, and interpersonal and communication skills, there were several incidents of suspect conduct and her involvement in contentious issues, but she was never placed on Academic Advisement nor threatened with termination of their employment, nor referred to PWC, noticeably she are not in my protected class, woman of Indian National Origin. (Lento Tr. 278-280, Ex. 111-118, 123-126).

18.7.   Dr. Julie Chepovetsky was involved in innumerable patient care lapses (delayed cases of over 2 or more weeks), unprofessional conduct, and so on, but she was never placed on any Academic Advisement or referred to PWC. (Ex. 127-135).

18.8.   Pathology Assistants, Roma Rosario had an abysmal record with poor patient care skills and her ongoing conflicts with both staff and medical doctors, and a record of ongoing absences from work, without any reprimand, despite the direct harm to patient care. (Ex. 136-139).

19. Dispute with and Additional material facts

19.1.   As of December 23 2010, I had set forward my account of December 2010 incidents to Caucasian supervisors such as Schiller, Bleiweiss, Pessin and Lento on December 8, 9, 10, 13, 21, 2010 but the response was the disregard of my complaints, further discriminatory conduct, retaliation, and hostile workplace creation. (Varughese Tr. 702-714, 737-746, 827-833, 862-863, 762-777, 876-877)

19.2.   From December 9-23 2010, I spoke to Dr. Barry Stimmel, the Caucasian Ombudsman about three - four times in person about my concerns of discrimination, hostile work environment, and retaliation against me. (Varughese Tr. 259-283, 877-879).

19.3.   On December 23, 2010, I wrote to the Director of Human Resources, Ms. Caryn Tiger-Paillex, a Caucasian, as per House Staff Manual, to report the employment issues that had occurred, which was to be expounded upon in the event of an interview with Tiger-Paillex but Tiger-Paillex was already engaging in the practice of Institution wide practice of covering up discrimination, reports of discrimination, and retaliation. (Varughese Tr. 879-880, Ex. 34, 87, 89-90, 95-99, 140-143).

19.4.   In January 2011, I reported discrimination, retaliation, hostile workplace, and illegal workplace conduct to Figur, Johnson, Tiger-Paillex and Barnett. (Varughese tr. 747-753, 777-781, 202-222).

20.  Dispute with and Additional material facts

20.1.   On December 9, 2010, my report of the incidents carried out caucasian coworkers against me, a woman of Indian descent, was unwelcome and silenced by Schiller with attacks on my 'DNA', who favorably advised the Caucasian Jordan to set forth an account via e-mail. (Varughese Tr. 121-122, Bleiweiss Tr. 65-75).

20.2.   On December 9, 2010, I reported gender and racial discriminatory conduct by Schiller and Bleiweiss amounting to hostile workplace and retaliation to Stimmel, the Ombudsman at Mount Sinai Hospital, and it the privilege log denotes my protected activity, and my supervisors awareness of their illegal conduct. (Varughese Tr. 107-114, 876-880).

20.3.    In retaliation, to my reiterating my complaints about workplace discrimination, harassment, and retaliation to Pessin, Schiller, Lento and Bleiweiss from December 8, 2010 onwards, especially on December 23, 2010 with a written submission, Pessin and Lento referred me to PWC and she forwarded all the emails from her Caucasian subordinates Jordan and McCash to Figur, but their allegations were not represented to me in as part of Figur's or Tiger-Paillex's investigations, rather these emails were hidden from me, a common theme with the Defendants, to create pretext, while subverting what really happened to protect the Caucasian doctors by the Caucasian Defendants, while work environment was made hostile against me because of the disparate treatment against me on the basis of my race and gender by my supervisors by this very pervasive bullying, retaliation, taunting, and discrimination of me. (Ex. 88, 89a).

20.4.    On December 23, 2010, I made protected complaints to Tiger-Paillex.  On January 4, 2011, I spoke to Tiger-Paillex about the gender discrimination, harassment, discriminatory and hostile workplace, and retaliation against me following December 8, 2010 in terms of the Academic Advisement but Pessin was informed of my complaints to Tiger-Paillex, so Pessin and Lento forwarded various emails by their subordinates Jordan and McCash to justify their discriminatory, hostile, and retaliatory conduct against me. (Varughese Tr.  117-124, 703-755, 801-803, 880, Tiger-Paillex Tr. 47-51, Ex. 88, 89a).

20.5.    On January 4, 2011, I explicitly reported gender discrimination and harassment, hostile work environment, and retaliation to Tiger-Paillex, whereby I also observed Tiger-Paillex make a note of "gender harassment" during the interview since I repeatedly referenced this concern to her, as per legal counsel.  There is also as my obvious appearance as a woman of Indian descent compared to that of Pessin, McCash, Schiller, Bleiweiss, Jordan, and Lento, all of whom are Caucasian in appearance. (Varughese Tr. 113-122, 703-755, 779, 801-803, 834-839, 876-880, Johnson Tr. 135-136, 144-151, Declaration # 27, 28,).

20.6.    I reported the incident from September 14, 2010 and December 8-10, 2010, which were confirmed by McCash himself to Tiger-Paillex.  I also reported to Tiger-Paillex that the only result was that I was blamed by Lento for McCash's conduct towards me, that Lento denied schedule changes for me, failed to intervene and/or to limit McCash from interacting with me after his aggressive behaviors, but in response, Lento, Schiller, and Pessin were hostile and openly aggressive towards me at work. (McCash Tr. 32-35, Varughese Tr. 761-839, Tiger-Paillex Tr. 25-61).

20.7.    On January 19, 2011 and February 9, 2011, I reported problems with work environment and Lento's behavior towards me to Barnett.  On January 20, 2011, my desk at work was broken into and the desk lock was broken.  On February 15, 2011, I was singled out to leave the assigned work post, despite the fact that both I and my male colleague, Jonathan Chow did not have the requisite clearance known as the mask fit test. (Varughese Tr. 805-833, 868-870, Ex. 90, Declaration 30-32, 34).

20.8.    In January, March, April, and May 2011, I spoke to Figur about the ongoing harassment and disruption of my patient care related work by the Defendants, and that my clinical work with Lento had to be limited, in addition, I reported that I felt that I was being discriminated against on the basis of my protected class of woman of Indian descent, that PWC was retaliatory, and it created a hostile workplace that singled me out. (Varughese Tr. 202-258, 571-574, 588-590, 804-833, 777-781, 876-880, Ex. 34, 89, 140, 162, 167, 175, Declaration # 33).

21.  Dispute with and Additional material facts

21.1.    In April 6 and 25, 2011, despite repeat verbal reports of discrimination, hostile workplace, and retaliation against me to Tiger-Paillex, she did not investigate nor attempt remedy the issues.  (Tiger-Paillex Tr. 28-41, Ex. 51, 84, 85, 88, 95, 100, 140-144, 175, Ex. 87, 89b, 95, 175a)

21.2.    By February 2011, Tiger-Paillex corroborated my claims about harassment and discrimination, but the adverse employment actions taken against me were not stopped, nor did Tiger-Paillex request to meet with me again, to inform me of this result of her investigation. (McCash Tr. 32-37, 101-102, 40-60, 67-82, Ex. 84, 85).

22. Dispute with and Additional material facts

22.1.   On or about April 6, 2011, I, Varughese met with human resources to report ongoing discrimination against me because of my protected class, the hostile work environment, and the Institution's refusal to investigate my complaints of discrimination and retaliation and the utter silence about my complaints, while there was ongoing harassment by the Physician Wellness Committee, a Caucasian male outfit that was derisive and engaged in inappropriate harassing and unacceptable attacks on my character, and professional qualifications. (Varughese Tr. 124-172, 175-192, 740-745, 761-799 Ex. 34, 64, 89a, 89b, 140b, 140a, 162, 167, 175).

22.2.   On March 2, 2011, McCash admittedly had to "reconsider how I dealt with the two situations,... and maybe should have tried a more diplomatic method" in his email to Tiger-Paillex who was still investigating, but the Institution did not cease it's adverse punitive retaliatory hostile and discriminatory conduct towards me after this admission by McCash, but immediately after the submission of my "account of the events", McCash began forwarding emails to Tiger-Paillex, as he had done with Figur and Johnson, and Pessin wanted to about further "recourse". (Ex. 41, 84, 85, 89a, 89b).

22.3.   On or about March 25, 2011 and April 8, 2011, I reported discrimination, hostile workplace, and retaliation in the conduct of Physician Wellness Committee and its' member Figur and Hughes, two Caucasian males who were acting in an aggressive and discriminatory manner, including that I objected to the toxicology screen and psychiatric evaluation, that was retaliatory and discriminatory, it constituted hostile workplace, and it was only directed at me because I am a woman physician of Indian descent. (Ex. 140b, 162, 167, 175b, 195).

22.4.   In April 2011, Tiger-Paillex informed me that I was referred to Physician Wellness Committee because of the falsified claim of 'patient care lapse', contrary to what Figur told me in January 2011, which was that Pessin referred me to PWC because Pessin was extremely angry at me and she stated that I was "insubordinate", meaning I challenged the Academic Advisement and their false accusations and I asked about

what actions were taken against McCash and Jordan.  In January 2011, Figur informed me that alleged "insubordination" is not a PWC worthy issue, but in March 2011, Figur stated that insubordination was why I had to meet with Figur and Daniel Hughes, PhD, whom I had not met previously.  In September 2011, I was told to meet with PWC again without any legitimate reason but to harass, humiliate, create a segregated hostile workplace for me, and retaliate against me.  (Varughese Tr. 136-138, 125-128, 202-247, 571-574, 981-983, Pessin Tr. 122, errata sheet deposition day 2, Ex. 45, 46, 140a, 140b, 162, 167, 170).

22.5.   On or about April 5, 2011, Tiger-Paillex informed me that McCash and Lento were told not to interact with me or oversee my duties, yet no actions were taken by the Institution or the Department of Pathology to remove Lento from his Program Director position and McCash from his Chief Resident role. (Varughese Tr. 876-888).

22.6.   On or about April 5, 2011, Tiger-Paillex also explicitly stated to me that she was also concerned that Jordan was promoted to Chief Resident. (Varughese Tr. 791-801).

23.  Dispute with and Additional material facts

23.1.   On April 11, 2011, I, Varughese was forwarded a letter which did not reflect what was discussed with Tiger-Paillex on or about April 5, 2011 when Tiger-Paillex claimed that my "perception and McCash['s]" were so different, that McCash was incapable of recognizing any wrongdoing on his part.  Then, Tiger-Paillex inexplicably also stated that Lento and McCash were already informed that they were not to work with me or oversee my work.  As per discovery, Tiger-Paillex was actively following up with McCash regarding his wrongdoing, and he apologized to Tiger-Paillex, Lento, and Figur, but they did not cease all discriminatory, hostile, and retaliatory conduct against me, nor take any actions against McCash.  (McCash Tr. 32-37, 101-102, 40-60, 67-82, Ex. 34, 38, 41, 84, 85, ).

24.  Dispute with and Additional material facts

24.1.   On or about April 11, 2011, Tiger-Paillex said that I, Varughese should have been informed that I was not work alone or directly with McCash and Lento.  Yet, Lento

continued to disrupt my work and to create an extremely hostile workplace for me with irrational demands of me. (Varughese Tr. 124-127, 804-833, 872-874, 877-880).

24.2.   In April 2011, Maniar informed me that she was unaware of any actions taken against me by the Department of Pathology or the Institution by way of Academic Advisement or PWC, and that she was entirely unaware that McCash and Lento were to limit their interactions with me, yet Jordan and Morency appears to have been informed because Maniar was excluded from the communications that were taking place between McCash, Lento, Pessin, Jordan, Morency, Schiller, and Barnett. (Varughese Tr. 123-128, 802-803, Declaration # 46, Ex. 146).

25.  Dispute with and Additional material facts

25.1.   By February 2011, Tiger-Paillex confirmed my account of various incidents from September 2010 onwards into April 2011.  Tiger-Paillex did not intervene, and she is representative of the Defendants harassment, discrimination and attacks on minorities nor did she stop PWC from harassing me nor did she advise Lento to stop discriminating against me, retaliating against me, and creating a hostile workplace. (Ex. 45, 46, 51, 80, 87, 95, 140).

25.2.   Barnett, the ACGME DIO utilized my protected complaints as the reason to discriminate against me, retaliate against me, and he stated that "further investigation serves no purpose" and Barnett had been hostile towards me on every protected complaint and retaliation issues, to consistently refuse to intervene throughout the entire period of my employment.  (Varughese Tr. 299-301, Barnett Tr. 56-57, Ex. 96, 97, 100, 142, 143, 144, 173, 186, 223).

25.3.   McCash retained the Chief Resident title and Chief Resident duties for the remainder of his residency, despite his September 14, 2010 and December 8, 2010 conduct towards me. (Figur Tr. 36-49).

25.4.   On April 26, 2011, Jordan was writing emails to inquire whether I would be on the schedule for the July 2011-June 2012, Jordan was lobbying to Dr. Kalir directly, and by May 24, 2011 around 8pm, Morency, another resident, fabricated nonsensical allegations without her informing me or my direct supervisors to Cordon-Cardo,

Lento, and Barnett, and by May 27, 2011, an entire specimen on my service was being sabotaged by Bleiweiss, in addition, to the ongoing problems. (Morency Tr. 77-92, Ex. 146, 178, 179, 181a, 181b, 181c, 181d, 182, 183, 184).

25.5.    Lento was responsible for yearly rotation schedule, not Chief Residents and the assignments.  Fallon was responsible for completing the yearly rotation schedule before Lento, hence the excusing of Jordan from difficult rotations such as Elmhurst Hospital rotation where she covered exactly zero months to my six months of coverage.  (Morency Tr. 73-76).

26.  Dispute with and Additional material facts

26.1.    To reiterate, since September 14, 2010, my communication with the Defendants were about retaliation against me, discrimination, and hostile work environment after my reports that are consistent with protected legal activity regarding the violation of my civil rights or discriminatory disparate treatment of me because of my protected class as a woman of Indian National Origin compared to Jordan, McCash, and other residents not in my protected class (as per discovery) who received far better preferential treatment, even in the face of egregious problems. (Varughese Tr. 111-113, 121-122, 748, 761-799, 877-880).

26.2.    Not only were no actions taken by the Defendants to protect my interests, rather increased workplace hostility, discrimination, and retaliation against me were sanctioned against me at the Defendant Institution level, until the termination of my employment on September 21, 2011, which was followed by active interferences into my obtaining employment, obtaining Board Certification in Anatomic Pathology, obtaining fellowship positions, or for that matter, any job for which I qualified. (Varughese Tr. 701-920, 928-1066).

26.3.    After each protected complaint, the Defendants would falsely allege that I did something wrong, deserved poor treatment, refused to intervene to prevent additional incidents, and/or ramp up retaliatory and hostile workplace activities, or allege that there was something wrong with my DNA and my nationality, especially when my

work was excelling to literally terrorize me and to make me fail. (Ex. 108a, 108b, 108c, 108d, 81c, 43, 64, 82, 83a)

27. Dispute with and Additional material facts

    27.1.    Discovery has shown that Tiger-Paillex's statements are meaningless and invalid, she had knowledge from her investigation of discrimination, hostile work place, and retaliation, and all of which she covered up for the Institution without taking the appropriate interventions.  Caryn Tiger-Paillex and Marina Lowy are directly responsible for funneling employment discrimination cases to Edwards Wildman and Palmer, LLP.  (Varughese Tr. 170-179).

    27.2.    Barnett stated that "no further investigation serves any purpose" in May 2011, contrary to his fiduciary duty to me, the Defendants had a duty to obtain and follow up on protected complaints, not subvert, frustrate, attack, retaliate, and ensure further discrimination of a minority woman to ensure a hostile work environment. (Ex. 98).

    27.3.    Tiger-Paillex ignored my initial reports in January 2011 of discrimination, hostile work place, and retaliation.  I met with her in April 2011 and May 2011, although my reports only lead to further harassment and retaliation against me, and their concerted reckless and malicious efforts to malign me to my immediate supervisors, despite apparent confirmation of various activities by McCash and Jordan about their violations of code of conduct and the hospital policies regarding workplace safety. (Varughese Tr. 170-179, 28-42, Ex. 45, 46, 140-144, 169-179, 80, 84-85).

28. Dispute with and Additional material facts

    28.1.    On May 5, 2011, I met with Tiger-Paillex to report that three Caucasian male employees of the Institution, Lento, Cordon-Cardo, and Castaldi verbally accosted me and threatened me with termination of my employment because of my protected class of woman of Indian National Origin and for legally protected activity of reporting discrimination, harassment, and retaliation.  I and my attorneys at Levine and Blit, LLC have repeatedly demanded an immediate stop of all adverse employment actions, retaliation against me, and all other discriminatory hostile

activities of the Institution against me that was creating a hostile work environment for me. (Varughese Tr. 911, 170-179, Ex. 88, 95-99).

28.2.  On May 5, 2011, I complained about Figur's criminally false allegations about me and my reputation as retaliation, and Figur's actions are beyond the scope of his role as an hospital administrator, and beyond the scope of his non-existent medical practice as a retired doctor. (Ex. 175a-c, Ex. 45 privilege pp. 8-10, 33).

28.3.  On June 9, 2011, Barnett stated "I mean, again, people who you report to told you listen, our perspective of what you wrote wasn't what we were looking for. We would like you to take some time, think about it, and come up with something a little different. And to the extent you did that or not is up to them to decide. The tone of it was very similar to the first, but, again, I think your — whether you believe who you believe — again, reasonable people — lots of reasonable people could look at all of these facts and interpret them very differently." informing me that I was being retaliated against by the Institution for the first self-reflection that put pen to paper on my account, as well as the first.  (Ex. 186, Transcript p. 26).

28.4.  On or about June 10, 2011, my attorneys sent in a cease and desist letter to report discrimination, retaliation and hostile work environment, as well as to inform the Institution to contact Levine and Blit, LLC regarding all future employment issues. (Varughese Tr. 911, Ex. 186, 187, 143).

29.  Dispute with and Additional material facts

29.1.  Figur was involved in adverse employment actions against me as early as January 3, 2011, prior to my meeting him and he coordinated with Lento, Pessin, and Barnett to assist them to create pretext, harass me, and investigate me for filing legally protected complaints as a minority woman. (Ex. 89a, Varughese Tr. 162-164, 588-590).

29.2.  On March 30, 2011, when I submitted the self-reflection, Pessin wanted to know if she had any "recourse" following which Figur's defamatory reports were created as per PWC and Fersh on April 11, 2011.  (Varughese Tr. 571-574, Lento Tr. 197-201, Ex. 89b, 45 pp. 33, 163, 175c, 175).

29.3.   McCash despite his repeat attack on me at work, explosive anger at work, interference into my duties not within his purview, and calls for drinking alcohol at work for over two years, McCash was not referred to Physician Wellness Committee for a toxicology screen and psychological evaluation. (Cordon Cardo Tr. 74-80, Varughese Tr. 675-707, 747-753, 848-855, 1056-1069).

29.4.   McCash continued to enjoy promotions and freedom to work without any adverse employment consequences against him by the Institution such as being subjected to toxicology screen for his numerous outbursts at work, drinking alcohol at work, menacing actions against me, delusional emails alleging the most farcical irrational claims, and his abusive conducts to female supervisors such as Dr. Rafaella Morrotti, and his racist sexist defamatory list that he kept against me, which he published to others such as Pessin, Figur, and Tiger-Paillex following the December 8, 2010 incidents. (Varughese Tr. 673-686, 694-701, 747-748, 749-753, 783-791, Morency Tr. 174-177, McCash Tr. 32-35, 39-46, 100-102, 84-86, 88-91).

30.   Dispute with and Additional material facts

30.1.   Lento, Firpo-Betancourt, Schiller, Barnett, and Figur made allegations against my character, diligence in my duties to my patient and labeled me, a physician engaged in legally protected activities as having mental health issues, which is direct evidence of discrimination, and a retaliatory intimidation tactic on the basis of gender, national origin, race by the employer that constitutes adverse employment action and it represented the hostile work environment created against me. (Varughese Tr. pp. 162-164, 588-590, 833-856, 857-874, 889-892, 911-919,976-991,1054-1066, complaint paragraph 28).

30.2.   Defendants conduct was intentional and with reckless disregard for my psychological wellbeing, my autonomy as an Indian woman, a physician, and their conduct was a violation of my civil rights on a fundamental level, nor did it serve any other purpose because there was no threat by me to them, their patients, or their operations from me, as I managed 1000s of cases for them, which the Defendant Institution expected from me as they harassed me with PWC. (Johnson Tr. 250-253).

30.3.    PWC is composed of Board of Trustees and predominantly Caucasian male
         leadership at Mount Sinai Medical Center which included Charney, a psychiatrist,
         and Dr. Davis is also a psychiatrist who is the CEO, it represents a tool for
         discriminatory activities in that they retaliate against and create hostile workplaces
         for minority women employees and women who engage in civil rights activities for
         minorities. "The Physicians Wellness Committee addresses the need to identify, treat,
         and monitor physicians who are mentally impaired, are substance abusers, or have
         physical handicaps that impede their ability to carry out their patient care
         responsibilities. For further information, contact the Director of Risk Management at
         (212) 241-5853.", reports of discrimination, harassment, abuse at work by
         supervisors, fabricated "patient care lapse" and insubordinate, do not constitute a
         reason for referral but reckless malicious behavior by the same supervisors who are
         not reprimanded or stopped by the Defendant Institution for engaging in obviously
         malicious illegal criminal activity.   (Tiger-Paillex Tr. 13-14, Varughese Tr. 899-909,
         Johnson Tr. 38-39, 44-48, 50-58, Ex. 5 p. 35).

30.4.    PWC did not target a number of other male residents such as Yao and Azar.  Yao was
         not referred to PWC despite his verbal outbursts and destruction of hospital property.
         Azar was not targeted despite habitual absences, refusal to cover for other residents,
         and refused to do presentations.  (Johnson Tr. 20-44, 48-52, 59)

30.5.    Daniel Hughes, referred herein as "Hughes" was responsible for "The Employee
         Assistance Program (EAP) is a free, short-term counseling and referral service
         available to employees and their families in a confidential manner, not to be divulged
         and shared with PWC. (Ex. 5 house staff manual p. 22).

30.6.    My single conversation with Fersh on May 12, 2011 was about my concerns
         regarding various aspects of discrimination, harassment, hostile workplace,
         whistleblowing, and retaliation against me, so her report, after this discussion with
         her, was retaliatory, reckless, malicious, and defamatory created in collusion with
         Marina Lowy, legal counsel.  (Varughese Tr. 232, 248-250, Ex.175c, Ex. 45, p. 10).

30.7. Residents (Jordan and Hechtman) were involved in what appeared to be the questionable suicide at best (by overdose of propofol of Hechtman's 'best friend' under the most suspicious circumstances) and they were not referred for toxicology screen and to PWC and Figur for evaluation by Lento and Cordon-Cardo for mental health evaluation, fitness for duty, or for their suspect conduct, such as that both of them inexplicably took off from work together. (Ex. 125-126, Declaration # 141).

30.8. The Caucasian leadership did not target residents suspected of rampant alcohol abuse at work, McCash for his repeat harassment against me and other women, or Jordan's rampant suspect conduct including admissions into Emergency Room routinely for injuries and dehydration while oral passageways appeared to be intact of Jordan, or for Jordan's anger issues to my response to an email, or criminally false allegations against me, and then for Jordan not performing her duties or for suicide or homocide of her family member etc to Physician Wellness Committee or Employee Assistance Program (EAP) or Mental Health Liaison despite the admitted effect on these residents and their performances that was egregious. (Jordan Tr. 180-182, 166-167, 215-216, Figur Tr. 81-87, Varughese Tr. 659-673, Figur Tr. 66-68, Ex. 104, 125-126, 171, 47, 48, 231-238).

30.9. Jordan, a Caucasian woman who is nearly 6 foot tall and 150 lbs or more on a medium frame, compared to my 5'2" and 110 lbs on a petite frame, as such Jordan was able to impose her size to intimidate me by picking up case material, hovering over me at my desk, she disrupted my work by involving herself into my duties, she instigated conflicts with her incompetency and lack of knowledge, Jordan stalked me at work, and Jordan followed me around during my work day rather than attend to her own duties. (Varughese Tr. 77-78, 143-146, 791-801, 804-813, 833, 848-850, 852-855, 859-861, Pessin Tr. 169-171, Bleiweiss Tr. 43-50).

31. Dispute with and Additional material facts

31.1. By December 2010, the Institution had notice of my protected complaints, and both Lowy and Figur were advising Lento, Barnett, and Pessin in December 2010 and early January 2011 to create a false narrative irrespective of the report,

substantiation, and corroborations of my complaints by myself, and other witnesses. (Figur Tr. 18-20, 40-43, 48-53, Bleiweiss Tr. 15, 30-31, 35-36, 61-65, Johnson Tr. 67-71, 123-132).

31.2.   I, Varughese reported discrimination, harassment, and retaliation to Fersh in May 2011 when I met with her, and Fersh ignored my report, even though she is also in a position to obtain reports of discrimination and harassment from physicians in residency as the Mental Health Liaison but she was rubber stamped by Figur on March 2011 for her position.  (Varughese Tr. 250-258, see statement #30.6 above, Ex. 163, 175c).

31.3.   Fersh's conduct represents a complete violation of professional medical ethics and the discriminatory hostile and retaliatory action of the Defendants to defraud me of my reputation, for which she should lose her medical license.  Fersh's evaluation was punitively rendered in consultation with PWC, a subcommittee of QCC committee of the Board of Trustees which is composed of Trustees, laymen who are prominent businessmen, spouses of these men, and exclusively Caucasian doctors, along with Marina Lowy, a caucasian lawyer, the sole purpose of the PWC appears to be to target minorities, especially in my case, for engaging in civil rights protected activities and discourse at the Defendant Institution following acts of discrimination and harassment directed at only me. (Figur Tr. 84-87, Ex. 175c, 45, 46).

31.4.   In June 2011, my legal counsel wrote to the Institution to request that the Institution stop discriminating against me and that the Institution communicate with them, the Institution did not communicate with my legal counsel as requested and Fersh's report was not made available to me or my lawyers, despite my requests, as I was being labeled as "special needs", despite my handling of thousands of cases without a single incident compared to my other coworkers and their actual performance problems. (Barnett Tr. 61-62, Ex. 102a,b, 103, 129, 265, 110).

32.  Dispute with and Additional material facts

32.1.   Figur was coordinating, aiding and abetting Lento and Pessin to discriminate against me, created a hostile work environment, and retaliated against me. (Varughese Tr. 1080-1081, Ex. 89a, 167, 175c, 202).

32.2.   Women are targeted by Physician Wellness Committee through Figur who literally stalked me to the 86th Street Subway station, threw tantrums about my vacation, he obtained protected medical information from a nurse, then, he disclosed various false information about me to House Staff Affairs Committee[5] members based on what he thought he knew, he obtained Fersh's report that was blatant professional misconduct by Fersh, which is all part of the Defendant's Quality Assurance and Quality Control committee run by the Board of Trustees to create a discriminatory, hostile, threatening workplace for me and the other minority women who are targeted by the PWC. (Ex.272, Johnson tr. 39-40, Declaration #57-59).

32.3.   The PWC is paranoid about their illegal fraudulent conduct against minority women being exposed by the employees to the medical professionals outside of the Institution, therefore, they do not allow employees to alleviate their allegations and concerns through an impartial third party.  (Ex. 140, 162, 167, 169).

33.   Dispute with and Additional material facts

33.1.   Tiger-Paillex's should have halted all PWC activities, investigation, and intimidation, as there was no rational explanation for PWC involvement, because during this time I was managing thousands of cases with my direct supervisors, covering for residents who were out sick, nor was there any restriction on any of my patient care duties. (Ex. 84, 85, 88, 95).

34.   Dispute with and Additional material facts

34.1.   I satisfied the terms of the academic advisement but Barnett insisted that I did not on both June 9, 2011 and on September 12, 2011, he said that I "threw some shit against the wall and hoped it would stick" regarding my account of what actually happened to me, and stated in ever increasing angry manner that "how dare you write that?"

---

[5] House Staff Affairs Committee - an alleged ad hoc committee of physicians at Mount Sinai Hospital that hears an appeal related to disciplinary action or termination of employment of a physician.

repeatedly to me. (Varughese Tr. 259-315, Cordon-Cardo Tr. 176-177, ex. 186, ex. 233 p.58).

35. Dispute with and Additional material facts

35.1.   Despite an ongoing investigation on the events of December 2010 by the Tiger-Paillex, Figur, and Barnett/Johnson, and my immediate rebuttal, I remained on Academic Advisement.  On January 10, 2011, Lento complained that I took matters the "outside the Department", because of my legally protected activity to report hostile workplace conduct, retaliation, and discrimination.  (Varughese Tr. 265-275).

35.2.   Lento stated in March 2011, "Well, the other thing is with regard to your reflection on the incident as you should have appreciated from the advisement originally that was supposed to have been handed in at the end of January. And I appreciate that you weren't able to do it initially on time". (Ex. 172).

35.3.   I met numerous times with Lento from December 2010 into March 2011, and he had informed me that there had been no complaints regarding me to him by anyone else, for that matter, there were only a few complaints about me, other than various false allegations by about 3-5 people based on false assumptions due to lack of expertise, miscommunication, or as retaliation to complaints or reports of harassment or workplace problems. (Ex 167).

35.4.   Yao informed me that he was not on Academic Advisement, he never signed any document, and that he wrote an apology letter to Ms. Ida White, he did not read the book that I was assigned to read because he was not assigned the book, and that he did not meet periodically with Kalir regarding the issue.  Yao explicitly stated to me that the whole matter was minor to his work environment, and there was no allegations or referrals to PWC. (Declaration #71).

35.5.   Yao felt that he was targeted by Jordan who was on a downward spiral of inexplicable animosity towards him, including sabotaging him for his interest in Dermatopathology fellowship, such as with her demands that I request Yao to forgo his elective.  After Yao was offered the fellowship, not Jordan, Jordan became further combative and aggressive, maintaining secretive lists on him.  Lento was already

targeting Yao, and he was apparently emboldened after the termination of my employment to target Yao. (Ex. 264, Declaration #71, ).

35.6.    Yao informed me that Jordan had on numerous occasions stated that "I will show her" in reference to me, which is consistent with Jordan's response that she was not "intimidated by" me at her deposition, her emails regarding me, and the ongoing reckless and malicious conduct. (Declaration #72, 73).

35.7.    In fact, I had not spoken to Jordan since December 13, 2011 regarding any matters, and all my communications with her were in email format, due to misconstruing of my communication with her as "threatening" as per Pessin and I was threatened with termination of my employment, not Jordan for being insubordinate to Pessin. (Lento Tr. 129-131, Pessin Tr. 88-93, 155, Varughese Tr. 95-105,  Ex. 82, 54).

36.  Dispute with and Additional material facts

36.1.    On September 12, 2011, I met with Barnett who called my self-reflection a "diatribe" and that I "threw some shit against the wall and hoped it would stick", and that I had to keep working with Firpo-Betancourt, despite my complaints about ongoing hostile work place, discrimination, and retaliation that were each forwarded the Defendants. (Ex. 223, 100, Firpo-Betancourt Tr. 262-269, Barnett Tr. 46-50).

36.2.    The essay adhered to my account of the events, reported on retaliation and discrimination that created a hostile workplace for me, and it represented a disclaimer about the unethical, uncivilized, and professional misconduct of the Defendants. (Ex. 51, 88, 100).

37.  Dispute with and Additional material facts

37.1.    I attempted to meet with Lento on December 9, 2010 and December 14, 2010 to report the repeat of altercations and disruption of my duties by McCash and to report ongoing problems with obstruction into my patient care duties, but there was no response to my requests, meanwhile, he was consulting with legal counsel on 12-14-10. (Varughese Tr. 265-268, Ex. 82b, 45 p. 33-34).

37.2.    I was on Autopsy rotation which Lento supervised from December 19, 2010 to
January 13, 2011 during the course of which, Lento became progressively aggressive
towards me at work in person.  (Varughese Tr. 872-874).

37.3.    Lento sent out derisive e-mails with derogatory characterization of women to various
list-serves in the residency program. Lento's interaction with other women were also
apparently curbed, Lento was informed in February 2011 that he would be replaced
as Program Director, Lento also had to utilize Pessin and Jordan as an intermediary
communicate with all other women, including Maniar. (Ex. 103a, 103b, 155).

37.4.    Barnett stated that Lento, "Pat has not embraced this responsibility to the extent that
any of us would have liked. Pat's underwhelmed me with how -- with his
performance", however, Lento continues to be in good standing professionally and
Lento promptly obtained a job at Westchester Medical Center in White Plains, NY
with John Fallon, M.D, who had been hostile towards me on the basis of my race and
gender. (Ex. 223 p. 46).

37.5.    In my opinion, Lento also engages in professional misconduct routinely with regards
to hospital's medico-legal malpractice cases, which he helped cover up as the
Director of the Autopsy service, as per my direct experience, and other physicians
who have reported rampant false reporting of "causes of death" by hospitals in
surveys. (Ex. 147, 148, 153, 154).

37.6.    Lento routinely ignored pages from residents. (Ex. 150).

37.7.    Lento was overheard stating that he felt that he was "fired" from the hospital after he
did the Defendant Institution's "dirty work". (Declaration # 104).

38.  Dispute with and Additional material facts

38.1.    I discussed the book listed in the notice of Academic Advisement with Lento,
Castaldi, and Cordon-Cardo, but in a manner characteristic of racist sexist bigotry,
they repeatedly claimed that I had not read the book, irrespective of the facts, they
didn't ask me about it on May 24, 2011 but falsely alleged that I threw the book
when I reported discrimination and retaliatory conduct, and then, the Defendants
claimed that I did not read the book in "final warning" in July 14, 2011, along with

other falsified allegations as per Lento, which underwent numerous revisions on how to even phrase their false "book incident". (Varughese Tr. 293-315, 316, 700-730, Firpo-Betancourt Tr. 262-264, Cordon-Cardo Tr. 176-177, Tiger-Paillex Tr. 67-73, Ex. 191a, 191b).

39. Dispute with and Additional material facts

39.1.    On May 3, 2011, Cordon-Cardo told me that he had "been updated by the persons in the institution, and we wanted to make sure that we are in the same -- on the same page" who then threatened to terminate my employment for writing the original self-reflection, then proceeded to harass me further by demanding a new self-reflection, while McCash publicly thanked Jordan "for essentially saving" their asses, "a %@ess. :)".  (Varughese Tr. pp. 311-312, Ex. 171).

39.2.    The Institution was hoping to substantiate their falsified allegations in the Academic Advisement, but when that failed with my disclaimers of which they had always been aware of, the meetings were to instigate an incident with which the Defendants can have a "fresh start" for themselves to continue their discrimination, hostile work place, and retaliation, and called my discrimination complaints "ugly". (Ex. 141, 173, 174, 179)

40. Dispute with and Additional material facts

40.1.    On May 3, 2011, Cordon-Cardo, Castaldi and Lento, "the guys" stated my employment would be terminated without any due process during the meeting, in addition, to inappropriate attack on my self-reflection essay. (Ex. 172a, pp. 7, 28-31, Varughese Tr. 288-296).

41. Dispute with and Additional material facts

41.1.    A meeting was scheduled in two weeks time from May 3, 2011, which according to the Institution was inexplicably May 24, 2011, and not May 18, 2014.

41.2.    On May 5, 2011, I submitted my concerns about illegal discrimination, ongoing retaliation, and hostile work place to Cordon-Cardo, to which he and Lento states that they will proceed more carefully. (Ex. 174).

42. Dispute with and Additional material facts

42.1.    On May 24, 2011, I observed Cordon-Cardo read the brief essay that I wrote, which he dismissed, and he had said that I refrain from reporting about doctors drinking on the job, but nothing about my reports of harassment, retaliation, and my cease and desist requests of their hostile discriminatory activities. (Varughese Tr. 700-701, 729, 747-748, 753-754,  Ex. 172c p.17, 97, 100).

43.  Dispute with and Additional material facts

43.1.    On or about May 24, 2011, Cordon-Cardo did not want to discuss any of my concerns nor my new self-reflection essay and the meeting ended abruptly, but only after Cordon-Cardo explicitly also stated that "a a a a reflection that didn't address whatever we wanted you to say". (Ex. 172c).

43.2.    During this period, I was working on various services of Mount Sinai Medical Center or Mount Sinai Hospital's Department of Pathology, such as gynecological pathology rotation, clinical chemistry, etc.  My duties included maintaining a record of ever increasing disruption of my various cases in an already dysfunction department, grossing cases, previewing the slides for diagnosis, teaching medical students, delegating tasks to pathology assistants and moonlighters, and finalizing both gynecological surgical cases and gynecological biopsy cases by working with one of the three pathologists, Kalir, Eliasen, and Deligdisch.  I had a professional and productive working relationship with each of these pathologists that was being actively sabotaged and ruined by Lento, Cordon-Cardo, Barnett, and especially, Bleiweiss who specifically took to targeting Kalir, with their increasing involvement and disruption of the GYN pathology service with some fall out against me with their conduct. (Varughese Tr. 737-754, 804-833, 840-847, 891-892, Ex. 180, 181, 182, 183-185, 186, 142, 143, 95-100).

43.3.    During this period, Morency was out sick routinely and she also left numerous cases unfinished each day and she fell behind on her primary duties with signing out patient cases.  In addition, Morency behaved erratically in that she would arrive in the grossing work area much later than I did, she 'twerked' in the middle of the grossing room to no music, she talked to herself, and then, she decided to leave her

work incomplete, as she was preoccupied with fabricating pretext to paper the
record, unbeknownst to me and my supervisors, with Cordon-Cardo, Lento, Castaldi,
Jordan, Bleiweiss, and McCash, and on May 24, 2011, around 8pm, Morency made
obviously false allegations to paper the file, that I had no knowledge of, until this
litigation. (Morency Tr. 34-35, 99-108, Ex. 179, 185, Declaration 61c, 87-90).

44. Dispute with and Additional material facts

44.1.   The first and the second self-reflections are reflective of my own account of the
incidents as requested by the Defendants.  Their attempt to coerce me to write a new
self-reflection continued until the termination of my employment and they utilized
PWC, psychiatric evaluation, drug testing, intimidations, verbal threats of
employment termination to do so but my reports of discrimination, retaliation, and
hostile workplace had not changed and it became more clear to me that they were
using illegal tactics to discriminate against me, retaliate against me, and segregate me
on the basis of gender and national origin vis a vis race from my profession with
their intimidation of me and anyone who supported me. (Varughese Tr. 299-315,
Johnson Tr. 135-148).

45. Dispute with and Additional material facts

45.1.   On May 24, 2011, the Defendants allegations of "throwing" or "Do you think that I
am harassing you because you are harassing me in a way throwing this book" and it
was a false allegation as that did not occur made in retaliation.  (Varughese Tr.
316-317, 700-701, 724-729, 747-748 Ex. 172c p. 3-4, 174, 178, 179).

46. Dispute with and Additional material facts

46.1.   On or about June 10, 2011, Levine and Blit, LLC requested that Mount Sinai
Medical Center cease and desist from all their adverse employment actions against
me and that it contact them, my legal counsels. (Tiger-Paillex Tr. 102-105, Ex. 99,
100, 187).

46.2.   As of May 2, 2011, the "final warning" was a collaborative effort made up of
imagined delusional material by Lento, Cordon-Cardo, Tiger-Paillex, Barnett, Firpo-
Betancourt, Figur, and Marina Lowy who had circulated the "final warning" drafts

for weeks in response to identification of illegal activities, protected complaints, and for my belonging to protected classes, as these were not reasons to warrant any adverse employment actions against me. (Cordon-Cardo Tr. 199-205, Lento Tr. 190-234, 246-259, Firpo-Betancourt Tr. 102-104, 114-117, 245-248, 262-264, Varughese Tr. 407, 412-413, 703-730, 737-754, 762-852, 804-813, 827-839, 850-855, 857-874, 870-881, 889-892, 905-909, 911-919, Johnson Tr. 149-151, Barnett Tr. 65-66, 78-80, Tiger-Paillex Tr. 76-117, Cordon-Cardo Tr. 176-177, Lento Tr. 259-266, Firpo-Betancourt Tr. 245-248, Ex. 45 p. 9, 190-195, 88, 89, 95, 140, 175a).

46.3.   During the period of July 2010 onwards, the ongoing performance problems of innumerable residents, not in my protected class, such as Hechtman, McCash, Jordan, Chepovetsky, Mikulosovich, Azar, in addition, to shouting at one another, delaying cases, stalking me at work (Jordan and McCash), drinking alcohol at work during grossing duty (McCash and Jordan), requesting moonlighters as early 8am for grossing assistance, lack of licensing as fourth year residents, and patterned insubordination to supervisors, were routinely ignored with preferential treatment given to them by Lento, Pessin, and Barnett, who engaged on their own professional misconduct. (Varughese Tr., 259-315, 702-730, 747-764, 804-813, 827-839, 850-855, 862-863, 872-880,, Ex. 38, 39, 41, 43, 44, 47-49, 52-55, 62-67, 69, 71-74, 84-85, 102a, 102b, 104-107, 109, 111-139, 147, 148, 150, 166, 171, 176, 177, Declaration # 94).

46.4.   The Defendants issuance of "final warning" was an act of professional misconduct and an example of the ongoing retaliation and hostile workplace conduct by holding me to arbitrary impossible standards by Lento, Barnett, Cordon-Cardo, and Firpo-Betancourt. (Varughese Tr. 322-330, 335-350, 714-717, Cordon-Cardo Tr. 176-177, 194-210, Fipro Tr. 245-248, 262-264, Barnett Tr. 65-66, 78-80).

47.  Dispute with and additional material facts

47.1.     On or about June 10, 2011, Levine and Blit, LLC requested that Mount Sinai
          Medical Center cease and desist from all their adverse employment actions against
          me and that it contact them, my legal counsels. (Tiger-Paillex Tr. 102-105, Ex. 99)

47.2.     On June 9, 2011, I met with Barnett and Tiger-Paillex without any explanation to me
          as to why I was asked to meet with them, because the Institution and Defendants
          were on a 'fishing expedition' against me, despite no complaints from my
          supervisors about my performance, who were aware about ongoing laboratory
          problems, as well as my extensive follow up and research into the issues having
          revealed that it was not my error. (Varughese Tr. 125-126, Morency Tr. 86-90, Lento
          Tr. 233-234, Ex. 143, 186).

47.3.     On or about June 22, 2011, shortly after the letter from my attorneys, the
          incompetent, untrained, unskilled Cordon-Cardo was again personally trying to
          obtain material with which to terminate my employment. (Varughese Tr. 702-811,
          911, Lento Tr. 239-248, Ex. 189, 186)

47.4.     All allegations of unprofessional behavior are false, much like patient care lapse,
          which were fabricated in December 2010 as retaliation and hostile actions against me
          for my protected class and engaging in protected civil rights activity.  In July 2011,
          without any single incident since December 2010 and without any complaints with
          regards to my work or my performance, professionalism, or patient care duties, the
          Defendants took adverse employment actions against me, and hired Firpo-Betancourt
          to harass me. (Varughese Tr. 701-753 762-764, 827-833, 855, Lento Tr. 248-259,
          Firpo-Betancourt Tr. 262-264, Ex. 192).

47.5.     The claims of unprofessionalism is retaliatory because McCash, Jordan, and a myriad
          of other coworkers were unprofessional and had academic performance problems but
          they were not targeted for termination, academic advisement, or final warning.
          (Varughese Tr. 783-803, 859-861, 848-852, 864-870, 889-892, 911-919).

47.6.     In June to July, 2011, Hechtman was breaking "policies" but she was not placed on
          Academic Advisement like me, rather her unprofessional conduct and patient care

issues were downgraded to a "warning", despite the ongoing trend.  (Lento Tr. 234-239, 274-280, Ex. 111-117, 123, 124).

47.7.    Shortly after this incident, Hechtman's schedule was changed to allow her to complete her residency in just three years, and she was also given the Gastrointestinal fellowship by the Defendants! (Ex. 119-121).

47.8.    Yao, Azar, Hechtman, McCash, Jordan, Chepovetsky, outside of my protected class, were not subjected to toxicology screening or psychological evaluation. (Ex. 39, 104, 109-139).

47.9.    Julie Chepovetsky, who is not in my protected class, was routinely delaying numerous cases, mishandling specimens, yet her evaluations during these periods were excellent in all competencies, and additionally, Chepovetsky did not answer pages, respond to emails, but she was not subjected reprimand such as Academic Advisement. (Ex. 128-135).

48.  Dispute with and Additional material facts

48.1.    Firpo-Betancourt, self-reported that he had retired from academic medicine following several federal lawsuits against him, he did not hold a title recognized by ACGME, as such the Director of Educational Activities, which was just made up for Firpo-Betancourt in direct connection to the Institution retaliating against me, and I should not have been made to meet with Firpo-Betancourt, especially while Firpo's duties were not to have any oversight over residents, and his duties did not overlap with those of Lento but he was hired to terminate my employment. (Varughese Tr. 329-335, Firpo-Betancourt Tr. 14-33, Ex.35).

48.2.    On August 2, 2011, I informed Firpo-Betancourt that the "final warning" was in retaliation to my protected legal activity and discriminated against me because of my status as a woman of Indian descent and it would further create a discriminatory hostile work environment.  I personally gave a self-reflection to Firpo-Betancourt, and I reported on my concerns of discrimination, hostile work environment, and retaliation, and I recounted all the separate incidents of discrimination, hostile workplace creation, and retaliation against me that had taken place in the past year,

and I personally forwarded copies of my self-reflections to Firpo-Betacourt. I also stated that I should not be subjected to the terms of "Final warning" but the Institution stated that my employment in the Anatomic and Clinical Pathology residency will be terminated, so irrespective of what I stated, the "final warning" was in effect since I was employed by Mount Sinai Medical Center. (Varughese Tr. 714-717, 726-727, 876-877, ex. 70, 98, 99, 100).

48.3.    Only two days after this meeting, Firpo-Betancourt recommended the termination of my employment on August 4, 2011, which spiraled into chaotic emails between Lowy, Firpo, Barnett, Johnson, Lento, Najfeld, and Jordan with Patel informing Fipro that "this has been dragging for two years now and we all want it to be over once and for all and move on". (Firpo-Betancourt Tr. 378-397, 280-288, Varughese Tr. 335-350, Ex. 202, 204).

48.4.    The Defendants did not take any adverse employment actions against other residents whose performance did not meet "ACGME requirements" because it was "an open discussion". (Firpo-Betancourt Tr. 70-71)

49.  Dispute with and Additional material facts

49.1.    I met with Firpo-Betancourt several times, and each of these meetings were punctuated with unprofessional and overtly discriminatory sexist conduct, and despite my efforts to maintain a professional relationship, he informed me that he will "pay out of his pocket" for late fees rather than change my schedule, following the first meeting he followed me outside the office, stepped into my personal space, and then, he told me out of the earshot of Patel that he was going to "help me" after stating that he has to figure out the "politics of the Institution" on August 2, 2011, which were hostile rhetoric with ongoing invasion into my personal space and work areas such as routinely stalking my desk, which were outside the professional ethical conduct. (Varughese Tr. 343-350, 524-536, 541-550, 730-737).

49.2.    Jordan and Dr. Robert Guarino was heard by myself stating to other residents that Fipro-Betancourt was hired to fire me in September 2011. Mabel Ko, M.D. shared the work space next to me, she complained about Firpo-Betancourt's odd and erratic

behavior that was ongoing, and that she felt threatened and concerned about his

stalking my desk, especially, when I stepped away from the desk. (Declaration #77).

49.3.   Ko was not the only resident who complained about Firpo-Betancourt, by August 2,

2011, innumerable complaints against Firpo-Betancourt were made to Barnett, which

led to further restriction of his role, which Firpo-Betancourt admitted to me on

August 17, 2011 that several new measures were taken against Firpo-Betancourt

following innumerable complaints of violation of privacy by residents and fellows,

and their report of fear of retaliation, which instead of alerting the Institution to the

problem conduct of Firpo-Betancourt and then, limiting his interaction with me, the

Institution encouraged Fipro-Betancourt to interact with me, and after the termination

of my employment, they made him Program Director, despite his lack of

qualifications. (Firpo-Betancourt Tr. 34-37).

49.4.   Residents and fellows have informed me that the Institution had no choice but to

limit Firpo-Betancourt's interaction with subordinates following the termination of

my employment and numerous complaints about him, and that he is a Program

Director in name only. (Declaration #1-3).

50.  Dispute with and Additional material facts

50.1.   On August 1, 2011, Barnett was already emailing "Micky" to determine if he could

continue his discrimination campaign against me. (Ex. 202, 204a).

50.2.   By August 4, 2011, Barnett was informing Firpo-Betancourt "don't bend over

backwards so far that you fall over!" after Patel directly emailed Firpo to inform him

as Firpo later states to Barnett that "this has been dragging on for two years"

meaning, since August 2009, or circa the Fallon hostile work place and

discrimination incident, following which I was told that I wasn't happy or smiling by

Schiller. (Ex. 202b).

50.3.   I was scheduled for two weeks from August 1, 2011 to August 14, 2011, of

cytogenetics with Vesna Najfeld, PhD, who "made people fail" for which she had a

bad reputation with the Program Coordinator, Allene Carter. (Varughese Tr. 745,

368-418, p.409 line 9 -"incident review" to "at last minute", Ex. 210).

50.4.  The Tumor Cytogenetics laboratory did not provide me with a designated desk space or access to computers during the Tumor Cytogenetics rotation. (Declaration # 95).

51.  Dispute with and Additional material facts

51.1.  On August 2, 2011, I met with Najfeld briefly for about 10 minutes, and she informed me that she was working on equipment upgrades, therefore she would be too busy to work with me and she did not want me to waste her time, so I was directed to read a chapter in a textbook and I was directed to work with technicians, but only as allowed by the technicians' schedule. (Varughese Tr. 368-418, 1077-1078, Ex. 204b, 203).

52.  Dispute with and Additional material facts

52.1.  On Monday, August 8, 2011, Najfeld could not be found for hours in her office in the morning hours and the afternoon hours, so I eventually e-mailed the presentation for her to review. (Varughese Tr. 368-418).

52.2.  Angela Scalise informed me that Najfeld informed her that Najfeld had a 'doctor's appointment', and she should have been back, but that Najfeld had not reappeared as expected for many hours, which was commonplace. (Varughese Tr. 368-418).

52.3.  Najfeld did not carry a pager, so I could not page her to inquire about her whereabouts, and since, I am not punitive about documenting and blaming my supervisors for not being present at work regularly, as many like Najfeld, Fallon, and Schiller were not at work regularly during routine work hours with supervisory responsibilities to a large staff and laboratory. (Varughese Tr. 368-418, Declaration #96).

53.  Dispute with and Additional material facts

53.1.  I went to Najfeld's office to review the presentation, she was absent from her own laboratory that she allegedly supervised. (Varughese Tr. 368-418).

53.2.  I asked Najfeld to provide me with a brief overview of any criticism, in a respectful and professional manner, to improve the simple presentation but Najfeld refused to provide me with any information because there were no major problems. (Ex. 204a, b, c, d).

53.3.   Najfeld emails never explained the problem with presentation, nor did she attempt to redline a copy back to me. (Ex. 204e).

54.  Dispute with and Additional material facts

54.1.   The purpose of presenting a case at the clinical pathology call or follow up conference was not to be punitive towards me and, nor were these talks or discussions graded in any way, and these conferences were held with the sole purpose of sharing an interesting case or clinical pathology information or problem to diversify the exposure of different residents to similar cases and topics. (Varughese Tr. 352/ 368-407).

54.2.   I was stunned by Najfeld's unprofessional conduct, her slurred words, and illogical demands. (Declaration # 97).

54.3.   I immediately forwarded the simple cytogenetics case presentation to practicing Board Certified pathologists to review, who informed me that the presentation was satisfactory. (Declaration # 98).

54.4.   To my knowledge, the only presentations that were reviewed and edited by my supervisors were Morbidity and Mortality conference presentations by Department of Pathology to another Department such as Surgery.  In my experience, Lento routinely changed these presentations to misrepresent and falsify the findings in medical-legal cases. (Declaration # 99).

55.  Dispute with and Additional material facts

55.1.   I did not receive a phone call or page from Najfeld until 5pm and then, I didn't have any reception for about 40-45 or more minutes because I was in the subway. (Varughese Tr. 368-418).

56.  Dispute with and Additional material facts

56.1.   I made the mistake of speaking to Najfeld after the regular duty hours, she was the one who was not in her office all day, just like she was not at work on Friday August 5, 2011, which is preferable for all staff and the lab is entirely operational without her, the supervisor. (Varughese Tr. 368-418).

57.  Dispute with and Additional material facts

57.1.    Najfeld illogically demanded that I return to the Institution in 10 minutes, which was impossible, I informed her repeatedly that I was at least 45 min to 1 hour away from the Institution and that I could not return by 6pm. (Varughese Tr. pp. 368-407).

57.2.    Despite my repeat explanation to her that I am nowhere near the Institution, Najfeld illogically demanded that I return to the Institution by 6pm.  Her voice sounded drowsy, she was unable to inform me over the phone any specifics that should be changes with regards to my simple case presentation.  (Varughese Tr. 368-418).

58.  Dispute with and Additional material facts

58.1.    Najfeld was the one who was not in her office all day, an all too common occurrence, and it was impossible for me to return in ten minutes by 6 pm, as I lived about 45 minutes to one hour away. (Varughese Tr. 368-418).

58.2.    The reason I moved out of the so-called "subsidized housing" by Mount Sinai Hospital was because there were repeat break ins into my apartment by the Institution that was unannounced, and I was worried about these ongoing rampant breaches to my privacy. (Declaration # 63).

59.  Dispute with and Additional material facts

59.1.    My presentation was never announced in the first place to the Department and it wasn't clear to me that Najfeld wanted me to announce the cancellation of a presentation that wasn't even announced in the first place. (Varughese Tr. 368-418, Ex. 204b, 204c, 204d, 204e, 204g).

60.  Dispute with and Additional material facts

60.1.    Multiple cases were routinely presented during the 9am Clinical Pathology call/ follow-up conference that covered resident physician activities at the Defendant Institution and there were typically discussions about various cases from Blood banking, Clinical Chemistry, Hematology, Microbiology, and Laboratory administration, so I was unaware of any change from this format and within this format, my presentation was unannounced, as was Chow's presentation. (Varughese Tr. 368-418).

60.2. Dr. Jonathan Chow had informed me that he was going to discuss a case at Clinical Pathology follow up conference, and there was no pressure for him to inform anyone about his talk, because there was no email from him about his presentation, which he also postponed. (Varughese Tr. 368-418).

61. Dispute with and Additional material facts

61.1. Najfeld did not ask that I email everyone else who could possibly attend the Clinical Pathology (CP) call and follow up conference, so I emailed Najfeld that she did not need to attend the 9am Clinical Pathology call and follow up conference as she had requested because I thought she didn't want to appear at the conference for other possible presenters. (Ex. 204e).

62. Dispute with and Additional material facts

62.1. During Tuesdays at 9am, where if there were no informal presentations, questions about call and informal discussions usually took place for about an hour. (Varughese Tr. 368-418).

62.2. I was uncertain that there would be no additional presentations, so I also waited for other people to present on Tuesday August 9, 2011. (Varughese Tr. 368-418).

62.3. Najfeld routinely emailed everyone regarding presentations by other residents who rotated in her lab. (Declaration #100).

62.4. I was comfortable presenting the case as it was on Tuesday August 9, 2011. (Varughese Tr. 368-418).

63. Dispute with and Additional material facts

63.1. As of August 5, 2011, I did not have any complaints regarding Tumor Cytogenetics because I worked with one or two technicians directly and I spent the remainder of time reading, and I spend a few minutes alone with Najfeld, which was my prior experience and what I expected for Tumor Cytogenetics rotation. It's quite possible other residents, especially Caucasians are given more one on one direction and training in every aspect of the residency as part of their employment in Anatomic and Clinical Pathology, including Tumor Cytogenetics from which I was excluded. (Varughese Tr. 368-418, Ex. 203).

63.2.    Najfeld, like the Defendants were unprofessional.  Firpo-Betancourt emailed and directed Najfeld about her duties, onwards of which date, my work environment went from the typical to hostile attacks on me about matters unrelated to the rotation, shouting at me, and derisive language directed at me by Najfeld. (Varughese Tr. 368-418, Ex. 204a-g).

63.3.    See 59, 60 and 61.

63.4.    Firpo-Betancourt ignored performance problems related to Chepovetsky, a white woman, and he proceeded to excuse her misconduct, and there were no academic advisement, disciplinary actions, or any other adverse employment action taken against Chepovetsky. (Firpo-Betancourt Tr. 147-159, 174-180, 198-205).

64.  Dispute with and Additional material facts

64.1.    The person who was absent and not present at the Tumor Cytogenetics laboratory was Najfeld.  Najfeld was out of work on Friday August 5, 2011, in addition, to Najfeld's unscheduled disappearance from the laboratory on Monday August 8, 2011. (Varughese tr. 368-418, Ex. 204c, 204d).

64.2.    My presence in the cytogenetics laboratory coincided with available technicians, not Najfeld, and the remainder of the time I directed my own work/study as was expected of me. (Ex. 203, Varughese Tr. 413-414).

64.3.    Najfeld, not a medical doctor, refused to work with me during my first two weeks of cytogenetics rotation because she alleged that she was writing up a research grant, which was likely untrue because the laboratory serves a clinical function providing highly lucrative reimbursable clinical tests to actual patients.  Najfeld, during the second two weeks of cytogenetics rotation in August 2011, did not want to work with me because she allegedly had equipment upgrades. (Ex. 204c).

64.4.    Lento was aware of ongoing performance problems of Azar, including his absence from cytogenetics laboratory, but no actions were taken. (Lento Tr. 279-280, Ex. 105).

65.  Dispute with and Additional material facts

65.1.    Najfeld went on a lengthy and disturbing verbal abuse about my presentation, she
shouted at me in a threatening manner, she threw tantrums, all of which was based on
the Defendants' racial and gender animus to create a hostile work place and
retaliation against me because previously, Najfeld just ignored me with her
preoccupation with alleged grants or equipment issues. (Varughese Tr. 413-414,
398).

66. Dispute with and Additional material facts

66.1.    I put away my smartphone when asked by Najfeld. (Varughese Tr. 416-417).

67. Dispute with and Additional material facts

67.1.    I was berated, singled-out, humiliated by a supervisor on basis of my presentation
and my medical knowledge based on one sentence answer about "APL" by a very
absentee supervisor who spend about one hour with me. (Jordan Tr. 146, Lento Tr.
258-266, Varughese Tr. 416).

67.2.    Other residents routinely, reviewed and discussed negative evaluations with the
evaluator, an opportunity that was not given to me.  (Jordan Tr. 141-142).

67.3.    On August 11, 2011, prior to my completing the two week of tumor cytogenetics
rotations and the presentation, Firpo and Lento mass emailed Vesna, Cordon-Cardo,
Patel, Lowy, Tiger-Paillex, Johnson, Barnett, and Jordan, another resident, about me,
and Jordan offered to assist further with the help of Morency to terminate my
employment from Hershey, PA and vacation. (Ex. 205a, 205b, 206).

68. Dispute with and Additional material facts

68.1.    On or about August 11, 2011, Najfeld was involved with legal counsel, Jordan, and
Defendants to pre-textually terminate my employment on the basis of the
cytogenetics rotation because Patel stated that this "was going on for 2 years".
(Jordan Tr. 138-142, 144-145, Firpo-Betancourt Tr. 166-173, 180-189, Varughese Tr.
368-418, Ex. 206).

68.2.    On August 16, 2011, I presented the tumor cytogenetics case, and it was well
received.  Chow informed me via text message that it was well done, but Morency

was visibly upset at this conference following my presentation, and I was concerned that she would act out against me. (Declaration # 101).

68.3.   On August 15, 2011, unbeknownst to me, Morency was already making defamatory allegations about me without addressing any of the allegations with me, since she was out of work on vacation for several weeks, and I had not worked with her or seen her since first week of June 2011. (Ex. 207-209).

68.4.   The Defendants fabricated that I did not meet the expectations, even though, I did meet the standards that everyone else in the residency program met for cytogenetics, with Anatomic and Clinical Pathology Board Certification exam being the accepted test for competency. (Ex. 210, 206).

68.5.   On August 17, 2011, I spoke with Firpo-Betancourt to whom I mentioned a number of problems with Najfeld and my dissatisfaction with Najfeld, but I was not informed that I had not satisfactorily completed the rotation or that Tumor Cytogenetics rotations would be a cause for termination of my employment.  (Varughese Tr. 352-364, 459-462, Morency Tr. 45-50, 90-100).

68.6.   On November 14, 2011, the evaluation by Najfeld was only reviewed by myself in connection with the House Staff Affairs Committee hearing. The negative evaluation dated August 12, 2010 (apparently meaning 2011) was also submitted prior my presentation on a cytogenetics case on August 16, 2011.  (Barnett Tr. 75-76).

68.7.   Lento was aware of Chepovetsky's "subpar" performance on numerous areas including over 15 cases not signed out for several weeks but she was not placed on Academic Advisement to read a book on professionalism and self-reflect, and Lento alleges that Firpo-Betancourt who was not even hired as of May 2011 responded to Jordan regarding this issue. (Lento Tr. 266-281, 286, Ex. 128-135).

68.8.   Azar did not show up to Tumor Cytogenetics, Blood Bank, Cytopathology, just to name a few rotations, as per his direct supervisors. (Ex. 109).

69.  Dispute with and Additional material facts

69.1.   Drs. Amanda Blouin and Taisha Roman reported their own concerns about providing coverage for other residents or services because they were on assignment on another

rotation in Clinical Pathology and the Defendants has asked Blouin to cover for another resident twice in a six month period. (Firpo-Betancourt Tr. 208-209, Ex. 165a, 216, 217).

70. Dispute with and Additional material facts

70.1. On August 4 and 5, 2011, the Defendants allegedly maintained a list that no one else could access, which certainly suggests that other residents or fellows would be available if a resident was unavailable to cover or out sick, so instead of proceeding to the next person on the list, Jordan attacked me, belittled me, and engaged in unprofessional conduct towards me in the most aggressive and delusional manner. (Varughese Tr. 418-430, Ex. 216).

70.2. Jordan and Morency, two Chief Residents were paid additional monies to provide additional coverage as part of their Chief Resident duties but both of them were unavailable at the Defendant Institution on August 5, 2011 to provide coverage for residents who were out sick. (Morency Tr. 90, Varughese Tr. 849-850).

70.3. Numerous residents reported conflicts with providing coverage, the usual course is to approach the next available resident for coverage and then, return to myself for the next coverage request. (Varughese Tr. 418-430).

71. Dispute with and Additional material facts

71.1. On August 4, 2011, as soon as I received the email, I informed Jordan that I could not cover for the sick resident on the following day due to an injury that I sustained. (Varughese Tr. 432-436, 456-458).

71.2. Jordan cited non-existent policies for many months, then some policies were created and installed while I was on vacation, and I had no part in it, yet other residents, except for me, were allegedly involved in the final decision. Firpo-Betancourt referred them to as "your (Jordan's) policies" that were randomly installed to codify harassment, discrimination, and disparate treatment of minorities and targeted minority woman doctors like myself, not Jordan or Chepovetsky, including Azar or Yao, as it was only for the year of 2011-2012. ( Johnson Tr. 26-27, Varughese Tr.

418-432, 424-428, 447-451, 964-968, Morency Tr. 45-47, 139-144, Firpo-Betancourt Tr. 198-200, Ex. 196-199, 201).

71.3.  The real policies of the Defendant institution as per Defendant. (Ex. 201).

71.4.  As per the list of residents to cover surgical pathology absences, logically Dr. Alicia Martinez should have been slotted to cover on August 5, 2011, not I, since she was covering Clinical Chemistry, so it was not surprising that I was targeted by Firpo, Lento, after their extensive emails prior to August 4, 2011. (Ex. 216).

71.5.  During this process Firpo-Betancourt divulged medical information about Dr. Sarah Blowe, a woman of color, to Martinez and others, which was unprofessional and unethical, likely set up a hostile environment for Blowe at the workplace, as even I was informed of various defamatory allegations about Blowe. (Ex. 207b, 230).

71.6.  Jordan was directly involved in adverse employment actions towards Drs. Sarah Blowe and Jonathan Yao both whom who were in several protected classes as minorities, having known both of them personally.  Blowe was on "forced leave" without her consent following months of discriminatory hostile workplace conduct towards her, that included the systemic Institutional discrimination patterned against minorities and minority women by Figur, Barnett, Johnson, Jordan, Firpo, Lento, Cordon-Cardo, Lowy, and Tiger-Paillex. (Jordan Tr. 171-172, Tiger-paillex Tr. 19-24, Figur Tr. 10-25, Ex. 50, 201, 230, 264, 272).

72.  Dispute with and Additional material facts

72.1.  It was my professional judgement, as a medical doctor that my injury precluded me from handling blades for scalpels and microtomes to take tissue samples for the intra-operative consultations for which the Department of Pathology had hired a technician in January 2011.  (Varughese Tr. 418-430).

73.  Dispute with and Additional material facts

73.1.  On August 5, 2011, I reported to Tumor Cytogenetics rotation because my arm injury did not preclude me from non manual labor on tumor cytogenetics.  Jordan routinely volunteers information about her own health that were also allegedly false per her

own over sharing conversations with me prior to December 2010. (Varughese Tr. 418-430, Declaration # 109-110).

74. Dispute with and Additional material facts

74.1.   The request for doctors' note was in excess of established hospital policy for being at work with an injury.  (Varughese Tr. pp. 424-432, 434-437, 453-459, 588-599, Jordan Tr. 146-150, 161-164, Morency Tr. 110-112, 178-180, Johnson Tr. 189-192, Ex. 211).

74.2.   As of August 15, 2011, other resident and fellows were not required to bring any note excusing their absences for weeks to days at a time, including weeks of fake jury duty, which was allegedly just a administrative leave for Jordan and Morency from work in excess of their vacations, conferences, and sick days, after both of them could not perform their patient care duties. (Jordan Tr. 146-150, 161-164, Morency Tr. 110-112, 178-183, Ex. 164a, 164b, 164c, 164d, 164e, 165a, 165b, 275, 276, ).

74.3.   If my own patient care duties were not compromised, I routinely covered for residents who were out sick on the Surgical Pathology rotation, were attending national conferences, wanted to change their call schedules, overwhelmed by increased number of autopsy cases, or requested my assistance, and I also taught medical students , unlike other residents during both their Pathology courses and during my rotations. (Ex. 91, 92, 162)

75. Dispute with and Additional material facts

75.1.   Friday, August 12, 2011, I covered for a sick resident as requested. (Varughese Tr. 463-467, 429-433).

75.2.   Najfeld had become increasingly irrational, erratic and Najfeld had repeatedly verbally berated me, therefore, my concern was dealing with Najfeld. (Varughese Tr. 404-416, 465-469, Ex. 204e).

76. Dispute with and Additional material facts

76.1.   On August 12, 2011, I had to attend to Tumor Cytogenetics rotation to speak to Najfeld, and then, cover another service. (Varughese Tr. 463-467)

76.2.   Most residents did not respond to emails at all, and if they did respond, it was usually weeks to days later. (Ex. 112, 132, 133, 217, 266).

76.3.   Jordan who was on an away elective after the Defendants encouraged her to provide no service to the Institution but paid her salary while she was at Dermatopathology elective in Hershey, PA. (Jordan Tr. 173-178).

77.   Dispute with and Additional material facts

77.1.   Lento informed Jordan that I was covering the surgical pathology service. (Varughese Tr. 459, 464-470).

78.   Dispute with and Additional material facts

78.1.   As of April 2011, Lento was supposed to remove himself from overseeing me as the Program Director, yet he was stalking me at work routinely, even alleged that I was sneaking out because I took the stairs out of the hospital, instead of the elevator. (Lento Tr. 280-281, Firpo-Betancourt Tr. 34-37, Ex. 247b, 248).

79.   Dispute with and Additional material facts

79.1.   I spoke to Lento on August 12, 2011, he called Najfeld's laboratory and he was on the phone with Najfeld intermittently, including when I arrived to the laboratory. (Varughese Tr. 466, 468, 626, 720-723).

80.   Dispute with and Additional material facts

80.1.   I did not ignore any pages. (Varughese Tr. 410-412, 463-470, 720-723, 976-977).

81.   Dispute with and Additional material facts

81.1.   I spoke to Lento within seconds of the alleged page, so Lento was on the phone during and following this alleged page to my pager. (Varughese Tr. 410-412, 463-470, 720-723, Lento Tr. 189-190).

81.2.   Morency did not respond to her pages on several occasions, and she "wouldn't usually get pages in general unless I (Morency) was on call", apparently, residents did not respond to pages routinely, which the Defendants knew about. (Morency Tr. 174-177).

81.3.   Jordan did not have a working pager for over two weeks while she was allegedly performing Chief Resident duties. (Varughese Tr. 522-525, Ex. 276).

81.4.   McCash lost his pager for some period of time. (Ex. 276).

81.5.   Morency was on vacation for two weeks from August 1, 2011 to August 14, 2011. Firpo-Betancourt demanded that Morency paper the file against me as an ACGME requirement to respond to ACGME citations along with the "legal team", which they then shared with Barnett and others as a legitimate complaint against me, either way, Morency's conduct was unprofessional, speaks to ongoing misconduct and criminal conduct of fabricating false material to terminate my employment, despite the fact that she was not even present at work for two weeks, and that I had not interacted with her since the June 2011. From June 2011 onwards, Jordan and Morency were working directly with Marina Lowy, Barnett, and Charney, to terminate my contracted employment. (Jordan Tr. 138-142, 144-145, Firpo-Betancourt Tr. 227-240, 244-245, correction: p. 234 line 18-19 "April 15, 2011" to "August 15, 2011")

81.6.   During this same period, Najfeld wrote a negative evaluation of me for the Tumor Cytogenetics rotation, which was kept hidden from me. (Varughese Tr. 720-723, 983, Firpo-Betancourt Tr. 227-234, correction: p. 234 line 18-19 "April 15, 2011" to "August 15, 2011")

81.7.   Numerous physicians routinely missed or did not answer pages while they were on call and they did not perform the emergency patient care services, but the Defendants took no actions against them for the patient care harm. (Lento Tr. 190, 195-196, Declaration # 113).

81.8.   Chepovetsky did not respond to her pages. (Firpo-Betancourt Tr. 216-227).

82.   Dispute with and Additional material facts

82.1.   After December 13, 2010, I restricted all my communications and interactions with Jordan to emails, and in April 2011, Tiger-Paillex informed me that Jordan was a bad choice for Chief Resident job but Lento was working with Jordan, and later Morency, to harass me and create various false allegations, including directly speaking to my supervisors, in excess of Bleiweiss, McCash, and Lento. (Varughese Tr. 463-469, Ex. 181a-e, 182, 159, 93-94).

82.2.   On August 5, 2011, Martinez ignored emails from Jordan. If the Defendants were to not discriminate, they would have placed Martinez, Chepovetsky, and others on

disciplinary action, academic advisement, or terminated her employment for not responding to Jordan's emails . (Ex. 216).

83. Dispute with and Additional material facts

   83.1.   Schedules were routinely changed to accommodate resident requests, i.e. Hechtman, Chepovetsky, Chen, Jordan, Blouin, Ko, etc... since the inception of the initial schedule by Lento in May 2011, irrespective of any "ripple effect" the change has on everyone else's schedule, the schedule changes were just not made for me by Lento. (Varughese Tr. 469-490, 531-, Barnett Tr. 83-88, Ex. 67, 119-121, 149).

   83.2.   Hechtman was given preferable treatment with a significant schedule change to convert to Anatomic Pathology to complete her residency in three years, and she was given an earlier assignment to the forensic pathology rotation at New York Office of medical examiner's that preceded my assignment, despite my seniority to her, my express interest in completing the medical examiner rotation early for Anatomic Board certification purposes, and my repeat requests since my second year for an earlier assignment. (Ex. 119-121, Declaration # 114).

   83.3.   Jordan was given preferable treatment with her schedules, and she never covered a single month of the Elmhurst Hospital Pathology Laboratory during her residency, although, I covered an additional month to cover for her. (Declaration # 115).

84. Dispute with and Additional material facts

   84.1.   Policies were made in excess of contract and it was not applied to everyone, at Firpo-Betancourt's deposition he cited some more policies that only exist in his delusional mind. (Varughese Tr. 418-430, 472-475, 964-966, Morency Tr. 17-26, 32, Firpo-Betancourt Tr. 198-206, Ex. 196-197).

85. Dispute with and Additional material facts

   85.1.   In May 2011, I requested a change to schedule as it was undergoing various changes, Jordan responded, per Lento, denying my request very aggressively within minutes. (Varughese Tr. 469-490)

   85.2.   I requested the schedule change to Firpo-Betancourt on August 2, 2011, because Firpo-Betancourt misrepresented himself as the Program Director, and Lento was

extremely hostile towards any requests by me regarding my workplace, interests, schedules, and complaints. (Varughese Tr. 469-490).

86.  Dispute with and Additional material facts

86.1.  The department knew that they would not change my schedule on September 1, 2011, however, I was not informed about this until September 7, 2011. (Barnett Tr. 83-88, Varughese Tr. 469-490, Johnson Tr. 191-200, Ex. 218, 219)

86.2.  If we were to accept the Defendants' logic, the termination of my employment must have destroyed the yearly schedule with the most serious ripple effect on the schedules and so, that would have been another reason to not terminate my employment. The schedules are commonly changed throughout the year for Hechtman, Jordan, Ko, Blowe, Blouin, Juan-Hernandez and Chen etc, and their demands should also be considered unprofessional and insubordinate, and left to the discretion of a couple of residents without any special qualifications such as Jordan and Morency. (Varughese Tr. 472-475, 527-536, Ex. 149, 120).

87.  Dispute with and Additional material facts

87.1.  On September 7, 2011, Firpo-Betancourt's letter to Marina Lowy the general counsel, Barnett, Lento, and Johnson report my making a legally protected complaint to Firpo-Betancourt during a civil discussion about my being treated differently that singled me out in the workplace and that had an adverse effect on the terms of my employment compared to others residents who were not in my protected class but the response was retaliatory in that I was labeled "unprofessional" by respondents to this e-mail. It's a wonder that my employment was not terminated on September 8, 2011 for "pattern of unprofessional and insubordinate behavior". (Varughese Tr. 484-490, Firpo-Betancourt Tr. 258-261, Johnson Tr. 191-200, 221-228, Ex. 221, 222).

88.  Dispute with and Additional material facts

88.1.  The motive for the Defendants in not changing my schedule was that they planned on harassing me and disrupting my patient cases to obtain reasons to terminate my contract, and they were angry that I foiled this plan, they actually cited it as a reason for termination. There were also no coverage issues for the GI service that required

mine or another resident covering, as per Dr. Yvelisse Suarez, one of the several different fellows on GI Pathology Fellowship. (Varughese Tr. 470-490, 730-733, Lento Tr. 286-289, Barnett Tr. 82-94 Ex. 221a, 221b, 222)

88.2.   On September 7, 2011, Jordan falsely claimed that I was the only resident requiring coverage during Osler review course, when in fact, there were several residents who required coverage for this same period because they were assigned to call assignments.  Some of these residents were attending Osler, even though they would not have qualified for the Anatomic and Clinical Pathology Board Exams without their medical licenses. (Ex. 220).

88.3.   Jordan was given multiple elective months and she was off-site for her elective without a working pager, most residents either left the Institution for 1-4 months for their electives or did research electives with minimal service to the Institution and they had minimal responsibilities to the Institution during their elective month, in addition, to attending national conferences, and their various sick or personal days. (Jordan Tr. 173-178).

88.4.   Chow was scheduled for GI-Elective rotation that he changed for Pulmonary Pathology elective. (Varughese Tr. 472-490, Ex. 149).

88.5.   Lento intentionally fanned a paranoia in Jordan about other physicians and their interests that was added to her existing paranoia and hysteria, as in my situation, or with Yao's interest in Dermatopathology, which was unacceptable unethical practice by Lento as an ACGME Program Director and medical doctor, with equal fiduciary duties to all residents in the Pathology department. (Ex. 264).

89.  Dispute with and Additional material facts

89.1.   At a May 20, 2011 resident's meeting that Ko and I attended, Ko agreed to switch to my scheduled GI-elective month in my place, so that I would not be on the GI elective. (Varughese Tr. 482-484)

90.  Dispute with and Additional material facts

90.1.   On September 7, 2011, I voiced my concern that I was not being treated fairly which was apparent based on the changes to other residents' schedules and electives, and I

was concerned about Lento and Firpo-Betancourt limiting my pathology residency according to the demands and whims of other residents such as Jordan or Morency with allegations of "pandora's box", and that I will "dilute the educational value of all the residents", which was exactly the ongoing discriminatory rhetoric by Defendants that was very hostile.  (Varughese Tr. 484-490, Ex. 214, 218-219, 221a).

90.2.   On September 12, 2011, I reported ongoing discrimination, harassment, and hostile work environment to Barnett, including the recurrent problems with Firpo-Betancourt. (Varughese Tr. 777-781, 876-877, Ex. 223).

91.  Dispute with and Additional material facts

91.1.   ACGME guidelines did not dictate 80% conference attendance, only that Institutions have didactic educational activities. (Varughese Tr. 490-521, 418-430).

91.2.   The hospital contract dictated oversight of educational activity to the discretion of the senior resident physicians, especially those of us who are licensed in the State of New York as Medical Doctors, which also certainly speaks to my professionalism and my standards of performance. (Ex. 1).

92.  Dispute with and Additional material facts

92.1.   I was in the process of contesting the policies that were fabricated randomly in July 2011 that was disruptive, and I was not present at any of the meetings regarding the new policies, and even before it was due, Jordan was obsessively citing them, while I had no idea what she was talking about. (Varughese Tr. 418-430, 495-497, 928-968, Morency Tr. 135-137, Firpo-Betancourt Tr. 198-200).

92.2.   Dr. Taisha Roman did not attend conferences, agree to to various requests to cover, or teach other residents because she didn't want it to interfere with her own interests. (Ex. 165a, 165b).

92.3.   Azar, Hechtman etc did not present on a lecture topic that they missed, and Firpo actually apologized to Azar for covering for another resident who was out sick. (Ex. 266-268).

93.  Dispute with and Additional material facts

93.1.   I attended 80% of didactic conferences available to me, that was convenient and conducive of my time and my requirements, of which I informed the Defendants, and it was also approved by the Defendants, in addition to the general excusing of the senior residents from introductory pathology lectures, which was what took place in August 2011. (Varughese Tr. 490-502, 536-540, 941-943, 947-948, 961-962, Jordan Tr. 23, Morency Tr. 25-26, Firpo-Betancourt Tr. 267-272, Ex. 225-226).

93.2.   The policies went into effect on August 15, 2011, as such I was at the Bronx-VA for two weeks from 8-15-11 to 8-26-11, which also had various didactics, tumor boards, and pathology conferences as required by ACGME.  (Ex. 225).

93.3.   By August 15, 2011, the Defendants had again attempted to terminate my employment, so they were on an hunt to find unprofessional conduct or instigate an incident in this hostile workplace, that was so outrageous, along with claims of "cheapen(s)" of residency program, "low caliber resident", meanwhile, Jordan allegedly took a year off medical school to get rid of her ovaries, and she barely graduated medical school from what was known. (Firpo-Betancourt Tr. 377-386, Ex. 47, 48, 202b, 205a, 207-209, 217, Declaration)

93.4.   The policy was not applied uniformly to others and Jordan did not attend most of these 8am pathology didactic lectures during her fourth year without any consequences such as termination of her employment or being labeled unprofessional etc. (Morency Tr. 25-26,  Ex. 275, 276).

94.  Dispute with and Additional material facts

94.1.   I offered to present a lecture on grossing of specimens, as there were numerous complaints about residents grossing specimens poorly, so a didactic lecture on grossing would have been useful to all the residents, including Jordan as well, but that was illogically rejected as topic for presentation. (Johnson Tr. 201-205, Ex. 228, 229).

94.2.   On September 13, 2011, I requested that Jordan cease all "chief resident" activities that was making my workplace hostile on the basis of my race and gender, including constant hovering over me at my work desk, in addition, to her ongoing false

allegations against me and her routine derisive attacks at on me at work. (Varughese Tr. 520-537, Ex. 230).

95.  Additional material facts

95.1.  On September 13, 2011, Jordan in response to my protected complaint to her to cease all her activities that created a hostile work place for me, on cue Jordan claimed that she was terrified to be at work, which Lento immediately called "fear and intimidation" of Jordan by me. (Varughese Tr. 516-538, Lento Tr. 280-281, Ex. 231-239).

95.2.  Lento acted on Jordan's allegations based on her email about being afraid of me without any basis, as Jordan was bullying me and she was attacking me at work, sanctioned by Lento, Lowy, and Barnett. (Lento Tr. 266-280, 286, Ex. 233).

95.3.  Lento did not believe Jordan about other resident physicians not in my protected class. (Lento Tr. 266-280, 286).

95.4.  Around 9:40 pm on September 13, 2011, in retaliation to my identification of impossible standards, hostile work place, and harassing conduct by Defendants, at Firpo-Betancourt's direction Jordan and Morency wrote an email where they identified my protected complaints about "workplace bullying and abuse" and "hostile work environment", that followed with requests to terminate my employment, and their complaints about their own failing mental health.  (Morency Tr. 145-146, 149-161, 166-168, Firpo-Betancourt Tr. 388-401, Ex. 232).

95.5.  Morency was in and out of the Charney's office, she had "eyeballs" to observe me when she was not even at the Institution, in fact, I had not seen or spoken to Morency in person at work since the first week of June 2011, and then, the since second week of June 2011 at a coworkers' party was the last I saw her in person, and she was acting erratically around me, and finally, I saw her at the Clinical pathology conference when I presented the case, and she was obviously dismayed and unhappy about the excellent case presentation.  (Morency Tr. 117-126, 153-168, 181-183, Ex. 273 p. 168)

96.  Dispute with and Additional material facts

96.1.  On September 13, 2011, Jordan fabricated that she was "acutely afraid for my own safety given her erratic behavior" at 11:04pm, which are patently false as acute fears mean immediate issue at like 11:04 pm. Two, my protected complaints with guilty as charged of the Defendants creating a hostile work environment for me, prompted them to make these farcical allegations. Jordan was not evaluated or referred to PWC following her making these criminally false allegations against me. (Ex. 232, 234).

96.2.  On September 14, 2011, Jordan continued to allege she was "terrified to be at work right now" and so on. (Ex. 234, 237).

96.3.  I did not agree to present a lecture on September 15, 2011, instead of Guarino who was scheduled to present for months in advance.  (Varughese Tr. 524-540, 527-529, 532-536, 536-542, 739-740, 862-863, Firpo-Betancourt Tr. 289-292, Ex. 227).

97.  Dispute with and Additional material facts

97.1.  I had not recovered from my ailment. (Varughese Tr. 540).

98.  Dispute with and Additional material facts

98.1.  Lento described the lecture as a "grand rounds", implying that the short notice on rescheduling given this expectation from him was also punitive.  Firpo-Betancourt was emailing Jordan asking if there was any news, giving inference to the fact that the real reason for scheduled lecture was part of the workplace harassment, retaliation, and they expected it to be harassing to me, and further a hostile workplace for me. (Varughese Tr. 540-542, ex. 273 p. 180).

98.2.  Those who cancelled their presentations were rescheduled weeks to months later, for example, Dr. Robert Guarino, a Caucasian male, who was scheduled to present his "grand rounds" on September 15, 2011 cancelled his presentation, despite adequate planning and announcement to the Department of Pathology and he suffered no consequences, he was also given about two months to present the lecture. (Varughese Tr. 537-540, Jordan Tr. 197-200, Morency Tr. 109-116, Bleiweiss Tr. 84-93, Ex. 227, 229).

98.3. On Tuesday, September 13, 2011, Guarino, a Caucasian male cancelled the lecture that he was scheduled for months in advance to present on September 15, 2011 but he showed up to the conference. I expected that Guarino would give a lecture on one of his interesting surgical pathology case, as is common for Thursday 8am lectures but Guarino's "grand rounds" presentation was cancelled by himself at the last minute, after it was announced to residents and attending pathologists in the Department of Pathology. (Varughese Tr. 538-540, 739-740, 746, 859-863, Ex. 226, 227, 228).

98.4. Others cancelled their presentations regularly or even had their presentations cancelled at the inconvenience of everyone else. (Morency Tr. 105-116, 134-136, Lento Tr. 286, , Firpo-Betancourt Tr. 72-76, Ex. 239).

98.5. Azar was given a longer time to present a lecture and an exception was made so that the lecture was on a topic that was not missed by Azar and of Azar's choosing. (Ex. 266-268).

98.6. Azar did not present on several occasions and both Fipro and Lento simply allowed him to present at a later time. (Firpo-Betancourt Tr. 72-76).

98.7. Hechtman did not present various conferences. (Firpo-Betancourt Tr. 72-76, 95-100)

98.8. Chepovetsky complained about presenting lectures. (Firpo-Betancourt Tr. 72-76, 95-100, Ex. 135).

98.9. Blouin, Fender, Chow and other residents, and attending pathologist routinely cancelled various lectures that they were to present. (Ex. 226).

98.10. Residents in final years of residency such as Drs. Lanjing Zhang, Mark Smethurst, Steven Mercer, Edward Trevino did not attend majority of didactic lectures in their 3rd and 4th years of residency.  In fact, Trevino was largely occupied with his matriculation in a M.B.A degree program and his course work to obtain the M.B.A. (Declaration # 116, 117, Ex. 275, 276).

98.11. Cordon-Cardo repeatedly cancelled several lectures that were announced to the Institution at large from April to September 2011. (Declaration # 118).

99. Dispute with and Additional material facts

99.1.   On September 12, 13, and 15, 2011, I complained about discrimination and hostile workplace to the Defendants with ongoing erratic, arbitrary, capricious, and hostile activities towards me by the Defendants.  (Varughese Tr. 541-548, Morency Tr. 109-118).

100.    Dispute with and Additional material facts

100.1.  On September 13 and 14, 2011, I utilized sick days. (Varughese Tr. 541-544, Morency Tr. 101-108, 162-167).

100.2.  On September 13, 2011 at 10 or 11pm at night, Jordan then goes on to allege that she was "acutely afraid" without any legitimate reason and I was not even at work on September 13 and 14, 2011.  I did not work directly with her in person nor have I spoken to her in a one on one conversation since December 10, 2010 because of these ongoing hysterical tantrums, and I limited all my communications with her to emails, although Jordan still continued to act out against me. (Morency Tr. 179-182, Firpo-Betancourt Tr. 279-292, Barnett Tr. 127-128, Johnson Tr. 204-213, Ex. 231-239).

100.3.  Jordan was allegedly "physically afraid" of me but she inexplicably throws a tantrum when she discovers that I won't be at work on September 14, 2011, rather than be relieved that she won't have to be fearful. The Defendants rather than hold Jordan, a Caucasian female responsible for her conduct, the Defendants invented various allegations against me to justify the termination my employment, that continued onwards into post-termination acts of retaliation, criminal activity, and tortious conduct. (Ex. 235).

100.4.  The Defendants fabricated a meeting with me that never occurred. (Ex. 238)

100.5.  Firpo-Betancourt fabricated allegations about my health, the origins of which were a total mystery to me but it evolved into ever more farcical allegations from one day to the next and by November 14, 2011, Firpo's allegations were defamatory, malicious and made with reckless disregard to paper the file. (Firpo-Betancourt Tr. 286-292, Ex. 241, 243, 273 pp. ).

100.6. During this period, other residents have heard Jordan state that Jordan will "show me", and she directed various threats to me, which was confusing to other residents because everyone else got along with me at work, and I didn't have any conflicts with any other resident about patient care duties or for any other matter. (Varughese Tr. 527-529, 532-536, Declaration # ).

100.7. Jordan was not barred from the workplace, nor were any actions taken to restrain her, nor was she referred to PWC following these false allegations she made against me, likely because Jordan was involved in illicit drugs and she told me she was hospitalized for weeks during her medical school years, she took a year off from medical school, and she told me that she had to "have her ovaries removed", yet she was claiming she had endometriosis and that she was spending weekends at the Cleveland Clinic or Mayo Clinic on chemotherapy to alternatively, she was spending her weekends in Long Island without a long distance pager for a significant period following chief resident promotion. (Ex. 104, 276a, Declaration #73-78).

100.8. I never shared any personal information with Jordan, because I found her untrustworthy given her ongoing ridiculous allegations about her health, personal life, and erratic conduct like bringing her dog into the hospital. (Declaration).

100.9. Since August 4, 2011, Jordan and Morency were threatening to quit, claimed mental health problems, in addition to other unprofessional, unreliable, and erratic conduct such as fabricating allegations against me, none of which were brought to my attention because Firpo-Betancourt, Cordon-Cardo, Lento, and Barnett likely put them up to it, and their conduct towards me was discriminatory, created a hostile workplace, and retaliatory. (Morency Tr. 162-167, Johnson Tr. 203-204, Ex. 204-209, 214-215).

101.    Dispute with and Additional material facts

101.1. The exercise of FMLA rights is a legally protected activity and my informing the Institution was a legally permissible activity, not an opportunity to harass me, remove me from work without informing me why I was not allowed to be at work following my request, and then the Defendants terminated my employment

immediately, i.e. "forced leave" meaning "suspension", and after requesting that Jordan and Defendants cease all her hostile conduct towards me. (Varughese Tr. 547-569, 730-733, 755-760, 1031-1040, Patel Tr. 80-96, Barnett Tr. 95-100, Johnson Tr. 204-211, 215-229, 239-253, Ex. 231, 232a-d).

101.2.   On September 15, 2011, I informed Firpo-Betancourt and Patel that I felt that I was being discriminated against, my work environment was hostile, and the response from Firpo-Betancourt at that time was that Jordan will no longer be allowed to interact with me because they had knowledge of ongoing harassment and misconduct against me by Jordan, Caucasian female, abruptly following this decision, they changed their mind again, without anything happening on my part other than my not being at my desk when Firpo walked by and him not seeing me at the Autopsy conference.  (Patel Tr. 80-96, Varughese Tr. 531-568, Ex. 241, 242).

101.3.   Morency and Jordan routinely stated that they felt overwhelmed with their duties, and they blamed me for their own failures and lack of professionalism, they engaged in illegal activities against me such fabricating events that did not even occur, obviously because these farcical claims were also not even brought to my attention, but it served to paper the file against me to mar my good reputation, character, and performance record. (Morency Tr. 34-35, 49-74, Ex. 164b, 209a-e, 231, 232a-d, 259).

102.   Dispute with and Additional material facts

102.1.   Between September 15, 2011 and September 16, 2011, Firpo-Betancourt met with the legal counsel, Office of Graduate Medical Education ("office of GME"), and Human Resources, according to communications during this period. (Varughese Tr. 734-736, Barnett Tr. 105-111, Johnson Tr. 204-229, Ex. 273 p.14-15, 227, 229-231, Ex. 243b, 255, 254)

102.2.   September 19, 2011, Lento "I fear, she is playing us by using her "leave" in order to attend the review course and not have to perform her duties here", and Lento's response to the termination of my employment was "good news" and that it would have "positive impact on the residents overall".  (Lento Tr. 298-304, 282-283, Ex. 247, 260, 262a, 262b).

103.    Dispute with and Additional material facts

103.1.  On September 15, 2011, Firpo-Betancourt brought Patel so they can "inform me of the procedure for requesting a leave of absence" but Patel now denies my requesting foreseeable FMLA after testimony about her post-dating FMLA forms. (Patel Tr. 66-73, Varughese Tr. 545-569, Ex. 273 p. 191-201).

104.    Dispute with and Additional material facts

104.1.  Patel's role was limited to assisting Cordon-Cardo, and her interactions with me should have been none, because Carter was the residency Program Coordinator. (Patel Tr. 11-35, 38-41, 74-79).

104.2.  On August 3, 2011, Patel had knowledge of over 2 years of my situation, which Barnett also confirmed on September 12, 2011. (Ex. 202b, 223 pp. 30-31).

104.3.  Jordan's false allegations were taken "seriously", as were her previous false allegations against me. (Patel Tr. 80-89, Ex. 234c).

105.    Dispute with and Additional material facts

105.1.  Patel was transferred to Department of Pathology in June 2011, after my attorneys sent a letter to the Defendants, rather than respond to my legal counsel and respect my status as professional employee.  (Varughese Tr. 911, Patel Tr. 113-115, Ex. 99).

105.2.  On September 16, 2011, the Defendants terminated my employment. (Ex. 243c, 244).

106.    Dispute with and Additional material facts

106.1.  My attorneys were not contacted by the Institution nor were they informed that I was not to be at the Institution in September 2011, nor was I certain that I was not allowed to be at work given the conflicting emails since I had not spoken to Firpo-Betancourt or Patel on September 16, 2011.  (Patel Tr. 113-115, Ex. 243a, 243b, 243c, 244).

107.    Dispute with and Additional material facts

107.1.  The Defendant Institution utilized Patel to confront me and stalk me because she was a woman of Indian descent, and I cannot ascribe Patel's presence at Starbucks on 96th

and Lexington as an innocent coincidence with her husband in tow. (Varughese Tr. 576-587, 892-894, Patel Tr. 113-117, Cordon-Cardo Tr. 234-239).

107.2.   Patel was not utilized for Chepovetsky, Hechtman, Martinez, and Azar issues, who are all not in my protected class. (Firpo-Betancourt Tr. 72-100)

108.   Do not Dispute

109.   Dispute with and Additional material facts

109.1.   Patel informed me that I was to return to the Defendant Institution with her and her husband was present, and she quarantined me to her office, rather than allow me to leave the Institution's premises or attend to my duites. (Varughese Tr. 892-894).

109.2.   Morency stated that she was feeling mentally unfit and she was not barred workplace, with ongoing utilization of innumerable sick days, absences for conferences nationally, and alleged jury duty, likely she was absent up to 40 days in excess of her vacation for 2011-2012. (Morency Tr. 34-36, 64, 68, 97-116, 158-168, 178-181, ex. 164e)

109.3.   Jordan was the proxy for the Defendant Institution to discriminate, harass, created a hostile work environment, and retaliate against me, a woman of Indian national origin, in real time with her constant contact with legal counsel, Marina Lowy. (Fipro Tr. 189-195, 278-293, Ex. 205a, Ex. 45 p.17, 46 pp.12-13).

109.4.   The Defendants did not reprimand Jordan for not performing her responsibilities as Chief Resident in November 2011, nor was Jordan recommended to PWC or barred from the workplace for making false accusations against me. (Firpo-Betancourt Tr. 206-207, Ex. 49, 104, 234)

110.   Dispute with and Additional material facts

110.1.   On September 20, 2011, Patel called Firpo-Betancourt and he arrived at her office while I was waiting there and he blankly stared at me without saying anything to me, and my employment was terminated for others perceived issues, not because of any actual performance or conduct on my part, as they had been attempting to terminate my employment for years from the residency program, and they could not because

my performance and competency was better than the other residents, including Jordan and Morency. (Ex. 256, 257, 258, 259, 260, 270).

111.    Dispute with and Additional material facts

111.1.    The Defendants were constantly harassing me, created a hostile work place, and retaliated against me, disrupted my cases or work material needed to do my work like the computers, and engaged in physical intimidation at the workplace against me, on the basis of my race and gender, which was the intentional infliction of emotional distress by inflicting psychological abuse against me in an ongoing manner, especially when my performance was excellent or above par compared to other residents, and they actively recruited others such as Lento and Firpo-Betancourt, rather than Strauchen or Kalir, on the basis that they would harass and attack me. (Ex. 35, 42, 108a, 108b, 140, 146, 273).

111.2.    Tiger informed me that a doctors note was not required from me to return or be present at the Institution, following my utilization of two sick days on September 13, 2011 and September 14, 2011 but that the Department did not want me at work, without any further explanation to me. (Varughese Tr. 587-605, Jordan Tr. 148-150, 157-161, 163-164, Ex. 255, 261).

112.    Dispute with and Additional material facts

112.1.    I did not say anything or do anything that Firpo-Betancourt had alleged against me, and in fact, I was never informed by Firpo-Betancourt why I was being barred from the workplace. (Varughese Tr. 555-569, Firpo-Betancourt Tr. 279-289, 294-298, 301-311).

112.2.    Jordan admitted that her accusations against me were false, she made no mention of her "afraid" claims on November 14, 2011, and Jordan was busy providing evidence supporting my "termination" of employment for months. (Jordan Tr. 130-135, 211, Ex. 209a, 209b, 209c, 259).

112.3.    Mr. McEvoy orchestrated the HSAC hearing, and Jordan was overheard asking McEvoy if she had done well in a high-pitched voice, and she appeared overtly joyous. (Declaration #119).

113.   Dispute with and Additional material facts

113.1.   On September 20, 2011, Patel quarantined me in her office, preventing me from attending the 8am Clinical Pathology conference after telling me that I was not allowed to be present at the Institution. (Varughese Tr. 575-629).

114.   Dispute with and Additional material facts

114.1.   There was a single folder that looked exactly like my folder and once the single folder was confirmed as not mine, the content of the folder was not reviewed, and Patel stated that she was only aware of stepping away from her office for a few seconds, and as such, I could not read the contents in a few seconds. (Varughese Tr. 575-629, Patel Tr. 106-110, Cordon-Cardo Tr. 224-228).

115.   Dispute with and Additional material facts

115.1.   There was no breach of data from my opening the lone folder that was not marked confidential, which I had also mistook as my own green folder that was left on my work desk was stolen or removed by Patel. (Varughese Tr. 575-629).

116.   Dispute with and Additional material facts

116.1.   Tiger-Paillex stated that my picking up a folder should not have constituted termination of my employment, about three years after the fact. (Tiger-Paillex Tr. 151-155).

117.   Dispute with and Additional material facts

117.1.   On September 21, 2011, the summary suspension and termination letter listed six reasons that were unverified, not brought to my attention, and which were also commonplace for other comparators, which against me were an ongoing slew of defamatory and criminally false allegations by the Defendants and its' agents to justify termination of my employment. (Varughese Tr. 614-630, 848-863, Cordon-Cardo Tr. 214-216, 219-234, Tiger-Paillex Tr. 144-148, 151-155, 102-140, Ex. 83c).

117.2.   For example, I provided coverage to the Institution because another employee was out sick, or offering to present a lecture on gross pathology is not unprofessional, picking up a folder that appeared similar to mine, or alleged performance on tumor cytogenetics that was kept hidden from me, or advocating for my interests in a

residency program or requesting a foreseeable FMLA is not a communication problem, these reason do not constitute ongoing unprofessional conduct and ongoing poor performance or that there was any other issue, given the elaborate and extensive inappropriate communications between Defendants, nor is there any evidence that I was a "risk to the hospital and it's operations" or on occasions, "her patients", anymore than the 30 other residents and fellows in Department of Pathology. (Ex. 228, 206, 207b, 209e, 219, 221a, 222, 223, 240, 247a).

117.3.   Firpo-Betancourt wrote an email stating that he is "working on an idea to deal with this", after Jordan's false allegations alleging falsely "acutely afraid for my own safety" 11:04 pm, knowing that it was a reaction to my request to cease and desist discriminatory and retaliatory conduct creating a hostile work environment. (Ex. 234b, 236)

117.4.   The Defendants invented an interview with me that never occurred with me on September 14, 2011 with Petersen, Barnett, Firpo, and Tiger-paillex, because I was not at work, contrary to the Defendants ongoing inventions. (Firpo-Betancourt Tr. 287, Ex. 238).

117.5.   Tiger-Paillex nor Johnson brought up Jordan's allegations to my attention on September 20, 2011 when I met with them. (Ex. 254-255, 261).

117.6.   Firpo-Betancourt and Patel stated that Jordan's false claims against me without basis were taken seriously but I was not informed of these allegations. (Firpo-Betancourt Tr. 275-285).

117.7.   The Institution stated that I was a threat to their operations at Mount Sinai Medical Center, yet the Institution inexplicably requested that I be present in person the following day at the Institution on September 21, 2011. (Ex. 261).

117.8.   On September 21, 2011, I discussed violations of my civil rights, hostile workplace, and discrimination to Petersen, who alleged to me that he was unaware of any legitimate reason for why the Defendants were behaving the way they were towards me. (Declaration # 120).

117.9. On September 21, 2011, I spoke with Dr. Xiao informed me that the Defendants could not terminate my employment after over 3 years of employment with good work performance. (Declaration # 121).

117.10. Immediately following the termination of my employment, I requested a key to open and remove my items contained within my desk drawers and cabinet, the Defendants refused to provide me with the key, which they provided to Jordan as per discovery. I have lost all of these items including my textbooks, study materials, notes on my cases for ACGME and ABP reporting purposes, work product notes on legitimate professional matters and delivery of patient care, which as a medical doctor, I have a reasonable expectation of privacy that is enforced by law. (Declaration # 122).

118.    Additional material facts

118.1. The Institution initially claimed that it did not receive the appeal letter that I sent to the Institution because they did not intend on providing a hearing since they fabricated that I was a "risk to the hospital and it's operations" without any basis in reality. (Varughese Tr. 629-630)

118.2. The employment termination letter of my employment did not substantiate the falsified allegation of "risk to the hospital and it's operations", which was entirely without any basis. The hearing was granted only because the Institution realized that the letter of employment termination was farcical and implausible. (Varughese Tr. 629-630, Ex. 83e pp.8-10).

119.    Additional material facts

119.1. The House Staff Affairs Committee does not serve as an impartial group or represent a fair decision making process regarding the adverse employment decision against a House Staff or resident physicians and fellows, and there were no minority women or men on this committee, in fact, all the committees and decision makers that I had dealt with were obviously Caucasian men and women, who were blatantly and unabashedly hateful, argumentative, irrational, illogical, bigoted, and uncivilized towards me. (Varughese Tr. 629-641, 899-911).

119.2.   The Defendants conduct can only be characterized as the naked aggression and assertion of white privilege to destroy my career, my reputation, and my economic security in a premeditated, coordinated, and corroborative fashion without any repercussions or fear of reprisal. (Varughese Tr. 1050-1070, 1041-1049, 992-1031).

119.3.   I have never been asked to serve on a House Staff Affairs Committee in the entire course of my residency, another opportunity not offered to me, probably to the detriment of physicians challenging adverse employment actions, since they do not have access to a diverse group of impartial physicians or a true ad hoc professional committee with a modicum of integrity, to determine the fairness and reasonability of an adverse employment action, that is made at the whim of Caucasian leadership that is very racist and sexist. (Declaration # 123).

119.4.   Dr. Michael Bronheim's significant other is/was Annette McEvoy, who has the same surname as Rory McEvoy, the lawyers representing the Institution in their employment discrimination cases, he was openly aggressive and disrespectful to me during the hearing. (Ex 83f, Ex. 273).

119.5.   Drs. Gila Leiter and Steven Weinfeld were both members of the Board of Trustees, they were extremely combative and disdainful towards me, including interrupting my responses. (Ex. 4, Ex. 273).

119.6.   Dr. Melissa Rocco, an anesthesia residency chief resident, fabricated allegations against me out of whole cloth at the House Staff Affairs Hearing, that was aggressively countered by both Marin and Bronheim with apparent conflation into my health, a tactic that is used repeatedly by the Defendant Institution against minorities and women. (Ex. 273 pp. 321-322).

119.7.   Dr. Marissa Raymond-Flesch was a PGY4 resident completing the combined Internal medicine and pediatrics residency, and in my opinion, she appeared shamelessly thrilled to have an opportunity to go along with discriminatory actions against me. (Declaration).

119.8.   Dr. Michael Marin already had a history of problem conduct towards me on several occasions by not providing me with his patient's surgical and medical history, but

then, also intentionally misleading me by making deceptive claims about the same patient that compromised my safety because his patient were implanted with sharp vascular stents. (Varughese Tr. 899-904).

120.    Dispute with and Additional material facts

120.1.  On September 13 and 14, 2011, Jordan a Caucasian woman physician acted in an unethical and unprofessional manner by alleging that she was "afraid" of me in response to my concerns about her conduct that she created a hostile workplace for me, a woman of Indian descent.  (Jordan Tr. 205-213, Ex. 234a-g, 235-237).

120.2.  In response to Jordan's farcical allegations, Lento immediately validates her false and defamatory allegations, while Lento ignored all my complaints about conduct of Jordan and McCash towards me that was hostile and discriminatory to participate and enable more discrimination, hostility, and retaliation against me. (Ex. 233).

120.3.  Firpo-Betancourt made defamatory and criminally false allegations against me that were entirely false and without any premise, which I nor my attorneys were informed about during the period of my employment, and these false allegations were hidden from myself and my attorneys until the discovery in this litigation, which was many years following the termination of my employment during the period which I could not obtain employment because the Defendants were stating these falsified statements to potential employers. (Varughese Tr. 966-991, 992-1031, 1041-1049).

120.4.  On September 2-5, 2011 and September 7, 2011, both Drs. Pamela Unger and Chandandeep Nagi stated to me in plain English that they "trusted" my diagnostic skills and I routinely made independent assessments of diagnostic information that were reviewed by experienced Pathologists with nearly 100% concurrence and I usually picked up nuanced diagnostic information to assist the patient care delivery. (Declaration #125).

121.    Additional material facts

121.1.  The department/institution was represented by McEvoy who also made various defamatory allegations against me at the hearing, but the Institution did not mention anything about Jordan's delusional allegations of being terrified of me, because the

Defendants adopted this false allegations for themselves as their "plan" that they then disseminated these false allegations to third parties. (Varughese Tr. 966-991, Ex. 273 pp. 318-319, 340-346).

122.    Additional material facts

122.1.  At the House Staff Affairs Committee hearing, I had felt "physically threatened" for my safety on December 8, 2010 because of McCash's conduct, shortly thereafter, Rocco, apparently an anesthesiologist made false allegations without evidence, such as that I missed call, and this allegation was not founded on any reality, when I corrected her and stated that her allegations about me missing call was untrue, the same House Staff Affair's Committee accused me of being argumentative and used it as a new rationale for the termination of employment. (Ex. 273 pp. 318-322, 83d pp. 6-7).

123.    Additional material facts

123.1.  The appeal committee was changed several times and it consisted of Susan Bernstein LCSW who is Daniel Hughes supervisor, Drs. Ira Nash (the Chief Medical Officer and Senior Vice President for Medical Affairs, and Appeal Committee Chair) and Andy Jagoda (Chair of Emergency Medicine and the responsible party in scheduling emergency cardiac procedures through the ER on weekends for non-emergency cases, and running a very dysfunctional and corrupt Emergency room that the emergency medical residents advised me to never use), all Caucasians and no minorities were present on this committee, as with House Staff Affairs Committee, and the Department of Pathology leadership. Amelie Trahant was present and she appeared to be in Nash's personal space, in that she was sitting very close to him and she whispered to him constantly throughout the entire process, it was inappropriate and unprofessional of Nash. (Varughese Tr. 641-643, Ex.89).

123.2.  McEvoy was at this time representing the Department of Pathology and not the Institution, so to speak, and McEvoy kept insisting at this hearing, albeit in a condescending manner and mockingly, that I had alleged a conspiracy against me by the Defendants to commit criminal acts, and to conduct an ongoing discrimination

campaign, which by the way, was obviously exactly what was happening. (Ex. 83a-f, Ex. 231-238).

124.    Additional material facts

124.1.  With what little was stated, mostly McEvoy's obsession with conspiracy against me, the Institution's "Appeal Committee" inexplicably reached the same conclusion as the House Staff Affairs Committee with even more outrageous defamatory criminally false claims by the Defendants. (Ex. 83e).

124.2.  Additionally, the Appeal Committee also created new rationale for the termination of my employment by falsely alleging I was absentee without any support for that statement, despite testimony from Morency that I was not out sick during work any more than any other resident.  In fact, I only took a small fraction of my allotted sick days and I was more present at work than Jordan, Morency, and a slew of other residents who were away with electives at non-affiliated hospitals, national conferences, sick days, jury duties, and so on.  Professionalism in caring for patients include the ability to determine when fatigue plays a role into personal well-being, including recognizing when one is ill, and utilizing available sicks days to manage personal health issues. (Varughese Tr. 856, Ex. 273 pp. 157-158, 104, 164b, 164d, 274, 277-278).

124.3.  The remaining residents, all of whom were out sick much more than I, not including weeks of time off from work for various conferences, electives, research electives, extracurricular activities such as weeks of jury duties, alleged rampant weather related absences, personal issues such as deaths of family members, pet problems, alleged medical issues, family commitments, more vacation time because a conference happen to fall during scheduled vacation, time off to move, personal days for marriage and honeymoons, days out for baby births for male residents not taking FMLA, etc... should all also be labeled as absenteeism and fired by the Institution. (Ex. 104, 164b, 164d, 274, 277-278).

124.4.  Figur reported directly to Nash, therefore, the decision of the Appeal Committee was a foregone conclusion, and, the vitriol, fabrications, and criminally false accusations

against me were consistent with the discriminatory hostile and retaliatory agenda against me. Nash left the Institution for Long Island Jewish Hospital shortly after his ongoing involvement in my case. (Ex. 89c).

125.    Dispute with and Additional material facts

125.1.    As of January 30, 2011, I was offered employment at the UMDNJ in New Brunswick to complete my final year of the four year residency program in Anatomic and Clinical Pathology. (Varughese Tr. 644-657).

125.2.    A mid-year summative evaluation was completed by my mentor, Petersen, with discussion about my performance and his advice that I focus on preparing for Board certification and independent practice, and I was promoted to the fourth year of residency in better standing than at least four other residents on my satisfactory performance alone. (Ex. 8).

126.    Dispute with and Additional material facts

126.1.    The summative evaluation form was defamatory, is defamation per se, and it cannot be utilized to obtain employment as it was punitively composed to harm further employment opportunities, after the initial tortious interference with employment at UMDNJ-Robert Wood Johnson University Hospital, and the summative evaluation constitutes an ongoing tort. (Varughese Tr. 655-658, 734-736, 966-1031, p. 658 line 13: "No" to "Yes", Barnett Tr. 12-19, 101-103).

126.2.    My evaluations during my 4th year and following the December 8, 2010 incidents where I was directly responsible for patient care, my immediate supervisors evaluated me positively. (Ex. 8, Firpo-Betancourt Tr. 317-329).

126.3.    In fact, I was performing above my comparators, including Jordan, but my supervisors reported to me that they were told to punitively evaluate me and downgrade me.  When I reported to Barnett that my performance was fine according to my immediate supervisors, Barnett implied to me that my supervisors were intentionally not listening to Barnett and others to downgrade me, which was making him obviously angry.  (Barnett Tr. 130-131, Ex. 223).

126.4.   Dr. Tamara Kalir and Dr. Rafaella Morrotti appears to have suffered retaliatory
consequences with referral to Physician Wellness Committee and apparently, they
met with Figur, who harassed, intimidated, and threatened women physicians at the
Defendant Institution. (Jordan Tr. 167).

126.5.   Morency was admittedly overwhelmed with her Chief Resident duties, but I was not
even informed of the negative evaluation by Najfeld for Cytogenetics but Morency
and Jordan were informed that I failed, but when I presented my case on August 16,
2011, Morency became visibly upset that it went well, and in general, act irrationally,
even now because she has her "eyeballs", yet Morency was not referred to the PWC
for her delusional rants and attacks on me. (Morency Tr. 17-26, 32-44, Ex. 164b).

126.6.   The summative evaluation was created punitively by Firpo-Betancourt in
consultation with legal department, Barnett, and Johnson, similar to their responses
to any requests for employment. (Ex. 275a,b, 20).

126.7.   Other Pathologist Program Directors find it implausible that I was unsatisfactory in
three different competency after over 3 years of satisfactory performance with
satisfactory completion of all my cases, medical licensure, and general good
performance. (Fyfe Tr. 12-13, 27-31, 50-51).

126.8.   Numerous residents have completed their residencies without completing their
requisite patient cases that they were responsible for with Attending Pathologists and/
or even acquiring minimal competence such as New York State medical license, and
they went on to fail various board certification exams and the likes, even having to
complete additional fellowships many years after their residency for failing Board
Certifications etc such as Drs. Brad Wasserman, common knowledge. (Pessin Tr.
172-174).

126.9.   There is no legitimate basis for the defamatory discriminatory punitive summative
evaluation against me. (Varughese Tr. 911-921, 966-991).

127.   Dispute with and Additional material facts

127.1.   The summative evaluation was not based on my performance because I was
informed by my immediate supervisors with whom I worked with regularly that I

was competent and performing satisfactorily in patient care, interpersonal skills and communication, and professionalism, as is consistent with my actual performance as medical doctor, unlike McCash who did an extra year of medical school, and Jordan with seven month leave from medical school. (Jordan Tr. 13-19, McCash Tr. , Ex. 6-8).

127.2.  Firpo-Betancourt, whom I did not work with directly on a single case because he was barred from hospital privileges, but he with the usual crowd of Mount Sinai Medical Center administrators such as Johnson, a communist poet with severe mental health issues, Barnett, a racist sexist doctor who could not muster it as a pediatrician, and attorneys such as Marina Lowy and Amelie Trahants punitively marked me unsatisfactory on the Summative evaluation to further disenfranchise me from my profession in the most discriminatory, retaliatory, and tortious manner.

127.3.  The verification of employment records associated with my Anatomic and Clinical Pathology was not performed despite requests from potential employers, my attorneys, and myself because the Defendants alleged that I filed a "lawsuit" against them, and the Defendants threatened me directly to drop a nonexistent lawsuit in January 2012, but I had filed a EEOC complaint that was known to the Defendants. (Varughese Tr. 643-657, Fyfe Tr. 12-13).

127.4.  I informed Fyfe that there was no lawsuit filed as of January 2012, to which she informed me that the Defendants' conduct is illegal and their actions are to prevent me from obtaining employment elsewhere, likely in retaliation for filing an EEOC complaint. (Declaration. Fyfe tr. 12-13).

127.5.  My attorneys represented me, and the Institution was aware of this fact, yet they regularly directed these explicit retaliation as such to myself and those that expressed an interest in employing me. (Ex. 14, 187).

128.    Dispute with and Additional material facts

128.1.  The Institution promoted one woman of indian descent, Maniar, to Chief Resident position but attacked me and marginalized me during that same period of around

2010-2011, decisions from which Maniar was entirely uninvolved. (Varughese Tr. 801-803, Maniar declaration #8, #9).

128.2. Similarly, the Institution promoted an African American woman, Morency, to Chief Resident position in pathology residency, while they attacked and marginalized another African American woman Dr. Sarah Blowe during that same period of around 2011-2012 of which Morency alleged to have no knowledge about. (Morency Tr. 181-184, Ex. 272).

128.3. The Defendants forced Blowe, an African American woman to leave the workplace on the premise that she was mentally unfit for duty, while the Defendants did not bar Jordan from work after directing various false allegations against me, that she later admitted to have been fabricated in response to alleged fear of being reported to NYSDOH for violation of hospital code of conduct on alcohol on September 14, 2011. (Patel Tr. 42-49, Varughese Tr. 593-594, Ex. 272).

128.4. Jordan mocked me at her deposition and she scoffed at me and cackled loudly when I asked her if she perceived me as a "competition to her". (Jordan Tr. 178-179, Declaration #126).

129.    Dispute with material fact as beyond the scope of discovery for this litigation

129.1. There was disparate treatment of me compared to my comparators who received favorable treatment for not belonging to my protected class of woman of Indian descent. (Ex. 279).

129.2. Numerous minority women have filed complaints against the Institution for discrimination and hostile work environment under Title VII of the Civil Rights Act of 1964 because the Defendants actively seek to discriminate, retaliation, and create hostile workplaces for minority women, and knowing the Defendants, it's absolutely their business practice to retaliate and discriminate and create hostile workplaces for minority women. (Declaration # 127).

130.    Dispute with material fact as beyond the scope of discovery for this litigation

130.1.  The Defendants are bringing a group of Indian Women into an imbroglio by publishing the names of these women because of their Indian nation origin or descent. (Declaration #128).

130.2.  Most of my formers coworker comparators are outside of my protected class, with whom I had a professional and cordial relationship where the only exception to this rule was McCash, following his ongoing menacing actions and the statutory assault, and Jordan's ongoing false allegations, after which I did not speak to her directly, rather emailed everything.  I had not idea Morency was launching various allegations against me without addressing them first with me or my direct supervisors. (Declaration #129, Ex. 91).

130.3.  My former caucasian coworkers support me and speak to me about a number of issues including the termination of my employment and the ongoing tortious interferences, and their concerns about it, which I can assure the court under oath has been that the farcical allegations made against are not only false, but also, that they are implausible, and that they have received far better and favorable treatment with every aspect of their employment compared to me. (Declaration # 130).

130.4.  I was informed that it was shocking that anyone would have taken Jordan's allegations seriously given her ongoing tactics during residency and she was also impeached for being a pathological liar sometime during her third year of residency. (Declaration # 131).

131.  Dispute with and Additional material facts

131.1.  Resident and fellows who are not my comparators and who may or may not have left a "program" voluntarily cannot be reasonably discussed without facts that are outside the scope of discovery in this litigation, including what may have been harassing, illegal, discriminatory, and hostile conduct, including disparate treatments towards them. (Declaration # 132).

132.  Dispute with and Additional material facts

132.1.  I, like the Defendant Institution also did not have any conflicts with any of these alleged women physicians of Indian Descent. (Declaration #133).

133.    Dispute with and Additional material facts

    133.1.  If Maniar was in the same situation where McCash and Jordan attacked her, she

        would have been treated the same way as I was by fabrication of patient care lapse

        and unprofessionalism claims, because the Defendant Institution create hostile

        workplaces, discriminate, and retaliate against minority women.  The terms of

        Maniar's medical school education at the Institution and then, her employment offer

        by the Defendant Institution are immaterial and beyond the scope of this litigation.

        The completion of the residency program by Maniar is immaterial to the legal issues

        of discrimination and disparate treatment of myself because of my race and gender as

        a women of indian descent by the Institution. (Declaration # 134, Ex. 118).

134.    Dispute with and Additional material facts

    134.1.  Maniar was one of the two chief residents from June 2010- June 2011, as well as

        with all the other former Chief Residents prior to McCash, even with requests for

        clarifications on any number of matters, complaints regarding work matters,

        disagreements about employment issues, schedules, there was never a single incident

        of unprofessionalism, harassment, physical intimidation, threats, raising of the voice,

        shouting between any of us, or any derisive degenerate commentary directed at me

        from them to myself or from me to them. (declaration # 135).

    134.2.  Pessin and Lento promoted Jordan to Chief Resident position, even though she was

        not licensed in New York at the time not did she have a good knowledge base,

        common sense, or experience to qualify for the position. (Ex. 44, 49, 48, 52-53, 102,

        104, 159, 164a, 164b).

    134.3.  Lento and Pessin did not offer the Chief Resident position to me, despite my

        qualifications, years of hard work, and a work record, that was essentially

        impeccable compared to Jordan etc., and I was very capable, rather they attacked me,

        referred me to PWC, and discriminated against me on the basis of my race and

        gender and the exercise of protected civil rights activity of reporting discrimination,

        retaliation, and hostile workplace. (Varughese Tr. 588-590, Ex. 40, 42, 43 51, 54, 55,

        80, 88, 95, 99, 99, 100, 101, 221b, 230).

134.4. Lento and Pessin had difficulty communicating with women of Indian descent, including Maniar, a problem that I also experienced in my interactions with Lento. Lento and Pessin did not interview Jaffer following the December 8, 2010 incidents. (Ex. 103a, 103b).

134.5. In my entire 3+ years of residency, other than the December 8, 2010 incident, there was never a single incident where I raised my voice, was unprofessional (ACGME guidelines), disrupted the work of others, or threatened anyone but I had repeatedly experienced this conduct towards me by Schiller, Fallon, Lento, Barnett, and McCash, all of whom are Caucasian males. (Ex. 223, Declaration #20, 22, 24, 25, 30, 33)

134.6. Jordan and Pessin, both Caucasian females exhibited racist sexist conduct towards me during my employment that was apparent to me, and they actively collaborated to threaten my employment, including for speaking to Jordan. (Ex. 82, 71-75).

135.    Additional material fact

135.1. Ironically, McCash and Jordan's summative evaluations have not been released by the Defendants, as these are actually relevant to this litigation, because they were involved in the incidents in question and they always received far better treatment than me. (Declaration #137).

135.2. Maniar's ratings of "Superior" in all six core competencies is irrelevant to this litigation, as I am not contesting whether or not I should receive "superior" in all six core competencies, and her ratings were apparently deserved as she was superior in the eyes of most attending pathologists, compared to McCash. (Ex. 103b).

136.    Dispute with and Additional material facts

136.1. Maniar was apparently excluded from various communications regarding my situation, and she informed me that she was often excluded from the goings on within the Department of Pathology by Lento, Pessin, Cordon-Cardo, and Schiller, unlike McCash and Jordan, which appear discriminatory and exclusionary of her as a woman of Indian descent.  Maniar was indoctrinated to accept these acts of discrimination as a normative part of employment and education because of her long

running history of medical school education and residency at the Defendant Institution, which in turn forms biases such as response bias, operant conditioning, and learned helplessness. (Varughese tr. 801-803, Declaration # 136).

136.2. Maniar informed me that she felt discriminated against from time to time, but she was afraid to speak up or report harassment and discrimination. (declaration # 82-85).

136.3. Maniar never dictated that I assign specific tasks to Moonlighters as per known moonlighting procedures. (Ex. 56, 57, 58, 59).

136.4. Aside from the one incident with McCash on December 8, 2010, I was never directed in real time by any other Chief Resident on any of my patient care cases or workload or about the delegation of work to moonlighters or pathology assistants, all of which are matters that I handled exclusively or with an attending pathologist. (Declaration).

136.5. I also had a very professional and productive relationship with my direct supervisors that I routinely worked with at the Institution, and I was often asked to return to specialty services they supervised. (Declaration).

136.6. Bleiweiss repeatedly asked me to do the surgical pathology fellowship with him at the Defendant Institution in August 2010 and December 2010, prior to the McCash and Jordan's attack on me during patient care, and my answer was definitely not, as I had been trying to transfer out to another residency program since my first year. (Declaration, Ex. 273 pp. 339).

137.    Dispute with and Additional material facts

137.1. On September 15, 2010, Maniar reported to me and Lento that McCash had already admitted that his September 14, 2010 behavior towards me was unwarranted at a prior joint meeting that Maniar requested. (Varughese tr. 801-803).

137.2. Maniar specifically confirmed her feeling as well that McCash was harassing towards me in his conduct towards me on September 14, 2010 that she witnessed. (Varughese tr. 801-803, 702-710, 866-867).

138.    Dispute with and Additional material facts

138.1.   I had a professional, mutually respectful relationship, and ethical relationship with all my Indian coworkers, supervisors, etc.  (Declaration).

138.2.   The Program Director to fellows on Surgical Pathology fellowship was Dr. Ira Bleiweiss. There was one instance, before the moonlighting program began in 2009-2010 period, where Bhusnurmath had to be informed by my Program Director and supervisor, Strauchen, to not delegate menial tasks to other residents and that she was to complete her own grossing work for her cases, and there was no unprofessional conduct related to this issue or favorable treatment of her over me because of appropriate non-discriminatory resolution of the conflict by my former mentor and Strauchen.  Bhusnurmath did not receive more favorable treatment than me, in this single minor disagreement, whereas those not in this class of woman of Indian descent were treated substantially better than me by the Institution in any conflict,  as a pattern of discriminatory conduct against me because I am woman of Indian descent. (Declaration ).

138.3.   Meanwhile, Guarino a Caucasian male in fellow working directly with Bleiweiss was given favorable treatment in similar circumstances.  (Declaration).

138.4.   I never worked with Dr. Alifa Khan nor have any knowledge about her employment activities or relationship with Dr. Arnold Szporn, her Program Director, as she was a fellow prior to the commencement of my employment. (Declaration).

138.5.   I did not work with Dr. Harleen Sidhu in her capacity as a fellow at the Institution nor have any knowledge about her employment activities or relationship with Dr. Miriam Birge, her Program Director. (Declaration).

139.    Dispute with and Additional material facts

139.1.   I was informed that I was not to speak to anyone regarding the incidents surrounding December 8, 2010, which included any Indian supervisors, and I was threatened with termination of my employment, but the Caucasians, McCash and Jordan were told to document their version of events and to sent mass emails to various staff regarding their versions by Schiller, unbeknownst to me, contributing to the discrimination and hostile work environment. (Ex. 82, Declaration # 91).

139.2. Harpaz thought that I had completed Gastrointestinal Pathology elective rotation in advance, because he had a positive impression of my work on Gastrointestinal cases on surgical pathology rotation, attending his didactic conferences, etc. (Ex. 221d, Varughese Tr. 479-480, 472-490).

140.    Dispute with and Additional material facts

140.1. Ramanathan informed me that Firpo-Betancourt and Cordon-Cardo were attacking my reputation and character, her specific words were, "you don't know what they are saying about you", she stated that it was derisive and their claims were deeply troubling and inherently unbelievable to her, but she was worried about my employment prospects because of their allegations. (Declaration # 102).

140.2. I never worked with Nayak and I don't know who she is but I suppose we are all aware now that the Defendant Institution hired women of Indian descent. (Declaration).

140.3. I had observed Jaffer, an attending pathologist obtain unfavorable treatment, including being subjected to ridicule by white male pathologists and unprofessional derogatory comments about her diagnostic skills, which I thought were excellent. (Declaration #104).

140.4. Jaffer informed the Institution that McCash had utilized profanity and raised his voice against me and she also informed them that she had to remove him from the grossing room area because McCash would not listen to her to leave the grossing room, while she was talking to me. (Declaration # 104).

140.5. I am skeptical of the "long and successful career" of Jaffer, Ramanathan, and Nayak, where the reality is that of dead end career, when compared to the Julie Celebi, M.D. who was sleeping with the boss, she was hired into two departments that included Pathology and Dermatology as full professor, and she was given her own doctors' office to see patients, sending all the wrong messages to these professional women doctors. (Ex. 32-33).

141.    Additional material facts

141.1.  Patel committed criminal perjury in her deposition when she invented that I threw a book at Cordon-Cardo on July 14, 2011, because she is aware of my report of harassment and discrimination made by myself that she should have reported to Davis and Charney from July 14, 2011, since she worked with them in "her real job". (Varughese Tr. 317-322, 892-894, Patel Tr. 10-63, Johnson Tr. 151-154, Ex. 273 pp. 203-205).

141.2.  Cordon-Cardo also admitted to going to the Bronx-VA himself to "resolve the developments that may bring it all more together" meaning coerce my supervisors to write negative reports about my performance for this impending arbitrary and capricious malicious and reckless activities such as "disciplinary action" against me, a licensed medical professional, after his own attempts to terminate my employment for "duty hours" logging were found to be invalid and untrue. (Ex. 188-189).

141.3.  Allene Carter was the designated Program Coordinator, the ACGME guideline specified administrator for the pathology residency and fellowship programs, but she was excluded from the discussions regarding my performance and termination of my employment, after her own perception of discriminatory conduct towards me was declared in her email, which to my knowledge, she also reviewed my self-reflection. (Ex. 210).

141.4.  Other residents and their employment performance issues were managed by Carter or their respective mentors, not hostile actors such as Lento, Barnett, Firpo-Betancourt, Figur (PWC), and Tiger-Paillex with advice from legal with every protected complaint and the subversion of the truth to make the work environment hostile for me and segregate me based on my race and gender. (Ex. 45, 46).

142.   Dispute with and Additional material facts

142.1.  McCash claimed to me that he was Caucasian during my first year and he appears Caucasian to Pessin, unlike my appearance as a woman of Indian descent. (Pessin Tr. 155).

143.   Dispute with and Additional material facts

143.1.  Jordan (Hackman) is a Caucasian woman. (Transcript).

143.2.  Chepovetsky is a Caucasian female. (Declaration).

143.3.  Hechtman is a Caucasian female. (Declaration).

143.4.  Kazi is a Caucasian female. (Declaration).

143.5.  Grunes is a Caucasian female. (Declaration).

143.6.  Martinez is a Native American and Ecuadorian female. (Declaration).

143.7.  Roman is a Dominican female. (Declaration).

143.8.  Azar is a Caucasian male. (Declaration).

143.9.  Trevino is a Caucasian male. (Declaration).

143.10. Smethurst is a Caucasian male. (Declaration).

143.11. Yao is minority male with other legally protected characteristics. (Declaration)

143.12. Blowe is an African American woman. (Declaration)

144.   Dispute with and Additional material facts

144.1.  Lento alleged to "speak to" McCash numerous times regarding McCash's conduct towards me since September 14, 2010 and McCash was not reprimanded in any way that constituted a similar adverse employment action taken against me, despite his repeat harassing conduct towards me. (Varughese Tr. 784-791, Ex. 43, 50, 100).

144.2.  Lento, as the Program Director was single handedly catering to the demands of Jordan for fellowships, asked for recommendations for Jordan, covered up for her, and specifically, he directed Jordan to be derisive towards me, and he obviously shared information about my work and performance with her, while her errors and problems were kept hidden from me, and likely, the complaints against Jordan have been removed from discovery production. (Ex. 104).

144.3.  During my entire employment period in the residency, Lento was openly hostile towards me at nearly every interaction, and Lento informed me that he will not assist me with fellowship applications, meanwhile, he was writing numerous letters of recommendation for Jordan and he was soliciting Cordon-Cardo to write letters for her as well. (Declaration #139).

144.4.  Lento ignored performance issues of Azar, rather attempted to bribe him with the "moonlighting coordinator" position where he can schedule himself to make

additional monies, just like Jordan did for 2010-2011, so that he would stop complaining about Jordan being promoted to chief resident. (Ex. 105, 106, 107, 109).

145.    Dispute with and Additional material facts

145.1.   The Defendant Institution confirmed that McCash and Jordan were bringing alcohol onto hospital premises and consuming alcohol at the hospital during patient care activities in violation of hospital policy likely based on NY Labor law 740 a and b, sections 1-5, that they are actually tasked with enforcing, not myself, as per state law, because McCash repeatedly states that he will take a "break from grossing" over a period of several years. Apparently, the hospital had a zero tolerance policy and the code of conduct that prohibited imbibing of alcohol while engaged in patient care duties and/or on hospital premises, but McCash and Jordan were not reprimanded for ongoing alcohol consumption at work, because they are Caucasians. (Varughese Tr. 658-687, 694-701, 747-753, Ex. 39, 127, 176, 177, 236).

145.2.   On September 13-14, 2011, Jordan stated that she was physically afraid to be at work but subsequently stated that she was only fearful of being reported to the NYSDOH for drinking alcohol at work, and losing her New York State Medical License for which she suffered no reprimand, adverse employment actions, or referrals for psychological evaluation and her removal from work. Jordan was also actively harassing me at work with false allegations and she took no responsibility for leaving early during surgical pathology rotations without completing her work, but there was no intervention or reprimand of Jordan. (Jordan Tr. 216, Cordon-Cardo Tr. 74-80, Tiger-Paillex Tr. 120-122, Ex. 52, 217, 231, 232a, 232b, 232c, 236, 234g).

145.3.   On September 14, 2011, I wasn't at work, Firpo,Tiger-Paillex, Petersen, and Barnett allegedly met with me as per their fabricated note and Firpo's testimony because they have to inform of Jordan's allegations, especially when they knew she was a pathological liar, and it was obvious that Jordan was becoming increasing irrational and erratic in a dangerous manner. (Firpo-Betancourt Tr. 287, Ex. 238, 209b, 217).

146.    Dispute with and Additional material facts

146.1.  Azar was "habitually" late, did not attend conferences, did not cover for other
residents, Azar did not attend work routinely as scheduled, and Azar failed to present
penalty lectures.  Azar and other residents habitually did not respond to pages.  Azar
was not expected to read the book on professionalism by Stephen Beeson about "fire
starters" and other ridiculous nonsense that Defendants consider "professionalism".
Azar did not to write a self-reflection essay.  Azar was not expected to meet with
Firpo-Betancourt.  Azar was not referred to PWC.  Azar was not subjected to
psychological evaluation by Fersh.   The standards for performance for Azar was
non-existent to low with precise non-onerous prescriptive expectation as outlined,
compared to the impossible standards for me set by the Defendant.  (Firpo-
Betancourt Tr. 72-76, 329-359, Ex. 110a, 110b).

146.2.  Azar was reprimanded on April 27, 2012, as such there was no deleterious effect on
Azar's career or future as a medical practitioner, after years of performance problems
that were not resolved even into April 27, 2012. (Ex. 110a, 110b).

146.3.  Yao's Academic Advisement claimed that a specimen was "desiccated" because of
Yao's negligence, he allegedly cursed out an African American employee (Yao
informed me he did not but he vented his frustrations at the computer), he destroyed
hospital property, he failed to directly supervise a 1st year resident with a complex
specimen during his 2nd year of residency, he ignored Jordan's demands and
tantrums, but he acknowledged the "Academic Advisement" document with his own
signature.  Yao did not have to read a book on professionalism by Stephen Beeson
about "fire starters" like Jordan or the deluded ideals of professionalism held by
Defendants.  He worked with Kalir, rather than Firpo-Betancourt. (Patel Tr. 62-63,
Firpo-Betancourt Tr. 359-377, Ex. 265-266).

146.4.  Yao, Patel, and others have stated that Yao was never on Academic Advisement and
there were no follow up meetings, in fact, during this period Yao was given the
Dermatopathology fellowship, passing over Jordan, which allegedly careened her
into fits of rage, harassment, discrimination, hostile stalking, and dangerous
delusions against Yao. (Ex. 264, Declaration #71-73).

146.5.  Yao received preferable treatment, like Chepovetsky, despite numerous issues with patient cares delivery, with positive evaluations by Bleiweiss. (Ex. 263).

146.6.  Firpo-Betancourt has been removed from overseeing residents due to ongoing racially charged sexist and hateful conduct towards minorities and women as per multiple reports. (Declaration #1-4).

146.7.  Azar had "habitual" issues but Lento did not take any actions against him, such as not attending conferences for which his ability to moonlight was not limited, whereas Roman, Martinez, and I were not allowed to moonlight after allegations of not attending 8am conferences.  I attended the 8am conferences during the period when I was informed that I would not be allowed to moonlight, because at this time I was following up with Lento to ensure a non-hostile workplace free of discrimination and harassment against me.  (Firpo-Betancourt Tr. 72-76, 98-99, Ex. 105-106, 108, 107, 109, 166, 273).

147.  Dispute with and Additional material facts

147.1.  Yao was not assigned a book to read following his unprofessional conduct and patient care related issues.  Yao did not have to meet with Firpo-Betancourt or Cordon-Cardo routinely.  Yao shouted and directed frustrations without any provocation, just like McCash had done towards me on several occasions, yet McCash was not reprimanded, because he is more Caucasian.  Yao alleged to have caused the "desiccation" of "a temporal biopsy" implying a destroyed and unusable specimen, which had a direct and detrimental effect on patient-care, and for the patient in question.   Yao was not reported to PWC for his conduct and there was no investigation by PWC into his behavior.  Yao did not undergo psychological evaluation by Fersh.  The Defendants did not demand a diagnosis of personality disorder for Yao, that was then disseminated to Jordan to disseminate to Kalir by Lento or Firpo-Betancourt.  Yao was not subjected to a toxicology screen following the incidents outlined in his Academic Advisement.  The department did not refer the Yao incident to legal department, despite the patient harm caused by desiccation of specimen, outbursts, destruction of hospital property, and other unprofessional

conduct. Yao a male resident, outside of my protected class, received far better treatment than me, a woman physician of Indian descent. (Firpo-Betancourt Tr. 76-95, Barnett Tr. 19-26, Tiger-Paillex Tr. 18-24).

147.2. On September 21, 2011, the day that my employment was terminated, Lento was actively lobbying for Jordan's Dermatopathology fellowship and Lento explicitly cited Yao as a threat to Jordan, which is malicious and reckless conduct that was typical of my experience working at Mount Sinai Medical Center, I could not have any interests because it threatened the Caucasian coworkers' interests or opportunities. (Firpo-Betancourt Tr. 76-95, Barnett Tr. 19-26, Tiger-Paillex Tr. 18-24, Ex. 264).

147.3. It's implausible that the Defendant Institution that was content with Azar's "habitual conduct" disciplined Azar to obtain or monitor his improvement, but rather to muddy the waters of the impending litigations from having terminated the employment of two minority women doctors under suspicious and eerily similar circumstances. Given Azar's habitual issues, his "final warning" only dispersed 1 month before the completion of his residency, it was done in a way to protect the Caucasian male from any adverse consequences, and to serve as a decoy for impending discrimination complaints, lawsuits, or legal action from Blowe or I, Varughese, who were subjected to discrimination, harassment, retaliation, and extremely hostile duplicitous workplace activities, given Jordan, Chepovetsky, Hechtman, Kazi, and Grunes issues, among the apparent delays and problems with patient care delivery. (Ex. 62, 102a, 102b, 130, 230, 271, 272).

147.4. Sarah Blowe, M.D. an African American woman, with whom I have personally worked with and supervised on an occasion is capable and no more immature than Yao or Azar, but she was on numerous adverse employment actions, and her employment with the Institution ended abruptly after she was placed on forced leave following harassment, various allegations against her, and apparent criminal activity by PWC against her. (Ex. 230, 272).

147.5.   Morency, a Haitian woman was the Chief Resident, while they attacked and marginalized an African American woman, Dr. Sarah Blowe during that same period of around 2011-2012 of which Morency alleged that she was not knowledgeable about, although, Morency does lack credibility. (Morency Tr. 181-184).

147.6.   The Defendants forced Blowe, an African American woman from the Defendant Institution alleging that she was unfit for duty, while the Defendants did not question Jordan for her criminally false claims against me, which she had admitted were false after it was clear that I was absent from the Institution on September 14, 2011. Jordan and McCash are still doctors despite their conduct towards me and violation of hospital policies because they are Caucasians, like their supervisors, Lento, Pessin, Schiller, Fallon, and Barnett, and not because their job performances as medical doctor were objectively better than me. (Patel Tr. 42-49, Varughese Tr. 593-594, Jordan Tr. 211).

148.   Dispute with and additional material facts

148.1.   The contract does not provide that the physician resident's employment can be "summarily suspended and terminated" with bad faith and fraudulent activities producing fabricated material on November 14, 2011 orchestrated by Mr. Rory McEvoy, the ongoing slew of "chaos" of defamatory emails to create pretext, and on the basis of the allegations that the Defendant Institution made out of whole cloth "the risk to the hospital and it's operations" in the employment termination letter and to most importantly, they are actively attacking me to prevent me from prospering in my profession because of my race and gender, not for any other legitimate reason. (Varughese Tr. 424-432, 718-719, 730-733, 755-760, 927-968, Ex.  273 pp. 1-62, 340-346, 275c, 280).

148.2.   McCash attacked me while delivering critical patient care according to the Defendant Institution's standard, he drank alcohol routinely at work against Defendant Institution's code of conduct, changed the medical records on my patient case, so as per Job Retention section: "A House staff officer may be disciplined up to, and including, termination of his or her residency program for failure to abide by the

House Staff Manual, By-laws, Rules and Regulations, or policies of the Medical Center; for falsification of any medical center document; any conduct that may threaten the safety or welfare of a patient, employee, other physician, or visitor; or for any other action that may be detrimental to Medical Center operations." McCash berated and physically threatened me and stalked me, a woman of Indian descent on several occasions, that was in fact reported by me because his actions threatened me, all of which should have earned him a demotion from Chief Resident, the Defendants should have ensured that there would not be a single instance of him interacting with me and they should have had a discussion or mediation to set the rules for conduct, McCash should have been referred to PWC, he should have undergone psychological evaluation and toxicology screening, he should have been subjected to discipline, but no adverse employment actions were taken against him, despite his own admissions of his actions against me. (Ex. 41, 84, 85).

148.3. Jordan fabricated defamatory false allegations against me routinely with farcical allegations against me, including from December 2010 that were utterly false, for which she was not restricted or removed from the Defendant Institution, rather promoted to harass me further, she was not referred to the PWC nor was any request for toxicology screening made to Jordan, she was not disciplined, and Jordan suffered no adverse employment actions. (Ex. 126, 234d, 234f, 235, 236).

148.4. I had no knowledge of Jordan's allegations, that Jordan herself identified her allegations as untrue fabrications, because she likely made these allegations with Firpo and Lento's direct advice. (Ex. 236, Jordan tr. p. 211)

148.5. Firpo-Betancourt, a chronic racist sexist discriminator with a litigation record, and the Defendant Institution with a same record, had direct access to my email account, a medical professional, because emails would routinely disappear from my account or be deleted, especially several e-mails containing protected complaints were deleted from my account, so Firpo was likely monitoring what I wrote or my responses in real time, then informing Jordan and Morency to compose specific

responses as retaliation, while also deleting my communication from my email account. (Declaration #231).

148.6.   House Staff Affairs Committee stated that despite being presented with evidence that there was no unprofessional issue surrounding my request for change in schedule, rather that I had identified unfair treatment towards me, and the Lento testimony of not informing me about available resources, an all Caucasian committee, that included Board of Trustees members such as Leiter and Weinfeld, found that my respectful advocating for equal opportunities as "unprofessional", in addition, to my correcting Dr. Melissa Rocco's false allegations against me as "argumentative", while the Caucasian men have routinely redirected to make allegations or give an appearance of a problem with me, to conflate the issues, however, pathetic and obviously, hostile, racist, sexist, and retaliatory it appears. (Ex. 221a, 222, 273 pp. 195-197, 321-322, 275b)

148.7.   The Appeal Committee, an all Caucasian group who were directly involved as supervisors of Figur (Nash) and Hughes (Bernstein) also continued on with defamatory criminal fabrications with reckless and malicious intent because of my protected class and for my engaging in protected legal activities, in any case, residents routinely complained about being overwhelmed, unable to perform duties, and they were not terminated or barred from the workplace, although, I have never made such statements to Firpo, as Firpo has alleged, nor have there even been any complaints about my performance by my direct supervisors to my knowledge, with the exception of the falsified "patient care lapse". (Ex. 275c, pp. 8-9, Ex. 47, 48, 89d, 164b, 209b, 217).