

MOUNT SINAI
SCHOOL OF
MEDICINE

Office for
Graduate Medical Education

# HOUSE STAFF MANUAL

# The Mount Sinai Medical Center House Staff Manual

OFFICE FOR GRADUATE MEDICAL EDUCATION
MOUNT SINAI SCHOOL OF MEDICINE
ONE GUSTAVE L. LEVY PLACE | BOX 1076
NEW YORK, NEW YORK 10029

**Revised February 2009**

# Contents

FOREWORD                                                      XI

SECTION ONE: WELCOME

Mission Statement                                            1
Consortium for Graduate Medical Education                   2
Core Competencies                                           2
Commitment to Diversity                                     3


SECTION TWO: EMPLOYMENT AT MOUNT SINAI

**House Staff Eligibility and Processing**
Employment Eligibility Verification                         5
  *Medical Licensure   5*
  *Requirements for Licensure   6*
Equal Employment Opportunity and Affirmative
  Action Commitment                                         7
CPR Qualifications                                          7
Criminal Background Check                                   7
Physical Examination                                        8
Security Processing                                         9
Toxicology Screening                                        9

**Compensation and Benefits**
Compensation                                               10
Paychecks                                                  10
Health and Related Benefits                                10
  *Employee Health Service   11*
  *Resident Mental Health Service   11*
Malpractice Insurance                                      11
Vacation                                                   12
Leave Time                                                 12

Accommodations for Disabled Employees                13
Dependent Care Reimbursement Account                 13

**Facilities**
Housing                                              13
Food Service                                         13
Gustave L. and Janet W. Levy Library                 14
   *Resources  14*
   *Hours  14*
   *Circulation Policy and Library Cards  15*
   *Printing, Photocopying, and Scanning  15*
   *Reference and Instruction  15*
   *Media Resource Center  15*
   *Electronic Mail  16*
   *Archives  16*
   *General Policies  16*
On-Call Rooms                                        16
Telephone and Paging Systems                         16
Safety                                               17
Security                                             18
   *Identification Cards  18*
   *Escorts  18*
   *Property Passes  18*
   *Shuttle Service  18*
Parking                                              18
Mailroom                                             19
Uniforms and Laundry                                 19

**Internet Resources**
Residency Management Software                        20
Privileging                                          20
Message Boards                                       20
Job Placement Website                                21
National Practitioner Data Bank                      21

**Activities and Services**
The Mount Sinai Alumni                               21
Employee Assistance Program                          22
Recreation                                           22
Child Care                                           23
Personal Check Cashing                               23
Medical Society of the State of New York             23
*Mount Sinai Journal of Medicine*                    24

**SECTION THREE: POLICIES AND PROCEDURES**

House Staff Titles                                             25
    *Resident (PGY-1 through PGY-8)*  25
    *Fellow*  25
Contracts                                                      26
House Staff Evaluation                                         26
House Staff Representation                                     27
    *Medical Board and Administrative Executive*
      *Committee of the Medical Board*  27
    *House Staff Affairs Committee*  27
    *Graduate Medical Education Committees*  27
    *Departmental Committees*  27
Privileging                                                    27
Work Hours                                                     28
Moonlighting                                                   29
Disciplinary Action                                            29
Professional Misconduct                                        31
Job Retention                                                  33
Program Closure or Reduction                                   33
Certificates                                                   33
Drug-Free Workplace                                            34
    *Statement to Employees*  34
    *Physicians Wellness Committee*  35
Harassment                                                     36
    *Definition of Unacceptable Behavior*  37
    *Harassment Grievance Board*  39
    *Protection from Retaliation*  40
    *Reevaluation of Procedures*  40
Conflicts of Interest and Related Matters                      40
Intellectual Property:
  Ownership and Commercial Development                40
Dress Code                                                     40
Press Relations                                                41
Disasters Affecting One or More Residency
  Programs                                            41

**SECTION FOUR: PATIENT CARE**

**Patient Care Guidelines**

Admissions and Discharges                                      43
    *Patient Access Services*  43
    *Utilization Review Guidelines*  43

*House Staff Role in Length of Stay  44*
*Discharge Planning  44*
*Temporary Discharge from the Hospital  45*
Consultations                                                                 46
Diagnosis-Related Groups                                              46
Emergencies: Medical and Surgical                                48
*Emergency Preparedness and Management  48*
*Team 7000: In-Hospital Resuscitation  48*
Ethics: Clinical Dilemmas                                             49
*Capacity Assessment  49*
*How to Approach Clinical Ethical Dilemmas  50*
Medication Practices                                                     51
*Drug Enforcement Agency Number  51*
*Department of Pharmacy  51*
*Adverse Drug Reaction Reporting  51*
*Antibiotic Control Program  52*
*Prescribing Restricted Drugs  53*
*Automatic Stop Orders  54*
*Bedside Medication  54*
*Drug Information Center  55*
*Investigational Drugs  56*
*Emergency Use of Investigational Drugs  58*
*Order Writing  58*
*Abbreviations Not Permitted  61*
*Non-Formulary Drugs  62*
*Reconciliation of Medications  64*
*Telephone and Verbal Order Policy  67*
Needlestick or Sharp Injury Procedure                          67
Patient Demise                                                            69
*Anatomical Gifts  69*
*Autopsy Consent  70*
*Birth, Spontaneous Termination*
     *of Pregnancy, and Induced Termination*
     *of Pregnancy Certificates  71*
*Death Certificates  72*
*Completing the Cause of Death  73*
*Completed Death Certificates  75*
*Medical Examiner's Cases  75*
*Brief Summary of Medical Examiner Referrals  76*
*Reportable Deaths  77*
*Post-Mortem Reports  78*
*Unclaimed Bodies  78*
Patient Issues, Rights and Responsibilities                  79
*Informed Consent  79*

*Advanced Directives, Health Care*
   *Agents, and Proxy Law   84*
*Patient Representative Department   86*
*Patient Bill of Rights   86*
*Patients with Financial Problems   86*
*Hearing/Speech-Impaired*
   *and Non-English-Speaking Patients   87*
Quality Improvement                   87
Reporting Occurrences              87
Restraints and Seclusion         88
Suicidal Patients                  90
Transfusions: Requests for Blood
  and Blood Products             90

**Departmental Information**
Ambulatory Care Services       90
  *Emergency Department   90*
  *Ambulatory Care Practices   91*
  *Home Health Care Services   92*
Clinical Laboratories             92
Infection Control               93
  *Indications for Airborne Precautions   95*
  *Criteria for Discontinuation*
    *of Airborne Precautions   96*
  *Clearance for Discontinuation*
    *of Airborne Precautions   98*
Nutrition Services               98
Nursing Department            99
  *Philosophy and Organization   99*
  *Private Duty Nurses or Companions   99*
  *Nurse and House Staff Responsibilities*
    *for Administration of Intravenous Therapy,*
    *Medications, and Blood Work   99*
  *Medications   100*
  *Use of Therapeutic Mattresses*
    *and Specialty Beds   100*
Operating Room               100
  *Pre-Operative Testing   100*
  *Attire   101*
  *Surgical Scheduling   101*
  *Arrival Time before Surgery   102*
  *Blood Availability for Elective Surgery   102*
  *Operative Procedures Not*
    *in the Operating Room   102*

*Operative Reports   102*
*Surgical Specimen Care and Requisition*
   *for Pathological Examination   102*
Radiology Services                                        103
   *Request for Exams   103*
   *Film File Room   103*
Social Work Services                                     103
   *Adoption Policy   105*

**Medical Records**
Use of Medical Records by House Staff          105
Confidentiality                                           106
   *Health Insurance Portability*
   *and Accountability Act of 1996   109*
   *E-mail and Protected Health Information   110*
Patient Medical Information                          113
Unit Number for Patient Identification           113
Central Dictating System                              114
Medical Record Content                              115
   *Admitting Diagnosis   115*
   *History and Physical Examination   116*
   *Progress Notes   116*
   *Discharge Summary   117*
   *Signatures   117*
   *Error Correction   118*
Incomplete Medical Records                         118

# Foreword

It is our hope that your training at Mount Sinai will enable you to develop the skills necessary to become a practitioner in your specialty and to foster the development of a personal program of learning that allows continued professional growth. As a House Staff Officer at Mount Sinai, you will be participating in safe, effective, and compassionate patient care under the clinical supervision of faculty. You will also be given the opportunity to participate, as appropriate, in other related activities.

As you fulfill these responsibilities, it is important that you remain aware of the practices, procedures, and policies of the institution. This Manual is designed to familiarize you with Medical Center policies and to help you carry out your administrative and patient care responsibilities as a House Staff Officer. The Hospital retains the right to make changes to this Manual without notice in accordance with applicable law.

Although this Manual attempts to be comprehensive, if you have a question or problem that is not covered, please feel free to contact your chief resident, program director, or our offices for guidance. If in the future you would like to see additional information included in this Manual, please let us know.

We all share the common goal of providing the finest quality care to our patients. During your training at Mount Sinai, your primary consideration should always be the patients in your charge.

We wish you success as a House Staff Officer and throughout your career. We look forward to meeting with you during your appointment at Mount Sinai.

Dennis S. Charney, M.D.
*Dean*
*Mount Sinai School of Medicine*

Scott H. Barnett, M.D.
*Associate Dean for Graduate Medical Education*
*Mount Sinai School of Medicine*

# Section One: Welcome

**Mission Statement**

*Preamble:* In the context of the Jewish traditions of scholarship and charity, the Board of Trustees commits The Mount Sinai Hospital and Mount Sinai School of Medicine to the advancement of the art and science of medicine through clinical excellence. This central mission consists of high-quality patient care and teaching conducted in an atmosphere of social concern and scholarly inquiry into the nature, causation, prevention, and therapy of human disease.

*Article I: Patient Care:* In this academic medical center, the responsibility to teach and conduct research in the laboratory, at the bedside and in the community enhances the fundamental goal of entirely personal, compassionate patient care. Mount Sinai will strive to provide superlative patient care, considered to be the requisite model for learning.

*Article II: Education:* The educational process will aim to graduate individuals who will be committed to a lifetime of continuing education while they are contributing in many and varied ways to the health needs of people. Mount Sinai will be responsible for the certification of physicians at the undergraduate, graduate, and postgraduate levels, as well as the certification of biomedical scientists at the graduate level and, as appropriate, will undertake the education of other health and allied professionals.

*Article III: Research:* Since medicine is a derivative science and must draw upon at least the biological, social, and physical sciences, no discipline will intentionally be excluded as irrelevant. Fundamental and applied research will be primarily centered in geographic proximity to clinical facilities. Mount Sinai will encourage, support, and evaluate innovative ideas and programs in health services delivery.

*Article IV: Dissemination of Knowledge:* Mount Sinai will participate as a national and international resource in the gathering, analysis, and dissemination of information pertaining to the prevention, diagnosis, and treatment of disease.

*Article V: Concern for the Community:* Mount Sinai will be ever sensitive to the social and health care needs of the many different communities it serves. Mount Sinai will be a participant in efforts to define and solve health problems in population groups and communities through its capability in developing scientific knowledge, education, and service.

*Article VI: Organization:* In a framework of free participation, Mount Sinai will strive to create a stable, evolving working environment conducive to individual creativity.

**Consortium for Graduate Medical Education**

The Mount Sinai School of Medicine Consortium for Graduate Medical Education is dedicated to centralizing, enhancing, and monitoring the quality of the education provided to House Staff in all programs at all participating institutions. The Graduate Medical Education Office works with affiliated institutions in the Consortium to meet the new demands and responsibilities inherent in maintaining quality residency education. The Consortium consists of 13 institutions in New York and New Jersey, sponsors more than 135 residency programs in virtually all medical specialties, and enrolls in the aggregate more than 2,250 House Staff. Activities and services provided to all House Staff, regardless of home institution or specialty, include:

- A two-day Core Curriculum for all entering House Staff
- An opportunity for clinical assessment using standardized patients in the School of Medicine's Morchand Center for Clinical Competence
- A two-day Retreat for all incoming chief residents
- Internal Reviews of residency programs to assure quality of resident education in all sponsored programs
- House Staff representation on all Consortium committees
- Opportunities for career placement through the utilization of the **Job Placement for Residents** website

The hospitals currently participating in the Consortium are:

- **Atlantic Health (Morristown Memorial Hospital)**
- **Atlantic Health (Overlook Hospital)**
- **Elmhurst Hospital Center**
- **Englewood Hospital and Medical Center**
- **Jamaica Hospital Medical Center (Family Practice Program)**
- **James J. Peters (Bronx) Veterans Affairs Medical Center**
- **Jersey City Medical Center**
- **The Mount Sinai Hospital**
- **North General Hospital**
- **Queens Hospital Center**
- **St. Joseph's Regional Medical Center**

**Core Competencies**

Residency programs must require their residents to obtain competency in the six areas below to the level expected of a new practitioner. Toward this end, programs must define the specific knowledge, skills, and attitudes required and provide educational experiences as needed in order for their residents to demonstrate:

I.   *Patient Care* that is compassionate, appropriate, and effective for the treatment of health problems and the promotion of health.

II.   *Medical Knowledge* about established and evolving biomedical, clinical, and cognate (e.g. epidemiological and social-behavioral) sciences and the application of this knowledge to patient care.

III.   *Practice-Based Learning and Improvement* that involves investigation and evaluation of their own patient care, appraisal and assimilation of scientific evidence, and improvements in patient care.

IV.   *Interpersonal and Communication Skills* that result in effective information exchange and teaming with patients, their families, and other health professionals.

V.   *Professionalism*, as manifested through a commitment to carrying out professional responsibilities, adherence to ethical principles, and sensitivity to a diverse patient population.

VI.   *Systems-Based Practice*, as manifested by actions that demonstrate an awareness of and responsiveness to the larger context and system of health care and the ability to effectively call on system resources to provide care that is of optimal value.

**Commitment to Diversity**

Mount Sinai School of Medicine strongly supports full and meaningful implementation of equal opportunity policies and objectives that will enhance the quality of our work life, the productivity of our workforce and learning environments, and to meeting the needs of the diverse body of students, officers, faculty, staff, and communities we serve. Our commitment to these goals goes well beyond meeting legal requirements and directives of equal opportunity. We are convinced that the personal uniqueness of each employee is an asset of incalculable worth and are dedicated to creating an environment within Mount Sinai School of Medicine that is free of discrimination and where all employees are afforded the opportunity to develop, perform, and advance to their maximum potential, without regard to race, color, creed, religion, cultural background, sex, age, national origin, marital status, citizenship status, sexual orientation or affectional preference, disability, or veteran status.

We believe that diversity in the health professions benefits every aspect of health care. Addressing the needs of our increasingly multicultural and ethnically diverse patient population at Mount Sinai makes it essential that patients have increased access to physicians who share their ethnic heritage, background, and belief. Further, interacting with a diverse peer group is important for students, House Staff, and faculty for effectively managing cross-cultural patient presentations and for having a beneficial impact on health outcomes.

The success of the equal employment opportunity program depends considerably on the support and positive direction given by managers and supervisors. We all lead by example, and we must set the right kind of example in this critical area. We urge you to join us in an active commitment to the principles of equal opportunity in their fullest sense. With your support and participation, we know we can turn workforce diversity from a leadership challenge into one of our greatest strengths. In so doing, Mount Sinai School of Medicine will earn recognition as both a great place to work and a place that does great work.

# Section Two:
# Employment at Mount Sinai

HOUSE STAFF ELIGIBILITY AND PROCESSING

**Employment Eligibility Verification**

In compliance with federal regulations, The Mount Sinai Hospital must verify documentation of a House Staff Officer's identity and employment eligibility.

A House Staff Officer is required to provide proof of his or her identity and employment eligibility per United States Citizenship and Immigration Service (USCIS), Form I-9, Employment Eligibility Verification.

All U.S. employers are responsible for completion and retention of Form I-9 for each individual they hire for employment in the U.S. This includes citizens and non-citizens. On the form, the employer must verify employment eligibility and documents presented by the employee and record the document information on Form I-9. Original documents must be provided for verification.

International medical graduates (IMGs) may not begin their training until they have obtained an appropriate visa. If an appropriate visa is not obtained in a timely fashion, IMGs will not be permitted to begin training until the process is complete. Employers must keep a copy of the current visa on file.

*Medical Licensure*

Hospital policy requires that all graduates of U.S. (including Puerto Rico) and Canadian medical schools appointed to the House Staff must have a New York State limited permit or license to practice medicine. The only exceptions to this requirement are House Staff in their first postgraduate year (PGY-1s). IMGs are also exempt from this regulation, but must be certified by the Educational Commission for Foreign Medical Graduates (ECFMG) and must present a valid copy of their Certificates.

Graduates of U.S., Puerto Rican, and Canadian medical schools must apply for a New York State limited permit or license after their PG-1 year. If an eligible House Staff Officer does not show proof of registration for a New York State license or limited permit by the time s/he is to be reappointed to the PG-3 year, his or her salary will not be increased to the next PGY level. In effect, PGY-2s must have either a New York State limited permit or license by the middle of their PG-2 year.

IMGs must apply for a New York State limited permit or license after their PG-3 year. Eligible IMGs must show proof of a limited permit or license by the middle of the PG-4 year to be eligible for reappointment to the PG-5 year.

All fellows and clinical fellows must have a New York State limited permit or license before they may be appointed. All Dentistry House Staff must have a New York State license or limited permit.

Any exceptions to the above licensing requirements must be approved by the Medical Board.

*Requirements for Licensure*

First-time applicants for a New York State medical license need to be certified in Child Abuse Recognition and Infection Control.

Child Abuse Recognition certification is a one-time requirement. The course does not have to be retaken before renewal of the license. In addition to being a requirement for licensure, an Infection Control course is also a State and Hospital requirement for all House Staff. This course must be taken periodically for renewal of your New York State license.

All entering first-year residents are expected to attend the Core Curriculum, which includes both of the mandatory certifications discussed above. The training sessions are held during Orientation in late June. Other House Staff available at this time are also invited to attend to receive certification.

You may take either of these courses at any location as long as a certificate of completion is provided. Mount Sinai offers both courses on campus for the convenience of House Staff. For information regarding Child Abuse Recognition courses at Mount Sinai call (212) 731-7950; for Infection Control courses at Mount Sinai call (212) 659–9450.

For information about the required United States Medical Licensing Examination (USMLE), you may call the New York State Education Department's Office of the Professions at (518) 474–3839, visit the **website**, or write to:

    The New York State Education Department
    Division of Professional Licensing Services
    89 Washington Avenue
    Albany, NY 12234

**Equal Employment Opportunity and Affirmative Action Commitment**

The Mount Sinai Hospital and Mount Sinai School of Medicine are equal opportunity and affirmative action employers. All employees and applicants are treated and chosen on the basis of ability and qualifications without regard to race, color, creed, religion, cultural background, sex, age, national origin, marital status, citizenship status, sexual orientation or affectional preference, disability, or veteran status, and any other protected status in all employment decisions, including but not limited to recruitment, hiring, compensation, training and apprenticeship, promotion, upgrade, demotion, downgrading, transfer, layoff, termination, and all other terms and conditions of employment in compliance with federal, State, and municipal laws.

**CPR Qualifications**

*Basic Cardiac Life Support (BCLS) (Initial Course)* is required for all House Staff with patient care responsibilities. Recertification is required every two years.

*Advanced Cardiac Life Support (ACLS)* is required every two years for:

- Internal Medicine House Staff
- Emergency Medicine House Staff
- Anesthesiology House Staff
- Surgery House Staff and Critical Care Fellows
- Pulmonary / Critical Care Fellows
- Pediatrics House Staff
- Psychiatry House Staff (initial course only)
- Interventional Radiology Fellows (initial course only)
- Obstetrics and Gynecology House Staff (initial course only)
- All House Staff performing sedation or analgesia (regardless of specialty)

*Pediatric Advanced Life Support (PALS)* is required every two years for:

- Emergency Medicine House Staff
- Pediatrics House Staff

*Neonatal Resuscitation Program (NRP)* is required every two years for Pediatrics House Staff.

*Automated External Defibrillator (AED) Training* is required every two years for selected physicians in Psychiatry.

For further information please contact Nursing Education at x47050.

**Criminal Background Check**

A criminal background check will be completed on all new House Staff in order to evaluate whether any individuals might constitute an unreasonable risk to Medical Center property or

to the safety or welfare of patients or others. Any issues related to the background check will be reviewed by the Labor Relations Office and/or Medical Staff Services.

**Physical Examination**

In keeping with the policies of The Mount Sinai Hospital, the New York State Department of Health, the Joint Commission on Accreditation of Healthcare Organizations, and the U.S. Public Health Service, all House Staff Officers are required to submit to the Employee Health Service (EHS) documentation of a recent physical examination prior to commencing graduate medical education.

In addition to completing the standard history and physical examination forms enclosed in the hiring packet, the following studies are required:

I.   *Toxicology Screening:* Appropriate forms and instructions are included in the hiring packet.

II.  *Tuberculosis Screening:* A 5-TU (tuberculin units) PPD must be done within three months of commencing employment. The PPD screening form provided to House Staff should be forwarded to EHS. For those with a history of positive tuberculosis skin testing, a report of chest PA and lateral films, done within the previous six months, must be provided along with documentation for follow-up.

III. *Laboratory Reports:* Reports must be submitted for the following tests conducted within the last five years:

   A.  Measles titer.

   B.  Mumps titer.

   C.  Rubella titer.

   D.  Hepatitis B surface antigen/antibody titers. This may be declined but a declamation must be signed.

   E.  Varicella titer (if no history of disease).

For susceptible titers, documentation of booster vaccinations must be received.

All of the above, with the exception of toxicology screens, may be performed at EHS. Appointments must be scheduled well in advance of the beginning of training.

EHS is located at 17 East 102nd Street, Second Floor, and operates Monday through Friday, 8:00am-4:00pm. The phone number is (212) 241-6086, and the confidential fax number is (212) 426-7704.

All House Staff Officers are required to complete an annual health assessment questionnaire. The questionnaires are included in the officers' EHS records.

House Staff who previously had negative PPDs must also be retested *every 12 months*. Physicians within the Emergency Department and Jack Martin Fund Clinic must have a PPD test every six months if previously negative.

### Security Processing

All House Staff Officers must be photographed. The Security Department (located at 1468 Madison Avenue, MC Level) maintains a copy of the identification photograph and pre-employment data.

### Toxicology Screening

The Mount Sinai Hospital has always attempted to ensure that the work environment remains free from hazards to patients, employees, and visitors. Taking into account the recommendations of the New York State Department of Health, the Joint Commission on Accreditation of Healthcare Organizations, and the Drug-Free Workplace Act, the Hospital conducts a urine toxicology screening program for all new employees, incoming House Staff, and incoming medical students.

All House Staff rotating from other institutions must also be screened and submit evidence of a negative test result with their application. No paperwork will be processed if this documentation is not presented.

Mount Sinai's protocol includes screening for amphetamines, barbiturates, benzodiazepines, cannabinoids, cocaine, opiates, and phencyclidine. All initial positive specimens are confirmed by gas chromatography and then reviewed by a Certified Medical Review Officer. The typical limits of sensitivity tested are as follows:*

| Drug Name | Screen Cut-Off | Confirmation Cut-Off |
| --- | --- | --- |
| Amphetamines | 1,000ng/ml | 500ng/ml |
| Barbiturates | 300ng/ml | 300ng/ml |
| Benzodiazepines | 300ng/ml | 150ng/ml |
| Cannabinoids | 100ng/ml | 15ng/ml |
| Cocaine | 300ng/ml | 150ng/ml |
| Opiates | 300ng/ml | 300ng/ml |
| Phencyclidine | 25ng/ml | 25ng/ml |

The results of any information relating to drug screening are confidential, and a strict chain of custody is followed.

*\* These values may vary by laboratory.*

Compensation and Benefits

## Compensation

The appointment of a House Staff Officer with the title of Resident shall be based on his or her appropriate postgraduate year (PGY) in his or her particular training program, which shall be determined as follows:

I.   A House Staff Officer who has not completed at least one year of service in an ACGME- or ADA-approved training program shall be placed at the PGY-1 level.

II.  A House Staff Officer who has completed one or more years of service in a specific ACGME- or ADA-approved training program shall be placed at the PGY level that equals the number of such years of service in that training program plus one (e.g., House Staff who have completed two years in such a training program shall be placed at the PGY-3 level). House Staff required to spend a prerequisite period of service in an ACGME- or ADA-approved training program in a specialty other than that in which they are serving shall be classified on the basis of the required prerequisite. In the event that a House Staff Officer changes his or her specialty, s/he shall receive a maximum credit of one year (in his or her salary level) for prior service in such other ACGME- or ADA-approved training program at the discretion and approval of the Department Chair.

For compensation of fellows, please see Section Three, "House Staff Titles."

## Paychecks

Paychecks are issued biweekly and distributed every other Friday. All House Staff should contact their Department Administrator to find out where their checks may be claimed. Paycheck cashing is available on Hospital premises. Direct deposit is available. For information about Direct Deposit, call (212)731-3200.

## Health and Related Benefits

Mount Sinai provides House Staff Officers many benefits, including:

- Health Insurance
- Dental Insurance
- Optical Insurance
- Prescription Drug Coverage
- Life Insurance
- Workers' Compensation
- Short-Term Disability
- Long-Term Disability
- Nursery Care

Mount Sinai will provide certificates of insurance and/or explanatory booklets to each House Staff Officer at the time s/he commences employment at Mount Sinai. Further information is available from the Benefits Administration Office.

Under the Consolidated Omnibus Budget Reconciliation Act (COBRA), effective January 1, 1987, House Staff Officers may continue their group health insurance after leaving The Mount Sinai Hospital. Contact the Mount Sinai Benefits Center at (866)700-6762 for further information.

*Employee Health Service*

The Employee Health Service (EHS) is an ambulatory care unit located at 17 East 102nd Street, Second Floor. It operates Monday through Friday, 8:00am-4:00pm, solely for the care of Mount Sinai employees and applicants for employment and volunteer positions. The EHS staff also administers and reviews mandated annual employee health assessment questionnaires.

Services provided directly to employees include state-mandated OSHA tests and immunizations (measles, rubella and hepatitis B), administration of influenza vaccine, and return-to-work clearance (only in cases involving Workers' Compensation).

Mandated, routine, and periodic screening for tuberculosis (involving skin-testing and/or chest X-rays) is performed on all employees. Employees requiring tuberculosis prophylaxis are placed on a treatment and surveillance program managed by EHS staff.

On-the-job accidents, injuries, and exposures are evaluated, treated, and reported to the appropriate agencies. These include blood and body fluid exposures (see Appendix), animal bites, neuroskeletal injuries, falls, excoriations, and simple lacerations.

Employees must go to the Emergency Department for follow-up of these occurrences at times when EHS is closed.

For follow-up of all other illnesses and medical conditions, House Staff Officers should see their primary care providers.

*Resident Mental Health Service*

Dr. Kathy Berkman of the Department of Psychiatry is available for an initial consultation at no cost to House Staff Officers in need of mental health services. A referral will be made if it is considered to be necessary. The cost of continuing therapy will be arranged between the therapist and the House Staff Officer. Dr. Berkman can be reached at (212) 579-6670.

**Malpractice Insurance**

All members of the House Staff are covered by the Hospital for medical professional liability insurance under a group policy for work performed within the scope of their employment by the Hospital. In case of unanticipated and/or serious sequelae to any diagnostic or therapeutic

procedure, a report of the incident is to be made promptly by telephone to the Office of Risk Management at x47987.

Should any patient or family member express dissatisfaction regarding the quality of patient care that has the potential to become a professional liability matter, it should be reported promptly to Risk Management.


**Vacation**

Vacation for House Staff Officers is 20 paid days per annum (July 1 through June 30).

Any deviation from the above is granted at the discretion of the involved Department Chair and with the approval of the Director of the Hospital.

Vacation must be taken each year and may not accrue from year to year. House Staff Officers are not compensated for vacation time not taken.


**Leave Time**

House Staff Officers will receive 12 days of paid sick leave per year, cumulative to a maximum of 60 days.

A House Staff Officer will receive three condolence days in the event of the death of his or her parent, spouse, child, brother, sister or grandparent. These three days must be taken consecutively within a reasonable time of the day of death or day of the funeral and may not be split or postponed.

Time off with pay for specialty examinations will not be unreasonably denied; however, it is at the discretion of the Department Chair.

Educational leave time will be granted at the discretion of the Department Chair and in accordance with appropriate departmental policy.

In the event that a House Staff Officer needs to interrupt his or her training (i) due to the birth, adoption, care for a newborn, or placement of a child; (ii) in order to care for a child, parent, or spouse with a serious health condition; or (iii) because of the House Staff Officer's own serious health condition, 12 weeks of leave time may be available. When the need for leave is foreseeable, House Staff Officers must provide at least 30 days written notice explaining the reason for the leave and the leave's anticipated duration. When leave is not foreseeable, notice must be given within two working days of learning of the need for leave, except in extraordinary circumstances. Accrued vacation, holidays, free days, and sick time will be used during this leave. Health care coverage will be maintained provided the House Staff Officer pays his or her cost share. The Family and Medical Leave Policy may be read in its entirety in the Human Resources Policy Manual on the Mount Sinai Intranet.

The length of the leave will be determined by the Department Chair, who will take into consideration New York State and federal laws as well as attendance requirements for eligibility for Specialty Board examinations with reference to minimal, contiguous time that must be spent in a training program. Short-term disability will be paid in accordance with New York Disability Law. One parental day will be allowed at the discretion of the Department Chair.

### Accommodations for Disabled Employees

In compliance with the Americans with Disabilities Act, the Medical Center will attempt to make reasonable accommodations for qualified disabled individuals who are able to meet the essential functions of their position. A committee consisting of representatives from Human Resources, Engineering Services, Facilities Design and Construction, Rehabilitation Medicine, and the department employing the individual, will explore and recommend appropriate accommodations for The Mount Sinai Medical Center.

### Dependent Care Reimbursement Account

The Dependent Care Reimbursement Account (DCRA) allows eligible House Staff to deduct funds from their paychecks before taxes to be used to pay for the care of children, a disabled spouse or child, or an aging parent. Plan participants may set aside up to $5,000 per year for use in meeting the costs of dependent care. If you are interested in obtaining more information or in enrolling in the plan, call the Mount Sinai Benefits Center at (866)700-6762.

### FACILITIES

### Housing

Mount Sinai owns several apartment buildings used for professional housing in the vicinity of the Medical Center. Size of household is a factor in determining housing assignments. Accommodations include furnished bedrooms in shared suites in the Residence Hall, studios, and one- and two-bedroom apartments. Occupancy is subject to availability. Applications for housing are available from the Department of Real Estate at x89630, or may be picked up at 1240 Park Avenue, Mondays through Fridays, 10:00am-11:45am or 3:00pm-5:00pm.

### Food Service

Retail food service is available at reasonable rates on campus as follows:

> *Plaza Cafeteria, Guggenheim Pavilion, First Floor*
> *(Daily Menu Information at x41777)*
> Weekdays     6:30am–7:30pm
> Weekends, Holidays     7:00am-9:00am, 11:00am–3:00pm

*Starbucks Cafe, Guggenheim Atrium*
Weekdays    6:30am–6:30pm
Weekends    Closed

Vending machines are available 24 hours each day in the Cafeteria and in various locations throughout the Medical Center. Please call the Vending Attendant for refunds if a machine malfunctions at x46461.

Kosher meals are available daily and are prepared in the Kosher Kitchen under the supervision of the Orthodox Union.

**Gustave L. and Janet W. Levy Library**

The Gustave L. and Janet W. Levy Library is located on the 10th and 11th floors of the Annenberg Building. Enter through the passenger elevator lobby on the 11th floor of Annenberg. Mobility-impaired persons who would like access to the 10th floor of the Levy Library may make arrangements with the Library Circulation staff at x47791.

The library accommodates more than 300 users at tables, carrels, and individual and group study rooms. Internet and e-mail access, computer applications such as Microsoft Office Suite and digitally formatted educational materials are available from over 75 computer workstations. In addition, wireless access and an abundance of laptop jacks are available throughout the Library.

*Resources*

The Levy Library offers access to over 3,000 online biomedical journal titles, 1,400 full-text electronic books, and 80 databases through its website. Mount Sinai House Staff may access most online resources from off-campus. House Staff at affiliated institutions should consult with the librarian at their home institution to learn more about the online and print resources available to them.

The Library also houses over 34,000 print books, over 900 current print journal titles, and approximately 1,000 audiovisual materials in the biomedical sciences. The Levy Library Catalog provides information about the availability and location of books, journals, audiovisual resources, and software. Mount Sinai House Staff may obtain materials not in the collection via ILLiad, the online interlibrary loan system. House Staff at affiliated institutions should consult with the librarian at their home institution to learn more about interlibrary loan services available to them. Visit the **Levy Library website** for extensive information on programs and services.

*Hours*

Monday–Thursday    8:00am–11:50pm
Friday    8:00am–7:50pm
Saturday    9:00am–7:50pm
Sunday    12:00pm–11:50pm

*Media Resource Center*

| | |
|---|---|
| Monday–Thursday | 9:00am–10:50pm |
| Friday | 9:00am–7:50pm |
| Saturday | 9:00am–4:50pm |
| Sunday | 12:00pm–7:50pm |

Further information about Library hours is available at x47791.

*Circulation Policy and Library Cards*

*Circulation Policy:* Circulation periods for various categories of materials vary by type of material. Materials may be renewed twice online, by telephone, or in person, provided they have not been requested by other Library patrons. A schedule of fines for overdue material is posted at the Circulation Desk.

*Library Cards:* House Staff may register to borrow Library materials at the Circulation Desk. A barcode will be affixed to your identification card, which must be presented to check out materials.

*Printing, Photocopying, and Scanning*

Library computers are networked to black-and-white printers. In addition, the Library offers one color printer and one poster printer. There are six photocopy machines (including one color copier). To operate most Library copiers and printers, patrons must purchase a reusable copy card for a one-dollar fee. The cost of copies must be added to the card; black-and-white copies are ten cents per page. Credit copy cards allow copies to be charged to departmental budgets, grants, or funds.

*Reference and Instruction*

Reference librarians provide support in literature searching and in identifying and using appropriate print and online journals, books, databases, and Internet resources. Reference services are provided from Monday through Friday, 9:00am–5:00pm, at the Reference Desk, by telephone (x47793), and via AOL's *Instant Messenger* service (Screen Name *mssmref*). E-mail reference is available through the **"Ask a Librarian"** service.

Reference librarians offer a variety of classes on the use of the Library's databases and applications. Librarians also provide individual consultations, group training sessions, and Library tours and orientations upon request.

*Media Resource Center*

The Media Resource Center (MRC), located on the 10th floor of the Annenberg Building (access from the 11th Floor), contains educational materials in a variety of formats as well as computers, a high-speed scanner, and a flatbed scanner for general use. There is also a large-format printer that may be used for a fee to prepare posters (24" x 60"). An additional fourteen computers are located

adjacent to the MRC in a classroom that is used to teach courses on accessing computer-based information.

*Electronic Mail*

Mount Sinai House Staff e-mail accounts are available through the Library. E-mail can be accessed from computers in the Library, from the hospital computers, or from home. Accounts are created in the MRC. A Mount Sinai House Staff e-mail list enables communication among the group.

House Staff at affiliated institutions may obtain Mount Sinai e-mail accounts by requesting them through the librarian at the home institution.

*Archives*

The Archives Division of the Library is charged with identifying, collecting, preserving, and making available the documentary evidence relating to Mount Sinai and its component parts. The collection includes paper records, oral histories, video recordings, photographs, artifacts, and memorabilia dating from 1852 to the present. If you have any questions about Mount Sinai's history or are in need of information or images for a project, please contact the Archives at x47239.

*General Policies*

Beverages in covered containers are permitted in the Library. Eating is strictly prohibited in the Library in order to preserve Library materials and maintain a pleasant, clean environment in which to work or study.

**On-Call Rooms**

On-call rooms are available for members of the House Staff whose clinical departments require them to be on call at night. Cooking or keeping food in on-call rooms is not permitted in compliance with fire and sanitation safeguards. Each House Staff Officer is expected to regard the House Staff on-call room as s/he would his or her own home and to follow accepted rules of conduct. See your Department Administrator for additional information.

**Telephone and Paging Systems**

The Hospital maintains an internal dialing system for interoffice calls. The Hospital Telephone Directory lists five-digit extensions that may be dialed directly. Telephone extensions and pager IDs can also be found on the Mount Sinai Intranet under Core/Administrative Services.

Certain telephones have direct outside lines that may be reached by dialing "99" and waiting for a dial tone. These lines only accept calls within area codes 212, 646, 917, and 718. For calls outside these areas, contact your Department Administrator.

The Hospital has a public address page system and a dial-access radio receiver system. Many physicians and other key Hospital personnel may be reached by dialing x41300, then the pager identification number, followed by "#". You will hear the current status of the person you are paging. If the person is available for paging, the system will ask you to enter your call-back number.

The overhead voice page can generally be heard throughout the Patient Pavilions, the Cafeteria, Annenberg 2, 3, and 4, and B-1 Level. To place a public address page or request information on a dial-access radio page or receiver, dial x41800 (or x41400 for emergencies).

Pagers are assigned to new House Staff by the departments during Orientation. The number assigned is stamped on the case. If an incoming message is unclear, dial x41200, and follow the prompts to retrieve your messages.

*Handle with Care:* The pocket pager is a valuable instrument, costing approximately $300.00, and requires careful handling to work properly. The best precaution against damage is to carry it clipped to a belt or inside pocket. The Hospital expects pagers to be guarded against carelessness and abuse. An individual will be held responsible for loss or damage through negligence.

*Pager Coverage:* There should not be a place within the confines of the Medical Center, including yard areas, where one cannot receive a page. House Staff should not place the paging unit on or near metal desks or metal equipment, as this impedes reception. If reception is poor, the Telephone Services Supervisor should be notified promptly at x47707.

*Rotations:* When rotating to affiliated hospitals, beepers should be returned to the Department Administrator prior to leaving Mount Sinai.

*Additional Features:* For instructions on additional features such as changing page status, retrieving stored messages, changing a greeting and assigning a security code, visit the **Mount Sinai Intranet** and select "Paging System User Guide" on the left menu.


**Safety**

Mount Sinai is committed to providing a safe environment for the people it serves: patients, staff, employees, students, and visitors. To meet these needs, the Medical Center has a comprehensive safety program consisting of:

- Safety Education and Training
- Employee Accident Management
- Hazardous Materials Management
- Emergency Preparedness
- Life Safety Management
- Equipment Management
- Utility Management

Certain departments, such as Chemical Safety, Radiation Safety, and Fire Safety, also deal with specific safety issues.

An interdisciplinary Center Safety Committee oversees the operations of the overall safety programs of the Medical Center.

Individual departments have specific safety policies and procedures that are available for reference and review.

If a House Staff Officer observes a safety problem, s/he should call x4SAFE (x47233).

## Security

### Identification Cards

Medical Center identification cards are issued during initial processing. Identification cards must be presented for access to the Medical Center and employees must wear identification cards while on the premises.

### Escorts

Security escorts are available within the Medical Center as well as to parking lots and residences immediately adjacent to the Hospital. 10 minutes before departure, please call Security at x46068 or 46069 to arrange for an escort.

### Property Passes

Property and equipment removed from the Hospital must be accompanied by a property pass. Passes for personal or Hospital property can be obtained from the Security Department and should be signed by the appropriate Department Administrator.

### Shuttle Service

Shuttle service is available at no charge to House Staff on rotations to the Bronx Veterans Affairs Medical Center and Elmhurst Hospital Center. Shuttle service is also provided for a nominal cost to the 125th Street Metro North train station. Schedules are available in the Security Office at 1468 Madison Avenue, MC Level.

## Parking

Parking is available to Mount Sinai staff on a monthly basis at reasonable rates. For information, contact the Security Office at 1468 Madison Avenue, MC Level.

**Mailroom**

The Mailroom is located at 5 East 98th Street, SB level. Days and hours of operation are Monday through Friday, 8:00am-6:00pm. The Mailroom is responsible for handling outgoing, incoming, interoffice, and incoming express mail. It also handles certain incoming UPS packages. It does not pickup or deliver mail or packages. Mail is picked up by the U.S. Postal Service twice daily (1:30pm and 4:15pm). Other services include:

Mail dropboxes: Dropboxes are located in Annenberg 18, Annenberg Plaza, KP-1, KCC MC-level, GP MC level, 5 East 98th Street (1st Floor), GP Basement, BSB-1, and 19 East 98th Street. Dropboxes cannot accommodate boxes or large packages. Mail is picked up from these boxes at approximately 3:00pm from Monday through Friday.

*Patient Mail:* Mail is delivered to nursing stations in the late afternoon from Monday through Friday.

*Priority Mail:* Registered, certified or express mail is processed daily from 9:00am to 12:00pm. Priority mail must be hand-delivered to the Mailroom for processing.

*Express Couriers:* Mount Sinai vendors for outgoing and incoming express service are DHL Domestic, DHL International, and UPS. The Mailroom only receives mail from Federal Express.

*Postage Stamps:* The mailroom does not sell stamps. A postage stamp vending machine is located in the Klingenstein Pavilion, MC level.

The mailing address should appear as follows:

> House Staff Officer's Name
> Clinical Service Department Name, Box #
> The Mount Sinai Hospital
> One Gustave L. Levy Place
> New York, NY 10029–6574

Personal mail, including magazines, should be mailed to the House Staff Officer's home address.


**Uniforms and Laundry**

Uniforms are furnished without charge. Subject to certain exceptions, House Staff Officers may select any combination of lab coats, trousers/skirts, and shirts/blouses. Eight pieces may be selected as long as no more than four of any one item are chosen. Fellows and Anesthesiology residents receive up to four lab coats only. Uniforms are optional for Pediatrics residents. First-year Psychiatry residents receive uniforms; however, other Psychiatry residents and fellows do not.

Laundry service is provided free for Hospital uniforms only. The Uniform Room, located in the Guggenheim Pavilion West, SC Level, is open from Monday to Friday, 7:00am-12:00pm, and Wednesdays, 12:30pm-4:30pm. During these times, soiled uniforms may be brought in for cleaning and clean uniforms may be picked up. The Uniform Room is closed Tuesdays and Thursdays.

INTERNET RESOURCES

### Residency Management Software

New Innovations Residency Management Suite (RMS) is a web-based software program that serves House Staff, program administration, and hospital administration. It is important for House Staff to review their demographic information in the system for accuracy. The Residency Coordinator should be notified of any errors or changes. It is especially important to maintain a current e-mail address (a personal e-mail address is acceptable) because important information relevant to the residency or fellowship will be transmitted through this software. A logon/password for New Innovations RMS may be obtained from the Residency Coordinator.

The use of the various functions available in the New Innovations RMS will vary from program to program. The New Innovations RMS includes demographic data, rotation schedules, event calendars, a procedures module, a duty hours module, and evaluations of the House Staff Officer, faculty, rotations, and program.

### Privileging

A "privilege" is the permission to perform a procedure without the supervision of an attending physician. Privileges are earned by accumulating the required number of repetitions of a procedure (which vary from procedure to procedure) under the supervision of an attending physician who will then evaluate competence.

Privileges that have been granted may be viewed in the Procedure Logger module of New Innovations. Access to privileging information is available to the clinical staff at The Mount Sinai Medical Center and all hospitals in the GME Consortium. House Staff are encouraged to review their posted list of privileges from time to time with their Residency Coordinator.

### Message Boards

The GME Office hosts message boards that allow residents to communicate and exchange information regarding their educational and work environment, their programs, and other resident issues. These forums may be accessed at **http://fusion.mssm.edu/gme/board/**.

**Job Placement Website**

The Consortium for Graduate Medical Education's Job Placement for Residents website has been developed to assist House Staff Officers completing their training in looking for career opportunities. Visit the **Job Placement for Residents** site for more information. While specific information is requested concerning the identity of physicians or organizations posting positions, the accuracy of posts cannot be verified. It is incumbent on each House Staff Officer to carefully evaluate the postings and the descriptions of these positions. Comments and suggestions for the Job Placement website should be addressed to Paul Johnson at paul.f.johnson@mssm.edu.


**National Practitioner Data Bank**

The National Practitioner Data Bank was created in accordance with federal law and serves as a national clearinghouse for information concerning physicians, dentists and other health care providers.

For House Staff, the Hospital must consider reporting to the Data Bank instances where the license to practice medicine or dentistry has been revoked or limited. Malpractice insurers including the Hospital (for its self-pay portion) must also report to the Data Bank any payments made on behalf of a House Staff Officer.

Hospitals are required to query the Data Bank when performing credentialing and privileging functions. This requirement does not generally apply to House Staff; however, if a House Staff Officer moonlights for the Hospital in another capacity (i.e., in the Emergency Room), the Data Bank is queried.

Under the law, a House Staff Officer may have access to his or her own Data Bank File. Requests for information should be directed through the **National Practitioner Data Bank website**.


ACTIVITIES AND SERVICES


**The Mount Sinai Alumni**

The Mount Sinai Alumni, founded more than 100 years ago, is an organization comprised of graduates from the School of Medicine, the Graduate School of Biological Sciences, and physicians who completed training at The Mount Sinai Hospital and its affiliates.
The Mount Sinai Alumni is concerned with the present and future of the School and its affiliated hospitals, the quality of their education and research, and the quality of resident and student life. It is a vigorous organization devoted to fostering enduring relationships among its members, promoting the educational and charitable purposes of The Mount Sinai Medical Center, and recognizing medical excellence in clinical care and academic endeavors.

Programs supported by The Mount Sinai Alumni include:

- Each Saturday throughout the year, the Alumni hosts a communal Saturday Night Dinner for House Staff on call.
- A Career Planning Seminar is held each fall. Topics include financial, legal, and other important issues for House Staff as they begin their job search. Seminars are held at Mount Sinai and at an affiliated institution in New Jersey.
- Scholarships and debt relief assistance.
- Levy Library facilities, services and instructional programs.
- Alumni publications and website.
- Annual Alumni Reunion Week.
- Student and House Staff events, publications, and activities.
- Student and House Staff orientations and graduation celebrations.
- Alumni reunions.
- Expansion and renovation of Mount Sinai's teaching and research facilities.
- The Mount Sinai Alumni recognition, humanitarian, and service awards.

For more information, call (212) 241-6116 or 1-877-MSSM-EDU (toll-free), or e-mail at **alumni@ mssm.edu**. Please also visit **The Mount Sinai Alumni website** for more information.


**Employee Assistance Program**

The **Employee Assistance Program (EAP)** is a free, short-term counseling and referral service available to employees and their families. An individual may consult with a member of the EAP counseling staff concerning such issues as family and marital difficulties, emotional problems, illness and stress, alcohol or drug abuse, financial or legal worries, and difficulties in getting along with co-workers.

If an employee appears to be having problems, a supervisor or physician may suggest calling the EAP at x48937. However, the service is strictly voluntary and confidential, and no reference will be made in personnel records. EAP is located at 19 East 98th Street, Room 3A.


**Recreation**

The Recreation Consumer Office provides discounts on tickets to Broadway and Off-Broadway shows, sporting events, children's and family events, movies, concerts, operas, ballets, local attractions, restaurants, museums, and much more. House Staff are invited to use the services offered through the Office.

The Office is located at 19 East 98th Street, Room 2F, and may be reached at (212)241-6660. Office hours are Monday to Friday, 12pm-5:15pm, and Wednesday, 8-9am.

The listing of available tickets is updated daily and may be accessed by calling the ticket tape ((212)241-9531 for the same-week tape and (212)241-7257 for the future tape) or by visiting the Recreation Office online at **http://intranet1.mountsinai.org/humanresources** or **http://www. mssm.edu/recreation**.

**Child Care**

On-site child care services are available to Medical Center employees, faculty, and students. The Louis Green and Evelyn Davis Child Care Center on East 97th Street provides innovative child care. The Center operates on a fee-for-service basis and is open Monday through Friday, 6:45am to 6:00pm. It is available to children ranging from three months to five years of age. For additional information, contact the Child Care Center Director at (212) 410-3518.

For information about family day care providers, group family day care homes, school-age programs for afterschool, vacation and holiday child care, or summer camps, call the Employee Assistance Program at x48937, Monday through Friday, 9:00am-5:00pm.

**Personal Check Cashing**

Upon presentation of a Mount Sinai identification card, personal checks not exceeding $50.00 may be cashed at the Main Cashier's Office (Guggenheim Pavilion, First Floor):

| | |
|---|---|
| Monday–Friday | 9:00am–3:00pm |
| Saturday–Sunday; Holidays | 9:00am–12:30pm; 1:00pm–5:00pm |

Third-party checks will not be cashed. A fee of $10.00 will be charged for checks returned by the bank. A fee of $1.00 will be charged for cashing personal checks. There is a limit of one check per day.

**Medical Society of the State of New York**

The Medical Society of the State of New York (MSSNY) has a Resident Physician Section offering a forum to address common concerns and a mechanism to bring them to the AMA, to Residency Review Committees, and to other appropriate agencies.

For more information about membership, visit the **MSSNY website** or call (516) 488-6100.

*Mount Sinai Journal of Medicine*

Established in 1934, the **Mount Sinai Journal of Medicine** is a peer-reviewed general medical journal indexed in Index Medicus, Current Contents, and other major sources. It has an international circulation and is published six times per year. Mount Sinai House Staff and medical students are encouraged to submit their original manuscripts to the *Journal* for publication. Throughout the training years, medical students and House Staff automatically receive complimentary copies of the *Journal*. For further information, visit the *Journal* website at http://mountsinaijournal.org.

# Section Three:
# Policies and Procedures

**House Staff Titles**

The Medical Board has adopted the following titles, definitions, and conditions applicable to House Staff positions in accredited residency programs or other type appointments made principally for educational purposes. The Accreditation Council for Graduate Medical Education (ACGME) considers all physicians in ACGME-approved programs to be residents.

*Resident (PGY-1 through PGY-8)*

*Definition:* Title assigned to qualified physicians or dentists accepted for enrollment in accredited residency training programs as part of the requirement to qualify for specialty certification from an American Specialty Board.
*Condition:* Appointments will be made at the appropriate postgraduate year (PGY) of training in a particular program. Salary (compensation) level will be as approved by the Compensation Committee.

*Fellow*

*Definition:* Title assigned to qualified physicians or dentists appointed for approved training in either ACGME-approved specialty programs or non-ACGME-approved programs that have received institutional approval.
*Condition:* Fellow appointments to ACGME-approved programs will have a salary level commensurate with their PGY. Fellow appointments to non-ACGME-approved positions will carry no fixed salary (compensation) level. A compensation rate for each appointment shall be established pursuant to funds available to the training program director and confirmed to the appointee in a letter/contract of appointment. Fringe benefits are available comparable to those provided House Staff Officers.

**Contracts**

I.    Each House Staff Officer shall, prior to his or her employment, receive a written contract which shall set forth Mount Sinai's commitment to the House Staff Officer and the House Staff Officer's responsibilities to the Hospital.

II.   The House Staff Officer will be reappointed to the next level of training at the Program Director's sole, reasonable discretion. The Program Director will base the reappointment and promotion determinations on the House Staff Officer's successful completion of his/her training and the absence of pending disciplinary action against the House Staff Officer. House Staff Officers will be notified in writing at least four months before the expiration of their appointment (no later than March 1 for appointments commencing July 1) if their contracts are not to be renewed for the next year of a given residency program or if they will not be promoted to the next postgraduate year of training. Notifications of nonrenewal or nonpromotion will include the reasons for the action and are subject to the hearing rights specified below in "Section Four: Disciplinary Action: I-V."

III.  Contracts must be returned to the Medical Staff Office within two (2) weeks of the time a House Staff Officer receives the contract. Failure to return a contract will result in a suspension of privileges.

**House Staff Evaluation**

All House Staff are regularly evaluated by faculty and the program director. Formal feedback concerning a House Staff Officer's performance by the program director occurs at periodic intervals that may vary with the specific program, but occurs no less than semiannually. The criteria for promotion will be provided on a departmental basis to all House Staff.

The program director or his or her designee will meet with each House Staff Officer at least twice a year to review his or her performance.

All House Staff are to be provided access to their evaluations upon request.

House Staff Officers must also have the ability to submit to the program director an anonymous, written evaluation of faculty, clinical rotations, and the residency program at least annually.

Interventions based on evaluations may include academic advisement or disciplinary action. An academic advisement (or academic alert) is undertaken when a House Staff Officer's academic performance does not meet departmental standards but is not sufficiently below standards to warrant disciplinary action. Disciplinary actions may include, but are not limited to, written warnings, probation, suspension, or termination. See "Disciplinary Action" below for more information.

Departments are encouraged to implement electronic evaluations in New Innovations RMS. House Staff may view evaluations of their performance and evaluate faculty, rotations, and the program on the New Innovations RMS site. New Innovations RMS also covers evaluations of procedures. House Staff may obtain their logon and password from the Residency Coordinator.

**House Staff Representation**

*Medical Board and Administrative Executive Committee of the Medical Board*

The Medical Board and the Administrative Executive Committee of the Medical Board include in their regular voting membership representatives of the House Staff. These representatives are elected at the Chief Residents Retreat.

*House Staff Affairs Committee*

When a request for a hearing has been made by a House Staff Officer, the President of the Medical Board shall appoint an *ad hoc* committee to serve as the House Staff Affairs Committee. The House Staff Affairs Committee shall consist of two members of the House Staff elected at the Chief Residents Retreat and at least three members of the Medical Staff. No one from the same department as the House Staff Officer requesting the hearing and no one with a conflict of interest shall be appointed as a member of the Committee. The President of the Medical Board shall appoint a Chair of the Committee.

*Graduate Medical Education Committees*

The Consortium for Graduate Medical Education (GME) has a coordinating GME Committee, which meets monthly, and subcommittees addressing House Staff recruitment, internal reviews and size of House Staff. House Staff representation exists on all committees, with some representatives elected annually at the Chief Residents Retreat. Other resident representatives, such as those in Internal Medicine and Pediatrics, are selected by peers in their residency programs. The GME Committee's objectives include enhancing the quality of education provided, addressing all issues pertaining to GME, and assessing the current and future distribution of House Staff and programs within the Consortium. Resident representatives are encouraged to bring any questions concerning GME to the Committee. In addition to the Consortium-wide GME Committee, individual institutions and departments may have their own committees addressing GME. These committees also encourage resident participation.

*Departmental Committees*

Each program has established a mechanism for House Staff Officers to exchange information concerning their education and work environment. If a satisfactory resolution cannot be obtained on a departmental level or a House Staff Officer wishes confidentiality, the issue should be brought to the Dean for Graduate Medical Education or discussed with the Internal Review Committee during its confidential meeting with House Staff Officers as part of the quality assurance process.


**Privileging**

The New York State Hospital Code Section 405.4 (The Bell Commission Report) contains several provisions that apply to postgraduate trainees in New York State. This includes a credentialing requirement for postgraduate trainees, stipulating that trainees may not perform treatments

or procedures without direct visual supervision by an authorized physician until they have been granted authorization (i.e., "privileged") to perform these procedures under general supervision.

Each department has its own House Staff privileging process with a list of treatments and procedures that are specific to each PGY level. All House Staff Officers should know what procedures they are privileged to perform under general supervision and which procedures require direct visual supervision.

For more information, see "Privileging" in Section II.

**Work Hours**

The New York State Hospital Code Section 405.4 (The Bell Commission Report) establishes guidelines for working hours of House Staff Officers.

In addition, effective July 1, 2003, the Accreditation Council for Graduate Medical Education (ACGME) approved similar standards relative to supervision, on-call activities, and moonlighting.

Postgraduate trainees may not have work schedules that exceed 80 hours per week, averaged over a four-week period, inclusive of all work activities. However, on an individual basis a program may apply to the appropriate Residency Review Committee (RRC) for a 10 percent exception to the 80-hour limit based on a sound educational rationale, and only with prior approval from the Graduate Medical Education Committee.

Postgraduate trainees may not be scheduled to work more than 24 consecutive hours and must have at least one 24-hour period of nonworking time each week as well as at least ten hours between all daily duty periods, and after in-house call; postgraduate trainees must not be assigned in-house call more frequently than every third night, averaged over a four-week period. Work in the Emergency Room is limited to no more than 12 consecutive hours per assignment.

All 7,800 residency programs in the United States must comply with the ACGME's Duty Hours Standards, which limit House Staff duty hours to a maximum of 80 hours a week and set other restrictions. These standards, which apply to House Staff in all specialties, are meant to balance the needs of patient care, resident well-being, and academic and clinical education. Programs that fail to comply with the new standards will face adverse accreditation action, including loss of accreditation.

The ACGME monitors compliance with work hours standards through multiple methods, including confidential resident surveys; interviews with program directors, staff, and residents during accreditation site visits; and ACGME Monitoring Committee assessment of the performance of Residency Review Committees for all specialties in applying and enforcing the accreditation standards. The ACGME communicates with all residents in accredited programs, informing them that it takes the new standards seriously and plans on rigorous monitoring and enforcement. RRCs will keep resident complaints about duty hours violations, like all resident complaints, confidential. Programs that violate duty hours standards must correct the problem within 8 to

12 weeks, and ACGME field staff will conduct follow-up site visits to some of those programs to ensure compliance.

## Moonlighting

House Staff Officers are never required to engage in moonlighting activities. Should House Staff Officers wish to engage in such activities, they must notify their respective Chairs of their intent to work additional hours as physicians providing professional patient care services, and they must have a New York State license. Regulations on maximum work hours have been set forth in Section 405.4 of the New York State Health Code and the ACGME Duty Hours Standards. The time spent on moonlighting activities must be counted toward the limits imposed by these standards. The House Staff Officers have the sole responsibility of guaranteeing that they are in compliance with these hours. For more information regarding Section 405.4 of the New York State Health Code, see the above section, "Work Hours."

Mount Sinai House Staff may not moonlight if the work entails care for inpatients at Mount Sinai. They may moonlight in an outpatient department or in the Emergency Department at Mount Sinai if i) they complete a moonlighting agreement; ii) they are appropriately credentialed via the medical staff office; and iii) they have approval from their program director to moonlight. International medical graduates who wish to moonlight must first discuss and verify eligibility with the International Personnel Office.

House staff may also moonlight at another institution if i) they receive approval of their department or division chief at Mount Sinai; ii) they are credentialed at the other institution; and iii) they have their own malpractice insurance coverage that covers them at the institution where they will moonlight.

It is the obligation of the House Staff Officer seeking dual employment to gain written permission from his or her Program Director. A copy of the Program Director's letter of permission must be placed in the House Staff Officer's file. It is at the discretion of the Program Director to place further constraints on moonlighting for House Staff Officers as s/he deems appropriate. House Staff Officers who are not U.S. citizens or permanent residents must obtain additional, written permission to moonlight from the Office for International Personnel. In addition, the House Staff Officer's performance in the residency will be monitored to determine the effects of these extra hours. Any adverse effects on performance of duties as a House Staff Officer may result in a withdrawal of permission to moonlight.

## Disciplinary Action

I.   *Disciplinary Action:* The Program Director, the Department Chair, the President of The Mount Sinai Hospital, or the Medical Director of The Mount Sinai Hospital of Queens may take disciplinary action, including termination for cause, against any House Staff Officer who:

   A.   Fails to demonstrate an acceptable level of professional competence, clinical judgment in the treatment of patients, or professionalism.

B. Commits an act that constitutes professional misconduct under the New York State Education Law or a breach of professional ethics.

C. Fails to abide by the By-laws, Rules and Regulations, or policies of the Hospital or the Medical Staff.

D. Engages in any activities that are a threat to the welfare or safety of patients, employees, other physicians, or the Hospital.

E. Falsifies any Mount Sinai document, or falsifies or misrepresents prior training or educational experience.

II. *Notice:* Notice of disciplinary action shall be in writing and shall include the action taken and the basis therefor. If no request for a hearing is made by the House Staff Officer pursuant to Section III below, the disciplinary action shall become effective and final.

III. *Right to a Hearing:* Any House Staff Officer who has received notice of proposed disciplinary action may request, in writing, a hearing before the House Staff Affairs Committee of the Medical Board within ten days from receipt of such notice. Requests should be directed to the President of the Medical Board in care of the Medical Staff Office at Box 1116. Should you have any questions, call x46114 or x46917. The nonrenewal of a contract is subject to a hearing by the House Staff Affairs Committee of the Medical Board.

IV. *Hearing*

A. The House Staff Affairs Committee shall hold a hearing no sooner than 15, and no later than 45 days, from the date the written request for the hearing is received. A majority of House Staff Affairs Committee members shall constitute a quorum. The House Staff Officer shall be entitled to be present at the hearing, to present relevant evidence and witnesses on his or her behalf, and to question witnesses appearing in support of the charges made.

The House Staff Officer may challenge for cause the participation of any member of the House Staff Affairs Committee who in the House Staff Officer's opinion would not be able to render an impartial decision. It shall be at the sole discretion of the Committee Chair whether to excuse any member of the Hearing Committee so challenged.

The scope of the hearing shall be limited to determining whether there is sufficient evidence to demonstrate that the adverse action taken by the Department was not arbitrary and capricious. All testimony at the hearing shall be under oath, and a transcript of the hearing shall be made. The rules of evidence shall not apply, and the decision shall be based on a preponderance of the evidence.

At the hearing, the staff member or applicant may be represented by an attorney or other person of his or her choice. The role of this representative or department's attorney shall be limited to: (1) providing advice and counsel to the Staff Member or applicant; and (2) addressing the members of the Hearing Committee. The role of the

representative shall not include the presentation of evidence or the examination or cross-examination of witnesses. The Hearing Committee may, in its discretion, further define, expand or limit the role of any such representative.

A majority of members of the House Staff Affairs Committee shall constitute a quorum. The House Staff Affairs Committee shall make such additional rules as it deems necessary to assure prompt, fair, and expeditious handling of the matter. The House Staff Affairs Committee may take whatever action, consistent with Hospital policy, it considers appropriate.

B.  Within 30 days of the conclusion of the hearing, the House Staff Affairs Committee shall make a written report of its findings and decision to the Director of the Hospital, the Department Chair and the House Staff Officer.

V.  *Appeal:* The decision of the House Staff Affairs Committee may be appealed by the House Staff Officer, the Department Chair or Hospital President to a committee composed of the Hospital's Chief Medical Officer (or designee), an Officer of the Medical Board, and a member of the Medical Board who did not participate in the ad hoc committee hearing within 15 days of receipt of notice of the decision of the House Staff Affairs Committee. If no request for an appeal is made, the decision of the House Staff Affairs Committee shall be final. The appeal shall be limited to the record of the proceedings before the House Staff Affairs Committee, and the scope of review shall be limited to determining whether there is a reasonable basis on which to support the findings and conclusions of the House Staff Affairs Committee. Within 30 days after the conclusion of the appeal, the Appeal Committee shall send notice of its decision to the House Staff Officer, the Department Chair, and the Hospital President. The decision of the Appeal Committee shall be final.

VI.  *Summary Suspension:* A House Staff Officer may be summarily suspended from his or her duties and responsibilities without a hearing where his or her continued presence is deemed a risk to the Hospital or its patients. Following such action either by the Department Chair or by the Hospital President, the House Staff Officer shall have the right to an immediate appeal to the House Staff Affairs Committee. A summary suspension of a House Staff Officer pending termination shall be a suspension without pay. If the House Staff Officer requests a hearing before the House Staff Affairs Committee, and is subsequently reinstated, he or she may be entitled to full or limited back pay at the discretion of the House Staff Affairs Committee.

### Professional Misconduct

New York State law defines the parameters of misconduct. The following is a summary of the most significant types of professional misconduct that must be reported. The complete text of this act can be found in Article 131-A (Definitions of Professional Misconduct Applicable to Physicians, Physician Assistants, and Specialist Assistants) of New York State Law.

- Obtaining the license fraudulently
- Practicing the profession fraudulently or beyond its authorized scope

- Practicing the profession with negligence on more than one occasion
- Practicing the profession with gross negligence on a particular occasion
- Practicing the profession with incompetence on more than one occasion
- Practicing the profession with gross incompetence
- Practicing the profession while impaired by alcohol, drugs, physical disability or mental disability
- Being a habitual abuser of alcohol, or being dependent on or a habitual user of narcotics, barbiturates, amphetamines, hallucinogens, or other drugs having similar effects, except for a licensee who is maintained on an approved therapeutic regimen which does not impair the ability to practice, or having a psychiatric condition which impairs the licensee's ability to practice
- Being convicted of committing an act constituting a crime
- Being found guilty of improper professional practice or professional misconduct by a duly authorized professional disciplinary agency of another state where the conduct upon which the finding was made would, if committed in New York State, constitute professional misconduct under New York State law
- Accepting and performing professional responsibilities that the practitioner knows s/he is not competent to perform
- Delegating professional responsibilities to a person when the practitioner knows or has reason to know such person is not qualified to perform them
- Performing professional services that have not been duly authorized by the patient or his or her representative
- Altering or falsifying medical records in such a way that needed information for patient care is omitted or falsified
- Fee splitting

In addition to the requirement that a physician be reported for conduct described above, any licensed health care professional and any physician in training must be reported if the following should occur:

I.   The suspension, restriction, termination, or curtailment of the training, employment, association, or professional privileges of a licensed health care practitioner, or medical resident, related in any way to:

A. alleged mental or physical impairment;

B. incompetence;

C. malpractice;

D. misconduct; or

E. impairment of patient welfare.

II.  The denial of certification or completion of training of any individual for reasons related in any way to I.A-E above.

III. The voluntary or involuntary resignation or withdrawal of association, or of privileges, to avoid the imposition of disciplinary measures.

IV. The receipt of information that indicates that any licensed health care professional or medical resident has been convicted of a crime.

V. The denial of staff privileges to a physician if the reasons for such denial are related to I.A-E above.

**Job Retention**

I. A House Staff Officer may be terminated from his or her residency program for failure to abide by the By-laws, Rules, and Regulations, or policies of the Medical Center or of the medical staff; for falsification of any Medical Center document; for any activity that may threaten the safety or welfare of a patient, employee, or other physician; or for any action that may be detrimental to Medical Center operations.

As stated above in "Disciplinary Action," a House Staff Officer may be disciplined up to, and including, termination of his or her residency program for failure to abide by the House Staff Manual, By-Laws, Rules and Regulations, or policies of the Medical Center; for falsification of any medical center document; any conduct that may threaten the safety or welfare of a patient, employee, other physician, or visitor; or any other conduct that maybe detrimental to Medical Center operations.

II. Mount Sinai will notify each affected House Staff Officer immediately:

A. Of a decision to discontinue any training program for any reason; and/or

B. Upon receipt from the Accreditation Council for Graduate Medical Education or the Commission on Dental Accreditation of any notification regarding non-accreditation or probationary status of any training program.

**Program Closure or Reduction**

If a decision is made to significantly reduce the size of a residency program or to close a specific program, the House Staff Officers will be informed in writing of this decision as soon as possible. In such a case, institutions will allow House Staff Officers already in the program to complete their education when possible or will assist the House Staff Officers in enrolling in ACGME-accredited programs either within the Consortium or at other institutions.

**Certificates**

A certificate will be granted to each House Staff Officer upon satisfactory completion of the training program. Certificates may not be ready on the date the House Staff Officer completes his

or her training. Therefore, the House Staff Officer must be sure to provide his or her Department Administrator with a forwarding address.

A certificate cannot be issued until the House Staff Officer has completed his or her medical records, returned any borrowed books to the Levy Library, completed the checkout procedure at the termination of his or her appointment, and fulfilled all Medical Board requirements.

**Drug-Free Workplace**

The Drug-Free Workplace Act of 1988 requires Mount Sinai, as a federal grant recipient and contractor, to certify that it will provide a drug-free workplace. To accomplish this, each employee engaged in a federal grant or contract is provided with the Medical Center's Drug-Free Workplace Policy and Statement and is expected to be familiar with its contents.

As a condition of employment under such a grant or contract, employees will abide by the terms of this Statement, and notify the Vice President of Human Resources and Labor Relations or his or her designee of any criminal drug statute conviction for a violation occurring in the workplace no later than five (5) days after such conviction.

In addition, the health screening program for all new employees, incoming residents, and medical students includes urine toxicology testing (see "Toxicology Screening" in Section II of this Manual). This policy includes all House Staff rotating from other institutions.

A Drug-Free Awareness Program has been established to inform all employees about the dangers of drug abuse in the workplace; the Medical Center's policy of maintaining a drug-free workplace; the available drug counseling, rehabilitation, and employee assistance programs; and the potential penalties for drug-abuse violations.

Although the adverse effects of the excessive use of alcohol and the use of nicotine and other mood-altering substances are well described as part of the School of Medicine curriculum, see Table 1 for a summary of the effects of the commonly abused drugs.

*Statement to Employees*

The following statement describes Mount Sinai's policy regarding substance abuse for all employees, including faculty, House Staff, and bargaining and non-bargaining unit employees:

The Medical Center has a significant interest in ensuring that the work environment is free from the hazards to patients, employees, and visitors that are created due to the unauthorized use of alcohol, drugs, or controlled substances.

The illegal sale, manufacture, distribution, or unauthorized use or possession of drugs or controlled substances by employees on Medical Center premises, or in the course of Medical Center business, are prohibited and may be grounds for immediate dismissal.

The Medical Center may, at its discretion, take any other appropriate disciplinary action short of termination against employees who have violated the above rules.

*Physicians Wellness Committee*

The Physicians Wellness Committee addresses the need to identify, treat, and monitor physicians who are mentally impaired, are substance abusers, or have physical handicaps that impede their ability to carry out their patient care responsibilities. For further information, contact the Director of Risk Management at (212) 241-5853.

| Table 1. Common Drugs and Symptoms of Abuse | | | | | |
|---|---|---|---|---|---|
| **Drug/ Group** | **Drug Name** | **Street Names\*** | **Method of Use** | **Signs and Symptoms** | **Hazards of Use** |
| **Marijuana Hashish** | Tetrahydro-cannabinol (THC) | Pot, Grass, Reefer, Pasto, Weed, Colombian, Hash, Hash Oil, Sinsemilla, Joint, Chiba, Herb, Spliff, Smoke | Most often smoked; can also be swallowed in solid form. | Sweet burnt odor, red eyes, lethargy, lack of coordination. Chronic heavy use may lead to loss of interest and motivation, possible weight change. | Impaired memory perception, interference with psychological maturation. Possible damage to lungs, heart, reproductive and immune systems. Psychological dependence. |
| **Stimulants** Includes look-alike drugs that contain caffeine, phenylpropano-lamine (PBA) and ephedrine. | **Amphetamine** Dextroamph-etamine, Methamph-etamine, Biphetamine | Speed, Uppers, Pep Pills, Bennies, Ice, Dexies, Moth, Crank, Crystal, Black Beauties | Smoked or swallowed in pill or capsule form; also injected. | Excess activity, irritability, restlessness, nervousness and mood swings. Dilated pupils. | Loss of appetite, weight loss. Hallucinations; paranoia. |
| | **Nicotine** | Coffin Nail, Butt, Smoke, Cigarettes, Cigars, Chew, Snuff | Smoked, inhaled or chewed. | Smell of tobacco, stained teeth and yellow fingers. High carbon monoxide levels. | Cancers of the lung, throat, mouth, esophagus. Heart disease, emphysema. |
| | **Cocaine** | Coke, Snow, Toot, White Lady, Blow Rock, Crack, Girl, Uptown, Perico | Most often smoked or inhaled; also injected in powder, pill or rock form. | Restlessness, irritability, anxiety, talkativeness. Dilated pupils, sniffling. Intense, short-term high followed by depression. Hallucination and paranoia with prolonged use. | Intense psychological dependency; sleeplessness; anxiety; nasal passage damage; lung damage; liver toxicity, cardiovascular effects and death from overdose. |
| **Alcohol Sedatives Hypnotics** | Benzodi-azepines: Valium, Xanax, Halicion | Tranks, Sleepers, Vs, or Vees | Swallowed in pill form or injected. | Drowsiness, confusion, impaired judgment, slurred speech, needle marks, constricted pupils. | Infection, addiction with severe withdrawal symptoms, loss of appetite, nausea, death from overdose. |
| | Barbiturates: Pentobarbital, Secobarbital, Amobarbital | Barbs, Goof Balls, Downers, Yellow Jackets, Nembies, Red Devils, Blue Devils | Swallowed in pill form or injected. | Impaired judgment and performance; also drowsiness, slurred speech. | Death from overdose, injury or car accident; synergistic effects with alcohol. |
| | Alcohol: Includes Beer, Wine, Wine Coolers, Distilled Spirits | Booze, Hooch, Juice, Brew, Taste, Sauce | Swallowed in liquid form. | Impaired muscle coordination and judgment. Slurred speech. Blackouts. | Heart and liver damage with prolonged excessive use. Death from overdose, accidents. Addiction. |

| Table 1. Common Drugs and Symptoms of Abuse *(cont'd.)* | | | | | |
|---|---|---|---|---|---|
| **Drug/ Group** | **Drug Name** | **Street Names*** | **Method of Use** | **Signs and Symptoms** | **Hazards of Use** |
| **Narcotics (Opioids)** | Dilaudid, Percodan, Demerol, Methadone, Vicodin, Percocet, Darvocet | | Swallowed in pill or liquid form, injected. | Drowsiness, lethargy. Constricted pupils, slurred speech. | Addiction with withdrawal symptoms. Loss of appetite, death from overdose. |
| **Agonists** | Codeine | School boy, Licorice | Swallowed in pill or liquid form. | Needle marks, constricted pupils, neglected appearance. | |
| | Morphine, Heroin | Dope, Smack, Boy, Scug | Injected, smoked or snorted. | | |
| **Antagonists** | Buprenex, Butorphanol, Buprenorphine, Nalpuphine, Pentazocine | | Injected. | Similar to agonists. | Similar to agonists. Can precipitate withdrawal if person is already on an agonist. |
| **Hallucinogens** | PCP (Phencyclidine) | Angel Dust, Killer Hog, Weed, Super-grass, PeaCeePIll | Most often smoked, can also be inhaled (snorted) injected or swallowed in tablets. | Slurred speech, blurred vision, incoordination. Confusion, agitation, aggression. | Anxiety, depression, impaired memory and perception. Uncontrolled aggression. Death from accidents or overdose. |
| **Inhalants** | Gasoline, Airplane Glue, Paint Thinner, Dry Cleaner Fluid | | Inhaled or sniffed, often with use of paper or plastic bag or rag. | Poor motor coordination, impaired vision, memory and thought. | High risk of sudden death. Drastic weight loss. Brain, liver and bone marrow damage. |
| | Nitrous Oxide | Laughing Gas, Whippets | Inhaled or sniffed by mask or balloons. | Slowed thought, headache. | Death by anoxia. Neuropathy, muscle weakness. |
| | Amyl Nitrite, Butyl Nitrite | Poppers, Snappers, Rush, Locker Room | Inhaled or sniffed from gauze or ampules. | Abusive violent behavior, lightheadedness. | Anemia, death by anoxia. |

May vary from one geographic location to another. Adapted from "F.Y.I.: Common Drugs/Symptoms of Abuse," distributed by New York State Office of Alcoholism and Substance Abuse Services.

## Harassment

Harassment has become an increasingly prominent national concern in the workplace and in academic institutions. The School of Medicine regards any behavior that is harassing, discriminatory, or abusive as a violation of the standards of conduct required of all persons associated with

the academic mission of the institution. An ideal of U.S. medical, graduate, and postgraduate education is to create an environment that nurtures respect and collegiality between educator and student. In the teacher-student relationship, each party has certain legitimate expectations of the other. For example, the student can expect that the teacher will provide instruction, guidance, inspiration, and leadership in learning. The teacher expects the student to make an appropriate professional investment of energy and intellect to acquire the knowledge and skills necessary to become an effective physician or scientist. The social relationships required in the achievement of this academic ideal—mentor, peer, professional, staff—require the active trust of partnership, not the dependence of authoritarian dominance and submission.

The School of Medicine is responsible for providing a work and academic environment free of sexual and other forms of harassment. The institution may pursue any complaint of harassment known to it in order to achieve this goal. The Harassment Grievance Board was established in 1992 to serve as an educational resource to the School of Medicine community on issues relevant to harassment and to address complaints of sexual harassment and other forms of harassment and abuse as defined below. Complaints about implementation of school policies concerning appointment, promotion, and distribution of resources, including notification requirements associated with these policies, will not be addressed by this Grievance Board unless they involve, in addition to those complaints, an allegation of harassment or abuse as defined below. The responsibility of the Board in handling complaints of harassment and abuse extends to complaints brought by any faculty member, medical or graduate student, House Staff, or postdoctoral fellow against any other such member of the school community, concurrent with Human Resources involvement. Complaints by and against other employees of the School of Medicine will be handled by other appropriate existing grievance mechanisms (i.e., Human Resources). The operation of this Grievance Board can occur, at the Board's discretion, in addition to or concurrently with any other action an individual may take to exercise his or her rights both within and outside the institution.

The Board will attempt, whenever possible, to emphasize mediation and conciliation. It will rely on discreet inquiry and trust in dealing with complaints that are brought for its consideration. Confidentiality will be maintained to the maximum extent possible consistent with the need to investigate complaints and with the requirements of the law. Full cooperation with the Grievance Board is expected of all members of the community.

To ensure an environment in which education, work, research, and discussion are not corrupted by abuse, discrimination, and harassment, the following statement has been created to educate members of the academic community about the internal mechanism for the receipt, consideration, and resolution of complaints of such alleged acts.

*Definition of Unacceptable Behavior*

Certain behaviors are inherently destructive to the relationships that are required in a community organized to provide medical education. Behaviors such as violence, sexual and other harassment, abuses of power, and discrimination (based on race, color, religion, national origin, gender, sexual orientation, veteran status, age, disability, citizenship, marital status, genetic predisposition, or any other characteristic protected by law) will not be tolerated.

I.  *Sexual Harassment* is defined as unwelcome sexual advances, requests for sexual favors, and/or other verbal or physical conduct of a sexual nature when:

    A. Submission to such conduct is made either explicitly or implicitly as a term or condition of an individual's employment or academic success.

    B. Submission to or rejection of such conduct by an individual is used as a basis for employment or academic decisions affecting such an individual.

    C. Such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance or creating an intimidating, hostile, or offensive work or academic environment. Sexual harassment is a violation of institutional policy and of City, State, and federal laws. Sexual harassment need not be intentional to violate this policy.

    *Examples of sexual harassment include, but are not limited to:*

    1. sexual assault.

    2. inappropriate sexual advances, propositions, or demands.

    3. unwelcome physical contact.

    4. inappropriate persistent public statements or displays of sexually explicit or offensive material  which is not legitimately related to employment duties, course content, or research.

    5. threats or insinuations, which lead the victim to believe that acceptance or refusal of sexual favors will affect his or her reputation, education, employment, or advancement.

    6. derogatory comments relating to gender or sexual orientation.

    In general, though not always, sexual harassment occurs in circumstances where the harasser has some form of power or authority over the life of the harassed. As such, sexual harassment does not fall within the range of personal private relationships. Although a variety of consensual sexual relationships are possible between medical supervisors and trainees, such relationships raise ethical concerns because of inherent inequalities in the status and power that supervisors wield in relation to trainees. Despite the consensual nature of the relationship, the potential for sexual exploitation exists. Even if no professional relationship currently exists between a supervisor and a trainee, the future possibility that the supervisor may unexpectedly assume a position of responsibility for the trainee must be considered.

II.  *Discrimination* is defined as actions on the part of an individual, group or institution that treats another individual or group differently because of race, color, national origin,

gender, sexual orientation, religion, veteran status, age, disability, citizenship, marital status, genetic predisposition or any other characteristic protected by law. Discrimination or harassment on the basis of these characteristics violates federal, state, and city laws and is prohibited and covered by this policy.

III. *Abuse* is defined, for purposes of this policy, as behavior that is viewed by society and by the academic community as exploitative or punishing without appropriate cause. It is particularly objectionable when it involves the abuse of authority.

*Examples of behavior which may be abusive include, but are not limited to:*

1. habitual conduct or speech that creates an intimidating, demeaning, degrading, hostile, or otherwise seriously offensive working or educational environment.
2. physical punishment.
3. repeated episodes of verbal punishment (e.g. public humiliation, threats, and intimidation).
4. removal of privileges without appropriate cause.
5. grading or evaluations used to punish rather than to evaluate objective performance.
6. assigning tasks solely for punishment rather than educational purposes.
7. repeated demands to perform personal services outside job description.
8. intentional neglect or intentional lack of communication.
9. requirements of individuals to perform unpleasant tasks that are entirely irrelevant to their education and employment that others are not also asked to perform.

Constructive criticism, as part of the learning process, does not constitute harassment. To be most effective, negative feedback should be delivered in a private setting that fosters free discussion and behavioral change.

*Harassment Grievance Board*

I. *Purview:* The Harassment Grievance Board is charged with addressing any complaint of harassment or abuse brought by any member of the faculty, medical or graduate student, House Staff Officer, or postdoctoral research fellow against any other such member of the school community.

II. *Composition of the Board:* The Board will consist of 20 members. Among these will be two with counseling experience, two medical students, two graduate students, two House Staff, two faculty with administrative appointments, and two research postdoctoral fellows. Faculty members of the Board will be representative of both basic science and clinical, junior and senior faculty. Every effort will be made to have the Board reflect the full diversity of the medical school population. The Chairperson shall be a faculty member with experience in counseling who does not have an administrative appointment. All members of the Board, including the Chairperson, will be appointed by the Dean after consultation with relevant groups in the School. Faculty will serve staggered three-year renewable terms; students, postdoctoral fellows, and House Officers will serve renewable one-year terms.

*Protection from Retaliation*

All individuals involved in registering a complaint, serving as representatives for the complainant or respondent, as witnesses, or on the Board will be free from any and all retaliation or reprisal of threats thereof. This principle applies with equal force after a complaint has been adjudicated. Upon submission of a complaint or threat of retaliation, the Board will review the facts and recommend appropriate action.

*Reevaluation of Procedures*

The Board will review the grievance procedures periodically. Proposed changes, approved by a majority of the Board, must be reviewed and approved by the Office of the General Counsel before being implemented.

## Conflicts of Interest and Related Matters

The purpose of the Policy on Conflicts of Interest and Related Matters is to ensure that all institutional decisions are made solely to promote the best interests of Mount Sinai and its patients without favor or preference based on personal considerations, and to provide for the highest ethical conduct with respect to the actions and business relationships of all trustees, House Staff, employees, and voluntary staff. All House Staff must review these policies and disclose any potential conflicts as provided by the policies. House Staff should also review the Mount Sinai Code of Conduct and Business Ethics, which details guidelines for relationships with vendors (e.g., pharmaceutical companies). Violations of the Code of Conduct and Business Ethics can be reported confidentially by calling the Mount Sinai Compliance Hotline at (800) 853-9212. Copies of the publications are available through the Office of Corporate Compliance.

## Intellectual Property: Ownership and Commercial Development

All employees of Mount Sinai, including members of the faculty and House Staff, are required to abide by institutional policies on **Intellectual Property: Ownership and Commercial Development**.

## Dress Code

It is incumbent upon the medical community to set standards of professionalism, of which manner of dress is one tangible component. As such, the Medical Board has addressed this issue and has voted to adopt the dress code outlined below. It is intended to provide a standard to follow while acting in the capacity of House Staff Officer and representative of the Hospital.

*Men:*
- Dress shirt and tie
- Trousers (no blue or faded jeans)
- White pants (provided)

- White coat (provided)
- Clean, white sneakers are acceptable (no open-toed shoes)
- No "greens" or booties beyond sterile environment unless properly covered
- Identification badges are to be worn at all times while on Medical Center premises

*Women:*
- Dresses, skirts, blouses, slacks (no blue or faded jeans)
- White skirt or pants (provided)
- White coat (provided)
- Clean, white sneakers are acceptable (no open-toed shoes)
- No "greens" or booties beyond sterile environment unless properly covered
- ID badges are to be worn at all times while on Medical Center premises

A white coat is optional for Pediatrics and Psychiatry House Staff.

Protective attire, including scrub suits, must not be worn beyond restricted areas. Gowns used as covering must be tied securely in back. Long lab coats used as a cover-up must be buttoned. *At no times are scrub suits to be worn outside the Medical Center.*


### Press Relations

While the Medical Center does not restrict the right of House Staff to communicate with the media as individuals, such contacts carry the potential for misrepresentation, dissemination of incorrect information, disclosure of confidential matters, violation of privacy, and the misinterpretation of the comments of an individual as being representative of the policy or viewpoint of the entire Medical Center. Therefore, House Staff should refer all media inquiries directly to Press Relations at x49200.

No news media or promotional audio or video recording, filming, or still photography may be conducted within the Medical Center without authorization and advance arrangement through Press Relations, which will advise the Security Office of all such arrangements. Since Medical Center procedures provide that the Security Office will prevent any photographer or camera crew arriving unexpectedly from entering the Medical Center, Press Relations should be advised in advance whenever an outside camera crew or photographer will be coming to the campus for any purpose.


### Disasters Affecting One or More Residency Programs

A disaster is an event or set of events causing significant alteration to the residency experience at one or more residency programs.

If, because of a disaster, at least an adequate educational experience cannot be provided for each resident and/or fellow the institutional sponsor of the residency program(s) will:

I.   arrange temporary transfers to other programs and/or institutions until such time as the residency and/or fellowship program can provide an adequate educational experience for each of its residents and/or fellows;

II..  cooperate in and facilitate permanent transfers to other programs or institutions. Programs or institutions will make the keep or transfer decision expeditiously so as to maximize the likelihood that each resident will timely complete the resident year; and

III.  inform each transferred resident of the minimum duration of his or her temporary transfer, and continue to keep each resident informed of the minimum duration. If and when a program decides that a temporary transfer will continue to and/or through the end of a residency year, it must so inform each such transferred resident.

The Designated Institutional Official (DIO) will call or email the Institutional Review Committee Executive Director with information and/or requests for information.

Similarly, the Program Directors will contact the appropriate Review Committee Executive Director with information and/or requests for information.

Residents should call or email the appropriate Review Committee Executive Director with information and/or requests for information.

Within ten days after the declaration of a disaster, the DIO of each sponsoring institution with one or more disaster-affected programs will contact ACGME to discuss due dates that ACGME will establish for the programs (a) to submit program reconfigurations to ACGME, and (b) to inform each program's residents of resident transfer decisions. The due dates for submission shall be no later than 30 days after the disaster unless other due dates are approved by ACGME.

In the event of a disaster at non-Consortium programs or institutions, consideration will be given to accepting temporary or permanent transfers.

# Section Four:
# Patient Care

Patient Care Guidelines

## Admissions and Discharges

*Patient Access Services*

Patient Access Services (PAS) is located in the Guggenheim Pavilion, 9 Center, Room 271, where Bed Management is centralized (excluding Psychiatry, Physical and Rehabilitation Medicine, and Maternal Child Health Services). PAS is a 24/7/365 operation where all emergency, inter-hospital transfers, intra-hospital transfers, PACU, and direct admissions are processed for bed procurement.

The departments within PAS include: Bed Management, the Inter-Hospital Transfer Service, Surgical Admission Planning and Patient Accounts. They can be reached 24 hours per day at 1-866-GOT-A-BED or from an in-house phone at x47461. The director of PAS may be reached at x43914. The Clinical Nurse Manager can also be reached at x43914.

*Utilization Review Guidelines*

**Admission and Continued Stay:** Federal and State regulations require hospitals to have Utilization Review (UR) programs to qualify for reimbursement for medical care rendered during hospitalization. Documentation in the patient's record is reviewed concurrently by a Hospital case manager for medical justification of admission and continued stay. Review includes the completeness of notes, legibility, and the presence of signatures with code, date, and time of note.

When the medical justification is not evident through chart review, the case manager will refer the case to a Physician Advisor (PA) for a decision. The PA may contact a House Staff Officer when there is a question regarding care. Adverse determinations rendered as a result of this activity can result in loss of reimbursement to the Hospital, if reviewed by a third-party payer.

The Peer Review Organization (PRO), Island Peer Review Organization (IPRO), Blue Cross agencies, and commercial insurance providers conduct retrospective and current review of records to determine medical necessity of admission and continued hospital stay. Adverse determinations from these reviews will result in fiscal penalties to the Hospital. The physician may be asked to assist in appeals to these denials.

*House Staff Role in Length of Stay*

The Mount Sinai Hospital recognizes the importance of managing the length of stay (LOS) of patients admitted to the inpatient service. Not only does reducing the LOS increase the efficiency of medical care and improve the quality of care provided, it also assures revenue availability to the Hospital for program development. Throughout the Hospital, mechanisms are in place to reduce LOS. All Hospital personnel must be cognizant of this pressing issue. Case managers and social workers are actively involved in discharge planning and are routinely available on the patient floors for consultation with the medical staff. House Staff are encouraged to interact with these individuals and, wherever possible, bring to administration's attention any areas where intervention could play a part in reducing LOS.

*Discharge Planning*

An integral component of all patient care, Discharge Planning is mandated by federal and State regulations, and is an essential element of Utilization Management. Optimally, such planning begins at the time of admission. The goal of Discharge Planning is to enable the patient to complete his or her care in the Hospital and to return home or to transfer to another facility with arrangements for the continuing care s/he may require.

It is the responsibility of the patient care team to work together to establish a target LOS for the patient, and to work with the patient and family to establish an appropriate discharge plan working toward this goal.

The physician is responsible for thinking about the discharge plan and probable date of discharge as soon as the patient is admitted, and for communicating alterations in that plan and date to other health care team members. S/he is also responsible for the final discharge determination and writing of the discharge orders. It is essential that physicians communicate with other team members regarding the patient's needs and readiness for discharge.

The Department of Social Work Services is responsible for coordinating discharge planning for patients having complex needs for post-Hospital care. To identify such patients, social workers employ a high-risk screening program when patients are admitted and collaborate with other health professionals during Hospital stays.

Early referral by physicians of patients with complicated psychosocial or health care needs is a further impetus to initiate planning efforts as early as possible. Current application procedures and eligibility criteria for all services, whether institution- or home-based, are quite complicated. The social work staff members explain these to the physician as they affect individual situations and expect cooperation in completing necessary applications and summaries.

*Temporary Departure from the Hospital*

A patient may leave the Hospital temporarily only upon the written order of a physician on staff in emergency situations, for purposes of a court hearing, and/or for therapeutic indications in Psychiatry.

I. The nurse must sign the Pass Form (Form A-1-A-10 5M 11/78 ABG) and note the date/hour of departure. The form is placed in the patient's record. NOTE: This data must be accurately recorded for insurance and reimbursement purposes.

II. When considering passes for patients, bear in mind that third-party payers may not cover the cost of pass days. Inform the patient that such costs must and will be passed on to the patient if not absorbed by third-party payers.

III. Depending on the patient's insurance coverage, the following will apply:

A. Psychiatry patients:

    1. Medicaid:

        a. Psychiatry patients who are covered by Medicaid must be in the Hospital for 15 consecutive days before a pass is issued.

        b. Therapeutic passes (limited to 2 days per pass) are honored and are limited to 18 days for any 12-month period.

        c. Therapeutic need and the goal of the leave must be a part of the patient's medical record pursuant to the physician's treatment plan.

        d. Therapeutic passes must be cleared through the Psychiatry Administrative Office.

    2. Commercial insurance plans, including Blue Cross and Medicare: Rules and regulations as outlined for medical/surgical patients (B.1-4 below) pertain.

B. Medicine and Surgery patients:

    1. Pass days are discouraged and should be used only in an emergency (e.g., death in the family) or for presence at a court hearing to determine patient capacity.

    2. Patient must return by midnight on the day of departure.

    3. Approval and payment for the pass day(s) rest solely with the third-party payer. Inform the patient that s/he may be responsible for the payment of the pass day(s).

4.   The emergency nature of the pass must be documented.

IV.   If there are any questions relating to the provision of insurance coverage, phone the Patient Accounts Department at (212) 731-3961.

V.   The physician issuing the pass must complete the Approval of Temporary Leave Form (Form A-1-A-10), including the length of leave, the specific reason for the leave, signature, and date.

VI.   The patient and/or responsible party or guardian must sign the form before leaving the Hospital. The nurse must sign and date the form and place it in the medical record.

VII.   In Psychiatry, the form is forwarded to the Psychiatry Administrative Office, from which it is forwarded to the Patient Accounts Department.

**Consultations**

In general, the decision to request a consultation should be made with the knowledge of the patient or family and the attending physician.

*Patients Admitted to the Hospital without a Private Attending Who Subsequently Have an Attending Physician Appointed by the Hospital:* To request a consultation from another service, the House Staff Officer contacts the consulting service and must specify the nature of the need for consultation (non-urgent, urgent, or emergent). A note to this effect is then recorded in the patient's chart. A Request for Consultation Form is then prepared and placed in the patient's chart. More detailed information regarding consultations, including required time frames for responding to non-urgent, urgent, and emergent consultation, can be found in the Rules and Regulations of The Mount Sinai Hospital.

*Patients Admitted to the Teaching Service Who Have a Private Attending:* If the attending physician wishes to obtain a consultation from another service, s/he contacts the consulting physician or service directly.

*Routine Tests:* It should be noted that the House Staff Officer of the primary service rather than the consulting service has the responsibility for ordering routine tests. All tests performed on patients must have a corresponding order dated and signed by the requesting physician on the patient's order sheet.

**Diagnosis-Related Groups**

Hospital stays in New York State are paid under a prospective payment system. The basis for payment under this system is the Diagnosis-Related Group (DRG). The DRG is a method for classifying patient hospitalizations by diagnosis and procedure on the assumption that similar costs are expended by patients with similar intensity of resources (e.g., hours of nursing care,

laboratory tests, Operating Room (OR) time, medications). Patients are initially divided into medical or surgical subgroups, depending on whether or not an OR procedure was performed. DRGs are then assigned based on the following:

- Principal diagnosis;
- Principal OR procedure;
- Complication or co-morbid condition (cc);
- Patient's age (either under or over 18);
- Discharge status (e.g., expired, transferred, discharged home with help); and
- Newborn's birth weight.

The driving factor is the principal diagnosis, defined at the time of discharge as that which is determined to have caused the admission. It is not the most resource-intensive diagnosis. Certain managed care contracts negotiate special agreements such as a per diem rate or pass-through of charges for specific high cost items used.

DRG payment is calculated by multiplying the specific DRG weight by the Hospital's current Medicare, Medicaid, or negotiated payer rate per case. The main component in the payment for each patient is the DRG's relative weight. The federal and State governments have developed indices of relative weights that reflect the intensity of resources consumed for each DRG. A relative weight of 1.00 reflects the average resources consumed for treating a patient. Any weight greater than 1.00 is considered to consume more resources than average and thus be more costly. Higher relative weights, therefore, reflect medical or surgical conditions requiring more intense hospital resource consumption and lead to higher reimbursement. In addition to case mix, Medicare and Medicaid payment rates for hospitals are adjusted for medical education and capital costs. Medicare also provides additional reimbursement called disproportionate care for hospitals that treat a high percentage of Medicaid and disabled patients.

Coding practices have not always kept up with emerging technologies, resulting in certain situations where a procedure may be severely under- or overcompensated. It may take time to redress these inequalities.

The geometric mean length of stay (LOS) is intended as a guide reflecting the average LOS for the typical patient with a given illness or disorder. Outliers are patients with atypically long LOS or high costs. Medicare provides additional reimbursement for acute patients that are deemed to be high-cost. Medicare sets a high cost threshold for each DRG. If the cost for a case exceeds this threshold, then the Hospital receives 80% or its costs above this amount. Medicaid provides additional reimbursement for acute patients who are deemed to be high-cost or long-stay outliers. Medicaid sets a high cost threshold and a high trim LOS for each DRG. If the cost for a case threshold is exceeded, then the Hospital receives a percentage of its costs above this amount. If the high trim point is exceeded, the Hospital receives incremental per diem reimbursement. Additionally, Medicaid provides low trim points for each DRG. If the patient's LOS is below the low trim point, Medicaid provides reduced reimbursement through a per diem payment rather than the full DRG payment. Cost per case is determined by the Hospital's historical ratio of cost to charges (RCC) for both Medicare and Medicaid.

**Emergencies: Medical and Surgical**

*Emergency Preparedness and Management*

The Hospital's Emergency Management plan is aimed at prompt and efficient handling of any community or Hospital emergency. The plan is designed as an "all hazards plan." The Hospital uses the Hospital Emergency Incident Command System, which defines chain of command and operations objectives. The Emergency Operations Center is the site from which response efforts are coordinated by an Incident Commander. Drills are performed and evaluated throughout the year. This provides staff the opportunity to reinforce their knowledge of the plan while providing the Hospital an opportunity to make improvements to the plan. Participation is mandatory for all employees in departments involved in a drill.

If the Emergency Management Plan is activated, it will be announced by overhead loudspeaker. House Staff may receive a page from Hospital operators or their departments. After the House Staff Officer ensures his or her safety and that of his or her patients, s/he should contact a direct supervisor for further instructions. House Staff should not attempt to respond to the scene of the incident or the Emergency Department unless directed to do so by a supervisor, or unless it is the responsibility of the House Staff Officer under the Emergency Management Plan. A copy of the Plan can be found in the Nursing Units, in Department Administrators' Offices, and on the Mount Sinai Intranet.

House Staff should make sure that their departments have their current contact information so that professional staff availability may be assessed in emergencies.

*Team 7000: In-Hospital Resuscitation*

Occasionally, unforeseen problems arise that constitute an immediate threat to the life of a patient. Cardiac arrest, respiratory tract obstruction, and other emergencies must be treated quickly. To help meet these emergencies, there are Team 7000 carts strategically located throughout the Hospital. At all times there is a team of physicians, including an anesthesiologist, an internist, and a cardiologist, available for assistance.

*To Get Assistance:* Dial x47000 and tell the operator where the emergency team is needed. Do not call the operator to page individuals, as this will only delay arrival of the team.

*Emergency Equipment:* All Nursing Units contain a Team 7000 Cart. This cart has pertinent cardiac and respiratory stimulants as recommended by the Medical Board. Monitors and defibrillators for use in Team 7000 are available on the carts.

For information and specific help concerning any emergency, call:

> Cardiac and/or Respiratory Arrest:
> Team 7000 (Cardio-Respiratory Emergency Team)
> x47000

External Cardiac Pacemaker or Electrical Defibrillator
Cardiology Resident through Department of Cardiology during routine hours
x47784

Following a cardiac emergency, a note must be put in the patient's chart.

**Ethics: Clinical Dilemmas**

The Ethics Committee of the Medical Board of The Mount Sinai Hospital is available for consultation and guidance on ethical issues concerning patient care and treatment. To contact the Ethics Committee, call:

|                                      |        |
|--------------------------------------|--------|
| Ian Holzman, M.D., Chair             | x45446 |
| Richard Stein, M.D., Vice Chair      | x48848 |
| Rosamond Rhodes, Ph.D., Secretary    | x43757 |
| Patient Representative Department    | x66    |

Information on clinical ethical dilemmas, capacity assessment, and decision-making (Figure 1) is provided below.

*Capacity Assessment*

The more significant the consequences of refusal, the more certain House Staff should be that the patient has decisional capacity. They should assess whether the patient:

- *Understands* and *appreciates* the diagnosis, prognosis, likelihood of risks and benefits, and the treatment alternatives.
- *Makes* and *communicates* a choice.
- Articulates a *reason* for the refusal that is consistent with patient's values.

House Staff should elicit the patient's reasons for refusal:

- "Help me understand why you decided to refuse _____."
- "Tell me what makes _____ seem worse than the alternatives."
- "What do you believe will happen if you don't have _____?"

It should also be determined whether the patient has a related mood or other distortion of judgment (e.g., depression, fear, or anxiety).

*Responding to Surrogate Decisions:* When a patient lacks decisional capacity, a surrogate (e.g., appointed proxy or guardian, or next of kin) may make decisions on behalf of the patient. See "Patient Rights and Responsibilities: Advance Directives, Health Care Agents, and Proxy Law" below for a summary of NYS law.

Fiduciary responsibilities to patient require House Staff to assess the surrogate's:

- • decisional capacity and appropriate concern for the patient's well-being.
- • decisions to assure that they are *not unreasonable*.

Treatments that are likely to avert serious harm cannot be refused by a surrogate without clear evidence of the patient's wishes.

Treatments that are not likely to significantly alter the patient's course may be refused by a Proxy or other surrogate.



Figure 1. Decision-Making

*How to Approach Clinical Ethical Dilemmas*

I.   Identify the dilemma about the case and formulate a question that reflects the conflict.

II.  Collect *all* relevant data that could help to answer your question.

III. Identify the basic principles involved (e.g., confidentiality, autonomy).

IV.  Explain how they relate to this case.

V.    Consider whether principles conflict in this situation *or* whether there is uncertainly about what a particular principle (e.g., beneficence) directs the physician to do.

VI.   Decide which principle should have priority in this case, and support that choice with factors relevant to the case <u>or</u> find an alternative that avoids the dilemma.

VII.  Evaluate the decision by asking if it is what an exemplary doctor should do in such a situation.

VIII. Plan the practical steps that should be taken, focusing on the details of the case and foreseeable future issues.

IX.   When uncertainty persists, note whether there is some missing information that would help to resolve the dilemma. Which information? How will it help to resolve the dilemma?

## Medication Practices

*Drug Enforcement Agency Number*

In order to prescribe and administer controlled substances to Hospital inpatients or outpatients, it is necessary to use the Hospital Drug Enforcement Administration (DEA) number with an assigned suffix (if a physician does not have his or her own DEA number). The House Staff Officer must sign his or her name in person when issued this number at Orientation or in the Pharmacy Administrative Office (Annenberg B2-12) x46171.

A physician's DEA number must be indicated on all prescriptions for outpatient controlled substances, Schedule II-V. Dictation control numbers should be written on all orders for inpatients.

*Department of Pharmacy*

The Pharmacy Department is on Annenberg B2; several pharmacy satellites are located in patient care areas. The pharmacist on duty can be reached 24 hours a day, 7 days a week, at x47714. See Table 2 below for locations and hours of operation.Only a registered pharmacist (or authorized pharmacy personnel under the direction and supervision of a registered pharmacist) may prepare, dispense, or make label changes on medication, or transfer medication from one container to another.

*Adverse Drug Reaction Reporting*

An Adverse Drug Reaction (ADR) Report Form (Form B2-B40) must be completed if an adverse drug reaction is suspected. The form is available on all Nursing Units and Pharmacy Satellites.

The reaction should be reported to the physician responsible for the patient's care and recorded in the patient's medical record.

Completed Drug Reaction Report Forms should be forwarded to the attention of the Drug Use Evaluation Coordinator, Pharmacy Department, Box 1211, or called in directly to the ADR hotline at x40799.

| Table 2. Pharmacy Locations and Hours | | |
|---|---|---|
| **Location** | **Phone** | **Hours of Operation** |
| GP11C | x841510 | 7:30am–11:30pm |
| GP10C | x841509 | 7:30am–11:30pm |
| GP8C | x841507 | 7:30am–11:30pm |
| GP6C | x841805/841806 | 7:30am–11:30pm |
| KP3 (NICU/PICU) | x49515 | 7:30am–11:30pm |
| KP4 | x48795 | 7:30am–11:30pm |
| GP3 OR | x41989 | 6:30am–7:00pm |
| A6-OR | x48701 | 7:00am–3:30pm |
| Employee Pharmacy: Annenberg B1 | x47720 | 8:30am–5:00 pm (Monday–Friday) |

*Antibiotic Control Program*

I.   House Staff should refer to the Mount Sinai Drug Online Formulary on the Intranet. Click "Medical Services," then "Pharmacy" on the left hand menu bar. On the "Online Formulary," click "Indexes," then select the antibiotic group for an alphabetical listing of all formulary antimicrobials.

Antibiotics not listed are non-formulary or are listed as "restricted" and approval from Antimicrobial Assistance Program Infectious Disease physicians or Pharm D pharmacists must be obtained before they can be used in a particular patient.

*Day Approvals (9:00am–6:00pm):*
- Adult Patients: Page 9407 to request approval of a restricted antimicrobial.
- Pediatric Patients: Page 3737 to request approval of a restricted antimicrobial.
- The Infectious Disease attending on-call (Adult or Pediatric, as appropriate) should be paged if a House Staff Officer is unable to reach the approval team.
- Please make every effort to page to an extension that accepts outside calls (avoid extensions that begin with a "3") so that the page can be returned expeditiously.

*Night Approvals (6:00pm-9:00am):*
- Complete the "Night Request for Use of Restricted Antimicrobial Agents" form to authorize the pharmacy to dispense the antibiotic up to and including the 10:00am dose the following morning.

- If therapy with the restricted antimicrobial agent(s) listed is to continue beyond this time, Antimicrobial Assistance Program approval must be obtained. Prescribers should page the appropriate antimicrobial approval pager (Adult 9407 or Pediatric 3737) between the hours of 9:00am and 12:00pm the following morning.
- The following antimicrobial agents require Infectious Disease approval (Adult 9407 or Pediatric 3737) at all times and may not be dispensed via the Night Approval System:

  Amphotericin B Liposomal (Ambisome®)
  Caspofungin (Cancidas®)
  Voriconazole (Vfend®)
  Dalfopristin-Quinupristin (Synercid®)
  Linezolid (Zyvox®)
  Daptomycin (Cubicin®)
  Tigecycline (Tygacil®)
  Pentamidine Inhaled (Pentam®)
  Vancomycin IV (Pediatrics only)
  Acyclovir IV (Pediatrics only)

II.   All requests for restricted antimicrobials, (including all restricted antifungals) for any patient will need Infectious Disease approval.

Cefepime for neutropenic fever can continue to be dispensed without Inectious Disease approval.

The doctor or nurse practitioner must page for Infectious Disease approval for any patient (including Oncology and bone marrow transplant patients). If there is any delay in reaching the AAP or an Infectious Disease physician via the pager system, the first dose may be dispensed by the satellite pharmacy but subsequent doses will require Infectious Disease approval.

II.   If there is any delay in reaching an Infectious Disease pharmacist or physician and the patient needs a restricted antimicrobial emergently, the satellite pharmacy should be called directly to request that the first dose be released stat. Subsequent doses will require approval.

*Prescribing Restricted Drugs*

Restricted drugs are medications that have been approved by the Pharmacy and Therapeutics Committee for use only by specific services, for specific indications, or for a combination of both.

*Restricted to a Particular Service or Specialty:* A drug may be dispensed only when prescribed or approved by a physician (attending or fellow) from that service, a Chief of Service, or the Chair of the Pharmacy and Therapeutics Committee (or designees).

*Restricted to a Particular Indication:* A drug may be dispensed only for the approved indication unless approved by a Department Chair or the Chair of the Pharmacy and Therapeutics Committee (or designees).

*Restricted to a Particular Service for a Specific Indication:* A drug may be dispensed only for the approved indication when prescribed or approved by a physician (attending or fellow) from that service, a Department Chair, or the Chair of the Pharmacy and Therapeutics Committee (or designees). The use of these drugs for non-approved indications, whether by physicians from the approved service or not, requires approval from the Department Chair, or the Service approved to use the drug. Approval may also be obtained from the Chair of the Pharmacy and Therapeutics Committee (or designees).

*Automatic Stop Orders*

The Medical Board has approved an automatic stop order for all medications when duration or dosage is not specifically prescribed. It is the responsibility of the prescriber to be aware of the termination date and reorder the medication if needed.

Orders specifying "as needed" (p.r.n.) must have a diagnosis or indication for use as well as a defined dosing schedule.

Orders for controlled drugs specifying p.r.n. must be rewritten every seven days if therapy is to continue on a specified schedule. A p.r.n. order for a controlled substance without a specific frequency is valid for a single administration only within a 72-hour period.

Specific controlled substance orders for individual patients with specified administration times shall not be valid after seven days. Therefore, such orders must be rewritten at least every seven days.

Other medications for which duration or dosage is not specifically prescribed will be discontinued after seven days.

In order to standardize the discontinuance of medications automatically stopped by reason of this policy, the 9:00am or 10:00am dose will be the last one administered on the day following the termination date (as noted on the order sheet).

Should the physician elect to order medication for a specified period, the automatic stop order will not apply except for controlled drugs.

All drug orders for patients undergoing surgery are automatically discontinued.

*Bedside Medication*

The following medications may be kept at the patient's bedside upon specific written order of the prescriber:

- Nitroglycerin tablets in quantities not to exceed the amount contained in the smallest commercially available package;
- Antacid preparations;
- Dermatologic lotions, creams and ointments;
- Oral forms of pryidostigmine bromine;
- Ophthalmic preparations used in the treatment of glaucoma and pre- and postoperative intraocular surgical cases;
- Artificial tears for the treatment of dry eyes;
- Topical antibiotics;
- Topical agents to be administered prior to an office or clinic visit;
- Bronchodilator inhalers;
- Insulin Pen Devices (for patients on isolation).

Patients on the Psychiatry and Geriatrics units are not permitted to keep medication at the bedside.

*Drug Information Center*

The Department of Pharmacy maintains a formal Drug Information Center, located in the Inpatient Pharmacy on the Annenberg B-2 level, at x46619. The Center provides information regarding pharmacotherapy and other issues relating to the use of medications in order to assist health care providers in treating and educating patients. In addition, clinical pharmacists are available for pharmacotherapeutic consultations with the medical, nursing, and related professional staff. The Drug Information Center is well equipped with medical journals, abstracting services, textbook resources, and a number of computerized literature retrieval systems. These resources make it possible to provide the professional staff of The Mount Sinai Medical Center with up-to-date information in many areas, including investigational or foreign drugs, therapeutic alternatives, pharmacodynamics, pharmacokinetics, adverse drug reactions, toxicology, drug compatibility, and drug-drug, drug-food, and drug-disease state interactions.

Practitioners may also access drug information via the Intranet:

I. The Mount Sinai Drug Formulary, which is accessible to all health care professionals. To access the online formulary you should:

   A. Log in to the Intranet.

   B. Click on the "Medical Services" tab on the top of the screen.

   C. Click on "Pharmacy" on the left hand menu bar.

   D. Click on the "Online Formulary."

   E. Type the name of the Drug (either generic or brand) in the "Search" box on the left side and click "Search."

F.  If the medication is not on our formulary, it will state "No occurrences found."

G.  Other links are available:

- New Drugs
- Special Alerts
- FDA Shortages
- FDA Recalls
- Lexi-Comp Online Assistance
- Lexi-Comp Value-Added Products
- Lexi-Interact
- Lexi-DrugID
- Lexi-Calc
- IV Compatibility

II.  The Micromedex® Healthcare Series provides a wide range of databases tailored to meet the needs of healthcare professionals, including information related to drugs, acute care, toxicology, and patient education. Micromedex® is updated on a quarterly basis.

To access Micromedex from the desktop:

A.  Log in to the Medical Center Intranet.

B.  Click on the tab labeled "Manuals & Documents" at the top of the screen.

C.  Click on "Micromedex®" located under 'Educational Databases" on the left hand bar.

D.  Bookmark the site for future use.

The Drug Information Center provides services Monday through Friday, between 9:00am and 5:00pm at x46619. If immediate assistance is required, the Drug Information Coordinator should be paged at 4461. At other times, message may be left on the Phone Mail system or the inpatient pharmacy may be reached at x47714.

*Investigational Drugs*

Investigational drugs are those drugs not approved by the Food and Drug Administration (FDA) and/or drugs approved by the FDA but used in doses, routes of administration, or indications for which no acceptable precedent exists in the medical literature.

I.  Investigational drugs may be used by the principal investigator and/or his or her collaborators after a formal application, including a Pharmacy Information Data Sheet, has been approved by the Institutional Review Board.

II.  An Informed Consent Form (Permission Sheet #3) must signed by the patient or his or her representative and appropriately witnessed when the patient is a minor or is mentally

incompetent. This must be completed prior to the administration of investigational drugs. The principal investigator must secure the necessary signed consent forms, which are then incorporated into the patient's Hospital chart. This consent form is approved by the Institutional Review Board (IRB).

III. All investigational drugs should be properly labeled, stored, and dispensed by the Pharmacy Department. The principal investigator and the Pharmacy Department will make arrangements for proper investigational drug storage and distribution.

IV. Investigational drugs may not be kept at a Nursing station or administered by a nurse unless they are dispensed or relabeled by the Pharmacy Department.

V. When appropriately dispensed by the Pharmacy Department, the investigational drug shall bear a label indicating:

  A. Investigational drug name;

  B. Dose, route, and frequency of administration;

  C. Patient name and location;

  D. Principal investigator;

  E. Institutional Review Board project number; and

  F. Protocol termination date.

VI. The Pharmacy Department will provide a Research Drug Information Sheet to the Nursing Unit. The information sheet shall include the following:

  A. Principal investigator and collaborators; and

  B. Investigational drug information, including use, dose, route of administration, known pharmacological action, known side effects, and other pertinent information.

VII. Principal investigators and/or collaborators may store and administer investigational drugs themselves only upon approval of the Institutional Review Board. In this case, the principal investigator must provide the Nursing Unit and the Pharmacy Department with the Research Drug Information Sheet, as indicated above.

VIII. An investigational drug shall not be administered by a staff nurse or physician without the written order of the principal or co-investigators. An investigational drug must be administered by a licensed professional nurse, the principal investigator, or study collaborators only. Such administration must be promptly recorded in the patient's Hospital chart.

IX.   Investigational drugs shall be removed from the unit promptly and returned to the Pharmacy Department upon discontinuation, project termination, or patient discharge.

*Emergency Use of Investigational Drugs*

The following procedure shall be followed if the administration of a non-commercially available drug is therapeutically indicated for the urgent welfare of any patient:

I.   Obtain written approval of the appropriate Department Chair or Division Director. The approval letter should indicate that the investigator is approved by the drug sponsor to use the drug in the manner described in the sponsor's IND application. Approval may be verbally communicated by the Department Chair to the Director of the Pharmacy and followed up by written communication.

II.   Obtain signed consent (Permission Sheet #3).

III.   Forward the written approval and a copy of Permission Sheet #3 to the Pharmacy Department. Indicate the drug and the condition for which its use is requested.

IV.   Submit additional reports as required.

V.   The emergency use of an investigational drug may be employed only once within the Hospital. If a drug is to be used more than one time in the institution, then a formal emergency use protocol has to be written by the investigator and submitted to the IRB for approval. Once approved, the investigator and others designated will be able to order the drug for emergency use.

VI.   If the drug is to be administered by the Nursing staff, it must be labeled by the Pharmacy Department.

VII.   The prescriber may be required to provide the Research Drug Information Sheet if one is not on file in the Pharmacy Department.

VIII. The prescriber may administer the drug himself/herself.

IX.   If a drug is available under a Treatment IND, follow the procedure outlined above. However, the physician may not use the drug for more than one patient without an IRB-approved protocol. Also, the Department Chair approval requirement may be waived, as determined by the Pharmacy and Therapeutics Committee and the IRB.

*Order Writing*

To maintain uniformity, provide clarity, and avoid errors, House Staff must familiarize themselves with drug and treatment ordering procedures.

I.   All orders should be written legibly and clearly using a ballpoint pen; do not use felt-tip pens.

II.   All medication orders entered into the TDS hospital computer system will be transmitted electronically to the Pharmacy Department.

III.   All orders shall include the following:

A.   Patient's full name;

B.   Unit and serial number;

C.   Patient location;

D.   Date and time written;

E.   Generic name of drug;

F.   Dose, route, and frequency of administration;

G.   Prescriber's signature and dictation control number.

*Note: The metric system must be used for all drug orders (except when dosage is commonly expressed as drops or units). All orders indicating a trade name product will be filled with the generic brand in stock.*

IV.   All orders should be specific. An order reading "50 mg – 100 mg Q 3-4 h p.r.n." is not acceptable. An exact dose and dosing interval must be indicated, e.g., "50 mg q4h p.r.n."

V.   Admission orders (including all information outlined above) and the patient's diagnosis, drug allergies, and weight, should be forwarded to the Pharmacy Department as part of all patients' initial drug orders.

VI.   All medications prescribed for inpatients should be approved drugs listed in The Mount Sinai Hospital Formulary. Investigational agents must be approved by the Hospital's IRB or the Committee on Pharmacy and Therapeutics. The Drug Formulary is available online as detailed in the section of this Manual entitled "Medication Practices: Department of Pharmacy: Drug Information Center."

VII.   When required, "p.r.n." orders must indicate the minimum interval between doses and the indication for use and if for pain, the level of pain (e.g., "acetaminophen 650 mg p.o. q6h daily, p.r.n. for mild pain"). NOTE: An order indicating a change of drug or amount will discontinue a previous "p.r.n." order for that drug.

VIII. A list of abbreviations not permitted in the medication orders or medication documentation may be found in the next section of this Manual. These unapproved abbreviations must not be used The Mount Sinai Medical Center.

*Note: Daily orders are administered at 10:00am. Daily orders placed after this time should be written "1st dose now" and then daily thereafter.*

IX.  Mount Sinai Clinic patients should be directed to a local pharmacy for prescription filling. An exception would be patients participating in a Hospital research study.

X.  Prescriptions for patients seen in a Hospital clinic must be written on a New York State official prescription or printed on NYS official prescription paper. This requirement is for all medications, both non-controlled and controlled drugs.

   A.  Patient name, age, and address (on each patient's clinic card);

   B.  Date prescription written;

   C.  Name, strength, quantity of prescribed drug and directions for use;

   D.  Prescriber's signature and dictation control number;

   E.  Prescriber's imprinted or stamped name (embossing plate should be used for this purpose);

   F.  Prescriber's profession (M.D., D.D.S., etc.);

   G.  New York State License Number;

   H.  A DEA Number must be included for all controlled substance prescriptions, schedules II-V. House Staff members may use their four-digit suffix as assigned along with the Mount Sinai Hospital DEA Number.

XI.  Please note the following guidelines pertaining to prescription writing:

   A.  Stamped or pre-printed prescriber's signatures are not allowed;

   B.  Stamped or pre-printed prescriptions are not allowed;

   C.  Drug name abbreviations are not acceptable;

   D.  Schedule II-V controlled substances may be prescribed for up to 30-day quantities;

   E.  Schedule III-V controlled substances may be refilled up to five times or six months. (There are, however, some exceptions.)

XII.  The following guidelines pertain to Medicaid prescriptions only:

   A.  Medicaid prescriptions are only valid within 14 days from issue;

B. Drugs for acute illness should be limited in quantity, while no more than a 30-day supply should be prescribed for maintenance drugs;

C. Drugs should be prescribed as generic equivalents even if a brand name is used. The full name of the drug must be written;

D. The "DAW" designation should be avoided as this may cause difficulty for the patient in obtaining the drug. If a specific brand is required for a defined medical reason, indicate "DAW" and "Brand" on the prescription.

| Table 3. Abbreviations Not Permitted ||
|---|---|
| **DO NOT USE** | **ALWAYS USE** |
| QD | Daily |
| OD | Daily |
| QOD | Every other day |
| U | Unit |
| IU | Int. Unit *or* International Unit |
| Trailing zeros (*i.e.* 1.0 mg) | 1 mg |
| Naked decimals (*i.e.* .1 mg) | 0.1 mg (Leading zero) |
| MS, $MSO_4$ | Morphine or Morphine Sulfate |
| $MgSO_4$ | Magnesium or Magnesium Sulfate |
| TIW | Three times a week |
| BIW | Twice a week |
| Cc | mL |
| OD, OS, OU | Right eye, Left eye, Both eyes |
| AD, AS, AU | Right ear, Left ear, Both ears |
| x 2/D | x 2 doses *or* x 2 days |
| gr *or* grains (apothecary system) | mg *or* G (metric system) |

*Abbreviations Not Permitted*

The Joint Commision on Accreditation of Healthcare Organizations (JCAHO) has expanded the National Patient Safety Goal regarding unapproved abbreviations. All institutions must have a list of abbreviations that are not permitted (a "Do Not Use" list). Most of the abbreviations chosen for this list are prohibited by JCAHO, and the rest were selected by the institution. These abbreviations are not permitted in medication orders or any medication-related documentations (e.g., medication

administration records, H&P). It is important to note that this requirement applies to all inpatient records and outpatient clinic records, as well as the employee pharmacy. It does not apply to practitioners' private practices.

*Non-Formulary Drugs*

The Mount Sinai Hospital has adopted a "closed formulary" approach. A closed formulary allows only a limited number of drugs in a particular drug class to be utilized within the institution. These agents are selected by the Committee on Pharmacy and Therapeutics based on pharmacologic,

| Table 4. Additions to Therapeutic Categories | |
|---|---|
| **Skeletal Muscle Blockers** | *Cyclobenzaprine (Flexeril), Tizanidine (Zanaflex)*, Baclofen, Diazepam |
| **Diuretics** | *Bumetanide (Bumex)*, Furosemide (Lasix), Ethacrynic acid (Edecrin), Hydrochlorthiazide, Chorthalidone |
| **Vasodilators** | *Isosorbide mononitrate (Imdur, 30 mg), Clonidine patches (7 day treatment)*- only for patients already receiving and due for replacement patch during hospitalization, *no initiation*, Isosorbide dinitrate, Nitroglycerin, Minoxidil, Hydralazine |
| **Beta-Blockers** | *Metoprolol (25 mg), Nadolol (20 mg), Propranolol 200 mg/5 mL liquid,* Carvedilol, Labetalol, Atenolol, Esmolol |
| **Anti-hyperlipidemic** | *Fenofibrate (Tricor)*, Gemfibrozil |
| **Anti-Parkinsons** | *Amantadine (Liquid), Entacapone (Comtan), Pramipexole (Mirapex), Ropinirole (Requip)*, Levodopa/Carbidopa, Selegeline |
| **Sustained release products** | *No NF requests accepted* |
| **Miscellaneous** | *Ammonium Lactate 12% (LacHydrin), Calcitriol liquid, Capsaicin 0.025% and 0.075%, Calcium acetate (Phos-Lo), Coenzyme Q10 tablet, Desmopressin oral (0.1 mg, 0.2 mg), Dornase alfa (Pulmozyme), Flucytosine 500 mg capsules, Hydrocortisone 5 mg tablets, Ivermectin (Stromectol) 3 mg (ID rest), Levetiracetam liquid (Keppra), Linezolide liquid (ID restricted), Lipase Amylase/Protease (Creon), Mesalamine suppositories (Rowasa) and capsules (Pentasa),Methylprednisolone tablets (Medrol), Midodrine, Polyethylene Glycol powder (Miralax packets), Mupirocin ointment (Bactroban), Nicotine lozenges (2 mg, 4 mg), Oxybutynin XL (Ditropan XL5 mg, 10 mg and 15 mg), Pentoxyphylline (Trental), Riboflavin, Trientine (Syprine)* |

pharmacokinetic, and therapeutic profiles of the drugs in the class, as well as a review of drug interactions, adverse effects, and approved indications. The Committee recommended the line extension of some items already on formulary and the addition of other items pertaining to different therapeutic categories.

Prescribers are limited to formulary medications only. In the event that a prescriber would like to use a non-formulary medication, the patient would need to bring in his or her own supply. Patients bringing in their own supply of medication must provide their medication to be identified and

| Table 5. Agents on Formulary | |
|---:|:---|
| **ACE inhibitors** | Lisinopril, Enalapril, Captopril |
| **ARBs** | Losartan, Valsartan |
| **HMG CoA Reductase Inhibitors** | Simvastatin, Pravastatin, Atorvastatin (with restriction) |
| **Calcium Channel Blockers** | Amlodipine, Verapamil, Verapamil SR, Diltiazem, Diltiazem CD, Nifedipine, Nifedipine XL, Nimodipine, Nicardipine (injectable only) |
| **Histamine $H_1$-antagonists** | Cetirizine, Loratadine |
| **Histamine $H_2$-antagonists** | Famotidine, Ranitidine |
| **Proton Pump Inhibitors** | Esomeprazole oral and I.V. formulations, Lansoprazole suspension |
| **Antidiabetic Agents (oral)** | Glimepiride, Glipizide XL, Repaglinide, Pioglitazone, Rosiglitazone |
| **Insulins** | Human Insulins (Novolin® only) regular, NPH, Human insulin analogs (Novolog only) aspart, 70/30 Mix, Insulin glargine |
| **Benzodiazepines (Oral)** | Alprazolam, Chlordiazepoxide, Clonazepam, Diazepam, Lorazepam, Temazepam, Zolpidem |
| **5-HT3 Antagonists** | Granisetron (Oncology), Ondansetron (Surgery) |
| **RBC Factors** | Darbepoetin (preferred), Erythropoetin (with restriction, only up to 10000 units/mL) |
| **Migraine** | Sumatriptan PO, IN, SQ; Eletriptan PO; Rizatriptan MLT only |
| **LMWH** | Enoxaparin, Fondaparinux (rest. Hematology) |
| **Liposomal Amphotericin** | Ambisome |
| **Antidepressants on Formulary without Restriction** | Buproprion, Citalopram, Desipramine, Mirtazapine, Nortriptyline Phenelzine, Tranylcypromine, Trazodone, Sertraline, Venlafaxine |
| **Antidepressants on Formulary with Restriction** | Amitriptyline (available for indications other than depression), Escitalopram (patients on the agent prior to admission), Fluoxetine (patients on the agent prior to admission), Paroxetine (patients on the agent prior to admission) |
| **Antipsychotics on Formulary without Restriction** | Clozapine, Haloperidol, Fluphenazine, Loxapine, Chlorpromazine, Risperidone, Quetiapine, Ziprasidone |
| **Antipsychotics on Formulary with Restriction** | Aripiprazole (patients on the agent prior to admission; patients with documented treatment failure with multiple agents-requires psychiatry approval) Olanzapine (patients on the agent prior to admission; patients with documented treatment failure with multiple agents-requires psychiatry approval; can only be prescribed on a scheduled basis) |

relabeled by the Pharmacy before inpatient use. On a patient-specific basis, if an acute need exists for a unique medication where there is no formulary alternative, then a non-formulary request can be made. These requests will require the approval of the Department Chair.

Requests for changes or additions to the formulary will require completion of the Request for Formulary Addition form, approval of the Department Chair, and disclosure of any potential conflicts of interest. Forms are available by contacting the Director of Pharmacy.

In order to make the transition easier for practitioners, a number of frequently requested non-formulary agents have been added to the formulary. Please see Table 4 for therapeutic categories where additions have been made. Bold items represent new additions or new dosage forms.

For your convenience, Table 5 includes an abbreviated list of agents on the formulary, arranged by therapeutic class. For a full list of formulary agents, please see the online formulary on the Mount Sinai Intranet.

*Reconciliation of Medications*

I.   *Introduction:* Medical errors and adverse drug events in hospitals are known to be due to poor communication of medical information at transition points across the continuum of care. To promote safety and reduce the potential for medication errors, the Joint Commission on Accreditation of Healthcare Organizations (JCAHO) mandated implementation of their medication reconciliation National Patient Safety Goal initiative, effective January 2006.

II.  *Purpose:* The purpose of medication reconciliation is to provide a process for obtaining and documenting the most accurate lists of patients' medications prior to admission, and matching these lists with the medications that the Hospital will provide during the inpatient stay. This process is repeated at discharge. Medication reconciliation helps avoid transcription errors and omissions and prevents duplication of therapy, drug interaction, and drug-disease interaction.

III. *Definitions:* Medication is defined as any prescription medication, herbal remedies, over-the-counter medication, sample medication, vitamins, nutriceuticals, diagnostic or contrast agent, radioactive medication, blood derivative, parenteral nutrition, intravenous solution, vaccine, and/or product determined by the Food and Drug Administration as a drug.

IV.  *Procedure*

A. Transition Point: *Admission*

   1. From the Emergency Department (ED): The ED initiates an accurate list of the patient's current medications in Ibex. The Current Medication List Record is sent along with the ED Summary Report to the inpatient unit.

   2. As part of his or her admitting note, the admitting House Staff officer or nurse practitioner obtains a complete list of the patient's medication and documents the information on the Medication Reconciliation form, using the Current Medication List Record as a guide.

   3. Information regarding this list may be obtained from the patient, family, pharmacy, doctor's office, clinic, and/or care facility, or by careful review of the transfer note.

4. The Medication Reconciliation Form should be completed within 24 hours of patient admission. It is the responsibility of the admitting provider to obtain the list of current medication and to compare this list with the new medication orders.

5. Entry of medication should be initialed and dated by the provider.

6. A registered nurse's (RN's) involvement is required when additional information is provided by the patient or family regarding current medication. The RN then communicates this information to the provider. The provider updates the Medication Reconciliation sheet accordingly.

7. All entries and signatures must be legible.

8. The Medication Reconciliation Form should be affixed to the history and physical examination record that is completed by the admitting doctor or nurse practitioner.

9. The NCR copy of the sheet will be placed in the Medication Room and picked up by a representative from the pharmacy within a reasonable amount of time.

B. Transition Point: *Unit/Service Transfers*

1. The transferring provider documents current medications in the transfer note and/or TDS medication summary.

2. The accepting provider compares and reviews medications from the source unit or service, home medications, and new orders.

C. Transition Point: *Discharge*

1. The list of medications is reviewed:

   a. Home medications;

   b. Current medications;

   c. Discharge list of continuing medications.

2. Using the Medication Reconciliation Form, the discharging provider indicates which medications are being continued or discontinued upon discharge.

3. The discharging provider documents in the final discharge note all medications the patient is to receive upon discharge, and specifies which medications have been discontinued or changed from the prior home regimen.

4. The discharging provider educates the patient and/or family on the list of discharge prescriptions, and informs the patient and/or family and the patient's primary care provider. The listing is also documented in the transfer note to the next provider of any changes to the regimen previously made at home or at another facility.

5. Discharge instructions and/or patient education are carried out by the provider and/or RN.

6. The original Medication Reconciliation Form remains in the patient's chart adjacent to the history and physical examination record.

D. Transition Point: *Preoperative Services: GP2*

1. The nurses obtain a complete list of the patient's medications and document the information on the Medication Reconciliation Form. Medication listing sections found in the nursing assessment forms (for both Ambulatory and Day Admission Surgery patients) are not to be completed. "See Medication Reconciliation Form" should be written in these sections.

2. The RN must sign the bottom section of the Medication Reconciliation Form (Admission) indicating they have completed the information.

3. The anesthesiologist will review the Medication Reconciliation Form.

4. The surgeon will review the form and reconcile the medications upon admission and sign at the bottom.

E. Transition Point: *Phase II Post-Anesthesia Care Unit (PACU)*

1. At the time of patient arrival in the PACU, the RN checks for completion of the Medication Reconciliation Form.

2. If the form is incomplete, the RN pages the House Staff Officer before patient discharge.

3. The House Staff Officer must complete the "Reconcile on Discharge" column for each individual medication and sign/print name and date in the bottom section ("Discharge").

F. *Ambulatory Surgery Patients*

1. The Medication Reconciliation Form is **initiated upon admission only.** No reconciliation is required at the time of discharge for these patients.

2. Nurses discharging patients will indicate in the comment section of the form "Ambulatory Surgery Patient."

*Note: For Direct or Emergency Department admissions to the Surgery Service, see "Transition Point Admission" above.*

*Telephone and Verbal Order Policy*

Verbal orders and orders dictated over the telephone shall be accepted only in the case of an emergency. In areas serviced by a unit-dose system, only a registered pharmacist may accept a verbal order from a member of the Hospital staff legally qualified to prescribe drugs and approved to do so by the Medical Board. A registered professional nurse can accept a verbal or telephone order in areas not serviced by a unit-dose system or when a pharmacist is not available.

I.   The order must be written on the Doctor's Order Sheet exactly as stated verbally or via the telephone. The order must indicate the following:

    A.  Drug name, dose, route, and frequency of administration;

    B.  Prescriber's name;

    C.  Time the order was taken;

    D.  Name of the professional taking the order.

II.  The prescriber shall countersign the order within 24 hours.

III. Oral orders for Schedule II controlled drugs are valid for an initial dose only unless countersigned.

IV.  Telephone and verbal orders received in the Narcotics Rehabilitation Center shall be countersigned as follows:

    A.  Verbal orders received Monday through Friday shall be countersigned within 24 hours;

    B.  Verbal orders received on the weekend are to be countersigned within 72 hours.

V.   Telephone and verbal orders for medications are accepted in the Employee Pharmacy.

**Needlestick or Sharp Injury Procedure**

Potentially infectious body fluids include blood, cerebrospinal fluid, pleural fluid, pericardial fluid, peritoneal fluid, amniotic fluid, synovial fluid, semen, vaginal secretions, any visibly bloody fluid, and unfixed tissues. Vomit, saliva, nasal secretions, sputum, tears, sweat, urine, and feces are considered *not* infectious *unless* visibly contaminated with blood.

In order to ensure immediate and appropriate management following exposure to blood or another potentially infectious body fluids, please follow these steps:

I.   *Wash* the area with soap and water as soon as possible. In cases of mucous membrane exposure (e.g., eye), flush with water.

II.  *Report* the exposure to the supervisor (e.g., clinical nurse manager) of the area where the exposure occurred.

III. The supervisor will *notify* the "Needle-Stick Coordinator" (Monday through Friday, 9:00am-5:00pm (*pager # 4118*)). On weeknights from 5:00pm-9:00am, weekends, and holidays, the supervisor will notify the Assistant Nursing Administrator via the Page Operator.

IV.  *The source patient will be assessed.* (If exposure occurs in an outpatient setting, the source patient should be asked to *remain* in the clinic until assessment is completed.)

   A. *Risk Factor Assessment:* The Coordinator will interview the source patient and/or review the medical record as necessary.

   B. *Laboratory Testing:* Source patient is to be tested for Hepatitis B surface antigen (HBsAg) and Hepatitis C antibody (anti-HCV or HCV Ab). These samples (in a red or speckled top tube) may be obtained without a physician order (Medical Board decision-see Infection Control Manual section B-3.2). The source patient should also be tested for HIV, using the rapid HIV antibody test, after informed consent is obtained.

V.   *The exposed person should be referred for medical evaluation*:

   A. *Staff, volunteers:* Employee Health Service from Monday to Friday, 8am-4pm, or the Emergency Department at all other times.

   B. *Medical Students:* Jack Martin Fund Clinic from Monday to Friday, 9am-4pm, or the Emergency Department at all other times.

   C. *All Other Students:* Emergency Department at all times.

   D. *Agency/Contract/Travel Staff:* Emergency Department at all times.

VI.  *The exposed person should take the following documents,* completed by the supervisor, to the medical evaluation:

   A. Employee Accident/Injury Report or Non-Employee Occurrence Form

   B. Employee Health Service Referral Form

For more detailed information regarding the above, as well as procedures to follow if exposures to other persons, including visitors and patients, occur, refer to the Infection Control Manual, Section 3.2, on the Mount Sinai Intranet.

**Patient Demise**

*Anatomical Gifts*

All deaths must be referred to the New York Organ Donor Network ("the Donor Network") for possible organ donation in accordance with the Public Health Service Act, Section 372 (Routine Referral Law).

Donor Network staff will request consent to donate anatomical gifts from the Next-of-Kin or guardian for all patients who are suitable candidates for tissue/organ donation at the time of death. Based on acceptable medical standards for screening potential donors, a designated representative will speak with the family/guardian unless there is actual notice of contrary intentions by the decedent, actual notice of opposition by any of the persons listed in hierarchy of consent, or actual notice that such an anatomical gift is contrary to the decedent's religious or moral beliefs.

*Note: According to New York State law, only an individual trained and certified to counsel and request organs from families may initiate the discussion of donation with a family member. The Donor Network has trained counselors who will come to the Hospital to work with families.*

*Tissue Donation:* Notification to the Donor Network is made at the time of death by the pronouncing physician, or a registered nurse or nurse practitioner when the physician is unavailable. (The phone number of the Donor Network is (800) GIFT-4NY; (800) 443-8469.) Provide the information listed on the "Routine Referral Form" available on all nursing units. Include:

- Patient name and medical unit number
- Age of patient
- Admitting diagnosis and cause of death
- Date and time of death
- Patient location and unit phone number
- History of diseases that are contraindications to donation (cancer, hepatitis, autoimmune [lupus], intravenous drug use, Sepsis)
- Name and beeper number of the pronouncing physician if s/he did not place the call to the Donor Network
- Name and phone number of Next-of-Kin

Determination of suitability for tissue donation is made by New York Organ Donor Network staff, who determine whether the patient meets the preliminary acceptable criteria for tissue donation. The Donor Network coordinator will:

I.   Request additional information from the pronouncing physician or nurses.

II.  Notify a skin or eye bank regarding potential donors, and the tissue bank or the Donor Network will contact the unit directly for follow up.

III. Identify additional medical/social information using the Donor Network information sheet.

IV.   Determine if there are any known objections by the family or patient.

V.   Confirm that the family has been notified of the patient's death directly by the responsible physician.

*Solid Organ Donation:* Donor Network notification of potential solid organ donation is made when the brain death protocol is imminent or initiated. A Donor Network procurement coordinator will come to the unit to review the case and approach the family regarding possible consent for solid organ donation. Cases falling under the jurisdiction of the Medical Examiner are acceptable candidates for organ donation; however, the Donor Network must contact the Medical Examiner to obtain the proper release for donation and must contact the next of kin to obtain approval for organ donation.

*Autopsy Consent*

Permission to perform an autopsy must be requested from the Next-of-Kin of all patients who expire at The Mount Sinai Medical Center (Permission Sheet #17: Request for Post-Mortem Examination). Members of the medical staff are expected to exhaust all reasonable efforts to obtain post-mortem permission. If help is needed, House Staff must request assistance from the attending on the case. The Next-of-Kin may not be aware of the possibility of an autopsy unless it is addressed.

- If permission for autopsy is not granted, this fact and the reason for it must be documented in the patient's medical record on the bottom of the consent form itself and on the Death Certificate.
- For cases where the Medical Examiner assumes jurisdiction, the Next-of-Kin does not need to be asked for permission for autopsy.
- In cases declined by the Medical Examiner, requests for autopsy must be made of the Next-of-Kin.
- Consent for autopsy must be obtained from legal Next-of-Kin as defined by the New York City Health Code. (See below.)
- All autopsies are performed either by members of the Pathology staff of The Mount Sinai Medical Center and/or by the Office of Chief Medical Examiner for the City of New York.

*Definition of "Next of Kin":* New York City Health Code Article 205, Section 205.1 (Definition) Paragraph D states that 'Next of Kin' means person or persons, in the following order of priority, who are available within the applicable limits of time as provided in the article to receive communications and give communications and give instruction regarding the disposal of a decedent's remains either personally, by telephone, telegraph, mail, or other usual means.

I.   Spouse or registered domestic partner
II.   Children over 21 years of age or older
III.   Grandchildren and other descendants 21 years of age or older
IV.   Parents or surviving parent
V.   Brothers and sisters of the decedent 21 years of age or older

VI.   Grandparents
VII.  Great-grandparents, uncles, and aunts 21 years of age or older
VIII. Other persons 21 years of age or older entitled to share in the estate

The New York City Health Code *does not recognize* common law relationships in determinations of Next-of-Kin. A health care proxy is not acceptable for purposes of Next-of-Kin. All of the above apply only if there is no anatomical gift declaration prior to death.

When there is a controversy among members of a group of equal kinship over permission for autopsy, it is suggested that it is unwise to accept consent from only one individual. The kin should be advised to come to a group agreement concerning whether or not to proceed with an autopsy.

*Note: Grandchildren have priority over parents or siblings in the New York City Health Code.*

According to NY Public Health Code (4214): In no case shall an autopsy or dissection be performed upon any body within 48 hours after death unless a **written consent or directive** therefor has been received from the person or persons legally entitled to consent to or order such autopsy or dissection.

*(In other words, written consent must be obtained within 48 hours of the death of an individual. This can be achieved by having the Next-of-Kin come to the Hospital to sign the form or by faxing a copy of the consent form to them and then having them fax it back after signing it.)*

After 48 hours of the death of an individual, one may obtain consent for autopsy via the telephone; however, the Hospital operator must serve as a witness to the conversation.

*Birth, Spontaneous Termination of Pregnancy, and Induced Termination of Pregnancy Certificates*

The preparation of Birth Certificates is the responsibility of the House Staff Officer and/or the attending physician. The following information must completed on all Birth Certificates:

I.    Signature of the "certifier" (Cynthia McKie-Addy).

II.   Numbers 16 to 40 in the "Confidential Medical Report" section of the certificate.

In the case of an infant born alive, (heartbeat after birth or voluntary muscle movement), but dying within a few moments after delivery, both a Birth Certificate and a Death Certificate must be completed.

A Certificate of Spontaneous Termination must be completed for any terminated pregnancy that does not result in a live birth, regardless of the period of gestation. This applies in the case of a stillborn fetus or where fetal tissues are recovered at curettage. Abortions are to be reported on Induced Termination Certificates. These forms are available at the treatment areas.

The completed certificate (either Birth or Spontaneous Termination) is to be left in the Birth Certificate dropbox on K2 or with the Operating Room supervisor. (The Birth Certificate Office

must be informed if the Operating Room supervisor completes the form.) An abstract of the Birth Certificate will be inserted in the chart after processing by the Birth Certificate Office.

Birth Certificates should be sent to the Birth Certificate Office. Spontaneous and Induced Termination Certificates are processed by Natalie Weinstein on KP-9. Certificates must be completed immediately after delivery, as the time limit for filing with the Health Department is 48 hours after birth.

*Death Certificates*

It is the responsibility of the House Staff Officer to complete the Death Certificate for deaths that occur on his or her service. This is to be done promptly after the patient has been pronounced dead. Prior to certificate completion, the pronouncing physician must consider whether the case needs to be referred to the Office of the Chief Medical Examiner. In addition, the House Staff Officer must notify the attending physician of the death. At that time, the House Staff Officer and the attending should determine who will contact the Next-of-Kin of the death and who will request autopsy permission from the Next-of-Kin. Information concerning Medical Examiner referral, pronouncement of death and the request for autopsy permission must be indicated in a note in the patient's chart (i.e., "note at the time of death"). A deceased individual may not be removed from the Hospital by a funeral director until an appropriately completed Death Certificate has been provided by the physician. Delays in completing certificates can impact a family's ability to proceed with timely funeral arrangements.

A House Staff Officer may be asked to complete a Death Certificate for a patient s/he is only covering for, or on a patient that s/he has never seen or cared for. In this sense, the House Staff Officer acts as a representative of the Hospital with regard to completion of a Death Certificate. By signing the certificate, one is merely stating that the information contained therein is correct "to the best of your immediate information," as ascertained from the patient's medical record or discussion with the attending of record. In other words, information written in a Cause of Death Statement on a Death Certificate is the House Staff Officer's best opinion based on available information.

*Note: The House Staff Officer completing the Death Certificate need not: a) have ever seen the patient alive; b) have pronounced the patient dead; or c) have been on duty when the patient died.*

All certificates must be completed in *black ink*. Felt tip pens are unacceptable, even if in black ink.

*Definition of Death:* Criteria and techniques for determination of death should be determined in accordance with Medical Board criteria. Questions concerning the pronouncement of death should be discussed with the appropriate Chief Resident and/or attending physician.

*General Guidelines for Completion of Death Certificate:* To avoid errors when completing Death Certificates, please follow the procedures below.

Complete the Death Certificate as soon as possible after the patient has expired. From *8:00am to 4:00pm,* the Death Certificate Clerk in Medical Records (ext. 44636) may be of assistance in helping

to complete the certificate. Business Associates (BAs) may also be of assistance in this matter. From *11:00pm to 8:00am*, the Nursing Administrator assumes such responsibility.

- *Type or print in ink (black only; do not use felt-tipped pen).*
- Enter patient's name (first name first).
- Erasures, strikeouts, whiteout, or write-overs are not permitted. If an error is made, a new certificate must be written or it will not be accepted by the Department of Health. This is a legal document.
- No abbreviations can be written. For example, write in full "Manhattan," " Male," "Female," "months," or "carcinoma." You must also write out the disease in the cause of death statement. For example, "COPD," "CHF," "HIV," and "AIDS" are unacceptable.
- Do not write in the middle section of Page 1 (personal particulars to be filled in by Funeral Director) or on the back page, except as directed for Medical Examiner case referrals.
- Complete the cause of death section in the same way as for all other expirations.
- Use American style for writing numbers (e.g., "7").
- If completing a certificate manually, you may wish to utilize a Death Certificate Worksheet to avoid errors. These are available on some nursing units.

When the official Death Certificate is printed or prepared, the BA on the Care Center or the Death Certificate Clerk will obtain your signature on the official copy. If the certificate is not ready before the end of your shift, the resident to whom you sign off is responsible for signing it.

Call the Administrator on duty if there is a question of a Medical Examiner's case. Do not complete a Death Certificate if the Medical Examiner assumes jurisdiction of a case. Instead, complete the Medical Examiner's form.

If autopsy consent is obtained, inform the administrator on duty and the Pathology Department (x47376). If there is urgency to the performance of an autopsy, the administrator on duty will contact the Pathology staff. If the Next-of-Kin has not decided about permission for autopsy, complete the Death Certificate, except for item 26; then, call the BA on the Care Center or x47601 as soon as it is known whether or not the Next-of-Kin has granted permission for the autopsy.

For religious reasons, some families elect to remove the deceased directly from the nursing unit without the body going to the morgue ("Direct Removal"). In these circumstances, the Nursing Administrator will direct that the certificate be completed and signed on the nursing unit.

*Completing the Cause of Death*

Use the following guidelines in completing the cause of death:

I. Cause, Mechanism, and Manner of Death

A. The *underlying (proximate)* cause of death is the disease or injury responsible for initiating the lethal sequence of events. A competent cause of death should be etiologically specific. "Congestive heart failure" is not an acceptable underlying (etiologically specific) cause of death and cannot stand alone on a certificate. An example of an acceptable, etiologically specific cause of death is "coronary atherosclerotic disease."

B. The *mechanism* of death refers to the altered physiologic, biochemical, functional, or mechanical derangement whereby the underlying (proximate) cause exerts its lethal effect. *Mechanisms* of death lack etiologic specificity and are *unacceptable* as substitutes for underlying causes of death. Common mechanisms of death include congestive heart failure, cardiac arrhythmias, asphyxia, sepsis, exsanguination, renal failure, and hepatic failure. These terms often appear on a cause of death statement as the "immediate cause of death" but cannot stand alone on the certificate and must be followed by an underlying / etiologically specific cause. The term "cardiorespiratory arrest" is essentially meaningless for purposes of death certification.

C. The *manner* of death explains how the cause arose: natural or violent (accident, homicide, suicide, or undetermined). Natural deaths are defined as those that are caused exclusively (100 percent) by disease. If an injury of any sort causes or contributes to death, no matter how minor the contribution, the manner of death cannot be natural. Never use mixed classifications of the manner of death (e.g., natural / accident).

II. *Proximate versus Immediate Cause of Death:* The underlying or proximate cause of death is that which, in a natural and continuous sequence unbroken by any efficient intervening cause, produces the fatality and without which the end result would *not* have occurred. Immediate causes of death are complications and sequelae of the underlying cause. There may be one or more immediate causes, and they may occur over a prolonged interval, but none absolves the underlying cause of its ultimate responsibility. In some cases, the etiologically specific cause of death is not known. In such instances, this fact must be made known on the cause of death statement. For example, a patient expires from an esophageal variceal bleed due to Hepatitis C cirrhosis. The immediate cause of death is the variceal bleed. The underlying proximate cause of death would appear to the Hepatitis C cirrhosis. While this is partly true, the etiology of the Hepatitis C infection must be stated on the Death Certificate. Since the "cause" of many cases of Hepatitis C infection is not known, an appropriate way to write this on the death certificate would be as follows: Hepatitis C cirrhosis of unknown (or undetermined) etiology.

III. In instances of suspected poisoning or drug overdose, it is essential to retain samples of blood, urine, and gastric lavage obtained at or about the time of admission to the Hospital for appropriate chemical testing.

IV. All indwelling tubes, intravascular catheters, and drains should remain undisturbed *in situ* following the death of a person who is to be autopsied (whether a Hospital autopsy or Medical Examiner autopsy is to be done). If needed, endotracheal and nasogastric tubes can be cut outside the nostril or lips and the cut end sealed with tape to patient's body.

*Note: In the interest of safety, we urge that draining venipuncture sites and indwelling intravascular catheters or needles be covered with a gauze bandage and sealed by tape. Drains and intravascular catheters should be ligated or knotted before they are covered and taped.*

*Completed Death Certificates*

I.   Death Certificates will be reviewed for appropriate completion by Medical Records and/or the Care Center staff or administrator on duty. If incomplete, the physician responsible for completion will be notified and asked to complete the Death Certificate.

II.  On the night shift, the Night Administrator will receive and review Death Certificates.

III. Permission to perform an autopsy must be noted on the Death Certificate. (Check "yes" or "no" in Section 26.) If left incomplete, the Death Certificate will be returned to the physician for completion. If this information is not known at the time of certificate completion, the designated area may be left blank but must be completed by the physician as soon as the information is available.

Accuracy is imperative in the completion of Death Certificates, since the certificate becomes a matter of permanent and official record. Erasures and/or deletions make the certificate **unacceptable** to the Bureau of Vital Records of the Department of Health. Diagnoses with question marks are not acceptable.

A completed Death Certificate is attached (not stapled) to the chart of the deceased and retained at the Nursing Station pending post-mortem consent information. For additional information, see "Autopsy Consent" above.

*Medical Examiner's Cases*

A Hospital death falls under the jurisdiction of the Office of Chief Medical Examiner (OCME) if it is unnatural or possibly unnatural or if it presents impelling legal or public health implications. Such deaths should be immediately reported by telephone to the OCME by a physician (i.e., clinician) fully acquainted with the case. The 24-hour telephone number of the OCME in NYC is (212) 447-2030.

If a case is accepted by the OCME, a signed Hospital autopsy consent is not necessary and the OCME is responsible for completing the Death Certificate. A Medical Examiner (ME) form is completed by the clinician (in lieu of the Death Certificate) and is forwarded with the body to the OCME. An OCME "case number" should be recorded on the ME form. Admission blood, urine, or gastric contents should be preserved and refrigerated for possible transport to the OCME. If Next-of-Kin objection to an autopsy is known, then the clinician must indicate this to the ME when the referral is made. If a case is accepted by the OCME, the Next-of-Kin should be notified of this fact by the clinician who reported the case. The OCME will also contact the family prior to the performance of an autopsy (in case there are objections to the autopsy).

At times, the OCME may accept a case but allow the Hospital to perform the autopsy. In this case, the clinician must have previously obtained a signed consent for autopsy from the Next-of-Kin and, upon referral of the case to the OCME, the ME must be made aware of the clinician's and Next-of-Kin's desire to have the autopsy done at the Hospital. The OCME "case number" must be given

to the pathologist. Once the autopsy is performed, the pathologist faxes a Preliminary Anatomic Diagnosis (PAD) to the OCME, which will then issue a death certificate.

If the OCME determines that the death does not fall within its jurisdiction, the case is deemed "non-reportable" and responsibility for death certification reverts back to the Hospital (i.e., the clinician needs to fill out the Death Certificate). The phrase "non-reportable" is written in pencil by the clinician on the upper-left-hand corner of the reverse of the Death Certificate together with the medico-legal investigator's name.

In cases where the ME wants to document a death for epidemiologic purposes but chooses not to perform an autopsy, a "no case number" is given to the clinician. This number should be written in pencil on the upper-left-hand corner of the reverse of the Death Certificate together with the investigator's name. For "no case" and "non-reportable" deaths, processing proceeds in the same manner as with other Hospital deaths. Autopsy consent may then be requested of the Next-of-Kin in both circumstances.

The clinician must note any communication with the OCME in the patient's chart, indicating the investigator's name, the decision rendered, the ME case number, if provided.

The period of time a person is in the Hospital in and of itself does not dictate whether a death falls under the jurisdiction of the OCME. Rather, the circumstances surrounding the death are controlling.

There is no "24-hour rule" for reporting cases to the OCME.

*Brief Summary of Medical Examiner Referrals*

Before filling out the Death Certificate and asking for permission to do an autopsy, the clinician must consider, in every case, if the case should be referred to the OCME.

If the OCME considers the case *non-reportable*, the OCME will not do an autopsy. The clinician proceeds with completion of the Death Certificate and a request for autopsy permission. The clinician writes "non-reportable" with the OCME investigator's name <u>in pencil</u> on the upper-left-hand corner of the back of the Death Certificate and includes a note in the patient's chart.

If the ME gives the case a *"no case"* number, the OCME records information for epidemiological purposes but will not do an autopsy. The clinician proceeds with completion of the Death Certificate and a request for autopsy. The clinician records the *"no case"* number and OCME investigator's name <u>in pencil</u> on the upper-left-hand corner of the back of the Death Certificate and includes a note in the patient's chart.

If the ME accepts the case and gives a *case number,* the body will go to the OCME office for an autopsy. The clinician does not need to complete a death certificate or make a request for autopsy but must fill out the ME form, which will go to the OCME with the body.  The ME will complete a Death Certificate. The clinician places a note in the patient's chart and contacts the family to indicate that the OCME has assumed jurisdiction over the case.

Any and all communication with the ME must also be indicated in a note in the chart.

*Reportable Deaths*

The Office of Chief Medical Examiner (OCME) has jurisdiction over deaths occurring under the following circumstances. All such cases must be reported to the OCME:

- All forms of criminal violence or from an unlawful act or criminal neglect (applies whether the death occurs immediately and directly, or indirectly after a lapse of weeks, months, or even years).
- All accidents (motor vehicle, industrial, home, public place, etc.).
- All suicides.
- All deaths caused or contributed by drug and/or chemical overdose or poisoning (any infectious complication of intravenous drug use should also be referred to the OCME (e.g. AIDS, Hepatitis, endocarditis, etc)).
- Sudden death of person in apparent good health
- Deaths of all persons in legal detention, jail, or police custody (including prisoners who are patients in the Hospital, irrespective of the cause of death).
- Deaths during diagnostic or therapeutic procedures or from complications of such procedures.
- Deaths of particular health significance (i.e. anthrax, smallpox, etc)
- Deaths due to disease, injury, or toxic agent resulting from employment.
- When a fetus is born dead in the absence of a physician or midwife. (Stillbirths in the hospital need not be reported to the Office of the Chief Medical Examiner unless there is a history of maternal trauma or drug abuse, or the case has some other unusual or suspicious circumstance. Neonatal deaths from prematurity and its complications must be reported if the premature delivery was caused by maternal trauma or drug abuse.)
- Deaths unattended by a physician and where no physician can be found to certify the death ("unattended" means not treated within 31 days prior to death).
- When there is intent to cremate the body or dispose of a body in any fashion other than internment in a cemetery (affects funeral directors).
- Dead bodies brought into the city without proper medical certification.
- Deaths in any suspicious or unusual manner.

A simplified way of determining whether or not a case needs to be referred to the OCME is to ask if the death was "natural" (i.e., due to disease) or "unnatural" (i.e., due to some violent reason or therapeutic misadventure). If the death is unnatural in any way, referral to the ME is warranted. The ME may choose, however, not to accept certain cases. It is the clinician's responsibility not to determine if a case will be accepted by the OCME or not but simply to consider which cases need referral.

*Permission for Autopsy in Certain Medical Examiner's Cases:* As noted above, in certain cases where jurisdiction has been assumed by the OCME, the Medical Examiner may allow the Hospital to perform the autopsy. In such cases, both the clinician and Next-of-Kin must desire the case to be performed at the hospital, and the Next-of-Kin must have signed a hospital autopsy consent form indicating such a desire. Examples of such cases may include but are not necessarily limited to:

I.  Deaths or sudden deaths associated with necessary therapeutic or diagnostic procedures in acutely or chronically ill persons.

II.  Fractures of the femur in elderly persons resulting from simple falls at home or elsewhere when there is no question of negligence.

*Procedures to Follow in Medical Examiner's Cases:* When it is decided that a death is under the jurisdiction of the Medical Examiner's Office:

I.  No Death Certificate is issued by the Hospital.

II.  In lieu of a Death Certificate, the House Staff Officer will furnish complete data of each case on the Medical Examiner's Hospital Report Form. This form must contain accurate and adequate information concerning each case. As it is an official city document that is often referred to in criminal and civil proceedings, care must be taken to avoid misleading or inaccurate information and to include all pertinent and relevant data. A duplicate copy of the Medical Examiner's Report Form is made part of the patient's record. It should be filled out promptly, preferably by the House Staff Officer who is most familiar with the case.

If there is doubt whether a case falls within the jurisdiction of the Medical Examiner's Office, the Administrator on duty should be consulted. Alternatively, the Morgue staff or Autopsy Director (Pat Lento, M.D., at x49157) may be consulted.

*Post-Mortem Reports*

Preliminary Anatomic Diagnoses are provided to the attending clinician of record within 48 hours of the performance of an autopsy. This information may then be distributed by the attending to all interested medical personnel involved in the ante-mortem care of the decedent. Final reports are also provided to the attending clinician and may be distributed similarly. The attending clinician also assumes the responsibility of communicating autopsy findings to the Next-of-Kin.

*Unclaimed Bodies*

If a body remains unclaimed after 48 hours of a bona fide inquiry to locate a relative (procedures for this are documented elsewhere), or if no objection is made by the Next-of-Kin within 24 hours after notice of death, the Hospital Administrator, according to Public Health Law 4214.1, may order an autopsy. In general, such autopsies are performed only when an attending physician makes a formal request for autopsy in this setting.

Under New York City Health Code (Section 205.19), the Hospital Administrator is to notify the Department of Health by telephone of such an unclaimed body and of intent to perform an autopsy pursuant to Section 4214.1 of the Public Health Law. Under such circumstances, the filing of the Death Certificate and confidential medical report may be postponed until 72 hours after death.

**Patient Rights and Responsibilities**

*Informed Consent*

The following guidelines establish procedures for obtaining consent for treatment at The Mount Sinai Hospital. Consent is a process of communication between physician and patient in which the patient grants permission for the proposed treatment based on a realistic expectation of the potential risks and benefits. These guidelines are designed to facilitate that communication without encumbering or interfering with patient care. The guidelines describe who must give consent, how consent should be obtained, and when written forms are necessary to document the consent process.

If any question or problem arises that is not discussed below, the appropriate Care Center Director should be notified.

I.   What Is Consent?

An individual must consent, either orally or in writing, to all procedures, treatment, or operations performed upon him or her. The requirement of an "informed consent" means that a patient is entitled to know all the information that may be relevant in deciding whether or not to undergo the proposed treatment. Patients are presumed to have the capacity to consent.

A.   *Disclosure by Physician:* Disclosures by the patient's physician must include, at a minimum, the nature, purposes, risks of, and alternatives to the proposed treatment. The patient should be told the information that a reasonable physician would tell his or her patient to make a knowledgeable evaluation. The information must be presented in a manner that the patient can be reasonably expected to understand. The physician, relying upon his or her professional judgment, may withhold discussion of risks if s/he reasonably believes his or her disclosure would have a substantial, adverse effect upon the patient's condition. In such situations, the health care proxy or surrogate should be notified and asked to grant additional consent. Information may not be withheld from the patient out of fear that disclosure would cause the patient to refuse to undergo treatment deemed necessary by the physician.

B.   Types of Consent

1.   *Express Consent:* Express consent is a patient's stated decision, either orally or in writing, to undergo proposed treatment. Those treatments for which written consent is appropriate are discussed throughout this section.

2.   *Implied Consent:* For routine and non-hazardous procedures and treatments, a patient may be deemed to have given consent by presenting himself or herself for treatment at the Hospital.

3.   *Emergencies:* Consent may also be implied in emergency situations where an attempt to obtain express consent would result in a delay of treatment detrimental

to the health of the patient. Relatives of the patient, or the health care agent (if the patient has designated one pursuant to the Health Care Agents and Proxy Law) must be notified of any action taken as soon as possible.

II.   Who Must Give Consent?

A patient must give consent for himself or herself if s/he is 18 years of age or over. The patient must be capable of understanding that s/he is granting consent, must understand what is being consented to, and must be capable of making a rational decision. If the physician has any question as to whether a patient is mentally capable to grant consent, s/he should obtain a consultation from a psychiatrist, neurologist, or other physician, as appropriate, and the reasons for the determination should be carefully documented in the patient's chart.

If the patient is 18 years of age or older and has become incapacitated, as determined by the attending physician, a health care agent may give consent if a valid health care proxy exists. The agent's authority commences when the attending physician determines, to a reasonable degree of medical certainty, that the patient lacks capacity to make health care decisions (defined as the ability to understand and appreciate the nature and consequences of health care decisions, including the benefits and risks of, and alternatives to, any proposed treatment, and to reach an informed decision).

The attending physician must make a note in the patient's medical record that includes a finding as to the patient's capacity and, in the event the patient is found to lack capacity, the cause, nature, extent, and probable duration of the incapacity.

When the patient is under 18 years of age or mentally incapable of granting consent, and has no health care proxy, the following persons (if themselves capable of giving consent) may give consent on behalf of the patient in the following order: guardian, spouse, adult child, parent, sibling, aunt or uncle, and cousin. If a patient has more than one person in the relevant category, the consent of one is sufficient unless the others object. If no one is available to grant consent for the patient, the appropriate Care Center Clinical Director should be notified. For disputes between family members, see "Special Consent Problems" below. Where a patient is under 18, a parent or legal guardian may give consent. A patient under 18 years of age may grant consent on his or her own behalf if s/he is a) a parent, b) married, or c) self-supporting and living away from his or her parents. In addition, minors who are fully able to understand and evaluate the nature, risks, and benefits of the proposed treatment may consent to abortions and receive birth control examinations, information, and devices (including treatment for any complications related thereto and treatment for venereal disease without parental consent). Any failure to recognize a minor's right to consent to abortion, birth control examination, information, or treatment, as stated here, is a violation of that minor's rights. Do not notify parents or guardians unless the minor so wishes. Consent forms are written in English and Spanish. Be sure to apprise the patient of Spanish translation to ensure full comprehension where needed.

III.   How Should Consent Be Obtained?

A.   *General:* It is the obligation of the physician to obtain the patient's consent to medical treatment. The physician's discussion of the elements of consent should, if possible,

take place at least 12 hours before the operation or procedure, and the patient should be given the opportunity to ask questions. When a written consent form is used, the patient should be given adequate time to read the form. Both the patient and physician should sign the form at the end of the discussion, and the form should be attached to the patient's chart. Each clinical service should develop written outlines for high-risk procedures that list relevant information to be discussed with the patient. The physician should follow this outline in making his or her presentation to the patient, modifying it as s/he sees fit to suit the individual situation of the patient.

B.  *Witnesses:* The purpose of a witness is to substantiate that the physician/patient communication has occurred and consent has been given. The witness should therefore be present when the physician speaks to the patient. In general, use of a witness is optional. However, the consent for participation in research projects, consent to sterilization (DSS 3134), and consent for novel procedures or drugs (Permission Sheet #3) must be witnessed. In addition, it is recommended that consent to hazardous treatment be witnessed. The witness should be a member of the patient's family. If no family member is available, Hospital employees may serve as witnesses.

IV.  Procedures Requiring Written Consent

The purpose of the consent form (Permission Sheet) is to document that the consent process has taken place. The following list indicates the procedures for which written consent must be obtained and the form to be used in each instance:

A.  Surgical procedures and other hazardous treatment procedures, including anesthesia (use Permission Sheet #1).

B.  Diagnostic procedures (use Permission Sheet #1), including, but not limited to:

1.  Diagnostic or X-ray studies with injection of contrast media, including but not limited to arteriography, myelography, myeloencephalography, pneumoencephalography, IVP (adults only) and brain scan.

2.  Laparoscopy.

3.  Endoscopy with biopsy, such as bronchoscopy, esophagoscopy, cystoscopy, sigmoidoscopy, colonoscopy.

4.  Needle biopsy.

5.  Amniocentesis and chorionic villi biopsy.

6.  Paracentesis, thoracentesis.

C.  Novel procedures or drugs (use Permission Sheet #3)

D.  Catheterization and angiography (use Permission Sheet #4)

E.   Kidney transplant (use Permission Sheet #5)

F.   Electroshock treatment or electroconvulsive therapy (use Permission Sheet #6)

G.   Radiation therapy (use Permission Sheet #7)

H.   Abortion (use Permission Sheet #8)

I.   Sterilization (use DSS 3134)

J.   IUD placement (use Permission Sheet #10)

K.   Videotaping, photographing, recording (use Permission Sheet #11)

L.   Unauthorized departure (use Permission Sheet #12)

M.   Refusal to consent to recommended treatment (use Permission Sheet #13)

N.   Off-premises activities (use Permission Sheet #12)

O.   Disposal of amputated member (use Permission Sheet #15)

P.   Ritual circumcision (use Permission Sheet #16)

Q.   Post-mortem examination (use Permission Sheet #17)

R.   Consent for removal of organs (use Permission Sheet titled Consent for Removal of Organs, Form #2047G/JS)

*NOTE: This list is not exhaustive. Written consent should be obtained for all other potentially hazardous diagnostic procedures. Written consent is not necessary for non-hazardous procedures such as routine venipuncture or routine lumbar punctures (use Permission Sheet #2). Permission Sheets can be found on all Nursing Units and Operating Services.*

V.   Research

Federal and State laws require special procedures and forms for experimental and research-oriented procedures and/or treatments. Further information and copies of the relevant documents are available in the Institutional Review Board office. Permission Sheet #3 should be used for novel or unusual treatment that is not part of a research protocol.

VI.   For How Long Is Consent Valid?

A patient's consent to a particular treatment may be obtained prior to the patient's admission and remains valid so long as there has been no change in the patient's condition that affects the risks or consequences of, or the alternatives to, the proposed treatment, and so long as there are no intervening circumstances indicating the patient has withdrawn his or her consent. As a general guideline in the case of procedures requiring written consent,

a new permission sheet should be signed by the patient if the permission sheet has been signed more than three weeks prior to the procedure.

Consent may be obtained once for a series of similar procedures or treatments if it is so indicated on the consent form and the patient is fully aware of the proposed course of treatment.

VII.   Right to Refuse Treatment

A mentally competent adult patient has the right to refuse treatment for himself or herself no matter how detrimental to his or her health such a refusal may be. The physician should document a patient's refusal to be treated by using Permission Sheet #13 and by carefully documenting in the patient's chart the circumstances surrounding the refusal and the patient's competence to make the refusal. As indicated above, if there is any question as to the patient's mental capacity, a consultation should be obtained from a psychiatrist, neurologist, or other appropriate physician, and the reasons for the determination should be carefully documented in the chart. In all cases where such refusal seriously endangers the patient's health, the appropriate Care Center Clinical Director should be notified.

VIII.  Special Consent Problems

A.   *Parent's or Relative's Refusal to Consent to Needed Treatment for Child or Incompetent:* When a parent's refusal to consent to treatment for his or her child, or a family member's refusal to consent to treatment for a relative presents a risk to the patient's health or life, the Care Center Director should be notified.

   *NOTE: A parent or other relative may not prevent a patient from receiving urgent and critical medical care for religious or other reasons.*

B.   *Parental or Relative Disagreement Over Treatment for Child or Mentally Incapacitated Patient:* After obtaining consent from one parent, consent need not be obtained from the other. However, in the situation where the physician is aware of a disagreement, the appropriate Care Center Director should be notified. Similarly, if siblings or other relatives with equal authority to consent are in disagreement, the appropriate Care Center Director should be notified.

C.   *Implied Consent under Anesthesia:* Although the physician has the obligation to disclose to the patient prior to surgery the reasonably foreseeable risks and complications, s/he may treat an unanticipated condition discovered after the patient has been anesthetized if it presents a serious risk to the patient and requires immediate attention; or if it is good medical practice to treat the condition, and the physician has no reason to believe the patient would object to the treatment. Whenever possible, a close relative should be notified before proceeding.

D.   *Discovery of Lack of Consent after Administration of Preoperative Sedation or Anesthesia:* Since informed consent must be based on a knowing and rational decision, consent should not be obtained after a patient has been sedated for surgery. Except in emergencies, a

patient should not be admitted to the Operating Room without a signed consent form attached to his or her chart.

E. *Consent by Telephone:* When the patient is unable to consent to treatment and no appropriate relative is available to give consent in person, consent by telephone is acceptable. A second person, such as the operator, should listen to the conversation, and the physician should immediately confirm in the patient's chart the time and content of the conversation and the name and title or identity of the witness. A Spanish-speaking operator or witness may be requested if needed. It should then be noted in the patient's chart that the witness and person requesting the consent conducted the discussion in Spanish.

F. *Consent for Prescription Drugs:* The duty of the physician to disclose reasonable alternatives, risks, and benefits extends to the prescription of drugs. While written forms may be impractical, the physician should discuss with the patient the nature and risks of the prescribed drugs. When prescribing drugs involving a high degree of risk, it is appropriate to use Permission Sheet #1 to document the consent process or to note in the patient's chart that the elements of informed consent have been fully discussed. For experimental drugs, see Section V: Research (page 93).

G. *Consent to Sterilization and Hysterectomy:* New York City requires a special form and procedure for consent to sterilization, and additional federal and State requirements apply to both sterilizations and hysterectomies for Medicaid patients.

H. *Psychiatry Patients:* Consent by Psychiatry patients is not covered by this policy statement, but is subject to special State regulations. The appropriate Care Center Director should be contacted if there are any questions.

*Advance Directives, Health Care Agents, and Proxy Law*

Under federal and New York State laws, competent adults have the right to appoint someone they trust as their health care agent. The health care agent makes decisions about their medical care in the event that they become unable to make these decisions for themselves.

It is the policy of The Mount Sinai Hospital to provide all patients with information concerning the New York State Health Care Proxy Law to assist those who wish to execute a health care proxy, and to honor decisions made by health care agents pursuant to validly executed health care proxies. If the patient has executed a proxy, this document is placed in the medical record. Power of Attorney executed under New York State law is not a health care proxy and does not confer on its holder the right to make health care decisions.

An individual designates an agent by completing a health care proxy. A health care proxy can make health care decisions only once the patient has been found to lack capacity to make those decisions. Unless the patient limits the powers, an agent may make all health care decisions the competent adult may make, including decisions to withhold or withdraw life-sustaining treatment, such as CPR or artificial respiration. The law requires the agent to have specific knowledge of the patient's wishes concerning artificial hydration and nutrition.

An agent's authority begins when a physician determines that the patient has lost the capacity to decide about treatment. It is the physician's obligation to inform the agent and to give the agent all pertinent information about the patient's condition, prognosis and suggested therapies. Health care providers are obligated to comply with decisions made by a duly appointed agent.

*Do Not Resuscitate (DNR) Order:*   There is a presumption in favor of cardiopulmonary resuscitation for patients who suffer an arrest while in the Hospital. Nonetheless, the application of cardiopulmonary resuscitation (CPR) to all patients who suffer an arrest is not always appropriate.

Thus, in order to prevent inappropriate resuscitative measures, it is very important that, when arrests seem likely, the appropriateness of CPR in the event of an arrest be communicated to appropriate members of the health care team. Prior discussion with the patient or designated surrogate with respect to the appropriateness of resuscitation, and communication of the results of such deliberation is the responsibility of the attending physician. The decision to initiate or forgo CPR is fundamentally like all other treatment decisions, and, consequently, it should be made in accordance with the principles embodied in this informed consent policy.

The attending physician must discuss the implications of a DNR Order with the patient or the designated surrogate. The patient or designated surrogate makes the decision regarding the DNR Order. A physician may issue a DNR Order in the absence of a designated surrogate in limited circumstances. If the decision is reached that CPR would not be appropriate, it is the responsibility of the attending physician to ensure that the appropriate DNR Sheet is completed, and that the DNR Order is written on both the order sheet and in the progress notes in the patient's chart and that any discussion in which consent was obtained is documented. Moreover, the attending physician has not adequately discharged his or her responsibility to either Mount Sinai, the patient, or the patient's family unless and until the DNR decision has been communicated to appropriate members of the health care team involved in the care and treatment of the patient.

Under the DNR law the attending physician is the physician selected by or assigned to a patient who has primary responsibility for the treatment and care of the patient. When more than one physician shares this responsibility, any such physician can be considered the attending physician. In these circumstances senior House Staff can be considered the attending physician for DNR order purposes.

If a patient has appointed a health care agent, the agent has priority to decide about CPR and not the person appointed under the DNR Law, unless the patient's written proxy or surrogate appointment states otherwise. The agent's decision takes priority over any other surrogate decision-maker. Just as in the case of a consent (or refusal to consent), generally a DNR Order remains valid so long as there has been no relevant change in the patient's condition and so long as there are no intervening circumstances indicating the patient or surrogate has changed his or her mind. It is the responsibility of the attending physician to reevaluate the appropriateness of the DNR Order as may be required by the patient's condition, or if the patient changes his or her mind about DNR. In the event there is a change in status of the Order, the physician must communicate such a change to appropriate members of the health care team. *A DNR Order may be rescinded at any time.*

It is the responsibility of each department to educate its staff with respect to this policy and any methodologies established by the department necessary for the implementation of this policy. For instructions, see Mount Sinai Administrative Policy Manual, Section A3 116, on the Intranet. DNR documentation sheets are available at the Nursing station.

*Patient Representative Department*

Patient Representatives provide individual service to patients and their families, working interdepartmentally to resolve problems and complaints, to facilitate care, and to address unmet needs. The Department supplies information and assistance regarding patients' rights and advance directives, including the appointment of health care agents under the New York State Health Care Proxy Law, and serves as the Institution's centralized "Patient Grievance Mechanism." It also arranges for special services, such as sign and foreign language interpretation and notarization of patient documents. Patient Representatives are available to help medical staff resolve difficult situations concerning patients and families, to assist with issues of patient compliance, and to explain Hospital Policies and Procedures. They may be reached at x66.

*Patient Bill of Rights*

The New York State Department of Health mandates that information about the Patient Bill of Rights and the Health Care Proxy Law be given to patients upon admission to the Hospital or registration in the Clinics. It also requires all staff to be knowledgeable about their provisions and will question individual staff members during State reviews of implementation. In addition to providing patients with a booklet containing material on these laws, the Hospital has posted the Patient Bill of Rights on Nursing units and in clinic areas. If a proxy has been executed, it is placed in the patient's medical record. The Patient Representative Department (x66) will address issues regarding patients' rights and the Proxy Law.

*Patients with Financial Problems*

House Staff Officers should not attempt to handle any financial questions raised by patients. Questions should be referred to Patient Accounts Financial Screening Unit at x48895 when an impending admission is planned, or the patient should be directed to the Financial Screening Office in Guggenheim Pavilion, 6 Center, Room 271, whenever feasible. Hospital patients who have financial questions should be instructed to call Patient Accounts at (212) 754-7726.

Indigent service patients may be eligible for medical assistance under the Medicaid program. Other service patients may be covered by Medicare, Blue Cross, or other hospitalization insurance plans. Regardless of the method of reimbursement, members of the House Staff are charged with the responsibility for managing the care of the patient and determining the appropriateness of diagnostic tests, drugs, and other therapeutic and diagnostic procedures. To the extent that the Hospital is accountable to various governmental and reimbursement agencies, as well as to the community, the Hospital strongly urges members of the House Staff to avoid ordering unnecessary tests and diagnostic procedures. This measure will help to minimize incidents that may deprive the patient of maximum third-party coverage.

Compliance with the above considerations can prevent significant revenue loss to the institution. Please direct any inquiries in this regard to the office of Quality Assessment and Improvement at x47981. The goal is to reduce costs without compromising the quality of patient care.

*Hearing/Speech-Impaired and Non-English-Speaking Patients*

Mount Sinai is committed to providing effective communication for hearing- and speech-impaired and non-English-speaking patients. The hearing-impaired should be identified with a special symbol or sign placed on the medical record and, with permission, on the wall behind the bed. Telephone amplifiers and teletypewriters can be obtained from the Communications Department at x47707. "Communi-Card," a device that assists patients in nonverbal communication with their health care providers, and interpreter services in foreign and sign languages are available through the Patient Representative Department at x66. Advance notice is necessary for sign-language interpreters. In addition, Hospital staff has access to a 24-hour translation service, the AT&T Language Line, which provides interpretation in more than 140 languages. Instructions for its uses are available on each Nursing Unit.

## Quality Improvement

The Hospital utilizes a committee structure that serves to facilitate quality improvement activities. The Quality Improvement Council (QIC) and its subcommittee, the Hospital Quality Review Board (HQRB), are standing committees of the Medical Board. The Quality Control Committee is a subcommittee of the Board of Trustees. These committees function together to assure the appropriate review and evaluation of ongoing monitoring of high-risk, problem-prone processes or care and to evaluate significant patient events (Sentinel Events) that occur in the organization. These committees make recommendations for additional reviews, measures, and/or improvements to uphold our standards for excellence in patient care and to provide a safe environment for our patients. Corrective action plans developed in response to serious patient events are reviewed and evaluated to assure that patients receive appropriate, high-quality care in an efficient manner.

These committees serve to demonstrate to the Governing Body, Medical Board and third-party payers that:

Opportunities to improve care are identified and acted upon;
Care is medically necessary and resources are utilized efficiently; and
Patient care is delivered in conformity with established criteria for medical practice and in accordance with the By-Laws and Rules and Regulations of the Medical Staff.

## Reporting Occurrences

Unusual events, such as falls, burns, or other iatrogenic injuries or events, must be recorded in the patient's record immediately, and the printed form for Occurrence Reports originated by Nursing Service must be completed at the time of the injury. *Do not* document that an occurrence report was completed. If a serious injury occurs in the Hospital, the House Staff Officer should immediately inform the Clinical Nurse Manager for the area and the Department of Risk Management, Regulatory and Insurance Affairs, at x47987.

Since 1985, the New York State Department of Health has required hospitals to report patient incidents that are not thought to be part of the natural course of the patient's disease or usually expected treatment. The Department of Risk Management, Regulatory and Insurance Affairs, is obligated to investigate such occurrences and, as appropriate, to report to the Department of Health within specified time periods. The physician may be asked to assist with information relative to such an investigation, at which time full cooperation is required. It is the House Staff Officer's obligation to cooperate fully with any quality assurance, risk management, or peer-review investigation undertaken by the Hospital. For detailed information refer to the Hospital's policy for "Incident Reporting," available on the Mount Sinai Intranet. Only clinical aspects of the patient's treatment plan should be discussed with the patient or his or her relatives. Non-relevant conversations relative to the occurrence itself should be avoided.

*Note: Risk Management provides assistance 24 hours a day through the page operator.*

**Restraints and Seclusion**

The Mount Sinai Hospital promotes a restraint-free environment to the greatest extent possible. The use of restraints and seclusion is limited to clinically justified situations to prevent harm to patients or others. The federal government has emphasized its regulations concerning the use of restraints for the acute medical and surgical care of Medicare and Medicaid patients. These regulations state:

I.   The patient has the right to be free from restraints of any form that are not medically necessary or are used as a means of coercion, discipline, convenience, or retaliation by staff.

II.  A restraint can only be used, if needed, to improve the patient's well-being and less restrictive interventions have been determined to be ineffective.

III. The use of restraints must be in accordance with the order of a physician or other licensed independent practitioner.

IV.  The condition of the restrained patient must be continually assessed, monitored, and reevaluated.

Source: Health Care Financing Administration: Department of Health and Human Services. Medicare and Medicaid programs: hospital conditions of participation, patients' rights. Fed Regist 1998; 64: 36070-89

To reduce the risks associated with restraints, less restrictive alternatives are implemented first. When these measures are ineffective in maintaining a safe environment, restraints may be used. Restraints include any device that immobilizes the patient; this excludes therapeutic holding or comforting of children. Types of restraints include, but are not limited to, wrist and ankle restraints, mitts, vests, siderails, and tabletop chairs.

Medications are also considered a restraint when the primary reason for the drug is to restrict and confine movement. Situations when medications are not considered a restraint include:

- Sedation used to facilitate the treatment plan (i.e., mechanical ventilation)
- Conditions such as brain injury, anoxia, tumor or stroke often require use of PRN medications such as, but not limited to, benzodiazepines, to enable the patient to participate in therapy
- Common PRN medications to reduce anxiety and agitation when indicated by predictable responses to illness or medical diagnosis
- Psychotropics as the standard treatment to decrease agitation in the treatment of dementia and delirium

A registered professional nurse may apply or supervise trained personnel in the application of restraints in an emergency situation, when least restrictive alternatives are not an option or are ineffective. After ensuring the patient's safety, the nurse notifies the physician, nurse practitioner (NP), or physician assistant (PA) (physician only in Psychiatry). A face-to-face assessment of the patient and entry of orders in the patient record must be completed by the physician, NP, or PA within one hour of initiation of restraints for non–Psychiatry patients and 30 minutes for Psychiatry patients. Documentation in the patient record must include the less restrictive alternatives attempted, the behavior warranting restraint, the type of restraint implemented, and a brief follow-up plan.

Restraint devices such as adaptive devices (e.g., tabletop chairs) and devices for positioning extremities related to procedures (e.g., intravenous armboard, safety devices, and lap belts) do not require a medical order. A registered professional nurse has the authority to determine the need to apply and to discontinue these devices based on the New York State Nursing Practice Act and professional nursing license.

The Hospital limits the duration of use for different types of restraints as follows:

- 24 hours: one-point and two-point mitts, and vest restraints (non-Psychiatry patients only)
- 4 hours: four-point and five-point mitts, seclusion (all adult patients), vest, (Psychiatry only)
- 2 hours: any restraint or seclusion for Psychiatry patients age 9-17 years
- 1 hour: any restraint or seclusion for Psychiatry patients under age 9

When patients in restraints must be transported to a diagnostic test or procedure, a physician or registered professional nurse must accompany the patient for the duration of the procedure to ensure appropriate assessment and positioning of restraints. This excludes areas such as the cardiac catheterization and cystoscopy laboratories, where a registered nurse continuously monitors the patient during the procedure.

For additional policy and care information, refer to Hospital Policy A3-109 in the Hospital Administrative Manual, available on the Hospital Intranet.

**Suicidal Patients**

A psychiatric consultation must be called if it is thought that a patient has suicidal tendencies. In addition, the Director of the Care Center where the patient is located should be notified in the case of a suicide attempt.

**Transfusions: Requests for Blood and Blood Products**

Specimens for blood transfusion may be drawn by House Staff, physicians, phlebotomy team members, and Nursing personnel. All labeling and requests must be filled out and signed by the individual who draws the specimen. At the time of phlebotomy, the patient must be correctly identified and the specimen drawn into a labeled tube. The patient identification and label should be verified before leaving the patient. This verification must be validated by the signature of the phlebotomist on the specimen and the Requisition Form.

The circular of information for the use of blood and blood components can be obtained from the Blood Bank. In addition, all questions regarding blood product use and transfusion reactions should also be directed to the Blood Bank Laboratory at x46101.

DEPARTMENTAL INFORMATION

**Ambulatory Care Services**

*Emergency Department*

No patient will be denied evaluation in the Emergency Department. Rapidity of evaluation will depend upon the severity of the complaint. Failure to comply may result in legal action.

All patients presenting to the Emergency Department will be evaluated by House Staff and/or attendings following nursing triage. Patients will be admitted to the appropriate service by the House Staff or attendings according to Hospital Guidelines if:

- judged seriously ill without improvement in status while under treatment;
- extensive deterioration of a chronic condition is noted; or
- a potentially serious diagnosis is entertained.

All questions regarding disposition must be brought to the attendings or chief residents who are responsible to Department Chairs (Internal Medicine, Surgery, Pediatrics, Psychiatry) for all professional matters and the Director of the Hospital for administrative matters.

If the decision is made not to admit a patient referred by a private physician, the Emergency Department attendings must attempt to contact that physician. The referring physician should also be notified of admissions so that continuity of care is maintained.

All patients to be admitted must be listed with Bed Management. Actual bed locations will be determined by Bed Management.

All transfers shall be made in accordance with federal and State laws and the Hospital's Transfer Policy. All transfer forms are available in the Emergency Department Administration Office.

All referrals to the clinics must be arranged by the Emergency Room (ER) staff, who must verify that a patient's insurance will be accepted. In addition, the ER staff must call the clinic during regular business hours to verify that a patient may be referred directly to them. During off hours, patients should be given the number of the clinic call center and advised to call for an appointment. Patients should be informed that the clinic may only see them if their insurance will be accepted by the particular clinic. The ER staff cannot independently instruct patients to appear at a clinic at a particular time without following the steps noted above.

PGY-1s and -2s will be oriented to the function of the Emergency Department by their respective supervisors and will be supervised by PGY-3s and attendings. Emergency Department attendings will adjudicate all matters of disagreement regarding admission decisions.

*Ambulatory Care Practices*

Generally, the Ambulatory Care Practices operate Monday through Friday, 8:00am-5:00pm, and selected evenings for some Primary Care Practices. Schedules and hours of operation of the Practices are available at all Nursing Stations and in the Emergency Room.

During operating hours, the Practices should be called directly when referring Emergency Room patients for primary care follow-up or a specialty consultation appointment. During off hours, patients should be given a referral form with the name and the telephone number of the Practice so that they may make an appointment. If a referral is being made to a Specialty Practice, it may be necessary to obtain prior approval from the physician in charge of the Practice or the patient's primary care provider.

When referring patients upon discharge to a Practice for follow-up, the name and telephone number of the Practice should be noted on the discharge orders.

If a patient requires an immediate follow-up or has an unusual problem, a telephone call to the physician in charge of the Practice is always appreciated. Call the Practice directly and ask to speak with the physician in charge.

*Documentation in the Medical Record:* All outpatient medical records should be problem oriented and contain information pertinent to the care of the patient. The following guidelines should be followed:

I.   A physician, nurse practitioner, midwife, or physician assistant must document a complete medical history and comprehensive physical examination at the time of the initial visit.

II.  A physician, nurse practitioner, midwife, or physician assistant must document a noted and focused physical examination at the time of a subsequent visit.

A.  An attending physician/preceptor must countersign notes written by House Staff and physician assistants.

B.  A note written by the attending, nurse practitioner, midwife or physician assistant must accompany notes written by students (including medical students).

III.  At the time of each visit the provider must update the patient's problem and medication lists.

IV.  The progress notes should include a notation that lab results have been reviewed.

V.  When specific practice guidelines warrant a nursing assessment (including vital signs), this nursing assessment must be documented in the ambulatory record.

VI.  The health care team assesses pain according to unit specific policies.

VII.  New York State Health Code Section 405.11 requires an identifiable signature for every entry in the medical record. Signatures at The Mount Sinai Medical Center are identifiable by the dictation code number. It is recommended that this code number accompany every signature.

*Home Health Care Services*

The Mount Sinai Hospital has a preferred provider relationship with the Visiting Nurse Service of New York (VNSNY), a certified home health agency. There are many such agencies in the New York area and patients should be given a choice of agency for referral. All home health agencies provide a wide range of home health services to qualified patients, including skilled nursing, physical, occupational and speech therapies, social work, home health aides, medical supplies and equipment, laboratory services, and intravenous therapy. Home health services are covered by most types of insurance, and most agencies have a small allotment for charity care. There are criteria which a patient must meet in order to qualify for service which the on-site home care coordinator from VNSNY can review. In all referrals a physician must certify that the services requested are necessary. The intake number at Mount Sinai is (212) 241-6650 and the main VNSNY office number is (212) 290-3800. The social workers on the units maintain a list of all certified agencies for patient choice.

**Clinical Laboratories**

Clinical laboratories at Mount Sinai are organized under the Center for Clinical Laboratories; the administrative office is located in the East Building (Room 8-40). Specimens pass through Central Accessioning (East Building, 8th Floor) to the Automated Core Labs and other areas.

| | |
|---|---|
| Chemistry | East Bldg. (Room 8-52) |
| Hematology | East Bldg. (Room 8-02) |
| Immunology | Atran 2 |
| Microbiology | East Bldg. (Room 9-52) |
| Endocrinology | East Bldg. (Room 8-26) |

Other major laboratories in the institution are:

      Histology/Cytology   Annenberg 15
      Cytogenetics         Annenberg 17
      Tumor Cytogenetics  Atran 2

Stat specimens from the Emergency Room, Operating Rooms, and ICUs are handled separately through the Stat Lab in Chemistry (Icahn Medical Institute, Room 8-52).

Laboratory results are available through TDS, EDR, EPIC, IBEX, and Laboratory Information System (known as SCC); the SCC icon is found on the computer terminals located throughout the institution. House Staff access to the system is determined by a unique login ID and password, which should not be shared. Questions regarding available tests and their requirements may be directed to Client Services at x4LABS.

Assistance with terminal and access problems can be obtained by calling the IT Help Desk at x4-HELP.

In accordance with the institution's confidentiality regulations, all Laboratory testing information, including HIV testing, may be viewed on the HIS and SCC computer systems. As per HIPAA regulations an audit trail may be performed for all personnel viewing clinical information.


**Infection Control**

The Infection Control Program is a multifaceted program aimed at the prevention of infection in the Hospital environment. The Infection Control Manual is available on the Mount Sinai Intranet (see Medical Services: Infection Control) and is comprised of guidelines necessary for controlling Hospital-acquired infection. See "Medical Licensure" in Section Two of this Manual for information about required Infection Control course work.

Infection Control training for House Staff is required as follows:

    I.    *Mount Sinai and New York State Required Infection Control Curriculum:* This is *required every four years* for all licensed health professionals and House Staff Officers practicing or training in New York State.

    II.   *Mount Sinai OSHA Infection Control Training:* This is *required every year* for all healthcare workers who have contact or potential contact with blood or other body substances and/or with patients with tuberculosis or potential tuberculosis.

In the year that the New York State-required Infection Control curriculum is completed, if completed at Mount Sinai (lecture or web-based), the annual Mount Sinai OSHA requirement is also fulfilled.

*Management of Exposures to Blood and Body Fluids:* An exposure is defined as: a percutaneous injury (e.g., needle-stick, cut with a sharp object, or bite), contact of mucous membranes, contact of tissue, or contact of skin (when the exposed skin is chapped, abraded or afflicted with dermatitis, or the contact is prolonged or involving an extensive area) with blood, tissue, or body fluids,

(as defined in the Infection Control Manual, Section 3.2). Blood and body fluid exposures are considered significant and potentially infectious, and therefore require immediate attention.

*Note: The source and/or exposed person may be an employee, patient, visitor, voluntary physician, student, or volunteer.*

The Infection Control Guidelines for the Management of Exposures to Blood and Body Fluids (Infection Control Manual, section B 3.2) elucidates a Medical Center-wide protocol designed to expedite the evaluation of sources of HIV, Hepatitis B, and Hepatitis C. The provision of medical attention to manage these exposures is available 24 hours a day, seven days a week, and on holidays.

If an exposure to blood/tissue or body fluid takes place, notify the supervisor in the area where the incident occurred, notify the Needle-Stick Coordinator, (Pager #4118, Monday through Friday 9:00am-5:00pm or the Nursing Administrator on call at all other times), and report to the Employee Health Services, Monday through Friday, 8:00am-4:30pm, or the Emergency Room at all other times (including holidays).

The source patient's medical provider(s) may be called upon to assist in the risk assessment or treatment (if infected) of the source patient. Refer to the Infection Control Manual, section B.3.2, for further information.

*Reporting Reportable Communicable Diseases:* House Staff are responsible for notifying the Infection Control Staff (x89450) of patients with suspected or confirmed communicable diseases. A list of reportable diseases is available in the Infection Control Manual, Section K 14.0.

*Standard Precautions:* Practices established to prevent the transmission of blood-borne and other transmissible pathogens are referred to as Standard Precautions. Standard Precautions are designed for the care of all patients, regardless of their diagnosis or presumed infectious status. Standard Precautions expand upon Universal Precautions (which were designed to decrease the risk of transmission of blood-borne pathogens) to include measures to prevent the transmission of non-blood-borne pathogens as well. Standard Precautions therefore address blood-borne diseases such as HIV, Hepatitis B, and Hepatitis C, as well as other transmissible pathogens such as multi-drug-resistant gram-negative bacteria and *C. difficile*.

*Transmission-Based Precautions:* House Staff, in collaboration with Nursing personnel, are responsible for timely and appropriate application of transmission-based precautions. When a patient's condition warrants, isolation/precautions are to be ordered. A physician's written (electronically generated) order is required to implement or discontinue transmission-based isolation/precautions. The Transmission Based Precautions Tables (Infection Control Manual, Section H 5.50 (Adults) and H5.51 (Pediatrics)) define the conditions warranting isolation/precautions.

Consultation with the Infection Control Practitioner (x889450, Monday to Friday, 9:00am-5:00pm) is recommended when questions arise regarding isolation/precautions. Leave a message on phone mail after 5:00pm. The on-call Infectious Disease Fellow (Adult or Pediatrics) may be consulted during evenings, nights, weekends, or holiday hours.

*Infectious Waste/Regulated Medical Waste:* The Institution has a moral and legal responsibility to comply with New York City and State laws and EPA regulations regarding the disposal of regulated medical waste. House Staff are to familiarize themselves immediately with The Mount Sinai Hospital disposal procedure (see Infection Control Manual, section I-6.01 and I-6.1: Handling Potentially Infectious Waste/Regulated Medical Waste).

*Tuberculosis Isolation and Sputum Induction Guidelines:* Guidelines have been developed to protect staff and patients from acquiring *M. tuberculosis* and should be carefully followed. In the next section are the criteria for instituting and discontinuing Airborne Precautions. See the Infection Control Manual, Sections E 5.35 and F 5.37-5.41, for further information. It is also important to note the following:

I.   All personnel who enter rooms or perform procedures (e.g., sputum induction) for patients on Airborne Precautions must wear an N95 particulate respirator.

II.  All House Staff are required to be trained in the use and maintenance of particulate respirators. Fit testing and training are provided during House Staff Orientation.

III. Sputum induction can only be done in a negative pressure airborne isolation room or a designated tent or booth.

*Indications for Airborne Precautions*

I.   Confirmed active *M. tuberculosis* respiratory tract disease: Positive culture from upper or lower respiratory tract (e.g. sputum, bronchoalveolar lavage, transbronchial, open lung or laryngeal biopsy).

II.  Suspected *active M. tuberculosis* respiratory tract disease:

A. Positive AFB smear from upper or lower respiratory tract (e.g., sputum, bronchoalveolar lavage, transbronchial, open lung or laryngeal).

B. *M. tuberculosis* disease should also be suspected in the following clinical situations and isolation considered:

1. Non-HIV positive patients without risk factors for HIV infection with:
   a. A subacute or chronic presentation, and:

   b. Chest X-ray findings:

      i.   Upper lobe infiltrates (with or without cavitation).

      ii.  Cavitation.

      iii. Other locations of infiltrates with:

           1) Hilar/mediastinal adenopathy.

2)  Other supporting clinical evidence, as below:

    a)  history of tuberculosis.

    b)  history of exposure to tuberculosis.

    c)  history of positive PPD.

    d)  hemoptysis.

    e)  persistent productive cough.

    f)  night sweats.

    g)  anorexia.

    h)  weight loss.

    i)  fever.

c.  Pleural effusion.

d.  Any infiltrate determined unresponsive to non-antituberculous antimicrobial therapy.

2.  HIV-positive patients (or non HIV-positive patient with risk factors for HIV infection), as above in II.B.1.b or:

  a.  Chest X-ray findings (in addition to II.B.1.b above) including:

    i.  Interstitial infiltrates.

    ii.  Increased interstitial markings.

    iii.  Nodule(s).

    iv.  Hilar/mediastinal adenopathy.

    v.  Pleural effusion.

  b.  Unexplained productive cough of more than five days' duration regardless of chest X-ray findings (including negative chest X-ray).

*Criteria for Discontinuation of Airborne Precautions for Tuberculosis*

I.  Patients treated with anti-tuberculosis therapy.

A. Known/suspected isolate susceptible to anti-tuberculosis agents:

    1. after 14 days of effective therapy, and;

    2. clinical response to therapy (i.e., resolution/significant diminution of cough and fever), and;

    3. decreased number of organisms on AFB smear (if specimen available).

B. Known/suspected isolate resistant to anti-tuberculosis agent(s).

    1. after 14 days of effective therapy, and;

    2. clinical response to therapy (i.e., resolution/significant diminution of cough and fever), and;

    3. negative AFB smears (three, if available).

II. Patients not thought to have tuberculosis and not treated with anti-tuberculosis therapy.

A. Other (non-*M. tuberculosis*) confirmed etiology (for example, *S. pneumoniae* isolated from blood, PCP identified in BAL).

    1. Clinical response (i.e., improvement in respiratory/pulmonary status and resolution/diminution of fever) without other clinical parameters to suggest concurrent tuberculosis and AFB smear(s) if available, are negative.

    2. Isolation may also be discontinued on a case-by-case basis without a clinical response if above criteria (II.A.1) are satisfied.

III. Other (non *M-tuberculosis*) presumed/unconfirmed etiology.

A. Clinical response (improvement in respiratory/pulmonary status and resolution/diminution of fever) and;

B. Clinical parameters (including chest X-ray) completely consistent with confirmed diagnosis (e.g., without persistent productive cough, without hilar/mediastinal adenopathy or cavitation, if diagnosis presumed PCP) and, AFB smear(s) if available are negative.

*Clearance for Discontinuation of Airborne Precautions*

I. Decisions regarding clearance for discontinuation of isolation will be reviewed on a case-by-case basis by Infection Control. Clearance for discontinuation of isolation must be approved by Infection Control or as indicated below.

II. Infectious Diseases, AIDS, and Pulmonology attending physician(s) may approve discontinuation of isolation under the following circumstances:

A. When acting in the role of responsible attending physician on an individual case.

B. When acting as responsible attending physician for a service patient or as the service consultant attending.

III. Clearance for discontinuation of Airborne Precautions on nights and weekends may also be made by the Infectious Disease attending and/or fellow.

IV. Infection Control must be informed prior to discontinuation of isolation and will monitor implementation of the above guidelines. The physician in charge of Infection Control maintains the authority to veto any decision that is inconsistent with the above guidelines.

**Nutrition Services**

The Department of Clinical Nutrition encourages House Staff to become active participants in the nutritional care of patients. Research has shown that even today malnutrition exists in hospitals and is associated with an increase in morbidity and mortality rates, longer lengths of hospital stays, increased patient complications and an increase in the cost of health care. Early and appropriate nutrition intervention is associated with a shortened recovery period and enhanced quality of life for the patient.

In the care centers, every unit is covered by a Registered Dietitian who will work with House Staff to ensure optimal nutritional care. House Staff Officers may refer patients to the Registered Dietitians for nutrition assessment or counseling. They may be reached by beeper or by initiating a nutrition consult in TDS. For those units not yet equipped with TDS, an order may be written in the medical record. For continued education after discharge, you may refer the patient to the Internal Medicine Associates (IMA) clinic at (212) 824-7636, located at 1470 Madison Avenue.

The Mount Sinai Diet Manual on every nursing unit is a comprehensive guide to diet prescriptions as well as a quick reference regarding appropriate diet restrictions. In addition, Enteral nutrition products on formulary are described in the Diet Manual.

Our staff of Registered Dietitians are dedicated to provide quality nutritional care to our patients. Clinical nutrition intervention includes:

- Comprehensive Nutrition Assessment, including Anthropometric and Biochemical markers
- Detection of Malnutrition Risk Factors
- Nutrition Care Plan, including recommendations for Enteral and Parenteral Nutrition Support
- Education/Counseling regarding therapeutic diets and meal planning

**Nursing Department**

*Philosophy and Organization*

Interdisciplinary collaboration, effective communication, and collegial partnerships among nurses, physicians, and other health professionals, ensure the provision of high-quality patient care.

Each Mount Sinai inpatient has a primary nurse from admission to discharge who is accountable to plan, coordinate, deliver, and evaluate care for the patient and family. In the absence of the primary nurse, an associate nurse cares for the patient. Professional nurses have clinical autonomy to determine care interventions within the scope of nursing practice, to advocate for patient rights, to ensure continuity of care, and to promote communication within the interdisciplinary team.

Clinical Nurse Managers have 24-hour accountability for the delivery of patient care within designated clinical areas and programs. To promote excellence in patient care, the Clinical Nurse Manager creates a therapeutic environment for caregiving that supports the nurse-patient relationship and the implementation of evidence-based practice. Advanced practice nurses, such as nurse practitioners, midwives, nurse anesthetists, nurse clinicians, clinical coordinators, and education specialists, provide support to the clinical nurses in the management of complex patients. Nursing Education provides initial and ongoing education to all nurses to ensure and sustain excellence in patient care. Through the Nursing Practice Committee and the Nursing Research Committee, clinical nurses determine and advance standards of nursing care that meet the changing needs of patients.

All Specialty Services have a Clinical Director who is responsible for nursing practice across a number of patient care units cohorted by clinical specialization. The Vice President of Nursing is accountable for all Nursing services throughout the Hospital and ensures that standards are implemented and evaluated consistently.

*Private Duty Nurses or Companions*

When a patient or family wishes to obtain private duty nurses or companions, they are referred to the Private Duty Nursing Office, which may be reached at x47383.

*Nurse and House Staff Responsibilities for Administration*
*of Intravenous Therapy, Medications, and Blood Work*

**Intravenous (IV) Therapy and Blood Work:** Registered professional nurses competent in IV therapy techniques are available to initiate, restart, and discontinue peripheral IV therapy catheters. Patient Care Associates (PCAs) or technicians are also available in many patient care areas to complete orders for phlebotomy. In the absence of a registered nurse, the physician must initiate, restart, or discontinue peripheral IVs.

Patients requiring a peripherally inserted central catheter (PICC) may be referred to Interventional Radiology or the Surgical Line Service.

*Medications*

Registered professional nurses administer medications by all routes based on unit competencies. All medications require a valid medical order with the drug name, dose (concentration and flow rate for intravenous administration), frequency, and route, in accordance with the current *Mount Sinai Drug Formulary*. Only drugs approved by the Formulary Committee may be administered to patients.

Information regarding the administration of investigational drugs can be found in *Mount Sinai Drug Formulary* on the Mount Sinai Intranet or the section titled "Medication Practices: Department of Pharmacy: Investigational Drugs" in this Manual.

*Verbal/telephone orders are only accepted in an emergency* and must be authenticated and cosigned by the prescriber as soon as possible (not to exceed 24 hours), in accordance with the *Rules and Regulations of the Medical Staff of The Mount Sinai Hospital*.

When a physician administers a medication, it must be entered in the medical orders and the drug name, dose, route, and time administered is entered in the patient record. If a medication is administered in error (i.e., wrong dose, extra dose), an occurrence report must be completed by the involved Nursing and medical staff. This form must be completed immediately after discovery and forwarded to the responsible Clinical Nurse Manager.

*Use of Therapeutic Mattresses and Specialty Beds*

When a patient is at significant risk for skin breakdown, a pressure-relieving mattress or bed may be required. Use of these beds must be approved by the Clinical Nurse Manager, who will process the request for the device. When the patient is no longer at risk or the pressure ulcer is healed, the device should be discontinued.

**Operating Room**

*Pre-Operative Testing*

*Chest X-rays* are required for all surgical patients 70 years of age and over except for patients scheduled for minor procedures such as cataract removal; chest X-rays may be ordered for other surgical patients when appropriate.

*Electrocardiograms (ECGs)* are required for all patients 50 years of age and older, except those who are scheduled for minor procedures under local or monitored anesthesia care and who are asymptomatic.

*Pregnancy tests* are required for all female patients of childbearing age (from age of menses to one year after last menstrual period). For inpatients, a serum HCG level is to be drawn.

*Blood glucose tests* are required for all diabetic patients within three hours of surgery.

*Potassium tests* must be drawn on the day of surgery for all patients on dialysis.

The patient's history must be taken and a physical examination must be performed by a practitioner credentialed by The Mount Sinai Hospital within seven days of surgery. Revalidation must be documented on the H & P form or the Progress Note.

It is the responsibility of the House Staff Officer managing the patient's medical care to ascertain that these procedures are completed. Prior to admission, an Admission Test Order Sheet, which can be obtained from the Admitting Office, should be completed.

*Attire*

All personnel entering the surgical suites are to wear appropriate attire. (See Infection Control Manual: Infection Control Guidelines for Operating Room/Surgical Scrub Procedure Special Instructions: Section 1.)

Operating Room attire is not to be worn outside of the Operating Room unless covered by a clean lab coat or gown. Scrubs are not to be worn in the street. Masks, hats, and shoe coverings should be removed before leaving the Operating Room area.

Street clothes are not to be worn in restricted or semi-restricted areas.

*Surgical Scheduling*

The scheduling of elective surgery for all services is to be done via the Surgical Admission Planning (SAP) Office by dialing x4CASE or x42273. All patient information should be made available at the time of scheduling. Procedures scheduled after the schedule has been finalized may be placed on a wait list and will be accommodated as quickly as possible.

Procedures are to be scheduled realistically with a full appreciation for the need for accurate information by the Operating Room staff. Operations should be listed in the order in which they are to be performed. For Anesthesiology consultation on problem cases, call x47475 from 8:00am to 4:00pm, Monday to Friday, or page the Anesthesiology resident on call during evenings or weekends.

The printed preliminary Operating Room schedule is available on the Intranet after 4:00pm. Changes to the Operating Room schedule should be communicated immediately to the Operating Room Scheduling Office at x46283, to permit optimal utilization of Operating Room time. This includes cancellations, changes in the order of procedures, and changes in types of procedures. After 6:00pm, all changes to the Operating Room schedule are to be communicated to the front desk at x41990.

Preoperative orders are to be written for those patients appearing on the schedule. All "on call" orders should note destination, e.g., "on call to OR" (refer also to Operating Room Nursing Policy #40 on "Scheduling Patients for Surgery").

*Arrival Time before Surgery*

Surgical House Staff should arrive in the Operating Room 30 minutes prior to the scheduled time of the operation. House Staff should interview their patients in the Holding Area, confirming consent and marking the side and site following Universal Protocol Policy. They should be present in time to observe the induction of anesthesia and to assist in any way possible, such as positioning of the patient.

*Blood Availability for Elective Surgery*

Requests to reserve blood for elective surgical cases are filled by the Blood Bank according to the Maximal Blood Ordering for Surgery (MBOS) guidelines. To reserve in excess of these guidelines, the attending physician must speak with a Blood Bank Supervisor. For further information, call the Blood Bank at x46101.

*Operative Procedures Not in the Operating Room*

Except for acute emergencies or situations where it is impossible to transport the patient, operative procedures are to be done in the Operating Room.

*Operative Reports*

Operative Reports are dictated as soon as possible following the surgical procedure. Telephone extensions are available for this purpose in the main Operating Suites. Complete identification of the patient (full name and unit number) must precede each Operative Report and the physician must identify him/herself at the end of each report.

An outline for the dictation of Operative Reports is posted in the main Operating Suites. The dictator is urged to become familiar with this process to minimize transcription errors. Poorly dictated reports may not be transcribable or may be typed unacceptably.

Refer to "Medical Records" below for details on dictating Operative Reports.

*Surgical Specimen Care and Requisition for Pathological Examination*

I.   All tissue removed from every patient during surgery is to be appropriately and accurately identified and sent to Surgical Pathology for histological examination.

II.  After each specimen is obtained, the scrub nurse will verify anatomical identification for the specimen, the type of solution media, and the desired pathological examination with the surgeon.

III. The surgeon or House Staff Officer will complete the Pathology Form upon completion of the operative procedure and give the completed form to the circulating nurse.

IV.  Any specimen that is removed from the Surgical Suites by the surgeon or House Staff Officer is to be signed out in the Operating Room Log Book by the responsible physician.

*Biopsy for Frozen Section:* A biopsy removed for frozen section is handled immediately by Nursing personnel. The nurse-in-charge sends the specimen over to the laboratory with the Identifying Pathology Slip completely filled out. This specimen goes over exactly as removed and is not placed in any solution.

## Radiology Services

The Radiology Department includes diagnostic radiology, ultrasonography, computerized tomography (CT), interventional radiology, nuclear medicine, positron emission tomography (PET), magnetic resonance imaging (MRI), mammography, and early detection screening CT. The Department provides services to inpatients and emergency patients 24 hours per day and services to outpatients approximately 12 hours per day, Monday through Friday, and on a limited schedule on weekends. The range of services includes diagnostic imaging and special interventional or therapeutic procedures, utilizing ionizing and nonionizing radiation, with and without the use of contrast media.

*Request for Exams*

All requests for imaging studies or interventional procedures must be electronically ordered through the Hospital Order Entry System (TDS) on an appropriate Radiology Request Form or submitted through the HIS order entry system by members of the medical staff. Access codes are provided during House Staff Orientation.

*Film File Room*

Reports of imaging studies are available through multiple information systems: IDXRad, GEPACS, EDR, and TDS. Terminals are located throughout the Medical Center. Images are available via GE PACS Web Icon, EDR, and at full PACS terminals in Radiology locations. Access codes and training sessions are available during House Staff Orientation.

## Social Work Services

Social work services are provided at The Mount Sinai Hospital. Patients and families are more effectively served when personal and family problems influencing health care treatment and recovery are treated simultaneously and in close relationship with the diagnosis and treatment of illness. The services are provided by the professionally trained and licensed staff of the Department of Social Work Services.

Based on the recognition that social and emotional factors are fundamental concerns in illness and can be disruptive to health and medical care, the Department of Social Work Services is prepared to help patients and their families in meeting these related problems. Social workers also provide consultation and technical assistance related to behavioral health issues. The referral guidelines below were developed to assist physicians and other professional staff in identifying patients or families in need of social work intervention at any point during the course of treatment. The

Department should be contacted if any of the following situations:

I.   Patient/family safety issues interferes with continuity of care, including:

   A.   patient with evidence of lack of sufficient care in the community.

   B.   suspicion of abuse, neglect or domestic violence.

   C.   lack of family and/or community support system adequate for care plan.

   D.   inadequate insurance or other resources for recommended levels of care.

   E.   evidence of substance abuse and/or psychiatric disorder impeding care.

II.  Potential exists for extended or long-term care needs, including:

   A.   need for subacute or long-term placement.

   B.   need for hospice care.

   C.   need for supervised living arrangements/foster care.

   D.   frail elder with multiple admissions and/or failure to thrive.

   E.   homelessness.

   F.   concern that patient's condition will alter his or her ability to continue present living arrangements.

   G.   need for Medicaid related home care services.

   H.   need for home care services, to which the patient has not been referred by the primary nurse or other health care professionals.

III. There is evidence of patient/family coping and/or compliance issues, including:

   A.   complex patient/family dynamics interfering with medical treatment plan; history of refusing needed skilled or support services at home.

   B.   history of AMA discharge or current AMA.

   C.   non-adherence to medical regime.

   D.   lack of follow-through with efforts to plan hospital discharge.

   E.   need for bereavement counseling.

      F.  psychosocial issues related to adjustment/adaptation to illness or medical condition.

      G.  mental health issues impacting medical management.

IV.  There are legal/regulatory issues, including:

      A.  inability to make decisions regarding safe discharge alternatives and no surrogate decision maker.

      B.  inability to access financial assets for continuing care needs.

      C.  immigration issues.

      D.  need for involvement of Administration for Children's Services [ACS].

V.  There are immediate resource concerns, for example:

      A.  all medically necessary transportation arrangements.

      B.  financial assistance with discharge needs including prescriptions.

      C.  need for durable medical equipment.

*Preparing Patients and Families for Referral:* Social workers use high-risk criteria to determine whether to initiate intervention with patients. When physicians refer to the Department of Social Work, it is very helpful if they discuss with the patient/family the reason for referral in relation to the medical treatment plan. Interpretation of the importance of getting assistance with emotional and social problems, as part of comprehensive health care, can be most helpful.

*Adoption Policy*

It is the policy of The Mount Sinai Hospital that no employee of the Medical Center, nor any physician with privileges at The Mount Sinai Hospital, may participate in making legal adoption arrangements for private adoptions. The Department of Social Work Services is available to assist prospective parents who wish to place a baby for adoption in obtaining the services of licensed adoption agencies.

## MEDICAL RECORDS

### Use of Medical Records by House Staff

The rules governing the use of charts are established by the Medical Board and are enforced by the Medical Records Department. A House Staff Officer may call the following numbers for any problems or questions with regard to medical records:

Chart Retrieval/Release of Information:
Assistant Director                      x46035

General Issues:
Director                                x44649

Chart Completion or Dictation:
Chart Completion Manager                x46525

Electronic Signature:
Coordinator Computer systems            x45212

I.   To ensure availability for transfer to Medical Records, charts should not be taken from the clinics or Nursing stations. Charts are delivered daily from the Nursing station to the Medical Records Department beginning at 10:00am and from the Clinics after clinic hours end.

II.  Unless the patient authorizes release otherwise, copies of medical records will be released to physicians for continued care, quality review, and approved research only.

III. Charts requested other than for patient care will be held on reserve for 48 hours in the Medical Records Department, and, if not claimed by then, will be returned to file.

IV.  Charts are not to be removed from the Medical Records Department without specific authorization, and under no circumstances are charts to be taken from Hospital premises.

## Confidentiality

I.   Medical records, Radiology films, and Pathology slides are kept for the benefit of the patient, but are the legal property of the Hospital.

   A. The original medical record may not be taken off-site. In the event of a court order or subpoena, contact the Legal Department immediately.

   B. Original slides may be released for outside consultation only if there is a contract with the consultant or the patient has authorized it.

   C. Original slides or Radiology films may be released to the patient only if s/he attests in writing to having taken them.

   D. Authorization of the patient, surrogate, or legal guardian is required for release of copies off-site except:

1. To comply with a regulation.

2. In response to a subpoena or court order.

3. To enable continued patient care in the event of:

   a. Direct transfer.

   b. Diagnostic interpretations or second opinions (only if a contract exists with consultant).

   c. Case conference (if care is taken to eliminate identifying material appropriately).

E. Providers may look at information belonging to patients whose care they were involved in for these episodes and preceding episodes leading up to those episodes only.

F. Records may be reviewed for educational purposes as long as:

   1. Patient identification is removed from each page if a copy is made.

   2. Names and identifying information are not used during case presentation.

   3. Patients are not identified by name or initials in committee minutes.

G. The record may be used for IRB-approved research if:

   1. Patient names are blocked out on any photocopies made.

   2. Cases are assigned numbers, with a number key maintained under lock and key.

II. Confidential Patient Information

A. Includes all:

   1. Clinical and psychosocial information gathered during the diagnostic or therapeutic process.

   2. Financial information related to a patient's or employee's personal financial status, credit, and insurance information.

   3. Any demographic information, including the fact of treatment, regarding a patient receiving psychiatric or substance abuse-related treatment.

B. May exist in:

    1.  A patient record (either hard copy or electronic format).

    2.  Logs (either hard copy or electronic).

       a.  Lab.

       b.  Radiology.

       c.  Medical Records/Finance.

       d.  SAP Scheduling.

       e.  Outpatient Scheduling.

       f.  Pathology.

    3.  Published Schedules (e.g., Operating Room).

       a.  Data Repositories.

       b.  QA Reports.

       c.  Registries.

       d.  Requests from third-party payers.

       e.  Research Records.

       f.  Clinical Trial Case Reports.

C.  Protected records require special releases and handling; they include:

    1.  Psychiatric records.

    2.  Substance abuse records.

    3.  HIV-related records.

III.  Responsibility

A.  Passwords should never be shared.

B.  All research, even if it is limited to chart review, requires Institutional Review Board (IRB) approval.

C.  Confidential information should never be discussed or shared in any public or unsecured environment, including:

    1. Cafeteria.

    2. Elevators.

    3. Unencrypted e-mail.

    4. Publicly accessed laptop.

IV. Disposal

  A. Non-permanent material, including copies of paper records, computer printouts, and microfiche, must be disposed of by:

    1. Shredding.

    2. Emulsion.

  B. Information accessed online must be cleared from the terminal and the session logged out prior to leaving the workstation.

  C. Electronic media containing confidential information must be secured.

V. To obtain a network logon, contact your department administrator. Additional assistance for this and other computer-related issues is available from the IT Help Desk at x44357 (x4HELP).

*Health Insurance Portability and Accountability Act of 1996 (HIPAA)*

The Health Insurance Portability and Accountability Act of 1996 (HIPAA) was passed to improve the efficiency and effectiveness of the healthcare system while preventing fraud and abuse.

The Mount Sinai School of Medicine and its affiliate institutions have always placed a high priority on maintaining the confidentiality of its records, documents, agreements, and other sensitive information. However, the passage of the HIPAA privacy regulations has made it essential that House Staff understand that access to confidential information is solely for the purpose of performing your responsibilities as a House Staff Officer within the Hospital or ambulatory care settings.

The HIPAA privacy regulations establish a stringent and complex set of standards that governs all uses and disclosures of what is considered protected health information. It is essential to be aware that lack of compliance with these regulations may lead to personal, criminal, and civil penalties. Any Medical Center employee who fails to follow these standards is subject to disciplinary action, up to and including termination.

Protected health information is any clinical, financial, or demographic information that is created or received by a health care provider, and relates to the past, present, or future physical or mental health condition of an individual, the provision of health care to an individual for the past, present

or future regarding payment for the provision of health care to an individual, or identifies the individual in any way and with such information maintained or transmitted electronically or in oral or written form. It includes specific diagnostic and treatment-related information about an individual and may include the mere fact that an individual is a patient in a Hospital or its ambulatory care centers, or if the patient opts out of the Hospital Directory.

Although these regulations are very complex with respect to disclosure, House Staff should also be aware of the following guidelines:

I.   House Staff should view only information needed to care for patients or to fulfill the responsibilities of House Staff Officers. Patient records or other confidential information not needed to perform work responsibilities should never be accessed.

II.   Any patient information or other confidential information may not be shared with anyone who does not have an official need to know. That includes not sharing such information with others in casual conversations.

III.   All records, both paper and electronic, must be handled with care to prevent unauthorized use or disclosure of confidential information.

IV.   Confidential information must not be removed from the immediate work area, nor may copies be made of medical records, or may records be removed from the patient floors or the medical records department.

V.   Electronic messages containing individually identifiable health information to patients cannot be sent unless authorized by the patient.

VI.   All confidential information in one's possession that is no longer needed must be disposed of in a way that ensures that others will not have access to it.

VII.   Any passwords or dictation codes or electronic signature codes assigned to a specific House Staff Officer are equivalent to a personal signature and are intended for the individual's use only and are not to be shared with any other individual.

VIII. All Medical Center computers, information systems, Intranet, and Internet are to be solely for performing assigned job responsibilities. Software that is not approved by the Medical Center should not be copied or downloaded, nor should such confidential information and software be used to function in the residency to be used for personal benefit or to benefit another unauthorized institution.

*E-mail and Protected Health Information*

Please note that the "Consent to Communication via E-mail" (MR-240) form is available on the Mount Sinai Intranet under Core Administrative Services: HIPAA: Forms.

I.   When choosing to use e-mail, certain of its characteristics need to be appreciated to assure that privacy is maintained. Specifically, there is potential for misdirection and interception

of e-mail in our unencrypted environment. Each department should develop procedures for the use of e-mail containing PHI that are consistent with institutional policies.

II.  The minimum necessary amount of Protected Health Information (PHI) should be disclosed via e-mail, even for treatment purposes.

III.  PHI that is specially protected by law (i.e., related to mental health, substance abuse, HIV, genetic testing) must be handled in accordance with applicable law and institutional policies.

IV.  The "To" field must be checked carefully and the contents of any earlier message strings reviewed and deleted, if appropriate, before sending an e-mail message containing PHI, to ensure that the message is sent to the correct person and earlier messages are not forwarded in error.

V.  E-mail containing PHI should be printed for secure filing immediately, if appropriate, then deleted; it should not be maintained in an electronic archive (including mail archives, inbox, and sent items). If it is treatment- or payment-related, it should be made part of the Designated Record Set in accordance with institutional policy. Exercise care to insure that communication is printed out in an area that is not accessible to the public.

VI.  All staff with access to confidential patient information communicated via e-mail must be instructed that such information is confidential patient information and must not be shared with any third parties not involved in the patient's care. A footer regarding confidentiality should be attached. For example:

*This e-mail and any attachments may contain confidential information and are intended for use solely by the addressee(s). If you are not the intended recipient of this e-mail, please be aware that any dissemination, distribution, copying, or other use of the e-mail in whole or in part, is strictly prohibited. If you have received this e-mail in error, please notify the sender and permanently delete the original and all copies of the e-mail, attachments, and any printouts. Thank you.*

VII.  Anyone using e-mail (including members of a physician's office staff) must use his or her own logon and password and not share items with anyone.

VIII. If an e-mail containing PHI is misdirected, an incident report should be documented in the appropriate Accounting of Disclosures. (See H-6)

IX.  Depending on the nature of the e-mail communication, the following additional standards apply:

A.  Physician-Physician Communication

1.  Wherever appropriate for patient care, the institution's e-mail system may be used to transmit PHI. Users should be aware of other more secure mechanism of obtaining clinical information (e.g., EDR).

2.  Employees of ancillary areas are considered extensions of physicians when they are e-mailing test results to or on behalf of physicians.

B.  Staff-Staff Communication: If it is essential to transmit PHI via e-mail between Mount Sinai staff in order to provide proper care or to perform one's job function, three options are available:

1.  Use the medical record number without the patient's name.

2.  If a single patient is the subject of the e-mail and it is clear who is being referenced, put the PHI in one e-mail and the patient's name in a second, non-linked e-mail.

3.  For routine interactions use pre-defined contact lists.

4.  E-mail should not be used to communicate PHI with non-Mount Sinai staff not involved in patient care unless it is encrypted or transmitted in a password-protected zip file.

C.  Provider-Patient Communication: If a patient wishes to communicate with his or her provider via e-mail regarding his or her care, the provider must obtain the patient's consent. Exceptions to the standards set forth below should be addressed specifically in the patient consent.

1.  The patient's e-mail address should be verified unless s/he initiated the contact. Each provider should establish a turn-around time e-mail replies as appropriate to his or her practice. Patients should be advised of same. E-mail should not be used for urgent communication.

    a.  Incoming e-mails should be acknowledged upon receipt and include an expected response time. (Outlook utilities may be utilized.)

    b.  The response should include a telephone number to call if immediate medical attention is needed.

2.  Patients should be instructed as part of the consent process that:

    a.  They may escalate any communication to a phone call or visit if:

        1)  The use of e-mail is not addressing their needs.

        2)  There are network problems.

    b.  The subject of the message should be labeled appropriately (appointment, prescription, instructions, test or billing questions, etc.).

    c.  The message should include the patient's name and a second identifier (e.g., date of birth) to prevent confusion regarding patients with the same name.

**Patient Medical Information**

In order to protect patient confidentiality and to comply with legal restrictions concerning the release of information, all requests for medical information of a non-emergent nature from outside the Hospital are to be referred in writing to the Medical Information Unit of the Medical Records Department. Information deemed urgent is to be transmitted with the utmost discretion when consistent with legal requirements. House Staff should not complete any forms for patients unless requested to do so by the Medical Information Unit. They should, however, attempt to determine at the time of discharge when the patient may return to work. Questions may be directed to the Medical Information Supervisor at x44110.

*HIV Confidentiality Law:* The New York State HIV Confidentiality Law requires that all health care professionals who have access to HIV-related information must comply with the following procedures:

*Disclosure of HIV-Related Information:* Any information related to the HIV status (be it positive or negative) of a patient may not be released without written consent from the patient. The New York State Authorization for Release of Confidential HIV-Related Information Form, available at each Nursing station, must be completed prior to release.

 There are groups of people who are involved in the care of the patient who may receive HIV-related information without authorization from the patient. These groups are listed in the Law. Any time information is released, it must be accompanied by a statement prohibiting redisclosure and informing the recipient of the confidential nature of the materials.

*Partner Notification:* Contacts (spouses or sex partners) of infected patients with a significant risk of infection or persons identified as having been exposed to infected blood from patients may be notified by the patient's physician. However, the disclosure must be made without mentioning the name of the infected patient, and the physician must have attempted to have the patient inform the contact. A good rule of thumb is to keep information about a patient's HIV status strictly confidential.

*HIV Pre- and Post-Test Counseling and Consent for Testing:* HIV testing may not be performed without counseling the patient regarding specific issues outlined in the Law. Patients are required to sign a specific informed consent form developed by the Department of Health prior to testing and must receive post-test counseling with either positive or negative results.

*HIV Test Results:* HIV test results and related material must be maintained directly in the patient's medical record.

A copy of the law can be obtained from the AIDS Center at x41897 or the Legal Department at x48105.


**Unit Number for Patient Identification**

The Hospital presently uses a unit-number system for both inpatient and outpatient identification.

This seven-digit number is prominently marked on the chart and is assigned to the patient for life. Patients who repeatedly use Mount Sinai services usually have a card and/or plastic plate on which the unit number is marked. Care should be taken to record this number correctly when entering information in the chart, dictating reports, ordering medications, or otherwise directing patient care.

**Central Dictating System**

The Hospital has a direct-dial dictating system that operates through the telephone. The system is presently restricted to the preparation of Discharge Summaries and Operative Reports.

The direct dial system is available 24 hours per day. Questions or assistance can be obtained by calling x46525, Monday through Friday, 8:00am-11:00pm, or x47601, Saturday and Sunday, 8:00am-4:00pm

An added feature, electronic signature capability, is now available. For information and training contact Mary-Anne Ross at x45212.

Whether dictating from a Medical Center phone or an off-premises digital phone, the following special features apply:

I.   Dial x46653, or (212) 241-6653 when dialing from outside.

II.  Listen for instructions:

    A. Press "1" to dictate;

    B. Enter your five-digit dictating code; and

    C. Enter the seven-digit medical record number followed by:

        1. "0" for discharge summary

        2. "1" for inpatient operative report

        3. "2" for ambulatory operative report.

        *Note: You may bypass voice prompts at any time by entering the appropriate numbers.*

III. Begin dictation after the tone.

IV.  State and spell:

    A. Your name;

      B.  Your dictation code;

      C.  Patient name;

      D.  Medical record number; and

      E.  Admission and discharge date (for discharge summary); or

      F.  Preoperative diagnosis, procedure, postoperative diagnosis, procedure date and surgeon (for operative report).

V.    When in record mode, you can pause up to three minutes. After that you will be disconnected from the system. To resume recording press "2." VI. To listen to a brief portion of your dictation, press "3." Playback is automatic. To resume recording, press "2."

VII.  To hear a longer portion of your dictation, five seconds each time, press "*" to rewind and then "5" to listen. To resume recording, press "2."

VIII. To rewind to the beginning of your dictation, press "7." Playback is automatic. To resume recording, press "2."

*NOTE: To edit, rewind to the required spot and press "2" to start recording over the previous dictation.*

IX.   To dictate another report, press "6." Begin by identifying items 4c – 4f.

X.    To finish dictating, press "#" to get a four-digit confirmation number, then hang up. This will automatically mark a dictation as "closed" and ready for transcription.

Please call x46525 for information and / or assistance. You can also press "0" to obtain all commands available.

All dictated reports and summaries are sent to a transcription service outside the Hospital; typically, summaries are returned within five business days and inpatient operative reports are returned within 48 hours. Dictated reports are accessible via TDS and EDR. All physicians are urged to use the direct-dial dictating system, thereby expediting the chart completion process and improving documentation.

**Medical Record Content**

*Admitting Diagnosis*

Each patient must have a presumptive diagnosis recorded upon admission to the Hospital. This is particularly important for Hospital and medical insurance purposes, as well as to justify the need for hospitalization. It also facilitates patient care plans and discharge planning.

*History and Physical Examination*

A complete history and physical examination must be dated, timed, and recorded within 24 hours of admission, regardless of the service to which the patient is admitted.

The following will be included:

I.     Date of admission

II.    Demographic information including patient's age, race, sex, marital status, and occupation

III.   Chief complaint

IV.    Present illness

V.     Past history: general health, childhood diseases, adult illnesses, trauma, and operations

VI.    System review

VII.   Habits

VIII.  Marital and social history

IX.    Family history

X.     Record of complete physical examination prefaced by temperature, pulse, respiration, blood pressure (state arm recorded from and position of patient), and pelvic exam for female patients over 21 years of age.

XI.    Diagnostic impression (emphasis should be placed on a single impression)

XII.   Diagnostic and therapeutic program

XIII.  Signature of author

XIV.   Doctor's dictation code

In addition to the standard elements, House Staff must become familiar with any specific items of a complete history and physical examination required by the department in which s/he is serving.

*Progress Notes*

Progress notes insure continuity of care between shifts and disciplines, justify care to third-party payers and regulatory agencies, and help to defend quality in a legal action. Entries are made by

all disciplines involved in a patient's care and should be made as often as the patient's condition warrants, but not less than once a day. Notes should be objective and deal primarily with the patient's care; editorializing should be avoided. They should be legible, dated (month, day, and year), and timed, and the signature and dictation code should be included.

I.  As a rule, the first progress note should contain the attending physician's name, any significant history or physical findings not previously recorded, diagnostic impressions, and any further suggestions.

II.  Subsequent notes should contain statements relative to all significant findings, changes in diagnosis, condition, or therapeutic program. All laboratory and ancillary test results should be documented.

III.  Prior to surgery, a note should indicate the preoperative diagnosis and reason for surgery. Immediately following surgery, a brief note should be completed.

IV.  If a physician chooses not to follow a consultant's recommendations, s/he should document his or her reasoning.

V.  The final progress note prior to discharge should contain the principal diagnosis (that which is determined upon discharge to have caused the admission), complications, comorbidities and therapeutic recommendations of the attending physician.

VI.  When changing services, a final "off-service" note should be placed in the chart, including the major diagnoses, so far as they are known, as well as the therapeutic program.

VII.  Prior to the discharge of the patient, all Division cases (direct or indirect referrals) must be assigned by the Chief Resident to the house physician responsible for completion of the Operative Report and Summary. Please make this assignment in the orders or the last progress note.

*Discharge Summary*

The increasing demands for and uses of the medical record (e.g., billing, mandatory reporting, regulatory requirements) require unfailing physician cooperation in completing the record. Therefore, immediately prior to the discharge of a patient, the discharge diagnoses should be entered on the Attending Physician Attestation Form, and a Discharge Summary should be dictated by the Attending or the House Staff Officer (see Section IV, "Admissions and Discharges"). A handwritten Discharge Summary Form (available on the patient record) may be completed in lieu of a dictation. Transcribed dictations are available for review on EDR or TDS from terminals on each unit.

*Signatures*

The Joint Commission on Accreditation of Healthcare Organizations (JCAHO) and New York State Health Code (section 405.11) require an identifiable signature for every entry in the medical

record. Signatures at Mount Sinai are identifiable by the dictation code number. *Please use this code number whenever signing any portion of the chart.*

*Error Correction*

To correct an error: Place one line through it, label it "error" and date, time, and initial the correction. Never white out, scribble out, write over, tear out a page, or squeeze in an entry. To correct an electronic error in TDS, an addendum must be dictated separately.

**Incomplete Medical Records**

Operative reports are to be dictated as soon as possible after surgery. Discharge summaries are to be completed immediately following discharge. If the House Staff Officer has not completed his or her medical records at the time of the patient's discharge, s/he may obtain the record for completion in the chart completion area of the Medical Records Department (GP-2, Room 211).

When a House Staff Officer is on rotation at an affiliate hospital, it is his or her responsibility to complete dictation of all of his or her medical charts before rotating to another affiliated institution or returning to Mount Sinai.

House Staff will be notified by mail of chart deficiencies. Charts not completed within 30 days (including signatures) are deemed delinquent. Department chairs at Mount Sinai and its affiliates will be notified of any delinquent records.

The Medical Board has approved suspension of admitting and operating privileges of physicians with delinquent medical records, and has agreed to the following additional sanctions for House Staff:

I.  A notation shall be placed in the House Staff Officer's file, noting their failure to meet the required time frame or to respond to warnings about chart completion.

II.  The annual salary increase commensurate with promotion to the next postgraduate year will not be awarded unless all medical records have been completed.

III. The House Staff Officer's diploma/certification will not be awarded upon residency completion unless all medical records have been completed.

# Comments Requested

Please help us to improve the Manual by sending your comments to Paul Johnson by email to paul.f.johnson@mssm.edu or by interoffice mail to Box 1076.