| | |
|---|---|
| **From:** | Figur, Arthur |
| **Sent:** | Wednesday, March 23, 2011 12:24 PM |
| **To:** | Varughese, Leena (MSSM-Imail) |
| **Cc:** | Hughes, Daniel (MSSM-Imail); Lento, Patrick |

Leena, I heard from Dr. Leno that you are back at Mount Sinai. Dan Hughes and I could either meet with you this Friday 3/25 at 11 AM or Monday 3/28 at 11 AM in my office. Pick which is most convenient for you and the department. I am in the Icahn (East building) 2nd floor room L2-65. Thanks in advance for your cooperation
Art Figur

Arthur M. Figur, MD
Associate Medical Director
The Mount Sinai Hospital
ext 88544

1

CONFIDENTIAL

D_ESI012093

From:           Pessin-Minsley, Melissa
Sent:           Wednesday, March 23, 2011 6:05 PM
To:             Lento, Patrick
Subject:        RE: Leena

Absolutely, did she ever respond to your last email?

Melissa Pessin-Minsley, MD PhD
Medical Director, Center for Clinical Laboratories Associate Professor and Interim Chair,
Department of Pathology Mount Sinai Medical Center


-----Original Message-----
From: Lento, Patrick
Sent: Wed 3/23/2011 5:11 PM
To: Pessin-Minsley, Melissa
Subject: Leena

Melissa,


Before you leave, can I get your notes, etc on Leena so I can put them in her file?


Thanks,
Pat

CONFIDENTIAL                                                    D_ESI012092

Exhibit 168

| From: | Strauchen, James |
|---|---|
| Sent: | Friday, March 25, 2011 3:17 PM |
| To: | Lento, Patrick |
| Subject: | RE: Autopsy |

Yeah, I asked Leena to order Ig G,A,M,K,L on the deposits and CD3 and CD20 on the liver and marrow. I think the nuclear inclusions in the liver are an artifact but she could do HSV. Jim

-----Original Message-----
**From:** Lento, Patrick
**Sent:** Friday, March 25, 2011 3:13 PM
**To:** Strauchen, James
**Subject:** RE: Autopsy

Thanks for the follow up Jim. The lymphangiectasia is interesting. I assume this is a secondary lymphangiectasia likely related to his lymphoma and adenopathy. I also came across reports of Waldenstrom's causing a similar appearance due to IgM deposits causing secondary lymphangiectasia but the deposits are more eosinophilic so I wonder if this could be the case here! I am going to order some stains to try to figure it out. Thanks for your help !

Pat

-----Original Message-----
**From:** Strauchen, James
**Sent:** Wednesday, March 23, 2011 6:25 PM
**To:** Lento, Patrick
**Subject:** RE: Autopsy

I think the spleen is extramedullary hematopoiesis in the red pulp. The bone marrow contains multiple lymphoid aggreates composed of small lymphs which I think is his low grade lymphoma. The most fascinating part is the pink stuff in the dilated lymphatics of the lymph node and bowel. Intestianl lymphangiectasia and/or some sort of protein deposition disease come to mind. Jim

-----Original Message-----
**From:** Lento, Patrick
**Sent:** Wednesday, March 23, 2011 5:27 PM
**To:** Strauchen, James
**Subject:** Autopsy

Jim,

The case I asked Leena to show you has a h/o NHL (on steroids) but no diagnosis here. There is massive splenomegaly (~1300 g) and abdominal adenopathy but the histology doesn't look like lymphoma to me (unless it melted away!). I am curious what you might think when she shows you the slides.

Pat

1

CONFIDENTIAL

D_ESI012042

Exhibit 169

## Lento, Patrick

**From:** Leena [leena.bookworm@gmail.com]
**Sent:** Wednesday, April 27, 2011 1:08 PM
**To:** Lento, Patrick
**Subject:** Re: Follow up

Ok.

On Apr 26, 2011, at 1:55 PM, "Lento, Patrick" <Patrick.Lento@mountsinai.org> wrote:

Leena,

Your period of academic advisement has ended. Now that you are back from vacation, I would like to meet with you to follow up. I will contact you with a day and time to meet. Please confirm with me that you have received this email.

Thanks,
Pat

Patrick Lento, M.D.

Associate Professor, Departments of Pathology,

Internal Medicine, Division of General Internal Medicine

and Medical Education

Residency Program Director, Pathology

Mount Sinai Medical Center and School of Medicine

Box 1194

One Gustave Levy Place

New York, NY 10029

Tel: 212-241-9157

Fax: 212-876-4038

email:patrick.lento@mountsinai.org

D02628

Exhibit 170

**From:** Figur, Arthur
**Sent:** Thursday, May 12, 2011 4:44 PM
**To:** Lento, Patrick
**Subject:** RE:

Yes, thank you.
Is there a meeting Monday?

Arthur M. Figur, MD
Associate Medical Director
The Mount Sinai Hospital
ext 88544

> -----Original Message-----
> **From:** Lento, Patrick
> **Sent:** Thursday, May 12, 2011 3:12 PM
> **To:** Figur, Arthur
> **Subject:** RE:
>
> Did Leena get in touch with you?
> Pat
>
> > -----Original Message-----
> > **From:** Figur, Arthur
> > **Sent:** Thursday, May 12, 2011 12:13 PM
> > **To:** Lento, Patrick
> > **Subject:** RE:
> >
> > I called all three extensions and she was not in two.  43787 was on voice mail. She also has not
> > answered her in house or long range pager.
> >
> > Arthur M. Figur, MD
> > Associate Medical Director
> > The Mount Sinai Hospital
> > ext 88544
> >
> > > -----Original Message-----
> > > **From:** Lento, Patrick
> > > **Sent:** Thursday, May 12, 2011 11:46 AM
> > > **To:** Figur, Arthur
> > > **Subject:** RE:
> > > **Importance:** High
> > >
> > > She is scheduled on our GYN rotation here at Sinai from May 9-June 3 so she is definitely
> > > around. The rotation is pretty busy but you should be able to reach her by paging her (917-641-
> > > 4268). If that doesn't work, the resident room is x49146, the GYN area is x43787 and the
> > > grossing room is x45143.
> > >
> > > If you still have trouble tracking her down, please let me know.
> > >
> > > Pat

CONFIDENTIAL

D_ESI010881

-----Original Message-----
**From:** Figur, Arthur
**Sent:** Thursday, May 12, 2011 11:38 AM
**To:** Lento, Patrick
**Subject:**

Also left you an email message. Where is Leena today, off site or on site?
Thanks
Art

Arthur M. Figur, MD
Associate Medical Director
The Mount Sinai Hospital
ext 88544

2

D_ESI010882

Exhibit 171

Sun Java System Communications Express                    https://imail.mssm.edu/en/mail.html?sid=9cPGS8P0dbo&lang=en

Sun Java System Messenger Express     Welcome leena varughese          Help    Log Out

Folders  Inbox  Sent  Trash  Drafts  Addresses  Options

leena.varughese@mssm.edu: Sent

Compose  Reply  Reply All  Forward  Delete  Add Addresses  Previous  Next  Close     Move message to folder:

From leena varughese <leena.varughese@mssm.edu>

Sent Friday, September 23, 2011 6:28 am
To leena.bookworm@gmail.com
Subject Fwd: Re: [Pathologyresidents] Moonlighting has Ended
Attachments  vCard(leena.varughese)                                                  1K

----- Original Message -----
From Samuel McCash <s.mccas.i@gmail.com>
Date Tue, 03 May 2011 10:05:22 -0400
To Kruti Maniar <kruti.maniar.mssm@gmail.com>
Cc "Jordan, Adrienne" <adrienne.jordan@mountsinai.org>, pathologyresidents@mssm.edu, "Lento, Patrick"
   <Patrick.Lento@mountsinai.org>
Subject Re: [Pathologyresidents] Moonlighting has Ended

And thank her for essentially saving our a%@ess. :)


On Mon, May 2, 2011 at 3:54 PM, Kruti Maniar
<kruti.maniar.mssm@gmail.com> wrote:
>
> I just want to take a moment to thank Adrienne for initiating the moonlighting program this year, and for working so hard to maintain it
all year long.  Adrienne, you did a fantastic job.  Thank you!
>
>
> On Mon, May 2, 2011 at 3:39 PM, Jordan, Adrienne <adrienne.jordan@mountsinai.org> wrote:
>>
>> As many of you have noticed, we are now fully staffed in the gross room (2 PA's, grossing room clerk, senior lab coordinator, and one
per diem PA).  Because of the extra help, we have only needed a moonlighter once in the last month.  Since we are now at full staff,
moonlighting will have to come to an end.  Now that the basic structure of the program is in place, if we should ever need to, it would be
very simple to start back up again.  For now though, this will be the last week moonlighters will be scheduled.  Thank you to all who
volunteered this year.  I am deeply grateful to you all.
>>
>>
>> Adrienne Jordan, M.D.
>>
>> The Mount Sinai Hospital
>>
>> Department of Pathology - Box 1194
>>
>> One Gustave L. Levy Place
>>
>> New York, NY  10029
>>
>>
>>
>> Pager (917) 401-5341
>>
>> Cell (330) 327-7339
>>
>>
>>

Exhibit 172

TRANSCRIPT OF CONVERSATIONS
(MAY 3, 2011)

PARTICIPANTS:

PATRICK LENTO
LEENA VARUGHESE
ANDREW CASTALDI
CARLOS CORDON-CARDO

Transcriber, Kimberly Upshur
**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, NJ 08619**
          **(609)586-2311**
**FAX NO.  (609)587-3599**
**E-mail:   jjcourt@jjcourt.com**
**Website:  www.jjcourt.com**

Audio Recorded

Colloquy                    2

```
 1            MR. LENTO:  Good morning, Carlos.
 2            MR. CORDON-CARDO:  Good morning.
 3            MR. LENTO:  How are you?
 4            MR. CORDON-CARDO:  Good.  How are you?
 5            MS. VARUGHESE:  All right.  How are you?
 6            MR. CARDON-CARDO:  We want to address your
 7      (indiscernible) with how we're going to proceed with
 8      the group of discussions that we have had.  We have
 9      been updated by the persons in the institution, and we
10      wanted to make sure that we are in the same -- on the
11      same page, and that we (indiscernible) that we want to
12      do with, you know, helping in the context of your
13      career and the further development.  Okay.
14            MS. VARUGHESE:  Okay.
15            MR. CORDON-CARDO:  So maybe we can followup
16      on some of the notes that you have.
17            MR. LENTO:  Sure.  So, I mean, the purpose of
18      this really is to followup on the academic advisement.
19            MR. CORDON-CARDO:  Yes.
20            MS. VARUGHESE:  Okay.
21            MR. LENTO:  That's really the only thing that
22      the meeting is designed to do.  What I was hoping to do
23      was, I guess, to provide my perspective, but before
24      that, you know, to see what your perspective was with
25      regard to the specific things that we had discussed
```

Colloquy                    3

```
 1      regarding the academic advisement from your
 2      perspective.  And then I can sort of let you know in a
 3      sense what I'm thinking as well.
 4            MS. VARUGHESE:  I'm not really understanding
 5      the question.
 6            MR. LENTO:  Okay.
 7            MS. VARUGHESE:  I think I had written, you
 8      know, you gave me the academic advisement and I was --
 9      I feel like I was badgered into having to sign this
10      document.  Meanwhile whether or not I signed the
11      document I would have been on academic advisement
12      anyway.
13            MR. LENTO:  That's correct.
14            MS. VARUGHESE:  So, you know, I didn't
15      understand what -- where that was coming from, one.
16      Two, I wrote a rebuttal and I believe I sent that to
17      you.
18            MR. LENTO:  But we already had a meeting with
19      yourself and me and Freda to discuss that the academic
20      advisement requirements were still going to be
21      stipulated and you were going to be required to --
22            MS. VARUGHESE:  All right.  So I -- and I
23      just responded to that saying that this is what I
24      thought was the problem, because I felt like my concern
25      wasn't adequately explored.
```

Colloquy                                4

1       MR. LENTO:  I understand your concerns, but
2   as you know there were multiple separate
3   investigations, okay.
4           MS. VARUGHESE:  Okay.  Well, I mean, I --
5       MR. LENTO:  The purpose of today's meeting
6   really isn't to go through the specifics and rehash
7   everything.  You were put on academic advisement, there
8   were certain requirements of the advisement that you
9   were expected to comply with.  What I'd like to know is
10  your perspective on those particular things that we had
11  requested you to do.
12          MS. VARUGHESE:  I think I adequately have met
13  the requirements.
14      MR. LENTO:  Okay.  So I'd like to go through
15  them then just to rehash, because I don't necessarily
16  agree with you.
17          The first thing was a book that we had
18  requested that you read.  Have you read the book?
19          MS. VARUGHESE:  I think the (indiscernible)
20  about professionalism.
21      MR. LENTO:  And can you tell us a little bit
22  about the book itself?
23          MS. VARUGHESE:  Well, I agree with its
24  content that, you know, you need to treat each other
25  with respect and learn to put aside some -- our

Colloquy                                5

1   differences.
2       MR. LENTO:  And you purchased the book?
3       MS. VARUGHESE:  No, I just borrowed it
4   briefly.
5       MR. LENTO:  And who was the author?
6       MS. VARUGHESE:  I can't remember.
7       MR. LENTO:  So I think that your
8   characterization of it being about professionalism
9   really just rehashes the title.  I'd be interested to
10  know if there were specific things that you were able
11  to glean from your readings.
12          MS. VARUGHESE:  I feel like it pretty much
13  agrees with what my position is on professionalism
14  (indiscernible).
15      MR. LENTO:  Okay.  But I'm curious to know
16  some specific things that the book addressed.
17          MS. VARUGHESE:  Is there any particular thing
18  you would like to know about?
19      MR. LENTO:  Well, I'm curious to know if you
20  actually read the book.  So I'd like you to tell me a
21  little bit about the book, because it was one of the
22  requirements that you actually read the book.  And I'm
23  not sure that saying that the professionalism approach
24  of the book agreeing with what you consider to be
25  professionalism really helps me understand that you did

Colloquy                          6

1    in fact read the book.  I mean, you did have several
2    months to borrow or purchase the book.  I had indicated
3    we would even buy the book for you if you wanted us to.
4              MS. VARUGHESE:  I agree with the content that
5    I think, you know, we need to be professional, you
6    know, that certain individuals may be in certain, you
7    know, like in the medical field you have a certain
8    hierarchy and that's important in terms of making the
9    work environment.  Listening to --
10             MR. LENTO:  I mean, those were things that we
11   discussed.  I'm not so sure that that helps me
12   understand that you actually read the book.
13             MS. VARUGHESE:  Okay.  Well, what are your
14   other concerns?
15             MR. LENTO:  Well, the other thing is with
16   regard to your reflection on the incident as you should
17   have appreciated from the advisement originally that
18   was supposed to have been handed in at the end of
19   January.  And I appreciate that you weren't able to do
20   it initially on time, but I did continually ask you to
21   provide me with the essay which you never actually did.
22   You sent out an e-mail to a number of people with what
23   you referred to as a reflection.
24             And I would argue two things.  One, I don't
25   believe that your reflection provided any insight into

Colloquy                          7

1    the circumstances of what happened back in December.
2    I'm only focusing on that.  With regard to your
3    reassessment of yourself after the discussions that
4    we've had as well as the hope was that you would have
5    been able to gain some additional perspective from the
6    book to provide you with the ability to in fact
7    reflect.  I mean, your essay was simply a rehashing of
8    the issues as you saw them.  I really didn't see any
9    additional reflection, really, on how you could have
10   approached the situation differently.  I mean, that was
11   certainly what we had discussed as the major purpose of
12   the exercise, and I didn't really -- I mean, would you
13   guys -- I don't know if you had a chance to look at it
14   and read it all --
15             MR. CORDON-CARDO:  Yes.  I read it and
16   actually commented on it.
17             MR. LENTO:  -- but I really, you know --
18   look, the purpose Leena, of the advisement was to allow
19   you to take some time to step back and realistically
20   see how you could have done something differently and
21   maybe then carry that with you in the future.  And I
22   just have some trouble really appreciating that you
23   were able to do it especially in light of the essay
24   that you did provide us, because it's obvious that you
25   have some anger issues regarding what happened, and I

Colloquy                                    8

1     can appreciate that.  I'm not saying that there wasn't
2     two sides to the story.  But your --
3               MS. VARUGHESE:  Okay.
4               MR. LENTO:  I don't understand your rolling
5     your eyes.
6               MS. VARUGHESE:  No, I didn't say anything.  I
7     just said well, okay.
8               MR. LENTO:  Well, your gestures imply
9     something here.
10              MS. VARUGHESE:  Okay.  Well, let's start over
11    from the beginning.  Let's just ignore that.  If you
12    felt like that I'm sorry.
13              MR. LENTO:  Well, how could I not feel that
14    way?  I think everybody in the room can see that you
15    rolled your eyes with regard to my comments here.
16              MR. CASTALDI:  I mean, are you dismissing
17    this whole process --
18              MS. VARUGHESE:  No, no, I'm not.
19              MR. CASTALDI:  -- are you dismissing what Dr.
20    Lento is saying, because --
21              MS. VARUGHESE:  Okay.  You were saying that
22    there are two sides to the story.
23              MR. LENTO:  And I appreciate that you may
24    have some anger regarding it, but the reality is as
25    we've discussed that whether or not you felt you were


Colloquy                                    9

1     in the right is almost irrelevant in the setting of the
2     investigation and our assessment of the situation.
3     That's why you were placed under the academic
4     advisement from the get-go, okay.  And your essay, I
5     think, completely missed the point.  In fact I'm not
6     really sure I understand the point of your essay other
7     than it was an attempt to resummarize the things that
8     we had in a sense already discussed, and in addition
9     brought up some additional things that I think had not
10    even been brought up from the beginning.
11              So, you know, from my perspective I'm not
12    really sure that you were able to satisfy the request
13    that we had made.  And I'm not even looking at, you
14    know, the stipulation that we would try to meet on a
15    more regular basis.  I mean, I know that there was an
16    issue where I did ask you to meet before my vacation.
17    You said I didn't confirm with you, but I said that I
18    needed to meet with you, tell me the day and time that
19    you can meet before I go on vacation.
20              The fact that you didn't followup on that, I
21    think is problematic.  But I'd like to really stick
22    with what we've already talked about.  I mean, what's
23    your perspective?
24              MS. VARUGHESE:  Well, my perspective, I
25    think, the reflection, you know, is -- explains my

Colloquy                                    10

1   perspective, my point of view and where I'm coming
2   from.  And --
3            MR. LENTO:  But we already knew your
4   perspective.  And we already had the discussions.
5            MS. VARUGHESE:  Okay.
6            MR. LENTO:  I mean, the whole purpose of the
7   exercise was to look at it from a different light.
8   From one that would be somewhat more professional, one
9   that we would expect --
10           MS. VARUGHESE:  Okay.
11           MR. LENTO:  -- our residents to do in other
12  circumstances not just your circumstance.  And I don't
13  really feel like we were able to get that.  So I'm
14  concerned that if we were to see a similar circumstance
15  down the road that you would not necessarily be able to
16  approach it from a more professional standpoint which
17  is really the whole purpose of the advisement from the
18  get-go.
19           MS. VARUGHESE:  Well, my hope is that this
20  circumstance would not arise in the future.  Where --
21           MR. LENTO:  But we have no way of
22  guaranteeing --
23           MS. VARUGHESE:  -- and if it were to arise I
24  think I would be able to manage the situation perfectly
25  well.

Colloquy                                    11

1            MR. CASTALDI:  I think the point is that you
2   feel like you were in no way wrong in this instance.
3   And that doesn't even matter at this point, because it
4   was already evaluated, this and that.  So you're hung
5   up on the point that you're not in the wrong relating
6   to it.  That's fine.  The purpose of this meeting is
7   that you had certain requirements to meet as part of
8   your advisement, and you didn't meet them, and
9   basically that's what happened.  You didn't read the
10  book, you didn't write an essay that you were supposed
11  to write.  You were supposed to meet with Dr. Lento on
12  a regular basis, you didn't do that.  So, I mean,
13  that's --
14           MS. VARUGHESE:  Well, you know what, the
15  essay part I discussed this with Dr. Stimmel actually
16  and he read over it and he said that's accurate because
17  I had been speaking to him from the get-go as to when
18  the situation had happened.  And when I thought that it
19  was getting out of control I had spoken to him since
20  that point.  So him knowing what has happened in the
21  course of the events that had taken place following it
22  he said that -- the reflection was, you know,
23  appropriate given the circumstances.  And --
24           MR. LENTO:  Well, it was a reflection of the
25  circumstances as you see it, and I don't know what Dr.

Colloquy                         12

1  Stimmel knows in terms of the specifics of the academic
2  advisement.  I have to imagine that you did not discuss
3  or share with him that the purpose of the essay or the
4  reflection was to look at it from a different
5  perspective, one of professionalism, one of a different
6  approach that may have been better given the
7  circumstances of the way an incident had played out.
8          MS. VARUGHESE:  Okay.
9          MR. LENTO:  So again -- I'm sorry, Andrew, I
10  mean, I don't want to interrupt you.
11          MR. CASTALDI:  No, no, that's fine.  I mean,
12  you understood what the purpose of this was, that you
13  had to meet certain requirements.  You understood what
14  the purpose of the essay was, right or wrong?
15          MS. VARUGHESE:  Yes.
16          MR. CASTALDI:  Yes.  And you chose not to
17  follow that.  That's basically what you did.  You chose
18  to dismiss the process because you didn't agree with
19  it.  You didn't agree with the fact that you were at
20  that point, because you felt like you were not in the
21  wrong in the past, and that's fine.  That's a separate
22  issue.  But you dismissed the whole process and now
23  we're here trying to talk to you about it and you're
24  dismissing everything we're saying.  You don't have
25  time for us, you know, you don't feel like you, you


Colloquy                         13

1  know --
2          MS. VARUGHESE:  I'm making the time.  I'm
3  meeting because I have to.  I'm not dismissing anything
4  that you're saying.
5          MR. CASTALDI:  No, but your attitude is such
6  that you're dismissing it.
7          MS. VARUGHESE:  I'm not.
8          MR. CASTALDI:  It's not important, you don't
9  want to deal with it.
10          MS. VARUGHESE:  But I think I've been through
11  a lot given the circumstance -- the situation that has
12  happened, okay, from being on academic advisement to
13  being referred to the Physician Wellness Committee to
14  the GME Office.  I've had to go through this for the
15  past three, four months.  You're not in my shoes.  And
16  given the situation where I feel like I'm the one who
17  is being intimidated, harassed, et cetera, et cetera,
18  and for me to have to go through all this it's a pretty
19  trying process.
20          MR. CASTALDI:  I understand that.
21          MS. VARUGHESE:  So --
22          MR. CASTALDI:  I'm not saying it's not
23  trying.
24          MS. VARUGHESE:  -- you know, I feel like I'm
25  not dismissing your concern, but I have legitimate

Colloquy                                14

1    concerns that need to be addressed as well.  And --
2              MR. LENTO:  But I think you're hung up on --
3              MS. VARUGHESE:  And I think we can just say
4    that, you know, we can say that, you know, there's
5    concerns on that side, there's concerns on my side, and
6    we can agree to --
7              MR. CASTALDI:  But those concerns I'm then
8    saying that they've been addressed.  I mean, there's an
9    investigation that's gone on.  They've been addressed.
10   So --
11             MR. LENTO:  Well, right.  So I think there
12   have been several investigations --
13             MR. CASTALDI:  Yes.  Yes.
14             MR. LENTO:  -- notwithstanding let's say our
15   own investigation.
16             MR. CASTALDI:  Yes.
17             MR. LENTO:  So independent investigations as
18   you know that have not only in a sense addressed the
19   concerns by meeting with you, but meeting with others
20   and trying to piece together in the best fashion that
21   one can do when doing something retrospectively like
22   this and none of the investigations have found that
23   anything is different other than what we've said from
24   the beginning.  And I'm sure that the GME Office has
25   shared with you their investigation results as has

Colloquy                                15

1    human resources.
2              MR. CASTALDI:  So by no means are we being
3    flippant about it.  We're not just saying well, we're
4    going to dismiss what you're saying.  It's gone through
5    a process.  And the fact is that both of us are new and
6    I came into this meeting with no prior knowledge of
7    anything, Carlos probably the same thing.  I was
8    willing to listen to you and give you the benefit of
9    the doubt and say let's just move on with this and
10   let's just, you know, wipe our hands of it and go
11   forward.  But frankly your attitude to us is
12   disrespectful and I really don't appreciate it.  And
13   the fact that, you know, Dr. Lento who's really a very
14   nice guy is talking to you about something and not
15   yelling or not going crazy and you're rolling your
16   eyes, and, you know, making comments.  I mean, I just
17   don't appreciate it.  I really don't.  So, you know,
18   this was your chance to have a clean slate --
19             MS. VARUGHESE:  I'm not rolling my eyes or
20   making any comments.
21             MR. CASTALDI:  Okay.  This was your chance to
22   have a clean slate and to say let's start fresh --
23             MS. VARUGHESE:  Okay.  Let's start fresh.
24             MR. CASTALDI:  -- we're not going to worry
25   about the past, and that's it.  But, you know, I don't

Colloquy                                                    16

1    see that happening.  I really don't.  And that's my
2    concern really.  I mean, it's not about what happened
3    in the past.  I don't care what happened in the past,
4    because we weren't here and we're not looking to judge
5    anybody.  We're looking to make this program work and
6    to make it work for you.  But from my point of view
7    when somebody has an attitude like that, you know, it's
8    just not acceptable, it really isn't.
9              MS. VARUGHESE:  Well, I don't think I really
10   have an attitude.  I had a legitimate concern.  There
11   have been several instances where this particular chief
12   resident that I had discussed with Dr. Lento in the
13   past, and then again.  And then, you know, I am placed
14   in this position where, you know, I continue -- I had
15   to continue to work with this person.  You know, in
16   fact, in June I have to -- I went on rotation with this
17   person at the VA where we both had to share a room,
18   office space.  I mean, for me that's -- I feel very
19   uncomfortable.
20             MR. LENTO:  Well, I've already addressed
21   that, okay, with Sam.  He will not be sharing the room
22   with you.  You are not on the same rotation.  I think
23   you are incorrect in that.
24             MS. VARUGHESE:  We're at the same hospital.
25             MR. LENTO:  You're at the same hospital.

Colloquy                                                    17

1    However, you are at the same hospital presently.
2              MS. VARUGHESE:  But it's just weird the way
3    two people work.  The residents were there.
4              MR. LENTO:  Okay.  I can appreciate that.
5    And I think that --
6              MS. VARUGHESE:  And we commonly share the
7    same office space.
8              MR. LENTO:  I understand.  But we're dealing
9    with that, okay.  The idea was --
10             MR. CASTALDI:  I think the point is that,
11   okay, you have an issue with Sam.  That's something
12   that has to be worked out and that's being worked out.
13   What if something happens with somebody else?  How are
14   you going to handle it then?  That's the point of this
15   whole exercise.  How are you going to handle it down
16   the road ten years from now when there's somebody
17   that's either working with you or above you that you
18   don't get along with, how are you going to handle it
19   then?  That's the point really.  It's not about one
20   person against another person.
21             MS. VARUGHESE:  Okay.  So in my defense I
22   tried to handle the situation appropriately.  I told,
23   you know, there is a moonlighter there, I told.  He
24   offered to put the specimen back on the cart.  I said,
25   okay, I'll do the specimen once from the cart.  I

Colloquy                    18

 1    offered to do it myself once I'm done with whatever I
 2    was doing at the present time when he walked in.  But
 3    that wasn't adequate for him.  He was like that's not
 4    the point.  Well, what's the pont?  We're just trying
 5    to get the work done.  You know, that's the point.  So
 6    for me I'm trying to understand why -- how I can avoid
 7    a situation like this in the future.  But I'm failing
 8    to grasp that, you know, we have like such conflict of
 9    interest in finishing work versus --
10              MR. LENTO:  But I think --
11              MS. VARUGHESE:  It's a little bit of a
12    trickier situation.  If there isn't that conflict then
13    I think if we all had shared the common interests then
14    there wouldn't be an issue here, right?
15              MR. LENTO:  But the reality is that the chief
16    resident in a sense oversees what you do.  So there is
17    a hierarchy that you have to basically be accountable
18    to whether you like it or not.  I respond to Dr.
19    Cordon-Cardo and I respond to Mr. Castaldi, because f
20    the hierarchy that exists.  Sometimes I may be asked to
21    do things that I may not want to do.  If that's the
22    case we can discuss it.
23              The reality of the circumstance and the
24    incident was that there was no real discussion.  And
25    that was the purpose of not just the advisement, but

Colloquy                    19

 1    the essay as well to try to hey, take a step back,
 2    reassess without anything -- without any people looking
 3    over your shoulder how could I have done something
 4    differently so that maybe I could have defused it, or
 5    the circumstances wouldn't have escalated to the point
 6    where people were yelling, running into other rooms,
 7    running into Dr. Bleiweiss' office, having --
 8              MS. VARUGHESE:  I feel like it didn't have to
 9    be escalated.  I don't know whether Sam was misinformed
10    or not because he came in there with this attitude
11    like, why are you doing this?  And I didn't even know
12    why he thought that the moonlighter was grossing the
13    specimens because he wasn't there.  It just seems like
14    he magically knew that the moonlighter was grossing the
15    specimens.  And when I just said oh, can he not gross
16    them, they just seemed like margins to me and she's
17    busy.
18              MR. LENTO:  Leena, you're fixated on the
19    actual incident.  The reality is it has been
20    investigated.  Okay, so whether you agree with it or
21    not it's been investigated and we have decided the
22    approach, okay.  We did speak with Sam, we decided to
23    do something with you.  You did not satisfy, in my
24    opinion, the things we kind of laid out for you with
25    regard to the academic advisement.  And I think that's

1   a problem, Leena.
2         I mean, look, I'm not trying to intimidate
3   you, I'm trying to let you know that we designed the
4   academic advisement which I don't even know that you
5   read when you were trying to follow it.  I mean, I'll
6   give an example.  The self-reflection exercise to be
7   handed in four weeks from the date of the letter which
8   was December 21st you were expected to write down you
9   account of the situation and describe how you could
10  have approached things in a better fashion including
11  commentary on physician professionalism and its role in
12  the circumstance.
13        Based on what's written there you didn't
14  satisfy a single part of it.  And I'm concerned,
15  because at this point with the academic advisement
16  being ended I don't feel like we can just wipe our
17  hands and have a clean slate.  Because the reality of
18  wiping the slate clean was really in your hands, not in
19  ours.  And I think you did try to make some attempts
20  and I let you know that during the whole period.  If I
21  had received comments from people that you had done a
22  better job, that you were in a sense doing what we
23  would expect I let you know that.  I told you that
24  verbally.  I didn't just e-mail you.  I let you know.
25  Okay.  But the reality is that that was only part of

1   it.  And you didn't really satisfy, to my expectations,
2   anyway, what we wanted.
3         MS. VARUGHESE:  Well, that's not what you led
4   me to believe.  You told me that I'm no longer on
5   academic advisement --
6         MR. LENTO:  Yes.  The period of --
7         MS. VARUGHESE:  -- which led me to believe
8   that --
9         MR. LENTO:  No, no, I didn't say anything
10  other than you were -- the period of academic
11  advisement had ended.  It was going to be for several
12  months.  The purpose of the meeting was then to assess
13  the period of academic advisement and what we should do
14  next.  What do you think we should do next?
15        MS. VARUGHESE:  I think I satisfied the
16  academic advisement requirements.  I think I'm doing
17  what I need to do, and in fact, I complied with the
18  Physician Wellness Committee, I complied with the GME
19  Office.  I think --
20        MR. LENTO:  Well, those are separate.  But,
21  okay, I'm not going to comment on those because I'm not
22  privy to probably the majority of what goes on then.
23        MS. VARUGHESE:  And that has been basic -- to
24  my knowledge that has been started by the Department.
25  And they did find and investigate a complaint against

Colloquy                          22

1     me.  This is before obviously when you had started.
2     And this is --
3               MR. LENTO:  Well, no, it did not emanate from
4     the Department, okay.  The investigation by the GME
5     Office eventually led to the Physician Wellness issue.
6     It had nothing to do, at all, with the Department other
7     than their knowledge that there was an issue and a
8     concern with regard to your performance.  Okay.  So we
9     did not dictate or stipulate that portion.  Okay.  And
10    I would disagree with you with regard to your
11    fulfilling the academic advisement as it was laid out
12    for you.  And that may just be my opinion, okay, and
13    that's okay.  So I think that what we will do is we
14    will assess as a group and with others.  I mean, I
15    think that obviously the GME Office will be able to
16    assess.
17              MS. VARUGHESE:  I think it's unfair that I'm
18    being put under all this pressure.
19              MR. LENTO:  What --
20              MS. VARUGHESE:  Because I'm --
21              MR. CORDON-CARDO:  You are not signing out
22    everyday.  You are not -- you have been asked to --
23              MS. VARUGHESE:  But I would --
24              MR. CORDON-CARDO:  -- exercise --
25              MS. VARUGHESE:  -- I would like to focus on

Colloquy                          23

1     my --
2               MR. CORDON-CARDO:  Let me talk.
3               MS. VARUGHESE:  Okay.
4               MR. CORDON-CARDO:  I let you talk for so
5     long, you know.  Everyday I have so many thing that I
6     need to do.  I'm working hours that I don't want to
7     work, but I do it.  The next working I'm here at seven
8     o'clock in the morning to do -- to read the letter and
9     to fulfill something that's in a couple of pages after
10    several months is not something that has any
11    justification.  And all of the actions led us to
12    believe that you are not approaching, you know, the
13    help that we want -- that we are offering you in the
14    most appropriate manner either.
15              And it's disturbing, because we don't want to
16    have another instance in which you can't be in a
17    situation that's trouble for yourself and others.  So
18    we would like to see you witness to help us and
19    yourself (indiscernible) in a way that presented to
20    authorities we will feel comfortable.  Because right
21    now I'm almost (indiscernible) because I'm new to that
22    and I'm reading what you have been writing and now
23    realize to which degree you have worked hard, but that
24    book makes me feel that first of all no one's stressed
25    you here.  They are giving you a good deal of time as a

Colloquy                    24

1    nature individual to address these concerns and to have
2    a time of reflection, and to have an attitude that will
3    be constructive for all of us rather than an attitude
4    of either denial or keep on (indiscernible) because
5    it's not the case either.  So we need to -- we just ask
6    that we need to make sure that we do the best for
7    everybody here including the fact of assessing you
8    clearly.  You want to go through this process and you
9    are willing to understand the process.
10           MS. VARUGHESE:  I think I understand the
11   process and I'm willing to understand the process.  But
12   there have been several concerns that I've had over the
13   course of the year that I had addressed with Dr. Lento,
14   and, you know, it hasn't been addressed adequately or
15   satisfactorily.  And I know that as a resident there,
16   you know, I have to do certain duties, requirements
17   but I also expect to work in an environment that's, you
18   know, conducive to that.  And for me --
19           MR. CORDON-CARDO:  That's a two-way street,
20   and you need to also respect your peers and understand
21   the line of command and to help (indiscernible).
22           MS. VARUGHESE:  And I think I do that.  I
23   don't think there has been any -- that particular
24   incident, I feel like it was just a huge
25   misunderstanding even maybe even -- I don't -- you know

Colloquy                    25

1    for me I find it hard to gauge why it was so relevant
2    to a certain individual there.  You know.  So I feel
3    like there has been some misunderstanding and I was
4    hoping that, you know, you would understand that and
5    perhaps, you know, have a mediator discussion between
6    me and Sam and just put that behind us and carry on
7    working.  Because I feel like it wasn't -- like I'm
8    trying to gauge where it's coming from, but --
9            MR. LENTO:  You've already indicated, I
10   think, in an e-mail or something, you know, that Sam
11   did apologize to you at one point.
12           MS. VARUGHESE:  When?  Which one?  For the
13   first incident or the second one?
14           MR. LENTO:  I have no idea.
15           MS. VARUGHESE:  See, the first incident he
16   tried -- I think he wanted to apologize to me.  But
17   instead what happened was he just went on to tell me
18   that, you know, nobody likes you, you're not doing your
19   job, no one's going to hire you.  Which are all like in
20   a professional environment very frightening.  And
21   uncalled for.
22           MR. CASTALDI:  So when did these happen
23   again?  What was the date?  And what was the date on --
24           MR. LENTO:  Well, there were not several
25   incidents.  I mean, we can certainly go back and talk

Colloquy                          26

1    about it.  There are two incidents.  There was an
2    incident I guess back in August or early September
3    where Sam had asked Leena to, I believe, was help cover
4    for a day when there was going to be a resident who was
5    either going to be at a meeting or something of that
6    nature.
7              MS. VARUGHESE:  Well, Sam actually didn't ask
8    me.  It was the resident and Kruti.
9              MR. CASTALDI:  I'm sorry, I don't want to get
10   into the details right now.
11             MS. VARUGHESE:  Okay.
12             MR. CASTALDI:  I just wanted to get a time
13   frame.  So basically a year ago, almost a year ago.
14             MR. LENTO:  And I met with Leena and with the
15   other chief resident Kruti to discuss the specific
16   incident.  And I also spoke with Sam subsequent to
17   that.  The second incident was in December where I
18   think it was a little bit beyond a misunderstanding,
19   because the medical student who was present left
20   because she felt intimidated and felt that the
21   circumstances were out of control.  And I'm not making
22   this up.  This is what I'm told.  And that's what led
23   to the academic advisement.
24             MS. VARUGHESE:  I don't even know who this
25   medical student is.  And I feel like --

Colloquy                          27

1              MR. LENTO:  It's irrelevant.
2              MR. CASTALDI:  Okay.  It's irrelevant.  So it
3    was basically August, September and December.  So we're
4    looking at, you know, almost half of year ago and a
5    year ago.  So that process has, you know, been beaten
6    to death I'm sure and everybody's evaluated it and
7    that's fine.  The issue is in the past, you can't do
8    anything about it at this point.
9              But I want to ask you a question.  Why did
10   you not feel the need to follow the instructions on the
11   academic advisement?  Why didn't -- because you didn't
12   agree with the process?  Or what was your reasoning for
13   not following this process?
14             MS. VARUGHESE:  Well, one, I wasn't -- I
15   didn't understand why that I had to sign this document,
16   because I felt like it was --
17             MR. CASTALDI:  There's a process in place.
18   There's rules and regulations that's outside of our
19   purview that this is the process for the medical
20   center.  That's the process.  Why did you choose not to
21   complete these things?  What was your reasoning for
22   that?
23             MS. VARUGHESE:  Well, I met with Dr. Lento
24   and, I mean, I think I met all the requirements.
25   Perhaps I hadn't read the book as in depth as I should

Colloquy                                    28

1    have or to the extent that I should have.
2            MR. CASTALDI:  Again, we're trying to help
3    you here.  There's no pressure, okay.  The reason I'm
4    asking is this, because from my point of view it's
5    almost like if you're going to change your mindset now
6    and say you would do it I would say almost okay, let's
7    take you to two more weeks and then we'll meet two
8    weeks from now and if you read the book and if you
9    wrote an essay that reflects properly I think we can
10   move forward on it.  But if you're not willing to do it
11   then we can't waste more time on this.
12           So from my point of view if you guys agree, I
13   mean, I'm willing to -- again, we came into this with
14   clear heads, we weren't looking at the past, we weren't
15   looking at any -- I don't care who you met with in the
16   past Freda, whoever else, we're looking to address this
17   now.  If you can demonstrate to us that you're going to
18   change, and again, we could always -- we'll disagree
19   probably forever on what happened and who was right and
20   who was wrong.  But if we can move forward on this
21   process and do it the right way and you can meet the
22   requirements I think we can all move forward on this.
23           MS. VARUGHESE:  I don't have any problems
24   with professionalism.  And problem areas identified is
25   failure to demonstrate an appropriate level of

Colloquy                                    29

1    professionalism.  And two, patient care
2    (indiscernible).  I don't see how -- I mean, I can read
3    the book again.
4            MR. CASTALDI:  But you understand what I just
5    said, right?
6            MS. VARUGHESE:  Yes.
7            MR. CASTALDI:  We're willing to give you the
8    benefit of the doubt, and we're willing to just move
9    forward on this and say, okay, we'll give you another
10   two weeks.  If you can complete these processes and
11   actually do them in the right way not just, okay, I'll
12   read the book, you know, go through the motions.
13   Actually do it the right way and come back to us in two
14   weeks and say yes, I reflected, this is how I could
15   have handled it differently.  Really try and look at it
16   from a different perspective.  Not just go through the
17   motions.  I understand it's an exercise that probably
18   nobody would want to go through, but this is where we
19   are right now and how we're going to address it.
20   That's basically where we are right now, how we're
21   going to address it.  Do you want to be part of the
22   process or do you not want to be part of the process?
23           MS. VARUGHESE:  Well, here's the thing, as a
24   physician you have certain responsibilities to your
25   patients.  For me on any grossing day when I'm on

Colloquy                                    30

1    surgical pathology service I have a certain
2    responsibility to the patients that have had surgeries.
3    The specimens are, you know, really there and I'm
4    supposed to manage them.  And it's my responsibility.
5    And I have to do it for the right thing.
6              MR. CASTALDI:  Okay.  I'm saying you've had
7    over four months to complete this process.  That's long
8    enough.  But if you are willing to come back and do it
9    we'll give you another two weeks.  That's -- I feel
10   like that's a fair compromise.  What do you think about
11   that?  I mean, we're willing to wipe the slate clean
12   again and just say let's move forward with this.
13             MR. CORDON-CARDO:  We need to move forward --
14             MR. CASTALDI:  We want to move forward.
15             MR. CORDON-CARDO:  -- for your best interest
16   as well.  And we don't want to --
17             MR. CASTALDI:  Because if we go back and say
18   you didn't meet the requirements, what's the next step
19   in the process?
20             MR. LENTO:  Well, then we would have to
21   decide.  I mean, I think that a formal warning would be
22   potentially in order.  Or, I mean, as the academic
23   advisement noted that, you know, potential risk for no
24   longer being with the program.
25             MR. CASTALDI:  Yeah.


Colloquy                                    31

1              MR. LENTO:  I mean, I don't think that that's
2    something that we would want t do, but I mean obviously
3    there's several things --
4              MR. CASTALDI:  We don't want to go down this
5    road.  That's the bottom line.  We need you to help us,
6    okay.  We need you to help us complete this process.
7    Okay.
8              MR. CORDON-CARDO:  I feel we can help in a
9    way that you can feel comfortable and in a way that
10   (indiscernible) but we see, you know, a change in
11   attitude and also the willingness to work with us and
12   to work with your peers which is very, very important.
13             MS. VARUGHESE:  I just want to note that I
14   don't have any problems working with my peers.  And
15   too, I don't have any problems with Kruti Maniar who is
16   the other chief resident.  So this is sort of, you
17   know, a problem with one particular chief resident who
18   is antagonizing me I feel.  And I have several
19   incidents still like --
20             MR. CASTALDI:  You're still not getting what
21   I'm saying.
22             MS. VARUGHESE:  -- but --
23             MR. CASTALDI:  You're still not understanding
24   what I'm saying.
25             MS. VARUGHESE:  -- I think that my attitude

Colloquy                          32

1    can improve obviously in the sense that, you know, I
2    mean, we can all have differences and I can -- we can
3    agree to disagree and, you know, if next time, you
4    know, I'm asked to do something that is not really
5    within the purview of the chief resident to ask me even
6    or (indiscernible) but anyway I can discuss that with
7    Dr. Lento or somebody else in authority.  I don't have
8    to --
9             MR. CASTALDI:  We want everything --
10            MS. VARUGHESE:  -- I don't need to respond to
11   a confrontation.
12            MR. CASTALDI:  -- we want everything to be
13   done the right way.
14            MS. VARUGHESE:  I don't need to respond to a
15   confrontation.  That's all.
16            MR. CASTALDI:  Yes.  Exactly.  So I think
17   that should be the process.  We should meet in another
18   two weeks.  I want you to come here prepared.  I don't
19   want you to come the way you came today.  I want you to
20   come prepared to discuss the book, discuss your essay.
21            MR. CORDON-CARDO:  Give us an essay that will
22   reflect, you know, what you really -- what you see
23   happen or what is going, but, you know, in a way to put
24   aside all of these things and to be creative and to,
25   you know, forward thinking.

Colloquy                          33

1             MR. CASTALDI:  And there's no pressure.  We
2    want to help you, okay.  We're not here to be
3    combative.  Maybe the people in the past were being --
4    I don't know what happened in the past.  We're here to
5    help you, we really are.  I don't want to deal with
6    this stuff, I want to help you.  We all want to help
7    you.  So don't think of it like pressure.  It's not.
8    It's really not.  We have a process, we're in the
9    middle of a process right now.  We can't just drop it
10   and say oh, well.  We have to finish it.  We have to
11   complete it and we have to do it properly.  So help us
12   do that.
13            MS. VARUGHESE:  Well, I think that academic
14   advisement is over.  In excess of that if you would
15   like me to write a reflection on how I've, you know,
16   changed my perspective or --
17            MR. CASTALDI:  I want you to complete these
18   requirements as they're written.
19            MR. CORDON-CARDO:  Read carefully these two
20   pages and make sure that if asked by an administrator
21   in the context of an academic (indiscernible) studies
22   that you fulfill what they may want to (indiscernible)
23   as well.  And by doing that I think that you'll help
24   yourself, you'll help us and we can move on with the
25   process and we can bring this situation to an end which

Colloquy                    34

1    is what you want.  An end that is going to be
2    productive rather than disruptive.
3              MS. VARUGHESE:  Absolutely.  And to that note
4    I am not against you or you or you so it's not me
5    versus --
6              MR. CASTALDI:  Absolutely not.
7              MS. VARUGHESE:  -- you know so --
8              MR. CASTALDI:  We don't want you to have it
9    that way.
10             MS. VARUGHESE:  This is just a concern that
11   has a, you know, that I had to bring up because of what
12   had happened while I was trying to work.  So, you know,
13   I just want to feel like that's been adequately
14   addressed.
15             MR. CORDON-CARDO:  And we are.  And we have
16   lots of checks and balances in the system and we have
17   been discussing the situation with professionals.  And
18   part of the educational process is also being
19   (indiscernible).  And there are lots of new individuals
20   that we are bringing (indiscernible), you know, from
21   the both -- in different positions both clinical
22   pathology, molecular pathology, pathology information
23   technology education.  So we want to try if we can to
24   have a very harmonious group that works in sync and
25   everybody feels that it's a good fit and that we all

Colloquy                    35

1    can work together, because God knows that we have great
2    responsibilities and a good deal of work to produce.
3    Understanding that's what we want.  And we want you to
4    reflect on that and to be prepared for the next steps
5    to be happy to be here and to be engaged and to be
6    capable of understanding that sometimes there are
7    differences of opinions.  But as we all know, you know,
8    we need to follow compliance and that's what we are
9    trying to do here.  And by just dismissing things we
10   don't want just to be reviewed that the process at the
11   moment in which the (indiscernible) from all of the
12   angles, changing administration, change in leadership,
13   change in some of the aspects.
14             We don't need not to follow the rules
15   ourselves and to feel comfortable with jobs just
16   (indiscernible.  But that's what we are asking you to
17   do to help us and to help the process.  For you to do
18   your best because that's what we are expecting from you
19   and that's what we want from you.  And when, you know,
20   you went through the residency training we want to feel
21   all of us, you know, confident of our careers into the
22   future and proud of training people.  That's why we are
23   here.
24             MS. VARUGHESE:  Yes.  Absolutely.  And I
25   mean, I think moving forward there shouldn't be any

Colloquy                                36

```
 1     issues in terms of --
 2              MR. CORDON-CARDO:  So help us in doing that.
 3     Read that carefully.  Take these two weeks to really
 4     look up -- a good deal of time (indiscernible) and put
 5     it in the past.  Don't even go there anymore.  Just
 6     look into the future, give us an essay that would be
 7     appropriate not that reflects what I said, he said, she
 8     said.  A good friend of mine who's a lawyer
 9     (indiscernible).  It's always here's her story, his
10     story, and their story.  And the story is better seen
11     from the outside.  So we don't even want to go there.
12     Just put in perspective, you know, your future career.
13     If time -- this time also to see which areas that you
14     enjoy the most and we are going to have (indiscernible)
15     into the next couple of years coming.  So I think that
16     you are going to be able to enjoy a training exercise
17     that will be very creative.  But we need you to help us
18     with that.  And we need to get this thing away
19     (indiscernible).
20              MS. VARUGHESE:  (Indiscernible).
21              MR. CORDON-CARDO:  And the wavelengths are
22     probably going to be all over the place.
23              MS. VARUGHESE:  I don't see any conflicts
24     from here forward, really.  I mean, I think we're on
25     the same page.
```

Colloquy                                37

```
 1              MR. CASTALDI:  Okay.  Yeah.  So let's meet in
 2     two weeks .
 3              MS. VARUGHESE:  Okay.
 4              MR. CASTALDI:  Let's meet in two weeks, and
 5     you know, come prepared, please, and we'll go with it.
 6              MS. VARUGHESE:  Okay.  Great.
 7              MR. CASTALDI:  Okay.
 8              MS. VARUGHESE:  All right.
 9              MR. CASTALDI:  Very good.  Thank you.
10              MS. VARUGHESE:  Okay.  Wonderful.
11                        * * * * *
12              C E R T I F I C A T I O N
13
14              I, KIMBERLY UPSHUR, the assigned transcriber,
15     do hereby certify the foregoing transcript of
16     proceedings on compact disk, playback number 11:50 to
17     12:37 is prepared in full compliance with the current
18     Transcript Format for Judicial Proceedings and is a
19     true and accurate compressed transcript of the
20     proceedings as recorded, and to the best of my ability.
21
22     /s/ Kimberly Upshur
23     KIMBERLY UPSHUR     AOC#528
24     J&J COURT TRANSCRIBERS, INC.  Date: May 12, 2014
```

TRANSCRIPT OF CONVERSATIONS
(May 24, 2011)

PARTICIPANTS:

   PATRICK LENTO
   LEENA VARUGHESE
   CARLOS CORDON-CARDO
   ANDREW CASTALDI

Transcriber, Lori Auletta
**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, NJ 08619**
     **(609)586-2311**
**FAX NO.**   **(609)587-3599**
**E-mail:**   **jjcourt@jjcourt.com**
**Website:**  **www.jjcourt.com**

Audio Recorded

Colloquy                              2

1        MS. VARUGHESE:  Suffer for this
2   (indiscernible) give a shit, stop harassing me.  And,
3   no (indiscernible)
4            MR. CORDON-CARDO:  How are you?
5            MS. VARUGHESE:  I -- to me this is rather
6   silly given that I've already written a reflection and
7   the last meeting I clearly stated that I wanted to move
8   forward.  And I apologized for whatever I had done.
9   That is considered unprofessional.  I did write a new
10  reflection.  I even changed my mind as to how I feel
11  regarding everything, but I think the actions being
12  taken are completely unprofessional and I've had
13  enough.  You're retaliating against me for making a
14  complaint.  That's what it seems to me.
15           CORDON-CARDO:  We are not retaliating.  We
16  are asking you to reflect on not what happened, but
17  what are the things that you would like to move forward
18  working with your peers.
19           MS. VARUGHESE:  Yeah. I already said I
20  apologized.  And, you know, I don't have a problem
21  mowing forward and working with my peers.  I've taken
22  it upon myself to like not confront anyone.  I've never
23  confronted anybody to see to -- you know, summary of
24  events as noted in academic advisement is pretty much
25  incorrect as far as I'm concerned because anything I

Colloquy                              3

1   had brought up was not addressed in that particular
2   summary of events and I've been found to be at fault.
3   I mean, whatever.
4            Like, this has happened a long time ago and I
5   put this behind me and I moved forward, but it seems
6   like I'm continuing to be dragged back into this.
7   Every single time there's a meeting there's something.
8   And I'm supposed to go back and reflect.  I already
9   told you that I want to move forward.  What's happened
10  has happened and that's that.
11           MR. LENTO:  So the purpose of the academic
12  advisement was to allow you to move forward by reading
13  the book, by providing a reflection?
14           MS. VARUGHESE:  Yeah, I read the book, so I
15  --
16           MR. LENTO:  But providing a reflection --
17           MS. VARUGHESE:  Tell me what you want to
18  know from this book as it pertains to professionalism.
19           MR. LENTO:  Leena, let me tell you something.
20  By cavalierly throwing the book on the table, I mean,
21  and saying you've read the book in front of your
22  chairman and your department administrator -- I don't
23  care about myself, but --
24           MS. VARUGHESE:  I hate to say this, but the
25  chairman and the department administrator are new

Colloquy                     4

```
 1    authority figures to the department and they were not
 2    here when this incident took place.
 3                MR. LENTO:  I'm talking about your attitude
 4    right now.
 5                MR. CASTALDI:  We were giving you a chance to
 6    start fresh and that's what we said the last meeting,
 7    that we were giving you a chance to start fresh .
 8                MR. CORDON-CARDO:  Do you think that I am
 9    harassing you because you are harassing me in a way
10    throwing this book and --
11                MS. VARUGHESE:  I didn't throw it.  I just --
12                MR. CORDON-CARDO:  -- and everyone --
13                MS. VARUGHESE:  What, I'm not allowed to put
14    the book --
15                MR. LENTO:  No, Leena, that's not how you do
16    it.
17                MR. CORDON-CARDO:  No, this is not how you do
18    things in life and I hope that you understand that
19    because we are here to move on.  I can see here that
20    you're constantly saying that you are -- you know,
21    that's not what we want to see.
22                MS. VARUGHESE:  I already apologized for
23    everything I have done.  I mean, you are bringing me
24    back to the same situation over and over again despite
25    the fact that I've --
```

Colloquy                     5

```
 1                MR. CORDON-CARDO:  No, you are bringing you
 2    back to the same situation over and over again.  I
 3    would like to see something that is written saying,
 4    during next year I would like to do these electives, I
 5    want to do this, I want to do that (indiscernible), not
 6    something that, you know -- this is the same thing that
 7    you said, in fact, the matter -- it is not the fact of
 8    the matter it's your fact of the matter.  Many people
 9    have been over -- I mean, this is unacceptable, this is
10    (indiscernible) you know, I mean, we don't want an
11    account of what happened.  We want an account of what
12    you want to do for your life.  What do you want?
13                MS. VARUGHESE:  I would like to move forward
14    and not have to go back.  I -- the last --
15                MR. CORDON-CARDO:  We don't want to go back
16    either.
17                MS. VARUGHESE:  The last part is I've always
18    been mindful of professionalism.  I cannot -- you know,
19    I tried to diffuse the situation immediately.  I said I
20    would gross the specimen.  I mean, there's not much
21    else I can do.  This is --
22                MR. CORDON-CARDO:  But you keep saying you
23    don't want to go back.  We don't want to go back
24    either, but you keep bringing us back and you don't
25    want to talk about this.
```

Colloquy                            6

1          MS. VARUGHESE:  Okay, you know, here's the
2    thing, if this is the way it's going to be then you can
3    speak to a professional mediator or a lawyer because I
4    cannot have -- you know, I cannot continue to harbor on
5    the same points.  I want an apology from Samuel McCash
6    because he did, you know, create the situation.  I
7    tried to diffuse it.  I asked for mediation
8    immediately.  I asked him to come with me to speak to
9    Dr. Bleiweiss or somebody else who was an authority
10   because I felt like he was harassing me.  And that
11   didn't happen and instead he continued to like harp on
12   the same incident.  He came back and he spoke to me
13   about it.  I feel that that was when --
14          MR. CASTALDI:  You're saying you don't want
15   to keep harping on the same subject, but you keep
16   bringing up this stuff that we don't even know -- we
17   don't know anything about.  And at the end of the day
18   if you don't want to keep talking about it why do you
19   keep bringing it up then?  We're not bringing it up.
20          MS. VARUGHESE:  Because that's what this is
21   about.
22          MR. CASTALDI:  It's not about this.  This is
23   about you were assigned two different tasks to
24   complete.  Very simple.
25          MS. VARUGHESE:  And I have --


Colloquy                            7

1          MR. CASTALDI:  Very simple.
2          MS. VARUGHESE:  The academic advisement
3    stated self reflection exercise, you are expected to
4    write down your account of the situation, which I did,
5    describe how you could approach things in a better
6    fashion, which I did, including commentary on physician
7    professionalism and its role in this circumstance.
8          MR. LENTO:  And how did you do that?
9          MS. VARUGHESE:  In the prior --
10          MR. LENTO:  How you could approach it in a
11   different fashion and --
12          MS. VARUGHESE:  Yeah, by --
13          MR. LENTO:  -- professionalism and its
14   application to the particular area with regard to you.
15   I didn't see any of that.
16          MS. VARUGHESE:  I did.  I said that I tried
17   to diffuse the situation.  I asked for mediation
18   immediately.
19          MR. LENTO:  You're describing what you did.
20   You're not describing --
21          MS. VARUGHESE:  Well, and --
22          MR. LENTO:  -- how you could have approached
23   the situation differently.
24          MS. VARUGHESE:  And, you know --
25          MR. LENTO:  I'll give you an example, Leena,

Colloquy                                8

1    okay.  I've already given you examples.  We've had the
2    discussion not only with you and myself, but with Freda
3    present, et cetera, with Dr. Pessin present.  You know,
4    as an example if you were yelling and shouting -- as an
5    example -- I'm not using your specific situation -- but
6    a way of approaching that would be to say that, you
7    know, if this was inappropriate then it could have been
8    approached in a different fashion by removing myself
9    from the situation --
10           MS. VARUGHESE:  I did.  I left the gross --
11   but not even -- you're not speaking about me, but that
12   --
13           MR. LENTO:  But that is how the reflection
14   was supposed to have been written.  And that was also
15   the purpose of reading the book, which was, I thought,
16   a pretty good generalized approach at physician
17   professionalism.  Granted, some of it may have been
18   focused more on patient-related physician
19   professionalism, but there was a part in the book that
20   also talked about collaboration amongst physicians.
21   And this is specifically the area where you had
22   trouble, not just with one particular physician, but it
23   was the entire room where there was a problem.  And it
24   wasn't just Sam that you had a problem with, it was the
25   moonlighter and the person overseeing moonlighters.


Colloquy                                9

1            MS. VARUGHESE:  Okay.  The moonlighter, who
2    was not the primary moonlighter that day, who --
3            MR. LENTO:  It doesn't matter, Leena.  The
4    point is --
5            MS. VARUGHESE:  My point is that, you know, I
6    am grossing that day.  It's my responsibility to do
7    this job, the work, the grossing and I deem as -- you
8    know, as I deem appropriate.  And I'm handling my work.
9    It's about people who are getting in my way and
10   harassing me and bullying me and preventing me from
11   doing that.  And this has escalated to the point where
12   Sam actually came over and straight out harassed me.
13   That's how bad it's escalated.  I made a complaint
14   about it and this is what has happened since.
15           MR. LENTO:  You made a complaint about his
16   harassment and this is the result of it?  I don't think
17   so
18           MS. VARUGHESE:  Yes, I --
19           MR. CASTALDI:  It's two separate issues.  HR
20   reviewed the harassment and they came to their own
21   conclusion that we don't even know anything about, to
22   be honest with you, so --
23           MS. VARUGHESE:  Sure.
24           MR. CASTALDI:  -- you know, that's separate.
25   That's separate.  This is the task that we were

Colloquy                              10

```
 1     assigned and, frankly, you know --
 2               MS. VARUGHESE:  Frankly, this is --
 3               MR. CASTALDI:  -- I don't' even care about
 4     the essay and I don't even care about the book.  I care
 5     more about the fact that you came in here with an
 6     attitude again and you --
 7               MS. VARUGHESE:  I'm not coming in here with
 8     --
 9               MR. CASTALDI:  -- could have just wiped the
10     slate clean.  Don't you understand that?  You could
11     have wiped the slate clean with both of us and said,
12     you know what, I'm moving forward --
13               MS. VARUGHESE:  I am moving forward.  I don't
14     want to -- like, do you understand that this is like
15     placing me in a situation where I made a complaint --
16     I've spoken to other residents, I'm still speaking to
17     them, and they think this is retaliatory.  So, the
18     point of the matter is this is not professional.  When
19     I came here last meeting I was very conciliatory, but
20     instead you -- what did you say, you're going to
21     address me -- you know, you basically -- you know, I'm
22     here, I don't have representation, there's three of you
23     here --
24               MR. CASTALDI:  Okay --
25               MS. VARUGHESE:  -- and you approached me and
```

Colloquy                              11

```
 1     speak to me in a certain way and you think that's
 2     appropriate.  That's not appropriate at all.
 3               MR. CASTALDI:  First of all, there's no
 4     threat.
 5               MS. VARUGHESE:  Okay.
 6               MR. CASTALDI:  Second of all, we're in the
 7     middle of a process here.
 8               MS. VARUGHESE:  You didn't make a threat --
 9               MR. CASTALDI:  We're in the -- I made a
10     threat.  I made a threat.
11               MS. VARUGHESE:  Yes, you made threatening
12     comments --
13               MR. CASTALDI:  What does that -- what did I
14     say?
15               MS. VARUGHESE:  -- just like, issues, you
16     know, of disciplinary action if I don't write a
17     reflection and I've already written a reflection.  You
18     sent me an e-mail stating that academic advisement
19     period has ended.  You didn't tell me what this meeting
20     was about.
21               MR. LENTO:  The purpose was to review the
22     academic advisement --
23               MS. VARUGHESE:  To follow up.
24               MR. LENTO:  -- with a followup on the
25     academic advisement.
```

Colloquy                                      12

1      MS. VARUGHESE:  But after you tell me that
2   the academic advisement had ended.
3           MR. LENTO:  The period had ended.
4           MS. VARUGHESE:  Then you should have --
5           MR. LENTO:  The period --
6           MS. VARUGHESE:  -- you should have -- well, I
7   don't understand why you didn't come before and say,
8   okay, I want to review everything, see if you have met
9   the goals of academic advisement --
10          MR. LENTO:  It's not my responsibility to see
11  if you met it.  It's your responsibility.  Your
12  responsibility.
13          MS. VARUGHESE:  Well, I am reviewing that
14  with you and following up with you.  You are supposed
15  to ascertain whether or not I have met my
16  responsibilities --
17          MR. LENTO:  And that was the purpose of the
18  meeting.
19          MS. VARUGHESE:  -- and then end academic
20  advisement or continue with academic advisement.
21  Instead, you e-mailed me saying that period of academic
22  advisement had ended.  When I got here you said, no, I
23  don't think so, I'm not quite satisfied.
24          MR. LENTO:  I didn't even say that.  And
25  you're playing with words, Leena.  I don't know where


Colloquy                                      13

1   you're going with this.
2           MR. CORDON-CARDO:  Well, you know, let's try
3   to stop here.  Do you have anything else to say to us
4   because based on what you are giving us and the things
5   that you are now accusing us --
6           MS. VARUGHESE:  No, this is based on the
7   conversation.
8           MR. CORDON-CARDO:  No, we need to discuss
9   that with, you know, with academic administration and
10  then we'll get back to you.
11          MS. VARUGHESE:  I want retaliatory actions to
12  stop, otherwise --
13          MR. LENTO:  This is not retaliation.
14          MR. CORDON-CARDO:  We are not talking about
15  retaliation.  I mean, I don't want this attitude in my
16  office.  (Indiscernible) and I don't think that we are
17  going anywhere with the discussion.  it's going to get
18  worse.  We'll review it.  Thank you, very much.  We are
19  going to review that with administration and with legal
20  counseling and we'll come back to you.  Thank you, very
    much.
1           MS. VARUGHESE:  My understanding is that I
2   wrote the reflection.  It didn't meet the requirement.
3   It was handed in March 23rd.  I could have been
4   approached earlier, prior to the end of academic

Colloquy                    14

1    advisement.  Instead, academic advisement period had
2    ended then during the meeting I'm told it was not -- it
3    has not ended and I have to discuss a book.  That
4    should have been something that should have been
5    ascertained before ending the period of academic
6    advisement if I had not satisfactorily -- because the
7    book is rather comprehensive.  I -- what do you -- what
8    aspect --
9             MR. LENTO:  You had over three months to read
10   it.
11            MS. VARUGHESE:  Yes, I did.  And you could
12   have asked me about it about it at any given point, but
13   you didn't.
14            MR. LENTO:  (Indiscernible) the academic
15   advisement period.
16            MS. VARUGHESE:  After you said the academic
17   advisement period had ended.
18            MR. CORDON-CARDO:  Leena, we asked you for
19   the author of the book.
20            MR. LENTO:  You didn't even know the author
21   of the book.
22            MS. VARUGHESE:  I -- well, what do you -- I
23   said I didn't disagree with anything in the book and I
24   don't.
25            MR. CORDON-CARDO:  Buy, you know, I mean, you

Colloquy                    15

1    had three months to study it.  You don't even know who
2    the author of the book was.
3             MS. VARUGHESE:  Well, I was trying to put
4    everything behind me.  I mean, here's the thing, I come
5    to a meeting expecting that the academic advisement had
6    ended and instead I'm told that it hasn't.  Then I have
7    to discuss --
8             MR. LENTO:  You were told you didn't meet the
9    requirement that was stipulated in the academic
10   advisement.  That's what you were told.
11            MS. VARUGHESE:  Well, then you should figure
12   out -- you should figure out --
13                 (Multiple people speaking)
14            MS. VARUGHESE:  You should figure out whether
15   or not I had met the requirements or not before telling
16   me that the period of academic advisement has ended.
17            MR. LENTO:  How would you have known that
18   unless you spoke to me about it?
19            MS. VARUGHESE:  Then you should have spoken
20   to me before you ended the academic advisement.  I
21   don't understand -- like, this is not my fault.
22            MR. LENTO:  The period of academic advisement
23   had ended, period.  I didn't end it. You --
24            MS. VARUGHESE:  No.  It said depending on
25   whether not you had met -- after, we'll meet again in

Colloquy                    16

1   three months to review your progress, et cetera, et
2   cetera, et cetera.
3           MR. LENTO:  Right.
4           MS. VARUGHESE:  So, you know, after that you
5   should decide.  I mean, this is not -- you know, this
6   is not a -- it's an indefinite period it seems like.
7           MR. CASTALDI:  If you had come prepared it
8   would have ended.  You were prepared.  What don't you
9   understand about that?  There is no grey area there.
10  You're prepared or you're not prepared.  You didn't
11  come prepared.
12          MS. VARUGHESE:  What do you mean by prepared?
13  I --
14          MR. CORDON-CARDO:  You didn't know the book,
15  you didn't know the answers.  You sent us a reflection
16  that didn't address whatever you wanted to say.  We
17  have you an opportunity to readdress, which we didn't
18  have a chance to read because you said that you were
19  going to send it (indiscernible)
20          MS. VARUGHESE:  Well, I'm willing to put this
21  whole incident behind me despite the fact that I never
22  had Sam apologize to me.  I apologized to him
23  immediately for using colorful language against him.
24  And if I had offended anyone else in any way, shape or
25  form I apologize for that.


Colloquy                    17

1           MR. LENTO:  Why wouldn't you have come --
2           MR. CORDON-CARDO:  But the best way to put
3   the -- you know, and to move on is not with this
4   attitude.  You can come here with another attitude and
5   to say, look, you know, I don't know you well, you
6   don't know me well, forget about all of that, let's
7   move on. I'm going to drop all of this nonsense of
8   people drinking, let's just start fresh.  I --
9           MS. VARUGHESE:  These are important matters
10  that need to be addressed in the department because you
11  can't just have people doing whatever they want.
12          MR. CORDON-CARDO:  We are addressing these
13  people.  I know people that are going to help us, also,
14  besides Mr. Lento, so we are taking these matters very
15  seriously today.  We need people to know that we want
16  to keep the program as in shape as possible and we have
17  a lot of work to do, but, you know (indiscernible) but
18  at the end of the day it's a program to teach and to
19  train people that are excited and passionate about
20  pathology, not that are upset or that have problems.  I
21  mean, we want --
22          MS. VARUGHESE:  I'm excited and passionate
23  about pathology, but I'm dealing with, you know, a lot
24  of situations here and -- but, I'm working through it
25  because of my interest in pathology, not because --

Colloquy                                    18

```
 1              MR. CORDON-CARDO:  Let's try to drop this
 2    attitude (indiscernible) you know --
 3              MS. VARUGHESE:  Well, I made every -- every
 4    --
 5              MR. CORDON-CARDO:  You can't keep going back
 6    and forth because if you keep going back and forth --
 7              MS. VARUGHESE:  I am not going back and
 8    forth.
 9              MR. CORDON-CARDO:  -- coming back with new
10    allegations now this person is drinking and now the
11    other person is drinking then no one knows what it's
12    about if you're talking and to be honest with you --
13              MS. VARUGHESE:  Well, we need some honesty
14    and transparency then because, you know, you can't just
15    have one person, you know, saying whatever they want
16    and doing whatever they want, such as on the
17    moonlighting nights -- I'm the primary moonlighter,
18    really, then why does the schedule say somebody else is
19    the primary moonlighter?  You know, these are issues
20    like, you need to address, like if you are going to
21    have integrity you're going to have integrity across
22    the board, if not, you're not.  That's just a matter of
23    -- you know, that is -- just applies to everybody.
24    And, you know, I've maintained my professionalism here.
25    I've been in -- you know, exhibited integrity.
```

Colloquy                                    19

```
 1              I mean, unfortunately what happened,
 2    happened.  You know, I want to move forward and I would
 3    like an apology because the fact of the matter is Sam
 4    did harass me.  He threatened me.  I left the gross
 5    room because it was just so bad.  I came back because I
 6    wanted to deliver appropriate and timely patient care,
 7    not because I wanted to come back, because I had a
 8    commitment to the patients.  So that's who I am and if
 9    that's the issue here then you know what, I'm sorry,
10    but you know, I -- you know, I'm -- I think it's time
11    to meet me halfway, right.
12                        * * * * *
13
14
15
16
17
18
19
20
21
22
23
24
25
```

20

## <u>C E R T I F I C A T I O N</u>

       I, LORI AULETTA, the assigned transcriber, do
hereby certify the foregoing transcript of proceedings
on tape, index number 12:28:42 to 12:50:53, is prepared
in full compliance with the current Transcript Format
for Judicial Proceedings and is a true and accurate
compressed transcript of the proceedings as recorded,
and to the best of my ability.

<u>/s/ Lori Auletta</u>
LORI AULETTA          AOC #543
J&J COURT TRANSCRIBERS, INC.  DATE: May 12, 2014

Exhibit 173

# Appointment

**Leena V**                                                Thu, May 5, 2011 at 11:42 AM
<leena.bookworm@gmail.com>
To: "Cordon-cardo, Carlos" <carlos.cordon-cardo@mssm.edu>
Dr. Cordon-Cardo:

I can meet this Monday. Please arrange for a time that is convenient for you. I would like to speak to you about the disciplinary actions that have been taken since my initial complaint regarding harassment because of gender by Samuel McCash. I feel that his actions towards me were based on gender bias. It has become apparent to me that the actions taken thus far have been in retaliation to my complaints of harassment and request for mediation. Additionally, I had concerns regarding alcohol use by Samuel McCash and Adrienne Jordan while involved with patient care related duties on several evenings including November 23rd. This is outside of the drinking during "dementia rounds", which had never been an issue. Additionally, the evaluations that I had written about the surgical pathology rotations have went missing from the system. I spoke to New Innovations and they could not identify them. However, the GME office had assured me that they have copies and will be used as a critical evaluation tool. Finally, Dr. Lento had e-mailed me saying that the period of Academic Advisement had ended and I would like it to end, not contingent on a new reflection, as the old reflection is an account of what had happened and this fact was discussed with Dr. Stimmel. I also have several concerns regarding Dr. Lento's unfair treatment of me. I want all disciplinary actions taken against me to be terminated. I believe that with you as the Chairman and based on what you had specifically said to me on Tuesday, and the fact that Samuel McCash will be graduating in 2 months time, there are no more conflicts of interest between your goals and mine. I feel that we can work together and with you as the Chairman of the Department, you are in the position to end this retaliation that had taken place before you started your tenure. I thank you for your time.

Dr. Varughese

Exhibit 174

**From:**      Cordon-cardo, Carlos [carlos.cordon-cardo@mssm.edu]
**Sent:**      Friday, May 06, 2011 6:42 PM
**To:**        Lento, Patrick; Castaldi, Andrew (MSSM)
**Subject:**   RE: Appoinment

Thank you, Pat.  I agree with you, and we need to be cautious regarding how we move forward.
Let's discuss prior to the meeting with her!

Carlos Cordon-Cardo, M.D., Ph.D.
Professor and Chairman,
Department of Pathology,
Professor, Department of Genetics and Genomic Sciences, The Mount Sinai School of Medicine.
Professor and Director,
Department of Pathology,
The Mount Sinai Hospital.
Phone: 212-241-8014
Fax: 212-426-5129
E-mail: carlos.cordon-cardo@mssm.edu

Office Address:
Annenberg 15th Floor, Office 15-62
1468 Madison Avenue
New York, New York 10029-6574

Mailing address:
One Gustave L. Levy Place, Box 1194 New York, New York 10029-6574

--------------------------------------------------------
IMPORTANT WARNING:  This email (and any attachments) is only intended for the use of the
person or entity to which it is addressed, and may contain information that is privileged and
confidential.  You, the recipient, are obligated to maintain it in a safe, secure and
confidential manner.  Unauthorized redisclosure or failure to maintain confidentiality may
subject you to federal and state penalties. If you are not the intended recipient, please
immediately notify us by return email, and delete this message from your computer.
--------------------------------------------------------


-----Original Message-----
From: Lento, Patrick [mailto:Patrick.Lento@mountsinai.org]
Sent: Thursday, May 05, 2011 4:17 PM
To: Cordon-cardo, Carlos; Castaldi, Andrew
Subject: RE: Appoinment

This is ugly. She seems to be trying to use the fact that you guys are "new" as a way of
getting around the disciplinary issues.

Caryn Tiger from HR has been investigating her gender bias claim (which she only recently
made after many months of the department, GME office and HR dealing with this).

Her claim of seeing residents drinking seems like an attempt to distract us from her own
issues.

1

CONFIDENTIAL                                                           D_ESI026142

I am not sure I understand her claim of my unfair treatment of her since her academic advisement was determined not by myself in isolation but by many involved in the investigation of her claims, including Melissa Pessin, the GME office, and hospital legal. HR and Physician Wellness (Dr. Figur) have also been significantly involved.

From my perspective, Leena seems to turn against anyone who has agreed with her version of events and she seems to now want to escalate things from a gender bias standpoint to try to strong-arm her way through this.

Pat


-----Original Message-----
From: Cordon-cardo, Carlos [mailto:carlos.cordon-cardo@mssm.edu]
Sent: Thursday, May 05, 2011 3:51 PM
To: Castaldi, Andrew (MSSM); Lento, Patrick
Subject: FW: Appoinment

Several emails today in a space of few hours!

Carlos Cordon-Cardo, M.D., Ph.D.
Professor and Chairman,
Department of Pathology,
Professor, Department of Genetics and Genomic Sciences, The Mount Sinai School of Medicine.
Professor and Director,
Department of Pathology,
The Mount Sinai Hospital.
Phone: 212-241-8014
Fax: 212-426-5129
E-mail: carlos.cordon-cardo@mssm.edu

Office Address:
Annenberg 15th Floor, Office 15-62
1468 Madison Avenue
New York, New York 10029-6S74

Mailing address:
One Gustave L. Levy Place, Box 1194 New York, New York 10029-6574

---------------------------------------------------------
IMPORTANT WARNING:  This email (and any attachments) is only intended for the use of the person or entity to which it is addressed, and may contain information that is privileged and confidential.  You, the recipient, are obligated to maintain it in a safe, secure and confidential manner.  Unauthorized redisclosure or failure to maintain confidentiality may subject you to federal and state penalties. If you are not the intended recipient, please immediately notify us by return email, and delete this message from your computer.
---------------------------------------------------------


-----Original Message-----
From: leena varughese [mailto:leena.varughese@mssm.edu]
Sent: Thursday, May 05, 2011 12:40 PM
To: Cordon-cardo, Carlos; Castaldi, Andrew
Subject: Appoinment

Dr. Cordon-Cardo:

2

D_ESI026143

I can meet this Monday. Please arrange for a time that is convenient for you. I would like to speak to you about the disciplinary actions that have been taken since my initial complaint regarding harassment because of gender by Samuel McCash. I feel that his actions towards me were based on gender bias. It has become apparent to me that the actions taken thus far have been in retaliation to my complaints of harassment and request for mediation. Additionally, I had concerns regarding alcohol use by Samuel McCash and Adrienne Jordan while involved with patient care related duties on several evenings including November 23rd. This is outside of the drinking during "dementia rounds", which had never been an issue. Additionally, the evaluations that I had written about the surgical pathology rotations have went missing from the system. I spoke to New Innovations and they could not identify them. However, the GME office had assured me that they have copies and will be used as a cri tical evaluation tool. Finally, Dr. Lento had e-mailed me saying that the period of Academic Advisement had ended and I would like it to end, not contingent on a new reflection, as the old reflection is an account of what had happened and this fact was discussed with Dr. Stimmel. I also have several concerns regarding Dr. Lento's unfair treatment of me. I want all disciplinary actions taken against me to be terminated. I believe that with you as the Chairman and based on what you had specifically said to me on Tuesday, and the fact that Samuel McCash will be graduating in 2 months time, there are no more conflicts of interest between your goals and mine. I feel that we can work together and with you as the Chairman of the Department, you are in the position to end this retaliation that had taken place before you started your tenure. I thank you for your time.

Dr. Varughese

CONFIDENTIAL

D_ESI026144

Exhibit 175

EXHIBIT

4/6/11  Dr. Varughese
What has happened
Dr. McCash

Was not told that Kruthi was the person to
deal w/ as a Chief Resident.

Group meeting

I received academic advisement. Don't
agree w/ that. Got

Being presented to wk. I feel harassed

I asked Dr. Bleiweiss to move to diff
rotation. He didn't want to approve.
Dr. __ to Prog Dir?
Yes but wasn't here.
Just over reacting. (was told)               **Confidential**

Have not been yelled at or harassed since
but went through a very difficult time durg

Dr. Pessin said won't be the Chief for that
week. Not an option to switch out of
rotation.
Dr. Pessin - called me in the next week
she told me not to interfere w/ her
investigation.

D02322

Did you speak w/ other resident like Dr. Phinph
yes questioned a moonlighter about the
case & wanted to know why Sam
went in

Wanted to have a mtg w/ Sam — why is
he having a issue w/ me using moonlighters

The Surgical Resident in Gross gets
to make decision not the Chief Res.
The moonlighters are there to aid us
+ I get to Make The decisions

Specimens at 4pm. Wasn't able to
do all

**Confidential**

Met w/ Dr Figura 3X — met w/ him
1st w/ questions; Insubordination for
not signing the Notice of academic advise-
ment. Met w/ Dan Hughes + Dr. Figura
I feel like he is being retaliatory

*[margin: not anger issue]*

Met criteria re: Academic Advisment
Did my reflection.
Meeting Dr. Cento & regularly? Yes met
with him.

D02323

I want to just put This behind me,
residency is hard enough

**Confidential**

D02324

4/11/11  Mtg w/ Dr. Varughese.
Sept 12  1st incident
Dec 8th 2nd incident
Dr. Lento out of town

Dr. Schuller — should see a shrink

Felt really intimidated.
Wanted them to mediate
Transfer out of service

Meeting w/ Dr. Figua stressful. Dr. F was
partial towards incident.

Dr. F emailed me. in March, 2011. Dr. Lento
interfered w/ emails responding

Monday, after incident of Dr. Pessin

**Confidential**

Friday 4/8 — evaluations I did are
missing. Sent to get drug tested
by Physician Wellness

Seeing Therapist who is helping me
manage stress. Put it behind me,

D02325

5/11/11 Mtg w/ Dr. LVaruguese, Marie Ann, CT

Come to discuss the reasons why told not on academic.
Wanted LV to go over the book + didn't like
the reflection. Need more specifics.
How can I have a the behavior.
Need positive constructive ways. Sent

**EXHIBIT**

Tiger    6
12/13/13    JS

CONFIDENTIAL

D02852



Arthur M. Figur, M.D.
*Associate Medical Director*

The Mount Sinai Hospital
One Gustave L. Levy Place, Box 1238
New York, NY 10029-6574
Tel:  (212) 659-8544
Fax:  (212) 659-9304
E-mail: arthur.figur@mountsinai.org

April 11, 2011

Leena Varughese

Most workplace behavioral issues can be summarized as inappropriate outbursts (emotional dysregulation ) instead of collegial discussions in response to occupational by not accepting the hierarchy of delegated authority.

The presenting behavior: shouting, screaming, incoherent rants in the hallway in response to an admonishment by a chief resident, which she felt was unjustified. She did not admit to us that she was out of control although numerous unbiased witnesses agreed that she behaved in that manner.

When she met with the Interim Chair of The Department of Pathology she was insubordinate.

When frustrated by the lack of learning when denied the ability to see immunologic staining, she went to the director of GME for the consortium and loudly yelled at him instead of resolving the issue with attending physician.

Two of the above incidents precipitated the referral to PWC. The third occurred later but was also addressed at out interview.

Referral by Dr. Schiller the chair in her first year that she "see a psychiatrist" because she was unhappy. We attempted to have her describe her behavior that made him perceive she was unhappy. She did not answer our question. She saw Dr. Berkman at that time.

The outbursts are "unpredictable" and over 70% of the time she is collegial.



EXHIBIT NO 19
FOR ID
6-11-13

DEFT
TRN

Page 1 of 1

**Figur, Arthur**

From:    Figur, Arthur
Sent:    Friday, April 08, 2011 12:49 PM
To:      Fersh, Madeleine (MSSM)
Subject: FW: QA WORK-PRODUCT, PRIVILEGED AND CONFIDENTIAL

Madeleine, we met with Leena today. I gave her your name and telephone number and need to know that she set up an appointment.
After long explanations that we are referring her so that you could best determine the way she should address the work-place issues which were the basis of the referral to the PWC, she wants the list of behaviors exhibited that I will be providing you.
She cooperated easily with my taking her for the tox. screen.
However, the data that I had sent you earlier is confidential between you and me.
I will try to make a list of behaviors, which were described, but not documented in her file and may not have been addressed one on one with her as well as the precipitating one.
This will only make her more angry with the program which she believes doesn't accept her side of any story. However, as outlined before, the learning environment for the house staff was not good and neither was the chain of delegated authority and responsibility.
For her the best defense is a strong offense, but this is not in her best interests.
We again reiterated to her that her success in the residency is our and your primary concern. I asked why Dr. Schiller referred her to a psychiatrist she answered because he thought she was unhappy. She could or would not tell me the "behavior" that made him think she was unhappy.
My interpretation is that whenever there is a conflict she aggressively confronts her superiors instead of requesting advice or help in a respectful way to resolve the conflict.
Thank you for your help.
Art

Arthur M. Figur, MD
Associate Medical Director
The Mount Sinai Hospital
ext 88544



PRIV.00052
D02812

NOTES TO MADELEINE FERSH

`May 4, 2011

Leena Varughese   summary

Most workplace behavioral issues can be summarized as inappropriate outbursts (emotional dysregulation ) instead of collegial discussions in response to occupational stresses by not accepting the hierarchy of delegated authority.

The presenting behavior was shouting, screaming, incoherent rants in the hallway in response to an admonishment by a chief resident, which she felt was unjustified. She did not admit to us that she was out of control although numerous unbiased witnesses agreed that she was irrational and uncontrollable at the time.

When she met with the Interim Chair of The Department of Pathology she was insubordinate.

When frustrated by the lack of learning when denied the ability to see immunologic staining, she went to the director of GME for the consortium and loudly yelled at him instead of resolving the issue with attending physician.

The first two incidents precipitated the referral to PWC. The third occurred later but was also addressed at out interview.

Referral by Dr. Schiller the chair in her first year that she "see a psychiatrist" because she was unhappy. We attempted to have her describe her behavior that made him perceive she was unhappy. She did not answer our question. She saw Dr. Berkman at that time. We have not spoken with Kathy.

The outbursts are "unpredictable" and over 70% of the time she is collegial.

She is perceived as bright, but has unexplained variable performance in areas in which she had already been trained from excellent to at other times that she needs to be told all over again how to do the task.

I would preface the session with the statement that we are here to help her succeed in the residency program and for her future career. Therefore, you are addressing work place issues brought to your attention by me even

PRIV.00061
D02813

MAY 4 2011

though she may not agree that they are issues for her to solve. To be realistic, if she doesn't resolve them she will only be hurting herself. This statement if you make it so bluntly, will be considered a threat by her, since she has taken every time I have explained, with full transparency, to her about the PWC policy to which I have to adhere in reporting non-compliance and the possible discipline which the hospital may impose including termination she considered a threat, instead of information for making an informed decision.

Questions to be asked in no particular sequence.

1. How did Dr. Schiller recognize you were unhappy and referred you to see a psychiatrist?
2. Why do you have difficulty with authority which in the past has included, the chair of the department, the interim chair of the department, the program director and the authority delegated to the Chief Residents? All who have seen you in action agree to this difficulty even though may not have recognized it in yourself.
3. Since there will always be authority figures for the remainder of your training and in your future professional life what alterations in your behavior (knee jerk reactions) do you plan to make?
4. What was the outcome and/or what workplace issues did you address with the therapist at the time of your "referral" by Dr. Schiller?
5. Has your therapist prescribed medication for you, which ones, and if so are they helping?
6. What can you, personally, do, since you now have a new Department chair to get off on the correct foot with him?
7. I know that Dr. Figur had you drug tested once and the results were negative for illicit drugs. Are you consuming substances like caffeine which can make you emotionally labile?
8. What support do you have at home to help you through these very emotionally trying times?

I would also go through her training history, high school, college, medical school and has she had prior difficulties in any of these settings. Also include a social history, re sleep, significant others, exercise, travel, alcohol, caffeine, tobacco, over the counter medications, prescribed medications. Here I would stress that this information stays with you, but you need it to make recommendations to her and to PWC. She will get a copy of your report to PWC, since this report will only address work place issues and

2.

MAY 4 2001

recommendations for improvement or solutions. For example, if she will require behavior modification therapy, time management courses, etc, these will be included the report. If you have recommendations for her personal mental health you can give them to her orally, or in writing if she requests it in writing.

I hope all this information will help you to help her succeed here at Mount Sinai..
Art

3

CONFIDENTIAL

PRIV.00063
D02815



MOUNT SINAI
SCHOOL OF
MEDICINE

Department of Psychiatry

One Gustave L. Levy Place
Box 1230
New York, NY 10029-6574

Tel: (212) 659-8638
Fax: (212) 996-8931

**Administrative Evaluation**
**Leena Varughese**
**May 12, 2011**

I met this afternoon with Leena Varughese, who is currently a PGY3 resident in the Department of Pathology at Mount Sinai Hospital. Leena was referred to me for evaluation by the Physicians Wellness Committee (PWC) due to workplace behavioral issues that were referred to by the PWC as "inappropriate outbursts (emotional dysregulation) instead of collegial discussions in response to occupational by not accepting the hierarchy of delegated authority." Today's scheduled evaluation was preceded by Leena emailing this morning to cancel the appointment; she then called back after the scheduled time to say she wanted to meet afterall when she was confronted by the PWC on the cancellation. On arrival to my office, Leena seemed quite irritable and angry. She began the conversation by telling me that her grandfather had recently passed away over the weekend in India and I offered her my condolences.

When asked, Leena described to me the episodes leading to the PWC investigation. She was, however, vague on many details including the timing of some of the events and I am unsure whether she truly does not recall details or whether she was hiding or minimizing them in front of this MD. For instance, she was unable to give a coherent timeline of when she began in therapy, when she began seeing a psychiatrist, and how long ago she'd started and stopped taking the Adderall. She was also unable to tell me for what reason she was prescribed the Adderall. When asked for permission to contact any of her prior psychiatric providers, including Dr. Birkman, she refused. Therefore, I remain uncertain about the details of her treatment, diagnosis and medication history. Overall Leena was cooperative with the evaluation, but at a few points I found her to be dismissive of my questions, and disrespectful either by rolling her eyes at this MD or checking text messages on her cell phone.

Leena admitted that the past 6 months or so since this investigation has been going on have been difficult for her and she reports multiple sources or support during this time. She denies any symptoms of depression, mania, anxiety or psychosis. She endorsed use of alcohol a few times per week but denied recent blackouts or ever coming into work intoxicated or hung-over. She denied use of any other substances. When I asked questions surrounding concentration, attention and memory, given she had told me she was recently prescribed Adderall, Leena gave vague answers and all in all told me she was able to concentrate to get her work done. She also

denied ever having issues with authority figures in her previous schooling, and denied any rifts or difficulties in her personal relationships.

Overall, Leena did not demonstrate a great deal of insight regarding the nature of her responsibility for the events that took place leading to the PWC investigation. She continued to externalize and blame others, primarily her Chief Resident. She answered questions in a prominently vague manner and refused to allow this MD to obtain any collateral information. She denied all psychiatric symptoms that were asked, including ones surrounding ADHD for which presumably she was recently prescribed a stimulant.

My diagnostic impression is that Leena has a personality disorder, likely falling into the Cluster B category. I did not find any evidence to support any Axis I psychiatric diagnosis; however it is possible that she minimized symptoms in the setting of this mandated evaluation, in the setting of having cancelled and coming to appointment at the last minute, or being distracted by the recent death of her grandfather.

In order to assist Leena in successfully completing her residency training at Mount Sinai, I recommend the following interventions:

1) Ongoing psychotherapy, which should have either a Cognitive Behavioral Therapy (CBT) or Dialectical Behavioral Therapy (DBT) focus. It is unclear to me whether Leena is currently seeing a therapist, given her report the treatment has been "on and off." She would also benefit from a DBT group, however given the rigors of residency training I am not sure that realistically she would have the time.

2) Referral to, or continuation with, a psychiatrist for medication evaluation.

3) Neuropsychological testing, specifically looking for learning and attentional difficulties, depressive symptomatology, and personality themes

Should Leena feel that she was too distressed during today's evaluation to talk freely, given the recent death of her grandfather, I would be willing to meet with her again at a later time.

Thank you for this referral.

Sincerely,

Madeleine E. Fersh, MD
Medical Director, Student/Trainee Mental Health Program

CONFIDENTIAL

Exhibit 176

5/5/11   Dr. S. M°Cash

No day ever dranke alcohol + went back to wk.

Finished work for day. Tired in firm room.
Brought stuff back drinking in room,
& V. came in, don't recall date, asked
her to join us, said no thanks → left.

**Confidential**

Exhibit 177

5/4/11  Dr. Adrienne

Take over a Chief Resident pos - 5/2/11 (2 month prior)

Responsible of moonlighting - main moonlighter + back up (if needed.

In Darwin Dr. Ileana V gross Paul Azato (primary) moonlighter question - AD pick up

Required to start wk in gross at 7am
IV showed up at 12p. (late)
Cases should be handled by Resident resp.
gross small things
Told Sam McCash about her asking

asked I V to do Dr Goldfarb's breast cases.

**Confidential**

Busy that night but manageable
Time = after case
Sam overhead me asking Paul why

Sam strict + firm - LV yelling profanities
LV stormed out
AD + PA went out back door. LV followed
+ yelled at AD. She did not respond
(not approp to yell).
Left her (LV) w/ mastectomy.
Few day later LV yelled again - always
causing drama - Advised by Dr. P
Blaming me for incident

D02327

Told her (IV) told Cam. not discuss w/
you. Told not to talk w/her. + didit.
I will not be alone w/her. Don't
want she said she said.

Had party that day — aware of it? We
have had cake — gatherings for occasions

bottle of wine + Captain Morgan — left
over from party. Put in book shelf
carved w/ door — drawer supposed
to take bottles.
Did you ever

The night of our dementure rounds
~ 6pm or later. Once a month meet
socially (Thurs). After hours w/Dr.
Folks (Neuropathologist). May have
been people on call that night — not
drinking.
There was alcohol at the social gathering
        beer + captain morgan.      ~~Confidential~~

Usually meet on 16th floor in conference
but 1 time meet in Fun room
Done this for years. Never an issue
Everyone is aware of it.

D02328

Exhibit 178

------Original Message------
**From:** Lento, Patrick
**Sent:** Tuesday, May 24, 2011 3:00 PM
**To:** Barnett, Scott (MSSM); Johnson, Paul F (MSSM-Imail); Lowy, Marina
**Cc:** Castaldi, Andrew (MSSM); Cordon-cardo, Carlos (MSSM)
**Subject:** Resident follow up

Dr. Cordon-Cardo, Andrew Castaldi and I met with Leena Varughese again today, as a follow up to our May 3rd meeting regarding her academic advisement.

Despite requests from Andrew (and me) that Leena provide a copy of her re-written reflection essay in advance of today's meeting, she ignored our emails and came to the meeting with a "new" version in hand. I can provide a hardcopy of her re-written essay, if necessary.

She was flippant and disrespectful to us at the outset of the meeting and noted quite clearly that she felt she was continually being harassed by us and that she considered her treatment as retaliation to her request for intervention after her incident in December. She does not appear to recognize, understand or appreciate that anything she did was wrong and believes, incorrectly, that her attempts to satisfy the academic advisement were met.

She was angry that she didn't have "representation" at the meeting and noted several times that she felt her treatment was undertaken in, what she considers, an unprofessional manner.

Despite providing Leena with more than one opportunity to get past this, it is apparent that we are at an impasse.

Pat

**Patrick Lento, M.D.**
Associate Professor, Departments of Pathology,
Internal Medicine, Division of General Internal Medicine
and Medical Education
Residency Program Director, Pathology
Mount Sinai Medical Center and School of Medicine
Box 1194
One Gustave Levy Place
New York, NY 10029
Tel: 212-241-9157
Fax 212-876-4036
email:patrick.lento@mountsinai.org

This email and any attachments may contain confidential information which are intended for use solely by the addressee(s). If you are not the intended recipient of this email, please be aware that any dissemination, distribution, copying or other use of the email in whole or in part is strictly prohibited. If you have received this email in error, please notify the sender and permanently delete the original and all copies of the email, attachments and any printouts. Thank you.

1

PRIV.00071

Exhibit 179

| | |
|---|---|
| **From:** | Jordan, Adrienne |
| **Sent:** | Wednesday, May 25, 2011 1:25 PM |
| **To:** | Lento, Patrick; Cordon-cardo, Carlos (MSSM); Elizabeth Morency |
| **Cc:** | Castaldi, Andrew (MSSM) |
| **Subject:** | RE: Meeting |

Yes, Liz and I need to attend the same meeting.  If you'd still like to meet is there another time you can meet Dr. Cardo and Dr. Lento?

Adrienne Jordan, M.D.
The Mount Sinai Hospital
Department of Pathology - Box 1194
One Gustave L. Levy Place
New York, NY  10029

Pager (917) 401-5341
Cell (330) 327-7339


-----Original Message-----
From: Lento, Patrick
Sent: Wednesday, May 25, 2011 9:12 AM
To: Cordon-cardo, Carlos (MSSM); Jordan, Adrienne; Elizabeth Morency
Cc: Castaldi, Andrew (MSSM)
Subject: RE: Meeting

Carlos,

There is Department QA at 11 am tomorrow that I need to attend.

Pat

-----Original Message-----
From: Cordon-cardo, Carlos [mailto:carlos.cordon-cardo@mssm.edu]
Sent: Wednesday, May 25, 2011 9:09 AM
To: Lento, Patrick; Jordan, Adrienne; Elizabeth Morency
Cc: Castaldi, Andrew (MSSM)
Subject: Meeting

Thank you for the continued efforts.  I would like to have a short meeting to discuss this and other ongoing (good) issues.  How about tomorrow around 11:00 am?

Carlos

Carlos Cordon-Cardo, M.D., Ph.D.
Professor and Chairman,
Department of Pathology,
Professor, Department of Genetics and Genomic Sciences, The Mount Sinai School of Medicine.
Professor and Director,
Department of Pathology,
The Mount Sinai Hospital.
Phone: 212-241-8014
Fax: 212-426-5129
E-mail: carlos.cordon-cardo@mssm.edu

1

CONFIDENTIAL

D_ESI026131

Office Address:
Annenberg 15th Floor, Office 15-62
1468 Madison Avenue
New York, New York 10029-6574

Mailing address:
One Gustave L. Levy Place, Box 1194 New York, New York 10029-6574

----------------------------------------------------------
IMPORTANT WARNING:  This email (and any attachments) is only intended for the use of the
person or entity to which it is addressed, and may contain information that is privileged and
confidential.  You, the recipient, are obligated to maintain it in a safe, secure and
confidential manner.  Unauthorized redisclosure or failure to maintain confidentiality may
subject you to federal and state penalties. If you are not the intended recipient, please
immediately notify us by return email, and delete this message from your computer.
----------------------------------------------------------

-----Original Message-----
From: Lento, Patrick [mailto:Patrick.Lento@mountsinai.org]
Sent: Wednesday, May 25, 2011 9:06 AM
To: Jordan, Adrienne (MSH); Elizabeth Morency
Cc: Cordon-cardo, Carlos; Castaldi, Andrew
Subject: RE: Ongoing resident issue

Dr. Cordon-Cardo and I have discussed Leena this morning.

We had a meeting with her yesterday in the early afternoon and I believe she may have been
acting out afterward. This does not, however, excuse her from her responsibilities. Problems
related to Leena have, unfortunately, persisted over several months and we are awaiting
further input from the GME office and legal regarding how best to proceed.

Obviously, this is a delicate matter so please be mindful not to discuss this with anyone.

Pat

-----Original Message-----
From: Jordan, Adrienne
Sent: Tuesday, May 24, 2011 11:11 PM
To: Elizabeth Morency
Cc: Cordon-cardo, Carlos (MSSM); Lento, Patrick
Subject: Re: Ongoing resident issue

I just wanted to emphasis Liz's point of the need to meet tomorrow if possible to discuss
this. She and I are becoming exceptionally concerned at this point for the welfare not only
of Leena but also of the other residents and staff. I know we all have very hectic schedules,
but hopefully we can meet soon to discuss our options and where we would like to go from here
Thank you all for your time.

Adrienne

Sent from my iPhone

On May 24, 2011, at 8:06 PM, "Elizabeth Morency"
<elizabeth.morency@gmail.com> wrote:

> Hi Dr. Cordon-Cardo,

2

CONFIDENTIAL

D_ESI026132

>
>        I know this isn't a new issue, and is something you are already
dealing with but I just wanted to keep you up to date with the ongoing problems we have been
having with Leena Varughese. She is currently on Gyn this month and I am on GI so we are both
in the grossing room everyday and I have been noticing some recurring issues between her and
the PAs. As you know we are incredibly busy in the gross room and while the PAs try to help
the two of us on the subspecialty services as much as they can, they generally spend the
majority of the time grossing general surgical specimens. This is nothing new, especially on
days where it is especially busy like today but in spite of knowing this Leena has gotten
into arguments with both Bassel and Roma about helping her gross specimens, including large
cases like hysterectomies that are usually exclusively the responsibility of the resident.
These disagreements have been escalating in the past couple of days and I had to stop
grossing myself to help diffuse a disagreement between Roma and Leena this afternoon over
grossing an IUD that was witnessed by several other residents and was completely unfounded.
Shortly thereafter she left the grossing room and informed me that she would not be able to
finish grossing because "she wasn't feeling well" and felt that the PAs were unwilling to
help her in particular even after I explained to her that they were not doing this on purpose
and simply trying to help our overwhelmed surgical resident. As a result the Gyn fellow who
has already had to cover for her in the past even though she has completed all of her own
grossing months, had to finish the rest of Leena's specimens so that there wasn't a delay in
processing and this is unfair.
>
>        This is just one example of an issue that has come up in the
past couple of weeks. I really feel that you, myself, Adrienne and Dr.
Lento need to sit down and have a meeting to discuss Leena's increasingly erratic behavior
and her future in our program. I am becoming increasingly concerned, not only for her well
being, but for the well being and morale of the other residents and PAs that are also
affected by her behavior. Please let me know if and when we can all meet preferably as soon
as possible to discuss this sensitive issue. Thank you for your time.
>
> Elizabeth Morency, M.D.
> Pathology resident, PGY-3
> Department of Pathology
> The Mount Sinai Medical Center
> New York, NY 10029
> Pager: 917-641-1845
>

CONFIDENTIAL

D_ESI026133

Exhibit 180

| | |
|---|---|
| **From:** | Jordan, Adrienne |
| **Sent:** | Thursday, May 05, 2011 4:05 PM |
| **To:** | Truong, Jonathan; Chen, Wei H (MSSM); Maddara, Maria-Liza; Rosales, Laine: SENOSIN, SABINO; Lento, Patrick; Hauptman, Eileen; Sarraj, Bassel; Rosario, Roma; Hauptman, Eileen; White, Ida; Nagi, Chandandeep; Bleiweiss, Ira; pathologyresidents@mssm.edu; Valentin, Renato |
| **Subject:** | IMPORTANT CHANGE IN POLICY MUST READ |
| **Importance:** | High |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

As many of you may have experienced, the shuffling of specimens to and from A-tran is causing serious issues including lost or misplaced specimens and dramatically increased turn around time. Please note the change of policy effective IMMEDIATELY:

The ONLY specimens to be sent to A-tran from this point on are products of conception (POC's) less than 12 weeks gestational age. Everything else that normally would be sent to A-tran will be grossed in Annenberg as follows:

1. Skin specimens will be grossed by Senior Lab Coordinator and will be placed in PEACH cassettes and assigned to the dermatopathology fellow.
2. GI biopsies will be grossed by Senior Lab Coordinator and/or PA's and will be placed in TAN cassettes and assigned to the GI fellow or resident. Special stains which are typically ordered (ie. Alcian blue stain for esophageal biopsies and giemsa for gastric biopsies) will continue to be ordered at the time of accessioning.
3. Endometrial biopsies, curretings, and endometrial polyps will be grossed by Senior Lab Coordinator and/or PA's and will be placed in YELLOW cassettes and assigned to the GYN fellow or resident.
4. All other specimens (vocal cord, breast, prostate, bladder, liver biopsies) will be placed in YELLOW cassettes and will be assigned to the resident who is assigned to biopsies the NEXT day. Special stains which are typically ordered (ie. iron and trichrome stains for liver biopsies and blank slides for prostate biopsies) will continue to be ordered at the time of accessioning.

Additional Notes:

- These specimens do not need to be dictated when grossing. Simply write the dimensions of the specimen down on the accessioning sheet followed by your initials and the transcriptionists will type in the gross. You MUST turn in paperwork in a timely fashion to ensure the gross descriptions are in the computer and paperwork is to the resident prior to sign out. You DO however need to make sure the CORRECT resident initials are placed on the container in POWER PATH (ie. the surgical resident on biopsies, GI fellow, GYN fellow, or Liver fellow)
- When ordering blocks, please make sure to be ordering biopsy blocks (Power Path code is BX) not the typical surgical blocks (Power Path code 1B1S).
- Even though these specimens are not going in pink (rush) cassettes, please order the blocks in Power Path as RUSH blocks to ensure that they come out the following day and we maintain the required 24 hour turn around time for biopsies.

1

CONFIDENTIAL

D_ESI011104

Obviously we will be monitoring turn around time for MS biopsies now that this new policy is in effect, however, if anyone notices a change in biopsy turn around time or any other issues pertaining to this new policy, please let Ms. Hauptman, Elizabeth, or myself know ASAP.  Thank you all for your attention to this very important matter.

Adrienne Jordan, M.D.
The Mount Sinai Hospital
Department of Pathology - Box 1194
One Gustave L. Levy Place
New York, NY  10029

Pager (917) 401-5341
Cell (330) 327-7339

CONFIDENTIAL

D_ESI011105

| From: | Jordan, Adrienne |
|---|---|
| Sent: | Friday, May 27, 2011 11:27 AM |
| To: | pathologyresidents@mssm.edu |
| Cc: | Carter, Allene; Lento, Patrick |
| Subject: | PLEASE DIS-REGARD PREVIOUS MEMO....THIS IS THE CORRECT WEEKLY MEMO |
| Attachments: | Moonlighting Coverage for Renato.doc |

Sorry everyone, I did not mean to send that first memo. This is the correct weekly memo.

As per the last resident meeting, Liz and I will be sending out once per week memos with the things that would have originally been sent out as numerous e-mails throughout the week. This is in an effort to consolidate the number of e-mails that residents get. This will however make for a lengthy e-mail at the end of every week that residents are expected to read. Below is this weeks memo.

General Resident Issues:

1. Please remember to log your duty hours in New Innovations.
2. Conference attendance has been horrible the last two weeks. The department is doing lots of things to help us with our education (new microscopes have been ordered, book fund for next year is increased, Elmhurst has been eliminated as a mandatory rotation, etc). Please lets do our part in getting our conference attendance up. We don't want the department to see our low conference attendance and think we do not care about our education.
3. Obviously with the recent changes to the Elmhurst rotation, Liz and I had to completely re-do the entire yearly schedule. This means we have little to no time to make changes prior to finalizing this. Please send Liz and I any changes that need to be made to the schedule by Wednesday June 1st.
4. With the schedule changes, the deadline for call requests is pushed back to June 3rd to allow residents more time to review what months they can be on call. Please also let Liz and I know which conferences you plan on attending next year so that we do not put you on call during those times.
5. Let Adrienne know if you would like to contribute to Roma's graduation present but have not done so yet.
6. Don't forget to sign the resident meeting minute acknowledgement sheet that is on Adrienne's desk. Signatures are due June 10th. Failure to sign the sheet will result in documentation in the resident's permanent file.
7. Unlike previous years where at least some of our residents already live in the city, this year I believe ALL of our incoming residents are moving to NYC from out of state. As you have all been told, orientation is June 23rd this year. I would like to give them a little "tips for living in the city" type of booklet. Can everyone please e-mail me little things that you discovered made living in NYC easier or made the transition better for you? For example, signing up for Groupon, the name of a really good moving company, getting your metro passes pre-tax by having it deducted from your paycheck, etc. If everyone could do this by June 15th I would really appreciate it.

Surgical Issues:

7. Please see below from Dr. Garcia

We have finally started the long awaited Interdisciplinary Sarcoma Conference, which takes place on the first and third Thursdays of the month at 5 PM in the Department of Orthopaedics (5 East 98th street 9th floor library). The most

1

D_ESI010492

important cases of the month are discussed with participation of Radiology, Pathology, Surgery and Oncology. Those who are interested are welcome to attend. Refreshments are served.

It is extremely important to have good gross photographs of the cases. Please make sure that all tumor cases from our main Orthopaedic Oncologists James Wittig and Ilya Iofin get gross photographs and whenever possible, they must be shown to Dr. Garcia. It is OK to wait an extra day to have him look at the case if he is not available. Otherwise, good gross pictures of the external surface and most importantly the **cut surface** will be a good substitute.

Your cooperation will help us improve the Bone and Soft Tissue Division.

8.  Please remember to save specimens for gross show!!
9.  Please remember to write "sent" on the side of the cassette for sentinel node biopsy specimens in breast cancer. This way the blocks get cut properly from the start.
10. New policy for gross only specimens. They will be grossed by the PA's and put into a folder attached to the placenta cabinet. Renee will then pick up the paperwork and assign in directly to the attendings. Residents should no longer be involved in gross only specimens. If this does not happen, please let us know.
11. Renato is out from 5/30-6/10. The emergency moonlighting schedule is attached. As you can see there are several days open so please let Liz or Adrienne know ASAP if you can moonlight during those two weeks.
12. RE: Dr. Dikman

Out of Office May 26 to June 12

Coverage:

Renal cases/ UNOS/ transplantation: Dr. S. Ward ext 48687

Ear Nose Throat (ENT): Dr. Beasley 45307 Dr. Zhu 44226, Dr. Ramer 3662 and 47215

13. Per the last resident meeting, since we are no longer sending MS (hospital) biopsies to a-tran to be grossed due to frequent loss of specimens, a-tran will be sending one of their grossers to annenberg from 4-5 pm every day to gross these specimens so that our PA's and gross room clerks are not burdened with this extra work. Please let Adrienne and Liz know if there is a problem with biopsy paperwork, slide assignment, or turn around time since this change has gone into effect.
14. There was a concern from residents that since the specimens are no longer being grossed in a-tran, they can no longer tell which paperwork is for surgicals and which is for biopsies. The grossers will now be ordering biopsy blocks at "Biopsy" not "1B1S." If you see the order "biopsy" on the front sheet that is attached to the accession sheet, it is for biopsy signout.
15. The surgical QA document was updated this week. Please review it if you submitted cases to the document to see the follow up. If the problems persist beyond the implementation of the solutions listed next to each issue, PLEASE inform the chief residents or add more cases with similar problems to the QA document.
16. Incomplete cases: For the time being, incomplete cases will still be given out to residents. This comes from administration. If you are given incomplete cases without a post-it note letting you know which slides are missing, please let Liz and Adrienne know. If you have to track down the missing slides after days of waiting, please let us know. We need to follow these issues for documentation purposes so we can show administration that this policy may not be working.
17. Frozen section: Turn around time for each frozen is EXTREMELY important to our lab and our accreditation with CAP. If you happen to forget to stamp the accession sheet after doing a frozen,

2

D_ESI010493

please DO NOT stamp it later when you remember (for example 20 min after the frozen is done). This massively effects our turn around time.

Adrienne Jordan, M.D.
Pathology Resident, PGY2
The Mount Sinai Medical Center
Department of Pathology- Box 1194
One Gustave L. Levy Place
New York, NY 10029
Pager: 917-534-7491
Cell: 330-327-7339

3

CONFIDENTIAL

D_ESI010494

| | |
|---|---|
| **From:** | Bleiweiss, Ira |
| **Sent:** | Friday, May 20, 2011 9:18 AM |
| **To:** | Jordan, Adrienne |
| **Subject:** | RE: Call |

just generally to check EVERYTHING. Entirely too many human errors being made by everyone, not just residents or fellows

-----Original Message-----
**From:** Jordan, Adrienne
**Sent:** Friday, May 20, 2011 9:16 AM
**To:** Bleiweiss, Ira
**Subject:** RE: Call

You got it. Anything else I should bring up?

Adrienne Jordan, M.D.
The Mount Sinai Hospital
Department of Pathology - Box 1194
One Gustave L. Levy Place
New York, NY 10029

Pager (917) 401-5341
Cell (330) 327-7339

-----Original Message-----
**From:** Bleiweiss, Ira
**Sent:** Friday, May 20, 2011 9:15 AM
**To:** Jordan, Adrienne
**Subject:** RE: Call

please also stress the importance of **checking** the block numbers when using preprinted numbered blocks for grossing

-----Original Message-----
**From:** Jordan, Adrienne
**Sent:** Friday, May 20, 2011 9:12 AM
**To:** Bleiweiss, Ira
**Subject:** Call

Dr. Bleiweiss,

I added the topic of checking the OR schedule when on call to the resident agenda for today so this problem will hopefully be avoided in the future. Sorry again for the trouble.

Adrienne Jordan, M.D.
The Mount Sinai Hospital
Department of Pathology - Box 1194
One Gustave L. Levy Place
New York, NY 10029

*EXHIBIT 6*

*BLEIWEISS*
*11/13/13*
*AP*

1

CONFIDENTIAL

D_ESI016036

Pager (917) 401-5341
Cell (330) 327-7339

2

CONFIDENTIAL

D_ESI016037

Exhibit 181

| | |
|---|---|
| **From:** | Kalir, Tamara |
| **Sent:** | Friday, May 27, 2011 10:46 AM |
| **To:** | Lento, Patrick |
| **Subject:** | RE: Leena |

Much, much appreciate. I think it would be good for the entire group if they can come to the point of helping each other out. I will try and relay to Leena the importance of respecting others.


Tamara Kalir, M.D., Ph.D.
Associate Professor of Pathology
Director, Division of Gynecologic Pathology
Director, Fellowship in Gynecologic Pathology
Phone: (212) 241-3784
Fax: (212) 289-2899

-----Original Message-----
**From:** Lento, Patrick
**Sent:** Thursday, May 26, 2011 5:56 PM
**To:** Kalir, Tamara
**Subject:** RE: Leena

We will try to do the best that we can to help..... ☺

-----Original Message-----
**From:** Kalir, Tamara
**Sent:** Thursday, May 26, 2011 5:43 PM
**To:** Lento, Patrick
**Subject:** RE: Leena

Would be super, Pat. I think, given she has apparently antagonized the grossing staff and people are feeling resistant to helping her, that it would be very good for everyone if you try and implement this plan. Otherwise I'm afraid that, I will have no other choice than to get in there and help her gross, myself.


Tamara Kalir, M.D., Ph.D.
Associate Professor of Pathology
Director, Division of Gynecologic Pathology
Director, Fellowship in Gynecologic Pathology
Phone: (212) 241-3784
Fax: (212) 289-2899

-----Original Message-----
**From:** Lento, Patrick
**Sent:** Thursday, May 26, 2011 5:38 PM
**To:** Kalir, Tamara
**Subject:** Leena

Tamara,

I discussed things further with Adrienne to see what we can do to try to help Leena. The evening PA will be out next week so residents are set to moonlight each day. I have asked Adrienne to

1

CONFIDENTIAL

D_ESI026135

see if the moonlighters can also help Leena a little bit next week. The objective is to provide some assistance, not do her job for her, so she can try to get back on track.

If this plan is viable, I asked Adrienne to meet with Leena and you tomorrow to briefly discuss that we would try to help her out as best as we can.

Pat

**Patrick Lento, M.D.**
Associate Professor, Departments of Pathology,
Internal Medicine, Division of General Internal Medicine
and Medical Education
Residency Program Director, Pathology
Mount Sinai Medical Center and School of Medicine
Box 1194
One Gustave Levy Place
New York, NY 10029
Tel: 212-241-9157
Fax: 212-876-4036
email:patrick.lento@mountsinai.org

**This email and any attachments may contain confidential information which are intended for use solely by the addressee(s). If you are not the intended recipient of this email, please be aware that any dissemination, distribution, copying or other use of the email in whole or in part is strictly prohibited. If you have received this email in error, please notify the sender and permanently delete the original and all copies of the email, attachments and any printouts. Thank you.**

CONFIDENTIAL

D_ESI026136

**From:**     Bleiweiss, Ira
**Sent:**      Friday, May 27, 2011 3:13 PM
**To:**        Lento, Patrick
**Subject:**   leena

pat -

are you around?

please call me

ira

CONFIDENTIAL

D_ESI010538

| | |
|---|---|
| From: | s.mccas.i@gmail.com on behalf of Samuel McCash [Samuel.McCash@mssm.edu] |
| Sent: | Wednesday, June 01, 2011 12:14 PM |
| To: | Lento, Patrick |
| Subject: | Hi Dr. Lento |

Hi Dr. Lento,
   Two things.  The first more serious than the second.

   Last night I was moonlighting and Justin asked me for help on an ectopic pregnancy case
that was given to him as a POC.  He is on autopsy service.  I told him to ask Dr. Magid to
see if Peds would take it, or if it should go to GYN.  Dr. Magid said that it was a GYN case,
so he brought it over to Leena since she is on GYN service.
Leena told Justin to do it, himself, under GYN supervision.  There were no GYN attendings
available so he just processed it as a POC.  I am a little perturbed that Leena made Justin
do a "GYN" case, in fact I felt that she was abusing him.  I didn't do anything at the time
due to our present situation as well as me not being chief anymore; but I think someone needs
to be notified, so I am letting you know.

   Second, I was wondering if I could use my book fund money to go towards my board fees.

Sam

1

CONFIDENTIAL

D_ESI026134

**Tiger-Paillex, Caryn**

| | |
|---|---|
| **From:** | Lento, Patrick [Patrick.Lento@mountsinai.org] |
| **Sent:** | Thursday, June 02, 2011 3:31 PM |
| **To:** | Barnett, Scott; Tiger-Paillex, Caryn |
| **Cc:** | Cordon-cardo, Carlos; Lowy, Marina (MSH); Johnson, Paul F (GME) (MSSM-Imail); Barnett, Scott |
| **Subject:** | RE: Ongoing resident issue |

I will let both Tamara and the PA know.
Pat

> -----Original Message-----
> **From:** Barnett, Scott [mailto:scott.barnett@mssm.edu]
> **Sent:** Thursday, June 02, 2011 3:28 PM
> **To:** Lento, Patrick; Tiger-Paillex, Caryn (MSSM)
> **Cc:** Cordon-cardo, Carlos (MSSM); Lowy, Marina; Johnson, Paul F (MSSM-Imail); Barnett, Scott (MSSM)
> **Subject:** Re: Ongoing resident issue
>
> Caryn – do we need to meet with the fellow? Seems not much will be added except, yes I covered
>
> Please ask Robert to work with Phillip to schedule the meetings
>
> Pat/Carlos – probably best that you let Tamara know she is expected to meet with us – the PA too
> Scott
>
> ---
> Scott H. Barnett, M.D.
> Associate Dean for GME
> President, Faculty Council
> Mount Sinai School of Medicine
> (P) 212-241-6694
> (f) 212-426-7748

---

**From:** "Lento, Patrick" <Patrick.Lento@mountsinai.org>
**Date:** Thu, 2 Jun 2011 15:20:16 -0400
**To:** "Barnett, Scott (MSSM)" <scott.barnett@mssm.edu>, "Tiger-Paillex, Caryn (MSSM)" <caryn.tiger-paillex@mssm.edu>
**Cc:** "Cordon-cardo, Carlos (MSSM)" <carlos.cordon-cardo@mssm.edu>, "Lowy, Marina" <Marina.Lowy@mountsinai.org>
**Subject:** FW: Ongoing resident issue

Scott and Caryn,

Last week's incident involving Leena occurred while she was on the GYN service (see forwarded email below). As you can see, Leena subsequently left that day before completing her work. As a result, the director of that service had to get the fellow to complete Leena's patient care-related work.

The people involved included:
Leena
Roma Rosario (PA)
Liz Morency (chief resident)
Tamara Kalir (GYN service director)
Yuxin Liu (the GYN fellow that Dr. Kalir had finish Leena's work for the day)

Pat



PLAINTIFF'S EXHIBIT
Lento 4
JR 10/25/13

1

PRIV.00067
D02819

Exhibit 182

6/9/11 | Dr. Kalir, Dr. Barnett, CT

LV 2nd time on rotation. Requested to come through again.

~~Extra~~ electrodes

Don't get a lot of help from PAs - gross every day - nothing can do.

LV continuously asked for help when don't have. All housestaff complains every day. All say ok understand.

Spoke w/ Roma R on that week - I don't like the way she talks to me. She shouldn't be in the program. Spoke w/ LV about how to talk w/ people when need them to asst.

Wk 1 - May 9-13.

Wk 2 - May 16-20 - one of grandparents died - distracted - crying (20th - took off) fellow covered.

Wk 3 - May 23-27 - Very distracted - at Mfg or Dr. Ca - (May 24th) desk - Admin meeting concerns that dept trying to get her out of program. Thought LV was going to leave - had a talk - told her to take a break at end of day ~3:30-5p → took break - came back

Very distracted that wk.

CONFIDENTIAL

D02861



EXHIBIT
Morency
14
3/27/14 JH

Very distracted — Carol + Dr. K — kept close watch
w/ her. Checked her each day — how
grossing a 3:30pm > whole cont need PA help
9-10A — preview time
10-11
11-12
12-1 — lunch
1-2 — preview biopsies
2-3:30 —

Gave LV time due to death — tried to optimize

Chief Res — LM overheard discussion
Tones of LM + LV — PAs couldn't help
large Volume, LV said under alot of
stress — dont understand what is going on.
Told LV do what need to do,
Under circumstances — do what can
— PAs + moonlighters

Dr. IB find specimens, Dr. TK was told
by LV didn't gross specimens left from
yesterday. Roma — told uterus — not opened
Questioned LV she said — I would never
leave a uterus unopened.

5/27 — Friday — anomosity between LV + RP

CONFIDENTIAL

D02862

LV per Residents - LV never wants to
help anyone.
Had discussion w/ LV - addressed all
issues from 3 wks. Had death in
family + then had Admin mtg very stressful
Discussed w/ her about her coming in.
Show up 10am for preview. Show up 2pm
organized ready for sign out.

Dr. I B - pulled me out of a sign out to
discuss specimen have been holden +
not done. Want to see be a good Resident.
      Show me what can do for last wk.
Wk 4 - did well - came in on time, took
      care of cases. Talked to her
Hushen Lu - top of list - Fellows 4 wks
prior rotation to the 4 wks (LV)
W/ such disorganization - LV can not
succeed w/ Mont Sinai however in Mass
she would do well even though was - would
get asst.

June 3rd - last day - went to check on
her - getting started ≈ 5-6p. Full cart.
Cancer specimens, complicated cases.

CONFIDENTIAL                                          D02863

6/21/11

Dr. Kalir + ct
Ann 15-76

In cases where felt overwhelmed, occasionally
will come to Dr. K to discuss
rarely approach me to indicate not finished
1st week uneventful on her rotation.
~ Wed 5/18 - approached Dr. K told death
of family - gave Friday

Tuesday of 3rd week; mtg w/Admin

Argument between Raina + Leena
Always paro w/who's responsible.
PAS log in now on grossing specimens.
Dr. Ira Bleiweiss came to see Dr. Kalir
regarding specimen left by LV

standardize
Dr. Nagi

Adrienne complaining now about
not having PA's astw/grossing.

Now w/new process of PAs logging in

Lab was in most disorganized state ever.
PA pool - all time low as well.

At frank conversation on 5/27 - told
all complaints Admin will be asking Dr. K on
Dr. L.V.

CONFIDENTIAL

Exhibit 183

**From:**        Kalir, Tamara
**Sent:**        Thursday, June 02, 2011 6:19 PM
**To:**          Lento, Patrick
**Subject:**     RE: Resident follow up

Hi Pat,
     You've caught me on a bad day, and I do want to be fair to Leena.  I've just spoken with Carol Eliasen and she tells me Leena has shown SIGNIFICANT improvement this week (Carol is covering biopsy service, I'm covering gross).  Carol reminded me that missing and mixed up gross slides and blocks may not be the resident's fault but due to the Histology Lab's disorganization.  And the gross cases I found problematic were from the latter part of last week.  They may have been grossed before we talked (I caught her at the end of the day last Friday).  Let's see how tomorrow goes.


Tamara Kalir, M.D., Ph.D.
Associate Professor of Pathology
Director, Division of Gynecologic Pathology
Director, Fellowship in Gynecologic Pathology
Phone: (212) 241-3784
Fax: (212) 289-2899

          -----Original Message-----
          **From:** Lento, Patrick
          **Sent:** Thursday, June 02, 2011 5:45 PM
          **To:** Kalir, Tamara
          **Subject:** RE: Resident follow up

          I understand Tamara. You were nice enough to have given her some room to try to improve.
          Pat

                    -----Original Message-----
                    **From:** Kalir, Tamara
                    **Sent:** Thursday, June 02, 2011 5:03 PM
                    **To:** Lento, Patrick
                    **Subject:** RE: Resident follow up

                    Sorry to have missed you, Pat.  Not wanting to harm, I told Leena last Friday that if she can make an
                    "about face" this her last week on our service, I could mention only that after being spoken to, she
                    showed improvement.  However by this Thursday of her last week I feel I am at the end of my rope with
                    cases with resident not showing up on time, missing slides, missing blocks, incompletely grossed cases
                    (no weights for fibroids – a required part of our standard procedure).  I haven't spoken to her because I
                    don't want to upset her, but I really am feeling almost abused at this point.


                    Tamara Kalir, M.D., Ph.D.
                    Associate Professor of Pathology
                    Director, Division of Gynecologic Pathology
                    Director, Fellowship in Gynecologic Pathology
                    Phone: (212) 241-3784
                    Fax: (212) 289-2899

                              -----Original Message-----
                              **From:** Lento, Patrick
                              **Sent:** Thursday, June 02, 2011 3:41 PM
                              **To:** Kalir, Tamara
                              **Subject:** Resident follow up

                                             1

CONFIDENTIAL                                                    D_ESI026137

Tamara,

I tried calling you but got your voicemail.

Leena's professional performance has been problematic for some time and the incident on your service last week appears to be another in a pattern of problems that she has had. As such, it is important to appropriately document the incident. The GME office and Human Resource office will perform an investigation of the matter and will likely ask to speak with you about it.

Pat

**Patrick Lento, M.D.**
Associate Professor, Departments of Pathology,
Internal Medicine, Division of General Internal Medicine
and Medical Education
Residency Program Director, Pathology
Mount Sinai Medical Center and School of Medicine
Box 1194
One Gustave Levy Place
New York, NY 10029
Tel: 212-241-9157
Fax: 212-876-4036
email:patrick.lento@mountsinai.org

**This email and any attachments may contain confidential information which are intended for use solely by the addressee(s). If you are not the intended recipient of this email, please be aware that any dissemination, distribution, copying or other use of the email in whole or in part is strictly prohibited. If you have received this email in error, please notify the sender and permanently delete the original and all copies of the email, attachments and any printouts. Thank you.**

CONFIDENTIAL

D_ESI026138

Exhibit 184



Leena V <leenav@gmail.com>

## missing part of a case and paperwork
1 message

**leena varughese** <leena.varughese@mssm.edu>                         Fri, May 27, 2011 at 7:51 PM
To: "Morency, Elizabeth (MSSM-Imail)" <elizabeth.morency@mssm.edu>

Liz,

I have case # ms11-63288 part B but I cant find the container for part A nor the paperwork. It was received
and in the system as of 5:42 pm so it's to be grossed today. I am on call so I will be here tomorrow and will f/u
with you .

Leena

P002611

Exhibit 185



## Fwd: cases pending final

**leena varughese** <leena.varughese@mssm.edu>                    Mon, Sep 26, 2011 at 12:00 PM
To: leena.bookworm@gmail.com


---------- Forwarded message ----------
From: "Hauptman, Eileen" <eileen.hauptman@mountsinai.org>
To: "Zhong, Minghao" <minghao.zhong@mountsinai.org>, "Azar, Paul (MSSM-Imail)"
<paul.azar@mssm.edu>, "Blouin, Amanda (MSSM-Imail)" <amanda.blouin@mssm.edu>, "Chepovetsky, Julie
(MSSM-Imail)" <Julie.Chepovetsky@mssm.edu>, "Cherneykin, Sergey"
<sergey.cherneykin@mountsinai.org>, "Chow, Jonathan (MSSM-Imail)" <jonathan.chow@mssm.edu>,
"Fender, Justin" <justin.fender@mountsinai.org>, "French, Jessica (MSSM-Imail)"
<jessica.french@mssm.edu>, "Frost, Sarah (MSSM-Imail)" <Sarah.Frost@mssm.edu>, "Grunes, Dianne"
<dianne.grunes@mountsinai.org>, "Guarino, Robert" <robert.guarino@mssm.edu>, "Hechtman, Jaclyn"
<jaclyn.hechtman@mountsinai.org>, "Jordan, Adrienne" <adrienne.jordan@mountsinai.org>, "Kazi, Sofia"
<Sofia.Kazi@mountsinai.org>, "Kim, Stacey (MSSM-Imail)" <stacey.kim@mssm.edu>, "Ko, Mabel (MSSM-
Imail)" <Mabel.Ko@mssm.edu>, "Liu, Yuxin" <yuxin.liu@mountsinai.org>, "Maniar, Kruti (MSSM-Imail)"
<Kruti.Maniar@mssm.edu>, "Martinez, Alicia (MSSM-Imail)" <alicia.martinez@mssm.edu>, "McCash,
Samuel (MSSM-Imail)" <Samuel.Mccash@mssm.edu>, "Mercer, Stephen (MSSM-Imail)"
<Stephen.Mercer@mssm.edu>, "Morency, Elizabeth (MSSM-Imail)" <elizabeth.morency@mssm.edu>,
"Ouyang, Jie" <jie.ouyang@mountsinai.org>, "Paul, Andrea" <andrea.paul@mountsinai.org>, "Raoufi,
Mohammad" <mohammad.raoufi@mountsinai.org>, "Roman, Taisha (MSSM-Imail)"
<Taisha.Roman@mssm.edu>, "Smethurst, Mark (MSSM-Imail)" <Mark.Smethurst@mssm.edu>, "Trevino,
Edward (MSSM-Imail)" <Edward.Trevino@mssm.edu>, "Varughese, Leena (MSSM-Imail)"
<leena.varughese@mssm.edu>, "Yao, Jonathan (MSSM-Imail)" <Jonathan.Yao@mssm.edu>
Cc: "Zhu, Hongfa" <Hongfa.Zhu@mountsinai.org>, "Beasley, Mary" <Mary.Beasley@mountsinai.org>,
"Bleiweiss, Ira" <Ira.Bleiweiss@mountsinai.org>, "Deligdisch, Liane" <Liane.Deligdisch@mountsinai.org>,
"Dikman, Steven" <Steven.Dikman@mountsinai.org>, "Eliasen, Carol" <Carol.Eliasen@mountsinai.org>,
"Fiel, MariaIsabel" <MariaIsabel.Fiel@mountsinai.org>, "Fowkes, Mary" <Mary.Fowkes@mountsinai.org>,
"Garcia, Roberto A" <Roberto.Garcia@mountsinai.org>, "Harpaz, Noam" <noam.harpaz@mountsinai.org>,
"Jaffer, Shabnam" <Shabnam.Jaffer@mountsinai.org>, "Kalir, Tamara" <Tamara.Kalir@mountsinai.org>,
"Lento, Patrick" <Patrick.Lento@mountsinai.org>, "Magid, Margret" <margret.magid@mountsinai.org>,
"Morgello, Susan (MSSM-Imail)" <Susan.Morgello@mssm.edu>, "Morotti, Raffaella"
<Raffaella.Morotti@mountsinai.org>, "Nagi, Chandandeep" <Chandandeep.Nagi@mountsinai.org>, "Phelps,
Robert" <robert.phelps@mountsinai.org>, "Polydorides, Alexandros"
<alexandros.polydorides@mountsinai.org>, "Qiu, Libo" <Libo.Qiu@mountsinai.org>, "Ramer, Naomi"
<Naomi.Ramer@mountsinai.org>, "Strauchen, James" <james.strauchen@mountsinai.org>, "Thung, Swan"
<Swan.Thung@mountsinai.org>, "Unger, Pamela" <Pamela.Unger@mountsinai.org>, "Ward, Stephen
(MSSM-Imail)" <Stephen.Ward@mssm.edu>, "Xiao, Guang-Qian" <Guang-Qian.Xiao@mountsinai.org>
Date: Thu, 12 May 2011 18:27:30 -0400
Subject: cases pending final



Eileen Hauptman

P002400

Laboratory Administrative Manager

Department of Pathology

Mount Sinai Medical Center

1468 Madison Avenue

NY, NY 10029

212-241-9158 Office

917-218-1262 Long Range pager

212 426 5129 Fax

This e-mail transmission and any document, files, or previous e-mail messages attached to it, may contain confidential information that is legally privileged. The information contained in the transmission is exempt from disclosure under applicable law prepared in accordance with New York State Public Health Law 2805 j through m; New York State Education Law 6527 and Federal Public Law 109-41. This transmission is only intended for the individual or entity to which it is addressed. If the reader of this transmission is not the intended recipient, you are notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, please notify the sender immediately by telephone.

 **cases pending final RES 5-9.xls**
28K

# WEEK ENDING 5-9-11

| | Accession# | Current Status (I | Accession D: | Recv Date | Primary Specimen Description |
|---|---|---|---|---|---|
| **AUTOPSY - HOSPITAL** | | | | | |
| CHEPOVETSY, JULIE, MD | | | | | |
| | MA-11-00041 | FAD Dictation | | 3/5/11 | 3/5/11 AUTOPSY - ANATOMIC |
| CHOW, JONATHAN, MD | | | | | |
| | MA-11-00056 | FAD Dictation | | 4/5/11 | 4/5/11 AUTOPSY - ANATOMIC |
| JORDAN, ADRIENNE, MD | | | | | |
| | MA-11-00028 | FAD Dictation | 2/21/11 | 2/21/11 | AUTOPSY - ANATOMIC |
| **TISSUE MN** | | | | | |
| Smethurst M.D., Mark E. | | | | | |
| | MN-11-00451 | Gross Transcripti | | 5/9/11 | 5/9/11 LEFTLEGMBX. |
| **SURGICAL** | | | | | |
| ROMAN, TAISHA, MD | | | | | |
| | QS-11-01793 | Resident Review | | 5/9/11 | 5/9/11 GALLBLADDER |
| **TISSUE MS** | | | | | |
| BLOUIN, AMANDA, MD, PHD | | | | | |
| | MS-11-60853 | Resident Review | | 5/2/11 | 5/2/11 FISTULA AND SKIN ? |
| | MS-11-60868 | Resident Review | | 5/3/11 | 5/3/11 SIGMOID COLON |
| | MS-11-60876 | Resident Review | | 5/3/11 | 5/3/11 LIPOMA |
| | MS-11-61343 | Resident Review | | 5/6/11 | 5/6/11 PLACENTA |
| | MS-11-61392 | Resident Review | | 5/9/11 | 5/9/11 PLACENTA |
| | MS-11-61397 | Resident Review | | 5/9/11 | 5/9/11 PLACENTA |
| | MS-11-61459 | Resident Review | | 5/9/11 | 5/9/11 POC |
| | MS-11-61462 | Resident Review | | 5/9/11 | 5/9/11 RIGHT FEMORAL HEAD |
| CHEPOVETSY, JULIE, MD | | | | | |
| | MS-11-61231 | Resident Review | | 5/5/11 | 5/5/11 ADENOIDS |
| | MS-11-61234 | Resident Review | | 5/5/11 | 5/5/11 GALLBLADDER |
| | MS-11-61238 | Resident Review | | 5/5/11 | 5/5/11 LEFT TONSIL |
| | MS-11-61246 | Resident Review | | 5/6/11 | 5/6/11 CONTENTS OF LEFT MASTOID |
| | MS-11-61255 | Resident Review | | 5/6/11 | 5/6/11 PSEUDOANEURYSM |
| | MS-11-61257 | Resident Review | | 5/6/11 | 5/6/11 LEFT GREAT TOE |
| | MS-11-61263 | Resident Review | | 5/6/11 | 5/6/11 RIGHT ABOVE KNEE AMPUTATION |
| | MS-11-61284 | Resident Review | | 5/6/11 | 5/6/11 BONE FROM RIGHT FOOT |
| | MS-11-61290 | Resident Review | | 5/6/11 | 5/6/11 STERNAL BONE |
| | MS-11-61292 | Resident Review | | 5/6/11 | 5/6/11 BONES RIGHT ANKLE |
| | MS-11-61303 | Resident Review | | 5/6/11 | 5/6/11 LEFT FEMORAL HEAD |

**CHERNEYKIN, SERGEY, MD**

| | | | |
|---|---|---|---|
| MS-11-61323 | Resident Review | 5/6/11 | BONE FROM RIGHT FOOT AND SOFT TISSUE |
| MS-11-61336 | Resident Review | 5/6/11 | RIGHT KNEE BONES |
| MS-11-61374 | Resident Review | 5/6/11 | MEDIASTINAL LYMPH NODE |
| MS-11-61375 | Resident Review | 5/7/11 | LEFT MAXILLARY FRACTURE BONE |

**JORDAN, ADRIENNE, MD**

| | | | |
|---|---|---|---|
| MS-11-61121 | Resident Review | 5/4/11 | TISSUE FROM L3 - L1 |
| MS-11-61165 | Resident Review | 5/5/11 | ICD GENERATOR |
| MS-11-61186 | Resident Review | 5/5/11 | RIGHT COLON |

**MS-11-61000** Resident Review 5/3/11 RIGHT MANDIBULAR FISTULA
**MS-11-61047** Resident Review 5/4/11 TEETH x 2 E & F

**KAZI, SOFIA, MD**

| | | | |
|---|---|---|---|
| MS-11-61485 | Resident Review | 5/9/11 | L3-L4 INTERBODY SPACE |
| MS-11-61510 | Resident Review | 5/9/11 | ARYTENOID RIGHT |
| MS-11-61511 | Resident Review | 5/9/11 | SEPTUM |
| MS-11-61517 | Resident Review | 5/9/11 | RIGHT INFERIOR TURBINATE |
| MS-11-61513 | Resident Review | 5/9/11 | DEGENERATIVE DISC  L 5 - S I |

**MCCASH, SAMUEL, M.D.**

**MS-11-61272** Resident Review 5/6/11 BIOPSY OF UTERUS LINING

**MERCER, STEPHEN, M.D., PHD**

| | | | |
|---|---|---|---|
| MS-11-61099 | Resident Review | 5/4/11 | LEFT AXILLARY SENTINEL LYMPH NODE |
| MS-11-61469 | Resident Review | 5/9/11 | GLOBULAR SKIN TUMOR 2 O'CLOCK |

**MORENCY, ELIZABETH, MD**

| | | | |
|---|---|---|---|
| MS-11-60984 | Resident Review | 5/3/11 | ILEOCOLIC RESECTION |
| MS-11-61137 | Resident Review | 5/5/11 | GASTROENTEROSTOMY |
| MS-11-61142 | Resident Review | 5/5/11 | ILEO-COLIC RESECTION |
| MS-11-61261 | Resident Review | 5/6/11 | LEFT PELVIC ABSCESS CAVITY |
| MS-11-61295 | Resident Review | 5/6/11 | ILEOSTOMY STOMP |
| MS-11-61521 | Resident Review | 5/9/11 | PERI COLON |

**RAOUFI, MOHAMMAD, MD**

**MS-11-61198** Resident Review 5/5/11 STOMACH

**COOMAN, TAISHA, MD**

| | | | |
|---|---|---|---|
| MS-11-61409 | Resident Review | 5/9/11 | APPENDIX |
| MS-11-61433 | Resident Review | 5/9/11 | APPENDIX |
| MS-11-61438 | Resident Review | 5/9/11 | LEFT THYROID LOBE |
| MS-11-61467 | Resident Review | 5/9/11 | LEFT BREAST SCAR |
| MS-11-61493 | Resident Review | 5/9/11 | RIGHT FEMORAL HEAD |

| | | | | |
|---|---|---|---|---|
| **VARUGHESE MD, LEENA** | | | | |
| | MS-11-61502 | Resident Review | 5/9/11 | 5/9/11 TUBE LEFT EAR |
| | MS-11-61451 | Resident Review | 5/9/11 | 5/9/11 ANTERIOR LEEP |
| **TISSUE PRIVATE PN** | | | | |
| Smethurst M.D., Mark E. | | | | |
| | PN-11-00029 | Gross Transcripti: | 5/6/11 | 5/6/11 RIGHT THIGH MUSCLE BIOPSY |
| **TISSUE PRIVATE PS** | | | | |
| ROMAN, TAISHA, MD | | | | |
| | PS-11-10640 | Resident Review | 5/9/11 | 5/9/11 BILATERAL VAS DEFERENTIA |
| | PS-11-10647 | Resident Review | 5/9/11 | 5/9/11 RIGHT BREAST CAPSULE |
| VARUGHESE, LEENA, MD | | | | |
| | PS-11-10648 | Resident Review | 5/9/11 | 5/9/11 COPPER T IUD |