> returning will we do everything in our power IF it is possible to
> adjust the schedule so that she covers some time when you are both
> next on surgicals so that you can complete your training for the
> rotation you are currently on.
>
> Lastly, I would ask that we try and keep this as quiet as possible for
> now.  Like I mentioned before, we do not know when Sarah is returning.
> It is within the realm of possibilities, although unlikely, that she
> would return on Monday.  If she does we will, of course, notify you
> immediately.  Until we know more about the situation, it is best if
> this information stays between the few people addressed in this
> e-mail.  I would hate for rumors to circulate about the potential
> absence of Sarah for the remainder of the month if it turns out not to
> be the case.
>
> Again, I am terribly sorry to have to ask this of you, but we all must
> work together to get through the current situation.  Please let me
> know if this plan requires any adjustment that I am unaware of.
> Adrienne Jordan, M.D.
> Pathology Resident, PGY3
> The Mount Sinai Medical Center
> Department of Pathology- Box 1194
> One Gustave L. Levy Place
> New York, NY 10029
> Cell: 330-327-7339
>

2

CONFIDENTIAL

D_ESI018000

Exhibit 218

8/9/2011
12:45 PM

**Firpo, Adolfo**

| | |
|---|---|
| **From:** | Birge, Miriam <Miriam.Birge@mountsinai.org> |
| **Sent:** | Tuesday, August 09, 2011 12:45 PM |
| **To:** | Firpo, Adolfo |
| **Subject:** | RE: Dermatopathology rotation request |

Dear Adolfo,

Thank you so much for the request; we are thrilled that residents want to rotate with us. Please tell Dr. Varughese that we will welcome her and do all we can to make her experience in Dermpath a positive one.

On another note, I am in the process of constructing standard evaluations to be used by our fellow of our faculty, and by our faculty of our fellow. Do you know if a template exists for such an evaluation?

Sincerely,

Miriam Birge

-----Original Message-----
From: Firpo, Adolfo [mailto:adolfo.firpo@mssm.edu]
Sent: Thursday, August 04, 2011 7:25 AM
To: Birge, Miriam
Subject: Dermatopathology rotation request
Importance: High

Dear Dr. Birgé:

Dr. Leena Verughese, one of out 4th year residents has requested the opportunity to rotate through dermatopathology from Sept 26 - October 31, 2011. This represents a change in her already scheduled rotations but it should have minor impact on the overall program. I agreed to explore the feasibility of your service to accommodate Dr. Varughese during this period.

With appreciation,

Adolfo Firpo

Adolfo Firpo, M.D.,M.P.A.,FCAP
Professor and Director
Pathology Educational Activities
Department of Pathology,
The Mount Sinai School of Medicine.
The Mount Sinai Hospital
Phone: 212-659-8214
Fax: 212-348-7556
E-mail: adolfo.firpo@mssm.edu

Office Address:
Icahn Medical Institute 8th Floor, Office 8-40 , Box-1612

1

D02649

Exhibit 219

Firpo, Adolfo

| | |
|---|---|
| From: | Lento, Patrick <Patrick.Lento@mountsinai.org> |
| Sent: | Thursday, September 01, 2011 9:46 AM |
| To: | Harpaz, Noam (MSH) |
| Cc: | Firpo, Adolfo; Morency, Elizabeth (MSSM-Imail); Jordan, Adrienne (MSH) |
| Subject: | RE: Dr. Varughese |

Irrespective of whether that is true, she had requested GI and now wants to change it. The decision not to grant her new request was made after consideration of many factors so it is unfair, in my mind, for her to ask you to allow it after the fact.

Pat

-----Original Message-----
From: Harpaz, Noam
Sent: Thursday, September 01, 2011 9:41 AM
To: Lento, Patrick
Cc: Firpo, Adolfo (MSSM); Morency, Elizabeth (MSSM-Imail); Jordan, Adrienne
Subject: RE: Dr. Varughese

Thanks for informing me, Pat.  I'm under the impression that she rotated in GI 2 years ago, but it's irrelevant to the matter at hand.

-----Original Message-----
From: Lento, Patrick
Sent: Thursday, September 01, 2011 9:28 AM
To: Harpaz, Noam
Cc: Firpo, Adolfo (MSSM); Morency, Elizabeth (MSSM-Imail); Jordan, Adrienne
Subject: RE: Dr. Varughese

Noam,

This had already been addressed and the request was denied.

Without going in to great detail, Leena had made a request for GI when the schedule was being made before the start of the year. She has not done GI in the past but has already done DP. In addition, the chiefs spoke with Bob Phelps about this and he was gracious enough to indicate that Leena was welcome to join the DP signout everyday from 6-8 am if she was interested.

Pat

-----Original Message-----
From: Harpaz, Noam
Sent: Thursday, September 01, 2011 9:01 AM
To: Morency, Elizabeth (MSSM-Imail); Jordan, Adrienne
Cc: Firpo, Adolfo (MSSM); Lento, Patrick
Subject: Dr. Varughese



20

D02256

-----Original Message-----
From: Lento, Patrick [mailto:Patrick.Lento@mountsinai.org]
Sent: Thursday, September 01, 2011 9:46 AM
To: Harpaz, Noam (MSH)
Cc: Firpo, Adolfo; Morency, Elizabeth (MSSM-Imail); Jordan, Adrienne (MSH)
Subject: RE: Dr. Varughese

Irrespective of whether that is true, she had requested GI and now wants to change it. The
decision not to grant her new request was made after consideration of many factors so it
is unfair, in my mind, for her to ask you to allow it after the fact.

Pat

-----Original Message-----
From: Harpaz, Noam
Sent: Thursday, September 01, 2011 9:41 AM
To: Lento, Patrick
Cc: Firpo, Adolfo (MSSM); Morency, Elizabeth (MSSM-Imail); Jordan, Adrienne
Subject: RE: Dr. Varughese

Thanks for informing me, Pat.  I'm under the impression that she rotated in GI 2 years
ago, but it's irrelevant to the matter at hand.

-----Original Message-----
From: Lento, Patrick
Sent: Thursday, September 01, 2011 9:28 AM
To: Harpaz, Noam
Cc: Firpo, Adolfo (MSSM); Morency, Elizabeth (MSSM-Imail); Jordan, Adrienne
Subject: RE: Dr. Varughese


Noam,

This had already been addressed and the request was denied.

Without going in to great detail, Leena had made a request for GI when the schedule was
being made before the start of the year. She has not done GI in the past but has already
done DP. In addition, the chiefs spoke with Bob Phelps about this and he was gracious
enough to indicate that Leena was welcome to join the DP signout everyday from 6-8 am if
she was interested.

Pat

-----Original Message-----
From: Harpaz, Noam
Sent: Thursday, September 01, 2011 9:01 AM
To: Morency, Elizabeth (MSSM-Imail); Jordan, Adrienne
Cc: Firpo, Adolfo (MSSM); Lento, Patrick
Subject: Dr. Varughese

Dear Chiefs - Dr. Varughese has requested my permission to drop out of her upcoming
assigned rotation in GI Pathology (starting Sept 26) to allow her to rotate in Dermpath
instead.  I responded in no uncertain terms that this change would require authorization
from the Chief Residents AND another housestaff assigned to take her place.  To avoid any

misunderstanding, I will assume until hearing otherwise that she will be rotating in GI as
scheduled.

Noam Harpaz, M.D., Ph.D.
Professor of Pathology and Medicine (Gastroenterology) Mount Sinai School of Medicine
Director, Division of Gastrointestinal Pathology The Mount Sinai Medical Center Annenberg
Building 15-38 One Gustave L. Levy Place New York, NY 10029
Tel: 1-212-241-6692
Fax: 1-212-828-4188

This email and any attachments may contain confidential information and are intended for
use solely by the addressee(s). If you are not the intended recipient of this email,
please be aware that any dissemination, distribution, copying or other use of the email is
whole or in part is strictly prohibited.  If you have received this email in error, please
notify the sender and permanently delete the original and all copies of the email,
attachments and any printouts.

**From:**        leena varughese [leena.varughese@mssm.edu]
**Sent:**        Wednesday, May 18, 2011 10:23 AM
**To:**          Lento, Patrick; Morency, Elizabeth (MSSM-Imail); Jordan, Adrienne
**Subject:**     Schedule

**Follow Up Flag:**    Follow up
**Flag Status:**       Flagged

Hi.

The program description that was recently updated notes that the "clinical pathology component" is 4 months of clinical chem, microbiology, and hematology; and 3 months of blood banking and 1 month of lab management. In addition, there is space for 1-2 months of elective. This is the layout for the structured training in clinical pathology at this residency.  As of the end of this year, the clinical pathology rotation breakdown for me is as follows: 3 months of microbiology (2 at the va and 1 at msh); 1 month of molecular pathology (1 elective); 0.5 month of tumor cytogenetics (hematopath or .5 elective); 1.5 month clinical chemistry; 1 month blood bank; 0.5 month flow cytometry (hematopath or 0.5 elective); 1 month of hematopathology (AP or CP). This is a total of 8.5 months of cp training. I still require 9.5 months of structured cp training, which should technically meet the program description: 3 months of hematology ( or 2 months of hematology and 1 month of hematopatho logy); 1 month of micro at MSH; 1.5 months of clinical chemistry; 2 months of blood banking; 2 weeks of lab management. This will leave me with 2.5 months for AP of which has to be 1 month at the ME, then the other 1.5 months can be split evenly between GI elective and the new biopsy rotation. Please make the changes required to the schedule to meet the requirements for appropriate clinical pathology rotations and structured training. Thank you.

Leena Varughese

CONFIDENTIAL

D_ESI010802

Exhibit 220

---------- Forwarded message ----------
From: "Jordan, Adrienne" <adrienne.jordan@mountsinai.org>
To: "Chow, Jonathan (MSSM-Imail)" <jonathan.chow@mssm.edu>, "Morency, Elizabeth
(MSSM-Imail)" <elizabeth.morency@mssm.edu>, "Azar, Paul (MSSM-Imail)"
<paul.azar@mssm.edu>, "Martinez, Alicia (MSSM-Imail)" <alicia.martinez@mssm.edu>,
"Roman, Taisha (MSSM-Imail)" <Taisha.Roman@mssm.edu>, "Varughese, Leena (MSSM-
Imail)" <leena.varughese@mssm.edu>, "Hechtman, Jaclyn" <jaclyn.hechtman@mountsinai.org>
Date: Wed, 07 Sep 2011 17:08:08 -0400
Subject: Osler

Many people have been asking about the Osler course. We met with Ms.
Patel today to discuss the financial aspect of it. Here is the deal:


The first osler course is October 2-8 in Tampa, FL. Other dates and locations will
be released soon. If you would like to attend the Tampa course you must let Liz and I know by
the END OF THIS WEEK. If you would like to wait and see when the other dates and locations
are, you must also let us know that. Once you say you want to attend the Tampa course you can
not change your mind when the other locations are released. If the Tampa course fills while you
are waiting, you are out of luck. If you are on a service rotation for the Tampa course, you can
still go but you must find coverage (Leena I believe this only applies to you since you are on GI).


Now the issue of payment. As you are aware, in the past the department
reimburses you after you return from a conference. Due to the expense
of Osler the department has agreed to pay for SOME of the cost before
hand. The department will pay for the registration, syllabus, slide lab,
and microscope rental for you. WE will register you for Osler in order
to pay for this in advance. We will also set up a way to monitor your
attendance at the review. Should you fail to attend the lectures, you
would be required to reimburse the department for the cost of your trip
and registration fees. The department will also pre-pay for your flight
but you MUST use the Axiom website to book your flight (refer to the e-
mails we got last year about how to use this website. If you are unsure,
ask me and I will forward you the details. Its really very easy). The
ONLY thing you need to pay out of pocket for and wait to be reimbursed
is meals and the hotel. With respect to the hotel, you must use the hotel

associated with the review course and you MUST room with one other person. Please let Liz and I know who you will be rooming with. When you return from your trip you simply turn in your receipts and credit card statements as usual and you will be reimbursed.

As this is a new benefit to our residents I am sure I have left things off or not addressed all of your concerns so please let me know ASAP if there are any other details we should address. Lets also be grateful to Dr. Firpo, Dr. Lento, and Ms. Patel who worked so hard to secure this educational experience for us and lighten the financial burden.

Adrienne Jordan, M.D.

The Mount Sinai Hospital

Department of Pathology - Box 1194

One Gustave L. Levy Place

New York, NY 10029

Pager (917) 401-5341

Cell (330) 327-7339

---------- Forwarded message ----------
From: "Jordan, Adrienne" <adrienne.jordan@mountsinai.org>
To: "Jordan, Adrienne" <adrienne.jordan@mountsinai.org>, "Varughese, Leena (MSSM-Imail)" <leena.varughese@mssm.edu>, "Morency, Elizabeth (MSSM-Imail)" <elizabeth.morency@mssm.edu>, "Hechtman, Jaclyn" <jaclyn.hechtman@mountsinai.org>, "Chow, Jonathan (MSSM-Imail)" <jonathan.chow@mssm.edu>, "Martinez, Alicia (MSSM-Imail)" <alicia.martinez@mssm.edu>, "Roman, Taisha (MSSM-Imail)" <Taisha.Roman@mssm.edu>, "Azar, Paul (MSSM-Imail)" <paul.azar@mssm.edu>
Date: Tue, 13 Sep 2011 17:09:07 -0400

Subject: RE: Osler

One more thing, when you make the hotel reservations, again remember that you HAVE to stay at the hotel associated with the course (which for Tampa is the Wyndam Hotel) and when you make the reservations, tell them you are with the Osler course because there is a discounted rate.

Adrienne Jordan, M.D.

The Mount Sinai Hospital

Department of Pathology - Box 1194

One Gustave L. Levy Place

New York, NY  10029

Pager (917) 401-5341

Cell (330) 327-7339

-----Original Message-----

**From:** Jordan, Adrienne

**Sent:** Tuesday, September 13, 2011 5:06 PM

**To:** Varughese, Leena (MSSM-Imail); Morency, Elizabeth (MSSM-Imail); Hechtman, Jaclyn; Chow, Jonathan (MSSM-Imail); Martinez, Alicia (MSSM-Imail); Roman, Taisha (MSSM-Imail); Azar, Paul (MSSM-Imail)

**Cc:** Firpo, Adolfo (MSSM); Lento, Patrick

**Subject:** Osler

Hey guys,

Few things about Osler. I need to know if you want the Glass
Slide Lab. You can go to the lab the Saturday before the
conference starts or stay for the Sunday after the conference
starts. According to the people who went to Osler previously, the
slide lab may not be entirely beneficial because you are in lecture
until 9pm and then don't really have the energy to review more
slides. But of course, Elizabeth and I built the cost of the lab into
the budget so if you want it, you can have it. But if you don't
think it will be helpful, lets not waste the money. If you plan on
doing the slide lab, I also need to know if you need a microscope
rental or if you plan on bringing your own (yes, that is partially
my attempt at a joke, sorry guys, bad joke). So below is the list
of residents I have going to Tampa. Please update the missing
information ASAP so we can get you guys registered.


Going to Tampa:

1. Leena Varughese- Arrangements made separately

2. Jonathan Chow- Slide Lab (Saturday); Microscope Rental Needed

3. Taisha Roman

4. Jackie Hechtman

5. Elizabeth Morency- Slide Lab (Saturday); Microscope Rental Needed

6. Paul Azar

7. Alicia Martinez

P1154

Adrienne Jordan, M.D.

The Mount Sinai Hospital

Department of Pathology - Box 1194

One Gustave L. Levy Place

New York, NY  10029


Pager (917) 401-5341

Cell (330) 327-7339

P1155

Exhibit 221




**From:** "Firpo, Adolfo" <adolfo.firpo@exchange.mssm.edu>
**Date:** Wed, 7 Sep 2011 15:21:43 -0400
**To:** "Barnett, Scott" <scott.barnett@exchange.mssm.edu>, "Johnson, Paul F (GME) (MSSM-Imail)" <paul.f.johnson@mssm.edu>
**Cc:** "Cordon-cardo, Carlos" <carlos.cordon-cardo@exchange.mssm.edu>, "Patel, Shema" <shema.patel@exchange.mssm.edu>
**Subject:** RE: Meeting - Dr. Leena Varughese - New developments today

Scott and Paul:

She showed up here in my office initially friendly but claiming that she was once more she was being treated unfairly. Eventually the denial of her request to drop off the GI elective surfaced. She explained that Dr. Harpaz had told her that she could drop off the rotation if she found a replacement because he had no one else to gross GI since his fellows were away that week. She said that she intended to contact all the other residents directly to see if someone else was willing to take her place in the GI elective. I told her that doing that would be inappropriate since her request had already been denied by everyone. She said that it was her right to seek a change in her schedule as she had made it known a long time ago that she wanted out of the elective GI rotation. She claims that she had requested to drop this elective at a resident's meeting and Dr. Mabel Ko had taken her place in it, she said that she was originally scheduled to do the elective in September and not in October and claims that she was placed on the rotation in October not knowing it; she said she brought this to the attention of one of the chief residents when the official schedule came out and had insisted on being taken off the rotation but was denied that option. She assumed that I would make it happen despite the fact that she was not following the policy of making her formal request to the chief residents. She was ccd the e-mail in which I asked the chief residents to consider her request objectively and fairly. She acknowledges having received it but insists that I had committed to make it happen for her since I had mentioned that it may be possible when we first talked about it as a possibility. I reminded her that at all times I made her fully aware that there was a process to follow and that I would only intervene on her behalf; the final decision would depend on the feasibility of altering the schedule, finding a replacement, having the agreements of both attendings. At no time did I guarantee that the change would be made, much less by my decision alone.

During quite a heated discussion I happened to glance at Scott's e-mail and told her that I would look into it over the next two days and would get back to her. She finally left my office but still insisting that denial of her right to substitute a rotation for another was unfair and discriminatory of her as a resident whose training was being paid by the Federal government. I assured her that my intentions were to be objective and fair towards everyone, but made it clear that I would not make a unilateral decision in favor of her or anyone else, nor violate established policies and not consider the potential impact on the rest of the program and all involved.

Thanks for your support and guidance,

D01170

Adolfo

Adolfo Firpo, M.D:,M.P.A.,FCAP
Professor and Director
Pathology Educational Activities
Department of Pathology,
The Mount Sinai School of Medicine.
The Mount Sinai Hospital
Phone: 212-659-8214
Fax: 212-348-7556
E-mail: adolfo.firpo@mssm.edu

*Office Address:*
Icahn Medical Institute 8th Floor, Office 8-40 , Box-1612
1425 Madison Avenue and E98th Street
New York, New York 10029-6574

*Mailing address:*
One Gustave L. Levy Place, Box 1619
ATTN: Dr. Firpo
New York, New York 10029-6574

---

**From:** Barnett, Scott
**Sent:** Wednesday, September 07, 2011 2:17 PM
**To:** Firpo, Adolfo; Johnson, Paul F (GME) (MSSM-Imail); Barnett, Scott
**Subject:** Re: Meeting - Dr. Leena Varughese - Any ideas to reply to her?
**Importance:** High

I suggest telling her you need a day or two to think this over and we will discuss tomorrow
Scott

Scott H. Barnett, M.D.
Associate Professor of Medical Education and Pediatrics
Associate Dean for GME
President, Faculty Council
Mount Sinai School of Medicine
(P) 212-241-6694
(f) 212-426-7748

**From:** "Firpo, Adolfo" <adolfo.firpo@exchange.mssm.edu>
**Date:** Wed, 7 Sep 2011 14:09:25 -0400
**To:** "Johnson, Paul F (GME) (MSSM-Imail)" <paul.f.johnson@mssm.edu>, "Barnett, Scott" <scott.barnett@exchange.mssm.edu>
**Subject:** FW: RE: Meeting - Dr. Leena Varughese - Any ideas to reply to her?

Paul and Scott:

I had to officially notify her that her request to drop the elective in GI had been denied. I never told her that it would be fine to do so. I mentioned to her that requests for changes to the schedule were processed by the chief residents and that the attending had to agree to the change. Dr. Harpaz did not agree to allow her to drop off the rotation and actually reminded her that this had to be processed by the Chief residents when she approached him directly despite our discussion and recommendations on how to approach this issue.

Should I wait until tomorrow to respond to her?

Adolfo

Adolfo Firpo, M.D.,M.P.A.,FCAP
Professor and Director
Pathology Educational Activities
Department of Pathology,
The Mount Sinai School of Medicine.
The Mount Sinai Hospital
Phone: 212-659-8214
Fax: 212-348-7556
E-mail: adolfo.firpo@mssm.edu

*Office Address:*
Icahn Medical Institute 8th Floor, Office 8-40 , Box-1612
1425 Madison Avenue and E98th Street
New York, New York 10029-6574

*Mailing address:*
One Gustave L. Levy Place, Box 1619
ATTN: Dr. Firpo
New York, New York 10029-6574

---

**From:** leena varughese [mailto:leena.varughese@mssm.edu]
**Sent:** Wednesday, September 07, 2011 1:46 PM
**To:** Firpo, Adolfo
**Subject:** Re: RE: Meeting - Dr. Leena Varughese
**Importance:** High

Dr. Firpo,

I attempted to call you several times and only to be connected to say hello and then for the call to be dropped promptly afterwards.

I will discuss with Dr. Petersen any of the specifics regarding the HP rotation. Do you mind emailing me a copy of the objectives for the Hemepath rotation?

Three, I don't understand why Dr. Harpaz wants to deny me from switching from GI to Dermpath. If the concern is finding a resident to gross for the month as Dr. Harpaz had mentioned to me when I discussed this issue with him earlier last month, then it would be possible to look at the schedule and perhaps transfer another resident on CP rotation to that slot.

At this point in the training, I really need more exposure to Dermpath and I want Dermpath as my elective. This is most certainly not an unreasonable request by any means. In fact, many of the residents are granted away rotation/electives already and even while they were supposed to be on duty at the hospital. I find all of this to be rather egregiously unfair towards me and partiality or favoritism towards some individuals. This is very unacceptable as this is affecting my training in pathology at this hospital. In fact, I would like to point out the lack of rotation asssignment to Hematology over the past 4 years,

D01172

excess number of Microbiology at the VA and additionaly months at Englewood despite my lack of interest in this rotation. The implication that this is simply all acceptable because Dr.Lento finds this to alright does not translate immediately to adequate or sufficient training or comparable training to other residents in my cohort, and those who graduated las t year or those immediately junior to my year.

Finally, I have made plans to attend the Osler in Tampa, Fl next month and have made all the necessary arrangements. I will be submitting the forms for reimbursement and will be away for the first week of October. You also said that it should not be a problem for me to switch my elective. I appreciate your time and look forward to coming to an amicable resolution.

Regards,

Dr. Varughese

----- Original Message -----
From: "Firpo, Adolfo" <adolfo.firpo@mssm.edu>
Date: Wednesday, September 7, 2011 12:07 pm
Subject: RE: Meeting - Dr. Leena Varughese
To: "Varughese, Leena (MSSM-Imail)" <leena.varughese@mssm.edu>

> Dr. Varughese:
>
> 1.    Thank you for your e-mail. I don't understand what the
> problem was with the phone and why the communication was lost each
> of the two times you called this morning. It is fine to meet next
> week, Wednesday 14 September  at 9:00AM in my office.
>
> 2.    I understand this week you started a new rotation in
> Hematopathology.*     Have you met with your supervisor yet?
> *     Were you made aware of the goals and objectives of this
> rotation?*     Were you given a detailed schedule describing
> your daily responsibilities and work hours?
> *     Are there any special tasks that will be assigned to you
> as a 4th year resident?
> *     Were all your questions answered and any concerns you
> might have had properly addressed?
>
> 3.    I must also inform you that your request for dropping off
> the elective GI rotation with Dr. Harpaz was denied. You will
> report to begin that rotation as scheduled.
>
> Sincerely,
>
> Dr. Firpo
>
> Adolfo Firpo, M.D.,M.P.A.,FCAP
> Professor and Director
> Pathology Educational Activities
> Department of Pathology,
> The Mount Sinai School of Medicine.
> The Mount Sinai Hospital

> Phone: 212-659-8214
> Fax: 212-348-7556
> E-mail: adolfo.firpo@mssm.edu<mailto:adolfo.firpo@mssm.edu>
>
>
> Office Address:
> Icahn Medical Institute 8th Floor, Office 8-40 , Box-1612
> 1425 Madison Avenue and E98th Street
> New York, New York 10029-6574
>
> Mailing address:
> One Gustave L. Levy Place, Box 1619
> ATTN: Dr. Firpo
> New York, New York 10029-6574
>
>
>
> -----Original Message-----
> From: leena varughese [mailto:leena.varughese@mssm.edu]
> Sent: Wednesday, September 07, 2011 11:46 AM
> To: Firpo, Adolfo
> Subject: Meeting
>
> Dr. Firpo,
>
> I am emailing to apologize for not being able to meet with you
> this morning at 9am. I attempted to call you and have a
> conversation over the telephone several times this morning but the
> call was dropped every single time. Anyway, I was wondering if we
> could reschedule for another time this week or the next. I usually
> sign out around 2 pm and go to the GI conferences around 4 pm.
> Thank you.
>
> Dr. Varughese
>
>

D01174

| | |
|---|---|
| From: | Paul Johnson [paul.f.johnson@mssm.edu] |
| Sent: | Wednesday, September 07, 2011 3:47 PM |
| To: | Firpo, Adolfo |
| Cc: | Barnett, Scott; Cordon-cardo, Carlos; Patel, Shema; Lowy, Marina (MSH); Tiger-Paillex, Caryn |
| Subject: | Re: Meeting - Dr. Leena Varughese - New developments today |

I should check with Scott before replying! I defer to him...we shall discuss more tomorrow. Thanks, Paul

On Sep 7, 2011, at 3:39 PM, Paul Johnson wrote:

Her refusal to accept the program's decision fits into her pattern of unprofessional and insubordinate behavior. You have already explained the valid reasons for denying her request. I would think that in the next conversation, you should tell her that the decision is final (reviewing with her how you arrived at the decision) and that she is expected to complete the rotation that was assigned to her.

On Sep 7, 2011, at 3:21 PM, Firpo, Adolfo wrote:

Scott and Paul:

She showed up here in my office initially friendly but claiming that she was once more she was being treated unfairly. Eventually the denial of her request to drop off the GI elective surfaced. She explained that Dr. Harpaz had told her that she could drop off the rotation if she found a replacement because he had no one else to gross GI since his fellows were away that week. She said that she intended to contact all the other residents directly to see if someone else was willing to take her place in the GI elective. I told her that doing that would be inappropriate since her request had already been denied by everyone. She said that it was her right to seek a change in her schedule as she had made it known a long time ago that she wanted out of the elective GI rotation. She claims that she had requested to drop this elective at a resident's meeting and Dr. Mabel Ko had taken her place in it, she said that she was originally scheduled to do the elective in September and not in October and claims that she was placed on the rotation in October not knowing it; she said she brought this to the attention of one of the chief residents when the official schedule came out and had insisted on being taken off the rotation but was denied that option. She assumed that I would make it happen despite the fact that she was not following the policy of making her formal request to the chief residents. She was ccd the e-mail in which I asked the chief residents to consider her request objectively and fairly. She acknowledges having received it but insists that I had committed to make it happen for her since I had mentioned that it may be possible when we first talked about it as a possibility. I reminded her that at all times I made her fully aware that there was a process to follow and that I would only intervene on her behalf; the final decision would depend on the feasibility of altering the schedule, finding a replacement, having the agreements of both attendings. At no time did I guarantee that the change would be made, much less by my decision alone.

During quite a heated discussion I happened to glance at Scott's e-mail and told her that I would look into it over the next two days and would get back to her. She finally left my office but still insisting that denial of her right to substitute a rotation for another was unfair and discriminatory of her as a resident whose training was being paid by the Federal government. I assured her that my intentions were to be objective and fair towards everyone, but made it clear that I would not make a unilateral decision in favor of her or anyone else, nor violate established policies and not consider the potential impact on the rest of the program and all involved.

Thanks for your support and guidance,

ESI.PRIV.00107

Adolfo

Adolfo Firpo, M.D.,M.P.A.,FCAP
Professor and Director
Pathology Educational Activities
Department of Pathology,
The Mount Sinai School of Medicine.
The Mount Sinai Hospital
Phone: 212-659-8214
Fax: 212-348-7556
E-mail: adolfo.firpo@mssm.edu

*Office Address:*
Icahn Medical Institute 8th Floor, Office 8-40 , Box-1612
1425 Madison Avenue and E98th Street
New York, New York 10029-6574

*Mailing address:*
One Gustave L. Levy Place, Box 1619
ATTN: Dr. Firpo
New York, New York 10029-6574

**From:** Barnett, Scott
**Sent:** Wednesday, September 07, 2011 2:17 PM
**To:** Firpo, Adolfo; Johnson, Paul F (GME) (MSSM-Imail); Barnett, Scott
**Subject:** Re: Meeting - Dr. Leena Varughese - Any ideas to reply to her?
**Importance:** High

I suggest telling her you need a day or two to think this over and we will discuss tomorrow
Scott

Scott H. Barnett, M.D.
Associate Professor of Medical Education and Pediatrics
Associate Dean for GME
President, Faculty Council
Mount Sinai School of Medicine
(P) 212-241-6694
(f) 212-426-7748

**From:** "Firpo, Adolfo" <adolfo.firpo@exchange.mssm.edu>
**Date:** Wed, 7 Sep 2011 14:09:25 -0400
**To:** "Johnson, Paul F (GME) (MSSM-Imail)" <paul.f.johnson@mssm.edu>, "Barnett, Scott" <scott.barnett@exchange.mssm.edu>
**Subject:** FW: RE: Meeting - Dr. Leena Varughese - Any ideas to reply to her?

Paul and Scott:

I had to officially notify her that her request to drop the elective in GI had been denied. I never told her that it would be fine to do so. I mentioned to her that requests for changes to the schedule were processed by the chief residents and that the attending had to agree to the change. Dr. Harpaz did not agree to allow her to drop off the rotation and actually reminded her that this had to be processed by the Chief residents when she approached him directly despite our discussion and recommendations on how to approach this issue.

2

ESI.PRIV.00108

CONFIDENTIAL

D03181

Should I wait until tomorrow to respond to her?

Adolfo

Adolfo Firpo, M.D.,M.P.A.,FCAP
Professor and Director
Pathology Educational Activities
Department of Pathology,
The Mount Sinai School of Medicine,
The Mount Sinai Hospital
Phone: 212-659-8214
Fax: 212-348-7556
E-mail: adolfo.firpo@mssm.edu

*Office Address:*
Icahn Medical Institute 8th Floor, Office 8-40 , Box-1612
1425 Madison Avenue and E98th Street
New York, New York 10029-6574

*Mailing address:*
One Gustave L. Levy Place, Box 1619
ATTN: Dr. Firpo
New York, New York 10029-6574

**From:** leena varughese [mailto:leena.varughese@mssm.edu]
**Sent:** Wednesday, September 07, 2011 1:46 PM
**To:** Firpo, Adolfo
**Subject:** Re: RE: Meeting - Dr. Leena Varughese
**Importance:** High

Dr. Firpo,

I attempted to call you several times and only to be connected to say hello and then for the call to be dropped promptly afterwards.

I will discuss with Dr. Petersen any of the specifics regarding the HP rotation. Do you mind emailing me a copy of the objectives for the Hemepath rotation?

Three, I don't understand why Dr. Harpaz wants to deny me from switching from GI to Dermpath. If the concern is finding a resident to gross for the month as Dr. Harpaz had mentioned to me when I discussed this issue with him earlier last month, then it would be possible to look at the schedule and perhaps transfer another resident on CP rotation to that slot.

At this point in the training, I really need more exposure to Dermpath and I want Dermpath as my elective. This is most certainly not an unreasonable request by any means. In fact, many of the residents are granted away rotation/electives already and even while they were supposed to be on duty at the hospital. I find all of this to be rather egregiously unfair towards me and partiality or favoritism towards some individuals. This is very unacceptable as this is affecting my training in pathology at this hospital. In fact, I would like to point out the lack of rotation assignment to Hematology over the past 4 years, excess number of Microbiology at the VA and additionaly months at Englewood despite my lack of interest in this rotation. The implication that this is

3

ESI.PRIV.00109

simply all acceptable because Dr.Lento finds this to alright does not translate immediately to adequate or sufficient training or comparable training to other residents in my cohort, and those who graduated las t year or those immediately junior to my year.

Finally, I have made plans to attend the Osler in Tampa, Fl next month and have made all the necessary arrangements. I will be submitting the forms for reimbursement and will be away for the first week of October. You also said that it should not be a problem for me to switch my elective. I appreciate your time and look forward to coming to an amicable resolution.

Regards,

Dr. Varughese

----- Original Message -----
From: "Firpo, Adolfo" <adolfo.firpo@mssm.edu>
Date: Wednesday, September 7, 2011 12:07 pm
Subject: RE: Meeting - Dr. Leena Varughese
To: "Varughese, Leena (MSSM-Imail)" <leena.varughese@mssm.edu>

> Dr. Varughese:
>
> 1.      Thank you for your e-mail. I don't understand what the
> problem was with the phone and why the communication was lost each
> of the two times you called this morning. It is fine to meet next
> week, Wednesday 14 September  at 9:00AM in my office.
>
> 2.      I understand this week you started a new rotation in
> Hematopathology.*     Have you met with your supervisor yet?
> *      Were you made aware of the goals and objectives of this
> rotation?*     Were you given a detailed schedule describing
> your daily responsibilities and work hours?
> *      Are there any special tasks that will be assigned to you
> as a 4th year resident?
> *      Were all your questions answered and any concerns you
> might have had properly addressed?
>
> 3.      I must also inform you that your request for dropping off
> the elective GI rotation with Dr. Harpaz was denied. You will
> report to begin that rotation as scheduled.
>
> Sincerely,
>
> Dr. Firpo
>
> Adolfo Firpo, M.D.,M.P.A.,FCAP
> Professor and Director
> Pathology Educational Activities
> Department of Pathology,
> The Mount Sinai School of Medicine.
> The Mount Sinai Hospital
> Phone: 212-659-8214

4

ESI.PRIV.00110

CONFIDENTIAL

D03183

> Fax: 212-348-7556
> E-mail: adolfo.firpo@mssm.edu<mailto:adolfo.firpo@mssm.edu>
>
>
> Office Address:
> Icahn Medical Institute 8th Floor, Office 8-40 , Box-1612
> 1425 Madison Avenue and E98th Street
> New York, New York 10029-6574
>
> Mailing address:
> One Gustave L. Levy Place, Box 1619
> ATTN: Dr. Firpo
> New York, New York 10029-6574
>
>
>
> -----Original Message-----
> From: leena varughese [mailto:leena.varughese@mssm.edu]
> Sent: Wednesday, September 07, 2011 11:46 AM
> To: Firpo, Adolfo
> Subject: Meeting
>
> Dr. Firpo,
>
> I am emailing to apologize for not being able to meet with you
> this morning at 9am. I attempted to call you and have a
> conversation over the telephone several times this morning but the
> call was dropped every single time. Anyway, I was wondering if we
> could reschedule for another time this week or the next. I usually
> sign out around 2 pm and go to the GI conferences around 4 pm.
> Thank you.
>
> Dr. Varughese
>
>

5

ESI.PRIV.00111

CONFIDENTIAL

D03184

**From:**       Barnett, Scott
**Sent:**       Wednesday, September 07, 2011 2:17 PM
**To:**         Firpo, Adolfo; Johnson, Paul F (GME) (MSSM-Imail); Barnett, Scott
**Subject:**    Re: Meeting - Dr. Leena Varughese - Any ideas to reply to her?

**Importance:**     High

I suggest telling her you need a day or two to think this over and we will discuss tomorrow
Scott

Scott H. Barnett, M.D.
Associate Professor of Medical Education and Pediatrics
Associate Dean for GME
President, Faculty Council
Mount Sinai School of Medicine
(P) 212-241-6694
(f) 212-426-7748

**From:** "Firpo, Adolfo" <adolfo.firpo@exchange.mssm.edu>
**Date:** Wed, 7 Sep 2011 14:09:25 -0400
**To:** "Johnson, Paul F (GME) (MSSM-Imail)" <paul.f.johnson@mssm.edu>, "Barnett, Scott"
<scott.barnett@exchange.mssm.edu>
**Subject:** FW: RE: Meeting - Dr. Leena Varughese - Any ideas to reply to her?

Paul and Scott:

I had to officially notify her that her request to drop the elective in GI had been denied. I never told her that it would be
fine to do so. I mentioned to her that  requests for changes to the schedule were processed by the chief residents and
that the attending had to agree to the change. Dr. Harpaz did not agree to allow her to drop off the rotation and actually
reminded her that this had to be processed by the Chief residents when she approached him directly despite our
discussion and recommendations on how to approach this issue.

Should I wait until tomorrow to respond to her?

Adolfo

Adolfo Firpo, M.D.,M.P.A.,FCAP
Professor and Director
Pathology Educational Activities
Department of Pathology,
The Mount Sinai School of Medicine.
The Mount Sinai Hospital
Phone: 212-659-8214
Fax: 212-348-7556
E-mail: adolfo.firpo@mssm.edu

*Office Address:*
Icahn Medical Institute 8th Floor, Office 8-40 , Box-1612
1425 Madison Avenue and E98th Street
New York, New York 10029-6574

1

CONFIDENTIAL

D_ESI003635

*Mailing address:*
One Gustave L. Levy Place, Box 1619
ATTN: Dr. Firpo
New York, New York 10029-6574

---

**From:** leena varughese [mailto:leena.varughese@mssm.edu]
**Sent:** Wednesday, September 07, 2011 1:46 PM
**To:** Firpo, Adolfo
**Subject:** Re: RE: Meeting - Dr. Leena Varughese
**Importance:** High

Dr. Firpo,

I attempted to call you several times and only to be connected to say hello and then for the call to be dropped promptly afterwards.

I will discuss with Dr. Petersen any of the specifics regarding the HP rotation. Do you mind emailing me a copy of the objectives for the Hemepath rotation?

Three, I don't understand why Dr. Harpaz wants to deny me from switching from GI to Dermpath. If the concern is finding a resident to gross for the month as Dr. Harpaz had mentioned to me when I discussed this issue with him earlier last month, then it would be possible to look at the schedule and perhaps transfer another resident on CP rotation to that slot.

At this point in the training, I really need more exposure to Dermpath and I want Dermpath as my elective. This is most certainly not an unreasonable request by any means. In fact, many of the residents are granted away rotation/electives already and even while they were supposed to be on duty at the hospital. I find all of this to be rather egregiously unfair towards me and partiality or favoritism towards some individuals. This is very unacceptable as this is affecting my training in pathology at this hospital. In fact, I would like to point out the lack of rotation asssignment to Hematology over the past 4 years, excess number of Microbiology at the VA and additionaly months at Englewood despite my lack of interest in this rotation. The implication that this is simply all acceptable because Dr.Lento finds this to alright does not translate immediately to adequate or sufficient training or comparable training to other residents in my cohort, and those who graduated las t year or those immediately junior to my year.

Finally, I have made plans to attend the Osler in Tampa, Fl next month and have made all the necessary arrangements. I will be submitting the forms for reimbursement and will be away for the first week of October. You also said that it should not be a problem for me to switch my elective. I appreciate your time and look forward to coming to an amicable resolution.

Regards,

Dr. Varughese

----- Original Message -----
From: "Firpo, Adolfo" <adolfo.firpo@mssm.edu>
Date: Wednesday, September 7, 2011 12:07 pm
Subject: RE: Meeting - Dr. Leena Varughese

2

CONFIDENTIAL

D_ESI003636

To: "Varughese, Leena (MSSM-Imail)" <leena.varughese@mssm.edu>

> Dr. Varughese:
>
> 1.     Thank you for your e-mail. I don't understand what the
> problem was with the phone and why the communication was lost each
> of the two times you called this morning. It is fine to meet next
> week, Wednesday 14 September  at 9:00AM in my office.
>
> 2.     I understand this week you started a new rotation in
> Hematopathology.*     Have you met with your supervisor yet?
> *     Were you made aware of the goals and objectives of this
> rotation?*     Were you given a detailed schedule describing
> your daily responsibilities and work hours?
> *     Are there any special tasks that will be assigned to you
> as a 4th year resident?
> *     Were all your questions answered and any concerns you
> might have had properly addressed?
>
> 3.     I must also inform you that your request for dropping off
> the elective GI rotation with Dr. Harpaz was denied. You will
> report to begin that rotation as scheduled.
>
> Sincerely,
>
> Dr. Firpo
>
> Adolfo Firpo, M.D.,M.P.A.,FCAP
> Professor and Director
> Pathology Educational Activities
> Department of Pathology,
> The Mount Sinai School of Medicine.
> The Mount Sinai Hospital
> Phone: 212-659-8214
> Fax: 212-348-7556
> E-mail: adolfo.firpo@mssm.edu<mailto:adolfo.firpo@mssm.edu>
>
>
> Office Address:
> Icahn Medical Institute 8th Floor, Office 8-40 , Box-1612
> 1425 Madison Avenue and E98th Street
> New York, New York 10029-6574
>
> Mailing address:
> One Gustave L. Levy Place, Box 1619
> ATTN: Dr. Firpo
> New York, New York 10029-6574
>
>
>
>

3

D_ESI003637

> -----Original Message-----
> From: leena varughese [mailto:leena.varughese@mssm.edu]
> Sent: Wednesday, September 07, 2011 11:46 AM
> To: Firpo, Adolfo
> Subject: Meeting
>
> Dr. Firpo,
>
> I am emailing to apologize for not being able to meet with you
> this morning at 9am. I attempted to call you and have a
> conversation over the telephone several times this morning but the
> call was dropped every single time. Anyway, I was wondering if we
> could reschedule for another time this week or the next. I usually
> sign out around 2 pm and go to the GI conferences around 4 pm.
> Thank you.
>
> Dr. Varughese
>
>

4

D_ESI003638

Exhibit 222

5/10/13 1:41 PM

   Leena V <leena.bookworm@gmail.com>

## Fwd: Re: RE: Elective GI rotation in September 2011

**leena varughese** <leena.varughese@mssm.edu>   Wed, Sep 21, 2011 at 1:48 PM
To: leena.bookworm@gmail.com

---------- Forwarded message ----------
From: leena varughese <leena.varughese@mssm.edu>
To: "Firpo, Adolfo" <adolfo.firpo@mssm.edu>
Cc: "mabel ko" <ok.lebam@gmail.com>, "Jordan, Adrienne (MSH)" <adrienne.jordan@mountsinai.org>,
"Morency, Elizabeth (MSSM-Imail)" <elizabeth.morency@mssm.edu>, "Lento, Patrick (MSH)"
<Patrick.Lento@mountsinai.org>, "Cordon-cardo, Carlos" <carlos.cordon-cardo@exchange.mssm.edu>,
"Harpaz, Noam (MSH)" <Noam.Harpaz@mountsinai.org>
Date: Wed, 07 Sep 2011 21:10:45 -0400
Subject: Re: RE: Elective GI rotation in September 2011

I am sorry, this was a passing coversation at a residents meeting very many many months ago. It doesn't
suprise me if she doesn't remember and that's ok. However, this does not preclude me from having to take
the GI elective or not. I am not asking for an away elective but rather to be switched to Dermpath. This is a
request that I made with you in July. Two, GI is an excellent rotation and has been to my knowledge very
interesting and educational for the residents who had rotated thru it. However, I was not scheduled for the
rotation as was most of my peers last year. Instead, I had additional months of Elmhurst, GYN, and Autopsy.
This year however, I have several other interests and I requested for electives in several different specialties
as is practiced at Mt. Sinai. The only option given to me was to rotate thru GI. I am not interested in rotating
thru GI at this juncture and want to switch to DP as I had requested earlier in July, and if there is a conflict
with too many residents on DP or whatever else that month, I am willing to switch to a different rotation such
as Hematology, as you had suggested, and also because as you well know, this year I am covering an
excess of months at affiliates, including an additional month of Englewood (I aready did my required 2
months) and two months of microbiology at the VA (I already did my 2 months of microbiology at the VA),
instead of attempting to meet the CP requirements in a structured and adequate fashion as is mentioned in
the program description and as per ACGME requirements. Finally, Dr. Harpaz mentioned the possibility of not
having enough residents to cover the grossing of surgical specimens for the next period but that should not
be an issue as there are 6 people on surgical pathology and a total of three fellows covering liver and GI. I am
sure some amicable resolution can be worked out to res olve this matter without elevating this issue to some
colossal problem. One more final point, please don't be offended by anything written in this email as it's not
meant to hurt anyones' feelings or sensibility.

Regards,

Dr. Varughese

----- Original Message -----
From: "Firpo, Adolfo" <adolfo.firpo@mssm.edu>
Date: Wednesday, September 7, 2011 8:01 pm
Subject: RE: Elective GI rotation in September 2011
To: 'mabel ko' <ok.lebam@gmail.com>

P1525

Cc: "Varughese, Leena (MSSM-Imail)" <leena.varughese@mssm.edu>, "Jordan, Adrienne (MSH)"
<adrienne.jordan@mountsinai.org>, "Morency, Elizabeth (MSSM-Imail)" <elizabeth.morency@mssm.edu>,
"Lento, Patrick (MSH)" <Patrick.Lento@mountsinai.org>, "Cordon-cardo, Carlos" <carlos.cordon-
cardo@exchange.mssm.edu>, "Harpaz, Noam (MSH)" <Noam.Harpaz@mountsinai.org>

> Dr. Ko:
>
> Thank you for your prompt reply.
>
> Dr. Firpo
>
> Adolfo Firpo, M.D.,M.P.A.,FCAP
> Professor and Director
> Pathology Educational Activities
> Department of Pathology,
> The Mount Sinai School of Medicine.
> The Mount Sinai Hospital
> Phone: 212-659-8214
> Fax: 212-348-7556
> E-mail: adolfo.firpo@mssm.edu<mailto:adolfo.firpo@mssm.edu>
>
>
> Office Address:
> Icahn Medical Institute 8th Floor, Office 8-40 , Box-1612
> 1425 Madison Avenue and E98th Street
> New York, New York 10029-6574
>
> Mailing address:
> One Gustave L. Levy Place, Box 1619
> ATTN: Dr. Firpo
> New York, New York 10029-6574
>
>
>
> From: mabel ko [mailto:ok.lebam@gmail.com]
> Sent: Wednesday, September 07, 2011 8:00 PM
> To: Firpo, Adolfo
> Cc: Varughese, Leena (MSSM-Imail); Jordan, Adrienne (MSH);
> Morency, Elizabeth (MSSM-Imail); Lento, Patrick (MSH); Cordon-
> cardo, Carlos; Harpaz, Noam (MSH)
> Subject: Re: Elective GI rotation in September 2011
>
> Hello,
>
> No, I have already done my GI elective (in August). I haven't
> talked to Leena about taking over an elective.
>
> I also was unaware of her request at the resident's meeting.
>
> Thanks,
> Mabel
> On Wed, Sep 7, 2011 at 6:54 PM, Firpo, Adolfo
> <adolfo.firpo@mssm.edu<mailto:adolfo.firpo@mssm.edu>> wrote:

> Dear Dr. Ko:
>
> Without any details or explanations answer the following two
> questions:
>
> 1.     Did you agree to take over the September's elective GI
> rotation for Dr. Varughese?
>
> 2.     Did you agree to do so  in response to her request to be
> taken off the elective GI rotation during a resident's meeting?
>
> Thank you,
>
> Dr. Firpo
>
> Adolfo Firpo, M.D.,M.P.A.,FCAP
> Professor and Director
> Pathology Educational Activities
> Department of Pathology,
> The Mount Sinai School of Medicine.
> The Mount Sinai Hospital
> Phone: 212-659-8214<tel:212-659-8214>
> Fax: 212-348-7556<tel:212-348-7556>
> E-mail: adolfo.firpo@mssm.edu<mailto:adolfo.firpo@mssm.edu>
>
>
> Office Address:
> Icahn Medical Institute 8th Floor, Office 8-40 , Box-1612
> 1425 Madison Avenue and E98th Street
> New York, New York 10029-6574
>
> Mailing address:
> One Gustave L. Levy Place, Box 1619
> ATTN: Dr. Firpo
> New York, New York 10029-6574
>
>
>

---

**2 attachments**

📄 **leena.varughese.vcf**
   1K

📄 **leena.varughese.vcf**
   1K

Exhibit 223

Transcript of Conversations

(September 12, 2011)

PARTICIPANTS:

Leena Varughese

Scott Barnett

Raj

Transcriber, Carla Oakley
**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, NJ 08619**
         **(609)586-2311**
**FAX NO.   (609)587-3599**
**E-mail:   jjcourt@jjcourt.com**
**Website:  www.jjcourt.com**

Audio Recorded

```
                        Colloquy                    2

 1              LEENA VARUGHESE:  Hi.  This is
 2      (indiscernible) my friend.
 3              RAJ:  Hi.  I'm Raj (indiscernible), nice to
 4      meet you, his friend, just come in.
 5              SCOTT BARNETT:  So, it's your meeting.
 6              LEENA VARUGHESE:  Yeah, so -- okay.  So
 7      basically I wanted to switch my elective and I had
 8      discussed this with Dr. Firpo several months ago and he
 9      said it shouldn't be a problem.  And he asked Dr. Birge
10      (phonetic) and she said it's okay.  And he was supposed
11      to talk to Dr. Harpaz (phonetic), but he never did.
12              SCOTT BARNETT:  Ah --
13              LEENA VARUGHESE:  And that was, you know,
14      just before the rotation, you know, that was going to
15      start, so I said, you know, do I need to do something
16      else such as like, you know, fill out a form or make it
17      like more of an official request?  But I initially
18      thought that like I was asking him -- he -- I was under
19      the impression that he was the program director.
20              SCOTT BARNETT:  No.
21              LEENA VARUGHESE:  I know, but he told me that
22      he was.  And this was like --
23              SCOTT BARNETT:  He's knows he's not.
24              LEENA VARUGHESE:  Well, I don't understand
25      why --
```

```
                        Colloquy                    3

 1              SCOTT BARNETT:  He's the director of
 2      education of the department.
 3              LEENA VARUGHESE:  Well, I don't understand
 4      why he would say that he was the program director
 5      several months ago.
 6              SCOTT BARNETT:  Well, listen, I met with Dr.
 7      Firpo and talked with him many, many times and I'm on
 8      -- cc'd on all the emails that go back and forth.  And
 9      Adolfo has a different understanding of what he said
10      and what was and was not promised.  Basically, his view
11      is that he never told you it wouldn't be a problem
12      (indiscernible) and he did -- he talked to Dr. Harpaz
13      and Dr. Birge and that Dr. Harpaz never promised it
14      could be done.  He said he would think about it and
15      depending on the coverage and stuff and that Dr. Firpo
16      knows he's not a program director.  I mean, he never
17      said --
18              LEENA VARUGHESE:  Well, that's why I ask him
19      straight out.  I said, hey, you know, are you the
20      program director?  Are you acting in the capacity of
21      program director?  He said, yes, I am.
22              SCOTT BARNETT:  But he supersedes the program
23      director.  He's the director of education of the
24      department.  Every -- all the program directors report
25      to him.  But there seems to be a little bit of he said
```

Colloquy                                    4

1    she said going on here, and Dr. Firpo doesn't -- he
2    never thinks quite the same way that you do.  And who's
3    right and who's wrong, I don't know if anybody's right
4    or anybody's wrong.  I think there was a -- I mean, for
5    what it's worth, Dr. Firpo strikes me as a guy who was
6    fair and is fair and he's trying his best to get a hold
7    of the issues in that program and your particular
8    training situation.  And he's trying to be fair and
9    objective and open-minded and start from a neutral
10   position.  And then I don't know why it appears to be
11   there isn't anybody to replace you on that rotation
12   because it's -- I mean, again, I don't know to what
13   extent you've tried to talk to each of your colleagues
14   and tried to get coverage (indiscernible), you know.  I
15   mean, I was the program director for a very long time
16   and most scheduling problems are the old warm body
17   problem.  You need x number of people in the rotation.
18   They have x number of people.  If you leave they'll
19   have x minus one and they need x.
20           And I don't think most program directors --
21   and I told Dr. Firpo that letting the people in the
22   rotation who are in charge of the rotation decide who
23   should be allowed to rotate is not a great philosophy
24   because then you leave it open to people that say,
25   well, I don't want that person, you know, I want this

Colloquy                                    5

1    person.  And, you know, and say, well, you can't rotate
2    with me.  You know, there are broader training things,
3    but that if a person running in experience has to have
4    a certain number of people and that's the way this unit
5    has to run, they're entitled to have that number of
6    people.  But I don't think anybody really cares who is
7    there.  And I don't think Dr. Firpo cares.  I don't
8    think Dr. Harpaz cares, at least I get that sense.  And
9    if you were to be able to find somebody to replace you
10   for part or all of that experience, I think something
11   could be worked out.  But the problem is I don't think
12   that that person's been (indiscernible).  That's my
13   understanding.
14           LEENA VARUGHESE:  Well, that's interesting
15   that's their understanding, because I was basically,
16   you know, sending email by Adrienne saying that I'm not
17   allowed to speak to any residents regarding switching
18   or switching into the rotation for coverage issues.
19   And -- what did she say?  She said that I can only talk
20   to Dr. Yao or -- no, I can only contact Dr. Yao by
21   electronic email or I cannot talk to him in person.
22   This is like beyond ridiculous.  This is the kind of
23   like emails that are sent to me on a regular basis.  So
24   I want you to take a look at this and tell me what you
25   think.  And two, GI rotation does not always have a

1     resident.
2                SCOTT BARNETT:  No, but I think the problem
3     is the fellow is away that week, right?
4                LEENA VARUGHESE:  The fellow is also there.
5                SCOTT BARNETT:  No, my understanding is the
6     fellow is away and that's the problem.
7                LEENA VARUGHESE:  She's away the last week.
8     She's on --
9                RAJ:  You spoke to the fellow, right?
10               LEENA VARUGHESE:  Yeah, and I --
11               RAJ:  Yvie Suarez (phonetic)?
12               LEENA VARUGHESE:  Yeah, I also spoke to the
13    fellow who said it shouldn't -- you know, it's not
14    necessarily a resident dependent rotation.  But the
15    last week, she is on vacation.  And, two, I had already
16    made plans to go to Osler (phonetic) for the second
17    week.  And that shouldn't be an issue anyway because
18    there's going to be coverage.  You know, given all
19    that, it's still a resident independent rotation to the
20    degree -- you know, in the sense that like there's not
21    always a resident there and it still works out just
22    fine.
23               SCOTT BARNETT:  Listen, I -- sitting here on
24    the fifth floor, it's very hard -- I mean, again, there
25    is 1,666 residents in training in the programs that I

1     oversee.  There are 150 training programs.  I -- it's
2     not generally feasible for me to adjudicate issues like
3     this, all right.  Now, this is clearly a much more
4     complicated thing.  And whether they can have a
5     resident, they usually have a resident, they don't have
6     a resident, that's sort of too much information.  I
7     just -- I don't -- it's just not feasible for me to be
8     involved on this scale.  But, you know, you -- between
9     -- I don't love this email.  I don't understand.  It
10    seems overly confrontational to me and I don't -- I
11    mean, Dr. Yao is your colleague.  I mean, it's a free
12    country.  If you want to pick up the phone and talk to
13    Dr. Yao -- now, again, I'm not sure.  I'm certainly
14    happy to speak to Firpo and tell him like what is this
15    email about and why did you choose to take this
16    approach?  It seems like they are asking you to do
17    something that is not standard, you know.  Most people
18    if they had (indiscernible).  Now, I don't know, maybe
19    Dr. -- maybe they talked to Dr. Yao and they said
20    (indiscernible) pressured.. I don't have no idea why
21    they chose to suggest this particularly interesting
22    layout of schedules.
23               RAJ:  That seems to be the tone of the email
24    she's getting.  Also, it's -- you know, it's to that
25    point.  I think that's why she wanted to speak with you

Colloquy                               8

1    because it's --
2               SCOTT BARNETT:  Well, I also -- I think that
3    they're trying to establish -- the training program was
4    and is less so but still remains in effect.  There are
5    issues that Dr. -- the new chairman and the new
6    director of education are trying to get a handle on.
7    They're trying to standardize things that are things --
8    switches toward a certain way.  They want these to
9    work.  They're trying to do this and they're trying to
10   say, well, this is the way we want it done.  And
11   they're trying to ask people to adhere to that.  So
12   there are polices.  There are procedures.
13              RAJ:  It seems Leena is being unfairly
14   treated though.  She's -- you know, Dr. Firpo sent an
15   email to Dr. Peterson (phonetic) stating he wanted a
16   list on how she's meeting all these ACGME requirements,
17   the competencies that everybody (indiscernible).
18   Several years ago I went to residency training.  I know
19   what you have to do.  And if he's requiring that of
20   Leena, why she -- you know, he should require it of
21   every resident.
22              SCOTT BARNETT:  But how do you know that he's
23   not?  You don't know that.
24              RAJ:  I don't know that, but, you know, I --
25              SCOTT BARNETT:  Well, you can't accuse him of


Colloquy                               9

1    discriminating unless you know those facts.  And the --
2    you know, this is -- again, this is not in isolation.
3    You know, there was an academic advisement here about
4    the number of issues, including professionalism.  And
5    Firpo was asked by the chairman and by us to sort of
6    wipe the slate clean, meet with Leena every two weeks,
7    go over these things.  As far as I know, she's the only
8    person on academic advisement in the program.  So if
9    that's the case, asking for information about progress
10   related -- the only person who is on academic
11   advisement is not treating somebody differently.  It's
12   just doing due diligence.
13              RAJ:  That's true, but, you know, unless
14   there's a specific problem why go to the extent of --
15   to the point of intimidating her superiors and saying,
16   you know, I need specific points on every, you know,
17   each of the competencies?
18              SCOTT BARNETT:  They're not intimidating
19   superiors.  It's what people -- that's their job.  If
20   the program director asks you to give you an
21   evaluation, that's your job.  Otherwise, you get fired.
22   That has nothing to do with intimidation.
23              RAJ:  No, no, no, an evaluation is a separate
24   issue.
25              SCOTT BARNETT:  Yeah.

Colloquy                                    10

1       RAJ:  But this was -- you can show the email.
2   I don't --
3       SCOTT BARNETT:  Listen, the program director
4   and the director of education have the right to solicit
5   information about the trainees.  That's their job.  To
6   the extent they're doing it to other residents, I
7   couldn't tell you.  Whether they're doing it -- if this
8   is a department-wide or program-wide issue, I don't
9   know.  This is -- Dr. Peterson is your new advisor,
10  right?
11      LEENA VARUGHESE:  Yeah, he's been my adviser.
12      SCOTT BARNETT:  Okay, so he's your adviser.
13      RAJ:  I think Leena just wants even and fair
14  treatment like everyone else.
15      SCOTT BARNETT:  Well, again, I don't know
16  that -- again, for all I know this email was sent to
17  every advisor by Firpo saying, listen, I'm director of
18  education.  You're the advisor.  I want to meet with
19  you to discuss how his department now is evaluating its
20  trainees.
21      RAJ:  Well, you could see --
22      SCOTT BARNETT:  I know.
23      RAJ:  -- it was sent specifically to Leena
24  and then --
25      SCOTT BARNETT:  Yeah, but --

Colloquy                                    11

1       RAJ:  -- cc'd to several other --
2       SCOTT BARNETT:  Yeah, but you don't know that
3   Adolfo didn't send the same mail to Joe Blow (phonetic)
4   who's another advisor cc'd to the person that he'd be
5   advising.  You don't know that.  I don't know that.
6       RAJ:  But that's the type of pressure Leena
7   is under.  She's under a lot of emotional stress.  I've
8   seen her like crying about this.
9       SCOTT BARNETT:  Yeah, but again, I --
10      RAJ:  She feels like she's being singled out,
11  you know, unfairly.
12      SCOTT BARNETT:  But you don't -- without
13  knowing that you're being singled out.  How do you know
14  that?  I mean, if he wanted to be --
15      LEENA VARUGHESE:  Well, I'm on academic
16  advisement then --
17      SCOTT BARNETT:  If he wanted to be
18  surreptitious, he wouldn't have cc'd you, right?
19      RAJ:  Uh-huh.
20      SCOTT BARNETT:  I mean, the fact that he cc'd
21  you, you could -- again, I could argue -- I'm a great
22  arguer.  I grew up with my mother.  She could argue
23  anything.  I could argue anything.  I could easily make
24  the point that if he wanted discriminate against you,
25  he wouldn't have let you know what he was doing.  He

Colloquy                                         12

1    would have left you out of the loop.  There was no
2    reason he had to include you on this email at all,
3    right?  If he was on a vendetta, he could say, tell me
4    what you've got about this and leave it to me now.  The
5    fact that he was -- that he's apparently open about it
6    to me seems like, okay, everybody -- every advisee is
7    going to know --
8               RAJ:  I don't think that's the case.  Dr.
9    Peterson asked me, you know, what's this about?  What's
10   going on?
11              SCOTT BARNETT:  Well, Dr. Peterson is a
12   schmuck.  What is --
13              LEENA VARUGHESE:  He's not a schmuck.
14              SCOTT BARNETT:  Tell the guy to shut up.
15              LEENA VARUGHESE:  Don't say that.
16              SCOTT BARNETT:  Tell him to shut up.  It's
17   not his job to question you about what Adolfo Firpo is
18   doing.  It's stupid.  I mean, come on.  The guy --
19              LEENA VARUGHESE:  He didn't question me.  He
20   just said, you know, Dr. Firpo stopped by.
21              RAJ:  He is her advisor.
22              LEENA VARUGHESE:  He's my advisor.
23              RAJ:  And he's asking her what is this about,
24   so it seems strange, you know.
25              SCOTT BARNETT:  No, no, listen, it's not his

Colloquy                                         13

1    job.  His job is a faculty member.
2               LEENA VARUGHESE:  He's my advisor.
3               SCOTT BARNETT:  It doesn't matter.  He
4    reports to the department chairman and the director of
5    education.  If they tell him to produce the
6    information, produce the information.  What are they
7    talking to you for?  It's stupid.
8               RAJ:  I know, but --
9               SCOTT BARNETT:  I would never have tolerated
10   that as a vice chairman of a department.  I mean, it's
11   silly.  I mean, you know, that whole department is
12   insane.  Your department is insane.  I mean, it's --
13              RAJ:  Yeah, I asked Dr. -- you know, for her
14   to ask Dr. Peterson to come here today and she said,
15   you know --
16              SCOTT BARNETT:  Dr. Peterson --
17              RAJ:  -- he would, you know, flip out and
18   have a panic attack.
19              SCOTT BARNETT:  Dr. Peterson doesn't belong
20   in this discussion.  This is -- there's a department
21   chairman and a director of education.  They call the
22   shots.  If they ask Dr. Peterson to jump up and down on
23   his head, he has to jump up and down on his head or
24   resign from the department and the training program.
25   That's what -- I was a vice chairman for a long time.

Colloquy                                  14

 1    Somebody has got to run the training program.  And if
 2    he wants information, if he wants to instruct the --
 3    you know what, there was no control over the training
 4    program at all for 50 years.  Nobody knew what anybody
 5    was doing.  There were no protocols.  There were no
 6    goals and objectives.  There was no -- nothing.  And he
 7    -- my sense is, is that Firpo is trying to standardize
 8    all this, get it underway, get the expectations
 9    realigned so everybody knows what they're doing.  And
10    he cc'd you to let you know that he is expecting your
11    advisor to meet with him so he understands -- the
12    advisor understands what the expectations are.  Why
13    would the advisor ask you?  Let him ask Firpo what he
14    means by this.  Why is he asking you?  He placed you in
15    a terribly awkward situation.  It makes it sounds like
16    you're being --
17              RAJ:  You're the only one who is under that
18    situation, so.
19              SCOTT BARNETT:  Yeah, but for all I know that
20    there are 12 advisors and every advisor got the same
21    email.  I don't know that, and until I know that I
22    can't make a statement about it.  And if you want to
23    know, you could send an email -- you were cc'd -- to
24    Dr. Firpo if you -- it would be reasonable.  I would
25    have no -- I can't imagine an objection.  If there is,

Colloquy                                  15

 1    it would be -- I wouldn't understand it.  Dr. Firpo,
 2    thank you for including me on this email and just for
 3    my own edification, have you sent emails -- similar
 4    emails to all the advisors and their advisees?  You
 5    could send that email.  That would be a perfectly
 6    reasonable thing.  And if they said no, then again, he
 7    has that right to meet with Peterson, all right?
 8              RAJ:  Of course, yeah.
 9              SCOTT BARNETT:  But if he was going to be --
10    if he was going to single you out in this way, cc'ing
11    you is an extraordinarily (indiscernible).  If he
12    wanted to hide this, he shouldn't have cc'd you.  You
13    wouldn't have known about it.  So I think if you want
14    to reassure yourself or try to reassure yourself that
15    you're not being singled out, you could take that
16    approach.  The business about the elective, I just
17    don't have enough information to know whether your
18    absence without a switch is feasible.  I don't know the
19    answer to that.
20              RAJ:  And this is also her one elective
21    rotation in four years, whereas the other residents
22    seem to be getting, you know, for example, I think you
23    said Adrienne was on an away elective rotation, you
24    know, Dr. Jordan (phonetic) --
25              SCOTT BARNETT:  Right.

1    RAJ:  -- chief resident.  Now, you know, she
2  requested this change in July and she got indications
3  that it was changed.  And then at the last minute --
4  it's the last minute now -- they're saying they can't
5  do that, you know.
6    SCOTT BARNETT:  Again, I think there seems to
7  be a he said she said kind of thing.  I think the
8  pathology department doesn't believe that it was so --
9  they didn't think they had given the impression nor did
10  they wish to give the impression this was a done deal,
11  that it was okay, that it was already done, that it was
12  not going to be a problem (indiscernible) that he would
13  --
14    RAJ:  She made arrangements for Osler, the
15  resident review course in Tampa.  She paid for
16  everything.  She thought she had that rotation and --
17    LEENA VARUGHESE:  Well, even if I'm on the
18  rotation --
19    RAJ:  You can take it?  Okay, good.
20    LEENA VARUGHESE:  I can take it regardless.
21  It's not --
22    SCOTT BARNETT:  Right.
23    RAJ:  No, but, you know, that's good that
24  you're clear to take that week off?
25    LEENA VARUGHESE:  Well, I have to speak to

1  Dr. Harpaz, but --
2    RAJ:  Speak to Dr. Harpaz about it?
3    LEENA VARUGHESE:  -- it shouldn't be --
4    SCOTT BARNETT:  Right.
5    RAJ:  Because, you know -- because I've seen
6  the emails from Dr. Jordan saying, oh, unless you find
7  a person to cover for that week, you're not allowed to
8  go and you know, have resident education board review,
9  you know?  It seems that's the type of tone that's --
10    SCOTT BARNETT:  Well, again, I -- the tone of
11  individual emails, again, that's way beyond my ability
12  to police.  I mean, I can't monitor the emails of all
13  16 hundred trainees here.  The fact that I'm cc'd on
14  almost every email in the department now is
15  interesting.  Almost every email that's sent about any
16  trainee issue obviously (indiscernible).  I already get
17  200 emails a day.  So -- but I  think he's trying to
18  make sure I understand what he's trying to do, which is
19  fine.  I think there's several -- the approach I would
20  take is one to clarify whether the Osler experience is
21  in the bag (indiscernible).
22    RAJ:  There are several other of her fellow
23  residents are going and it would be unfair for her to
24  be singled out not to go, you know.
25    LEENA VARUGHESE:  Yeah.

Colloquy                                    18

1    SCOTT BARNETT:  I -- unless there's some
2  other piece of information that I'm missing, I --
3       LEENA VARUGHESE:  Well, I don't know what
4  other piece of information is going to just suddenly
5  like come up --
6       SCOTT BARNETT:  I don't know.
7       LEENA VARUGHESE:  -- because it was just like
8  the academic advisement, you know, disciplinary action
9  that's been taken since even though I met all the
10 requirements.
11      SCOTT BARNETT:  Well, I think -- I know the
12 department may have a slightly different view of how
13 well you're adhering to the terms of the advisement.  I
14 mean, again, it's something that you probably since
15 Adolfo Firpo is the person who is monitoring the
16 (indiscernible), you should be talking about your
17 meeting with him.  You know, I want this
18 (indiscernible).  I mean, I want this to work how.  How
19 do you think I'm doing?
20      LEENA VARUGHESE:  I did.  I did meet with him
21 and -- no, but we were supposed to discuss
22 professionalism, et cetera, then he just wanted to talk
23 about, you know, how the program is just so out of
24 control, this, that.  It's like, you know, this is not
25 all my fault.  Like I didn't -- you know, I'm just a

Colloquy                                    19

1  resident here.  You know, I had a bad experience with
2  one of the chief residents last year.  You know, I made
3  a complaint about it.  And then since then, like I've
4  been trying to move past that traumatic incident.
5  Instead, I keep getting dragged into all these -- you
6  know, this just keeps getting out of control.  It as if
7  like anything I say or do doesn't matter because it's
8  already predetermined that, you know --
9       SCOTT BARNETT:  I --
10      LEENA VARUGHESE:  -- no matter what there's
11 going to be this negative attitude towards me and this
12 is where it's going to go --
13      SCOTT BARNETT:  I don't know --
14      LEENA VARUGHESE:  -- as opposed to like, you
15 know, just resolve the issue, let's move past, because
16 I've given my word that I'm not taking any action or
17 I'm just not taking any real, you know, legal recourse
18 or actions given the situations and circumstances.  So
19 there's no reason to like really drag me into --
20      RAJ:  Her fellow residents are aware of
21 what's been happening and they advised her to get a
22 lawyer because of the, you know, just the crazy --
23      SCOTT BARNETT:  Listen, it's a free country.
24      RAJ:  Yeah.
25      SCOTT BARNETT:  You can get a lawyer.

Colloquy                                    20

1       RAJ:  Yeah.
2       SCOTT BARNETT:   You can do whatever you want.
3  I don't --
4       RAJ:  Yeah.
5       SCOTT BARNETT:   You can do whatever you want.
6       RAJ:  Right.
7       SCOTT BARNETT:   Whatever due process of a
8  recourse --
9       RAJ:  But that's the type of atmosphere
10 that's there and it shouldn't be like that, you know.
11      SCOTT BARNETT:  Well, listen, all I could do
12 is I have a slightly different take on this.  I am not
13 so sure based on, you know, I've heard some of what you
14 said and I'm trying -- I speak a lot more to Firpo and
15 Carlos, the chairman, Dr. Cordon-Cardo.  They --
16 they're not 100 percent sure that you've made the
17 strongest effort to put these things behind you.  There
18 are still occasional interactions you have with the
19 both of them that are unsatisfactory with them,
20 something that the other day people came out of their
21 offices and couldn't figure out why you were screaming
22 at Firpo.  Your voice was really --
23      LEENA VARUGHESE:  I wasn't screaming at him.
24      SCOTT BARNETT:  Maybe you don't perceive it
25 that way, but you probably didn't perceive it that the

Colloquy                                    21

1  first time you were in this room sitting in that chair,
2  you were yelling at me.  You might remember that I
3  asked you to look at my ID card and to read the title
4  on my card, right, which explains that I might outrank
5  you by like a million levels.  You wouldn't
6  (indiscernible).  Paul was about to come in here
7  through that wall.  You may not -- you may be
8  misinterpreting that your tone is perceived by others
9  as being more aggressive --
10      LEENA VARUGHESE:  I know.
11      SCOTT BARNETT:  -- than someone at your level
12 is entitled to.  You're not entitled to raise your
13 voice to the chairman of the department or the director
14 of education.  You are not entitled to do that.  I
15 never raised my voice with -- there are lots of people
16 I thought were douche bags.  This is my 34th year at
17 Mount Sinai and my 37th year in the profession, okay.
18 I've met lots more people than you have and there's
19 lots of people I would love to choke the shit out of,
20 but I didn't raise my voice to them and I didn't yell
21 at them and I didn't have an attitude with them,
22 because there's a hierarchy.  This is one of the most
23 conservative clubs in the world, medicine.  It is a
24 strict hierarchy.  It's not like the -- it's almost
25 like the military except we don't salute, okay.  It's

Colloquy                          22

```
 1     very obvious that that's the case.  And me, I'm the
 2     most free spirited 58 year old on the planet.  I'm the
 3     most informal person and my (indiscernible).  And it
 4     was very clear to me that there are certain lines
 5     you've got to be really careful about.  And I've had to
 6     deal with this my whole life.  I have a very reverent
 7     sense of humor.  I'm extraordinarily sarcastic.  And I
 8     have to count to 20 almost every time I open my mouth
 9     every day because I'm likely to say the most
10     irreverent, silly thing I can think of.  And I meet
11     with people, deans and presidents of hospitals and
12     presidents of medical centers and department chairmen,
13     and a lot of people outrank me.  And it takes a lot to
14     control myself.  I have a short temper.  People piss me
15     off really readily, but I've learned you've just got to
16     count to 20 and you've got to say, okay, I'm talking to
17     the department chairman.  And then some time --
18             RAJ:  Leena does have a short temper.
19             LEENA VARUGHESE:  No, I don't.
20             RAJ:  But, you know, she's defending her
21     point.  You know --
22             SCOTT BARNETT:  Okay, but there are --
23             RAJ:  -- she hasn't said anything outrageous.
24             SCOTT BARNETT:  I think --
25             RAJ:  She hasn't done anything outrageous.
```

Colloquy                          23

```
 1             SCOTT BARNETT:  I think that there are people
 2     --
 3             RAJ:  And she's entitled to defend yourself.
 4             SCOTT BARNETT:  She is.
 5             RAJ:  And I think that's all she's done,
 6     that's all.
 7             SCOTT BARNETT:  Well, you're her --
 8             RAJ:  And if you raise your voice when you're
 9     defending yourself, you're entitled to do that, you
10     know.
11             SCOTT BARNETT:  I think that you're allowed
12     to be passionate in your defense of yourself, but you
13     are -- but there are still rules or perceived rules of
14     interaction that you may have run afoul of, that's all
15     I'm saying, yes?
16             RAJ:  That's true, and that leaves a bad
17     taste in your mouth, but (indiscernible) treated fairly
18     and not just, you know --
19             SCOTT BARNETT:  Listen, my -- I had another
20     house officer in here (indiscernible) my role as the
21     associate dean for DME is to try my best to ensure that
22     exactly that is happening.  I have three sons of my own
23     at different stages of their life.  And all you could
24     handle -- all I want people to treat them, I want to
25     treat people fairly.  That is very important.
```

```
 1              RAJ:  If this was your daughter would you
 2     want her treated like this?  You know, like --
 3              SCOTT BARNETT:  I'm not convinced that she's
 4     being treated totally unfairly.  I don't agree with
 5     that assessment.  I think there are things that I might
 6     have handled differently, but I -- if you think this is
 7     all one sided, you're -- I think you're mistaken.  And
 8     I think that certainly the beginning of this, there
 9     were things that -- it was not handled well.  But
10     there's a new chairman.  There's a new director.
11              LEENA VARUGHESE:  Yes, plus continuing the
12     same treatment of me despite the fact that --
13              SCOTT BARNETT:  You know that is completely
14     not true.  I met with Carlos and Adolfo.  They came --
15     I'm completely convinced in my mind that they came here
16     with an open mind and wanted to move past this.  And it
17     was not -- I don't get the sense that they're
18     unreasonable people.  I think the -- you know,
19     Schiller, Jim Strauchen (phonetic) here when you first
20     started it was very different.  And (indiscernible) has
21     been under -- could have done a stronger job of taking
22     control of a somewhat (indiscernible) and getting it
23     all lined up to the standards that we expect.  I --
24     listen, you're -- I haven't been the recipient of any
25     of the meetings.  I don't know what report they've
```

```
 1     done.  And it could be very well true that these people
 2     who seem to me to be reasonable and fair are being --
 3     in their dealings with me are being less than that with
 4     you, right?  I have a certain administrative title
 5     here.  They know that if they piss me off I'll go to
 6     the dean, so that's not a good idea.  And they made --
 7     you know, I work with a -- one of my colleagues is a
 8     peds intern resident with somebody that I went to
 9     college with.  And then he went downstate, I went to
10     NYU, and came back here as an intern.  And Mitch
11     (phonetic) was a great fellow resident, and he was one
12     of the worst chief residents we've ever had in
13     pediatrics in all these years.  You could work with him
14     but you couldn't work for him.  He was a terrible
15     leader.  And if you said to him, listen, they're
16     pulling the wool over your eyes, they're a bunch of
17     (indiscernible) people and they're not being fair and
18     you don't -- you  have not been one -- you know, on
19     these meetings, you have no idea what's going on,
20     that's (indiscernible).
21              RAJ:  She's getting these emails also from
22     Dr. Firpo about the -- what was it?  About the -- what
23     was that email about?  Oh, you could not communicate
24     with Mabel (phonetic), that email?
25              LEENA VARUGHESE:  Oh, yeah, Mabel.
```

1          RAJ:  You know, it's not that she's imaging
2     it.  She's getting the emails that says you're not --
3          SCOTT BARNETT:  Yes, but again, based on --
4          LEENA VARUGHESE:  Yeah.
5          SCOTT BARNETT:  There was supposedly again,
6     Leena apparently had made the comment that Mabel seemed
7     to be aware of your need and Mabel has no recollection
8     of that, so he didn't want Leena to start pressuring
9     her because I think Mabel said, I don't want to talk
10    about this with everybody, so that's why he sent an
11    email.  It wasn't that email.  It's just that Mabel
12    didn't remember the conversation, didn't agree to make
13    the switch and didn't want to talk about it.
14          RAJ:  She had already had a GI rotation.  It
15    wasn't an issue at all.  You know, she had spoken to
16    her long before, so it wasn't --
17          LEENA VARUGHESE:  This wasn't like about this
18    particular rotation that was coming up.
19          RAJ:  Yeah.
20          LEENA VARUGHESE:  This was about like a long
21    time ago.  I was actually scheduled for the month that
22    Mabel actually did the GI rotation.  So we were at a
23    residents' meeting and Mabel just -- I was like, oh, I
24    not really interested in GI -- doing the GI rotation
25    anymore, you know.  And Mabel is like, oh, I want that

1     rotation.  And what -- I had thought she wasn't
2     scheduled for the rotation, but in fact she was
3     scheduled for the rotation several months later.  She
4     actually wanted to do the rotation earlier.
5          SCOTT BARNETT:  Right.
6          LEENA VARUGHESE:  So what happened was she
7     just got switched into my spot and they switched me to
8     a later month instead of removing me and, you know,
9     giving to her like an -- you know what I mean?  So
10    that's basically what happened.
11          RAJ:  And it's a pretty long email.
12          LEENA VARUGHESE:  And then --
13          RAJ:  You know, it's pretty intimidating,
14    too, without any further question or something.  You
15    know, it's just --
16          LEENA VARUGHESE:  Details or explanation,
17    answer the following two questions.
18          SCOTT BARNETT:  Again --
19          LEENA VARUGHESE:  Did you agree to take over?
20          SCOTT BARNETT:  There's no place to respond
21    to this.  You don't think the emails I get from my
22    bosses are intimidating?  I don't get a kind, gentle
23    email from the people above my head ever.
24          LEENA VARUGHESE:  But this is like not just
25    like one or two emails.  This is --

Colloquy                                    28

1           RAJ:  These are not, and then --
2           SCOTT BARNETT:  What have you got?  I've been
3    (indiscernible).
4           LEENA VARUGHESE:  These are just like every
5    other email I get and any communications that I have
6    with Adrienne or, you know, Dr. Firpo.
7           RAJ:  She injured her arm one day and
8    couldn't do frozen sections, so Adrienne emailed her
9    and said, oh, I need a note from the physician.  She
10   was here at work.  She was doing her rotation, but she
11   couldn't do the doing of the frozen section.
12          LEENA VARUGHESE:  Frozen section.
13          RAJ:  And she demanded a physician's note for
14   that.  And then Dr. Firpo asked for that note recently.
15   That's the type of tone.
16          LEENA VARUGHESE:  Yeah, but I talked to him
17   he's like --
18          RAJ:  It's the tone -- strange, you know.
19          LEENA VARUGHESE:  -- where is that note that
20   --
21          RAJ:  Is she supposed to go --
22          LEENA VARUGHESE:  -- I said, well, you know,
23   it was here.
24          SCOTT BARNETT:  Wait, wait.  Again, this is
25   under the background of somebody who is on academic


Colloquy                                    29

1    advisement for professionalism shoes.  And being unable
2    to do your work, saying I can't do my work when you're
3    on advisement is not the same as you can't have done
4    your work when you're not on advisement.  It's not the
5    same --
6           LEENA VARUGHESE:  I'm not on advisement any
7    more.  Apparently I'm on disciplinary action according
8    to a letter that was written by Dr. Lento and signed by
9    Dr. Cordon-Cardo.  In the letter, Dr. Lento refers to
10   himself and then Dr. Cordon-Cardo signs the letter,
11   which is like --
12          SCOTT BARNETT:  I mean, I --
13          LEENA VARUGHESE:  -- unheard of, like this is
14   such like abuse, and like, you know, mental,
15   psychological abuse.  Like I cannot say anything else
16   beyond that.  And, you know, my voice gets a little
17   loud now.  Do you think I'm yelling?
18          RAJ:  That's because she's upset and she also
19   --
20          LEENA VARUGHESE:  Do you think --
21          SCOTT BARNETT:  If you were  yelling at me --
22          LEENA VARUGHESE:  But do you --
23          SCOTT BARNETT:  -- I would tell you to stop
24   yelling at me.
25          LEENA VARUGHESE:  But you think I'm yelling

```
 1    at you now?  Do you think I'm yelling at you?
 2              SCOTT BARNETT:  No, I --
 3              LEENA VARUGHESE:  No, you're not -- I'm not.
 4    So if I speak like this (indiscernible) that I'm
 5    yelling?
 6              SCOTT BARNETT:  Wait a second.
 7              LEENA VARUGHESE:  You know what I mean?
 8              SCOTT BARNETT:  Wait, wait, wait, wait, see,
 9    now you -- again, if I told you that the last time you
10    were yelling at me, you were yelling at me.  It's not
11    because your voice was raised.  I know the difference.
12    I know the difference between being yelled at and have
13    something -- having a discussion that is difficult and
14    somebody getting a little agitated.  I know the
15    difference.  I've been yelled at a million times on my
16    job.  At home I get yelled at all the time.  There's a
17    difference.  I know the difference.  Again, I have a
18    short temper myself and I -- but --
19              LEENA VARUGHESE:  I don't have a short
20    temper.
21              SCOTT BARNETT:  Maybe yes, maybe no.  That's
22    up to you to decide, but --
23              LEENA VARUGHESE:  It takes a lot for me to be
24    provoked.  The first time Sam like started screaming at
25    me, yelling at me, I didn't get provoked.  I said, you
```

```
 1    know, listen, what's going on?  The first time Dr.
 2    Fallon (phonetic) told me, oh, take the slides from my
 3    lab and go label them, yeah, I got upset but I didn't
 4    get mad at him.  I spoke to my friend about it.  The
 5    other time, you know --
 6              SCOTT BARNETT:  You're going back a year and
 7    a half --
 8              LEENA VARUGHESE:  No, that's going back three
 9    years.
10              SCOTT BARNETT:  -- and that was investigated
11    and --
12              LEENA VARUGHESE:  That was going back three
13    years.  This is going back last year.  Then Dr. Morotti
14    (phonetic) goes to me -- she screams to me in front of
15    all the secretaries about like how I took a day off and
16    how I shouldn't take days off because I took a sick day
17    because, you know, that just makes me look bad.  Dr.
18    Bleiweiss and Dr. Unger (phonetic) is not going to help
19    you find a job.  You're not going to like do well once
20    you get out there, you know --
21              RAJ:  Dr. Schiller told her there's something
22    wrong with her DNA.
23              LEENA VARUGHESE:  DNA.
24              RAJ:  This is like a pattern that really --
25              LEENA VARUGHESE:  This is a pattern of like
```

Colloquy                              32

1    abuse, psychological abuse.
2              SCOTT BARNETT:  I don't know what was said
3    but that was a year -- you're talking over a year ago.
4    You're rehashing stuff.  Nobody has said that since.
5              RAJ:  Yeah.
6              SCOTT BARNETT:  I mean, again --
7              LEENA VARUGHESE:  Nobody is going to say that
8    since, but the thing is like is has taken its affect.
9    It has taken its --
10             RAJ:  But the atmosphere that -- yeah, that
11   really --
12             LEENA VARUGHESE:  That's the psychological
13   toll that it takes on a resident.  I mean
14   (indiscernible) works in this organization.
15             SCOTT BARNETT:  I have to disagree with the
16   two of you.  That happened when Schiller was the chair
17   and --
18             LEENA VARUGHESE:  He wasn't even the chair at
19   that point.  He had resigned.
20             SCOTT BARNETT:  That's okay but -- and --
21             LEENA VARUGHESE:  But the tactic is take me
22   to Dr. Schiller who is intimidating enough and have him
23   talk to him instead of like, you know, actually
24   addressing the issue and having a discussion, but
25   that's --

Colloquy                              33

1              SCOTT BARNETT:  Yeah, but that
2    (indiscernible) you're aware the -- where he was in the
3    interim --
4              LEENA VARUGHESE:  But since then I've been
5    put on academic advisement following that incident.  It
6    wasn't before that incident I was on academic
7    advisement but following it.  After I made a complaint,
8    I had to go to HR.  I had to do all these things
9    basically because I felt like I wasn't even --
10             SCOTT BARNETT:  Are you really telling me
11   that you believe that every single one of your
12   interactions with your colleagues that you've never
13   displayed an unprofessional interaction with any of
14   your colleagues?  Are you trying to tell me that?
15             RAJ:  What's an example of that, you know?
16   Like she's --
17             SCOTT BARNETT:  I'll give you one.  You met
18   with the chairman of the department several times and
19   you, according to the chairman, took a book and threw
20   it on the table.  Oh, I didn't read it.  This is the
21   chairman of a department.
22             RAJ:  I think they're blowing that out -- she
23   took a book --
24             SCOTT BARNETT:  But it doesn't matter.
25             LEENA VARUGHESE:  Yeah, I just put it down

```
                            Colloquy                    34
 1    like this and --
 2              SCOTT BARNETT:  And you think that's
 3    (indiscernible).
 4              RAJ:  And I think that can be blown out of
 5    proportion.
 6              LEENA VARUGHESE:  I know.  That's not --
 7              SCOTT BARNETT:  Wait a second.  You can't say
 8    that everybody --
 9              RAJ:  It's not (indiscernible).
10              LEENA VARUGHESE:  That's a perception.
11    That's --
12              SCOTT BARNETT:  Wait a second.  Again, you
13    can't say that everybody's perception of you is
14    incorrect and your --
15              RAJ:  Well, even if that were the case is
16    that a reason to put someone on academic advisement --
17              SCOTT BARNETT:  The answer is --
18              RAJ:  and disciplinary action?  I don't think
19    the crime --
20              SCOTT BARNETT:  Again --
21              RAJ:  -- fits the punishment here and that's
22    -- clearly, she's just passionately defending her case.
23              SCOTT BARNETT:  Well, if you didn't believe
24    that, you should have asked for a hearing by the --
25              RAJ:  Her lawyers advised her against that
```

```
                            Colloquy                    35
 1    because they know this, you know --
 2              SCOTT BARNETT:  Well, so that's --
 3              RAJ:  That's her choice.  That's hers -- you
 4    know.
 5              SCOTT BARNETT:  Yeah, you had -- you were
 6    offered due process.
 7              LEENA VARUGHESE:  I would have actually asked
 8    for a hearing back in the day when Sam actually
 9    initially harassed me.  I would have asked that to be
10    put on trial.
11              RAJ:  He told her, shut up, shut up, in front
12    of other residents since, you know --
13              SCOTT BARNETT:  Yeah, but again, you could
14    have -- whatever you did or didn't do.
15              LEENA VARUGHESE:  That's what I wanted to do,
16    but instead like I -- because of the way I've been
17    treated, how I felt and what was happening, I actually
18    went to HR and complained about it.  And I said, you
19    know --
20              SCOTT BARNETT:  And it was investigated and
21    there was a lot of people who felt that your
22    interaction with Sam was inappropriate.  They got tons
23    of people who said that that was not the way you
24    perceived it.  Again, they interviewed a tone of people
25    said that this is not actually how Leena portrayed it.
```

Colloquy                                    36

1    Okay?  They did their due diligence.  The story was
2    somewhere in between Sam's story and your story.  It
3    was somewhere between it.  It doesn't matter what you
4    say.  They met with lots of people and it wasn't the
5    way you said it and it wasn't exactly Sam.  It was
6    somewhere in the middle.
7              RAJ:  I mean, there were only two other
8    people there, so that's --
9              SCOTT BARNETT:  It doesn't -- whatever it was
10   that your side of that story was not corroborated.
11   Okay?  It wasn't corroborated.  So, again, my job is to
12   make sure that, again, people seem to be acting fairly,
13   and I believe that Carlos and Adolfo are trying to be
14   fair, and that if they do something, they're not doing
15   it in a crazy way.  And again, I'll tell you a story.
16   Somebody came to my -- one of the program directors,
17   who is no longer a program director because I had him
18   changed, came to me and said, I want to put x person on
19   probation again.  I said, what are you talking about?
20   I never heard of such a thing.  Why was the person on
21   probation the first time?  He said, oh, we put him on
22   probation.  I said, did you do it in writing?  No.  Did
23   you offer them due process?  No.  I said, well, how do
24   you like that?  They were never on probation.  And if
25   they ever ask you if they're on probation, the answer

Colloquy                                    37

1    is no.  And this time you don't have enough proof to
2    put him on probation.  I stopped it, okay.  I've met
3    with -- about this a million times already including
4    last week.  I've been on every email.  Are there
5    interactions that I think -- I don't know -- I'm not
6    sure why the chief resident is in the middle of all
7    this.  That's not the way I would have done business if
8    I was the program director.  But this is between you
9    and Adolfo.  Very simplistically, he is the person
10   assigned by the department to figure out how to get you
11   through the rest of your training.  That's all it is.
12             RAJ:  And she feels she's being unfairly
13   treated.  That's why she's here.  She just wants to
14   know that she can come to you or authority figures when
15   she's not being --
16             SCOTT BARNETT:  Yes.
17             RAJ:  Like who does she go to when she feels
18   she's not --
19             SCOTT BARNETT:  Well, what do you want to
20   happen now?  You still have to get through Carlos.  You
21   have to still get through Adolfo, okay.  You have to
22   work this out with Adolfo.  I mean, he's the one who is
23   making the determination on behalf of the department.
24   And, I mean, again. you're meeting with him.  You
25   should -- again, by now it should be clear what you're

Colloquy                                      38

1    talking about, what's going on.  If you have a
2    question, again, he supposedly has an open door about
3    this.  You could -- you're supposed to be able to talk
4    to him about your concerns about this.  I mean, if --
5    and if he's -- and if you're telling me that he's --
6              RAJ:  Well, he seems to be consulting with
7    Dr. Jordan, who is the chief resident, and then coming
8    to a decision, which he should make a decision not
9    consult with Dr. Jordan or Dr. --
10             SCOTT BARNETT:  No, no, wait, wait, wait, he
11   can consult with anybody he wants.  He's not -- he
12   doesn't observe you.  He's not -- but if he's going to
13   figure out whether you've turned the corner in your
14   relation with the department, he has to talk to the
15   people you're working with.  He has to do that.  He has
16   to talk to your adviser.  He has to talk to your
17   attending.  He has to talk to your chief resident.  He
18   has to talk to everybody and then he could filter it.
19   I don't know that that's unreasonable.  He's not going
20   to tag along with you, handcuffed to you to make sure
21   you're acting professionally every second of the day.
22   It's not his job.  He doesn't have to -- just like I
23   can't do it.  He has to -- he's trying to get -- he's
24   trying to straighten out the entire educational
25   enterprise of that goofy department of yours.  That's

Colloquy                                      39

1    his job.  So if he needs more information, he's
2    entitled to get it.  As long as it --
3              RAJ:  But it's clear that they're not being
4    fair to her.  That's the only reason she's here.  If
5    she was being treated fairly, she wouldn't complain.
6              SCOTT BARNETT:  Again, I will --
7              LEENA VARUGHESE:  And it's almost like, you
8    know, we will treat you unfairly, try and complain.
9    Try and ask us for, you know, fair treatment.  Try and
10   ask us for elective.  We will just deny it.  We will
11   just find a reason --
12             SCOTT BARNETT:  Yeah, I don't know that it --
13             LEENA VARUGHESE:  -- why it's not necessary
14   for you to do that.
15             SCOTT BARNETT:  I don't know that -- I don't
16   get that sense.
17             LEENA VARUGHESE:  Okay.  Well, here is
18   another email.  Okay.  What did I say?  I haven't --
19   you know, I would like to switch into hematology.  I
20   already did microbiology at the VA, which is like two
21   months per resident.  I did Englewood (phonetic) two
22   months per resident.  They scheduled me for another
23   month of Englewood this year and two months of micro at
24   the VA.  I had one month of hematology.  Everyone else
25   in the program has at least two months or three months.

Colloquy                           40

1     Blood bank, I think I'm going to have two months.
2     Clinical chemistry, I think I'm going to have like two
3     maybe three months.  It's like, you know, there are
4     certain like areas that I feel weak in and I need like
5     exposure to, and I'm not like scheduled for those
6     particular rotations and I'm worried.
7              SCOTT BARNETT:  (Indiscernible) then --
8              LEENA VARUGHESE:  And every time this has
9     happened in the past where it's like I haven't
10    scheduled working hematology hemopath.  I haven't been
11    -- I wasn't scheduled for GI last year.  And I have
12    asked for those rotations and it doesn't happen.
13             SCOTT BARNETT:  Well --
14             LEENA VARUGHESE:  It just doesn't happen.
15             SCOTT BARNETT:  So if --
16             LEENA VARUGHESE:  So like --
17             SCOTT BARNETT:  Listen, I'm perfectly -- I'm
18    very happy because --
19             LEENA VARUGHESE:  So this is like -- you
20    know, this like with the hematology.  And you know who
21    responds to me?  Adrienne.  And what does she say?  She
22    says, I understand your concerns and I have spoken to
23    Dr. Lento and he's in agreement with the following.
24    First, you have x number of months of CPs, so you need
25    this much this year.  And then it says, very few


Colloquy                           41

1     residents are actually completing this recommended
2     rubric outlined in the program description that you
3     have referenced.  As long as residents are exposed to
4     each service and Dr. Lento is confident you have a
5     well-rounded CP rotation, then he goes off -- goes to
6     sign off on your board applications, the requirements
7     of the program have been satisfied.  I mean, that's
8     sort of a problem like because, you know, I know like
9     Dr. Lento has the power to say that I have completed --
10             RAJ:  And she's spoken to Dr. Firpo about
11    this.  There's no program objectives or -- you know,
12    usually when, you know --
13             SCOTT BARNETT:  No, he -- Firpo is putting it
14    together because there weren't --
15             LEENA VARUGHESE:  Well, there were program
16    objectives.  There were some, you know --
17             SCOTT BARNETT:  It was very isolated.
18             LEENA VARUGHESE:  There was like a hematology
19    one but it says, you know, residents (indiscernible) in
20    each case like, you know, what you're supposed to need
21    --
22             RAJ:  Cover and (indiscernible).
23             LEENA VARUGHESE:  The report cover and need
24    the --
25             SCOTT BARNETT:  And none of this was there?

Colloquy                                    42

1        LEENA VARUGHESE:  And that -- no, that was
2   already there before.  And, you know like --
3        SCOTT BARNETT:  It wasn't (indiscernible).
4   That doesn't meet any standard.
5        LEENA VARUGHESE:  -- that is sort the
6   expectation of a resident when they come to this
7   program, but that's not really like what, you know, is
8   met.  Like you could be here for like four years and
9   never have like, you know, a month of hematology
10  because, what, the program director feels like your
11  training is met?  Meanwhile, as a resident you feel
12  like, well, you're not meeting that requirement
13  because, you know, that's like your worst subject.  You
14  need exposure to that.  Like based on my RICE
15  (phonetic) scores, based on other evidence that I have,
16  I know like I need exposure to certain rotations.  And
17  I cannot make time when I'm on a different rotation for
18  that because like I'm studying something else and I'm
19  trying to follow up on that, not focus on, you know,
20  the other things.  So I need that protected time.  Like
21  I need my 18 months of CP.  Like Englewood is not
22  necessarily CP.  That's -- well --
23       SCOTT BARNETT:  It's like you have it half
24  the time.
25       LEENA VARUGHESE:  It's like -- well, like 90

Colloquy                                    43

1   percent psychology, you know, some (indiscernible),
2   which isn't very significant.  And there's a lab there.
3   You can like, you know, go to the lab.  You know, it's
4   not really like for you, you know, really do anything
5   in the lab because it's, you know, most of the CP lab
6   is automated.  So, you know, you need like that
7   required time that's protected to do CP.  And, you
8   know, I'm -- technically, I mean, I guess I'm doing 18
9   months, quote, unquote, but in reality, I'm probably
10  doing 17 months and then with the coverage for other AP
11  rotations, et cetera, you know, I'm doing less than my
12  required time.
13       SCOTT BARNETT:  Well, part of the -- again,
14  part of the problem is is that --
15       LEENA VARUGHESE:  And we have like extra
16  number of residents now.  There's no reason -- like
17  this rotation --
18       SCOTT BARNETT:  Well, you don't have an extra
19  number of residents.  You were supposed to have extra
20  residents but somebody's been out on a prolonged leave
21  of absence.  You're down to -- you have the same 22
22  bodies -- warm bodies that you had before.  You're
23  supposed to have 24.  You're still at the same 22 warm
24  bodies.  So that leeway doesn't exist as far as I know.
25  Now, listen, I -- the program --

Colloquy                    44

1        LEENA VARUGHESE:  And then there is also my
2   class had seven residents, maybe six now because one of
3   the persons is only CP -- I mean, I'm sorry, only AP.
4   So the issue is that like, you know, among my class, we
5   have covered all the requirements -- major requirements
6   instituted by the hospital and for the program in a big
7   way, because there's like six or seven of us.  There is
8   no reason any single person in my class should not meet
9   our requirement even as a class.  Like, you know,
10  (indiscernible) collective of the 22, but as a class we
11  have met a lot of requirements.  We had done a lot of
12  extra work.
13        SCOTT BARNETT:  It's not even a class.  It's
14  an individual trainee.  You may not --
15        LEENA VARUGHESE:  As Elmhurst (phonetic), we
16  have done extra months of Elmhurst I know the other
17  residents in the program have not done, like, you know,
18  maybe they've done one month of Elmhurst but it wasn't
19  --
20        SCOTT BARNETT:  But Elmhurst is not even a
21  rotation in the program.
22        LEENA VARUGHESE:  Yeah, but last year I did
23  like, you know, I did extra months.
24        SCOTT BARNETT:  Again, the program wasn't --
25        LEENA VARUGHESE:  See, the thing is when it

Colloquy                    45

1   was happening --
2        SCOTT BARNETT:  The program was crazy for the
3   first two and a half years.  It didn't make any sense.
4        LEENA VARUGHESE:  Well, least year Dr. Lento
5   took over and he had -- you know, they believed he
6   could change the schedule, make the schedule as he
7   wanted.  You know, apparently Sam and Kruti made the
8   schedule and Dr. Strauchen was still the program
9   director when the schedule was made.  I went to him
10  because I didn't get anything that I had requested last
11  year.  And Dr. Strauchen actually made it a point to
12  say that like, you know, make sure Leena gets x, y and
13  z because I noticed that you guys made the schedule and
14  she is not being given these rotations.  And he made
15  sure that I got certain rotations.  Otherwise, I would
16  not have had any of those rotations.
17        SCOTT BARNETT:  That's the program director's
18  job.
19        LEENA VARUGHESE:  That was his job and he was
20  doing the job.  And, you know, I go to Dr. Lento with
21  the same concerns --
22        SCOTT BARNETT:  Take it from me, Strauchen
23  had to go.  You take it from me, he had to go.
24        LEENA VARUGHESE:  Well, that's fine.  I know,
25  that's fine, that's fine.  But I'm just saying like,

1    you know -- but I've been to Dr. Lento and I've tried
2    to explain like what my concerns are and what my
3    problems are, and what he does he like he doesn't --
4    you know, he doesn't really like.
5              SCOTT BARNETT:  No, listen, Pat has not
6    embraced this responsibility to the extent that any of
7    us would have liked.  Pat's underwhelmed me with how --
8    with his performance.
9              LEENA VARUGHESE:  Well, the problem is like
10   he confronts residents.
11             SCOTT BARNETT:  Yeah, forget it.  Don't worry
12   about it.
13             LEENA VARUGHESE:  And it's like really --
14   it's like really intimidating.
15             SCOTT BARNETT:  That's --
16             LEENA VARUGHESE:  I mean, he's the program
17   director.  He can go onto --
18             SCOTT BARNETT:  He's not going to be the
19   program director for that much longer, don't worry
20   about it.  It's not -- it's going to change.  But --
21   and until then, I think it has to be Adolfo that you
22   deal with.  Again, I mean, it's the only way -- and I'm
23   going to ask him with your permission -- when was the
24   next time you're supposed to meet with him?
25             LEENA VARUGHESE:  This Wednesday.

1              SCOTT BARNETT:  Okay.  That you laid out
2    reasonable concerns about the content of your training,
3    the -- there are things you feel your weakness is that
4    you would like to address and that you would like the
5    opportunity to discuss your training and that you need
6    him -- because Dr. Lento has been very helpful in this
7    regard.  You need him -- you need Dr. Firpo to evaluate
8    your training and try his best to rearrange the
9    remainder of your training so that it gets you where
10   you want to go.  I also think that you should give
11   serious consideration saying that it's possible that
12   your perception of your interactions with him and
13   others may not be exactly the same as the people you're
14   dealing with, and that -- because I think you're
15   beating your head against the same wall here, okay.
16   You're -- I think -- yeah, I have not been at any of
17   these meetings.  It almost doesn't matter sometimes
18   what you think is going on until other people perceive
19   what is going on that is the issue.  And that I think
20   it's fair to say that there are -- still at this point
21   there are people who don't perceive, as I said, the
22   interactions you're having with them the same way you
23   are.
24             And again, I've had to deal with this my
25   whole career because sometimes I think I've toned down

Colloquy                          48

1    the irreverence and the sarcasm to where even a normal
2    human being could tolerate it and it's not the case.
3    And people, you know, look at me like, what did you
4    just say?  I said, gee, I thought I -- in my mind I
5    cleaned that up really well.  It sounded like -- in my
6    mind that was going to work.  And people say -- look at
7    me like, cut the goof ball act, Scott.  You're almost
8    59 years old, you know.  And it's -- sometimes in the
9    heat of wanting to get your point across or as you just
10   -- it's not coming out the way you think it's coming
11   out.  It happens to everybody.  And I think you -- it
12   would be reasonable for you to think about whether
13   that's the case.  I'm telling you, I think they're
14   perceiving it differently than you are.  And it almost
15   doesn't matter at this point since somebody is in
16   charge and somebody is responsible and you're a trainee
17   that if they're not getting it right, the burden of
18   proof is on you to get it right, not on them to get it
19   right.  You're the one who's being -- you know, you're
20   the one in this awkward position.
21          RAJ:  That's true, but there's a power
22   differential here.  They can say whatever they want to
23   say.
24          SCOTT BARNETT:  It's a power differential
25   every day in life.

Colloquy                          49

1          RAJ:  And if you're going to say someone is
2    unprofessional -- if I'm going to say you're
3    unprofessional, then I have to prove it, right?
4          SCOTT BARNETT:  No, you just have to proof --
5          RAJ:  She doesn't have to prove she's not
6    unprofessional.
7          SCOTT BARNETT:  Yes, you do because you do
8    and I think you're wrong about that.  I think I have to
9    disagree with you.  I think that you have to be --
10         RAJ:  You're defending yourself against
11   something -- you know, how do you defend yourself
12   against a charge that you can't even put a finger on,
13   you know?
14         SCOTT BARNETT:  Well, I think some of it is -
15   - again, I think some of it is -- and you and I may
16   (indiscernible) same thing is you're -- again, it may
17   not be yelling, but I know people -- like there's a guy
18   -- the guy who runs a surgical like critical care
19   program -- training program -- three critical care
20   programs, pulmonary critical care, medical critical
21   care (indiscernible).  I've known him a long time.  I
22   have never heard him raise his voice beyond this level,
23   never.  This is the way he talks and this is --
24         LEENA VARUGHESE:  That's the way I used to
25   be, too.

Colloquy                    50

1    SCOTT BARNETT:  Well, I mean, again, I sat
2  with him in a meeting with another department.  It was
3  very heated.  It was very contentious and
4  (indiscernible).  I'm not sure I agree with that.  It
5  was remarkable.  I mean, I couldn't (indiscernible).
6    RAJ:  That's his personalty.  We're all
7  different personalities.
8    SCOTT BARNETT:  However, when you have a
9  personality that's a little excitable, it's not -- and
10  again, I've dealt with this.  Other people don't have
11  to put up with your excitability.  They don't.  They're
12  not obligated to.  They're not obligated to.
13    RAJ:  She just wants to be treated fairly.
14  That's all --
15    SCOTT BARNETT:  Okay, but I think you have to
16  --
17    LEENA VARUGHESE:  And I -- but, I mean, you
18  know how to deal with personalities, but then here's
19  the thing, sometimes you have to deal with people who
20  go off on you.  And, you know, I don't know how to put
21  up with that either.  Like, what's being done about
22  that?
23    RAJ:  She's entitled not to be verbally
24  abused, physically intimidated, you know, demeaned
25  publicly.

Colloquy                    51

1    SCOTT BARNETT:  But, again --
2    LEENA VARUGHESE:  Whether or not that's like
3  corroborated or not.
4    SCOTT BARNETT:  And again --
5    LEENA VARUGHESE:  I mean, you  know --
6    SCOTT BARNETT:  That's again -- you see, if
7  you raise an issue and it's investigated and people say
8  it's not exactly the way you said, that doesn't mean
9  they're wrong.  That means that you're a little bit
10  wrong and maybe they're a little bit wrong.  But not
11  everybody in the world is crazy.  Not everybody in the
12  world is crazy.
13    RAJ:  She's not saying that.
14    SCOTT BARNETT:  Well, no, you're basically
15  saying that you said something, they didn't believe it
16  but they're wrong.  That's what you're saying.  That's
17  exactly what you're saying.
18    LEENA VARUGHESE:  I didn't say that.  I've
19  been putting up with all this.  I am not saying -- I
20  mean, I am basically trying to work through this whole
21  difficult situation.  And I'm asking for empathy.
22    SCOTT BARNETT:  Right.
23    LEENA VARUGHESE:  And, you know, not to be
24  alienated and further, you know --
25    SCOTT BARNETT:  And again, my own personal

Colloquy                        52

1   feeling is that the chairman and the director of
2   education gave you that opportunity and there's a
3   disagreement -- a little bit of a -- a lack of
4   alignment the extent to which they believe you have
5   taken advantage of that opportunity.
6           RAJ:  Well, she was basically blind sided not
7   meeting with Dr. Cordo with Dr. Lento and, you know --
8           SCOTT BARNETT:  It doesn't --
9           LEENA VARUGHESE:  Mr. Castaldi.
10          SCOTT BARNETT:  Listen, it doesn't --
11          RAJ:  Mr. Castaldi, three men
12  (indiscernible).
13          SCOTT BARNETT:  What do you think I've never
14  -- you know, I've been at meetings all throughout my
15  career --
16          RAJ:  If that was your daughter, you wouldn't
17  want that.  That's not -- this is --
18          SCOTT BARNETT:  No, you know what I'd tell my
19  daughter, I'd say there's a hierarchy in this world and
20  sometimes you get your ass screamed at.
21          RAJ:  She acknowledges the hierarchy, but --
22          SCOTT BARNETT:  But sometimes you get yelled
23  at by your boss.
24          RAJ:  But you have to defend yourself.  If
25  you hold a position, you cannot just -- you know, just

Colloquy                        53

1   say, oh, everybody is going to be right and I'm going
2   to walk away.  You would have to like --
3           SCOTT BARNETT:  But you have to --
4           RAJ:  You know, you have to stand up for what
5   is right.  You can't just, you know, bow down to, you
6   know, to someone who is a higher rank than you.  If
7   they say something untrue, you're entitled to defend
8   yourself, that's all.
9           SCOTT BARNETT:  And but the extent -- and
10  again, if the institution didn't offer you that
11  opportunity, that's unfortunate.  But, again, there are
12  opportunities that you haven't taken advantage of.  I
13  don't know what your lawyer was telling you, but there
14  were opportunities for due process that you didn't take
15  advantage of. That's what the house affairs committee
16  of the medical board is for, to hear your side of the
17  story and determine whether you were treated unfairly
18  and to say, sorry, pathology, you screwed this up.  It
19  doesn't sound right.  Start from scratch.  You didn't
20  take --
21          RAJ:  She tried to do that, too, but her
22  lawyers advised her not to.
23          SCOTT BARNETT:  Well, again -- but, again, if
24  you don't take advantage of the due process, then you
25  can't just say, well, the due process would have found

Colloquy                    54

```
 1    this anyway.  It's a self-fulfilling prophesy.
 2              RAJ:  Yeah.
 3              SCOTT BARNETT:  Either you let the system
 4    work itself out or you don't.  The fact that you didn't
 5    take advantage of that for whatever reason the lawyer
 6    had, and maybe it was a good one and maybe it wasn't.
 7    I don't know enough about it.  And maybe there's a
 8    bigger picture he's trying to think of.  The fact is too
 9    that just like you're in a certain position, I am, too.
10    I report to lots of people and if they think -- it
11    almost doesn't matter if they think I'm not doing a
12    good job if I think I am because they're the guys who
13    pay my salary, right?  And if -- and I got an email
14    from the dean of the medical school a few weeks ago on
15    a Saturday.  I thought I was going to die.  He was -- I
16    mean, I can just hear the -- it was like, Scott, you --
17    essentially, Scott, you moron, why did you do that?
18    That was the tone of the email.  He didn't come out and
19    say it, but that was the exact email from my boss,
20    right?  Now, what am I supposed to do, right?  Go to
21    the board of trustees and take (indiscernible).  The
22    guy is my boss.
23              RAJ:  That's true.
24              SCOTT BARNETT:  And if I don't like want to -
25    - if I don't like my boss, I get a new job.  You're not
```

Colloquy                    55

```
 1    in that position.  You're in a training program.  And
 2    when I was in a training program, I was in the same
 3    way, you know.  You're in an awkward position in your
 4    life.  You're in a very dependent position.  And when
 5    you're finished your training, you will always have
 6    bosses.  You're not in an independent state.  If you
 7    want to -- you know, that's not what pathologists do.
 8    You can't work in your little office doing your own
 9    thing like a pediatrician, you know.  And if -- and
10    that's why a lot of people don't work in institutions
11    like this, because it's a big hierarchy and you have to
12    deal with a million people.  They just want to go to
13    their office and do their thing and they don't want
14    anybody to tell them what to do, all right.  That's
15    part of -- the fact that I work here at Mount Sinai in
16    a place with 15,000 people and a lot of high powered
17    personnel in peds means that every once in a while I'm
18    going to get my ass kicked by somebody either below me
19    or above me.  And my job is to count to 50 and figure
20    out how to make a mess of this difficult situation.
21              RAJ:  But being a resident, you know, she's
22    $200,000 in debt.  She is -- just wants to do her work
23    and get out -- you know, get out and go to work, you
24    know.
25              SCOTT BARNETT:  And again --
```

Colloquy                                    56

1          RAJ:  And, you know, like --
2          SCOTT BARNETT:  And I --
3          LEENA VARUGHESE:  Yeah, it's --
4          RAJ:  It's a difficult position.  If you
5   charge someone as being unprofessional, then you have
6   to have a serious charge and defend that charge because
7   that's -- you just can't come out --
8          SCOTT BARNETT:  Listen --
9          RAJ:  -- you know, I feel this way, you know
10  --
11         SCOTT BARNETT:  -- if -- all I could do --
12         RAJ:  I don't have a good feeling when I see
13  you, you know, that doesn't work.
14         SCOTT BARNETT:  Again --
15         RAJ:  That's not right.  That's not the way
16  it should be.  And she's appealing to you to intervene
17  at this point and I think --
18         SCOTT BARNETT:  Listen, I disagree with both
19  of you.  I think that if you've thought about every
20  single interaction you've had with every single person
21  in that department --
22         RAJ:  It's not every single person.
23         SCOTT BARNETT:  It doesn't matter.
24         RAJ:  She has great interactions with a lot
25  of people, but these are the people that are in place

Colloquy                                    57

1   of, you know, determining whether professionalism is
2   there or not, you know, and it's not right that they,
3   you know --
4          SCOTT BARNETT:  There are -- listen, I think
5   you're just wrong about this.  There are -- somebody --
6   there are people in this world who act
7   unprofessionally, right?  That's just a core
8   competency.  There are individual evaluations in your
9   training file, lots of them, that hint at problems in
10  that particular competence.  It was -- the department
11  is obligated to do something about it.  And academic
12  advisement is a nonformal process and it's not reported
13  to anybody.  It's the lowest stage.  We have these
14  concerns.  This is where we want you to get over them.
15  And if you get over them, great.  That's -- I mean,
16  again --
17         LEENA VARUGHESE:  Yeah, but it was one thing
18  if that was the case and they said, okay, we're putting
19  you on academic advisement before the whole thing with
20  Sam happened.  But, you know, we're concerned because
21  we feel like you are being unprofessional here, here
22  and here and they said the reason we feel that way,
23  fine.  But then, since like what had happened where,
24  you know, I feel like I was harassed and attacked, and
25  then I was put on academic advisement.  I tried -- I

Colloquy                                    58

1     met the requirements in the sense that I, you know,
2     wrote that reflection.  I read the book.
3                SCOTT BARNETT:  You know, maybe you're being
4     a little disingenuous here.
5                LEENA VARUGHESE:  I tried to keep in touch
6     with --
7                SCOTT BARNETT:  That first reflection was not
8     a reflection.  It was a diatribe.  I read it.
9                LEENA VARUGHESE:  Yeah, that's exactly --
10    that's the other thing, this whole word diatribe.  You
11    know --
12               SCOTT BARNETT:  It was exactly what it was,
13    Leena.  It was -- again, if one of my kids were to read
14    that, I would have screamed at them, how dare you write
15    that?  How dare you write that?  It was one-sided.  It
16    was not an attempt in any way to address the program's
17    concerned.  It was a rehashing of issues that they were
18    trying to put behind you.  And it was not -- my mind
19    that was not a good faith attempt to do what they were
20    asking you to do.  And, basically, you got pissed off
21    and you just threw some shit against the wall and hoped
22    it would stick.  That's what it was.
23               LEENA VARUGHESE:  No.
24               SCOTT BARNETT:  And again, you are --
25               RAJ:  That was her perception of the events


Colloquy                                    59

1     that had happened and the tone was confrontational
2     because --
3                SCOTT BARNETT:  But you don't --
4                RAJ:  -- she's defending herself against a
5     ridiculous charge.
6                SCOTT BARNETT:  But that was the wrong way to
7     go about it.
8                RAJ:  It was the wrong way.  I -- you know,
9     that's the wrong tone to have, but --
10               SCOTT BARNETT:  Again, there's bosses and
11    there's underlings.  And if your boss tells you to
12    write a confession, even if you think it's the
13    stupidest thing you ever did in your life, say, okay,
14    boss, I've thought about this and I -- while I might
15    not have initially --
16               RAJ:  Well, that's the strange thing, she
17    complained about being, you know, verbally yelled out
18    and like the guy came to her nose --
19               LEENA VARUGHESE:  Publicly humiliated.
20               RAJ:  -- and then she felt physically
21    threatened.  And then she was asked to write a
22    reflection about her fault in that matter.
23               SCOTT BARNETT:  I'm telling you, that --
24               LEENA VARUGHESE:  Yeah.
25               RAJ:  That's like, you know --

Colloquy                                          60

1      SCOTT BARNETT:  That was investigated and
2  your side of the story was not upheld.  It wasn't
3  upheld.
4      LEENA VARUGHESE:  So why --
5      RAJ:  Well, that might be, but that --
6      LEENA VARUGHESE:  My side of the story was
7  upheld then.
8      RAJ:  That may not be the truth, you know.
9      LEENA VARUGHESE:  Yeah, well, it was upheld.
10      SCOTT BARNETT:  It doesn't -- you were
11  talking --
12      LEENA VARUGHESE:  What was corroborated then?
13      SCOTT BARNETT:  I don't know.  I didn't do
14  the investigation, but your side of the story was not
15  upheld.  It was --
16      LEENA VARUGHESE:  What was corroborated then?
17      SCOTT BARNETT:  I -- it's not up to me to
18  answer that question.  I didn't do the investigation.
19  It was investigated.  Nobody -- one side of the story
20  was not --
21      RAJ:  Just because the investigation came to
22  a complete --
23      LEENA VARUGHESE:  So it's just like your side
24  does that -- you know, it's like nobody, you know, is
25  up-front or clear.  I mean, I know I work in a

Colloquy                                          61

1  hierarchy and, you know, I don't -- you know, I'm not
2  the boss, but I do have rights and like --
3      SCOTT BARNETT:  You have rights and so you
4  tried.
5      LEENA VARUGHESE:  And people just like say,
6  oh, you know --
7      SCOTT BARNETT:  You went to human resources.
8  They didn't uphold your interpretation of the events.
9  If you had a problem with that, you had other options.
10      LEENA VARUGHESE:  But they upheld the other
11  interpretation of things?
12      SCOTT BARNETT:  I think that's -- I don't
13  know what they upheld.  I didn't do the investigation
14  and nor am I responsible --
15      LEENA VARUGHESE:  So that's --
16      SCOTT BARNETT:  -- to do their investigation.
17      LEENA VARUGHESE:  That's the thing.  Then it
18  just keeps getting out of --
19      SCOTT BARNETT:  Listen, the person who runs
20  HR in this hospital is a phenomenally talented woman
21  who is in my mind extraordinary fair, and I've had
22  nothing but wonderful dealings with her in the entire
23  time I've known her.  If she said she did an
24  investigation and she couldn't corroborate your side of
25  the story, I believe her.  I have no reason not to

Colloquy                                    62

1    because every time I've dealt with her, she's been
2    fair, above board and effective in what she does.  I'm
3    not going to -- she doesn't report to me.  She doesn't
4    work for me.  I have no right to say, what did you
5    find?  She did her investigation and she was satisfied
6    with it.
7              RAJ:  And then Leena is at fault.  Was the
8    other person held to academic advisement as well?  You
9    know, like they're just coming after her for --
10             SCOTT BARNETT:  It was not found that the
11   other person acted unprofessionally.  What do you want
12   me to do?  Leena's story was not corroborated.
13             LEENA VARUGHESE:  No, it wasn't that --
14             SCOTT BARNETT:  Nobody upheld her story.
15             LEENA VARUGHESE:  That's not true.  I --
16             SCOTT BARNETT:  They're not going to -- it's
17   not like, okay, we don't understand either of you.
18   You're both going on advisement.
19             RAJ:  Well, she's the person that --
20             LEENA VARUGHESE:  And there was --
21             RAJ:  -- is at a lower level.
22             LEENA VARUGHESE:  Yeah.
23             RAJ:  So, you know --
24             LEENA VARUGHESE:  And actually --
25             SCOTT BARNETT:  Wait a second --

Colloquy                                    63

1              LEENA VARUGHESE:  It doesn't matter.  I was
2    put on academic advisement before even there was an
3    investigation.  I actually -- that was the department's
4    course of action.  I actually emailed HR after the
5    department's course of action because I felt like I was
6    being treated unfairly and what my concerns were.
7              SCOTT BARNETT:  The department also
8    investigated it and the (indiscernible) corroborated.
9              LEENA VARUGHESE:  Yeah, and the department,
10   that's the conclusion they came to.  So do you think HR
11   is going to come to a different conclusion?
12             SCOTT BARNETT:  Yes, HR is independent of the
13   department.  The (indiscernible) of HR reports to the
14   dean of the medical school.  She doesn't care about me.
15   She doesn't care about a department chairman.  Her boss
16   is the dean of the medical school and he -- and her job
17   is to make sure that this was handled correctly.
18   Otherwise, the dean is going to yell at her.  The same
19   guy yelled at me is going to yell at her.  And she --
20   and if she says it's true, then the dean will believe
21   her 100 percent and not even talk to a chairman about
22   it.  Sorry, dude, it was investigated.  You're wrong,
23   shut up.  That's exactly what he would do, because
24   that's -- he trusts her completely.  She reports
25   directly to the dean, not to a chairman, not to

Colloquy                                    64

1    anybody.  She has unlimited authority to handle these
2    situations because she's proven she can do it.  And if
3    she said -- if she couldn't corroborated your story, it
4    wasn't corroboratable (phonetic).  And it doesn't
5    matter whether you're above or -- they didn't take --
6              LEENA VARUGHESE:  Well, what they said was
7    they felt like Sam didn't -- Sam feels like he didn't
8    do anything wrong.
9              SCOTT BARNETT:  If Sam -- no, who gives a
10   shit about Sam?  If Sam fucked up they would have
11   slapped him around, too.  Nobody cares about it.  We
12   have -- we could put every one of -- every single one
13   of you 16 hundred house officers on academic advisement
14   at the same time, who cares?  Everybody who is on
15   academic advisement is going to be on academic
16   advisement.  It's not a quota system.  Everybody who
17   needs it, gets it.  Everybody who deserves it, gets it.
18   If Sam needed it, he would have gone on it.  It's not
19   like we've got one per department and you're in.  It's
20   just not the way it is.  If Sam -- if it was felt by
21   the department and the people investigating that Sam
22   needed to be straightened out, he would have gotten
23   straightened out.  Whether he's a sociopath that he was
24   able to convince people there's something that never
25   happened, I couldn't tell you.  But it would have been


Colloquy                                    65

1    -- nobody would have cared if the both of you would
2    have wound up on academic advisement.
3              RAJ:  Yeah, but she just feels she's being
4    untreated -- you know, not treated fairly, so and --
5              SCOTT BARNETT:  Well, I'm not sure I agree
6    with you.  I just don't agree with you.  I think that
7    this is a very difficult situation, that even to this
8    point there are still things you could do better to
9    convince the department that you are meeting its
10   expectations.  And they're the ones who set the
11   expectations, all right.  They're the ones you have to
12   convince.  And even if you don't love them and you
13   don't -- you wouldn't want to go out to dinner with
14   them, they're still your bosses.  And just like I don't
15   socialize with the dean of the medical school.  He's
16   not my friend, he's my boss, right?  And in the best of
17   all worlds, every house officer would want to name
18   their child after their program director, all right.
19             I'm still -- except for the last year I was
20   program director where I sort of burnt out, there are
21   well over 200 people that graduated from our program
22   here at Sinai that consider me the person who taught
23   them everything they know in pediatrics.  And I adore
24   them and they adore me.  In the best of all worlds,
25   that's the way it would be.  Your department's got a

Colloquy                                    66

1    way to go before we can get to there.  And, again, I
2    don't know how any of you people wound up here.  I
3    wouldn't have come here if they paid me a million
4    dollars a year as a trainee, especially when you
5    started.  I don't understand how, you know --
6            RAJ:  Even Dr. Kenneth Kline (phonetic) who
7    was, you know, our medical school's program director in
8    pathology, warned her not to come here.
9            SCOTT BARNETT:  Well --
10           RAJ:  But she was a student here.  She did
11   research here and she, you know --
12           SCOTT BARNETT:  Well, listen, I'm -- but I
13   think it is realities to the world.  Realities to the
14   world is that there's always somebody who has more
15   power than somebody else, right?  And pretending that
16   doesn't exist or it's not fair, it's fair because
17   that's the way the world works.
18           RAJ:  There should be some level we -- you
19   know, that's a given, but there should be some baseline
20   level.  You shouldn't be constantly harassed and
21   harangued for every little thing that you want, you
22   know.
23           SCOTT BARNETT:  Again, there -- I -- this
24   business about these rotations and stuff like that,
25   again, the details elude me.  I don't know enough of

Colloquy                                    67

1    that nor do I really want to.  I do think that every
2    program director and every department should make a
3    good faith effort to make sure that each individual
4    trainee gets the training they need to make them the
5    best possible pathologist, pediatrician, vascular
6    surgeon that they can be.  You know, they walk out of
7    here and they're ready to rock and roll.  And I think
8    the department should do that for you.  And when you
9    meet with Adolfo on Wednesday, I think you should have
10   a calm, collegial discussion about all the issues that
11   concern you, the rest of your training, this rotation,
12   the fact that you believe that your request to do these
13   rotations is not arbitrary, that the last thing you
14   need in the world is two more months of microbiology,
15   done that -- been there, done that.  There's much
16   better time -- there's much better use of the rest of
17   your training to do that.
18           And the other part of this is, to the extent
19   that you're willing to do is to say, listen, I think
20   we're still not meeting eye to eye here about this
21   professionalism thing, and that to the extent that in
22   any way I have led you to believe that I am not 180
23   percent committed to being the most collegial resident
24   and the best team player, I apologize.  That is not my
25   intent.  This has been a very difficult time for me.

Colloquy                                    68

1   This has been a little bit harder to work through than
2   I thought.  And if I've raised my voice to you or even
3   if I -- you know, you perceived this in a different way
4   that I have, I am very sorry.  Again, it almost doesn't
5   matter -- if you're having a difficult time -- again,
6   some people say -- well, if you said, listen, sweetie,
7   I think -- and you say, well, how can you talk to me
8   that way?  Well, that person is an idiot, okay.  If you
9   try to be nice and you -- everybody in the world said,
10  well, you're nice, and they -- but there were -- I'm
11  telling you there were -- one of these sessions you had
12  with Firpo, people came out of their office and said,
13  what was that all about?  She was talking really loud.
14  So, again, if other people perceived it as there being
15  a little bit more than they're used to hearing, you
16  have to accept the fact that it was.  You just -- you
17  have to accept that.  And again, you may not like it
18  and you may not understand why people don't or they
19  just chill out and deal with the fact that -- accept
20  the fact that I'm a little agitated and I'm blowing off
21  a little steam here, but, you know, I mean, again, I
22  have --
23           LEENA VARUGHESE:  I wasn't blowing off any
24  steam.
25           SCOTT BARNETT:  People -- whatever --

Colloquy                                    69

1            LEENA VARUGHESE:  I was talking in a higher
2   level or --
3            SCOTT BARNETT:  Is was enough --
4            LEENA VARUGHESE:  -- decibel, but I was not
5   angry.  I wasn't screaming or --
6            SCOTT BARNETT:  It doesn't -- it almost
7   doesn't matter what you say.  If you scream -- if I
8   scream at my wife who puts up with me until I say,
9   you're the best wife I ever had, and I'm screaming at
10  her, she's going to yell at me.  So if you want to give
11  me a compliment, how about you do it without screaming
12  at me?
13           RAJ:  Yeah.
14           SCOTT BARNETT:  Sometimes it's just style.
15           RAJ:  Yeah.
16           SCOTT BARNETT:  Style is what people
17  perceive.  It's they lose track of the words because of
18  the manner in which you are imparting --
19           RAJ:  Right.
20           SCOTT BARNETT:  Right?  So -- and it's
21  difficult to do.  I told you, I have the same problem
22  again, but I'm in a position in my life where if I
23  don't -- I can't -- I get phone calls from trustees who
24  want to do this and it's stupid.  And I want to just
25  say, listen, I can't believe you're like a billionaire.

1   You're the dumbest bozo I ever met.  I can't do that.
2   There are so many times I want to yell -- I want to
3   answer the dean back when he says something
4   (indiscernible).  I can't do it.  I -- you know, you
5   just can't.  And I'm not saying it's easy.  I'm much
6   older than you are.  It's taken me a long, long, long
7   time to get even to the level of the behavior I have
8   now, which most people would consider having a fault.
9   They would say, you've really got some style there.
10  You  know, I do say things to the dean that people say,
11  how did you get away with that?  They're like mostly
12  (indiscernible).  But, again, I'm going to be 59 next
13  month and I"ve been here -- it's my 24th year.
14  Everybody knows me.  But this is only your fourth year
15  here.  You've got a long way to go before people are
16  used to your shtick, all right?
17          And, again, sometimes -- and sometimes I know
18  I say, listen, there's a line beyond which I -- I can't
19  -- I just can't be totally normal.  I have to be
20  irreverent.  I'm going to be sarcastic.  And there's
21  some level where I won't go and I know -- but I know
22  that there are people that are going to get pissed off
23  and they're not going to understand me.  But I say,
24  well, if they don't understand me, it's okay because
25  they probably don't have a sense of humor.  They don't

1   understand sarcasm.  If there are -- I'm willing to
2   accept that there are a percentage of people I know who
3   don't get me.  But I also understand that if I do it to
4   the wrong person, I can't get -- it's a fine line,
5   right?  And it's something that as you go through your
6   life, you have to say, well, what -- where's the line?
7   What's the line I could deal with?  And you have to
8   sort of work within (indiscernible).
9           RAJ:  Yeah.
10          SCOTT BARNETT:  And I -- you know, again, I
11  think Adolfo is the key here.  He's the guy who is
12  making -- going to make the determination whether you
13  have worked -- had been working with him sincerely and
14  faithfully to address the (indiscernible) going to move
15  successfully past all of this.  And on Wednesday if you
16  go in there as contrite as you can manage and say,
17  listen, I think you have to -- it's important for us to
18  be on the right foot.  I think it would be helpful to
19  me if you understood how difficult this has been and
20  how stressful this has been and how -- and that I do
21  accept the fact that I might not have in every
22  interaction done it in a way that people were
23  comfortable with, but I am trying my best.  I really
24  want to make this work.  I really want to be
25  successful.  I want to be a great pathologist.  And I

Colloquy                                    72

```
 1        just -- you and I have -- please let me know how I'm
 2        doing and what I need to do to continue to prove to you
 3        that I am the kind of person that I feel I am.  I just
 4        -- show me that's --
 5                RAJ:    That's a good way, Leena, so, yeah.
 6                SCOTT BARNETT:  And that's the bottom line.
 7        And if somebody takes that and is unfair to you, that
 8        would cross the threshold to me --
 9                RAJ:  Yeah.
10                SCOTT BARNETT:  -- of being unreasonable,
11        because I think that's as reasonable as you can be.
12        Yeah, you don't have to say, you know -- yeah, you've
13        been under a lot of pressure.  This has been difficult.
14        And I've -- again, my -- each of my three boys has been
15        through difficult stuff in their life and it wasn't
16        easy.  There was a -- my son came this close to losing
17        his job last year.  He did -- I mean, and three years
18        before that, he did something so dopey you could hear
19        me screaming at him over the telephone from the next
20        state.  I said, why are you -- why -- he said, dad,
21        calm down, you're going to have a stroke.  I said, what
22        were you thinking?  He said, I don't know what I was
23        thinking.  I have no idea what I was thinking when I
24        did that.  He said, but I -- but -- and the next day he
25        met with his -- with the person involved and they got -
```

Colloquy                                    73

```
 1        - and he apologized and he asked for their forgiveness
 2        and they put it there.
 3                But he -- it was -- I thought I was going to
 4        die.  I thought -- I couldn't believe I was so angry
 5        with him and so -- you know, but -- you know, and our
 6        little -- my youngest one got arrested when he was 17
 7        years old.  He got arrested, my son.  He got arrested.
 8        And I asked him, what were you thinking?  He said, they
 9        were in a park and there was -- him and his friend Rob
10        and there was a (indiscernible) quarter in it.  There's
11        not a person for ten blocks, he said.  So what does he
12        do?  And this park is next to the police station.  So
13        he starts walking away with the bag.  He gets to the
14        edge of the park.  He said, what am I doing?  Let me
15        bring this to the police station.  And he -- and the
16        person whose bag it was, the police officer said,
17        that's the -- that's my bag.  And the officer said,
18        where were you going?  They thought he was stealing it
19        and he got arrested.
20                RAJ:  That's an accident.  Yeah, he was just
21        -- he was --
22                SCOTT BARNETT:  Well, he was 17.  He should
23        have gone --
24                RAJ:  Yeah.
25                SCOTT BARNETT:  -- right to the police
```

Colloquy                                    74

1    station.  He actually started to walk out of the park
2    with it and he -- it was clear if he would have taken
3    it from where it was on the bench to the police
4    station, he wouldn't have taken that route.  So it was
5    clear that he had done the wrong thing.
6              RAJ:  He's a young kid, you know.
7              SCOTT BARNETT:  Yeah, but he did the -- I
8    mean, so how -- my wife and I have dealt with plenty of
9    stuff.  Shit happens.  Not everything works out the way
10   you want it to work out, but the idea is to move past
11   it.  Learn from it and some -- and again, there are
12   just some times in your life you're going to say,
13   listen, I think I'm doing this the right way and I
14   think they're wrong, but they're the boss and I've just
15   got to suck it up.
16             RAJ:  Right.
17             SCOTT BARNETT:  You know, so -- right?  So
18   right now, if I understand you, you're on probation,
19   right?  You did not take advantage of the fact that you
20   had due process because the lawyer told you not to.
21             LEENA VARUGHESE:  No, I'm on disciplinary
22   action.
23             SCOTT BARNETT:  Well, that's called
24   probation.  If you're on disciplinary action, that's
25   called probation.

Colloquy                                    75

1              LEENA VARUGHESE:  Just before I went on
2    vacation.
3              SCOTT BARNETT:  Right.  Well, yeah, I mean --
4              LEENA VARUGHESE:  It was a -- it was written
5    --
6              SCOTT BARNETT:  -- the timing of it and all
7    that stuff, that was --
8              LEENA VARUGHESE:  The letter was written by
9    Dr. Lento --
10             SCOTT BARNETT:  Yeah, I know.  I saw that
11   letter.
12             LEENA VARUGHESE:  -- who (indiscernible).
13             SCOTT BARNETT:  They --
14             LEENA VARUGHESE:  Then it's signed by Dr.
15   Cordon-Cardo, who is the chairman of the department.
16             SCOTT BARNETT:  But the chairman of the
17   department outranks the -- there are departments where
18   the chairman of the department is the program director.
19             LEENA VARUGHESE:  This is ridiculous.  Like
20   why doesn't the program director just sign the letter?
21             SCOTT BARNETT:  That's --
22             LEENA VARUGHESE:  This is -- no, this is not
23   minor issues.  These are like major points.  These are
24   --
25             SCOTT BARNETT:  **But t**hey're not important at

1  all because it wouldn't have mattered, because if that
2  was your only objection to the due process, it wouldn't
3  have been upheld, because it would not have been
4  upheld.  I'm telling you.  I know the way they work.
5  They only care about the issues that underlie it, the
6  technical aspect.  If they wouldn't have given you the
7  letter at all, that's one thing.  If they wouldn't have
8  offered you due process in the letter, that's another
9  thing.  The fact that the program director did or
10 didn't sign or the date was wrong, they would have
11 restarted the clock.  The technical issues were not the
12 deciding issue.  Again, it's probably just more
13 indicative of a bit of disarray in the department more
14 than anything else.  In fact, there's no way to know
15 because you didn't --
16          RAJ:  The program director --
17          LEENA VARUGHESE:  Maybe it's a problem with
18 the disarray or whatever in the department, but this is
19 like, you know, they keep dragging me back into this.
20 I mean, what do you -- like, that's it, enough is
21 enough.  Like this is getting out of control.
22          SCOTT BARNETT:  You're missing again --
23 you're missing the point.  I think that you have to
24 accept the fact that some of your behaviors are
25 allowing them to drag you back into it.  You're not --

1  neither party in any dispute is completely guilty or
2  completely innocent.  There are things that they could
3  do better, and I believe that there are things that you
4  could do better as well.  It's not that -- when I was
5  working at Elmhurst in the 80's, my boss who is still
6  the director at Elmhurst, Mel Gerdner (phonetic),
7  called me into my office and said -- he said, Scott, I
8  have four words for you, gray is a color.  You can go
9  now.  That's all he said, gray is a color.  I'm a black
10 -- I was always a black and white kind of guy.  And,
11 you know, nothing is black and white.  It's all shades
12 of gray.
13          LEENA VARUGHESE:  I'm not black and white.
14          SCOTT BARNETT:  Well, again --
15          LEENA VARUGHESE:  at all.  In fact, I'm --
16          SCOTT BARNETT:  Again, I think you are, they
17 keep dragging me through this.  They keep doing this.
18 They keep doing that.  The fact -- it's not all they.
19 It's not all you.  Somewhere in the middle is the
20 truth.
21          LEENA VARUGHESE:  Somewhere in the middle is
22 a power differential --
23          SCOTT BARNETT:  Leena --
24          LEENA VARUGHESE:  -- which can like --
25          SCOTT BARNETT:  -- I can't spend an hour and

Colloquy                                                78

1    a half talking to you and go back to this --
2              LEENA VARUGHESE:  Okay, fine, but I have
3    several points that I want to --
4              SCOTT BARNETT:  That's not going to happen.
5              LEENA VARUGHESE:  I have several points that
6    I needed to actually get through at this meeting.  So,
7    you know, and then there is this perception out there
8    that I'm very unprofessional, but, in fact, you know, I
9    have done my job quite well.  I helped out a resident
10   who was on call.
11             SCOTT BARNETT:  Convince Adolfo Firpo that
12   you're professional.
13             LEENA VARUGHESE:  Autopsies.  Meanwhile, the
14   chief resident who is supposed to be at the hospital
15   working is never there.
16             SCOTT BARNETT:  It's not your problem.
17             LEENA VARUGHESE:  That's the problem because
18   --
19             SCOTT BARNETT:  It's not our system of
20   relativity, it's yours.  If the chief resident needs to
21   be put on discipline, they'll go on discipline.
22             LEENA VARUGHESE:  But nobody will.  See,
23   that's the thing, I'm the only person who will like,
24   you know --
25             SCOTT BARNETT:  Leena, I'm telling you that's


Colloquy                                                79

1    not the case.  If we had to put all 22 of you bozos on
2    academic advisement, we'd put all 22 of you on.  It's
3    not -- there's no limit on these things.  It's not a
4    lottery ticket, all right.  If ever --
5              LEENA VARUGHESE:  It's not, but like I've
6    been treated so unfairly, I couldn't like look at my
7    folder last year.  My boss --
8              SCOTT BARNETT:  You could look at it, but you
9    couldn't copy it.  You wanted to copy it.
10             LEENA VARUGHESE:  No, I didn't want to copy
11   it.  I just want to look at the folder.
12             SCOTT BARNETT:  You're entitled to look at
13   the folder tomorrow.
14             LEENA VARUGHESE:  No, but I wasn't allowed
15   to.
16             SCOTT BARNETT:  You can do it tomorrow.
17   Tomorrow you can go in there and look at it under
18   supervision.
19             LEENA VARUGHESE:  No.
20             RAJ:  She can do it tomorrow because she was
21   not allowed to, yeah.  They said --
22             SCOTT BARNETT:  Every house officer is
23   allowed to look but not take under appropriate -- to
24   make sure nothing is --
25             LEENA VARUGHESE:  I didn't want to copy

Colloquy                              80

1    anything.  I just wanted to look at the folder.
2              SCOTT BARNETT:  You can ask -- if you wish to
3    do that on Wednesday during your meeting, you can email
4    him, say you spoke to Scott Barnett, that in accordance
5    with institutional policy, you would like to look at
6    your folder.  And if they say, okay, it's going to be
7    in this room with me sitting over there, that's okay.
8    They're entitled to monitor your looking at it but
9    you're entitled to look at your folder.
10             LEENA VARUGHESE:  And then like all those
11   evaluations that I complete under new innovations never
12   show up in new innovations anymore.  So I don't even
13   know like --
14             SCOTT BARNETT:  Your evaluations of whom?
15             LEENA VARUGHESE:  Like if I were to evaluate
16   the program or rotation.
17             SCOTT BARNETT:  You can't see those.  No one
18   sees them.  They disappear.
19             LEENA VARUGHESE:  Why can't I see them?
20             SCOTT BARNETT:  You're not allowed to see
21   them.  They go into -- once they're completed, they're
22   put in that bin.  You don't get a chance to see them.
23   It says right on it, once you sign it you have no
24   further right to look at it or -- it's on every single
25   evaluation.  That's the way the system works.

Colloquy                              81

1              LEENA VARUGHESE:  But I think other residents
2    can look at it.
3              SCOTT BARNETT:  That is not the case.  If
4    it's the case, I want to know about it.  Once you --
5    once that sails off, you don't have the right to see it
6    anymore.  That's why you're not supposed to finalize it
7    until you're ready to send it.  It goes off -- if you
8    write an evaluation of Pat Lento, it goes into Pat
9    Lento's file.  You don't get a chance to see --
10             LEENA VARUGHESE:  Yeah, well, you know, like
11   everything is like all this like last year when Sam
12   first went off on me after the CP conference, I went
13   and talked to Dr. Lento about this.  He basically
14   interrogated me on why -- when I was on call assessment
15   didn't get sent to flow cytometry for an hour, okay.
16   Why didn't it get sent to flow --
17             RAJ:  We don't need to go back to all that
18   stuff.
19             LEENA VARUGHESE:  Why didn't it get sent to
20   flow cytometry?  Because the hospital didn't inform all
21   the clinicians.
22             SCOTT BARNETT:  That's water under the
23   bridge.
24             RAJ:  Yeah.
25             LEENA VARUGHESE:  Yeah, but then he -- you

```
 1    know, I -- he wouldn't discuss the whole incident with
 2    Sam.  And he's like, oh, I'll speak to him.  And then
 3    he said, oh, well, you know, that's too bad because why
 4    would you write a diatribe of an evaluation against
 5    surgical pathology rotation here?  Okay, so I sent
 6    those evaluations to other residents in the program and
 7    they were like, this is not a diatribe at all.  This is
 8    in fact the fact of the matter.  There is no reason --
 9                SCOTT BARNETT:  If there's a person -- you
10    can write whatever you want.
11                LEENA VARUGHESE:  There is no reason you
12    should not be allowed to write an evaluation as per the
13    program director.
14                SCOTT BARNETT:  You can write whatever you
15    want as long as it's professional.
16                LEENA VARUGHESE:  And then the same program
17    director continues to like put me on, you know,
18    academic advisement.--
19                SCOTT BARNETT:  That's not a (indiscernible)
20    --
21                LEENA VARUGHESE:  -- probation.
22                SCOTT BARNETT:  You're on academic
23    advisement.  It's just you've got to get out --
24                LEENA VARUGHESE:  But that's all part of the
25    negative attitude towards me.  That's what I am trying
```

```
 1    to tell you.  Like it's just like --
 2                SCOTT BARNETT:  Listen, you can -- I think
 3    you're never going to convince me of it.  You're not
 4    going to convince me that there is a vendetta against
 5    you.  You're not going to convince me.  It's not going
 6    to happen.
 7                LEENA VARUGHESE:  Then the -- having to go
 8    see Dr. Fersh as per physician wellness committee.
 9                RAJ:  Yeah, a drug test.  You know, they --
10    you know --
11                LEENA VARUGHESE:  Drug -- okay, fine.
12                RAJ:  -- have to take a drug test.
13                LEENA VARUGHESE:  I don't mind taking a drug
14    test and all that.  I want to prove that --
15                SCOTT BARNETT:  That's a -- what do you think
16    this is, a kindergarten?  If anybody had concerns about
17    your performance, they're obligated to send you to
18    wellness and get a drug test.  That's the -- you don't
19    want to do it?  Quit.  That's the institutional policy.
20                LEENA VARUGHESE:  See, that's the -- that is
21    --
22                SCOTT BARNETT:  That's the institutional
23    policy.  If somebody thought that I was -- if somebody
24    --
25                RAJ:  But she did it.  She did everything.
```

1       SCOTT BARNETT:  And that's your obligation.
2  If you don't comply with wellness, you get fired on the
3  spot.  If somebody said to me, Scott, I have concerns
4  about your performance, you're acting erratically, I
5  want you to go (indiscernible) today, if I didn't show
6  up, I get fired on the spot.
7       RAJ:  That's true.  I mean, you know --
8       SCOTT BARNETT:  That's just hospital --
9  that's institutional policy.
10      RAJ:  That's fine, but what did she do that
11 it merited that?
12      SCOTT BARNETT:  It doesn't matter.
13      RAJ:  You know like --
14      SCOTT BARNETT:  It doesn't matter.  Again,
15 you're trying to make -- you're trying to wrap this
16 into something it's not.  It doesn't matter.
17      LEENA VARUGHESE:  But that's what it is.
18      SCOTT BARNETT:  In your opinion, that's fine.
19 It should -- you have your opinion.
20      LEENA VARUGHESE:  It's not in my opinion.
21      SCOTT BARNETT:  Again, if it's not your
22 opinion, prove it.
23      RAJ:  I mean, this is her -- what she's going
24 through like on a daily basis.  It's tough for her to
25 do her daily work when you're constantly --

1       SCOTT BARNETT:  Suck it up and do it.  Again,
2  don't -- if you want to know what (indiscernible), just
3  do it, be quiet and do your work and convince people.
4  That's what the answer is.  Stop whining about it.  Do
5  your job and convince people that you're not the --
6  that's right.  Again, you don't --
7       RAJ:  But the (indiscernible), you can just
8  see what's happening, you know.
9       SCOTT BARNETT:  But it doesn't matter.  You -
10 - somebody --
11      RAJ:  I know it doesn't matter, but like --
12      SCOTT BARNETT:  Somebody wrote this --
13      RAJ:  -- if you're only one small person in a
14 huge institution, you need to feel like is there some
15 rules that you can, you know, follow.
16      SCOTT BARNETT:  And I'm telling you the
17 answer is in my opinion due -- all the due process
18 rights that you were allotted to were offered to you,
19 you took advantage of some and not others.  The fact
20 that you don't agree with the investigation that was
21 done doesn't make you right.  It doesn't make you
22 right.
23      RAJ:  That's true.
24      LEENA VARUGHESE:  Well, I don't have a
25 problem I -- you know, with the new disciplinary action

```
                          Colloquy                      86

 1     and that, you know, probation or -- so anyway, so I
 2     just said I have to meet with Dr. Firpo twice a week --
 3               SCOTT BARNETT:  Yeah.
 4               LEENA VARUGHESE:  Biweekly.
 5               SCOTT BARNETT:  No, it's every other week.
 6               LEENA VARUGHESE:  Well, that's what --
 7     biweekly is what it says which --
 8               SCOTT BARNETT:  All right, maybe --
 9               LEENA VARUGHESE:  I mean --
10               SCOTT BARNETT:  Biweekly is every other week.
11     That's what it means.
12               RAJ:  Bimonthly maybe.
13               LEENA VARUGHESE:  Bimonthly, yeah.
14               SCOTT BARNETT:  No (indiscernible) every
15     other month.
16               RAJ:  Every other month.
17               SCOTT BARNETT:  Semiweekly is twice a week,
18     okay.  (Indiscernible) with every other week.  That's
19     my understanding.  That's his understanding.  You meet
20     with him any more, you'd be married to him.  Again,
21     that's --
22               RAJ:  Yeah, so you just be with him --
23               LEENA VARUGHESE:  Okay, well, I didn't have a
24     problem with meeting with Dr. Firpo or like discussing
25     any of the issues.
```

```
                          Colloquy                      87

 1               SCOTT BARNETT:  And again, you don't have to
 2     decide whether you have a problem with it.  That's --
 3     that was what was laid out for you.
 4               LEENA VARUGHESE:  No, I -- that's what I
 5     mean.  That's why I had to go through due process to,
 6     you know, I don't want to do all these -- take these
 7     actions that's being right now in this particular
 8     probationary document.  So I said, okay, that's not a
 9     problem.  I can do that.
10               SCOTT BARNETT:  Okay.
11               LEENA VARUGHESE:  But now I'm concerned like
12     is Dr. Firpo going to be really straight with me and
13     fair with me and --
14               RAJ:  You know, ultimately, to graduate as a
15     resident, you need to fulfill all the (indiscernible).
16               LEENA VARUGHESE:  I know.  Now I'm really
17     concerned with this --
18               SCOTT BARNETT:  So my -- if you're asking me
19     my opinion, I -- my --
20               LEENA VARUGHESE:  -- if that's where it's
21     really going to go.  I don't want to be back here in
22     like two months --
23               RAJ:  If he's going to say she's not
24     professional and then not graduate her --
25               LEENA VARUGHESE:  -- I'm not professional,
```

Colloquy                                         88

1    this, that --
2              SCOTT BARNETT:  Adolfo --
3              LEENA VARUGHESE:  You know, I can't -- I
4    don't want to like be in this predicament again.
5              RAJ:  Is that even possible?
6              SCOTT BARNETT:  Listen, if you're asking me
7    whether Adolfo Firpo is capable of being fair, the
8    answer is yes, I believe that.
9              LEENA VARUGHESE:  You believe that, okay.
10             SCOTT BARNETT:  I do believe that.  If it
11   turns out he wasn't fair, you will have -- listen, if -
12   -
13             LEENA VARUGHESE:  I'm a little concerned
14   because I went to him and I said, you know, like you
15   said that you were going to talk to Dr. Harpaz.  He's
16   like, oh, I haven't had an opportunity.  I called him
17   just before I started my hemopath rotation here.  I
18   called him on the phone because I hadn't heard from him
19   after I discussed with him to do the dermpath versus
20   GI.  And he says, oh, you know, I have to like deal
21   with all this ACGME competencies.  I have to call all
22   these people.  I haven't had an opportunity yet, but,
23   you know, I will talk to Dr. Harpaz at my earlier
24   convenience.  I said, okay, then he went on vacation
25   for a week.  He didn't come back.  Then he emailed --

Colloquy                                         89

1    then, you know, in the meantime, I was on call on the
2    24th.  I went to Dr. Harpaz and said, listen, you know,
3    like I'm supposed to be on your -- on this rotation
4    with -- you know, and I'm on GI.  I'm going to be
5    working with you.  But, here's the thing, I'm
6    interested in doing dermpath and I was thinking maybe I
7    can switch.  And he said, okay, you know, let's see
8    like do you think, you know, there's somebody who can
9    cover?  Like how is this going to work?  And I said,
10   okay, let me see.
11             SCOTT BARNETT:  My understanding from talking
12   --
13             LEENA VARUGHESE:  Let me see.  Let me look
14   into it.  And then, you know, I was thinking of
15   emailing other residents, but I didn't because Dr.
16   Firpo was on vacation, so I wanted to run it by him.
17   And he said, oh, well, you know, I didn't have a chance
18   to like talk to Dr. Harpaz yet.  And this is like last
19   week when I'm talking to him.  How do I --
20             SCOTT BARNETT:  (Indiscernible) disorganized.
21             LEENA VARUGHESE:  He was like, how dare you
22   go -- and he's like, how dare you go above me and talk
23   to Dr. Harpaz?  I said, what?  Are you --
24             RAJ:  That's a little strange.
25             LEENA VARUGHESE:  That's a little strange.

Colloquy                    90

1    I'm like, why would I --
2             RAJ:  That's not above him to speak to the
3    rotation, you know, that he wants her to --
4             LEENA VARUGHESE:  Supervisor.  And like
5    that's just like really, you know, unprofessional,
6    this, that.  I was like, wait a second, it's not.  It's
7    not at all.  See, now I'm really concerned like --
8             SCOTT BARNETT:  Let's think about it.  I'm a
9    worst case scenario kind of guy.
10            LEENA VARUGHESE:  This is like -- they are
11   like, you know, the psychological stressors take --
12            RAJ:  And that's what --
13            SCOTT BARNETT:  Well, listen --
14            LEENA VARUGHESE:  You know, it's like I'm
15   willing to x but then it becomes y.  I'm willing to do
16   z, then it becomes b.  I'm willing to do b, then it
17   becomes like --
18            SCOTT BARNETT:  Don't -- if you -- if he has
19   made it clear that he wants to know about it, run
20   everything by him even if he's on vacation.  I'm sure
21   he answers email.  I haven't heard back from you.  I
22   know you're on vacation.  I'm concerned that this
23   rotation hasn't been straightened out.  One, can we
24   talk about it when you're on vacation?  Two, can we
25   talk about it on Monday when you come back?  In the


Colloquy                    91

1    interim, can I talk to Dr. Harpaz?  Right?  Run it by
2    him.  He's the guy.  He's the gatekeeper.  Run it by --
3    the options by him so you know if he's the one who --
4    if he's more -- if he has a more controlling sense,
5    then it's -- I mean, again, why he chose that way, I
6    don't know, and I would -- I mean, I wouldn't have done
7    that either.  I would have let do it -- try to work it
8    out, but --
9             RAJ:  Exactly.  It just, you know --
10            SCOTT BARNETT:  But it doesn't matter.  He's
11   the guy that --
12            RAJ:  (Indiscernible) autonomy as a person,
13   as a physician --
14            SCOTT BARNETT:  It doesn't matter.  There's
15   no autonomy.  You're a house officer and he's the
16   director of education.  You're don't have autonomy.
17   It's not a free country.  It's not a free country.
18   It's -- you're a house officer in a training program.
19            RAJ:  I think you should just try and make
20   him happy, honestly.
21            SCOTT BARNETT:  It's exactly right, and
22   that's what we're trying to say.  Figure out with him
23   on Wednesday what's it going to take to make him happy
24   and him convinced that you are the kind of person that
25   you believe you are.

Colloquy                          92

1     LEENA VARUGHESE:  I am, but I'm being
2  constantly told that I am not, and I'm going to have to
3  prove myself every --
4     SCOTT BARNETT:  You have to prove yourself.
5  You have to prove yourself.  That's the way it is.
6  Don't get --  nobody takes anything at face value.
7     LEENA VARUGHESE:  But this is like, you know
8  --
9     SCOTT BARNETT:  You have to put --
10    LEENA VARUGHESE:  This is like me knocking
11  your self-esteem and telling you who you are and having
12  you to prove to me that you're a sarcastic person and
13  you are so and so, you are --
14    SCOTT BARNETT:  I know I have self-esteem for
15  12 people.  I don't give a shit what you say about me -
16  -
17    LEENA VARUGHESE:  I know.  Give me some of
18  that then.  You know what I mean?
19    SCOTT BARNETT:  -- or what you say about me.
20    LEENA VARUGHESE:  Give me some of that.  Give
21  me some of that self-esteem.
22    SCOTT BARNETT:  You should have been born
23  from my mother.
24    LEENA VARUGHESE:  Yeah, seriously.  I do the
25  --

Colloquy                          93

1     SCOTT BARNETT:  My father died two years ago
2  in Israel where my family lives.  We went to visit my
3  mother.  My wife hadn't seen the (indiscernible) grave.
4  We went with my wife, my mother and my father, and we
5  all agreed -- we're sitting there saying, you know,
6  that my mother firmly believed that the sun rose and
7  set over me.  I was the center of the universe.
8     LEENA VARUGHESE:  That's nice.
9     SCOTT BARNETT:  I could do no wrong and I
10  could say no wrong.  And that's why I always --
11    LEENA VARUGHESE:  That's how my mother feels
12  about my brother, too.
13    SCOTT BARNETT:  Right.
14    LEENA VARUGHESE:  There's a thing about boys.
15    SCOTT BARNETT:  Right.
16    LEENA VARUGHESE:  So this is the other --
17  this is the email I sent to, you know, Dr. Lento, Liz
18  and Adrienne about, you know, my schedule and some
19  other CP requirements a long time ago.
20    SCOTT BARNETT:  Right.
21    LEENA VARUGHESE:  That was very long ago.
22  And the response I got was very, you know, sort of, we
23  feel they're confident, da, da, da, da, da.  So since
24  then I've been very reluctant too much even have to
25  discuss such issues with them because -- and I thought

1    Dr. Firpo when he told me that he's the program
2    director, I can just go directly to him and, you know,
3    work with him.
4            SCOTT BARNETT:  Well, again, for the purposes
5    of this you can.  I think that's the only person you
6    can work with.
7            LEENA VARUGHESE:  And then too --
8            RAJ:  Leena, I think you just have to try to
9    make Dr. Firpo happy and then if problems -- real
10   problems arise, you're always here.
11           SCOTT BARNETT:  Right.  Again, if you're
12   making what everybody would believe and listen, this
13   nice man is clearly a friend of yours, you can talk
14   about what your strategy is and you seem to -- you
15   know, if you say, listen, that's a reasonable approach,
16   go for it.  And if -- and let's say worst case
17   scenario.  Let's say the department decides you haven't
18   met, we're going to fire you.  You still have -- you
19   have the right to a hearing, and if that doesn't go,
20   you have the right to another hearing, right?  So --
21   and if they're not acting professionally, they're going
22   to get slapped.  If they're not doing it the right way,
23   people will say, well, wait a second, this woman came
24   to you.  She told you, I'm -- this is really important
25   to me.  I want to make this work.  I understand that

1    you may be perceiving my actions differently, but I'm
2    under a lot of stress and I'm telling you I want this
3    to work.  I'm anxious to make it work.  I'll do
4    everything that I can to make it work and if you -- and
5    if that's the case and they're still being unfair,
6    they'll have to pay the price for it because that's all
7    you can do.
8            RAJ:  That's all you can do.  There's nothing
9    --
10           SCOTT BARNETT:  But you have to be explicit
11   about it.
12           RAJ:  You just have to like, you know --
13           SCOTT BARNETT:  Be explicit about what you're
14   trying to accomplish.
15           RAJ:  Yeah, you just have to work on --
16           SCOTT BARNETT:  You know, they
17   (indiscernible) in there like, listen, you know, I
18   thought I was acting in a way that was reasonable, but
19   it's totally possible from what I understand it was
20   still interpreted in a way that I didn't want it to be
21   and I apologize and I --
22           LEENA VARUGHESE:  I am really humble.  I
23   always act (indiscernible). You  know, every time I
24   work with a case on anyone, I never like go out of my
25   way to outcall or overcall.  Like if I have any

1    concerns, yeah, I just state that these are my, you
2    know, concerns like --
3              RAJ:  And she's had great evaluations from a
4    lot of people, but the people that are, you know,
5    harassing her are harassing her.  So that's what --
6              SCOTT BARNETT:  And the idea is is that
7    listen, not everybody -- there are a lot of -- I guess
8    there's somebody -- the person who is in charge was
9    just recently charged with the institute for medical
10   education which is the education faculty development
11   arm of the medical school just left.  Her name was Lisa
12   Complin (phonetic).  And she -- we had lunch together.
13   I took her out for a little lunch when she left.  She -
14   - we had the same job and (indiscernible).  She said,
15   Scott, I have to admit something.  The first time I met
16   you, I thought you were such a jerk.  You said
17   something really obnoxious to somebody that I invited
18   for ground rounds I thought was obnoxious.  And she
19   said, you know, I was completely wrong about you.  She
20   said, you can -- you are really sarcastic and sometimes
21   you're very flip.  She said, but I realize you ask
22   those same sort of blunt questions to everybody and
23   you're a nice guy and you mean really well and you've
24   been a wonderful friend to me.  She said, I was
25   completely wrong about you, completely wrong about you.

1    So sometimes you -- people perceive you wrongly and
2    they change their mind.  But if you want them to change
3    their mind, you have to sort of work with them, you
4    know, because some people just don't get it.  You have
5    to work with them and say, okay, what is it going to
6    take for me to convince you I'm not a total jerk?  I'm
7    a little bit of a jerk.  Nobody is going to -- I mean,
8    nobody is going to talk to me and say, Scott, you can
9    be a jerk.  I could be a jerk.  I know that.  You know,
10   the question is, where is the line?  Is it five percent
11   of the time or seven percent of the time?  It can't be
12   50 percent of the time.  And -- but there's a -- like I
13   said, there's an amount of behavior I can't -- I can't
14   be so normal because I have all this stuff floating in
15   my head and it has to come out sometimes.
16             RAJ:  Yeah.
17             SCOTT BARNETT:  So you have to figure out
18   what you're comfortable with, what you want to be
19   constantly comfortable with, what accommodations you're
20   going to take to the fact this is a very conservative
21   club we're in, that there's a very strict hierarchy
22   that people -- and you just have to find the balance.
23   And in this particular case, once you get past this and
24   you have to -- you're don't have to deal with these
25   people again.  You can work in a place where everybody

Colloquy                          98

1    -- but for this period of your life, you have to get
2    these people to believe in you, these people.  If you
3    can get them to do it --
4               LEENA VARUGHESE:  Well, the problem is there
5    are like completely bias against me whether or not I've
6    tried --
7               RAJ:  It doesn't matter.  You have recourse
8    in the future (indiscernible) this place.  You know,
9    you just have to like work with them.
10              SCOTT BARNETT:  And again, you should believe
11   that gray is a color.  Nobody -- it's hard for me to
12   believe that everybody in that department wants you --
13              RAJ:  Not everyone but like people that --
14              SCOTT BARNETT:  Some of the -- some of them.
15   But the only person in my  mind that counts is Adolfo
16   Firpo.  And I still think the man is fair and is trying
17   to be open-minded.  If you can convince him, he'll shut
18   everybody up.  He'll say, listen, I've worked with this
19   woman.  I don't care what your relationship was.  I'm
20   new here.  I have -- and I'm developing a really good
21   relationship with her and I think you've got to cut her
22   some slack, because she's proven to me that we could
23   have a very good relationship.  So shut up, I don't
24   want to hear about it any more.  And that's why he --
25              RAJ:  I think that's about all we can -- you

Colloquy                          99

1    know, we can hope for, yeah.  And he's the one in
2    charge and you've just got to work with him.
3               LEENA VARUGHESE:  Well, he's not a program
4    director though.
5               RAJ:  He's not but I guess --
6               SCOTT BARNETT:  He outranks him.
7               RAJ:  -- he's in charge.
8               SCOTT BARNETT:  He out ranks him.  He's one
9    stop above the next steps in the chain.  The chairman
10   has told him, I want you to get a hold of these
11   programs, the training issues, every single fellowship,
12   the neuropath programs (indiscernible) as of two weeks.
13   There are a lot of issues in that -- you know, lots of
14   issues.
15              RAJ:  And Dr. Lento has gone -- spoken with
16   Dr. Firpo and he said Dr. Firpo spoke with Leena and
17   said, oh, Dr. Lento told me that you had all these
18   problems in the first year, this and that.  You know,
19   it seems, you  know --
20              SCOTT BARNETT:  Well, again, (indiscernible).
21   I think that's --
22              LEENA VARUGHESE:  And your folder says all
23   these things.  And I was like, like, wait a second.
24              SCOTT BARNETT:  Tell her what you want.  I
25   like to look with -- according to Scott I'm allowed to

1   do that.  I'd like to look at that so I understand what
2   is in that folder.  And I said that what -- as my
3   sister would say what was was was.  That's in the past.
4   I'm not looking at the past anymore.  I'm looking from
5   this point forward to establish a relationship with you
6   and this department that we could all be happy with,
7   you know.
8              LEENA VARUGHESE:  Yeah, you know, I couldn't
9   make it to a meeting with Dr. Firpo last week, so I
10  called him several times and I think he hung up the
11  phone on me.
12             SCOTT BARNETT:  He told me no.  He told me --
13  I saw -- he told me he has no idea what the source of
14  the technical difficulties were but --
15             RAJ:  He said his name and then it's --
16             LEENA VARUGHESE:  Yeah, I was like, hi, it's
17  Leena.
18             SCOTT BARNETT:  He said -- I think -- we're
19  you calling on her cell phone or something?
20             LEENA VARUGHESE:  Yeah, but I was having
21  conversations on my phone.  There's no problem with my
22  phone.
23             SCOTT BARNETT:  Well, it could have been
24  where, you know, again, there are dead spots all over.
25  If you walk into the center portion of the --

1              LEENA VARUGHESE:  No, I've had five bars.  It
2   was --
3              SCOTT BARNETT:  Yeah, but it -- you may have
4   had five bars, but he --
5              LEENA VARUGHESE:  And I made five phone calls
6   to him.  I was like, oh, like, oh, I'm --
7              SCOTT BARNETT:  He told me he has no idea --
8              LEENA VARUGHESE:  -- fastly calling him,
9   calling him, calling him.
10             SCOTT BARNETT:  He said it was a technical
11  problem.  Listen, Leena, he's got -- he would be -- get
12  the hang up.  I mean, come on.  (Indiscernible) hang up
13  on you.  You know, it doesn't make sense.  I mean,
14  that's assuming a degree of maliciousness that I don't
15  think that most people are capable of.  I don't sense
16  it.
17             LEENA VARUGHESE:  Well, I'm not capable of
18  that, but I know people are.
19             SCOTT BARNETT:  Well, I don't believe --
20             LEENA VARUGHESE:  So that's -- I mean, that's
21  been my experience here.
22             SCOTT BARNETT:  I would encourage you not to
23  believe that of him.
24             LEENA VARUGHESE:  That's been my experience
25  here.

```
 1          SCOTT BARNETT:  Well, again, he's not
 2     (indiscernible).  He's Strauchen.  He's not Alan
 3     Schiller.  He's Adolfo Firpo.
 4          LEENA VARUGHESE:  Well, I've -- you know,
 5     aside from the whole, you know, the chemistry issue,
 6     I've never had any problems with Dr. Strauchen, so --
 7          SCOTT BARNETT:  I had problems with him.
 8     That's all that counts.
 9          LEENA VARUGHESE:  Yeah, that's different.
10     That's not my -- you know, that's not an issue for me.
11          SCOTT BARNETT:  He was a pain in my ass.
12          LEENA VARUGHESE:  And, you know, I almost
13     feel bad about like saying that, oh, you know, he
14     wasn't letting me do immuno chemistry, because
15     otherwise he's been completely reasonable.
16          SCOTT BARNETT:  Yeah, but from an
17     administrative point of view, we couldn't get any stuff
18     out of him.  He never answered his emails.  He never
19     responded to anything.  So I've got a job to do.  The
20     program director is not allowing me to do my job,
21     they've got to get their head cut off.  That's just the
22     way it goes.
23          LEENA VARUGHESE:  But he knew the rules and -
24     -
25          SCOTT BARNETT:  Yeah, that's okay.
```

```
 1          LEENA VARUGHESE:  -- and like, you know, he
 2     was always professional.  He never --
 3          SCOTT BARNETT:  You do know this, that both
 4     the program director and the department chairman no --
 5     in that department no longer exist?
 6          LEENA VARUGHESE:  What?
 7          SCOTT BARNETT:  The program director and the
 8     department chairman in that department no longer have
 9     their jobs?  You notice that --
10          RAJ:  Well, the program director is --
11          SCOTT BARNETT:  The program --
12          RAJ:  Oh, the former program director.
13          SCOTT BARNETT:  And the former chairman --
14          RAJ:  Chairman, right.
15          SCOTT BARNETT:  -- who was fired from his
16     job.
17          LEENA VARUGHESE:  I'm sorry, but that's --
18          SCOTT BARNETT:  He was fired from his job by
19     the dean, because you're the only pathology department
20     on the planet that loses money and you were
21     hemorrhaging money.
22          LEENA VARUGHESE:  Oh, see, that's the other
23     issue that the hospital has with him.  I mean, it has
24     nothing to do with me.
25          SCOTT BARNETT:  It has a lot to do with you,
```

Colloquy                                      104

```
 1    because it doesn't matter whether he was the best
 2    chairman in terms of education in the world.  If he's
 3    not doing his job, people that don't do your job, you
 4    get --
 5            LEENA VARUGHESE:  Well, when I started, I was
 6    told that there's a $5 million surplus in the
 7    department and, you know, there's a -- you know,
 8    there's a lot of reason --
 9            SCOTT BARNETT:  Well, it went away.
10            LEENA VARUGHESE:  There's a lot of reason to
11    come to this program.  It's the best program in the
12    country.  We have the most amount of specimens.
13            SCOTT BARNETT:  Well, it might have been in -
14    -
15            LEENA VARUGHESE:  We have the best teachers.
16    We have the best pathologists.
17            SCOTT BARNETT:  That's just a slight
18    overstatement.
19            LEENA VARUGHESE:  Da, da, da, da, da, da, da,
20    da, da.
21            SCOTT BARNETT:  Yes, it wasn't exactly truth
22    in advertising.
23            LEENA VARUGHESE:  Well, that's what we were
24    all led to believe.
25            SCOTT BARNETT:  Right, and I'm --
```

Colloquy                                      105

```
 1            LEENA VARUGHESE:  So that's why we all came
 2    here.  And we thought it wasn't -- you know, you knew
 3    like it was going to be a tough four years, but I
 4    didn't realize it was going to be like--
 5            SCOTT BARNETT:  And you know what's going to
 6    happen?  Long after you're gone, that's what it's going
 7    to be --
 8            LEENA VARUGHESE:  -- to the point where I
 9    just really --
10            SCOTT BARNETT:  -- because there are new
11    sheriffs in town.  It's going to be better.  We're
12    going to make it better.  The bottom dropped out of
13    that program and the department.  The bottom dropped
14    out.  The problem went -- the program went from a five-
15    year no citation to probation, and I don't think we're
16    going to be able to undue it.  It just turned into a
17    zoo.
18            LEENA VARUGHESE:  Oh, God, I don't want to
19    know.
20            SCOTT BARNETT:  It just turned into a circus.
21    (Indiscernible) a little bit and --
22            LEENA VARUGHESE:  Yeah, and people assume
23    that I'm the bad guy in all of this.  And I haven't
24    done anything but be helpful to the program.
25            SCOTT BARNETT:  Leena, you're the only person
```

```
                        Colloquy                    106

 1      --
 2              LEENA VARUGHESE:  I never (indiscernible) --
 3              SCOTT BARNETT:  -- among the 22 current
 4      trainees that is --
 5              LEENA VARUGHESE:  But, listen, I've never
 6      been to ACGME.  I never made any official complaint.
 7      There is stuff out there about the program that's
 8      really terrible.
 9              SCOTT BARNETT:  Leena, you can do whatever
10      you think.  That's up to you.
11              LEENA VARUGHESE:  But I'm not -- like that's
12      not just not me.  Like, you know, I have a professional
13      --
14              RAJ:  You're entitled to do what you have to
15      do.
16              LEENA VARUGHESE:  I have a professional
17      attitude and like --
18              SCOTT BARNETT:  Right.
19              LEENA VARUGHESE:  -- you know, I have sense
20      of loyalty.  And there's a rank here and I'm not going
21      to overstep that and do anything that's detrimental.
22      That's who I am.
23              SCOTT BARNETT:  Okay.
24              LEENA VARUGHESE:  And that's where I come
25      from.  So like --
```

```
                        Colloquy                    107

 1              SCOTT BARNETT:  Okay.  So if it takes --
 2              LEENA VARUGHESE:  -- to be told that I'm not
 3      doing --
 4              SCOTT BARNETT:  So, again, you have to --
 5              RAJ:  She is being a scapegoat a little bit
 6      with all of this but --
 7              LEENA VARUGHESE:  Yeah.
 8              SCOTT BARNETT:  Even if it's --
 9              LEENA VARUGHESE:  And that's what Dr. Preston
10      (phonetic) said, too.
11              SCOTT BARNETT:  Again, it's not totally the
12      case and it's not -- it maybe partially the case --
13              LEENA VARUGHESE:  It is partially the case.
14      That's a lot of the problem, too.
15              SCOTT BARNETT:  But again, the solution is --
16              LEENA VARUGHESE:  Well, you need somebody who
17      is like, you know, not perfect, somebody like me as a
18      scapegoat because then you know it can be validated or
19      it can be, okay, if she is --
20              SCOTT BARNETT:  If I felt that this was
21      completely off the wall crazy --
22              LEENA VARUGHESE:  You know, that's how I
23      feel.
24              SCOTT BARNETT:  -- I would have put a stop to
25      it already.  You have my word on it.  It wouldn't be
```

Colloquy                              108

1    the first time.  It won't be the last time.  Again,
2    from what I know, there's -- this is a gray situation,
3    some of what you said --
4              LEENA VARUGHESE:  That's why -- I know.
5              SCOTT BARNETT:  So you have to deal with it,
6    right?  If it was all black and white and they screwed
7    some completely, we wouldn't be having this
8    conversation.  I would have put an end to it.  There's
9    somewhere in between they suck and you suck is the
10   answer.  That's somewhere in the middle now.  There's a
11   little bit of blame to go around and your job as Raj
12   said is to get -- is to work with Adolfo to get this
13   done and graduate (indiscernible).  And Wednesday you
14   start, send an email that says like, you know, if you
15   still wanted to see your file, establish the ground
16   rules with Adolfo.  And if you feel like the department
17   is being completely unreasonable and they're not being
18   -- you get back to me and --
19             LEENA VARUGHESE:  See, that's why I always
20   appeal to you.  Even if I feel like, you know, I don't
21   think you're, you know -- I think you're a fair person.
22             SCOTT BARNETT:  I hope so.
23             LEENA VARUGHESE:  And I know like you do your
24   best no matter what.  So even if I feel like
25   (indiscernible) take my side or what not, I always

Colloquy                              109

1    appeal to you or, you know, I email you and Mr. Johnson
2    (phonetic) or --
3              SCOTT BARNETT:  (Indiscernible).
4              LEENA VARUGHESE:  Because I feel like, you
5    know, that's what I do.  That's the hierarchy.
6              SCOTT BARNETT:  Well, that's my job.  That's
7    what I get paid to do.
8              LEENA VARUGHESE:  That's the hierarchy.
9    That's how I approach things.
10             SCOTT BARNETT:  Right, and I --
11             LEENA VARUGHESE:  I don't like to step out of
12   line.  I don't want like --
13             SCOTT BARNETT:  No, we appreciate that.
14             LEENA VARUGHESE:  But that's just me.  I just
15   don't want that to be more fodder for --
16             SCOTT BARNETT:  No, no, it's not, and anybody
17   who would use your approaching me or Paul and there
18   would be retribution, it would be unfair.  You're
19   supposed to be able to talk to me or Stimmel or Paul or
20   your rep on the house staff council.  There are
21   mechanisms and we want to use them.  And it is my -- my
22   job is not just to make the trains on time like
23   Mussolini did.  You know, that's what everybody said
24   about Mussolini.  He was a good guy because the trains
25   ran on time. The fact that he was a fascist and, you

```
                              Colloquy                     110

  1        know, he was killing people, -- right.  So the idea is
  2        --
  3                 LEENA VARUGHESE:  Sorry, sorry.  That's a
  4        little --
  5                 SCOTT BARNETT:  -- my job is to make sure all
  6        the i's are dotted and the t's are crossed but that
  7        people -- that the institution is treating people
  8        fairly and accordingly.  I try my best to make sure
  9        that (indiscernible) to make sure every opportunity you
 10        have to graduate and do the right thing and get this
 11        done.  So let's go forward with this --
 12                 RAJ:  I think that's all she's asking for and
 13        that's --
 14                 SCOTT BARNETT:  Okay, and I'm committed to
 15        it.  But there's an important bunch of people that are
 16        over me that also have to be convinced.  I can't say --
 17        oh, I talked to Leena, you know, this is over.  I can't
 18        do that.  That's stepping out of bounds.
 19                 RAJ:  Of course.
 20                 SCOTT BARNETT:  And that's not the way the
 21        institution works.  I think -- I certainly want and
 22        respect them to also believe that gray is a color to
 23        give you every possible opportunity to make this right
 24        and if -- and to treat you fairly.  And if they're not,
 25        they'll be held accountable.  So let's see where we go.
```

```
                              Colloquy                     111

  1        Sound good?
  2                 RAJ:  That sounds fair.
  3                 LEENA VARUGHESE:  Okay.
  4                 SCOTT BARNETT:  Okay.  (Indiscernible).
  5                 RAJ:  Yeah, yeah.
  6                 SCOTT BARNETT:  (Indiscernible) the run?
  7                 RAJ:  That's the run.  With my director
  8        there?
  9                 SCOTT BARNETT:  Yeah, that's cool.  Some of
 10        my former (indiscernible).  It's a good place, take
 11        care.
 12                 RAJ:  All right, thanks.
 13                 SCOTT BARNETT:  Good luck with things.
 14
 15                            *  *  *  *  *
 16
 17
 18
 19
 20
 21
 22
 23
 24
 25
```

112

# C E R T I F I C A T I O N

I, CARLA OAKLEY, the assigned transcriber, do
hereby certify the foregoing transcript of proceedings
on compact disk, playback numbers 13:03:58 to 15:01:41,
is prepared in full compliance with the current
Transcript Format for Judicial Proceedings and is a
true and accurate compressed transcript of the
proceedings as recorded, and to the best of my ability.


/s/ Carla Oakley_____   Date: May 12, 2014
CARLA OAKLEY      AOC#479
J&J COURT TRANSCRIBERS, INC.

Exhibit 224

>> ——— Original Message ———
>> From: "Jordan, Adrienne" <adrienne.jordan@mountsinai.org>
>> Date: Monday, September 12, 2011 3:20 pm
>> Subject: Please Respond
>> To: "Varughese, Leena (MSSM-Imail)" <leena.varughese@mssm.edu>,
>> "Firpo, Adolfo (MSSM)" <adolfo.firpo@mssm.edu>, "Lento, Patrick"
>> <Patrick.Lento@mountsinai.org>, "Morency, Elizabeth (MSSM-Imail)"
>> <elizabeth.morency@mssm.edu>
>>
>>> Dr. Varughese,
>>>
>>>
>>>
>>> Dr. Morency and I have e-mailed you several times about the
>> following> two issues yet you have failed to respond.  Please
>> respond
>>> immediately.
>>>
>>>
>>> 1.   What is your topic for Wednesday conference?  I now, in addition
>>> to residents asking, have attendings asking as well.  We must
>> have
>>> thisinformation today.
>>> 2.   Have you asked Jonathan Yao about switching your GI month?  I
>>> need to finalize schedules today.  Additionally, if Dr. Yao was
>> unable> to switch with you, did you want me to switch one of your M-
>> VA months
>>> for Hematology as I suggested in an earlier e-mail?
>>>
>>>
>>>
>>> Please respond to these two points immediately.  Thank you for your
>>> time.
>>>
>>>
>>>
>>> Adrienne Jordan, M.D.
>>>
>>> The Mount Sinai Hospital
>>>
>>> Department of Pathology - Box 1194
>>>
>>> One Gustave L. Levy Place
>>>
>>> New York, NY  10029
>>>
>>>
>>>
>>> Pager (917) 401-5341
>>>
>>> Cell (330) 327-7339
>>>
>>>
>>>
>>>

On Sep 12, 2011, at 6:56 PM, "leena varughese" <leena.varughese@mssm.edu> wrote:

> It's going to be review on grossing of several different types of specimens of interest to me and gross pictures of common malignancies.... this is the lecture I am interested in presenting.
>
> ----- Original Message -----
> From: "Jordan, Adrienne" <adrienne.jordan@mountsinai.org>
> Date: Monday, September 12, 2011 6:33 pm
> Subject: RE: Please Respond
> To: "Varughese, Leena (MSSM-Imail)" <leena.varughese@mssm.edu>
> Cc: "Morency, Elizabeth (MSSM-Imail)" <elizabeth.morency@mssm.edu>, "Firpo, Adolfo (MSSM)" <adolfo.firpo@mssm.edu>, "Lento, Patrick" <Patrick.Lento@mountsinai.org>
>
>> Dr. Varughese,
>>
>> That is not an appropriate lecture topic. We have had 8 grossing
>> lectures already where this topic was discussed in great detail.
>> Additionally, the attendings are covering this during their normal
>> histology lectures. Lastly, the policy states that you must give a
>> lecture on a topic that you missed. I have taken the liberty of
>> lookingat your absences and these are areas that you missed:
>> Cytology GYN
>> infections, Cytology GYN dysplasia, Normal GU histology, Acid-Base
>> Chemistry, and Cytology Squamous Cell Carcinoma. Additionally you
>> missed several Autopsy conferences. Several suggestions for topics I
>> have for you are: an interesting cytology case in one of the above
>> mentioned topics, board review of clinical chemistry questions, or
>> follow up of an interesting autopsy case with a good work up,
>> differential diagnosis, etc. I am sorry that you have to create
>> anotherpresentation, but this is why Dr. Morency and I asked you
>> several weeks
>> ago for your topic. Please respond ASAP with what your topic will be.
>>
>> Adrienne Jordan, M.D.
>> The Mount Sinai Hospital
>> Department of Pathology - Box 1194
>> One Gustave L. Levy Place
>> New York, NY 10029
>>
>> Pager (917) 401-5341
>> Cell (330) 327-7339
>>
>>

Exhibit 225

8/15/2011 - 8/26/2011

Leena Varughese

Dronz-VH - surgical pathology rotation

|  | Arrived | Left | Conference |
|---|---|---|---|
| 8/15/2011 | 10 AM | 6:45 pm | Dermatology flu c̄ Dr. Shez 5:20 - 6:30 pm |
| 8/16/2011 | 10:45 AM | 6:45 | CP conference didactic 8-9AM  CP call conference @ 9-10AM |
| 8/17/2011 | 9:30 AM | 6:30 pm | Cytology conference 8-9AM  12 - Brief didactic c̄ Drlemp. |
| 8/18/2011 | 9:30 AM | 6 pm | ~~Surgical pathology~~ flu ~~conference~~ 8-9 AM  1-2pm - Tumor board |
| 8/19/2011 | 9:30 AM | 7 pm | ~~Autopsy flu conference 8 AM~~ |
| 8/22/2011 | 9:30 AM | 6:45 pm. | Derm clinical rev./810 @ 5pm. |
| 8/23/2011 | 9:30 AM | 5:30 pm | CP conference |
| 8/24/2011 | 9:30 AM | 5:15 pm | cytology conferen.  ⊘ AP/CP/Autopsy call |
| 8/25/2011 | 9:30 AM | 7pm | ~~surg path flu conf~~  1-2pm Tumor board |
| 8/26/2011 | 9:30 AM | 5:30 pm | ~~Autopsy conf.~~ |

P002598

Exhibit 226

| Date | Time | Conference | Presenter | AP/CP | Any Change |
|---|---|---|---|---|---|
| **Aug 1, 2011** | 8-9 am | Grossing Lecture | Julie Chepovetsky | AP -SP | Did not present, Cancelled |
| **Aug 2, 2011** | 8-9 am | CBC-Opathies | Eleanor Peerschke | CP -Hematology | |
| **Aug 3, 2011** | 8-9 am | GYN reactive changes/ Infection | Selegean | AP - Cytology | |
| **Aug 4, 2011** | 8-9 am | Grossing Lecture | Paul Azar | AP -SP | |
| **Aug 5, 2011** | 8-9 am | Autopsy Case conference | | AP -SP | |
| **Aug 8, 2011** | 8-9 am | Grossing Lecture | Justin Fender | AP -SP | Did not present, Cancelled |
| **Aug 9, 2011** | 8-9 am | Hemoglobinopathies | Eleanor Peerschke | CP -Hematology | |
| **Aug 10, 2011** | 8-9 am | No Conference | | | |
| **Aug 11, 2011** | 8-9 am | Grossing Lecture | Alicia Martinez | AP -SP | |
| **Aug 12, 2011** | 8-9 am | Autopsy Case conference | | AP -Autopsy | Cancelled |
| **Aug 15, 2011** | 8-9 am | Heart dissection | Patrick Lento | AP -SP | |
| **Aug 16, 2011** | 8-9 am | Abnormal clotting tests | Eleanor Peerschke | CP -Hematology | |
| **Aug 16, 2011** | 9-10 am | Case Conference for CP | Leena Varughese, Jonathan Chow | CP -Call conference | |
| **Aug 17, 2011** | 8-9 am | GYN Dysplasia | Selegean | AP - Cytology | |
| **Aug 18, 2011** | 8-9 am | Interesting Surgical Pathology cases | Julie Chepovetsky, Justin Fender | AP -SP | |
| **Aug 19, 2011** | 8-9 am | Autopsy Case conference | | AP -Autopsy | |
| **Aug 22, 2011** | 8-9 am | Basic or normal GU histology | Guang Xiao | AP -SP | Originally Noam Harpaz on schedule |
| **Aug 23, 2011** | 8-9 am | Acid/ Base Abnormalities | Lakshimi Ramanathan | CP -Clinical chemistry | |
| **Aug 24, 2011** | 8-9 am | Squamous cell carcinoma insitu/invasion | Selegean | AP - Cytology | |
| **Aug 25, 2011** | 8-9 am | Interesting Surgical Pathology cases | Mabel Ko/ Amanda Blouin | AP -SP | Amanda Blouin did not present as scheduled |
| **Aug 26, 2011** | 8-9 am | Autopsy Case conference | | AP -Autopsy | Cancelled |
| | | | | | |
| | | 6 lectures cancelled during period 2 | | | |
| | | SP = Surgical Pathology | | | |
| | | | | | |
| **Sep 15, 2011** | 8-9 am | Interesting Surgical Pathology cases, B1080 | Robert Guarino, Jeremy Klapper | AP | Robert Guarino Cancelled |

Exhibit 227

From

"Jordan, Adrienne" <adrienne.jordan@mountsinai.org>
Sent
Friday, September 9, 2011 1:03 pm
To
"Ramanathan, Lakshmi" <lakshmi.ramanathan@mountsinai.org> , "Schiller, Alan" <IMCEAEX-
   O=MSNYUHEALTH_OU=FIRST+20ADMINISTRATIVE+20GROUP_CN=RECIPIENTS_CN=Aschil01@mountsinai.org> ,
"Szpom, Arnold" <Arnold.Szpom@mountsinai.org> , "Eliasen, Carol" <Carol.Eliasen@mountsinai.org> ,
pathologyresidents@mssm.edu , "Firpo, Adolfo (MSSM)" <adolfo.firpo@mssm.edu> , "Lento, Patrick"
<Patrick.Lento@mountsinai.org>
Subject
[Patologyresidents] Weekly Schedule 9/12-9/16


********If you are an attending receiving this message, you are scheduled for a lecture or unknown conference.


MONDAY

Sept 12, 2011


8:00 – 9:00

GYN Pathology – Dr. Eliasen

Annenberg Conference Rm. 16-02


3:00

Liver Review

Multi-headed Scope Room 15-239


4:00

GI Review – Dr. Harpaz

GI Pathology Suite Room 15-38


AP Resident/Fellow on Call: Dr. Klapper

CP Resident/Fellow on Call: Dr. Kazi

Autopsy Resident on Call: Dr. Kazi

TUESDAY

Sept 13, 2011

8:00 – 9:00

Therapeutic Drug Monitoring – Dr. Ramanathan

East Building 8th Floor Conference Room

AP- Breast Teaching Conference, Dubin Breast Center

9:00 – 10:00

CP Case Conference

East Building 8th Floor Conference Room

11:30 – 12:00

Gross Show - Dr. Dikman

Gross Room

2:00

Renal Pathology Conference - Dr. Dikman

Multi-headed Scope Room 15-239

3:00

Liver Review

Multi-headed Scope Room 15-239

4:00

GI Review – Dr. Harpaz

GI Pathology Suite Room 15-38

AP Resident/Fellow on Call: Dr. Kadire

CP Resident/Fellow on Call: Dr. Roman

Autopsy Resident on Call: Dr. Roman


WEDNESDAY

Sept 14, 2011


8:00 – 9:00

Case Presentation – Dr. Varughese

Annenberg Conference Rm. 16-02


12:00 – 12:30

Unknown Session - Dr. Szporn

Multi-headed Scope Room 15-239


3:00

Liver Review

Multi-headed Scope Room 15-239


4:00

GI Review – Dr. Harpaz

GI Pathology Suite Room 15-38


AP Resident/Fellow on Call: Dr. Zhang

CP Resident/Fellow on Call: Dr. Azar

Antopsy Resident on Call: Dr. Azar


THURSDAY

Sept 15, 2011

8:00 – 9:00

Interesting Case Presentations -- Dr. Guarino and Dr. Klapper

Annenberg Conference Rm. 16-02

10:30

Brain Cutting- Dr. Fowkes

Autopsy Suite, MC level

3:00

Liver Review

Multi-headed Scope Room 15-239

4:00

GI Review -- Dr. Harpaz

GI Pathology Suite Room 15-38

AP Resident/Fellow on Call: Dr. Suarez

CP Resident/Fellow on Call: Dr. Chow

Autopsy Resident on Call: Dr. Chow

FRIDAY

Sept 16, 2011

8:00 – 9:00

Autopsy Case Conference - Dr. Schiller

Autopsy Suite, MC level

12:00 – 1:00

Clinical Chemistry Practice questions - Dr. Ramanathan

East Building 8th Floor Conference Room


3:00

Liver Review

Multi-headed Scope Room 15-239


AP Resident/Fellow on Call: Dr. Suarez

CP Resident/Fellow on Call: Dr. Azar

Autopsy Resident on Call: Dr. Azar


Adrienne Jordan, M.D.

The Mount Sinai Hospital

Department of Pathology - Box 1194

One Gustave L. Levy Place

New York, NY  10029


Pager (917) 401-5341

Cell (330) 327-7339

| | |
|---|---|
| **From:** | pathologyresidents-bounces@mssm.edu on behalf of Jordan, Adrienne [adrienne.jordan@mountsinai.org] |
| **Sent:** | Monday, September 19, 2011 8:38 AM |
| **To:** | pathologyresidents@mssm.edu |
| **Subject:** | Re: [Pathologyresidents] Weekly Memo 9/12-9/16 |
| **Attachments:** | Friday 12pm Lecture.xls; Thursday 8am Lecture.xls; ATT3165385.txt |

I forgot to attach the schedules that I said I would. These files are password protected so that only the chief residents can edit them, but you can open them as a read only document.

I also forgot to list the vacations for the week of 9/19:
Jeremy Klapper
Sorin Selegean
Alicia Martinez
Sofia Kazi

Adrienne Jordan, M.D.
The Mount Sinai Hospital
Department of Pathology - Box 1194
One Gustave L. Levy Place
New York, NY 10029

Pager (917) 401-5341
Cell (330) 327-7339

-----Original Message-----
**From:** pathologyresidents-bounces@mssm.edu [mailto:pathologyresidents-bounces@mssm.edu] **On Behalf Of** Jordan, Adrienne
**Sent:** Friday, September 16, 2011 3:52 PM
**To:** pathologyresidents@mssm.edu
**Subject:** [Pathologyresidents] Weekly Memo 9/12-9/16

Resident Issues:

1. Please log your duty hours.
2. Some people have stated that they did not receive the initial e-mail stating when they were scheduled to give a Thursday morning or Friday noon time lecture. I have attached the schedules for you to review. They are also on the G drive under chief resident files. These files are password protected but can be opened as a read only.
3. Don't forget Dr. Cordon-Cardo's convocation is this Tuesday at 5pm. We all should make every effort to attend.
4. Please sign the card for Dr. Nagi. It is on Bob Guarino's desk.
5. Don't forget Elizabeth needs all of your publications and abstracts since you started residency. Please get those to her ASAP.
6. Everyone who is onsite and is able to should come to the resident meeting on Friday.
7. As most of you know who have the United Health Care insurance through Mount Sinai, we are supposed to fill out a yearly health survey in order to receive a discount on our insurance. In years past we have been able to leave certain sections blank (ie. cholesterol, BP, etc). From my

1



PLAINTIFF'S
EXHIBIT
27
4/25/2014

D_ESI018441

conversations with HR this week, we will not be able to leave those sections blank this year. Mount Sinai is holding a Health Fair every Monday and Wednesday from 8-10 am in Guggenheim Pavilion. During this fair you can get your blood pressure and cholesterol checked. To make this easier for everyone, we will end lecture on September 26 at 8:30 am so people who need to can go to the health fair and get their cholesterol checked so they can fill out the health survey. I know this seems obvious, but remember to have an empty stomach.

Surgical Issues:

1. Roma is out sick for the time being. We do not know when she will return. Please let Liz and I know if a moonlighter is needed as early in the day as possible.
2. Luiba is on vacation from September 16-September 30
3. Everything else was pretty much said in the mid-weekly memo

Adrienne Jordan, M.D.
The Mount Sinai Hospital
Department of Pathology - Box 1194
One Gustave L. Levy Place
New York, NY 10029

Pager (917) 401-5341
Cell (330) 327-7339

2

D_ESI018442

## THURSDAY 8AM LECTURES, 2011-2012

| Date | Lecturer | Topic |
|---|---|---|
| 7/7/2011 | Jordan | Gross Lecture |
| 7/14/2011 | Hechtman | Gross Lecture |
| 7/21/2011 | Grunes | Gross Lecture |
| 7/28/2011 | | RESIDENT MEETING |
| 8/4/2011 | Azar | Gross Lecture |
| 8/11/2011 | Martinez | Gross Lecture |
| 8/18/2011 | Chepovetsky, Fender | Interesting Case |
| 8/25/2011 | Blouin, Ko | Interesting Case |
| 9/1/2011 | | |
| 9/8/2011 | Azar | Senior Unknowns |
| 9/15/2011 | Guarino, Klapper | Interesting Case |
| 9/22/2011 | Grunes, Smethurst | Interesting Case |
| 9/29/2011 | Jordan | How to Give a Presentation |
| 10/6/2011 | Morency | Senior Unknowns |
| 10/13/2011 | Schubeck, Yao | Interesting Case |
| 10/20/2011 | Guarino, Zhang | Interesting Case |
| 10/27/2011 | | |
| 11/3/2011 | Varughese | Senior Unknowns |
| 11/10/2011 | Khachaturov, Kadire | Interesting Case |
| 11/17/2011 | Suarez, Prera | Interesting Case |
| 11/24/2011 | | THANKSGIVING (NO CONFERENCE) |
| 12/1/2011 | Roman | Senior Unknowns |
| 12/8/2011 | Jordan, Jacob | Interesting Case |
| 12/15/2011 | Zhang, Groh | Interesting Case |
| 12/22/2011 | Kalir | Cervical neoplasms |
| 12/29/2011 | | |
| 1/5/2012 | Eliasen | Uterine neoplasms |
| 1/12/2012 | Rosario, Blowe | Interesting Case |
| 1/19/2012 | Martinez | Senior Unknowns |
| 1/26/2012 | Chow | Senior Unknowns |
| 2/2/2012 | Ciomek, Schubeck | Interesting Case |
| 2/9/2012 | Blouin, Hechtman | Interesting Case |
| 2/16/2012 | Azar | Senior Unknowns |
| 2/23/2012 | Grunes, Klapper | Interesting Case |
| 3/1/2012 | Li, Smehurst | Interesting Case |
| 3/8/2012 | Jordan | Senior Unknowns |
| 3/15/2012 | Beasley | Uncommon Pulmonary Tumors |
| 3/22/2012 | | NO CONFERENCE (USCAP) |
| 3/29/2012 | Beasley | COPD/Obstructive Diseases |
| 4/5/2012 | Beasley | Interstitial Diseases Part 2 |
| 4/12/2012 | Fender, Kazi | Interesting Case |
| 4/19/2012 | Hechtman | Senior Unknowns |
| 4/26/2012 | Rosario, Kadire | Interesting Case |
| 5/3/2012 | Jacob, Zhang | Interesting Case |
| 5/10/2012 | | |
| 5/17/2012 | Chepovetsky | Senior Unknowns |
| 5/24/2012 | Groh, Blowe | Interesting Case |
| 5/31/2012 | Suarez, Chepovetsky | Interesting Case |
| 6/7/2012 | Yao, Ko | Interesting Case |
| 6/14/2012 | Kazi | Senior Unknowns |
| 6/21/2012 | Prera, Ciomek | Interesting Case |
| 6/28/2012 | Li, Khachaturov | Interesting Case |

CONFIDENTIAL

| WEEK | TOPIC | LECTURE | ATTENDING |
|---|---|---|---|
| 7/7/08 | BASIC PATHOLOGY | Cardiovascular | Fallon |
| 7/14/08 | | GI | Harpaz |
| 7/21/08 | | Liver | Fiel |
| 7/28/08 | | Gyn | Eliasen |
| 8/4/08 | | Derm | Emanuel |
| 8/11/08 | | Head and Neck | Rivera |
| 8/18/08 | | Bone and Soft tissue | Garcia |
| 8/25/08 | | Pulmonary | Beasley |
| 9/1/08 | | <<LABOR DAY>> | |
| 9/8/08 | | Genitourinary | Xiao |
| 9/15/08 | | Breast | Jaffer/Nagi |
| 9/22/08 | | Pediatric | Magid |
| 9/29/08 | | Neuro | Fowkes |
| 10/6/08 | CARDIOVASCULAR | Ischemic Disease | Fallon |
| 10/13/08 | | Valvular Disease | Fallon |
| 10/20/08 | | Cardiomyopathies | Fallon |
| 10/27/08 | | Vasculitides | Fallon |
| 11/3/08 | | Congenital Disease | Magid |
| 11/10/08 | GASTROINTESTINAL | Esophagus/Stomach | Harpaz |
| 11/17/08 | | Infection/Inflammatory | Harpaz |
| 11/24/08 | | Colonic neoplasms | Harpaz |
| 12/1/08 | LIVER | Hepatitis | Thung |
| 12/8/08 | | Liver neoplasms | Fiel |
| 12/15/08 | GYN | Cervical neoplasms | Kalir |
| 12/22/08 | | Endometrial neoplasms | Schlosshauer |
| 12/29/08 | | Ovarian neoplasms | Deligdisch |
| 1/5/09 | PEDIATRIC | Common Pediatric Tumors | Morotti |
| 1/12/09 | ORAL PATHOLOGY | Neoplasms | Fahmy |
| 1/19/09 | | <<MARTIN LUTHER KING>> | |
| 1/26/09 | HEAD AND NECK | Salivary Glands | Rivera |
| 2/2/09 | | Thyroid and Parathyroid | Rivera |
| 2/9/09 | BONE AND SOFT TISSUE | Bone Tumors Part I | Garcia |
| 2/16/09 | | <<PRESIDENT'S DAY>> | |
| 2/23/09 | | Bone Tumors Part II | Garcia |
| 3/2/09 | | Bone Tumors Part III | Garcia |
| 3/9/09 | HEME/LYMPH | Lymphoma | Strauchen |
| 3/16/09 | | Pituitary Neoplasms | Kleinman |
| 3/23/09 | PULMONARY | COPD | Beasley |
| 3/30/09 | | Neoplasms | Beasley |
| 4/6/09 | NEUROPATHOLOGY | Infectious Pathology | Fowkes |
| 4/13/09 | | Degenerative Diseases | Fowkes |
| 4/20/09 | | CNS Neoplasms | Fowkes |
| 4/27/09 | | Bone Marrow Pathology | Petersen |
| 5/4/09 | BREAST | Benign Lesions | Jaffer/Nagi |
| 5/11/09 | | Neoplasms | Jaffer/Nagi |
| 5/18/09 | GENITOURINARY | Testicular neoplasms | Xiao |
| 5/25/09 | | <<MEMORIAL DAY>> | |
| 6/1/09 | | Non-neoplastic Kidney Disease | Dikman |
| 6/8/09 | | Kidney neoplasms | Xiao |
| 6/15/09 | | Prostate & Bladder neoplasms | Xiao |
| 6/22/09 | DERM | Carcinomas of Skin | Phelps |
| 6/29/09 | | Melanoma | Phelps |

P002323

| WEEK | TOPIC | LECTURE | ATTENDING |
|---|---|---|---|
| 7/6/09 | **BASIC PATHOLOGY** | Cardiovascular | Fallon |
| 7/13/09 | | GI | Harpaz |
| 7/20/09 | | Liver | Fiel |
| 7/27/09 | | Gyn | Eliasen |
| 8/3/09 | | Dermatopathology | Emanuel |
| 8/10/09 | | Head and Neck | Rivera |
| 8/17/09 | | Genitourinary | Xiao |
| 8/24/09 | | Bone and Soft tissue | Garcia |
| 8/31/09 | | Pulmonary | Beasley |
| 9/7/09 | | <<LABOR DAY>> | |
| 9/14/09 | | Breast | Jaffer/Nagi |
| 9/21/09 | | Oral pathology | Lumerman |
| 9/28/09 | **FORENSIC** | Death Certification | Scordi-Bello |
| 10/5/09 | **CARDIOVASCULAR** | Cardiomyopathies & Valvular Disease | Fallon |
| 10/12/09 | | Ischemic & Vasculitides | Fallon |
| 10/19/09 | **GASTROINTESTINAL** | Pancreatic Neoplasms | Zhu |
| 10/26/09 | | Colon polyps | Ward |
| 11/2/09 | | Colitis | Qin |
| 11/9/09 | | Colon Cancer | Polydorides |
| 11/16/09 | | Gastric diseases | Yuan |
| 11/23/09 | **LIVER** | Hepatitis | Thung |
| 11/30/09 | | Liver neoplasms | Fiel |
| 12/7/09 | **GYN** | Cervical neoplasms | Kalir |
| 12/14/09 | | Endometrial neoplasms | Schlosshauer |
| 12/21/09 | | Ovarian neoplasms | Deligdisch |
| 12/28/09 | **PEDIATRIC** | Common Pediatric Tumors | Morotti |
| 1/4/10 | **NEUROPATHOLOGY** | Neuropathology | Fowkes |
| 1/11/10 | **ORAL PATHOLOGY** | Neoplasms | Fahmy |
| 1/18/10 | | <<MARTIN LUTHER KING>> | |
| 1/25/10 | **HEAD AND NECK** | Salivary Glands | Rivera |
| 2/1/10 | | Thyroid and Parathyroid | Rivera |
| 2/8/10 | **BONE AND SOFT TISSUE** | Bone Tumors Part I | Garcia |
| 2/15/10 | | <<PRESIDENT'S DAY>> | |
| 2/22/10 | | Bone Tumors Part II | Garcia |
| 3/1/10 | | Bone Tumors Part III | Garcia |
| 3/8/10 | **PULMONARY** | COPD | Beasley |
| 3/15/10 | | Neoplasms | Beasley |
| 3/22/10 | **HEME/LYMPH** | Lymphoma | Petersen |
| 3/29/10 | | Bone Marrow Pathology | Petersen |
| 4/5/10 | **NEUROPATHOLOGY** | Infectious Pathology | Fowkes |
| 4/12/10 | | Degenerative Diseases | Fowkes |
| 4/19/10 | | CNS Neoplasms | Fowkes |
| 4/26/10 | | Pituitary Neoplasms | Kleinman |
| 5/3/10 | **BREAST** | Benign Lesions | Jaffer/Nagi |
| 5/10/10 | | Neoplasms | Jaffer/Nagi |
| 5/17/10 | **GENITOURINARY** | Non-neoplastic Kidney Disease | Dikman |
| 5/24/10 | | Kidney neoplasms | Xiao |
| 5/31/10 | | <<MEMORIAL DAY>> | |
| 6/7/10 | | Testicular neoplasms | Xiao |
| 6/14/10 | | Prostate & Bladder neoplasms | Xiao |
| 6/21/10 | **DERM** | Inflammatory Diseases | Phelps |
| 6/28/10 | | Skin Neoplasms | Phelps |