**From:** "Firpo, Adolfo" <adolfo.firpo@mssm.edu>
**Date:** July 31, 2012 1:42:11 PM EDT
**To:** "Blowe, Sarah (MSH)" <sarah.blowe@mountsinai.org>
**Cc:** "Tiger-Paillex, Caryn" <caryn.tiger-paillex@mssm.edu>, "Johnson, Paul"
<paul.johnson@mssm.edu>
**Subject: Leave of Abscence**

Dear Dr. Blowe:

I sincerely hope that you accept and realize that everyone you met this morning in my office had only one concern and objective in mind: How to help Dr. Sarah Blowe get well as soon as possible so she can return to her residency and realize her full potential. I was delighted by your final decision to accept the medical leave of absence (LOA) option and to be evaluated again.

Please try to fill in all the LOA paperwork and turn it in to Ms. Caryn Tiger-Paillex Office by Friday to get the process going and so that you can get all the support you may need. Sometimes it is very difficult to accept that one needs help, but it is important to realize that everyone needs help and support from others at some point in life, so please don't turn away this offer. Let us help you. Even if you are convinced that you don't need help I ask that you to please just give it try and go through the motions and see what happens. I hope that as you go through this process you will start to see things differently and feel better about your peers and everyone else at work. No one here knows anything about you, so don't agonize over thoughts like the one you shared with us this morning which I understand can be very upsetting.

Once you submit the paperwork for your LOA you must concentrate on yourself and disconnect from work, just stay away from Mount Sinai in general unless you are asked to come in for a specific function or activity. When the time comes and your physician decides that you are ready to come back we will deal with all that and do whatever is needed to initiate the process.

With best wishes to you,

Dr. Firpo

Adolfo Firpo, M.D.,M.P.A.,FCAP
Professor
Director Pathology Education,
Director, Pathology Residency Training Program

1

CONFIDENTIAL

D03025

Department of Pathology, Room A15-50B - Box 1619
The Mount Sinai School of Medicine.
The Mount Sinai Hospital
Phone: 212-241-6048
Fax: 212-828-4188
E-mail: adolfo.firpo@mssm.edu


Office Address:
Department of Pathology, Room A15-92b
The Mount Sinai School of Medicine
1468 Madison Avenue
New York, NY 10029

Mailing address:
One Gustave L. Levy Place, Box 1619
ATTN: Dr. Firpo
New York, New York 10029-6574

PRIVILEGED AND CONFIDENTIAL: This e-mail, and any attachments thereto, may contain legally privileged and/or confidential information. Dissemination, distribution or copying of this e-mail, or the information herein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is strictly prohibited. If you have received this e-mail in error, please respond to the individual sending the message, and permanently delete the original and any copy of any e-mail and printout thereof.

D03026

**From:** "Cordon-cardo, Carlos" <carlos.cordon-cardo@mssm.edu>
**Date:** August 16, 2012 5:41:30 PM EDT
**To:** "Blowe, Sarah (MSH)" <sarah.blowe@mountsinai.org>
**Cc:** "Firpo, Adolfo" <adolfo.firpo@mssm.edu>, "Johnson, Paul" <paul.johnson@mssm.edu>, "Semet, Daphne" <daphne.semet@mssm.edu>, "Cordon-cardo, Carlos" <carlos.cordon-cardo@mssm.edu>
**Subject: Your leave of abscence**

Dear Dr. Blowe,

It has come to my attention that you arrived unexpectedly on the 15th Floor of the Annenberg Building today with the intention to complete work related to the residency program. I am writing to remind you that while you are on medical leave, you may not be in the departmental work area without proper clearance.

On July 30, 2012, you met with Dr. Firpo-Betancourt and representatives from the Physician Wellness Committee, the Office for Graduate Medical Education, the Student/Trainee Mental Health Service, and Human Resources to discuss the need for you to take a medical leave of absence. At that time you began the process of filing for family and medical leave. (You subsequently provided Human Resources with medical documentation to support your leave, which has been approved under the Family and Medical Leave Act.) During your July 30 meeting, Dr. Firpo-Betancourt clearly instructed you to remain away from work until the program deemed you able to perform your duties.

Ms. Caryn Tiger-Paillex, Director of Human Resources, will write to you separately to elaborate upon the process for returning from medical leave. Based on the documentation provided, the program anticipates your date of return to be December 1, 2012. Your return is contingent upon clearance by Mount Sinai. Even if you wish to return on a different date, the rules for returning still apply.

I encourage you to use the time allotted by your medical leave to focus on your well-being, and I assure you that I support you during your leave period. However, until you have been cleared by Mount Sinai to return to work, any further unexpected appearance in the department will be considered a breach of the program's professionalism standards and will be subject to disciplinary action up to and including termination.

Sincerely,

Carlos Cordon-Cardo, M.D., Ph.D.
Professor and Chairman,
Department of Pathology,

1

D03027

Professor, Department of Genetics and Genomic Sciences,
The Mount Sinai School of Medicine.
Professor and Director,
Department of Pathology,
The Mount Sinai Hospital.
Phone: 212-241-8014
Fax: 212-426-5129
E-mail: carlos.cordon-cardo@mssm.edu

*Office Address:*
Annenberg 15th Floor, Office 15-62
1468 Madison Avenue
New York, New York 10029-6574

*Mailing address:*
One Gustave L. Levy Place, Box 1194
New York, New York 10029-6574

--------------------------------------------

IMPORTANT WARNING:  This email (and any attachments) is only intended for the use of the person or entity to which it is addressed, and may contain information that is privileged and confidential.  You, the recipient, are obligated to maintain it in a safe, secure and confidential manner.  Unauthorized redisclosure or failure to maintain confidentiality may subject you to federal and state penalties. If you are not the intended recipient, please immediately notify us by return email, and delete this message from your computer.

--------------------------------------------

CONFIDENTIAL

D03028

Exhibit 273

# In The Matter Of:

*APPEAL HEARING of DR. LEENA VARUGHESE,*

## MEETING
*November 14, 2011*

## *RAYVID REPORTING SERVICE, INC.*
*225 Varick Street - 10th Floor*
*New York, NY 10014*
PH: 212-267-3877 / FAX: 212-692-9171

MEETING - Vol. 1

APPEAL HEARING of DR. LEENA VARUGHESE


TO THE MEDICAL HOUSE STAFF


AFFAIRS COMMITTEE



MOUNT SINAI HOSPITAL


6:00 p.m.


November 14, 2011

Page 2

```
1              LEENA VARUGHESE
2
3   PANEL:
4
       DR. STEVEN WEINFELD, Chair
5      DR. GILA LEITER
       DR. MICHAEL MARIN
6      DR. HAROLD BRONHEIM
       DR. MARISSA RAYMOND-FLESCH
7      DR. MELISSA ROCCO
8   FOR THE PANEL:
9
10     MICHAEL G. MacDONALD, ESQ.
11     Mount Sinai General Counsel
12
13  FOR THE DEPARTMENT:
14
15     DR. CARLOS CORDONE-CARDO
16     DR. ADOLFO FIRPA
17                ,
18     RORY McEVOY, ESQ.
19     Edwards Wildman Palmer LLP
20     750 Lexington Avenue
21     New York, NY 10022
22
23  FOR THE APPELLANT:
24     DR. LEENA VARUGHESE, Pro Se
25     DR. RAJIT MALLIH
```

Page 4

```
1              LEENA VARUGHESE
2   Department of Obstetrics Gynecology and
3   Reproductive Science.
4      Dr. Michael Marin, Professor and
5   Chairman Department of Surgery.
6      Dr. Harold Bronheim, Clinical
7   Professor of Psychiatry and Clinical
8   Professor of Medicine.
9      Dr. Marissa Raymond-Flesch, PGY 4
10  department of medicine in pediatrics and
11  Dr. Melissa Rocco, Chief Resident,
12  department of anesthesiology.
13     Also present are Michael Macdonald,
14  General Counsel School of Medicine,
15  serving as counsel to the committee, Ms.
16  Karen Jones, also of the general counsel's
17  office, who is also assisting Mr. McDonald
18  and the committee.
19     Dr. Carlos Cordone-Cardo and
20  Dr. Adolfo Firpa, Mr. Rory McEvoy of the
21  law firm of Edwards, Wilman & Palmer, who
22  is assisting of the Department of
23  Pathology in it's presentation.
24     Ms. Marina Lowy, of the general
25  counsel's offices, also assisting the
```

Page 3

```
1              LEENA VARUGHESE
2
3   P R O C E E D I N G S
4
5      DR. WEINFELD:  I would like to
6   call the proceedings to order.
7      This is the appeal of Dr. Leena
8   Varughese of the decision dated September
9   21, 2011 of Dr. Cardone-Corda and
10  Dr. Firpa to suspend and terminate
11  Dr. Varughese from the pathology residency
12  program of the Mount Sinai School of
13  Medicine.
14     Dr. Varghese's appeal was perfected
15  in her letter dated September 28, 2011 to
16  Dr. Michael Harris, President of the
17  Medical Board, which was received on
18  September 30, 2011.
19     My name is Steven Weinfeld, I'm
20  serving as the Chairman of the House Staff
21  Affairs Committee that has been convened
22  to consider and decide Dr. Varghese's
23  appeal.
24     I would like to introduce the other
25  members of the Committee, Dr. Gila Leiter,
```

Page 5

```
1              LEENA VARUGHESE
2   Department of Pathology, Dr. Leena
3   Varughese and Dr. Rajit Mallih.
4      DR. MALLIH:  I am Dr. Leena
5   Varghese's friend, I am a practicing
6   pathologist also.
7      DR. WEINFELD:  Dr. Varughese, are
8   you going to have counsel with you today
9   or no?
10     DR. VARUGHESE:  No.
11     DR. WEINFELD:  So, just for the
12  record, that Dr. Varughese is entitled
13  to have an attorney present, has chosen
14  not to appear with counsel today.
15     Procedures that will govern this
16  appeal are set forth in the house staff
17  manual and include the following, Drs.
18  Cordone-Carda and Dr. Firpa may present
19  relative evidence and witnesses in
20  presenting the department's position.
21     They may question Dr. Varughese and
22  her witnesses.
23     Similarly, Dr. Varughese may
24  present relevant evidence and witnesses on
25  her behalf, and may question Drs.
```

2 (Pages 2 to 5)

Page 6

1           LEENA VARUGHESE
2    Cordone-Cardo and Firpa and the witnesses
3    who supported the Department of
4    Pathology's decision.
5           B, it the scope of the hearing will
6    be limited to determine whether there is
7    sufficient evidence to determine that the
8    adverse action taken by the Department of
9    Pathology was not arbitrary and
10   capricious.
11          All testimony at the hearing will
12   be under oath, and a transcript of the
13   hearing is being made.
14          The Rules of Evidence do not apply
15   and the decision of the Committee will be
16   based on a preponderance of the evidence.
17          I would like to stress this is a
18   peer review proceeding and members of the
19   Committee may take an active role in
20   questioning the witnesses.
21          In that connection the role of
22   attorneys is limited to providing advice
23   and counsel to Dr. Varughese and the
24   department as the case may be and
25   addressing the members of the Committee.

Page 7

1           LEENA VARUGHESE
2           The role of the representatives may
3    not include the presentation of evidence
4    or the examination or cross-examination of
5    witnesses.
6           The committee may in its discretion
7    further define, expand or limit the role
8    of any representatives as we go along.
9           In addition, the committee may make
10   such additional rules as it deems
11   necessary to assure a prompt, fair and
12   expeditious handling of this appeal.
13          Members of the Committee have
14   reviewed the September 21, 2011
15   termination letter from Drs. Cordone-Cardo
16   and Firpa to Dr. Varughese.
17          Before we turn to Drs.
18   Cordone-Carda and Firpa for their
19   presentation, then to Dr. Varughese for
20   her presentation, I would like to ask Dr.
21   Varughese and the Department whether there
22   are any preliminary matters they would
23   like to raise before we proceed further.
24          Dr. Varughese?
25          DR. VARUGHESE: No.

Page 8

1           LEENA VARUGHESE
2           DR. WEINFELD: And.
3           MR. McEVOY: Yes.
4           DR. VARUGHESE: Actually, I do
5    now.
6           DR. WEINFELD: Yes.
7           DR. VARUGHESE: So is
8    Dr. Cordone-Cardo and Dr. Firpa
9    intending to defend themselves, or is
10   the lawyer speaking for them?
11          DR. WEINFELD: The Department
12   will be making a presentation, but
13   the -- as I just said, the lawyers are
14   not presenting evidence, so they will
15   provide advice to the members of the
16   Department.
17          MR. McEVOY: The only thing I was
18   going to say was that I would ask the
19   committee to accept as an Exhibit the
20   section of the house staff manual
21   dealing with disciplinary action, which
22   I don't think should be any problem with
23   because I understand that Dr. Varughese
24   has submitted that as one of her
25   proposed exhibits, and secondly, that

Page 9

1           LEENA VARUGHESE
2    the committee take into evidence Dr.
3    Varughese' residence contract for the
4    PGY 4 year.
5           DR. WEINFELD: Is that something
6    we don't have copies of currently?
7           MR. MacDONALD: Well, I think --
8    actually I think on the house staff
9    manual we can almost take that by
10   judicial notice.
11          If you want to mark it as a
12   Committee Exhibit 1 and Committee Exhibit
13   2, why don't we do that, and do we need to
14   do that physically to do that?
15          MR. MacDONALD: I think those
16   documents -- why don't we do that; let's
17   be sure that we mark the excerpt or
18   maybe the entire house staff manual, the
19   excerpt and the disciplinary proceedings
20   as Committee Exhibit 1 and the house
21   staff contract as Committee Exhibit 2.
22          DR. WEINFELD: So we will get
23   those marked into evidence.
24          I would like to start by asking
25   Drs. Cordone-Cardo and Dr. Firpa to make

                              3 (Pages 6 to 9)

Page 10

1         LEENA VARUGHESE
2 their presentations on behalf of the
3 Department of Pathology.
4         DR. CARDONE-CORDO: Dr. Firpa
5 will make the presentation.
6         DR. WEINFELD:  Are we going to
7 swear him in?
8         MR. MacDONALD:  I think what we
9 should do is to swear Dr. Varughese, Dr.
10 Cordone-Cardo and Dr. Firpa all at the
11 same time so we don't have to interrupt
12 the flow of the proceedings.
13         Would you do that, Mr. Reporter.
14
15 A L E E N A     V A R U G H E S E,  A D O
16 L F O    F I R P O    and   C A R L O
17 S  C O R D O N E - C A R D O,  were
18 called as witnesses, having been duly
19 sworn by the Notary Public, were examined
20 and testified as follows:
21
22         DR. WEINFELD:  So all three are
23 sworn now, good.  So the Department will
24 proceed.
25         DR. FIRPA: Mr. Chairman, ladies

Page 11

1         LEENA VARUGHESE
2 and gentlemen, members of the Committee,
3 good evening.
4         My name is Adolfo Firpa
5 Bettencourt, I am the Director of
6 Pathology Educational Activities as of the
7 1st of July of 2011.
8         When I joined Mount Sinai my
9 primary duty is to oversee accredited
10 pathology training programs, both
11 residency and fellowships, and together
12 with Dr. Pat Lento, the Pathology
13 Residency Program Director, to assess,
14 monitor and guide compliance with all
15 ACGME accreditational requirements as
16 specified in the Residency Review
17 Committee for Pathology guidelines.
18         And the directives of the Mount
19 Sinai's institutional GME office and other
20 institutional policies.
21         At this hearing we will demonstrate
22 unequivocally that the decision to
23 summarily suspend and terminate Dr.
24 Varughese from the pathology residency
25 program was not arbitrary, nor capricious,

Page 12

1         LEENA VARUGHESE
2 but a carefully weighed and deliberated
3 decision.
4         The decision made after major and
5 repeated efforts to address her concerns
6 about being able to satisfy all her
7 residency requirements to qualify for the
8 Board examination in 2012 and in response
9 to her persistent accusations of unfair
10 treatment by everyone whenever she was
11 expected to be accountable for her conduct
12 and decisions.
13         Despite all efforts, she was
14 insubordinate toward her chief residents,
15 the program director, and unprofessional
16 in her dealings with others and towards
17 her responsibilities to the faculty and
18 the staff.
19         She lacked insight about her
20 problematic behavior, how damaging they
21 were to others and how disruptive it was
22 to the program operations.
23         Repeatedly she demonstrated her
24 lack of integrity toward her professional
25 responsibilities and poor sense of moral

Page 13

1         LEENA VARUGHESE
2 judgment.
3         The documentation we provided and
4 the testimony of the witnesses will
5 demonstrate to you that Dr. Varughese was
6 unable to make any progress to grow into a
7 responsible medical professional as
8 expected of any accredited training
9 program.
10         The decision to terminate her from
11 residency was nothing more than the
12 ultimate result of her poor performance,
13 misconduct, insubordination, lack of
14 professionalism and integrity.
15         The decision to terminate Dr.
16 Varughese is authorized by the house staff
17 manual section on disciplinary action that
18 provides that the Department Chair may
19 terminate for cause a house officer who
20 fails to demonstrate an acceptable level
21 of professional competence, clinical
22 judgment in the treatment of patients, or
23 professionalism or who engages in any
24 activities that are a threat to the
25 welfare or safety of patients, employees,

4  (Pages 10 to 13)

Page 14

LEENA VARUGHESE

1
2  other physicians, or the hospital itself.
3       Dr. Varughese also violated her
4  residence contract which requires her to
5  comply faithfully with and be subject to
6  the policies, rules and regulations of the
7  hospital.
8       The decision to summarily suspend
9  Dr. Varughese was based on the judgment of
10  the Chair of the Department, the GME
11  office and me that her continued presence
12  at the hospital would pose a risk to Mount
13  Sinai and it's patients.
14       The events documented in the
15  materials we provided to you and the
16  experiences that the witness will describe
17  will demonstrate Dr. Varughese' poor
18  performance, persistent misconduct and a
19  pattern of escalating insubordination.
20       Lack of professionalism and her
21  lack of personal and professional
22  integrity which rapidly deteriorated
23  between July 15th to the middle of
24  September when this difficult, but
25  unavoidable and necessary decision was

Page 15

LEENA VARUGHESE

1
2  made.
3       She was summarily terminated in
4  fairness to other residents, faculty and
5  staff, in an attempt to restore a sense of
6  normal to the complex environment in which
7  educational activities take place in
8  pathology and for the very safety of the
9  operations of the Department as they
10  relate to patient services.
11       On September 15th, Dr. Varughese
12  told me that she could not perform her
13  work, was unable to concentrate, felt
14  overwhelmed and was gradually losing
15  control and needed to take a leave of
16  absence.
17       Out of concern for her well-being
18  as well as the hospital and it's patients,
19  I instructed residents and supervisors to
20  excuse her from her regular
21  responsibilities and consulted with her
22  rotation supervisor to arrange for a light
23  work schedule for the day.
24       We were so concerned by her
25  appearance that day that we concluded that

Page 16

LEENA VARUGHESE

1
2  she may represent a threat to self and to
3  others and decided to keep her under
4  minimal stressful conditions within the
5  hospital for the rest of the day to be
6  able to observe her until we make
7  arrangement to have her seen by hospital
8  wellness or student health wellness.
9       DR. BRONHEIM: Can you describe
10  her appearance that day?
11       DR. FIRPA: Yes.
12       Earlier in the morning I received
13  an e-mail from the Chief Residents that
14  they were concerned about her behavior
15  that morning, she had come in late, showed
16  a blank affect, she was practically
17  unresponsive and just sitting there.
18       The perception of the residents was
19  that she may be undergoing a major crisis
20  and that she may -- they were afraid that
21  this could precipitate some type of
22  radical behavior.
23       Having been notified of that and
24  being familiar with the policies of safety
25  in the workplace, I immediately

Page 17

LEENA VARUGHESE

1
2  communicated with the Human Resources
3  Department, the office of GME, the
4  Department Chair and others, about the
5  situation.
6       Called and requested somebody to
7  come and assess the situation until I was
8  able to arrive.
9       Upon my arrival I found her
10  literally quiet, sitting at her desk,
11  looking at some slides.
12       I asked her to talk to her in
13  private.  We proceeded to the student
14  lounge and I asked her bluntly what's
15  wrong?
16       She first said nothing.  Finally I
17  insisted that I know something is wrong,
18  please tell me, I know you now, what seems
19  to be the problem?
20       And then she relayed I cannot take
21  it anymore, I feel very bad, I am unable
22  to work, I cannot concentrate, I have not
23  prepared a presentation that I have been
24  asked to prepare many times, not because I
25  really don't want to, but because I feel

5 (Pages 14 to 17)

Page 18

LEENA VARUGHESE

1
2   unable to concentrate and do any work.
3       And I really feel overwhelmed and I
4   think I need to take a leave of absence,
5   go away for a while.
6       Even during her narration, she
7   exhibited behavior which made me suspect
8   that this may be an organic episode, for
9   moments she'll stop her narrative, she'll
10  flicker her eyes, as if having a petit mal
11  seizure then will continue and captured
12  her train of thought.
13      I was really, really very
14  concerned.
15      I instructed her to calm down,
16  don't be stressed, I'll make arrangements
17  for you to be excused for all duties of
18  the day.
19      I talked to the Chief Residents and
20  instructed them not to bother her, and
21  excuse her from all the activity.
22      I went and found her rotation
23  supervisor, Dr. Peterson, discussed my
24  impressions, he shared with me that he had
25  been observing some deterioration also,

Page 19

LEENA VARUGHESE

1
2   but didn't feel that it had been so
3   serious, but it was not a surprise.
4       So we agreed to put a very light
5   workload for the day, so that she'll be
6   able to remain under observation.
7       With that, and I then proceeded to
8   find out what was the necessary steps to
9   take to arrange for a leave of absence,
10  what are the requirements, what were the
11  procedures, and that I left leaving her
12  behind under those instructions.
13      Out of concern for Dr. Varughese as
14  well as the hospital, I instructed the
15  residents and supervisor to excuse her
16  from regular responsibilities and
17  consulted with her rotation supervisor I
18  just described.
19      Despite my explicit instructions --
20  the following morning I formally advised
21  her not to report back to work until she
22  has secured a doctor's note and had
23  completed the required application for her
24  leave of absence as she was instructed by
25  Ms. Patel on the 15th at noon in the early

Page 20

LEENA VARUGHESE

1
2   afternoon after the initial incident in
3   the morning.
4       Despite my explicit instructions of
5   not to come to work, she continued to come
6   and meet with her rotation supervisor in
7   private without any other work
8   responsibilities.
9       Her lack of insight about her
10  unstable conduct, her apparent lack of
11  understanding of the potential risks she
12  posed to others after having acknowledged
13  her inability to concentrate and being
14  unable to perform at a minimal level of
15  competence are the factors that we
16  considered to represent a risk to other
17  persons in the work environment and
18  ultimately to the safety of patients and
19  the quality of services provided by our
20  Department.
21      These were the the ultimate reasons
22  that led to her summary suspension on
23  September 21, 2011.
24      The Pathology Department at Mount
25  Sinai, as you may well know, is the

Page 21

LEENA VARUGHESE

1
2   largest in any single comparable academic
3   institution in New York City.
4       The surgical pathology case volume
5   is over 150,000 specimens per year, and
6   our clinical laboratory service processing
7   is comparable to a commercial laboratory
8   in volume and complexity.
9       Educational pathology programs
10  include the residency and specialty
11  fellowships in cytology, gastrointestinal
12  pathology, gynecologic pathology, liver
13  pathology, molecular genetics, surgical
14  pathology, as well as elective rotations
15  to visiting students and pathology
16  rotations, to residents in other specialty
17  training programs here at Mount Sinai.
18      The Mount Sinai pathology residency
19  offers three options, clinical pathology
20  only program for three years or the
21  combined anatomic clinical pathology
22  program over four years.
23      Most of our residents choose the
24  combined program, as did Dr. Varughese.
25      The program proceeds in a series of

6 (Pages 18 to 21)

P. 890

## Page 22

LEENA VARUGHESE

1
2  sequential rotations for periods of time
3  proscribed by the ACGME which provide the
4  ability to sit for the Board specialty
5  examination.
6       The rotations provide educational
7  experiences for the resident to acquire
8  knowledge and skills necessary to grow
9  professionally into a competent,
10  independent general pathologist in
11  practice.
12       The combined program requires a
13  minimum of 18 months rotations in each of
14  the AP and CP components, the AP component
15  requires a total of 11 months of autopsy
16  pathology and at least 12 months of
17  surgical pathology, training experience.
18       Autopsy education requires each
19  resident to perform and report at least on
20  50 autopsies.
21       To participate in gross organ
22  reviews, an informal autopsy presentation
23  by other members of the Department, the
24  program includes time exposures to
25  forensic, pediatric, perinatal and similar

## Page 23

LEENA VARUGHESE

1
2  autopsy, the scheduled rotations fulfill
3  all the rotation requirements of the
4  ACGME.
5       The clinical pathology component at
6  Mount Sinai includes all the required
7  instructional experiences for
8  accreditation by the ACGME in all the
9  areas, microbiology, immunopathology,
10  blood bank and transfusion medicine,
11  chemical pathology, cytogenetics,
12  hematology, coagulation, toxicology,
13  medical microoscopy, molecular biology,
14  techniques and other advanced diagnostic
15  techniques as they become available.
16       Rotating residents are assigned
17  specific tasks in areas of responsibility
18  compatible with the level of training and
19  the most strict level of competency in
20  performing of the duties.
21       The ACGME also requires programs to
22  establish didactic component of core
23  competencies and educational experiences
24  and an accredited program must maintain
25  records and have in place mechanisms for

## Page 24

LEENA VARUGHESE

1
2  disciplinary actions for nonattendance to
3  this core educational activities.
4       Residents are evaluated according
5  to the six ACGME core competencies which
6  are patient care, medical knowledge,
7  practice based learning and improvement,
8  interpersonal and communication skills,
9  professionalism and system based practice.
10       In each of those domains,
11  particularly, in practice based learning
12  and improvement and interpersonal
13  communications skills and professionalism,
14  Dr. Varughese' performance demonstrated
15  consistently lack of growth and
16  development in acquiring the necessary
17  skills to perform at a level of competence
18  consistent not even with a level of a PGY
19  3.
20       Residents evaluations are provided
21  by faculty at the end of each rotation,
22  using electronic program called New
23  Innovations, which is available to all
24  residency programs in the institution.
25       The evaluations are reviewed by the

## Page 25

LEENA VARUGHESE

1
2  residents with their faculty advisor and
3  program director semi-annually.
4       In addition, residents are
5  evaluated in 360 degree fashion by
6  technical ancillary staff and surgical
7  pathology technical staff, including
8  physician assistants throughout the year.
9       Dr. Varughese was a senior PGY 4
10  resident in the combined APC pathology
11  program.  She graduated from UMDMJ New
12  Jersey Medical School in May 2008 and was
13  admitted and started residency with us in
14  July 1 of 2008.
15       Her initial performance in the
16  program was shaky, as evidenced by her
17  evaluations, but gradually improved
18  sufficiently to a mostly satisfactory
19  level and she was promoted through her
20  third year in the program.
21       While a PGY 3 in December 2010 Dr.
22  Varughese was placed on academic
23  advisement.
24       Dr. Varughese failed to comply with
25  the plan of actions in the academic

Page 26

LEENA VARUGHESE

1
2   advisement, and in July 2011 she was
3   issued a final warning by Dr. Carlos
4   Cordone-Cardo, recently appointed new
5   Chairman of the Department.
6       The warnings stemmed from her
7   failure to fulfill the requirements of the
8   academic advisement and her behaviors at
9   the follow-up meeting on May 24th with the
10  Chairman and the Department administrator.
11      These are included as Department
12  Exhibit 3 in the manual handed to you.
13      And the details set forth in the
14  final warning are in Exhibit 2 of the
15  exhibits.
16      MR. MacDONALD:  Excuse me, shall
17  we mark -- these are the exhibits of the
18  Department in this binder which have
19  been passed out to everybody.
20      Can we -- you are going to submit
21  all of these into the record?
22      MR. McEVOY:  Yes.
23      MR. MacDONALD:  So can we mark
24  these as you submit them as departments
25  Exhibits 1 through 17 for our record.

Page 27

LEENA VARUGHESE

1
2       These will be submitted to the
3   record as you make your presentation and
4   these will be called Department's Exhibits
5   1 through 17.
6       MR. McEVOY:  The only other thing
7   is that Exhibit 1 is the letter from
8   Drs. Cordone-Cardo and Dr. Firpa, the
9   suspense and termination letter which I
10  think you already made reference to
11  earlier, so that's Exhibit 1, so.
12      MR. MacDONALD:  Let's keep the
13  numerical order of the exhibits.
14      DR. FIRPA:  The final warning was
15  delivered to Dr. Varughese by Dr.
16  Cordone-Cardo on July 15, 2011.
17      Dr. Varughese' job performance
18  after the final warning did not improve or
19  did so marginally.
20      On our first meeting responding to
21  the final warning on August 2, 2011 I
22  emphasized to her that we should consider
23  this a new beginning.
24      She talked about all her fears and
25  concerns of not being able to satisfy

Page 28

LEENA VARUGHESE

1
2   requirements to sit for the pathology
3   Board exam in 2012.
4       And her desire to replace her
5   elective rotation through GI pathology
6   with one in dermatopathology.
7       I finally suggested we should
8   discuss the issues related to her final
9   warning, her problems with professionalism
10  and any other issues related to her
11  current situation.
12      Initially she bluntly refused to
13  discuss any of these issues.
14      She told me quite clearly and
15  explicitly that she could not discuss any
16  of these items because she was pursuing
17  legal action and that I had to talk with
18  her lawyer about any of them.
19      I had to call the GME office on
20  three occasions during the session
21  requesting advice, given her refusal to
22  talk, and finally gave her two options as
23  instructed by Mr. Paul Johnson.
24      One, either accept to discuss these
25  issues which are the underlying reason for

Page 29

LEENA VARUGHESE

1
2   the final warning, or two, refuse to do so
3   and incur another violation that will
4   require further disciplinary action,
5   including the possibility of her dismissal
6   from the program.
7       After a long pause she finally
8   accepted to talk and we agreed to meet
9   bi-weekly on Tuesday mornings at 9:00 over
10  three months for a total of seven 50
11  minute sessions about professionalism,
12  concepts, challenges and its demands on
13  medical professionals.
14      I explained to her that during the
15  first week of each rotation she would meet
16  with her rotation supervisor to review the
17  specific competence level objectives and
18  to make sure that she understood the
19  specific responsibilities assigned to her
20  during the rotation.
21      I also told her that at the end of
22  the rotation I will obtain feedback on her
23  performance.
24      Particularly on each level of the
25  competence areas, paying attention to

8  (Pages 26 to 29)

| Page 30 |
|---|

LEENA VARUGHESE

1   improvement in her professional behavior.
2
3       I made it clear that she should
4   become familiar with the six ACGME
5   competence based objectives and explained
6   to her that these would provide a neutral
7   ground to objectively discuss her growth
8   in each competence over the three months
9   of the final warning, and her upcoming
10  rotations.
11      Our shared goal was to put the past
12  behind, move forward beyond the three
13  months ahead so she could proceed to
14  complete her training.
15      I agreed to look into her program
16  of rotations to ascertain her status and
17  meeting requirements to make the Board's
18  exam in 2012 and to explore the
19  possibility of switching her elective GI
20  rotations for one in pathology.
21      At the end of the session I gave
22  her a printed copy of the ACGME
23  requirements for pathology residency
24  programs and asked her to review them,
25  paying particular attention to requirement

| Page 31 |
|---|

LEENA VARUGHESE

1
2   number 5 on professionalism.
3       My assignment to her was simple,
4   think about what it really means to be a
5   professional.
6       Over the following days and weeks
7   identify professional behaviors in your
8   working environment and observe examples
9   of behaviors that she'll consider
10  unprofessional.
11      The objective was to begin an open
12  discussion about professionalism and the
13  challenges it might pose to medical
14  professionals as they perform their
15  responsibilities.
16      She agreed to put the past behind
17  and move forward toward completion of her
18  residency program and the specialty Boards
19  in 2012.
20      Despite an apparent good start, her
21  inability to behave professionally and
22  responsibly started to surface during her
23  rotation through tumor cytogenetics and
24  Dr. Vesna Najfeld's laboratory.
25      I received calls and e-mails from

| Page 32 |
|---|

LEENA VARUGHESE

1
2   Dr. Najfeld's complaining about her lack
3   of interest in the work she was assigned
4   to do in the laboratory, her consistent
5   late arrivals to work, her early
6   departures, her inability to follow
7   instructions, her lack of insight and
8   understanding of the basic principles of
9   even preparing a case for presentation,
10  her absence from the lab, her
11  disrespectful attitude toward her and her
12  staff and many other troublesome behaviors
13  over this two week rotation and deficient
14  medical knowledge.
15      Worse and most disheartening to
16  everyone was her indifference to efforts
17  made by Dr. Najfeld herself and her staff
18  to help her recover from her dismal
19  performance to the point of even bluntly
20  refusing to return to the laboratory to
21  work with her and redo a poorly prepared
22  presentation that was scheduled for the
23  next day.
24      While still rotating through the
25  cytogenetics laboratory she started to

| Page 33 |
|---|

LEENA VARUGHESE

1
2   have problems, she continued to have
3   problems with the Chief Residents, being
4   insubordinate, questioning every action
5   and requesting -- and any requests to
6   comply with established procedures on
7   policies that were recently agreed upon
8   and implemented as required by the ACGME.
9       She refused to cover frozen section
10  service when a fellow resident called in
11  sick, then tried to avoid covering
12  surgical pathology service on another
13  occasion of the same resident's illness.
14      She ignored pages, e-mails and even
15  an on occasion offered explanations and
16  excuses for her failures to respond that
17  were interpreted as questionable reasoning
18  such as well, not to respond means that I
19  agree to cover.
20      Or not having -- I don't have to
21  respond to e-mails that just state facts
22  and don't ask questions.
23      As I promised her to do during the
24  initial meeting, I asked Dr. Lento to
25  ascertain that she'll be able to satisfy

9 (Pages 30 to 33)

Page 34

LEENA VARUGHESE

1
2  requirements to take the pathology Board
3  exam in 2012, as she wished.
4      We found that she had only
5  performed 24 of her required 50 autopsies
6  over three years of training.
7      Dr. Lento immediately contacted the
8  office of the Medical Examiner to arrange
9  that during her rotation there she'll be
10  able to participate in at least one
11  autopsy per day so that she could meet the
12  requirement.
13      We reviewed the total rotation
14  hours to the various clinical pathology
15  service she had completed and was on
16  schedule over the following months.
17      To our satisfaction we were
18  confident that she would be able to
19  fulfill the required 18 months in the
20  required areas specified by the ACGME
21  review and required to be eligible to sit
22  for the board exam.
23      I informed her of these efforts and
24  each time she complained of being treated
25  unfairly, insisting that other residents

Page 35

LEENA VARUGHESE

1
2  had more elective time, or more rotation
3  time in areas or another, that the
4  rotations she had received were not
5  providing enough experience for her to
6  feel competently prepared for making the
7  board exam.
8      Given the possibility that she may
9  not have completed all requirements by the
10  deadline to apply for the Board
11  examination, and anticipating that she may
12  have to pay a late application penalty
13  fee, I consulted with our Chairman, Dr.
14  Cordone-Cardo, and suggested to him to
15  help her by paying the penalty fee, and he
16  agreed to do so.
17      I personally contacted Dr. Miriam
18  Berchay and ascertained that if she would
19  be able to change the rotation schedule
20  and it will be possible and acceptable for
21  her to drop the GI elective she could
22  rotate through the dermatopathology
23  instead of GI.
24      I reminded her of the procedure and
25  personally requested that she be given

Page 36

LEENA VARUGHESE

1
2  special consideration which was granted,
3  but despite all efforts and consideration
4  it was finally decided that it was not
5  possible to allow her to drop the GI
6  elective, which was turned out to have
7  been requested by her at the time the
8  schedule was prepared.
9      Repeatedly she refused to accept
10  the denial to her request to drop the
11  elective in GI, violating the established
12  policy and protocol and creating problems
13  with attendings and residents, even making
14  claims of events and actions that could
15  not be substantiated, or even confirmed
16  but by the very same individuals that she
17  had indicated could witness and support
18  her statements.
19      Problems with her behavior
20  continued and even escalated, she was
21  unwilling to prepare and make a
22  presentation on the topic of her choice as
23  penalty for being absent for more than 20
24  percent of the required mandatory core
25  morning conferences over the preceding

Page 37

LEENA VARUGHESE

1
2  training block.
3      She questioned the validity of
4  having the requirement as part of our
5  departmental policy.
6      She misrepresented information and
7  regarding attendance to other educational
8  activities and conferences, both here and
9  at the VA.
10      She fought fought all the way and
11  by every means not to comply with this
12  minor task of a senior resident, twice she
13  called in sick when she had been scheduled
14  and finally made her presentation and
15  finally on another day just came in late,
16  sat through the presentation of a fellow
17  scheduled to speak before her, and as he
18  was finishing his presentation, just stood
19  up and walked out without a word.
20      On the 17th of August we had our
21  second meeting under the final warning,
22  Shema Patel, Department Administrator,
23  witnessed the meeting.
24      The meeting went surprisingly well
25  after all the events that transpired just

10  (Pages 34 to 37)

Page 38

LEENA VARUGHESE

1
2  before, she had no objections to have Ms.
3  Patel present.
4      We discussed in detail the problems
5  with her performance as a resident and the
6  numerous e-mail exchanges related to
7  request to acknowledge minutes of the
8  residents meeting, the new policies and to
9  abide by the new policies questioning
10  authority and changes in the overall
11  operation of the residency with new
12  control that did not seem to make sense
13  and appeared unjustified.
14      I made it clear that the policies
15  were available on the G drive and
16  available for her review at any time.  She
17  said that she had already signed
18  acknowledged receipt of the minutes and
19  policies on the 15th as required by the
20  Chief Residents.
21      I explained to her that the
22  policies were to fulfill accreditational
23  requirements and standards.
24      We agreed that it would provide
25  objective documentation of any issues we

Page 39

LEENA VARUGHESE

1
2  have discussed and she agreed to bring
3  documentation to support any explanations
4  she had given to explain the circumstances
5  of her conduct as described that morning.
6      She said that she was aware that
7  this disciplinary action may culminate in
8  some further action and that she would
9  appreciate knowing as soon as possible
10  what was being considered for her so that
11  she could act accordingly.
12      She also claimed that she was never
13  given a fair chance to resolve events that
14  led to her present disciplinary action and
15  that she had written the reflection and
16  had fulfilled all the requirements.
17      She claimed that Dr. Cardone-Cor
18  notifying her of the disciplinary action
19  at this time was confusing and she was not
20  clear what she was supposed to do or
21  accomplish.
22      I handed her a printed paper on
23  professionalism to discuss our next
24  session.
25      She mentioned having found an

Page 40

LEENA VARUGHESE

1
2  excellent web reference at some website on
3  professionalism in pathology practice that
4  she felt everybody should read as part of
5  her training.
6      I asked her to e-mail the link and
7  that I will read it and consider placing
8  it in the program description.
9      Once again, swspite an apparent
10  improvement in her attitude at the meeting
11  on 8/17, and some positive and promising
12  interactiona with the Chief Residents on
13  the following days, problems resurfaced
14  once again over an apparen
15  miainterpretatio TAEUGS of a scheduled
16  call during the Memorial Day weekend which
17  when ultimately clarified, but led to the
18  resurgence of Dr. Varughese' determination
19  to drop out of the elective GI rotation
20  and replace it with one through the
21  dermatopathology.
22      Given her strong argument and
23  apparent genuine desire to get additional
24  exposure to dermatopathology, one of the
25  Chief Residents arranged for early morning

Page 41

LEENA VARUGHESE

1
2  sign up of cases with Dr. Phelps, the
3  Director of the Dermatology Division who
4  is at work early and signs up cases
5  between 6:00 and 8:00 in the morning.
6      He agreed to offer her access to
7  this period to discuss cases with her.
8      She was also offered to have access
9  to additional private learning material
10  that this chief resident had obtained on
11  dermatopathology, given that is her
12  personal interest as a specialty.
13      In an effort to be helpful Dr.
14  Varughese was repeatedly informed that her
15  request for dropping GI elective had been
16  denied, that she was expected to report to
17  rotation as scheduled.
18      Nevertheless, on September 1st she
19  approached Dr. Harpaz directly and once
20  again began another cycle of discussions
21  and arguments about not doing the elective
22  GI rotation.
23      By now she claimed to have already
24  made her own arrangements to attend a
25  review conference on pathology in Florida,

11  (Pages 38 to 41)

P. 895

Page 42

LEENA VARUGHESE

1
2  and just informed everyone that she'll not
3  be available to do the GI rotation and
4  she'll find someone to cover for her.
5      Period.
6      Her third and final warning meeting
7  had been scheduled for Wednesday, the 7th
8  September at 7:00 a.m. at her own request,
9  but she did not show up.
10     At around 11:45 that day she sent
11  an e-mail apologizing for missing the
12  appointment and claiming that she had
13  tried to call me several times, but the
14  call had not gone through and was
15  repeatedly dropped.
16     She requested to meet the following
17  week in the afternoon.
18     I replied to her and reminded her
19  that as part of starting a new rotation
20  through hemopathology she had to meet with
21  her supervisor and review the competence
22  based objectives as per the ACGME
23  requirements, and be clear about what she
24  was expected to do during her rotation.
25     I also told her that requests to

Page 43

LEENA VARUGHESE

1
2  drop out of the elective GI rotation was
3  officially denied, and any arguments
4  concerning this issue should be over.
5      She was expected to report to the
6  service as scheduled.
7      Later that afternoon she sent an
8  e-mail raising all kind of issues about
9  the unfairness of the final decision.
10     Around 2:30 p.m. she came into my
11  office and a very gradually escalating
12  tone and practically yelling at me towards
13  the end, claimed that she was once again
14  being treated unfairly and insisting that
15  I had committed to make it happen for her,
16  since I had mentioned that it may be
17  possible when we first talked about it as
18  a possibility.
19     I reminded her that at all times I
20  had made her fully aware that there was a
21  process to follow and that I would only
22  intervene on her behalf, the final
23  decision would have to depend on the
24  feasibility of others on the schedule,
25  finding a replacement for her during the

Page 44

LEENA VARUGHESE

1
2  rotation, having and obtaining the
3  agreement of both attendings.
4      At no time did I guarantee to her
5  that the change will proceed.
6      Much less, by my decision alone.
7      Eventually she brought the issue,
8  on September 15th emerged the need for the
9  leave of absence.
10     She was instructed to contact Dr.
11  Hughes of the wellness committee which she
12  has repeatedly failed to do, initially
13  claiming that her interaction in the past
14  with the wellness committee had been
15  unfruitful and really a waste of time.
16     Ms. Patel and Dr. Varughese --
17  later on as over the following days she
18  continued to report to work when she was
19  told not to, to process for her leave of
20  absence.
21     She was encountered by Ms. Patel in
22  the morning near the Starbucks buying
23  coffee and she reported that she was on
24  the way to work.
25     She was reminded that she was not

Page 45

LEENA VARUGHESE

1
2  supposed to come to work and was invited
3  to come over to Ms. Patel's office at the
4  President's chamber.
5      Ms. Patel then called the Office of
6  Human Resources for advisement how to
7  proceed, and me.
8      For a short time she stepped out of
9  the office, for 5 minutes, and on her
10  return found Dr. Varughese going over her
11  personal private confidential files in her
12  desk.
13     When addressed and asked what she
14  was doing, she initially denied that she
15  had been doing anything, eventually told
16  her to chill out, continued to dismiss as
17  a totally trivial event and eventually was
18  convinced to go and meet with the Human
19  Resources with representatives of the
20  Human Resources at the present time.
21     And Mr. Paul Jones, also from the
22  GME office.
23     Given a few -- these are just some
24  examples of her poor performance and mixed
25  conduct which the witnesses will relate in

12  (Pages 42 to 45)

Page 46

LEENA VARUGHESE

1
2  more detail as we call upon them to
3  describe for you, their experiences.
4      Dr. Varughese, I already said at
5  the beginning the conditions that led to
6  our termination -- to the termination
7  process.
8      It was not an easy decision, it was
9  over the concerns of the risks her
10  presence represented to patient's
11  well-being and the capacity of working
12  effectively.
13      On the 21st she showed up to work,
14  she sat at her desk, she refused to leave,
15  she had been scheduled for a meeting that
16  day in the afternoon to discuss the terms
17  of her future in the Department.
18      At that point when addressed by Ms.
19  Patel and myself, she said that she'll not
20  leave until she had something in writing
21  instructing her to leave the premises.
22      At that point we called upon the
23  Office of Human Resources, Dr. Hughes and
24  the office of the GME who convened
25  immediately and tried to make a decision

Page 47

LEENA VARUGHESE

1
2  how to proceed.
3      After some deliberation over some
4  hours it was decided to proceed with her
5  summary termination, she was then invited
6  into Dr. Carlos Cordone-Cardo's office
7  where she was handed the letter of
8  termination and instructed to review the
9  final paragraph which specified her rights
10  under the law and the policies and
11  regulations of the hospital.
12      During the whole process she
13  insisted in having -- in arguing some of
14  the content, in bringing other information
15  that was irrelevant to the issue.
16      Repeatedly she has to be reminded
17  this is not an argument, this is not a
18  discussion, this is a final decision,
19  these are your rights, read them carefully
20  and you have a given amount of time to
21  request an appeal.
22      Those were the events that led to
23  the termination.
24      I shall conclude by saying that
25  after you will hear all the witnesses'

Page 48

LEENA VARUGHESE

1
2  experience and review the documents that
3  we have provided for you, we are confident
4  that you will find that the decision to
5  terminate Dr. Varughese was, indeed, not
6  arbitrary or capricious in any way.
7      And that responded to the best
8  interests of the patients and the
9  hospital.
10      That's the end of my statement.
11      DR. WEINFELD:  So we are going to
12  call some witnesses?
13      MR. MacDONALD:  Well, I think Dr.
14  Varughese may have an opportunity to ask
15  questions and the Committee may also ask
16  questions directly to clarify anything
17  that Dr. Firpa may have said.
18      MR. McEVOY:  What I would ask in
19  addition to the committee asking Dr.
20  Firpa's statement as the opening
21  statement of the Department, that they
22  also accept his statement to the extent
23  it articulates his personal experiences
24  as his testimony so as the need to avoid
25  calling him again as a witness and then

Page 49

LEENA VARUGHESE

1
2  Dr. Varughese, as Mr. MacDonald
3  suggests, if she wants to ask Dr. Firpa
4  questions about the things to which he
5  testified, then that would I think
6  expedite the proceeding.
7      DR. WEINFELD:  That sounds very
8  reasonable, as long as Dr. Firpa is
9  available for questioning.
10      MR. MacDONALD:  Dr. Varughese may
11  have questions herself to ask or the
12  committee may have questions, also.
13      DR. WEINFELD:  So we want to
14  allow for questions now or do we want to
15  have Dr. Varughese give her
16  presentation?
17      MR. MacDONALD:  I think what
18  should happen, Dr. Weinfeld, is the
19  Department should make it's full
20  presentation with its witnesses, but as
21  each witness testifies I think Dr.
22  Varughese should have the opportunity to
23  ask questions while the witnesses are
24  present.
25      DR. WEINFELD:  Do you want to go

13 (Pages 46 to 49)

Page 50

LEENA VARUGHESE

1          LEENA VARUGHESE
2  ahead and ask Dr. Dr. Firpa any
3  questions as theoretically the first
4  witness?
5       DR. VARUGHESE:  Sure, yeah, I
6  think I will.
7
8  CROSS-EXAMINATION BY DR. VARUGHESE:
9
10     Q    So you said that on September 15
11  you thought my appearance and behavior was very
12  unusual or radical?  Like what do you mean by
13  that?
14     A    It was very concerning in terms
15  of your mental status.
16     Q    How so?
17     A    Well, you exhibited total
18  flattened affect, very slow responses,
19  proceeded to give a very chaotic statement
20  about being unable to cope, being overwhelmed
21  by your work, not being able to concentrate as
22  the reasons for your persistent refusals to
23  prepare the presentation that you were required
24  to do.
25       During the presentation you even

Page 51

LEENA VARUGHESE

1          LEENA VARUGHESE
2  paused at one point, flickerred your eyes,
3  which were to me indicative or reminiscent of a
4  petit mal seizure, then recapture your line of
5  thinking and continued.
6     Q    Okay, so when you were speaking
7  to me, wasn't Ms. Patel also there?
8     A    No, the first session in the
9  morning when I first came we were alone, then I
10  returned with Ms. Patel.
11     Q    You didn't initially arrive with
12  Ms. Patel, or it was within like half an hour
13  of these two incidents?
14     A    I arrived early in the morning.
15  As soon as I was able to reach the place, I
16  found you in that condition.
17       I called you to a private
18  session in the lounge room, and after seeing
19  this situation I came out, we were alone, I
20  came back, I instructed the residents to excuse
21  you from all responsibilities that day, as I
22  had asked you if you wanted me to do, I also
23  went and talked to your supervisor,
24  Dr. Peterson, about your status and suggested
25  that if he -- if it would be possible to have a

Page 52

LEENA VARUGHESE

1          LEENA VARUGHESE
2  light work day so that you can remain in
3  premises until we find out how to proceed about
4  your consensual request to procure a leave of
5  absence.
6     Q    Well, I think I did state to you
7  that I was fine and I wanted to be at work and
8  I was going to be able to cope with whatever it
9  was, but my specific concern was the rash of
10  e-mails that was being sent to me about
11  presentation, about acknowledgment of policies
12  which did not even go into effect until the
13  15th which was halfway through period 2.
14     A    That's not a question, Dr.
15  Varughese.  What is it that you want me to
16  respond to?
17     Q    I am just wondering why you're
18  falsifying what actually happened?
19       How are you so certain that's
20  what happened?
21     A    Well, that's what happened, I
22  was there, there were witnesses all around us,
23  it took place over -- other than the few
24  minutes we had in private discussion,
25  everything else was witnessed before and

Page 53

LEENA VARUGHESE

1          LEENA VARUGHESE
2  afterwards, and when I returned with Ms. Patel
3  and the information to provide you the forms on
4  how to request the leave of absence that you
5  indicated, she was able to confirm the
6  condition in which you were in that day.
7       Again, in front of her in the
8  second session you reiterated your need to take
9  a leave of absence because you were unable to
10  cope.
11     Q    I said -- I don't think that's
12  what I said.  I never said unable to cope, I
13  said that I would consider taking a leave of
14  absence if my physicians can approve it and
15  it's a foreseeable --
16     A    That's not a question again, Dr.
17  Varughese.  What is it you want me to respond
18  to.
19     Q    That's what I said to you.  So I
20  don't understand why you are misrepresenting
21  what had happened that morning?
22     A    I am not misrepresenting
23  anything, I am just relating the summary of the
24  experience.
25     Q    That's your impression.

14 (Pages 50 to 53)

Page 54

LEENA VARUGHESE

1
2      DR. WEINFELD: Is Ms. Patel being
3  called as a witness?
4      MR. McEVOY: Yes.
5      DR. WEINFELD: She would be able
6  to answer some of these questions as
7  well.
8      Q     Then you said -- what's your
9  experience in clinical medicine, because you
10  said that I'm having a petit mal seizure?
11      A     Well, I went through medical
12  school.
13      Q     So you are not an expert, but
14  you made --
15      A     I did not claim, I said it was
16  an impression.
17      Q     All right, fine.
18      A     I did not make a diagnosis.
19      Q     That's fine, thank you.
20      You said Dr. Lento mentioned
21  that I had only performed 24 autopsies?
22      A     24 or 26, that was the total.
23      Q     I had corrected that, in fact I
24  had done 36 autopsies to completion and
25  assisted in, perhaps, at least 3 or 4?

Page 55

LEENA VARUGHESE

1
2      A     Again, that is not a question.
3  What is your point?
4      Q     My point is that that's not a
5  fact. That's once again I am being
6  misrepresented as not having done the work that
7  I did, but, in fact, I already did 36 autopsies
8  satisfactorily and the Department is stating I
9  had only done 24.
10      A     The requirement for you to be
11  able to sit at the Boards is 50 autopsies. You
12  realize that you had not completed the 50, and
13  we made arrangements for you to complete
14  whatever number was necessary to fulfill that
15  requirement.
16      Q     In January?
17      A     When we count the 24 or 26 and
18  we brought that to you, you said well, I have
19  not kept up my log, and I have done many more
20  which are not yet entered into New Innovation,
21  the only source that we had to make the counts
22  is what you report.
23      Q     Well, actually I have a
24  completed log in ACGME which I would like to
25  submit at some point as part of my exhibit.

Page 56

LEENA VARUGHESE

1
2      In fact, there are 36 autopsies
3  under the ACGME log and they can all be noted
4  for and they are done to completion.
5      A     So what's your question
6  regarding that now?
7      Q     My question is why were you led
8  to believe that it was only 24 when I already
9  informed you that I had also done 36?
10      DR. WEINFELD: He already
11  answered that, but you can submit the 36
12  logs as a --
13      MR. MacDONALD: Is the 36 log in
14  your --
15      DR. VARUGHESE: It's not there.
16      MR. MacDONALD: You can submit
17  that.
18      DR. VARUGHESE: Great.
19      Q     Yes, you did say that you
20  consulted with Dr. Cordone-Cardo regarding
21  payment for possibly a penalty fee if I were to
22  take the anatomic pathology boards late.
23      When did you consult, after you
24  told me?
25      A     Once we verified that you were

Page 57

LEENA VARUGHESE

1
2  short of the 50 requirement that your rotation
3  through the Medical Examiner's office would not
4  occur until January.
5      Q     Yes, because I'm scheduled late
6  for the Medical Examiner rotation and, in fact,
7  that I wanted to be --
8      A     And what is the question?
9      Q     So my request that I would
10  actually be scheduled earlier in the schedule,
11  because obviously my next year's schedule was a
12  concern that I brought to you when you first
13  came here, because I had noted that I am not
14  being trained given the rotations that I need
15  for adequate training in clinical pathology?
16      A     So what is your question again?
17      Q     My question was when did you
18  consult with Dr. Cordone-Cardo, what date and
19  when, what time?
20      A     It must have been on the -- I
21  don't remember exactly the date, but it was
22  shortly after we verified that you did not have
23  the 50 autopsies required for sitting in.
24      Q     Thank you.
25      And also when did I ask you for

15 (Pages 54 to 57)

Page 58

LEENA VARUGHESE
1
2  the GI elective to be switched to the dermapath
3  elective?
4      A     On the very first time we met,
5  on August 2nd.
6      Q     On August 2nd, right?
7          So when did you ever return or
8  respond to me about that elective?
9      A     Yes.  That very same day I
10  called Dr. Rojet to check, as I discussed with
11  you, first the plan was I will verify if it
12  will be a space in dermapathology first, if
13  that was available, then we will have to see
14  what was the procedure, because you will have
15  then to be allowed to drop the GI elective to
16  replace it and and that there was a procedure
17  in place and a policy that you have to confirm
18  with.
19      Q     Okay, do you recall telling me
20  you needed to figure out what the politics is
21  in this space was before you can proceed?
22      A     Well, yes, I said that every
23  organization has its own system of policies,
24  rules and regulations which represent the
25  institutional politic environment.

Page 59

LEENA VARUGHESE
1
2          And we had to beware of those
3  requirements before making any final decision.
4      Q     So, how do you suppose a
5  resident who is on disciplinary action and
6  feels that they are unfairly on disciplinary
7  action feels when a person who's supposed to
8  oversee their disciplinary action process says
9  that to them?
10          What do you think is the -- what
11  do you think the resident would feel?
12      A     I have no idea how they will
13  feel.  If you are intelligent you will
14  understand the meaning.
15      Q     Okay, I should make an
16  impression based on what you said, okay, good.
17          DR. WEINFELD:  Any other
18  questions for Dr. Firpa?
19          DR. VARUGHESE:  No.
20          DR. WEINFELD:  Do you want to go
21  ahead and call your witnesses.
22          MR. McEVOY:  I have a question,
23  normally the way --
24          DR. LEITER:  I have a question,
25  could you elaborate a little bit on Dr.

Page 60

LEENA VARUGHESE
1
2  Varughese' performance in the first two
3  years?
4          I understand you weren't there, but
5  for at least the summary you had gotten?
6          DR. FIRPA:  I went through New
7  Innovation and I pulled out the summary
8  of her performance results and
9  repeatedly many of her rotations both in
10  surgical, primarily in surgical
11  pathology, she was in many components of
12  the ACGME rated as marginal and
13  gradually she progressed to acceptable,
14  so for a while for the first two years,
15  she was in many areas she was considered
16  marginal.
17          DR. LEITER:  Was there any
18  remedial work?
19          DR. FIRPA:  Well, there were
20  recommendations about how to improve and
21  she was monitored in subsequent
22  assessment of similar experiences and
23  she progressed a little bit, and those
24  observations were recorded in her
25  evaluations.

Page 61

LEENA VARUGHESE
1
2          That's why she was allowed
3  eventually to proceed down the --
4          DR. LEITER:  Can I ask one more
5  question, just the other question was
6  was there a formal psychiatric
7  evaluation on the day that you felt that
8  perhaps there was some disorganized
9  behavior?
10          DR. FIRPA:  We requested it,
11  that's why we called student wellness
12  and Dr. Harpaz, but she refused under
13  any circumstances to see them or
14  follow-up.
15          She insisted that she had her own
16  private physician that she'll talk to and
17  everything referred to that.
18          DR. BRONHEIM:  Did you ever
19  receive a request from Dr. Varughese'
20  physicians for her to have a medical
21  leave of absence?
22          DR. FIRPA:  No.  She never
23  followed through, that's what we kept
24  waiting for and waiting for and she
25  never, and I kept telling her, you have

16  (Pages 58 to 61)

Page 62

LEENA VARUGHESE

1
2  to have a formal request and a doctor's
3  note, either clearance to return or see
4  student wellness, you cannot return to
5  work.
6
7       DR. WEINFELD:  You wanted to say?
8       DR. ROCCO:  The written
9  evaluations that you discussed from New
10  Innovations, are they included in your
11  Exhibit?
12      DR. FIRPA:  No.
13      DR. ROCCO:  Why not?
14      DR. FIRPA:  They were preceded.
15      DR. ROCCO:  Why not?
16      DR. FIRPA:  No.
17      DR. ROCCO:  Why not?
18      DR. FIRPA:  Because they preceded
19  the issues that led to her dismissal
20  which were the events following her
21  final warning on July 15th, disciplinary
22  actionings had been taken before.
23      DR. WEINFELD:  Did you want to
24  add something?
25      MR. McEVOY:  Two things, I guess.

Page 63

LEENA VARUGHESE

1
2  One is just because the question was
3  raised about timing, the position of the
4  Department is that everything that
5  happened before July 15th of 2011 which
6  is when Dr. Cordone-Cardo gave her the
7  final warning is largely irrelevant to
8  this proceeding.
9       We are not here to talk about why
10  she got a final warning, why she got an
11  academic advisement, what her ratings were
12  during the first two years.
13      Her final warning is her final
14  warning.  That's the record.
15      She did not appeal from it, so what
16  I think the committee is here to consider
17  is what happened after the final warning
18  until she was terminated that either did
19  or didn't sustain the decision to
20  terminate her, that's I think what is
21  appropriate for the committee to look at.
22      Secondly, which is just a
23  procedural point, is that normally in
24  these hearings in my experience after the
25  Department makes its opening presentation,

Page 64

LEENA VARUGHESE

1
2  its opening statement, if you will, before
3  the witnesses are called, the resident, in
4  this case Dr. Varughese, is permitted the
5  opportunity to make an opening statement
6  before we actually call witnesses.
7       She can decline to do that,
8  obviously, but I think she gets that
9  opportunity.
10      MR. MacDONALD:  Well, that's
11  fine, but I understood that this was
12  also testimony.
13      MR. McEVOY:  It is.
14      MR. MacDONALD:  Is this an
15  opening statement plus testimony?
16      MR. McEVOY:  Yes.
17      MR. MacDONALD:  So you are asking
18  Dr. Varughese, which is appropriate, and
19  you can respond as you wish, Dr.
20  Varughese, as to whether you would like
21  to make an opening statement before we
22  proceed to the witnesses of the
23  Department.
24      Or you can wait until your
25  presentation, if you wish.

Page 65

LEENA VARUGHESE

1
2       DR. VARUGHESE:  I would just like
3  to respond to the counsel for the
4  department.
5       MR. MacDONALD:  Okay.
6       DR. VARUGHESE:  It's just that
7  you are saying me being on disciplinary
8  action is irrelevant, but in fact
9  without that particular aspect this
10  whole situation would be arbitrary and
11  capricious, and I think we have all read
12  through the summary suspension letter
13  and we can review it again, it's not
14  enough to get anybody fired or suspended
15  or terminated.
16      MR. McEVOY:  That's a perfectly
17  legitimate position for Dr. Varughese to
18  take if she says what happened between
19  July 15th and September 21st is not
20  sufficient to warrant termination,
21  that's a legitimate position for her to
22  take.
23      MR. MacDONALD:  We understand
24  that and we understand that is going to
25  be your presentation, if you have

17 (Pages 62 to 65)

Page 66

LEENA VARUGHESE

1
2    anything to say now as a preliminary
3    statement you are free to do so, or we
4    can now proceed to the witnesses for the
5    department.
6          Shall we proceed in that way, Dr.
7    Varughese?
8          DR. VARUGHESE:  Okay.
9          MR. McEVOY:  I shall get the
10   first witness.
11         DR. WEINFELD:  I don't know if
12   you narrowed the list since Friday, but
13   you would know the answer, there are no
14   witnesses on both sides?
15         DR. VARUGHESE:  No.
16         DR. WEINFELD:  Of the 20
17   witnesses, are any of the witnesses the
18   same as the Department is calling?
19         DR. VARUGHESE:  Since the
20   Department is already calling certain
21   witnesses, I figured I will just
22   follow-up after.
23         DR. WEINFELD:  So is it --
24         DR. VARUGHESE:  I was planning on
25   cross-examining them, not necessarily

Page 67

LEENA VARUGHESE

1
2    call them as a witness.
3          DR. MARIN:  Are there 20
4    witnesses out there waiting?
5          DR. VARUGHESE:  I'm not sure if
6    they are all here.
7          MR. MacDONALD:  Where is our
8    witness sitting.
9          MR. MacDONALD:  Dr. Firpa, will
10   you be questioning the witness?
11         DR. FIRPA:  Yes, sir.
12         MR. MacDONALD:  Okay.
13
14   V E S N A   N A J F E L D,   called as a
15   witness, having been first duly affirmed
16   by the Notary Public, was examined and
17   testified as follows:
18
19         MR. McEVOY:  Can the witness be
20   given a set of the Department's
21   exhibits, because I think there are
22   certain exhibits in there that Dr. Firpa
23   is going to ask her to look at.
24         DR. WEINFELD:  Dr. Varughese, do
25   you have a copy of these?

Page 68

LEENA VARUGHESE

1
2          DR. VARUGHESE:  I do, actually.
3          DR. WEINFELD:  I want to make
4    sure you have access to what they are
5    looking at.
6
7    DIRECT EXAMINATION BY DR. FIRPA:
8
9          Q    Dr. Najfeld, good evening.
10         A    Good evening.
11         Q    Would you state your employment
12   here at Mount Sinai and your position?
13         A    I am a professor of pathology
14   and medicine and I am director of tumor
15   cytogenetics laboratory at the Mount Sinai
16   Hospital and professor in the Mount Sinai
17   School of Medicine.
18         Q    Thank you.
19         Would you describe for the
20   benefit of all of us in very general terms what
21   is tumor cytogenetics?
22         A    The tumor cytogenetics is a
23   study of chromosomes in cancer cells and it's
24   these days used for diagnostic as well as for
25   therapeutic purposes, particularly in patients

Page 69

LEENA VARUGHESE

1
2    with hematological malignancies, as well as
3    some solid tumors.
4          Q    Have you ever had Dr. Varughese'
5    rotate through your laboratory?
6          A    Yes.  Twice.
7          Q    When?
8          A    She rotated in August of this
9    year, the second rotation and apparently -- for
10   two weeks, and apparently the first rotation
11   was about two years before that, which we have
12   very little documentation about that, we have
13   very good documentation about August 2011.
14         Q    At the time of this rotation
15   when she began, were you aware of Dr.
16   Varughese' disciplinary history or of any
17   problems with her performance and conduct?
18         A    None whatsoever.
19         Q    Was there an incident regarding
20   Dr. Varughese' clinical case presentation on
21   August 9th, and if so, please correct the
22   incident?
23         A    She was asked, most of the
24   residents who rotate through the lab basically
25   get a case per week to present.

18 (Pages 66 to 69)

Page 70

LEENA VARUGHESE

1
2      At the center for clinical
3  laboratories, clinical case presentations.
4      She was no exception to this
5  rule, she got the case I think within the first
6  day or two of the rotation.
7      She was asked to show me the
8  presentation by Friday, she took two days after
9  work to present -- to prepare for the case,
10  most of the residents basically do that in
11  their spare time in the evening.
12      On Friday before Tuesday
13  presentation she did come to consult me about
14  the presentation, I was not in the office for
15  that 5 minutes.
16      I was told that she came at 3:00
17  in the afternoon and so I was hoping she was
18  going to come back and she never did, so the
19  presentation was sent to me on Monday at 4:00
20  in the afternoon, she did not pick up the
21  images on Friday from the lab, and I said this
22  is the case I'm going to present tomorrow.
23      I looked at the case and I tried
24  to call her, indicating that the case was not
25  of sufficiently good quality.

Page 71

LEENA VARUGHESE

1
2      I couldn't find Leena in the
3  residents' office, I couldn't -- she did not
4  respond to the page, I called Dr. Firpa, I said
5  I'm looking for Leena because I need to get in
6  touch with her.
7      So, he gave me another number
8  and I finally got to the residents' room and I
9  said can I leave a message for Leena to call me
10  back.
11      Which she did in about half an
12  hour, and I said Leena, this presentation is
13  not of sufficient quality to be presented
14  tomorrow.
15      Can you come and we can work on
16  it?
17      She says -- this is Monday at
18  about 4:15, 4:30, she says no, I'm out of Mount
19  Sinai.
20      I said that's fine, I'll be here
21  until 6:00, come over and we can work on it.
22      I cannot come back to Sinai.
23      So I said if you cannot, this is
24  not going to -- the presentation will not take
25  place tomorrow, which is fine, it can take

Page 72

LEENA VARUGHESE

1
2  place the following week, as long as you make
3  sure that you tell everybody because people
4  come from various parts early in the morning
5  for the presentation.
6      There was no e-mail informing
7  the faculty of the center of clinical labs that
8  the presentation will not take place.
9      I e-mailed her on Tuesday at I
10  think 6:20 or 6:30, please make sure that it's
11  e-mailed to all the faculty so they don't have
12  to waste time.
13      I must have twice sent twice or
14  three times this e-mail, nothing happened.
15      And finally I got an e-mail at
16  10:00 only directed to me and saying there is
17  not going to be a presentation.
18      To me, who actually knew all
19  about it.
20      At 9:00 when the presentation
21  was taking place everybody was asking is there
22  a presentation today?
23      Leena was there and never
24  actually said I'm sorry, I was supposed to give
25  a talk, but I'm not ready today, we will do it

Page 73

LEENA VARUGHESE

1
2  next week.
3      She sat there, never answering
4  to the director of the lab who sat there and
5  said I'm sorry, it's not going to take place.
6  Q    May I call your attention to the
7  Exhibit 5.
8  A    I don't know where I am supposed
9  to look here, actually.
10      MR. McEVOY:  Behind tab number 5.
11  Q    There is tab number 5.
12  A    Okay, got it.
13  Q    Would you look through them and
14  tell us how that content relates to what you
15  just told us?
16  A    This is fine.  It's now pages
17  and pages, yes.
18  Q    Just tell us what it represents.
19  A    So there is at page, I guess --
20  at some point my e-mail to her on Monday,
21  August 8th, do you want me to read this?
22  Q    No, just give us in general
23  terms what those demonstrate?
24  A    This e-mail says Leena, you were
25  supposed to take the patient's images on Friday

19 (Pages 70 to 73)

Page 74

LEENA VARUGHESE

1   from my staff, you had a whole day today and
2   never came to take the images.
3        The reason we present the case
4   is for educational purposes and the patient's
5   images are presented as a part of this learning
6   experience.
7        This refers to the fact that she
8   did not take the images from these patients but
9   downloaded from somewhere, which is really not
10  the reason why we actually have case
11  conferences.
12       The case conferences refer and
13  the images are very specific for that patient.
14       If I was not here at 3:00 p.m.
15  when you stopped by, you should have written me
16  a note and I would have called you the moment I
17  came in.
18       Meanwhile, I left since 4:18
19  p.m. a number of e-mails and messages only to
20  find out that you left at 5 p.m. and would not
21  return to Sinai to work with me on this
22  presentation.
23       I was willing to work with you
24  until 6:00 p.m., I think a lot more work needs

Page 75

LEENA VARUGHESE

1   to go into this presentation and let's try for
2   the next week.
3        Thanks, Vesna.
4   Q    Did you consider that the work
5   reflected in the presentation submitted to you
6   was compatible with her level of training?
7   A    No. Fourth year resident.
8   Q    How would you assess --
9        DR. BRONHEIM: Could you explain
10  your no?
11       THE WITNESS: I think the fourth
12  year resident in pathology should not --
13  should know how to give a presentation.
14       To take patients out images, I
15  don't think this is a teaching, for the
16  fourth year, this is maybe for the first
17  year resident.
18       DR. BRONHEIM: I thought you were
19  referring to content?
20       THE WITNESS: I actually at some
21  point asked Leena out of this context,
22  did anybody spend any time with her
23  teaching her how to present a case,
24  because I was so appalled by this

Page 76

LEENA VARUGHESE

1   presentation.
2        DR. WEINFELD: And what was her
3   response?
4        THE WITNESS: I cannot remember
5   exactly, so I am not going to impose,
6   but I remember asking this question.
7        She may remember, I can't remember,
8   really.
9   Q    Was it related to her knowledge
10  about the field, pathology in general, the fact
11  that she had rotated through your lab before,
12  did her behavior and knowledge that she
13  exhibited in your rotation reflect any growth
14  or knowledge at all in the field?
15  A    I think somewhere here during
16  our little tutorial, we came upon the
17  definition of what should be a stat case for
18  this lab -- I'm sorry, what should be the stat
19  case for our lab.
20       And I said we don't have too
21  many stat cases that needs instant attention,
22  but one of the leukemia that it is APL, acute
23  promyelocytic leukemia.
24       So I asked Leena to tell me the

Page 77

LEENA VARUGHESE

1   definition of APL.
2        Her response was I have done
3   hematopathology a few years ago.
4        So I said, that's fine, why
5   don't you look it up and let me know tomorrow.
6        I have never got an answer to
7   this very day what's the definition of APL.
8   Q    Overall, how would you rate Dr.
9   Varughese' attendance during her rotation at
10  your lab?
11  A    Well, I mentioned earlier two
12  days immediately was taken off from the
13  rotation to prepare the case.
14       I think this is in my view out
15  of two weeks unacceptable, one day she called
16  in sick, that's a third day, so it's two weeks,
17  it's like ten working days.
18       In the ten working days at least
19  six steps have to be done so somebody should
20  pass the rotation, so the last day of her
21  rotation was also the day when I was asked by
22  anatomic pathology people to spare her because
23  there was an emergency there in the afternoon.

20  (Pages 74 to 77)

Page 78

LEENA VARUGHESE

1
2      So in the morning was her
3  basically the last day there, so it was like
4  three and a half days of the ten days rotation
5  that she wasn't there.
6      I don't think she ever came at
7  9:00 in the morning to the lab, most of the
8  time it was 10:30, she was told one morning on
9  Wednesday to come at 1:00 because we have lab
10  meetings and my entire lab knows at 1:00
11  Wednesday is 1:00 sharp, she walked in at 1:30.
12      It's called poor attendance and
13  not on time.
14      Q    Now, you said on her last day of
15  rotation there was an incident that she was
16  taken off the rotation during the afternoon.
17      Can you tell us more about what
18  you observed related to that?
19      A    First of all, prior to her
20  coming to the lab there was -- I had a number
21  of e-mails from the chief resident and
22  everybody else, has Leena arrived to the lab
23  and I kept saying no, and it was nothing
24  unusual, she has never come before 10:30 in the
25  lab, to the lab.

Page 79

LEENA VARUGHESE

1
2      At 10:30 I think she walked in
3  and we told her, that although I understand
4  that she has to help in anatomic pathology in
5  the afternoon, she got to finish her few
6  karyotypes.
7      And I put her intensely to work
8  alone as well as with a supervisor onto work on
9  that.
10      At some point Dr. Pat Lento
11  called me and says is Leena in the lab?
12      I said yes.
13      Would you ask her to come on the
14  phone? I said I'm sorry, I'm not her
15  secretary.
16      If you need her, page her.
17      Which he proceeded to do and she
18  didn't answer the page because I was standing
19  next to her, I heard her page going and she did
20  not answer.
21      So then he called back and says
22  could you please get her?
23      So I said what can I do?  Of
24  course I will.
25      Okay, so her conversation with

Page 80

LEENA VARUGHESE

1
2  him in front of my entire lab staff was not
3  very nice.
4      And everybody in the lab was a
5  little bit basically made comments that this is
6  not how you talk to anybody, and that they had
7  no idea who Pat Leto is.
8      So they didn't know, you know,
9  what is his relationship to Leena, but they
10  realized that the type of conversation was
11  going on was not very respectful, that much I
12  can tell you.
13      And while the supervisor was
14  trying to squeeze any minute before noon, I
15  moved and went to my office, and she said I
16  don't know why I'm doing this, it's really a
17  waste of my time.
18      I am only five feet away, so I
19  heard all of that.
20      I decided not to intervene
21  because there was nothing more I can say.
22      In my view even if something --
23  we all learned a few things in life that we
24  thought maybe we didn't have to, but even if
25  something is a waste of time, you don't spell

Page 81

LEENA VARUGHESE

1
2  it out in front of the entire lab staff, it's a
3  bad morale for the lab.
4      Q    Let me call your attention to
5  Exhibit 4.
6      He addresses the following
7  concern, what is your role evaluation of Dr.
8  Varughese' performance in your rotation
9  regarding professionalism.
10      What does the exhibit represent,
11  briefly?
12      A    Well, the exhibit is basically
13  the summary of my thoughts about her.
14      And I'm just going to give one
15  example, sort of put our relationship
16  immediately wrong, so to speak wrong.
17      I actually spend time with the
18  residents, I give them tutorials, I really
19  dedicate myself to this education.
20      And I was giving Leena a
21  tutorial with a computer screen all with
22  chromosomes, genes and everything else.
23      And she is on a Blackberry and I
24  said put this Blackberry back, because this is
25  very disrespectful to me personally.

21 (Pages 78 to 81)

P. 905

Page 82

```
1              LEENA VARUGHESE
2         She put it back, 5 minutes later
3  she's on the Blackberry.
4         And I said Leena, put this
5  Blackberry, I don't want to see this.
6         This by the way happened almost
7  every day.
8         This I don't call -- it's a
9  personal insult to me and to everybody else who
10 takes the time and invests time to teach, so
11 this is called unprofessional.
12        I think coming late to the lab
13 is unprofessional.
14        Calling in sick when you're
15 supposedly presenting the case is
16 unprofessional.
17        Having total lack of enthusiasm
18 and ambition, fourth year resident should be
19 excited about the life ahead of it, and not to
20 be excited at anything and then when
21 you are asked go home and look what's APL, one
22 sentence definition, just come back to your
23 person who is teaching you and say I looked it
24 up, I know what it is, isn't that exciting?
25        There was nothing of that.
```

Page 83

```
1              LEENA VARUGHESE
2         DR. FIRPA:  Okay, I have no
3  further questions.
4         DR. WEINFELD:  Dr. Varughese,
5  would you like to ask questions?
6
7  CROSS-EXAMINATION BY DR. VARUGHESE:
8
9      Q    So, how do you manage, how do
10 you keep track of the residents' time when the
11 residents' are in your lab, what do you do?
12     A    As I just mentioned, you realize
13 where I am sitting, so I can actually see
14 what's going on straight from the imaging lab
15 to the tissue culture lab, except for the fish
16 lab, so I actually can observe very much and
17 you were not necessarily on fish rotation this
18 time; correct?
19     Q    I was, actually.
20     A    For a few hours.
21     Q    For several days here and there.
22     A    But primarily karyotypes, that's
23 imaging lab sitting right in front of me, so I
24 can actually see what's going on.
25     Q    So, did you observe me there the
```

Page 84

```
1              LEENA VARUGHESE
2  first day?
3      A    Yes.
4      Q    The second day?
5      A    No, because you took some days
6  off to prepare the case.
7      Q    No, I didn't.
8      A    Yes, you did.  You have asked
9  me, you have asked me to take the time off to
10 prepare the case.
11     Q    I have asked you if I could go
12 to the library and just work.
13     A    That's right, so you were not
14 there.
15     Q    Or I was at the residents' room?
16     A    I don't know where you were.
17 You were not where you are supposed to be, the
18 computer is there for the residents.
19     Q    Okay.
20          So, do you realize your staff
21 e-mails me every day and tells me what to do
22 for the rest of the day?
23     A    Um-hum.
24     Q    So, you do realize the staff
25 tells me when to come into the lab?
```

Page 85

```
1              LEENA VARUGHESE
2      A    Um-hum.
3      Q    And what activities I'm supposed
4  to do each day?
5      A    Um-hum.
6      Q    Do you realize there were
7  certain days where your staff asked me not to
8  come into the lab?
9      A    No.
10     Q    Okay, there were, that's why I
11 was not there.
12     A    Okay.  Can we have documentation
13 for that?
14     Q    Yeah I have documentation of
15 that.
16          DR. MARIN:  Is it in this
17 exhibit?
18          DR. VARUGHESE:  Let me just see.
19 It's not, but I will add it to the
20 exhibit.
21          MR. McEVOY:  No, I object to
22 this.  Let me state this objection.
23          DR. VARUGHESE:  You are allowed
24 to ask --
25          MR. McEVOY:  I can object, Dr.
```

22 (Pages 82 to 85)

Page 86

LEENA VARUGHESE

1             LEENA VARUGHESE
2   Varughese.  I have done a lot of these
3   in my time.
4        Here is my objection, the Committee
5   directed Dr. Varughese to provide a list
6   of her exhibits by the close of business
7   on Thursday or Friday.Dr. Varughese chose
8   to ignore that without any explanation,
9   without any requests for an extension.
10       She e-mailed the Committee 47
11   exhibits three hours before this hearing
12   was scheduled to start.Dr. Varughese has
13   had an enormous amount of time to prepare
14   her exhibits, she chose to ignore the
15   Committee's request.
16       Just when she felt like it, she
17   sent 47 exhibits.
18       And now, twice she has raised oh, I
19   have documentation that proves that what
20   she's known about from the termination
21   letter is the issues in this case and what
22   she says is oh, I'll give those to you
23   later, we will submit those later.
24       I don't think that's
25   appropriate.Dr. Varughese had plenty of

Page 87

LEENA VARUGHESE

1             LEENA VARUGHESE
2   time to submit these exhibits, there is
3   nothing surprising about these exhibits,
4   and the Department objects to Dr.
5   Varughese sort of setting her own schedule
6   and her own time to submit exhibits.
7       And, quite frankly, it's
8   prejudicial to the Department to expect
9   them and us to review 47 exhibits in three
10   hours and be prepared to respond to them,
11   and now exhibits are just kind of coming
12   from well, I have them and I'll give them
13   to you some time, some way, in some
14   context; it's not appropriate.
15      DR. VARUGHESE:  Fine, that's
16   wonderful, but here is can I make a
17   point --
18      MR. McEVOY:  It's not wonderful,
19   it's correct.
20      DR. WEINFELD:  That's enough.
21      DR. VARUGHESE:  Okay, that's not
22   what I meant to say, the point is this
23   hearing is basically for my job, so if I
24   want to say there is evidence even
25   though I didn't put it in there, and

Page 88

LEENA VARUGHESE

1             LEENA VARUGHESE
2   request that it be submitted at some
3   point, I don't think that's me asking
4   for too much.
5       Even though you correctly stated
6   that you didn't have time to review.
7      MR. McEVOY:  I have said what I
8   have to say.
9      DR. WEINFELD:  Okay
10      DR. VARUGHESE:  On another note,
11   I was also not informed this hearing --
12      DR. WEINFELD:  Wait one second,
13   we have a witness on the stand.  Let's
14   deal with the witness.
15      DR. VARUGHESE:  Sure.
16   Q    All right, so your staff is, in
17   fact, responsible for when I'm working with
18   them, and you know that?
19   A    What's the question?
20   Q    So that you know that your staff
21   is going to be --
22   A    I am well aware what my staff is
23   doing.  My staff is doing based on my
24   instructions.
25   Q    Good.

Page 89

LEENA VARUGHESE

1             LEENA VARUGHESE
2   A    I am totally aware of that.
3   Q    So, there have been times where
4   they have asked me not to come in?
5   A    Correct, but they would ask you
6   to come in maybe a little bit later, or not.
7       When they told you the lab
8   meeting is at 1:00, the lab meeting is at 1:00,
9   you would come at 1:30, that's disrespect to
10   me.
11       Forget about the lab meeting and
12   anybody else.
13   Q    What date was that?
14   A    Wednesday.  Whatever date day it
15   was, June, I don't know.
16   Q    Okay, all right.
17       So you made a comment saying
18   that my presentation was not compatible with my
19   year of training?
20   A    Um-hum.
21   Q    And you said this because I used
22   cytogenetic images from the internet?
23   A    Correct.
24   Q    Is that correct?
25   A    And you were told to come on

23 (Pages 86 to 89)

Page 90

LEENA VARUGHESE

1         LEENA VARUGHESE
2   Friday to pick up the images from the lab.
3      Q   I don't think so.
4      A   Yes.
5        DR. WEINFELD:  Is there a
6   question?
7      Q   I don't think that's true.
8      A   It's all in the e-mail that I
9   sent to you, and there is -- that document.
10     Q   So, the e-mail you sent to me?
11     A   That's very well documented.  So
12  what's the question, actually?
13     Q   So basically I came to your
14  office and I couldn't find you, I was informed
15  by your staff that you would not be there
16  for -- until 4:00 p.m. or later, I waited for
17  you until 4:00 or so, I didn't see you so I
18  assumed that I'll e-mail you documentation.
19     A   You e-mailed the documentation
20  on Friday, this is Friday.
21     Q   So I e-mailed you everything on
22  Friday?
23     A   No.
24     Q   Including my presentation?
25     A   No, on Monday.

Page 91

1         LEENA VARUGHESE
2      Q   I e-mailed you my presentation
3   on Friday, right?
4      A   No, on Monday.
5      Q   Well, I would like to refer to
6   Exhibit 24.
7        MR. McEVOY:  I don't think that
8   Dr. Najfeld has that.
9        THE WITNESS:  I don't have this.
10       DR. WEINFELD:  We can get you a
11  copy.
12       MR. MacDONALD:  24.
13       DR. VARUGHESE:  Yes.
14       DR. WEINFELD:  What does that
15  have to do with the point we are
16  discussing?
17       DR. VARUGHESE:  So this is
18  basically --
19     Q   Anyway, I just want to point
20  out --
21       THE WITNESS:  I'm sorry?
22       DR. WEINFELD:  You brought up the
23  point, you e-mailed on Friday, does this
24  exhibit address that issue or not?
25       DR. VARUGHESE:  It sort of

Page 92

1         LEENA VARUGHESE
2   addresses the problems here.
3        DR. WEINFELD:  No, no, that
4   wasn't my question, my question --
5        DR. MARIN:  Am I looking at the
6   right thing?  I have a e-mail from Dr.
7   Adolfo --
8        DR. VARUGHESE:  Yes, that's it.
9        DR. WEINFELD:  So the question
10  was you are disputing whether you sent
11  an e-mail Friday versus Monday, how does
12  this e-mail address that question?
13       DR. VARUGHESE:  I actually don't
14  have the Friday e-mail I sent to her.
15     A   I do.
16       DR. VARUGHESE:  Actually it's in
17  Exhibit --
18       DR. WEINFELD:  A different
19  exhibit?
20       DR. VARUGHESE:  It's the exhibit
21  that's part of the Department's list.
22       MR. MacDONALD:  Exhibit 5?
23       DR. VARUGHESE:  Exhibit 5.
24       DR. WEINFELD:  There is an e-mail
25  dated Monday, August 8th.

Page 93

1         LEENA VARUGHESE
2        MR. McEVOY:  I think Dr. Najfeld
3   is confused.
4        MR. McEVOY:  I am confused.
5        THE WITNESS:  This is the e-mail
6   I just read, actually.
7        MR. McEVOY:  This is the exhibit.
8        THE WITNESS:  Yes.
9        THE WITNESS:  It's Monday, August
10  8 at 4:18 p.m.
11       DR. WEINFELD:  These are all
12  Monday August 8th.
13       DR. VARUGHESE:  So I sent the --
14  I apologize.
15       DR. WEINFELD:  Let's move on to
16  the next point.
17       DR. VARUGHESE:  It was sent on
18  Monday, not on Friday.
19       DR. WEINFELD:  That's what she
20  said.
21       THE WITNESS:  That's what I
22  basically said.
23     Q   You are correct, you are
24  correct, so the presentation was for the next
25  morning on Tuesday at 9:00 a.m.?

24 (Pages 90 to 93)

Page 94

LEENA VARUGHESE

1
2    A ·   That's exactly right.  You were
3    supposed to come on Friday.
4    Q    No, you gave me the presentation
5    to do when, what day did you give me the
6    presentation?
7    A    Monday or Tuesday of that week.
8    Q    No.
9    A    Where is the documentation?
10   Q    Well, here is the thing, when
11   did you discuss the goals and objective of the
12   rotation with me?
13   A    At the beginning of the week.
14   Q    No.  So let's refer to Exhibit
15   24?
16        DR. WEINFELD:  So what's the
17   question?
18        DR. VARUGHESE:  So this is Dr.
19   Firpa e-mailing Dr. Najfeld the details
20   of the cytogenetics rotations and what
21   she has to do with any resident that
22   happens to be on her -- on that
23   particular elective or that rotation.
24        DR. WEINFELD:  So what's the
25   question?

Page 95

LEENA VARUGHESE

1
2    Q    Then Dr. Najfeld actually I
3    think she thinks that she discussed everything
4    with me in the beginning of the week, but in
5    fact she didn't, she actually only discussed
6    everything with me on maybe Friday, I think
7    Friday morning, late Thursday.
8        DR. MARIN:  What does this have
9    to do with that?  I'm not understanding?
10       DR. VARUGHESE:  That Dr. Najfeld
11   was given the tumor cytogenetics
12   requirement rotation -- rotation
13   requirements on Thursday, she discussed
14   everything pertaining to the rotation
15   requirements with me on Thursday
16   afternoon and gave me the assignment to
17   present this case for Tuesday on
18   Thursday afternoon.
19       DR. WEINFELD:  Right, okay.
20       DR. VARUGHESE:  Which doesn't
21   really give me as much time as I need
22   to --
23       DR. WEINFELD:  So, how do you
24   explain, though, she was willing to stay
25   to help you and you didn't even respond?

Page 96

LEENA VARUGHESE

1
2        DR. VARUGHESE:  On Monday
3    afternoon, on Monday evening and I
4    wasn't sure if she was even returning
5    that evening because she wasn't in her
6    office when I got there.
7        THE WITNESS:  I'm sorry, I think
8    there is a lot of discrepancy in what
9    you are saying.
10       And I could probably document this
11   further.
12       It doesn't matter at this point, we
13   give the cases, you took the beginning of
14   the week off, you were not in the lab in
15   order to prepare the case we are talking
16   about it.
17       So, it cannot be the truth that I
18   gave you the case on Thursday.
19       I would not have given you a case
20   on Thursday and tell you come on Friday
21   because I have not done this ever to
22   anybody, and I would have not made you an
23   exception to the rule.
24       That's number one.
25       There is no way, I don't want to

Page 97

LEENA VARUGHESE

1
2    use the L word here, but this is
3    absolutely not reflecting the truth and
4    the way my lab functions.
5        And I can have the entire lab here
6    for that.
7        So, that's number one.
8        Number two, I am teaching you, if I
9    am willing as your senior to stay late in
10   order to make your presentation look good,
11   I can tell you that when I was a fellow I
12   would have never said this to my
13   professor.
14       Period.
15       Lack of respect and
16   professionalism.
17       DR. WEINFELD:  So any other
18   questions?
19       DR. VARUGHESE:  I just want to
20   note Dr. Najfeld did e-mail Dr. Firpa
21   back and she said she was very busy that
22   week and, you know, it has been very
23   difficult for us.
24       DR. WEINFELD:  Okay, noted.
25       DR. VARUGHESE:  And also on

25  (Pages 94 to 97)

P. 909

Page 98

LEENA VARUGHESE

2 Monday evening when I e-mailed the
3 presentation to her, but I did get her
4 messages, the e-mails and the phone
5 call, I'm not sure if she called me, but
6 it was already 5:30 or so and I was
7 already home because I had taken the
8 train home at that point, which may
9 explain why I didn't receive the page
10 from 5:00 to 5:30 or so, and it would be
11 impossible for me to have returned to
12 Mount Sinai at that point to review with
13 her in person, and I think I explained
14 that to her at that point and she
15 understood.
16        THE WITNESS:  No.
17        MR. McEVOY:  There is no
18 question.
19        DR. WEINFELD:  So, next question.
20    Q     Did you give me an exit
21 interview on Friday?
22    A     No.
23    Q     You didn't give me an exit
24 interview?
25    A     You were taken -- swept away, so

Page 99

LEENA VARUGHESE

2 to speak, because, you had to go back to the
3 anatomic pathology, we only managed to do five
4 karyotypes and I did not give it to you.
5        You are 100 percent right.
6        DR. BRONHEIM:  If you did give
7 her an exit interview, what would you
8 have told her?
9        THE WITNESS:  Had I had the
10 chance and if it wasn't -- I would have
11 really told her just about everything I
12 wrote here, I wouldn't change anything.
13        I must tell you I am at Sinai 30
14 years, this is probably from the
15 educational point of view one of the worst
16 experiences I ever had had.
17        I would have told her that she
18 failed.
19        Anybody who behaved that way, with
20 so little respect for knowledge and so
21 little respect for the time we all invest,
22 I would not pass her.
23        I also feel if you ask somebody to
24 go ahead and look overnight what the
25 definition of APL is, this is our stat

Page 100

LEENA VARUGHESE

2 case, and for that person not to ever to
3 come back and tell you I know what it is,
4 I better learn this, it's a failure.
5        DR. VARUGHESE:  Okay, so my
6 impression was that you did give me an
7 exit interview on Friday because you
8 asked me several questions pertaining to
9 fish and different translocations
10 associated with different diseases and I
11 think I answered you pretty competently.
12        So my impression was that that was
13 the exit interview, and karyotyping these
14 10 karyotypes was also a part -- 5 to
15 determine that I can adequately karyotype,
16 not with expertise with someone who has
17 done cytogenetics for 30 or 40 years, no
18 one can do that, I mean I don't think
19 anybody can do that.
20        THE WITNESS:  That was not
21 expected.
22    Q     But I did manage to karyotype
23 adequately, no?
24        DR. MARIN:  That was a question.
25 She asked you if she did an adequate job

Page 101

LEENA VARUGHESE

2 with the karyotype?
3    A     No, because she had a supervisor
4 sitting behind her and that's when she said I
5 don't know what I'm doing here, it's a waste of
6 my time.
7        DR. MARIN:  No is sufficient.
8        DR. WEINFELD:  Any other
9 questions for Dr. Najfeld?
10        DR. VARUGHESE:  No.
11        MR. MacDONALD:  Any further
12 questions.
13        DR. WEINFELD:  Any further
14 questions from the Department?
15        DR. FIRPA:  Yes, permission to
16 redirect.
17
18 REDIRECT EXAMINATION BY DR. FIRPA:
19
20    Q     May I bring your attention to
21 her Exhibit 24.
22    A     That's this.
23    Q     Second page.
24    A     Your response to me on Thursday
25 August 4th, would you please read the second

26  (Pages 98 to 101)

Page 102

1           LEENA VARUGHESE
2    sentence in that e-mail?
3        A    Oh, thank you, the second
4    sentence says, "We have given her to read and
5    told her about the case presentation for the
6    next week."
7           So I told you this on August
8    4th.
9        DR. VARUGHESE: So you told me at
10   least on August 4th?
11          THE WITNESS: Okay, not on
12   Thursday, a week later.
13          DR. VARUGHESE: But I don't think
14   you told me.
15          THE WITNESS: You've got to be
16   truthful; it pays in life, trust me.
17          DR. VARUGHESE: But you didn't
18   tell me on Tuesday.
19          THE WITNESS: I am reading from
20   Exhibit --
21          DR. VARUGHESE: 24, you are
22   saying that you cannot --
23          THE WITNESS: We have given her
24   to -- this is August 4th, Thursday.
25          DR. WEINFELD: Thursday.

Page 103

1           LEENA VARUGHESE
2          DR. MARIN: This does not
3    identify the time that it was given.
4          THE WITNESS: Okay, I'm so sorry.
5          DR. MARIN: It validates at least
6    by Thursday it was done.
7          DR. VARUGHESE: Or at least she
8    planned on telling me.
9          DR. BRONHEIM: No it says, "We
10   have given her."
11         DR. VARUGHESE: "We have given
12   her to read and told her about the
13   presentation for the next week."
14         DR. MARIN: But you are cc'd on
15   this e-mail, so you would have received
16   this then.
17         DR. VARUGHESE: Yes.
18         DR. MARIN: So.
19         DR. VARUGHESE: My point is she
20   was saying she was very busy with
21   equipment upgrades and this is after Dr.
22   Firpa sent her this e-mail asking her to
23   discuss cytogenetic requirements with
24   me.
25         DR. WEINFELD: I have a question,

Page 104

1           LEENA VARUGHESE
2    do you deny saying that this rotation
3    was a waste of time?
4          DR. VARUGHESE: Yes.
5          DR. WEINFELD: Okay.
6          DR. VARUGHESE: I didn't think
7    the rotation was a waste of time at all.
8          In fact, I offered to work further
9    with her in the future on another two
10   weeks if she felt that my competency level
11   on cytogenetics was not adequate and I
12   said this to Dr. Firpa after the
13   conference the following Tuesday morning.
14         I also offered to write a paper
15   because I had a very interesting case that
16   was in my first year on pediatric
17   pathology that I had this case where they
18   covered a novel translocation.
19         So I actually was interested in
20   that particular case and I was considering
21   writing it up, but I just didn't feel
22   comfortable after this approaching her
23   about it.
24         DR. WEINFELD: Any other
25   questions for Dr. Najfeld, or can we

Page 105

1           LEENA VARUGHESE
2    excuse the witness?
3          Thank you.
4          DR. BRONHEIM: Thank you very
5    much for your time.
6          MR. MacDONALD: Steve, maybe we
7    need to take a witness out of sequence,
8    Dr. Varughese, Scott Barnett whom you
9    have called as a witness has to leave by
10   8:00 or 8:15, maybe we should take him
11   out of sequence so that --
12         DR. WEINFELD: He's being called
13   by the Pathology Department?
14         MR. MacDONALD: By Dr. Varughese,
15   but --
16         DR. WEINFELD: At this rate we
17   probably should, if that's okay.
18         MR. MacDONALD: So is that okay
19   if we do that?
20         DR. FIRPA: No objections.
21         MR. MacDONALD: Okay.
22         I think we should try to
23   accommodate, obviously, as many of the
24   witnesses as possible given the schedule
25   and the time, et cetera.

27 (Pages 102 to 105)

Page 106

LEENA VARUGHESE

1
2      DR. VARUGHESE:  So I am a little
3  bit concerned now, it's 7:36, it's past
4  7:30 p.m., so --
5      DR. WEINFELD:  What's your
6  question.
7      DR. VARUGHESE:  How long do you
8  think this process will take, or do we
9  convene on another day if --
10      MR. MacDONALD:  Well, we should
11  go as far as we can go, and the
12  Department has several more witnesses.
13      DR. MARIN:  You have 20 witnesses
14  that you called in to hear that we
15  should really --
16      MR. MacDONALD:  You have 20, the
17  Department has -- we want to take Scott
18  Barnett out of sequence because he has
19  to leave at 8:15.
20      He is Dr. Varughese' witness and I
21  understand that you have no objection, so
22  we should bring him in here and let him
23  testify.
24      MR. McEVOY:  Just so the
25  Committee is aware, there is another

Page 107

LEENA VARUGHESE

1
2  witness here who is Dr. Varughese'
3  witness who I don't know what her
4  schedule is, but there are a whole bunch
5  of folks here who have other things to
6  do.
7      So I don't have an objection to
8  Dr. Barnett, but I do have an objection to
9  presenting this case out of sequence other
10  than for Dr. Barnett, and I'll be candid,
11  Karen Tiger is here as her witness.
12      If Ms. Tiger goes on at 1:00 this
13  morning, if she goes on at 1:00 this
14  morning there is no reason why the
15  witnesses for the Department should be any
16  more inconvenienced than the witnesses for
17  Dr. Varughese.
18      So I have no objection to
19  Dr. Barnett, but that's the only witness
20  that I don't have an objection to being
21  out of sequence.
22
23  S C O T T   B A R N E T T,   called as a
24  witness, having been first duly sworn by
25  witness was examined and testified as

Page 108

LEENA VARUGHESE

1
2  follows:
3
4      DR. WEINFELD:  This is Dr.
5  Varughese' witness, but obviously the
6  Department will have a chance to ask
7  questions as well.
8      Why don't we proceed.
9
10  DIRECT EXAMINATION BY DR. VARUGHESE:
11
12      Q    Thank you for appearing.
13      So my question, have I brought
14  concerns to you over the past year or so?
15      A    Yes.  I believe we met at least
16  twice.
17      DR. MARIN:  When were the dates
18  of those, is it over a year that's been
19  going on?
20      THE WITNESS:  I would have to
21  consult my calendar.  I could look it
22  up, but I don't have the dates in front
23  of me.
24      DR. LEITER:  Prior to August?
25      THE WITNESS:  Certainly if you

Page 109

LEENA VARUGHESE

1
2  wish to I could look it up.
3      DR. MARIN:  Yes.
4      DR. BRONHEIM:  Is there any time
5  after August?
6      THE WITNESS:  Same response, I
7  have to look it up.
8      DR. WEINFELD:  Dr. Varughese, do
9  you have any dates that would make it
10  easier?
11      DR. VARUGHESE:  Yes, September 11
12  we met at noon.
13      DR. WEINFELD:  September 11 of
14  this year.
15      DR. WEINFELD:  Scott, does that
16  click with your calendar?
17      THE WITNESS:  I have Monday, May
18  16th is the first time and I have
19  September 12th or September 11th was a
20  Sunday.
21      DR. WEINFELD:  Okay.
22      THE WITNESS:  Those are the two
23  dates.
24      DR. WEINFELD:  Go ahead.
25      DR. BRONHEIM:  Could you just

28 (Pages 106 to 109)

Page 110

LEENA VARUGHESE

1
2     state for the record in what capacity?
3         THE WITNESS: I am the Associate
4     Dean for Graduate Medical Education and
5     our office oversees the residency and
6     fellowships here and at our affiliated
7     institutions.
8         Q    So, did I bring a concern to you
9     about my concern about being treated fairly
10    while I was on disciplinary action to you?
11        A    You did.
12        Q    Cau I ask what you thought about
13    that?
14             Is that a question that I can
15    ask what you thought about?
16        A    Well, if you ask me what I
17    thought about your coming to me, I'm certainly
18    happy to meet with all house officers and make
19    it very clear, orientation and Chief Residents
20    are told in every forum that I am among the
21    resources that are offered to house staff who
22    have concerns about their training, including,
23    among others, the institutional ombudsman, Dr.
24    Stimmel and Human Resources, but I'm certainly
25    always happy to meet with house staff.

Page 111

LEENA VARUGHESE

1
2         Q    So I told you I was concerned
3     about Dr. Firpa not being able to oversee the
4     disciplinary action?
5         A    I don't recall that, but, I do
6     remember you talking to me and having concerns
7     and I explained to you that my role in the
8     institution, as I understand it, is to make
9     sure that institutional and departmental
10    policies and procedures were being adhered to
11    and that I was not a judge or a jury, but my
12    job was to ensure that people were being
13    treated fairly and that I either at that first
14    meeting or second meeting, I do remember
15    stating that in my view that I did feel that
16    departmental policies and procedures were being
17    followed.
18        Q    What's your opinion of the
19    Department of Pathology?
20             DR. WEINFELD: That's not
21    relevant, I'm going to direct him not to
22    answer that question.
23             What other questions do you have?
24             DR. VARUGHESE: That's all.
25             DR. MARIN: Thank you.

Page 112

LEENA VARUGHESE

1
2         DR. FIRPA: No questions.
3         DR. WEINFELD: Scott, thank you
4     very much.
5         THE WITNESS: You are quite
6     welcome.
7         DR. WEINFELD: Let's get back to
8     our regular scheduled witness schedule.
9         MR. MacDONALD: Can we go off the
10    record.
11        (Discussion off the record.)
12    A D R I E N N E  C.  J O R D A N,  called
13    as a witness, having been first duly sworn
14    by the Notary Public, was examined and
15    testified as follows:
16
17
18    DIRECT EXAMINATION BY DR. FIRPA:
19
20        Q    Would you please state your job
21    title?
22        A    I am a postgraduate year 3
23    anatomic and clinical pathology resident, as
24    well as Chief Resident of the Department of
25    Pathology, one of the Chief Residents.

Page 113

LEENA VARUGHESE

1
2         Q    And your formal employment is?
3         A    Sorry?
4         Q    And you are employed by?
5         A    Mount Sinai Hospital.
6         Q    What year of residency are you
7     in?
8         DR. WEINFELD: She already said
9     that.
10        Q    Do you know Dr. Varughese?
11        A    I do.
12        Q    Would you describe your job
13    duties as part of the responsibility of Chief
14    Resident.
15        A    I am charged with enforcing and
16    making sure that Department and hospital
17    policies, institutional policies are equally
18    distributed -- equally enforced amongst all the
19    residents, as well as ensuring appropriate
20    supervision of our junior residents, basically
21    arranging for coverage and that sort of thing
22    when a resident is absent, scheduling issues
23    and things of that nature.
24        Q    How do you know Dr. Varughese?
25        A    She was one of our postgraduate

29 (Pages 110 to 113)

P. 913

Page 114

LEENA VARUGHESE

year 4 residents in the pathology program.

Q    Did you have any problem over coverage issues on August 5th?

A    I had a resident call out sick on August 5th. Unfortunately this resident had been ill multiple times during her surgical pathology month and so we have a policy in place for residents who call out sick.

Basically it dictates an order in which we pull residents to cover our other services so that we have the same residents aren't getting asked to cover over and over again.

Because this resident had been out so many times, I had now gotten down to the rotation where Dr. Varughese had to cover for the absent resident.

Q    Was Dr. Varughese aware of this and of other departmental policies and if so, how?

A    She was aware, we discussed the new policies that were going into place for the year at a resident meeting, which Dr. Varughese was not able to make, she was on vacation, it

Page 115

LEENA VARUGHESE

was an excused absence, but she did sign the resident meeting minute acknowledgment sheet, I'm sorry, I believe she did, I'm not 100 percent sure on that, but she did sign the acknowledgment of Department policies acknowledging she did receive them and she was aware.

Q    Would you refer to Exhibit number 17? Department Exhibit 17.

Would you browse through the content of the exhibit and describe in your own words briefly what they represent?

A    The first page is Dr. Varughese' acknowledgment of the Department policies, there are six policies listed that she acknowledged the procedure if she had to make a schedule change, absent a coverage policy, which was the one I just referenced, which dictates the order in which we pull residents whenever they are absent, morning conference attendance policy, corrective action policy, as well as reviewing the resident meeting minutes and acknowledging them and transitions of care and the pages that follow are those policies.

Page 116

LEENA VARUGHESE

Q    Did you need Dr. Varughese to cover the the frozen section room on August 5th?

A    I did.

Q    Why?

A    The residents, like I said, had called out sick multiple times, I had rotated through several other residents in order of the policy and the next person to be pulled according to the policy was Dr. Varughese.

Q    How did you tell Dr. Varughese that she needed to cover the service?

A    I contacted her by e-mail -- I contacted her by e-mail, I'm not entirely positive if it was the night before or the morning of.

Q    What was her response to that e-mail?

A    She said that her initial response was she could not cover.

Q    Did she cover frozen sections on that day?

A    No, she did not.

Q    Why not?

Page 117

LEENA VARUGHESE

A    In subsequent e-mails she told me that she had an injury to her arm and that she would not be able to perform those duties due to her jury.

Q    Did she ever provide proof of had her alleged injury?

A    No.

Q    Would you refer to Exhibit 6, Department Exhibit 6, browse through them and describe in your own words what they represent or document?

A    That's my communication with Dr. Varughese on -- starting on the Thursday August 4th, the night before I needed her to cover asking her to cover, her subsequent e-mails back describing her injury and how it limited her ability to cover frozen sections for that Friday afternoon, and then her subsequent suggestions to me that in the past we had had -- the Chief Residents just asked residents to cover and didn't dictate it.

I explained to her in another portion of the e-mail that we were no longer were asking residents to cover because

30  (Pages 114 to 117)

Page 118

LEENA VARUGHESE

1 unfortunately the same residents would get
2 pulled over and over, only the residents who
3 would agree to cover.
4        The new policy made it easier
5 for the Chief Residents to find coverage so
6 that we didn't have to ask a whole bunch of
7 different people, it was already laid out who
8 would be pulled.
9     Q    Did you ever ask Dr. Varughese
10 to submit proof of her injury?
11    A    I did.
12    Q    Did she ever -- did you ever
13 find out why she was, in fact, injured or
14 submitted proof of that?
15    A    To the best of my knowledge she
16 never submitted proof and I am not aware what
17 the extent of her injury was.
18    Q    Did you need Dr. Varughese to
19 cover surgical pathology service on August
20 12th?
21    A    Yes.
22    Q    Why?
23    A    Again, I had a resident who
24 called out sick for that day and the service

Page 119

LEENA VARUGHESE

1 required coverage.
2     Q    Why was Dr. Varughese
3 specifically assigned to cover surgical on that
4 day?
5     A    Since I did -- I assigned
6 another resident rather than her to cover
7 frozen sections, the next person up in rotation
8 would logically be her, since she was passed
9 over due to her injury, the next time somebody
10 needed coverage she was the first go to person.
11    Q    Did you attempt to contact Dr.
12 Varughese to tell her that she needed to cover
13 surgical?
14    A    I did, I contacted her via
15 e-mail.
16    Q    Did Dr. Varughese respond to
17 your e-mails or page?
18    A    No.
19    Q    What did you do?
20    A    I contacted Dr. Lento via phone,
21 I was doing all of this remotely I was on an
22 away elective at the time, so I was contacting
23 him.
24        I contacted Dr. Lento via phone

Page 120

LEENA VARUGHESE

1 to see if he could possibly get ahold of Dr.
2 Varughese since I was very concerned about the
3 service being covered and making sure that the
4 specimens were processed.
5        I asked him to step in and see
6 if he could contact her to find out if she
7 would cover the service.
8     Q    What did he do?
9     A    To the best of my knowledge,
10 what I was told is he paged her.
11    Q    Did she cover surgicals that
12 day?
13    A    Yes.
14    Q    Did she ever respond to your
15 e-mails?
16    A    No.
17    Q    Refer to Exhibit 7 and 8.
18 Browse through them and describe briefly what
19 they represent.
20        DR. BRONHEIM:  Before we leave
21 Exhibit 7, I see that there is a message
22 from Dr. Adrienne to Dr. Morency.
23        You covered about 15 differen --
24 you cc'd about 15 different people.

Page 121

LEENA VARUGHESE

1        Would you explain why you made such
2 an extensive list?  I am on page -- sorry
3 Dr. Adrienne.
4        DR. WEINFELD:  Of that exhibit?
5        DR. BRONHEIM:  Yes.
6        THE WITNESS:  Yes, I can.
7 Dr. Morency was cc'd because she's my
8 co-Chief, Dr. Blau was the resident who
9 was sick, so she is on there so that she
10 knew who covered for her.
11        A lot of times the residents like
12 to say thank you for covering when I was
13 out, so she was cc'd on that, Dr. Firpa
14 and Dr. Lento because they are the program
15 directors respectively, Dr. Blejwas
16 because he is the head of anatomic
17 pathology, and since I was also commenting
18 on the biopsies being covered that day he
19 needed to be aware of the situation.
20        Dr. Grunis was Dr. Blau's surgical
21 partner, she needed to be aware of what
22 the coverage was because in the afternoon
23 whenever the -- I'm sorry, I'm going too
24 fast.

31 (Pages 118 to 121)

Page 122

LEENA VARUGHESE

1
2      The biopsy frozen resident does
3   biopsies in the morning then -- they are
4   partnered, does frozen in the afternoon
5   then midday they switch, Dr. Grunis would
6   be signing over the rest of the biopsies
7   that hadn't gotten signed out to whoever
8   her partner was for that day.
9      Since Dr. Blau, her normal partner,
10   was out, I was asking Dr. Varughese to
11   step in, I wanted Dr. Grunis to be aware
12   of who she would be exchanging the
13   biopsies with.
14      So that's why she's on there.
15
16      DR. BRONHEIM: So, would you say
17   that Dr. Varughese not agreeing or not
18   being available to cover created a great
19   deal of complicated rescheduling?
20      THE WITNESS: It was complicated
21   to reschedule her, yes, but I did not
22   include these people on the subsequent
23   e-mails.
24      Once I sent out that general e-mail
25   these people were dropped to just a few

Page 123

LEENA VARUGHESE

1
2   people who were intricately involved.
3      DR. BRONHEIM: Okay.
4   Q      Any comments on Exhibits 7 and
5   8.
6      Now is there a --
7   A      Sorry, I am still reading 7 and
8   8.
9   Q      What is Department Exhibit 7
10   first?
11      A      Exhibit 7 is my e-mail to Dr.
12   Varughese and several other people asking her
13   to cover for an absent resident on surgical
14   service that day.
15      The other people included on the
16   e-mail are other people that asked to step in
17   and help in the gross room, so that way Dr.
18   Varughese wouldn't be overwhelmed with the
19   grossing responsibilities for that day and she
20   could at least somewhat participate in her
21   normally scheduled rotation.
22   Q      And would you turn over to
23   Department Exhibit 8?
24      A      The rest of Exhibit 7 is my
25   communications with Dr. Najfeld and Dr. Lento

Page 124

LEENA VARUGHESE

1
2   where I'm trying to follow up on the fact that
3   Dr. Varughese hasn't yet responded to my e-mail
4   for coverage.
5      Like I said, I was off-site
6   during this time, so I really needed to make
7   sure that patients weren't being put at risk by
8   their specimens not being processed.
9      So I was contacting the program
10   director to make sure that she was covering and
11   then one of the e-mails is Dr. Lento's response
12   back to me saying he instructed Dr. Varughese
13   to contact me to let me know she would cover,
14   and she never did.
15   Q      What is Department number 8?
16      A      Exhibit 8 is my e-mail to Dr.
17   Najfeld where I'm asking if Leena had come in,
18   Dr. Varughese had come in for the day because I
19   was getting concerned for the service and I
20   also knew that Dr. Najfeld had an appointment
21   later in the morning, and needed to meet with
22   her earlier in the day, so I was concerned for
23   everybody's time.
24   Q      Now, is there a policy regarding
25   attendance to core conferences in the

Page 125

LEENA VARUGHESE

1
2   Department as part of the program?
3      A      There is.
4   Q      Would you explain it, please?
5      A      May I refer to the exhibit real
6   quick?
7   Q      Sure.
8      A      That was Exhibit Department 6,
9   right?
10      MR. McEVOY: The policy?
11      THE WITNESS: Yes.
12      MR. McEVOY: 17.
13      A      Department Exhibit 17, so the
14   policy for morning conference attendance to
15   ensure that the residents receive a complete
16   academic curriculum during their program time
17   here, they are required to attend conference
18   per ACGME guidelines.
19      There is a sign-up sheet out in
20   the morning whenever there is conference at
21   8:00 a.m. and if they fail to -- while nobody
22   is perfect, we allow an 80 percent conference
23   rate, basically allowing the residents to miss
24   one conference a week to allow for things like
25   sleeping in, traffic, doctors appointments and

32  (Pages 122 to 125)

Page 126

LEENA VARUGHESE

1  
2  so on.
3          If they fail to meet that 80
4  percent level there are penalties, if they fall
5  between the 60 and 80 percent averaged over the
6  four week block, then they have to prepare one
7  lecture.
8          DR. WEINFELD: We can read this,
9  let's keep going. It's not your fault
10  let's move along.
11          This is going to take forever,
12  let's move it.
13      Q    Did Dr. Varughese ever fail to
14  meet the 80 percent required?
15      A    Yes.
16      Q    What happened?
17      A    My co-Chief, Dr. Morency,
18  e-mailed her and explained to her, she had
19  fallen below the 80 percent conference
20  attendance for period 2 and that she would be
21  required to give a make-up lecture at a later
22  date, and I believe that e-mail also stated
23  which date Dr. Varughese was assigned.
24      Q    Did she ever respond to
25  Dr. Morency's e-mails?

Page 127

LEENA VARUGHESE

1  
2      A    Not at that time, later, about a
3  month later she did.
4          Whenever I followed up in
5  another e-mail asking what her topic was.
6      Q    Did Dr. Varughese fail to
7  respond to subsequent follow-up e-mails from
8  Dr. Morency and you?
9      A    I'm not sure what the time line
10  of her response was, she eventually did respond
11  with topics that she wished to present and as
12  Chief Residents Elizabeth and I discussed her
13  topics and we felt that they weren't to the
14  level of a PGY 4 resident, so we did not
15  approve the topics and made some alternate
16  suggestions for things that she could present.
17      Q    Do you recall ever her calling
18  in sick after being scheduled to present on
19  September 13 or 14?
20      A    Yes, September 13th was the
21  first date she was assigned to give her penalty
22  conference, she did call out sick that day.
23      Q    What happened then?
24      A    I rescheduled her for September
25  14th.

Page 128

LEENA VARUGHESE

1  
2      Q    And what happened then?
3      A    She came into morning
4  conference, as there was another resident
5  presenting that morning, she came in for
6  lecture at 8:00 a.m.
7          Lecture starts at 8:00 a.m., she
8  came in at 8:15 and sat down and when the first
9  resident completed their presentation at 8:30,
10  we were waiting for her to transition up to the
11  podium to give her presentation and she walked
12  out.
13      Q    Is there a policy in place
14  requiring proof of illness for failing to
15  fulfill tasks required as part of the job?
16      A    Yes. Anything that requires a
17  violation in Department policy, for example,
18  not covering the service whenever it's your
19  turn in the rotation does require
20  documentation.
21      Q    Did she provide any proof of
22  illness on those days she failed to present?
23      A    No.
24      Q    Would you refer to Exhibits 9
25  and 10, Department Exhibits 9 and 10. First

Page 129

LEENA VARUGHESE

1  
2  Department Exhibit 9, briefly describe what
3  they represent?
4      A    It's a series of e-mails, my
5  first e-mail being that is Dr. Varughese had to
6  acknowledge the resident meeting minutes for
7  the resident meeting that took place on August
8  26th, I send out the minutes within two weeks
9  after the meeting, then the residents have two
10  weeks to sign the acknowledgment sheet that
11  they approved the minutes meeting and they are
12  aware of that content.
13          We discuss serious material at
14  these meetings that we need the residents to be
15  aware of, so they must acknowledge it.
16          Then it's an e-mail from you
17  asking her to comply with the Chief Residents
18  according to ACGME guidelines and our
19  Department policies.
20          And then it's another e-mail
21  from me to Dr. Varughese asking her, thanking
22  her for her acknowledgment of the meeting
23  minutes, but also asking her for her topic of
24  the penalty conference which she was scheduled
25  for at that time to be on September 13th, which

33 (Pages 126 to 129)

Page 130

```
 1              LEENA VARUGHESE
 2  was the day she called out sick.
 3       Q       Go to Department Exhibit 10.
 4       A       The first e-mail is the one that
 5  was sent at the end of August from Dr. Morency
 6  informing Dr. Varughese that she fell below the
 7  80 percent level of conference attendance for
 8  period 2, and will be required to give a
 9  make-up conference on September 14th, but I
10  believe that was a mistake in the dating, I
11  believe Dr. Morency actually meant Wednesday
12  September 13th, but I would have to look at the
13  calendar, I'm sorry.
14              The next e-mail is from Dr.
15  Varughese on September 13th stating that she
16  was not required to be at all the conferences
17  because she spoke with Dr. Firpa and she was
18  attending other conferences which were of
19  educational value to her, and that she was
20  requesting a hospital-wide conference list for
21  all the available daily conferences in that she
22  would present the next day a hodgepodge of all
23  the cytology lectures that she missed.
24              Then Dr. Firpa responded that
25  she can attend as many other conferences as she
```

Page 131

```
 1              LEENA VARUGHESE
 2  wants, but the 8:00 a.m. conferences are still
 3  mandatory for all residents.
 4              Then Dr. Varughese called out
 5  sick for the following day that she was
 6  supposed to present and that she's not
 7  qualified to give any real core lecture because
 8  she's only a resident.
 9              And then -- I'm sorry, she's not
10  calling out sick at this point, I interpreted
11  her e-mail as calling out sick, she said she
12  wasn't feeling well and wouldn't be able to
13  present.
14              I then sent an e-mail to
15  everyone saying she was calling out sick, I
16  presumed when she said I don't feel well that's
17  what it meant, and she sends me a response back
18  basically stating that I wasn't available for
19  the residents in period 2, so I don't know who
20  was keeping track of attendance.
21              That I am making a hostile work
22  environment, that I am dictating who she can
23  and cannot talk to and that I should only -- I
24  should communicate with her through Dr. Firpa
25  in the future.
```

Page 132

```
 1              LEENA VARUGHESE
 2              Then the last part of that
 3  exhibit is my response back to her apologizing
 4  that I thought she was calling out sick for the
 5  next day and I would correct that, that all the
 6  residents who needed me while I was on my away
 7  elective were able to get in touch with me and
 8  that I could provide her with documentation of
 9  that.
10
11              DR. WEINFELD:  Why don't we ask a
12       question, this is reading through the
13       exhibits we all have.
14       Q       Did Dr. Varughese ever challenge
15  your authority as Chief Resident?
16       A       Yes.
17       Q       How?
18       A       Well, in that particular e-mail
19  she states that I was essentially not the Chief
20  Resident during period 2, when, in fact, I was,
21  I was just an off-site Chief Resident.
22       Q       Was this the only instance in
23  which she challenged your authority as Chief
24  Resident?
25       A       No.
```

Page 133

```
 1              LEENA VARUGHESE
 2       Q       What did you do in each of those
 3  instances?
 4       A       I responded to her in my
 5  capacity as Chief Resident and I made sure that
 6  both Drs. Firpa and Dr. Lento and my co-Chief
 7  Dr. Morency were aware of the issues.
 8              DR. FIRPA:  I have no further
 9       questions.
10              DR. WEINFELD:  Dr. Varughese.
11
12  CROSS-EXAMINATION BY DR. VARUGHESE:
13
14       Q       So, you were, in fact, not here
15  for the period 2?
16       A       I was not on-site, correct.
17       Q       So where were you?
18              Were you on an away elective?
19              DR. WEINFELD:  She said she was
20       away on an elective, so let's move on.
21       Q       Was your pager working the
22  entire time you were not here?
23       A       No, there were two weeks where
24  my short range pager -- I found out on my first
25  day of my rotation did not work, I sent out an
```

34 (Pages 130 to 133)

P. 918

Page 134

LEENA VARUGHESE

1 LEENA VARUGHESE
2 e-mail to all of the residents and the faculty
3 stating what my cell phone number was and where
4 they could reach me, and I made the Department
5 aware of it, and they sent me an overnight -- a
6 national-wide pager, but it took about a week
7 and a half to get to me, but through that time
8 I did send constant e-mails telling everybody
9 what my cell phone number was and that they
10 could reach me by phone.
11     Which several residents did do.
12     Q    So when was the policy
13 acknowledgment due, what date was it due?
14     A    I don't recall.
15     Q    When were we supposed to have
16 read everything, understood and submitted the
17 policy acknowledgment?
18     A    I don't recall.
19     Q    Well, okay, let's refer to
20 Exhibit 17 by the Department.
21     DR. WEINFELD: Tell us what
22 policy you want us to refer to, please.
23     DR. VARUGHESE: So Exhibit 17
24 Page 1, it shows the acknowledgment of
25 Department policies and I have signed it

Page 135

LEENA VARUGHESE

1 LEENA VARUGHESE
2 and dated it as of 8/15/2011 that's when
3 it was due.
4     So, yes, when Dr. Jordan first
5 e-mailed me about covering I had, of
6 course, just been on vacation, came back,
7 I had responsibilities on other rotations,
8 I am managing all those.
9     No, I did not get to read through
10 approximately how many pages, 7 new pages
11 of Department policy at that point.
12     DR. WEINFELD: Can I ask a
13 question, what's the policy on
14 acknowledgment of Department policy?
15     Is this something that residents
16 sign when they first -- when they are PGY
17 2, 1, this was signed three months ago, so
18 why was this signed three months ago and
19 not at the beginning of the residency?
20     DR. LEITER: It's new policy.
21     DR. WEINFELD: I'm not asking
22 you, I'm asking the Department.
23     DR. FIRPA: There were policies
24 but they were not formalized policies in
25 place at the Department.

Page 136

LEENA VARUGHESE

1 LEENA VARUGHESE
2     So as of July 1, one of the first
3 tasks were to formalize all this general
4 ideas into written documents.
5     It was scheduled then at a
6 residents and fellows meeting to present
7 them with the final draft as they were
8 consensuated among the established
9 policies in other comparable programs with
10 the United States.
11     DR. WEINFELD: New policies in
12 the Department, is that it?
13     DR. FIRPA: Many of them were
14 already in place, but this is the first
15 formal acknowledgment and incorporated
16 into the program description.
17     A meeting was held, the residents
18 voted, she was absent because she was on
19 vacation, but upon her return, the package
20 was in her mailbox and she was informed as
21 everybody was who was absent that this was
22 the consensus, and that they had to read
23 them and acknowledge receipt by signature.
24     The deadline for submitting the
25 signature was 8/15 and she waited until

Page 137

LEENA VARUGHESE

1 LEENA VARUGHESE
2 the very last day to do that.
3     DR. WEINFELD: Okay.
4     DR. BRONHEIM: Dr. Varughese, you
5 are a PGY 4 resident, you have had Chief
6 Residents for many years, are you saying
7 that a Chief Resident tells you that you
8 have to be on call, that it's up to you
9 to decide whether or not it's
10 appropriate?
11     DR. VARUGHESE: No, she had
12 e-mailed me the day before and she said
13 that, you know, one of the residents was
14 calling out sick and I needed to cover
15 for this resident for that morning.
16     I e-mailed her saying that I
17 couldn't because of my arm injury, and
18 because I knew I wouldn't be able to
19 because of my arm injury I just wanted to
20 give her advance notice.
21     I didn't explain myself, I just
22 told her that I couldn't cover.
23     DR. WEINFELD: When they asked
24 you for, well this is relevant to this,
25 when they asked for documentation of

35  (Pages 134 to 137)

Page 138

LEENA VARUGHESE

1
2  that, how come you didn't provide that?
3      DR. VARUGHESE: Well, because I
4  was actually at work on Friday, I had
5  the arm injury for several days, it
6  wasn't something that I just had, and it
7  was not something that I went to see a
8  doctor for.
9      It was, you know, so I don't have a
10  doctor's note for that, I actually came
11  into work despite all that.
12      DR. WEINFELD: The question was
13  why didn't you provide documentation
14  knowing that that was what was required?
15      DR. VARUGHESE: Well, I didn't
16  know I was required, actually, to
17  provide documentation.
18      THE WITNESS: May I say
19  something?
20      DR. WEINFELD: Sure.
21      THE WITNESS: Actually I realize
22  that we are physicians and we don't
23  always seek a doctor's appointment
24  whenever we hurt ourselves, so actually
25  whenever I e-mailed Dr. Varughese to ask

Page 139

LEENA VARUGHESE

1
2  her for proof of her illness one of my
3  options I even gave her was to just
4  write a letter herself stating what her
5  injuries were and to turn that in and I
6  would accept that as proof.
7      I trust her as a --
8      DR. VARUGHESE: Well, okay.
9      DR. WEINFELD: Were you finished?
10  Do you want to finish your thought?
11      THE WITNESS: I was just going to
12  say I was going to accept that as
13  documentation of her illness, but to the
14  best of my knowledge she didn't turn
15  that in either.
16      So I wasn't requiring specifically
17  a physician's note.
18      DR. VARUGHESE: I mean I want to
19  refer to the exhibit that relays all
20  these e-mails from I'm not sure which
21  one that was, was it 7 or 9?
22      DR. WEINFELD: Which e-mail are
23  you referring to?
24      DR. VARUGHESE: I think it was
25  Exhibit 7.

Page 140

LEENA VARUGHESE

1
2      DR. BRONHEIM: From the
3  Department?
4      DR. VARUGHESE: From the
5  Department.
6      DR. WEINFELD: What's your
7  question?
8      DR. VARUGHESE: Department
9  Exhibit 8 -- not Exhibit 8.
10      Anyway, I do explain my injury to
11  some extent in an e-mail to Dr. Jordan on
12  August 5th when she asked me to cover.
13      So, in fact, I did explain to her
14  already, I mean beyond that, I --
15      DR. WEINFELD: Tell us the e-mail
16  you are referring to that you explain
17  that.
18      DR. ROCCO: Exhibit 6.
19      DR. MARIN: Department Exhibit 6.
20      DR. ROCCO: I think that's what
21  she's trying to find.
22      DR. WEINFELD: Looks like second
23  page of Exhibit 6, middle of the page,
24  Department Exhibit 6..
25      DR. VARUGHESE: So, here I just

Page 141

LEENA VARUGHESE

1
2  say that I don't have -- if I didn't
3  have a wrist, hand injury I would be
4  happy to oblige.
5      DR. MARIN: That doesn't
6  constitute an explanation.
7      What she's talking about is just
8  explaining what happened to your hand why
9  you were injured and what the nature of
10  the problem is.
11      DR. ROCCO: Can you explain why a
12  wrist and hand injury would prohibit you
13  from taking part in this rotation or the
14  coverage for the day in frozen?
15      DR. VARUGHESE: So frozen section
16  basically involves me cutting, making
17  slides to be read, so if -- and handling
18  specimens, I have to cut the specimens,
19  then processing specimens, and then
20  label and everything, so that requires
21  some dexterity, so I just didn't feel
22  that, you know, I could do that.
23      DR. MARIN: Can you explain to us
24  what you -- it sounds like you were able
25  to go into work that day, what you were

36  (Pages 138 to 141)

Page 142

LEENA VARUGHESE

1
2  able to do, what rotation you felt like
3  you were physically able to do.
4        DR. VARUGHESE:  In genetics it's
5  not a manually, it doesn't require
6  manual labor, so I did go to that
7  rotation.
8        DR. WEINFELD:  Okay, let's move
9  on.
10        Any other questions for Dr. Jordan?
11     Q    So you said that I have not
12  responded to the e-mails from the Chief
13  Residents in the past.
14     A    Yes.
15     Q    But, in fact, I have and I
16  requested a meeting, I was at the VA for
17  several weeks, the first two weeks I was in
18  cytogenetics and the second two weeks of period
19  two I was at the VA, so there was a request for
20  a meeting and I suggested perhaps everyone can
21  come there because, you know, and have this
22  meeting and have Dr. Jordan on the phone, but
23  that was -- I never got a response to that.
24        DR. WEINFELD:  So what you are
25  saying, how many residents were at the

Page 143

LEENA VARUGHESE

1
2  VA, you?
3        DR. VARUGHESE:  It was me, yes.
4        DR. WEINFELD:  How many residents
5  were here?
6        DR. VARUGHESE:  There were --
7        DR. WEINFELD:  20?
8        DR. VARUGHESE:  I'm not sure.
9        DR. WEINFELD:  So 20 residents
10  should go to accommodate one resident.
11  That doesn't make sense.
12        DR. VARUGHESE:  Not 20 residents,
13  the Chief Resident, because they
14  wanted --
15        DR. WEINFELD:  Ask your question,
16  I'm sorry.
17        DR. VARUGHESE:  So I never got a
18  response to that.
19     A    I believe that you did,
20  actually, but Dr. Morency would have to speak
21  to that because she was the one who was
22  contacting you.
23        But to the best of my knowledge
24  from what I remember on my e-mails she did
25  respond to you and after that, but again, that

Page 144

LEENA VARUGHESE

1
2  was not communication with me.
3     Q    One more thing, why did you
4  state that I was not presenting?
5        I mean why did you state that I
6  would not come into work?
7     A    I'm sorry.
8        DR. WEINFELD:  What date are you
9  talking about?
10        DR. VARUGHESE:  On Wednesday,
11  that would be the 13th.
12        DR. WEINFELD:  September 13th?
13        DR. VARUGHESE:  Yes.
14     A    Because your e-mail to me stated
15  that you weren't feeling well and couldn't
16  present the next day, and I assumed that meant
17  that you were calling out sick, which you, in
18  fact, did do.
19     Q    Yes, because -- because of the
20  hostility that I am receiving every time there
21  is any issue that comes up.
22        What happens is Dr. Jordan sends
23  me these -- this particular e-mail where she is
24  asking telling me that I'm not going to be
25  coming into work, she addresses Dr. Carter, she

Page 145

LEENA VARUGHESE

1
2  calls out sick for me on my behalf, how rude
3  and obnoxious is that?
4        DR. WEINFELD:  Let's ask a
5  question.
6     Q    Do you think you're warranted to
7  call out for me?
8     A    Like I said --
9     Q    To make a statement for me on my
10  behalf, as the Chief Resident?
11     A    Like I said, I interpreted your
12  e-mail that you were calling out sick.
13        I did speak with somebody else
14  who was cc'd on that e-mail who also
15  interpreted that you were calling out sick, but
16  once you said that you didn't, my point one in
17  my ten point e-mail back to you was I
18  apologized for assuming you were calling out
19  sick.
20        That's the first thing I put in
21  that lengthy e-mail, so if that was my mistake,
22  I apologize, I assumed that's what you were
23  doing.
24     Q    I feel like there have been a
25  lot of assumptions that you make for other

37  (Pages 142 to 145)

Page 146

LEENA VARUGHESE

1
2   people when, in fact, it goes beyond your Chief
3   Resident responsibility.
4        A    If you can provide me with
5   evidence of that, I would respond.
6        DR. MARIN:  Dr. Varughese, can I
7   ask you a question, if you did want to
8   call out sick, what would you do?
9        DR. VARUGHESE:  I would send an
10  e-mail out to the Chief Residents.
11       DR. LEITER:  So why didn't you
12  present?  I'm unclear.
13       DR. VARUGHESE:  I didn't present
14  because I wanted to do a presentation on
15  gross pathology and some other -- and
16  sections to submit and I think it's
17  really relevant and I thought I would do
18  that presentation and that would be
19  adequate.
20       DR. WEINFELD:  On your September
21  13th e-mail this is?
22       DR. VARUGHESE:  They wanted me to
23  do a different presentation.
24       DR. WEINFELD:  This says I don't
25  feel well, I won't be able to present

Page 147

LEENA VARUGHESE

1
2   tomorrow.
3        What expectation would we have
4   other than you wouldn't be at work because
5   if you going to work but you wouldn't be
6   well enough to present, I don't really
7   understand that.
8        DR. VARUGHESE:  Well, actually I
9   wasn't feeling well that day and I
10  wanted to make a presentation that was
11  about gross pathology and submitting the
12  appropriate sections.
13       When that wasn't to be, I had to
14  make a new presentation which I couldn't
15  do and the topics they actually gave me
16  which is not -- I don't know if it's
17  listed in any of these exhibits, in fact
18  they are in excess of what was presented
19  and discussed that particular period.
20       DR. WEINFELD:  What other
21  conclusion would a person come to by you
22  saying I don't feel well, I won't be
23  able to present the lecture I'm supposed
24  to present?
25       DR. VARUGHESE:  A it's arbitrary

Page 148

LEENA VARUGHESE

1
2   and capricious what they say to me on
3   any given day.
4        I do not know where I stand or what
5   I'm supposed to do and to what degree I
6   can do my job without having to deal with
7   this kind of issue on any given basis or
8   any given day.
9        DR. WEINFELD:  Okay, let's go for
10  another question, any other questions
11  you have for Dr. Jordan?
12       Q    Yes, I do.
13       So, I would like you to look at
14  Exhibit 34, my Exhibit 35.
15       DR. WEINFELD:  Of your exhibits?
16       DR. VARUGHESE:  Of my exhibits.
17       DR. WEINFELD:  What's your
18  question?  We are there.
19       Q    So, it says I have missed
20  certain presentations here and I would like you
21  to refer to Exhibit 44.
22       DR. WEINFELD:  Wait, we are on
23  35?
24       DR. VARUGHESE:  On Page 2?
25       THE WITNESS:  Sorry, which

Page 149

LEENA VARUGHESE

1
2   exhibit are we on?
3        DR. WEINFELD:  The big book, 35
4   Page 2.
5        Q    Page 1 is basically me
6   responding to an e-mail from Dr. Jordan about
7   what the topic is going to be for the
8   presentation, because she was interested in
9   knowing, so I sent her e-mails just saying that
10  it's going to be what it's going to be.
11       Then on -- then following that
12  she said that's not an appropriate lecture
13  topic?
14       DR. WEINFELD:  Right.
15       DR. VARUGHESE:  And she lists
16  several appropriate lecture topics that
17  I can present from.
18       These include cytology.
19       DR. LEITER:  We can read it,
20  what's the question?
21       Q    So basically if you were to
22  refer to Exhibit 44 for a period and this is
23  all the different conferences that were
24  supposedly presented in period 2, you will note
25  that there is actually a -- she has placed a

38  (Pages 146 to 149)

Page 150

LEENA VARUGHESE

```
1            LEENA VARUGHESE
2  lecture?
3       DR. BRONHEIM:  What page?
4       DR. VARUGHESE:  So there were
5  four cytology lectures that were given
6  that month, so one of the cytology
7  lectures, these are all Wednesday
8  mornings, so one of them included GYN,
9  reactive changes/infections.
10      DR. WEINFELD:  So what are you
11 saying, it's not clear?
12      DR. VARUGHESE:  Basically what
13 I'm saying is that she has arbitrarily
14 placed a lecture that wasn't presented
15 that month as something that I should
16 present for a follow-up -- for a
17 conference that I need to make up
18 because I didn't attend the required
19 conference.
20      DR. MARIN:  So I don't see what
21 was arbitrary.
22      I can understand you may not have
23 wanted to do the topic there and that's up
24 for discussion, but you haven't given us
25 any information that says it's an
```

Page 151

LEENA VARUGHESE

```
1            LEENA VARUGHESE
2  arbitrary decision to ask you to present
3  on one topic versus the other, that seems
4  to be within the domain of a Chief
5  Resident.
6
7       DR. VARUGHESE:  So the normal --
8  she basically said normal -- okay, so I
9  understand, but this is according to the
10 departmental policy, it is stated that
11 when we do have to make up a conference
12 for missing these conferences that are
13 mandatory, you basically had to present
14 from one of those that you missed, not
15 necessarily something they decide on,
16 that's departmental policy, so I think
17 there is a lot of confusion regarding
18 this new policies that have been
19 instituted.
20      DR. LEITER:  Why didn't you just
21 choose a topic and e-mail?
22      DR. VARUGHESE:  I did choose a
23 topic and present, but they said it
24 wasn't appropriate.
25      DR. BRONHEIM:  They are also
```

Page 152

LEENA VARUGHESE

```
1            LEENA VARUGHESE
2  saying I'm sorry that you have to create
3  another presentation, but this is why
4  Dr. Morency and I asked you several
5  weeks ago for your topic.
6       Why didn't you provide your topic
7  at least a week in advance?
8       That's in your 35, Page 2.
9       DR. VARUGHESE:  Yes, I understand
10 what you are saying, so here is the --
11 so for period 2 there were two Chief
12 Residents we have on, so one Chief
13 resident wasn't there for two weeks the
14 first two weeks.
15      That's when I was on cytogenetics,
16 then for the following two weeks that
17 other Chief Resident was on-site and this
18 Chief Resident was away for the entire
19 month.
20      I did attend a lot of these
21 conferences.
22      DR. WEINFELD:  You attended
23 conferences that you were marked absent
24 for, is that what you are saying?
25      DR. VARUGHESE:  I have a
```

Page 153

LEENA VARUGHESE

```
1            LEENA VARUGHESE
2  suspicion that may be true, because I
3  actually was -- I did go to these
4  conferences and I also had a discussion
5  with Dr. Firpa regarding me attending
6  conferences that are educational to me
7  when I was at a different institution,
8  and he said it was okay, I had to make a
9  note of that, I am actually going to
10 these conferences and that would be
11 adequate or appropriate.
12      DR. WEINFELD:  Okay, so let's ask
13 a question then.
14      DR. MARIN:  Are there any other
15 questions for this witness?
16      THE WITNESS:  I'm sorry I am
17 bouncing around.
18      DR. MARIN:  This is for you, is
19 there anything else you would like to
20 ask her?
21      DR. VARUGHESE:  I want to make
22 myself clear.
23      DR. MARIN:  It's questions for
24 the witness.
25      DR. VARUGHESE:  No.
```

39 (Pages 150 to 153)

Page 154

LEENA VARUGHESE

1   I just want to make the last
2   statement clear, I did attend a lot of the
3   conferences I'm not sure if the attendance
4   list was done appropriately.
5       DR. LEITER:  Isn't there
6   documentation?
7       THE WITNESS:  Yes, there is, the
8   attendance sheet was every day that
9   there was no chief on-site and we know
10  this because everybody else signed in.
11  It's common knowledge in our
12  Department and our residency program that
13  there is a sign-in sheet out there every
14  morning you have to sign in to get credit
15  for the conference.
16      DR. WEINFELD:  Is there a reason
17  why you wouldn't sign a sheet?
18      DR. VARUGHESE:  If I didn't see
19  the sign in sheet immediately.
20      DR. LEITER:  You knew there were
21  penalties if you didn't sign in.
22      DR. VARUGHESE:  The policy only
23  went into effect as the 15th.
24      DR. WEINFELD:  Everyone signed

Page 155

LEENA VARUGHESE

1   the sign in sheet but you didn't?
2       DR. VARUGHESE:  Two weeks, August
3   29th, on the first day of period 3 they
4   want to tell me that I have to present.
5       DR. WEINFELD:  Any other
6   questions for this witness?
7       DR. VARUGHESE:  It seems --
8       DR. WEINFELD:  The witness is
9   excused, thank you.
10      MR. MacDONALD:  Can we go off the
11  record.
12      (Discussion off the record.)
13
14  ELIZABETH   MORENCY,   called
15  as a witness, having been first duly sworn
16  by the Notary Public, was examined and
17  testified as follows:
18
19      DR. WEINFELD:  Can we go back on
20  the record.
21
22  DIRECT EXAMINATION BY DR. FIRPA:
23
24      Q   Dr. Morency, who is your

Page 156

LEENA VARUGHESE

1   employer?
2       A   Mount Sinai Medical Center.
3       Q   What is your title?
4       A   Fourth year resident, Chief
5   Resident.
6       Q   What are your job duties?
7       A   As a resident or as a Chief
8   Resident.
9       Q   As a Chief Resident.
10      A   As a Chief Resident to organize
11  the schedules, to help orient new and incoming
12  residents, to serve as a liaison between
13  administration faculty and staff and residents,
14  that's basically it.
15      Q   Was there ever a time when Dr.
16  Varughese failed to meet the 80 percent
17  requirements of attendance to core conferences?
18      A   Yes.
19      Q   Do you recall what that was?
20      A   Period 2.
21      Q   Do you remember what happened?
22      A   Yes, I sent an e-mail out Monday
23  August 29 informing her of that fact we
24  scheduled her for a date to give a make up

Page 157

LEENA VARUGHESE

1   presentation per our conference attendance
2   policy, and she initially failed to respond,
3   she subsequently did acknowledge the fact that
4   she was scheduled to present on that date, and
5   then called out sick, so then we reschedule her
6   for the next day.
7       So the initial date was the 14th
8   she called out sick, so we scheduled her for
9   the 15th, she called out sick again.
10      So then, she did show up that
11  Thursday, whatever that Thursday was, came in
12  but then left without making a presentation so
13  she never ended up making a question.
14      DR. MARIN:  Is this common to
15  call out sick that frequently in
16  pathology residency, is this different,
17  is that an acceptable event?
18      THE WITNESS:  Given the
19  circumstances she was supposed to make a
20  presentation, I just think its kind of
21  strange.
22      DR. MARIN:  People call out sick
23  frequently as residents?
24      THE WITNESS:  Sure, not -- it

40 (Pages 154 to 157)

Page 158

LEENA VARUGHESE

1
2     depends, if you are sick you call out,
3     it's variable.
4          DR. MARIN: Thank you.
5          Q    Did she ever provide, did you
6     ever ask her for proof of illness since her
7     absences precluded her from fulfilling a task?
8          A    No, because the policy is you
9     have to miss three consecutive days and she
10    only missed two, so I didn't ask her.
11         Q    Would you look at Exhibit 10 in
12    that book, Department's Exhibit 10, and briefly
13    describe what they represent?
14         A    So this is just a series of
15    e-mails back and forth initially starting
16    explaining when she needs to come in and give
17    her make up presentation, then she responded
18    that she was going to be out sick, so then we
19    wanted to reschedule her, but then she started
20    to question as to why she had to give the
21    presentation?
22              Were there other residents
23    required to give presentations?
24              Why on that particular Wednesday
25    she was scheduled, because we normally have our

Page 159

LEENA VARUGHESE

1
2     weekly cytology lectures, so it was just kind
3     of a back and forth, back and forth trying to
4     establish a date when she was going to come.
5          DR. WEINFELD: Can I interrupt a
6     second, is there some new information we
7     are going to get from this witness?
8          DR. FIRPA: This is it, this is
9     the end for our questioning.
10         DR. WEINFELD: Great.
11         DR. VARUGHESE: I have a few
12    questions.
13
14    CROSS-EXAMINATION BY DR. VARUGHESE:
15
16         Q    There was a fellow scheduled to
17    present on Thursday?
18         A    Yeah, for a 30 minute period so
19    there are two 30 minute spots on Thursday
20    available.
21         Q    Who were the two fellows
22    supposed to present on Thursday?
23         A    It was just one, Dr. Klapper.
24         Q    Well, as of that week when we
25    were sent out the weekly conference list, the

Page 160

LEENA VARUGHESE

1
2     fellow was on the list, right, as scheduled to
3     present on Thursday?
4          DR. WEINFELD: Were you supposed
5     to present that day, Dr. Varughese?
6          DR. VARUGHESE: No, not on
7     Thursday. I was supposed to present on
8     Wednesday.
9          DR. WEINFELD: The day you walked
10    out and left, can you explain that?
11         DR. VARUGHESE: Do you -- I was
12    asking a question, can we --
13         DR. WEINFELD: I know, but I am
14    trying to get to the root of the
15    question here.
16              You can ask your question in a
17    second, but do you have an explanation for
18    leaving a conference that you were
19    supposed to present at without
20    explanation?
21         DR. VARUGHESE: Well, I never
22    agreed to present on Thursday, September
23    14th.
24         DR. WEINFELD: So you are saying
25    you weren't supposed to present that

Page 161

LEENA VARUGHESE

1
2     day?
3          DR. VARUGHESE: I never agreed to
4     it.
5          DR. WEINFELD: I don't know what
6     that means.
7          DR. LEITER: Were you prepared to
8     present?
9          DR. VARUGHESE: No, I was sent an
10    e-mail very late on September 13th, was
11    it, saying I have to present because
12    somebody canceled.
13         THE WITNESS: No, that's not how
14    it worked.
15         DR. MARIN: Were you prepared to
16    present on the 13th, the day you were
17    originally scheduled?
18         DR. VARUGHESE: I was able to
19    present what I was prepared to present
20    on the 13th, but not the lecture topics
21    that was mentioned in Dr. Jordan's
22    e-mail that we had heard before.
23              They didn't want me to present that
24    and I wasn't about to make up a new
25    presentation as I was taking a sick day

41 (Pages 158 to 161)

Page 162

LEENA VARUGHESE

1
2  and I wasn't going to work.
3          If I were at work I would have
4  worked on both Tuesday and Wednesday.
5          DR. WEINFELD:  Ask your question,
6  I'm sorry.
7     Q    So Thursday there were two
8  fellows who were --
9     A    One fellow.
10    Q    One fellow, but as of the week,
11 beginning of the week the two fellows were both
12 on the list as being able to present that week?
13    A    One fellow, Dr. Klapper only.
14    Q    Well, there was a different
15 fellow when you sent out the conference list.
16         DR. MARIN:  She already told you
17 there was one fellow scheduled.
18         She answered your question, you
19 can't keep asking her the same question.
20         DR. VARUGHESE:  Here is the
21 thing, I want you to look at Exhibit --
22 so I want you to look at Exhibit --
23 that's Exhibit 45 in my exhibits.
24         DR. WEINFELD:  This is Dr.
25 Varughese' Exhibit 45.

Page 163

LEENA VARUGHESE

1
2     Q    So here is a list of presenters
3  for the year that's listed here from the
4  Department of Pathology.
5          So if you look at the date that
6  I was supposed to present which was 9 -- well
7  newly assigned to present I believe it is
8  9/15/11, this is Akozi and Klapper.
9     A    Yes.
10    Q    So when did they cancel, when
11 did doctor?
12    A    Dr. Akozi I honestly don't know
13 but we knew as of Wednesday when we sent you
14 the e-mail you were to present Thursday it was
15 only going to be one fellow presenting that
16 day.
17    Q    Okay, well actually I had also
18 gotten an e-mail that earlier that week saying
19 the people presenting on Thursday was
20 Dr. Guarino, I believe and Dr. Klapper was it?
21    A    I don't remember the exact.
22         DR. WEINFELD:  Do you have a copy
23 of that e-mail?
24         DR. VARUGHESE:  I do not have it
25 in that particular exhibit list, I would

Page 164

LEENA VARUGHESE

1
2  like to add it at a later date.
3          DR. WEINFELD:  So 47 exhibits, we
4  don't have that.
5          DR. VARUGHESE:  Here is a list
6  that says who is supposed to present as
7  of Wednesday, one person is not
8  presenting and up until then there were
9  two people presenting that date the
10 person canceled last minute and I
11 believe that was Dr. Guarino who
12 canceled the presentation that he was
13 supposed to make at the last minute.
14         And I was told I can present
15 because he canceled and this is on
16 Wednesday.
17         And that's my sick day.
18    Q    So, anyway my other question for
19 you is that you were on vacation for the first
20 two weeks, right?
21    A    Of when?
22    Q    Of period 2.
23    A    Yes.
24    Q    So, basically you were on
25 vacation and Dr. Jordan was not here for period

Page 165

LEENA VARUGHESE

1
2  2?
3     A    Yes.
4     Q    And her e-mail, I'm sorry, her
5  pager was not working?
6     A    She had a national pager.
7     Q    Right, eventually.
8          So, basically we had no Chief
9  Residents on-site for --
10    A    Two weeks, she wasn't on-site
11 but she was the covering resident we had
12 Jonathan Chow in charge of conference
13 attendance making sure that he kept track of
14 the sheet so everything was covered.
15    Q    Okay, great.
16         So, what are the other Chief
17 Resident responsibilities that you spoke of
18 earlier?
19         DR. WEINFELD:  Why don't we
20 specifically ask what you're going to
21 ask, we covered this.
22    Q    Basically does Chief Resident
23 have supervisory roles?
24    A    In a broad overarching sense,
25 yes.

42 (Pages 162 to 165)

P. 926

Page 166

```
1              LEENA VARUGHESE
2       Q    But not in the sense that if a
3   resident is sick or not able to perform their
4   duty they are going to cover or help them, or
5   any given day?
6       A    They either help to organize
7   coverage or they cover if they can't find
8   people and I have covered people who called out
9   sick, if necessary.
10      Q    Let's say for the first two
11  weeks there are residents, it's the first year
12  residents are on service, who is helping them
13  manage?
14      A    The other senior residents.
15      Q    Not a Chief Resident?
16      A    No, because no one is there.
17          DR. LEITER:  What's the point of
18  the question?
19          DR. VARUGHESE:  I am just saying
20  they say that they are delegating
21  responsibilities and acting in
22  supervisory positions over the
23  residents, but then here we are, there
24  is nobody present.
25          DR. ROCCO:  What does that have
```

Page 167

```
1              LEENA VARUGHESE
2   to do with you?
3           DR. VARUGHESE:  It just has to do
4   with the fact that we don't have a
5   resident who should be supervising or
6   on-site, acknowledgment of the policies
7   were not due until the 15th and here we
8   have somebody who is e-mailing saying
9   that these are the new policies, I
10  cannot even speak to her, she's not
11  there, her pager is not working.
12          I don't know, it just seems just
13  to --
14          DR. BRONHEIM:  Can we safe this
15  for your own presentation, because it's
16  not really a question,.
17          DR. WEINFELD:  You will have a
18  chance to make whatever comments you
19  want to make about anything so we can
20  get through the witnesses and then go
21  forward.
22      Q    So one final question, I mean
23  this is just going to go back to the fellow who
24  was to present on the 15th who didn't present
25  on the 15th.
```

Page 168

```
1              LEENA VARUGHESE
2       So you don't know when he
3   decided that he couldn't present on the 15th?
4       A    I don't.
5       Q    Do you know if he was at the
6   conference that day?
7       A    No, I was at the Dean's office.
8   I wasn't there.
9           DR. VARUGHESE:  Thank you.
10          DR. WEINFELD:  Any further
11  questions?
12          Thank you.
13
14  P A T    L E N T O,    called as a witness,
15      having been first duly sworn by the Notary
16      Public, was examined and testified as
17      follows:
18
19  DIRECT EXAMINATION BY DR. FIRPA:
20
21      Q    Dr. Lento, would you state your
22  employer?
23      A    Mount Sinai Medical Center.
24      Q    And your title?
25      A    Excuse me?
```

Page 169

```
1              LEENA VARUGHESE
2       Q    Your job title?
3       A    I am currently residency program
4   director, autopsy director and cardiovascular
5   pathologist.
6       Q    What are your job duties as
7   program director of pathology residency?
8       A    Oversee the program with regard
9   to the education of residents in all four years
10  of the pathology program.
11      Q    For how long and have you known
12  Dr. Varughese?
13      A    Since she was a PGY 1 resident.
14      Q    Could you describe to us your
15  relationship with her?
16      A    Well, she's a resident in the
17  program, so I have had the opportunity to deal
18  with her directly with regard to patient
19  specimens, autopsies, surgical specimens, and
20  in addition as program director with regard to
21  more recently disciplinary actions, et cetera.
22      Q    What is the nature of her
23  response to you, to your pages, to calls and to
24  efforts to contact and requesting actions
25  related to her performance?
```

43 (Pages 166 to 169)



Page 170

LEENA VARUGHESE
1
2    A    Well, one of the difficulties
3  that I have had with Leena is she virtually
4  never responded to my pages and infrequently
5  responded to my e-mails.
6         DR. BRONHEIM:  Over what period
7  of time?
8         THE WITNESS:  In general, I would
9  say that one of the problems that I have
10  had with, personally with Leena is that
11  she hasn't responded to pages over a
12  number of years.
13         DR. MARIN:  This is not a new
14  problem it's something that's been
15  present for --
16         THE WITNESS:  No, it's not a new
17  problem at all.
18    Q    Have in any way, shape or form
19  this affected her capacity to perform in
20  regards to the other residents and her duties
21  as part of the rotations to which she is
22  assigned?
23    A    In terms of anything
24  specifically?
25    Q    Yes.

Page 171

LEENA VARUGHESE
1
2    A    With regard to her pages.
3    Q    Your inability to establish
4  contact with her, has it affected in any way
5  the quality of the service and the performance
6  of the other resident's service?
7    A    I understand.
8         Well, in particular with regard
9  to an incident with regard to coverage when we
10  had the resident who was out, I tried to reach
11  Leena by paging her and was unsuccessful, but
12  this occurred after others had truly tried to
13  reach her for this same coverage issue.
14    Q    Could you refer to the issue of
15  coverage requested of her on August 12th?
16    A    Is that the incident on a
17  Friday?
18    Q    The one regarding coverage for
19  the surgical pathology service due to the
20  illness of one of the residents.
21    A    If I remember correctly this was
22  while Leena was on cytogenetics?
23    Q    Correct.
24    A    Leena was expected to cover the
25  surgical pathology based on the policy that the

Page 172

LEENA VARUGHESE
1
2  Department had developed.
3         She was first in line from that
4  standpoint and the Chief Residents were unable
5  to reach her.
6         They let me know they were not
7  able to reach her, so I did try to reach out to
8  her myself.
9         I believe initially I tried to
10  send her an e-mail, but she did not respond, I
11  did try to Page her, but I did not receive a
12  response.
13         Subsequently I contacted her
14  directly at the rotation that she was on which
15  was the cytogenetics rotation, and I don't
16  believe she responded to my initial page, so I
17  spoke directly to the site director Dr. Najfeld
18  and let her know I needed to speak directly to
19  Leena.
20         And at that point I was able to
21  speak to Leena, she put her on the phone, I
22  explained to Leena the situation about the need
23  for her to cover.
24         She was resistent at first, I
25  explained to her that this was her job, her

Page 173

LEENA VARUGHESE
1
2  duty, she was required to do it based on our
3  policy.
4         It was a fair policy and that
5  she then would need to cover the service that
6  day.
7         I think this was in the morning
8  probably around 10:00 or so, she did tell me at
9  that time that she would cover.
10         I indicated to her that she
11  needed to let the Chief Residents know that she
12  was going to be covering, that they were
13  overseeing the process and that I was only
14  serving, essentially, as an intermediary to get
15  this actually covered.
16         And I left it at that.
17         She did cover, she did go to
18  cover, I think it was frozen sections actually
19  that afternoon, but she did not contact the
20  Chief Residents and let them know that she
21  would be doing it.
22    Q    Okay.
23         What was your involvement in her
24  persistent request to change her electives in
25  gastrointestinal pathology and switch to dermal

Page 174

LEENA VARUGHESE

1            LEENA VARUGHESE
2 pathology?
3     A    So that was in regard to this
4 year's schedule.
5     Q    Yes, sir.
6     A    Leena had been assigned to GI in
7 I believe it's October, and she had requested a
8 change, this was a rotation actually that she
9 had originally requested, so we offered to the
10 residents certain opportunities, I will call
11 them electives, this was one that Leena had
12 opted to choose on her own.
13         These selections are made to the
14 Chief Residents in advance of the schedule
15 being made, the schedule is then made and
16 residents have an opportunity in advance of the
17 schedule to come out to potentially make
18 alteration or question certain things, et
19 cetera.
20         That wasn't done initially, it
21 was only subsequent to the schedule coming out,
22 at which point the residents, including Leena,
23 were aware that we were not going to make
24 schedule changes unless there was a very
25 significant reason to do so.

Page 175

LEENA VARUGHESE

1            LEENA VARUGHESE
2     Q    Would you explain the
3 circumstances under which a resident is allowed
4 to change an elective?
5     A    Well, I guess if there is a
6 death in the family or an illness, if there is
7 extenuating circumstances that might require a
8 resident to have a schedule change.
9     Q    How frequently are requests to
10 change electives made by a resident honored?
11     A    I don't have a statistic on how
12 frequently they are.
13     Q    In your opinion.
14     A    Infrequently.
15     Q    Why are they so infrequent?
16     A    Well, because any one particular
17 person's schedule can affect other people's
18 schedules.
19         So, it has, in a sense, a ripple
20 effect on things that can happen throughout the
21 scheduling.
22         You can't simply take one
23 resident off a particular rotation without
24 having someone fill in that particular
25 rotation.

Page 176

LEENA VARUGHESE

1            LEENA VARUGHESE
2     Q    Did Dr. Varughese provide a
3 reason for her insistence to be allowed to
4 proceed with this change?
5     A    I believe she was interested in
6 switching with dermopath, I don't recall a
7 specific reason why she wanted to switch to
8 dermopath.
9     Q    Was her request granted,
10 discussed, approved?
11     A    It was denied.
12     Q    Why was it denied?
13     A    Because I didn't think that she
14 had an appropriate rationale for why she wanted
15 to change the rotation.
16     Q    Did you at any time communicate
17 with Dr. Norman Harpaz regarding her direct
18 request to change her elective after being told
19 it had been denied?
20     A    I don't remember speaking with
21 Norm directly after that.
22     Q    Had you had any communications
23 with him over this issue, e-mails or whatever?
24     A    I don't recall.
25     Q    Who is Dr. Harpaz?

Page 177

LEENA VARUGHESE

1            LEENA VARUGHESE
2     A    He's the director of
3 gastrointestinal pathology.
4     Q    Would you refer to Exhibit 13 in
5 the small book, Department's Exhibit 13.
6         Would you briefly summarize what
7 they represent?
8     A    I'm looking at an e-mail that I
9 sent to Norm about the switch.
10         And at this bottom e-mail I
11 indicated that Leena had made a request, she
12 had not done GI in the past, but had already
13 done dermopath and in addition the Chief
14 Residents had spoken with Dr. Phelps who was
15 the director of dermatopathology.
16         He was gracious enough to
17 indicate that Leena was welcome to join him in
18 the sign-out early before the GI rotation, so
19 if she was interested in gaining additional
20 dermatopathology exposure she could do so
21 before the start of the GI rotation.
22     Q    Would you refer to the first
23 e-mail on that page, please?
24     A    The top e-mail?
25     Q    Yes -- the bottom.

Page 178

LEENA VARUGHESE

1
2     A     The one that starts Dear Chiefs?
3     Q     Yes.
4     A     So this is an e-mail from Norman
5  Harpaz.
6          DR. WEINFELD:  What's the
7     question?
8     Q     **Does that refresh your memory**
9  **about this incident when she approached him**
10 **directly and led him to request to notify**
11 **everybody else about the procedure and**
12 **instructed her to proceed as she had been**
13 **repeatedly indicated to do?**
14    A     Right.  Well, apparently that's
15 obviously the e-mails, I don't recall directly
16 without the information in front of me.
17    Q     **Are you aware of the issues**
18 **related to her failure to meet the required 80**
19 **percent attendance to the core conferences?**
20    A     Yes, Leena and occasional other
21 residents have failed to meet the 80 percent
22 attendance requirement.
23          As a result, Leena was asked to
24 provide an educational lecture that would cover
25 some of the material that was missed during her

Page 179

LEENA VARUGHESE

1
2  absences.
3          Based on the policy that we had
4  designed we had tried to set something up so
5  that even if the resident had been absent they
6  would still be able to make up the material
7  from an educational standpoint.
8     Q     **Were you aware of the events**
9  **that took place on September 15 during the**
10 **weekly residents pathology conference that she**
11 **was supposed to present after being absent for**
12 **two days because of illness?**
13    A     Is September 15th a Thursday?
14    Q     Yes.
15    A     So, Leena had been asked to
16 provide an educational lecture, again, to make
17 up for some of the material she had missed
18 during her absences.
19          I believe that the Thursday in
20 question that you raise was an alternate day.
21          Originally Leena was asked to
22 provide the lecture on another day, and I
23 believe that she did not present on the initial
24 date.
25          The subsequent date was the

Page 180

LEENA VARUGHESE

1
2  Thursday morning conference.
3          Our Thursday morning conferences
4  essentially are grand rounds, residents present
5  every week or every other week various cases,
6  et cetera, so it was the perfect venue for
7  Leena to do something like provide this
8  educational conference.
9          On the particular day Leena was
10 well aware that she was expected to give a
11 conference on that day, I was present and Leena
12 came in about 15 or 20 minutes late while the
13 first person was giving their presentation.
14          She sat down right in front of
15 me, she didn't acknowledge anybody, she didn't
16 say hello.
17          She sat there for about 10
18 minutes and as the presenter was finishing up,
19 Leena just got up and left.
20          I was personally surprised
21 because I was under the expectation that she
22 was going to be giving a lecture but she
23 didn't.
24          I didn't know why she decided to
25 just leave.

Page 181

LEENA VARUGHESE

1
2     Q     **Did you receive an e-mail from**
3  **Dr. Ara Blejwas regarding her conduct at that**
4  **conference?**
5     A     I may have.
6          I know we certainly talked about
7  it.
8     Q     **Would you refer to Exhibit 12,**
9  **Department's Exhibit 12.**
10    A     So he basically summarized the
11 situation, I think as I have already explained.
12    Q     **So would you say it was fair**
13 **that she must have been aware that she was**
14 **expected to present on that morning since so**
15 **many of you expected her presentation to take**
16 **place?**
17    A     Oh, I think there was no
18 question that she was aware.
19    Q     **Did you have any e-mail**
20 **communications with me regarding her conduct at**
21 **this conference?**
22    A     I don't recall, I may have.
23    Q     **Would you refer to Department**
24 **Exhibit 11.**
25    A     So, again, my e-mail basically

46 (Pages 178 to 181)

Page 182

LEENA VARUGHESE

1    summarized what I've already described.
2    Q    Did you meet with Dr. Varughese
3    regarding the other residents' concern about
4    her conduct and behavior at any time?
5    A    During the academic year?
6    Q    In this last weeks leading to
7    September 15th.
8    A    No, I did not.
9    DR. FIRPA:  No further questions.
10   DR. WEINFELD:  Dr. Varughese.
11
12   CROSS-EXAMINATION BY DR. VARUGHESE:
13
14   Q    So, was there a fellow who was
15   supposed to present on Thursday morning?
16   Who were the fellows, who were
17   the two people that were supposed to present
18   that morning?
19   A    Oh, I don't recall, it's not
20   always two people, necessarily, sometimes it's
21   just one person, and I believe I could be
22   mistaken that there was an open slot, in other
23   words there was one person scheduled for that
24   day, and you were provided the second slot in

Page 183

LEENA VARUGHESE

1    order to provide your educational lecture.
2    Q    So, you have said that I have
3    not responded to your pages. Can you give me
4    an example, I mean you say that I didn't
5    respond to your pages when you wanted me to
6    cover on August 12th.
7    A    Right, yes; that's true, Leena.
8    Q    But is it possible that I didn't
9    get the page that day.
10   I mean I don't think I got that
11   page.
12   A    I find it hard to believe that
13   you wouldn't have received my pages.  You
14   haven't responded to other pages that I have
15   sent out to you in the past.
16   And you've taken the opportunity
17   not to respond to e-mails that I have sent out
18   to you.
19   Not all the time, but it's a
20   pattern, as far as I'm concerned.
21   Q    Well, how about this, how about
22   like we have been on call on weekends, on
23   autopsy call, I've never been on surgical
24   pathology call with you, but have I -- I have

Page 184

LEENA VARUGHESE

1    always followed up with you regarding any
2    autopsy case, any given issues that come up,
3    have I not?
4    A    Well, if you are talking about
5    call in particular, in general the contact
6    would have been initiated by you contacting me
7    about a case on the weekend, which is a little
8    bit different than me trying to reach out to
9    you.
10   Q    Well, there are actually
11   instances where you have actually reached out
12   to me before.
13   DR. WEINFELD:  Is there a
14   question you want to ask him?
15   Q    I am saying there at least has
16   been one or several instances where you reached
17   out to me on a case that may or may not come in
18   because you are the director of autopsies here.
19   A    Um-hum.
20   Q    And I have responded to you
21   immediately, have I not?
22   A    I didn't say that you never
23   responded to my pages, but you have a habit of
24   not responding.

Page 185

LEENA VARUGHESE

1    Q    I believe that's not true.
2    DR. BRONHEIM:  Maybe I can help.
3    Q    That's a misstatement that you
4    are making?
5    DR. BRONHEIM:  Maybe I can help.
6    Outside of call, what percent of e-mails
7    and pages do you think Dr. Varughese has
8    not responded to, rough estimate?
9    THE WITNESS:  Over the entire
10   residency?
11   DR. BRONHEIM:  Yeah.
12   THE WITNESS:  That's kind of a
13   hard one to estimate.
14   DR. MARIN:  Take the past year.
15   THE WITNESS:  Well, the past year
16   is potentially problematic, but I would
17   say that Leena has taken the opportunity
18   not just to not answer my pages, I can't
19   remember a single page of mine that
20   Leena has answered this year.
21   E-mails are haphazard.
22   DR. MARIN:  Thank you.
23   Q    Do you have my pager?
24   A    On me?

47  (Pages 182 to 185)

Page 186

LEENA VARUGHESE

1
2       DR. WEINFELD: His number.
3       A    I have access.
4       Q    Do you have access to my number?
5       A    Of course, it's on my bulletin
6   board in my office.
7       Q    So, you said that you denied
8   every request for the GI elective?
9       A    Um-hum.
10      Q    Were you the one who denied the
11  request or was it Dr. Firpa?  I'm confused?
12      A    Well, we, Dr. Firpa and I.
13      Q    Your title is you are the
14  program director.
15      A    Yes.
16      Q    And Dr. Firpa's title?
17      DR. WEINFELD: Let him answer the
18  question.
19      A    I am the program director, Dr.
20  Firpa is the educational director, starting
21  since July 1st, and Dr. Firpa and I
22  confirmed -- confer on a number of issues
23  regarding the residents as a whole.
24      Q    So Dr. Firpa is director of
25  educational activities, Dr. Firpa is the

Page 187

LEENA VARUGHESE

1
2   director of educational activities?
3       A    Yes.
4       Q    So I made the request to him on
5   August 2nd and then he subsequently informed
6   you at some point to deny my request or --
7       A    We discussed the request, the
8   rationale potentially for having it.
9            And the decision was made that
10  we were going to deny it.
11      Q    When was this decision made?
12      A    I don't recall the specific day
13  in advance of the elective we made the decision
14  to deny the switch.
15      Q    I would like --
16      A    And that was obviously
17  communicated to you.
18           But you knew in advance that we
19  were basically not going to permit switches
20  once the year had begun unless there was
21  significant extenuating circumstances.
22           In this particular situation,
23  you had requested the GI elective, and then
24  wanted to switch it to something else.
25      Q    Actually I would like to refer

Page 188

LEENA VARUGHESE

1
2   to exhibit from me Exhibit number 19.
3       DR. WEINFELD: We are there, go
4   ahead.
5       Q    So that basically shows a list
6   of elective rotation requests for me for the
7   entire following year, GI is in fact there, but
8   there are also other rotations that I was
9   interested I was not --
10      DR. WEINFELD: So what's the
11  question?
12      Q    If the point is that because I
13  requested GI I was given that and not given
14  maybe like an elective pathology in bone and
15  soft tissue.
16      DR. WEINFELD: So what's the
17  question?
18      DR. VARUGHESE: I had made other
19  requests that wasn't granted.
20      DR. WEINFELD: I am still waiting
21  for a question.
22      DR. VARUGHESE: I would also like
23  you to refer to a different exhibit.
24      MR. McEVOY: Can I ask a
25  question, I'm not sure what this exhibit

Page 189

LEENA VARUGHESE

1
2   is, 19, I mean is this something that
3   Dr. Varughese created for this hearing,
4   is it some official --
5       DR. WEINFELD: Could you tell us
6   what it is?
7            Go ahead, tell us what this is.
8       DR. VARUGHESE: This is actually
9   a form that's given to every resident in
10  the program that's already there, and
11  you get to list what you would like to
12  take next year.
13           You can say you want to take GI
14  elective, elective of the month, you can
15  can say I want to do hemopath several
16  months, maybe, whatever.
17      DR. WEINFELD: So what's the
18  question relating to this?
19      DR. VARUGHESE: It's just that I
20  had requested -- I just want to note
21  that I had requested other electives
22  other than GI.
23      DR. WEINFELD: You will have an
24  opportunity.
25      DR. MARIN: Thank you.

48  (Pages 186 to 189)

Page 190

1    LEENA VARUGHESE
2       DR. VARUGHESE: Okay, next.
3       Q    The next exhibit I would like
4    you to look at it is --
5       DR. MARIN: Do you need the
6    witness any more?
7       DR. VARUGHESE: I do, actually.
8       DR. MARIN: Can you direct the
9    questions to him and then come to your
10   exhibits.
11      DR. VARUGHESE: Yes.
12      Q    Dr. Lento, do you recall
13   e-mailing me that you had ended academic
14   advisement?
15           Period of academic advisement
16   has ended?
17      A    Yes, I e-mailed you that the
18   period of the advisement had ended, that's
19   correct, and I wanted to meet with you to
20   discuss it, that's correct.
21           I think you misinterpreted it.
22      Q    But according to the academic
23   advisement, which is exhibit -- it's in the
24   Department's Exhibit list.
25      DR. WEINFELD: Can you guys help

Page 191

1    LEENA VARUGHESE
2    us with this, which one is that?
3       DR. FIRPA: Number 3.
4    Department's Exhibit 3.
5       MR. McEVOY: That's the academic
6    advisement.
7       DR. WEINFELD: Right.
8       DR. WEINFELD: Do you want to ask
9    a question?
10      Q    Yes, according to this it just
11   states that this is dependent on have I
12   performed an academic advisement not
13   necessarily, so if he entered the period of
14   academic advisement without noting how I had
15   performed during the academic advisement
16   period, I don't understand why Dr. Lento would
17   make the statement that the period of academic
18   advisement had ended when, in fact, he hadn't
19   determined or deemed that and academic
20   advisement can --
21      DR. WEINFELD: So the question
22   is?
23           Just form it in a question. It
24   sounds like there is a question there, so
25   go ahead and ask it.

Page 192

1    LEENA VARUGHESE
2       Q    So did you determine that my
3    period of academic advisement had ended without
4    actually ensuring that I had met all the
5    requirements?
6       A    If you note here in follow-up,
7    we will meet again in three months to review
8    your progress.
9           So basically at that point it
10   was around March when the period designed for
11   your academic advisement would have ended, but
12   we were to review your progress to determine
13   whether or not we would have to proceed with
14   any further disciplinary actions, or if you had
15   satisfied the criteria that we had laid down in
16   the academic advisement.
17           Then we may have taken you off
18   the disciplinary action and you could have
19   proceeded as other residents would have.
20      Q    Okay, but you didn't try to
21   figure out if I had met all the requirements?
22      A    You hadn't met all the
23   requirements.
24      Q    Until April 26th.
25      A    No, you had not met the

Page 193

1    LEENA VARUGHESE
2    requirements.
3       DR. WEINFELD: Did the meeting
4    take place, was there a meeting that
5    took place?
6       THE WITNESS: No, she basically
7    did not meet with me, she did not
8    respond to my e-mail, it wasn't until I
9    reached out to our Chair,, Dr.
10   Cordone-Cardo.
11      DR. VARUGHESE: That's not
12   actually right, my Exhibit 12 shows that
13   I did respond to Dr. Lento the following
14   day, in fact.
15      DR. WEINFELD: One second.
16      DR. VARUGHESE: I also spoke to
17   him, I know.
18      DR. WEINFELD: Let's go to 12,
19   hold on.
20      DR. WEINFELD: Big book number
21   12. In Exhibit 12 there is one e-mail
22   in there dated May 3rd.
23      DR. VARUGHESE: Well, the second,
24   it's a string e-mail string so on April
25   27 I say okay, I actually spoke to Dr.

49  (Pages 190 to 193)

Page 194

LEENA VARUGHESE

1  Lento as well and he said okay, did you
2  get me my e-mail?
3      What's going on?
4      I said yes, I got your e-mail, okay
5  I will meet with you. Let me know when we
6  need to meet and --
7      THE WITNESS: I believe that was
8  after Dr. Cordone-Cardo had already
9  reached out to you as Chairman.
10     DR. VARUGHESE: He reached out to
11 me, when did he reach out to? Me I
12 don't have that.
13 Q   Do you have that e-mail?
14     DR. CORDONE-CARDO: I reached out
15 to you as soon as I arrived in the
16 program. In our first meeting was on
17 May 3rd.
18     DR. VARUGHESE: When did you
19 arrive at the program?
20     DR. CORDONE-CARDO: April 1st, so
21 my first week of acting as the new Chair
22 I already reached out to you and
23 actually was the case it the including
24 because I was worried about many

Page 195

LEENA VARUGHESE

1  circumstances.
2      My time will come to answer the
3  questions and the first time we met was on
4  May 3rd.
5      DR. WEINFELD: Any other
6  questions for this witness?
7  Q   Are you aware that I wasn't --
8  you never spoke to me or Dr. Firpa did not
9  inform me that if I was interested in
10 dermatopathology I can attend the sign-outs in
11 the morning, or you had cleared that with Dr.
12 Phelps.
13     Did you clear that with Dr.
14 Phelps? It seemed from this conversation with
15 this question and answer session that took
16 place, it seems that you had already discussed
17 this with Dr. Phelps and that I was able to
18 attend sign-out if I wanted to?
19 A   I did not have that direct
20 conversation.
21 Q   But it seems that you were aware
22 that I could do that if I wanted to?
23 A   Yes.
24 Q   But I was not informed of that,

Page 196

LEENA VARUGHESE

1  by either of you?
2      DR. MARIN: Question?
3  Q   Did you inform me of that? You
4  didn't inform me of that?
5  A   I did not, that was not
6  something --
7      DR. WEINFELD: We have one
8  question, actually, you want to ask it.
9      DR. BRONHEIM: Dr. Lento, going
10 back to notice of advisement in the
11 Department's Exhibit binder, Exhibit 3,
12 it says Dear Leena, this letter is to
13 inform you, you are being placed on
14 academic advisement. This decision is
15 based on investigation of your
16 altercations with other residents while
17 on the surgical pathology rotation
18 December 8 and December 10, 2010.
19     THE WITNESS: Yes.
20     DR. BRONHEIM: Do you remember
21 what those altercations were about?
22     THE WITNESS: Yes, I can briefly
23 summarize it for you. I was actually
24 away at the time at a meeting, and Leena

Page 197

LEENA VARUGHESE

1  was in an altercation with one of our
2  Chief Residents while she was on the
3  surgical pathology service.
4      An altercation that was loud and
5  disruptive to the service related to her
6  ability to provide patient care with
7  regard to very specific specimens that she
8  was expected to be grossing or examine.
9      DR. BRONHEIM: There are two
10 dates, was it like one extended episode
11 with a single Chief Resident?
12     THE WITNESS: If I recall
13 correctly the December 10th incident was
14 related to another resident that she was
15 blaming for having us caused all the
16 problems that have basically resulted in
17 her being essentially placed on academic
18 advisement.
19     DR. BRONHEIM: Thank you.
20     DR. WEINFELD: Any further
21 questions?
22 Q   Who was the other resident that
23 I blamed?
24 A   Dr. Jordan.

50 (Pages 194 to 197)

P. 934

Page 198

1    LEENA VARUGHESE
2    DR. MARIN: No further questions?
3    DR. VARUGHESE: No, not at the
4    moment.
5    DR. WEINFELD: Thanks very much.
6    THE WITNESS: Thank you.
7    DR. VARUGHESE: Actually can we
8    bring Dr. Lento back?
9    DR. WEINFELD: No, but in your
10   statement you can address an issue if
11   you need to address it.
12
13   S H E M A    P A T E L,    called as a
14   witness, having been first duly sworn by
15   the Notary Public, was examined and
16   testified as follows:
17
18   DR. WEINFELD: Okay.
19
20   DIRECT EXAMINATION BY DR. FIRPA:
21
22   Q    Thank you, Ms. Patel.
23   Who is your employer?
24   A    Mount Sinai Medical Center.
25   Q    What is your job title?

Page 199

1    LEENA VARUGHESE
2    A    Currently I am interim
3    department administrator for pathology.
4    Q    What are your job duties as
5    administrator of the pathology department?
6    A    The day-to-day operation,
7    financial, dealing with residents, employees,
8    faculty.
9    Q    Do you recall on September 15
10   meeting with me and Dr. Varughese following the
11   incident early morning when she was considered
12   to be unstable?
13   A    Um-hum.
14   Q    Did you remember, and can you
15   relate to us what happened when you gave her
16   information about her request for a leave of
17   absence?
18   A    Sure. When we met with her we
19   discussed FMLA, we talked to her about giving
20   her papers later in the day to go she should
21   meet with me to go over the FMLA paperwork, the
22   designation form and such papers like that.
23   Q    Did you meet with her later on
24   that day?
25   A    Yes, she met me on Annenberg 15,

Page 200

1    LEENA VARUGHESE
2    I was supposed to meet her in the resident
3    room, but she met me at the elevators and she
4    took the folder from me.
5    At that point I did not have any
6    further discussions with her after that.
7    Q    Did you at any time emphasize to
8    her the importance of having a doctor's
9    appointment as part of her application?
10   A    Yes, I did.
11   Q    Did she agree to proceed with
12   that request?
13   A    Yes, she said she was going to
14   call her doctor and get back to me the next
15   day.
16   Q    On September 20th, you met with
17   Dr. Varughese ones again, were you aware that
18   she had requested a leave of absence by then?
19   A    No, I was not.
20   Q    Were you also aware that Dr.
21   Varughese had been instructed not to come to
22   work pending approval of her request for leave?
23   A    Yes, I was.
24   Q    How did you know that?
25   A    Yes, I did.

Page 201

1    LEENA VARUGHESE
2    Q    How did you know that?
3    A    Oh, how did I know that. You
4    and I had discussed it with Karen Tiger and
5    Paul Johnson the day before and it was
6    instructed that she should not appear to work
7    until we knew what the status of her FMLA was.
8    Q    Did you attempt to contact her
9    on September 16th and 19th?
10   A    Yes, I did.
11   Q    Why?
12   A    Because we had not heard from
13   her, she had not come to work and we were
14   genuinely concerned about her well-being.
15   Q    Did she respond to any of your
16   e-mails or phone calls?
17   A    No.
18   Q    On September 20th did you see
19   her at or near Mount Sinai?
20   A    It was close to Mount Sinai,
21   yes.
22   Q    Where and at what time?
23   A    It was a Starbucks at 97th and
24   Lexington or 96th and Lexington.
25   Q    At what time?

51 (Pages 198 to 201)

Page 202

```
1              LEENA VARUGHESE
2      A    Around 8:00 a.m. a little before
3   8:00 a.m.
4      Q    Did you speak to her?
5      A    As I was walking in I saw her
6   and she approached me.
7      Q    What was the conversation about?
8      A    She had wanted to know about
9   deferring her FMLA, she said she was feeling
10  better and wanted to not take it at that time.
11     Q    Did she mention anything else
12  about her intent of activity for that day?
13     A    She said she was headed to a
14  conference but she wanted to know more about
15  deferring her FMLA, so I knew that she
16  shouldn't go to conference because the
17  residents had concerns, the faculty had
18  concerns, so I asked her to come with me to my
19  office.
20     Q    What did you do then?
21     A    So we got there, we sat down and
22  we started talking and then a visitor came in
23  looking for the President.
24     Q    What happened then?
25     A    So I walked out to just point to
```

Page 203

```
1              LEENA VARUGHESE
2   where Dr. Davis' office was, came right back to
3   my office and literally a few seconds and she
4   was going through some of my files.
5          DR. WEINFELD:  On a computer, in
6      a file cabinet?
7      A    No, there were files in my desk.
8   There was a stack of files in the corner of my
9   desk.
10         DR. BRONHEIM:  Can you describe
11     what you observed?
12         THE WITNESS:  As I was walking in
13     I saw her going through the files like
14     this, looking at what was inside.
15         DR. BRONHEIM:  Were they other
16     people's files or whose files were they?
17         THE WITNESS:  They were my files,
18     like department files.
19     Q    What did you -- did you ask her
20  what she was doing?
21     A    Yes, I asked her.  I said Leena,
22  what are you doing, why are you going through
23  my files?
24         And she kind of didn't say
25  anything at first.
```

Page 204

```
1              LEENA VARUGHESE
2          I asked her again, it was like
3   what are you doing, why were you going through
4   my files?
5          And she said what's the big
6   deal?  And I said how would you feel if someone
7   went through your things.
8          Your purse is sitting there, how
9   would you feel if you caught me going through
10  your purse?
11         I said if I walked into your
12  work station and was going through your work
13  station how would you feel if I went through
14  your things?
15         I said my office is
16  confidential, you know, I have files in my
17  office that are confidential and you shouldn't
18  go through them, it's unprofessional.
19         She continued to say what's the
20  big deal?  She stated that I should chill out
21  and it didn't phase her that it was wrong.
22         DR. BRONHEIM:  Could these have
23     been confidential files?
24         THE WITNESS:  Yes, I work in the
25     office of the President in my real job,
```

Page 205

```
1              LEENA VARUGHESE
2      yes.
3          DR. FIRPA:  No further questions.
4          DR. WEINFELD:  Dr. Varughese.
5
6   CROSS-EXAMINATION BY DR. VARUGHESE:
7
8      Q    So, you called me on Tuesday was
9   it, September what was it, 20th?  Or the 19th,
10  you called me on the 19th.
11     A    Yes, I called you on the 16th
12  and the 19th.
13     Q    So you called me on the 19th,
14  why did you ask me to come to your office on
15  the 19th?
16     A    I didn't ask you to come to my
17  office on the 19th.
18     Q    You did.  You called, you left a
19  message, said you need to speak with me.
20     A    I asked you what the status of
21  the FMLA was, but I asked you if you were able
22  to speak to your physician to get the paperwork
23  going because I wanted to help you.
24     Q    So let me rephrase the question,
25  did I come to your office on the 19th, this is
```

52  (Pages 202 to 205)

Page 206

LEENA VARUGHESE

1
2  Monday?
3       A    I have to recall, was that the
4  day you came to sign the designation form?
5       Q    Well, that was the day I came so
6  that you can sign the designation form and gave
7  it to you --
8       A    I believe the 19th, yes, you
9  came.
10      Q    Because you needed a date
11 verifying and the medical leave of absence
12 form?
13      A    I believe what was the day? I
14 don't recall, but I can check.
15      Q    That was the 19th?
16      DR. WEINFELD: Move on.
17      Q    That was Monday afternoon,
18 Monday evening like 4:30?
19      A    Okay.
20      Q    And Kimberly Joseph, she was
21 there?
22      A    She was there to witness that.
23      Q    So essentially you didn't like
24 date and sign these forms or anything up until
25 then?

Page 207

LEENA VARUGHESE

1
2       But you were supposed to have
3  before you you gave them to me, right?
4       A    What do you mean?
5       Q    You were supposed to date and
6  sign because you dated the forms for when, when
7  you signed it?
8       A    Right, because remember we were
9  supposed to meet and you met me at the elevator
10 and you took the forms from me, I told you you
11 should come sit down and meet with me so we can
12 could designate the form.
13      Q    No, you didn't, you didn't say
14 that to me.
15      DR. WEINFELD: Where are you
16 going with this? What's the question?
17      Q    So basically you backdated the
18 form?
19      A    I didn't backdate it, I dated
20 that day the 19th or whatever day it was.
21      Q    All right, so the following
22 morning I saw you at Starbucks, right?
23      A    Yes.
24      Q    So I said hello to you just to
25 be polite and I just said oh, you dated that

Page 208

LEENA VARUGHESE

1
2  form and do you mind dating it, so when after I
3  have spoken to my doctor and they actually
4  approve the family medical leave of absence?
5       A    We never talked about
6  backdating.
7       Q    I did ask you --
8       DR. MARIN: You can ask her the
9  question. If she says no, you can't
10 keep asking her. She has a right to say
11 yes or no, yes or no.
12      DR. VARUGHESE: All right.
13      Q    So I asked you that, if you
14 could date the form to when after I have spoken
15 to my doctors and then they will approve it,
16 did I have that conversation with you?
17      A    No, we talked about -- you
18 talked about deferring my FMLA.
19      Q    I didn't talk about deferring my
20 FMLA?
21      DR. MARIN: Remember, yes or no,
22 you asked her, she said no, you go on to
23 your next question.
24      Q    So the next question is but you
25 at that point said where are you going?

Page 209

LEENA VARUGHESE

1
2       A    That is correct.
3       Q    And I said I'm going to the CP
4  core conference, that's at 8:00 at the Icahn
5  building, right?
6       A    Um-hum.
7       Q    And what did you say, you said
8  you can't go to the floor, what did you -- you
9  said I couldn't go to the floor?
10      A    I asked you if you can come with
11 me, so I can put you in contact with Karen
12 Tiger to talk more about the FMLA.
13      Q    Why did I need to talk more
14 about the FMLA at that point?
15      A    Because you approached me in
16 Starbucks and you had questions about it.
17      Q    I just had a minor question
18 about dating issues, but then in terms of
19 dating the form to when I actually take the
20 leave, because obviously from that day onward
21 is when the FMLA is in effect.
22      So you told me that I couldn't
23 go to the floor and you asked me to come to
24 your office?
25      DR. WEINFELD: Is there a

53 (Pages 206 to 209)

Page 210

LEENA VARUGHESE

1
2      question?
3      Q    Yes.
4      A    Yes.
5      Q    So when I was in the office,
6   what were you doing, you were calling, who were
7   you calling?
8      A    I didn't make a phone call, I
9   e-mailed Karen Tiger and Dr. Firpa to let them
10  know you were here.
11     Q    So, did Dr. Firpa come
12  downstairs to your office that morning?
13     A    He did, yes.
14     Q    This was before 9:00 a.m.?
15     A    I believe so, yes.
16     Q    So meanwhile I was telling you
17  that I wanted to go to the CP core conference
18  because I was not sick, right?
19     A    I don't recall actually, to be
20  honest with you.
21     Q    That's fine.
22           So then you stepped out, tell me
23  what was on your desk?
24     A    I had a stack of files on my
25  desk.

Page 211

LEENA VARUGHESE

1
2      Q    How many files was that?
3      A    I don't recall, I have tons of
4   files on my desk at a given time, I don't
5   remember how many exactly.
6      Q    Well, this is what I remember,
7   because I was accused of looking through her
8   files.
9           DR. WEINFELD: So ask her a
10  question.
11     Q    So as I recall there was one
12  file, a green file, actually, that's on your
13  desk at the corner and I was sitting in front
14  of it and my coffee was right next to it, so
15  that's all I recall.
16          DR. WEINFELD: Is there a
17  question.
18     Q    Is that what you recall or do
19  you recall several different files?
20     A    I recall several different
21  files.
22     Q    That's all I need to know.  So I
23  only recall one file there.
24          So you -- somebody came by the
25  door and they wanted to be escorted to a nearby

Page 212

LEENA VARUGHESE

1
2   office, right?
3      A    Correct.
4      Q    And you left, you left me alone
5   in your office?
6      A    For a few seconds only.
7      Q    For a few seconds.
8      A    Yes.
9           DR. WEINFELD: Okay, go ahead.
10          DR. VARUGHESE: In my
11  recollection it wasn't a few seconds.
12     Q    So when you came back you
13  think -- you thought that I was looking at your
14  files?
15     A    I saw you looking at the files.
16     Q    Did you see me like what
17  happened, was it in my lap, was it like this?
18     A    No, it was still on my desk.
19     Q    Okay, all right, so they were
20  still on the desk.
21          Do you often leave people alone
22  in your office?
23     A    If someone comes to see the
24  President of the medical center and I have to
25  help them, yes.

Page 213

LEENA VARUGHESE

1
2      Q    Especially -- well, when you
3   have confidential documentation or documents in
4   your office, do you think that's appropriate?
5      A    People at Mount Sinai I trust
6   and would never think would do something --
7      Q    I wasn't at Mount Sinai at that
8   point.  I guess you trusted me, okay.
9           So my point --
10          DR. MARIN: No point, are there
11  any or questions for this witness?
12          DR. VARUGHESE: I do.
13          DR. MARIN: Please go ahead with
14  your questions.
15     Q    So you decided to call Karen
16  Tiger and basically you wanted me to go over to
17  meet her, why was that?
18     A    So you can discuss the FMLA
19  paperwork and the incident in my office,
20  because I --
21     Q    But you were just -- that just
22  came up on the fly, not even necessarily?
23     A    I have e-mailed her again
24  afterwards for the incident, Dr. Firpa was on
25  that e-mail as well.

54 (Pages 210 to 213)

Page 214

LEENA VARUGHESE
1
2    Q    But there was really no --
3        DR. MARIN:  Dr. Varughese, back
4    to the questions.  You ask her a
5    question, she'll respond to it, then you
6    ask her another question.
7        It's not open for discussion.
8        DR. VARUGHESE:  There was nothing
9    here that wanted me to go through her.
10       DR. MARIN:  This is not a
11   discussion, you will have a chance later
12   to give your opinion.
13       DR. VARUGHESE:  All right, sorry.
14   Q    So, do you think what I talked
15   to you, just me having a basic question about
16   the FMLA leave basically warranted you dragging
17   me to your office and making me wait there for
18   the entire core conference that morning, or
19   were there other reasons for that?
20   A    No, there wasn't.
21   Q    That was your only reason.
22   That's all I needed to know, good.
23       DR. MARIN:  Thank you.
24       DR. WEINFELD:  Thanks very much.
25       MR. MacDONALD:  Let's make it

Page 215

LEENA VARUGHESE
1
2    clear that Dr. Varughese' binder with
3    the documents are in the record, are
4    admitted in the record and the Committee
5    will take them for what they are worth
6    and connect them to the testimony as
7    appropriate.
8        And the same is true with the the
9    Department's exhibits, so that there is no
10   question what's in and what's out of the
11   evidence.
12       DR. MARIN:  Understood.
13
14   P A U L   J O H N S O N,   called as a
15   witness, having been first duly sworn by
16   the Notary Public, was examined and
17   testified as follows:
18
19   DIRECT EXAMINATION BY DR. FIRPA:
20
21   Q    Good evening, Mr. Johnson.
22   Who is your employer?
23   A    Mount Sinai School of Medicine.
24   Q    What is your job title?
25   A    Director of GME, graduate

Page 216

LEENA VARUGHESE
1
2    medical education.
3    Q    What are your duties in that
4    capacity?
5    A    I help to oversee the residency
6    programs in our consortium, there are 91 in
7    all, so we help to assess program quality and
8    to help programs with their curricula, also to
9    help with resident issues, to help residents
10   resolve concerns and to assist programs when
11   they are dealing with resident issues.
12   Q    Would you describe
13   professionalism standards and core
14   requirements?
15   A    So there are six ACGME core
16   competencies that are expected to be part of
17   resident education.
18       One of them, one of those
19   competencies is professionalism, so residents
20   are expected to attain this competency which
21   entails having compassion and respect for
22   others, to have a commitment to patient care
23   that supersedes self-interest, and to display
24   sensitivity to a diverse range of patients and
25   to be dependable and to just sort of embody

Page 217

LEENA VARUGHESE
1
2    professionalism as it's defined by the ACGME.
3    Q    Do you recall any questions or
4    clarifications regarding Dr. Varughese and
5    advice to the Department during the period
6    after her final warning?
7    A    Yes.
8    Q    Would you tell us about that?
9    A    Are we talking about advising
10   Dr. Varughese or advising the Department.
11   Q    Advising the Department on how
12   to deal.
13   A    So, in the period after the
14   final warning, the first time the Department
15   sought advice from our office was in Dr.
16   Firpa's first meeting with Dr. Varughese as
17   outlined in the final warning.
18       Dr. Varughese was initially
19   refusing to participate in the meeting and Dr.
20   Firpa called a couple of times when Dr.
21   Varughese was saying things such as that the
22   Department needed to speak with her lawyer
23   regarding all of the professionalism concerns.
24       So, I made sure that the
25   Department was aware that Dr. Varughese didn't

55  (Pages 214 to 217)

Page 218

LEENA VARUGHESE

1
2  have an option about participating in these
3  meetings, and the meeting eventually did go
4  forward.
5          After that, the program was --
6  Dr. Firpa was new to his position and so I
7  would receive fairly regular updates about Dr.
8  Varughese' performance.
9          At -- I would say the next time
10 I became aware of an issue it related to the
11 coverage for surgical pathology.
12         The Chief Residents were having
13 issues with Dr. Varughese and I advised Dr.
14 Firpa to have the program leadership address
15 the concerns, to sort of back up the Chief
16 Residents in what they were experiencing.
17         After that, we did have some
18 interaction with the Department related to Dr.
19 Varughese' requests to switch her elective
20 rotation.
21         We were aware that the
22 Department had really been paying a lot of
23 attention to AP time, anatomic pathology and
24 clinical pathology time and how it was balanced
25 in resident schedules and we were confident

Page 219

LEENA VARUGHESE

1
2  that the Department had really given good
3  consideration to the request and ultimately
4  denied it.
5          So we sort of stood by the
6  Department in its decision and then in
7  the final period there was sort of rapid
8  sequence of advice that was given to the
9  Department about the need for leave and that
10 was, I don't know, should I --
11         DR. WEINFELD: Go ahead.
12     Q    How did you become aware that
13 Dr. Varughese was requesting a leave of
14 absence?
15     A    I became aware of Dr. Varughese'
16 need for leave when she was expected to give a
17 conference presentation in mid-September and
18 she didn't give that presentation.
19         Dr. Firpa met with her after she
20 didn't present and reported to us that Dr.
21 Varughese was unable to perform her function as
22 a resident because she was having serious
23 issues.
24     Q    Would you refer to Exhibit 15,
25 Department's Exhibit 15, and briefly describe

Page 220

LEENA VARUGHESE

1
2  what they are represent?
3      A   This was an e-mail responding to
4  Dr. -- an e-mail from Dr. Varughese about on
5  various topics, including who was responsible
6  for the -- being program director in pathology,
7  access to various policies in the Department,
8  also whether she was required to present proof
9  of an illness when she refused to take a call
10 assignment, and also related to the resident
11 schedules and the division between anatomic
12 pathology time and clinical pathology time.
13     Q    What did you say about all this?
14     A    I just -- most of the e-mail was
15 just clarifying policies and procedures, I mean
16 there is one clearly designated program
17 director who is Dr. Lento, and both Dr. Firpa
18 and Dr. Lento have responsibilities related to
19 the residency, but in terms of the ACGME and
20 designating someone, Dr. Lento was the program
21 director.
22         With regard to the policies, I
23 did offer her assistance if she was looking for
24 a particular policy, I was willing to sort of
25 help her in talking to the Department to make

Page 221

LEENA VARUGHESE

1
2  sure that if there was such a policy that the
3  residents would have access to it.
4          I confirmed that she was
5  required to submit proof of illness if the
6  Department was requesting it and I also assured
7  her that Dr. Firpa and Dr. Lento were carefully
8  looking into the resident schedules to make
9  sure that the ACGME requirements for time in
10 each side of pathology were met.
11     Q    Let's go back to the request for
12 leave of absence following September 15th.
13         Were you aware that I had
14 instructed her not to come to work pending
15 approval of her leave request?
16     A    Yes.
17     Q    Were you aware that Dr.
18 Varughese ignored that request and continued
19 coming to work?
20     A    I didn't become aware of it
21 until the following week, but yes.
22         DR. WEINFELD: Dr. Firpa, was
23 that request made in writing, the
24 request for her not to come to work?
25         DR. FIRPA: Yes, on the 16th.

56 (Pages 218 to 221)

P. 940

Page 222

LEENA VARUGHESE

1
2    DR. WEINFELD: Can we have a copy
3  of that somewhere?
4    DR. BRONHEIM: Under Mount Sinai
5  law if that is written, is that --
6    DR. WEINFELD: There is no Mount
7  Sinai law.
8    DR. BRONHEIM: Mount Sinai
9  guidelines, if such a letter is written,
10  does it prohibit the resident from
11  appearing.
12    DR. LEITER: Is there
13  documentation of her -- is there any
14  documentation of your request for her
15  not to come back?
16    DR. WEINFELD: It looks like
17  Exhibit 16, does that cover -- it's an
18  e-mail from Dr. Firpa to Dr. Varughese.
19    DR. FIRPA: Yes, on the last
20  paragraph the second sentence from the
21  last.
22    I must also ask you not to return
23  without the doctor's note and assessment
24  for the leave of absence.
25    DR. WEINFELD: Okay, thank you.

Page 223

LEENA VARUGHESE

1
2    Q    Did the GME office take any
3  action with regard to what I have told you
4  about the meeting with Dr. Varughese on the
5  15th?
6    A    Yes, we did provide some advice
7  about leave, but the day that followed Dr.
8  Varughese' initial request for leave I
9  contacted the physician wellness committee to
10  arrange for an assessment.
11    Well, to ask them to arrange for
12  an assessment.
13    DR. WEINFELD: Do we know if that
14  assessment ever took place?
15    THE WITNESS: If never took
16  place.
17    Q    Did you meet with Dr. Varughese
18  on September 20th?
19    A    September 20th, yes.
20    Q    How did that meeting come about?
21    A    It came about because Ms. Patel
22  on the morning of the 20th had encountered Dr.
23  Varughese at Starbucks and had arranged with
24  Ms. Tiger Paillex to meet with her and me, that
25  is the answer to your question.

Page 224

LEENA VARUGHESE

1
2    Q    Well, did you recall that she
3  had intended to go to work and she was in
4  violation of her direct and explicit request by
5  me not to come to work until the doctor's note
6  was provided and fill in the application for
7  leave of absence?
8    A    Yes.
9    Q    What happened during that
10  meeting between you, Dr. Varughese and Karen
11  Tiger?
12    A    I think first we were interested
13  in knowing why Dr. Varughese hadn't responded
14  to e-mail and phone contact from the program to
15  follow up on her leave of absence.
16    And her response to that was
17  that she didn't respond to the -- this contact
18  because it didn't contain any questions, it
19  just -- these contacts just stated facts.
20    And I think she said if they had
21  asked me whether I was working I would have
22  said yes, and it was difficult to determine why
23  she had been coming to work even though the
24  Department had asked her not to be working in
25  the period where her FMLA paperwork was being

Page 225

LEENA VARUGHESE

1
2  filled out.
3    We also asked about wellness
4  because we knew that Mr. Hughes from the
5  wellness committee had been trying since the
6  previous Friday to contact Dr. Varughese, and
7  was unsuccessful and Dr. Varughese said that
8  she found the wellness committee to be
9  unhelpful in her previous interaction with
10  them, that she had been trying to obtain a
11  report from them that she never received and we
12  or I told her that participation with the
13  wellness committee was mandatory, and that a
14  resident couldn't refuse to cooperate without
15  facing possible disciplinary action.
16    At which point she said that she
17  would consider making an appointment with them
18  at her convenience.
19    Ms. Tiger Paillex and I found
20  that answer to be unsatisfactory so we got
21  wellness on the phone while we were there and
22  arranged an appointment between Dr. Varughese
23  and Dr. Hughes for that Thursday.
24    We also asked her questions
25  about and the incident that had happened less

57 (Pages 222 to 225)

Page 226

LEENA VARUGHESE

1        LEENA VARUGHESE
2    than an hour before in Ms. Patel's office.
3        Dr. Varughese initially said she
4    didn't want to say anything about the incident,
5    but then had an explanation where her coffee
6    was next to some documents and Ms. Patel
7    misunderstood the situation.
8        But then went into -- so Ms.
9    Tiger Paillex then said you realize that Ms.
10   Patel has confidential files in her office?
11       And Dr. Varughese' response was
12   if somebody has confidential files in their
13   office, they shouldn't leave people unattended
14   with them.
15       And I mean that was pretty much
16   the extent of the conversation.
17   Q    Do you remember at any time
18   during that conversation she made reference to
19   her intent to see a psychiatrist and what was
20   the outcome of that intent?
21   A    By that point she had seen one
22   physician and she had told us that that
23   physician had denied to certify the leave.
24       Declined to certify the leave.
25   Q    Were you involved in the

Page 227

1        LEENA VARUGHESE
2    decision to summarily suspend and terminate Dr.
3    Varughese?
4    A    Yes.
5    Q    Why was she terminated?
6    A    I think in the period from the
7    final warning to the termination there were
8    several incidences that consistently
9    demonstrated a failure to meet the professional
10   standard, professionalism standards for
11   residency.
12       It also became apparent towards
13   the very end that there was in my mind some
14   danger to patients.
15       Because Dr. Varughese had
16   requested leave and it seemed as though there
17   was something serious going on with her, the
18   GME office and the Department really wanted to
19   make sure that that serious condition was
20   addressed.
21       Dr. Varughese' failure to follow
22   up on that really created a problem in that she
23   was returning to work when we didn't feel that
24   she was able to function as a resident.
25       And that poses potential issues

Page 228

1        LEENA VARUGHESE
2    with patients.
3    Q    Would you refer to Exhibit
4    number 1; the Department's Exhibit 1.
5        And briefly summarize what this
6    represents -- you don't have to, it's there.
7
8        DR. WEINFELD:  Thank you.
9    Q    Are the reasons for her
10   termination set out in her letter?
11       DR. WEINFELD:  Let the record
12       reflect that item number 1 in the
13       Pathology Department's record indicates
14       the summary suspension termination.
15   A    Everything that's here does
16   support the termination.
17       At a certain point, it doesn't
18   go right up until the end of Dr. Varughese's
19   service at Mount Sinai, but at a certain point
20   the documentation in this letter had to stop in
21   order for the termination to take place, so
22   there may be some issues that happened after
23   the time period covered in the letter, but I
24   think what's here does represent an accurate
25   record of the professionalism issues.

Page 229

1        LEENA VARUGHESE
2        DR. FIRPA:  Thank you.  No
3    further questions.
4        DR. WEINFELD:  Dr. Varughese.
5
6    CROSS-EXAMINATION BY DR. VARUGHESE:
7
8    Q    So, you were aware that I had
9    already spoke to one of my physicians and they
10   denied me the family medical leave of absence
11   as of Tuesday morning?
12   A    Yes.
13   Q    And they deemed me fit to work,
14   which means that they thought I didn't need the
15   family medical leave of absence?
16       DR. WEINFELD:  We know what that
17       means.
18       DR. BRONHEIM:  Did you provide a
19       letter to that effect?
20       DR. LEITER:  Is there a document?
21       DR. BRONHEIM:  Do you have a
22       document?
23       DR. WEINFELD:  So, you have
24       documentation that you saw a physician.
25       DR. BRONHEIM:  Who made that

58  (Pages 226 to 229)

Page 230

LEENA VARUGHESE

1
2 statement?
3     DR. VARUGHESE: I spoke to a
4 physician who said she's not
5 comfortable.
6     DR. WEINFELD: Is this somebody
7 you saw as a patient or somebody you
8 spoke to?
9     DR. VARUGHESE: Somebody I spoke
10 to regarding what was happening.
11     DR. WEINFELD: Okay, so go ahead,
12 ask your question.
13     A   So, yes.
14     Q   So that afternoon I followed up
15 with you and I said I saw my physician, do you
16 remember me saying that to you?
17     I saw the physician?
18     A   The second physician.
19     Q   Yes, I saw my physician I told
20 you that?
21     A   Yes, who also declined to
22 certify the leave of absence.
23     Q   Yes, who has declined to certify
24 the leave of absence and thought that I should
25 be at work.

Page 231

LEENA VARUGHESE

1
2     A   Yes.
3     Q   And this is a physician who has
4 reviewed my medical history extensively, has
5 known me for at least three plus years.
6     DR. BRONHEIM: Wait a minute, he
7 doesn't know that.
8     Have you provided evidence?
9     DR. VARUGHESE: I am telling you
10 there is a person who knows me for over
11 3 years.
12     DR. MARIN: For clarification, is
13 the documentation about that physician
14 in your statement, one of your points in
15 here?
16     DR. VARUGHESE: Well, he didn't
17 fill the form, but I have a letter
18 saying that I saw him that day.
19     DR. MARIN: Is that in here so we
20 can review it?
21     DR. VARUGHESE: No, it's not in
22 there.
23     I mean it's something I would have
24 given to the Department.
25     DR. WEINFELD: Go ahead.

Page 232

LEENA VARUGHESE

1
2     DR. MARIN: It's a statement
3 then, you don't have any evidence for
4 it, is what I'm asking?
5     DR. VARUGHESE: I don't and I
6 never had an opportunity to give that
7 document to the Department.
8     Q   So I want you to refer to
9 Exhibit 26.
10     DR. WEINFELD: In the big book.
11 Okay.
12     Q   So my question is this, when
13 were you aware that Dr. Firpa was -- when did
14 Dr. Firpa tell you I'm not supposed to be at
15 the hospital because I'm not well, what date?
16     A   It was the date of this e-mail,
17 Thursday the 15th.
18     Q   Thursday the 15th.
19     So, here is an e-mail that Dr.
20 Firpa sent to me Thursday the 15th.
21     The tone, the sentiment
22 expressed in this e-mail is --
23     DR. LEITER: What's the question?
24     Q   In this e-mail he doesn't -- he
25 seems to, Dr. Firpa, seems to understand --

Page 233

LEENA VARUGHESE

1
2     DR. MARIN: This is something you
3 would have to address with Dr. Firpa.
4     You have a different witness on the
5 stand, so your question should be
6 pertaining to him.
7     Q   Right, so I sent Mr. Johnson an
8 e-mail on the 20th because I wasn't sure why --
9     DR. MARIN: Dr. Varughese, it's a
10 back to the question concept.
11     The way it works is you ask him a
12 question and he responds to it, this is
13 not the forum for you to explain text
14 inside of your --
15     DR. LEITER: If you have no
16 questions for him, perhaps you want to
17 move on so you can present your case.
18     Q   So according to the
19 institutional policy Dr. Firpa is the director
20 of educational activities, what authority does
21 he have to tell me that I should not come to
22 work?
23     He's not a program director,
24 what is his role in that?
25     A   I mean to go back to the e-mail

Page 234

LEENA VARUGHESE

1  
2  that we looked at just a few minutes ago, both
3  Dr. Firpa and Dr. Lento have responsibilities
4  relating to the residency program.
5      One is officially called a
6  program director, whether we are dealing with
7  the ACGME, but that doesn't mean that that is
8  the sole person who has any authority over
9  residency training at the institution.
10     DR. WEINFELD: So, the answer is
11  that Dr. Firpa does have that authority?
12     THE WITNESS: Yeah, we consider
13  him to be in the program leadership.
14     DR. WEINFELD: That was the
15  question, okay.
16  Q   In terms of the policies that
17  the Department has instituted as of August
18  15th, I believe, that was, is that the date
19  that we are -- it was supposed to be
20  instituted?
21  A   It's not a policy.
22  Q   I'm talking about the new
23  departmental policies.
24  A   I can't really speak to that.
25     DR. WEINFELD: She's referring to

Page 235

LEENA VARUGHESE

1  
2  item 17 in the small book.
3      DR. BRONHEIM: I don't think you
4  know that.
5      DR. WEINFELD: So what's your
6  question.
7      DR. MARIN: It's not relevant to
8  him.
9  Q   So, according to the
10  institution's policy, I mean who -- did the GME
11  make up these policies?  Would made these
12  policies?
13     How were these, not -- I
14  understand the ACGME came here and inspected
15  you have to take some action to correct that,
16  but --
17     DR. WEINFELD: Ask the question.
18  Q   Who can -- how does this policy,
19  I thought according to the hospital's house
20  staff policy manual it's the Chairman who has
21  to --
22     DR. WEINFELD: What's your
23  question?
24     DR. VARUGHESE: Is it even like
25  that the residents have to --

Page 236

LEENA VARUGHESE

1  
2      DR. WEINFELD: Can we strike this
3  because there is no question.
4      You have to go somewhere with this.
5      DR. CORDONE-CARDO: As the Chair
6  I presented in many occasions the line
7  of reporting and everybody knew and I
8  had various special meetings with all of
9  the residents about the roles of Dr.
10  Firpa.
11     That was very clear to everybody.
12     DR. WEINFELD: Is the question,
13  Dr. Varughese, maybe I can clarify this,
14  is your question who makes Department
15  policy, is that what you are trying to
16  ask?
17     DR. VARUGHESE: Yeah, I'm asking
18  Mr. Johnson, yes.
19     DR. MARIN: That's not a question
20  for him.
21     DR. WEINFELD: I don't know
22  that's a question, but I think it was
23  answered.
24     DR. VARUGHESE: Okay.
25  Q   Are you aware that Dr. Firpa

Page 237

LEENA VARUGHESE

1  
2  indicated to me that he was a program director
3  at some point?
4  A   I was no the aware of that.
5      DR. WEINFELD: Any other
6  questions for Mr. Johnson?
7  Q   Yes.
8      You said that you referred me to
9  the physician wellness committee on what,
10  Friday?
11  A   On that Friday I asked Dr.
12  Hughes to contact you.
13  Q   Why did you ask Dr. Hughes to
14  contact me?
15  A   Because the previous day the
16  program informed us that you could have a
17  serious medical condition that would warrant an
18  assessment by physician wellness.
19  Q   So the Department asked you to
20  contact --
21  A   No.
22     DR. VARUGHESE: All right, thank
23  you.
24     DR. WEINFELD: Thank you, very
25  much.

60 (Pages 234 to 237)

Page 238

LEENA VARUGHESE

1
2          DR. WEINFELD: Is the Department
3     done?
4          DR. FIRPA: Two more witnesses.
5
6     A R T H U R    F I G U R,    called as a
7          witness, having been first duly sworn by
8          the Notary Public, was examined and
9          testified as follows:
10
11    DIRECT EXAMINATION BY DR. FIRPA:
12
13          MR. MacDONALD: Let's proceed.
14     Q     Who is your employer,
15    Dr. Figure?
16     A     The Mount Sinai Center Hospital.
17     Q     What is your job title?
18     A     I am the Associate Medical
19    Director of the Mount Sinai Hospital.
20     Q     What are your job duties in that
21    capacity?
22     A     Multiple, I do investigations of
23    certain kinds of quality improvement, quality
24    issues, I also Chair the investigative arm of
25    the physicians wellness committee.

Page 239

LEENA VARUGHESE

1
2          I sit on a variety of quality
3     assurance committees, I try and get Chief
4     Residents to participate in the various
5     committees of the hospital.
6          I still go to some of the
7     meetings of the division of hematology because
8     that's where I was before getting the
9     administrative work.
10     Q     What is your role in the
11    physician wellness committee?
12     A     When physicians are referred to
13    us for evaluation, we try and interview as many
14    people who have had firsthand experience with
15    the physician so we can understand the issues,
16    we then interview the physician to get his or
17    her side of the story and the reason for the
18    referral.
19          We obtain toxicology screens,
20    it's almost mandatory, we may refer out for
21    outside evaluations, whether it's a vision
22    problem to an ophthalmologist, if we feel it's
23    behavioral issues or professional issues we
24    refer them out for evaluation by a
25    psychiatrist.

Page 240

LEENA VARUGHESE

1
2          When it's drug abuse issue, then
3     they are automatically suspended and referred
4     to CPH of the medical society for treatment.
5     Q     When was Dr. Varughese' first
6     referred to the Committee?
7     A     I think she was first referred
8     in January of this year.
9     Q     Why was she referred to the
10    committee?
11     A     Dr. Pessan called me to say that
12    she had -- Dr. Pessan became the interim Chair
13    of the Department of Pathology and she referred
14    Dr. Varughese to us because one, she was
15    insubordinate to Dr. Pessan, two she had an
16    altercation with one of the Chief Residents,
17    that she was often late for working and that
18    she harassed other residents.
19          And those were the reasons she
20    gave.
21     Q     Did you recall her ever
22    resisting going to see psychiatrists?
23     A     Okay, well, before we get to
24    that, we went up to the Department to see what
25    was in her folder as far as attending notes and

Page 241

LEENA VARUGHESE

1
2     so on about the behavior, we did find e-mails
3     but at the time there were other issues in the
4     Department, they were GME issues, Dr. Schiller
5     had retired, they were searching for a new
6     Chair.
7          So to try and find the
8     documentation backing up that she needed
9     physician wellness rather than discipline for
10    being insubordinate to a Chair, I made the
11    decision in my other hat as Associate Medical
12    Director to interview people along with Paul
13    Johnson to see first of all would it be
14    warranted, and if so, then we would say she
15    should come to us, and we agreed that the
16    referral was indicated and then it took a long
17    time to convince her to come to a meeting
18    between Dr. Hughes, Leena and myself.
19     Q     What about the referral to the
20    physician wellness committee in September of
21    this year?
22     A     I was away in September, Dr.
23    Hughes did call me to say that Leena had called
24    him because she needed a physician who could
25    give her backup that she needed a leave of

61 (Pages 238 to 241)

Page 242

LEENA VARUGHESE

1
2  absence because of illness.
3        That's all he was able to tell
4  me and he informed her that's not the function
5  of the physician wellness.
6        Our function is if we feel there
7  is an issue that needs to be addressed, that we
8  report people to the appropriate therapists for
9  therapy, but we don't refer to mandate or to
10  confirm that somebody needed a leave of
11  absence.
12       Q     Was there anything else that the
13  wellness committee could have done or other
14  remediation measures the Committee could have
15  taken to help Dr. Varughese?
16       A     Yes, but at this point when Dr.
17  Cordone-Cardo and you came in we had a meeting
18  in your office where I did voice that based on
19  our handling of the situation earlier that
20  really the next more appropriate step would be
21  an increase in disciplinary action.
22        You guys felt, appropriately,
23  that you were new, you wanted to give her every
24  opportunity to succeed and to finish the
25  program, and that you would start a fresh as

Page 243

LEENA VARUGHESE

1
2  new persons, not related to any other
3  experiences she might have had in the past and
4  would be willing to start again.
5        So, when Dr. Hughes and I
6  discussed this, knowing that she resented
7  authority, that she would resent referral to a
8  therapist, that she would resent having
9  toxicology screens which we deemed were
10  necessary because her behavior was
11  unpredictable, she would be late, she would not
12  finish her work, so to me those were signs of
13  possible impairment.
14        The toxicology screen that she
15  had at the original meeting with us was
16  negative, but she wanted to drink an excessive
17  amount of water.
18        When I told her no, I took her
19  over and the nurse at employees health would
20  also refuse to give her more water and she
21  admitted that she is on medications, Ambien and
22  dexadryl and possibly Aderol, I would then be
23  very concerned and would mandate that she give
24  us a prescription from her current treating
25  people who gave her these medications because

Page 244

LEENA VARUGHESE

1
2  I'm always concerned about self-medicating by
3  physicians.
4        And we felt if we confronted her
5  with that, plus having to sign the contract
6  which we normally have physicians sign, that
7  would negate everything you people were doing,
8  and I sort of washed my hands of it and hoped
9  that you were able to succeed.
10       DR. BRONHEIM:  When was this, Dr.
11  Figur?
12       THE WITNESS:  I don't know when
13  our meeting was, but shortly after they
14  arrived, so whether it was September,
15  the exact date I can't remember.
16       Q     Do you remember as we continued
17  on that strategy and time moved on and things
18  got really worse and worse, about September we
19  consulted with you or we shared with you our
20  concerns and our decision about possibly
21  terminating her, did you feel at that time that
22  there was any -- something else that could have
23  been done to help her in any way?
24       A     My -- our feeling at the
25  Committee was that we have tried everything we

Page 245

LEENA VARUGHESE

1
2  could do to help her and that if you are
3  terminating her it's very hard for us to sign
4  an agreement because she'll no longer be here,
5  that she needs to follow the directions of the
6  the Committee, sign HIPPA consent that we can
7  contact the treating therapist and the
8  therapist would have been somebody, an expert
9  in anger management, unless we found that drugs
10  became an issue, and based on her lack of
11  cooperation in the past, there was no need for
12  us to proceed.
13       DR. FIRPA:  Thank you, I have no
14  further questions.
15       DR. WEINFELD:  Dr. Varughese.
16
17  CROSS-EXAMINATION BY DR. VARUGHESE:
18
19       Q     You mentioned that you met with
20  Dr. Cordone-Cardo when you first arrived at the
21  hospital?
22       A     Yes.  Well, not when he first
23  arrived, at a meeting when you were brought up
24  for discussion.
25       Q     So when was that?

62 (Pages 242 to 245)

Page 246

LEENA VARUGHESE

1
2     A    I can't recall the date.
3     Q    I feel like that's relevant, was
4  it in May, was it in April?
5     A    No, no, they weren't here.
6         DR. MARIN:  He says he doesn't
7  recall the date.  That's the answer.
8     A    I don't recall the date, it was
9  after their arrival.  Maybe a month after their
10  arrival when they became educational director
11  and Chairman of the Department.
12     Q    So it was with both Dr. Firpa
13  and with Dr. Cordone-Cardo?
14     A    They were both in the room, yes.
15     Q    So that was probably you started
16  on -- may I address Dr. Firpa at this point?
17         DR. MARIN:  Your questions are to
18  Dr. Figur.You arrived on July 1st?
19         DR. FIRPA:  Yes.
20         DR. WEINFELD:  What's the
21  question?
22         DR. BRONHEIM:  The questions are
23  to Dr. Figur.
24     Q    So my questions are to Dr. Figur
25  now.

Page 247

LEENA VARUGHESE

1
2         And so you advised there should
3  be more disciplinary action?
4     A    Yes.
5     Q    As opposed to --
6     A    Yes.  They didn't take my
7  advice.
8     Q    They didn't take your advice?
9     A    No, they gave you another
10  chance.
11         They wanted to start fresh, they
12  told you they would start fresh, they would
13  start with you from the beginning and --
14     Q    Well, what would you consider
15  starting fresh?
16         Would you consider me being
17  placed on disciplinary action starting fresh?
18     A    I'm not aware of any of the
19  disciplinary actions they took, I'm aware of
20  the academic advisement that you got earlier,
21  but after they arrived and they made the
22  decision that they were going to start fresh,
23  they were going to give you the chance to start
24  anew, wipe out the past slate, I was no longer
25  involved.

Page 248

LEENA VARUGHESE

1
2     Q    So you were no longer involved
3  after that meeting.
4         Well, I just want to inform you
5  on July 15th Dr. Cordone-Cardo --
6         DR. MARIN:  Dr. Varughese, this
7  is not the time to inform, your job is
8  to ask the question.
9         DR. VARUGHESE:  They gave me a
10  disciplinary final warning letter.
11         DR. MARIN:  Ask questions.
12     Q    So, are you aware that I met
13  with Dr. Cordone-Cardo, Dr. Lento and Mr.
14  Castaldi on May 4th?
15     A    No.
16     Q    Well, they insisted I write a
17  new reflection on May 4th.
18         DR. MARIN:  Go back to what I
19  just said to you, questions.
20         He said no; next question.
21         DR. VARUGHESE:  Okay, sir, all
22  right.
23     A    I heard, if you are asking that,
24  I heard after the fact that yes, they felt you
25  did not respond to the academic advisement and

Page 249

LEENA VARUGHESE

1
2  that they asked you to rewrite your reflection
3  after reading a certain book, which I don't
4  know what it was, and you didn't fulfill that
5  academic advisement.
6     Q    So, Dr. Pessan who was part of
7  the Department reached out to you?
8     A    Yes.  When she was acting Chair.
9     Q    When was she acting Chair, in
10  January?
11     A    I think in January.
12     Q    But you were aware there was a
13  back story to why she may have asked you?
14     A    I sort of outlined the five
15  reasons, you were insubordinate to her, which
16  in my opinion is really not a physician
17  wellness issue, which is really a disciplinary
18  issue and should be handled immediately by the
19  Chair, because as an interim Chair I presume
20  she felt she didn't want to do it, but then
21  there were other issues about your lateness,
22  your not being a team player, your not
23  cooperating with the other residents, your
24  harassing them and you have been demeaning a
25  variety of the staff in the Pathology

63  (Pages 246 to 249)

Page 250

LEENA VARUGHESE

1
2    Department, and that's a physician wellness
3    issue.
4        Q      How did she say that I was
5    insubordinate?
6        A      I didn't ask.
7        Q      How many altercations did she
8    say there were?
9        A      There was one altercation.
10       Q      And she said that I was
11   responsible?
12       A      She said -- she said there was
13   an altercation, she didn't put the blame
14   anywhere, there was no specific write up and
15   that was one of the reasons Mr. Johnson and I
16   interviewed members of the Department, so we
17   could figure out did it occur, how did it
18   occur, what started it, and who could have been
19   responsible.
20       Q      How often was I late?
21       DR. WEINFELD:  It's not a
22   question for Dr. Figur.
23       A      I didn't ask.
24       DR. WEINFELD:  He wasn't asked to
25   keep track of your lateness.

Page 251

LEENA VARUGHESE

1
2        Q      So, you said you were contacted
3    in January but you did not contact me until?
4        A      The policy of the Committee, as
5    I outlined, is to get firsthand information,
6    not second or thirdhand information from people
7    who have had experience with the physician's
8    behavior so that we don't get filtered
9    information.
10       So it takes a while to gather
11   that data and once we were ready with that
12   information, it took a while to get to you come
13   to meet with us.
14       Q      So you basically e-mailed me --
15   my Exhibit 40 in the big book.
16       DR. WEINFELD:  Exhibit 40 in the
17   big book.
18       Q      So you e-mailed me on February
19   28th and --
20       DR. WEINFELD:  Is there a
21   question?
22       Q      And said that physician wellness
23   would -- but, in fact Dr. Lento responded for
24   me as opposed to me actually responding to this
25   particular request saying that I wasn't --

Page 252

LEENA VARUGHESE

1
2        DR. MARIN:  Let's get back to the
3    questions.
4        Q      What did you -- what was your
5    opinion of that?
6        A      Well, there was no problem and
7    Dr. Lento told me you would be unable to come
8    because you were at another rotation, and that
9    when you were available to come and be here
10   that then you would appear.
11       Q      Right so this is a physician
12   wellness committee issue, it's supposed to be a
13   confidential issue, but you are telling --
14       A      No, your program director would
15   know about this because the Chairman is the one
16   who referred you, and certainly the program
17   director needs to know what's going on with
18   residents in the program.
19       Q      Right, after an interview if
20   there was an issue that they needed to address
21   or --
22       A      No, you were referred to us, you
23   did not come.  I had to be blunt with you
24   because based on all the other interviews we
25   have had with other people before I reached out

Page 253

LEENA VARUGHESE

1
2    to you, was that you needed to be very blunt
3    with Leena, otherwise she's not going to hear
4    you.
5        So I was very blunt to make
6    certain that you understood that if you don't
7    come you can be suspended and you can be
8    terminated, and that's in the procedures and
9    policies approved by the Medical Board which
10   you can find online.
11       So I didn't want you to say to
12   me you never told me the outcome if I don't
13   show up.
14       Q      So, anyway I met with you and
15   Dr. Hughes several times and eventually you
16   asked that I take the toxicology screening
17   test.
18       A      Right.
19       Q      So I took the test, did I try
20   not to take the test?
21       DR. WEINFELD:  What was the
22   question?
23       Q      I mean I took the test, it was
24   negative, was it?
25       A      Yes, the test was negative.

64 (Pages 250 to 253)

Page 254

LEENA VARUGHESE

1
2    Q    Okay, good.
3    A    But as I said before, there were
4    issues before you took the test.
5         DR. WEINFELD:  We heard.
6         DR. LEITER:  Is that all?
7         DR. VARUGHESE:  No.
8    Q    So, you wanted me to meet with
9    Dr. Fursch eventually?
10   A    Yes.
11   Q    But I had requested that I could
12   follow up with my therapist?
13   A    Yes we wanted an independent
14   opinion, which you thought was your therapist.
15   Q    Or I said somebody at the
16   Medical Center of New York?
17   A    Yes.
18   Q    That was my other option?
19   A    Right.
20   Q    But I wasn't given that option?
21   A    No, you were not given that
22   option because at our discretion it needed to
23   be someone from here based on the performance
24   issues in the past.
25   Q    Do you recall telling me that

Page 255

LEENA VARUGHESE

1
2    you will give me a document?
3    A    I don't recall, but as I say, I
4    don't recall, we do have a communication from
5    Dr. Fursch which is not here because it was
6    confidential to the Committee and it should
7    remain confidential with the Committee.
8         Once we decided that we are not
9    going to have you sign a contract and refer you
10   out and monitor you periodically, the
11   recommendations that we got became moot because
12   we weren't going to follow them.
13   Q    Don't you think it's odd that
14   I'm going to see this therapist for physician
15   wellness committee and she won't give me any
16   follow-up summary?
17   A    I didn't know you were going to
18   see any therapist.
19   Q    And I'm not followed up with
20   that particular --
21   A    I have no objection after the
22   disciplinary action is fulfilled, if Dr. Fursch
23   has no objection, of telling you what her
24   recommendations were.
25        And I agree, you need to know

Page 256

LEENA VARUGHESE

1
2    that.
3         But at this point in the
4    proceedings we can't mandate whom you should go
5    to and so from my point of view, it's moot.
6         Now, if you do go to a therapist
7    I will be happy to let that therapist know
8    exactly some of the issues that came up in the
9    workplace that you need to address to be
10   successful in the future, and that's our
11   concern, your future.
12        And protecting the patients.
13   Q    So far we have discussed
14   professionalism as being the issue here.
15        What do you mean protect the
16   patients?
17   A    Mount Sinai is fortunate that in
18   the Department of Pathology although the
19   residents do the grossing and have a great
20   responsibility of cutting margins on specimens,
21   that the attending is the final arbiter of what
22   report goes out and when.
23        So if you don't do your work
24   diligently and you don't do a proper margin cut
25   on a breast specimen, or any place else, we can

Page 257

LEENA VARUGHESE

1
2    send out a wrong report.
3         That became an issue.
4         Yes, the attending will read the
5    slides that are available, but the attending is
6    not there to watch every time a resident cuts
7    the slides.
8         And the information we got is
9    some days you were perfect and you did
10   extremely well and without rhyme or reason the
11   next time they came around you had no idea what
12   you were doing and had to ask the same
13   questions of the same people who had just gone
14   through this material with you a week ago, and
15   it's like starting in the beginning.
16        And that's what I mean by
17   protecting our patients.
18        And that was one of the reasons
19   we needed the toxicology screen, that when you
20   were educated to something you couldn't retain
21   it.
22        Not my opinion, those were the
23   opinions of people we interviewed.
24   DR. MARIN:  Questions.
25   DR. VARUGHESE:  For the record,

65 (Pages 254 to 257)

Page 258

```
1              LEENA VARUGHESE
2     that's not true.
3         DR. WEINFELD:  A question, a
4     question.
5     Q     It seems that you have been
6  misled.
7         DR. WEINFELD:  Do you have any
8     further questions before I excuse him?
9         DR. VARUGHESE:  No.
10        DR. WEINFELD:  Do you have any
11    further questions, not commentary,
12    questions?
13    Q     In our interactions, what's your
14  opinion, am I -- do I need anger management
15  or --
16    A     Based on the interviews of other
17  people, yes.
18    Q     Well --
19    A     You were never angry with me,
20  except for being reluctant to come and needing
21  a lot of urging and what you would consider
22  threatening, what I considered informational,
23  no, you've never been anything but courteous
24  with us.
25        DR. VARUGHESE:  All right, so one
```

Page 259

```
1              LEENA VARUGHESE
2     more thing.
3     Q     With Dr. Fursch, I had been a
4  little resistent to going to that particular
5  meeting.
6     A     Yes.
7     Q     But I did inform you my
8  grandfather had just passed away that week?
9     A     Right.
10        DR. WEINFELD:  Is there a
11    question for Dr. Figur?
12    Q     Are you aware there is a
13  hospital policy where you can take up to three
14  condolence days?
15        DR. WEINFELD:  Who was it?
16        DR. VARUGHESE:  My grandfather?
17    A     That's not my area of expertise,
18  I am not aware of it.
19        DR. WEINFELD:  Ask him a hospital
20    policy question, that's not for Dr.
21    Figur.
22    Q     You requested that I go despite
23  the fact --
24    A     You had an appointment which you
25  canceled.  Dr. Fursch notified me, so I
```

Page 260

```
1              LEENA VARUGHESE
2     e-mailed you, please keep that appointment.
3         I think you may then have said
4     something about your grandfather dying, it may
5     be in your e-mail trail, I certainly don't have
6     that.
7     Q     But I wasn't advised to take a
8  day off.
9         DR. WEINFELD:  Thank you, Dr.
10    Figur, you are excused.
11        Thanks very much.
12        MR. MacDONALD:  Is that the last
13    witness?
14        DR. FIRPA:  One more.
15
16  C A R L O S    C O R D O N - C A R D O,
17        called as a witness, having been first
18        duly sworn by the Notary Public, was
19        examined and testified as follows.
20
21  EXAMINATION BY DR. FIRPA:
22
23    Q     Good evening, Dr. Cordone-Cardo.
24        Who is your employer?
25    A     Mount Sinai School of Medicine.
```

Page 261

```
1              LEENA VARUGHESE
2     Q     What is your job title?
3     A     I am the Chair of Pathology.
4     Q     What are your duties as Chair of
5  Pathology?
6     A     I am to oversight both the
7  service, educational and research operations of
8  the Department.
9     Q     When did you become Chair of
10  Mount Sinai?
11    A     April 1st.
12    Q     When did you first meet with Dr.
13  Varughese?
14    A     I met first with Dr. Varughese
15  on May 3rd.
16    Q     What happened at that meeting?
17    A     I was informed as I arrived
18  after talking to our leadership that there were
19  some issues with Dr. Varughese including a
20  meeting on April 26th describing the lack of
21  responses to repetitive e-mails from several of
22  the faculties.
23        So as a new Chair I wanted to
24  address that immediately and I wanted to make
25  sure that Dr. Varughese also had the chance to
```

66 (Pages 258 to 261)

Page 262

LEENA VARUGHESE

1
2  meet with me much before I met with some of the
3  faculty.
4      Q    Did you discuss with her
5  anything regarding her academic advisement?
6      A    I did. I went over the past
7  academic advisement.
8          I realized that she was asked in
9  December to put forward a statement on events
10 on professionalism, that she was supposed to
11 hand in a matter of four weeks upon agreement
12 of herself with the Committee.
13         That report was not submitted
14 until March 30th, two days before my arrival
15 and some three months later of what she was
16 required.
17         So I wanted to understand why,
18 but at the same time I wanted to give Dr.
19 Varughese the chance to meet me, give Dr.
20 Varughese the chance of starting fresh and
21 making very clear that what is happened in the
22 Department in the past was not going to happen
23 now.
24         We strive for integrity, we
25 strive to not disruption of operations, we

Page 263

LEENA VARUGHESE

1
2  strive to professionalism, I also asked Dr.
3  Varughese to make sure that she had a copy of
4  the book that she was recommended, if not the
5  Department would buy that book and I tried to
6  start a new relationship and at that meeting we
7  did meet with the person who was at that time
8  the acting administrator, Mr. Castaldi.
9          The interview was not easy, she
10 was quite rude, she never offered an
11 explanation for why she delayed three months
12 and why all of a sudden a day before I started
13 the report appears, which wasn't the report
14 that was asked for, it was essentially a
15 recount of what has happened.
16         I said to her look, I read it,
17 and this is not what you were asked, you were
18 asked to write a report on professionalism, how
19 you should act upon being a pathologist, being
20 fair to your peers and being respectful, the
21 lack of integrity that has been demonstrated in
22 the past, it's not going to happen on my watch,
23 but let's start fresh.
24         So how long do you need to write
25 a new report?

Page 264

LEENA VARUGHESE

1
2          And she said I need a couple of
3  weeks, a month.
4          Do you have the copy of the
5  book?
6          No, we will buy the copy of the
7  book. I am going find out and this is how we
8  started on that first meeting.
9      Q    What happened in the follow-up
10 meeting to that initial agreement?
11     A    Well, we met on May 24th because
12 nothing was being submitted, I wasn't sure if
13 the report was being prepared.
14         I didn't want the same report of
15 the past which is at the end of day what we
16 received, and I wanted to make sure that she
17 had access also to the book, at which point I
18 asked together with Dr. Lento do you recall the
19 author of the book?
20         Which Dr. Varughese said that
21 she didn't recall that the book has been
22 written by Stephen Pisan on practice excellence
23 and it's a manual of how to conduct business in
24 our business.
25         So we advised her that this was

Page 265

LEENA VARUGHESE

1
2  not what we were expecting and conveyed the
3  message that we wanted and we expected more
4  from her.
5      Q    What was her general behavior
6  during that interaction with you?
7      A    We met again at which point the
8  book had been written -- at least she brought a
9  copy of the book, the report that we requested
10 was essentially the same a recount of what had
11 happened, weeks after what we expected and at
12 that meeting essentially when I started trying
13 to put it in perspective, I said well you have
14 a copy of the book, have you read it?
15         She essentially threw the book,
16 not essentially, to myself, but I started
17 saying what's happening? You threw the book,
18 Leena, from one side of the table to the other,
19 that's the fact.
20         And I said look, I mean, what's
21 happening here?
22         Are you reading that, this is
23 what you are learning and she started
24 escalating, trying to go back to the same
25 story, oh, because, so it was so difficult in

67 (Pages 262 to 265)

LEENA VARUGHESE

1
2 that I saw that we were not going anywhere.
3 So I end the meeting short
4 thinking that she was going to have time to
5 reconsider the matters and inviting her back.
6 Q   How did you come to the
7 conclusion of issuing a final warning?
8 A   The series of repetitive
9 incidents the lack of integrity, not responding
10 to e-mails, not going to lectures and sitting
11 in the Department, together with the lack of
12 professionalism that she was displaying to all
13 of our faculty, as well as the residents and
14 the fellows, brought up as to a -- brought us
15 to a point that we thought the disruption of
16 operations was so large that besides the final
17 warning and besides that final warning we were
18 going to go ahead.
19 And after realizing that she was
20 in the office of senior administrator going
21 over important potential documents and the lack
22 of integrity proven throughout this period, I
23 took, together with academic administration and
24 the senior leadership of the Department, the
25 next step of presenting her with a letter of

LEENA VARUGHESE

1
2 suspension and termination.
3 And I told her that at some
4 point we were trying to avoid it, but that at
5 some point we need to do the next steps and I
6 asked her to review the letter to make sure
7 that she read the final paragraph on the rights
8 that she had, that she has definitely used
9 today, and we conveyed the message that she was
10 going to be escorted outside by security, but
11 also that we have requested that -- I
12 specifically had requested the presence of
13 professional help in order if she wanted to
14 have a member of our psychology psychiatry team
15 being there for her to support that difficult
16 moment and that I was concerned, I was
17 concerned for her.
18 Q   Did you feel at that time that
19 you had exhausted all the opportunities to give
20 her an opportunity to redeem herself?
21 A   At this point I thought that
22 there is nothing arbitrary and capricious on
23 the issues we were taking, we had much
24 documented the fact that the lack of integrity
25 was there repetitively, that the disruption of

LEENA VARUGHESE

1
2 operations were there, and that we couldn't
3 come to have professionalism and respect as it
4 happens at moments that are critical like this
5 one in our job, which is an important job, we
6 are the second Department in the country in
7 volume and we cannot afford any mistakes at any
8 point for our patients.
9 DR. FIRPA:  I have no other
10 questions.
11 DR. WEINFELD:  Dr. Varughese.
12
13 CROSS-EXAMINATION BY DR. VARUGHESE:
14
15 Q   How many times have you met me?
16 A   I met you at least three
17 different times, on the first one being on May
18 3rd, just a month after I arrived here, but
19 having e-mails with you since mid-April.
20 One of them on April 26th.
21 Q   April 26th, is that an exhibit?
22 A   I believe, yes, but anyway the
23 first meeting was on May 3rd but we scheduled
24 that meeting for May 3rd, of course.
25 DR. BRONHEIM:  When did you start

LEENA VARUGHESE

1
2 here?
3 THE WITNESS:  April 1st.
4 DR. BRONHEIM:  That's pretty
5 quick.
6 Q   So how many times have I
7 mishandled a surgical pathology specimen?
8 A   On several occasions there have
9 been reports of cases being delayed and in
10 several cases.
11 Q   I mean mishandled or where a
12 patient would suffer?
13 A   I don't have this information.
14 Q   Did you say that my self
15 reflection exercise did not meet the
16 requirements of the academic advisement?
17 A   No, it did not because we went
18 over -- you essentially put a recount of a
19 story that we wanted you to be further away and
20 we asked you to produce something on
21 professionalism.
22 Q   Okay.
23 Are you aware of what the
24 academic advisement says?
25 A   Yes.

68 (Pages 266 to 269)

P. 952

Page 270

LEENA VARUGHESE

1
2       Q    I would like to refer to Exhibit
3  3 on the Department.
4       DR. WEINFELD:  Department Exhibit
5  3, okay.
6       Q    It's on Page 19, last point, it
7  says, "Self reflection exercise to be handed
8  into me within four weeks.  You are expected to
9  write down your account of the situation and
10 describe how you could have approached things
11 in a better fashion, including commentary on
12 physician professionalism and explore it in
13 this circumstance."
14      I think my first reflection
15 which is Exhibit 2 in my list, I think that
16 particular reflection actually does address all
17 points of the academic advisement.
18      A    So also in this --
19      DR. WEINFELD:  So what's the
20 question?
21      Q    Do you agree that it addresses
22 it or not?
23      A    We don't, and as a matter of
24 fact, if you recall, to the first line on this
25 very same page it says that this needs to be

Page 271

LEENA VARUGHESE

1
2  done in three or four weeks and that was on
3  March 30th and you were supposed to handle it
4  in January 24th.
5       Q    Are you aware that I filed a
6  grievance with the Human Resources Department
7  of this hospital regarding this particular
8  action taken against me, the academic
9  advisement?
10      A    It was before my time and when I
11 arrived it's for the reason I wanted to start
12 fresh with you again.
13      Q    Would it be fair, understandable
14 why it was delayed?
15      I mean do you think there may be
16 other reasons why it was delayed, not just
17 my --
18      A    As an academic I can assure you
19 I can understand a delay of one week, two
20 weeks, three weeks, but in something that is to
21 be in a month to wait three months and wait one
22 day before I started, I don't see the excuse in
23 that.
24      Q    Well, I filed a grievance with
25 the Human Resources Department.

Page 272

LEENA VARUGHESE

1
2       A    What's the question?
3       Q    They never got back to me about
4  the findings.
5       DR. MARIN:  I think that's to be
6  dealt with, he's not part of that, so
7  your question should pertain --
8       DR. VARUGHESE:  I am going to
9  explain to him that.
10      DR. WEINFELD:  Right now he's a
11 witness.  You have to ask him questions.
12      DR. BRONHEIM:  You can tell us
13 all of this in your discussion.
14      Q    So, at that meeting exactly to
15 what extent were you aware of this particular
16 reflection that I had written, did you read it
17 already?
18      A    Yes, I did.
19      Q    Okay, good.  Did Mr. Castaldi
20 also read the --
21      A    Yes, he did.  We read it
22 actually also at the end together before we met
23 you, because we were surprised at the points of
24 professionalism from both of our parts didn't
25 come up, it was mainly a recount of some of the

Page 273

LEENA VARUGHESE

1
2  events.
3       Q    Do you remember Mr. Costaldi was
4  confused as to what the events were?
5       A    I don't recall.
6       Q    I mean you are saying that --
7       DR. MARIN:  I don't recall.
8       He answered your question.
9       A    I recall him being very sharp, I
10 don't recall him being confused.
11      Q    He seemed confused.
12      So then I met with you again two
13 weeks later, no, three weeks later, and you
14 said I threw a book at you?
15      A    Yes.
16      DR. WEINFELD:  Is there a
17 question?
18      Q    Describe how I threw the book at
19 you?
20      A    I said did you read the book?
21 What do you mean?  This book?  Yes, I read it
22 and you through it, if you don't say -- how you
23 call that?
24      You didn't get up and say
25 well --

69 (Pages 270 to 273)

Page 274

LEENA VARUGHESE

1
2     Q    That's not what happened, I just
3  put the book down like this.
4         DR. MARIN:  You asked him to tell
5     you what his reflection is.  He's given
6     it to us.
7         DR. VARUGHESE:  I am just saying
8     I just placed it on his desk.  If I
9     threw it at him, it wasn't my intent to
10    hurt him.  I didn't do that.
11        DR. MARIN:  Questions and
12    answers.
13    Q    So I gave you the second
14 reflection, you read it and you said that you
15 needed to consult the hospital's legal?
16    A    It was very similar to the same
17 recounts, I thought that you were not following
18 the kind of advice that you were given by
19 several of the members of the Department and we
20 thought that we needed to consult both with our
21 colleagues in the Department and outside of the
22 Department.
23    Q    So you wanted to consult the
24 hospital's legal department, okay.
25        So here is the thing --

Page 275

LEENA VARUGHESE

1
2         DR. MARIN:  Hold it, questions.
3     Q    Question, question.
4         So, you got the reflection, you
5  said that you were going to consult --
6         DR. MARIN:  Is there a question?
7     Q    Do you recall me e-mailing you,
8  or I actually e-mailed Dr. Lento to ask him
9  exactly what should go into the second
10 reflection.
11        He never responded to me,
12 then --
13        DR. MARIN:  Dr. Varughese you are
14    supposed to ask him questions.
15    Q    You responded to me at some
16 point and --
17        DR. MARIN:  We won't continue the
18    proceedings if you can't follow in some
19    sort of pattern that we can help you
20    with.
21        DR. WEINFELD:  Take a minute,
22    think about what you want to ask.
23        I think there is a question.
24        DR. VARUGHESE:  I just want to
25    make a statement.

Page 276

LEENA VARUGHESE

1
2         DR. MARIN:  This is not a time
3  for a statement.
4         DR. BRONHEIM:  You will have an
5     opportunity to make a statement.
6     Q    Did you advise me as to what
7  should go into the new reflection?
8     A    Of course we did, and we got the
9  book for you and we read the book as well and
10 of course I was I expected to know what was in
11 the book, we said that we could buy it for you,
12 you said you were going to get it.
13    Q    Did you buy me the book?
14    A    You said that you had it
15 yourself, the book, and you went to the library
16 to pick it up.
17    Q    It's not in the library, it's
18 not available.
19        DR. BRONHEIM:  Did you obtain the
20    book?
21        DR. VARUGHESE:  Yes, I have the
22    book.
23    Q    You did e-mail me and you said
24 future constructive --
25        DR. LEITER:  If you don't have a

Page 277

LEENA VARUGHESE

1
2  question, you are better off not listing
3  it.
4     Q    Well, I asked Dr. Cordone-Cardo
5  for advice, but I did not get adequate response
6  back about what needs --
7         DR. MARIN:  Dr. Varughese, again,
8     you are not asking, you can terminate
9     your questions at this time if there is
10    nothing else, and we can go on to the
11    next witness.
12        DR. VARUGHESE:  Okay.
13        DR. MARIN:  Thank you.
14        DR. WEINFELD:  Thank you.
15        MR. McEVOY:  The Department
16    rests.
17        DR. WEINFELD:  I would like to
18    move that we take a two minute break
19    because I think people need to answer
20    pages.
21        (At this point in the proceedings
22    there was a recess, after which the
23    hearing continued as follows:)
24        DR. WEINFELD:  Dr. Varughese, you
25    will have the opportunity to present

70  (Pages 274 to 277)

Page 278

LEENA VARUGHESE

2 your case, you can make an opening
3 statement, call witnesses and we should
4 proceed; it's getting late.
5         DR. VARUGHESE: So I am just
6 going to read a statement that I
7 prepared to the best of my ability.
8         So, ladies and gentlemen, members
9 of the Board and the Department, and Mr.
10 MacDonald from general counsel, so
11 basically here is the story.
12        So I was placed on academic
13 advisement on December 21 of last year
14 following an altercation with the previous
15 Chief Resident, Samuel McCash where I felt
16 that I was being physically and verbally
17 intimidated, humiliated.
18        This is as per house staff policy
19 manual which is Exhibit 43, some of you
20 may have it.
21        And I believe pages 31 to 35 notes
22 what is considered harassment in this
23 hospital.
24        I have attached my reflection of
25 the event which is sort of details what

Page 279

LEENA VARUGHESE

2 happened, but also discusses
3 professionalism and how I would have
4 approached things differently.
5         DR. WEINFELD: Where is that?
6         DR. VARUGHESE: That's Exhibit 2.
7         DR. LEITER: I see it in 3.
8         DR. VARUGHESE: 2 and 3, I was
9 asked to the old reflection, write a new
10 one.
11        At this point I had requested a
12 formal apology from Samuel McCash, as
13 Chief Resident and a mediation regarding
14 this particular incident and there was
15 another incident, so I asked for
16 mediation.
17        None of this had occurred and at
18 that point I was placed on academic
19 advisement, like I mentioned before, so I
20 made an official complaint to Human
21 Resources when action was taken against me
22        Human Resources performed an
23 investigation of the matter but did not
24 contact me to inform what their findings
25 were.

Page 280

LEENA VARUGHESE

2         And this is as of when I turned in
3 my reflection which was in March and in
4 April eventually I had to contact Human
5 Resources to find out what their decision
6 was.
7         So basically before the resolution
8 of this incident I had to meet with Dr.
9 Lento on January 18th and I was continued
10 to be on academic advisement at that
11 point.
12        Meanwhile Samuel McCash was not
13 reprimanded at all, and that still stands
14 to my knowledge.
15        So, prior to this there was a
16 previous incident with the Chief Resident
17 where he shouted at me shut up, shut up,
18 shut your mouth, repeatedly in front of my
19 colleagues following a discussion of
20 coverage for an away resident.
21        He wanted to speak to me following
22 this incident on his own during this
23 conversation, he told me that no one liked
24 me, that I would never find a job, no one
25 is teaching me and that I won't be

Page 281

LEENA VARUGHESE

2 successful.
3         I believe this behavior constituted
4 an outright hostile work environment for
5 me at that point.
6         So I had sent an e-mail to the
7 leadership of the Department of Pathology
8 to address what had happened to me that
9 morning.
10        And how I considered what Samuel
11 McCash was saying to me to be very hostile
12 in attitude and also very descriminative
13 towards me as a girl, as a woman, because
14 I really don't think he would treat a man
15 like that.
16        So then I also spoke with the
17 program director soon after, he made
18 excuses for Samuel McCash saying sometimes
19 people yell and that there is a place
20 where people to be shouted at and that the
21 bullying situation is that sometimes
22 residents need to be told.
23        He also said that the Department
24 was a dysfunctional Department family aud
25 I was then accused of writing a diatribe

71 (Pages 278 to 281)

LEENA VARUGHESE

1
2 both on evaluation about surgical
3 pathology.
4        Essentially he effectively -- well,
5 he indicated to me that in so many words
6 that my rights won't be protected as me
7 as he believed that I wrote a negative
8 evaluation, and he felt more in line with
9 the Chief Resident who was also his
10 friend.
11        So a lot of excuses were made and I
12 essentially felt like there was no
13 recourse for me to follow up on this
14 particular matter and I just left it at
15 that.
16        That was in September and then
17 following that I served on the ACGME
18 review program to help the program prepare
19 for the ACGME review and I was not asked
20 to present the program to the ACGME for
21 inspection, which is fine, but perhaps my
22 evaluations were included for the ACGME
23 evaluation, I hope so, but I'm not sure
24 about that.
25        But anyway the Department is

LEENA VARUGHESE

1
2 currently ACGME accredited and that's all
3 wonderful and I'm very happy about that.
4        So moving on, on 4/26/2011 I
5 received an e-mail from Dr. Lento stating
6 that a period of academic advisement had
7 ended.
8        I was then contacted by Basil
9 Ocinto via e-mail to meet Dr.
10 Cordone-Cardo, Lento and Mr. Castaldi and
11 May 3, 2011 so at this meeting Dr.
12 Cordone-Cardo, Dr. Lento and Mr. Costaldi
13 were very confrontational and antagonistic
14 towards me in their attitude and demeanor,
15 they said that they felt that my
16 reflection was not satisfactory in its
17 tone and demonstrated a lack of insight
18 and had to be recast.
19        I calmly stated that the reflection
20 addressed every point as mentioned in the
21 letter of academic advisement and was an
22 accurate portrayal of what had happened to
23 me on the evening of December 8, 2010.
24        The tone of my reflection which I
25 believe is rather defensive was

LEENA VARUGHESE

1
2 necessitated because of the actions taken
3 against me instead of some acknowledgment
4 and mediation.
5        And what I believe was a rather
6 traumatizing event that occurred to me.
7        The reflection also addressed my
8 involvement in the event, so the
9 reflection does accurately reflect what
10 happened.
11        I e-mailed Dr. Lento soon after the
12 meeting to ask him to please state what
13 your concerns are, and be specific as to
14 what you would like for me to do.
15        I did not receive a response to
16 this e-mail. After review of the
17 reflection written and submitted on March
18 30, 2011 I decided that it accurately
19 reflected with appropriate amount of
20 insight.
21        I met Dr. Lento and Dr.
22 Cordone-Cardo and Mr. Costaldi again on
23 May 24, 2011 and submitted the new
24 reflection.
25        I was prepared to discuss the book

LEENA VARUGHESE

1
2 on professionalism by Steven Pesan at
3 length, I was not given this opportunity
4 at that point, and that's okay, since in
5 light of all the issues.
6        Basically I respectfully disagree
7 with Dr. Lento and Dr. Cordone-Cardo that
8 my reflections lack insight or
9 professionalism and I demonstrated
10 professionalism and restraint during all
11 of my meetings.
12        So, and of course I have a detailed
13 record of all these meetings, if it comes
14 to having to review that in the future.
15        I have also retained legal counsel
16 following April 20 -- April 2011 to advise
17 me on the matter at hand, and I have also
18 worked with several other lawyers
19 including several consultations to protect
20 myself from further punitive actions that
21 may be taken by the hospital or the
22 Department.
23        So, following my second meeting
24 with Dr. Cordone-Cardo, Dr. Lento and
25 Mr. Costaldi, the law firm that I retained

72  (Pages 282 to 285)

Page 286

LEENA VARUGHESE

1       at that point sent in a letter to the
2       hospital on June 13, 2011 detailing the
3       reasons why I have retained their
4       services.
5           Which to me is obviously the
6       hostile work environment that I am
7       experiencing at this point.
8           Subsequently after this letter was
9       sent in I was placed on disciplinary
10      action on 7/14 -- on July 15th, sighting
11      my second reflection as being inadequate
12      and demonstrating lack of insight and
13      several other issues that are not true,
14      and that's also in the exhibit.
15          Finally I would like to address the
16      various points that were addressed that
17      were noted in the summary of suspension
18      letter, termination, suspension,
19      termination.
20          So basically there was a concern of
21      duty and professionalism concerning two
22      cytogenetics rotation, I believe we had an
23      opportunity to speak with Dr. Najfeld, so
24      basically my statement in response to that

Page 287

LEENA VARUGHESE

1       particular statement is that clinical
2       pathology rotations including cytogenetic
3       rotations are "light rotations" or
4       resident independent rotations regarding
5       observation and understanding of
6       laboratory tests and most importantly
7       extensive reading.
8           Many residents also use some of
9       this time to prepare for the Board
10      examination.
11          When I began cytogenetics rotation,
12      which is a two week rotation which began
13      on 8/1/2011 and went on to 8/12/2011, I
14      was asked by Dr. Najfeld to read a chapter
15      written by herself in the Molecular
16      Genetic Pathology Book by Dr. Sang.
17          So I performed that task and spent
18      some time reviewing the manuals and worked
19      with the technologist observing how the
20      cytogenetic testing was performed, and
21      reviewed some basic principles of
22      karyotyping during the first week.
23          Please feel free to interview the
24      laboratory staff if that's necessitated.

Page 288

LEENA VARUGHESE

1           And then I believe I was
2       professional and cordial with the staff
3       and Dr. Najfeld at all times.
4           The laboratory staff contacted me
5       several times by e-mail asking me not to
6       come in for very specific reasons, such as
7       being on short staff, short staffing
8       issues and also because their clinical
9       responsibilities that they could not pay
10      attention to my needs in terms of teaching
11      me, what they do.
12          On Thursday August 4, 2011 Dr.
13      Najfeld was contacted by Dr. Firpa to more
14      closely supervise my activities.
15          She wrote an e-mail in response
16      saying she was very busy implementing new
17      equipment during that first week and that
18      she did not have enough time to spend
19      time, that she did not have enough time to
20      spend with me.
21          Following this Dr. Najfeld became
22      more combative and berated me in front of
23      the staff several times,
24          I sometimes used a Blackberry

Page 289

LEENA VARUGHESE

1       device to take notes on research
2       information, Dr. Najfeld took offense at
3       this and I stopped doing that.
4           Dr. Najfeld asked me to give a
5       presentation on CML on Thursday for the
6       following week, on Tuesday, this was
7       Thursday 4/11 and for Tuesday 8/9, 11 on
8       Monday, 8/8/11 which was the beginning of
9       the final week of this rotation I spoke to
10      Dr. Najfeld in the morning to review the
11      rotation requirements for the first time.
12          The day before I was to give my
13      presentation on CML Dr. Najfeld wanted to
14      review the presentation with me.
15          However, she was away for most of
16      the afternoon and gave no indication as to
17      when she would return.
18          I left the Department around 4:00
19      p.m. or so, and e-mailed my presentation
20      to her.
21          I was on my -- on the subway back
22      to my home in Brooklyn, Dr. Najfeld
23      apparently called me and e-mailed me
24      several times, but I was not able to

73  (Pages 286 to 289)

Page 290

LEENA VARUGHESE

1
2 receive a call on the subway and I arrived
3 at home around 5:40 or so, and I called, I
4 tried to return her e-mails.
5      I must also note actually the first
6 week on Friday she wasn't at work, she was
7 working from home, so, in fact, she may
8 have gotten the e-mail on Thursday, but
9 she actually didn't speak to me on Friday
10 because -- and she had to speak to me on
11 Monday because she was working from home
12 on Friday.
13      So anyway, going back, when I
14 returned home I noted the e-mail messages
15 and contacted her immediately.
16      She said that the presentation was
17 not ready due to my stylistic preferences
18 in discussing the case and certain minor
19 errors.
20      I asked her to e-mail me or simply
21 tell me what the issue was, but she wanted
22 me to return to her office.
23      It was rather late and it was out
24 of the question that I return from before
25 6:00 from my home in Brooklyn, it takes me

Page 291

LEENA VARUGHESE

1
2 approximately 30 minutes to get back.
3      Then on the morning of the
4 presentation at 7:00 a.m. Dr. Najfeld
5 e-mailed me stating she did not want me to
6 make the presentation, even though I was
7 prepared to do so, she also asked me to
8 inform other attendees that I would not
9 present.
10      The presentation was postponed to
11 the next week, also the CP core conference
12 tends to have more than one conference
13 that gets presented so there is often me
14 and several other people who present.
15      People may attend depending on the
16 number of conferences that are being
17 presented, and it's not always common
18 knowledge who is presenting, what is the
19 interesting case conference that we can,
20 so people do tend to show up at 9:00 a.m.
21 anyway and just are ready to discuss any
22 issues you have or any interesting
23 clinical pathology cases that have come
24 up.
25      So that's one hour available time

Page 292

LEENA VARUGHESE

1
2 for CP. It's not a very formal event.
3      So, the presentation was postponed
4 to the next week, the following week the
5 case was discussed at length in
6 conjunction with the hemopath resident who
7 was on the hemopath service who had also
8 needed time to form the case and present
9 as well.
10      Overall the presentation was well
11 done and well received, I had attached the
12 presentation, as Exhibit 25, Dr. Najfeld
13 also gave no indication that my
14 performance was unsatisfactory at the end
15 of this rotation.
16      I believe I did the best job I
17 could give in the short time on this
18 rotation and added pressure to serve or
19 function on other services.
20      The point 2, duty concerns
21 regarding coverage.
22      So frozen section coverage on
23 August 5th, I was asked to cover frozen
24 section service for an absent resident on
25 August 4th.

Page 293

LEENA VARUGHESE

1
2      I said that I would not be able to
3 do so without giving an elaborate
4 explanation as to why to the Chief
5 Resident.
6      Basically I was not able to elevate
7 my arm because I had slept on it the wrong
8 way and my arm was numb for days. It
9 never happened to me before, so as such I
10 could not cover the frozen section service
11 for that day.
12      I was sent an e-mail by Dr. Jordan
13 the co-Chief Resident who was on rotation
14 at this point that I needed to provide a
15 doctor's note documenting this injury.
16      This is not something that can be
17 easily done, and especially if I am at
18 work, or so I wasn't able to do that, but
19 I explained to her that I tried to explain
20 to her that this particular -- I had this
21 particular injury, that's why I'm not able
22 to cover that particular day.
23      So, she wanted me to -- so I found
24 that her request for me to -- and this is
25 not a call coverage, this is mainly every

74  (Pages 290 to 293)

Page 294

LEENA VARUGHESE

1
2  day duty coverage, and actually at this
3  point the service tends to be mostly
4  resident dependent as well, the frozen
5  sections because there is a technologist
6  who does some of the work, but personally
7  for me I just couldn't cut the specimens
8  and some of those duties would require
9  some manual dexterity.
10       So anyway, so I found the request
11  for a doctor's note rather unreasonable,
12  because I did go to work that day for
13  cytogenetics rotation and I was working
14  with the staff there.
15       Dr. Najfeld was not there that day,
16  and anyway in order for me to get a -- so
17  I just thought it was unreasonable because
18  I would have to leave work and get a note.
19       I also did -- I didn't change my
20  rationale for refusing the assignment, and
21  I did not believe I was dishonest or
22  insubordinate in these matters.
23       I mentioned at a later date that I
24  did not think that it is ideal for me to
25  have to lose out on the limited time on CP

Page 295

LEENA VARUGHESE

1
2  rotations to cover AP service, similarly
3  because CP service is about 18 months and
4  AP service is about 36 months.
5       Personally I am not even -- I don't
6  think I am getting actually 18 months of
7  CP even though it's being stated that it
8  is CP by Dr. Lento.
9       So, I really am concerned that I
10  have the adequate time that I need for CP.
11       And last year there was a strict
12  prohibition of course within reason from
13  asking a senior resident on CP service to
14  cover AP services.
15       And this is not meaning like you
16  can't teach, of course, as a senior
17  resident you have to go and teach and do
18  all that, but from saying that you're
19  assigned to like the service if you really
20  need that requirement.
21       Finally, point 2, surgical coverage
22  on August 12th, so basically on August 12,
23  2011 I was asked to cover the surgical
24  pathology service by an e-mail from
25  Dr. Jordan, the Chief Resident who was on

Page 296

LEENA VARUGHESE

1
2  an away in Pennsylvania.
3       Dr. Jordan did not ask me to reply
4  to her, you can check the e-mail, it was a
5  little bit -- it was one of Elizabeth's
6  but she doesn't specifically ask me to
7  respond to her, and since I had this
8  discussion with her the Friday before
9  about the new policies in the Department,
10  I had a chance to review it and I decided
11  okay, if she says that I have to cover, it
12  just means that I am going to have to
13  cover, if I couldn't, I would have to tell
14  her.
15       Her rationale is that I'm not
16  telling her that I'm covering, but I
17  didn't think it was up to me at this
18  point, because I have to cover.
19       Anyway, so there was -- I
20  acknowledged her e-mail and I planned to
21  cover the service, if I was unable to
22  cover the service of course I would have
23  informed her.
24       But you have to also remember that
25  I have other responsibilities such as

Page 297

LEENA VARUGHESE

1
2  going to cytogenetics so I had to meet
3  with Dr. Najfeld for the exit interview
4  which I expected would be somewhat
5  challenging,
6       I needed to prepare for this, I
7  spoke to her briefly regarding what I had
8  learned while I was on cytogenetics for
9  two weeks and she asked me questions on
10  techniques and methods in cytogenetics,
11  principles in cytogenetics and also
12  specific translocations associated with
13  different diseases, she also had me
14  complete the karyotype for the case that I
15  had to present, and I feel that at this
16  point I was ready to karyotype a case
17  somewhat competently.
18       So it was good that I didn't
19  present the case because before that I
20  would not have been able to karyotype this
21  case anyway, so I karyotyped the case and
22  I presented the same case the following
23  Tuesday.
24       During the midst of this Dr. Lento
25  calls cytogenetics lab and accuses me of

75 (Pages 294 to 297)

Page 298

LEENA VARUGHESE

1
2  not answering his pages.  I never received
3  these pages and I apologized to him if he
4  had paged me and I did not call him back.
5        He then asked me if I knew that I
6  was covering and I said yes, I would be
7  covering for the afternoon and I also felt
8  confident that Dr. Lento would relay this
9  appropriate message to Adrienne Jordan and
10 I proceeded to work on my cytogenetics
11 rotations at that point.
12       Point 3, unprofessional response to
13 request for change of elective rotation.
14       So on August 3, 2011 I requested a
15 change from GI pathology to dermopath
16 directly to Dr. Firpa,
17       I was told by Dr. Firpa that the
18 change would be fine if he had clearance
19 from Dr. Blejwas and that he would contact
20 her the following day.
21       I spoke to him again on August 24th
22 of 2011 and he said that he was busy and
23 was not able to consider the request --
24 consider my request to switch to
25 dermopath.

Page 299

LEENA VARUGHESE

1
2        Finally, my request was denied on
3  September 7th.
4        I spoke to Dr. Firpa in person to
5  discuss why my request was denied, and he
6  initially told me that Dr. Blejwas had
7  approved my request.
8        I had also spoken to Dr. Harpaz
9  several times at this point, I spoke to
10 him on August 24th because I was on call
11 at the hospital, so I spoke to him about
12 5:30 or so, and then I spoke to him again
13 on September 1st when I arrived back at
14 the hospital.
15       So he had told me that he was
16 amenable to me changing from GI pathology
17 to any other elective of my choosing, as
18 long as he had coverage.
19       So, basically I talked to Dr.
20 Harpaz and he said that he was amenable to
21 my request if he had a medical student or
22 resident who was on the service, but any
23 way I just accepted at this point that my
24 request was denied and I was going to have
25 to do GI whether I liked it or not, and

Page 300

LEENA VARUGHESE

1
2  that was fine, I figured okay, you know,
3  it's an elective, great, I'll just do the
4  elective at this point.
5        But I was e-mailed on like a day
6  following that or two days following that
7  by Dr. Jordan stating that Dr. Firpa had
8  spoken to her about the GI elective and if
9  I wanted to switch it I would have to
10 speak to Dr. You, who was the only person
11 who was to switch with me, it was just very
12 confusing for me and she just mandated
13 that I only speak with Dr. You, I only
14 e-mail him with Dr. Firpa cc'd.
15       And she stated I couldn't directly
16 approach Dr. You or talk to him or talk to
17 any other residents in the Department.
18       That event effectively prevents me
19 from doing my job, if there are other
20 residents interested in doing the
21 elective, that means I can switch to a
22 different elective, but Dr. Adrienne
23 Jordan is basically saying that I am only
24 allowed to talk to Dr. You, she is the
25 only person who can switch with you and

Page 301

LEENA VARUGHESE

1
2  you have to do it in this particular
3  format; don't approach this person.
4        I mean it's just rather strange.
5        Anyway, so anyway so I spoke with
6  Dr. Firpa that day, that was around
7  lunchtime, he claims that I was being
8  loud, but when I left his office he said I
9  can -- he has an open door policy and I
10 can bring my concerns to him in the
11 future.
12       So I just thought we left
13 everything off on a nice cordial note, not
14 necessarily that he was very upset with me
15 and he felt that I was yelling at him.
16       So anyway, eventually I spoke to
17 Dr. Elise Suarez who was the GI fellow at
18 the moment, and I made arrangements with
19 her for the week of October 2nd because I
20 wanted to attend the Ossler, I imagine
21 even if I were to be on GI elective I
22 would be allowed to attend the Ossler
23 review course, which was coming up soon,
24 so I made arrangements with her and she
25 said that was fine, she's happy to cover

76  (Pages 298 to 301)

Page 302

LEENA VARUGHESE

1
2  for one week, and then basically I found
3  out when I got the summary suspension
4  that, you know, this was all misconstrued
5  as being unresolved.
6        Anyway moving on, Moore conference
7  attendance and adherence to departmental
8  policy.
9        On August 29, 2011 I was sent an
10  e-mail stating I had not attended 80
11  percent of the conferences during period
12  2.
13        This new conference attendance
14  policy was instituted on on August 15th by
15  Dr. Adrienne Jordan as I had signed an
16  acknowledgment of receipt and I also
17  submitted and signed the acknowledgment of
18  receiving and reviewing this new policies
19  on August 15th.
20        Dr. Adrienne Jordan, the co-Chief,
21  was not at the hospital for that period
22  and Dr. Elizabeth Morency, the other Chief
23  Resident, was on vacation for the first
24  two weeks of this rotation.
25        On September 13, 2011 I called out

Page 303

LEENA VARUGHESE

1
2  sick, however I had hoped that I would
3  recover and present a brief surgical
4  pathology lecture.
5        Dr. Adrienne Jordan was not
6  satisfied with the topic and wanted me to
7  present on some other list of topics,
8        I did not have the adequate time to
9  prepare a new presentation when I wasn't
10  feeling well, the following day, September
11  14th I did not feel significantly better
12  so I called out sick again.
13        Soon after on September 14th when I
14  was out sick I was sent another e-mail
15  stating I had to present on September 15th
16  because a fellow who had been scheduled to
17  present for several months prior would not
18  be presenting.
19        I attended the September 15th
20  conference but I could not present because
21  I did not have adequate time to prepare
22  the presentation.
23        Following this the Department
24  decided to refer me to physician wellness
25  committee for the second time because I

Page 304

LEENA VARUGHESE

1
2  didn't present at the conference.
3        It states that, there was an e-mail
4  sent to me by Dr. Hughes of the physician
5  wellness committee that states that its
6  because I didn't present at a conference.
7        It's one of my exhibits.  So that's
8  Exhibit 21.
9        The fellow, Dr. Robert Guarino who
10  was initially assigned to present on
11  August 14th and given ample time to
12  prepare, I believe that was 15th,
13  September 15th and given ample time to
14  prepare, attended the conference and did
15  not present that day, that morning.
16        I did not believe my inability to
17  present a conference on a very short
18  notice is a fair reason for referral to
19  the physicians wellness committee.
20        The fellow who was initially
21  supposed to present and was in attendance
22  was not referred to the physician wellness
23  committee for not presenting.
24        Poor communication regarding leave
25  of absence.

Page 305

LEENA VARUGHESE

1
2        Dr. Firpa did not meet with me to
3  discuss an early departure from the
4  residence conference on Thursday as
5  mentioned above.
6        Later that morning on September
7  15th, Dr. Firpa asked me how I was
8  feeling, I had taken two sick days
9  previously and I said that I was well, but
10  I was considering taking a month off
11  through the Family Medical Leave Act, if
12  it can be approved by the hospital and by
13  my doctors.
14        He stated that it may be a good
15  idea, he said that I had a lot of
16  potential and that I'm an excellent
17  resident, he stated that in the meantime
18  he wanted nothing more than for myself to
19  be able to work on hemopath without
20  additional stressors.
21        He stated that he would e-mailing
22  Dr. Jordan and would communicate directly
23  with me.
24        I also shared with him that I spoke
25  to my doctor already and that it would be

77 (Pages 302 to 305)

## Page 306

LEENA VARUGHESE

1   at least one week before I could obtain an
2   appointment.
3      So, Dr. Firpa was aware that it
4   would take me at least one week to obtain
5   an appointment with my doctor.
6      Dr. Firpa apparently misconstrued
7   this information and he sent me an e-mail
8   and that's Exhibit 26, this e-mail was
9   sent to me on Thursday, at 3:51 p.m. by
10  Dr. Firpa, the other individual cc'd on
11  this e-mail is Bruce Peterson, Shema
12  Patel, Patrick Lento and Karen Tiger
13  Paillex.
14     I continued with my work for the
15  remainder of the day.
16     The following day, September 16th,
17  I arrived at 9:00 a.m. and continued with
18  the work for the day.
19     I received an extremely unusual
20  e-mail that afternoon from Dr. Firpa which
21  made little sense when compared to the
22  e-mail he sent to me the day before.
23     And this e-mail is exhibit -- one
24  of the exhibits from the Department.

## Page 307

LEENA VARUGHESE

1      So this is Exhibit 16 from the
2   Department.  So e-mail sent the next
3   afternoon.
4      Which basically the sentiment and
5   the tone is completely opposite of the
6   e-mail he sent to me the day before.
7      He stated that I needed a doctor's
8   note to attend work.  He wanted doctor's
9   notes for my previous sick days to be in
10  the hospital.
11     As you are well aware and we have
12  discussed this, the HR policy, the
13  hospital policy is doctor's notes are only
14  required for three consecutive sick days
15  or if there is a call coverage issue and
16  call is not covered.
17     I received an e-mail from
18  Dr. Jordan also stating that this was the
19  case.
20     Then shortly after I received a
21  page, the same day I received a page when
22  I was in the hospital I returned that page
23  but no one answered and then around 5:30
24  p.m. I noted several e-mails from Dr.

## Page 308

LEENA VARUGHESE

1   Hughes who stated that physician wellness
2   committee would like to speak to me.
3      Due to these confusing messages and
4   e-mails, I called my doctor and asked
5   specifically if I could proceed with the
6   family medical leave of absence, she's a
7   psychiatrist, called to inform me to speak
8   to my primary care physician.
9      At that point I took her advice and
10  spoke to my primary care physician who has
11  known me as a patient for several years.
12     I talked with him at length about
13  my health and work related stressors.
14  After much consideration his opinion was
15  that the family medical leave of absence
16  is not necessarily warranted.
17     He said that if all my concerns
18  were due to work related stress, to please
19  call the psychiatrist again.
20     So I spoke to my psychiatrist again
21  and she refused to grant me a leave of
22  absence after a lengthy phone conference.
23     I did not attempt to leave, I did
24  not attempt to obtain a third opinion, at

## Page 309

LEENA VARUGHESE

1   this point I resolved myself to having to
2   work through this particular situation.
3      I did not make any attempts to
4   mislead or misrepresent my intentions
5   regarding the family medical leave of
6   absence to Dr. Firpa, Human Resources,
7   physicians wellness committee, medical
8   education, Ms. Patel, et cetera.
9      In fact, I informed HR, Mr. Robert
10  Maglione, who is the administrative
11  assistant to Karen Tiger, that my
12  physicians have all denied me family
13  medical leave of absence.  This is on
14  Tuesday, around noon.
15     In the meantime, they all sent me
16  e-mails, left voice mails and so on
17  stating that their sentiment regarding my
18  right to be at work is that I do not have
19  the right to be at work.
20     In this particular circumstance I
21  felt the best course of action for me was
22  to follow hospital policy and be present
23  at work unless I was going to take a sick
24  day or be not at the hospital if I felt

78  (Pages 306 to 309)

Page 310

LEENA VARUGHESE

1
2 ill.
3       I do have the right to request
4 family medical leave of absence for
5 personal health problems, I think that the
6 Federal Law states that it can be up to 12
7 months.
8       There are portions that are covered
9 by the health insurance or without pay, I
10 felt that my request was not unreasonable
11 but the communication and befudllement
12 were all a production of Dr. Firpa and Ms.
13 Patel.
14       This has been a problem for me with
15 Dr. Firpa over the past few months and
16 this is a discussion that I had already
17 had with Dr. Barnett on September 11,
18 2011.
19       So, going to 6, an incident in Ms.
20 Patel's office.
21       I spoke to Ms. Patel on September
22 19th, 2011 with Ms. Kim Berlin present
23 regarding the family medical leave.
24       Around 4:30 p.m., Ms. Patel didn't
25 verify the date and sign the forms that

Page 311

LEENA VARUGHESE

1
2 they should have, that the hospital should
3 have when she gave me the form an
4 9/15/2011.
5       The following day I saw Ms. Patel
6 at the Starbucks and I said hello to be
7 polite and she started being extremely
8 confrontational
9       she said I cannot attend the
10 morning conference at 8:00 a.m, she then
11 asked me to go to her office and she
12 wouldn't allow me to leave.
13       I asked her repeatedly what the
14 issue was and whether or not I could
15 attend the 8:00 a.m. conference. She kept
16 making several phone calls to Ms. Tiger,
17 Dr. Firpa and so on.
18       While I simply waited there in her
19 office. She left the office and stepped
20 out for a very long time to assist a young
21 man to a nearby office, the door to her
22 office was open as I waited there, there
23 was a folder on her desk next to where I
24 placed my coffee which I leafed through
25 with no ulterior motive.

Page 312

LEENA VARUGHESE

1
2       She came in soon after and accused
3 me of looking at confidential information,
4 she stated that everything in her office
5 was confidential, at which point I was
6 once again bewildered by the incongruency
7 of the situation, in regard to -- and her
8 disregard of my plans for the day which
9 was attending the conference and carry on.
10       Anyway, I had no intention of
11 rising from my chair and exploring all the
12 documents in her office, I simply looked
13 at the folder that was in front of me very
14 briefly.
15       Finally, Ms. Tiger Paillex rang Ms.
16 Patel at which point Ms. Patel insisted
17 that I walk over to HR office to meet with
18 myself, Tiger Paillex, I was effectively
19 incredulous at the turn of events and
20 summarily dumbfounded by the turn of the
21 day.
22       Ms. Tiger Paillex wanted
23 Mr. Johnson or the GME to attend the
24 meeting and waited, wanted me to wait for
25 him, however the meeting ensued shortly,

Page 313

LEENA VARUGHESE

1
2 they essentially interrogated me regarding
3 my presence at work, then I'm snpposed --
4 when I'm supposed to see the doctor,
5 forced me essentially to speak to Dr.
6 Hughes on the physician wellness committee
7 and essentially treated me like a
8 criminal.
9       I managed to maintain my reasonable
10 and calm nature and spoke to them.
11       I answered all their questions to
12 the best of my ability, and also I would
13 like to point out that I do have the house
14 staff policy manual here and in that the
15 family medical leave of absence can be
16 foreseeably asked up to 30 days in
17 advance, and it can be planned.
18       So I believe there isn't a real
19 issue with how I communicated with them on
20 this particular issue.
21       So anyway, in conclusion, I am a
22 fourth year resident in the final year of
23 training, the most arduous part of the
24 pathology residency training is surgical
25 pathology rotations or the AP part, where

79 (Pages 310 to 313)

Page 314

LEENA VARUGHESE

1  LEENA VARUGHESE
2  the resident is required to grow, render
3  diagnostic information in conjunction with
4  attending pathologists.
5      To date I have yet to be aware of
6  how or where I have mismanaged any case
7  that has affected patient's outcome, and I
8  have not.
9      So many of the attendings that I
10 work with say that I have well studied my
11 cases usually and I use clinical and
12 pathological correlation appropriately to
13 render the pathologic diagnosis.
14     I was on call many times and
15 attendings trust me to render frozen
16 section diagnosis independently with their
17 approval, many of my evaluations including
18 my most recent surgical pathology
19 evaluations are very positive.
20     I believe that I satisfactorily
21 completed all my rotations to this point
22 despite the stress, scrutiny and
23 hostility directed at me.
24     I would like to call witnesses to
25 expand on all these points, but I believe

Page 315

1  LEENA VARUGHESE
2  the only witness that I have here is Ms.
3  Karen Tiger Paillex.
4      DR. WEINFELD:  You want to call
5  the witness?
6      DR. VARUGHESE:  Yes.
7      MR. McEVOY:  No questions.
8      DR. MARIN:  I would like to ask
9  some brief questions.
10     It came to me as I was listening to
11 you that the issue when you were in
12 Starbucks you had received prior to that
13 you had received a statement you were not
14 to return to work.
15     When you were in Starbucks, were
16 you planning on coming back into the
17 hospital or were you just happened to be
18 at Starbucks and then you were recruited
19 to come to Ms. Patel's office?
20     Was it your intention to come into
21 the hospital that day?
22     DR. VARUGHESE:  Yes.
23     DR. BRONHEIM:  Even though you
24 were told to leave?
25     DR. VARUGHESE:  Well, this is

Page 316

1  LEENA VARUGHESE
2  Tuesday, so basically I was sent an
3  e-mail by Dr. Firpa stating that okay,
4  in the last --
5      DR. MARIN:  You can let that go.
6      DR. VARUGHESE:  Here is the
7  thing, I'm getting conflicting messages
8  from Dr. Firpa, this has exactly been my
9  problem.
10     DR. MARIN:  We read the message
11 there was at least one statement that
12 was clear in that proposed letter that
13 said you were not to come in until that
14 was resolved.
15     I will just ask one question, it
16 was your intention to come in?
17     DR. VARUGHESE:  It was my
18 intention to come into work.
19     DR. MARIN:  The next question is
20 you looked at one of the files, is that
21 correct, without question, you were in
22 the office, you opened the file that
23 didn't belong to you, is that true or
24 not true?
25     DR. VARUGHESE:  That is true.

Page 317

1  LEENA VARUGHESE
2      DR. MARIN:  What did the file
3  say?
4      DR. VARUGHESE:  I wasn't trying
5  to find anything.
6      DR. MARIN:  I understand, but
7  what did you see?
8      DR. VARUGHESE:  I don't -- I
9  didn't even really read anything.
10     DR. MARIN:  Did you think it was
11 wrong that you did that?
12     And do you think it was wrong now?
13     At the time was it wrong and do you
14 think you were wrong at this time?
15     DR. VARUGHESE:  I wasn't trying
16 to look at confidential information.
17     DR. MARIN:  I'm not asking you
18 that.
19     Do you think that having done that,
20 looked at that file at the time was wrong
21 and now after consideration do you think
22 it's wrong today?
23     DR. VARUGHESE:  I mean at the
24 time I didn't think I was doing anything
25 wrong.

80  (Pages 314 to 317)

Page 318

```
1            LEENA VARUGHESE
2        DR. MARIN: Okay, how about
3   today?
4        DR. VARUGHESE: Today, now that I
5   know it's confidential information --
6        DR. MARIN: No, no, you are in
7   someone else's office you open up a file
8   on their desk, is that wrong or is that
9   not wrong?
10       DR. BRONHEIM: Okay, that's an
11  answer.
12       DR. WEINFELD: Why don't we --
13       DR. MARIN: I have one more
14  question, you mentioned, and this is
15  very important, during your description
16  here you said you had this altercation
17  with the Chief Resident, and you
18  specifically said and it went into the
19  record, that you were physically abused
20  by that Chief Resident.
21       Is that what you meant to say, or
22  would you retract that statement?
23       DR. VARUGHESE: I didn't say
24  that.
25       DR. MARIN: You did say that.
```

Page 319

```
1            LEENA VARUGHESE
2   You may not have meant to say it, that's
3   what I want to clarify.
4        DR. VARUGHESE: Physically.
5        DR. MARIN: Physically, you were
6   you were stating that you were
7   physically intimidated.
8        DR. VARUGHESE: Yes.
9        That means following me around
10  pointing at me, with very little --
11       DR. MARIN: Did he place his
12  hands on you? Did he hit you or did you
13  at any point feel threatened.
14       DR. VARUGHESE: Yes, I did feel
15  threatened, yes.
16       DR. MARIN: My last question is
17  in the entire Department of Pathology,
18  is there any attending in the Pathology
19  Department that you could call upon who
20  would be your mentor or your advocate in
21  these proceedings now or that you find
22  as a friend and a close confidante,
23  after four years in the Department?
24       DR. VARUGHESE: Yes.
25       DR. MARIN: Who would that be?
```

Page 320

```
1            LEENA VARUGHESE
2        DR. VARUGHESE: Well,
3   Dr. Peterson is my advisor.
4        DR. MARIN: Is there someone who
5   you feel would be your confidante and
6   would rise to your defense in the
7   context of all the things that have
8   happened?
9        DR. VARUGHESE: I think most
10  people can.
11       DR. MARIN: I'm asking not most
12  people, I'm asking you and I'm asking
13  for is there one person.
14       DR. VARUGHESE: Who wouldn't
15  defend me and I think at that point you
16  can call in any other people.
17       DR. MARIN: I didn't ask you that
18  question, I asked you is there a single
19  person in the Department who you could
20  go to who would rise and defend you in
21  the context of what's happening after
22  four years in the Department.
23       DR. VARUGHESE: Yes.
24       DR. MARIN: Who would that be?
25       DR. VARUGHESE: There would be
```

Page 321

```
1            LEENA VARUGHESE
2   several.
3        DR. WEINFELD: Just name one,
4   that's all we ask.
5        DR. VARUGHESE: All right, well I
6   can say Dr. Lamp from the Bronx VA.
7        DR. MARIN: Thank you.
8        DR. ROCCO: I have one question.
9   So you've been accused of many things
10  today and you've kind of gone through
11  them and we listened to your
12  explanation, I just want to know out of
13  all of the things in terms of your
14  actions, do you take responsibility or
15  do you feel remorse involving any of the
16  things that you've talked about, if you
17  just think about your own actions?
18       DR. VARUGHESE: Is there a
19  particular --
20       DR. ROCCO: Is there anything
21  that you feel you know what, I was wrong
22  on this case and I kind of take
23  responsibility for that, out of all of
24  the incidents that we heard today?
25       Like missing call?
```

Page 322

LEENA VARUGHESE

1  
2       DR. VARUGHESE: I didn't miss
3  call. Various.
4       DR. ROCCO: Any of the things
5  that have been brought up today, any?
6       DR. VARUGHESE: Well, I never
7  missed call.
8       DR. ROCCO: That was just one
9  example, anything.
10      DR. BRONHEIM: Do you think you
11 should have seen a psychiatrist and
12 taken medical leave?
13      DR. VARUGHESE: What?
14      DR. BRONHEIM: Do you think you
15 should have taken medical leave and seen
16 a phsyciatrist as recommended?
17      DR. VARUGHESE: That's what I was
18 trying to do.
19      DR. BRONHEIM: When?
20      DR. VARUGHESE: When I asked for
21 the medical leave of absence.
22      DR. BRONHEIM: But you didn't see
23 somebody.
24      DR. VARUGHESE: I did, I spoke to
25 the psychiatrist that I was seeing and

Page 323

LEENA VARUGHESE

1  
2  she just felt given the circumstances
3  and she was aware of the surrounding
4  situation and the story, she didn't feel
5  comfortable given a family medical leave
6  of absence.
7       DR. LEITER: She was seeing
8  someone outside of the hospital.
9       DR. WEINFELD: We will have an
10 opportunity to do this if we need, why
11 don't we bring our witness in.
12      Let's do that and then we can
13 proceed.
14 
15 C A R Y N   T I G E R   P A I L L E X,
16 called as a witness, having been first
17 duly sworn by the Notary Public, was
18 examined and testified as follows:
19 
20      DR. WEINFELD: Dr. Varughese, go
21 ahead.
22 
23 DIRECT EXAMINATION BY DR. VARUGHESE:
24 
25      Q   So, can you please describe what

Page 324

LEENA VARUGHESE

1  
2  the reason was that I came to see you on
3  Tuesday, for the family, this wasn't on Tuesday
4  morning, Shema Patel called you?
5       A   The last time I met with you?
6       Q   Yes.
7       A   Shema called me because the
8  Department had met with you, you had told them
9  that you were not able to work, that you were
10 not feeling well, you had taken a couple of
11 days off prior and the Department allowed you
12 the time to get off, that your well-being is
13 most important and that you see your physician.
14      They gave you the time off on
15 that Tuesday, they found out after numerous
16 e-mails and calls that you didn't respond to,
17 that you were actually working in the
18 Department during the days even though the
19 Department had given you off.
20      So they asked me to meet with
21 you for a couple of reasons, one being that
22 they were concerned about your well-being and
23 wanted to know about your FMLA status.
24      One being that they were
25 constantly contacting you and you weren't being

Page 325

LEENA VARUGHESE

1  
2  responsive.
3       And you were showing up to work
4  even though they asked you not to, until you
5  had medical documentation.
6       And that you were in Shema's
7  office and when she left you in her office you
8  were going through files on her desk.
9       So I asked to meet with you to
10 follow up with those issues.
11      Q   What is the hospital policy
12 regarding the Family Medical Leave Act?
13      A   What is?
14      Q   Can I plan that in advance? Can
15 I request, can I foresee that I may need a
16 family medical leave of absence?
17      A   Sure, that's what you did and
18 you were provided the documentation, but you
19 continued to come to work and the reason why
20 you were asked not to come to work is because
21 you were saying that you weren't feeling well
22 and you weren't feeling well enough to work,
23 that's why they not only -- the Department not
24 only asked you if you had an appointment with
25 your doctor, but they also offered to get an

82 (Pages 322 to 325)

Page 326

LEENA VARUGHESE

1    LEENA VARUGHESE
2  appointment because you had told them that you
3  weren't going to be able to get a doctor's
4  appointment until the following week.
5       When I met with you that
6  Tuesday, you had told me that you went to your
7  psychiatrist the week before and they wouldn't
8  grant you a family leave and they told you to
9  go see your primary care physician.
10       And you were going to see your
11  primary care physician that afternoon.
12       During that same meeting I asked
13  you if you got ahold of Dr. Dan Hughes because
14  he was trying to reach out to you, and you said
15  no, because you didn't want to deal with him.
16       We explained to you that he was
17  part of physicians wellness and you needed to
18  reach out to him, and we actually called him,
19  if you recall, in my office and had the two of
20  you talk and actually scheduled an appointment
21  for that Thursday to follow up.
22    Q    So here is the thing Dr. Firpa
23  sent me an e-mail on Thursday at 3:51 p.m.
24  basically saying what the circumstances were
25  regarding the sick day and how he understood.

Page 327

LEENA VARUGHESE

1
2       In fact, let me just quote him
3  here.
4       DR. MARIN:  You will have to have
5  a question.
6       DR. WEINFELD:  Are you coming to
7  a question?
8       DR. BRONHEIM:  You can sum up
9  later.
10       DR. WEINFELD:  Are you coming to
11  a question?
12       DR. VARUGHESE:  Yes.
13    Q    So basically he says that I'm
14  sorry you could not get an appointment with
15  your physician sooner than next week.
16       Since your health is paramount
17  to all of us, please meet with Dr. Peterson and
18  discuss the situation candidly.
19       And he also says, just referring
20  to the family medical leave, as you asked of
21  me, I will wait to inform the Chief Residents
22  to remove from the rotation schedule until you
23  obtain and provide this doctor's note and I
24  think Dr. Firpa is referring to the family
25  medical leave having that form filled out by my

Page 328

LEENA VARUGHESE

1
2  doctor?
3    A    The paperwork.
4    Q    The paperwork before he
5  instructs anybody that I'm not going to be in
6  the hospital.
7       DR. WEINFELD:  So what's the
8  question?
9    Q    So, were you surprised that now
10  I don't have this document yet, but everybody
11  is asking me not to be at work?
12    A    Am I surprised at what?
13    Q    Like why is that, why is
14  everyone asking me?
15       I mean I am well, I am
16  interacting with my mentor, I am signing out
17  all the cases without any mistakes and this is
18  Thursday, Friday, Monday, Tuesday, so what do
19  you think, why do you think people are saying
20  that I shouldn't be, after understanding what I
21  conveyed, saying that, you know, now I'm here,
22  you know, I will have to get a doctor's note in
23  the future, and Dr. Firpa had understood that,
24  then going back and claiming that I'm not well
25  enough now and I need to get a doctor's note in

Page 329

LEENA VARUGHESE

1
2  order to be on the floor on I guess Monday was
3  and then Tuesday?
4       DR. WEINFELD:  So what's the
5  question for Ms. Tiger?
6    Q    So do you think that's a
7  reasonable thing to do?
8    A    You are asking my opinion on
9  whether or not I think?
10    Q    I am asking you like what is the
11  protocol for something like that?
12    A    I think if the Department, if
13  you tell the Department that you do not feel
14  well enough to work, they should and did try to
15  make every effort to get you to a doctor to
16  help you.
17       DR. WEINFELD:  Could I interrupt
18  you for a second.  I'm not sure it's
19  clear what your official position is at
20  Mount Sinai, so I would like to ask what
21  your position is in Mount Sinai.
22       THE WITNESS:  My position is
23  Director of Human Resources for the
24  School of Medicine.
25    Q    I met with you on Tuesday

83  (Pages 326 to 329)

Page 330

LEENA VARUGHESE

1
2     morning and what did you think of -- you spoke
3     to me and we had a one hour long conversation
4     with you, me and Mr. Johnson, so did you think
5     that I was so ill that I couldn't at work?
6         A     I'm not a physician, so I can't
7     answer whether or not you are ill.
8             So --
9         Q     So the hospital policy is I can
10    foresee a family medical leave absence or a
11    leave of absence for up to 30 days in advance,
12    right, and I can take the time I need to come
13    up with the documentation?
14        A     I don't understand your
15    question.
16        Q     The Human Resources policy --
17            DR. MARIN:  I think we have
18            already established that's well
19            documented in the hospital policies, we
20            don't need to go through it again.
21        Q     So the HR policy on sick days,
22    it's after three days that I have to bring a
23    doctor's note?
24            After three days?
25        A     In the house staff manual?

Page 331

LEENA VARUGHESE

1
2         Q     Yes.
3         A     I would have to check.
4         Q     I don't think it's in the house
5     staff manual, it's in a different manual.
6             So it's basically three days
7     unless it's call, so there is no real reason to
8     ask me to bring a doctor's note.
9             DR. BRONHEIM:  That's different
10            from being asked by your Department to
11            take a leave.
12            You are asking about the medical
13            illness like the flue versus your being
14            formally asked by letter to take a leave,
15            that's a different, those are different
16            issues.
17            DR. VARUGHESE:  Well, I requested
18            a leave, they were not asking me to take
19            a leave.
20            DR. BRONHEIM:  Okay.
21        Q     So I filed a grievance with you
22    in December sometime regarding the academic
23    advisement and you never -- when did you get
24    back to me about the findings related to that
25    particular complaint?

Page 332

LEENA VARUGHESE

1
2         A     I don't think your claim was on
3     the academic advisement, I think it was on
4     harassment.
5             And I investigated the
6     harassment claim and issued a decision.
7             In my findings --
8         Q     At what point?
9         A     Sometime in April.
10        Q     Sometime in April?
11        A     Yes.
12            DR. WEINFELD:  Who gets a copy of
13            that decision?
14            THE WITNESS:  Of the?
15            DR. WEINFELD:  It says the
16            findings of the grievance.
17            THE WITNESS:  I sent Dr.
18            Varughese a copy of my decision and the
19            Department was made aware of my
20            decision.
21            DR. BRONHEIM:  Can you tell us
22            what it was?
23            THE WITNESS:  I did not find
24            harassment.
25            DR. BRONHEIM:  By Dr. Najfeld?

Page 333

LEENA VARUGHESE

1
2             THE WITNESS:  Yes.
3             DR. WEINFELD:  I have a question,
4     Dr. Varughese said that she never heard
5     back and you are saying that a decision
6     was sent to her and to the Department?
7             THE WITNESS:  Right, we actually
8     met and I met with her to discuss my
9     findings and then I gave her a
10    formalized letter.
11            DR. WEINFELD:  Does that jog your
12    memory at all?
13            DR. VARUGHESE:  Yes, I was being
14    continued on academic advisement I had
15    to go through the physician wellness
16    committee, all these things were
17    happening and I was just getting more
18    and more worried and then finally I
19    reached out to Karen, Ms. Tiger because
20    I felt like I didn't know what their
21    findings were, and I'm still on all
22    these actions were taken against me and
23    there is nothing is resolved and this
24    keeps continuing onward and onward.
25            DR. WEINFELD:  The question was

84  (Pages 330 to 333)

Page 334

1         LEENA VARUGHESE
2  did you receive a response.
3     DR. VARUGHESE: I contacted her
4  then she gave me --
5     DR. WEINFELD: Did you --
6     DR. VARUGHESE: Yes, she gave me
7  a document stating that that was her
8  finding at that point, a month before.
9     DR. WEINFELD: Any other
10  questions for Ms. Tiger Paillex?
11     DR. VARUGHESE: No.
12     DR. WEINFELD: Any questions from
13  the Department of Pathology?
14     DR. FIRPA: No.
15     DR. WEINFELD: Questions from the
16  Committee?
17     Thank you for staying.
18     DR. WEINFELD: Dr. Varughese, any
19  other witnesses you would like to call?
20     DR. VARUGHESE: Well, I don't
21  think anyone else is out there, so --
22     DR. WEINFELD: Do you need more
23  time to coordinate witnesses? I mean to
24  present additional evidence on your
25  behalf?

Page 335

1         LEENA VARUGHESE
2     DR. LEITER: Did you want to
3  summarize or say anything else?
4     DR. WEINFELD: We are not there
5  yet.
6     DR. VARUGHESE: Can you give me a
7  minute?
8     DR. WEINFELD: Sure.
9     Anything further, Dr. Varughese,
10  that you want, any further witnesses?
11     DR. VARUGHESE: I mean I don't
12  think I want to call -- I had a witness
13  list but no one is here, so I think I
14  would just like to conclude the hearing.
15     DR. WEINFELD: I just wanted to
16  ask, if you have any objection to the
17  proceedings that took place today,
18  anything that -- the conduction of this
19  hearing that you want to put on record?
20     DR. VARUGHESE: No.
21     DR. WEINFELD: Okay, any closing
22  statements, concluding remarks by either
23  Dr. Varughese or Department of
24  Pathology?
25     MR. McEVOY: If the Committee

Page 336

1         LEENA VARUGHESE
2  would like one, we can certainly do it.
3     DR. WEINFELD: We would have
4  liked it four hours ago, but if you
5  would like it you can have one now, too,
6  it's okay.
7     MR. McEVOY: Dr. Varughese gets
8  to go first.
9     DR. WEINFELD: Do you want to
10  make any concluding remarks?
11     DR. VARUGHESE: Yes, I would like
12  to make concluding remarks.
13     So basically all the points listed
14  in the summary suspension termination
15  letter were not previously mentioned to me
16  as possible reasons for termination.
17     While I was on a final warning,
18  meaning disciplinary due to issues prior
19  to either Dr. Cordone-Cardo or Dr. Firpa's
20  arrival, I feel that they have played a
21  major role in what has happened, and for
22  these reasons I feel that the actions
23  taken against me were both arbitrary and
24  capricious.
25     And, in fact, the way it was

Page 337

1         LEENA VARUGHESE
2  conducted by asking Dr. Firpa, Tiger
3  Paillex, having several security personnel
4  while all the residents were in the
5  residents room and I was being essentially
6  asked to leave the premises while I wasn't
7  doing anything wrong, other than being at
8  work and as approved by both my
9  physicians.
10     So I did what I could, I calmly
11  collected my things from my desk and I was
12  escorted by security and I left the
13  hospital.
14     In the past I have worked with good
15  faith with my superiors, including Dr.
16  Lento, but I feel that he has been very
17  dishonest and not very forthright in his
18  dealings with me in the past year.
19     I have also been suspended and
20  terminated in my final year as I prepare
21  to take my Board examination, including
22  having paid for the Ossler course out of
23  my own pocket and the Department is paying
24  for everybody else.
25     So I do believe that I am treated

85 (Pages 334 to 337)

Page 338

LEENA VARUGHESE

1  
2  unfairly on a daily basis and, in fact,
3  once again these actions are very
4  arbitrary and capricious, and although I
5  don't have a lawyer here, I do have legal
6  counsel who advises me and I will have to
7  take whatever actions I need to.
8      But I felt this was a peer-to-peer
9  review Committee and I feel very
10 comfortable and calm that the Committee is
11 competent and I don't need to have legal
12 counsel, per se.
13     And finally, in conclusion, I
14 basically I worked with the Department of
15 Pathology and the pathology residency
16 program at Mount Sinai Hospital, I
17 performed all my duties to my most
18 ) capability and very competently.
19     I have attempted to reconcile my
20 differences with the former director, Dr.
21 Lento and I also feel that I have had to
22 attend and I have also tried to attend
23 therapy for related stressors, et cetera,
24 due to this particular -- due to
25 specifically what's happening.

Page 339

LEENA VARUGHESE

1  
2      And I had also previously requested
3  a transfer as PGY 2 and even as a PGY 3
4  with Dr. Lento because I felt that it may
5  be too -- given the circumstances it may
6  be difficult for me.
7      DR. WEINFELD: Transfer to what?
8      DR. VARUGHESE: To a different
9  program, however I felt that I could
10 successfully complete the training given
11 a fair opportunity to do so and by
12 removing the ambivalent, arbitrary and
13 capricious actions taken against me over
14 the past year.
15     Since my formal complaint with
16 Samuel McCash inherently committed his
17 harassing actionings, so basically I just
18 wanted to be treated fairly, I want to do
19 my job and I just want to graduate and go
20 on with my life.
21     DR. WEINFELD: Thank you.
22     DR. VARUGHESE: Thank you.
23     MR. McEVOY: I think the rules
24 permit counsel to make the closing
25 statement.

Page 340

LEENA VARUGHESE

1  
2      In the interests of time I would
3  request the Committee's permission to make
4  the closing statement on behalf of the
5  Department.
6      DR. WEINFELD: Okay.
7      MR. McEVOY: First of all, I just
8  want to refocus the Committee on the
9  fact that at least it's the Department's
10 position that the period of time we are
11 looking at here is between the final
12 warning and the discharge, roughly a
13 period of about two months, from July
14 15th to September 21st of 2011.
15     And you have heard testimony from
16 the witnesses for the department on all of
17 the incidents that form the basis of the
18 decision to terminate Dr. Varughese.
19     And you have heard Dr. Varughese
20 essentially say none of that is true,
21 everybody is wrong, everybody is out to
22 get me.
23     I don't think it serves any of our
24 interests or purpose for me to go through
25 each of those incidents in detail to

Page 341

LEENA VARUGHESE

1  
2  explain why what Dr. Varughese says is
3  demonstrably not true, you have heard it,
4  you can read her self-assessment and
5  decide for yourselves whether it is really
6  what she says it is, or what Dr.
7  Cordone-Cardo says it is.
8      You can read the e-mails that show
9  that Dr. Varughese insists that she e-mail
10 the presentation to Dr. Najfeld on Friday,
11 but the e-mail shows it's on Monday, there
12 are so many of those that I wouldn't even
13 know where to start, and it would take me
14 a long time to finish.
15     But the short answer is that in
16 order to believe Dr. Varughese' version of
17 all of these incidents, you have to
18 disbelieve every witness who testified on
19 behalf of the Department.
20     That Dr. Cordone-Cardo, Dr. Firpa,
21 to Dr. Najfeld to Dr. Jordan to
22 Dr. Morency to Dr. Lento to Mr. Johnson to
23 Ms. Patel, have all made this up out of
24 hole cloth that none of these things
25 happened, even though Dr. Varughese kind

86 (Pages 338 to 341)

Page 342

LEENA VARUGHESE

1                  LEENA VARUGHESE
2  of ultimately admits well, I did sort of
3  flip through a file, but can't bring
4  herself to say that that's wrong.
5         Can't bring herself to acknowledge
6  that that was something she shouldn't have
7  done, and that really is the point of all
8  of this.
9         The events that took place in a six
10  or eight or ten week period more than
11  justify the decision to terminate somebody
12  who is on final warning.
13        But the real problem I think is
14  that Dr. Varughese is unable to accept the
15  fact that she bears any responsibility for
16  any of this.
17        That she did anything wrong, that
18  anything that she was told to do or asked
19  to do or was instructed to do is
20  reasonable or fair and what it really
21  comes down to is Dr. Varughese wants to
22  set her own rules.
23        This is the -- she feels free to
24  ignore her program director, she feels
25  free to ignore her Chief Residents, she

Page 343

1                  LEENA VARUGHESE
2  feels free to ignore her Chair, to ignore
3  the instructions of Dr. Firpa, just
4  because that's what she wants to do.
5        I don't know what the reason for
6  that is, I'm not sure it matters what the
7  reason for that is, but what it tells us
8  all is that there is no reasonable
9  expectation that if this Committee put her
10  back to work, that anything would change,
11  that she would be able to comply with the
12  rules and regulations of the program.
13        You know, my mother had an
14  expression when I was a, kid and she said
15  not everybody is out of step in the army
16  but you.
17        And in Dr. Varughese' army
18  everybody is out of the step in the army
19  but her; it doesn't work that way.
20        When you go to work and your
21  program director tells you to do
22  something, you do it.
23        There are recourses if you disagree
24  with it, if you think it's unfair, but you
25  don't get to ignore it.

Page 344

1                  LEENA VARUGHESE
2        You don't get to not respond to
3  pages, you don't get to not respond to
4  e-mails.
5        When Dr. Firpa tells you don't come
6  to work, there are ways to have recourse
7  for that, too, but you can't ignore it and
8  just show up for work.
9        Dr. Varughese never contacted Dr.
10  Firpa and said I want to come to work, I
11  think I'm well enough to come to work,
12  reassess your view.
13        She just showed up.  She never
14  talked to anybody about that, she follows
15  her own set of rules and marches to her
16  own drum.
17        Unfortunately, those set of rules
18  are not Mount Sinai's set of rules and
19  they are certainly not the Department of
20  Pathology's set of rules, so there is
21  really little doubt here that given where
22  she started from, the final warning, given
23  what took place, and her inability to
24  recognize that in any shape, manner or
25  form, she bears some responsibility.

Page 345

1                  LEENA VARUGHESE
2        The question that she was asked,
3  did you do anything wrong?
4        Is there anything here that you
5  take any responsibility for?
6        The answer is no.
7        And that really is the point, she
8  takes responsibility for nothing.  She
9  blames everyone else for her problems,
10  there is no evidence that anyone is
11  responsible for her problems, that anyone
12  was out to get her, that anyone had
13  treated her unfairly.
14        To the contrary, the evidence shows
15  everybody bent over backwards to treat her
16  fairly, to give her another chance to let
17  her succeed and she quite frankly
18  sabotaged herself, she hasn't followed the
19  rules this Committee set down, she hasn't
20  followed the rules pretty much from the
21  day she got here.
22        So now it's too late, quite
23  frankly, for her to come before the
24  Committee and say all this is unfair give
25  me another chance.

87  (Pages 342 to 345)

Page 346

LEENA VARUGHESE

1
2      She's had any number of chances,
3   she hasn't taken advantage of those
4   chances, by no stretch of the imagination
5   can anyone come to the conclusion it was
6   arbitrary and capricious for Dr.
7   Cordone-Cardo and for Dr. Firpa to decide
8   that there was no recourse left but to
9   terminate here her.
10      They consulted with GME at all the
11  appropriate steps, they consulted with
12  Human Resources at all the appropriate
13  steps, I think the only conclusion the
14  Committee can reach is that there is no
15  basis to conclude that it was arbitrary
16  and capricious to terminate Dr. Varughese.
17      Thank you.
18      DR. WEINFELD:  Well, I want to
19  thank everyone for staying to this late
20  hour and appreciate everyone's efforts.
21      We are adjourned.
22
23
24
25

Page 347

1      LEENA VARUGHESE
2
3      C E R T I F I C A T E
4
5
6      I, STEPHEN J. MOORE, a Shorthand
7   Reporter and Notary Public of the State of
8   New York, do hereby certify:
9
10      That, the Proceedings
11  hereinbefore set forth is a true and
12  accurate record of the Hearing.
13
14      I further certify that I am not
15  related to any of the parties to this
16  action by blood or marriage; and that I am
17  in no way interested in the outcome of
18  this matter.
19      _____
20      STEPHEN J. MOORE, CRR
21
22
23
24
25

88 (Pages 346 to 347)

Exhibit 274

2008 EMPLOYEE ATTENDANCE RECORD

2008 ATTENDANCE RECORD FOR

Name: Narvekar Leena

Employee # 735941

Department: 665

Date Hired: _____  Position #: _____



IN EACH DATE ENTER HOURS (TO NEAREST 1/4 HOUR) AND/OR ONE OF THE FOLLOWING CODES:

A   – Absence (Unpaid)
AN  – Absence - Not Notified
H   – Holiday
SH  – Substitute Holiday
F   – Free Day

V   – Vacation Day
M   – Marriage Day
P   – Paternity Day
C   – Condolence Day
J   – Jury Duty Day

SIL – Sick Leave of Absence
MAL – Maternity Leave of Absence
MIL – Military Leave of Absence
LOA – Other Leave of Absence
CR  – Crisis Day

L   – Late
O   – Day Off
C   – Compensatory
S   – Sick Pay (Paid or Unpaid)
SN  – Sick Day - Not Notified

P144

AT EACH YEAR'S END OR ON TERMINATION OF EMPLOYMENT SEND THE ORIGINAL TO PERSONNEL DEPT, P/R RECORDS SECTION

THE MOUNT SINAI HOSPITAL                    2009 EMPLOYEE                    ATTENDANCE RECORD



2009 ATTENDANCE RECORD FOR

Name: Varghese Leena    Employee #: 17621941

Department: 665    Position #: _____    Date Hired: _____

IN EACH DATE ENTER HOURS (TO NEAREST 1/4 HOUR) AND/OR ONE OF THE FOLLOWING CODES:

| | | | |
|---|---|---|---|
| V | – Vacation Day | SIL | – Sick Leave of Absence |
| M | – Marriage Day | MAL | – Maternity Leave of Absence |
| P | – Paternity Day | MIL | – Military Leave of Absence |
| C | – Condolence Day | LOA | – Other Leave of Absence |
| J | – Jury Duty Day | CR | – Crisis Day |

| | | | |
|---|---|---|---|
| A | – Absence (Unpaid) | | |
| AN | – Absence - Not Notified | | |
| H | – Holiday | | |
| SH | – Substitute Holiday | | |
| F | – Free Day | | |

| | | |
|---|---|---|
| L | – Late | |
| D | – Day Off | |
| C | – Compensatory | |
| S | – Sick Pay (Paid or Unpaid) | |
| SN | – Sick Day - Not Notified | |

P-176 (10/08)

P145

THE MOUNT SINAI HOSPITAL

2010 EMPLOYEE ATTENDANCE RECORD

2010 ATTENDANCE RECORD FOR

Name _Vindaresh leena 17329u_

Employee # _____  Date Hired _____

Department _____  Position # _____

| Month | S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|---|
| **JANUARY** | | | | | | 1 NEW YEARS DAY | 2 |
| | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| | 17 | 18 MARTIN LUTHER KING JR DAY | 19 | 20 | 21 | 22 S | 23 |
| | 24 | 25 V | 26 V | 27 V | 28 V | 29 V | 30 |
| **FEBRUARY** | 31 | 1 V | 2 V | 3 V | 4 V | 5 V | 6 |
| | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| | 14 | 15 PRESIDENTS DAY | 16 | 17 | 18 | 19 | 20 |
| | 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| **MARCH** | 28 | 1 | 2 | 3 | 4 | 5 | 6 |
| | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| | 21 | 22 S | 23 | 24 | 25 | 26 | 27 |
| | 28 | 29 | 30 | 31 | 1 | 2 | 3 |
| **APRIL** | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| | 18 | 19 | 20 S | 21 S | 22 S | 23 S | 24 |
| | 25 | 26 | 27 | 28 | 29 | 30 | 1 |
| **MAY** | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| | 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| | 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| **JUNE** | 30 | 31 MEMORIAL DAY | 1 | 2 | 3 | 4 | 5 |
| | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| | 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| | 27 | 28 | 29 | 30 | | | |

| Month | S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|---|
| **JULY** | | | | | 1 | 2 | 3 |
| | 4 | 5 INDEPEN DENCE DAY | 6 | 7 | 8 | 9 | 10 |
| | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
| **AUGUST** | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| | 8 | 9 | 10 | 11 | 12 | 13 S | 14 |
| | 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| | 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| | 29 | 30 | 31 | 1 | 2 | 3 | 4 |
| **SEPTEMBER** | 5 | 6 LABOR DAY V | 7 | 8 | 9 | 10 | 11 |
| | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| | 19 | 20 | 21 | 22 | 23 S | 24 | 25 |
| | 26 | 27 | 28 | 29 | 30 | 1 | 2 |
| **OCTOBER** | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| | 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| | 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| **NOVEMBER** | 31 | 1 | 2 | 3 S | 4 | 5 S | 6 S |
| | 7 | 8 | 9 | 10 | 11 | 12 S | 13 |
| | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| | 21 | 22 | 23 | 24 | 25 THANKS GIVING DAY | 26 | 27 |
| **DECEMBER** | 28 | 29 | 30 | 1 | 2 | 3 | 4 |
| | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| | 19 | 20 | 21 | 22 | 23 S | 24 CHRISTMAS DAY | 25 |
| | 26 | 27 S | 28 | 29 | 30 | 31 | |

IN EACH DATE ENTER HOURS (TO NEAREST 1/4 HOUR) AND/OR ONE OF THE FOLLOWING CODES:

| Code | Description | | Code | Description |
|---|---|---|---|---|
| L | - Late | | V | - Vacation Day |
| DO | - Day Off | | M | - Marriage Day |
| CD | - Compensatory | | P | - Paternity Day |
| O | - O/C Pay (Paid or Unpaid) | | C | - Condolence Day |
| S | - Sick Day (Paid or Unpaid) | | J | - Jury Duty Day |
| SN | - Sick Day - Not Notified | | | |
| A | - Absence (Unpaid) | | SIL | - Sick Leave of Absence |
| AN | - Absence - Not Notified | | MAL | - Maternity Leave of Absence |
| H | - Holiday | | MIL | - Military Leave of Absence |
| SH | - Substitute Holiday | | LOA | - Other Leave of Absence |
| F | - Free Day | | CR | - Crisis Day |

AT EACH YEAR'S END OR IN TERMINATION SEND ORIGINAL TO PERSONNEL DEPT. RECORDS SECTION

P-176 (08/09)
STAPLES

P146

THE MOUNT SINAI HOSPITAL    2011 EMPLOYEE    Attendance RECORD

2011 ATTENDANCE RECORD FOR

Name: Var guese Jena

Department: 665

Employee #

Position #

Date Hired 04/28/41

IN EACH DATE ENTER HOURS (TO NEAREST 1/4 HOUR) AND/OR ONE OF THE FOLLOWING CODES:

L   – Late
O   – Day Off
O   – Compensatory
S   – Sick Pay (Paid or Unpaid)
SN  – Sick Day - Not Notified

A   – Absence (Unpaid)
AN  – Absence - Not Notified
H   – Holiday
SH  – Substitute Holiday
F   – Free Day

V   – Vacation Day
M   – Marriage Day
P   – Paternity Day
C   – Condolence Day
J   – Jury Duty Day

SIL – Sick Leave of Absence
MAL – Maternity Leave of Absence
MIL – Military Leave of Absence
LOL – Other Leave of Absence
CR  – Crisis Day

P-176 (09/10)
STAPLES

P147

Exhibit 275

**Carter, Allene**

| | |
|---|---|
| **From:** | Barnett, Scott |
| **Sent:** | Friday, June 15, 2012 8:59 AM |
| **To:** | Carter, Allene; Firpo, Adolfo; Johnson, Paul; Tiger-Paillex, Caryn |
| **Cc:** | Barnett, Scott |
| **Subject:** | Re: GME Verification Request (215172933, Leena Varughese, Pathology-Anatomical and Clinical) |

Adolfo should fill it out using the data in her file

Scott

―――――――――――――――――――――――――

Scott H. Barnett, M.D.
Associate Dean for GME
Mount Sinai School of Medicine
(P) 212-241-6694
(f) 212-426-7748



Received Verification from FCVSGME for Leena Varughese.

*Allene Carter*
*Department of Pathology – Box 1194*

―――――――――――――――――――――――――

**From:** FCVSGME [mailto:FCVSGME@fsmb.org]
**Sent:** Thursday, June 14, 2012 9:58 AM
**To:** Carter, Allene
**Subject:** GME Verification Request (215172933, Leena Varughese, Pathology-Anatomical and Clinical)



Date: 6/14/2012

Name of Physician: Leena Varughese
Dates Attended: June 2008 to September 2011

**NOTE:** This applicant has designated a state medical or osteopathic board which has special requirements. Please include the following when you complete the form to avoid any additional follow up for these special board requirements:

- The form must be affixed with a seal or notary for submission to the state board Physician has designated. (Emailing the form back can be considered sealed electronically.)

D00478

## Carter, Allene

| | |
|---|---|
| **From:** | Firpo, Adolfo |
| **Sent:** | Wednesday, June 20, 2012 9:05 AM |
| **To:** | Carter, Allene; Johnson, Paul |
| **Subject:** | RE: GME_Verification_Form (3) (leena varughese) |

Please pull and review Dr, Varughese's file for the following information:

1. Date she was summarily suspended, kept out of the program until the final decision of her dismissal. – This should be the explanation for her brake from her training. (Unless Paul indicates that this refers to a voluntary break).
2. I am not sure if she was ever placed on probation or not. I don't believe she was but let's check her official record. If so the letter provides the explanation for the action.
3. Yes, she was disciplined at three times, 1st before we arrived, 2nd the final notice she received when I arrived (which led to her summary dismissal) and 3rd her summary dismissal from the program (dates).
4. Yes, I am not sure how many. Please review her record and tag the faculty evaluations with comments about her behavior in rotation. For sure Dr. Najfeld's report of her rotation through her service provides extensive information on disciplinary problems. Also Dr. Lento's e-mails and the transcript of Dr. Najfeld, Dr. Lento and me at the hearing provides many examples of her problem behavior.
5. I believe this should be Yes. The special requirements were for disciplinary reasons, the tasks she was assigned to perform in the first 2 disciplinary actions which she failed to fulfilled.

This should provide the information necessary to respond and send Paul for his final review and approval before submission.

Adolfo

---

**From:** Carter, Allene
**Sent:** Wednesday, June 20, 2012 8:33 AM
**To:** Johnson, Paul; Firpo, Adolfo
**Subject:** GME_Verification_Form (3) (leena varughese)

I cannot complete this form. I would need to know what responses to put for questions 1 through 5.  Explanation is involved.

Allene Carter

D00477

**Carter, Allene**

| | |
|---|---|
| **From:** | Johnson, Paul |
| **Sent:** | Wednesday, June 20, 2012 10:01 AM |
| **To:** | Firpo, Adolfo |
| **Cc:** | Carter, Allene |
| **Subject:** | Re: GME_Verification_Form (3) (leena varughese) |

1. No

2. No

3. Yes

4. Yes

5. Yes

The explanation should be exactly the same as the one on the GME verification form. Please use that text.

Paul

On Jun 20, 2012, at 9:04 AM, Firpo, Adolfo wrote:

Please pull and review Dr. Varughese's file for the following information:

1. Date she was summarily suspended, kept out of the program until the final decision of her dismissal. – This should be the explanation for her brake from her training. (Unless Paul indicates that this refers to a voluntary break).
2. I am not sure if she was ever placed on probation or not. I don't believe she was but let's check her official record. If so the letter provides the explanation for the action.
3. Yes, she was disciplined at three times, 1st before we arrived, 2nd the final notice she received when I arrived (which led to her summary dismissal) and 3rd her summary dismissal from the program (dates).
4. Yes, I am not sure how many. Please review her record and tag the faculty evaluations with comments about her behavior in rotation. For sure Dr. Najfeld's report of her rotation through her service provides extensive information on disciplinary problems. Also Dr. Lento's e-mails and the transcript of Dr. Najfeld, Dr. Lento and me at the hearing provides many examples of her problem behavior.
5. I believe this should be Yes. The special requirements were for disciplinary reasons, the tasks she was assigned to perform in the first 2 disciplinary actions which she failed to fulfilled.

This should provide the information necessary to respond and send Paul for his final review and approval before submission.

Adolfo

---

**From:** Carter, Allene
**Sent:** Wednesday, June 20, 2012 8:33 AM
**To:** Johnson, Paul; Firpo, Adolfo
**Subject:** GME_Verification_Form (3) (leena varughese)

I cannot complete this form. I would need to know what responses to put for questions 1 through 5. Explanation is involved.

D00476



Federation of
STATES
MEDICAL
BOARDS

...eration Credentials Verification Service (F......)
400 Fuller Wiser Road, Suite 300, Euless, TX 76039
Tel: (817) 868-5000  Fax: (817) 868-5099

8/10/2012

## Verification of Graduate Medical Education

Institution: Mount Sinai Hospital

Attention: **PATHOLOGY**

Specialty: Pathology-Anatomical and Clinical

Affiliated University: _____

Address: New York, NY

**EXHIBIT**

Johnson 16
11/3/13  PS

| Verification For: | Name: Varughese, Leena |
|---|---|
| | DOB: 01/26/1981 |
| | Individual's Name on Record (If different from above): |

| Program Participation: | Training Level: 1-3 (e.g., 1, 2, etc.) | Specialty/Subspecialty: _Pathology_ |
|---|---|---|
| **Important:** Report Incomplete Training Levels (years) separate from those that were successfully completed. | ☐Internship ☒Residency ☐Chief Residency ☐Fellowship ☐Research | From: 07/01/2008   To: 06/30/2011 |
| | | Successfully Completed?: ☒Yes ☐No ☐In Progress |
| | | Accredited by: ☒ACGME ☐AOA ☐LCGME ☐RSC ☐CFPC ☐RCPSC ☐APPAP ☐None of these |

| If the training level (year) is currently in progress report the expected completion date in the "To" field. | Training Level: 4 (e.g., 1, 2, 3, etc.) | Specialty/Subspecialty: **Pathology** |
|---|---|---|
| Report Internships, Residencies and Fellowships separately. | ☐Internship ☒Residency ☐Chief Residency ☐Fellowship ☐Research | From: 07/01/2011   To: 09/21/2011 |
| | | Successfully Completed?: ☐Yes ☒No ☐In Progress |
| | | Accredited by: ☐ACGME ☐AOA ☐LCGME ☐RSC ☐CFPC ☐RCPSC ☐APPAP ☐None of these |

| Use one section per Department/Specialty. If the Department/Specialty is rotating or transitional, please provide a schedule of rotations. | Training Level: _____ (e.g., 1, 2, 3, etc.) | Specialty/Subspecialty: _____ |
|---|---|---|
| | ☐Internship ☐Residency ☐Chief Residency ☐Fellowship ☐Research | From: / /   To: / / |
| | | Successfully Completed?: ☐Yes ☐No ☐In Progress |
| | | Accredited by: ☐ACGME ☐AOA ☐LCGME ☐RSC ☐CFPC ☐RCPSC ☐APPAP ☐None of these |

| Unusual Circumstances: | | |
|---|---|---|
| Check the correct response. Omitted responses require written explanation. | 1. Did this individual ever take a leave of absence or break from his/her training? | ☐Yes ☒No |
| | 2. Was this individual ever placed on probation? | ☐Yes ☒No |
| | 3. Was this individual ever disciplined or placed under investigation? | ☒Yes ☐No |
| If necessary, you may continue your explanation on a separate sheet of paper. | 4. Were any negative reports for behavioral reasons ever filed by instructors? | ☒Yes ☐No |
| | 5. Were any limitations or special requirements placed upon this individual because of questions of academic incompetence, disciplinary problems or any other reason? | ☒Yes ☐No |

Please explain any "Yes" response from above:

Dr. Varughese's evaluations over the initial portion of her Pathology training at Mount Sinai demonstrated satisfactory development in the six Core Competency domains. In some rotations her performance was considered superior by individual attendings, particularly in the areas of patient care (gynecological pathology) and medical knowledge (VA Hospital rotations).     continue Page 2.

| Certification: | |
|---|---|
| Affix your institutional seal in this space. If no seal is available, you must have this form notarized | Completion of the following is certification that the information above is an accurate account of this individual's records and is true and correct. The signature line must contain the original signature, or the electronic typed signature, of the program director (M.D./D.O. only). |
| | Name: ___Allene Carter___     Signature: _Allene Carter_ |
| | Title of Signatory: Program Coordinator     Date of Signature: 8/10/2012 |
| | Tel: (212) 241-8014     Fax: (212) 426-5129     E-Mail: allene.carter@mountsinai.org |

Rev. 07/31/2012     FCVS ID: 240344     FID: 215172933     FFF CODE: 107834

D00466

Page 2

Unusual Circumstances (Explanation continued)

However, Dr. Varughese began to exhibit unprofessional behavior and was placed on academic advisement in December 20 I 0, in the middle of her third year of training. While the program advanced Dr. Varughese to her fourth year of training, her substandard performance led the Department Chair to issue her a final warning notice on July 1, 20 II. Dr. Varughese's level of professionalism continued to be unsatisfactory and she was summarily suspended pend ing termination from the program on September 21, 20 I 1. Following Mount Sinai's grievance procedures, Dr. Varughese appealed the termination, but the decision was upheld.

D00467

Exhibit 276

**From:**       Jordan, Adrienne [adrienne.jordan@mountsinai.org]
**Sent:**       Thursday, August 11, 2011 12:16 PM
**To:**         Jordan, Adrienne (MSH); Morotti, Raffaella (MSH); Magid, Margret (MSH); Deligdisch, Liane
               (MSH); Kalir, Tamara (MSH); Eliasen, Carol (MSH); Fowkes, Mary (MSH); Carter, Ailene
               (MSH); Cordon-cardo, Carlos; Odintsov, Basil; Strauchen, James (MSH); Petersen, Bruce
               (MSH); Harpaz, Noam (MSH); Polydorides, Alexandros (MSH); Ward, Stephen (MSSM-
               Imail); Fiel, MariaIsabel (MSH); Thung, Swan (MSH); Xiao, Guang-Qian (MSH); Unger,
               Pamela (MSH); Garcia, Roberto A (MSH); Beasley, Mary (MSH); Zhu, Hongfa (MSH); Nagi,
               Chandandeep (MSH); Jaffer, Shabnam (MSH); Bleiweiss, Ira; Lento, Patrick (MSH); Firpo,
               Adolfo; Keys, Calvin (MSH); White, Ida (MSH); Hauptman, Eileen (MSH); Truong, Jonathan
               (MSH); Rosario, Roma (MSH); Sarraj, Bassel (MSH); Ramanathan, Lakshmi (MSH);
               Leonard, Kathleen; LaBombardi, Vincent (MSH); Peerschke, Ellinor (MSH); Szporn, Arnold
               (MSH); Phelps, Robert (MSH); Birge, Miriam (MSH); Pathologyresidents@mssm.edu
**Subject:**    RE: Chief Resident Pager Issue

I am pleased to report that I now have a pager that works while I am at my rotation here in
Pennsylvania. The pager number is the same as before (917-401-5341). Please feel free to
page me with any issues or concerns. If I do not return your page, I am probably in a "dead"
area and you are more then welcome to reach me via cell phone. Thank you all for your
patience during this small problem.

Adrienne Jordan, M.D.
Pathology Resident, PGY3
The Mount Sinai Medical Center
Department of Pathology- Box 1194
One Gustave L. Levy Place
New York, NY 10029
Cell: 330-327-7339


-----Original Message-----
From: Jordan, Adrienne
Sent: Tue 8/2/2011 9:54 AM
To: Morotti, Raffaella; Magid, Margret; Deligdisch, Liane; Kalir, Tamara; Eliasen, Carol;
Fowkes, Mary; Carter, Allene; Cordon-cardo, Carlos (MSSM); Odintsov, Basil (MSSM); Strauchen,
James; Petersen, Bruce; Harpaz, Noam; Polydorides, Alexandros; Ward, Stephen (MSSM-Imail);
Fiel, MariaIsabel; Thung, Swan; Xiao, Guang-Qian; Unger, Pamela; Garcia, Roberto A; Beasley,
Mary; Zhu, Hongfa; Nagi, Chandandeep; Jaffer, Shabnam; Bleiweiss, Ira; Lento, Patrick; Firpo,
Adolfo (MSSM); Keys, Calvin; White, Ida; Hauptman, Eileen; Truong, Jonathan; Rosario, Roma;
Sarraj, Bassel; Ramanathan, Lakshmi; Leonard, Kathleen; LaBombardi, Vincent; Peerschke,
Ellinor; Szporn, Arnold; Phelps, Robert; Birge, Miriam; Pathologyresidents@mssm.edu
Subject: Chief Resident Pager Issue

Hello all,

As many of you are aware, I am off site this month doing an elective rotation out of state.
Elizabeth, the other chief resident, is currently on vacation. I am continuing my chief
responsibilities while off site so please feel free to contact me with any problems.
However, I have recently discovered that my pager does not work out of state. While the
department is rapidly trying to correct this problem, for the time being, please e-mail me or
call my cell phone (330-327-7339) with any problems. Please also forward this e-mail to any
additional faculty or lab members I may have inadvertently forgotten. I apologize for any

1

CONFIDENTIAL                                                      D_ESI005362

inconvenience this may cause.  I will let you all know immediately when my pager is functioning again.  Thank you for your time.

Adrienne Jordan, M.D.
Pathology Resident, PGY3
The Mount Sinai Medical Center
Department of Pathology- Box 1194
One Gustave L. Levy Place
New York, NY 10029
Cell: 330-327-7339

2

CONFIDENTIAL

D_ESI005363

| From: | Firpo, Adolfo [adolfo.firpo@mssm.edu] |
|---|---|
| Sent: | Monday, August 01, 2011 4:18 PM |
| To: | Patel, Shema (MSSM) |
| Cc: | Lento, Patrick; Cordon-cardo, Carlos (MSSM); Jordan, Adrienne |
| Subject: | FW: Pager Problem |

**Importance:**     High

Dear Ms. Patel:

Dr. Adrianne Jordan's pager range is currently limited to onsite. On week-ends she is on Long Island and now while on elective rotation out of MS she continuous coverage of the Chief's areas of responsibility delegating to others on per case basis. I would like to have her pager be reset as long rage to enable her to attend to these duties. What will be needed to do so? Will Dr. Jordan have to bring her pager somewhere for the adjustment?

With appreciation for your support,

Dr. Firpo

Adolfo Firpo, M.D.,M.P.A.,FCAP
Professor and Director
Pathology Educational Activities
Department of Pathology,
The Mount Sinai School of Medicine.
The Mount Sinai Hospital
Phone: 212-659-8214
Fax: 212-348-7556
E-mail: adolfo.firpo@mssm.edu

*Office Address:*
Icahn Medical Institute 8th Floor, Office 8-40 ; Box-1612
1425 Madison Avenue and E98th Street
New York, New York 10029-6574

*Mailing address:*
One Gustave L. Levy Place, Box 1612
ATTN: Dr. Firpo
New York, New York 10029-6574

**From:** Jordan, Adrienne [mailto:adrienne.jordan@mountsinai.org]
**Sent:** Monday, August 01, 2011 3:27 PM
**To:** Firpo, Adolfo
**Subject:** Fwd: Pager Problem

Dr. Firpo,

Since I spend much of my weekends on Long Island and I am away this month, do you think it would be worth while to upgrade my pager to long range? I only ask because the lab will frequently page the chief when our over night histo tech calls out and if they can't get ahold of me there could be problems.

Adrienne

Sent from my iPhone

CONFIDENTIAL                                                                         D_ESI015666

Begin forwarded message:

**From:** "Carter, Allene" <Allene.Carter@mountsinai.org>
**Date:** August 1, 2011 2:54:17 PM EDT
**To:** "Jordan, Adrienne" <adrienne.jordan@mountsinai.org>
**Subject: RE: Pager Problem**

It will in New York, not outside certain parts of New York

Allene

-----Original Message-----
From: Jordan, Adrienne
Sent: Monday, August 01, 2011 2:51 PM
To: Carter, Allene
Cc: Lento, Patrick; Firpo, Adolfo (MSSM)
Subject: Re: Pager Problem


So my pager won't work at home in new York city either?

Sent from my iPhone

On Aug 1, 2011, at 2:26 PM, "Carter, Allene"
<Allene.Carter@mountsinai.org> wrote:

Found out what it was.  It is an onsite pager, any long range or
    nationwide pagers  department will have to pay for service.

    So if anyone has to contact you, it will have to be through your
    e-mail or cell phone.  Sorry.

    Allene

    -----Original Message-----
    From: Jordan, Adrienne
    Sent: Monday, August 01, 2011 1:09 PM
    To: pathologyresidents@mssm.edu; Lento, Patrick; Firpo, Adolfo (MSSM);
    Cordon-cardo, Carlos (MSSM); Bleiweiss, Ira; Carter, Allene
    Subject: Pager Problem


    Apparently there is an issue with my pager which telecommunications

2

CONFIDENTIAL

D_ESI015667

hopes to have fixed by tomorrow. In the mean time since I am off
campus this month and Liz is on vacation, please email or call my cell

phone

(330-327-7339) with any problems. Please also let any faculty members
who may be looking for a chief resident know this as well. Thank you.

Adrienne

Sent from my iPhone

3

CONFIDENTIAL

D_ESI015668

**From:**     Carter, Allene
**Sent:**     Friday, January 07, 2011 9:03 AM
**To:**       McCash, Samuel (MSSM-Imail)
**Cc:**       Lento, Patrick; Pessin-Minsley, Melissa; Burstyn, Freda
**Subject:**  Misplaced Pager

Have you found the pager? If not, then you would  have to get a telecommunications form from me and pay a fee of
$50.00 for new pager.

*Allene Carter*
*Residency & Fellowship Program*
*Department of Pathology - Box 1194*
*Mount Sinai School of Medicine*
*One Gustave L. Levy Place*
*New York, New York 10029*
*(212) 241-8014*
*(212) 426-5129 - Fax*

1

CONFIDENTIAL                                                     D_ESI015118

Exhibit 277

*mandatory for juniors only*

**8AM LECTURE ATTENDANCE SHEET: 2010-2011**

| Date | | Wed 9/1 | Thurs 9/2 | Fri 9/3 |
|---|---|---|---|---|
| Topic: | | Cyto: FNA | Surg: HEPTL | Autopsy |
| Lecturer: | | Dr. Wu | Dr. Moriner | Dr. Shiller |
| **PGY1** | | | | |
| Blouin, Amanda | | Vac | Vac | Vac |
| Fender, Justin | | | | |
| Grunes, Dianne | | | | MKO |
| Ko, Mabel | | MKO | | |
| Yao, Jonathan | | | | |
| **PGY2** | | | | |
| Chepovetsky, Julie | | JAC | JAC | JAC |
| Hechtman, Jaclyn | | | ACJ | ACJ |
| Jordan, Adrienne | | | | |
| Kazi, Sofia | | Sofia Kazi | | |
| Paul, Andrea | | | | |
| **PGY3** | | | | |
| Azar, Paul | | Vac | Vac | Vac |
| Chow, Jonathan | | | | |
| French, Jessica | | | ARM | |
| Martinez, Alicia | | Vac | Vac | Vac |
| Morency, Elizabeth | | | | |
| Roman, Taisha | | | | |
| Varughese, Leena | | | | |
| **PGY4** | | | | |
| Frost, Sarah | | | | sjk |
| Kim, Stacey | | | | |
| Maniar, Kruti | | | Away | Away |
| McCash, Samuel | | Away | Away | Vac |
| Trevino, Edward | | | | |
| **Fellows** | | | | |
| Cherneykin, Sergey | | | | |
| Guarino, Robert | | LH | | |
| Liu, Hui | | | | |
| Liu, Yuxin | | | | |
| Mercer, Stephen | | | | |
| Ouyang, Jie | | | | |
| Raoufi, Mohammad | | | | |
| Smethurst, Mark | | | | |
| Zhong, Minghao | | | | |

D02464

**8AM LECTURE ATTENDANCE SHEET: 2010-2011**

| Date | Monday 9/6 | Tuesday 9/7 | Wed 9/8 | Thurs 9/9 | Fri 9/10 |
|---|---|---|---|---|---|
| Topic: | AP: | CP: Coag. | Cyto: Cyd gland. | Surg: | Autopsy |
| Lecturer: | | Peershke | Dr Liu | | |
| **PGY1** | | | | | |
| Blouin, Amanda | HOL- | Vacation | Vac | NO | NO |
| Fender, Justin | | | | | |
| Grunes, Dianne | | | | LEC | CON- |
| Ko, Mabel | IDAY | | plate rounds | | |
| Yao, Jonathan | | | | | |
| **PGY2** | | | | TURE | FER- |
| Chepovetsky, Julie | | JAC | JAC | | |
| Hechtman, Jaclyn | | England signal | ACS | | ENCE |
| Jordan, Adrienne | | | | | |
| Kazi, Sofia | | | | | |
| Paul, Andrea | | | | | |
| **PGY3** | | | | | |
| Azar, Paul | | PA | PA | | |
| Chow, Jonathan | | | J French | | |
| French, Jessica | | | | | |
| Martinez, Alicia | | Vacation | Vacation | | |
| Morency, Elizabeth | | | Roman | | |
| Roman, Talsha | | LXV | | | |
| Varughese, Leena | | | | | |
| **PGY4** | | | | | |
| Frost, Sarah | | | | | |
| Kim, Stacey | | | | | |
| Manlar, Kruti | | KM | KM | | |
| McCash, Samuel | | CM | CM | | |
| Trevino, Edward | | | | | |
| **Fellows** | | | | | |
| Cherneykin, Sergey | | | | | |
| Guarino, Robert | | | Hu Liu | | |
| Liu, Hui | | | | | |
| Liu, Yuxin | | | | | |
| Mercer, Stephen | | | | | |
| Ouyang, Jie | | | | | |
| Raoufi, Mohammad | | | | | |
| Smethurst, Mark | | | | | |
| Zhong, Minghao | | | | | |

CONFIDENTIAL

# 8AM LECTURE ATTENDANCE SHEET: 2010-2011

| Date | Monday 9/13 | Tuesday 9/14 | Wed 9/15 | Thurs 9/16 | Fri 9/17 |
|---|---|---|---|---|---|
| Topic: | AP: ILD | CP: Liver Masses | Cyto: Bethesda | Surg: Dr. Trevino | Autopsy |
| Lecturer: | Dr. Beasley | Ramanathan | Chen | J. Roman | Dr. Schiller |
| **PGY1** | | | | | |
| Blouin, Amanda | | | | | |
| Fender, Justin | | | | | MCO |
| Grunes, Dianne | | | | | |
| Ko, Mabel | Mabel YAO | Mabel YAO | Plate Rounds | | |
| Yao, Jonathan | | | | | |
| **PGY2** | | | | | |
| Chepovetsky, Julie | | VAC OJFH | | | |
| Hechtman, Jaclyn | | ACT | Englewood | Englewood | SK |
| Jordan, Adrienne | | | | | |
| Kazi, Sofia | | | | | |
| Paul, Andrea | | | | | |
| **PGY3** | | | | | |
| Azar, Paul | | | V2 | | JRF |
| Chow, Jonathan | | | | | VAC |
| French, Jessica | | Vac | Vac | | |
| Martinez, Alicia | Vac | | Micro Rounds | | |
| Morency, Elizabeth | Vac | Roman | | Roman | |
| Roman, Taisha | | LXV | LXV | LXV | LXV |
| Varughese, Leena | | | | | |
| **PGY4** | | | | | |
| Frost, Sarah | | | | | |
| Kim, Stacey | | EPM | | KPM | |
| Manlar, Kruti | | CM | 8M | SM | |
| McCash, Samuel | SIM | | | ETI | |
| Trevino, Edward | | | | | |
| **Fellows** | | | | SNC | |
| Cherneykin, Sergey | | | | | |
| Guarino, Robert | | | | | |
| Liu, Hui | | | | | |
| Liu, Yuxin | | | | | |
| Mercer, Stephen | | | | | |
| Ouyang, Jie | | | | | |
| Raoufi, Mohammad | | | | | |
| Smethurst, Mark | | | | | |
| Zhong, Minghao | | | | | |

CONFIDENTIAL

D02466

**8AM LECTURE ATTENDANCE SHEET: 2010-2011**

| Date: | Monday 9/20 | Tuesday 9/21 | Wed 9-22 | Thurs 9-23 | Fri 9-24 |
|---|---|---|---|---|---|
| Topic: | AP: breast | CP: Renal Fx | Cyto: Thin Prep | Surg: Basic Reds | Autopsy |
| Lecturer: | Jaffer | Ramanathan | Szporn | Magid | Schiller |
| **PGY1** | | | | | |
| Blouin, Amanda | | | Frozens Cervix | | MFD |
| Fender, Justin | | | | | |
| Grunes, Dianne | | | | | |
| Ko, Mabel | | | Micro | | |
| Yao, Jonathan | | | | | |
| **PGY2** | | | | | |
| Chepovetsky, Julie | | | | | |
| Hechtman, Jaclyn | Eng | Eng | | Eng | Eng |
| Jordan, Adrienne | | | | | AP |
| Kazl, Sofia | | AP | | | |
| Paul, Andrea | | | | | |
| **PGY3** | | | | | |
| Azar, Paul | | | | | JRF Vac |
| Chow, Jonathan | JC | | | JC | |
| French, Jessica | Vac | Vac | Vac | Vac | CAP |
| Martinez, Alicia | | EM | Micro | EM | |
| Morency, Elizabeth | | | Aroman | | |
| Roman, Taisha | Aroman | LVV | | out Sick | |
| Varughese, Leena | | | | | |
| **PGY4** | | | | | CAP |
| Frost, Sarah | | | | | |
| Kim, Stacey | | | | | 8M |
| Maniar, Kruti | | 8M | 8M | 8M | |
| McCash, Samuel | | | B-17 | | |
| Trevino, Edward | 8-17 | | | | |
| **Fellows** | | | | | |
| Cherneykin, Sergey | | | | | |
| Guarino, Robert | | | | | |
| Liu, Hui | H.Liu | | | H.Liu | |
| Liu, Yuxin | | | | | |
| Mercer, Stephen | | | | | |
| Ouyang, Jie | | | | | |
| Raoufi, Mohammad | | | Vac | Vac | Vac |
| Smethurst, Mark | | | | | |
| Zhong, Minghao | | | | | |

CONFIDENTIAL

D02467

**8AM LECTURE ATTENDANCE SHEET: 2010-2011**

| Date | Monday 9/27 | Tuesday 9/28 | Wed 9/29 | Thurs 9/30 | Fri 10/1 |
|---|---|---|---|---|---|
| Topic: | AP: Forensics | CP: Vitamins | Cyto: Amalgam | Surg: Cert trophs | Autopsy |
| Lecturer: | Dr Scardi-Belli | Ramanathan | Dr Search | Manlar | |
| **PGY1** | | | | | |
| Blouin, Amanda | | Blouin | Blouin | | NO |
| Fender, Justin | | | | DBC | |
| Grunes, Dianne | | | Vac | Vac | Vac |
| Ko, Mabel | Vac | V2c | | | |
| Yao, Jonathan | | | | | |
| **PGY2** | | Vac | Vac | Vac | CON |
| Chepovetsky, Julie | Vac | CAP Vac | Vac | Vac | Vac |
| Hechtman, Jaclyn | Vac | ENG | Engm | Eng | FBR |
| Jordan, Adrienne | CAP | CAP | CAP | | |
| Kazi, Sofia | | Maternity | | | |
| Paul, Andrea | | | | | |
| **PGY3** | | | | | ENCF |
| Azar, Paul | VK | DC | | | |
| Chow, Jonathan | | | | | |
| French, Jessica | | | | | |
| Martinez, Alicia | CAP | CAP sick | | | |
| Morency, Elizabeth | | out sick | | | |
| Roman, Taisha | LXV | LXV | LXV | LXV | |
| Varughese, Leena | | | | | |
| **PGY4** | CAP | CAP | out sick | | |
| Frost, Sarah | | SK | | | |
| Kim, Stacey | | 14m | | | |
| Manlar, Kruti | | Sm | | out sick | |
| McCash, Samuel | | | | ETT | |
| Trevino, Edward | | | | | |
| **Fellows** | | | | | |
| Cherneyklin, Sergey | | | | | |
| Guarino, Robert | | | LH | | |
| Liu, Hui | | | | | |
| Liu, Yuxin | | | | | |
| Mercer, Stephen | | | | | |
| Ouyang, Jie | | | | | |
| Raoufi, Mohammad | | | | | |
| Smethurst, Mark | | | | | |
| Zhong, Minghao | | | | | |

D02468

**8AM LECTURE ATTENDANCE SHEET: 2010-2011**

| Date | Monday 10/25 AP: | Tuesday 10/6 CP: | Wed 10/27 Cyto: Reg.cultures Dr Liu | Thurs 10/28 Surg: fungi Dr Kim | Fri 10/29 Autopsy |
|------|---------|---------|------|-------|---------|
| **Topic:** | | | | | |
| **Lecturer:** | | | | | |
| **PGY1** | | | | | |
| Blouin, Amanda | | | | | |
| Fender, Justin | CAN- | CAN- | | | CAN- |
| Grunes, Dianne | | | | | |
| Ko, Mabel | | | | | |
| Yao, Jonathan | | | | | |
| **PGY2** | | | | | CEL |
| Chepovetsky, Julie | CEL- | CEL- | | | |
| Hechtman, Jaclyn | | | | Vac | Vac |
| Jordan, Adrienne | LED | LED | | | |
| Kazi, Sofia | | | FMLA | FMLA | |
| Paul, Andrea | | | | | |
| **PGY3** | | | | | |
| Azar, Paul | | | | | |
| Chow, Jonathan | | | | | |
| French, Jessica | | | | | |
| Martinez, Alicia | | | | | |
| Morency, Elizabeth | | | | | |
| Roman, Taisha | | | | | |
| Varughese, Leena | | | | | |
| **PGY4** | | | | | |
| Frost, Sarah | | | | AK | |
| Kim, Stacey | | | plate rounds | HOM | |
| Manlar, Kruti | | | CM | SEM | |
| McCash, Samuel | | | ME | ME | ME |
| Trevino, Edward | | | | | |
| **Fellows** | | | | | Vac |
| Cherneykin, Sergey | | | Vac | Vac | |
| Guarino, Robert | | | LH | | |
| Liu, Hui | | | | | |
| Liu, Yuxin | | | | Ouyang Ji | |
| Mercer, Stephen | | | | | |
| Ouyang, Jie | | | | | |
| Raoufi, Mohammad | | | | | |
| Smethurst, Mark | | | | | |
| Zhong, Minghao | | | | | |

CONFIDENTIAL

D02469

**8AM LECTURE ATTENDANCE SHEET: 2010-2011**

| Date | Monday 11/1 | Tuesday 11/2 | Wed 11/3 | Thurs 11/4 | Fri 11/5 |
|---|---|---|---|---|---|
| Topic: | AP: CP: RBC/Ag's | CP: Donor Nos. | Cyto: | Surgi: Resident Meeting | Autopsy Dr. Schiller |
| Lecturer: | Dr. Choo | Dr. Kester | | | |
| **PGY1** | | | | AB | |
| Blouin, Amanda | Blouin | | CAN | JDF | Drovs |
| Fender, Justin | | | | DBG | mdel |
| Grunes, Dianne | | | | MKO | TLY |
| Ko, Mabel | | | | JLY | |
| Yao, Jonathan | JY | | CFL | | |
| **PGY2** | | | | JAC | |
| Chepovetsky, Julie | | JAC | Vac | Vac | Vac |
| Hechtman, Jaclyn | Vac | Vac | | ACJ | |
| Jordan, Adrienne | ACJ | ACJ | | SK | |
| Kazi, Sofia | FMLA | FMLA | FMLA | FMLA | FMLA |
| Paul, Andrea | | | | | |
| **PGY3** | | | | | PJA |
| Azar, Paul | | PJA | | | JC |
| Chow, Jonathan | JC | Late 8:30 | | JRF | French |
| French, Jessica | (AP only) | | | | |
| Martinez, Alicia | | | | EGM | jimmy |
| Morency, Elizabeth | | | | post-overnight call | |
| Roman, Talsha | sick leave | LtV | | out sick | out/sick |
| Varughese, Leena | | | | | |
| **PGY4** | | | | SEF | SEF |
| Frost, Sarah | Sarah | SEF | | SAK | |
| Kim, Stacey | Frey | | | KPM | KPM |
| Manlar, Kruti | KPM | KPM | | SLM | tumor board |
| McCash, Samuel | SLM | | | ME | ME |
| Trevino, Edward | ME | MF | ME | | |
| **Fellows** | | | | SNC | |
| Cherneykin, Sergey | A. Brmsky | | | BAG | |
| Guarino, Robert | | | | | |
| Liu, Hui | | | | | |
| Liu, Yuxin | | | | JOY | |
| Mercer, Stephen | | | | | |
| Ouyang, Jie | | | | | |
| Raoufi, Mohammad | | | | | |
| Smethurst, Mark | | | | | |
| Zhong, Minghao | | | | | |

CONFIDENTIAL

D02470

**8AM LECTURE ATTENDANCE SHEET: 2010-2011**

| Date | Monday 11/8 | Tuesday 11/9 | Wed 11/10 | Thurs 11/11 | Fri 11/12 |
|------|-------------|--------------|-----------|-------------|-----------|
| Topic: | AP: Colon biopsies | CP: Donor screening | Cyto: | Surg: Drs Blain + Hechtman | Autopsy (early afternoon) |
| Lecturer: | Dr. Ward | Dr. Leonard | | | Dr. Lamb |
| **PGY1** | | | | | |
| Blouin, Amanda | | | CAN | | Blain |
| Fender, Justin | | | | | |
| Grunes, Dianne | | | CE I | | |
| Ko, Mabel | | | | | |
| Yao, Jonathan | | | | | |
| **PGY2** | | | | JAC | |
| Chepovetsky, Julie | | | LED | JH | JA |
| Hechtman, Jaclyn | | ACJ | | ACJ | ACJ |
| Jordan, Adrienne | out sick | | | SK | SK |
| Kazi, Sofia | | | | FMLA | FMLA |
| Paul, Andrea | FMLA | FMLA | | | |
| **PGY3** | | PJA | | | |
| Azar, Paul | | | | JC | |
| Chow, Jonathan | JC | | | French | |
| French, Jessica | French | AKM | | | |
| Martinez, Alicia | AKM | | | | A Roman |
| Morency, Elizabeth | | | | | |
| Roman, Taisha | | | | | |
| Varughese, Leena | LKV | LKV | | | |
| **PGY4** | | | | | |
| Frost, Sarah | Vac | Vac | | Vac | Vac |
| Kim, Stacey | | | | | |
| Mantar, Kruti | covering Frozens | out sick | | KM | SEM |
| McCash, Samuel | ME | ME | | ME | ME |
| Trevino, Edward | | | | | |
| **Fellows** | | | | | |
| Cherneykin, Sergey | | | | | |
| Guarino, Robert | | | | | |
| Liu, Hui | | | | | |
| Liu, Yuxin | | | | | |
| Mercer, Stephen | | | | | |
| Ouyang, Jie | | | | | |
| Raoufi, Mohammad | MR | | | | |
| Smethurst, Mark | | | | | |
| Zhong, Minghao | | | | | |

CONFIDENTIAL

8AM LECTURE ATTENDANCE SHEET: 2010-2011

| Date | Monday 11-15 | Tuesday 11-16 | Wed 11-17 | Thurs 11-18 | Fri 11-19 |
|---|---|---|---|---|---|
| Topic: | AP: GI | CP: Platelets | Cyto: Lui | Surg: GI | Autopsy |
| Lecturer: | Polydorides | Wu | Lui | Polydorides | Ditman |
| **PGY1** | | | | | |
| Blouin, Amanda | | | | | |
| Fender, Justin | | | | | |
| Grunes, Dianne | | | | | |
| Ko, Mabel | | | | | |
| Yao, Jonathan | | | | | |
| **PGY2** | | | | | |
| Chepovetsky, Julie | | | | | |
| Hechtman, Jaclyn | | | | | |
| Jordan, Adrienne | | | | | |
| Kazi, Sofia | | Maternity | Maternity | Maternity | Maternity |
| Paul, Andrea | | | | | |
| **PGY3** | | | | | |
| Azar, Paul | | | | | |
| Chow, Jonathan | | JC | | | |
| French, Jessica | | | | | |
| Martinez, Alicia | | | | | |
| Morency, Elizabeth | | | | | |
| Roman, Taisha | Vac | Vac | Vac | Vac | Vac |
| Varughese, Leena | | | | | |
| **PGY4** | | Heme Lecture | | | Sick |
| Frost, Sarah | | | Vac | Vac | Vac |
| Kim, Stacey | Vac | Vac | ME | ME | ME |
| Maniar, Kruti | ME | ME | SM | SM | SM |
| McCash, Samuel | SM | SM | ME | ME | ME |
| Trevino, Edward | ME | ME | | | |
| **Fellows** | | | | | |
| Cherneykin, Sergey | | | | | |
| Guarino, Robert | | | | | |
| Liu, Hui | | | | | |
| Liu, Yuxin | | | | | |
| Mercer, Stephen | | | | | |
| Ouyang, Jie | | | | | |
| Raoufi, Mohammad | | | | | |
| Smethurst, Mark | | | | | |
| Zhong, Minghao | | | | | |

CONFIDENTIAL

D02472

**8AM LECTURE ATTENDANCE SHEET: 2010-2011**

| Date | Monday 11-22 | Tuesday 11-23 | Wed 11-24 | Thurs 11-25 | Fri 11-26 |
|---|---|---|---|---|---|
| Topic: | AP: Pancreas | CP: Ig Therapy | Cyto: Effusions | Surg: Holiday | Autopsy |
| Lecturer: | Zhu | Choo | Lui | Thanksgiving | CANCELLED |
| **PGY1** | | | | | |
| Blouin, Amanda | | Blouin | Blouin | | |
| Fender, Justin | Fender | | | | |
| Grunes, Dianne | | | | | |
| Ko, Mabel | | | | | |
| Yao, Jonathan | | | | | |
| **PGY2** | | | | | |
| Chepovetsky, Julie | JACJ | JAC | JA | | |
| Hechtman, Jaclyn | | | CHD Lab | | |
| Jordan, Adrienne | ACJ | ACJ | | | |
| Kazi, Sofia | | | | Maternity | Maternity |
| Paul, Andrea | Maternity | Maternity | Maternity | | |
| **PGY3** | | | | | |
| Azar, Paul | | PJA | | | |
| Chow, Jonathan | JA | | | | |
| French, Jessica | | | | | |
| Martinez, Alicia | | | | | |
| Morency, Elizabeth | | | | | |
| Roman, Taisha | | | A Roman in ER | | |
| Varughese, Leena | LN | | | | |
| **PGY4** | | | | | |
| Frost, Sarah | Sick | Sick | Sick | | |
| Kim, Stacey | | | | | |
| Manjar, Kruti | ME | ME | ME | ME | ME |
| McCash, Samuel | 8m | 8m | Micro Plate Rounds | | |
| Trevino, Edward | Interview | | ER | | |
| **Fellows** | | | | | |
| Cherneykin, Sergey | | | | | |
| Guarino, Robert | | | | | |
| Liu, Hui | | | | | |
| Liu, Yuxin | | | | | |
| Mercer, Stephen | | | | | |
| Ouyang, Jie | | | | | |
| Raoufi, Mohammad | | | | | |
| Smethurst, Mark | | | | | |
| Zhong, Minghao | | | | | |

CONFIDENTIAL

D02473

**8AM LECTURE ATTENDANCE SHEET: 2010-2011**

| Date | Monday 11-29 | Tuesday 11-30 Wed 12-1 | Cyto: | Thurs 12-2 Surg: | Fri 12-3 Autopsy |
|---|---|---|---|---|---|
| Topic: | AP: Liver | CP: Blood Comp. 2 | Lui | Grunes/Fende | |
| Lecturer: | Thung | Wu | | | |
| **PGY1** | | | | Blouin | |
| Blouin, Amanda | | | | Presenting | Grunes |
| Fender, Justin | | | | | |
| Grunes, Dianne | | | | | |
| Ko, Mabel | | | | | |
| Yao, Jonathan | | | | | JAC |
| **PGY2** | | | | | |
| Chepovetsky, Julie | JAC | | | | ACJ |
| Hechtman, Jaclyn | ACS | | ACS | ACS | |
| Jordan, Adrienne | | | | | Maternity |
| Kazi, Sofia | Maternity | Maternity | Maternity | Maternity | |
| Paul, Andrea | | | | | |
| **PGY3** | | | | | P-JA |
| Azar, Paul | J | JC | | | |
| Chow, Jonathan | | Not Require | J french | french Appointment | arm |
| French, Jessica | | | | | |
| Martinez, Alicia | | | | | A Roman |
| Morency, Elizabeth | | | Roman | Roman | |
| Roman, Taisha | | | | | |
| Varughese, Leena | | | | | |
| **PGY4** | | | | | Tumor Board |
| Frost, Sarah | | | | | |
| Kim, Stacey | CK | | ME | ME | ME |
| Maniar, Kruti | ME | ME | Plt Rounds | SM | SM |
| McCash, Samuel | SM | SM | | | |
| Trevino, Edward | | | | | |
| **Fellows** | | | | | |
| Cherneykin, Sergey | | | | | |
| Guarino, Robert | | | | | |
| Liu, Hui | HL | | | | |
| Liu, Yuxin | | | | | |
| Mercer, Stephen | | | | | |
| Ouyang, Jie | JO | | | | |
| Raoufi, Mohammad | | | | | |
| Smethurst, Mark | | | | | |
| Zhong, Minghao | | | | | |

CONFIDENTIAL

D02474

**8AM LECTURE ATTENDANCE SHEET: 2010-2011**



| Date: | Monday 12-6 | Tuesday 12-7 | Wed | Thurs 12-9 | Fri |
|---|---|---|---|---|---|
| Topic: | AP: | CP: | Cyto: CANCELLED | Surg: | Autopsy CANCELLED |
| Lecturer: | | | | | |
| **PGY1** | | | | | |
| Blouin, Amanda | | | | | |
| Fender, Justin | | | Placed | | |
| Grunes, Dianne | MCo | MCO | | MCo | |
| Ko, Mabel | | | | | |
| Yao, Jonathan | | | | | |
| **PGY2** | | | | | |
| Chepovetsky, Julie | | | | | |
| Hechtman, Jaclyn | | ACJ | | | |
| Jordan, Adrienne | | | | | |
| Kazi, Sofia | | | Maternity | Maternity | Maternity |
| Paul, Andrea | Maternity | Maternity | | | |
| **PGY3** | | | | | |
| Azar, Paul | | PJA | | | |
| Chow, Jonathan | | | | | |
| French, Jessica | | | | | |
| Martinez, Alicia | | | | | |
| Morency, Elizabeth | | Thomas | | | |
| Roman, Taisha | | | | LRV | |
| Varughese, Leena | | | | | |
| **PGY4** | | | | | |
| Frost, Sarah | | | | | |
| Kim, Stacey | | | ME | ME | ME |
| Manlar, Kruti | ME | ME | | RM | |
| McCash, Samuel | SM | SICK | | SICK | |
| Trevino, Edward | | | | | |
| **Fellows** | | | | | |
| Chemeykin, Sergey | | | | | |
| Guarino, Robert | | | | | |
| Liu, Hui | | | | | |
| Liu, Yuxin | | | | | |
| Mercer, Stephen | | | | | |
| Ouyang, Jie | | | | | |
| Raoufi, Mohammad | | | | | |
| Smethurst, Mark | | | | | |
| Zhong, Minghao | | | | | |

CONFIDENTIAL

D02475

**8AM LECTURE ATTENDANCE SHEET: 2010-2011**

| Date | Monday 12-13 | Tuesday 12-14 | Wed 12-15 | Thurs 12-16 | Fri 12-17 |
|---|---|---|---|---|---|
| Topic: | AP: Cervical lesion | CP: Root cause | Cyto: CSF | Surg: Forensics | Autopsy |
| Lecturer: | Dr. Kalir | Dr. Kaplan | Dr. H./Liu | Dr. French | Hechtman/Fender |
| **PGY1** | | | | | |
| Blouin, Amanda | | Pt | | | |
| Fender, Justin | Step 3 | Step 3 | Orient | orient | |
| Grunes, Dianne | SICK | | Orient | Orient | MB |
| Ko, Mabel | MKO | MW | MB | MKO | MKO |
| Yao, Jonathan | | TY | | | |
| **PGY2** | | MB (30 min late) | | | NAE (Tumor board) |
| Chepovetsky, Julie | JAC | JEH | JA | JA | TEH |
| Hechtman, Jaclyn | RCLS | ACJ | RCLS | Derm agend review | ACJ |
| Jordan, Adrienne | ACJ | ACJ | | | |
| Kazi, Sofia | | Maternity | Maternity | Maternity | Maternity |
| Paul, Andrea | Maternity | Maternity | | | |
| **PGY3** | | PJA | | | |
| Azar, Paul | | JC | JC | JC | J. French |
| Chow, Jonathan | | Not Required | post-call | JCF | |
| French, Jessica | | Derm approval | ARM | | |
| Martinez, Alicia | | EGM | EGM | EGM | |
| Morency, Elizabeth | | | | TYR | Interview |
| Roman, Talsha | A Roman | | extension | LXV | |
| Varughese, Leena | LV | LXV (15 min late) | | | |
| **PGY4** | | | | | |
| Frost, Sarah | | | | | |
| Kim, Stacey | | | | | |
| Manlar, Kruti | | H. Man | Plate Room 5 | | |
| McCash, Samuel | | | | | late / frozen |
| Trevino, Edward | | Interview | Interview | Interview | |
| **Fellows** | | | | | |
| Cherneykln, Sergey | | | | | |
| Guarino, Robert | | | lecturing | | |
| Liu, Hui | | | | | |
| Liu, Yuxin | MHC | | | | |
| Mercer, Stephen | | | | | |
| Ouyang, Jie | | | | | |
| Raoufi, Mohammad | | | | | |
| Smethurst, Mark | | | | | |
| Zhong, Minghao | | | | | |

D02476

**8AM LECTURE ATTENDANCE SHEET: 2010-2011**

| Date | Monday 12/20 | Tuesday 12/21 | Wed 12/22 | Thurs 12/23 | Fri 12/24 |
|---|---|---|---|---|---|
| Topic: | AP: Uterine tumors | CP: Pencell tx | Cyto: Uche | Surg: NO | Autopsy No |
| Lecturer: | Dr. Eliasen | Dr. Weinberg | Dr. Liu | Conference | Conference |
| **PGY1** | | | | | |
| Blouin, Amanda | | | | | |
| Fender, Justin | | | | | |
| Grunes, Dianne | | | | | |
| Ko, Mabel | | | | | |
| Yao, Jonathan | | | | | |
| **PGY2** | | | | | |
| Chepovetsky, Julie | | | | | |
| Hechtman, Jaclyn | | | | | |
| Jordan, Adrienne | | | | | |
| Kazi, Sofia | FMLA | FMLA | FMLA | FMLA | FMLA |
| Paul, Andrea | | | | | |
| **PGY3** | | | | | |
| Azar, Paul | Vac | Vac | Vac | Vac | |
| Chow, Jonathan | JC | JC | hvul | | Vac |
| French, Jessica | | Not Required | Vac | Vac | |
| Martinez, Alicia | Vac | EGM | plate rounds | | Vac |
| Morency, Elizabeth | | | Vac | Vac | |
| Roman, Taisha | Vac | Vac | | | Vac |
| Varughese, Leena | LRV | LRV | | Vac | |
| **PGY4** | | | | Vac | Vac |
| Frost, Sarah | Vac | Vac | Vac | | |
| Kim, Stacey | | | | | |
| Manlar, Kruti | | | Vac | Vac | Vac |
| McCash, Samuel | Vac | Vac | Vac | | |
| Trevino, Edward | | ETT | | | |
| **Fellows** | | | S. Wilson | | |
| Cherneykin, Sergey | | | | | |
| Guarino, Robert | | | LH | | |
| Liu, Hui | | | | | |
| Liu, Yuxin | | | | | |
| Mercer, Stephen | | | | | |
| Ouyang, Jie | | | | | |
| Raoufi, Mohammad | | | | | |
| Smethurst, Mark | | | | | |
| Zhong, Minghao | | | | | |

CONFIDENTIAL

**8AM LECTURE ATTENDANCE SHEET: 2010-2011**

| Date / Topic: / Lecturer: | Monday 12/27 AP: No Conference | Tuesday 12/28 CP: Conference cancelled | Wed 12/29 Cyto: No Conference | Thurs 12/30 Surg: No Conference | Fri 12/31 Autopsy Holiday |
|---|---|---|---|---|---|
| **PGY1** | | | | | |
| Bloun, Amanda | NO | CAN- | NO | NO | HOL- |
| Fender, Justin | | | | | |
| Grunes, Dianne | | | | | |
| Ko, Mabel | | | | | |
| Yao, Jonathan | | | | | |
| **PGY2** | CON- | CEL- | CON- | CON- | IDAY |
| Chepovetsky, Julie | | | | | |
| Hechtman, Jaclyn | FER- | LED | FER- | FER- | |
| Jordan, Adrienne | | | | | |
| Kazi, Sofia | | | | | |
| Paul, Andrea | | | | | |
| **PGY3** | ENCE | | ENCE | ENCE | |
| Azar, Paul | | | | | |
| Chow, Jonathan | | Not Required | | | |
| French, Jessica | | | | | |
| Martinez, Alicia | | | | | |
| Morency, Elizabeth | | | | | |
| Roman, Taisha | | | | | |
| Varughese, Leena | | | | | |
| **PGY4** | | | | | |
| Frost, Sarah | | | | | |
| Kim, Stacey | | | | | |
| Maniar, Kruti | | | | | |
| McCash, Samuel | | | | | |
| Trevino, Edward | | | | | |
| **Fellows** | | | | | |
| Cherneykin, Sergey | | | | | |
| Guarino, Robert | | | | | |
| Liu, Hui | | | | | |
| Liu, Yuxin | | | | | |
| Mercer, Stephen | | | | | |
| Ouyang, Jie | | | | | |
| Raoufi, Mohammad | | | | | |
| Smethurst, Mark | | | | | |
| Zhong, Minghao | | | | | |

CONFIDENTIAL

D02478

**8AM LECTURE ATTENDANCE SHEET: 2010-2011**

| Date | Monday 1/3/11 | Tuesday 1/4/11 | Wed 1/5/11 | Thurs 1/6/11 | Fri 1/7/11 |
|---|---|---|---|---|---|
| Topic: | AP: *Tattoo define* | CP: *Morphogen* | Cyto: | Surg: *Dr. Cheparobe* | Autopsy |
| Lecturer: | Dr. Mercer | Dr. Chang | | Surgical antigen | Dr. Shiller |
| **PGY1** | | | | | |
| Blouin, Amanda | | | NO | | |
| Fender, Justin | | | | | |
| Grunes, Dianne | | *Dianne G* | | | *PSG* |
| Ko, Mabel | MKO | MKO | CON- | Mabel | MKO |
| Yao, Jonathan | | | | | |
| **PGY2** | | | FER- | JAC | |
| Chepovetsky, Julie | | | | | |
| Hechtman, Jaclyn | | | | | |
| Jordan, Adrienne | ACJ | ACJ | | | tumor board |
| Kazi, Sofia | | | ENCE | SAK | |
| Paul, Andrea | | Andrea Paul | | ACP | ACP |
| **PGY3** | | | | | |
| Azar, Paul | | PSA | | | |
| Chow, Jonathan | Vac | Vac | | Vac | Vac |
| French, Jessica | Vac | Not captured | | | Vac |
| Martinez, Alicia | AM | | | AM | |
| Morency, Elizabeth | Vac | | | | |
| Roman, Taisha | Vac | Vac | | | |
| Varughese, Leena | LXV | LXV | | | LXV |
| **PGY4** | | | | | |
| Frost, Sarah | Vac | Vac | | | |
| Kim, Stacey | | SAK | | | |
| Maniar, Krull | | KM | | | KM |
| McCash, Samuel | Vac | Vac | | SEM | post-call |
| Trevino, Edward | EMC | ETT | | | |
| **Fellows** | | | | | |
| Cherneykin, Sergey | Vac | | | Vac | Vac |
| Guarino, Robert | | | | | |
| Liu, Hui | | | | | |
| Liu, Yuxin | YCL | | | | |
| Mercer, Stephen | lecturing | | | | |
| Ouyang, Jie | | | | | |
| Raoufi, Mohammad | | | | | |
| Smethurst, Mark | | | | | |
| Zhong, Minghao | | | | | |

CONFIDENTIAL

D02479

**8AM LECTURE ATTENDANCE SHEET: 2010-2011**

| Date | Monday 1/10/11 | Tuesday 1/11/11 | Wed 1/12/11 | Thurs 1/13/11 | Fri 1/14/11 |
|---|---|---|---|---|---|
| Topic: | AP: Ped. tumors | CP: Molecular | Cyto: / | Surg: Case Conference | Autopsy |
| Lecturer: | Dr. Orotti | Fei | CANCELLED | Chernykin/Yao | |
| **PGY1** | | | | | |
| Blouin, Amanda | | | | | |
| Fender, Justin | | | | | |
| Grunes, Dianne | | | | MKO | Dry Appointment |
| Ko, Mabel | MKO | MKO | | | |
| Yao, Jonathan | | | | | |
| **PGY2** | | | | | |
| Chepovetsky, Julie | | | | | |
| Hechtman, Jaclyn | | ACS | | | ACS |
| Jordan, Adrienne | | | | AER | |
| Kazi, Sofia | | SK | | SK | AER |
| Paul, Andrea | | AP | | | |
| **PGY3** | | | | | |
| Azar, Paul | | | | | |
| Chow, Jonathan | JC | JC | | | |
| French, Jessica | Vac | CP Not Required | | | |
| Martinez, Alicia | | | | | |
| Morency, Elizabeth | | | | Roman | Human |
| Roman, Taisha | | | | | Wedding |
| Varughese, Leena | LPV | | | | |
| **PGY4** | | | | | |
| Frost, Sarah | | | | | |
| Kim, Stacey | | | | | |
| Manlar, Kruti | | | | | |
| McCash, Samuel | CM | CM | | CM | CM |
| Trevino, Edward | | | | | |
| **Fellows** | | | | | |
| Cherneykin, Sergey | | | | | |
| Guarino, Robert | | | | | |
| Liu, Hui | | | | | |
| Liu, Yuxin | | | | | |
| Mercer, Stephen | | | | | |
| Ouyang, Jie | | | | | |
| Raoufi, Mohammad | | | | | |
| Smethurst, Mark | | | | | |
| Zhong, Minghao | | | | | |

CONFIDENTIAL

D02480

8AM LECTURE ATTENDANCE SHEET: 2010-2011

| Date | Monday 1/17/11 | Tuesday 1/18/11 | Wed 1/19/11 | Thurs 1/20/11 | Fri 1/21/11 |
|------|------|------|------|------|------|
| Topic: | AP: NO | CP: AMJ | Cyto: Thyroid | Surg: Case pres. | Autopsy |
| Lecturer: | CONFERENCE Dr. Wu | | Dr. Liu | Dr. Ko | |
| | | | | | |
| **PGY1** | | | | ASP | |
| Blouin, Amanda | HOL | Justin | | DRG | Jua Su |
| Fender, Justin | | | | MKO | Dreaming |
| Grunes, Dianne | | | | JLY | MKO |
| Ko, Mabel | | MKO | | | JW |
| Yao, Jonathan | | JY | | | |
| | | | | | |
| **PGY2** | I | | # Eng | JAC | |
| Chepovetsky, Julie | | | | JFH | |
| Hechtman, Jaclyn | | | ACJ | ACJ | ACJ |
| Jordan, Adrienne | DAY | | | | |
| Kazi, Sofia | | AEP | AEP | AUP | AEP |
| Paul, Andrea | | | | | |
| | | | | | |
| **PGY3** | | | PJA | PJA | |
| Azar, Paul | | JC | JC | JC | JC |
| Chow, Jonathan | | Not Required | | | |
| French, Jessica | | | | ARM | ARM |
| Martinez, Alicia | | | | RGM | |
| Morency, Elizabeth | | | Aloman | TYR | Aloman |
| Roman, Taisha | | | | XV | LY |
| Varughese, Leena | | | | | |
| | | | | | |
| **PGY4** | | | | | |
| Frost, Sarah | | | | SAK | |
| Kim, Stacey | | | | | frozen |
| Manlar, Kruti | | ME | AE | ME | ME |
| McCash, Samuel | | ETT | | | |
| Trevino, Edward | | | | | |
| | | | | | |
| **Fellows** | | | | | |
| Chemeykin, Sergey | | | | | |
| Guarino, Robert | | | | | |
| Liu, Hui | | | | | |
| Liu, Yuxin | | | | | |
| Mercer, Stephen | | | | JOY | |
| Ouyang, Jie | | | | | |
| Raoufi, Mohammad | | | | | |
| Smethurst, Mark | | | | | |
| Zhong, Minghao | | | | | |

CONFIDENTIAL

D02481