Sign in Sheet Wed 4/25

SK
Diane Su
Jon Chow
Justin Fender
Brian
Vadim Khachaturov
Natalie Cioma
MKD
Juan Corlor
Mary Chen
Frances Rosario
J. Yoo
Robert Shikata
Katherine Rodriguez

CONFIDENTIAL

D03004

**8AM LECTURE ATTENDANCE SHEET: 2011-2012**   4/30/12   ✳

| Date | Monday 4/30/12 | Tuesday 5/1 | Wed 5/2 | Thurs 5/3 | Fri 5/4 |
|---|---|---|---|---|---|
| Topic: | AP: Neuropath | CP: Cytogenetics | CP/Cyto: PP Case | Surg: Case oves. | Autopsy check samples |
| Lecturer: | MES | V. Naifeld | (Jordan) | Zhang / Jacob | SK, VK, JHP |
| **PGY1** | | | | | |
| Jacob, Seby | | | | | |
| Ciomek, Natalie | NC | | | | |
| Khachaturov, Vadim | VK | | | | |
| Li, Zonghua | 7HL | | | | |
| Rosario-Quinones, Frances | FRQ | | | | |
| Blowe, Sarah | | | excused | | |
| Chen, Mary | | mc | | | |
| Silva, Vitor | | | | | |
| Hernandez-Prera, Juan | | | | | |
| **PGY2** | | | | | |
| Blouin, Amanda | | | | | |
| Fender, Justin | JDF | | | | |
| Grunes, Dianne | DBG | | | | |
| Ko, Mabel | MKo | MKo | MKo | | MKo |
| Yao, Jonathan | 42K JLY | | JLY | | |
| **PGY3** | | | | | |
| Chepovetsky, Julie | | | JAC | | |
| Hechtman, Jaclyn | JFH | NOT REQUIRED | | | JFH |
| Jordan, Adrienne | | ACJ | ACJ | | |
| Kazi, Sofia | SK | SK | | | |
| **PGY4** | | | | | |
| Azar, Paul | PA | | | | |
| Chow, Jonathan | | JC | JC | | |
| Martinez, Alicia | | | | | |
| Morency, Elizabeth | SICK | | | | |
| Roman, Taisha | TVR | | | Roman | |
| **Fellows** | | | | | |
| Klapper, Jeremy | JK | | | | |
| Schubeck, Andrew | | | | | |
| Guarino, Robert | | | | | |
| Selegean, Sorin | | | | | |
| Kadire, Buhalqem | | | | | |
| Sidhu, Harleen | | | | | |
| Zhang, Xuchen | | | | presenting | |
| Iuga, Alina | | | | | |
| Suarez, Yvelisse | | | | | |
| Smethurst, Mark | | | | | |
| Shibata, Robert | | RS | | | |

✳ Not enough space at multi-headed scope for all residents.

CONFIDENTIAL

D03005

## RESIDENT/FELLOW MEETING MINUTES ACKNOWLEDGEMENT
## 2011-2012

By signing next to my name below, I hereby acknowledge that I have received and reviewed the minutes from the resident/fellow meeting which took place on 5/4/12 , and am therefore aware of and responsible for the information contained therein.

**PGY1**
Blowe, Sarah *(frozens)*
Chen, Chen
Ciomek, Natalie
Hernandez Prera, Juan *(VA)*
Jacob, Seby
Khachaturov, Vadim
Li, Zhonghua
Rosario Quinones, Frances
Silva, Vitor



**PGY2**
Blouin, Amanda
Fender, Justin
Grunes, Dianne
Ko, Mabel
Yao, Jonathan *(gyn slo)*



**PGY3**
Chepovetsky, Julie
Hechtman, Jaclyn
Jordan, Adrienne
Kazi, Sofia

**PGY4**
Azar, Paul
Chow, Jonathan
Martinez, Alicia
Morency, Elizabeth
Roman, Taisha



**Fellows**
Guarino, Robert
Klapper, Jeremy
Schubeck, Andrew
Selegean, Sorin
Kadire, Buhalgem
Sidhu, Harleen
Zhang, Xuchen
Suarez, Yvelisse
Iuga, Alina
Smethurst, Mark
Shibata, Robert

CONFIDENTIAL

**8AM LECTURE ATTENDANCE SHEET: 2011-2012**

| Date | Monday 5/7/12 | Tuesday 5/8/12 | Wed 5/9 | Thurs 5/10 | Fri 5/11 |
|---|---|---|---|---|---|
| Topic: | AP: Neuropath | CP: cml | CP/Cyto: Cyto | Surg: Consult/intake | Autopsy FRU |
| Lecturer: | Smethhurst | Naifeld | Seleaean | Magid | Cihiller |
| **PGY1** | | | | | |
| Jacob, Seby | | | | SMJ | |
| Clomek, Natalie | ✓ | N breast cm | ✓ | | ✓ |
| Khachaturov, Vadim | ✓ | | | | |
| Li, Zonghua | | | | | |
| Rosario-Quinones, Frances | | | | | presenting |
| Blowe, Sarah | vaca | vaca | vaca | vaca | vaca |
| Chen, Mary | Mae Lee | | Plate rounds | MC | |
| Hernandez-Prera, Juan | | ✓ | | ✓ | |
| **PGY2** | | | | | |
| Blouin, Amanda | | | | | |
| Fender, Justin | | | | JDF | |
| Grunes, Dianne | | MSSM res retreat → | | | |
| Ko, Mabel | MKo | MSSM res retreat → | | MKO | |
| Yao, Jonathan | | NOT REQUIRED | J | | |
| **PGY3** | | | | | |
| Chepovetsky, Julie | | NOT REQUIRED | | | |
| Hechtman, Jaclyn | | | | | |
| Jordan, Adrienne | | ACT | ACT | | |
| Kazi, Sofia | | MSSM res retreat → | | | |
| **PGY4** | | | | | |
| Azar, Paul | | | | | |
| Chow, Jonathan | | | Sick | | |
| Martinez, Alicia | | | | | |
| Morency, Elizabeth | | | | | |
| Roman, Taisha | | | | | Semken |
| **Fellows** | | | | | |
| Klapper, Jeremy | | | | | |
| Schubeck, Andrew | | | | vaca | |
| Guarino, Robert | | | | vaca | |
| Selegean, Sorin | | | | present | |
| Kadire, Buhalgem | | | | | |
| Sidhu, Harleen | | | | | |
| Zhang, Xuchen | | | | | |
| Iuga, Alina | | | | | |
| Suarez, Yvelisse | | | | | |
| Smethurst, Mark | | | | | |
| Shibata, Robert | | | | | |
| Vitor | VS | VS | | VS | VS |

CONFIDENTIAL

**8AM LECTURE ATTENDANCE SHEET: 2011-2012**

| Date | Monday 5/14/12 | Tuesday 5/15 | Wed 5/16 | Thurs 5/17 | Fri 5/18 |
|---|---|---|---|---|---|
| Topic: | AP: all pigmented | CP: PhO MPN | CP/Cyto: CP | Surg: Sr. Unknown | Autopsy VL, JH? DBG |
| Lecturer: | lesions - Phelps | Naifeld | LM - TVR | JAC | Check Samples |
| **PGY1** | | | | | |
| Jacob, Seby | | | | | |
| Ciomek, Natalie | NAC | | | | |
| Khachaturov, Vadim | Vadim | Vadim | Vadim | Vadim | Vadim |
| Li, Zonghua | RR | RR | | | |
| Rosario-Quinones, Frances | | | Step 3 | Step 3 | |
| Blowe, Sarah | vaca | vaca | vaca | vaca | vaca |
| Chen, Mary | Mary | Path Rule Boards | Plate rounds | MC | |
| Silva, Vitor | HVS | | VS | HV | |
| Hernandez-Prera, Juan | | | | | KF |
| **PGY2** | | | | | |
| Blouin, Amanda | | AB | Bh | | |
| Fender, Justin | | JDF | | | |
| Grunes, Dianne | Dr t | Dianne | Dianne | Dianne | Dianne |
| Ko, Mabel | | MKO | MKO | MKO | MKO |
| Yao, Jonathan | J | | | | Raconteur (Derm) |
| **PGY3** | | | | | |
| Chepovetsky, Julie | rAC | JAC | | presenting | JDFC |
| Hechtman, Jaclyn | JFH | NOT REQUIRED | | JFH | JFH |
| Jordan, Adrienne | SICK | | ACJ | ACJ | |
| Kazi, Sofia | | | | | |
| **PGY4** | | | | | |
| Azar, Paul | | | | | |
| Chow, Jonathan | Jc | Jco | Jom | JC | |
| Martinez, Alicia | | | | | |
| Morency, Elizabeth | EGim | | | | |
| Roman, Taisha | | | presenting | | |
| **Fellows** | | | | | |
| Klapper, Jeremy | JAK | JAK | | | |
| Schubeck, Andrew | ATS | ATS | | AKTS | ATS |
| Guarino, Robert | BAG | | | | |
| Selegean, Sorin | SS | SS | | | SS |
| Kadire, Buhalgem | BHK | | | | |
| Sidhu, Harleen | HVS | | | | |
| Zhang, Xuchen | XZ | | | | |
| Iuga, Alina | | | | | |
| Suarez, Yvelisse | | | | | |
| Smethurst, Mark | | | | | |
| Shibata, Robert | | RS | | | |

CONFIDENTIAL

D03008

**8AM LECTURE ATTENDANCE SHEET: 2011-2012**

7:30!!

| Date: | Monday 5/21 | Tuesday 5/22 | Wed 5/23 | Thurs 5/24 | Fri 5/25 |
|---|---|---|---|---|---|
| Topic: | AP: Non-neo kidney | CP: MDS & Vidaza | CP/Cyto: CP | Surg: Sr. Unknowns | Autopsy Cyto- |
| Lecturer: | dx · Dr. Dikman | Naifeld | NP (Shinato)/NP Tsao | Jordan | Peds. Selcecan |
| **PGY1** | | | | | |
| Jacob, Seby | | | presenting | | |
| Ciomek, Natalie | | | | | |
| Khachaturov, Vadim | Vadim | | Vadim h | Vadim L | Vadim L |
| Li, Zonghua | 2L | | 2L | 2L | 2L |
| Rosario-Quinones, Frances | Vaca | Vaca | Vaca | Vaca | Vaca |
| Blowe, Sarah | SEB | | | | |
| Chen, Mary | MC | | Plate rounds | MC | MC |
| Sliva, Vitor | | VS | VS | VS | |
| Hernandez-Prera, Juan | Vaca | Vaca | Vaca | Vaca | Vaca |
| **PGY2** | | | | | |
| Blouin, Amanda | | | | | |
| Fender, Justin | | | | Just Fender | JustM JM |
| Grunes, Dianne | | | chief resident seminar | → | → |
| Ko, Mabel | MKO | | chief resident seminar | → | → |
| Yao, Jonathan | | | J | | |
| **PGY3** | | | | | |
| Chepovetsky, Julie | MAC | | MAC | MAC | |
| Hechtman, Jaclyn | | NOT REQUIRED | Pathology Board Exams → | → | → |
| Jordan, Adrienne | autopsy & call | ACS | ACS | presenting | vacation |
| Kazi, Sofia | | | chief resident seminar | → | → |
| **PGY4** | | | | | |
| Azar, Paul | ← | Pathology Board Exams → | → | → | → |
| Chow, Jonathan | ← | Pathology Board Exams → | → | → | → |
| Martinez, Alicia | | | | | |
| Moroney, Elizabeth | ← | Pathology Board Exams → | → | → | → |
| Roman, Taisha | | | | | |
| **Fellows** | | | | | |
| Klapper, Jeremy | | | | | |
| Schubeck, Andrew | | | | | |
| Guarino, Robert | | | | | |
| Selegean, Sorin | | | | bbofy Kor | |
| Kadire, Buhalgem | | | | | |
| Sidhu, Harleen | | | | | |
| Zhang, Xuchen | Vaca | Vaca | Vaca | Vaca | Vaca |
| Iuga, Alina | | | | | |
| Suarez, Yvelisse | Vaca | Vaca | Vaca | Vaca | Vaca |
| Smethurst, Mark | | | | | |
| Shibata, Robert | | | presenting | | |

CONFIDENTIAL

D03009

**8AM LECTURE ATTENDANCE SHEET: 2011-2012**

| Date | Monday 5/28 | Tuesday 5/29 | Wed 5/30 | Thurs 5/31 | Fri 6/1/12 |
|---|---|---|---|---|---|
| Topic: | AP: | CP: HSCT | CP/Cyto: AP cases | Surg: SP Cont case | Autopsy CP |
| Lecturer: | Mirkovich Day | Scigliano | HP → DBG cases | JAC: VS | orientation |
| **PGY1** | | | | | |
| Jacob, Seby | | | | present | not required |
| Ciomek, Natalie | | | | present | |
| Khachaturov, Vadim | | Jadyn | Vadim K | | Vadim K |
| Li, Zonghua | | | ZL | ZL | not required |
| Rosario-Quinones, Frances | | vaca | vaca | vaca | |
| Blowe, Sarah | | | | | not required |
| Chen, Mary | | called out | Plate rounds | | MC |
| Sliva, Vitor | | | VS | present | not required |
| Hernandez-Prera, Juan | | | vaca | | |
| **PGY2** | | | | | |
| Blouin, Amanda | | BA | BA | | not required |
| Fender, Justin | | | | | |
| Grunes, Dianne | | MKO | presenting | | |
| Ko, Mabel | | MKO | MKO | present | not required |
| Yao, Jonathan | | | | late 2/2 illness | not required |
| **PGY3** | | | | | |
| Chepovetsky, Julie | | | JAC | presenting | JAC |
| Hechtman, Jaclyn | | NOT REQUIRED | vaca | vaca | not required |
| Jordan, Adrienne | | VACA | vaca | vaca | not required |
| Kazi, Sofia | | | | | |
| **PGY4** | | | | | |
| Azar, Paul | | | | | |
| Chow, Jonathan | | | | | NOT |
| Martinez, Alicia | | | | | REQUIRED |
| Morency, Elizabeth | | | | | |
| Roman, Taisha | | | | Roman | |
| **Fellows** | | | | | |
| Klapper, Jeremy | | | | | |
| Schubeck, Andrew | | AB | | | |
| Guarino, Robert | | | | present | |
| Selegean, Sorin | | | | | |
| Kadire, Buhalqem | | | | | |
| Sidhu, Harleen | | | vaca | | |
| Zhang, Xuchen | | | | present | |
| Iuga, Alina | | | | | |
| Suarez, Yvelisse | | Yvelisse S | | presenting | |
| Smethurst, Mark | | | | | |
| Shibata, Robert | | | | | |

CONFIDENTIAL

D03010

**8AM LECTURE ATTENDANCE SHEET: 2011-2012**

| Date | Monday 6/4 | Tuesday 6/5 | Wed 6/6 | Thurs 6/7 | Fri 6/8 |
|---|---|---|---|---|---|
| Topic: | AP: Kidney neoplasms | CP: Lab Directors | CP/Cyto: Micro. aut | Surg: int. case | Autopsy CP |
| Lecturer: | Xiao | Simson | ARM, Blowe | Yao, Ko | Intro-microscope |
| **PGY1** | | | | | |
| Jacob, Seby | ✓ | | | | not req'd |
| Ciomek, Natalie | | | | | not required |
| Khachaturov, Vadim | Vadim | | Vadim | Vadim | not req'd |
| Li, Zonghua | | | | | |
| Rosario-Quinones, Frances | | | | | not required |
| Blowe, Sarah | | | present | | |
| Chen, Mary | | | | | not req'd |
| Silva, Vitor | √S | | | | √S |
| Hernandez-Prera, Juan | Vaca | | | | not req'd |
| **PGY2** | | | | | |
| Blouin, Amanda | SICK | | | | |
| Fender, Justin ✓ | Vaca | Vaca | Vaca | Vaca | Vaca |
| Grunes, Dianne ✓ | Vaca | Vaca | Vaca | Vaca | Vaca |
| Ko, Mabel | MKO | MKO | MKO | MKO | |
| Yao, Jonathan | | | | | not required |
| **PGY3** | | | | | |
| Chepovetsky, Julie | | | JAC | JAC | not req'd |
| Hechtman, Jaclyn ✓ | Vaca | NOT REQUIRED | | | not required |
| Jordan, Adrienne | | | ACT | | ACT |
| Kazi, Sofia ✓ | Vaca | vaca | Vaca | Vaca | Vaca |
| **PGY4** | | | | | |
| Azar, Paul | | | | | ↑ |
| Chow, Jonathan ✓ | Vaca | Vaca | Vaca | Vaca | Vaca |
| Martinez, Alicia | | | Presently | | NOT |
| Morency, Elizabeth | SICK | | presented | | REQUIRED |
| Roman, Taisha | | ARoman | present | | ↓ |
| **Fellows** | | | | | |
| Klapper, Jeremy | | | | | |
| Schubeck, Andrew | | | | | |
| Guarino, Robert | R. Guarino | | | | |
| Selegean, Sorin | | | | | |
| Kadire, Buhalgem | | Kadire | | | |
| Sidhu, Harleen | Vaca | vaca | vaca | vaca | Vaca |
| Zhang, Xuchen | | | | | |
| Iuga, Alina | | | | | |
| Suarez, Yvelisse | | | | | |
| Smethurst, Mark | | | | | |
| Shibata, Robert | | | | | |

CONFIDENTIAL

**8AM LECTURE ATTENDANCE SHEET: 2011/2012**

| Date | Monday 6/11 | Tuesday 6/12 | Wed 6/13 | Thurs 6/14 | Fri 6/15 |
|---|---|---|---|---|---|
| Topic: | AP: Tectic, Neu. | CP: Future of | CP/Cyto: | Surg: Sr. Unk | Autopsy |
| Lecturer: | Xiao | Simson | Jacob/Jordan | Kazi | SEB JLY |
| **PGY1** | | | | | |
| Jacob, Seby | | present | presenting | | |
| Clomek, Natalie | | present | | Mar | |
| Khachaturov, Vadim | | | | | |
| Li, Zonghua | | ZL | ZL | | |
| Rosario-Quinones, Frances | | present | | | |
| Blowe, Sarah | | present | | | presenting |
| Chen, Mary | MClee | | | | |
| Silva, Vitor | | VS | | | |
| Hernandez-Prera, Juan | | present | | | Conference |
| **PGY2** | | | | | |
| Blouin, Amanda | | AGB | | | |
| Fender, Justin | vaca | vaca | vaca | vaca | vaca |
| Grunes, Dianne | | Dianne | Dian | | |
| Ko, Mabel | vaca | vaca | vaca | vaca | vaca |
| Yao, Jonathan | | JLY | post call | | |
| **PGY3** | | | | | |
| Chepovetsky, Julie | | | JAC | | |
| Hechtman, Jaclyn | | NOT REQUIRED | | | |
| Jordan, Adrienne | | ACS | presenting | | |
| Kazi, Sofia | | | | presenting | |
| **PGY4** | | | | | |
| Azar, Paul | | | | | |
| Chow, Jonathan | | presenting | | | |
| Martinez, Alicia | | | | | |
| Morency, Elizabeth | | | | | |
| Roman, Taisha | | | | | |
| **Fellows** | | | | | |
| Klapper, Jeremy | vaca | vaca | vaca | vaca | vaca |
| Schubeck, Andrew | | | | | |
| Guarino, Robert | | | | | |
| Selegean, Sorin | | | | | |
| Kadire, Buhalgem | | | | | |
| Sidhu, Harleen | | | | | |
| Zhang, Xuchen | | | | | |
| Iuga, Alina | | | | | |
| Suarez, Yvelisse | | | | | |
| Smethurst, Mark | | | | | MES |
| Shibata, Robert | | present | | | |

**8AM LECTURE ATTENDANCE SHEET: 2011-2012**

| Date | Monday 6/18/12 | Tuesday 6/19 | Wed 6/20 | Thurs 6/21 | Fri 6/22/12 |
|---|---|---|---|---|---|
| Topic: | AP: Interesting GU | CP: Hemepath | CP/Cyto: | Surg: Resident au | Autopsy CP Intro: 7-9 |
| Lecturer: | Celles Dr. Unger | Petersen | Chow / Morency | JHP/NAC | Dr. Singh et al |
| **PGY1** | | | | | |
| Jacob, Seby | | | | | |
| Ciomek, Natalie | MCM | MCM | | presenting | MM |
| Khachaturov, Vadim | Vladimir | | Peds gross diss, Maria | Vladimir | Vladimir |
| Li, Zonghua | ZL | ZL | ZL | | ZL |
| Rosario-Quinones, Frances | | | | | |
| Blowe, Sarah | | | SEB | SICK | not required |
| Chen, Mary | MC | | MC | MC | MC |
| Silva, Vitor | NS | | VS | | |
| Hernandez-Prera, Juan | X | ✓ | | presenting | not required |
| **PGY2** | | | | | |
| Blouin, Amanda | | | | | |
| Fender, Justin | Just | | Jm | | |
| Grunes, Dianne | | | | | Diane |
| Ko, Mabel | | MKO | MKO | MKO | MKO |
| Yao, Jonathan | vaca | vaca | vaca | vaca | vaca |
| **PGY3** | | | | | |
| Chepovetsky, Julie | | | | | |
| Hechtman, Jaclyn | | NOT REQUIRED | | | not required |
| Jordan, Adrienne | | | SICK | ACJ | ACJ |
| Kazi, Sofia | | | | | |
| **PGY4** | | | | | |
| Azar, Paul | | | | | ↑ |
| Chow, Jonathan | | | presenting | | NOT |
| Martinez, Alicia | | | | | REQUIRED |
| Morency, Elizabeth | | | presenting | | |
| Roman, Taisha | | | | | ↓ |
| **Fellows** | | | | | |
| Klapper, Jeremy | | | | | |
| Schubeck, Andrew | | | | | |
| Guarino, Robert | | | | | |
| Selegean, Sorin | | | | | |
| Kadire, Buhalgem | | | | | |
| Sidhu, Harleen | | | | | |
| Zhang, Xuchen | vaca | vaca | vaca | vaca | vaca |
| Iuga, Alina | vaca | vaca | vaca | vaca | vaca |
| Suarez, Yvelisse | | | | | |
| Smethurst, Mark | | | | | |
| Shibata, Robert | | | | | |

CONFIDENTIAL

D03013

**8AM LECTURE ATTENDANCE SHEET: 2011-2012**

| Date | Monday 6/25/12 | Tuesday 6/26/12 | Wed 6/27 | Thurs 6/28 | Fri 6/29 | |
|---|---|---|---|---|---|---|
| Topic: | AP: | CP: | CP/Cyto: | Surg: Int Case | ~~Autopsy~~ | 7-8! |
| Lecturer: | Snares In-service | Hemepath | Hechtman | Li, Khachaturov | CP Orientation | |
| **PGY1** | | | | | | |
| Jacob, Seby | | | Sm.J | | | |
| Ciomek, Natalie | MCM | MCM | | MCM | MCM | |
| Khachaturov, Vadim | | | | presenting | VK | |
| Li, Zonghua | | ZL | | presenting | | |
| Rosario-Quinones, Frances | | | | | | |
| Blowe, Sarah | | | | SEB | not required | |
| Chen, Mary | | MRC | | | | |
| Silva, Vitor | | | | VS | VS | |
| Hernandez-Prera, Juan | | X | X | X | not required | |
| **PGY2** | | | | | | |
| Blouin, Amanda | | ACLS | | | | |
| Fender, Justin | | | | | | |
| Grunes, Dianne | | | | | | |
| Ko, Mabel | MKO | ACLS | MKO | MKO | MKO | |
| Yao, Jonathan | | | | | not ~~granted~~ required | |
| **PGY3** | | | | | | |
| Chepovetsky, Julie | JAC | | JAC | JAC | JAC | |
| Hechtman, Jaclyn | | NOT REQUIRED | presenting | | not required | |
| Jordan, Adrienne | ACJ | ACJ | | | ACJ | |
| Kazi, Sofia | | | | | | |
| **PGY4** | | | | | | |
| Azar, Paul | | | | | | |
| Chow, Jonathan | | | | JC | NOT | |
| Martinez, Alicia | | | | | REQUIRED | |
| Morency, Elizabeth | | | | | | |
| Roman, Taisha | | | | | | |
| **Fellows** | | | | | | |
| Klapper, Jeremy | | | | | | |
| Schubeck, Andrew | | | | | | |
| Guarino, Robert | | | | | | |
| Selegean, Sorin | Vac | Vac | Vac | Vac | Vac | |
| Kadire, Buhalqem | | | | | | |
| Sidhu, Harleen | | | | | | |
| Zhang, Xuchen | | | | | | |
| Iuga, Aina | | | | | | |
| Suárez, Yvelisse | | | | | | |
| Smethurst, Mark | | | | | | |
| Shibata, Robert | | | | | | |

#PGY-1  2012 July
Suparna Sarkar

CONFIDENTIAL

D03014

Exhibit 279

Ronald J. Wronko (RW1859)
RONALD J. WRONKO, LLC
134 Columbia Turnpike
Florham Park, New Jersey 07932
(973) 360-1001
Attorneys for plaintiff
Leena Varughese, M.D.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| LEENA VARUGHESE, M.D., | : | Civil Action No. 12 cv 8812 (CM/JCF) |
| Plaintiff, | : | ECF CASE |
| v. | : | CIVIL ACTION |
| MOUNT SINAI MEDICAL CENTER, | : | **DECLARATION OF RONALD J.** |
| PATRICK LENTO, M.D., CARLOS | : | **WRONKO** |
| CORDON-CARDO, M.D., ADOLFO | : | |
| FIRPO, M.D., IRA J. BLEIWEISS, | : | |
| M.D. and ABC Corp. 1-10, and JOHN | : | |
| DOES 1 -10, | : | |
| Defendants. | : | |

**I, RONALD J. WRONKO**, an Attorney at Law of the State of New Jersey, does hereby declare that:

1.      I am an attorney at law of the State of New Jersey and counsel for plaintiff Leena Varughese, M.D.  I make this certification in support plaintiff's motion for leave to file a Second Amended Complaint.

2.      Annexed hereto as Exhibit A is a true and correct copy of the proposed Second Amended Complaint.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23rd Day of October, 2013, in Florham Park, NJ.

_____
Ronald J. Wronko, Esq.

**EXHIBIT A**

Ronald J. Wronko, Esq. (RW 1859)
RONALD J. WRONKO, LLC
134 Columbia Turnpike
Florham Park, New Jersey 07932
(973) 360-1001
Attorneys for Plaintiff
Leena Varughese, M.D.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEENA VARUGHESE, M.D., | Civil Action No. 12 cv 8812 (CM/JCF) |
| Plaintiff, | ECF CASE |
| v. | CIVIL ACTION |
| MOUNT SINAI MEDICAL CENTER, PATRICK LENTO, M.D., CARLOS CORDON-CARDO, M.D., ADOLFO FIRPO, M.D., IRA J. BLEIWEISS, M.D. and ABC Corp. 1-10, and JOHN DOES 1-10, Defendants. | **SECOND AMENDED COMPLAINT AND JURY DEMAND** |

Plaintiff Leena Varughese ("plaintiff"), by way of this Second Amended Complaint against the defendants Mount Sinai Medical Center, Patrick Lento, M.D., Carlos Condon-Cardo, M.D., Adolfo Firpo, M.D., and Ira J. Bleiwess, M.D., ("defendants") says:

### I. Nature of Action, Jurisdiction and Venue

1

1.    This is an action seeking legal and equitable relief for (1) a violation of Title VII of the Civil Rights Act (gender discrimination); (2) a violation of Title VII of the Civil Rights Act (race and national origin discrimination); (3) a violation of Title VII of the Civil Rights Act (hostile work environment); (4) a violation of Title VII of the Civil Rights Act (retaliation); (5) a violation of the New York State Human Rights Law (gender discrimination); (6) a violation of the New York State Human Rights Law (race and national origin discrimination); (7) a violation of the New York State Human Rights Law (hostile work environment); (8) a violation of the New York State Human Rights Law (retaliation); (9) a violation of the New York City Human Rights Act (gender discrimination); (10) a violation of the New York City Human Rights Act (race and national origin discrimination); (11) a violation of the New York City Human Rights Act (hostile work environment); (12) a violation of the New York City Human Rights Act (retaliation); (13) tortious interference with prospective economic advantage; (14) defamation and defamation per se; (15) breach of contract; (16) breach of the covenant of good faith and fair dealing; (17) violation of whistleblower law; (18) violation of Section 1981 of the Civil Rights Act; (19) violation of the Family Medical Leave Act ("FMLA"); (20) intentional infliction of emotional distress; (21) aiding and abetting liability against the individual defendants; and (22) injunctive relief.

2.    This court has jurisdiction due arising out of federal question jurisdiction 28 U.S.C. § 1331.

3.    Venue is proper pursuant to 28 U.S.C. § 1391, as the acts or omissions giving rise to the claims alleged herein occurred within this judicial district, and the defendant is subject to the personal jurisdiction in this district.

2

## II. Factual Allegations

### A. The Parties

4.     Plaintiff, Dr. Varughese is a thirty one (31) year old female, who resides in Union County, New Jersey.

5.     The Mount Sinai Medical Center ("defendant" or "the Hospital") is a hospital and school of medicine, with a principle place of business located at One Gustave L. Levy Place, Box 1099, New York, New York 10029-6574.    Upon information and belief, the Mount Sinai Medical Center encompasses the Mount Sinai Hospital and the Mount Sinai School of Medicine.

6.     At all times relevant to this charge of discrimination, the respondent maintained an employment relationship with 20 or more individuals and is an "employer" within the meaning of applicable Federal, New York state and New York City statutes.

7.     At all times relevant to this charge of discrimination, Dr. Varughese served in the Department of Pathology for respondent, and was an "employee" of the respondent within the meaning of federal and local statutes, and was entitled to protection under Title VII of the Civil Rights Act of 1964 and Section 1981 of the Civil Rights Act of 1991.

8.     Throughout the relevant portions of this charge of discrimination, Dr. Patrick Lento ("Dr. Lento") served as Residency Program Director, and as such, served in a supervisory and/or managerial capacity for the respondent over the complainant and had authority to undertake or recommend tangible employment decisions and/or control the terms and conditions of complainant's employment.

3

9.    Throughout the relevant portions of this charge of discrimination, Dr. Carlos Cordon-Cardo ("Dr. Cordon-Cardo") served as Chair of the Department of Pathology, and as such, served in a supervisory and/or managerial capacity for the respondent over the complainant and had authority to undertake or recommend tangible employment decisions and/or control the terms and conditions of the complainant's employment.

10.   Throughout the relevant portions of this charge of discrimination, Dr. Adolfo Firpo ("Dr. Firpo") served as Director of Educational Activities for the Department of Pathology, and as such, served in a supervisory and/or managerial capacity for the respondent over the complainant and had authority to undertake or recommend tangible employment decisions and/or control the terms and conditions of the complainant's employment.

11.   Throughout the relevant portions of this charge of discrimination, Dr. Ira J. Bleiweiss ("Dr. Bleiweiss") was the former Chairman of the Department of Pathology, and served in a supervisory and/or managerial capacity for the respondent over the complainant and had authority to undertake or recommend tangible employment decisions and/or control the terms and conditions of the complainant's employment.

**B. Background Facts and Discrimination and Harassment based upon Gender, Race, and National Origin as well as Retaliation based upon protected activity**

12.   Dr. Varughese began her employment tenure at the Hospital in or about late June of 2008, as a Medical Doctor in the Department of Pathology. Dr. Varughese was eminently qualified for her position, having esteemed academic and professional

qualifications.

13.     Dr. Varughese enjoyed significant achievements and overwhelmingly positive feedback from numerous supervisors regarding her professional accomplishments with renewals of her employment contract.

14.     In each of her years as an employee, Dr. Varughese and the Hospital were parties to an ACGME Resident employment contract (the "Contract") governing their relationship.  The Contract incorporated by reference the Mount Sinai Medical Center House Staff Manual, including a Section entitled, "Job Retention".

15.     Through her date of termination, Dr. Varughese did not commit any acts defined under the "Job Retention" section for her to have been suspended or terminated from her position in the pathology residency program.  Dr. Varughese's contracted employment to Mount Sinai Medical Center could be terminated only if the 'house staff' failed to abide by the By-laws, Rules and Regulations, or policies of the Hospital or of the medical staff, falsified a Hospital document, threatened the safety or welfare of a patient, employee, or other physician or for any action that may be detrimental to the Hospital operations.

16.     In or around mid-to-late 2010, Dr. Samuel McCash, who served as Chief Resident for the Department of Pathology, engaged in a series of inappropriate acts against Dr. Varughese based on Dr. Varughese's gender, and not her qualifications.  In fact, upon information and belief, Dr. McCash regularly harassed and directed hostile treatment towards not only Dr. Varughese, but other female staff, as well, while treating male staff at all times with professionalism and courtesy.

17.     On or around September 14, 2010, Dr. McCash physically and verbally

5

intimidated and humiliated Dr. Varughese for no justifiable reason, screaming and lurching at her to "shut up, shut up, shut your mouth Leena." In a most demeaning manner, Dr. McCash told Dr. Varughese that his aggressive and threatening tone was, "for her own good," and that she was, "unfit professionally," by stating that she was "not qualified" that for her position, "no one was teaching you (Dr. Varughese)", she would "never get a job", "no one will hire you (Dr. Varughese)", and that she was lucky to be 'here'.

18. Dr. McCash's loud and threatening tone, aggressive physical gestures, and derogatory comments caused Dr. Varughese to feel physically threatened, publically humiliated, demeaned; and concerned for her professional development. Upon information and belief, Dr. McCash never treated Dr. Varughese's male colleagues in a similar manner. In fact, Dr. McCash would go out of his way to cover for male staff, often at the expense of Dr. Varughese.

19. Dr. Varughese immediately complained to Dr. Lento and requested a transfer away from Dr. McCash as well as intervention and mediation to prevent future or further harassment. Dr. Varughese's requests were ignored. Instead, Dr. Lento began falsely accusing Dr. Varughese of having mismanaged patient care without any supporting evidence, of being deserving of being 'yelled' at, of negatively evaluating her experience during an assignment, and of having a negative perception of her work environment. In contrast to his retaliatory treatment of Dr. Varughese, Dr. Lento made excuses for Dr. McCash's behavior despite confirmation from other house staff of Dr. McCash's action towards Dr. Varughese.

20. On or about December 8, 2010, Dr. Varughese suffered another incident at

the hands of Dr. McCash, prompted by Dr. McCash's discriminatory views of Dr. Varughese based on her gender. Dr. McCash approached Dr. Varughese in a physically intimidating and threatening manner while Dr. Varughese was performing critical patient care related work. Dr. Varughese was the sole senior resident on assignment on the surgical pathology service and was responsible for managing patient care duties, including managing the utilization and role performed by per diem ancillary staff known as moonlighters.

21.     During that second altercation initiated by Dr. McCash against Dr. Varughese, Dr. McCash's actions were so threatening to Dr. Varughese that Dr. Varughese immediately attempted to leave the lab to seek help. Meanwhile, Dr. McCash continued to follow Dr.Varughese around the lab in an aggressive manner, rushed at Dr. Varughese, pointed at Dr. Varughese, and invaded Dr. Varughese's personal space. Finally, when Dr. Varughese managed to exit the lab, she immediately informed Dr. Ira J. Bleiweiss of Dr. McCash's highly inappropriate and hostile behavior. Dr. Bleiweiss ignored Dr. Varughese's complaint.

22.     Dr. Varughese requested transfer away from Dr. McCash for the remainder of her assignment on surgical pathology because of the harassment, disruption of her work environment, and continued obstruction of her performance of her work duties by Dr. Bleiweiss. For example, Dr. Varughese was inappropriately forced to meet with the former chairman of the department, Dr. Schiller. Dr. Schiller immediately showed his intention to protect Dr. McCash at the expense of Dr. Varughese merely because she complained of discrimination.

23.     At that time, Dr. Schiller stated that there was, <u>something wrong with [Dr.</u>

7

Varughese's] DNA, and that she should seek therapy.  Dr. Schiller's remark was a direct reference to Dr. Varughese's race as an Indian and national origin from India.  Prior to the "DNA comment," Dr. Schiller remarked to Dr. Varughese during a conference presentation in random fashion and without any benefit to the presentation), "you don't know the crazy things you find in India."  At this time, Dr. Schiller defended McCash and Dr. Jordan who are Caucasian doctors.

24.     On or around December 9, 2010, Dr. Varughese filed formal complaints regarding the discrimination and harassment she was suffering at the hands of Dr. McCash and the subsequent derogatory statements and disparate treatment from Drs. Bleiweiss and Schiller to the ombudsman Dr. Barry Stimmel, and Dr. Pessin-Minsley (the interim Chair of the Pathology Department).

25.     Only about four (4) days after her official complaint of discrimination, Dr. Varughese received a hostile and threatening letter from Drs. Pessin-Minsley and Lento. Rather than properly responding to Dr. Varughese's protected complaints, the Hospital began engaging in an institutional practice of retaliation against Dr. Varughese for her complaints.  In the letter, Dr. Varughese was told by Dr. Pessin-Minsley and Dr. Lento that they were in the 'process' of investigating her complaints, but that should she confront anyone regarding her discrimination complaint, that *she* would suffer, "removal from service, possibly including termination."  Meanwhile, Dr. Varughese continued to experience increased obstruction such as missing materials necessary to perform Dr. Varughese's duties.

26.     On December 21, 2010, only *eight (8) days* after this threatening and retaliatory letter and *twelve (12) days* after Dr. Varughese's formal complaint of

8

discrimination, Dr. Varughese received a Notice of Academic Advisement from Dr. Lento. The letter, akin to a disciplinary action, was the first such letter Dr. Varughese received during her employment tenure and contained no legitimate accusations. Dr. Varughese was told that she could not contest the Academic Advisement that was clearly in retaliation and for reporting the second incident of harassment perpetuated by Dr. McCash against Dr. Varughese.

27.     Up until this point Dr. Varughese had received good reviews for her job performance and was never targeted for discipline. The concerns that Dr. Varughese reported to the respective individuals regarding the events that occurred on December 8, 2010, were not addressed. Instead, the Academic Advisement outlined how a Caucasian female, Dr. Adrienne Christine Jordan (formerly Hackman) and Caucasian male Dr. McCash were allegedly wronged.

28.     In or around late December of 2010, Dr. Pessin-Minsley, a Caucasian female, contacted the Physician Wellness Committee ("PWC") to report Dr. Varughese in order to provoke the PWC to take negative action against Dr. Varughese in retaliation for her complaints. The PWC, at that time, refused to take any action at the urging of Dr. Pessin-Minsley, as the PWC's role was not disciplinary, and the PWC had no authority to take such action.

29.     Soon thereafter, Dr. Bleiwiess' gave Dr.Varughese a negative evaluation for her performance during the surgical pathology assignment during the course of which Dr. Varughese had been harassed and assaulted by Dr. McCash. It was the only negative evaluation that she received for the period during which she was attacked by Dr. McCash. Dr. Bleiweiss also reported Dr. Varughese to the former chair, Dr. Schiller

9

even though he was no longer chairman and did not have any oversight over the department, the residency program, or Dr. Varughese. The Hospital was clearly engaging in systematic and institutional retaliation against Dr. Varughese for her protected complaints, in favor of Dr. McCash and Dr. Jordan.

30. Following her report of harassment, Dr. Varughese continued to be subjected to a hostile work environment, including by the department's refusal to provide work materials and support required for Dr. Varughese to perform her work in pathology. Often, the slides, paperwork, and necessary follow-up studies would not be available to Dr. Varughese. Such instances during her training period were distressful to Dr. Varughese and concerned Dr. Varughese regarding her own professional development and the lack of fair and good faith treatment. Dr. Varughese reported these instances to hospital administration and appropriate individuals but no assistance was ever provided to Dr. Varughese. Dr. Varughese was repeatedly humiliated on several instances with comments made regarding her intelligence, and asked if she was "special needs" when she made the same requests that were routinely made by other residents.

31. On February 15, 2011, only Dr.Varughese was required to leave her assigned work post despite the fact that both she and her male colleague did not have the requisite clearance known as a mask fit test. Immediately following this incident, Dr. Lento reported Dr. Varughese to the PWC to take actions against her because of her request that she be treated the same as male colleague, and not prevented from attending to duties.

32. Dr. Varughese was treated differently by the Hospital than her similarly-situated peers and in retaliatory fashion. As per her work in the pathology department,

much of Dr. Varughese's work entailed the analysis of slides. Dr. Varughese would often, for no reason, be delayed by the hospital in receiving slides, and additional studies necessary to perform her work. Also, Dr. Varughese would oftentimes order special stains which were critical to her research and work. For no justification, the Hospital would refuse to provide the necessary stains, intrinsic to making a final diagnosis in pathology. When Dr. Varughese reported the issues and level of obstruction that she was experiencing on a daily basis to her colleagues, the colleagues denied having similar problems on similar assignments.

33.     Later, in or around the end of February, 2011, Dr. Varughese was forced to meet with the PWC, or else be subject to disciplinary action. Such threat is highly irregular, as the PWC had no disciplinary authority and was instituted to be a resource for physicians, not to be used against physicians in such a manner, as per JCAHO now known as The Joint Commission, and New York State Medical Societies (MSSNY) and the State of New York, Office of Professional guidelines, and Hospital practice.

34.     The Hospital's actions were clearly retaliatory. For instance, Dr. Jordan is a Caucasian female, similarly situated co-worker/resident of plaintiff. Dr. Jordan was promoted to chief resident status, even though plaintiff had accurately reported in an act of whistleblowing that Dr. Jordan had brought alcohol to and consumed it at work. This was not the first time that drinking had occurred at the workplace during working hours. In the months leading up to this incident, Dr. McCash solicited by e-mail other residents to participate in "dementia" rounds, during which residents would drink hard alcohol and beer during work hours on Hospital premises. He even admitted to taking a "break" from grossing specimens to drink alcohol.

11

35.    Dr. Varughese's complaint about Dr. Jordan was verified.  The bottle of Captain Morgan's Rum that Dr. Jordan brought to work and was drinking on the job was discovered. Rather than suffer any disciplinary action, Dr. Jordan was promoted to chief resident status over plaintiff and four other qualified co-workers with seniority over Dr. Jordan.

36.    Dr. Jordan was given further preferential treatment such as a being permitted to take an elective in Pennsylvania even though she had the duty of being a chief resident at the New York City based hospital.  During which time, Dr. Jordan did not carry a working pager and admitted to phone reception and email access issues.  In contrast, plaintiff did not receive comparable treatment and, instead, was the subject of repeated discipline over the course of a period of year and termination for alleged offenses that were commonplace for other coworkers including Drs. Jordan and McCash and offenses that were less significant than drinking on the job when patient care is at risk.  When plaintiff complained to Dr. Schiller regarding Dr. Jordan, he defended Dr. Jordan.  In fact, many of Dr. Varughese's reports of problems were ignored in favor of Dr. McCash's and Dr. Jordan's advancement reflecting disparate treatment against Dr. Varughese.

37.    The Hospital sought every opportunity to harass Dr. Varughese subsequent to her discrimination and whistleblowing complaints.  One of the conditions of the Academic Advisement which Dr. Varughese received in retaliation for her complaint was that Dr. Varughese had to write a 'self-reflection.'  The self reflection was to be "your account of the situation" which led to her complaint about Dr. McCash, and a description of how *she*, not the Hospital or her harasser, could have approached

12

things "in a better fashion".

38.     The Hospital also imposed disparate requirements upon Dr. Varughese subsequent to her discrimination complaint.  The hospital imposed upon her numerous meetings with Dr. Lento, Dr. Cordon-Cardo and department administrator Mr. Castaldi without informing Dr. Varughese of the nature or reason for the meetings.  After the hiring of Dr. Firpo as Director of Educational Activities in July 2011, Dr. Firpo "reviewed" Dr. Varughese's 'professionalism.'  The tone of many of these meetings was unprofessional and threatening to Dr. Varughese.  The attitudes and comments made to Dr. Varughese were demeaning and unprofessional, and reflected a continuation of the institutional practice of retaliation against Dr. Varughese for reporting several incidents of harassment by Dr. McCash and the inaction of her supervisor, Dr. Lento.

39.     Dr. Varughese complied with the Hospital's request that she write a 'reflection', though she was forced to write the reflection under the threat of disciplinary action and in clear retaliation for her complaints of discrimination.

40.     When Dr. Varughese submitted the reflection, it was vastly and unjustifiably criticized, even though it was a self-reflection, and in an act of further harassment on or about May, 2011, the Hospital forced her to write a second reflection, by threatening immediate termination.  This was in clear violation of Mt. Sinai's Hospital's contractual obligations and policies.

41.     At a follow-up meeting relating to the self-reflection exercise, Dr. Cordon-Condo explicitly requested that Dr. Varughese refrain from making complaints about doctors drinking on the job.

42.     For months subsequent to her complaints to human resources and the

13

ombudsman, Dr. Varughese received no response from the Hospital regarding her complaints of discrimination. During that time period, disciplinary action against Dr. Varughese by the Hospital continued unabated. Additional actions taken against Dr. Varughese included refusal to credit Dr. Varughese for the work she performed, and removal of and tampering with Dr. Varughese's data from the residency management software known as New Innovations.

43.     In or around April, 2011, Dr. Varughese followed up her initial complaint of discrimination, in December 2010, by reiterating her complaint to the Director of Human Resources, Caryn Tiger-Paillex ("Paillex"), that she felt as if she was discriminated against based upon her gender.

44.     Very soon thereafter, Ms. Tiger-Paillex followed up Dr. Varughese's protected complaint with a letter to Dr. Varughese, dated April 11, 2011. The letter, dated four months after Dr. Varughese's initial official complaint, was wholly dismissive of Dr. Varughese's claims. Very simply, the letter which took four months to produce and which was only prompted by Dr. Varughese's continued inquiry into her complaints, stated, "I was not able to confirm your version of events, or to substantiate your claims of harassment, abusive behavior or abuse of power."

45.     The very same day, the PWC followed-up with Dr. Varughese by presenting completely new claims and accusations against Dr. Varughese that were never even discussed with Dr. Varughese. The hospital's actions were a continuation of retaliatory practices against Dr. Varughese.

46.     Since the submission of the self-reflection, the following months included continued report to Human Resources and Graduate Medical Education by Dr.

Bleiweiss, even though, he was not supervising Dr. Varughese, confrontation of Dr. Varughese's superiors by Dr. Bleiweiss and requests to write negative evaluation of her performance, which effectively created an extremely hostile and disparate work environment for Dr. Varughese, especially, when compared to Dr. McCash and Dr. Jordan, who enjoyed various and numerous promotions that were overseen by Drs. Lento, Cordon-Cardo, and Firpo.

47.     Recognizing that the Hospital lacked diligence in their treatment of Dr. Varughese's discrimination complaints and, more importantly that the Hospital had begun retaliating against Dr. Varughese subsequent to her engagement in protected activities, Dr. Varughese had her attorneys contact the Hospital by letter on or about June 10, 2011.  In the letter, Dr. Varughese's attorneys reiterated Dr. Varughese's complaints of discrimination, highlighted the hospital's failure to act diligently subsequent to her complaints, and outlined potential retaliatory acts committed by the hospital.  The letter explicitly requested that Dr. Varughese' attorneys be contacted, but the hospital never responded to the June 10, 2011 letter.

48.     Approximately *only one month* after the letter from Dr. Varughese's attorneys, on July 14, 2011, Dr. Cordon-Cardo issued to Dr. Varughese a trumped up final warning.  The 'final' warning letter, dated July 1, 2011, articulated no performance related issues whatsoever, and merely harped on alleged issues of professionalism, no doubt related to Dr. Varughese's unwelcome harassment and discrimination complaints. In criticism of Dr. Varughese and in 'justification' of the final warning, the letter admonished Dr. Varughese for bringing up, "the events that led to the Academic Advisement and various ways in which you [Dr. Varughese] feel that you were

15

wronged." This particular statement was a clear acknowledgement by the hospital that the Academic Advisement discipline that Dr. Varughese received in December, 2010, was clearly in retaliation for her complaints, including the June 10, 2011 letter of counsel, of discrimination. And, it clearly acknowledged that this final warning was for the same.

49.    The 'final' warning letter also criticized the 'Self-Reflection' essay that Dr. Varughese was required to submit, as per her December, 2010, Academic Advisement. Because Dr. Varughese maintained her discrimination complaints in the self-reflection, the hospital determined that the essay, "did not meet the Advisement's requirements." In clear condemnation of Dr. Varughese's complaints, the letter also criticized Dr. Varughese for her, "failure to appreciate the need to function within a hierarchy." The hospital's continued retaliation against Dr. Varughese for her complaint of discrimination was relentless. Dr. Varughese always remained professional and functioned well within the hierarchy and was not accused of being unprofessional until the report of harassment by McCash.

50.    Following the 'final warning', Dr. Varughese was tasked with meeting with Dr. Fipro, a new hire who began his work in July 2011 as Director of Educational Activities, a newly created position. During the first meeting on August 2, 2011, Dr. Varughese was told by Dr. Firpo, in the most unprofessional manner, that he has to figure out the politics of the institution before he assists Dr. Varughese. Dr. Varughese provided Dr. Firpo with the 'self-reflections' of which he claimed to not have had any prior knowledge.

51.    During the second meeting on August 17, 2011, Dr. Varughese raised

concerns of abusive treatment on a two week assignment with Dr. Najfeld and concerns regarding timely scheduling to assignments required for Anatomic Pathology board exam requirement. In the most unprofessional manner, Dr. Firpo offered to pay out of his own pocket for late fees rather than accommodate reasonable change in schedule.  In addition, over the course of the next month, Dr. Firpo would appear at Dr. Varughese's desk at random times and hours without any purpose. On occasions where Dr. Varughese was not present at the desk, it would lead to accusatory emails to Dr. Varughese, despite the fact that Dr. Varughese was attending to her duties which required leaving the desk for numerous reasons over the course of the work day.

52.    On September 12, 2011, Dr. Varughese met with Associate Dean for Graduate Education, Dr. Scott Barnett, to voice concerns regarding continued disparate treatment by the department leadership and malignant behavior directed at Dr. Varughese.

53.    During this period, on September 13, 2011, Dr. Firpo sent an email to Dr. Varughese stating it would be most desirable to "rewrite your reflection recasting your experiences".   The intimidation of and retaliation against Dr. Varughese was unrelenting. No such demands were made to Dr. McCash. In fact, none of the meetings that took place were professional, much less, the actions and the demands being made of Dr. Varughese for one incident described previously where Dr. Varughese was allegedly unprofessional.

54.    In or about September 14, 2011, Dr. Varughese was notified that she was scheduled as a presenter on September 15. Dr. Varughese was scheduled to present because another doctor, who was scheduled to present for over at least one month, had

cancelled his presentation at the last minute. The doctor who cancelled his presentation at the last minute was not disciplined for doing so. Though Dr. Varughese was scheduled at the last minute, when Dr. Varughese acted to reschedule her presentation, the Hospital threatened serious disciplinary action and referred her to the Physician Wellness Committee.

55.     In or about September 2011, Dr. Varughese requested leave under the Family Medical Leave Act ("FMLA") to attend to Dr. Varughese's own health. She was advised that she would have to provide a doctor's certification in support of such request for leave.

56.     Before Dr. Varughese even had a chance to submit the doctor's certification and before she had been advised that her FMLA leave was approved or was commencing, defendants barred her from the workplace. To return to work, she would have to provide a doctor's note. Such request for a Fit for Duty certification was entirely premature as Dr. Varughese had not even taken FMLA leave yet. Such negative action was taken to interfere with Dr. Varughese's attempts to exercise her rights under FMLA. As a result of the immediate action taken by defendants to discourage her attempted exercise of her rights under FMLA, Dr. Varughese and her physician decided not to proceed forward on the request.

57.     On September 20, 2011, Dr. Varughese obtained the note from her treating physician permitting her to return to work as insisted on by the Hospital. In addition, Dr. Varughese provided the information to Human Resources and Graduate Medical Education as instructed to do so by the director human resources, Ms. Tiger-Paillex.

58.     Dr. Varughese attended work on September 21, 2011, and now was

officially cleared by her physician as explicitly requested by MSMC.  However, while Dr. Varughese was at her work desk, the Hospital security was called to her desk and Dr. Varughese was accosted in front of her colleagues for several hours.  Defendants illegally used Dr. Varughese's communications to exercise rights under FMLA as a negative factor justifying a summary suspension termination in violation of 29 C.F.R. § 825.220.

59.     On September 21, 2011, Dr. Firpo and Dr. Cordon-Cardo issued a letter of summary suspension termination from the Pathology Residency Program to Dr. Varughese.  Though no previous restrictions were placed on Dr. Varughese's privileges and responsibilities, the letter deemed her a 'risk' to the hospital and her patients. The letter summarized numerous pretextual or fabricated reasons purporting to support the summary suspension and termination and again harped on Dr. Varughese's professionalism and failure to provide the hospital an adequate 'self-reflection.'  Dr. Varughese's failure to drop her protected discrimination complaints and take blame for the incidents ultimately led to her retaliatory termination.

60.     The Hospital breached the employment Contract with Dr. Varughese by terminating her.  The Hospital did not have any of the grounds under the Job Retention section of the Manual to terminate the Contract.  Dr. Varughese's contract was guided by the non-profit organization concerned with overseeing the quality of residency programs known as Accreditation Council of Graduate Medical Education, ACGME. As such, Dr. Varughese is to be given notice of any and each failure in a timely manner, not in a final write-up or after termination.  During the numerous meetings during which Dr. Varughese met with superiors, Dr. Varughese was not informed of the numerous

19

claims that were ultimately made against her in support of summary suspension and termination.

61.     Defendant's reasons for terminating Dr. Varughese's employment were entirely pretextual and were a continuation of retaliation that had occurred since she engaged in protected activities including report of repeat instances of harassment to her superiors, who regularly blamed Dr. Varughese or insisted that Dr. Varughese deserved to be subjected to harassment and humiliation.

62.     The discriminatory and retaliatory treatment that Dr. Varughese endured during her employment has caused great stress and anxiety for her, and has had a negative effect on her health, as well as a severe effect on her personal finances both in the present and future. The stated reasons for Dr. Varughese's termination are a pretext for the respondent's unlawful discrimination and retaliation against Dr. Varughese. The complainant's professional goals and growth have been implicated, and personal finances have been impacted, by respondent's unlawful conduct, which demonstrates a reckless indifference to her state and local protected rights under the New York Human Rights Act and the New York City Human Rights Act.

### C.    Post-termination acts of Retaliation and Defamation

63.     Dr. Varughese had already satisfactorily completed 95 percent of the assignments in Anatomic Pathology with only the assignment at the Medical Examiner remaining and the Clinical Pathology assignments remained were to be completed during the final year. For that matter, the respondents have insisted that Dr. Varughese will not be assigned the requisite rotations for Clinical Pathology and follow up by Dr.

Varughese did not yield any change by respondents.

64.     When a potential employer requested that Mount Sinai Medical Center and Dr. Firpo forward the record of the years of work that Dr. Varughese had completed satisfactorily, they refused.  After the Medical Center denied verification of employment record to the requesting institution, the Mount Sinai Medical Center  created a punitive record known as a "summative evaluation" that would prevent Dr. Varughese from obtaining appropriate employment anywhere that would reference her medical career from 2008-2012. The summative evaluation notes new issues related to Dr. Varughese that were completely contrary and never brought to Dr. Varughese's attention.  Mount Sinai Medical Center and Dr. Firpo took such action after claimant's termination in further retaliation, continued spite, and in malice against claimant and to prevent Dr. Varughese from obtaining qualified work and ruining Dr. Varughese employment prospects in pathology.   In sharp contrast, Dr. McCash and Dr. Jordan have enjoyed significant advancements in their careers with full support of the respondents.

### D.     Administrative Prerequisites

65.     At the commencement of this action, notice thereof was provided to the Attorney General of the State of New York, as provided by N.Y. Civ. Rights Laws, § 40-d.

66.     At the commencement of this action, a copy of the Complaint was served upon the New York City Commission on Human Rights and the New York City Corporation Counsel, as provided by the New York City Human Rights Law, N.Y.C. Admin. Code § 8-502(c).

67.     Plaintiff has also received a Right to Sue letter from the EEOC.  This

21

action has been filed prior to expiration of the ninety (90) day period for suit to be filed

## COUNT I
### (Gender Discrimination under Title VII of the Civil Rights Act of 1964)

68.     Plaintiff realleges and incorporates herein the above paragraphs.

69.     Plaintiff is in a gender protected class (female), performed her duties satisfactorily, was subject to adverse employment actions, and the adverse employment actions occurred under circumstances giving rise to an inference of unlawful discrimination.

70.     The foregoing facts and circumstances demonstrate that defendant has violated Title VII of the Civil Rights Act of 1964, by treating plaintiff in a disparate fashion and discriminating against plaintiff based upon plaintiff's gender.

71.     As a direct and proximate result of the actions of defendant, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and embarrassment.  Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life.  Moreover, plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care . Plaintiff's damages have been experienced in the past, and they will continue into the future.

72.     Furthermore, plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.

## COUNT II
### (Race/National Origin Discrimination under Title VII of the Civil Rights Act of 1964)

73.     Plaintiff realleges and incorporates herein the above paragraphs.

74.     Plaintiff is in a race/national origin protected class (Indian), performed her duties satisfactorily, was subject to adverse employment actions, and the adverse employment actions occurred under circumstances giving rise to an inference of unlawful discrimination.

75.     The foregoing facts and circumstances demonstrate that defendant has violated Title VII of the Civil Rights Act of 1964, by treating plaintiff in a disparate fashion and discriminating against plaintiff based upon plaintiff's race/national origin as Indian.

76.     As a direct and proximate result of the actions of defendant, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and embarrassment.  Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life.  Moreover, plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care Plaintiff's damages have been experienced in the past, and they will continue into the future.

77.     Furthermore, plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.


## COUNT III
**(Hostile Work Environment under Title VII of the Civil Rights Act of 1964)**

78.     Plaintiff realleges and incorporates herein the above paragraphs.

79.     Plaintiff was subjected to a hostile work environment on account of her gender, race and/or national origin.  The harassing conduct to which plaintiff was subjected would not have occurred but for plaintiff's gender, race and/or national origin.

80.     The harassing actions and statements directed at plaintiff were severe and pervasive.

81.     The sexually harassing actions and statements directed at plaintiff altered the conditions of plaintiff's employment and created an intimidating, hostile, offensive and abusive working environment because of plaintiff's gender, race and/or national origin.

82.     A reasonable woman of plaintiff's race and national origin and a reasonable person would consider the actions and statements directed toward plaintiff to have created an intimidating, hostile, offensive and abusive working environment because of gender, race and/or national origin.

83.     As a direct and proximate result of the actions of defendant, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and embarrassment.  Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life.  Moreover, plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care .  Plaintiff's damages have been experienced in the past, and they will continue into the future.

84.     Furthermore, plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.

## COUNT IV
### (Retaliation under Title VII of the Civil Rights Act of 1964)

85.     Plaintiff realleges and incorporates herein the above paragraphs.

86.     Plaintiff engaged in protected activity under Title VII of the Civil Rights Act of 1964, by reporting her good faith belief that she was the subject of a hostile work environment and the victim of gender discrimination.

87.     Plaintiff suffered adverse employment actions that materially change the terms and conditions of employment in a way that was adverse to plaintiff.

88.     The adverse employment actions were causally related to plaintiff's protected activity.

89.     The foregoing facts and circumstances demonstrate that defendant has violated Title VII of the Civil Rights Act of 1964 by retaliating against plaintiff for engaging in protected activity.

90.     As a direct and proximate result of the actions of defendant, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and embarrassment.  Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life.  Moreover, plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care .  Plaintiff's damages have been experienced in the past, and they will continue into the future.

91.     Furthermore, plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.

## COUNT V
### (Gender Discrimination under the New York Human Rights Law)

92.     Plaintiff realleges and incorporates herein the above paragraphs.

93.     Plaintiff is in a gender protected class (female), performed her duties satisfactorily, was subject to adverse employment actions, and the adverse employment actions occurred under circumstances giving rise to an inference of unlawful discrimination.

94.     The foregoing facts and circumstances demonstrate that defendant has violated the New York Human Rights Law, by treating plaintiff in a disparate fashion and discriminating against plaintiff based upon plaintiff's gender.

95.     As a direct and proximate result of the actions of defendant, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and embarrassment.  Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life.  Moreover, plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care . Plaintiff's damages have been experienced in the past, and they will continue into the future.

96.     Furthermore, plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.

**COUNT VI**
**(Race/National Origin Discrimination under the New York Human Rights Law)**

97.     Plaintiff realleges and incorporates herein the above paragraphs.

98.     Plaintiff is in a race/national origin protected class (Indian), performed her duties satisfactorily, was subject to adverse employment actions, and the adverse employment actions occurred under circumstances giving rise to an inference of unlawful discrimination.

99.     The foregoing facts and circumstances demonstrate that defendant has violated the New York Human Rights Law, by treating plaintiff in a disparate fashion and discriminating against plaintiff based upon plaintiff's race/national origin as Indian.

100.     As a direct and proximate result of the actions of defendant, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and

embarrassment. Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life. Moreover, plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care . Plaintiff's damages have been experienced in the past, and they will continue into the future.

101.    Furthermore, plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.

### COUNT VII
### (Hostile Work Environment under the New York Human Rights Law)

102.    Plaintiff realleges and incorporates herein the above paragraphs.

103.    Plaintiff was subjected to a hostile work environment on account of her gender, race and/or national origin. The harassing conduct to which plaintiff was subjected would not have occurred but for plaintiff's gender, race and/or national origin.

104.    The harassing actions and statements directed at plaintiff were severe and pervasive.

105.    The sexually harassing actions and statements directed at plaintiff altered the conditions of plaintiff's employment and created an intimidating, hostile, offensive and abusive working environment because of plaintiff's gender, race and/or national origin.

106.    A reasonable woman of plaintiff's race and national origin and a reasonable person would consider the actions and statements directed toward plaintiff to have created an intimidating, hostile, offensive and abusive working environment because of gender, race and/or national origin.

107.    As a direct and proximate result of the actions of defendant, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and

embarrassment. Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life. Moreover, plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care . Plaintiff's damages have been experienced in the past, and they will continue into the future.

108.    Furthermore, plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.

## COUNT VIII
### (Retaliation under the New York Human Rights Law)

109.    Plaintiff realleges and incorporates herein the above paragraphs.

110.    Plaintiff engaged in protected activity under the New York Human Rights Law, by reporting her good faith belief that she was the subject of a hostile work environment and the victim of gender discrimination.

111.    Plaintiff suffered adverse employment actions that materially change the terms and conditions of employment in a way that was adverse to plaintiff.

112.    The adverse employment actions were causally related to plaintiff's protected activity.

113.    The foregoing facts and circumstances demonstrate that defendant has violated the New York Human Rights Law by retaliating against plaintiff for engaging in protected activity.

114.    As a direct and proximate result of the actions of defendant, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and embarrassment. Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life. Moreover, plaintiff has and/or

may have to incur expenses for medical, psychiatric, and/or psychological counseling care .
Plaintiff's damages have been experienced in the past, and they will continue into the future.

115.    Furthermore, plaintiff has been required to retain an attorney to assist
Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.

### COUNT IX
### (Gender Discrimination under the New York City Human Rights Law)

116.    Plaintiff realleges and incorporates herein the above paragraphs.

117.    Plaintiff is in a gender protected class (female), performed her duties
satisfactorily, was subject to adverse employment actions, and the adverse employment
actions occurred under circumstances giving rise to an inference of unlawful discrimination.

118.    The foregoing facts and circumstances demonstrate that defendant has
violated the New York City Human Rights Law, N.Y. Admin. Code § 8-107, et seq., by
treating plaintiff in a disparate fashion and discriminating against plaintiff based upon
plaintiff's gender as a woman.

119.    As a direct and proximate result of hostile work environment created by
defendant, plaintiff has suffered mental anguish, physical discomfort, pain and suffering,
and shame and embarrassment.  Furthermore, plaintiff has suffered lost wages, a diminished
ability to earn a living, and a diminished capacity to enjoy plaintiff's life.  Moreover,
plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or
psychological counseling care .  Plaintiff's damages have been experienced in the past, and
they will continue into the future.

120.    Furthermore, plaintiff has been required to retain an attorney to assist
Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.

29

## COUNT X
**(Race/National Origin Discrimination under the New York City Human Rights Law)**

121.   Plaintiff realleges and incorporates herein the above paragraphs.

122.   Plaintiff is in a race/national origin protected class (Indian), performed her duties satisfactorily, was subject to adverse employment actions, and the adverse employment actions occurred under circumstances giving rise to an inference of unlawful discrimination.

123.   The foregoing facts and circumstances demonstrate that defendant has violated the New York City Human Rights Law, N.Y. Admin. Code § 8-107, et seq., by treating plaintiff in a disparate fashion and discriminating against plaintiff based upon plaintiff's race/national origin as a person of Indian race and of national origin of India.

124.   As a direct and proximate result of hostile work environment created by defendant, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and embarrassment.  Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life.  Moreover, plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care .  Plaintiff's damages have been experienced in the past, and they will continue into the future.

125.   Furthermore, plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.

## COUNT XI
**(Hostile Work Environment under the New York City Human Rights Law)**

126.    Plaintiff realleges and incorporates herein the above paragraphs.

127.    The foregoing facts and circumstances demonstrate that defendant subjected plaintiff to a workplace where unwanted gender-based and/or race-based and/or national origin-based offensive conduct existed in violation of New York City Human Rights Law, N.Y. Admin. Code § 8-107, et seq.

128.    As a direct and proximate result of hostile work environment created by defendant, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and embarrassment.  Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life.  Moreover, plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care .  Plaintiff's damages have been experienced in the past, and they will continue into the future.

129.    Furthermore, plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.

### COUNT XII
### (Retaliation under the New York City Human Rights Law)

130.    Plaintiff realleges and incorporates herein the above paragraphs.

131.    Plaintiff engaged in protected activity under the New York City Human Rights Law, N.Y. Admin. Code § 8-107, et seq., by reporting her good faith belief that she was the subject of a hostile work environment and the victim of gender discrimination.

132.    Plaintiff suffered adverse employment actions that materially change the terms and conditions of employment in a way that was adverse to plaintiff.

133.    The adverse employment actions were causally related to plaintiff's protected activity.

134.    The foregoing facts and circumstances demonstrate that defendant has violated the New York City Human Rights Law, N.Y. Admin. Code § 8-107, et seq., by retaliating against plaintiff for engaging in protected activity.

135.    As a direct and proximate result of the retaliation engaged in by defendant, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and embarrassment.  Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life.  Moreover, plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care . Plaintiff's damages have been experienced in the past, and they will continue into the future.

136.    Furthermore, plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.


### COUNT XIII
### (Interference with Business Relations)

137.    Plaintiff realleges and incorporates herein the paragraphs set forth in this Complaint.

138.    The actions of Defendant give rise to a violation of interference with business relations.

139.    As a direct and proximate result of the actions of Defendants, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment, emotional distress injuries, the physical manifestation of emotional distress injuries, and/or

32

physical injury.  Furthermore, Plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiff's life.  Moreover, Plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care .  Plaintiff's damages have been experienced in the past, and they will continue into the future.

140.    Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting Plaintiff's claims and protecting Plaintiff's rights.

## COUNT XIV
## (Defamation and Defamation Per Se)

141.    Plaintiff realleges and incorporates herein the paragraphs set forth in this Complaint.

142.    Defendant has made false and defamatory statements about plaintiff of a nature that would negatively impact plaintiff's reputation in her chosen profession.

143.    In particular, Defendants Mt. Sinai and Adolfo Firpo, M.D., prepared a Verification and Summative Evaluation of Graduate Medical Education/Training as of March 8, 2012 ("Summative Evaluation").  The Summative Evaluation marked plaintiff as being "unsatisfactory" in three (3) categories:  (a) patient care; (b) professionalism; and (c) interpersonal and communication skills.  Dr. Firpo stated that plaintiff did not demonstrate sufficient competence to enter practice without direct supervision.  The Summative Evaluation is false in part or in whole.

144.    Defendant made and published the false statements with malice and/or with reckless disregard for the falsity of the statements made.

145.    Plaintiff has been damaged as a result of the defamatory statement(s) made by defendant.  Moreover, as defendant's false and defamatory statements have been made

33

for purposes of harming plaintiff's reputation in her chosen profession, defendant's defamatory statements amount to defamation per se for which no damages need be shown.

## COUNT XV
### (Breach of Contract)

146.   Plaintiff realleges and incorporates herein the paragraphs set forth in this Complaint.

147.   The Hospital breached the Contract between the parties.

148.   Plaintiff has been damaged as a result of the Hospital's breach of contract. Plaintiff's damages include compensatory damages and foreseeable consequential damages.

## COUNT XVI
### (Breach of Covenant of Good Faith and Fair Dealing)

149.   Plaintiff realleges and incorporates herein the paragraphs set forth in this Complaint.

150.   There is a covenant of good faith and fair dealing in each contract in the State of New York.

151.   The Hospital breached the covenant of good faith and fair dealing in the parties' Contract.

152.   Plaintiff has been damaged as a result of the breach of the covenant of good faith and fair dealing.   Plaintiff's damages include compensatory damages and foreseeable consequential damages.

## COUNT XVII
### (Whistleblower Law)

153.   Plaintiff realleges and incorporates herein the paragraphs set forth in this Complaint.

154.    Plaintiff disclosed to her superiors that the Chief Resident was drinking alcohol on the job.

155.    Plaintiff disclosed such violation of law and/or public policy in good faith, and such complaint was substantiated.

156.    The actions of the Chief Resident created a substantial and specific danger to public health.

157.    Plaintiff was the subject of retaliation because of her disclosure of this issue.

158.    Plaintiff has been damaged as a result of the retaliation and is subject to recovery under McKinney's Labor Law § 740(4).

### COUNT XVIII
### (42 USC § 1981)

159.    Plaintiff realleges and incorporates herein the paragraphs set forth in this Complaint.

160.    Plaintiff is a member of a racial minority (Indian) and a gender minority (female).

161.    Defendant has demonstrated an intent to discriminate on the basis of race and gender.

162.    Defendant terminated plaintiff in discriminatory fashion.

163.    As a direct and proximate result of the actions of Defendants, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment, emotional distress injuries, the physical manifestation of emotional distress injuries, and/or physical injury. Furthermore, Plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiff's life. Moreover, Plaintiff has and/or

may have to incur expenses for medical, psychiatric, and/or psychological counseling care. Plaintiff's damages have been experienced in the past, and they will continue into the future.

164.    Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting Plaintiff's claims and protecting Plaintiff's rights.

## COUNT XIX
### (Family Medical Leave Act "FMLA")

165.    Plaintiff realleges and incorporates herein the paragraphs set forth in this Complaint.

166.    Plaintiff attempted to exercise rights under the Family Medical Leave Act.

167.    Defendants interfered with plaintiff's attempts to exercise rights.

168.    Defendants took plaintiff's attempts to exercise rights under FMLA into account in taking an adverse employment action against plaintiff.

169.    Plaintiff has suffered damages, including lost wages, front pay, and attorneys fees and costs, as a result of interference and retaliation arising out of her attempts to exercise rights under the FMLA.

## COUNT XX
### (Intentional Infliction of Emotional Distress)

170.    Plaintiff realleges and incorporates herein the paragraphs set forth in this Complaint.

171.    Defendant has engaged in extreme and outrageous conduct with the intent to cause or disregard of a substantial probability of causing severe emotional distress to plaintiff.

172.    Defendant's conduct caused plaintiff's harm in the form of severe emotional distress.

## COUNT XXI
### (Individual Liability)

173.   Plaintiff realleges and incorporates herein the paragraphs set forth in this Complaint.

174.   The foregoing facts and circumstances demonstrate that defendants Cordon-Cardo, Firpo, and Lento have violated the above-referenced federal, state, and local discrimination and whistleblower statutes by aiding and abetting or otherwise assisting the commission of or attempting to commit acts of disparate treatment, discrimination, and retaliation against plaintiff based upon the above-referenced protected traits and activity.

175.   As a direct and proximate result of the actions of these individual defendants, plaintiff has suffered mental anguish, physical discomfort, pain and suffering, and shame and embarrassment. Furthermore, plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy plaintiff's life. Moreover, plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling care . Plaintiff's damages have been experienced in the past, and they will continue into the future.

176.   Furthermore, plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting plaintiff's rights.

WHEREFORE, as to each and every count, plaintiff demands judgment on each and all of these counts against the defendants jointly and severally, as follows:

A.   Compensatory and/or consequential damages in excess of $1,000,000.00;.

B.   Damages for lost wages and benefits, back pay and front pay;

C.    Damages for humiliation, mental and emotional distress;

D.    Statutory damages, if applicable;

E.    Punitive damages and or liquidated damages where permitted by law;

F.    Attorneys' fees and costs of suit;

G.    Lawful interest – including pre-judgment interest on lost wages;

H.    Lawful interest – including pre-judgment interest on any wages not paid in a timely manner;

I.    Injunctive Relief, including but not limited to, an Order for the following:

1.    Restraining defendants from any further dissemination of the Summative Evaluation and/or Compelling defendants to retract the Summative Evaluation and/or to issue a new Summative Evaluation that will permit plaintiff to proceed with acceptance, enrollment, and/or transfer into a different Residency program and to take the American Board of Pathology examination;

2.    Requiring defendants to take all appropriate steps to fully certify plaintiff's three (3) completed years of residency and signing off on her taking the American Board of Pathology examination.

J.    Such other, further and different relief as the Court deems fitting, just and proper.

Plaintiff hereby reserves the right to amend this Complaint to supplement or modify the factual obligations and claims contained herein, based upon information received from the defendant, witnesses, experts, and others in the course of discovery in this matter.

## DEMAND FOR TRIAL BY JURY

Plaintiff respectfully demands a trial by jury on all issues in the within action so triable.

## DESIGNATION OF TRIAL COUNSEL

RONALD J. WRONKO is hereby designated as trial counsel on behalf of plaintiff.

RONALD J. WRONKO, LLC
Attorney for plaintiff

By _____
Ronald J. Wronko

Dated:

39

## **CERTIFICATION**

The undersigned hereby certifies that to the best of his knowledge he knows of no other actions or arbitration hearings pending in connection with the within action now being filed with the Court.

Dated: _____

                                                   Ronald J. Wronko, Esq. (RW 1859)

                                                   Ronald J. Wronko, LLC
134 Columbia Turnpike
Florham Park, NJ 07932
(973) 360-1001
(973) 360-1881 (facsimile)
ron@ronwronkolaw.com

Exhibit 280

# AN APPRAISAL OF ECONOMIC LOSS
## TO LEENA VARUGHESE

Kristin K. Kucsma, M.A.
Frank D. Tinari, Ph.D.

### TINARI ECONOMICS GROUP
www.TinariEconomics.com

293 Eisenhower Parkway      112 West 34th Street
Suite 190      17th Floor
Livingston, NJ 07039      New York, New York 10120
973 / 992-1800  phone      212 / 201-0938  phone
973 / 994-1571  fax      212 / 201-0937 fax

June 3, 2013

# TABLE OF CONTENTS

Certification  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Purpose of Appraisal  . . . . . . . . . . . . . . . . . . . . . . . . .  2

Opinion of Economic Damages . . . . . . . . . . . . . . . . . . .  2

Background Facts and Assumptions  . . . . . . . . . . . . . . .  3

Summary  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

Exhibits

Appendix of Tables

Qualifications Profiles

Statement of Ethical Principles and Principles of Professional
Practice

## Certification

This is to certify that we are not related to any of the parties to subject action, nor do we have any present or intended financial interest in this case beyond the fees due for professional services rendered in connection with this report and possible subsequent services. Further, we certify that our professional fees are not contingent on the outcome of this matter but are based on the time expended on the services provided to counsel in connection with subject action.

This is to further certify that all assumptions, methodologies, and calculations utilized in this analysis are based on current knowledge and methods applied in the determination of projected pecuniary losses.

In addition, this is to further certify that we pledge to abide by the spirit and the letter of the Statement of Ethical Principles and Principles of Professional Practice of the National Association of Forensic Economics, a copy of which is attached to this report.

Lastly, we certify that the Tinari Economics Group has received, thus far, $2,500 compensation for preparation of a report for Varughese v. Mount Sinai Medical Center, et al. As of this date, an outstanding balance of $xxxx is due. The services of Kristin K. Kucsma are billed at $345.00 per hour for research and report preparation, and $370.00 for in-person consultation. The services of Frank D. Tinari are billed at $425.00 per hour for research and report preparation, and $470.00 for in-person consultation.

_____

Kristin K. Kucsma, M.A.

_____

Frank D. Tinari, Ph.D.



**VARUGHESE / Ronald J. Wronko, Esq.**                                    **page 2**

## Purpose of Appraisal

Tinari Economics Group (TEG) was retained to prepare a report evaluating the economic losses suffered by Leena Varughese resulting from alleged discrimination, harassment and retaliation in employment. Background facts on this matter were provided to us in a packet of documents. Additional information was obtained subsequent to the initial communications. We have relied on these documents, facts and publicly available documents in developing this appraisal. The respective document used as a source is duly noted at each point of use in the report.

The purpose of this report, therefore, is <u>to provide a written appraisal of the economic loss sustained by Leena Varughese in this matter</u>.

## Opinion of Economic Losses

Within a reasonable degree of economic certainty, and based on the information received and the analysis contained in this report, it is our professional opinion that the total present value of the economic loss sustained by Dr. Varughese amounts to

**EIGHT MILLION,
SEVEN HUNDRED THIRTY-ONE THOUSAND,
TWO HUNDRED THIRTY-THREE DOLLARS**


[   **$8,731,233**   ]

Our valuation does not take into account the ramifications of intangible, non-economic losses such as human suffering or emotional feelings that may have been suffered by plaintiff or plaintiff's family members.



VARUGHESE / Ronald J. Wronko, Esq.                                    **page 3**

## Background Facts and Assumptions

| | |
|---|---|
| 1) Plaintiff: | Leena Varughese; female |
| 2) Born: | January 26, 1981 |
| 3) Residence: | Union, New Jersey |
| 4) Education: | M.D. |
| 5) Former employment: | Anatomic and Clinical Pathology Four Year Residency Program at Mount Sinai Hospital (Sinai) |
| 6) Former position: | Post-graduate in 4th year of residency program |
| 7) Terminated: | September 21, 2011 |
| 8) Marital status: | single |

9) Life expectancy: as of the date of termination, females of plaintiff's age (30.65 years) live, on average, an additional 51.6 years. [SOURCE: *National Vital Statistics Reports,* Volume 61, No. 3, United States Life Tables, 2008, Table 2, September 24, 2012, http://www.cdc.gov/nchs/data/nvsr/nvsr61/nvsr61_03.pdf.] Therefore, persons in plaintiff's statistical cohort have an expected total life span averaging 82.25 years, implying a statistical date of death of April 27, 2063.

10) Statistical retirement age: as of the date of termination, females of plaintiff's age (30.65 years) and level of education (professional degree) have 35.50 years to retirement. [SOURCE: Gary R. Skoog and James E. Ciecka, "Probability Mass Functions for Years to Final Separation from the Labor Force Induced by the Markov Model," *Journal of Forensic Economics*, 16(1), 2003, pp. 51-86, by interpolation.] This implies a statistical retirement age of 66.15 years, occurring on May 22, 2047.

11) Expected working years: worklife expectancy tables provide statistics descriptive of the actual working life experience of the civilian population by gender, age, employment status, and schooling. As of the date of termination, females of plaintiff's age/education/labor-force-activity statistical cohort average 33.04 years of remaining labor force activity.[SOURCE: Gary R. Skoog, James E. Ciecka and Kurt V. Krueger, "The Markov Process Model of Labor Force Activity: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors", *Journal of Forensic Economics*, Volume 22, No. 2, August 2011, pp. 199-206, by interpolation.]



12) Worklife-to-retirement ratio: the number of years from the date of termination, until plaintiff's statistical retirement date (35.5 years in this case) exceeds the number of expected remaining working years (33.04 in this case). Thus, arithmetically, the number of years of worklife for this statistical cohort comprises 93.1% of the total remaining number of years until retirement.

13) Occupation and employment: at the date of termination, plaintiff worked in the 4th year of a 4-year pathology residency program at Sinai. It is alleged that she experienced discrimination, harassment and retaliation in that employment. Further, on September 21, 2011, her employment at Sinai was reportedly wrongfully terminated. Dr. Varughese reports that defendants have also interfered with her attempts to gain admission into a different residency program. She has reportedly been unemployed since the date of termination. [SOURCES: response to Tinari Economics Group Fact-Finding Questionnaire (FFQ); telephone interview of plaintiff on May 13, 2013; and First Amended Complaint, dated April 17, 2013.]

14) Earnings history: plaintiff's earnings for the years 2008 to 2012 are presented in the table that follows. [SOURCE: plaintiff's 2010 to 2011 W-2 Wage and Tax Statements; and her 2008, 2009 and 2012 federal income tax returns.]

| Year | Mt. Sinai (W-2) |
|------|-----------------|
| (1) | (2) |
| 2008 | $25,455 |
| 2009 | 52,411 |
| 2010 | 56,426 |
| *2011 | 44,702 |
| 2012 | 0 |

* terminated: September 21

15) Pre-termination earnings base: in this report, we assume that plaintiff, in the absence of the alleged wrongdoing, would have successfully completed the pathology residency program and begun employment as an Anatomic and Clinical Pathologist on July 1, 2012.



To quantify her earnings in that employment, we turn to a physician compensation survey which presents 2011 total compensation data for Anatomic and Clinical Pathologists by percentile. [SOURCE: Physician Compensation and Production Survey: 2012 Report Based on 2011 Data, All Owners, All Practices, http://data.mgma.com/DataDive.] Accordingly, we establish her starting-level earnings for her projected start date of July 1, 2012, at $255,408 in 2011 dollars based upon corresponding data for Anatomic and Clinical Pathologists at the 10th percentile. Further, we assume that plaintiff's earnings would have increased to the median compensation level for Anatomic and Clinical Pathologists ($375,530 in 2011 dollars) by 2022.

To obtain corresponding values for 2012 and 2013, we apply yearly increases of 0.1% and 2%, respectively, consistent with recent and expected annual wage growth for healthcare practitioners and technical occupations[1]. To project pre-termination gross earnings in the future (beginning in 2014), we apply a yearly increase of 3.8%, based on recent and expected wage growth economy-wide.[2] [SOURCES: U.S. Department of Labor, Bureau of Labor Statistics, Occupational Employment Statistics (OES), Median Hourly Earnings, Healthcare and Technical Occupations, http://www.bls.gov/oes, percent calculated by TEG; and Principal Economic Assumptions, *2012 Annual Report to the Board of Trustees of the Federal Old-age and Survivors Insurance and Disability Insurance Trust Funds*, Table V.B1, http://www.ssa.gov/oact/tr/2012/V_B_econ.html#236399.]

Use of the previously noted earnings data and the noted rates of increase, we calculate a compound average increase of 7.69% (rounded) over the period 2012 to 2022 as presented in Exhibit #1. Beginning in 2023, we utilize a long-term growth rate of 3.8%.

---

[1] We assume wage growth through 2016 is likely to reflect the immediate past four years which have been characterized by weak labor markets. Accordingly, we utilize compound wage growth from 2008 through 2012 to calculate annual wage growth in 2013.

[2]

The yearly increase is an overall compound growth rate that encompasses two assumptions. The first is that wage growth through 2016 is likely to reflect the immediate past four years which have been characterized by weak labor markets. Accordingly, we assume 2% annual wage growth from 2014 to 2016 (based on compound wage growth from 2008 through 2012, economy-wide). Annual wage growth after 2016 is best approximated by reference to the wage rate projections found in the Board of Trustees report cited above.



VARUGHESE / Ronald J. Wronko, Esq.                                           page 6

16) Post-termination earnings base: we assume that, in future years, plaintiff will obtain alternate employment consistent with females with a professional degree on July 1, 2013. To quantify her earnings in that employment, we turn to 2009 data (American Community Survey) on the earnings of full-time year round working females with a professional degree expressed in percentiles. [SOURCE: Expectancy Data, *Full Time Earnings in the United States: 2009 Edition*, Shawnee Mission, Kansas, 2011, p. 21.] Accordingly, we establish plaintiff's starting-level earnings for her assumed start date of post-termination employment (July 1, 2013) at $35,508 in 2009 dollars based upon corresponding data at the 10th percentile. Further, we assume that plaintiff's earnings will increase to the median level ($75,960 in 2009 dollars) by 2023.

To obtain corresponding values for 2012 and 2013, we apply yearly increases of 0.8% and 2%, respectively, consistent with recent and expected annual wage growth economy-wide[3]. To project post-termination gross earnings in the future (beginning in 2014), we apply a yearly increase of 3.8%, based on recent and expected wage growth economy-wide.[4] [SOURCES: U.S. Department of Labor, Bureau of Labor Statistics, Occupational Employment Statistics (OES), Median Hourly Earnings, All Occupations, http://www.bls.gov/oes, percent calculated by TEG; and Principal Economic Assumptions, *2012 Annual Report to the Board of Trustees of the Federal Old-age and Survivors Insurance and Disability Insurance Trust Funds*, Table V.B1, http://www.ssa.gov/oact/tr/2012/V_B_econ.html#236399.]

Use of the previously presented earnings data and the noted growth rates, we calculate a compound average increase of 12% (rounded) over the period 2013 to 2023 as presented in Exhibit #2. Beginning in 2024, we utilize a long-term growth rate of 3.8%.

19) Fringe benefits: the fringe benefits that plaintiff would have received as a pathologist are not known at present. Further, fringe benefits for her projected post-termination employment are similarly unknown. Thus, we do not value fringe benefits in this report.

20) Excess tax on lump-sum award: it is important to recognize that a lump-sum award received in this matter may be subject to a relatively high income tax bracket on the entire

---

[3] See Note 1.

[4] See Note 2.



amount in the year in which it is awarded. As a result, courts have ruled that plaintiffs are entitled to recover the excess taxes that would be incurred. In *O'Neill v. Sears Roebuck & Co.*, it was ruled that a plaintiff award is entitled to a court-ordered enhancement in order to compensate for the "negative tax consequences" of receiving, in a single year, a lump-sum award for back pay and front pay. The judge in a Washington Court of Appeals case, *Blaney v. Int'l Assoc'n Of Machinists and Aerospace Workers*, concluded that adverse federal income tax consequences "are within the scope of the term 'actual damages.'" In a New Jersey case, *Ferrante v. Sciaretta*, Judge Bernhard ruled that the adverse tax consequences of a lump-sum award of economic losses should be included as compensatory losses under the scheme of the New Jersey Law Against Discrimination. [SOURCES: *O'Neill v. Sears Roebuck*, 108 F. Supp.2d 443 (E.D.Pa.2000); *Blaney v. Int'l Assoc'n Of Machinists and Aerospace Workers*, 114 Wn.App. 80, 55 P.3d 1208 (2002); and *Ferrante v. Sciaretta*, 365 N.J. Super. 601 (Law Div. 2003).] This enhancement, or gross-up, recognizes and is in compliance with the "make-whole" doctrine set forth by the 3rd U.S. Circuit Court of Appeals 1995 decision in *Starceski v. Westinghouse Electric Corporation*. Importantly, the tax gross-up in *Ferrante* was approved in the Appellate Division decision in *Quinlan v. Curtiss-Wright*, 409 N.J. Super. 193 (2009).

Having established that compensation for any excess taxes is part of the award necessary to make plaintiff whole, the judge in *Ferrante* also clarified that the amount of excess taxes cannot be calculated until after the trial. Accordingly, we reserve the right to provide calculations in this regard once an award, if any, is made.

## Adjusted Earnings

In this section, cumulative loss calculations are made through plaintiff's statistical retirement date. This method reflects our understanding that, with respect to front pay or future lost earnings, courts allow claims for a "reasonable" period of time. The underlying theory is that a job seeker may experience a time lag in obtaining a replacement job, or that, even if a replacement job is found, that it may pay less than the former job. If it pays less, the job seeker may continue to search until a job is obtained that fully offsets the earnings from the earlier employment. All of this may take some years to accomplish. Thus, we present cumulative potential losses through plaintiff's statistical retirement date for the



VARUGHESE / Ronald J. Wronko, Esq.                                    page 8

trier-of-fact to consider. In light of all of the evidence that will be heard, the trier-of-fact in this matter would be expected to determine a reasonable period of time over which future losses may be assumed to continue.

This loss consists of the earnings plaintiff would have most likely generated had she begun employment as an Anatomic and Clinical Pathologist on July 1, 2012, less her projected post-termination earnings based a professional degree. Her post-termination earnings are projected to begin on July 1, 2013. We make our cumulative calculations of loss from the date of termination to plaintiff's statistical date of retirement (March 22, 2047). Plaintiff's pre- and post-termination earnings were previously established in Exhibits #1 and #2 appended to this analysis.

Gross earnings are adjusted to take into account several factors. An adjustment for worklife expectancy is necessary because the number of years of actual working life is generally less than the total number of years until retirement. The estimated remaining years of worklife, given in the Background Facts and Assumptions section above, amounts to 93.1% of the total remaining number of years until retirement for persons of plaintiff's statistical cohort.

As a result of case law, IRS rulings and legislation, economic losses awarded in wrongful termination cases are fully subject to income tax liabilities. [SOURCE: *Gray v. Commissioner*, CA 10, No. 96-9006, 1/13/97.] The Small Business Job Protection Act of 1996 states that only settlements or awards originating in physical injury or physical sickness claims are excludable from income taxes. All other damage awards are taxable, including claims filed under federal statutes such as the Age Discrimination in Employment Act. Therefore, no adjustment is made to account for this liability in the present analysis, because to do so would unduly penalize the plaintiff, as income taxes will have to be paid on any back/front pay award received in this matter.

Another adjustment to gross earnings addresses job maintenance expenses that plaintiff would have continued to incur in maintaining her employment. These expenses typically include transportation expenses, clothing, meals outside the home, and other costs. We estimate these expenses at 5% of earnings.

The preceding adjustments are summarized algebraically as follows:



**VARUGHESE / Ronald J. Wronko, Esq.**                                  **page 9**

| | |
|---|---|
| Gross Earnings Base | 100.0% |
| x worklife ratio | 93.1% |
| = Worklife Adjusted Earnings | 93.1% |
| x (1 - 5% job maintenance expenses) | 95.0% |
| = Adjusted Earnings Factor (AEF) | 88.5% |

Given the aforementioned, plaintiff's projected pre- and post-termination adjusted earnings are calculated at 88.5% of corresponding gross earnings.

Regarding future projected losses, it is possible to set aside a lump-sum monetary amount at the present time such that the annual flow of interest earnings from it plus a part of the principal would generate the equivalent amount of lost financial sums projected for each successive year under consideration. In other words, money has a time value. Pecuniary losses expected to be suffered at some future point in time are worth less in today's dollars because money can earn additional monies in the form of interest. Thus, to calculate the present value lump-sum amount, it is necessary to establish a reasonable interest rate which is referred to as a discount rate.

We note that interest earnings from any award in this case will be subject to future income taxation in each subsequent year. This poses a problem since the award will be, in effect, taxed indirectly when no provision has been made for this tax burden. Thus, it is assumed that any lump-sum award would be used to purchase investment instruments to provide a flow of <u>nontaxable</u> payments to plaintiff.

The tax-free return on high-grade municipal bonds serves as the basis of our discount rate. Over the past 20 years, the yield on high-grade municipal bonds of varying maturities has averaged 4.96%. Over the past 10 years, it has averaged 4.35%, and over the past 5 years, the yield has averaged 4.21%. [SOURCE: Bond Yields and Interest Rates, 1941-2012, *Economic Report of the President*, March 2013, Table B-73, http://www.gpo.gov/fdsys/pkg/ERP-2013/pdf/ERP-2013.pdf.]

However, in recent years, interest rates have dropped to historically low levels. Through 2016, interest rates are expected to remain at current levels. In future years, rates are expected gradually to resume historical trends. In light of historical municipal bond yields and current financial market trends, we select 4% as the appropriate discount rate.

Our calculations are presented in the following tables:



VARUGHESE / Ronald J. Wronko, Esq.                                    **page  10**

*Pre-Termination*

| Year | Portion of Year | Projected Pre-Termination Gross Earnings [@ increase] | Projected Pre-Termination Adjusted Earnings [(2) x (3) x 88.5%] | Present Value [@ 4%] | Cumulative Present Value |
|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) |
| 2012 | 50% | $255,663 | $113,131 | $113,131 | $113,131 |
| 2013 | 100% | 275,326 | 243,663 | 243,663 | 356,794 |
| 2014 | 100% | 296,501 | 262,403 | 252,311 | 609,105 |
| 2015 | 100% | 319,304 | 282,584 | 261,265 | 870,370 |
| 2016 | 100% | 343,861 | 304,317 | 270,537 | 1,140,907 |
| 2017 | 100% | 370,307 | 327,722 | 280,138 | 1,421,045 |
| 2018 | 100% | 398,787 | 352,926 | 290,080 | 1,711,125 |
| 2019 | 100% | 429,456 | 380,069 | 300,374 | 2,011,499 |
| 2020 | 100% | 462,485 | 409,300 | 311,034 | 2,322,533 |
| 2021 | 100% | 498,054 | 440,778 | 322,072 | 2,644,604 |
| 2022 | 100% | 536,358 | 474,676 | 333,501 | 2,978,106 |
| 2023 | 100% | 556,739 | 492,714 | 332,860 | 3,310,966 |
| 2024 | 100% | 577,895 | 511,437 | 332,220 | 3,643,186 |
| 2025 | 100% | 599,855 | 530,872 | 331,581 | 3,974,767 |
| 2026 | 100% | 622,650 | 551,045 | 330,943 | 4,305,710 |
| 2027 | 100% | 646,311 | 571,985 | 330,307 | 4,636,017 |
| 2028 | 100% | 670,870 | 593,720 | 329,672 | 4,965,689 |
| 2029 | 100% | 696,363 | 616,282 | 329,038 | 5,294,727 |
| 2030 | 100% | 722,825 | 639,700 | 328,405 | 5,623,132 |
| 2031 | 100% | 750,293 | 664,009 | 327,773 | 5,950,905 |
| 2032 | 100% | 778,804 | 689,241 | 327,143 | 6,278,048 |



**VARUGHESE / Ronald J. Wronko, Esq.**                                       **page 11**

| 2033 | 100% | 808,398 | 715,432 | 326,514 | 6,604,562 |
| 2034 | 100% | 839,117 | 742,619 | 325,886 | 6,930,449 |
| 2035 | 100% | 871,004 | 770,838 | 325,259 | 7,255,708 |
| 2036 | 100% | 904,102 | 800,130 | 324,634 | 7,580,342 |
| 2037 | 100% | 938,458 | 830,535 | 324,010 | 7,904,351 |
| 2038 | 100% | 974,119 | 862,096 | 323,387 | 8,227,738 |
| 2039 | 100% | 1,011,136 | 894,855 | 322,765 | 8,550,503 |
| 2040 | 100% | 1,049,559 | 928,860 | 322,144 | 8,872,646 |
| 2041 | 100% | 1,089,442 | 964,156 | 321,524 | 9,194,171 |
| 2042 | 100% | 1,130,841 | 1,000,794 | 320,906 | 9,515,077 |
| 2043 | 100% | 1,173,813 | 1,038,824 | 320,289 | 9,835,366 |
| 2044 | 100% | 1,218,418 | 1,078,300 | 319,673 | 10,155,039 |
| 2045 | 100% | 1,264,718 | 1,119,275 | 319,058 | 10,474,097 |
| 2046 | 100% | 1,312,777 | 1,161,808 | 318,445 | 10,792,542 |
| 2047 | 22% | 1,362,662 | 265,310 | 69,923 | **10,862,465** |



*Post-Termination*

| Year | Portion of Year | Projected Post-Termination Gross Earnings [@ increase] | Projected Post-Termination Adjusted Earnings [(2) x (3) x 88.5%] | Present Value [@ 4%] | Cumulative Present Value |
|------|------|------|------|------|------|
| (1) | (2) | (3) | (4) | (5) | (6) |
| 2013 | 50% | $37,908 | $16,774 | $16,774 | $16,774 |
| 2014 | 100% | 42,458 | 37,576 | 37,576 | 54,350 |
| 2015 | 100% | 47,553 | 42,084 | 38,909 | 93,259 |
| 2016 | 100% | 53,260 | 47,135 | 41,903 | 135,162 |
| 2017 | 100% | 59,652 | 52,792 | 45,127 | 180,289 |
| 2018 | 100% | 66,811 | 59,128 | 48,599 | 228,888 |
| 2019 | 100% | 74,830 | 66,225 | 52,338 | 281,226 |
| 2020 | 100% | 83,810 | 74,172 | 56,364 | 337,591 |
| 2021 | 100% | 93,869 | 83,074 | 60,702 | 398,292 |
| 2022 | 100% | 105,134 | 93,043 | 65,371 | 463,663 |
| 2023 | 100% | 117,752 | 104,211 | 70,401 | 534,064 |
| 2024 | 100% | 122,227 | 108,171 | 70,266 | 604,330 |
| 2025 | 100% | 126,871 | 112,281 | 70,131 | 674,461 |
| 2026 | 100% | 131,693 | 116,548 | 69,996 | 744,456 |
| 2027 | 100% | 136,697 | 120,977 | 69,861 | 814,317 |
| 2028 | 100% | 141,891 | 125,574 | 69,727 | 884,044 |
| 2029 | 100% | 147,283 | 130,346 | 69,593 | 953,636 |
| 2030 | 100% | 152,880 | 135,299 | 69,459 | 1,023,095 |
| 2031 | 100% | 158,689 | 140,440 | 69,325 | 1,092,420 |
| 2032 | 100% | 164,720 | 145,777 | 69,192 | 1,161,612 |
| 2033 | 100% | 170,979 | 151,316 | 69,059 | 1,230,671 |



| 2034 | 100% | 177,476 | 157,066 | 68,926 | 1,299,597 |
| 2035 | 100% | 184,220 | 163,035 | 68,793 | 1,368,391 |
| 2036 | 100% | 191,221 | 169,230 | 68,661 | 1,437,052 |
| 2037 | 100% | 198,487 | 175,661 | 68,529 | 1,505,581 |
| 2038 | 100% | 206,029 | 182,336 | 68,397 | 1,573,978 |
| 2039 | 100% | 213,859 | 189,265 | 68,266 | 1,642,244 |
| 2040 | 100% | 221,985 | 196,457 | 68,135 | 1,710,378 |
| 2041 | 100% | 230,421 | 203,922 | 68,003 | 1,778,382 |
| 2042 | 100% | 239,177 | 211,671 | 67,873 | 1,846,255 |
| 2043 | 100% | 248,265 | 219,715 | 67,742 | 1,913,997 |
| 2044 | 100% | 257,699 | 228,064 | 67,612 | 1,981,609 |
| 2045 | 100% | 267,492 | 236,730 | 67,482 | 2,049,091 |
| 2046 | 100% | 277,657 | 245,726 | 67,352 | 2,116,443 |
| 2047 | 22%  | 288,208 | 56,114  | 14,789 | **2,131,232** |

Subtracting projected post-termination earnings from projected pre-termination earnings yields the following:

| Future Time Period | Present Value of Pre-Termination Earnings | Present Value of Post-Termination Earnings | Present Value of Lost Earnings [(2) - (3)] |
|---|---|---|---|
| (1) | (2) | (3) | (4) |
| To Retirement | $   10,862,465 | $   2,131,232 | $   **8,731,233** |



VARUGHESE / Ronald J. Wronko, Esq.                                  page 14

## Summary

The preceding findings evaluating the magnitude of the earnings loss through plaintiff's statistical retirement date is calculated in this report at a total present value of **$8,731,233**. It is important to understand that this total loss figure is a present value amount (in 2013 dollars), representing a lump-sum payment needed at present to generate a flow of payments sufficient to compensate for the losses in each year of loss included in this appraisal. In addition, please note that pre-trial or pre-judgment interest has not been calculated. These interest losses are typically determined at the time of trial and would be in addition to the losses calculated in this appraisal report.

The preceding findings are based on information provided to us as of this date. They are subject to revision should additional information be forthcoming that would change any facts or assumptions upon which this analysis rests. We also note that pecuniary losses are an approximation and are provided by the economic expert as a guide to the trier-of-fact. Because a loss stream cannot be computed with absolute confidence, a lump-sum payment represents a "rough and ready" attempt to put the plaintiff in the same position had the termination not occurred. [SOURCE: *Jones v. Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 545-47 (1983).]



Exhibit #1

# Projected Annual Earnings for Leena Varughese

**Pre-Termination**
Anatomic and Clinical Pathologist

| | | | |
|---|---|---|---|
| 2012 Earnings Base (10th percentile) | $ | 255,408 | (2011 dollars) |
| 2012 Earnings Base (10th percentile) | | 255,663 | (2012 dollars) |
| 2022 Earnings Base (median) | | 375,530 | (2011 dollars) |
| 2022 Earnings Base (median) | | 536,358 | (2022 dollars) |

Avg. Annual Compounded Increase (2012-2022):          7.69%

| Year | Projected Earnings [@ Increase] | |
|---|---|---|
| 2012 | $ | 255,663 |
| 2013 | | 275,326 |
| 2014 | | 296,501 |
| 2015 | | 319,304 |
| 2016 | | 343,861 |
| 2017 | | 370,307 |
| 2018 | | 398,787 |
| 2019 | | 429,456 |
| 2020 | | 462,485 |
| 2021 | | 498,054 |
| 2022 | | 536,358 |

*rounded rate shown

Exhibit #2

# Projected Annual Earnings for Leena Varughese

**Post-Termination**
Professional Degree

| | | |
|---|---:|---|
| 2013 Earnings Base (10th percentile) | $ 35,508 | (2009 dollars) |
| 2013 Earnings Base (10th percentile) | 37,908 | (2013 dollars) |
| 2023 Earnings Base (median) | 75,960 | (2009 dollars) |
| 2023 Earnings Base (median) | 117,752 | (2023 dollars) |

Avg. Annual Compounded Increase (2013-2023):          12.0%

| Year | Projected Earnings [@ Increase] |
|---:|---:|
| 2013 | $ 37,908 |
| 2014 | 42,458 |
| 2015 | 47,553 |
| 2016 | 53,260 |
| 2017 | 59,652 |
| 2018 | 66,811 |
| 2019 | 74,830 |
| 2020 | 83,810 |
| 2021 | 93,869 |
| 2022 | 105,134 |
| 2023 | 117,752 |

*rounded rate shown

*APPENDIX*



National Vital Statistics Reports, Vol. 58, No. 21, June 28, 2010   11

**Table 3. Life table for females: United States, 2006**

| Age | Probability of dying between ages x to x + 1 $q_x$ | Number surviving to age x $l_x$ | Number dying between ages x to x + 1 $d_x$ | Person-years lived between ages x to x + 1 $L_x$ | Total number of person-years lived above age x $T_x$ | Expectation of life at age x $e_x$ |
|---|---|---|---|---|---|---|
| 0–1 | 0.006051 | 100,000 | 605 | 99,467 | 8,020,082 | 80.2 |
| 1–2 | 0.000427 | 99,395 | 42 | 99,374 | 7,920,615 | 79.7 |
| 2–3 | 0.000276 | 99,352 | 27 | 99,339 | 7,821,242 | 78.7 |
| 3–4 | 0.000185 | 99,325 | 18 | 99,316 | 7,721,903 | 77.7 |
| 4–5 | 0.000162 | 99,307 | 16 | 99,299 | 7,622,587 | 76.8 |
| 5–6 | 0.000149 | 99,291 | 15 | 99,283 | 7,523,288 | 75.8 |
| 6–7 | 0.000134 | 99,276 | 13 | 99,269 | 7,424,005 | 74.8 |
| 7–8 | 0.000123 | 99,262 | 12 | 99,256 | 7,324,736 | 73.8 |
| 8–9 | 0.000111 | 99,250 | 11 | 99,245 | 7,225,480 | 72.8 |
| 9–10 | 0.000099 | 99,239 | 10 | 99,234 | 7,126,235 | 71.8 |
| 10–11 | 0.000091 | 99,229 | 9 | 99,225 | 7,027,001 | 70.8 |
| 11–12 | 0.000093 | 99,220 | 9 | 99,216 | 6,927,776 | 69.8 |
| 12–13 | 0.000113 | 99,211 | 11 | 99,206 | 6,828,560 | 68.8 |
| 13–14 | 0.000155 | 99,200 | 15 | 99,192 | 6,729,354 | 67.8 |
| 14–15 | 0.000211 | 99,185 | 21 | 99,174 | 6,630,162 | 66.8 |
| 15–16 | 0.000275 | 99,164 | 27 | 99,150 | 6,530,988 | 65.9 |
| 16–17 | 0.000334 | 99,137 | 33 | 99,120 | 6,431,838 | 64.9 |
| 17–18 | 0.000382 | 99,103 | 38 | 99,085 | 6,332,718 | 63.9 |
| 18–19 | 0.000414 | 99,066 | 41 | 99,045 | 6,233,633 | 62.9 |
| 19–20 | 0.000434 | 99,025 | 43 | 99,003 | 6,134,588 | 62.0 |
| 20–21 | 0.000453 | 98,982 | 45 | 98,959 | 6,035,585 | 61.0 |
| 21–22 | 0.000475 | 98,937 | 47 | 98,913 | 5,936,626 | 60.0 |
| 22–23 | 0.000494 | 98,890 | 49 | 98,865 | 5,837,712 | 59.0 |
| 23–24 | 0.000508 | 98,841 | 50 | 98,816 | 5,738,847 | 58.1 |
| 24–25 | 0.000519 | 98,791 | 51 | 98,765 | 5,640,031 | 57.1 |
| 25–26 | 0.000532 | 98,739 | 52 | 98,713 | 5,541,266 | 56.1 |
| 26–27 | 0.000546 | 98,687 | 54 | 98,660 | 5,442,553 | 55.1 |
| 27–28 | 0.000562 | 98,633 | 55 | 98,605 | 5,343,893 | 54.2 |
| 28–29 | 0.000580 | 98,578 | 57 | 98,549 | 5,245,288 | 53.2 |
| 29–30 | 0.000604 | 98,520 | 59 | 98,491 | 5,146,736 | 52.2 |
| 30–31 | 0.000634 | 98,461 | 62 | 98,430 | 5,048,246 | 51.3 |
| 31–32 | 0.000671 | 98,399 | 66 | 98,366 | 4,949,818 | 50.3 |
| 32–33 | 0.000718 | 98,333 | 71 | 98,297 | 4,851,452 | 49.3 |
| 33–34 | 0.000769 | 98,262 | 76 | 98,224 | 4,753,155 | 48.4 |
| 34–35 | 0.000829 | 98,186 | 81 | 98,146 | 4,654,931 | 47.4 |
| 35–36 | 0.000893 | 98,105 | 88 | 98,061 | 4,556,785 | 46.4 |
| 36–37 | 0.000967 | 98,017 | 95 | 97,970 | 4,458,724 | 45.5 |
| 37–38 | 0.001057 | 97,923 | 103 | 97,871 | 4,360,754 | 44.5 |
| 38–39 | 0.001166 | 97,819 | 114 | 97,762 | 4,262,883 | 43.6 |
| 39–40 | 0.001293 | 97,705 | 126 | 97,642 | 4,165,120 | 42.6 |
| 40–41 | 0.001425 | 97,579 | 139 | 97,509 | 4,067,478 | 41.7 |
| 41–42 | 0.001563 | 97,440 | 152 | 97,364 | 3,969,969 | 40.7 |
| 42–43 | 0.001713 | 97,288 | 167 | 97,204 | 3,872,605 | 39.8 |
| 43–44 | 0.001877 | 97,121 | 182 | 97,030 | 3,775,401 | 38.9 |
| 44–45 | 0.002052 | 96,939 | 199 | 96,839 | 3,678,371 | 37.9 |
| 45–46 | 0.002236 | 96,740 | 216 | 96,632 | 3,581,532 | 37.0 |
| 46–47 | 0.002425 | 96,523 | 234 | 96,406 | 3,484,901 | 36.1 |
| 47–48 | 0.002617 | 96,289 | 252 | 96,163 | 3,388,494 | 35.2 |
| 48–49 | 0.002812 | 96,037 | 270 | 95,902 | 3,292,331 | 34.3 |
| 49–50 | 0.003020 | 95,767 | 289 | 95,623 | 3,196,429 | 33.4 |
| 50–51 | 0.003247 | 95,478 | 310 | 95,323 | 3,100,806 | 32.5 |
| 51–52 | 0.003497 | 95,168 | 333 | 95,002 | 3,005,483 | 31.6 |
| 52–53 | 0.003773 | 94,835 | 358 | 94,656 | 2,910,482 | 30.7 |
| 53–54 | 0.004070 | 94,477 | 384 | 94,285 | 2,815,825 | 29.8 |
| 54–55 | 0.004383 | 94,093 | 412 | 93,887 | 2,721,540 | 28.9 |
| 55–56 | 0.004710 | 93,681 | 441 | 93,460 | 2,627,653 | 28.0 |
| 56–57 | 0.005061 | 93,239 | 472 | 93,003 | 2,534,193 | 27.2 |
| 57–58 | 0.005457 | 92,767 | 506 | 92,514 | 2,441,190 | 26.3 |
| 58–59 | 0.005928 | 92,261 | 547 | 91,988 | 2,348,676 | 25.5 |
| 59–60 | 0.006494 | 91,714 | 596 | 91,416 | 2,256,688 | 24.6 |
| 60–61 | 0.007183 | 91,119 | 654 | 90,791 | 2,165,272 | 23.8 |
| 61–62 | 0.007966 | 90,464 | 721 | 90,104 | 2,074,481 | 22.9 |
| 62–63 | 0.008781 | 89,743 | 788 | 89,349 | 1,984,377 | 22.1 |
| 63–64 | 0.009551 | 88,955 | 850 | 88,531 | 1,895,027 | 21.3 |
| 64–65 | 0.010282 | 88,106 | 906 | 87,653 | 1,806,497 | 20.5 |
| 65–66 | 0.011073 | 87,200 | 966 | 86,717 | 1,718,844 | 19.7 |
| 66–67 | 0.011885 | 86,234 | 1,025 | 85,722 | 1,632,127 | 18.9 |



Case 1:12-cv-08812-CM-JCF   Document 205-37   Filed 01/05/15   Page 77 of 98

Table 3. Life table for females: United States, 2006—Con.

| Age | Probability of dying between ages x to x + 1 $q_x$ | Number surviving to age x $l_x$ | Number dying between ages x to x + 1 $d_x$ | Person-years lived between ages x to x + 1 $L_x$ | Total number of person-years lived above age x $T_x$ | Expectation of life at age x $e_x$ |
|---|---|---|---|---|---|---|
| 67–68 | 0.012855 | 85,209 | 1,095 | 84,662 | 1,546,405 | 18.1 |
| 68–69 | 0.014010 | 84,114 | 1,178 | 83,525 | 1,461,743 | 17.4 |
| 69–70 | 0.015359 | 82,936 | 1,274 | 82,299 | 1,378,218 | 16.6 |
| 70–71 | 0.016895 | 81,662 | 1,380 | 80,972 | 1,295,919 | 15.9 |
| 71–72 | 0.018652 | 80,282 | 1,497 | 79,534 | 1,214,947 | 15.1 |
| 72–73 | 0.020679 | 78,785 | 1,629 | 77,970 | 1,135,414 | 14.4 |
| 73–74 | 0.022999 | 77,156 | 1,774 | 76,268 | 1,057,444 | 13.7 |
| 74–75 | 0.025537 | 75,381 | 1,933 | 74,415 | 981,175 | 13.0 |
| 75–76 | 0.028641 | 73,449 | 2,104 | 72,397 | 906,760 | 12.3 |
| 76–77 | 0.031894 | 71,345 | 2,275 | 70,207 | 834,363 | 11.7 |
| 77–78 | 0.035502 | 69,070 | 2,452 | 67,844 | 764,156 | 11.1 |
| 78–79 | 0.039502 | 66,617 | 2,631 | 65,302 | 696,313 | 10.5 |
| 79–80 | 0.043932 | 63,986 | 2,811 | 62,580 | 631,011 | 9.9 |
| 80–81 | 0.048833 | 61,175 | 2,987 | 59,681 | 568,430 | 9.3 |
| 81–82 | 0.054251 | 58,188 | 3,157 | 56,609 | 508,749 | 8.7 |
| 82–83 | 0.060231 | 55,031 | 3,315 | 53,374 | 452,140 | 8.2 |
| 83–84 | 0.066824 | 51,716 | 3,456 | 49,988 | 398,766 | 7.7 |
| 84–85 | 0.074082 | 48,260 | 3,575 | 46,473 | 348,778 | 7.2 |
| 85–86 | 0.082058 | 44,685 | 3,667 | 42,852 | 302,305 | 6.8 |
| 86–87 | 0.090810 | 41,018 | 3,725 | 39,156 | 259,453 | 6.3 |
| 87–88 | 0.100392 | 37,294 | 3,744 | 35,422 | 220,297 | 5.9 |
| 88–89 | 0.110863 | 33,550 | 3,719 | 31,690 | 184,876 | 5.5 |
| 89–90 | 0.122277 | 29,830 | 3,648 | 28,006 | 153,186 | 5.1 |
| 90–91 | 0.134686 | 26,183 | 3,526 | 24,419 | 125,179 | 4.8 |
| 91–92 | 0.148146 | 22,656 | 3,356 | 20,978 | 100,760 | 4.4 |
| 92–93 | 0.162697 | 19,300 | 3,140 | 17,730 | 79,782 | 4.1 |
| 93–94 | 0.178377 | 16,160 | 2,883 | 14,718 | 62,052 | 3.8 |
| 94–95 | 0.195216 | 13,277 | 2,592 | 11,981 | 47,334 | 3.6 |
| 95–96 | 0.213232 | 10,685 | 2,278 | 9,546 | 35,352 | 3.3 |
| 96–97 | 0.232430 | 8,407 | 1,954 | 7,430 | 25,806 | 3.1 |
| 97–98 | 0.252902 | 6,453 | 1,631 | 5,637 | 18,376 | 2.8 |
| 98–99 | 0.274321 | 4,822 | 1,323 | 4,160 | 12,739 | 2.6 |
| 99–100 | 0.296944 | 3,499 | 1,039 | 2,979 | 8,579 | 2.5 |
| 100 and over | 1.00000 | 2,460 | 2,460 | 5,600 | 5,600 | 2.3 |

Tinari Economics Group

Skoog & Ciecka
### JOURNAL OF FORENSIC ECONOMICS
Years to Final Separation from the Labor Force
Active Women

| Age | Less Than High School Dipolma | High School Diploma | Some College, No Degree | Bachelors Degree | Advanced Degree |
|---|---|---|---|---|---|
| 16 | 43.76 | | | | |
| 17 | 42.77 | | | | |
| 18 | 41.77 | 43.90 | 45.81 | | |
| 19 | 40.78 | 42.91 | 44.82 | | |
| 20 | 39.79 | 41.91 | 43.82 | | |
| 21 | 38.79 | 40.92 | 42.83 | | |
| 22 | 37.80 | 39.92 | 41.83 | 42.73 | |
| 23 | 36.80 | 38.93 | 40.83 | 41.73 | |
| 24 | 35.81 | 37.94 | 39.84 | 40.74 | |
| 25 | 34.82 | 36.94 | 38.84 | 39.74 | |
| 26 | 33.82 | 35.95 | 37.85 | 38.75 | 40.12 |
| 27 | 32.83 | 34.95 | 36.86 | 37.75 | 39.13 |
| 28 | 31.84 | 33.96 | 35.86 | 36.76 | 38.13 |
| 29 | 30.85 | 32.97 | 34.87 | 35.77 | 37.14 |
| 30 | 29.86 | 31.98 | 33.87 | 34.77 | 36.14 |
| 31 | 28.87 | 30.98 | 32.88 | 33.78 | 35.15 |
| 32 | 27.88 | 29.99 | 31.89 | 32.79 | 34.15 |
| 33 | 26.89 | 29.00 | 30.90 | 31.80 | 33.16 |
| 34 | 25.90 | 28.01 | 29.91 | 30.81 | 32.17 |
| 35 | 24.91 | 27.02 | 28.92 | 29.82 | 31.18 |
| 36 | 23.93 | 26.04 | 27.93 | 28.83 | 30.19 |
| 37 | 22.94 | 25.05 | 26.94 | 27.84 | 29.19 |
| 38 | 21.96 | 24.06 | 25.95 | 26.86 | 28.20 |
| 39 | 20.98 | 23.08 | 24.96 | 25.87 | 27.21 |
| 40 | 20.01 | 22.10 | 23.98 | 24.88 | 26.23 |
| 41 | 19.03 | 21.12 | 22.99 | 23.90 | 25.24 |
| 42 | 18.06 | 20.14 | 22.01 | 22.92 | 24.25 |
| 43 | 17.10 | 19.17 | 21.03 | 21.94 | 23.26 |
| 44 | 16.15 | 18.19 | 20.05 | 20.96 | 22.28 |
| 45 | 15.21 | 17.23 | 19.07 | 19.98 | 21.30 |
| 46 | 14.28 | 16.27 | 18.10 | 19.01 | 20.31 |
| 47 | 13.37 | 15.32 | 17.13 | 18.05 | 19.33 |
| 48 | 12.48 | 14.37 | 16.16 | 17.08 | 18.35 |
| 49 | 11.63 | 13.44 | 15.21 | 16.12 | 17.38 |
| 50 | 10.79 | 12.53 | 14.25 | 15.17 | 16.40 |
| 51 | 9.97 | 11.63 | 13.31 | 14.23 | 15.44 |
| 52 | 9.14 | 10.76 | 12.38 | 13.30 | 14.47 |
| 53 | 8.34 | 9.90 | 11.46 | 12.38 | 13.51 |
| 54 | 7.58 | 9.08 | 10.56 | 11.48 | 12.56 |
| 55 | 6.87 | 8.30 | 9.68 | 10.60 | 11.62 |
| 56 | 6.20 | 7.55 | 8.82 | 9.76 | 10.68 |
| 57 | 5.57 | 6.84 | 7.98 | 8.93 | 9.76 |
| 58 | 4.96 | 6.16 | 7.20 | 8.16 | 8.85 |
| 59 | 4.44 | 5.54 | 6.45 | 7.48 | 7.97 |
| 60 | 3.94 | 4.96 | 5.75 | 6.86 | 7.13 |
| 61 | 3.59 | 4.49 | 5.09 | 6.32 | 6.34 |
| 62 | 3.33 | 4.06 | 4.51 | 5.84 | 5.61 |
| 63 | 3.09 | 3.70 | 4.00 | 5.46 | 4.93 |
| 64 | 2.89 | 3.35 | 3.60 | 5.19 | 4.36 |
| 65 | 2.74 | 3.01 | 3.24 | 5.02 | 3.95 |
| 66 | 2.58 | 2.76 | 2.89 | 4.72 | 3.72 |
| 67 | 2.42 | 2.57 | 2.65 | 4.35 | 3.47 |
| 68 | 2.27 | 2.46 | 2.48 | 3.90 | 3.17 |
| 69 | 2.19 | 2.39 | 2.40 | 3.44 | 2.77 |
| 70 | 2.01 | 2.30 | 2.42 | 2.93 | 2.33 |
| 71 | 1.81 | 2.15 | 2.35 | 2.58 | 1.95 |
| 72 | 1.67 | 1.97 | 2.08 | 2.32 | 1.79 |
| 73 | 1.53 | 1.81 | 1.84 | 2.09 | 1.72 |
| 74 | 1.40 | 1.70 | 1.70 | 1.93 | 1.66 |
| 75 | 1.29 | 1.70 | 1.61 | 1.90 | 1.65 |

Skoog & Ciecka, "Probability Mass Function for Years to Final Separation from the Labor Force Induced by the Markov Model," *Journal of Forensic Economics.* 16 (1) 2003, pages 51-86.



## Worklife Characteristics For Initially Active Women with Various Levels of Education

| Age | No Diploma, No GED | GED, No Diploma | High School Diploma | Some College, No Degree | Associate's Degree | Bachelor's Degree | Master's Degree | Professional or PhD Degree |
|---|---|---|---|---|---|---|---|---|
| 16 | 24.89 | 30.31 | | | | | | |
| 17 | 24.41 | 29.6 | 33.55 | | | | | |
| 18 | 23.92 | 28.95 | 32.91 | 35.70 | | | | |
| 19 | 23.43 | 28.33 | 32.28 | 35.13 | 38.28 | | | |
| 20 | 22.94 | 27.74 | 31.65 | 34.52 | 37.45 | 36.90 | | |
| 21 | 22.48 | 27.24 | 31.07 | 33.91 | 36.65 | 36.39 | | |
| 22 | 22.04 | 26.78 | 30.48 | 33.24 | 35.86 | 35.64 | 37.24 | |
| 23 | 21.59 | 26.30 | 29.90 | 32.56 | 35.13 | 34.83 | 36.44 | |
| 24 | 21.13 | 25.76 | 29.30 | 31.86 | 34.36 | 33.99 | 35.66 | 38.48 |
| 25 | 20.69 | 25.19 | 28.68 | 31.15 | 33.57 | 33.20 | 34.91 | 37.66 |
| 26 | 20.25 | 24.61 | 28.05 | 30.43 | 32.78 | 32.41 | 34.18 | 36.87 |
| 27 | 19.80 | 24.01 | 27.41 | 29.71 | 31.98 | 31.63 | 33.42 | 36.11 |
| 28 | 19.33 | 23.41 | 26.77 | 28.99 | 31.19 | 30.85 | 32.61 | 35.26 |
| 29 | 18.86 | 22.80 | 26.11 | 28.26 | 30.40 | 30.08 | 31.79 | 34.40 |
| 30 | 18.39 | 22.18 | 25.46 | 27.54 | 29.61 | 29.31 | 30.98 | 33.57 |
| 31 | 17.92 | 21.57 | 24.81 | 26.83 | 28.82 | 28.55 | 30.19 | 32.75 |
| 32 | 17.45 | 20.96 | 24.14 | 26.13 | 28.03 | 27.79 | 29.40 | 31.91 |
| 33 | 16.99 | 20.36 | 23.48 | 25.42 | 27.24 | 27.04 | 28.61 | 31.04 |
| 34 | 16.52 | 19.77 | 22.82 | 24.71 | 26.45 | 26.29 | 27.82 | 30.17 |
| 35 | 16.06 | 19.18 | 22.17 | 24.00 | 25.65 | 25.55 | 27.02 | 29.31 |
| 36 | 15.61 | 18.62 | 21.51 | 23.28 | 24.84 | 24.80 | 26.22 | 28.45 |
| 37 | 15.17 | 18.08 | 20.85 | 22.55 | 24.04 | 24.05 | 25.42 | 27.61 |
| 38 | 14.70 | 17.54 | 20.18 | 21.80 | 23.24 | 23.30 | 24.60 | 26.77 |
| 39 | 14.22 | 17.00 | 19.50 | 21.04 | 22.43 | 22.54 | 23.78 | 25.96 |
| 40 | 13.74 | 16.45 | 18.83 | 20.28 | 21.62 | 21.78 | 22.95 | 25.16 |
| 41 | 13.28 | 15.86 | 18.14 | 19.53 | 20.82 | 21.02 | 22.13 | 24.34 |
| 42 | 12.79 | 15.23 | 17.44 | 18.78 | 20.02 | 20.25 | 21.30 | 23.50 |
| 43 | 12.26 | 14.59 | 16.76 | 18.03 | 19.22 | 19.47 | 20.46 | 22.65 |
| 44 | 11.74 | 13.94 | 16.07 | 17.29 | 18.42 | 18.69 | 19.61 | 21.81 |
| 45 | 11.23 | 13.28 | 15.38 | 16.55 | 17.62 | 17.92 | 18.77 | 20.98 |
| 46 | 10.72 | 12.64 | 14.71 | 15.82 | 16.83 | 17.14 | 17.93 | 20.14 |
| 47 | 10.22 | 12.03 | 14.06 | 15.09 | 16.04 | 16.36 | 17.09 | 19.29 |
| 48 | 9.74 | 11.47 | 13.41 | 14.37 | 15.26 | 15.58 | 16.25 | 18.47 |
| 49 | 9.29 | 10.97 | 12.77 | 13.65 | 14.48 | 14.79 | 15.41 | 17.69 |
| 50 | 8.86 | 10.51 | 12.13 | 12.96 | 13.71 | 14.02 | 14.58 | 16.94 |
| 51 | 8.45 | 10.03 | 11.50 | 12.28 | 12.96 | 13.25 | 13.76 | 16.19 |
| 52 | 8.03 | 9.55 | 10.88 | 11.60 | 12.22 | 12.48 | 12.96 | 15.44 |
| 53 | 7.61 | 9.05 | 10.26 | 10.95 | 11.49 | 11.74 | 12.17 | 14.72 |
| 54 | 7.17 | 8.53 | 9.65 | 10.31 | 10.76 | 11.01 | 11.39 | 14.03 |
| 55 | 6.73 | 7.99 | 9.03 | 9.68 | 10.05 | 10.31 | 10.65 | 13.34 |
| 56 | 6.29 | 7.42 | 8.43 | 9.08 | 9.36 | 9.63 | 9.93 | 12.65 |
| 57 | 5.88 | 6.85 | 7.84 | 8.47 | 8.68 | 8.98 | 9.26 | 11.94 |
| 58 | 5.46 | 6.32 | 7.26 | 7.88 | 8.02 | 8.37 | 8.63 | 11.22 |
| 59 | 5.05 | 5.86 | 6.73 | 7.31 | 7.40 | 7.78 | 8.04 | 10.56 |
| 60 | 4.67 | 5.43 | 6.23 | 6.77 | 6.80 | 7.24 | 7.50 | 9.96 |
| 61 | 4.32 | 5.05 | 5.77 | 6.27 | 6.24 | 6.73 | 6.99 | 9.40 |
| 62 | 4.00 | 4.74 | 5.38 | 5.81 | 5.74 | 6.26 | 6.51 | 8.84 |
| 63 | 3.71 | 4.44 | 5.07 | 5.42 | 5.33 | 5.85 | 6.08 | 8.33 |
| 64 | 3.45 | 4.16 | 4.82 | 5.09 | 4.98 | 5.46 | 5.73 | 7.89 |
| 65 | 3.23 | 3.94 | 4.62 | 4.81 | 4.67 | 5.09 | 5.45 | 7.50 |
| 66 | 3.05 | 3.67 | 4.43 | 4.56 | 4.43 | 4.78 | 5.20 | 7.10 |
| 67 | 2.90 | 3.40 | 4.26 | 4.34 | 4.23 | 4.50 | 4.98 | 6.62 |
| 68 | 2.77 | 3.23 | 4.11 | 4.16 | 4.05 | 4.25 | 4.82 | 6.26 |
| 69 | 2.68 | 3.08 | 3.96 | 4.01 | 3.84 | 3.82 | 4.67 | 6.12 |
| 70 | 2.59 | 2.90 | 3.79 | 3.83 | 3.61 | 3.69 | 4.50 | 6.07 |
| 71 | 2.51 | 2.75 | 3.64 | 3.68 | 3.40 | 3.62 | 4.26 | 6.03 |
| 72 | 2.42 | 2.53 | 3.48 | 3.61 | 3.16 | 3.62 | 3.94 | 5.94 |
| 73 | 2.32 | 2.27 | 3.33 | 3.54 | 2.87 | 3.58 | 3.94 | 5.81 |
| 74 | 2.28 | 2.18 | 3.19 | 3.48 | 2.64 | 3.59 | 3.60 | 5.76 |
| 75 | 2.26 | 2.10 | 3.05 | 3.40 | 2.44 | 3.60 | 3.60 | 5.63 |

[SOURCE: Gary R. Skoog, James E. Ciecka and Kurt V. Kruger, "The Markov Process Model of Labor Force Activity: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors", *Journal of Forensic Economics*, Volume 22, No. 2, August 2011, pp. 199-206.]



## Historical Average Returns for AAA-Rated Municipal Bonds
### (percent per annum)

| Year | Average Annual Value for High-grade Municipal Bonds (Standard & Poor's) | Cumulative Average Return* |
|------|------|------|
| 2012 | 3.14 % | 3.14 % |
| 2011 | 4.29 | 3.72 |
| 2010 | 4.16 | 3.86 |
| 2009 | 4.64 | 4.06 |
| 2008 (5 years) | 4.80 | **4.21** |
| 2007 | 4.42 | 4.24 |
| 2006 | 4.42 | 4.27 |
| 2005 | 4.29 | 4.27 |
| 2004 | 4.63 | 4.31 |
| 2003 (10 years) | 4.73 | **4.35** |
| 2002 | 5.05 | 4.42 |
| 2001 | 5.19 | 4.48 |
| 2000 | 5.77 | 4.58 |
| 1999 | 5.43 | 4.64 |
| 1998 | 5.12 | 4.67 |
| 1997 | 5.55 | 4.73 |
| 1996 | 5.75 | 4.79 |
| 1995 | 5.95 | 4.85 |
| 1994 | 6.19 | 4.92 |
| 1993 (20 years) | 5.63 | **4.96** |
| 1992 | 6.41 | 5.03 |
| 1991 | 6.89 | 5.11 |
| 1990 | 7.25 | 5.20 |
| 1989 | 7.24 | 5.29 |
| 1988 | 7.76 | 5.39 |
| 1987 | 7.73 | 5.48 |
| 1986 | 7.38 | 5.55 |
| 1985 | 9.18 | 5.68 |
| 1984 | 10.15 | 5.83 |
| 1983 (30 years) | 9.47 | **5.95** |

\* arithmetic average

SOURCE: Bond Yields and Interest Rates, 1941-2012, *Economic Report of the President*, March 2013,
http://www.whitehouse.gov/sites/default/files/docs/erp2013/full_2013_economic_report_of_the_president.pdf



*Qualifications Profile*

**Kristin Kucsma, M.A.**
KKucsma@TinariEconomics.com
Tinari Economics Group
293 Eisenhower Parkway , Suite 190
Livingston, NJ 07039
973-992-1800

## Education

ABD in Economics, Rutgers University, New Brunswick, NJ
M.A. in Economics, Rutgers University, New Brunswick, NJ (1993)
B.A. in Economics / English Minor, Seton Hall University, South Orange, NJ, *summa cum laude*
(1991)

## Fields of Specialization

Applied Microeconomic Theory, American Economic History, Monetary History of the United
States, Macroeconomic Theory and Business Cycles, Banking Structure and Regulation

## Honors and Awards

"5.0" Teaching Commendation Award, Stillman School of Business, Seton Hall University,
2003-04.
Teaching Commendation Award, Stillman School of Business, Seton Hall University, 2002-
2003, 2001-2002.
Recognition Award, Educational Opportunity Program, Seton Hall University, 2003
Professor of the Year Award, Alpha Kappa Psi, Seton Hall University, 2002-2003, 2001-2002.
President's Award for Student Services, Seton Hall University, 2001
The Faculty Pirate Pride Award, Seton Hall University, 2000-2001
Feature of Faculty Profile, Seton Hall University Magazine, 2001

## Positions Held

Economist, Tinari Economics Group, January 2008 - present
> *Primary responsibilities:* analyze data, prepare reports, and provide expert testimony;
> manage a group of analysts and research assistants and collaborate on the firm's more
> complex cases; perform independent and co-authored research, present at national and
> regional conferences, and serve as an active participant in the field of forensic
> economics.



**Kristin Kucsma, M.A.**

**Positions Held (cont'd.)**

President, Bull and Bear Consulting, September 2006 - December 2007
> Review portfolios of equities, fixed-income securities and mutual funds for clients; manage financial assets for several high-end clients; advise clients and refer them to specialists regarding long-term care, supplemental health insurance and a variety of trusts including qualified personal residential and generation skipping trusts.

Lecturer, Department of Economics, Drew University, September 2004 – August 2006
> *Courses Taught:* Money, Banking and the Macroeconomy; Principles of Microeconomics; Principles of Macroeconomics; Intermediate Macroeconomic Analysis; and Mergers and Manias: The Business of Banking

Faculty Associate, Department of Economics, Seton Hall University, Sept. 1999 - July 2004
> *Graduate Courses Taught:* The National Economy (MBA Level Macro); HUB 1 (Blend of Economics and Corporate Finance); *Undergraduate Courses Taught:* Principles of Microeconomics; Principles of Macroeconomics; Money and Banking; Intermediate Microeconomic Theory; Government and Business; Labor Economics; Small Scale Technology; and Economics in Our Nation's Capital.

Program Coordinator for Economic History Sessions, Eastern Economic Association, 2005 - 07.

Faculty Advisor to Omicron Delta Epsilon, the International Honor Society in Economics, Drew University and Seton Hall University, September 1999 – August 2006

Faculty Advisor for the Fed Challenge, Seton Hall University and the Federal Reserve Bank of New York, 2002-2004

Co-chair and Project Coordinator for University Retention Committee, Seton Hall University, December 2000 – July 2004

Adjunct Lecturer, Department of Economics, Seton Hall University, 1998 – 1999

Adjunct Lecturer, Department of Economics, Drew University, 1997 – 1999

Instructor, Department of Economics, Saint Peter's College, on-campus as well as at corporate satellite centers, 1995 – 1998

Instructor, Department of Economics, Rutgers University, New Brunswick NJ, 1992 – 1995

Teaching Assistant, Department of Economics, Rutgers University, New Brunswick NJ, 1991 – 1992

**Professional Activities**

Member, District Ethics Committee, Office of Attorney Ethics of the Supreme Court of New Jersey, 2010 - present

National Association of Forensic Economics, 2010 - present

Member, Eastern Economic Association, 1997 - present

Member, American Monetary Institute, 2006 - present

Member, Conference Organizing Committee, Eastern Economic Association, 2006

Co-Developer of Revised Business Writing Course, Stillman School of Business, Seton Hall University, 2003 – 04.



### Kristin Kucsma, M.A.

### Professional Activities (cont'd)

Member, CDI-7: Writing Intensive Workshop for Business, Seton Hall University, 2003 – 04.
Designer of Various Question/Answer Duos for Sophomore Assessment, Stillman School of Business, Seton Hall University, 2001 – 2004
    Topics included the "Congested Parks Dilemma", the impact on the US economy of tobacco litigation, issues of market structure with respect to TIVO, the blackout of August 2003 that affected the northeast United States and the Martha Stewart litigation
Guest Speaker, National Council of Negro Women, Seton Hall University, February 2004

### Publications

"Assessing Economic Damages in Personal Injury and Wrongful Death Litigation: The State  of New Jersey," co-authored with Frank D. Tinari, *Journal of Forensic Economics*, 21(2), June 2010, pp. 219-234,
    http://www.JournalofForensicEconomics.com/doi/pdf/10.5085/jfe21.2.219.
"State's Housing Rules Ignore Needs of Immigrants," co-authored with Frank D. Tinari, *Daily Record*, Morris County, NJ, August 30, 2009. (Note: article title is what is available electronically; newsprint copy is titled: "COAH Rules Hurt Immigrants.")
White paper: Is Affordable Housing the Remedy to Perceived Discrimination Against Immigrants?, co-authored with Frank D. Tinari, prepared for the Community Forum on Immigration and Education Issues, convened by the New Jersey State Advisory Committee to the United States Commission on Civil Rights, May 2009.
"COAH Research is Full of Short-comings," co-authored with Frank D. Tinari, *Newark Star-Ledger*, April 1, 2009.
"Companionship, Advice, and Counsel Services," co-author, Section 640 of Chapter 6, The Value of Household Services, of *Determining Economic Damages,* by Gerald D. Martin, Ph.D., Costa Mesa, Ca: James Publishing, Inc., July 2008, pp. 6-7 - 6-11.
Wrote entries for *barter, cost of information, demand, the discount rate, the functions of money, price floors and ceilings and profit maximization* for forthcoming Encyclopedia of Capitalism, Dr. Syed B. Hussain, editor, Golson Books, Ltd.

### Papers Presented

"The Crisis in Economics Education and Its Impact on Political Participation and Economic Growth", The American Monetary Institute Monetary Reform Conference, Chicago IL, September 2006
"A Picture Comes into Focus: A Reexamination of the Crisis of 1877-78", Eastern Economic Association Conference, Philadelphia PA, February 2006
"The Opportunity Cost of Undervaluing Core Concepts in Macroeconomics Courses", Eastern Economic Association Conference, Philadelphia PA, February 2006



Kristin Kuesma, M.A.

### Papers Presented (cont'd)

"A Framework for Teaching Money and Banking in a Liberal Arts Setting", as part of a panel discussion with Mary Lesser and Steven Cechetti, Eastern Economic Association Conference, New York NY, February 2005

"Portrait of a Panic: The Crisis of 1877", Eastern Economic Association Conference, Washington DC, February 2004

"Betrayed by the FDIC? A Preliminary Examination of the D'Oench, Duhme Doctrine and Its Impact on the Potential Efficiency of Banks in the United States", Eastern Economic Association Conference, New York NY, February 2003

"Celebrating Economics as a Social Science", 14th Annual Conference on Teaching Economics: Instruction and Classroom Based Research at Robert Morris University, Moon Township PA, February 2003

"Deciphering the Mystery of Medieval Debasement", Eastern Economic Association Conference, New York NY, February 2001

### Comments, Notes and Reviews

Review for publisher of Laurence Ball's *Money and Banking* textbook, 2003 - 2004

Referee, "A Test of the Purchasing Power Parity Concept Including the Law of One Price and Its Applicability in International Business", *Journal of Applied Management,* South Orange, New Jersey, 1999

### Other Conference Activities

Session Organizer for Undergraduate Panel: "Tax Reform in the US: Is A Consumption Tax the Answer?" Eastern Economic Association Conference, Philadelphia PA, February 2006

Discussant for two panels: "Topics in Economic History" and "Teaching and Learning Economics: Achieving Desired Outcomes", Eastern Economic Association Conference, Philadelphia, February 2006

Discussant for two panels: "Personal Behavior: Time, Money, Risk and Trust" and "Lessons From the Past: Money, Trade and Wages", Eastern Economic Association Conference, New York NY, February 2001

Discussant for panel on "Political and Economic Transformations", Northeastern Political Science Association and International Studies Association Conference, Philadelphia PA, November 1999

### Research Papers

"A Picture Comes Into Focus: A Reexamination of the Crisis of 1877-78", Work in Progress

"The Opportunity Cost of Undervaluing Core Concepts in Undergraduate Macroeconomics Courses", February 2006



Kristin Kucsma, M.A.

## Research Papers (cont'd)

"Regulation of the US Banking Industry in the Aftermath of the Great Depression", Work in Progress, 2004

"Increasing the Marginal Utility Derived From An Economics Course Through Experiential Education", Work in Progress, 2004

"Betrayed by the FDIC? A Preliminary Examination of the D'Oench, Duhme Doctrine and Its Impact on the Potential Efficiency of Banks in the United States", 2001

## Speaking Engagements

"The Economist's Role: Lost Profits & Employment Litigation," co-presenter, New Jersey Law Journal's Spring CLE program, Florham Park, NJ, April 10, 2013.

"Documenting Vocational & Economic Damages in Catastrophic Personal Injury Cases," co-presenter, CLE program sponsored by CMCS Management, Inc., Saddle Brook, NJ, March 14, 2013. (video)

"Documenting Vocational & Economic Damages in Personal Injury Cases," co-presenter, CLE program sponsored by CMCS Management, Inc., Saddle Brook, NJ, October 11, 2012. (video taped)

"Some Key Issues in the Use of Economic Experts," introductory remarks for panel discussion of "Damages", *Litigation Summit*, Philadelphia, September 13, 2012. (audio/video taped)

"Proof of Damages in a Wrongful Death Case" at the "Proving Damages in Personal Injury Cases: How BIG is Your Case?" seminar, sponsored by the Gann Legal Education Foundation, Renaissance Woodbridge in Iselin, New Jersey, April 22, 2011.

"How Outstanding Plaintiff Lawyers Build Their Case on Damages - and How Effective Defense Lawyers Can Destroy It", Obstetric Malpractice: Cutting-Edge Techniques for Bringing and Defending Perinatal Brain Injury Cases, national conference, continuing education seminar, Chicago, IL, November 9 - 11, 2009.

"Deposition of an Economist from the Witness' Viewpoint", Taking and Defending Effective Depositions in New York, continuing education seminar, New York, NY, March 12, 2009.

"The Role of the Economist in Assessing Damages for Defendants," with co-presenter Frank D. Tinari, Ph.D., GEICO, Huntington, NY, July 31, 2008.

"Economic and Statistical Issues in Assessing Damages," with co-presenter Frank D. Tinari, Ph.D., LUM, DRASCO & POSITAN, Roseland, NJ, June 2, 2008.

"Economic Damages: Overlooked Elements in Personal Injury and Wrongful Death Cases", ATLA-NJ Women Attorney's Dinner Meeting, Mountainside, NJ, April 9, 2008.



### Kristin Kucsma, M.A.

### Trials, Arbitrations, Mediations, and Depositions

Ms. Kucsma has testified in over seventy trials, arbitrations, and mediations in both federal and state courts. She has testified in over ninety depositions. A detailed listing of Ms. Kucsma's trial and deposition testimony is available upon request.

Ms. Kucsma has prepared numerous economic loss evaluations for use in litigation regarding economic damages: earnings, fringe benefits, household services, guidance, companionship, employment discrimination, lost profits, commercial damages, breach of contract, defamation, divorce, and punitive damages.



## QUALIFICATIONS PROFILE

### FRANK D. TINARI

Principal Economist

TINARI ECONOMICS GROUP

293 Eisenhower Parkway - Suite 190

Livingston, NJ 07039

*a division of Sobel & Co.*

ftinari@TinariEconomics.com

phone: 973 / 992-1800

fax: 973 /994-1571

New York office: 212 / 201-0938

www.TinariEconomics.com

### *Education*

B.S.    1964    Economics, Fordham College
M.A.   1966    Economics, Fordham University
Ph.D.  1976    Economics, Fordham University

### *Employment*

Professor Emeritus of Economics, Seton Hall University, South Orange, NJ, 2002-present.
    Professor, Associate Professor, Assistant Professor, Department of Economics, 1971-2002.
Founder and Principal Economist, Tinari Economics Group, 1979- present.
Instructor, Economics, US Army Finance School, Indianapolis, IN, 1968-1970.
Other part-time and adjunct positions at other institutions, 1968-2002.

### *Academic and Professional Activities*

Member, Jobs and Employment Task Force of the New Jersey Catholic Bishops Poverty Initiative,
    Spring 2012 - present.
Member, New Jersey State Advisory Committee to the U.S. Commission on Civil Rights,
    April 2010 - present.
President, National Association of Forensic Economics, January 2005-January 2007.
    Immediate Past President, 2007-08.
    Chairman, Ethics Committee, 2001-2002.
    Vice-President, Eastern Region, 1998-2001.
Member representative, Southeast Morris Deanery, of the Diocesan Pastoral Council, Roman Catholic
    Diocese of Paterson, October 1, 2009 - present (three-year term).
Mayor, Borough of Florham Park, New Jersey, 2004-2007.
Trustee, Legal Center for the Defense of Life, Inc., Morristown, NJ, November 1, 2002 - present.
Adjunct Faculty, Graduate Certificate in Forensic Economics Program, University of Missouri at
    St. Louis, 2002-2007.
Board member, Labor Law, Society of Litigation Economists, 2000-2003.
Member, Council of Academic Policy Advisors, New Jersey Legislature, 2000-2001.
Board of Trustees, The Adult School of the Chathams, Madison and Florham Park.
    Board Member Emeritus.  Member, September 1986 - June 1994.
    Developer and Chairman, Thomas Kean Community Lecture Program, 1990-1994.
    Board Chairman, June 1988 - June 1990; Vice-Chairman, June 1990 - June 1994.

1



# FRANK D. TINARI

*Academic and Professional Activities* (continued)

Invited guest lecturer, University of International Business and Economics,
    Beijing, People's Republic of China, 1983 and 1985.
Councilman, Borough of Florham Park, budget & finance portfolio, 1993-2003.
Vice-Chairman, Planning Board, Borough of Florham Park, 1979-1988.
Director, Division of Research, W. Paul Stillman School of Business, 1980-82.
Editorial reviewer: *Journal of Forensic Economics*, 1989-present. *Journal of Legal Economics*,
    1994-present. *Journal of Economic Education,* 1990-present, *Perspectives on Economic
    Education Research,* 2006-present.
Reviewer of grant proposals, Sea Grant Program, 1984-1989.
Reviewer of economics manuscripts for major textbook publishers, 1974-80.
Founder/Director, Faculty Seminar Series (1974-79), Faculty Working Paper Series (1975-80), W.
    Paul Stillman School of Business, Seton Hall University.

## *Professional Memberships*

American Economic Association, 1964-present
National Association of Forensic Economics, 1987-present
Western Economic Association International, 1988-present
Eastern Economic Association, 1995-present
American Academy of Economic and Financial Experts, 1999-present

## *Honors, Awards, Recognition and Interviews*

Television interview for ET Now (Mumbai, India), at Thompson Reuters, New York, January 11, 2010.
Recognition listing for work with Trial Lawyer's Care on 911 Victim Compensation Fund , in "Trial
    Lawyers Doing Public Justice 2004", Trial Lawyers for Public Justice, 2004.
Recipient of "Past Presidents' Award for Outstanding Service to the Association," from National
    Association of Forensic Economics, January 3, 2003.
Televised appearance on ABC World News Tonight, January 20, 2002.
    Discussed September 11th Victims Compensation Fund.
Quoted on National Public Radio, January 18, 2002, regarding Victims Compensation Fund.
Recipient of Seton Hall University awards:   Merit Award, 1984-1990;   Dean's Award, W. Paul
    Stillman School of Business, 1984;   Faculty Achievement Award, 1978 and 1979.
National recipient, "Honorable Mention, College Level" Award from Joint Council on economic
    Education, for innovations in teaching of economics; 1979; 1980.
Awarded several research grants from various external agencies.
Faculty Administrative Internship, Consortium of East Jersey, 1976-77.
Commendation Medal, United States Army, September 1970.
"Prize Winning Author for 1969" from Executive Council, Army Finance Association.



# FRANK D. TINARI

*Peer-Reviewed Journal and Book Publications*

"Assessing Economic Damages in Personal Injury and Wrongful Death Litigation: The State of New York," co-authored with Lawrence Spizman, *Journal of Forensic Economics*, 22(1), June 2011, pp. 75-100.

"The Role of the Forensic Economist in Nursing Malpractice Actions," Chapter 13 of *Nursing Malpractice*, 4th Ed., edited by Patricia W. Iyer et al. Tucson: Lawyers & Judges Publishing Co., Inc., 2011, pp. 331-341. Earlier versions: Chapter 34 of 3rd Ed., 2007, ed. by Patricia W. Iyer & Barbara J. Levin, pp. 1009-19; Chapter 25 of 2nd Ed., 2001, ed. by Patricia W. Iyer, pp. 671-81.

"Assessing Economic Damages in Personal Injury and Wrongful Death Litigation: The State of New Jersey," co-authored with Kristin K. Kucsma, *Journal of Forensic Economics*, 21(2), June 2010, pp. 219-234. http://www.JournalofForensicEconomics.com/doi/pdf/10.5085/jfe.21.2.219

"The Practice of Forensic Economics: An Introduction," *Eastern Economic Journal*, 36(3), Summer 2010, pp. 398-406. Available at SSRN: http://ssrn.com/abstract=1633325 or doi:10.1057/eej.2010.29

"Companionship, Advice, and Counsel Services," co-authored with Kristin Kucsma, Section 640 of Chapter 6, The Value of Household Services, of *Determining Economic Damages*, by Gerald D. Martin, Ph.D., Costa Mesa, Ca: James Publishing, Inc., July 2008, pp. 6-7 - 6-11.

"Estimates of Labor Productivity of Economic Damages Experts," co-authored with Elias Grivoyannis, *Journal of Forensic Economics*, 18(2-3), Fall 2005 (published July 2006), pp. 139-153.

"Did the 9/11 Victim Compensation Fund Accurately Assess Economic Losses?", co-authored with Kevin E. Cahill and Elias Grivoyannis, *Topics in Economic Analysis & Policy*, Vol. 6, Issue 1, January 2006, pp. 1-42. ISSN 1538-0653, The B.E. Journals in Economic Analysis & Policy, http://www.bepress.com/bejeap/topics/vol6/iss1/art2. (Through Nov. 5, 2009: 270 full-text downloads)

"A Note on 'Household Services: Toward A More Comprehensive Measurement," *Journal of Forensic Economics*, 17(3), Fall 2004 (published December 2005), pp. 383-385.

"Approaches to Damages Measurement in Employment Litigation: an Introduction," Special Issues Editor, *Journal of Forensic Economics*, 16(2), Spring/Summer 2003 (published September 2004), pp.151-152.

"Teaching Forensic Economics in the University Curriculum," co-authored with Frank Slesnick, *Journal of Forensic Economics*, 14(3), 2001, pp. 243-260.

"Household Services: Toward A More Comprehensive Measure," *Journal of Forensic Economics*, 11(3), 1998, pp. 253-265.
 • Reprinted in *Journal of Life Care Planning*, 8(1), pp. 43-55.
 • Reprinted as Chapter 50 in Roger T. Kaufman, James D. Rodgers and Gerald D. Martin, *Economic Foundations of Injury and Death Damages*, Edward Elgar Publishing Ltd, 2005.
 • Reprinted as: "Broadening the Measurement of Household Services in Wrongful Death Cases," Reading 19 in *Assessing Family Loss in Wrongful Death Litigation: The Special Roles of Lost Services and Personal Consumption*, edited by Thomas R. Ireland and Thomas O. Depperschmidt, Tucson, Az: Lawyers & Judges Publishing Co., 1999.

"The Ethical Behavior of Academicians in Their Role as Experts in Litigation," Chapter 17, *Business Education and Training: Education and Value Conflict*, Vol. I, ed. by Samuel M. Natale & Mark B. Fenton, University Press of America, November 27, 1996.

"Do We Double-Count Damages in Severe Personal Injury Cases?" *Journal of Legal Economics*, Vol. 5, No. 2, Fall 1995, pp. 23-32.

"China's Economic Situation and the Status of Reform," *American Asian Review*, Vol. XIII, No. 3, Fall 1995, pp. 52-59.



## FRANK D. TINARI

***Peer-Reviewed Journal and Book Publications*** (continued)

"Work Rewards: Complementary and Conflicting Distributive Demands," in *Values, Work, Education: the Meanings of Work*, Editions Rodopi B.V., Netherlands, 1995, ed. by Samuel M. Natale, Brian M. Rothschild, Joseph W. Sora.

"Attorney Perspectives on the Use of Economic Experts: Survey Results," *Journal of Forensic Economics*, co-authored, Vol. VIII, No. 1, Winter 1995, pp. 13-23.

"The Socio-Economic Order and Forensic Economics," *International Journal of Social Economics*, Vol. 20, No. 8, 1993, pages 4-11.

"Competition for Forensic Economists and Their Ethical Behavior," *Journal of Forensic Economics*, Vol. VI, No. 3., Fall 1993, pages 263-269.

"Estimating Monetary Loss Due to Personal Injury," *Journal of Forensic Economics*, Vol. II, No. 2, April 1989, pages 75-78.

"Economic Reform in China: A Critical Turning Point," *The Journal of Social, Political and Economic Studies*, Vol. 14, No. 4, Winter 1989, pp. 443-452.

"Problems in Appraising the Economic Loss of a Child," *Journal of Forensic Economics*, Vol. II, No. 1, December 1988, pages 123-128.

*Economics: The Options For Dealing With Scarcity*. Glenview, IL: Scott, Foresman and Company, 1986. Preface, 492 pp., Glossary, Index. (College textbook)

"On the Erosion of Public Facilities," with J.E. Fredland, *Review of Social Economy*, Vol. XXXVI, No. 1, April 1978, pp. 71-77.

***Other Publications***

"How to Grab the Jury's Attention on Economic Damages," *New York Law Journal 2012 How To Guide*, November 2012, p. 6.

"When Not to Hire an Economic Damages Expert," *New Jersey Law Journal, 2012 How-To Guide*, September 2012, p. 7.

"When to Hire or Not Hire an Economic Damages Expert in a Trucking Case," *The Lawyer's LogBook*, Association of Plaintiff Interstate Trucking Lawyers of America, Vol. 2, No. 2, June-July 2012, pp. 42-43.

"A Lend Plan to Draw Buyers to Foreclosed Properties" co-authored with Dominick Mazzagetti, *Newark Star-Ledger*, December 15, 2011.

"Comment on 'Green v. Bittner and Progeny'," *Forensic Rehabilitation and Economics*, Vol. 4, No. 2, 2011, pp 109-112.

"How Attorneys Can Prepare Themselves and their Damages Expert for Trial," *New Jersey Law Journal, 2011 How-To Guide*, August 8, 2011, p. S-4. Also, in *New York Law Journal, 2011 How-To Guide*, November 2011, p. 10.

"Comment on Smith, Smith & Uhl, Estimating the Value of Family Household Management Services: Approaches and Markups," *Forensic Rehabilitation and Economics*, Vol. 4, No. 1, 2011, pp 33-36.

"New Federal Rule on Experts Now in Place" in Sobel & Co. Newsletter, January 20, 2011.

"How Your Economist Can Help You Value Damages in a Rule 50A Medical Malpractice Case" co-authored with Stephen B. Levinson, *Bill of Particulars*, New York State Trial Lawyers Institute, Vol. II, 2010, pp. 68-69.

"Hard to Scrub Numbers for BP Victims" co-authored with Manuel Smith, *Newark Star-Ledger*, December 7, 2010.



FRANK D. TINARI

*Other Publications* (continued)

"How to Ensure Economic Damages Will be Presented Effectively at Trial," *The Legal Intelligencer, 2010 How-To Guide*, October 5, 2010, pp. 12, 21.

"Cooperating on a New Idea: Avoiding Foreclosure Helps Both Lenders and Borrowers"co-authored with Dominick Mazzagetti, *The Washington Times*, p. 1, Feb. 16, 2010.

"Ban Mortgage-Backed Securities?" co-authored with Dominick Mazzagetti, *Newark Star-Ledger*, December 28, 2009.

"State's Housing Rules Ignore Needs of Immigrants," co-authored with Kristin Kucsma, *Daily Record*, Morris County, NJ, August 30, 2009. (Note: article title is what is available electronically; newsprint copy is titled: "COAH Rules Hurt Immigrants.")

White paper: Is Affordable Housing the Remedy to Perceived Discrimination Against Immigrants?, co-authored with Kristin Kucsma, prepared for the Community Forum on Immigration and Education Issues, convened by the New Jersey State Advisory Committee to the United States Commission on Civil Rights, May 2009.

"COAH Research is Full of Shortcomings," co-authored with Kristin Kucsma, *Newark Star-Ledger*, April 1, 2009.

"Preparing for the Next Wave of McMansions," co-authored with Robert Michaels, *New Jersey Municipalities*, Trenton, NJ, June 2008, pp. 30-35.

"Should Your Town Establish a Land Use Board?" co-authored with Robert C. Kirkpatrick, *New Jersey Municipalities*, Trenton, NJ, January 2008, pp. 14-17.

"Carefully Consider Merging Land Use Boards," *Daily Record*, Morris County, NJ, Sep. 23, 2007.

"Making Prevailing Plaintiffs Whole," co-authored with Christopher W. Hager, Esq., Financial Planning Section, *New Jersey Law Journal*, November 15, 2004, pp. S8-S9, S15.

"One Mayor's View of State vs. Local Taxes," *New Jersey Municipalities*, Nov. 2004, pp. 22-24.

"What Accounts for the Big Differences in Damages Calculations for Death Cases in Pennsylvania and New Jersey?", *Question & Answer Book, The Legal Intelligencer*, July 2003, pp. 16-17.

"In Employment Litigation, Stock Options are Real Money: The Expert's View," *New York Employment Law & Practice* (NY Law Jnl. Affiliate), Vol. 2, No. 7, April 2001, pp. 1-3.

"How to Keep Your Winning Clients from Getting Shortchanged by the Tax System," *New York Employment Law & Practice* (NY Law Jnl. Affiliate), Vol. 2, No. 5, Feb. 2001, pp. 6-7.

"Discipleship in the Marketplace: a Resource for Socially Responsible Investing and Purchasing," co-author of report as member of Commission on Justice and Peace, Archdiocese of Newark, NJ, 2001.

"Suited for Stock Options," *IT recruitingmag.com*, March-April 2000, pp. 170-171.

Book Review of *The New Hedonics Primer for Economists and Attorneys*, *Journal of Forensic Economics,*Vol. 12, No. 2, Spring/Summer 1999, pp. 159-160.

Book Review Essay: *The Dollar Value of a Day: 1997 Dollar Valuation, Journal of Legal Economics*, Vol. 8, No. 3, Winter 1998-99, pp. 93-99.

"Business Torts Litigation: Update 1999," handbook and cassettes, NJ Institute for Continuing Legal Education, co-author, 1999, 103 pages.

"Ethics in the Business School Curriculum," editor of special issue, *Mid-Atlantic Journal of Business*, Vol. 27, No. 1, March 1991.

"The Economic Expert for the Defense," *The Connecticut Law Tribune*, Vol. 12, No. 10, March 10, 1986, page 8.

5



FRANK D. TINARI

*Other Publications* (continued)

"Role of Economist in Negligence and Other Cases Involving Economic Loss," *New Jersey Law Journal*, Vol. CXI, No. 25, June 23, 1983.
"The Advantages of Home Ownership," *Washington Post*, June 16, 1973.
"Estimating the Real Income of the Army Officer," with J.E. Fredland, *Army Finance Journal*, January-February 1971.

### *Speaking Engagements, Seminars and Presentations*

**American Institute of CPAs**
- "Economic Damages - Lost Profit Case Study," AICPA National Forensic Accounting Conference, Boston, September 30, 2010.
- "IP Fundamentals - Trade Secrets, Patents, etc.," with co-presenter Laura Stamm, AICPA National Forensic Accounting Conference, Boston, October 1, 2010.

**Inns of Court:**
- "Economic Damages: Issues in the Use of an Expert Witness," Mercer County American Inn of Court, Trenton, NJ, May 12, 2010.
- Mock Trial Examination of a Damages Expert Economist, Worrall F. Mountain Inn of Court, Morris County, Morristown, NJ, January 25, 2010.
- "Role Playing in Mock Deposition of an Expert Economist," Hudson County Inn of Court, Jersey City, NJ, January 8, 2008.
- "How to Effectively Use a Forensic Economist," Worrall F. Mountain Inn of Court, Morris County, Morristown, NJ, October 15, 2007.
- "Cross-Examining the Expert Economist," Hudson County Inn of Court, Jersey City, NJ, February 10, 2003.
- "Issues in the Use of Experts," Arthur T. Vanderbilt Inn of Court, Essex County, East Hanover, NJ, May 20, 2002.   Essex Inns of Court, Justice William J. Brennan, Jr. Chapter, Newark, NJ, Jan.10, 2000.
- Worrall F. Mountain Inn of Court, Morris County, NJ, November 22, 1999.
- Arthur T. Vanderbilt Inn of Court, Essex County, East Hanover, NJ, May 24, 1999.
- "Ethics in the Use of Experts," Arthur T. Vanderbilt Inn of Court, Essex County, Roseland, NJ, April 28, 1997.
- "The Expert Economist," Worrall F. Mountain Inn of Court, Morris County, Pupilage Group VI, Morristown, NJ, May 10, 1993.

**National Employment Lawyers Association**
- Panelist, "Calculating the Tax Gross-Up in Employment Litigation," **NELA-NJ** Conference, *ABCs of Tax Law for Employment Lawyers*, New Brunswick, NJ, 3/21/12.
- Panelist, "Presenting Damages at Trial," **NELA-NJ** Conference, Iselin, NJ, 10/17/08.
- Guest Speaker, "How to Use an Economist to Prove Damages in an Employment Discrimination Case," **New York**, NYC, May 24, 2006.  (CLE credit granted; program videotaped)
- Invited Speaker, "Use of an Economic Expert in Employment Law Litigation," **NELA Regional Conference**, Yale Club of New York City, November 4, 2000.

**NJ Institute for Continuing Legal Education (CLE)**
- Panel Speaker, "Litigating a Wrongful Death Case," New Brunswick, NJ, 4/14/07 (audiotaped)



FRANK D. TINARI

*Speaking Engagements, Seminars and Presentations* (continued)

**NJ Institute for Continuing Legal Education (continued)**
- Panel Speaker, "Litigating the Employment Discrimination Case," Mt. Laurel, NJ, April 1, 2006. (audiotaped)
- "Mock Trial of an Employment Discrimination Case" panelist/mock trial witness, New Brunswick, NJ, July 30, 2003. (videotaped)
- "Valuing Employment Cases" panelist, Fairfield, NJ, October 26, 2002. (videotaped)
- "Calculating Damages in Employment Litigation" in *Litigating the Employment Discrimination Case* seminar, New Brunswick, NJ, January 19, 2002. (videotaped)
- Panelist, "Business Torts Litigation," New Brunswick, NJ, July 30, 1999.
- "Proving Economic Damages," Fairfield, NJ, December 16, 1995, Jan. 6 and 20, 1996.
- "Experts by Experts," New Brunswick, NJ, January 1993.

**New Jersey Association for Justice (formerly NJ ATLA)**
- Panel Speaker, "Economic Damages," *Personal Injury 2013: Spring Training for Trial Lawyers*. **New Jersey Association for Justice**, Atlantic City, NJ, April 19, 2013. (Program videotaped.)
- Speaker, "Assessing Economic Damages in Personal Injury and Wrongful Death Litigation". **New Jersey Association for Justice**, East Rutherford, NJ, November 16, 2012. (Program videotaped.)
- Speaker, "Proof of Economic Loss in a Wrongful Death Case". **New Jersey Association for Justice**, East Rutherford, NJ, November 11, 2011. (Program videotaped.)
- Panel Speaker, "Economic Damages Roundtable: Overlooked Elements in Wrongful Death Cases," **ATLA-NJ Boardwalk Seminar 2003**, Atlantic City, 4-25-03. (audiotaped)
- Speaker, "Employment Law: Using Experts on Liability & Damages," **ATLA-NJ Boardwalk Seminar 2003**, Atlantic City, April 25, 2003. (Program audiotaped.)
- Speaker, "Economic Damages Issues in Employment Cases," **ATLA-NJ Educational Foundation**, Boardwalk Seminar 2002, Atlantic City, NJ, April 26, 2002.
- Speaker, "Economic Losses Resulting from Injuries," in *Developing Damages* program, **ATLA-NJ Educational Foundation**, Edison, NJ, Nov. 3, 2001.
- Invited Mock Trial Expert Witness, "Employment Law Forum," **ATLA-NJ Boardwalk Seminar 2001**, Atlantic City, April 27, 2001. (Program audiotaped.)
- Speaker on Employment Law damages, **ATLA-NJ Educational Foundation**, Edison, NJ, 10-30-99.
- Panelist: damages in death case, **ATLA-NJ Educ. Foundation**, Edison, NJ, 12-6-97.

**Other Legal Associations**
- Speaker, "Comprehensive Damages Calculations from Your Economist." **National Interstate Trucking Conference**, Association of Plaintiff Interstate Trucking Lawyers of America, St. Louis, April 26, 2013. (Program videotaped.)
- Speaker, "Economic Analysis of Damages due to Premature Failure of Ortho Devices" at the AAJ Orthopedic Implant Litigation Group Meeting: Proving Damages in Failed TJR Cases, Phoenix, February 13, 2012.
- Panelist, "Economic and Vocational Experts: What You Need to Know and What You Can Expect". **New York State Trial Lawyers Institute**, NYC, September 14 &21, 2009. (Program videotaped.)

7



## FRANK D. TINARI

***Speaking Engagements, Seminars and Presentations*** (continued)

**Other Legal Associations (continued)**
- Guest speaker panelist on "Direct Examination of Forensic Economist: Guidelines and Case Study of Injured Woman," at *Seminar on Proving Damages at Trial*, **NYS Academy of Trial Lawyers**, June 18, 2009, Brooklyn, NY. Also: June 3, 2009, Albany, NY; April 1, 2009, New York City; March 31, 2009, Plainview, NY. (CLE credits granted; some programs recorded.)
- Talk using sample cases, "Direct & Cross Examination of the Economist", *Wrongful Death 2005*, **New York State Trial Lawyers Institute**, NYC, June 10, 2005. (videotaped)
- Participated as expert witness in mock-trial seminar, **New York State Trial Lawyers Institute**, NYC, October 9, 1996.

**In-house Seminars**
- "The Role of the Economist in Assessing Damages for Defendants," with co-presenter Kristin Kucsma, M.A., GEICO INSURANCE, Westbury, NY, July 31, 2008.
- "Economic & Statistical Issues in Assessing Damages," with co-presenter Kristin Kucsma, M.A., LUM DRASCO & POSITAN, Roseland, NJ, June 2, 2008.
- "The Role of the Economist in Assessing Damages," LIBERTY MUTUAL INSURANCE, Marlton, NJ, March 18, 2005.
- "Effects of Different Assumptions on Damages Calculations," BRAFF HARRIS & SUKONECK, Livingston, NJ, March 28, 2000.
- "Ten Points Regarding the Use of an Expert Witness Economist in Litigation," PORZIO, BROMBERG & NEWMAN, Morristown, NJ, March 9, 2000.

**Other Talks, Seminars and Presentations**

"The Economist's Role: Lost Profits & Employment Litigation," co-presenter, New Jersey Law Journal's Spring CLE program, Edison, NJ: May 1, 2013. Florham Park, NJ: April 10, 2013.

"Documenting Vocational & Economic Damages in Catastrophic Personal Injury Cases," co-presenter, CLE program sponsored by CMCS Management, Inc., Saddle Brook, NJ, March 14, 2013. (video)

"Documenting Vocational & Economic Damages in Personal Injury Cases," co-presenter, CLE program sponsored by CMCS Management, Inc., Saddle Brook, NJ, October 11, 2012. (video taped)

"Some Key Issues in the Use of Economic Experts," introductory remarks for panel discussion of "Damages", *Litigation Summit*, Philadelphia, September 13, 2012. (audio/video taped)

"Calculating Lost Fringe Benefits of Private Sector Union Worker in Injury Cases," presented at NAFE session, Eastern Economic Association Annual Conference, Boston, March 10, 2012.

"Majoring in Economics," presented at Mt. St. Michael Academy, Bronx, NY, November 18, 2011.

"Self Consumption in Death Cases: Nondivisible Consumption," panel speaker at The International Summer Conference of the Nat. Assoc. of Forensic Economics, Venice, Italy, May 26, 2011.

"Review of the Analysis of the Personal Expense Deduction," presented at Twelfth Annual NAFE Winter Meeting, Curacao, January 28, 2011.

"A Career in Economics," presented at Mt. St. Michael Academy, Bronx, NY, November 19, 2010.

"Presenting Damages at Trial: One Expert's Perspective," presented at the annual conference, American Academy of Economic and Financial Experts, Las Vegas, April 9, 2010.

"The Practice of Forensic Economics: an Introduction," presented at NAFE session, Eastern Economic Association Annual Conference, Philadelphia, February 27, 2010.



## FRANK D. TINARI

*Speaking Engagements, Seminars and Presentations* (continued)

**Other Talks, Seminars and Presentations** (continued)

Guest speaker on "The Role of the Economist in the Courtroom" at meeting of the Summit Area Old Guard (retired professionals), New Providence, NJ, January 12, 2010.

Guest lecture on "Proving Damages through an Economist" at meeting of the Columbian Lawyers Association of Brooklyn, October 6, 2009.

Guest speaker on "Excelling at Your Direct Examination: Preparing Counsel to Ask You the Right Questions" at 18th Annual National Expert Witness Conference, SEAK, Hyannis, Ma., 6/26/09.

Panel speaker: "Is Affordable Housing the Remedy to Perceived Discrimination Against Immigrants?" at the Community Forum on Immigration and Education Issues, sponsored by the New Jersey State Advisory Committee to the **United States Commission on Civil Rights**, Trenton, NJ, May 8, 2009.

Paper presentation, "Assessing Economic Damages in Personal Injury and Wrongful Death Litigation: the State of New York," NAFE session, Eastern Economic Association Annual Conference, New York, February 27, 2009.

Discussant of Smith, Smith & Uhl, "Estimating the Value of Family Household Management Services: Approaches and Markups," NAFE session, Eastern Economic Association Annual Conference, New York, February 28, 2009.

Guest lecturer, "The Nature of Economics," Mater Ecclesiae College, Greenville, RI, Oct. 25, 2008.

Speaker, "Taking and Defending Effective Depositions in New York," Lorman Education Services, New York, NY, March 27, 2008.  (CLE credits granted; program audiotaped.)

Guest speaker, "Core Concepts of the Market Economy," Seminary of the Legionaries of Christ, Thornwood, New York, March 13, 2008.

Panel speaker, "Making Dollars & Cents of Your Employment Case: Evaluating & Litigating Damage Exposure," **New York City Bar Center for Continuing Legal Education**, New York, NY, May 9, 2007.  (CLE credits granted; program videotaped.)

Speaker, "Taking and Defending Effective Depositions," Lorman Education Services, New York, NY, March 27, 2007.  (CLE credits granted; program audiotaped)

Panel speaker, "New York Jets Training Facility and Corporate Headquarters: a Model Public-Private Partnership," CORENET GLOBAL program, Park Avenue Club, Florham Park, NJ, November 9, 2006.

"Assessing Economic Damages in Personal Injury and Wrongful Death Litigation: the State of New Jersey," presented at Annual Conference, ASSA, NAFE session, Boston, January 7, 2006.

Talk: "What is Forensic Economics?", presented at the Fordham University Graduate Economics Department Alumni Lecture Series, New York, November 29, 2005.

Paper presentation: "The Efficiency of the 9/11 Victim's Compensation Fund Formula in Awarding Economic Damages," presented at The Second International Summer Conference of the National Association of Forensic Economics, Dublin, Ireland, May 27, 2005.

Talk: "Florham Park: Commercial and Infrastructure Projects, 2004-05," Morris County Economic Development Corporation Meeting, Morristown, NJ, April 28, 2005.

Paper presentation, "Does the New Jersey Unisex Life Expectancy Table Alleviate or Promote Gender Discrimination?", with Kevin E. Cahill, Annual Conference, Eastern Economic Association, New York, March 4, 2005.

Paper presentation, "Statistical Examination of the 9/11 Victim Compensations Fund Awards: Calculated vs. Actual Economic Awards" with Kevin Cahill and Elias Grivoyanis, Annual Conference, ASSA, NAFE session, Philadelphia, January 8, 2005.

9



# FRANK D. TINARI

*Speaking Engagements, Seminars and Presentations* (continued)

**Other Talks, Seminars and Presentations** (continued)

Panel speaker, "Reflections on Damages Calculations for Victim Compensation Fund Claimants," National Association of Forensic Economics, Western Economic Association International, Vancouver, July 2, 2004.

Roundtable participant, "A Comparison of U.S. and U.K. Personal Injury and Wrongful Death Damages Analysis in Litigation," NAFE session, Annual Conference, Western Economic Association International, Vancouver, Canada, July 2, 2004.

Talk, "Report on My Experience Using VCF Tables for Calculation of Economic Loss," National Association of Forensic Economics International Conf., Edinburgh, Scotland, May 27, 2004.

Paper presentation, "Future Pension Gains are Treated as Losses in New York: a Note on a Perverse Result under New York State's Rule 50-A/50-B," Annual Conference, Southern Economic Association, NAFE session, San Antonio, November 23, 2003.

Speaker, "Damages in New Jersey Civil Trial Practice," National Business Institute, Saddle Brook, NJ, September 12, 2003.  (CLE credit granted; program audiotaped)

Speaker, Trial Lawyers Care Tele-Conference, "Economic Damages under the Victim Compensation Fund," Newark, NJ, February 11, 2003.

Roundtable Panelist, "Valuation of Time Spent in Companionship, Care & Society," National Association of Forensic Economics, Winter Conf., St. Thomas, U.S. Virgin Islands, 1-31-03.

Lecture, "The Economic Impact of 9/11", South Orange Public Library, January 23, 2003.

Paper presentation, "Productivity of Forensic Damages Experts", Annual Conference, ASSA, NAFE session, Washington, DC, January 3, 2003.

Roundtable Speaker, "The Structure, Content and Presentation of Reports," National Association of Forensic Economics, Western Economic Association International, Seattle, July 2, 2002.

Roundtable Panelist, "Ethics Symposium: a Discussion of the Proposed New Statement of Ethical Principles," National Association of Forensic Economics, Western Economic Association International, Seattle, June 30, 2002.

Panel Speaker, "Issues in Calculating Economic Losses," **Trial Lawyers Care Volunteer Training Seminar**, Atlantic City, NJ, April 26, 2002.

Paper presentation, "The Use of Forensic Economics in the Undergraduate Curriculum," with Frank Slesnick, Annual Conference, Eastern Economic Association, Boston, March 16, 2002.

Invited luncheon speaker, "The Victims Compensation Fund: Adequate and Fair?", *Disaster Recovery Conference*, Foundation for Accounting Education, Yale Club, NYC, Feb. 5, 2002.

Paper presentation, "The Market for Damages Experts: Preliminary Results of a National Survey," Winter Conference, NAFE, Cancun, Mexico, February 2, 2002.

Speaker, "Comments on Deficiencies in Economic Regulations of Victim Compensation Fund," Victims' Families of 9/11 Rally, New York City Armory, January 17, 2002.

Paper presentation, "Does the Victim Compensation Fund Shortchange Victims' Families?", Annual Conference, ASSA, NAFE sessions, Atlanta, Georgia, January 4, 2002.

Invited Expert Witness, "Mini-Trial of a Handicap Discrimination Case," **Essex County Bar Fndtn.,** Annual Spring Program, Labor & Employment Law Comm., Livingston, NJ, 6/7/01.

Invited Mock Trial Expert Witness, "The Trial and Defense of a Million Dollar Employment Law Case," **Touro College Jacob D. Fuchsberg Law Center and National Employment Lawyers Association/NY**, Huntington, NY, May 17, 2001.  (Program videotaped.)

Invited Speaker on damages issues in employment litigation, **American Arbitration Association**, Employment Arbitration panel, NYC, May 10, 2001.

**Tinari Economics Group**

# FRANK D. TINARI

*Speaking Engagements, Seminars and Presentations* (continued)

**Other Talks, Seminars and Presentations** (continued)

Invited speaker, Seminar on Expert Witnesses, Seton Hall Law School, Newark, October 16, 2000.
Invited Panelist, "Preparing Damages in Employment Litigation," **Essex County Bar
    Foundation,** Labor and Employment Law Committee, West Orange, NJ, Sept. 13, 2000.
Invited speaker, "Key Points Regarding the Use of an Expert Witness Economist in
    Litigation," Seton Hall University Law School, October 14, 1998.
Invited speaker and mock-trial expert witness, "The 1996 Defense Counsel Trial Academy,"
    **International Association of Defense Counsel,** Boulder, CO, July 25-26, 1996. More than 100
    young attorneys nationwide attended the academy.
"Use of Economic Experts to Calculate Lost Wages and Benefits," presented at **NJSBA Labor
    & Employment Law Section,** Fourth Annual Symposium, June 13, 1990.


*Consulting*

Expert testimony at nearly 1,000 trials, arbitration hearings and oral depositions. Author of numerous economic loss evaluations for use in litigation regarding economic damages: earnings, household services, guidance, companionship, employment discrimination, lost profits, commercial damages, breach of contract, defamation, divorce, and punitive damages.

Detailed listings of trial and deposition testimony may be found at www.TinariEconomics.com

rev. 5/1/13

11



# National Association of Forensic Economics
### P.O. Box 394
### Mount Union, PA 17066

*Journal of Forensic Economics*

(866) 370-6233
(814) 542-3253 FAX

nancy@nafe.net
http://nafe.net

## Statement of Ethical Principles and
## Principles of Professional Practice
## National Association of Forensic Economics (NAFE)
### (Effective October 1, 2004)

When providing expert opinion for use as evidence by the trier of fact, a NAFE member pledges, as a condition of membership, adherence to the following:

**1. Engagement**
Practitioners of forensic economics should decline involvement in any litigation when they are asked to assume invalid representations of fact or alter their methodologies without foundation or compelling analytical reason.

**2. Compensation**
Practitioners of forensic economics should not accept contingency fee arrangements, or fee amounts associated with the size of a court award or out-of-court settlement.

**3. Diligence**
Practitioners of forensic economics should employ generally accepted and/or theoretically sound economic methodologies based on reliable economic data. Practitioners of forensic economics should attempt to provide accurate, fair and reasonable expert opinions, recognizing that it is not the responsibility of the practitioner to verify the accuracy or completeness of the case-specific information that has been provided.

**4. Disclosure**
Practitioners of forensic economics should stand ready to provide sufficient detail to allow replication of all numerical calculations, with reasonable effort, by other competent forensic economics experts, and be prepared to provide sufficient disclosure of sources of information and assumptions underpinning their opinions to make them understandable to others.

**5. Consistency**
While it is recognized that practitioners of forensic economics may be given a different assignment when engaged on behalf of the plaintiff than when engaged on behalf of the defense, for any given assignment, the basic assumptions, sources, and methods should not change regardless of the party who engages the expert to perform the assignment. There should be no change in methodology for purposes of favoring any party's claim. This requirement of consistency is not meant to preclude methodological changes as new knowledge evolves, nor is it meant to preclude performing requested calculations based upon a hypothetical--as long as its hypothetical nature is clearly disclosed in the expert's report and testimony.

**6. Knowledge**
Practitioners of forensic economics should strive to maintain a current knowledge base of their discipline.

**7. Discourse**
Open, uninhibited discussion is a desired educational feature of academic and professional forensic economic conferences. Therefore, to preserve and protect the educational environment, practitioners of forensic economics will refrain from the citation of oral remarks made in an educational environment, without permission from the speaker.

**8. Responsibility**
Practitioners of forensic economics are encouraged to make known the existence of, and their adherence to, these principles to those retaining them to perform economic analyses and to other participants in litigation. In addition, it is appropriate for practitioners of forensic economics to offer criticisms of breaches of these principles.

**President**
*Frank D. Tinari*
Seton Hall University

**President Elect**
*Gary R. Skoog*
Legal Econometrics, Inc.

**Executive Director**
*George A. Schieren*
Appalachian State University

**Vice Presidents**
*Christopher J. Bruce*
University of Calgary

*Kurt V. Krueger*
John O. Ward & Associates

**Editors,** *Journal of Forensic Economics*
*Michael J. Piette*
Analytical Economics, Inc.

*Lawrence M. Spizman*
SUNY-Oswego

*Edward Foster*
University of Minnesota

*Steven J. Shapiro*
University of New Haven

**At Large Vice Presidents**
*Elizabeth A.W. Gunderson*
Hamline University

*Steven J. Shapiro*
University of New Haven

**Editor Emeritus**
*John O. Ward*
University of Missouri-Kansas City

