UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LEENA VARUGHESE M.D.,

Plaintiff,

v.

MOUNT SINAI MEDICAL CENTER, PATRICK LENTO M.D., CARLOS CORDON-CARDO M.D., ADOLFO FIRPO-BETANCOURT M.D., IRA J. BLEIWEISS M.D., AND ABC Corp., JOHN DOES 1-10,

Defendants.

12 Civ. 8812 (CM) (JCF)

PLAINTIFF'S DECLARATION

I, Leena Varughese, pursuant to U.S.C. Statue 1746, declares under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.

**Declarations**

1. Several residents and fellows from Mount Sinai Medical Center's Department of Pathology have informed me that Firpo-Betancourt directed racist and sexist commentary towards women and minorities.
2. Since September 2011, 1Firpo-Betancourt was placed on probation by the Defendant Institution according to physicians with knowledge on the subject for misconduct towards subordinates.
3. Firpo-Betancourt's role as program director has been restricted due to ongoing complaints of illegal harassment, discrimination, and intimidation by subordinates.
4. During Firpo-Betancourt's deposition, I observed Ira Greenberg sitting very close to this witness, nudge or kick his legs during his responses.
5. Dr. Sofia Kazi is a Caucasian female.

6. On September 15, 2010, Maniar admitted to Lento and I that McCash had admitted to his misconduct with his response to me on September 14, 2010 by shouting, threatening me, and directing defamatory allegations about my professional qualifications and standing.
7. I invested in becoming a licensed medical doctor because of my dedication to my professional interests, and as required by the Defendants in my first year of residency.
8. On Monday, September 13, 2010, Dr. Rafaella Morotti informed the Defendants that I, Varughese, handled the flow cytometry specimens during call appropriately.
9. I also spoke to the flow cytometry lab whose personnel informed me that they had become a continuous operation with appropriate weekend personnel staffing the flow cytometry lab some months back, but I and other clinicians, i.e. Westinghausen, were not informed by Pessin, which was a significant failure of Pessin's duty, and the real reason for alleged irateness of the clinician, and as I was also irate after learning this information.
10. In September 2010, following McCash's inappropriate conduct towards me, shortly after Morotti supported me against Pessin's and Lento's baseless claim regarding a specimen issue during weekend-call, McCash harassed, shouted at, and threatened Morotti, when she asked him to perform an administrative task of emailing a lecture change. I observed McCash behaving erratically, storming around the shared resident's office space, and making the same derisive statements about Dr. Rafaella Morotti that she was 'unfair,' he didn't like her, and that he was 'not her secretary' to announce changes to lecture schedule, McCash also had an aggressive physical demeanor as he stormed around the residents office area slamming doors.
11. In April or May 2010, I reported to Dr. James Strauchen that my schedule did not include assignments to Hematopathology and Blood Banking, so Strauchen changed the schedule. Following this incident, McCash cursed me and ranted about me in a derisive manner in the hallway and he loudly complained about me. Following this incident, Strauchen, the Program Director stated that I only work with Maniar, shortly after which Strauchen was kicked out as the Program Director.
12. In April 2010, shortly after my complaint of severe equipment problems with loss of data relating to patients, I was promptly accused of not signing out biopsies by Michael Mikulosovich, M.D., even though, I preferred to sign out biopsies as these are often with

which the initial diagnosis are made and the most interesting diagnostic cases in pathology practice. I reviewed the assignments for the biopsies that were alleged to not have been signed out and these cases were signed out by one of the other residents covering the surgical pathology rotation, because the slides were obtained by one of them, rather than me, as there was no system to sign in to receive pathology slides and cases to ensure a chain of custody at the Defendant Institution.

13. All other Medical Institutions that I worked at practiced a sensible and firm chain of custody with specimen slides and diagnostic specimen material that was far superior to the Defendant Institution's practices where Schiller, Pessin, and Bleiweiss managed the "dysfunctional" pathology lab.

14. Before December 8, 2010, I was efficient enough to not require moonlighters regularly during surgical pathology rotations, hence I did not request them to work as they were per diem, on an as needed basis only.

15. Dr. James Strauchen, former Program Director had informed me that I was not to speak to Schiller under any circumstances sometime in November 2009, and he reminded me again on December 9, 2010, following the December 8, 2010, incidents because he was worried about Schiller's discriminatory and hostile conduct towards me to single me out.

16. The sentiment of a number of other Attending Pathologists, especially, Caucasian Attending Pathologists of which I was informed was that Schiller was a bigot and very prejudicial towards minorities in his management practices.

17. During my entire residency period, Schiller did not present a single didactic lecture to the pathology residents and fellows at the Mount Sinai Medical Center, but he apparently traveled around the country by soliciting paid trips to present lectures at pathology residency programs.

18. Schiller solicited consultations in bone and soft tissue pathology to be diagnosed by him, even though, Schiller would not perform the consultation on these cases. Schiller, while the Chair of the Department of Pathology for many years, was limited and prevented from signing out cases or having any direct patient care responsibility sometime prior to 2008.

19. Schiller maintained a workplace that was in disarray throughout 2008-2011, where the department of pathology was a perpetual construction zone, that included disruption of office spaces were diagnostic work was performed, i.e during my GYN Pathology rotation in May 2011 - June 2011, all my work was done in a loud and disruptive area where there was constant commotion, because of "construction" that had been ongoing since prior to the commencement of my residency in July 2008, which was a bigger problem when I was on a service requiring a quiet workspace that was conducive to diagnosing patient cases.

20. On December 9, 2010, I was informed that I was to meet with Schiller by Mr. Basil Odsintov, one of Schiller's many personal secretary provided to him by Mount Sinai Medical Center, while I was processing a patient specimen for intra-operative consultation by myself in Annenberg 15 / Room 15-052. During the meeting, that included Bleiweiss,

    a. Schiller stated that he was the "chairman" and "the joint head of the department here".

    b. I informed Schiller in the presence of Bleiweiss that McCash and Jordan were harassing me, threatening me, to which Schiller blamed my "DNA".

    c. I informed Schiller and Bleiweiss that "Sam followed me around the gross room screaming... at the top of his lungs.", "He yelled at me at the top of his lungs telling me I'm a failure.", and that "I just want to have a professional relationship with him.... but, he is basically making it impossible."

    d. Schiller stated that he "don't have to know the whole story" when I told Schiller that McCash was "threatening me", Schiller stated that "but... you're a physician.", that "let that water roll off your back" and that "you're making up all these", but not how McCash and Jordan could change their conduct, given that they are also physicians.

    e. Bleiweiss equated physical intimidation, verbal abuse, and interference with my work to "some of the phone calls I (Bleiweiss) get".

    f. Schiller stated "whether it's right or wrong is irrelevant. It's a question of how you handle that kind of thing even now", but not how McCash handles himself or Schiller handles himself in a discriminatory, retaliatory, hostile, and threatening manner around me, a woman of Indian National Origin.

    g. Schiller stated that "I don't have to know the whole story" to me.

h. Schiller constantly interrupted me and he would not let me report my experiences throughout the meeting.

i. I stated that McCash should no longer remain as chief resident.

21. On December 9, 2010, I reported to Dr. Barry Stimmel, the Ombudsman about Schiller's pattern of hostile and retaliatory conduct towards me at the workplace, of which I had reported previously to him as well.

22. I have never began in an altercation with any of my coworkers, although at least five different incidents were instigated by Caucasian male supervisors and staff against me from June 2009 onwards.

a. From 2008-2011, Schiller continuously made derisive comments about Indians, India, and mocked me openly at several conferences where I presented autopsy cases, in front of medical students, coworkers, clinicians, and pathologists. I did not have a single adult autopsy case of an Indian national, so it was entirely apparent to me and everyone that Schiller was acting out openly in a racially biased manner towards me based on his racial and gender animus towards me. Several Caucasian male and female colleagues directly identified Schiller's conduct as racist and sexist to me on several occasions, and their assessment on what should be done and how to manage it.

b. In June 2009, John Fallon, M.D. verbally berated me and he requested that I remove tray of slides from his lap, after disrupting my patient care duties covering the intra-operative consultation service, in the middle of the day, that was part of the Surgical Pathology rotation. The incident occurred in a common office space with a number of witnesses, Fallon was immediately reported to the Institution.

c. In October 2009, Alan Schiller, M.D. disrupted my patient care duties covering the intra-operative consultation service that was part of the Surgical Pathology rotation to request a meeting with me and he informed me that I appeared unhappy, I didn't smile enough, and there was something wrong with my DNA, without any further explanation, even though, I had not even spoken or seen Schiller in or around that time. I reported Schiller's harassment, discrimination, and hostile workplace conduct to Dr. Kathy Berkman. I informed her that Schiller said that there was "something wrong with your DNA", told

me that I didn't "smile enough", and that I looked unhappy. Berkman told me that she had numerous pathology residents report to her about workplace issues related to Elmhurst Hospital Center, and she asked me if I was working at Elmhurst Hospital, which I was not, I was working at Mount Sinai Hospital on their Surgical Pathology rotation managing thousands of cases. In addition, I reviewed my work record from September 2009 - October 2009, I worked on thousands of cases, including highly complicated cases, beyond the usual acumen of most second year residents, without a single incident, with positive feedback from all my supervisors. This conduct by Schiller was based on discriminatory animus towards me because of my national origin and gender. He created an intimidating workplace for me, a woman of Indian descent, to threaten my success, in a workplace that was already utterly dysfunctional by his design.

d. In 2010, Robert Celentano, a pathology assistant threatened me, shouted at me, and stated that he won't take "shit" from me with regard to his working on cases from my service.

    a. Celentano was reported by both myself and another resident immediately because Celentano was not only increasingly expressing his discontent of working at Mount Sinai Medical Center's Anatomic Pathology lab, which, in my opinion, became worse with promotion of Roma Rosario over him. Celentano was acting out against me and his threatening me was entirely based on racial and gender animus. Schiller informed me that the other resident (Caucasian woman) had informed him, as well as an Attending Pathologist regarding the incident, so Schiller reluctantly asked me if I was all right to appease other Caucasian residents who were all livid about Celentano's conduct. Celentano obtained a pathology assistant job in Connecticut with better commute, at a work environment with more organization, and that was also closer to his significant other, where he did not have to work with physicians in residency and fellowships, so he left to work in Connecticut.

23. On December 10, 2010, I was asked to meet with Dr. Melissa Pessin by Basil Odsintov,

    a. I informed Pessin of Schiller's conduct towards me that was discriminatory, hostile, and retaliatory.

b. I informed Pessin that "I don't want to argue" about her utterly misinformed ideas about patient care delivery on the Anatomic Pathology services.

c. I informed her Jordan lied to me about her being the "primary moonlighter" when she was in fact the secondary moonlighter.

d. I informed Pessin that "I get to determine whether or not I need moonlighters or not" but Jordan was disrupting my work throughout the day.

e. Azar the actual primary moonlighter arrived and I assigned cases to him that I felt would be helpful to me.

f. I informed Pessin that McCash stated that "you're pushing your work off onto other people, you're not doing your job. You are such a failure. You're not going to be successful. No one's going to hire you. No one likes you."

g. I described McCash's actions as "in my space, ...like five inches away from me... enforcing his presence on me and yelling at me" and I told him to "back off" and "Get away from me".

h. I informed Pessin of "double standards", "unfair treatment", "picking on me", "bullying me" towards me by McCash, and Jordan's interference and disruption as a junior resident, especially compared to Maniar who treated me fairly and she and I remained professional through disagreements, as was my relationship with all the other residents and fellows, which was professional and cordial.

i. I informed Pessin that I am "being looked at as a scapegoat for whatever problem" irrespective of the reality, and McCash and Jordan were harassing me at work routinely.

j. I informed Pessin that I left the confrontation as soon as possible to obtain assistance from a supervisor due to the unreasonable, illogical, and irrational behavior and conduct, which was highly irregular and not expected of McCash or any chief resident.

k. I requested that McCash be removed as Chief resident given his repeat attacks on me at work that was disruptive and it created a hostile workplace but Pessin did not want to hear anything about reprimanding McCash.

24. On December 13, 2010,

a. Both Lento and Pessin threatened me with termination of my employment by a letter from legal and the Defendant Institution for speaking to Jordan, even though I was never informed that I couldn't speak to Jordan.

b. Jordan was insubordinate to Pessin's demands to Jordan to not speak to me, but she received preferential treatment in not being threatened with termination of employment by Pessin and Lento.

c. Both Pessin and Lento told me that I cannot report the incidents to Human Resources.

25. On December 21, 2010,

a. Lento stated Academic Advisement was "discipline" and they identified McCash as a "direct supervisor".

b. Pessin and Lento stated that even if I was 100% correct, my reaction was inappropriate, even though I had left, sought help, tried to complete the remaining cases, and tried to avoid McCash at work for many months because of this exact irrational conduct that the Defendants were aware of for many months.

c. Pessin and Lento said that there was no one I could report the hostile work environment, retaliation, and discrimination because Barnett approved their actions against me.

d. Pessin and Lento said that I am not to speak to other attending pathologists about their conduct or anyone else to obtain advice, while also cutting short my response or rebuttal to their allegations.

e. Lento and Pessin stated that I have to agree to the Academic Advisement for me to be on the disciplinary action, and I never agreed to it.

26. On December 23, 2011, I wrote to Caryn Tiger-Paillex, director of Human Resources to report the incidents after obtaining advice from several attorneys, including an experienced employment attorney admitted to practice in several Federal courts, exclusively for the plaintiffs side.

27. On January 4, 2011, I met with Tiger-Paillex to report discrimination because of race and gender, hostile work place, and retaliation against me by Lento, Pessin, Schiller, and Bleiweiss and to report the ongoing harassment and discriminatory conduct towards me by

McCash and Jordan at work that was threatening me, my patient care work, and preventing me from being able to work like other residents and fellows.

28. I obtained legal counsel from an experienced employment law attorney following December 8, 2010, due to the conduct of McCash, Schiller, Pessin, and Lento towards me that I deemed to be discriminatory, hostile, and retaliatory.

29. On January 10, 2011, Lento and Burstyn met with me

    a. Lento stated that I was on Academic Advisement.

    b. I reported my complaints again about the Defendants' hostile work place and retaliation against me with the Defendants' ignoring of McCash's conduct towards me, and their taking actions against me but not McCash or Jordan, and I reiterated the discriminatory hostile conduct and "retaliation" against me by the Defendants.

30. On January 19, 2011, I met with Barnett to report ongoing hostile workplace, along with prior direct threats to me by Lento, and Lento's stalking activity of tracking the evaluations that I submitted, his confronting me in response to my complaints about McCash, the refusal to change my schedule that would limit my interactions with McCash, and to request that I not have to work with Lento anymore because of his ongoing erratic conduct towards me.

31. Barnett informed me that the Department of Pathology is "crazy" and when I complained about Bleiweiss evaluation from December 2010 compared to other supervisors, he said the other supervisors were "crazy".

32. On January 20-21, 2011, only one day later my desk at work was broken into.

33. On January 19 and 24, 2011, I met with Figur, a proxy for the Institutions' legal counsel Lowy and Board of Trustees by way of their "Physician Wellness Committee", which is a subcommittee of Quality control committee, and Johnson, who was a proxy for Barnett.

    a. I reported discriminatory conduct towards me by Schiller that was discriminatory to me, retaliatory towards me for two years, and the recent actions of Schiller in favor of Caucasians Jordan and McCash.

    b. I reported that the hostile work environment and discrimination were perpetrated by Lento, Schiller, Pessin, and they made the work environment worse for me by

encouraging McCash to harass me further by not limiting his interactions with me following a number of incidents, including the September 14, 2010, incidents.

c. I reported that my schedule was not changed by Lento that would have to allowed me to avoid McCash in December 2010.

d. I reported that the adverse employment action because of disruption of my patient cases by McCash and Jordan, during my assignments was further discrimination against me, created a hostile work environment, and was retaliatory.

e. I reported the alcohol abuse in the Department of Pathology during patient care duties by Jordan and McCash outside of dementia rounds, and as well as part of the "dementia rounds" that McCash demanded routinely to have dementia rounds so that he could drink alcohol at work, which ended the meeting with Figur and Johnson abruptly.

34. On February 9, 2011, I reported to Barnett ongoing interferences with access to work materials necessary for diagnosis were not being made available to me, which Barnett seemed aware about as occurring, and he asked me to accuse Strauchen. I was aware Strauchen was not responsible for this issue, likely related to Barnett and Lento sabotaging my work.

35. On February 11, 2011, there was an inspector from ACGME who reviewed the program but I was informed that I was intentionally excluded from meeting with ACGME inspector.

36. On February 15, 2011, I was harassed and singled out at Elmhurst hospital center, although both I and another coworker, Jonathan Chow, M.D. did not have an updated "mask fit certificate". In addition, I was given the wrong information about the contact for the certification by the Defendants, while my coworker was given the right contact information. Dr. Valerie Glezerov appeared to be directly involved in this harassment towards me. Ironically, Chow was on assignment to gross, making the mask fit test much more pertinent to his work, rather than mine.

37. On February 18, 2011, I presented a case at tumor board at 7:30 am, the case was misdiagnosed by John Fallon, M.D., which lead to further surgery in a case where surgery was not required.

38. On February 18, 2011, Lento informed me that he "needs" to meet with me but this meeting was unusually after work hours at 6pm, the meeting time was not confirmed, and I did not feel comfortable meeting with Lento, but Lento kept emailing me until 7 pm, despite my informing him on the phone that I did not even return from Elmhurst Hospital Center until 6:30 pm and it was too late to meet with him, when I responded to a page from him.
39. On February 28, 2011, Figur informed me that I have to meet with Physician wellness committee but Lento informed him that I was at Elmhurst Hospital Center and it was only staffed by me because other residents were away at various national pathology conferences, indicating again that there was never any doubt about my patient care delivery, duties, and I was relied on and trusted to deliver critical patient care and cover for other residents routinely. Figur stated that he would have to meet with me after he returned from his three week vacation after March 20, 2011.
40. On or about March 4, 2011, I met with Lento to finalize autopsy cases. My patient's autopsy slides had gone missing for a case, so I had to resubmit the tissue, exposing me unnecessarily to high levels of formalin and other chemicals.
41. On or about March 24, 2011, Figur requested that I meet with him and Daniel Hughes as per PWC demands or that my employment will be terminated, after having completed over a thousand cases between December 2010 and March 24, 2011, without a single complaint against me from at least ten different supervisors or any other complaints from anyone else about my conduct or performance.
42. In April 2011, I met with Figur and Daniel Hughes PhD, I again reported my concerns of discrimination, hostile work environment, and retaliation by the Institution with their ongoing conduct.
43. Hughes reported that he knew the Pathology residency program is the problem, likely because he must have received complaints from resident physicians about the abysmal working conditions, access to necessary protective apparel such as gloves, aprons, and face shields, functioning computer systems and equipments, ongoing construction and disruption in all work areas used by resident physicians to work, teach and make critical patient care

diagnoses, and the hiring and promotion of unskilled and untrained employees and coworkers into various supervisory positions, at the discretion of Schiller, Lento, and Pessin.

44. On April 12, 2011, Figur informed me that I was to provide urine for a toxicology screen, without any probable cause for such a screen, because the ongoing erratic and repeat harassing conduct of McCash and Jordan did not lead to toxicology screen for them or a PWC referral that was deserved for them. The other residents and staff who were unprofessional, berating other residents, not showing up to work, destroying hospital property, drinking alcohol at work, were never subjected to toxicology screen, evaluation by PWC, and psychological evaluation in sporadic manner.

45. During the two meetings with PWC, I explicitly reported hostile work environment, favorable treatment being given to the harassers McCash and Jordan, discrimination by Defendants, lack of follow up on alcohol use at the Institution by Jordan and McCash, the ongoing harassment with attacks on my employment, my work, and my career despite my satisfactory work on thousands of case before and after December, 2010; the discrimination and hostile work place against me inherent in subjecting me to adverse employment actions to which perpetrators are not subjected despite repeat incidents, and the ongoing harassing conduct of Lento, and the retaliation against me for the report of my concerns and my reports with attacks on my career, threats against my person, and my financial security.

46. In April 2011, I spoke to Maniar after speaking to Tiger-Paillex and she informed me that she was unaware of any instructions that McCash was restricted in dealing with me and that she was to oversee my workplace concerns.

47. I was informed by a supervisor that Andrew Castaldi has been involved in the termination of employment of several minorities and older employees with discriminatory conduct in "difficult" situations, i.e. cases of discrimination or retaliation.

48. I had not met Castaldi until May 3, 2011, so his conduct, demeanor, language, and disrespectful conduct towards me was another evidence of the Defendants hostile, discriminatory, and retaliatory animus against me.

49. On or about May 3, 2011, Cordon-Cardo explicitly admitted that he had been "updated by the persons in the Institution" and there had been "group of discussions", and he wanted to

participate in the disciplinary actions against me, even though I had not met Cordon-Cardo personally until May 3, 2011.

50. On or about May 24, 2011, I met with Castaldi, Lento, and Cordon-Cardo.
    a. I reiterated they were "retaliating against me for making a complaint", that I did not have a problem working with my peers, that I never confronted anyone, that "I've maintained my professionalism here." and "exhibited integrity" so their conduct towards me was "completely unprofessional".
    b. Then Lento said he doesn't care about himself but that I cavalierly threw the book on the table, and after about several comments, Cordon-Cardo oddly stated that "you are harassing me in a way throwing this book", meanwhile, their malicious attack of my character with imaginary shared delusions continued because they were in a "process" and I didn't say whatever "we wanted you to say"
    c. I specified how I met all the different terms of academic advisement, even though it was a specific adverse employment action taken against me and no one else as follows:
        i. I wrote down my "account of the situation" as requested
        ii. In terms of professionalism and approaching things in a better fashion, I reiterated that I was professional in my conduct in that "I tried to diffuse the situation", then I "left the gross room", "asked for mediation immediately", yet the Institution continued to threaten my employment and continued their unjustified attack on my self-reflection.
    d. I told them that their conduct in condoning bullying, harassment, disruption of my patient care duties, retaliation, and that their conduct of threatening me, threatening my employment, not informing about the purpose of the meeting, and generally intimidating and hostile conduct was inappropriate to which they said that I had an "attitude" that was "looking bad".
    e. Cordon-Cardo stated that I "drop all this nonsense of people drinking", and that "drop this attitude" because "you're looking bad".

51. In May to June 2011, I was on assignment at Mount Sinai Medical Center on the Gynecological pathology service, while Morency was on the Gastrointestinal Pathology

service, where I personally observed her arrive into the grossing room work area after I arrived, dance to no music, act erratically, request assistance from Pathology assistants for simple cases, she did not come into work for many days, and she delayed numerous specimens for numerous days.

52. In May - June 2011, all my work was managed properly to my knowledge, and I was not informed of the allegations being made against me by Lento, McCash, and Morency, an ongoing theme and professional misconduct on their part to paper the file against me without my knowledge.

53. On May 12, 2011, I was told by Figur that my employment would be terminated immediately, if I did not meet with Dr. Madeline Fersh, M.D., and I was terrified of having security personnel approach me or remove me or physically harass me, as Figur and Lento had alternatively called Kalir and Kalir's secretary and informed them that I am to meet with Fersh for psychological assessment.

54. My own evaluation of Fersh was that she appeared unhinged, emotionally unstable, and her conduct was unethical, immoral, and delusional with her assumptions of me, much like Jordan, as these Caucasian women are held to lower standards for professionalism, as a victim of her "consultation", I can definitely speak to her lack of professionalism.

55. Fersh was provided conclusory defamatory allegations about me by Figur, some corrupt unprofessional retiree medical doctor, whom she should question in her role as a professional medical doctor, but she just "obeys" as is expected by Figur, as is commonplace of these women, as Caucasian male interests are consistently and systemically advanced by the Defendants with professional misconduct, fraud, and fabrications.

56. I reported to Fersh the incidents that occurred to me and my concerns about discrimination, retaliation, and hostile work place that was in violation of my civil rights. I nor my attorneys were informed of Fersh's report, until discovery in this litigation sometime in late 2013. In my opinion, Fersh is a doctor without any ethical obligation or professionalism to her profession in her role as a Mental Health Liaison for resident physicians, as is evident through her conduct with me, and it's deeply disturbing that she will continue in her career diagnosing or treating minorities, but my hope is that she does not. She disbelieved me when

I reported harassment, discrimination, hostile workplace, and retaliation, to then accuse me of not reporting or minimizing symptoms, which I do not have, as retaliation. The continued licensing of her as a psychiatrist is deeply troubling to me, as a physician, who had taken care of numerous severely mentally ill patients, and I have worked with numerous psychiatrists and clinicians to care for mentally ill patient, in that context of my professional experiences delivering care to patients who are ill with legitimate mental health issues, Fersh's conduct towards me is beyond the pale. I have been victimized by Fersh with a label of cluster B sort of personality disorder, that is a diagnosis by a doctor who didn't believe me when I met with her is professional misconduct. Fersh labeled me with a mental illness because as noted in her report, I complained about discrimination, retaliation, and hostile workplace during the interview with her. Unethical, unskilled, corrupt, and untrained doctors in the medical profession that engage in conduct like Fersh are promoted, over ethical and extensively experienced doctors, and this is the norm at the Defendant Institution, and where unethical doctors are given these critical positions who then act without obligations to patients or society at the request of the Defendant Institution's retaliatory and discriminatory animus or the politics of the Defendant Institution.

57. Dr. Sarah Blowe is a minority woman of color.
58. Dr. Arta Lahiji is also a minority woman of color.
59. The other evidence of such discriminatory conduct has been towards Dr. Sarah Blowe and Dr. Arta Lahiji, minority women, who were targeted by Figur and Physician Wellness Committee.
60. After the May 24, 2011 meeting Bleiweiss directly approached my supervisor on GYN pathology rotation and informed her that she was to downgrade me on evaluations. Bleiweiss and Lento were excluded from the management of GYN cases on GYN rotation, so they would not have any insight into our work, without actively involving themselves, which they did.
61. I had a professional and cordial relationship with all my peers with two exceptions:
    a. McCash because of his untenable discriminatory, hostile, and sexist conduct towards me. McCash was involved in disrupting my work, harassed me, conducted assaults against

me, verbally abused me, and even kept derisive defamatory lists of me without my knowledge that he was published to others.

b. Jordan was dishonest in her everyday dealings with me, fabricated incidents that never occurred, and she disrupted my patient care cases and my work items, such as removing or ransacking items on my desk, all of which are unprofessional and unethical in medical practice, yet she was deemed by Lento and Pessin to be superior to her peers, Kazi, Chepovetsky, and Hechtman, and unfortunately, the residents senior to her such as myself, Chow, Roman, Azar, French, and Martinez, for Chief Resident position.

c. I was unaware of Morency's involvement in any aspect of the workplace issues until this litigation, in fact, I spoke to Morency in October 2011, at the Tampla, Fl Osler Pathology Review Course, and she explicitly informed me that she was not involved in the termination of my employment nor did she have any input or knowledge as to why my employment was terminated.

d. In October 2011, I spent a considerable amount of time with all my former coworkers at lunch and dinner, and a number of doctors, including many from Mount Sinai Medical Center in New York, NY asked me to go out for dinner with them on a number of occasions.

e. After the termination of my employment in September 2011, I have went out socially with a number of coworkers, who informed me that the Defendant institution was poorly run as before.

62. In October 2009, I spoke to Dr. Kathy Berkman about psychological abuse and attack on my person by Fallon and Schiller, with direct disruption during the rotations, when I was actively involved in patient care delivery. I informed her that there were no complaints from my direct supervisors about my performance, in fact, I was often commended for my diagnostic acumen and management of work despite the chaotic and dysfunctional workplace.

63. The Defendant Institution admitted to entering my apartment that was subsidized by Mount Sinai Medical Center in New York City without my permission, which became a severe problem by March 2011 after numerous such incidents, I moved out of the Defendant owned apartment.