Varughese Tr.

9

Varughese

1
2    Nos. P90 through P95, marked for
3    identification, this date.)
4        Q.    Let me show you as an exhibit that
5    document.  Would you look at that and tell me if
6    you can identify it for me.
7        A.    This is the Mount Sinai Hospital
8    resident's contract.
9        Q.    Is this the resident's contract that
10    you signed in June of 2008, if you look at the
11    last page?
12        A.    Yes.
13        Q.    Let me show you what we'll mark as
14    Defendants' Exhibit 2.
15        (Defendants' Exhibit 2, document
16        headed "The Mount Sinai Hospital Resident's
17        Contract," for the academic year July 1st,
18        2009 to June 30, 2010, Bates Nos. D-36
19        through D-42, marked for identification,
20        this date.)
21        Q.    The same question Dr. Varughese.  Do
22    you recognize this document?
23        A.    Yes.
24        Q.    What is it?
25        A.    It's the Mount Sinai Hospital's

*Computer Reporting NYC Inc.*
*(212) 986-1344*

10

Varughese

1
2    resident's contract.
3        Q.    This is the one that you signed for
4    the academic year July 1st, 2009 to June 30, 2010?
5        A.    I believe it is.
6        Q.    Let me show another document which
7    we'll mark as Defendants' Exhibit 3.
8        (Defendants' Exhibit 3, document
9        headed "The Mount Sinai Hospital Resident's
10        Contract," for the PGY-3 year July 1st, 2010
11        until June 30, 2011, Bates Nos. P264 through
12        P270, marked for identification, this date.)
13        Q.    I ask you again to take a look at it.
14    Can you tell me what this document is?
15        A.    It's yet another Mount Sinai Hospital
16    resident's contract.
17        Q.    And your signature is on the last
18    page?
19        A.    Yes.
20        Q.    This is for your PGY-3 year 2010/2011?
21        A.    Yes.
22        Q.    Thank you.
23        MR. McEVOY:  And lastly, mark this as
24    Exhibit 4.
25        (Defendants' Exhibit 4, document

*Computer Reporting NYC Inc.*
*(212) 986-1344*

11

Varughese

1
2    headed "The Mount Sinai Hospital Resident's
3    Contract," for the PGY-4 year July 1st, 2011
4    until June 30, 2012, Bates Nos. P992 through
5    P998, marked for identification, this date.)
6        Q.    The same question.  Can you tell me
7    what this document is?
8        A.    This is the Mount Sinai Hospital
9    resident's contract.
10        Q.    And is your signature on the last
11    page?
12        A.    Yes.
13        Q.    And this is the contract that you had
14    for your PGY-4 year from 2011 to 2012?
15        A.    Yes, I believe it is.
16        Q.    OK.  Doctor, you were a resident in
17    the pathology department; is that correct?
18        A.    Correct.
19        Q.    I realize that your responsibilities
20    may have changed from year to year, but generally
21    what were you were responsibilities as a pathology
22    resident?
23        A.    It varied depending on the rotation or
24    service that was being covered by myself.
25        Q.    So let's focus on the PGY-3 year, just

*Computer Reporting NYC Inc.*
*(212) 986-1344*

12

Varughese

1
2    picking one.  What were your responsibilities
3    during that year?
4        A.    Once again, it varied widely.
5        Q.    Tell me how they varied.
6        A.    With the service that I was on.
7        Q.    What services were you on?
8        A.    If I recall correctly, I believe I was
9    on several months of surgical pathology at
10    Elmhurst, Mount Sinai Medical Center, VA.  That's
11    the Veteran's Administrative Affairs Hospital.  As
12    well as I believe I'm on the clinical chemistry
13    and perhaps a month of blood banking.
14        Q.    Blood banking?
15        A.    Blood banking.  And I'm not certain
16    now what the other.  I would have to look at my
17    schedule.
18        Q.    I understand.  So in surgical
19    pathology what were your job responsibilities?
20    What did you do?
21        A.    That involved, surgical pathology
22    involves prosecting specimens which are removed
23    from patients during surgery and submitting that
24    for histological analysis, followed by reviewing
25    of the histology under the microscope and then

*Computer Reporting NYC Inc.*
*(212) 986-1344*

13

Varughese

1   signing out the case with the attending
2   pathologist.
3       Q.    Anything else that you did during the
4   surgical pathology service?
5       A.    In a similar vein there is also
6   biopsies.
7       (Reporter asked witness to repeat.)
8       Q.    Just so you understand, the court
9   reporter sometimes won't hear what somebody says
10  and they will say I didn't hear you.  A lot of
11  times people think they want you to say something
12  more than that.  They just want to know what it is
13  that you said because they didn't hear what you
14  said.  OK?
15      A.    Correct.
16      Q.    You were saying in a similar vein
17  biopsies.
18      A.    Correct.
19      Q.    What about biopsies?
20      A.    Biopsies are also tissue acquired from
21  the patient and that's not processed by the
22  resident, but we do review it histologically under
23  the micro -- we review it under the microscope for
24  histology and then sign out those cases as well.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

14

Varughese

1       Q.    Anything else?  Any other job
2   responsibilities in surgical pathology?
3       A.    Yes.  At Mount Sinai Hospital I was
4   responsible for organizing the slides, the
5   paperwork, following on missing blocks, missing
6   slides and correcting or insuring correct gross
7   descriptions.
8       Q.    I take it you're familiar with the
9   grossing of specimens?
10      A.    Yes.
11      Q.    How does that work?
12      MR. WRONKO:  Form objection.
13      Q.    When I ask you how does that work,
14  what's the process by which specimens are grossed?
15      A.    It's simply examining the specimen
16  with your eye and making a determination of the
17  measurements, the size, sometimes the weight, and
18  making a note of any lesions that are there.
19      Q.    So at Mount Sinai now, not at Elmhurst
20  or the VA, where is grossing of specimens done?
21      A.    At Mount Sinai Hospital the grossing
22  of the specimens are done in what is known as the
23  grossing room.
24      Q.    And where is the grossing room?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

15

Varughese

1       A.    It's on the 15th floor in the
2   Annenberg building.
3       Q.    When you were grossing specimens in
4   the grossing room, where did the slides come from?
5   How did you get them?
6       A.    The slides were processed by the
7   histology staff in an adjacent lab and they had
8   several machines there that processed the blocks
9   that would be submitted overnight or for several
10  hours for -- and then it was embedded and then
11  further processed by the technicians.
12      Q.    Would they then send the slide to you
13  or to the grossing room?
14      A.    Yes.  They would usually put the
15  slides in a box.  We had boxes labeled with our
16  initials and last name, I believe, at this point
17  and it would be placed there.
18      Q.    How did you know which specimens you
19  were supposed to review as opposed to one of your
20  colleagues was supposed to review?
21      A.    It usually was determined by the cases
22  assigned to you, whether it is at the time that
23  you began your work for the day, by myself or by
24  the PA who was working.  So that's...

*Computer Reporting NYC Inc.*
*(212) 986-1344*

16

Varughese

1       Q.    Who would assign you the case?
2       A.    As far as I know, there was not a
3   formal assignment of cases.
4       Q.    So what types of specimens were being
5   grossed?  And by that I mean did they fall into
6   categories?  Were there breast specimens, prostate
7   specimens?  What were the categories?
8       A.    Yes, they did fall into a lot of
9   different categories.  I believe at some point the
10  program tried to organize it according to category
11  and divide the group into I believe two groups.
12  So people would only gross specimens from, let's
13  say, the knee or bone and soft tissue specimens
14  and GI and then the other group, the group two,
15  would be responsible for specimens that were
16  removed, breast specimens or lung specimens.
17  Those were common things that we --
18      Q.    When did that take place, that attempt
19  to categorize and set up two groups?
20      A.    I am not sure now.
21      Q.    What group were you in?
22      A.    I'm not sure if I participated in the
23  group in that particular group assignment.
24      Q.    Do you know why you didn't participate

*Computer Reporting NYC Inc.*
*(212) 986-1344*

17

Varughese

1  
2 in that group assignment?  
3     A.   I believe there was a constant change  
4 of method of approaching grossing there.  So it  
5 changed frequently.  
6     Q.   What role, if any, did the chief  
7 residents play in assigning grossing specimens to  
8 other residents?  
9     MR. WRONKO:  Form objection.  You can  
10 answer.  
11     A.   They did not play any role as far as I  
12 knew.  
13     Q.   Now, when you completed grossing the  
14 specimen what was your responsibility then?  What  
15 did you do after you were finished?  
16     A.   After finishing grossing just, you  
17 know, submitting the blocks, the tissue blocks,  
18 you submitted the specimen back into Formalin and  
19 in the properly labeled container and just put it  
20 for storage.  
21     Q.   Was there any report that you were  
22 supposed to generate or other paperwork that you  
23 were supposed to generate?  
24     A.   You're supposed to enter the blocks  
25 and enter the gross description.

18

Varughese

1  
2     Q.   What could the gross description be?  
3 What were the possible descriptions?  Or give me  
4 examples of what the descriptions might be.  
5     MR. WRONKO:  Form objection.  You can  
6 answer.  
7     A.   Gross description just is the  
8 measurement, like I mentioned before, weight,  
9 lesions, and the block submitted.  
10     Q.   And I think you said that you looked  
11 at the specimens visually.  
12     A.   Yes.  
13     Q.   Did you look at them under a  
14 microscope?  
15     A.   Usually we did have a magnifying glass  
16 we used on occasion if there was a -- for certain  
17 types of lesions we would use it and examine it  
18 under the microscope to see where the lesion was,  
19 and, um, but other than that, no.  Gross specimens  
20 are not examined under microscope.  
21     Q.   And the magnifying glass is not a  
22 microscope, correct?  
23     A.   No.  
24     Q.   During your PGY-3 year who was or were  
25 the chief residents?

19

Varughese

1  
2     A.   During the PGY-3 year it was Kruti  
3 Maniar, Samuel McCash.  Later in the year it was  
4 transitioned into Elizabeth Morency and Adrienne  
5 Jordan.  
6     Q.   Were Drs. Jordan and Morency the chief  
7 residents in your PGY-4 year?  
8     A.   Right, Morency was the PGY-4 year  
9 resident.  
10     Q.   Was Dr. Jordan a PGY-4 year as well?  
11     A.   Dr. Jordan was a PGY-3 year.  
12     Q.   She was a PGY-3.  
13     A.   Right.  
14     Q.   When was she the co-chief resident?  
15 What year of your residency was she the co-chief  
16 resident?  
17     A.   Well, I wasn't sure if she was  
18 co-chief resident until she has been referred to  
19 as such now.  But OK, I was a fourth-year resident  
20 when she was one of the chief residents.  
21     Q.   When you were a third-year resident it  
22 was Dr. McCash and Kruti Maniar.  
23     A.   For the majority of that year.  
24     Q.   When did that change?  And by your  
25 third year I assume we're talking about from July

20

Varughese

1  
2 1st of 2010 to June 30th of 2011.  That's your  
3 third year.  
4     A.   Correct.  
5     Q.   When did either Dr. McCash or  
6 Dr. Maniar stop being the chief resident during  
7 that period of time if you know?  
8     A.   I can't recall off the top of my head.  
9     Q.   OK.  Did you know Dr. McCash prior to  
10 his becoming the chief resident in your third  
11 year?  
12     A.   Yes.  He was a fellow resident in the  
13 program.  
14     Q.   I think we all know that at a certain  
15 point in time you had problems with Dr. McCash.  
16     A.   Right.  
17     Q.   And we'll get to that in a minute.  
18 And the first of them I understand was in -- are  
19 you OK?  
20     A.   Oh, yes.  
21     Q.   And the first of them I believe was in  
22 September of 2010; is that correct?  
23     A.   Yes.  I believe that's correct.  
24     Q.   So before September 2010 during the, I  
25 guess the two years that you were both

21

Varughese

1    co-residents and prior to 2010 did you have any
2    problems with Dr. McCash?
3        A.    Not particularly.
4        Q.    So tell me what happened in September
5    2010 with you and Dr. McCash.
6        A.    Well, September 2010 he, um, started
7    shouting at me in a conference room in a very
8    loud, with a very loud voice and with sort of an
9    intimidating demeanor.
10            I'm sorry, can I correct that?  Not
11   sort of, with an intimidating demeanor.  Can we go
12   off the record for a second?
13       Q.    Sure.
14            MR. McEVOY:  Off the record.
15            (Discussion off the record.)
16            MR. McEVOY:  So during an
17   off-the-record discussion Dr. Varughese
18   indicated she wanted to supplement her
19   answer to my question of prior to September
20   2010 did you have any problems with
21   Dr. McCash.
22       Q.    Go ahead.
23       A.    Well, there were issues which I
24   thought were minor ones at that time where he
25

22

Varughese

1    wanted to dictate to me how I should answer call
2    and why it was in my best interest as opposed to
3    what I had suggested.  And I believe that was a
4    freedom that was allowed other residents in making
5    their schedules and call schedules.
6        Q.    Did you raise those issues with
7    anybody in the program, the program director or
8    one of your attendings?
9        A.    At that time, I am not sure, I'm not
10   sure if I did.  Because I already had -- actually,
11   I had multiple other issues with McCash before
12   which I recall now.  Can I supplement?
13       Q.    Absolutely.
14       A.    Well, in terms of my end of my second
15   year going into third year there were some issues
16   with the scheduling and I actually had to involve
17   the former program director to ask him that my
18   rotations and assignments be comparable to the
19   remainder of my class and my peers because I was
20   not being assigned to the correct rotations.
21       Q.    Who made the scheduling assignments?
22       A.    That's -- I'm not a hundred percent
23   certain.
24       Q.    So I understand, and I'll ask you in a
25

23

Varughese

1    minute about the scheduling issues, but how is
2    Dr. McCash involved in your scheduling problems?
3        A.    Oh, because --
4        Q.    At the end of your PGY-2 year which is
5    what we're talking about.
6        A.    Well, I'm not sure if he is completely
7    involved or if both chief residents or somebody
8    else was making the schedules, because the
9    schedules were made I believe originally by
10   someone else and that person changed.  So I wasn't
11   sure what was happening that year in terms of the
12   schedule making.
13       Q.    So you're talking about the schedule
14   made at the end of your PGY-2 year for the
15   beginning of your PGY-3 year; is that right?
16       A.    Correct.
17       Q.    And who did you raise the scheduling
18   issues with?
19       A.    Well, I raised that with the former
20   program director, Dr. Strauchen.
21       Q.    What was the issue that you raised
22   with Dr. Strauchen?
23       A.    I simply informed Dr. Strauchen that
24   my schedule was not up to par for the year of
25

24

Varughese

1    training that I was going to go into and I would
2    require exposure to particular fields to be
3    relatively competent at the end of my four years
4    of training.
5        Q.    And was your schedule adjusted?
6        A.    Yes.
7        Q.    And was it adjusted to your
8    satisfaction?
9        A.    Yes, I believe it became more
10   equitable.
11       Q.    So going back to September 2010, you
12   had started telling me that in a conference room
13   Dr. McCash was shouting at you in a loud voice and
14   with intimidating demeanor; is that right?
15       A.    That's correct.
16       Q.    What else happened during this
17   September 2010 incident with Dr. McCash?  And to
18   put a finer point on it, what did he say -- let me
19   take a step back.
20            Who was in this conference room?  Was
21   it just you and Dr. McCash?
22       A.    No.
23       Q.    Were there other people present?
24       A.    There were other people present.
25

25

Varughese

1   Q.    Were they other residents?
2   A.    Um, yes.
3   Q.    Were there other people, other
4   physicians who weren't residents?  Or putting it a
5   different way, were they only for residents?
6   A.    No, there were other people who were
7   not residents.
8   Q.    Why were all of you in the conference
9   room?  What was the purpose of gathering there?
10  A.    Well, when the incident occurred they
11  were not in the residents' room yet.  I believe
12  they were arriving for the conference that would
13  take place at approximately 9 a.m. and 1 to 10
14  a.m.
15  Q.    When you say the residents' room, what
16  are you referring to?
17  A.    I'm sorry, not the residents' room,
18  the conference room.  It is located not in
19  Annenberg, but rather at the Icahn building, which
20  is on the corner of 97th and Fifth?  No, Madison.
21  Q.    So there was a conference you say
22  scheduled for 9 a.m.
23        (Witness nodded head up and down.)
24  Q.    Yes?  You can't nod your head.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

26

Varughese

1   A.    Well, usually there are.  It's an
2   informal conference usually.  It's called a CP
3   Call Conference and it's a very informal event.
4   Q.    And what's the purpose of the CP Call
5   Conference?
6   A.    It's just to discuss one or two
7   interesting cases that occurred when you were on
8   AP call.
9   Q.    Who --
10  A.    I'm sorry, CP call.
11  Q.    Who attends the CP Call Conference?
12  A.    It's attended by the clinical
13  pathology attendings.  They have a different
14  department, and they would attend those, which
15  included Dr. Pessin, Dr. Grace, Dr. Ramanathan,
16  Dr. Perschke.  Usually those were the attendees
17  and supervisory positions.
18  Q.    And I take it the residents as well.
19  A.    The residents who were available or on
20  CP conference/CP rotation would attend.
21  Q.    So you said that the incident with
22  Dr. McCash began prior to the start of this
23  conference, correct?
24  A.    Correct.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

27

Varughese

1   Q.    So tell me what Dr. McCash said to
2   you.  I understand you said he was yelling at you.
3   So tell me what, if you remember, what he said,
4   what you said.
5   A.    Right.  He just shouted at me to shut
6   up repeatedly, then "shut your mouth."  I believe
7   he said, "You talk too much."  And the rest I feel
8   like I blocked it out almost, because it's rather
9   painful.
10  Q.    In your complaint, Dr. Varughese, you
11  say that he also made comments to you that his
12  tone was, quote, for her own good, unquote, that
13  you were, quote, unfit professionally, unquote,
14  and, quote, not qualified, unquote, for your
15  position, and, quote, no one was teaching you,
16  unquote and that you, quote, would never get a
17  job, unquote, and, quote, no one would hire you,
18  unquote.  And you were, quote, lucky to be here,
19  unquote.
20        Does that refresh your recollection as
21  to other things Dr. McCash said during this
22  confrontation or whatever it was?
23  A.    At that confrontation I believe he did
24  not say that at the initial, when he was shouting.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

28

Varughese

1   I believe he did not shout that at the meeting.
2   It wasn't that...
3   Q.    Do you know why or did he tell you why
4   he was telling you to shut up or saying you were
5   talking too much?
6   A.    I believe he did later on when he, um,
7   I believe he presented a case that day and
8   following his presentation he, you know, I believe
9   I was sitting at the desk and he walked past me
10  and patted me on the shoulder and said, Oh, I
11  would like to speak to you after this conference.
12  Q.    So let's finish with what happened at
13  the conference first.  So when Dr. McCash says to
14  you what you just said, "shut up," "you talk too
15  much," did you say anything to him?
16  A.    I was very shocked.
17  Q.    And as far as you knew, this just sort
18  of came out of the blue and he just said this.
19  There was no prior discussion or disagreement
20  between you of any kind?
21  A.    Not to my knowledge.  It was a Tuesday
22  morning.  There nothing I knew of.
23  Q.    So then you said that after he made
24  his presentation he kind of tapped you on the

*Computer Reporting NYC Inc.*
*(212) 986-1344*

29

Varughese

2 shoulder and said I would like to talk to you
3 later, yes?
4     **A.**   Yes.
5     **Q.**   Did you talk to Dr. McCash after the
6 conference?
7     **A.**   Yes, I did.
8     **Q.**   Where did that conference take place?
9     **A.**   It took place in the same conference
10 room.
11     **Q.**   Were other people present or was it
12 just you and Dr. McCash?
13     **A.**   It was just me and Dr. McCash.
14     **Q.**   What did he say to you, what did you
15 say to him during this conversation?
16     **A.**   He stated those things that you just
17 restated from the complaint.  And I -- that's --
18 what I stated to him was, you know, just I'm just
19 trying to do my work.  I don't know why you feel
20 like or you feel entitled to say these things to
21 me.
22     **Q.**   Did he say to you why he was saying
23 the things?  I won't repeat them, but the things
24 that you allege that he said?
25     **A.**   He said he was saying it for my own

30

Varughese

2 good and to help me.
3     **Q.**   So any other discussion or
4 conversation between you and Dr. McCash during
5 this meeting that you had after the CP Call
6 Conference?
7     **A.**   None at all.  That was it.  I just
8 walked out.
9     **Q.**   So after this conversation or whatever
10 it was both during the conference or -- I'm sorry,
11 before the conference took place and where the
12 group was present and then after the conference,
13 just you and Dr. McCash, did you tell anybody at
14 Mount Sinai about this incident?
15     **A.**   Well, I was in the hall and Dr. Pessin
16 was waiting for the elevator and I just, you know,
17 I didn't think she was in any way aware of what
18 happened in the conference room.  So I just said,
19 you know -- I don't recall exactly what I said to
20 her.
21     **Q.**   In substance, what did you say to her?
22 I know you don't remember the exact words, but
23 what was the substance of what you said to her?
24         And before we get there, just so we
25 have it on the record, who was Dr. Pessin at the

31

Varughese

2 time?
3     **A.**   She was I believe the acting interim
4 chair of the department.
5     **Q.**   Of pathology.
6     **A.**   Yes.
7     **Q.**   So what did you say to Dr. Pessin
8 when you saw her after your conversation with
9 Dr. McCash?
10     **A.**   I believe I did not inform her of what
11 happened.  I just -- I believe I was just, you
12 know, just said hello.
13     **Q.**   Did you tell anybody at Mount Sinai
14 about this, I'll use the word "incident," the
15 incident with Dr. McCash?
16     **A.**   Yes, I did.
17     **Q.**   Who did you tell?
18     **A.**   I spoke to Dr. Lento the following
19 day.
20     **Q.**   Who's Dr. Lento at the time?
21     **A.**   He was a program director at that
22 time.
23     **Q.**   The program director of the residency
24 program in pathology.
25     **A.**   Correct.

32

Varughese

2     **Q.**   And where did you speak to Dr. Lento?
3     **A.**   I spoke to him in the autopsy suite.
4 There's a small office, a suite.
5     **Q.**   Was anybody else present?
6     **A.**   Yes, Kruti Maniar was there.
7     **Q.**   Anyone else?
8     **A.**   No.
9     **Q.**   And what did you say to Dr. Lento
10 during this meeting in the autopsy suite?
11     **A.**   I just simply told him, you know, what
12 had happened and how I did not, you know,
13 appreciate McCash's behavior and there was no
14 place for it and I would like for him to intercede
15 at this point or intervene in some way that would
16 be productive.
17     **Q.**   And what did Dr. Lento say?
18     **A.**   He just said, I wasn't there.  I don't
19 know.  I don't know what happened.  And he said,
20 Well, nobody really can corroborate that.
21         And I believe at that point Maniar was
22 there and she said, Well, you know, we discussed
23 this incident before and even McCash admits that
24 he was, you know, he lost his cool or temper.
25     **Q.**   When Maniar said that we discussed

33

Varughese

2  this incident before, before when?
3      A.   I believe they had some sort of staff
4  meeting, the chief residents and --
5      Q.   I assume that must have been between
6  the previous day and the day -- because you said
7  you met with Lento the next day, correct?
8      A.   Yes, the next day.
9      Q.   Did Dr. Lento say anything else?
10     A.   He said that he would, um, at this
11 point he said that he would speak to Sam.
12     Q.   Did he say anything else?
13     A.   No.  I don't recall.
14     Q.   Did you say anything else?
15     A.   No.
16     Q.   Did Dr. Maniar say anything else?
17     A.   No.  I just assumed Dr. Lento would
18 follow up.
19     Q.   And how long did the meeting last?
20     A.   What?
21     Q.   How long did the meeting last?
22     A.   It was a while.  It was about forty
23 minutes perhaps.  I'm not sure.
24     Q.   When you said that you wanted
25 Dr. Lento to intercede, did you tell him you what

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

34

Varughese

2  wanted him to do in particular?
3      A.   I did.  I asked him to have a
4  mediation or, you know, have a discussion with
5  McCash present just to -- so I can understand if,
6  why he is motivated to behave the way he does
7  towards me.
8      Q.   Did you have any further meetings or
9  discussions with Dr. Lento about the September
10 2010 incident?
11     A.   I did.
12     Q.   When was the next time you spoke to
13 Dr. Lento?
14     A.   I believe I e-mailed him the following
15 day or something just to confirm that he knew that
16 I was serious regarding the issue and I would like
17 him to mediate or something of that nature.
18     Q.   I will show you a document.  I think
19 you know the drill by now.  If you would take a
20 look at it while the reporter is marking it and
21 then I will ask you about it.
22     MR. McEVOY:  Would you mark this as
    Defendants' Exhibit 5.
24     (Defendants' Exhibit 5, e-mail dated
25 September 14, 2010 from Laura Varughese

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

35

Varughese

2  numerous individuals, Bates No. P870, marked
3  for identification, this date.)
4      Q.   Have you had a chance to look at that?
5  Yes?
6      A.   Yes.
7      Q.   Is this the e-mail you were just
8  referring to?
9      A.   No.
10     Q.   Is this an e-mail that you sent?
11     A.   Yes.
12     Q.   And it's an e-mail from you dated
13 Tuesday, September 14, 2010, at 10:34 p.m. to
14 Dr. Lento and several others, correct?
15     A.   Right.
16     Q.   And in this e-mail -- first, why did
17 you send this e-mail?  Because this is the same
18 day as the incident, correct?
19     A.   This is the same day as the incident.
20 I sent this e-mail because of McCash's continued
21 disdain and attitude towards me and generally for
22 my own concern for my, you know, well-being and
23 safety.
24     Q.   Just so that we have the sequence
25 correct, there was the preconference yelling by

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

36

Varughese

2  Dr. McCash, the postconference conversation with
3  Dr. McCash and then this e-mail?
4      A.   Yes.
5      Q.   And then after this e-mail you met
6  with Dr. Lento the next day.
7      A.   Yes.
8      Q.   So it says that you're saying in this
9  e-mail, quote, regarding a pattern of verbal abuse
10 experienced from various colleagues at Mount
11 Sinai.
12     Do you see that?
13     A.   I do, yes.
14     Q.   So other than Dr. McCash who, if
15 anyone, were you referring to as the other
16 colleagues?
17     A.   Well, various employees that worked
18 within the Department of Pathology.
19     Q.   I'm sorry.  Say that again?
20     A.   A number of employees who were
21 employed by the Department of Pathology.
22     Q.   So who were they?
23     A.   Yes, I mentioned a PA.
24     Q.   Named Rob.
25     A.   Rob.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

37

Varughese

2  Q.   What's Rob's last name, do you know?
3  A.   I believe it's Celantano.
4  Q.   So other than Mr. Celantano and
5  Dr. McCash, any other colleagues that you thought
6  were verbally abusing you as of September 14,
7  2010?
8  A.   Yes.  There was one of my, well, I,
9  well, one of the supervisors, one of the
10  supervisory attendings and I believe even
11  Dr. Schiller.
12  Q.   Well, who was the supervisory
13  attending?
14  A.   John Fallon.
15  Q.   Fallon?
16  A.   Fallon.
17  Q.   Is that the supervisory attending?
18  The supervisory attending that you just referred
19  to, that's Dr. Fallon.
20  A.   Right.
21  Q.   And Dr. Schiller, who was Dr. Schiller
22  in September of 2010?
23  A.   September.  I believe at that time he
24  was the former chairman.
25  Q.   Of pathology, correct?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

38

Varughese

2  A.   Correct.
3  Q.   Anybody else?
4  A.   Nothing stands out right now.
5  Q.   And the PA, how did he verbally abuse
6  you?  What did he do?
7  A.   Well, I was simply working next to him
8  and I don't know what I said to him now.  I
9  believe it was just, I think I was on GYN rotation
10  during my second year or -- I'm not quite sure
11  what year.  I believe it was the second year.  And
12  I simply asked him if he was busy or if he had
13  time to help out before he left for the day, which
14  is commonplace.  And he got very upset and just
15  sort of started flailing his arms and shouting at
16  me.
17  Q.   What did he say?
18  A.   I think he just said I'm sick and
19  tired of your B.S. and just, you know, I
20  don't want to -- I hate working here.  This place
21  is horrible and just -- but just a lot of flailing
22  of the arms.  He is like a six-foot five tall
23  person and he's sort of a little bit broad and
24  it's just a little -- it's intimidating to have
25  someone so tall and just shouting and flailing

*Computer Reporting NYC Inc.*
*(212) 986-1344*

39

Varughese

2  their arms around and that's what occurred.
3  Q.   And did you report that incident to
4  anybody?
5  A.   I just simply -- I thought I should
6  not report it because I didn't think he was going
7  to really help at that time.  So one of my
8  colleagues was, um, I believe at that time she was
9  a first year resident and she just got very
10  concerned.  So she reported it to I believe first
11  Dr. Nagi and then to Dr. Schiller.
12  Q.   Who was your colleague in the first
13  year who reported it?
14  A.   It was Jacqueline Hecthman.
15  Q.   How did Dr. Fallon verbally abuse you?
16  What did he do?
17  A.   Well, I was on surgical pathology
18  rotation and I was on the seventh floor of the
19  Guggenheim building performing frozen sections,
20  which are intraoperative consultations for
21  surgery, when he called me to come upstairs to the
22  15th floor on Annenberg and when I arrived he had
23  some slides, unlabeled slides and he said they
24  were my cases that I had not labeled.  So -- there
25  was a label.  It was written in pencil, but there

*Computer Reporting NYC Inc.*
*(212) 986-1344*

40

Varughese

2  wasn't a sticker.
3  So I assumed they were my slides
4  because, I mean, I didn't have time to check, and
5  I was like, well, OK, I'm sorry.  Like I'll just
6  take them and I'll label them, and but he was just
7  very upset saying, you know, Well, these are not
8  labeled.  Nobody is labelling slides here.
9  And then -- he just got upset and then
10  he had that, Oh, just take this tray out of my lap
11  and go label them now.  And I was like, excuse me.
12  Don't take that.  So I was just shocked and
13  offended.
14  Q.   Why were you offended?
15  A.   Because he told me to take a tray of
16  slides off his lap.  I thought it was just highly
17  inappropriate.
18  Q.   What is the procedure for labelling
19  slides?
20  A.   It's simply just putting the last
21  name, first initial, and the frozen section
22  number.
23  Q.   But you said that he seemed to be
24  upset about the fact that there weren't stickers
25  on the slide as opposed to however they had been

*Computer Reporting NYC Inc.*
*(212) 986-1344*

41

Varughese
1
2  labeled by you or someone else.
3      A.   Right.
4      Q.   Are they supposed to have stickers?
5      A.   Yes, for official filing we need to
6  have a sticker on it. So the frozen section slide
7  labelling process went through I guess three
8  rounds of labelling: One with a written pencil
9  and number with a name and the number of frozen
10  section number, then your own sticker with the
11  frozen section number and the name and then the
12  block number. And then the third round when it
13  was officially filed they would put the final
14  sticker on it.
15      Q.   Who puts the first sticker on, the one
16  that's in pencil?
17      A.   I do.
18      Q.   Who puts the second sticker on that
19  has the sticker label?
20      A.   Right. I do that too.
21      Q.   And the third one, the last one?
22      A.   The third one is put by the staff, one
23  of the technicians.
24      Q.   So other than this occasion that you
25  just described did Dr. Fallon verbally abuse you

42

Varughese
1
2  on any other occasion?
3      A.   No.
4      Q.   How did Dr. Schiller or when did
5  Dr. Schiller verbally abuse you? What did he do?
6      A.   Well, this is my second year, and he,
7  um, he wanted me to meet with him out of the blue
8  when I was working. I'm not sure what I was doing
9  that day. I just -- his secretary came to me and
10  said, Oh, he wants to speak to you. I said, About
11  what? And so I went over and I spoke to him.
12      Q.   What did he tell you he wanted to see
13  you about? What did he say?
14      A.   He told me that he wanted to see me
15  about, you know, about my unhappiness. He said
16  that I didn't look happy. Like what's going on? So on.
17  enough. Like what's going on? So on.
18      I believe he did say something about,
19  you know, the way you -- if you're unhappy that's
20  part of who you are and it's sort of your DNA and
21  so on. I was -- once again, I was very shocked
22  and offended.
23      Q.   Did Dr. Schiller say anything else
24  during this meeting?
25      A.   Right. And he thought that, you know,

43

Varughese
1
2  oh, he also said that people were unhappy like
3  that, it's trouble and I feel like it's going to
4  be a lot of, you know, you're in trouble or we
5  don't want you to be in trouble.
6      I was just very sort of confused with
7  this line of logic, but I was -- I listened to him
8  and then he thought I should speak to someone and
9  then he wants a note and --
10      Q.   You should speak to someone. Did he
11  say who you should speak to?
12      A.   He said I should speak to a
13  psychiatrist or somebody. He wanted to know if I
14  was speaking to someone, you know, getting help.
15  I just said no. I mean, I didn't think I needed
16  help.
17      Q.   And he wanted a note from who about
18  what?
19      A.   He wanted a note saying that I'm happy
20  and -- I am not sure what he wanted a note from
21  and why. I did not feel like I had the need to
22  see anybody, but he wanted me to see someone and
23  get a note.
24      Q.   And did Dr. Schiller say anything else
25  during this meeting?

44

Varughese
1
2      A.   That's all I recall right now.
3      Q.   And what did you say?
4      A.   I was just like, Why do you think
5  that? And did anybody say anything to you to make
6  you think that I'm unhappy?
7      And he did not have, you know, he did
8  not say anything. He did not mention anybody, did
9  not say anything, and he just said, Just go, go
10  see somebody and go see a psychiatrist.
11      Q.   Where did that meeting take place?
12      A.   It took place in his office.
13      Q.   Was anyone else present?
14      A.   No.
15      Q.   How long did it last?
16      A.   I believe maybe like fifteen minutes,
17  ten, fifteen minutes.
18      Q.   Were you unhappy at the time you met
19  with Dr. Schiller?
20      A.   No.
21      Q.   After that meeting did you speak to
22  anybody about what Dr. Schiller had said? I don't
23  mean did you go see a psychiatrist. I mean did
24  you talk to anybody at the hospital.
25      A.   Yes, I did. I didn't talk to any of

45

Varughese

1  Varughese
2  my colleagues because I felt like very
3  stigmatized. So I was afraid to say anything,
4  because I didn't want to have a label stating I'm
5  the official unhappy person. This is ridiculous.
6      Q.   So who did you talk to?
7      A.   I just talked to my family and friends
8  actually. I don't think I mentioned anything to
9  anybody.
10      Q.   Did you have any other conversations
11  with Dr. Schiller about your -- I'll just call it
12  whether you were happy or not?
13      A.   No, I was terrified of him and I chose
14  to avoid him if I can.
15      Q.   Why were you offended by what
16  Dr. Schiller said to you?
17      A.   Why? Because first he made
18  assumptions about my, you know, health. And I
19  have never had a conversation with him before
20  that. And for him to state that I'm unhappy and
21  he sees me not smiling seemed rather arbitrary as
22  an assessment, and...
23      Q.   Were there any other occasions in
24  which Dr. Schiller verbally abused you?
25      MR. WRONKO: I'm sorry, do you mean

*Computer Reporting NYC Inc.*
*(212) 986-1344*

47

Varughese

1  Varughese
2      A.   Yes.
3      Q.   OK. So other than this discussion
4  with Dr. Schiller about whether you were unhappy
5  or not, did you have any other occasions prior to
6  September 14th when you wrote the e-mail in which
7  Dr. Schiller verbally abused you?
8      A.   No.
9      Q.   Let me show another document. I think
10  this may be the e-mail you were referring to
11  before.
12      MR. McEVOY: While you look at that
13  the reporter can mark this as Defendants'
14  Exhibit 6.
15      (Defendants' Exhibit 6, e-mail dated
16  September 16, 2010 to Patrick Lento, Bates
17  No. P475, marked for identification, this
18  date.)
19      Q.   Dr. Varughese, have you had a chance
20  to look at the document I just showed you?
21      A.   Yes.
22      Q.   Can you tell me what it is?
23      A.   It's an e-mail I wrote to Dr. Lento.
24      Q.   And you mentioned a little earlier in
25  your testimony that after you met with Dr. Lento

*Computer Reporting NYC Inc.*
*(212) 986-1344*

46

Varughese

1  Varughese
2  prior to September 14, 2010?
3      MR. McEVOY: Yes, we're talking about
4  ever.
5      MR. WRONKO: Do you mean ever or do
6  you mean prior to September --
7      MR. McEVOY: Right now we're talking
8  about prior to September 14th.
9      Q.   So you're clear about that, we're
10  talking about the e-mail you wrote, right?
11      A.   OK.
12      Q.   The e-mail you wrote on
13  September 14th. And in that e-mail you say that
14  you have experienced verbal abuse. So I'm asking
15  you questions about what happened prior to the
16  date you wrote this e-mail.
17      A.   Right.
18      Q.   And I'm assuming, just so that
19  Mr. Wronko's point is made clear, that the
20  discussion you had with the PA, the incident with
21  Dr. Fallon, the discussion with Dr. Schiller,
22  those all took place prior to when you wrote this
23  e-mail, correct?
24      A.   OK.
25      Q.   Yes?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

48

Varughese

1  Varughese
2  and Dr. Maniar that you had sent an e-mail to
3  Dr. Lento a day or so later. Is this the e-mail
4  you're referring to?
5      A.   Yes.
6      Q.   After you sent this e-mail did you
7  hear back from Dr. Lento about your complaint
8  about Dr. McCash involving this September
9  incident?
10      A.   Well, I was referring to the incident
11  that occurred on September 14 and, no, I had not
12  heard anything back from Dr. Lento at that time.
13      Q.   But my question was after you sent
14  this e-mail.
15      A.   I actually don't recall if he e-mailed
16  me back now. I'm not a hundred percent sure.
17      Q.   So did Dr. Lento ever arrange for, to
18  use your word, a "mediation" between you and
19  Dr. McCash?
20      A.   No, there was no joint meeting.
21      Q.   Did Dr. Lento ever get back to you in
22  response to your complaint or discuss the
23  complaint with you at any time after that first
24  meeting?
25      A.   Well, he never brought it up to me,

*Computer Reporting NYC Inc.*
*(212) 986-1344*

49

Varughese

1 but I felt that I had to follow up with him.
2
3     Q.    So after you sent this e-mail on
4 September 16th did you have another conversation
5 or communication with Dr. Lento about this
6 September --
7     A.    I did.
8     Q.    When was that?
9     A.    It was I believe a week later I spoke
10 to him.
11     Q.    And where did that conference take
12 place?
13     A.    I believe it took place in his office.
14     Q.    Was anyone else present?
15     A.    In the office, no.  But in the outside
16 area?
17     Q.    No, anyone else who was present that
18 could hear that conversation between you and
19 Dr. Lento.
20     A.    No.
21     Q.    So what did you say to Dr. Lento, what
22 did he say to you in this meeting that took
23 place about a week after this September 16th
24 e-mail?
25     A.    Just in part if he had followed up

*Computer Reporting NYC Inc.*
*(212) 986-1344*

50

Varughese

1
2 and...
3     Q.    What did he say?
4     A.    He just said he hadn't had a chance to
5 speak to McCash yet.
6     Q.    Was there anything else said during
7 this meeting?
8     A.    I believe maybe some, you know, minor
9 things related to residency and --
10     Q.    No, I meant about the incident with
11 Dr. McCash.
12     A.    No, I don't think so.  Oh, I'm sorry,
13 perhaps there was.
14     Q.    OK.
15     A.    I believe -- I'm not sure if it was --
16 because I believe I met with Dr. Lento multiple
17 times following this incident to follow up with
18 him.  I'm not a hundred percent sure what was
19 said, except that I know that he had stated that
20 he hasn't spoken to him yet at some point and he
21 has also stated that, you know, sometimes people
22 yell and, you know, he made excuses for McCash in
23 my opinion by stating that, you know, people yell.
24 We're a dysfunctional family, and so on.
25     Q.    So when Dr. Lento said the things you

*Computer Reporting NYC Inc.*
*(212) 986-1344*

51

Varughese

1 just mentioned, you're not sure if he said them at
2 this meeting or at some other meeting or
3 conversation with him, but he said them at some
4 point.
5
6     A.    Yes.
7     Q.    Whether it was at this meeting or on
8 some other occasion when you spoke about this
9 incident, what else, if anything, did he say about
10 it other than what you already told me?
11     A.    He never confirmed that he had spoken
12 to McCash or had intervened in any way that would
13 be significant.
14          He had now reassured me that it would
15 not happen again.  He did not have a joint
16 meeting.  And he also did not want to facilitate,
17 you know, ways for me to not, me to be able to
18 avoid McCash.
19     Q.    Had you asked Dr. Lento to somehow
20 facilitate that, that you don't have to deal with
21 Dr. McCash?
22     A.    Yes, indirectly I did.
23     Q.    How did you do that indirectly?
24     A.    By simply asking him to -- because
25 with my work, you know, surgical pathology is one

*Computer Reporting NYC Inc.*
*(212) 986-1344*

52

Varughese

1
2 of the most relevant aspects of what we do as
3 pathologists, and I was concerned with my
4 potential treatment if I were on surgical
5 pathology rotation and McCash was chief because of
6 what had occurred and his opinion and --
7     Q.    But did you ever say to Dr. Lento I
8 want you to somehow -- I don't know how that would
9 work, but that I want you to create a situation
10 where I don't have to report to McCash or McCash
11 won't be my chief, I won't have to work with him?
12 Something like that?
13     A.    Did I simply state that?
14     Q.    Yes.
15     A.    I'm not sure now.  I'm not a hundred
16 percent certain.
17     Q.    How many conversations, because -- I
18 don't even need to go through each one of them,
19 but how many conversations did you have with
20 Dr. Lento about the September incident with
21 Dr. McCash?  Because we've now talked about the
22 first meeting with Dr. Maniar, the e-mail, the
23 follow-up meeting a week later in his office.
24          Were there other meetings or
25 discussions with Dr. Lento after that, the one in

*Computer Reporting NYC Inc.*
*(212) 986-1344*

53

Varughese
1  his office that we just talked about?
2      A.   Yes, I had met with him several times
3  and I just -- because I wanted to transfer with
4  the surgical pathology rotation, so I had met with
5  him just to request that.  He had allowed me to
6  transfer to another institution for that time in
7  December because I didn't want to be at Sinai.
8      Q.   So why did you want to transfer to
9  surgical pathology to get away from Dr. McCash?
10     A.   Yes, essentially the rotations at
11 Elmhurst and Mount Sinai Medical Center are
12 essentially similar.  They're both surgical
13 pathology and they all involve specimens removed
14 from surgery.
15     Q.   So at the time you were in the
16 surgical pathology rotation at Mount Sinai.
17     A.   Right.
18     Q.   And McCash was one of your chiefs.
19     A.   Right.
20     Q.   And you went to Dr. Lento to request a
21 transfer to the surgical pathology rotation at
22 Elmhurst?
23     A.   Yes.  It was a rather -- it involved
24 two different -- that was essentially the idea.

55

Varughese
1  intervened with the McCash issue and he had not
2  stated what he had done to prevent such incident
3  from occurring ever again.
4          And so I requested that I allowed, I
5  be allowed to transfer, and he felt that he
6  couldn't do it, he couldn't allow me to transfer,
7  and that was because he didn't have the power to
8  do so, one, and, two -- I'm not sure actually, I
9  am not sure actually if he said that, but he
10 definitely did say that there were some financial
11 reasons that he did not want us to transfer.
12     Q.   Did you transfer or not?
13     A.   No, I did not transfer.
14     Q.   So the request to transfer was denied
15 basically.
16     A.   Well, right.  That request to transfer
17 to Elmhurst for this big period was denied.
18     Q.   What about Dr. Hecthman?
19     A.   Yes, we had arranged it as a transfer
20 that would work between us, our two schedules.
21     Q.   So your request and Dr. Hechtman's
22 request was denied; is that right?
23     A.   Correct.
24     Q.   Do you know if Dr. Lento ever spoke to

54

Varughese
1      Q.   And if I understood you correctly, but
2  I want to be sure that I do, you wanted that
3  transfer to Elmhurst so that you would basically
4  not have to have contact with Dr. McCash.
5      A.   Yes.  That was my motivation.
6      Q.   When did you ask Dr. Lento to allow
7  you to transfer or to transfer you?
8      A.   I believe I requested that from the
9  chief resident.  So I wrote an e-mail to Kruti
10 Maniar, and it was myself and Jacqueline Hecthman
11 as well.  So we both wanted to do this transfer,
12 because we both thought it would work for both of
13 us.
14     Q.   And who had to approve the transfer?
15     A.   Dr. Lento.
16     Q.   Did you ever speak to Dr. Lento
17 directly or communicate with him directly about
18 the transfer and the reasons for the transfer?
19     A.   Right, in one of the meetings where I
20 met with him I did speak to him.
21     Q.   And what did you tell him?  About the
22 transfer obviously.
23     A.   Right, I just told him if I could
24 transfer and, I mean, at that point he had not

56

Varughese
1  Dr. McCash about the September incident?
2      A.   No.
3      Q.   Did you have discussions, and I'm not
4  talking about family or friends, did you have
5  discussions with anyone else at Mount Sinai about
6  the September incident with Dr. McCash?
7      A.   I cannot recall at this point.  If I
8  remember I'll correct that.
9      Q.   Now, directing your attention to the
10 second incident with Dr. McCash, the one that took
11 place in December of 2010 -- there was another
12 incident with Dr. McCash, correct?
13     A.   Correct.
14     Q.   And that took place when?
15     A.   That took place in December of 2010.
16     Q.   So before we get to the actual
17 incident, I want to ask you some questions about
18 the context in which the incident occurred.
19         Where did this incident take place?
20     A.   The incident took place in the gross
21 room.
22     Q.   And was that during the day, during
23 the evening?  What time of day did it take place?
24     A.   It was in the evening.

57

Varughese

Q.   And you were assigned to gross specimens that day?

A.   Correct, I was the only surgical pathology resident on service.

Q.   Who else was in the grossing room who was grossing specimens on that evening, I'll call it the evening shift, when you were there?

A.   That day I was the grossing resident. The surgical pathology rotation had once again changed, so there was only one person responsible for all the specimens.

Q.   Because at one time there had been two, correct?

A.   At one time there had been two. There had been -- I'm not sure how many times they changed the rotation, but this was a month when I was the only one responsible for all the specimens with the exception of GYN and GI.

Q.   Who was responsible for GYN and GI specimens?

A.   I'm not sure. They have their own fellows.

Q.   But it wasn't you.

A.   It wasn't me I believe, yes.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

58

Varughese

Q.   So when you're the only person --

A.   Actually, can I correct that?

Q.   Absolutely.

A.   There were different types of GI specimens. It's a little bit technical, but the GI specimens are usually divided into inflammatory bowel disease specimens and cancer or incidental emergency-type operations.

Q.   So as the resident you're the only person who technically is assigned to the grossing specimens?

A.   Myself, the pathology assistant or assistants, and there's a per diem PA and technically we are assigned.

Q.   Who was the PA on the day this incident occurred?

A.   There were multiple pathology assistants during the day. Their shifts have varied.

Q.   Just so I understand, is there one PA who is assigned to the grossing room while you're there or do they come and go?

A.   Pathology assistants, the ones that are --

*Computer Reporting NYC Inc.*
*(212) 986-1344*

59

Varughese

Q.   I asked you about the PA, not the pathology assistants. The physician assistant. You said there was a physician assistant.

A.   Oh, they're pathology assistants. They're not --

Q.   This is different than physician assistant.

A.   Yes.

Q.   With that definition of PAs, how many PAs were working in the grossing room on the day this incident occurred?

A.   I'm not a hundred percent sure how many PAs there were during the day. Usually they leave by 4 or 5 or 6 depending on their shift and the per diem PA starts his shift around 5, 5:30 p.m.

Q.   Who was the per diem PA that day?

A.   The per diem PA that day was Renato.

Q.   Now, what role, if any, do moonlighters play in the grossing of specimens?

A.   Moonlighters are requested by the resident who was grossing, was primarily -- the moonlighters are requested by the surgical pathology resident.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

60

Varughese

Q.   That would be you in this case.

A.   In my case, to come in and assist if there are too many cases or too many specimens that cannot be managed reasonably by the surgical pathology resident.

Q.   And as the surgical pathology resident can you make the decision to request assistance from moonlighters or do you have to get that approved by somebody?

A.   We have a rule that we can call up to two moonlighters and they can work for three hours maximum each and that's...

Q.   But you can do that without getting the permission from the chief resident or from the attending.

A.   Oh, absolutely. Absolutely. It's not up to the chief resident to request the moonlighter.

Q.   And just so we know, what are moonlighters?

A.   Moonlighting is just an activity outside of regular work that involves similar work, but you get paid for it outside of your hospital contract salary.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

61

Varughese

Q. So you get money in addition to your regular salary.

A. Yes.

Q. So again, on the day that this incident occurred, did you request assistance from moonlighters?

A. I did not have the opportunity to call the moonlighter to come and assist.

Q. But did moonlighters show up to assist?

A. Yes.

Q. How many moonlighters were there?

A. There were two moonlighters and they both showed up without me requesting that they come in.

Q. Do you know how it is that they came to show up if you didn't ask for them?

A. Well, I believe one of the moonlighters was on service, on another rotation, and she had already been there, and the second moonlighter was on service at Elmhurst Hospital, but he came in after his shift there.

Q. And who were the two moonlighters?

A. The two moonlighters were Adrienne

62

Varughese

Jordan and Paul Azar.

Q. And was Dr. Jordan otherwise a pathology resident?

A. Yes.

Q. And I take it from what you said before that she was a year behind you?

A. Yes, she started her residency one year after I went, one year after I completed my first year. No, one year after mine.

Q. So when you were a third year she was a second year.

A. Correct.

Q. And you said Dr. Azar?

A. He's the same year as I am.

Q. Is there such a thing as a chief moonlighter or a head moonlighter? Are you familiar with those terms?

A. Right. We didn't use that terminology when I was there. It was mostly said a primary moonlighter and a secondary moonlighter.

Q. And after Dr. Jordan and Dr. Azar arrived in the grossing room on this day in December, did you have any discussion with -- we'll start with Dr. Jordan. Did you have any

63

Varughese

discussion with Dr. Jordan about the assignment of grossing specimens or who was going to do what?

A. Correct, I had -- I didn't know she was moonlighting that day. So I simply asked her, you know, What are you doing? Because I don't want specimens to be confused and removed, and so on. So I just asked her just simply like, since I was a primary -- since I was a resident who was in surgical pathology, I was just more concerned for my work and making sure it didn't get mixed up.

So I just simply asked her if she was working or what, you know, what was going on. And she just said, Oh, I'm the primary moonlighter.

Q. So she's there obviously I would take it to do work, to gross specimens.

A. Correct.

Q. And you're there to gross specimens.

A. Correct.

Q. And someone has to decide who is going to gross what specimens, correct?

A. Correct.

Q. So did you have a discussion with Dr. Jordan as to who was going to or you're going to do these specimens, I'm going to do those

64

Varughese

specimens?

A. I had a -- I asked her, you know, what she wants, you know, if she's moonlighting and she said she's the primary moonlighter, I said, Do you mind grossing certain specimens so I can gross others things, others specimens? And I believe that's...

Q. What did she say?

A. I'm not sure if she said anything to me.

Q. So do you remember what specimens you wanted her to gross and what specimens you thought you would gross?

A. I'm not sure now. There were so many cases that day.

Q. Did you have any discussion with Dr. Azar about what specimens he would gross, what specimens you would gross?

A. Correct. Paul Azar came in at 5:30 or so and, you know, he just simply started grossing some specimens that were allotted to him by Adrienne Jordan, and I did not really have any discussion until he was finished grossing, which was only about 30 minutes or so, and I saw that he

65

Varughese

1  was already done and I had, you know, three or
2  four cases still remaining to complete. So I
3  asked him to gross a few more things.
4      Q.    And what types of specimens were
5  those?
6      A.    Can you elaborate?
7      Q.    Sure. You said you were grossing, you
8  had three or four specimens to work with. Were
9  they GI, prostate, breast, some other work?
10      A.    Correct. I believe there were some
11  mastectomy specimens, some GI, complicated GI
12  specimens. There was liver, complicated liver
13  surgery specimens, and I believe colon cancers and
14  noncancer, but surgical specimens from the GI
15  tract.
16      Q.    So is the way that it worked that
17  Dr. Jordan took responsibility for whatever
18  specimens she took responsibility for and then she
19  would assign certain specimens to Dr. Azar?
20      MR. WRONKO:  Form objection. Do you
21  mean on this one occasion?
22      MR. McEVOY:  Yes.
23      Q.    On this occasion. Because I thought
24  you said before, Dr. Varughese, that Dr. Azar was

66

Varughese

1  doing specimens that Jordan had given him to do.
2  That's why I'm asking you that question.
3      A.    Well, she had started moonlighting
4  much earlier than the time that we usually have
5  allotted for moonlighters to begin moonlighting.
6      Q.    You mean earlier that day.
7      A.    Earlier that day. So she had gone
8  under way with beginning to gross or prosect the
9  specimen.
10      Q.    Was there any disagreement between you
11  and Dr. Jordan as to who would do one particular
12  type of specimen as opposed to another type of
13  specimen?
14      A.    I don't remember having a disagreement
15  with her.
16      Q.    Did Dr. McCash come into the grossing
17  room at some point?
18      A.    Yes, he did.
19      Q.    And did Dr. McCash have a discussion
20  with you or say anything to you about what
21  specimens he wanted you to do and what specimens
22  he wanted Dr. Jordan to do?
23      A.    He wanted -- I'm not sure if he had
24  that discussion on what he wants me to do versus

67

Varughese

1  Jordan.
2      Q.    Did he tell you that he wanted you to
3  do certain breast cases and he wanted Dr. Jordan
4  to do the prostate cases?
5      A.    Well, I had a lot of breast specimens
6  that day, so I assumed he meant the mastectomy
7  and --
8      Q.    What do you recall him saying about
9  what specimens you should do?
10      A.    That's -- well, I just recall him
11  saying, Oh, let the prostates be done by the
12  moonlighters. Because I believe there were two
13  and I had already done one or something that day.
14  So I believe he wanted them to do that.
15      Q.    What did he want you to do?
16      A.    I assume he wanted me to do the
17  mastectomies and some of the other breast
18  specimens.
19      Q.    And after Dr. McCash had that
20  discussion did he leave the gross room or the
21  grossing room?
22      A.    Yeah, I'm not sure if it was -- I
23  don't think we had that discussion in the grossing
24  room.

68

Varughese

1      Q.    Where did you have it?
2      A.    I believe it was in the resident work
3  area that's outside the grossing, where the
4  computers and everything else is situated.
5      Q.    Wherever it took place, after
6  Dr. McCash said he wanted the moonlighter to do
7  the prostate cases and you to do the breasts cases
8  that you just described, he left, he went
9  somewhere.
10      A.    Right, he went -- I don't know where
11  he went. I mean, that was the only time I saw him
12  that day before 6 p.m.
13      Q.    And did you do all of the breast cases
14  or did you give one or more of them to the
15  moonlighters to do?
16      A.    Well, I mean, I was doing my work and
17  Paul Azar was finishing his grossing and I simply
18  asked, you know, told him if he would be able to
19  do the, some of the breast specimens. Very small
20  ones. That wasn't complicated, just...
21      Q.    So then I take it that somehow
22  Dr. McCash learned that Dr. Azar was doing some of
23  these breast cases?
24      A.    Correct.

69

Varughese

1
2     Q.     Do you know how he found out?
3     A.     Well, I believe he found out because
4  Adrienne Jordan had just left following my
5  conversation with Azar, and I assumed she said
6  something to him.
7     Q.     So your belief is that you gave, you
8  asked Dr. Azar to help with these breast cases.
9  Dr. Jordan was there when it happened and you
10 think she went and told Dr. McCash.
11    A.     Right.  I asked -- correct.
12    Q.     I'm just asking what you believe.  So
13 after you asked Dr. Azar to help on the breast
14 cases and after Dr. Jordan left, did Dr. McCash
15 come back to the grossing room?
16    A.     I'm sorry?
17    Q.     You said you asked Dr. Azar to help
18 with the breast cases.
19    A.     Right.
20    Q.     You said you saw Dr. Jordan leave the
21 grossing room.
22    A.     Uh-huh.
23          MR. WRONKO:  You have to verbalize.
24    Q.     You can't say "uh-huh" because he
25 can't take that down.  So is that yes?

Computer Reporting NYC Inc.
(212) 986-1344

70

Varughese

1
2          Let's do it this way.  You asked
3  Dr. Azar to help with breast cases, yes?
4     A.     Yes.
5     Q.     And at some point after Dr. Azar began
6  to help with the breast cases Dr. Jordan left the
7  grossing room, correct?
8     A.     Yes.
9     Q.     After Dr. Jordan left the grossing
10 room did Dr. McCash return?
11    A.     Yes, Dr. McCash appeared for the first
12 time in the grossing room that day when I was
13 there as well.
14    Q.     So when Dr. McCash came back into the
15 grossing room --
16    A.     Correct.
17    Q.     -- at this point in time that we're
18 talking about --
19    A.     Correct.
20    Q.     -- what, if anything, did Dr. McCash
21 say to you?
22    A.     He -- I believe he approached Azar
23 first and he asked him what was he doing, what
24 kind of specimens are you doing.  And Dr. Azar
25 said, Oh, just a few margins.

Computer Reporting NYC Inc.
(212) 986-1344

71

Varughese

1
2          And then McCash approached me and
3  said, What are you doing?  You're supposed to do
4  them.
5          And I tried to explain to him I had
6  several other cases that were piled up right next
7  to me one by one for which I needed to complete
8  the "grossing process" and submit blocks so I can
9  get everything -- I mean, technically there's no
10 rush, but I like to finish as much work as I can
11 on the first day in order to prevent backup the
12 following day and the day after.
13          So I tried to explained to him that's
14 what I was doing, simply, you know, going through
15 my work flow so I can...
16    Q.     Right.  And what else did Dr. McCash
17 say?
18    A.     He just insisted that I shouldn't be
19 doing that and I tried to find a reason why.  I
20 was like, Why do you think that?  And he's like, I
21 don't think he should do it.  I think you should
22 do it.
23          And at this point Azar offered to put
24 the specimens back.  He said, Well, listen, just
25 about put it back.  It's not a big deal.

Computer Reporting NYC Inc.
(212) 986-1344

72

Varughese

1
2          I said I'll do it.  Once I'm done with
3  whatever was in front of me, I'll do it.
4     Q.     What else did Dr. McCash say?
5     A.     Then I just, and he was just very
6  still very upset and glaring at me and so I just
7  said this is ridiculous.  So I just want to the
8  back of the gross room, which is about 30 feet in
9  length, and I tried to remove my gown and my
10 gloves and mask and my, you know, voice-over
11 dictation software and tried to leave.
12          Because I was concerned that, you
13 know, this is very unusual for him to be this
14 upset.  So I was just concerned about his, you
15 know, insistence that I do it.  Even after saying
16 that I would do it he would not let the situation
17 be completed.
18          But then I took off my gown and gloves
19 and I was going to the back and I was just
20 removing everything and he starts approaching me.
21 He starts charging at me and says, How could
22 you -- you don't just listen to me.  Why do you
23 not listen to me?
24          And then he just follows me around
25 like pointing to me and just invading my personal

Computer Reporting NYC Inc.
(212) 986-1344

73

Varughese

1  space.
2
3      Q.    So when you had the first part of the
4  conversation with Dr. McCash which is before you
5  went to the back to remove your gown and gloves,
6  where were you sitting or standing?
7      A.    I was standing by one of the doors.
8      Q.    Where was Dr. McCash?
9      A.    Dr. McCash was in the middle.
10      Q.    So as close as you and I or further
11  away than you and I?
12      A.    I believe closer because, you know,
13  like --
14          THE WITNESS:  Perhaps like where you
15      are.
16          MR. WRONKO:  Pointing to the reporter.
17          MR. McEVOY:  Indicating the reporter.
18      A.    (Continuing) Which is about four feet.
19      Q.    I would agree with you, it's about
20  four feet or so.  And was he speaking in a normal
21  tone of voice?  Was it raised?  Was he shouting?
22  How would you characterize his, during this period
23  of the conversation?
24      A.    I believe it was slightly raised.
25      Q.    And then when you went to the back and

74

Varughese

1
2  you said you removed your gown and your gloves and
3  he followed you to the back, how close was
4  Dr. McCash to you at that point?
5      A.    Just literally, you know, not very
6  far.
7      Q.    Can you estimate how far?  One foot?
8  Two feet?  Six inches?
9      A.    Yeah, maybe about five or six inches
10  from me at some point.
11      Q.    And what did you say in response?  Now
12  we're at the second part of the conversation where
13  he's followed you to the back and he's standing
14  six inches or so away from you.  What, if
15  anything, did you say in response to what
16  Dr. McCash just described?
17      A.    Just like, you know, at this point his
18  voice had become much louder and I believe he
19  was -- well, he stated that I wasn't listening to
20  him and I just don't do what I'm told, and just
21  very, very angry, just extremely angry, very
22  intimidating, sort of, you know, squared out his
23  chest and just point, point, point.
24      Q.    And what, if anything, did you say in
25  response to what he just described?

75

Varughese

1
2      A.    I was just once again really shocked
3  and I said, I believe I said, What is your
4  problem?  I mean, What's your problem?  And then I
5  just left.  I left.  I went to the door.
6      Q.    We're not up to leaving yet.  So did
7  you yell back at Dr. McCash?
8      A.    At that point?  No, I was too afraid
9  to say anything.
10      Q.    Did you tell Dr. McCash to, quote
11  unquote, fuck off?
12      A.    No.
13      Q.    So you said only what you just told
14  me.
15      A.    No, I was so terrified of him I could
16  not say anything to him at that time because I was
17  afraid I would make him more angry and it would
18  provoke some sort of action against me.
19      Q.    Who else was present in the grossing
20  room when both parts of this conversation took
21  place?
22      A.    Well, I believe it was just perhaps
23  Paul Azar and the per diem PA.
24      Q.    Did we ever figure out who the per
25  diem PA was that day?

76

Varughese

1
2      A.    Yes, it was Renato.
3      Q.    Renato.  Anyone else you recall being
4  present other than the PA and Dr. Azar?
5      A.    No.
6      Q.    So after you went to the back and the
7  second part of this conversation took place, you
8  said you attempted to leave or you left the
9  grossing room?  What was it?
10      A.    I did leave.  I went to the door and,
11  you know, and I just kind of looked back to see
12  where McCash was and it seemed like he was just
13  sort of, you know, sort of off to the side and I
14  said, Well, you should come.  We need to talk to
15  someone right now.  This is unacceptable.
16      Q.    Who did you say that to?
17      A.    McCash.  He was like on the other
18  side, you know, I walked out through the door that
19  has an actual door.  I opened it and I kind of was
20  outside and I told him we need to come and talk to
21  somebody because this was unacceptable.  You
22  cannot threaten me when I'm trying to perform my
23  work.
24      Q.    Where did you go next?
25      A.    Well, I just walked towards

77

Varughese

1 Dr. Bleiweiss's office, and that's where I went.
2 I went to speak to Dr. Bleiweiss.
3     Q.     Before you spoke to Dr. Bleiweiss did
4 you have any discussion with either Dr. Jordan or
5 Dr. Azar?
6     A.     No.
7     Q.     Did you see them leave the grossing
8 room and go to the histology area?
9     A.     No.
10     Q.     Did you follow them into the histology
11 area --
12     A.     No.
13     Q.     -- or did you go into the histology
14 area?
15     A.     No.
16     Q.     Did you yell or say to Dr. Jordan that
17 she was ruining the residency program?
18     A.     No.
19     Q.     And did you tell her that she should
20 not be running the moonlighting program?
21     A.     No.
22     Q.     Did you ask her why she was always
23 causing drama?
24     A.     No.

78

Varughese

1     Q.     Did you ever say those things to
2 Dr. Jordan?
3     A.     I may have said some of those things.
4     Q.     Which of them did you say?
5     A.     I'm not sure.  I mean, I'm not sure.
6     Q.     And when did you say some of those
7 things to Dr. Jordan?
8     A.     Um, um, I'm not sure.
9     Q.     Do you recall Dr. Azar taking
10 Dr. Jordan out of the histology area?  I assume
11 you don't since you said you never had the
12 conversation.  But I have to ask the question
13 anyway.
14        Do you recall Dr. Azar taking
15 Dr. Jordan out of the histology area?
16     A.     No.
17        MR. WRONKO:  Form objection.
18     Q.     Who was the senior attending that day?
19     A.     I believe it was Dr. Bleiweiss.
20     Q.     Where was Dr. Bleiweiss's office in
21 regard to or in relation to where the grossing
22 room is?
23     A.     It's a few doors down the hallway.
24     Q.     So to get there you would have to come

79

Varughese

1 out of the grossing room and walk down the hallway
2 a few doors?
3     A.     Right, I had to open the door and walk
4 out.
5     Q.     Did you do that?  Did you leave the
6 grossing room -- I think you said you did -- and
7 go to Dr. Bleiweiss's office?
8     A.     Yes.
9     Q.     While you were in the hallway before
10 you got to Dr. Bleiweiss's office, other than what
11 you described you said to Dr. McCash, did you have
12 any other discussion with anybody in the hallway?
13     A.     No, I did not.
14     Q.     Did you make any other statements or
15 say anything even if to no one in particular in
16 the hallway?
17     A.     No.
18     Q.     Did you see Dr. Bleiweiss?
19     A.     Yes.
20     Q.     Tell me what happened when you went
21 into Dr. Bleiweiss's office.  What did you say to
22 him, what did he say to you?
23        MR. McEVOY:  Off the record.
24        (A recess was taken from 11:41 a.m. to

80

Varughese

1 11:52 a.m.)
2 BY MR. McEVOY:
3     Q.     Before we get to Dr. Bleiweiss, is
4 there any pathology department policy regarding
5 who's supposed to do the breast cases?
6     A.     No.
7     Q.     When this incident took place I take
8 it that some of the breast specimens hadn't been
9 completed yet, correct?
10     A.     Yes.
11     Q.     Do you know what happened to them?
12     A.     Yeah, I -- there was a mastectomy, I
13 believe there was only one double mastectomy that
14 day and that was placed in Formalin.
15     Q.     So did you finish doing that specimen
16 or did someone else do that specimen?
17     A.     I did all the big cases, all the big
18 breast specimens, lumpectomies and so on.  I
19 prosected or I grossed them and the mastectomy
20 specimen, I took the measurements and I also made
21 cuts in the specimen to evaluate for the lesions
22 that are there.
23     Q.     When the incident with Dr. McCash
24 occurred, I remember you said you went to the back

81

Varughese

1 of the room, took off your grown, took off your
2 gloves. At that point in time was there still
3 work that you were doing that remained undone?
4     A.    Yes. I was in the middle of finishing
5 several cases for the day.
6         MR. McEVOY: Off the record.
7         (Discussion off the record.)
8     Q.    So the work that was undone when this
9 happened, do you know if it got done?
10    A.    Yes.
11    Q.    How did it get done?
12    A.    I completed it.
13    Q.    Did you complete it after this
14 incident took place?
15    A.    Yes.
16    Q.    You came back and did it?
17    A.    I completed just the initial
18 evaluation of several specimens and insuring that
19 they would be appropriately processed by fixing it
20 in formalin.
21    Q.    My only question is, did you do that
22 after this incident took place or before?
23    A.    I'm not sure.
24    Q.    And putting it another way, after the

*Computer Reporting NYC Inc.*
*(212) 986-1344*

82

Varughese

1 incident took place and after you spoke to
2 Dr. Bleiweiss and after whatever else took place
3 that we'll get to, did you go back to the grossing
4 room to do any further work on specimens?
5     A.    Yes.
6     Q.    What did you go back to do?
7     A.    I went back to complete the work that
8 I had remaining for that evening.
9     Q.    Once you completed it you put whatever
10 labels or stickers needed to go on it and sent it
11 wherever it needed to go.
12    A.    Yes.
13    Q.    OK. Now we'll go to Bleiweiss. So
14 you get to Dr. Bleiweiss's office and tell me what
15 happened there.
16    A.    I told him that, you know, McCash was
17 harassing me and threatening me and I would like
18 for him to come and speak to him.
19    Q.    And what did Dr. Bleiweiss say?
20    A.    He just shooed me away because he was
21 on the phone.
22    Q.    Tell me what happens. You get down
23 the hall to Dr. Bleiweiss's office. Is his door
24 opened or closed?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

83

Varughese

1     A.    His door is open.
2     Q.    And you walk in.
3     A.    Right. Here's like a small waiting
4 area where the secretary sits and she does the
5 transcription and then there's an inner door and
6 that was, um, I believe it was open.
7     Q.    So you came into what I'll call the
8 outer office.
9     A.    Right.
10    Q.    Was the secretary there?
11    A.    No.
12    Q.    So then did you go into
13 Dr. Bleiweiss's office?
14    A.    No, I didn't go in. I just spoke to
15 him while waiting in that area.
16    Q.    So you stood outside his door?
17    A.    Right.
18    Q.    He was inside?
19    A.    Right, he was on the phone.
20    Q.    Were you talking to him while he was
21 on the phone?
22    A.    I -- well, I wasn't sure. I didn't
23 see he had the phone on him, so I just -- he was
24 like yes. So I, you know.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

84

Varughese

1     Q.    So you said what you just told me you
2 said to him and then he kind of you said shooed
3 you away because he was on the phone.
4     A.    Yes, he was like, OK, and I believe,
5 that's -- yeah.
6     Q.    So what happened after that?
7     A.    And I think I did not go back
8 immediately. Actually, what did happen after that
9 is just -- oh, I know what happened. I just went
10 back to the gross room, because I was concerned
11 about the work that needed to be done. So I
12 thought perhaps I should just go back and I went
13 back.
14    Q.    Other than you're saying whatever you
15 said to Dr. Bleiweiss and his shooing you away,
16 did you talk to Dr. Bleiweiss after he got off the
17 phone?
18    A.    Well, I went back. Then later on in
19 the evening I spoke to him.
20    Q.    But at the time you didn't.
21    A.    At that time, no.
22    Q.    Did you speak to anybody else at that
23 time?
24    A.    At that time I don't think I spoke to

*Computer Reporting NYC Inc.*
*(212) 986-1344*

85

Varughese

1  anyone.  Perhaps I called my sister or something.
2
3      Q.    No, I don't mean family.
4             Do you know who Dr. Jaffer is?
5      A.    Yes.
6      Q.    Who is Dr. Jaffer?
7      A.    She's an attending pathologist.
8      Q.    Did you speak to Dr. Jaffer at around
9  the time that you were trying to go in to see
10  Dr. Bleiweiss?
11      A.    No, I did not.
12      Q.    So you go to see Dr. Bleiweiss.  You
13  say what you say you said.  He's on the phone.
14      A.    Right.
15      Q.    He shoos you away.  You go back to the
16  grossing room to finish the work that you
17  described.
18      A.    Right.
19      Q.    Then what happens?
20      A.    And a minute to gown up again,
21  put on just a plastic apron and put on my gloves
22  and sort of figure out with the dictation,
23  headphone and get back to my station when
24  Dr. Jaffer and I believe it was Dr. Jaffer and
25  McCash appeared.  And I believe Dr. Jaffer just

*Computer Reporting NYC Inc.*
*(212) 986-1344*

86

Varughese

1
2  showed up first and McCash followed soon after.
3      Q.    Did Dr. Jaffer say anything to you?
4      A.    She said, Hey, like what's going on?
5  Is everything OK?
6      Q.    What did you say?
7      A.    I was like, Well, you know, something
8  happened.  I was beginning to give into
9  explaining what happened when McCash interrupted.
10      Q.    What did Dr. McCash say then?
11      A.    I think he was saying that I wasn't
12  doing my work.  I was putting off my work.  I was
13  trying to avoid doing my work, and so on.  And I
14  said, Well, that's not true.  I'm doing my work
15  right now.
16      Q.    And did you say anything else?  During
17  this conversation that took place between you and
18  Dr. Jaffer and Dr. McCash.
19      A.    Well, I said, you know, just stop
20  lying and saying that I'm not doing my work when I
21  am and I'm managing all my responsibility.  So I
22  just asked him to stop saying what he was saying.
23      Q.    What else, if anything, did Dr. McCash
24  say?
25      A.    Dr. McCash just kept badgering me even

*Computer Reporting NYC Inc.*
*(212) 986-1344*

87

Varughese

1  though the attending was there.  I felt that he
2  was badgering me.
3      Q.    What did he say?
4      A.    Insisting that I wasn't doing my work
5  and me insisting that no, I am doing my work.  I
6  have this number of cases still remaining to
7  gross, to -- some things I had grossed which I had
8  to take sections from for histology, that I had to
9  wait until it was in Formalin for about a few
10  hours because it made the tissue more firm.  So I
11  had to wait for that.
12             So I pointed out I have so many cases
13  here that still need to be cut because it takes
14  some hours to process.
15      Q.    And during this conversation that
16  Dr. Jaffer was part of did you raise your voice?
17      A.    I don't remember raising my voice.
18      Q.    Did Dr. McCash raise his voice?
19      A.    I believe the conversation may have
20  gotten, in this course of back and forth, the
21  conversation perhaps had gotten heated.
22      Q.    What did Dr. Jaffer say while you and
23  Dr. McCash were going back and forth as you
24  described it?
25

*Computer Reporting NYC Inc.*
*(212) 986-1344*

88

Varughese

1
2      A.    Dr. Jaffer was just, you know, like
3  no, no, no.  She didn't want the argument.  So she
4  was just like -- she was saying, you know, don't
5  argue.
6      Q.    Do you know how Dr. Jaffer came to see
7  you?  You said Dr. Jaffer came into the grossing
8  room and asked you what was going on.
9      A.    She told me that Dr. Bleiweiss had
10  asked her.
11      Q.    How did the conversation between you
12  and Dr. McCash and Dr. Jaffer end?
13      A.    You know, I was still in the middle of
14  doing the work and I got very frustrated and then
15  I told him to back off, and he was like, No, I'm
16  the chief, and so on.  I said, Well, I'm trying to
17  do my work here.  This is my career and this is
18  important to me as well.  So please back off.  And
19  he insisted on not backing off.  I may have
20  used -- I'm not sure if I had cursed now, but I
21  may have.
22      Q.    So that's when you may have told him
23  to "fuck off"?
24      A.    I may have.
25      Q.    So again, how did this, I mean, you're

*Computer Reporting NYC Inc.*
*(212) 986-1344*

89

Varughese

1  Varughese
2  saying go away and leave me alone. He's saying,
3  I'm not going anywhere. This battle you describe.
4      I'm assuming at some point this
5  conversation came to an end, since you're not
6  still there arguing with Dr. McCash. So how did
7  it come to an end? Did Dr. Jaffer put an end to
8  it? Did Dr. McCash finally walk away? What
9  happened?
10     A.    It was equally heated, a heated debate
11 or argument about, you know, the work I'm doing
12 versus the work I wasn't doing. Finally I was
13 like just leave me alone and go away. And then,
14 you know, he said something and he just I think --
15 I don't know. I mean, this is like a very painful
16 event and --
17     Q.    I understand. So if you don't
18 remember how it ended, you can just tell me you
19 don't remember how it ended.
20     Did he walk away at some point?
21     A.    I believe I just -- I believe he and I
22 both walked away. I just left.
23     Q.    Was Dr. Jaffer there for this whole
24 conversation up until the point that it ended?
25     A.    I believe this event, yes. I believe

Computer Reporting NYC Inc.
(212) 986-1344

90

Varughese

1  Varughese
2  she was there. Or she was there, I'm pretty sure.
3      Q.    So then you said you finished the work
4  that you still had to do. Yes?
5      A.    Yes.
6      Q.    What happened next in terms of this
7  incident? You said you spoke to Dr. Bleiweiss
8  that evening.
9      A.    Right.
10     Q.    Did you talk to anybody other than
11 family, friends, et cetera? Did you talk to
12 anybody at Mount Sinai about the incident between
13 the end, your completing the end of your work and
14 when you saw Dr. Bleiweiss that evening?
15     A.    No. I believe I just left the floor
16 and I went downstairs.
17     Q.    Where did you go downstairs?
18     A.    There's like a cafe area. So I just
19 wanted to take myself out of the situation. I
20 just left there for a minute.
21     Q.    So then the next thing that happened
22 regarding this incident is you spoke to
23 Dr. Bleiweiss that you recall.
24     A.    Right. Then I eventually came back.
25 I may have been on the phone with someone

Computer Reporting NYC Inc.
(212) 986-1344

91

Varughese

1  Varughese
2  discussing the issue, the incident.
3      Q.    When you say talking to somebody, is
4  that like somebody a friend or family member as
5  opposed to somebody at Mount Sinai?
6      A.    Right.
7      Q.    So when did you see Dr. Bleiweiss?
8  That day, but what time?
9      A.    I saw Dr. Bleiweiss when -- I went
10 back to the gross room and this was perhaps like
11 40 minutes or 45 minutes later. And I was just
12 trying to wrap everything up for the evening,
13 because it was already -- it was already rather
14 late, and he just approached me to see what had
15 happened or what was going on.
16     Q.    Was anyone else present other than you
17 and Dr. Bleiweiss when you had this conversation?
18     A.    I don't remember, but I believe --
19 well, actually, the PA, Renato. Renato was there
20 though the entire time.
21     Q.    So you had a conversation with
22 Dr. Bleiweiss in the grossing room.
23     A.    Right, very brief conversation.
24     Q.    So tell me what he said and you said.
25     A.    He just said, What happened? And I

Computer Reporting NYC Inc.
(212) 986-1344

92

Varughese

1  Varughese
2  said, Well, you know, McCash was harassing me. I
3  find this is a pattern of his behavior. I find it
4  is unacceptable. You need to talk to him. I
5  cannot be treated this way. That's what I said to
6  him.
7      Q.    And what did he say?
8      A.    He said, Yeah, OK, I'll talk to him.
9  I'm going to go talk to him right now. And he
10 walked out and he said he was going to go talk to
11 him.
12     Q.    Do you know whether he did?
13     A.    No, I did not witness him discussing
14 anything with McCash.
15     Q.    So what is the next thing that
16 happened regarding this incident? What did you do
17 next, if anything?
18     A.    The same evening?
19     Q.    The same evening, next day, whenever.
20 Whenever the next event was.
21     A.    Oh, no, I just finished up my work and
22 I remained there and the other residents appeared
23 again. It was Paul Azar, Adrienne Jordan and
24 McCash and they -- apparently they were told to
25 get involved with grossing anything that I needed

Computer Reporting NYC Inc.
(212) 986-1344

93

Varughese

1  help, assistance with.
2      Q.    Do you know who told them that?
3      A.    Sorry?
4      Q.    Do you know who told them to assist
5  you?
6      A.    Well, I believe that would have to
7  come from Dr. Bleiweiss.
8      Q.    Do you remember the date on which this
9  happened?
10     A.    Yes.  It was 12/8/2010.
11     Q.    December 8, 2010.
12     A.    December 8, 2010, yes.
13     Q.    Between December 8th and December
14  13th, or putting it a different way, in the three
15  or four days after the incident took place, did
16  you talk to any of your colleagues about the
17  incident, other residents?
18     A.    Yes.
19     Q.    Who did you talk to?
20     A.    I talked to a lot of residents.
21     Q.    How many?
22     A.    Well, probably -- how many residents
23  did I speak to?  I can't recall off the top of my
24  head right now.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

94

Varughese

1      Q.    More than five?
2      A.    Yes.
3      Q.    More than ten?
4      A.    I do not believe I spoke to ten
5  residents.
6      Q.    And who do you recall speaking to?
7      A.    Just people I worked with.
8      Q.    What were their names?
9      A.    I spoke to nearly all my coworkers.  I
10  mean, this includes Alicia Martinez, Taiesha
11  Roman, John Chow, Ted Trevino.
12     Q.    What did you talk to them about?  What
13  were you telling them?
14        MR. WRONKO:  Form objection.  You can
15  answer.
16     Q.    I was trying to avoid going through
17  each one, but go ahead, you can answer.
18     A.    I just simply told them what had
19  happened and --
20     Q.    Where did you have those
21  conversations?
22     A.    Well, I had the conversations on the
23  phone or if they were there I just talked to them
24  in person.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

95

Varughese

1      Q.    So did you have it in the break room?
2  Did you have it while you were on service?  When
3  did you have it?
4      A.    Usually when I was alone with them
5  or -- that's it.
6      Q.    Did you have those conversations with
7  any of these residents while you were working and
8  they were working?
9      A.    I do not think so.
10     Q.    Did there come a point in time when
11  you received a letter from Dr. Lento and
12  Dr. Pessin-Minsley?
13     A.    Right.
14     Q.    Regarding the incident with
15  Dr. McCash?
16     A.    Yes.
17     Q.    While you're looking at that we'll
18  mark it as Defendants' Exhibit 7.
19        (Defendants' Exhibit 7, letter dated
20  December 13, 2010, from Dr. Melissa
21  Pessin-Minsley and Dr. Patrick Lento,
22  addressed to "Dear Leena," marked for
23  identification, this date.)
24     Q.    Have you had a chance to look at that?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

96

Varughese

1      A.    Yes.
2      Q.    Do you recognize it?
3      A.    Yes.
4      Q.    Can you tell me what it is?
5      A.    It's the letter I was presented with
6  on December 13, 2010.
7      Q.    How did you receive the letter?
8      A.    Dr. Pessin and Dr. Lento gave me the
9  letter.
10     Q.    So they gave it to you in person.
11     A.    Right.
12     Q.    And where did the, I'll call it a
13  meeting, where did the meeting take place that
14  they gave you this letter?
15     A.    The meeting took place in Dr. Pessin's
16  office.
17     Q.    And did Dr. Pessin or Dr. Lento say
18  anything to you before or after they gave you the
19  letter?
20     A.    Yes, we had a brief discussion.
21     Q.    And what did Dr. Pessin-Minsley say?
22     A.    She just said that I can't talk to any
23  of the residents regarding the incident and I'm
24  not allowed to and it has come to her attention

*Computer Reporting NYC Inc.*
*(212) 986-1344*

97

Varughese

1  that I've talked to people about it.
2      Q.   Did she say anything else?
3      A.   That's what I remember now.
4      Q.   What did Dr. Lento say?
5      A.   Who?
6      Q.   Dr. Lento.
7      A.   Dr. Lento, he said -- I believe he
8  didn't say very much.
9      Q.   Did he say anything that you recall?
10     A.   Yeah, I don't really recall what he
11 said.
12     Q.   What did you say?
13     A.   I just -- I didn't -- I don't think I
14 said much.  I just agreed not to speak to anybody
15 else regarding the incident.
16     Q.   Did you read the letter while you were
17 sitting with Dr. Minsley and Dr. -- I'm sorry,
18 Dr. Pessin and Dr. Lento?
19     A.   No.  Because they were just telling me
20 that, you know, essentially they summarized the
21 letter and they said that if I continued to speak
22 to any of the residents regarding the incident
23 they may want to terminate me or take some actions
24 against me.

98

Varughese

1      Q.   But you did read the letter after the
2  meeting I take it.
3      A.   At some point when I had the
4  opportunity to do so I did.
5      Q.   And was that the same day you received
6  it?
7      A.   I'm not sure.  I mean, I don't think
8  so, because I was very busy at work that day and I
9  didn't have much time.
10     Q.   The next day?
11     A.   Well, I think I read it.  When I got
12 home I read the letter.
13     Q.   So the letter says that "it has come
14 to our attention," meaning Dr. Pessin and
15 Dr. Lento, "that you," referring to you,
16 Dr. Varughese, "have been confronting your
17 colleagues regarding this investigation, making
18 various accusations, and disrupting departmental
19 operations."
20         Do you know what they were referring
21 to in saying you were confronting people, making
22 accusations and disrupting the operation of the
23 department?
24     A.   No, I wasn't completely sure what they

99

Varughese

1  were referring to.
2      Q.   Did you after you read the letter go
3  back to Dr. Pessin and say, I read this letter and
4  I don't know what you're talking about here, what
5  you're referring to here, to find out what they
6  were referring to specifically?
7      A.   No, I'm not certain now, but I believe
8  Dr. Pessin may have mentioned that -- but she said
9  I confronted somebody and I spoke to people.
10         I wasn't sure what she was talking
11 about, because I had spoken to several residents
12 at that point.  And then she said this letter is
13 from legal, they approved it.
14     Q.   I understand from what you said that
15 Dr. Pessin and Dr. Lento told you don't talk to
16 residents about this anymore.  Right?
17     A.   Right.
18     Q.   The letter says that you're being
19 confrontational, making accusations and being
20 disruptive.
21         Did you think that you were being
22 confrontational, making accusations and being
23 disruptive?

100

Varughese

1      A.   At that time I did not think so.
2      Q.   So my question is, after you read the
3  letter did you go back to either Dr. Lento or
4  Dr. Pessin and say, I've now read the letter.  I
5  don't know what you mean.  Explain it to me.
6      A.   Right, so I tried to request a meeting
7  from Dr. Lento on December 14th.  And we did not
8  meet.
9      Q.   Why didn't you meet?
10     A.   I don't think I was given a date where
11 I could meet with Dr. Lento, or a time.
12     Q.   Between December 13, 2010 and
13 September of 2011 did you ever speak to Dr. Lento
14 again?
15     A.   No, I don't think I spoke to him in
16 that time period.
17     Q.   So for approximately nine months
18 during which he was the program director you never
19 spoke to Dr. Lento?
20     A.   Oh, I misheard that particular.  What
21 did you ask?
22     Q.   I said, between December 13th, the
23 date of this letter, and the day you were
24 terminated, September of 2011, did you ever have

101

Varughese

1  any conversation with Dr. Lento on any subject at
2  any time?
3
4      A.    Yes.
5      Q.    So at any of those meetings that
6  you've had with Dr. Lento, however many there
7  were, did you ever bring up this letter or what
8  its content meant?
9      A.    No, I did not.  I actually spoke to
10 Dr. Stimmel, who was the ombudsman at the
11 hospital, because I was concerned with the
12 contents and he just told me not to worry.  He was
13 like forget this letter.
14     Q.    So when did you speak to Dr. Stimmel?
15     A.    I believe it was December 14th.
16     Q.    So you get this letter on the 13th.
17 You read it when you go home that night and you go
18 to see Dr. Stimmel on the 14th?
19     A.    Correct.
20     Q.    Where did the meeting with Dr. Stimmel
21 take place?
22     A.    I met with Dr. Stimmel in his office.
23     Q.    Was anybody present other than you and
24 Dr. Stimmel?
25     A.    No.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

102

Varughese

1
2      Q.    What did you say to him and what did
3  he say to you?  About the letter first.
4      A.    Right.  He just said that Dr. Pessin
5  had called him and to report that there were, you
6  know, there was an incident in the pathology
7  department and she had called him to speak to him
8  about it and he said, Well, you know, you already
9  spoke to me several days ago.  I didn't tell her
10 what the content of the conversation was or that I
11 had even spoken to you.  But, you know, I'm just
12 letting you know that she had called me today for
13 the first time.
14         So I said OK.  Well, you know what
15 happened.  And he kind of wanted to know, can you
16 elaborate?  He wanted me to elaborate further.
17 And I told him, you know, what had occurred
18 December 8th and my concerns, and he said, Well,
19 you know, he asked me some questions about McCash
20 and I just answered him honestly.
21     Q.    Did the letter come up?
22     A.    Yes.  Then I told him about the
23 letter.  And he said, Just forget about the
24 letter.  Don't worry about it.
25     Q.    Did he say anything about how you

*Computer Reporting NYC Inc.*
*(212) 986-1344*

103

Varughese

1  should conduct yourself going forward about
2  talking to residents, not talking to residents?
3  Did he give you any advice on that point?
4      A.    No, he didn't say anything about that.
5  He said I should speak to people if I want to.
6      Q.    Was it your understanding after
7  talking to Dr. Stimmel that what Drs. Lento and
8  Pessin had told you, that you shouldn't talk to
9  residents, that you now could talk to residents?
10 What was your understanding?
11     A.    Right, I mean, I just -- at this point
12 I felt that they didn't want me to speak to the
13 residents.  And Dr. Stimmel didn't seem to think
14 that was an issue and he wanted me to forget this
15 letter.
16         So I just thought, Well, I just need
17 to get back to do my work, because it was a very
18 intensive week in terms of my responsibilities to
19 the patients at Mount Sinai Hospital.
20     Q.    So going forward after this letter,
21 after these conversations with Lento and Pessin
22 and Stimmel, you did or didn't talk to residents
23 about the incident with McCash?
24     A.    Going forward I did not speak to

*Computer Reporting NYC Inc.*
*(212) 986-1344*

104

Varughese

1  anybody about the -- at least until I was out of
2  the surgical pathology rotation.  Then I may have
3  spoken to some of my colleagues again at some
4  point, but --
5      Q.    I understand.
6      A.    -- not, you know, during the week or,
7  you know.
8      Q.    After you spoke to Dr. Stimmel did you
9  communicate with anyone else at Mount Sinai about
10 this incident with Dr. McCash?  And by "this
11 incident" I mean the December 8th incident.
12     A.    Outside of Mount Sinai?
13     Q.    No, inside Mount Sinai.
14     A.    Yes, after December 8th I spoke to
15 Dr. Petersen, who was my mentor, and I just asked
16 him -- I just informed him about what happened and
17 what I thought, and he gave me some perspective
18 being that he was a chief resident previously at
19 Mount Sinai Medical Center.  So he just gave me
20 some perspective and he just told me, you know.
21     Q.    What did he tell you?
22     A.    He told me not to, you know, not to,
23 you know, he just tried to reassure me.  He said,
24 Well, nobody should speak to you that way and

*Computer Reporting NYC Inc.*
*(212) 986-1344*

105

Varughese

1  Varughese
2  nobody should demean you and harass you when
3  you're working, even if it's over some margins
4  that was being grossed by the moonlighter and they
   felt they were wrong.  There's no place for that.
6        He sort of agreed with me.  He agreed
7  with me on my opinion that McCash was acting out
8  of his authority and intimidating and harassing
9  me.
10       Q.    Anything else that Dr. Petersen told
11 you?
12       A.    No.
13       Q.    Who was the next person?
14       A.    Oh, actually, he did.  I think he told
15 me just to like, you know, I'm not sure if this
16 was this time, but some point we had discussed
17 this issue again and he just said we should try to
18 enjoy and not to worry about, you know, just
19 trying to be supportive.
20       Q.    When did you speak to Dr. Petersen?
21       A.    I spoke to him on December 14th, I
22 believe.
23       Q.    So after you spoke to Dr. Petersen on
24 the 14th and after you spoke to Dr. Stimmel on the
25 14th, who was the next person, if anyone, at Mount

106

Varughese

1  Varughese
2  Sinai who you communicated to about the
3  December 8th incident with Dr. McCash?
4        A.    Since December 8th I had communicated
5  with Dr. Schiller and Dr. Bleiweiss again.  That
6  was on December 9th.
7        Q.    Well, Dr. Bleiweiss was the
8  conversation that took place -- oh, no.  I'll ask
9  it this way.
10       Where did the conversation with
11 Dr. Bleiweiss take place on the 9th?
12       A.    Well, December 9th I was working and
13 catching up on the work from -- not catching up,
14 completing the work from the day before and I was
15 also on assignment for intraoperative
16 consultations that afternoon.  So I was performing
17 my work there.
18       Then Dr. Schiller's secretary found me
19 in that little office area for intraoperative
20 consultation and said that Dr. Schiller wanted to
21 speak to you.
22       Q.    Well, I asked you about Dr. Bleiweiss,
   but we'll talk about Dr. Schiller.  So did you go
24 see Dr. Schiller?
25       A.    Yes.

107

Varughese

1  Varughese
2        Q.    This was on December 9th.
3        A.    Yes.
4        Q.    Where did you see Dr. Schiller?
5        A.    He was in his former office.
6        Q.    Was anyone else present?
7        A.    Dr. Bleiweiss.
8        Q.    So when you say you saw Dr. Bleiweiss
9  and Dr. Schiller on the 9th, you saw them both at
10 the same time.
11       A.    Correct.
12       Q.    Together.
13       A.    Correct.
14       Q.    So told me what was said at that
15 meeting with Dr. Schiller and Dr. Bleiweiss.
16       A.    Well, Dr. Schiller just said that it
17 had come to his attention there were some events
18 or incidents.  And then he said, you know, he
19 said, Is everything OK with you?  And I was like
20 yes.
21       Basically to summarize, it's just he
22 just mentioned that, you know, if you were having
23 problems is a sign of worse things and we don't
24 want bad things to happen to you here.  Just like
25 very like generic intimidating language when I

108

Varughese

1  Varughese
2  just felt I'm just trying to do my work and I'm
3  not interested in, you know, doing anything else
4  and it just seemed really out in left field to me
5  and rather strange.
6        But I asked Dr. Schiller, Do you even
7  know what happened?  And he just said, It doesn't
8  matter what happened.  I don't care.  Whatever.
9        And it's almost like it was besides
10 the point, and I was like, well, you know, let me
11 tell you what happened so then you can decide if
12 it's besides the point or not.
13       And he wasn't really interested, but I
14 think I tried to get my, you know, point across
15 anyway and he told me I should go see someone
16 because I'm very upset, you know, getting upset.
17 And I said, Well, I have a reason to be upset.
18 This is not, you know, this is a very traumatic
19 event for me and I'm trying to work.  Like
20 pathology is very important to me.  It's what's
21 going to feed me going forward.
22       I don't believe I used those exact
23 words, but I told him that, you know, basically
24 it's a bread and butter, and I like what I'm doing
25 and I enjoy what I'm doing.

109

Varughese

1    Q.    When Dr. Schiller said you seem to be
2  upset, maybe you should go see someone, did he
3  mean you were upset then at the meeting or you
4  were upset during the discussion with
5  Dr. Bleiweiss and Dr. Schiller?
6         MR. WRONKO:  Form objection.  You can
7    answer.
8    A.    Do mean what he thinks?
9    Q.    Well, not what he thinks.  But he
10  said, you seem to be upset, you should go see
11  someone.  Did you interpret that to mean that he
12  thought you were upset at the time?
13   A.    I mean, I don't think so, because I
14  feel like he had planned to say that, because he
15  had called me in and I feel like it's a tactic
16  that he has used with me before.  I just thought
17  he's doing that again, which was even more
18  upsetting to me.
19   Q.    When you said "before," you're
20  referring to the incident you told me about with
21  Dr. Schiller earlier today?
22   A.    Right.
23   Q.    So what Dr. Bleiweiss saying during
24  this meeting, if anything?

110

Varughese

1    A.    He didn't say anything.  I think he
2  was also slightly shocked.  At least that was my
3  impression.  But, I mean, he didn't say much.
4    Q.    Did he say anything other than hello
5  and goodbye?
6    A.    He just said, you know, We can't have
7  people taking on work.  You need to work.  You
8  can't just not come in and, you know, you just
9  need to be here and work.  So that's what he said.
10  Along those lines.  That's what he said along
11  those lines.
12   Q.    Had there been some issue about you
13  not coming into work?
14   A.    No, not that period.
15   Q.    So then did you ask Dr. Bleiweiss what
16  he was referring to?
17   A.    No.  I don't think I did.
18   Q.    So after you met with Dr. Bleiweiss
19  and Dr. Schiller on the 9th -- well, when you met
20  with Schiller and Bleiweiss did you ask them to do
21  anything?
22   A.    Well, I mean, they weren't asking me
23  what had happened even.  They were sort of saying
24  what they wanted to say.

111

Varughese

1    Q.    I understand.  Did you ask them to do
2  anything?
3    A.    I believe I asked them to intervene in
4  some way.
5    Q.    Do you recall what you said?  Are you
6  sure that you asked them that?
7    A.    I can't -- I mean, I don't recall.
8    Q.    When you met with Dr. Petersen, I
9  mean, other than your telling him what happened
10  and him giving you a perspective, did you ask him
11  to do anything regarding this incident?
12   A.    Yes.
13   Q.    What did you ask Dr. Petersen?
14   A.    Well, Dr. Petersen said, Well, let me
15  speak to him.  I can talk to him.
16   Q.    Him being?
17   A.    I think he wanted to talk to Dr. Lento
18  at that time and he wanted to say something.
19   Q.    Do you know whether he spoke to
20  Dr. Lento?
21   A.    I don't know.
22   Q.    When you met with Dr. Stimmel, did you
23  ask him to do anything?
24   A.    Yes.

112

Varughese

1    Q.    And again, about the incident.
2    A.    Yes, I -- I gave him permission to
3  speak to Dr. Pessin.  If she talked to him again
4  or just present, you know, sort of my side as
5  well.  So I asked him to speak to her.
6    Q.    Do you know if he did?
7    A.    I'm pretty certain that they spoke at
8  some point just based on people saying that they
9  did.
10   Q.    So after December 14th what's the next
11  communication that you had with someone at Mount
12  Sinai about this December 8th incident?
13   A.    Well, the following day on
14  December 10th, 2010, I spoke to Dr. Pessin and she
15  said that this incident had occurred, had come to
16  her attention, and she wanted to know what
17  happened.  She wanted to know my side.  And she
18  said, Well, I want to know what happened.  Why
19  don't you tell me what happened.  Elaborate.
20        So I just recollected the incident and
21  what had happened that evening.  And then she told
22  me that, you know, Sam is no longer the chief for
23  the next week and Kruti is officially in charge as
24  of now.  So, you know, like if I have any concerns

113

Varughese

1    regarding my work I should delegate it to -- well,
2    I should bring it to her attention.
3        Q.    Her being Kruti?
4        A.    Kruti Maniar, yes, bring it to her
5    attention, and she just asked me if I'm OK to
6    work.
7        Q.    Where did that meeting take place?
8        A.    That was in Dr. Pessin's office.
9        Q.    Did you ask Dr. Pessin to do anything
10    about the incident?
11        A.    Yes.  I asked her to have McCash step
12    down as chief resident or take some actions
13    against him, because he was making it difficult
14    for me to perform my work and actually interfering
15    with me when I was performing work.
16        Q.    As far as you know, did Dr. McCash's
17    tenure as chief resident end sooner than it should
18    have?
19        A.    No.
20        Q.    So he was chief resident until the end
21    of his year.
22        A.    Correct.  He was, I mean, they
23    transitioned the chief residency over to the, um,
24    the chief residents will be chief the following

*Computer Reporting NYC Inc.*
*(212) 986-1344*

115

Varughese

1    reiterated what had happened and how I remember
2    Dr. Schiller and this is what he said to me.
3        I mean, the majority of my
4    conversation with Dr. Stimmel concerned what
5    Dr. Schiller said.
6        Q.    On the 9th.
7        A.    And me briefly mentioning the McCash
8    incident.
9        Q.    When you spoke to Dr. Stimmel on the
10    9th did that take place in his office?
11        A.    Yes.
12        Q.    The purpose of you seeing Dr. Stimmel
13    on that day was to talk about the conversation you
14    had with Schiller and Bleiweiss?
15        A.    Well, I was going to inform him about
16    what had happened anyway, but it was just so
17    that -- but since the Schiller incident occurred
18    it became about me reporting about McCash and then
19    the Schiller and Bleiweiss meeting.
20        Q.    On the 14th when you met with
21    Dr. Stimmel it was more about the letter that you
22    had received on the 13th from Lento and Pessin.
23        A.    Right.  After I received the letter my
24    discussion with Dr. Stimmel was about the letter.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

114

Varughese

1    year in the middle of the year.
2        Q.    That's the normal procedure.
3        A.    That's the normal procedure, but
4    essentially yes, he served out his full term.
5        Q.    Well, putting it a different way, your
6    request that he step down as chief resident didn't
7    happen.
8        A.    Yes, I asked that some action be taken
9    against him.
10        Q.    You told me that, but you also told me
11    you wanted him to step down as chief resident.
12        A.    I believe I asked her that he should
13    be removed as chief resident.
14        Q.    And he was not removed as chief
15    resident.
16        A.    No.  Only for a short period, but
17    never officially.  No, he wasn't removed.  He
18    wasn't removed as chief.
19        Q.    Who was the next person you spoke to
20    at Mount Sinai about the December 8th incident?
21        A.    Actually, I forgot to add Dr. Stimmel.
22    I did speak to Dr. Stimmel on December 9th right
23    after I spoke with Dr. Schiller and Dr. Bleiweiss,
24    and that was on December 9th as well and I just

*Computer Reporting NYC Inc.*
*(212) 986-1344*

116

Varughese

1        Q.    So who's the next person you spoke to
2    at Mount Sinai about the December 8th incident?
3        A.    After that I didn't -- I don't think I
4    spoke to anyone.
5        Q.    Do you know Caryn Tiger-Paillex?
6        A.    Yes.
7        Q.    Who is Ms. Paillex?
8        A.    She is the director of human
9    resources.
10        Q.    Did there come a time when you
11    communicated with her about this incident?
12        A.    Yes.
13        Q.    When did you do that?
14        A.    December 23rd.
15        Q.    I will show you a document.
16        MR. McEVOY:  Let's have it marked as
17    Exhibit 8.
18        (Defendants' Exhibit 8, e-mail dated
19    December 23, 2010 from Leena Varughese to
20    Ms. Tiger-Paillex with attachment, Bates
21    Nos. D-856 and 857, marked for
22    identification, this date.)
23        Q.    Have you had a chance to look that
24    over, Dr. Varughese?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

117

Varughese

1
2     A.    Yes.
3     Q.    Do you recognize it?
4     A.    Yes.
5     Q.    Can you tell me what it is?
6     A.    It's a letter I wrote to the director
7  of human resources, Caryn Tiger-Paillex.
8     Q.    I think it's actually an e-mail,
9  but it's --
10    A.    E-mail, correct.
11    Q.    It's from you to Caryn Tiger-Paillex
12 dated December 23, 2010, and it has a one-page
13 attachment labeled "Grievance," correct?
14    A.    Correct.
15    Q.    So why did you send this to
16 Ms. Paillex?
17    A.    Because I was concerned about
18 retaliation by the department for reporting, um,
19 what had happened to me and perhaps speaking to
20 Dr. Stimmel and...
21    Q.    Was that fear of retaliation just a
22 concern you had or had anything happened or
23 anybody said anything that made you come to that
24 conclusion?
25    A.    Well, my fear of retaliation was based

*Computer Reporting NYC Inc.*
*(212) 986-1344*

118

Varughese

1
2  on the academic advisement.
3     Q.    We'll come to that, but when were you
4  placed on academic advisement?
5     A.    I was placed on academic advisement --
6  well, I was informed of academic advisement on
7  December 20th.
8     Q.    So you received the academic
9  advisement, and like I said, we'll talk about that
10 more another time, but you received or you were
11 told about academic advisement on December 20th.
12    A.    Correct.
13    Q.    Was the receipt of the academic
14 advisement what prompted you to send this e-mail
15 to Ms. Tiger?
16    MR. WRONKO:   Form objection.  You can
17 answer.
18    A.    To some degree, yes.  But also I was,
19 I wanted to report the incident as it had
20 occurred.
21    Q.    So you sent this to Ms. Tiger-Paillex.
22 Did you either follow up with her or receive a
23 response from her to this e-mail and the
24 attachment, what I will now call "the grievance."
25    A.    Can you repeat that question?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

119

Varughese

1
2     Q.    Sure.  After you sent this e-mail to
3  Ms. Tiger-Paillex on December 23, 2010, did you
4  either follow up with her or did she communicate
5  with you about the grievance?
6     A.    Right.  She sent me an e-mail and
7  communicated with me.
8     Q.    Let me show you, it's an e-mail
9  string, I believe, if you will take a look at
10 that.
11    MR. McEVOY:   The reporter can mark it
12 as Defendants' Exhibit 9.
13    (Defendants' Exhibit 9, e-mail string,
14 Bates Nos. P866 and 867, marked for
15 identification, this date.)
16    Q.    Have you had a chance to look at it?
17    A.    Yes.
18    Q.    So do you recognize it?
19    A.    Yes.
20    Q.    Can you tell me what it is?
21    A.    It's an e-mail chain that originated
22 in December 23rd.
23    Q.    So at the moment I'm only going to ask
24 you about a couple of the e-mails and I will come
25 back to the others later.  But the first e-mail in

*Computer Reporting NYC Inc.*
*(212) 986-1344*

120

Varughese

1
2  the chain which is as usual is at the bottom is
3  the e-mail we just looked at that you sent to
4  Ms. Tiger-Paillex on December 23rd, correct?
5     A.    Correct.
6     Q.    And then the next e-mail in the chain
7  is from December 24th from Ms. Tiger-Paillex to
8  you in which you basically says she's received
9  your document and she wants to meet with you to
10 discuss the incident.  She won't be in until after
11 first of the year and please call to schedule an
12 appointment.
13    A.    Correct.
14    Q.    Did you call and schedule an
15 appointment with Ms. Tiger-Paillex?
16    A.    Yes, I did.
17    Q.    When was that appointment?
18    A.    Sometime after the new year.
19    Q.    Did you meet with Ms. Tiger-Paillex?
20    A.    Yes, I did.
21    Q.    Where did that meeting take place?
22    A.    In her office.
23    Q.    Was anyone else present besides you
24 and her?
25    A.    No.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

121

Varughese

1    Varughese
2        Q.    Tell me what happened at that meeting
3    and what you said to her, what she said to you.
4        A.    I just recounted the events as had
5    occurred to Tiger-Paillex and she asked me some
6    questions and I responded honestly to her and --
7        Q.    So to make it a little easier, did you
8    tell Ms. Tiger-Paillex about what had happened on
9    December 8th?
10       A.    Yes.
11       Q.    Did you tell her about the meetings
12   you had had with, putting it a different way, what
13   had occurred after the actual incident took place?
14   Did you tell her about the conversation between
15   you and Dr. Jaffer and Dr. McCash?
16       A.    Yes.  I believe she asked me who was
17   there and what happened and she wanted the full
18   sequence of events.  So I believe I would have
19   told her.
20       Q.    Did you also tell her about your
21   conversations with Dr. Petersen and Dr. Stimmel
22   and Dr. Schiller and Bleiweiss?
23       A.    I believe I told her about speaking to
24   Dr. Stimmel already.  And I'm not certain if I
25   talked about Dr. Schiller and Dr. Bleiweiss,

*Computer Reporting NYC Inc.*
*(212) 986-1344*

122

Varughese

1    meeting, but I did -- I talked about meeting with
2    Dr. Pessin and, you know, how I reported the
3    incident and then I also discussed academic
4    advisement and just what has ensued and my concern
5    that I was being singled out and targeted for
6    discipline while McCash was not.
7        Q.    What, if anything, did
8    Ms. Tiger-Paillex tell you what happened next as a
9    result of your filing this grievance?
10       A.    Well, she said that she will speak to
11   the different parties involved and she would -- I
12   believe she -- I'm not sure if she said that, but I
13   she definitely did say she will follow up with me
14   and she will investigate.
15       Q.    Do you know whether Ms. Tiger-Paillex
16   or someone at her request conducted an
17   investigation into the incident between you and
18   Dr. McCash?
19       A.    Um, I wasn't sure if she was
20   conducting an investigation, but I was requested
21   to meet with Dr. Figur and Paul Johnson at some
22   point in January after I met with Caryn
23   Tiger-Paillex.
24       Q.    And we'll come back to that, but other

*Computer Reporting NYC Inc.*
*(212) 986-1344*

123

Varughese

1    than being asked to meet with Dr. Figur, which is
2    figure without the E, Dr. Figur and Paul Johnson
3    who is not a doctor, do you know what, if
4    anything, else Ms. Tiger did to investigate your
5    grievance?
6        A.    I do not know what she did.
7        Q.    Do you know whether anybody else
8    participated in the investigation of your
9    complaint?
10       A.    Well, other than Dr. Figur and --
11       Q.    Other than the meeting you had with
12   Dr. Figur and Paul Johnson.
13       A.    No.
14       Q.    After the incident with Dr. McCash,
15   and the incident I'm referring to is the
16   December 8th incident, was any effort made or were
17   you ever told about who you should deal with going
18   forward?
19            And by that I mean, was there some
20   decision made that you were informed of to have
21   you report as your chief more to Kruti than to
22   Sam?
23       A.    Yes.
24       Q.    How did that come about?  How did you

*Computer Reporting NYC Inc.*
*(212) 986-1344*

124

Varughese

1    learn about that?
2        A.    I spoke to Caryn Tiger-Paillex and she
3    told me that I can talk to, instead of talking to
4    Dr. Lento and Sam, just talk to Kruti and have,
5    you know, go through her instead of going through
6    Sam and Dr. Lento for your requests or problems.
7        Q.    So what Ms. Tiger-Paillex told you was
8    going forward.  Was this at the meeting that took
9    place sometime in January?
10       A.    No.
11       Q.    It was later?
12       A.    It was in April.
13       Q.    So in April of 2011 now, I guess,
14   Caryn Tiger said to you that going forward you
15   could deal with her instead of with Dr. Lento as
16   the program director.
17       A.    Yes.
18       Q.    Right?
19       A.    Yes.
20       Q.    And in terms of your day-to-day work
21   you could deal with Kruti Megier (phon) instead of
22   Sam McCash, right?
23       A.    It's Maniar, M-a-n-i-a-r.
24       Q.    I'll have it right by the time we're

*Computer Reporting NYC Inc.*
*(212) 986-1344*

125

Varughese

1 done. And the question is, going forward you
2 dealt with Dr. Maniar, not with Dr. McCash.
3
4      A.    Right. After April at some point
5 that's what she wanted me to do.
6      Q.    Is that what you did?
7      A.    Well, that's not really an option
8 available to me, because the program director is
9 Patrick Lento.
10      Q.    But in terms of Dr. McCash, did you
11 then deal with Dr. Maniar?
12      A.    I tried my best not to interact with
13 him.
14      Q.    After the December 8th incident were
15 there any other incidents with Dr. McCash?
16      A.    Any other incidents with Dr. McCash?
17      Q.    And by any other incidents, I mean any
18 other incidents in which he yelled at you or in
19 your view harassed you or mistreated you in some
20 way.
21      A.    As far as I recall, he became more
22 aggressive around me. He would always stomp his
23 feet when he was walking around me. He would just
24 close the door really, you know, forceably when he
25 was going out of the room that was right next to

126

Varughese

1 my desk. He would, you know, stomp his feet and
2 make shows of disapproval.
3
4      Q.    Other than stomping his feet and
5 closing the door in the manner you described, how
6 else, if at all, did he manifest his disapproval?
7      A.    He, when I was on GYN pathology, he
8 was assigned for moonlighting duties for two days
9 and he would not assist me or he would not assist
10 me with my specimens that were, that could have
11 been grossed by the moonlighter, and he was on
12 moonlighting duty and he refused to do any of
13 those, gross any of those cases.
14      Q.    When you say he refused, did you ask
15 him?
16      A.    No, because I was afraid of him.
17      Q.    So did anyone else ask him?
18      A.    No. I left a note saying this is for
19 moonlighter. So I just put the specimens to the
20 side and I left a note saying this was for
21 moonlighter.
22      Q.    So he didn't do them.
23      A.    Yes, he did not do them.
24      Q.    Do you know whether Dr. McCash was
25 told anything about how he should interact with

127

Varughese

1 you going forward after the incident?
2
3      A.    No, I have no idea.
4      Q.    So other than stomping the feet and
5 closing of doors and what you just described about
6 the specimens, any other way in which Dr. McCash
7 expressed disapproval of you?
8      A.    Right. So while I was at the veterans
9 administrative affairs hospital and he was also
10 assigned there, he was not allowed to be in the
11 same work space as me.
12      Q.    How do you know that?
13      A.    Well, because Dr. Lento said he is not
14 allowed to be in the same work station as you.
15      Q.    When did Dr. Lento tell you that?
16      A.    Well, he didn't say that exactly. He
17 said, I'll talk to Sam. Again, that's what he
18 said and they said they won't be sharing an
19 office.
20      Q.    When did Dr. Lento tell you that?
21      A.    Sometime in May.
22      Q.    Of 2011?
23      A.    Uh-huh.
24      Q.    So you're saying you're both at the
25 VA's office.

128

Varughese

1
2      A.    Uh-huh.
3      Q.    You can't do uh-huh. You've got to --
4      A.    Yes.
5      Q.    So you started to tell me that you
6 were at the VA.
7      A.    Uh-huh.
8      MR. WRONKO: You've got to verbalize.
9      A.    Yes, yes, yes.
10      THE WITNESS: Do you mind if I get
11 something for my --
12      MR. McEVOY: Be my guest. Off the
13 record.
14      (A very brief recess was taken.)
15      Q.    So tell me what happened at the VA
16 with Dr. McCash.
17      A.    He was not allowed to be in the same
18 work space as me, but he would often leave his
19 things next to me in my, you know, that work area.
20      Q.    Anything else that Dr. McCash did that
21 you interpreted as being disapproving of you or --
22      A.    No, just glaring, the usual stomping.
23      Q.    Did you complain to anybody about the
24 stomping, the door closing, the specimens or
25 leaving his stuff near your work site?

129

Varughese

1
2    A.    At that point I just felt that
3  whatever I said would not be believed and it was
4  futile for me to complain any further.
5        Q.    So I take it the answer is no.
6    A.    Yes.
7    Q.    No, you didn't complain to anybody.
8    A.    No.
9    Q.    If you go back to the document that I
10  had just given you, and we'll just do these couple
11  of things and then we can break for lunch.  Turn
12  that over, Dr. Varughese, the one in front of you.
13      So we looked at the e-mail where
14  Ms. Tiger-Paillex asks you to set up the meeting
15  with her.  You set up the meeting, you have the
16  meeting.
17      The next e-mail as you go up the chain
18  is from you to Caryn Tiger-Paillex on March 30,
19  2011.  Do you see that?
20    A.    Yes.
21    Q.    And it basically says that, you know,
22  you're e-mailing her about the incident with
23  McCash which you discussed about almost three
24  months ago.  "The situation has progressed and
25  continues to ensue and is very negative for my

Computer Reporting NYC Inc.
(212) 986-1344

130

Varughese

1
2  well-being.  I would like to meet with you at this
3  point to discuss my concerns."
4      Between the meeting with Caryn
5  Tiger-Paillex in January of 2011 and this e-mail
6  at the end of March had you had any communications
7  with her about the complaint you had filed or the
8  grievance you had filed?
9    A.    No.  I don't think I spoke to her
10  again after that first interview.
11    Q.    When you say the situation has
12  "progressed and continues to ensue in a way that
13  is very negative for my well-being," what were you
14  referring to?
15    A.    The situation I was referring to was
16  the, you know, several meetings with Dr. Figur and
17  Paul Johnson, problems with work, when I was on
18  the floor, in terms of having access to work
19  material that I needed, referral to the Physician
20  Wellness Committee which I thought he was very,
21  you know, just very involved.
22      It was just, you know, I'm supposed to
23  be a doctor who is taking care of patients, but I
24  am in all these meetings every so many days.  I'm
25  sort of fearful to be at work to some degree and

Computer Reporting NYC Inc.
(212) 986-1344

131

Varughese

1
2  it just -- it was becoming very hostile I
3  believed.
4        Q.    So you've asked to meet with
5  Ms. Tiger-Paillex and the next e-mail going up the
6  chain says, and this is from Ms. Tiger-Paillex to
7  you, it says, I'm "sorry to hear that you
8  cancelled our meeting scheduled for yesterday.
9  Please call my office to reschedule so that I can
10  discuss the outcome of my fact finding.  Thank
11  you."
12      Then I take it that you met with
13  Ms. Tiger-Paillex on April 5th, correct?
14    A.    Yes.  I believe I met with her one of
15  those days.  I'm not sure --
16    Q.    Well, if you look at the first e-mail
17  it's from you to Ms. Tiger-Paillex, it says "Thank
18  you for taking the time to meet with me on Tuesday
19  April 5th."  So --
20    A.    Yes, but sometimes I mess up the
21  dates.
22    Q.    We'll assume at least for the moment
23  that you didn't.  Whether it was April 5th or some
24  other day, you met with Ms. Tiger-Paillex sometime
25  around April 5th, right?

Computer Reporting NYC Inc.
(212) 986-1344

132

Varughese

1
2    A.    Yes.
3    Q.    So tell me what happened at that
4  meeting.  What did you say to her, what did she
5  say to you?
6    A.    I just talked to her about, you know,
7  whether or not she had her fact, you know her
8  fact-finding was complete and if she had
9  documentation or any kind of documentation
10  regarding what her findings were.  And we
11  discussed some of the, you know, we discussed a
12  lot of her -- we discussed whatever I had said
13  that we had discussed at the meeting, whatever I
14  stated we discussed in this e-mail.
15    Q.    What else took place?  What else did
16  you say?  What else did Ms. Tiger-Paillex say?
17    A.    Um -- can we take a break now?
18      MR. WRONKO:  He's in the middle of a
19  question.  So you have to answer the
20  question.
21    Q.    We just have to finish.  Let's do this
22  if this is OK.  Then you can take a break.  Just
23  finish telling me about what happened at the
24  meeting and then we'll take a break.  We'll break
25  for lunch.  When we come back we'll talk about

Computer Reporting NYC Inc.
(212) 986-1344

133

Varughese

2 your e-mail.  So just tell me what was said at the
3 meeting.
4     A.     She said she thought that McCash was
5 not allowed to interact with me anymore.  She
6 thought, her impression was that he wasn't
7 supposed to be, you know, overseeing me or at
8 least Dr. Lento was not supposed to be overseeing
9 me either, and I was very confused because she
10 thought -- and then she also said that McCash
11 didn't feel like he did anything wrong and he
12 isn't capable of apologizing to me because he
13 feels like he didn't do anything wrong.  And she
14 said that was where she -- that was her finding.
15     Q.     Well, OK.  And so did you say anything
16 else at this meeting?
17     A.     I just reported what else was going
18 on.
19     Q.     What else was going on?
20     A.     In terms of the PWC, Physician
21 Wellness Committee and my concerns regarding that.
22 And my concerns regarding how I felt like I was
23 being treated differently than everybody else and
24 I just kind of want, you know, this whole like
25 institutional like actions to stop against me

*Computer Reporting NYC Inc.*
*(212) 986-1344*

134

Varughese

2 because I felt like I'm just trying to do my work
3 and I want to be treated like everyone else and
4 I'm not.
5     Q.     Anything else that you recall
6 happening or being said at this meeting?
7     A.     (After pause) I can't remember right
8 now, but if I recall something.
9         MR. McEVOY:  So we'll break for lunch
10 now.
11         Let me say one thing to you and I
12 think Mr. Wronko will confirm that.  It's
13 fine for you to have some later
14 recollection, OK?  But I would encourage you
15 to think about the things that we're talking
16 about, because if when you get the
17 transcript a month from now or whatever it
18 is you suddenly say, oh, here are ten things
19 I didn't remember, here are ten names I
20 didn't remember, you're going to wind up
21 coming back here because I will have
22 questions about it.
23         So this is really the time, and we're
24 going to come back on other days.  So this
25 is really the time to try to refresh your

*Computer Reporting NYC Inc.*
*(212) 986-1344*

135

Varughese

2 recollection.  But I just wanted to let you
3 know that, so that -- I don't want to
4 mislead you about if you say, oh, I recall
5 something later.  Later is a relevant
6 concept.  OK?
7         So with that we can take a break.
8         (A luncheon recess was taken at
9 1 p.m.)

*Computer Reporting NYC Inc.*
*(212) 986-1344*

136

Varughese

2 A F T E R N O O N   S E S S I O N
3         (Time noted:  2:09 p.m.)
4 L E E N A   V A R U G H E S E, resumed and
5     testified further as follows:
6 EXAMINATION BY (Cont'd.)
7 MR. McEVOY:
8     Q.     So Dr. Varughese, if you look at the
9 top e-mail in the chain, Defendants' Exhibit 9, I
10 think it is, why did you send Ms. Tiger-Paillex
11 this e-mail?
12     A.     Just to note that I had met with her
13 and review the content of our conversation that
14 afternoon to some degree.  It's not a complete
15 discussion of what occurred at that meeting.
16     Q.     You say in the e-mail, about the
17 second or third sentence, it says, "You indicated
18 that in addition to your investigation, Dr. Pessin
19 had conducted her own investigation, and
20 Dr. Bleiweiss had complained to regarding grossing
21 of a mastectomy specimen on December 8th 2010,
22 which resulted in a 3rd investigation by the
23 Physician Wellness Committee."
24         Do you see that sentence?
25     A.     Yes.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

137

Varughese

1
2      Q.     Did Ms. Tiger-Paillex tell you what in
3  particular Dr. Bleiweiss had complained about
4  regarding the grossing of the mastectomy specimen
5  on December 8th?
6      A.     She said she thought there was some
7  sort of patient care related labs related to that
8  specimen and she complained, and that's what she
9  thought.
10     Q.     That's what she thought Bleiweiss was
11 complaining about?
12     A.     Right.  And she thought that's why I
13 was referred to the Physician Wellness Committee.
14     Q.     Did she tell you what that lapse was?
15     A.     No.
16     Q.     Did she tell you that Dr. Bleiweiss
17 thought you were responsible for that lapse?
18     A.     Well, actually, I'm not sure if she
19 said there was some sort of lapse.  What I think
20 her understanding was there was some sort of
21 lapse, but not exactly why or I don't know if she
22 said it was delayed even.  Maybe she thought she
23 said it was delayed.  I'm not sure.
24     Q.     What did she say about this complaint
25 by Dr. Bleiweiss resulting in your being referred

**Computer Reporting NYC Inc.**
**(212) 986-1344**

138

Varughese

1
2  to the Physician Wellness Committee?
3      A.     Can you repeat that?
4      Q.     Sure.  Did she say anything about how
5  this complaint by Dr. Bleiweiss about this
6  mastectomy specimen resulted in you being referred
7  to the Physician Wellness Committee?
8          I know that's what the document,
9  that's what you say in your e-mail, but what did
10 she, Ms. Tiger-Paillex, say to you about how this
11 complaint resulted in your being sent to the
12 Physician Wellness Committee?
13     A.     She just said that that was a reason I
14 was sent to the Physician Wellness Committee.
15     Q.     Then you also say in the e-mail that
16 during the meeting with Ms. Tiger-Paillex she told
17 you that she would provide you with a document
18 which outlined her findings about, I guess as to
19 your grievance.  And then you say, it's April 7th,
20 we still haven't received it.
21         Did you get a document or e-mail or
22 something from Ms. Tiger-Paillex that set forth
23 her findings?
24     A.     Well, she was supposed to provide it
25 to me, but she did not.

**Computer Reporting NYC Inc.**
**(212) 986-1344**

139

Varughese

1
2      Q.     She didn't do it by the date that you
3  say in here she said she would.  But did you get
4  it eventually?
5      A.     Eventually she did give me a
6  paragraph.
7      Q.     Let me show you a document.
8          If you would look at that while the
9  reporter marks it as Defendants' Exhibit 10.
10         (Defendants' Exhibit 10, letter dated
11     April 11, 2011, to Dr. Varughese from Caryn
12     Tiger-Paillex, Bates No. P533, marked for
13     identification, this date.)
14     Q.     Have you had a chance to review it?
15     A.     OK.
16     Q.     It appears in the form of a letter.
17 Is this the letter you received from
18 Ms. Tiger-Paillex?
19     A.     Yes.
20     Q.     It's dated April 11, 2011.  Is that
21 the day you received it?
22     A.     Yes.
23     Q.     Now, the first part says basically
24 that she's been unable to corroborate your claims
25 against Dr. McCash, correct?  Yes?

**Computer Reporting NYC Inc.**
**(212) 986-1344**

140

Varughese

1
2      A.     Yes.
3      Q.     The second part says, "In any event,
4  after the incident, the Acting Chairman and
5  Program Director acted immediately to defuse the
6  situation by requesting that the Chief Resident
7  who was not involved in the incident, supervise
8  and address your assignments and schedules
9  whenever possible."
10         Is that in fact what happened?
11 Because we talked a little bit before about --
12     A.     Correct.
13     Q.     -- your relationship with Dr. McCash
14 and Dr. Venya (phon) going forward.
15         MR. WRONKO:  Form objection.  You can
16 answer.
17     A.     OK.  Well, was that exactly what
18 happened?  No.
19     Q.     So what did exactly happen?
20     A.     Well, I was only told that McCash was
21 not overseeing me as a chief resident for that
22 week when I was in surgical pathology.  But after
23 that there was no discussion about what his role
24 would be towards me and what kind of -- there was
25 no regulation of any interaction I would have with

**Computer Reporting NYC Inc.**
**(212) 986-1344**

141

Varughese

1  them and nobody reported to me that he was not
2  supposed to provide or manage my schedule or
3  assignments.
4      Q.    Do you know whether the chairman or
5  the acting chairman or the program director told
6  Dr. Maniar that she should supervise and address
7  your assignments and schedules whenever possible?
8      A.    I believe no.
9      Q.    Why do you believe no?
10     A.    Because I had to contact her and let
11 her know after HR told me that's what was supposed
12 to happen, that that's what she was supposed to be
13 doing.
14     Q.    Did she indicate to you that that came
15 as news to her, she didn't know that?
16         Well, let's put it this way. When you
17 contacted her what did she say?
18     A.    I don't think she e-mailed me back.
19 She didn't respond to me. But I think she had a
20 discussion of that with someone because I, um, I
21 mean, she indicated that she was going to talk to
22 someone about the e-mail. She didn't respond back
23 to me, but she said, Oh, I'll speak to the program
24 director about that e-mail.

142

Varughese

1      Q.    Are you saying that she didn't e-mail
2  you, but she spoke to you?
3      A.    Yes. I spoke to her in person.
4      Q.    And then it goes on to say that "You
5  have confirmed that since December, Dr. McCash and
6  you have had no direct interactions and that no
7  additional incidents have occurred."
8          Is that correct? Is that what you
9  told Ms. Tiger-Paillex?
10     A.    That was what I called Caryn Tiger,
11 yes.
12     Q.    Then it finally says, or other than in
13 a final sense, "Additionally, the GME office
14 and the Physician Wellness Committee are working
15 with your Program Director to address issues
16 surrounding your academic progress," and we'll
17 come back to that.
18         So after you received this e-mail, or
19 letter rather, from Caryn Tiger-Paillex, were you
20 satisfied with what her findings were?
21     A.    No.
22     Q.    Why not?
23     A.    Because at the meeting this is not
24 what she had said initially.

143

Varughese

1      Q.    And are you referring to the April 5th
2  meeting?
3      A.    Right.
4      Q.    What did she say at the April 5th
5  meeting that you thought was different than what's
6  reflected in or what's stated in the April 11th
7  letter?
8      A.    Well, she didn't say that she could
9  not substantiate my claims. She rather said that
10 McCash's behavior, you know, he doesn't consider
11 himself to be at fault and he has refused to
12 apologize to you in any way and he's not capable
13 of doing that.
14         So she was wondering how she could
15 prevent me from having to interact with him in any
16 meaningful way because of that.
17     Q.    Anything else that she said to you at
18 the April 5th meeting that you thought was
19 inconsistent with what she said in the April 11th
20 letter?
21     A.    After that meeting I have not, you
22 know, let's see. Right, and the GME office and
23 the Physician Wellness Committee, I didn't realize
24 that they were collaborating on my surrounding

144

Varughese

1  academic issues. I thought they were entirely
2  independent. The PWC, Physician Wellness
3  Committee, is nondisciplinary and not involved in
4  academic issues. It has more to do with physician
5  impairment.
6      Q.    Any other way in which you thought
7  that what Caryn said to you at the, um, Caryn
8  Tiger that is, at the April 5th meeting was
9  inconsistent or different from what's in her April
10 11th letter?
11     A.    Yes, and she also thought that -- she
12 was concerned that Adrienne Jordan would be the
13 chief resident.
14     Q.    What concern did she express about
15 that?
16     A.    She was concerned that it would pose a
17 problem for me, a risk for me, if she were the
18 chief resident.
19     Q.    What, if anything, did
20 Ms. Tiger-Paillex say about Dr. Jordan's becoming
21 the chief resident posing a risk for you?
22     A.    Well, I guess if she wasn't given the
23 position -- she didn't elaborate herself when she
24 said that. She didn't elaborate on her point, and

145

Varughese

1  she just asked me like has there been any issues
2  with you and Jordan as well, and I said there
3  hasn't been any.  And I, you know, I have had
4  conversations with her at some point, but I could
5  not recall any incidents at that time.
6      Q.    So if in your response to
7  Ms. Tiger-Paillex's question you said that there
8  weren't any incidents, you couldn't recall any
9  incidents, did you express any objection to
10  Dr. Jordan becoming the chief resident during your
11  meeting with Ms. Tiger-Paillex on April 5th?
12      A.    Not at that time, but when I got home
13  I called Ms. Tiger-Paillex up and I just left a
14  voice mail saying that, You know what?  I am
15  concerned about Adrienne Jordan being the chief
16  resident.
17      Q.    Then she couldn't have said anything
18  about it at the April 5th meeting if you didn't
19  call her until after the meeting took place,
20  right?
21      MR. WRONKO:  Form objection.
22      A.    Well, she was the one who brought it
23  up.
24      Q.    That's what I'm trying to understand.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

146

1  So she asked you, if I understand your testimony,
2  she asked you whether you had any problems with
3  Jordan and you said no.
4      Then she said, Well, I'm concerned
5  about Jordan becoming the chief resident because
6  it would pose a risk for you.  Is that what
7  happened?
8      A.    Yes.
9      Q.    And you didn't, during the meeting at
10  least, you didn't say anything about or voice any
11  objections to Jordan becoming the chief resident.
12      A.    Well, I had my reservations, but I
13  didn't want to seem...
14      Q.    So the answer is no, you didn't voice
15  any objections.
16      A.    Yes.
17      Q.    And then later you called and left a
18  message for Ms. Tiger-Paillex that evening and you
19  said you did have those concerns.
20      A.    Yes.
21      Q.    Did you say anything else in that
22  voicemail message other than I do have concerns
23  about that?
24      A.    No.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

147

Varughese

1      Q.    OK.  The day after you got the letter,
2  so this would be April 12th we're talking about,
3  did you send an e-mail to Ms. Tiger-Paillex?
4      A.    April?
5      Q.    12th.
6      A.    12th?
7      Q.    The day after that letter.
8      A.    No, I don't think so.
9      Q.    Let me show you a document.  Maybe it
10  will help refresh your recollection.
11      While you are looking at it, we'll
12  have the reporter mark it as Defendants'
13  Exhibit 11.
14      (Defendants' Exhibit 11, e-mail
15      string, Bates Nos. D-2134 and 2135, marked
16      for identification, this date.)
17      A.    OK.
18      Q.    Have you had a chance to look at that?
19      A.    Yes.
20      Q.    So did you send the e-mail dated
21  April 12th to Ms. Tiger-Paillex?
22      A.    Yes.
23      Q.    And first e-mail in this string, the
24  April 15th e-mail from Ms. Tiger-Paillex to you,

*Computer Reporting NYC Inc.*
*(212) 986-1344*

148

Varughese

1  it's at the top of the page, is that the e-mail
2  you received in response?
3      A.    Yes.
4      Q.    So in your e-mail you tell
5  Ms. Tiger-Paillex that you would like to request
6  FMLA leave.
7      A.    Correct.
8      Q.    And in her response she forwards you,
9  I guess attaches to the e-mail, the paperwork that
10  you need to complete.
11      A.    Yes.
12      Q.    Did you ever complete the paperwork?
13      A.    No.
14      Q.    Why not?
15      A.    I just -- I didn't have -- I mean, I
16  didn't have a treating physician.
17      Q.    So did you not complete the paperwork
18  because you didn't have a physician who could
19  complete it?
20      A.    Yes.  And, I mean, I just requested a
21  leave because of work-related stress and hostile
22  work environment.
23      Q.    No, what you did is you requested a
24  family medical leave of absence, right?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

149

Varughese

1
2    A.    Yes.
3         MR. WRONKO:  Note my objection.
4    Answer.
5    Q.    Ms. Tiger-Paillex sent you the
6    paperwork that needed to be completed for that
7    leave to be processed and approved, right?
8    A.    I'm not sure exactly how.
9    Q.    What are you not sure about?
10   A.    OK, well, in terms of what happened at
11   this time was I was -- I was on, um, I was being,
12   you know, asked to meet with Physician Wellness
13   Committee the end of March and then I had
14   met with Caryn Tiger-Paillex beginning of April to
15   discuss workplace issues and then I was asked to
16   meet with Physician Wellness Committee again and
17   they wanted me to take the drug test and they were
18   treating me very, um, just really -- I felt, you
19   know, differently and sort of marginalizing me and
20   saying that --
21   Q.    Finish.
22   A.    They were marginalizing me and stating
23   that, you know, I had to take this drug test.  I
24   had to speak to Dr. Fersch, their in-house
25   psychologist.  And then I had, after the urine tox

*Computer Reporting NYC Inc.*
*(212) 986-1344*

150

Varughese

1
2    screen I had met with Caryn Tiger again on the
3    11th, and I just felt like even though I had
4    voiced all my concerns, like she had completely
5    ignored everything that I had stated and she also
6    went back on her word or the sentiments she had
7    expressed before on the 5th and...
8    Q.    So what does any of that have to do
9    with your asking for Family Medical Leave Act on
10   the 12th?
11   A.    I just felt like this was becoming
12   very hostile and I was sort of afraid to be at
13   work even.
14   Q.    So you sent an e-mail to
15   Ms. Tiger-Paillex saying "I would like to request
16   family medical leave of absence for work related
17   stress from two weeks hence until June 30."
18   A.    Yeah, because I also felt that
19   McCash and -- this essentially sided with McCash's
20   side in its entirety and --
21   Q.    I want to understand.  Is your
22   interpretation of Ms. Paillex saying I can't
23   corroborate your claims siding with Dr. McCash, is
24   that how you interpreted that?
25   A.    Not exactly.  I just interpreted it as

*Computer Reporting NYC Inc.*
*(212) 986-1344*

151

Varughese

1
2    what was said here.
3    Q.    Wait, you just said, you just said to
4    me -- I can have the reporter read it back -- you
5    just said to me this document sided completely
6    with Dr. McCash.  And I just said to you --
7    A.    No, I mean --
8         MR. WRONKO:  Hold on, let him finish
9    his question.
10   Q.    What I said to you was it your
11   interpretation of Ms. Paillex's letter which says
12   "I am writing in response to your complaint
13   regarding two separate interactions with your
14   Chief Resident, Dr. McCash, and to let you know
15   the results of my investigation into this matter.
16   After interviewing a number of witnesses to the
17   events at issue, I was not able to confirm your
18   version of events, or to substantiate your claims
19   of harassment, abusive behavior or abuse of
20   power."
21        That's everything that
22   Ms. Tiger-Paillex says about the results of her
23   investigation, correct?
24        MR. WRONKO:  Form objection.  You can
25   answer.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

152

Varughese

1
2    A.    Well, she goes on to say --
3    Q.    I know what she goes on to say.  She
4    talks about Dr. Maniar and she talks about the GME
5    piece of it.
6         But in terms of her response to your
7    allegations about the two incidents regarding
8    Dr. McCash, the two sentences I just read are her
9    findings regarding your complaint about those two
10   incidents, correct?
11        MR. WRONKO:  Form objection.  You can
12   answer.
13   A.    Yes.
14   Q.    So I go back to my question.  Did you
15   interpret those two sentences that I just read to
16   you as Ms. Tiger-Paillex's siding completely with
17   Dr. McCash?
18   A.    Not completely, but showing that this
19   is what she believes has occurred and she's
20   communicating her position to me, and...
21   Q.    And I understand that you didn't agree
22   with that, but my question, because I'm really
23   asking you the question based on what you said --
24   A.    OK.
25   Q.    -- because you said to me in answer to

*Computer Reporting NYC Inc.*
*(212) 986-1344*

153

Varughese

1  one of my questions that this document shows or
2  says that she completely, she being Caryn
3  Tiger-Paillex, sided completely with Dr. McCash in
4  this incident. And you told me that's not what
5  you meant, so fine. Right?
6       So going back to the Family Medical
7  Leave Act, you make a request to take family
8  medical leave, right? On April 12th.
9
10      A.   Yes.
11      Q.   And Ms. Tiger-Paillex in her response
12  on the 15th says, "in regards to your request for
13  FMLA leave, you are entitled to such a leave if
14  you have a serious health condition that prevents
15  you from performing an essential function of your
16  job," and then refers you to the appropriate part
17  of the House Staff Manual.
18      "If you have a serious health
19  condition that qualifies you for a leave of
20  absence, please have your doctor complete the
21  attached health certification and forward it to my
22  office by April 29," which is two weeks later.
23      And then she said after she gets the
24  documentation they'll go about processing and
25  approving your leave. Right? Is that what it

154

Varughese

1  says?
2
3      A.   Yes.
4      Q.   I take it that the FMLA forms were
5  attached to the e-mail, you got them?
6      A.   I believe that's how it was sent, yes.
7      Q.   You said to me, I asked you if you had
8  the forms completed and you said no. Now I asked
9  you why. And I thought you said because you
10  didn't have a doctor to complete them; is that
11  right?
12      A.   Yes, I didn't have a treating M.D.
13      Q.   So did you consider going to -- I
14  mean, you work in a hospital. Did you consider
15  asking for a referral to a physician or going to
16  see some physician who could assist you in
17  completing those forms?
18      A.   Well, at that point I had moved, you
19  know, there was a lot of things going on in my
20  personal life in terms -- not a lot, just simply
21  that I had moved from my home in Manhattan or
22  New York City to Brooklyn and so I -- I did have a
23  therapist at that time who I was speaking to and I
24  wasn't able to keep my -- I wasn't able to keep
25  meeting with her because of the move and, I mean,

155

Varughese

1  I was really concerned about all these incidents
2  and had been speaking to her about it. And after
3  this document, which essentially I felt devalues
4  me as an individual by --
5      Q.   By what?
6      A.   By stating that, you know, this is the
7  finding of our investigation, and I just felt more
8  afraid to be at work. I didn't know what kind
9  of --
10      Q.   I don't mean to interrupt you, but I'm
11  only asking you why you didn't complete the form.
12  OK? And you said to me because you didn't have a
13  doctor. And I asked you, well, couldn't you have
14  gone to somebody at your hospital for a doctor?
15  Couldn't you have gotten a referral to see another
16  physician who could have assisted you and
17  evaluated you to complete this form?
18           MR. WRONKO: Form objection.
19      Q.   So did you seek a referral to another
20  physician to help you complete this form?
21      A.   No.
22      Q.   And I take it from what you said you
23  didn't complete the form?
24      A.   No, I did not complete the form

156

Varughese

1  because the person who I would speak to regarding
2  completing the form I had to take a break from
3  meeting with because of my move.
4      Q.   I understand. So tell me why now you
5  think that that Caryn Tiger letter of April 11th,
6  how you believe that devalued you?
7      A.   Because I felt that as a woman of
8  Indian descent, I felt that what I had said had
9  occurred and my statements are not, were not being
10  taken seriously.
11      Q.   So did you believe that Caryn Tiger
12  didn't credit what you said because you were a
13  woman of Indian descent?
14      A.   Well, I believe that --
15      Q.   It's a pretty simple question. Did
16  you believe that Caryn Tiger came to the
17  conclusion she came to about your complaints
18  against Dr. McCash because she devalued your
19  version of events because you were a woman of
20  Indian descent?
21           MR. WRONKO: Form objection. You've
22      got to let her answer.
23           MR. McEVOY: If she answers it, I'm
24      happy to let her answer.

157

Varughese

1    MR. WRONKO: Well, she said two words.
2 You've got to let her answer.
3    MR. McEVOY: The answer should be yes
4 or no and then I will ask her why.
5    Q.   Is that your belief?
6    MR. WRONKO: Answer it however she
7 wants. Go ahead.
8    A.   Yes, I believe that it had something
9 to do with it.
10   Q.   And what's the basis for that belief
11 other than the fact that you are a woman of Indian
12 descent?
13   A.   Well, when I noticed that McCash --
14   Q.   I'm talking about Ms. Tiger now.
15   A.   Ms. Tiger?
16   Q.   Yes. I want to be clear about this.
17 I just asked you whether you thought that
18 Ms. Tiger-Paillex wrote what she wrote in there.
19 And by that I mean that she said she couldn't
20 corroborate your version of the events, that she
21 devalued you because you're a woman of Indian
22 descent.
23        And the question I asked you is do you
24 believe that Ms. Tiger-Paillex came to the

*Computer Reporting NYC Inc.*
*(212) 986-1344*

158

Varughese

1 conclusion she came to and didn't credit your
2 version of the events because you're a woman of
3 Indian descent. And in response to that question
4 you said, Yes, I think so.
5        And I said, Why do you believe, what's
6 the basis of that belief that that's what
7 Ms. Tiger-Paillex did other than the fact that we
8 all agree with the fact that you're a woman of
9 Indian descent?
10   MR. WRONKO: Form objection. I even
11 don't know if there's a question in there.
12   MR. McEVOY: There is a question.
13 What's the basis -- go ahead, I'm sorry.
14   MR. WRONKO: And then this is the
15 second time she said two words and
16 then you cut her off and went on a diatribe.
17 You have to let her answer if you're going
18 to ask questions.
19   MR. McEVOY: And she has to be
20 responsive to the answer. And if I ask her
21 a question about Caryn Tiger-Paillex and she
22 tells me what Dr. McCash did, that's not
23 responsive. And I don't quite frankly have
24 to sit here and let her go on and on about

*Computer Reporting NYC Inc.*
*(212) 986-1344*

159

Varughese

1 Dr. McCash when the question is about Caryn
2 Tiger-Paillex.
3    MR. WRONKO: Two words isn't going on
4 and on and on. You didn't even allow her to
5 make a sentence. So don't say she's going
6 on and on and on. She said two words.
7    MR. McEVOY: She said Dr. McCash did
8 the following. I don't care about --
9    MR. WRONKO: OK, but you didn't know
10 where the thought was going to lead.
11   MR. McEVOY: I think I have a pretty
12 good idea.
13   MR. WRONKO: So counsel, I think that
14 you're immediately assuming, you're making
15 assumptions of what she's going to say
16 before she says it.
17   MR. McEVOY: So I'll ask the question
18 again.
19 BY MR. McEVOY:
20   Q.   What's the basis for your belief,
21 Dr. Varughese, that Caryn Tiger-Paillex came to
22 the conclusions that she came to in that letter
23 about your complaints about Dr. McCash because you
24 were a woman of Indian descent?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

160

Varughese

1    A.   Just the fact that when I met with her
2 on April 5th and to April 11th her tone had
3 completely changed towards me in our meeting.
4 Before she was, you know, more interested in
5 finding out what happened and essentially just
6 being more -- she wasn't confrontational in any
7 way. You know, she spoke to me in a very
8 respectful friendly manner and I felt when I met
9 with her again her tone had changed a lot.
10        She just presented me with this
11 letter. It wasn't -- I mean, there's an e-mail I
12 wrote that sort of shows sort of like a dialogue
13 that is not, you know, very confrontational and
14 just sort of more trying to understand the
15 circumstances of the situation. So this
16 particular letter, that's like -- which I feel is
17 almost official, that doesn't necessarily -- it
18 doesn't really make sense when you consider --
19 when I considered my meetings and the letter I got
20 here.
21   Q.   So assuming for the sake of this
22 question that Ms. Tiger-Paillex's tone changed
23 between the first meeting you had with her back in
24 March and the letter you got in April, why -- do

*Computer Reporting NYC Inc.*
*(212) 986-1344*

161

Varughese

1 think her tone changed because you're a woman of
2 Indian descent?
3      A.   No, I -- the thing is I met with her
4 on April 5th and she was like, So, how are things
5 at the floor? What are your interactions? And I
6 was shocked to find out I'm supposed to have most
7 of my mediations and interactions go through Kruti
8 Maniar and not through McCash and Dr. Lento.
9      It was all news to me. I had no idea.
10      Q.   I understand.
11      A.   And then I also didn't -- then she was
12 like, So what's going on with Dr. Jordan? And
13 like I had nothing to report other than, you know,
14 I was a little concerned about her being chief
15 resident. As me having a year of more experience,
16 I just felt that perhaps she wasn't the best
17 person for that position that year.
18      Q.   And what does any of that have to do
19 with the fact that you're a woman of Indian
20 descent?
21      A.   Well, then I called her and left her a
22 voice mail just stating my concern that, you know,
23 I'm concerned that Adrienne Jordan is going to be
24 the chief next year, and then four days later I
25

162

Varughese

1 get this letter that's like very --
2      Q.   I understand all of that,
3 Dr. Varughese. My question is, what's the basis
4 for your belief that that letter has anything, the
5 contents of that letter has anything to do with
6 the fact that you're a woman of Indian descent?
7      A.   Just, you know, after this letter and
8 given my discussion, what I had told her, and even
9 on April 11, I just got a sense that I wasn't
10 being treated the same way and I wasn't being
11 given the benefit of the doubt and they were
12 essentially taking the side of Dr. --
13      Q.   We're talking about Ms. Tiger-Paillex
14 at the moment. Just stay focused on her.
15      A.   Right, I'm going to --
16      MR. WRONKO: Counsel, you can't keep
17      interrupting her. She's in the process and
18      you're interrupting her.
19      A.   They were taking Dr. McCash's and
20 Dr. Jordan's viewpoint and taking their side in
21 this whole matter and essentially, you know,
22 telling me that, you know, they couldn't
23 corroborate what I had said had occurred.
24      Q.   And --
25

163

Varughese

1      A.   And that made me feel --
2      Q.   Now you're interrupting me. And you
3 weren't treated the same way as who?
4      A.   I wasn't being treated the same way as
5 Dr. Jordan and as Dr. McCash.
6      Q.   And in what way were they being
7 treated differently than you were at this point in
8 time that we're talking about?
9      A.   Well, I was not told of any actions
10 that were taken against Dr. McCash. Dr. Jordan I
11 did not ever complain about or have any -- well,
12 did not ever, but I did not say anything to
13 anybody about Dr. Jordan's interactions with me.
14      But I just felt that they were being
15 promoted, you know, Dr. Jordan was being promoted
16 to chief resident and then Dr. McCash is also
17 being promoted and he continues to have his chief
18 resident position and they continue to do whatever
19 they feel as they should do.
20      But I felt that while I'm on all these
21 rotations I'm having difficulty just being ability
22 to manage, just being able to obtain the very
23 basics of what is required for a pathology
24 residency in terms of education, in terms of
25

164

Varughese

1 material, work materials, and collectively I just
2 felt that it was discriminatory.
3      In addition, I felt the PWC,
4 Physicians Wellness Committee, I felt that was
5 very discriminatory and I felt stigmatized with
6 some sort of issues and they were telling me I had
7 all these mental health issues which, you know,
8 for Physicians Wellness Committee -- Dr. Figur is
9 a hematologist --
10      MR. McEVOY: Mr. Wronko, do you think
11      your client is being responsive to whatever
12      the last question I asked?
13      MR. WRONKO: Yes.
14      MR. McEVOY: Well, I disagree with
15      you.
16      MR. WRONKO: You're entitled to
17      disagree.
18      MR. McEVOY: I am, and I'm also
19      entitled to control this deposition and not
20      let the witness simply talk at length in a
21      narrative form that stops being responsive
22      to the question.
23      MR. WRONKO: Well, if you listened to
24      my objection, my objection was with regard
25

165

Varughese

2  to the fact that she had merely stated two
3  words and that's when you cut it off.
4          MR. McEVOY:  We're well past that.
5          MR. WRONKO:  I have never said that if
6  she goes on beyond the scope of the question
7  that you can't stop her.
8  BY MR. McEVOY:
9      Q.   So Dr. Varughese, let me stop you for
10 a second.  With regard to Dr. McCash, right?  At
11 the time the incident occurred in September of
12 2010 he was already the co-chief resident,
13 correct?
14     A.   Yes.
15     Q.   So what promotions did Dr. McCash get
16 after you complained about him?
17     A.   Well, he got the summative evaluation.
18     Q.   A summative evaluation is not a
19 promotion, is it?
20     A.   Well, effectively, yes.  You know,
21 he's going to get the summative evaluation and go
22 on to take the board exams and get on with his
23 life and his career.
24     Q.   So other than the summative evaluation
25 that you believe is a promotion, did Dr. McCash

Computer Reporting NYC Inc.
(212) 986-1344

166

Varughese

2  get any other promotions after you complained
3  about him?
4      A.   He continued to have his chief
5  resident responsibilities.
6      Q.   So if he's already the chief resident
7  and he continues as the chief resident --
8      A.   Well, he --
9      Q.   No, don't interrupt me.  -- that's not
10 a promotion, is it?
11     A.   No.  But it's a continued status.
12     Q.   I agree with you there.  You said you
13 didn't make any complaints about Dr. Jordan during
14 the period of time we're talking about, correct?
15     A.   Which period is this?
16     Q.   This period up till April of 2011.
17 Correct?
18     A.   I did not make any complaints about
19 her.  I believe I mentioned that she may have been
20 involved in the incident.  But I did not say that
21 she's responsible for Sam McCash's behavior.
22     Q.   So if you didn't make any complaints
23 about her or her being responsible for
24 Dr. McCash's behavior, why do you say that her
25 being promoted to chief resident for the following

Computer Reporting NYC Inc.
(212) 986-1344

167

Varughese

2  year is somehow treating you differently than
3  she's been treated?
4      A.   Because there's a professional
5  environment.  I feel like she did what they wanted
6  her to do and she got the promotion.
7      Q.   What is it that you think -- who are
8  the "they"?
9      A.   Meaning Dr. Lento or Dr. Schiller or
10 Dr. Bleiweiss expected her to do.
11     Q.   What did you think that these
12 individuals expected her to do?
13     A.   Well, I'm not -- can you rephrase that
14 question?
15     Q.   Well, no, I'm repeating what you said
16 to me.  You said you thought that they asked
17 Dr. Jordan to do what they wanted her to do and
18 when she did it she got promoted or words to that
19 effect.
20          So I want to know what it is they, who
21 you've now identified, what they wanted Dr. Jordan
22 to do to secure her promotion to chief resident.
23     A.   Well, I felt that she was inherently
24 more, given more respect and valued more as part
25 of the residency than I was, and --

Computer Reporting NYC Inc.
(212) 986-1344

168

Varughese

2      Q.   Well, that's not asking her to do
3  anything.  It's just a question of how they
4  evaluated --
5      A.   But it's sort of --
6      Q.   You're interrupting me again.  -- how
7  they evaluated her and maybe as compared they
8  evaluated you.
9          So I will accept your perception was
10 that they valued her more than they valued you in
11 some respects, but I'm still trying to find out
12 whether you think there's something that they
13 asked her to do to become chief resident.
14         MR. WRONKO:  Form objection.
15     Q.   You can answer.
16     A.   I'm not sure they asked her to support
17 Dr. McCash's version of events.
18     Q.   Do you know if she did?
19     A.   I'm not sure.
20     Q.   I'm correct, aren't I, Dr. Varughese,
21 that you met with Caryn Tiger in person twice
22 during this April time period?  I'm sorry, you met
23 with her in person on April 5th and you met with
24 her in person when you first made your complaint
25 back in December.

Computer Reporting NYC Inc.
(212) 986-1344

169

1          Varughese
2     A.   Right.
3     Q.   After the first of the year.
          Yes?
5     A.   Yes.
6     Q.   OK.  After the e-mails that I just
7  showed you that were April 12th and April 15th,
8  did you have any other or any further
9  communication with Ms. Tiger-Paillex about the Sam
10 McCash situation?
11    A.   Other than April 15th?
12    Q.   Yes, after April 15th.
13    A.   Yes, I spoke to her again.
14    Q.   When was that?
15    A.   I'll not sure if I spoke to her again
16 at the end of April and then again at the
17 beginning of May.
18    Q.   Let me show you a document.  Maybe
19 that will help you.
20          Take a look at that while the reporter
21 marks this as Defendants' Exhibit 12.
22          (Defendants' Exhibit 12, e-mail dated
23 April 25, 2011 to Caryn Tiger-Paillex from
24 Leena Varughese, Bates No. P1121, marked for
25 identification, this date.)

170

1          Varughese
2     Q.   Just let me know when you've finished.
3     A.   OK.
4     Q.   So can you tell me what this document
5  is?
6     A.   This is, it's an e-mail to Caryn
7  Tiger.
8     Q.   From you.
9     A.   Yes.
10    Q.   Dated Monday, April 25, 2011?
11    A.   Yes.
12    Q.   Now, there's obviously a number of
13 things in this e-mail and we'll come back to a
14 number of them.  But just generally,
15 Dr. Varughese, why did you send this e-mail to
16 Ms. Tiger-Paillex on April 25th?
17    A.   To explain my position regarding
18 what's happened and I just wanted her to
19 understand that this is, really this is what I was
20 complaining about and just inform her if she
21 wasn't informed.
22    Q.   So let me just ask you about one part
   of it in particular at the moment.
24          In the fourth paragraph, the one that
25 starts "I filed a grievance with human resources."

171

1          Varughese
2     Q.   Do you see that?
3     A.   Yes.
4     Q.   In the third line, second line rather:
5  "My perception was and is that I am being
6  threatened and berated by a male resident because
7  I am a woman."
8          Do you see that?
9     A.   Yes.
10    Q.   "I doubt that he would yell or attempt
11 to physically intimidate a male resident and now I
12 am fearful because since my complaint and request
13 for mediation in December, over approximately 4
14 months ago."
15          Do you see that too?
16    A.   Yes.
17    Q.   What's the basis for your perception
18 that you were being threatened and berated, I
19 presume by Dr. McCash, because you're a woman?
20    A.   Because he repeatedly intimidated me
21 at least on two occasions.  Then he stomped his
22 feet around me and then he slammed doors and all
23 these actions, you know, acts of aggressiveness --
24    Q.   So is it fair to --
25    A.   -- that --

172

1          Varughese
2     Q.   I'm sorry.
3     A.   -- that I felt were based on my
4  gender, so that's why I said that.
5     Q.   Do you think that Dr. McCash liked
6  you?
7     A.   Well, I don't think that --
8          MR. WRONKO:  Form objection.  You can
9  answer.
10    A.   I don't think gender discrimination
11 has to do with whether or not --
12    Q.   I didn't ask you what you thought
13 about gender discrimination.  I asked you whether
14 you thought Dr. McCash liked you.
15    A.   Well --
16         MR. WRONKO:  Form objection.  You can
17 answer.
18    A.   I don't know what he thought.
19    Q.   So why do you think that -- accepting
20 everything you say, Dr. Varughese, about how
21 Dr. McCash behaved towards you on the two
22 incidents, the stomping of feet, everything else
23 that you've told me, what's the basis for your
24 belief that he did that because you're a woman as
25 opposed to maybe he just didn't like you?

173

Varughese

1
2    A.    Well, in terms of whether or not he
3  liked me, I got very interesting mixed signals
4  from him.  There have been times that he would
5  shout at me one minute, tell me I'm a failure, I'm
6  not going to succeed.  Then a month later he would
7  ask me if I wanted patio furniture.  Then a month
8  later he would stomp his feet around again, then
9  yell at me again, threatened me and tell me I'm
10  not going to succeed.  And then, you know, that's
11  like a week before he decided he wants to be
12  friends with me.
13    So frankly I'm not -- I'm very
14  confused by the signals that he is sending me.
15    Q.    Did Dr. McCash ever say anything to
16  you about the fact that you were a woman, express
17  any dislike for you because you're a woman?
18    A.    I felt that his actions spoke louder
19  than his words.
20    Q.    That very well may be.  But my
21  question is, did Dr. McCash ever make any comment
22  to you about the fact that you were a woman or
23  that he felt that you were, you know, unqualified
24  or whatever he said to you because you're a woman?
25    A.    Well, I feel that he may have been

*Computer Reporting NYC Inc.*
*(212) 986-1344*

174

Varughese

1
2  motivated by my gender.  He was motivated by my
3  gender and likely my race, the fact that I'm a
4  minority.
5    Q.    Third time, Dr. Varughese.  Did
6  Dr. McCash ever say anything to you about your
7  gender?
8    A.    I can't recall.
9    Q.    Did anybody ever tell you that
10  Dr. McCash had said something negative about you
11  because you were a woman?
12    A.    Well, yes.
13    Q.    Who?
14    A.    It was implied.
15    Q.    OK.
16    A.    It was implied it was because I was a
17  woman.
18    Q.    Who implied that?
19    A.    Just other residents.
20    Q.    Who?
21    A.    Well, Paul Azar thought, you know, I
22  should be nice to him and --
23    Q.    I'm not concerned about what Paul Azar
24  thought.
25    A.    I'm sorry.  Can you repeat that

*Computer Reporting NYC Inc.*
*(212) 986-1344*

175

Varughese

1
2  question?
3    Q.    Sure.  Did anybody ever come up to
4  you, Dr. Varughese, and say, you know what, Leena?
5  I just was talking to Sam McCash and he said, I
6  don't like Leena because she's a woman.  A woman
7  shouldn't be here.  She's just some annoying
8  female.
9    Did anybody ever tell you Dr. McCash
10  said any negative comments about you because of
11  your gender?
12    A.    I don't recall.
13    Q.    Did Dr. McCash ever make any comments
14  to you or make any comment about the fact that
15  you're of Indian national origin?
16    A.    Not directly to me.
17    Q.    Did anyone tell you he had made them
18  to anyone else?
19    A.    No.
20    Q.    So just to be clear, as you sit here
21  today you can't recall any comment that Dr. McCash
22  made to you about the fact that you're a woman or
23  the fact that you're of Indian descent, correct?
24    A.    I can't recall.
25    Q.    And similarly, you don't have any

*Computer Reporting NYC Inc.*
*(212) 986-1344*

176

Varughese

1
2  recollection of anybody ever telling you that
3  Dr. McCash made comments about your gender or
4  national origin."
5    A.    No.
6    Q.    Then you go on to say in here that you
7  "doubt that he would yell or attempt to physically
8  intimidate a male resident."
9    What's the basis for that belief?
10    A.    Well, I never saw him intimidate a
11  male resident.
12    Q.    Did you spend every hour of every
13  working day with Dr. McCash?
14    A.    No.
15    Q.    Do you see every interaction
16  Dr. McCash has with every other resident?
17    A.    No.
18    Q.    Did Ms. Tiger-Paillex respond to your
19  e-mail that we just looked at?  The April 25th
20  e-mail I believe it is.
21    A.    This one?
22    Q.    Yes, the one you're looking at.
23    A.    She may have, yes.
24    Q.    Let me show you a document.  So you
25  take a look at that document, Dr. Varughese, while

*Computer Reporting NYC Inc.*
*(212) 986-1344*

177

Varughese

1
2    I ask the reporter to mark it as Defendants'
3    Exhibit 13.
4            (Defendants' Exhibit 13, letter dated
5        April 29, 2011 to Dr. Varughese from Caryn
6        Tiger-Paillex, Bates No. P534, marked for
7        identification, this date.)
8    A.    OK.
9    Q.    Have you had a chance to look at it?
10   A.    Yes.
11   Q.    Do you recognize it?
12   A.    Yes.
13   Q.    Can you tell me what it is?
14   A.    Let's see.  It's a letter that Caryn
15   Tiger addressed to me.
16   Q.    So it's a letter dated April 29, 2011.
17   A.    Yes.
18   Q.    Sent from Caryn Tiger-Paillex to you.
19   A.    Correct.
20   Q.    How did you receive it?
21   A.    I physically picked it up.
22   Q.    And in this letter in the first bullet
23   point Ms. Tiger-Paillex says, among other things,
24   that "Mount Sinai has strict policies prohibiting
25   workplace discrimination or retaliation, and takes

*Computer Reporting NYC Inc.*
*(212) 986-1344*

178

Varughese

1
2    such complaints very seriously.  To enable me to
3    investigate this complaint fully, please contact
4    my office at" whatever the number was, "to arrange
5    for a time for us to meet."
6            Do you see that?  The end of the first
7    bullet point.
8    A.    Yes.
9    Q.    Yes?
10   A.    Yes.
11   Q.    Did you arrange a meeting or contact
12   Ms. Tiger-Paillex to follow up on this complaint?
13   A.    No.
14   Q.    Why not?
15   A.    I just felt that any further
16   complaining about workplace harassment and
17   retaliation would be futile and it would not be
18   taken seriously and I felt the contact prior to
19   this letter by my superiors and HR and PWC
20   informed me of that.  And I just did not think it
21   would be in my best interest.
22   Q.    Did you think that Ms. Tiger-Paillex
23   was willing to investigate your complaint?
24   A.    Well, I felt that the complaint would
25   still return to the events on December 8th and

*Computer Reporting NYC Inc.*
*(212) 986-1344*

179

Varughese

1
2    what had occurred the next day, and, you know, and
3    the letter on December 13th and I just didn't
4    think it would really change anything and it would
5    be entirely a waste of time.
6    Q.    In the second bullet point
7    Ms. Tiger-Paillex says that during your meeting
8    on, I presume on April 5th, she told you that it
9    was her understanding that Dr. Pessin had
10   previously told you that you should feel free to
11   interact with Dr. Maniar rather than with
12   Dr. McCash.
13           Did Dr. Pessin tell you that?
14   A.    Dr. Pessin told me that on
15   December 10th.
16   Q.    Then in the third bullet point it
17   says, Your suggestion that your schedule should
18   have been changed so that you and Dr. McCash not
19   work at the VA at the same time is perplexing.
20   You currently work in the same hospital as
21   Dr. McCash, and by your own account you have had
22   no further incidents.  Moreover, at the VA you
23   will be on two separate rotations and Dr. McCash
24   will not be supervising you, so you're not likely
25   to interact."

*Computer Reporting NYC Inc.*
*(212) 986-1344*

180

Varughese

1
2            While you were at the VA were you and
3    Dr. McCash on two separate rotations?
4    A.    Yes.
5    Q.    And I take it, was Dr. McCash
6    supervising you at the VA?
7    A.    No, he was not supposed to be.
8    Q.    Now, one other thing, two other things
9    and then we'll take a little break.  They should
10   both be relatively short.
11           Let me show you a document.  While
12   you're looking at it we'll mark it as Defendants'
13   Exhibit 14.
14           (Defendants' Exhibit 14, One-page
15       document bearing heading "Specimens grossed
16       on 12-08-2010," marked for identification,
17       this date.)
18   Q.    Have you had a chance to look at that?
19   A.    Yes.
20   Q.    I will say just for the record that
21   it's a document that was produced by Mr. Wronko in
22   response to the hospital's discovery request.  So
23   can you tell me what it is?
24   A.    Yes, these are the specimens that were
25   grossed by me from 12/8/2010 and the following

*Computer Reporting NYC Inc.*
*(212) 986-1344*

181

Varughese

1  day.
2
3      Q.    Is this a printout of something?
4  Where does this document come from?
5      A.    I just made a list of the cases that I
6  had grossed, that I kept an account of.
7      Q.    I take it also a list of the cases
8  that Dr. Azar and Dr. Jordan had grossed as well.
9      A.    Correct.
10     Q.    Where did you get the information from
11  which you compiled the list?
12     A.    I just had this information. I keep a
13  tally of all the cases that I work on as I work on
14  them.
15     Q.    When did you compile this list?
16     A.    I just compiled the list most
17  recently, for discovery requests.
18     Q.    I'm not interested in conversation
19  that you had with Mr. Wronko, but was there some
20  particular reason that you compiled this list?
21     A.    Just to make a note of the amount of
22  work that I was responsible for and the work
23  that...
24     Q.    The others were responsible for.
25     A.    The work that moonlighters performed

*Computer Reporting NYC Inc.*
*(212) 986-1344*

182

Varughese

1  as part of their responsibilities.
2
3      Q.    A little earlier I had asked you about
4  other conversations you had had with --
5      A.    Oh, actually, can we go back to that?
6      Q.    Sure.
7      A.    It also notes the different cases that
8  were, you know, "grossed" by the different people
9  there, including myself and I believe Paul Azar
10  grossed -- well, Paul Azar grossed five cases here
11  and of them he had performed part B of PS10-25072
12  and he grossed part B and C of PS10-25163, and I
13  presume they were probably breast cases or
14  margins. And then he also grossed PS10-25173,
15  part A through D.
16     Just to note, that these cases, you
17  know, are probably the cases that I asked him to
18  gross and Dr. Jordan grossed of the breast cases I
19  believe MS10-79920, part A and B. And I grossed
20  part D through E of that case. So essentially she
21  had decided to gross those specimens without even
22  me even asking her to.
23     Because I believe at some point
24  Dr. Pessin had stated that we were not -- her
25  understanding was the specimens cannot be divided,

*Computer Reporting NYC Inc.*
*(212) 986-1344*

183

Varughese

1  so to be grossed by the moonlighter or some of the
2  residents or somebody else in the program. But
3  the moonlighters being available, we did that
4  routinely. A lot of our cases were split up to be
5  grossed, parts of it to be grossed by Azar or
6  Jordan or whoever the moonlighter was for that
7  day.
8      Q.    Anything else you wanted to say about
9  that document?
10     A.    Just to make a note that I grossed
11  more than -- I believe I grossed about 14
12  specimens and the complexities of all of them, for
13  a majority of them, were quite high.
14     Q.    Let me show you another document and
15  then we'll take a break.
16     MR. WRONKO: While the witness is
17  reviewing it we'll mark it as Defendants'
18  Exhibit 15.
19     (Defendants' Exhibit 15, one-page
20  e-mail to Leena Varughese from Dr. Lento
21  dated January 10, 2011 Bates No. D-2113,
22  marked for identification, this date.)
23     Q.    Have you had a chance to look at that?
24     A.    Yes.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

184

Varughese

1      Q.    Do you recognize this document?
2      A.    Yes.
3      Q.    Can you tell me what it is?
4      A.    It's an e-mail sent to me by Lento.
5      Q.    It's an e-mail to you from Dr. Lento
6  dated January 10, 2011 with cc's to Freda Burstyn
7  and Melissa Pessin-Minsley.
8      So do you recall meeting with
9  Dr. Lento and Ms. Burstyn on January 10th, 2011?
10     A.    Yes.
11     Q.    And how did that meeting come about?
12     A.    I'm not completely sure how this
13  meeting came about, but essentially I had filed a
14  grievance with HR and I had also reported my
15  concerns and my version of events to Dr. Lento and
16  Pessin and I had not heard anything back from them
17  and -- well, I was working with Dr. Lento at that
18  time on the autopsy rotation, but I hadn't spoken
19  to him regarding the letter I had sent to them.
20  And they wanted to meet with me regarding the
21  academic advisement.
22     Q.    Who is Ms. Burstyn?
23     A.    Well, this was the first time I had
24  met her. She's essentially an administrator.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

185

Varughese

1  
2  **Q.**  Administrator of what?  
3  **A.**  For the department of pathology, but  
she works for some other department. I'm not sure  
about that.  
6  **Q.**  So where did this meeting take place?  
7  **A.**  This took place in Freda Burstyn's  
8  office.  
9  **Q.**  Other than you and Dr. Lento and  
10  Ms. Burstyn, anybody else present?  
11  **A.**  No.  
12  **Q.**  What was said at this meeting about  
13  the incident with Dr. McCash on December 8, 2010?  
14  **A.**  What was said? Just they said that  
15  even though -- even if I disagree with the  
16  academic advisement I am still on academic  
17  advisement and I'm expected to understand that I'm  
18  still on academic advisement.  
19  **Q.**  Did they say anything else about the  
20  incident in December other than that you're still  
21  on academic advisement?  
22  MR. McEVOY: Excuse me one second.  
23  (A very brief recess was taken.)  
24  (A portion of the record was read.)  
25  **A.**  Yes, just that I couldn't appeal the  

*Computer Reporting NYC Inc.*  
*(212) 986-1344*

186

Varughese

1  
2  academic advisement. I'm expected to be on it,  
3  understand that I'm on it. They're going to  
4  investigate again and the investigation's findings  
5  have not been determined yet.  
6  **Q.**  The investigation about the  
7  December 8th incident.  
8  **A.**  Right.  
9  **Q.**  Anything else said at the meeting?  
10  **A.**  Dr. Lento said I was being very  
11  professional and that's what's expected of me and  
12  I believe he may have made some comment about  
13  you're smart, professional. I mean, I don't know  
14  if he said I'm smart, but he definitely said I was  
15  being professional.  
16  **Q.**  What did you say, if anything?  
17  **A.**  Strike that from the record that he  
18  may have said I'm smart.  
19  **Q.**  He can't strike anything from the  
20  record. You can correct it, but you can't strike  
21  it. Everything that gets said gets taken down.  
22  **A.**  OK.  
23  **Q.**  Did you say anything at the meeting?  
24  **A.**  I spoke very little.  
25  **Q.**  What did you say?  

*Computer Reporting NYC Inc.*  
*(212) 986-1344*

187

Varughese

1  
2  **A.**  What did I say at the meeting? I  
3  think I just reiterated that, you know, about what  
4  my concerns were and that's it.  
5  **Q.**  One other quick thing which I didn't  
6  show you before. I will show it to you now.  
7  Take a look at that, Dr. Varughese,  
8  and let me know when you've had a chance to review  
9  it.  
10  MR. McEVOY: In the meantime we'll  
11  mark it as Defendants' Exhibit 16.  
12  (Defendants' Exhibit 16, e-mail dated  
13  December 23, 2010 from Leena Varughese to  
14  Lento and Pessin-Minsley, with attachment,  
15  Bates Nos. D-853 and 854, marked for  
16  identification, this date.)  
17  **Q.**  Do you recognize this document?  
18  **A.**  Yes.  
19  **Q.**  Can you tell me what it is?  
20  **A.**  It's e-mail I sent to Dr. Lento and  
21  Dr. Pessin on December 12, 2010.  
22  **Q.**  Is it December 12th or December 23rd?  
23  **A.**  December 23, 2010, excuse me.  
24  **Q.**  It attaches the summary of, your  
25  summary of the incident with Dr. McCash.  

*Computer Reporting NYC Inc.*  
*(212) 986-1344*

188

Varughese

1  
2  **A.**  Yes.  
3  **Q.**  So did you send this to Dr. -- and I'm  
4  not trying to trick you. You sent this to  
5  Dr. Pessin and Dr. Lento the same day you sent it  
6  to Caryn Tiger, correct?  
7  **A.**  Yes.  
8  **Q.**  And the attachment is, although the  
9  heading is different, one says grievance and this  
10  says Drs. Lento and Pessin-Minsley, the substance  
11  of that, the content is the same, correct?  
12  **A.**  Yes.  
13  **Q.**  Last question before I take a break.  
14  Other than the people that you've told me about  
15  who you told about the incident involving  
16  Dr. McCash, and you sent the complaint, I'll call  
17  it the complaint or the grievance, to Drs. Lento  
18  and Pessin and to Ms. Tiger-Paillex, do you know  
19  who, if anyone, they told about your complaint?  
20  **A.**  They told about my complaint?  
21  **Q.**  Yes. So for example, do you know  
22  whether Ms. Tiger-Paillex or Dr. Pessin or  
23  Dr. Lento told Dr. Morency about your complaint?  
24  **A.**  I know Dr. Pessin had spoken to  
25  Dr. Stimmel at some point, because he had said so.  

*Computer Reporting NYC Inc.*  
*(212) 986-1344*

189

Varughese

1   I know Dr. Schiller had spoken to Dr. Pessin at
2   some point as well.
3       Q.   I'm asking you about Dr. Morency.
4       A.   Oh, Dr. Morency. If they had told
5   Dr. Morency?
6       Q.   Do you know if Dr. Morency knew that
7   you made this complaint?
8       A.   No, she wasn't even the chief resident
9   at that time, so...
10      Q.   Do you know if these individuals, and
11  I'm talking about Pessin, Lento and Tiger-Paillex,
12  if they told Dr. Nyfeld about your complaint?
13      A.   At that point you're almost a year
14  prior, no.
15      Q.   Do you know whether they told Scott
16  Barnett? You know who that is.
17      A.   Yes.
18      Q.   Did you know whether they told Scott
19  Barnett about your complaint?
20      A.   Probably, yes. They probably told
21  him.
22      Q.   Why do you say probably?
23      A.   Because he's the dean of graduate
24  medical education.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

190

Varughese

1       Q.   And do you know whether they told Paul
2   Johnson about your complaint?
3       A.   Well, possibly, because they work
4   together. I mean, it's possible. I don't know.
5   I don't know if they --
6       Q.   I just want to know whether you know
7   or not. I guess anything is possible.
8            Do you know whether they ever told
9   Ms. Patel, Shema Patel, about your complaint?
10      A.   At that time, no, I mean, December 23,
11  2010.
12      Q.   It's not just at that time. It's at
13  any time. Do you know whether at any time over
14  the course of your employment until you left in
15  September of 2011, do you know if Dr. Morency or
16  Ms. Patel or --
17      A.   Oh, in that course of event? Yes, I
18  believe all these people were probably informed.
19      Q.   When you say you believe they were
20  probably informed, do you know that they were
21  informed or is that just your belief?
22      A.   Well, I know that Dr. Pessin, Barnett,
23  Paul Johnson, Shema Patel, they were definitely
24  informed. Dr. Morency technically should not be

*Computer Reporting NYC Inc.*
*(212) 986-1344*

191

Varughese

1   informed because she is a co-resident, coworker,
2   even if she's a chief, who should not be informed
3   about what's going on, disciplinary goings on with
4   me.
5       Q.   What about Dr. Nyfeld?
6       A.   Dr. Nyfeld might have been informed.
7       Q.   Do you know?
8       A.   In my opinion? Well, I don't know for
9   sure. I think she was, but...
10      Q.   Similarly, when you say that Ms. Patel
11  was informed, what's the basis for your belief
12  that she knew about your complaint?
13      A.   Well, my basis for that is that she
14  was actually involved in all the meetings, the two
15  meetings that I -- the two meetings where I met
16  with Firpo, Dr. Firpo, she was also present. And
17  in the meeting I met with Cordon-Cardo she was
18  also present.
19      Q.   I'm not asking you whether she knows
20  something about what your situation was just so
21  that we're clear.
22           You made a complaint on December 23rd,
23  right? to Pessin, Lento and Tiger-Paillex and you
24  attached to the e-mail the details of your

*Computer Reporting NYC Inc.*
*(212) 986-1344*

192

Varughese

1   complaint.
2            Do you know whether Pessin or Lento or
3   Tiger-Paillex shared that complaint, told people
4   that you made a complaint to anybody other than
5   the individuals you've already identified?
6            So the fact that Ms. Patel was at some
7   meeting with Dr. Firpo several months later, do
8   you know whether anybody ever told Ms. Patel, not
9   that there had been an incident, not that there
10  had been a problem, but that Dr. Varughese made a
11  complaint against Dr. McCash?
12           Do you know whether she ever knew that
13  or that anybody ever told her that?
14      A.   Shema Patel, um, I believe she had
15  been informed.
16      Q.   What's the basis for that belief?
17      A.   Because she's an administrator and...
18      MR. McEVOY: Why don't we take a
19  five-minute break.
20           (A recess was taken from 3:24 p.m. to
21  3:29 p.m.)
22      MR. McEVOY: So in an off-the-record
23  discussion, a couple of things, Mr. Wronko
24  informs me that the witness has a headache,

*Computer Reporting NYC Inc.*
*(212) 986-1344*

Errata Sheet

Subject: Transcript of day #1 of deposition plaintiff, Dr. Leena Varughese, which was conducted on May 23, 2013

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 14 | 6 | Insert "up" after "following" |
| 14 | 7 | Correct "or insuring" to "and ensuring" |
| 15 | 11 | Correct "--" to "further processing in chemicals" |
| 17 | 11 | Correct "They" to "The chief residents" |
| 18 | 18 | Correct "microscope" to "magnifying glass" |
| 19 | 11 | Add "or PGY-2" before "year" |
| 21 | 9 | Delete "sort of" |
| 25 | 14 | Delete "1 to" |
| 26 | 18 | Correct "and" to "in" |
| 26 | 21 | Correct "conference" to "call" |
| 28 | 23 | Add "was" after "There" |
| 34 | 25 | Correct "Laura" to "Leena" |
| 39 | 6 | Correct "he" to "it" |
| 39 | 14 | Correct "Jacqueline Hecthman" to "Jaclyn Hechtman" |
| 40 | 10 | Correct "had" to "said" |
| 40 | 12 | Correct "Don't take that." to "Don't say that." |
| 47 | 8 | Correct "No." to "Yes." |
| 50 | 20 | Correct "him" to "McCash" |

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 51 | 17 | Delete "not" |
| 52 | 6 | Add "his records of several instances of abusive and harassing behavior towards me including the interfering in decision to manage work with my coworker, accusations related to moonlighting, problems with scheduling required rotations, threats directed at me, and inappropriately touching me on the shoulder." in place of "--" |
| 52 | 15 | Correct "I am not sure now. I am not a hundred percent sure certain." to "Yes, I did." |
| 53 | 4 | Correct "with" to "out of" |
| 53 | 6 | Delete "just", ".[period]", "had", and correct "allowed" to "allow" |
| 53 | 8 | Correct "Sinai" to "Mount Sinai Hospital." |
| 54 | 11 | Correct "Jacqueline Hecthman" to "Jaclyn Hechtman" |
| 55 | 9 | Delete "not" |
| 55 | 10 | Delete "not", "if", and "but" |
| 56 | 21 | Correct "gross" to "grossing" |
| 59 | 19 | Add "Valentin" before [period] |
| 59 | 23 | Delete "was primarily --" |
| 60 | 13 | Delete "..." and add "only at my discretion as the sole resident on surgical pathology service, not chief residents or moonlighters, according to moonlighting policy." |
| 63 | 8 | Correct ". So I just asked her just simply like," to ", so I talked to her." |
| 63 | 8-9 | Delete "since I was a primary --" |
| 63 | 9 | Correct "since I was a resident" to "Since I was the only resident" |

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 63 | 13 | Add "as to why Jordan was doing with specimens when I had not requested a moonlighter for assistance." after "on" |
| 66 | 8-10 | Correct "Earlier that day, So she had gone under way with beginning to gross gross or prosect the specimen" to "Earlier that day, she had gotten underway with grossing of specimens as a moonlighter without my request for her moonlighting services." |
| 67 | 23 | Correct "Yeah, I am not sure if it was -- I don't think we had that" to "We did not have that" |
| 68 | 4 | Add "room" after "grossing" |
| 68 | 21 | Remove ".", correct "wasn't" to "weren't", and add "usually grossed by moonlighters." after "just" |
| 70 | 16 | Change "Correct" to "Incorrect" |
| 71 | 13 | Correct "explained" to "explain" |
| 71 | 15 | Add "finish my work." after "can" |
| 71 | 24-25 | Change "Well, listen, just about put it back." to "Well, I will put the specimens back and won't gross them." |
| 72 | 7 | Correct "want" to "went" |
| 72 | 17 | Change "completed" to "resolved" |
| 73 | 7 | Change to "I was working at a grossing station." |
| 75 | 15 | Change "No" to "Yes" |
| 76 | 20 | Correct "come" to "go" |
| 76 | 23 | Add "as dictated by department policy." after "work" |
| 78 | 4 | Correct "I may have said some of those things." to "No." |
| 81 | 2 | Correct "grown" to "gown" |

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 81 | 24 | Add "what you are asking." to after "sure" |
| 82 | 19 | Add "to grossing room" after "come" |
| 87 | 3 | Add "and McCash cursed at me." after "me" |
| 87 | 22 | Add "McCash started shouting at me again that evening." after "heated" |
| 88 | 24 | Add "I asked him to get away from me and leave me alone." after "have" |
| 89 | 21-22 | Replace answer to "Dr. Jaffer asked McCash to allow me to do my work and leave." |
| 94 | 12 | Add "Paul Azar", "Sarah Frost", "Dianne Grunes" |
| 100 | 16-17 | Add "from December 13, 2010 to December 23, 2010." after "period." |
| 100 | 21 | Add "question." after "particular" |
| 105 | 6 | Delete "sort of" |
| 105 | 17 | Add "myself outside of work" after "enjoy" |
| 105 | 17 | Add "this incident." after "about" |
| 105 | 18-19 | Delete "you know, just trying to be supportive." |
| 108 | 4 | Correct "in" to "of" |
| 108 | 24 | Correct "a" to "the" |
| 109 | 9 | Insert "up" after "Do" |
| 110 | 8 | Correct "on" to "off" |
| 115 | 2 | Change "and how I remember" to "during the meeting with" |
| 124 | 22 | Correct "Megier" to "Maniar" |

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 137 | 7 | Correct "labs" to "lapse" |
| 137 | 8 | Correct "he" to "Bleiweiss or Pessin" |
| 137 | 22 | Correct "she" to "Bleiweiss or Pessin" |
| 140 | 14 | Correct "Venya" to "Lento" |
| 142 | 11-12 | Sentence should read "That was what Caryn Tiger stated." |
| 146 | 14 | Add "or become a target for further retaliation." in place of "..." |
| 149 | 24 | Correct "Fersch" to "Fersh" |
| 150 | 25 | Correct "Not exactly" to "Yes because Ms. Tiger, HR director, ignored all my concerns regarding my safety and ability to work without harassment." |
| 152 | 20 | Add "told me that McCash feels that he has done nothing wrong and is incapable of apologizing for his actions and behavior towards you. In essence, after over 3 months of investigation, the Director of HR, Ms. Tiger completely ignored my complaints and completely sided with McCash." in place of "..." |
| 155 | 10 | Add "further retaliation and discrimination that I could be subjected to because the HR director and Mount Sinai medical center ignored my concerns regarding harassment, discrimination, and retaliation by white coworkers such as Jordan and McCash, and white supervisors such as Lento, Schiller, Bleiweiss, Pessin-Minsely for the explicit favorable treatment of caucasians." in place of "--" |
| 156 | 15 | Add ", yes." in place of "--" |
| 157 | 9-10 | Delete ", I believe that it had something to do with it." |
| 157 | 14 | Add "and my supervisors were excused completely for their targeting me because of my race, gender, and national origin." |
| 161 | 4 | Change "No, I --" to "Yes," |

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 162 | 2 | Add "dismissive of my concerns and contradicts what she said to me at the meeting on April 5, 2011." in place of "--" |
| 162 | 13 | Add "McCash and Jordan, and dismissing my concerns, which she also stated that she had regarding what had happened." |
| 163 | 22 | Correct "ability" to "able" |
| 164 | 10 | Add ", when McCash is the one who regularly solicited other for drinking at work." in place of "--" |
| 168 | 25 | Add "promoted for engaging and actively participating in discrimination and harassment against me a brown to black colored women of indian descent." in place of "--" |
| 168 | 5 | Add "that Jordan was likely told to say and document things against me and actively harass me by Drs. Schiller, Bleiweiss, Lento, and Pessin-Minsely" in place of "--" |
| 168 | 19 | Correct "I am not sure." to "Yes" |
| 172 | 11 | Add "someone sexually harasses you." in place of "--" |
| 174 | 8 | Correct "I can't recall." to "Yes, I thought that what he said was derogatory and directed related to my gender." |
| 175 | 12 | Correct "I can't recall" to "Yes" |
| 181 | 23 | Add "that I had done, which included a lot of complicated cases, contrary to what has been asserted by the Melissa Pessin-Minsely, Ira Bleiweiss, and Samuel McCash." in place of "..." |
| 186 | 3 | Correct "They're" to "GME office was" |
| 186 | 13 | Add "in all our interaction." before "." |
| 186 | 13 | Delete "smart" |

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 189 | 10 | Add "she would not have been informed in December 2010 of my complaint and I don't think resident coworkers are allowed to be involved in taking disciplinary action against another resident." in place of "..." |
| 189 | 13 | Correct "Nyfeld" to "Najfeld" |
| 190 | 6 | Add "shared my exact complaints but they should have because he and Art Figur were both involved in interviewing me in January 2011." |
| 191 | 6 | Correct "Nyfeld" to "Najfeld" |
| 191 | 10 | Correct ", but..." to "told to write a derogatory evaluation of me." |
| 192 | 18 | Add "works for the President of the Mount Sinai Medical Center and Dean of Medical School." in place of "..." |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

200

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------X

LEENA VARUGHESE, M.D.,

    Plaintiff,

    vs.       12 Civ. 8812(CM)

MOUNT SINAI MEDICAL CENTER,
PATRICK LENTO, M.D., CARLOS
CORDON-CARDO, M.D., ADOLFO
FIRPO, M.D., IRA J. BLEIWEISS,
M.D. and ABC CORP. 1-10, and
JOHN DOES 1-10,

    Defendants.

------------------------------X

June 11, 2013

10:34 a.m.

Volume II

Continued deposition of LEENA
VARUGHESE, held at the offices of Edwards
Wildman Palmer LLP, 750 Lexington Avenue, New
York, New York, pursuant to Notice, before
Thomas R. Nichols, a Registered Professional
Reporter and a Notary Public of the State of
New York.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

201

A P P E A R A N C E S :

LAW OFFICES OF RONALD J. WRONKO, LLC
Attorneys for Plaintiff
    134 Columbia Turnpike
    Florham Park, New Jersey 07932
BY:  RONALD J. WRONKO, ESQ.

EDWARDS WILDMAN PALMER LLP
Attorneys for Defendants
    750 Lexington Avenue
    New York, New York 10022
BY:  RORY J. McEVOY, ESQ.
    JULIE L. SAUER, ESQ.

---

202

               Varughese

1

2    L E E N A  V A R U G H E S E , called as a

3    witness, having been duly sworn by a Notary

4    Public, was examined and testified further

5    as follows:

6  EXAMINATION BY (CONT'D.)

7  MR. McEVOY:

8      Q.    So Dr. Varughese, remember you have to

9  give oral responses so the court reporter can take

10  down what is being said.

11      A.    Correct.

12      Q.    And as I asked you the last day, are

13  you taking any medication of any type --

14      A.    No.

15      Q.    Let me finish.  -- that would affect

16  your ability to answer the questions?

17      A.    No.

18      MR. WRONKO:  Just remember, let him

19  finish his question before you give your

20  response.

21      Q.    So Dr. Varughese, are you familiar

22  with the Physician Wellness Committee?

23      A.    Yes.

24      Q.    And what is the Physician Wellness

25  Committee?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

203

               Varughese

1

2      A.    It is a committee set up by the

3  hospital to assist physicians who may be having

4  some sort of problems, either substance abuse,

5  which is what I really thought what their purpose

6  was, to intervene in those kinds of situations.

7      Q.    Let me show you a document, and it's a

8  document that you actually produced in discovery,

9  and take a look at it.

10      MR. McEVOY:  Mark it as Exhibit 17.

11      (Defendants' Exhibit 17, Mount Sinai

12    Medical Center's Policies and Procedures,

13    Subject No. A4-125, marked for

14    identification, this date.)

15      A.    OK.

16      Q.    What is this document?

17      A.    This is I believe HR or the hospital's

18  policy and procedure A4-125, and this is something

19  that Dr. Figur made me aware of because he sent

20  this document to me.

21      Q.    So you got this from Dr. Figur?

22      A.    Yes.

23      Q.    When did you get it from Dr. Figur?

24      A.    I believe it was when I was

25  interviewing with him under his, you know, role or

*Computer Reporting NYC Inc.*
*(212) 986-1344*

204

Varughese

1    Varughese
2    whatever his role was at the Physician Wellness
3    Committee back in like March or April of 2011.
4        Q.    Dr. Varughese, when were you first
5    referred to the Physician Wellness Committee?
6        A.    Well, according to Dr. Figur I was
7    referred to the Physician Wellness Committee in
8    December of 2010.
9        Q.    And was that your understanding of
10   when you were first referred?
11       A.    Yes.
12       Q.    Now, in the complaint in paragraph 28,
13   and I'm not going to read the whole thing, but in
14   essence what it says is that in or around late
15   December of 2010 Dr. Pessin-Minsley had contacted
16   the PWC to report you in order to provoke the PWC
17   to take negative action against you in retaliation
18   for your complaints.
19           I will come back to that part, but how
20   did you learn that Dr. Pessin-Minsley had reported
21   you to the PWC?
22           MR. WRONKO:  Form objection.  You can
23   answer.
24       A.    Well, I learned about it eventually in
25   like March of 2011 when Dr. Figur informed me that

*Computer Reporting NYC Inc.*
*(212) 986-1344*

205

Varughese

1    she had originally reported me to PWC, but he
2    thought that it wasn't -- the issues that were
3    coming up at that time were not a concern or
4    within the realm of PWC's jurisdiction at the
5    hospital.
6        Q.    So did Dr. Figur tell you who had
7    referred you to the PWC when he decided it was
8    appropriate for you to meet with him?
9            MR. WRONKO:  Form objection.  You can
10   answer.
11       A.    Had referred him?
12       Q.    Who had referred you to him.  You said
13   that Dr. Minsley had tried to report you and he
14   said he didn't think it was appropriate.
15       A.    Right.  That was his position, but I
16   did meet with him well before the PWC, quote
17   unquote, PWC got involved, because according to
18   Dr. Figur he wears many hats in the hospital and
19   I'm not sure what hat he was wearing when I met
20   with him in January of 5, 2011.
21       Q.    So when you met with Dr. Figur in
22   January of 2011 where did that meeting take place?
23       A.    That meeting took place in the
24   hospital.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

206

Varughese

1        Q.    Do you know where in the hospital?
2        A.    Sure.  It was in the graduate medical
3    education office.
4        Q.    Was anyone else present other than yo
5    and Dr. Figur?
6        A.    Paul Johnson was also present.
7        Q.    And what was discussed at that
8    meeting?
9        A.    Basically the circumstances, you know,
10   that -- a lot of things -- can I correct that?  A
11   lot of things were discussed.  Initially they
12   discussed, you know, how work is managed within
13   the department, and that went into, you know, what
14   actually took place and what my concerns were
15   and...
16       Q.    So when you say what took place, what
17   are you referring to?
18       A.    Well, I'm referring -- in terms of
19   what PWC, I mean, not PWC, Dr. Figur and Paul
20   Johnson wanted to know how the work flow of the
21   department, you know, went from I guess in the
22   morning to like when everyone washed up and went
23   home.  So that was one aspect of what they wanted
24   to know took place.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

207

Varughese

1            They wanted to also know like how work
2    was divided among people and how it was, I guess,
3    done on a regular basis.
4            And then he wanted to also know about
5    the incident that I had complained about, which
6    was McCash harassing me and intimating me.
7        Q.    That's the December incident?
8        A.    That's the December 8th incident,
9    right.
10       Q.    What else did they ask you to talk
11   about?
12       A.    They wanted to know about the
13   moonlighting and how the moonlighting worked.
14   They wanted to know more about just general, you
15   know, issues relating to moonlighting and what
16   else happened.
17           I think I mentioned, I just mentioned
18   what was going on in the department and what was
19   going on with me at that point.
20       Q.    And so what did you say about what was
21   going on with you, what was going on with the
22   department?
23       A.    Well, I informed him about, you know,
24   McCash basically harassing me and getting involved

*Computer Reporting NYC Inc.*
*(212) 986-1344*

208

Varughese

1  in work that I'm managing as part of my duties and
2  just him intimating me and regularly harassing me
3  at work and my report of that to Dr. Lento and his
4  lack of action on my complaints. So I believe
5  informed Dr. Figur and Paul Johnson about those
6  issues.
7      Q.    Anything else that you told him at
8  this meeting?
9      A.    I mean, is there a specific
10  question other than --
11      Q.    I wasn't at the meeting. I don't know
12  what happened there. So what I want to know is --
13      A.    Right, so I also --
14      Q.    Wait. Let me finish. Everything you
15  recall them saying to you and everything you
16  recall saying to them during that meeting.
17      A.    Right. Well, I also informed them
18  about what's -- Adrienne Jordan's drinking and
19  possibly McCash also consuming alcohol at work
20  without, you know, any concern or -- concern or
21  paying any attention to what the rules were within
22  the department and whether or not they were
23  involved in patient care, and in general, just
24  Adrienne Jordan's like -- just Adrienne Jordan

*Computer Reporting NYC Inc.*
*(212) 986-1344*

209

Varughese

1  just basically taking over moonlighting and
2  managing it in a way where it was just clearly in
3  her benefit. Because Dr. Figur wanted to know
4  if -- who was actually overseeing moonlighting to
5  ensure that the department wasn't spending an
6  exorbitant amounts of money paying for a service
7  that they didn't need depending on any given day.
8      So I frankly did not know if there was
9  any oversight over that program because Adrienne
10  Jordan was in charge of it.
11      Q.    Anything else that you told them or
12  talked about at this meeting?
13      A.    I believe I mentioned that I thought
14  McCash was harassing me because I was a woman and
15  it was probably motivated by my gender.
16      Q.    Anything else that you told them or
17  talked about that you recall?
18      A.    I cannot recall.
19      Q.    When you say that Adrienne Jordan was
20  running the moonlighting program for her benefit,
21  what did you mean?
22      A.    I'm not sure if I said that. Did I
23  say that?
24      Q.    You did.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

210

Varughese

1      A.    Well, the problem was she was in
2  charge of the moonlighting and she assigned
3  herself to moonlighting almost every day at her
4  convenience. It seemed like, you know, she was,
5  you know, her and McCash, they were always
6  assigning themselves to moonlighting duties and it
7  seemed like a lot of us, the lot of the remaining
8  residents, other residents in the cohort, they
9  were not allowed to moonlight. I would send them
10  e-mail saying I'm not allowed to moonlight, and
11  apparently a lot of my colleagues were also sent
12  e-mails saying that we were not allowed to
13  moonlight.
14      Q.    E-mails from Dr. Jordan?
15      A.    Right.
16      Q.    So when you say her benefit or
17  Dr. McCash's benefit, are you referring to their
18  financial benefit?
19      A.    Right, it paid $70 an hour and I think
20  it was a maximum of three hours per day, which is
21  a lot of money.
22      Q.    Other than telling Dr. Figur and
23  Mr. Johnson, this is the meeting in January 2011,
24  did you ever complain to anybody at the hospital

*Computer Reporting NYC Inc.*
*(212) 986-1344*

211

Varughese

1  about the way the moonlighting system worked?
2      A.    I believe I had mentioned my concerns
3  to -- Paul Johnson was the head of GME, and I also
4  believe I spoke to Dr. Barnett regarding it at
5  some point, perhaps very briefly. Just made them
6  aware, but....
7      Q.    What did Dr. Barnett say about the
8  moonlighting issue when you mentioned it to him?
9      A.    He didn't say much, and --
10      Q.    What did he say?
11      A.    He didn't say much at all. I mean,
12  Dr. Lento is the one who is overseeing it, so you,
13  know.
14      Q.    Did you talk to Dr. Lento about it?
15      A.    I'm not sure if I spoke to him. But I
16  was e-mailed by Dr. Jordan and I spoke to my
17  colleagues about the e-mail from Dr. Jordan about
18  not moonlighting and she said that it was, um,
19  Dr. Lento should be e-mailing me, not Dr. Jordan.
20  So I really don't know.
21      Either way it was fine with me because
22  I just said I shouldn't moonlight anymore. It's
23  not that big a deal.
24      Q.    When you say that you think you

*Computer Reporting NYC Inc.*
*(212) 986-1344*

212

Varughese

1    mentioned the fact that you thought that
2    Dr. McCash was treating you the way he was
3    treating you because you're a woman and because I
4    think you said a woman because of your gender,
5    which is the same thing, are you sure that you
6    mentioned that to Dr. Figur and Mr. Johnson?
7         MR. WRONKO:  Form objection.  You can
8    answer.
9    **A.**    I'm pretty sure I mentioned it.
10   **Q.**    What did you say?
11   **A.**    I'm pretty sure that I mentioned --
12   **Q.**    I know.  I heard you.  What did you
13   say?  What did you say to him?
14   **A.**    I think I said that they would not
15   treat a male resident or colleague in the same way
16   that they're treating me and there was a pattern
17   of behavior that I experienced at the hands of
18   Dr. McCash, whether it was telling me to shut up,
19   shut up in front of all my colleagues, at a
20   conference no less because he's upset, and then,
21   you know, to this incident which was also
22   physically intimidating to me and it just seems
23   that his behavior was getting more aggressive and
24   escalating from one to the next.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

213

Varughese

1    **Q.**    So other than saying that you thought
2    that Dr. McCash wouldn't treat male colleagues the
3    way he treated you, did you say anything else to
4    Dr. Figur or Mr. Johnson about your belief that
5    Dr. McCash was treating you in the manner you
6    described because you're a woman.
7    **A.**    I believe I made it very clear to them
8    that I was, you know, physically intimidated and I
9    felt afraid to be at work and to be around him.
10   **Q.**    Did you say anything else about that
11   subject?
12   **A.**    Well, I mean, relating to Dr. McCash,
13   I believe I did say more about his pattern of
14   behavior.
15   **Q.**    No, I understand that, Dr. Varughese.
16   I'm not asking you about what Dr. McCash did.
17   You've told me that at some length.
18        What I'm asking you, you said at the
19   meeting with Dr. Figur and Mr. Johnson, you said
20   that you thought Dr. McCash was treating you the
21   way you described because you were a woman and I
22   asked you what you said about that, about the fact
23   that he treated you that way because you're a
24   woman, and you said because you didn't think he

*Computer Reporting NYC Inc.*
*(212) 986-1344*

214

Varughese

1    would treat men the same way he treated you.  I
2    understand that.
3         Now my question is not what Dr. McCash
4    did or didn't do, but did you tell Dr. Figur and
5    Mr. Johnson anything else about why you thought
6    Dr. McCash was treating you the way he was
7    treating you because you're a woman other than he
8    didn't treat men that way?
9         MR. WRONKO:  Form objection.  I think
10   she's answered that.
11   **A.**    I believe I already answered that
12   question.
13   **Q.**    Did you say anything else to them
14   other than what you've already told me about
15   Dr. McCash's treating you the way he treated you
16   because you're a woman?
17   **A.**    Right, I explained the two incidents
18   and whatever other incidents that I thought was
19   relevant at that time to them and I'm not sure if
20   I draw a comparison between myself and my male
21   colleagues to further explain the point to them.
22   I'm not sure if I did do that at that time.
23   **Q.**    Did Dr. Figur or Mr. Johnson tell you
24   why they wanted to meet with you?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

215

Varughese

1    **A.**    Yes.  They explained that it was
2    because of the complaint and there was an
3    incident.
4    **Q.**    What complaint?
5    **A.**    Well, I assumed it was because of my
6    complaint.  I had sent a complaint into HR.  And I
7    assumed that's why they wanted to meet with me.
8    **Q.**    What did they say?
9    **A.**    Well, that's what I assumed initially,
10   but then they mentioned that Dr. Pessin had said
11   something about insubordination, and so on and so
12   forth.
13        So then I wasn't sure why they were
14   meeting with me and what their premise for the
15   investigation was at that time.
16   **Q.**    Did you ask them why they were meeting
17   with you?
18   **A.**    Well, they were asking me --
19   **Q.**    Did you ask them why they were meeting
20   with you?
21   **A.**    Yes.
22   **Q.**    What did they say?
23   **A.**    They said it was just related to these
24   incidents and they were trying to investigate what

*Computer Reporting NYC Inc.*
*(212) 986-1344*

216

Varughese

1  happened.
2     Q.   How did the meeting end?  And by how
3  did the meeting end, I mean what happened at the
4  end of the meeting?  Was there some follow-up that
5  was to take place?  What was supposed to happen,
6  if anything?
7
8     A.   Right.  So I met with them initially
9  for like an hour and then I had to meet with them
10 again because we couldn't complete the interview
11 at that time.  So after the second meeting we
12 just, um, I think they asked me some questions and
13 it ended abruptly and....
14    Q.   What happened at the second meeting?
15 Well, strike that.  How long after the first
16 meeting was the second meeting?
17    A.   I'm not sure now.  I believe it was
18 like a week maybe, approximately.
19    Q.   The same people at the second meeting,
20 you, Mr. Johnson and Dr. Figur?
21    A.   Right.
22    Q.   And what happened at the second
23 meeting?
24    A.   Well, I -- well, they had more
25 questions to ask me, so I just answered.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

217

Varughese

1
2     Q.   What questions did they ask you?
3     A.   I can't recall it right now.
4     Q.   Do you remember generally what the
5  topic of the second meeting was?
6     A.   No, but I remember their attitude
7  towards me had changed quite significantly.
8     Q.   Do you remember what the questions
9  they asked you, what the general topic was?  I
10 didn't ask you about their attitude.
11    A.   Well, the general topic was the
12 incidents and....
13    Q.   Incidents about what?
14    A.   The December 8th incident.
15    Q.   When you say their attitude had
16 changed, how did you perceive their attitude to
17 have changed from the first meeting to the second
18 meeting?
19    A.   They were very confrontational, the
20 second meeting.
21    Q.   And in what way was Dr. Figur
22 confrontational?
23    A.   Well, it was just -- well, it's just a
24 sense I got, but, I mean, you know, that's just my
25 perception.  I can't....

*Computer Reporting NYC Inc.*
*(212) 986-1344*

218

Varughese

1
2     Q.   And what about Mr. Johnson, is that
3  just your perception as well?
4     A.   Well, it's not just my perception.
5  It's pretty important if it's my perception.
6     Q.   Leave out the word "just."  Was it
7  your perception that Mr. Johnson had adopted a
8  more confrontational attitude?
9     A.   No, I cannot say Mr. Johnson was
10 particularly confrontational.
11    Q.   It was Dr. Figur who you perceived as
12 confrontational.
13    A.   Well, I felt Dr. Figur had sort of
14 been swayed in one way in a way towards a negative
15 attitude towards me and had this -- the way he
16 was asking me questions, I just thought that he
17 had assumed that I had done something wrong even
18 though he was just conducting the investigation
19 and he should not have a real attitude or opinion
20 yet.
21    Q.   Swayed by who?
22    A.   Well, I would imagine the department.
23    Q.   Do you know whether Dr. Figur had any
24 consultation with anybody in the department about
25 his meetings with you?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

219

Varughese

1
2     A.   I believe he did.
3     Q.   And what's the basis for that belief?
4     A.   Well, the basis for that belief is
5  just information that I had recently gleaned.
6     Q.   I don't know what that means.
7     A.   From the various discovery and such.
8  It seems that the department was e-mailing him and
9  contacting him and speaking to him on the phone.
10 I assume it's -- I assume that they had time to,
11 you know, collaborate, corroborate their stories.
12    Q.   So at the end of the meeting did
13 Dr. Figur or Mr. Johnson ask you to do anything?
14    A.   No.
15    Q.   Was there any follow-up meeting
16 scheduled?
17    A.   No.
18    Q.   Did you ask them to do anything?
19    A.   Right.  I reported to them about the
20 drinking and I think they said that they're going
21 to go up and investigate.
22    Q.   Did you ask them to do anything else?
23 At the end the meeting I'm talking about.
24    A.   No, I don't think I really -- I was
25 expecting them to, you know, follow up with me at

*Computer Reporting NYC Inc.*
*(212) 986-1344*

220

Varughese

1  some point about their findings, but that never
2  occurred.
3
4     Q.   Do you know, Dr. Varughese, whether
5  Dr. Figur or Mr. Johnson conducted an
6  investigation into the incident involving you and
7  Dr. McCash in December of 2010?
8     A.   I believe that was -- the line of
9  questioning involved that incident.
10    Q.   I understand that, but do you know
11 whether apart from the meeting that they had with
12 you or the meetings they had with you, do you know
13 whether Dr. Figur or Mr. Johnson did anything else
14 to investigate the incident involving you and
15 Dr. McCash in December of 2010?
16    A.   I'm not sure if they had interviewed
17 other people or there were further, you know,
18 other interviews with other people in the
19 department.
20    Q.   Now, did there come a time when -- let
21 me take a step back.  You said that this meeting
22 with Dr. Figur and Mr. Johnson was not in
23 connection with a referral to the PWC, correct?
24    A.   Well, they informed -- I believe they
25 informed me about the PWC.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

221

Varughese

1
2     Q.   But this wasn't a meeting that took
3  place within the parameters of the PWC program as
4  you understood it.
5     A.   Right.  Well, Dr. Figur explicitly
6  made a disclaimer that even though he had been
7  referred, insubordination or whatever complaint
8  Dr. Pessin made is not for -- it's not within the
9  realm of PWC.
10    Q.   Did there come a time when you were
11 referred to the PWC?
12    A.   Well, I was referred to the PWC by the
13 department leadership, which is
14 Dr. Pessin-Minsley.  So there's no question that
15 I, you know, there have been several times when
16 I've been referred to the PWC, that being one of
17 the first.
18    Q.   After that time did there come another
19 time when you were referred to the PWC after
20 January 2010 when you met with Dr. Figur and
21 Mr. Johnson?
22    A.   Right, I was referred to them sometime
23 in February of 2011.
24    Q.   Who referred you?
25    A.   I believe it was Dr. Lento.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

222

Varughese

1
2     Q.   And how did you learn that it was
3  Dr. Lento that had referred you to the PWC?
4     A.   How did I learn that?  Well, because
5  they sent me an e-mail, Dr. Figur sent me an
6  e-mail saying that I had been referred to the PWC
7  and he would like to meet with me like on
8  February, I believe it was 18, or I believe it was
9  around that time.
10    Q.   Did Dr. Figur in that e-mail say that
11 Dr. Lento had referred you?
12    A.   Well, I just -- I made that assumption
13 because he was cc'd on that e-mail.
14    Q.   New, let me show you a document,
15 Dr. Varughese, and I will tell you that it is a
16 fairly long and a little difficult to follow
17 e-mail string, but if you would look at it while
18 we mark it as Defendants' Exhibit 18 then I will
19 ask you some questions about it.
20         (Defendants' Exhibit 18, e-mail string
21         commencing with Bates No. D-1397 and ending
22         with Bates No. D-2129, marked for
23         identification, this date.)
24    A.   OK.
25    Q.   Have you had a chance to look at that?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

223

Varughese

1
2     A.   Yes.  It seems to be an e-mail
3  spanning a number of days or weeks.
4     Q.   The first part of it, which are Bates
5  numbers D-1397 to D-1402, is an e-mail string.  It
6  starts with an e-mail from Dr. Figur to you dated
7  Monday, February 28, 2011, and ends with an e-mail
8  from you to Dr. Figur dated April 7, 2011.
9         And this e-mail string is a little
10 unusual in that the earliest e-mail is in the
11 front, not in the back.  So the earliest one is on
12 the first page.
13        The second part of this e-mail string
14 is on Bates stamp numbers D-2128 to 2129, and it
15 is an e-mail string that now goes in the usual
16 reverse order, with the earliest one being a
17 Monday, March 28, 2011 e-mail from Dr. Figur to
18 you and the last one being an April 1, 2011 e-mail
19 again from Dr. Figur to you.
20        So, Dr. Varughese, if you look at the
21 first page which is the one numbered 1397, that's
22 an e-mail from Dr. Figur to you dated Monday,
23 February 28, 2011.
24        Do you see that?
25    A.   Right.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

224

Varughese

2   Q.   And it says, "Leena, you were referred
3   to meet with the Physicians Wellness Committee.
4   "Dr. Dan Hughes and I can meet with
5   you either March 1 at 12 noon or March 3d at 10
6   a.m.  Please email both of us which is the most
7   convenient date and time for you.
8   "Pat can you free her up for an hour
9   either time that is convenient to her schedule.
10   "I don't normally give the following
11   information to prospective interviewees, but being
12   aware of your past responses to requests, I just
13   want to lay it on the line.  Refusal to cooperate
14   (which means meeting with us, etc.) can be grounds
15   for immediate termination from the program and the
16   hospital without rights of appeal.
17   "It has happened in the past to other
18   physicians.
19   "Sorry to be SO blunt, but I don't
20   want there to be any misunderstandings or
21   miscommunications between us."
22   Did I read that correctly?
23   A.   Right.
24   Q.   So had Dr. Figur tried to schedule
25   meetings with you before February 28, 2011?

---

226

Varughese

2   after he returns on a March 20th and asked me to
3   let you know.
4   Did you receive that e-mail from
5   Dr. Lento?
6   A.   Yes.
7   Q.   Then the next e-mail is March 23rd of
8   2011 from Dr. Figur to you and it says: "Leena, I
9   heard from Dr. Lento that you are back at Mount
10   Sinai.  Dan Hughes and I could either meet with
11   you this Friday 3/25 at 11 a.m. or Monday 3/28 at
12   11 a.m. in my office.  Pick which is most
13   convenient for you and the department."
14   Then he tells you where his office
15   location is.  Did you receive that e-mail?
16   A.   Yes.
17   Q.   And then the next e-mail which is on
18   March 24th is from Dr. Lento to you saying:
19   "Please contact Dr. Figur right away regarding his
20   e-mail below."
21   Do you see that?
22   A.   Right.  That was the 24th, right.
23   Q.   And then the next e-mail in this
24   string is dated March 28th from Dr. Figur to you
25   and it says:  "Leena, it was nice bumping into you

---

225

Varughese

2   A.   Actually, no.  He has not made such a,
3   you know, effort that went to such lengths to
4   schedule a meeting with me.  This is e-mail I
5   received from him and I was rather shocked by the
6   tone and the attitude.
7   Q.   I didn't ask whether he went to great
8   lengths or made serious efforts.
9   Prior to this e-mail you got on
10   February 28th of 2011 had Dr. Figur or Dr. Hughes
11   attempted to schedule a meeting with you?
12   A.   I don't recall.  I believe they have
13   not.  I mean, I believe they have not.  I don't
14   want to say I don't recall, but to the best of my
15   knowledge, they have not.
16   Q.   So when Dr. Figur says being aware of
17   your past responses to requests, do you have any
18   idea what he's referring to?
19   A.   I had no idea what he was referring
20   to.
21   Q.   The next e-mail is from Dr. Lento to
22   you and he says that he let Dr. Figur know that
23   you were at an affiliate and we are short resident
24   coverage for this week given that so many are out
25   for the USCAP.  He said that it can wait until

---

227

Varughese

2   in the subway.  I need about 15 minutes of our
3   time to discuss Dan's and my recommendations.
4   Give me some dates and times you are free this
5   week."
6   Do you see that?
7   A.   Yes.
8   Q.   As of March 28th, Dr. Varughese, had
9   you met with Dr. Figur and Dr. Hughes?
10   A.   Yes, I believe I met with them.  Yes,
11   I did.
12   Q.   When did you meet with them?
13   A.   I think it was March 25th.
14   Q.   Where did that meeting take place?
15   A.   Or even March 23rd.  No, March 24th or
16   25th.
17   Q.   Where did that meeting take place?
18   A.   It took place in Dr. Figur's office.
19   Q.   And was Dr. Hughes present?
20   A.   Yes.
21   Q.   Anybody else other than the three of
22   you?
23   A.   Yes.
24   Q.   And what was discussed at that
25   meeting?

---

228

Varughese

2     A.    Just that I had been referred to them
3  at some point and the reasons for referral and,
4  you know, they wanted to know what my thoughts
5  were.
6     Q.    What were you told were the reasons
7  for the referral?
8     A.    They said it was a variety of issues
9  over the -- that, um, they said it was a variety
10 of issues.
11    Q.    What were the issues?
12    A.    I can't, I don't remember right now,
13 but it seemed really just random to me because it
14 seemed sort of that they were making the
15 supposition that or Dr. Figur was making the
16 supposition that all the matters that they
17 referred to were absolutely true.  They were
18 assuming that I had done something wrong over the
19 past like year or so, and, I mean, they were
20 essentially confronting me with these issues.
21    Q.    You don't remember what the issues
22 were.
23    A.    I mean, it just sort of was -- it was
24 a range of --
25    Q.    I understand that.  All I'm asking is,

Computer Reporting NYC Inc.
(212) 986-1344

229

Varughese

2  as you sit here today, Dr. Varughese, do you
3  recall any of the issues that they discussed with
4  you as being the reasons that you had been
5  referred to the PWC?
6     A.    Right, well, they referred, um, they
7  said that, you know, I was referred here because
8  of the incident with McCash.  Then they said that
9  they, and Dr. Pessin felt like I was being
10 insubordinate and then they said something about,
11 Oh, like, several years ago Dr. Schiller said
12 something, and -- it was just like really strange
13 in my opinion.
14    Q.    I didn't ask you if you thought it was
15 strange.  I asked you what you recall them saying
16 as to the reasons you were referred to the PWC.
17    A.    Right.
18    Q.    So you told me whatever you just told
19 me.  Are there any other reasons you remember
20 discussing or telling you were the reasons you had
21 been referred to the PWC?
22    A.    Well, those were the reasons and then
23 Dr. Figur said that since those were issues long
24 gone, even though he had been informed of them, he
25 is not really at liberty to act on them.  So he

Computer Reporting NYC Inc.
(212) 986-1344

230

Varughese

2  essentially said that his real concern was
3  Dr. Pessin's complaint at this point and the
4  McCash incident and that had followed.
5     Q.    And the Dr. Pessin complaint is the
6  one about you being insubordinate?
7     A.    Right.
8     Q.    I thought you told me a few minutes
9  ago that when you met with Dr. Figur and
10 Mr. Johnson in January Dr. Figur told you that
11 that was not an issue that was appropriate for the
12 PWC.
13    A.    Right.
14          MR. WRONKO:  Form objection.
15    A.    But the he revisited that issue at
16 this meeting.
17    Q.    And how long did this meeting last in
18 March 24th or 25th?
19    A.    Like approximately an hour.
20    Q.    What did you say during this meeting?
21    A.    Well, I just said that, you know, what
22 had happened was extremely troubling for me and I
23 find that, you know, this meeting is rather, I
24 felt like the meeting was not really trying to
25 help me, because it was making me revisit issues

Computer Reporting NYC Inc.
(212) 986-1344

231

Varughese

2  that were really traumatic for me and having to
3  defend myself or explain the situation, explain
4  the circumstances under which the McCash incident
5  took place and the actions that had been taken
6  against me since then, and I had to correct him on
7  his opinion about me about various things that he
8  was informed about.
9     Q.    Whose opinion?
10    A.    Dr. Figur.
11    Q.    What opinion did Dr. Figur express
12 about you?
13    A.    Well, he was saying, Oh, I heard all
14 these things.  I heard Dr. Schiller said this and
15 I heard that you had done X, Y and Z, which now
16 I'm not sure what they were right now, but, I
17 mean, I think --
18    Q.    Dr. Varughese, how do you come to the
19 conclusion that Dr. Figur's reporting to you or
20 telling you what he heard about you is expressing
21 his personal opinion about you?
22    A.    Well, he is the head of the Physician
23 Wellness Committee and he is at liberty to take
24 recommended action or not recommend something.
25 And I felt that he was inclined to recommend that

Computer Reporting NYC Inc.
(212) 986-1344

232

Varughese

1 Varughese
2 I do something as to just say, Well, we reviewed
3 the issues with Leena and we don't see there being
4 any sort of problem here.
5    Q.   So did you think that you needed to be
6 referred to the Physician Wellness Committee?
7    A.   No, not at all.
8    Q.   How did this meeting on March 24th and
9 March 25th end?
10    A.   Well, it was one meeting either the
11 24th or the 25th.
12    Q.   I understand.
13    A.   And it just ended with them letting me
14 know that they're going to make some
15 recommendations to me, and I believe they said
16 that they wanted me to meet with Dr. Fersch, and I
17 requested that if they do have recommendations or
18 opinions about my mental health I would appreciate
19 if they wrote it down. I wanted a report from
20 them because they were interviewing me as part of
21 the Physician Wellness Committee.
22    Q.   I take it that the meeting ended with
23 Dr. Figur and Dr. Hughes telling you they would
24 get back to you with recommendations?
25    A.   Right.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

233

Varughese

1 Varughese
2    Q.   Or they would make recommendations?
3    A.   Right.
4    Q.   And that brings us back to this e-mail
5 of March 28th where Dr. Figur is asking you to
6 meet with him and Dr. Hughes to discuss the
7 recommendations, correct?
8    A.   Right.
9    Q.   And then the next e-mail, which is
10 that same date, that evening, is from you to
11 Dr. Figur that says, among other things, "I'll be
12 able to meet on Thursday at 11:30 or 4 p.m. or
13 Friday at 11:30 or 4 p.m."
14    A.   Right.
15    Q.   Then the next e-mail is from Dr. Figur
16 dated March 29th and it says among other things,
17 "I can do 4 p.m. Thursday in my office."
18    A.   Right.
19    Q.   Then the next e-mail is from
20 Dr. Figur, which is April 1st at 10 a.m., and it
21 says: "Leena, it's 9:52 a.m. and you haven't
22 arrived. I assumed that since you didn't respond
23 that you could make it this morning to my
24 request for our 9:40 meeting that you would be
25 here. So I waited until 9:55 before leaving for

*Computer Reporting NYC Inc.*
*(212) 986-1344*

234

Varughese

1 Varughese
2 my other duties. Unfortunately, whether you
3 recognize it or not, this is unprofessional
4 behavior on your part as well as a lack of
5 courtesy."
6         Do you see that e-mail? Yes?
7    A.   Right.
8    Q.   Were you scheduled to meet with
9 Dr. Figur on April 1st at 9:40 a.m.?
10    A.   I believe it was 4 p.m. I'm not sure
11 now.
12    Q.   In any event, was there a meeting that
13 you were scheduled to attend with Dr. Figur that
14 you didn't go to?
15    A.   Yeah, I was -- I think I was out sick,
16 so I couldn't go in to the meeting.
17    Q.   And the next e-mail is from you to
18 Dr. Figur at 12:39 and it says, "I am out sick
19 today as well due to a cold/flew, which I have had
20 since Tuesday."
21    A.   Right.
22    Q.   "It was terrible on Wednesday during
23 the day. I was out sick Thursday and I am out
24 sick again today. I am sorry to have
25 inconvenienced you in any way. Perhaps you can

*Computer Reporting NYC Inc.*
*(212) 986-1344*

235

Varughese

1 Varughese
2 e-mail me what what you would like to say to me.
3 Also, my professionalism have been exemplary
4 throughout our meetings over the past three
5 months. I thank you in advance for your
6 patience." And then, "Please feel free to call me
7 on my cell."
8    A.   If there's an urgent issue.
9    Q.   If there's an urgent issue, correct.
10 And you say: "Also, my professionalism have been
11 exemplary throughout our meetings over the past
12 three months."
13         You mentioned the two meetings you had
14 with Dr. Figur and Mr. Johnson and then the one
15 meeting you had with Dr. Figur and Dr. Hughes.
16    A.   Right.
17    Q.   Any other meetings that you had with
18 Dr. Figur over the past three months?
19    A.   No, those were it.
20    Q.   Why didn't you e-mail Dr. Figur on
21 Tuesday or Wednesday or Thursday morning to tell
22 him you wouldn't make the meeting?
23    A.   Because I wasn't expecting to be out
24 sick.
25    Q.   And then there's an e-mail from

*Computer Reporting NYC Inc.*
*(212) 986-1344*

236

Varughese

1 Dr. Figur to you on April 5 saying, "Leena, I hope
2 you are feeling better. I have scheduled you to
3 meet with Dan and me at 11 a.m. this Friday, April
4 8th in my office. I have copied Dr. Lento so that
5 he can arrange for you to be free at that time
6 since we have no other times available and need to
7 complete our process this week."
8        And then Pat Lento sends an e-mail
9 also dated April 5th basically saying he's going
10 to free you up to go to that meeting.
11    A.    Right. He informed my rotation
12 supervisor.
13    Q.    Did you communicate with Dr. Figur at
14 all as to whether you would or wouldn't attend the
15 meeting on April 8th?
16    A.    On April 8th? No. I just told him I
17 will be there I think.
18    Q.    I'm sorry?
19    A.    I told Dr. Figur that I will be there
20 for the meeting.
21    Q.    When you did tell him that?
22    A.    Well, April 7th. I believe he
23 e-mailed me at 2:53 and I e-mailed him back at
24 3:07.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

237

Varughese

1    Q.    Between the time he e-mailed you on
2 April 5th to say that he wanted to meet with you
3 at 11 a.m. this Friday April 8th and then when he
4 e-mailed you two days later on April 7th did you
5 communicate with Dr. Figur to let him know you
6 were going to be at the meeting?
7    A.    Right, I believe I had e-mailed him at
8 that point.
9    Q.    Dr. Figur says in this e-mail, "I
10 haven't heard from you since my last e-mail and
11 phone call."
12    A.    Oh, so I spoke to him then.
13    Q.    "Just to make you aware, the
14 policy" -- well, in that phone call did you
15 remember talking to Dr. Figur on the phone?
16    A.    Of course.
17    Q.    So he didn't just leave you a message?
18    A.    No, I don't think he left a message.
19 I don't have any message from Dr. Figur.
20    Q.    I'm sorry?
21    A.    He has not left me any messages, voice
22 mails.
23    Q.    Ever.
24    A.    No.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

238

Varughese

1    Q.    "Just to make you aware, the policy
2 approved by the medical board in regard to the
3 Physicians Wellness Committee clearly states that
4 the failure to cooperate can lead to discipline
5 including termination from Mount Sinai. We have
6 terminated even senior attending physicians from
7 the Medical staff of the hospital for failure to
8 comply."
9        "This is an upfront notice about
10 failure to comply so that we are clearly
11 transparent in educating you of the process.
12        "This is not a threat. It is still
13 your choice to meet with us or not.
14        "To find the policy, log into the
15 Hospital Home Page, then Manuals and Documents,
16 then Medical Staff Services, then Physicians
17 Wellness. Read the entire policy. You will find
18 failure to cooperate in paragraph D Disciplinary
19 Action part of the policy."
20        Did you receive that e-mail from
21 Dr. Figur?
22    A.    Yes, I did.
23    Q.    Were you surprised when you got that
24 e-mail?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

239

Varughese

1    A.    Well, I just already knew he had a
2 negative attitude towards me at this point and
3 just repeated threats. I wasn't -- I was troubled
4 by the repeated threats that he felt he needed to
5 make, but was I surprised?
6    Q.    Yes. Well --
7    A.    No.
8    Q.    If, Dr. Varughese, you had --
9    A.    That seemed to be the general attitude
10 of the hospital leadership and --
11    Q.    If you had --
12        MR. WRONKO: Let's try not to speak
13    over one another.
14        MR. McEVOY: I agree with you.
15    Q.    If you had confirmed with Dr. Figur
16 that you were going to meet with him on April 8th,
17 which is what you just told me, right? Then did
18 you ask Dr. Figur why he would send you an e-mail
19 that suggests that he hasn't heard from you?
20    A.    No, I simply told him, in my e-mail I
21 just simply said I am aware of the meeting and
22 I'll be there tomorrow as requested.
23    Q.    And you sent that e-mail after you got
24 the e-mail that I just read.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

240

Varughese

2    A.    Right, just to appease him because
3  this is like an extremely threatening e-mail from
4  one of the hospital's leaders.  I didn't know what
5  else to do at this point.
6    Q.    The only other e-mail, Dr. Varughese,
7  just so the string is complete, if you turn to the
8  next page, 2128, after you sent Dr. Figur this
9  e-mail that said you were out sick, he sent you an
10  e-mail that same day.  It's at the top of the page
11  dated April 1st.
12         It says, "Leena, email me when you
13  have recovered and returned to work.  We will set
14  up a date and time to meet in person.  Email or
15  phone is not the means for our next conversation.
16  I wish you a speedy recovery."
17         Do you see that?
18    A.    Right.
19    Q.    So did you meet with Dr. Figur on
20  April 8th?
21    A.    Yes, I did.
22    Q.    Where did that meeting take place?
23    A.    In Dr. Figur's office.
24    Q.    Was anyone else present?
25    A.    Dr. Hughes.

241

Varughese

2    Q.    And what happened at that meeting?
3    A.    They just informed me that I had to
4  meet with Dr. Fersch and take a drug test, urine
5  toxicology screen at that time itself.  And they
6  also said like even if -- they said things are not
7  going to go my way even if I didn't do anything.
8    Q.    I don't know what that means.
9    A.    I don't know.  It seemed like --
10    Q.    So who said --
11    A.    -- more threats.
12         MR. WRONKO:  Let her finish.  Did you
13  finish your answer?
14         THE WITNESS:  Well, Mr. McEvoy is
15  intent on interrupting me.
16         MR. WRONKO:  No, finish your response.
17    Q.    No, I am not intent on interrupting
18  you.
19         MR. WRONKO:  Don't argue with the
20  witness.
21         MR. McEVOY:  I am not arguing with
22  her.  I am clarifying a point because
23  she seems to think I'm intent on
24  interrupting her.
25         MR. WRONKO:  Don't argue with the

242

Varughese

2  witness.
3         Did you finish your response?
4    A.    Right, it was Dr. Hughes.
5    Q.    What did Dr. -- I am sorry, did you
6  finish?
7    A.    No.
8    Q.    Finish.
9    A.    So Dr. Daniel Hughes, his impression
10  was that the program -- the pathology department
11  had a lot of issues.  The program was in some sort
12  of trouble, I mean, the details of which I'm not
13  completely, you know, privy to.
14         And he felt that even though that's
15  the case and I may be correct about what's going
16  on, it's still not, things are not going to go my
17  way.  It just seemed like there was no -- they
18  were not interested in being fair.  That's what I
19  gathered from that meeting, and then the urine
20  toxicology screen, which there was no reason to
21  suspect me of being on any sort of drugs or --
22  that's besides the point, but there is no, you
23  know, it seemed like if I was going to be tested
24  for drugs.  Then I would imagine my colleagues
25  should be as well, especially ones that were

243

Varughese

2  drinking at work or behaving erratically.  There
3  should be an even way of treating people, not just
4  I get the, you know, the brunt of all the negative
5  actions while McCash does not suffer any
6  consequences at all.
7    Q.    Well, now I am going to interrupt you,
8  Dr. Varughese, because you kind of strayed off the
9  question.
10         Did Dr. Hughes tell you that, did he
11  use the exact words "things are not going to go
12  your way"?
13    A.    No, the gist was things are not going
14  to work out or something along those lines.  But
15  that was the gist.  Because he made the comparison
16  to the program and he made it very clear that was
17  his opinion.
18    Q.    And that's my question.  What did he
19  say that made it very clear to you that things
20  were not going to go your way?  Not the gist, not
21  your impression.
22    A.    Right, because he --
23    Q.    Let me finish.  What did he say?
24    A.    Well, he said that the program had all
25  these issues and, you know, they used to be the

244

Varughese

1  problem and suddenly you're the problem. Even
2  though -- he seemed a little flabbergasted given
3  the circumstances, he said, even though there's
4  all this stuff going on, somehow you've become the
5  problem, even though you're not the problem. And
6  he is, Well, I feel like things are not going to
7  always would be out the way you want.
8
9          And I was ask just surprised because
10  the whole role of PWC is to investigate if there's
11  special physician impairment, not to tell me
12  things are not going to go my way or things are
13  not going to work out for me. That's further
14  threats from the hospital leadership about like
15  just more reaction and being fired and what not,
16  that I've been experiencing since like December
17  after the incident occurred with McCash.
18      Q.    Did Dr. Hughes say anything else to
19  you that led you to believe that things were not
20  going to go your way other than what you just told
21  me?
22      A.    Well, I wanted to meet with, you know,
23  a third-party psychiatrist.
24      Q.    I'm going to interrupt you. Did
25  Dr. Hughes say anything else to you other than

Computer Reporting NYC Inc.
(212) 986-1344

245

Varughese

1
2  what you just told me that led you to the
3  conclusion or to believe that things were not
4  going to work out for you?
5      A.    Right, I'm trying to explain the
6  premise for my conclusion before I say my --
7      Q.    I don't want to know the premise for
8  your conclusion. I want to know what Dr. Hughes
9  said or didn't say. That's the question. You
10  told me he said --
11      A.    Right, he said that I have to meet
12  with Dr. Fersch. A third-party psychiatrist
13  option was not offered to me for a psych
14  evaluation. That relates to my employability at
15  Mount Sinai Medical Center and I felt that also,
16  you know, that decision also made me feel that,
17  um, that was another sign that things may not
18  be -- may not go my way because I would prefer to
19  have a third-party neutral psychiatrist do a psych
20  eval.
21      Q.    Anything else that Dr. Hughes said
22  that led you to that conclusion?
23      A.    That's all really. Those two.
24      Q.    Did Dr. Figur say anything that you
25  thought indicated that he thought that things

Computer Reporting NYC Inc.
(212) 986-1344

246

Varughese

1
2  weren't going to go your way?
3      A.    Right, well, I talked to him as you
4  were walking to the employee health office or
5  employee health center and I asked him like, what
6  has been done about McCash? Like has any action
7  been taken against McCash? And he told me none.
8      Q.    Anything that else that Dr. Figur said
9  or did that led to you the conclusion that things
10  weren't going to go your way?
11      A.    Well, that pretty much. And then his,
12  eventually, I mean, he didn't give me like this
13  list of what he thought was wrong me. But
14  eventually he did provide me with a list of what
15  he thought was wrong with me or what his opinion
16  was.
17          And yeah, that also made me feel like
18  things are not going to go my way because it's
19  outlandish and defamatory and outright slander and
20  libel against my professional reputation and my
21  future and my career.
22      Q.    When you say that Dr. Figur gave you
23  some kind of a document that listed his concerns
24  about you, let me show you a document, which again
25  is one that you produced, and ask you to take a

Computer Reporting NYC Inc.
(212) 986-1344

247

Varughese

1
2  look at it.
3          MR. McEVOY: And while you're doing
4      that, we'll mark is as Defendants' 19.
5          (Defendants' Exhibit 19, letter dated
6      April 11, 2011 to Leena Varughese from
7      Dr. Arthur Figur, marked for identification,
8      this date.)
9      Q.    Have you had a chance to look at that?
10      A.    Yes.
11      Q.    Is that the document we just referred
12  to?
13      A.    Yes.
14      Q.    How did you get this document?
15      A.    Dr. Figur submitted it to his
16  secretary and forward it to me.
17      Q.    So you got it directly or indirectly
18  from Dr. Figur?
19      A.    Right.
20      Q.    After you got this document did you
21  talk to Dr. Figur about it?
22      A.    I did speak to him at one point on the
23  phone.
24      Q.    And when was that?
25      A.    That was sometime in May.

Computer Reporting NYC Inc.
(212) 986-1344

248

Varughese

1
2      Q.      When you spoke to Dr. Figur in May was
3  it about this document or was it about something
4  else?
5      A.      It was about, you know, his reasons
6  for referring me to Dr. Fersch, which I believe
7  these were the reasons that he referred me to
8  Dr. Fersch.
9      Q.      Was this a conversation by phone?
10     A.      Right.
11     Q.      What did you say to Dr. Figur, what
12  did he say to you during that telephone
13  conversation in May?
14     A.      At that time I had also discussed with
15  him I was interested in rescheduling my meeting or
16  my appointment with Dr. Fersch because I was on a
17  busy service at work and also because my, you
18  know, I was having some family issues with my
19  grandfather just having passed away, and so I
20  spoke to him just to inform him about the
21  situation and, you know, and I believe I briefly
22  discussed this with him.
23     Q.      What did you say about it?
24     A.      I just told him I -- I -- I mean, I
25  disagreed with him, but I -- that's what I told

249

Varughese

1
2  him.
3      Q.      What did he say?
4      A.      He didn't say much.  He just said,
5  Meet with Dr. Fersch.  We're trying to help you.
6      Q.      When was your meeting scheduled with
7  Dr. Fersch?
8      A.      Sometime in May, like May 2nd or 12th
9  or something.
10     Q.      I will tell you it was May 12th.  But
11  did you cancel your meeting with Dr. Fersch --
12     A.      Right.
13     Q.      Let me finish.  -- prior to the time
14  it was scheduled?
15     A.      Um, let me see.  Well, after this I
16  was on vacation for like two weeks.
17     Q.      After what?
18     A.      After meeting with the Physician
19  Wellness Committee.  I believe Dr. Fersch e-mailed
20  me at some point and I couldn't meet with her
21  because I was on vacation and she was also on
22  vacation at some point.  So the only date that
23  really worked was sometime in May.
24              And so we met and -- we were supposed
25  to meet, but I wanted to cancel, so I cancelled.

250

Varughese

1
2  I e-mailed her to cancel the meeting, but she
3  responded to Dr. Fersch, I mean, I'm sorry,
4  Dr. Figur and complained that I was cancelling the
5  meeting.
6              So then Dr. Figur called me in,
7  insisted that I meet with Dr. Fersch.
8      Q.      Did you meet with her on May 12th or
9  whatever date?
10     A.      Right, I met with her May 12th.
11     Q.      And did Dr. Fersch to your knowledge
12  prepare a report of your meeting?
13     A.      She said she would prepare a meeting,
14  I mean, a report of the meeting or the report of
15  her impression, and she would provide it to me,
16  but she never did.
17     Q.      You've never seen it.
18     A.      Right.  She refused to provide it.
19  She said it was some sort of confidentiality, even
20  though I'm the person who was being interviewed.
21  It doesn't make any sense.  It seems like a HIPAA
22  violation as far as I'm concerned.
23     Q.      But you have never seen it.
24     A.      No.
25     Q.      During the meeting with Dr. Fersch

251

Varughese

1
2  what was discussed?
3      A.      She asked me just general intake
4  questions as any psychiatrist would do.  And I
5  discussed, I answered her questions.
6      Q.      And during the session with Dr. Fersch
7  did she express any opinion to you one way or the
8  other about what she thought about the state of
9  your mental health?
10     A.      Not really, but I felt that she was
11  asking me leading questions.
12     Q.      In what way she was asking you leading
13  questions?
14     A.      She was implying that I should, you
15  know.  Well, like I just remember her being not
16  very friendly.
17     Q.      So did you think Dr. Fersch had a
18  negative attitude towards you?
19     A.      Yes.
20     Q.      Did you think she had a negative
21  opinion of you?
22     A.      Well, I believe she came there with
23  the expectation that she's going to, you know, be
24  able to write something negative or say something
25  negative to substantiate the hospital's referral.

252

Varughese

2 Q. What's the basis for you saying she
3 came to this meeting with an expectation that she
4 was going to be able to write something negative
5 about you?
6 A. Well, I felt that the hospital did not
7 really, um, it did not have a conflict of
8 interest. It would have allowed me to refer
9 myself to third parties, like psychiatrists, and
10 provide a report for me rather than have this all
11 be within the hospital.
12 Q. So is the basis for your belief that
13 she was expecting to write anything negative about
14 you the fact that you were referred to a
15 psychiatrist within Mount Sinai?
16 A. Well, I felt that I was not given the
17 choice or I wasn't able to make a decision
18 regarding -- first I felt that the Physician
19 Wellness Committee was retaliatory.
20 This is, you know, it's untrue, and so
21 given that premise and, you know, their referral
22 to the in-house psychiatrist I felt that was
23 retaliatory, and also given Dr. Charney and
24 Dr. Davis, both leaders of the hospital, the
25 institutional psychiatrists, I was greatly

253

Varughese

2 concerned.
3 Q. I understand, Dr. Varughese, that you
4 don't agree with the contents of the April 11th
5 document from Dr. Figur. And whether those
6 contents are true or not --
7 A. Well --
8 Q. No, no.
9 MR. WRONKO: Hold on. Let him ask you
10 a question.
11 Q. Why do you say that you believe it was
12 retaliatory?
13 A. Because these actions were not taken
14 against Samuel McCash or people who are known to
15 have problems at work, other people who are known
16 to have problems at work.
17 Q. Other than Dr. McCash what other
18 people do you know of that have problems at work?
19 A. Well, for instance there have been
20 other residents, other coworkers who have gone
21 into verbal outbursts against each other at work
22 and they were never referred to Physician Wellness
23 Committee.
24 Q. Who?
25 A. Paul Azar and Michael McClausovitch.

254

Varughese

2 Q. Anybody else?
3 A. Well, in terms of my experience with
4 the PA, Rob the PA, pathology assistant, he is not
5 a medical doctor, but he is also an employee who
6 works there and he was not referred to the
7 employee assistance program or the Physician
8 Wellness Committee.
9 Q. Anybody else?
10 A. Well, McCash, once again, he was not
11 referred.
12 Q. You mentioned him. OK. So you said
13 that Dr. Fersch had a negative attitude towards
14 you. And in what way did Dr. Fersch exhibit a
15 negative attitude against you?
16 A. She was very condescending and I felt
17 like her line of questioning was sort of directed
18 at -- they were leading questions.
19 Q. Leading in what way?
20 A. Well, she wasn't really interested in
21 hearing my point, you know, my perspective and my
22 concerns about my emotional well-being since what
23 had occurred. She was more interested in, you
24 know, directing me in a different direction
25 during, you know, psychiatric evaluation and I

255

Varughese

2 felt, well, if you're really interested in my
3 well-being as an employee here, you should be
4 concerned about how I feel.
5 Q. Do you know whether Dr. Figur or
6 Dr. Hughes or anybody else spoke to Dr. Fersch
7 before you saw her other than to tell her that you
8 were being referred to see her?
9 A. Do I have any evidence of that? No.
10 But do I believe that? Yes.
11 Q. You also said that you were asked to
12 take a toxicology screen?
13 A. Right.
14 Q. And did you do that?
15 A. Right, yes.
16 Q. And it came back negative I take it?
17 A. Of course it came back negative. I
18 don't abuse drugs.
19 Q. Now, Dr. Varughese, to your knowledge
20 did any of your coresidents know that you had been
21 referred to the PWC?
22 A. I believe yes.
23 Q. Who knew that you had been referred t
24 the PWC?
25 A. I believe Dr. McCash, Samuel McCash

256

Varughese

1   Varughese
2   and Adrienne Jordan, they knew.
3       Q.   How do you know that Dr. McCash knew
4   that you were being referred to the PWC?
5       A.   How did I know?
6       Q.   Yes.
7       A.   I'm making an assumption, because
8   Dr. Lento I believe confides or speaks to them on
9   a regular basis and Adrienne Jordan and Samuel
10  McCash have a direct line to Dr. Lento.
11      Q.   Any other basis for your belief that
12  Dr. Jordan and Dr. McCash knew that you had been
13  referred to the PWC?
14      A.   Well, I don't have any concrete
15  evidence, so I can't really guess or make comment
16  on.
17      Q.   So Dr. Varughese, do you know of any
18  other physician other than you that's been
19  referred to the PWC?
20      A.   No.
21      Q.   I take it that's because that's the
22  sort of information that you wouldn't normally be
23  privy to.
24           MR. WRONKO:   Form objection.
25      A.   Right.   I believe like coworker

Computer Reporting NYC Inc.
(212) 986-1344

257

Varughese

1   Varughese
2   referrals to Physician Wellness Committee and such
3   should be kept confidential no matter what.   Even
4   if there's a chief residence it should be kept
5   confidential from them as well.
6       Q.   Do you know whether every physician
7   who is referred to the PWC is asked to take a
8   toxicology screen?
9       A.   I believe referral to the PWC does not
10  automatically ensure toxicology screen.
11      Q.   What's the basis for that belief?
12      A.   I believe toxicology screen is done at
13  the discretion of Dr. Figur or Dr. Hughes.
14      Q.   And do you know what criteria are used
15  by Dr. Figur or Dr. Hughes to determine whether a
16  physician referred to the PWC should undergo a
17  toxicology screen?
18      A.   No, they never explained their
19  criteria.
20      Q.   And similarly, do you know whether
21  every physician who's referred to the PWC is asked
22  to undergo a psychiatric evaluation?
23      A.   I believe that would also be left to
24  the discretion of Dr. Figur and Dr. Hughes.
25      Q.   Assuming that belief is correct, do

Computer Reporting NYC Inc.
(212) 986-1344

258

Varughese

1   Varughese
2   you know what criteria they used to make that
3   determination?
4       A.   No, they did not explain their
5   rationale.
6           MR. McEVOY:   Take a five-minute break.
7           (A recess was taken from 11:41 a.m. to
8           11:50 a.m.)
9   BY MR. McEVOY:
10      Q.   Dr. Varughese, before you met with
11  Dr. Figur in January of 2011 had you ever met him
12  before?
13      A.   No.
14      Q.   And before you met with Dr. Hughes had
15  you ever met with him before?
16      A.   No.
17      Q.   Had you ever met Paul Johnson before?
18      A.   Yes.
19      Q.   Was that in his capacity as the
20  director of graduate medical education?
21      A.   No.
22      Q.   How did you meet Mr. Johnson?
23      A.   He used to work with graduate medical
24  education.   I believe he was made director at some
25  point in March or April of 2011.

Computer Reporting NYC Inc.
(212) 986-1344

259

Varughese

1   Varughese
2       Q.   You met him before he became the
3   director.
4       A.   Right.
5       Q.   Now, Dr. Varughese, were you placed on
6   academic advisement in December of 2010?
7       A.   Yes.
8       Q.   I'm showing you a document.
9           MR. McEVOY:   We'll mark this as
10          Exhibit 20.
11          (Defendants' Exhibit 20, notice of
12          academic advisement dated December 21, 2010,
13          to Leena Varughese from Patrick Lento,
14          marked for identification, this date.)
15      Q.   Have you had a chance to look at that,
16  Dr. Varughese?
17      A.   Yes.
18      Q.   Is that the notice of academic
19  advisement that you received in December of 2010?
20      A.   Yes.
21      Q.   And it's dated December 21, 2010?
22      A.   Correct.
23      Q.   Is that when you received it?
24      A.   Yes.
25      Q.   How did you get it?

Computer Reporting NYC Inc.
(212) 986-1344

260

Varughese

1
2  A.  I met with Dr. Lento and
3  Pessin-Minsley.
4  Q.  And where did that meeting take place?
5  A.  It took place in Dr. Pessin's office.
6  Q.  And what did Dr. Pessin say at that
7  meeting about the academic advisement?
8  A.  She said that this is to help me and,
9  you know, that's what she said.
10  Q.  What did Dr. Lento say about the
11  academic advisement at this meeting?
12  A.  He said that -- what did he say about
13  it?  Well, they just informed me that I was on
14  academic advisement.  I contested it right away.
15  I said, well, I disagree.  This is not what
16  happened.  And they said, That's not true and I'm
17  on academic advisement.
18  Q.  Did they give you the academic
19  advisement at this meeting?
20  A.  Yes.
21  Q.  Did you read it when they gave it to
22  you?
23  A.  Yes.
24  Q.  And you said that you "contested" it,
25  I think was your word.  What did you say?

262

Varughese

1
2  Q.  Did they tell you what they thought it
3  was?
4  A.  Right, so -- which is where I'm going
5  with this.
6  Q.  OK.
7  A.  Initially it was, you know, they
8  thought it was, has to do with some breast
9  specimens and then they thought it had to do with
10  some pelvic specimens and GI specimens.  Frankly
11  they were not at all clear about what they really
12  thought was the patient care related lapse.
13  Q.  Did Dr. Pessin or Dr. Lento tell you
14  at this meeting that the patient care related
15  lapse was that the day after the incident with
16  Dr. McCash they found a specimen you were supposed
17  to gross under your table unlabeled and
18  unsubmitted?
19      MR. WRONKO:  Form objection.  You can
20  answer.
21  A.  That's simply not true.
22  Q.  Did they tell you that?
23  A.  No.
24  Q.  Did anybody ever tell you that?
25  A.  No.  I never got an e-mail about it

261

Varughese

1
2  A.  Well, I said this does not address my
3  concerns.
4  Q.  What else did you say?
5  A.  I said, well, you know, I was
6  intimidated and physically threatened by Samuel
7  McCash.  What actions are being taken against him?
8  I felt like some action should be taken against
9  him, and I said that this is not what happened
10  essentially, the summary of events.  It's not
11  really what, I mean, this is really not true.
12  And, you know, I asked what the patient care
13  related lapse was.  So I had several questions
14  regarding this document and which I discussed with
15  both Lento and Pessin.
16  Q.  With regard to the patient care
17  related lapse did Dr. Pessin or Dr. Lento tell you
18  what that was?
19  A.  They sort of -- I believe like ever
20  since December 8th, even December 8th, they have
21  been toying with the idea of patient care related
22  lapse in some way and I believe it was really to
23  pin some sort of blame on me that would, you know,
24  lead directly to patient care, even though there
25  wasn't anything.

263

Varughese

1
2  or, you know.  I mean, it seems like a very
3  relevant issue and it was not addressed with me.
4  Q.  I understand.
5  A.  Which is surprising.
6  Q.  You say you discussed with Dr. Lento
7  and Dr. Pessin the incident and the events
8  surrounding the incident with Dr. McCash as sort
9  of summarized here in this summary of events and
10  you said that you disagreed with them.
11      What was that discussion?  What did
12  you say about those events, what did Dr. Lento and
13  Dr. Pessin say about the events at this meeting on
14  December 21, 2010?
15  A.  They just said, you know, whatever I
16  had brought up to them it never occurred.  There
17  was no such incident.  It was just outrageous.
18  Their accusations were outrageous.
19  Q.  I asked you --
20  A.  I had no idea where they were coming
21  up with this.
22  Q.  Dr. Varughese, what I asked you was
23  not whether you thought it was outrageous or not.
24  I asked you what you said to them and what they
25  said to you.

264

Varughese

1    A.    So that I told them, well, this is
2    what happened.  That did not happen, they said.
3         Well, McCash harassed me and
4    physically intimidated me or threatened me.  He
5    had a pattern of behavior that needs to be
6    addressed.
7         And they said, Well, that never
8    happened.  We do not corroborate it.
9         That's what they said.
10   Q.    The notice of academic advisement
11   contains a section called "Plan of action,"
12   correct?
13   A.    Correct.
14   Q.    And the plan of action has four
15   points.
16   A.    Right.
17   Q.    And the first one says, "Meeting with
18   the Program Director or, as needed, interim
19   chair/chair or others in authority within the
20   Department of Pathology every 3 to 4 weeks for
21   continued assessment and advisement."
22        Right?  That's what it says?
23   A.    It does say that, yes.
24   Q.    After you were placed on academic

265

Varughese

1    advisement did you meet with Dr. Lento every three
2    to four weeks?
3    A.    Yes, I did.
4    Q.    Where did those meetings take place?
5    A.    Well, I was, you know, I met with him.
6    I was on autopsy service with him for a month,
7    plus -- I met with him for that.  I had several
8    cases with him, which he needed, to sign out over
9    the following months.  So I met with him to sign
10   out those cases.
11   Q.    What did you understand meeting with
12   the program director every three to four weeks for
13   continued assessment and advisement to mean?  What
14   did you understand that obligated you to do?
15        MR. WRONKO:  Form objection.  You can
16   answer.
17   A.    Well, I -- it was a very generalized
18   statement and I just -- I assumed it just meant
19   that I had to meet with him and he would tell me
20   whatever he thought.
21   Q.    So was it your understanding that you
22   were supposed to actually go to Dr. Lento's office
23   every three to four weeks and sit down and discuss
24   your progress under the advisement or did you

266

Varughese

1    understand as you just described when you kind of
2    had occasion to chat with him about other -- or
3    talk to him about other things you were working on
4    that satisfied the requirement?
5         MR. WRONKO:  Form objection.  You can
6    answer.
7    A.    This seems like a document that he
8    wrote up or the legal department wrote up and it
9    says this is what I'm supposed to do.  It's his
10   prerogative to ensure that I meet with him.  And
11   if he wants to meet with me for an hour and
12   discuss professionalism, I'm open to that.
13        Did he do that?  I mean, I met with
14   him and I thought that was adequate.
15   Q.    So my question is, and where did you
16   meet with him every three to four weeks?
17        Let's do it this way.  You got this on
18   December 21, 2010, correct?
19   A.    Right.
20   Q.    When was the first time you met with
21   Dr. Lento pursuant to the requirement of the first
22   bullet point?
23   A.    Well, I met with him.  I was working
24   with him for that time period.

267

Varughese

1    Q.    So it was your understanding that
2    meeting with him while you were working with him
3    during that time period satisfied that
4    requirement?
5         MR. WRONKO:  Form objection.  You can
6    answer.
7    A.    Well, I'm not sure how to answer that
8    question frankly.
9    Q.    Well, Dr. Varughese, you understood
10   when you read this -- Mr. Wronko doesn't have the
11   answers.
12        Dr. Varughese, you got this and it
13   said you have to meet with the program director
14   every three to four weeks, right?  That's what it
15   says?
16   A.    It says it's a following plan, it's as
17   needed.
18   Q.    It says "Meeting with the Program
19   Director" --
20   A.    As needed.
21   Q.    -- "or, as needed, interim chair..."
22   So I don't want to parse this.
23   A.    Well, I'm going to parse this.  It
24   says as needed and I met with the program

268

Varughese

1  director. I met with him several times, we
2  discussed professionalism and he had informed me
3  that I'm professional.
4      In fact, on January 10th, 2011, I met
5  with him and Freda and he said, Oh, I'm very
6  impressed with your progress and you're so
7  professional and everything is wonderful here.
8      Q.   So you met with Dr. Lento on January
9  10th to discuss professionalism.
10     A.   Not exactly. I met with Dr. Lento on
11 January 10 because I contested the notice of
12 academic advisement and the summary of events as
13 it was described did not explain my point of view.
14 I met and they met with me to say that I was,
15 despite my concerns about this document, I was
16 still on academic advisement.
17     Q.   Dr. Varughese, can you contest an
18 academic advisement?
19     A.   Frankly any disciplinary action that's
20 taken against a professional can be contested,
21 especially within the, you know, medical
22 profession.
23     Q.   Is it your understanding that this is
24 a disciplinary action?

269

Varughese

1      A.   This is a variation of a disciplinary
2  action.
3      Q.   Is it a disciplinary action?
4          MR. WRONKO: Form objection.
5      A.   Dr. Lento said it was.
6      Q.   Do you know whether that's correct or
7  not? Do you know whether this is a disciplinary
8  action under the hospital's policy?
9      A.   The hospital did have a policy on
10 academic advisement that has since -- I cannot
11 assess. I believe they removed that policy from
12 their manual or whatever it was that they had it
13 in. But this is a form of disciplinary action and
14 it can be contested.
15     Q.   And what's the basis for your belief
16 that an academic advisement can be contested?
17         First of all, before you answer that
18 question, contested how? How do you believe it
19 can be contested?
20     A.   Well, I wrote to the department. It's
21 an internal form of discipline that's taken by the
22 department of pathology against me.
23         So I wrote to the department, I
24 explained my point of view and reiterated my

270

Varughese

1  concerns. That's essentially contesting or
2  requesting that my concerns be reexamined.
3      Q.   So going back to the meetings every
4  three to four weeks, how long was the academic
5  advisement for?
6      A.   Well, it says here how long it was
7  supposed to be for.
8      Q.   If you look at the second page under
9  "Follow up," it says, "We will meet again in three
10 months to review your progress."
11     A.   Right.
12     Q.   So does three months sound right?
13     A.   It sounds right.
14     Q.   So between December 21st of 2012 and
15 March 21st -- of 2010 rather and March 21st of
16 2011, during that three-month period, how many
17 times did you meet with Dr. Lento to discuss your
18 progress under the academic advisement?
19     A.   Right, so I met with him on January
20 10th where they informed me that I continued to be
21 on academic advisement. Therefore moving the
22 scale or the time period pushing it forward from
23 January 10th to February, March, April 10th of
24 2011 technically. That's the period of academic

271

Varughese

1  advisement, I believe, and then I met with him
2  perhaps three, four times in that time period.
3      Q.   To discuss the academic advisement.
4      A.   Yes, that was also discussed.
5      Q.   The second bullet point says,
6  "Continued performance of assigned resident duties
7  under the guidance of Pathology Chief resident(s),
8  Pathology faculty and/or Program Director."
9          And during the three-month period of
10 the academic advisement did you continue to
11 perform your assigned resident duties?
12     A.   Yes, of course.
13     Q.   Did anybody tell you that you hadn't
14 performed your resident duties?
15     A.   No.
16     Q.   Then says write a "self-reflection
17 exercise (to be handed in to me within 4 weeks).
18 You are expected to write down your account of the
19 situation and describe how you could have
20 approached things in a better fashion, including
21 commentary on physician professionalism and its
22 role in this circumstance."
23         Do you see that, the third one?
24     A.   Right.

272

Varughese

1
2       Q.      Did you hand in your self-reflection
3   essay to Dr. Lento within four weeks of the
4   academic advisement?
5       A.      No.
6       Q.      Why not?
7       A.      Because there was several other
8   investigations going on. I was still meeting with
9   the Physician Wellness Committee and I was meeting
10  with, um, what is it? the graduate medical
11  education. I had met with HR.
12      So there were other investigations
13  going on, which is why I was surprised Dr. Lento
14  would place me back on academic advisement given
15  that there was an investigation that was going to
16  take place regarding the summary of events even,
17  which is false obviously.
18      Q.      Dr. Varughese, how does all of what
19  you just said, assuming it's all true, how does
20  all of that excuse you from handing in your
21  self-reflection evaluation by the deadline set by
22  Dr. Lento?
23      MR. WRONKO: Form objection.
24      A.      How? Because the self-reflection
25  exercise is, um, assumes that I had done something

Computer Reporting NYC Inc.
(212) 986-1344

273

Varughese

1
2   wrong here and how I could approach things in a
3   better fashion and not Samuel McCash. My concern
4   was that, you know, he had something, he had done
5   something wrong and he has a pattern of behavior
6   that is deeply troubling and extends into physical
7   intimidation.
8       Q.      Was Dr. Lento the program director at
9   that time?
10      A.      I believe he was, yes.
11      Q.      And as the program director, to put it
12  in an overly simplistic way, he was your boss?
13      A.      Right, but he never e-mailed me or
14  contacted me. He also did not follow up
15  frankly with --
16      Q.      Dr. Varughese, is there anything that
17  you don't understand about hand in a
18  self-reflection essay within four weeks?
19      MR. WRONKO: Form objection.
20      Q.      Really, I assume, Dr. Varughese, that
21  we can both calculate four weeks from December
22  21st, correct? Yes?
23      A.      Frankly --
24      Q.      Yes or no, can you calculate four
25  weeks from December 21st?

Computer Reporting NYC Inc.
(212) 986-1344

274

Varughese

1
2       MR. WRONKO: Form objection. You can
3   answer.
4       A.      Can I do that? Yes.
5       Q.      And Dr. Lento who's your program
6   director and your boss told you to hand in a
7   self-reflection evaluation in four weeks and you
8   didn't do it.
9       So my question to you is, why do you
10  think that the other things you described excused
11  you from following the direction of your program
12  director?
13      A.      Frankly, I had contested it and
14  because of that, one; two, he did not stipulate to
15  me that the academic advisement still stood as it
16  did. But him wanting the self-reflection, he did
17  not inform me as such.
18      I met with him on January 10. He
19  didn't say, well, within two weeks I would like
20  that self-reflection exercise. I mean, he's my
21  boss. He should know what is required and he
22  didn't do that.
23      Q.      Did anybody ever tell you that you
24  weren't on academic advisement regardless of
25  whether you contested it or not?

Computer Reporting NYC Inc.
(212) 986-1344

275

Varughese

1
2       A.      Did anybody tell me I wasn't?
3       Q.      Yes.
4       A.      No. They only told me on January 10th
5   that I definitely was on academic advisement.
6       Q.      Dr. Varughese, do you have any doubt
7   when you got the December 21st notice of academic
8   advisement that you were on academic advisement
9   whether you thought it was fair or not?
10      A.      Yes, I did have some doubt about that.
11      Q.      What was your doubt? What was the
12  basis of your doubt?
13      A.      Well, my basis of my doubt was that
14  all the concerns that I had brought up. It was
15  completely ignored. They did not answer my
16  question about McCash and if any actions were
17  being taken against him.
18      And I had also spoken to Dr. Stimmel,
19  who was ombudsman at the hospital. And I wanted
20  to discuss this document with him as well to see
21  what his opinion was.
22      Q.      So because you disagreed with him and
23  thought it was unfair you thought it was
24  ineffective.
25      MR. WRONKO: Form objection.

Computer Reporting NYC Inc.
(212) 986-1344

276

Varughese

1  Mischaracterizes her testimony.
2          MR. McEVOY:  That' what I am asking
3  her.
4      A.    That's not what I said.
5      Q.    You got the notice of academic
6  advisement, right?  It says, "This letter is
7  to" -- first sentence.  "This letter is to inform
8  you that you are being placed on Academic
9  Advisement."
10         Is that the first sentence?
11     A.    Yes.  This is just essentially a
12 retaliation document.
13     Q.    I didn't ask you what you think it is.
14     A.    Retaliatory document.
15     Q.    Is that what it says, Dr. Varughese,
16 that you're being placed on academic advisement?
17 Yes?
18     A.    "This letter is to inform you."
19 That's what it states, the first sentence.
20     Q.    And so regardless of why you thought
21 you were given it, whether it was retaliatory or
22 not, why would you have any doubt that you were on
23 academic advisement as of December 21, 2010,
24 simply because you didn't agree with it or you

*Computer Reporting NYC Inc.*
*(212) 986-1344*

277

Varughese

1  thought it was retaliatory, or whatever it is you
2  thought about it?
3          MR. WRONKO:  Form objection.  You can
4  answer.
5      A.    Well, I had informed Dr. Pessin and
6  Dr. Lento that I would be speaking to Dr. Stimmel
7  regarding this particular document and I would
8  have to get some advice or counsel regarding my
9  options.
10         So yes, there was some -- and they
11 agreed with that.  They did not say, well, just
12 because we gave you this you're automatically,
13 even though it says this, it's something that I
14 have to agree because it is a course of action
15 for --
16     Q.    So you thought you were free to
17 disregard that plan of action.
18         MR. WRONKO:  Form objection.
19     A.    That's not what I said.
20     Q.    I am trying to understand what you're
21 saying, Dr. Varughese.
22     A.    Well, what I said was I would speak to
23 Dr. Stimmel and obtain some counsel and I would
24 get back to them.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

278

Varughese

1      Q.    And you never signed the academic
2  advisement, correct?
3      A.    No, because it's a false set of events
4  and I found this to be extremely retaliatory.
5      Q.    Retaliatory for what?
6      A.    And discriminatory.
7      Q.    Let's do one at a time.  Retaliatory
8  for what?
9      A.    Retaliatory because I had complained
10 about McCash was harassing me.  He has a record of
11 harassing me.  And instead of taking any actions
12 or obtaining some mediatory meeting to make sure
13 that there is like a functional work environment,
14 that they did not do that.  Rather they took
15 actions against me.
16     Q.    And in what way do you think this is
17 discriminatory?
18     A.    Well, Dr. McCash is a white male and I
19 felt that they were inherently favoring him and
20 his future.
21     Q.    And --
22     A.    As opposed to me.
23     Q.    I'm sorry.  And other than the fact
24 that he is white male is there any other basis for

*Computer Reporting NYC Inc.*
*(212) 986-1344*

279

Varughese

1  your belief that it was discriminatory?
2      A.    Right.  Then it says here that, you
3  know, somehow Dr. Jordan is now involved in this
4  whole situation and, I mean, I felt like she's
5  also, you know, a Caucasian female and I felt like
6  they were just, you know, by default, they felt
7  that they need to protect her future and her
8  career at an expense to me.
9      Q.    Because she is a white female.
10     A.    Well, at that point I did not make
11 that conclusion, but, you know, in retrospect I
12 believe that's true.
13     Q.    Did you ever prepare the
14 self-reflection evaluation?
15     A.    Yes, I did prepare self-reflection.
16 That is my account.  "Write down your account," so
17 I wrote down my account of the situation.
18     Q.    When did you submit that to Dr. Lento?
19     A.    I submitted that on March 30th.
20     Q.    I show you a document.
21         MR. McEVOY:  We'll mark this as
22 Exhibit 21.
23         (Defendants' Exhibit 21, e-mail from
24 Leena Varughese to Lento and Barnett dated

*Computer Reporting NYC Inc.*
*(212) 986-1344*

280

Varughese

1
2 March 30, 2011, with attached reflection for
3 the Notice of Academic Advisement, marked
4 for identification, this date.)
5       Q.     Have you had a chance to look at it,
6 Dr. Varughese?
7       A.     Yes.
8       Q.     Is this the self-reflection essay that
9 you submitted to Dr. Lento on March 30th?
10      A.     Yes.
11      Q.     And do you believe that this
12 self-reflection essay meets the requirements for
13 the essay that was set out in the Notice of
14 Academic Advisement?
15      A.     Yes.
16      Q.     Why did you submit it on March 30th?
17      A.     I submitted it because I was
18 encouraged by Dr. Figur to submit it.
19      Q.     Any other reason that you submitted it
20 on March 30th other than because Dr. Figur
21 encouraged you to do so?
22      A.     I also felt that I felt more
23 threatened at work.
24      Q.     What?
25      A.     Threatened and afraid to be at work

Computer Reporting NYC Inc.
(212) 986-1344

281

Varughese

1
2 because of the Physician Wellness Committee and I
3 just felt extremely harassed and harangued by the
4 hospital and its leadership and all this. So I
5 felt I -- and I was also encouraged to submit it
6 at that time, the reflection, so for those reasons
7 I submitted the reflection at that time.
8       Q.     The fourth bullet point which is on
9 the next page, is entitled "Reading Exercise."
10      A.     Right.
11      Q.     "You are expected to read the book
12 entitled Practicing excellence: A physician's
13 manual to exceptional health care by Steven Beeson
14 during the 3 month period of academic advisement,"
15 and then in parentheses it says "we can obtain a
16 copy for you if necessary."
17      A.     Correct.
18      Q.     Did you read the book during the three
19 months of academic advisement?
20      A.     Yes, I did.
21      Q.     Did you have a copy of it?
22      A.     Yes, I did have a copy of it.
23      Q.     So you didn't have to purchase one or
24 ask the hospital to purchase one for you?
25      A.     Well, eventually I had one and I lost

Computer Reporting NYC Inc.
(212) 986-1344

282

Varughese

1
2 it and then I had it repurchased and, yeah, which
3 the copy I lost again.
4       Q.     When did you read the book?
5       A.     I read the book during that time.
6       Q.     When during that time?
7       A.     During that three-month period.
8       Q.     When?
9       A.     When?
10      Q.     Yes.
11      A.     It was, um, I believe it was like
12 February or March.  I read it during that time.
13      Q.     I show you another document.
14             MR. McEVOY:  We'll mark this as
15 Exhibit 22.
16             (Defendants' Exhibit 22, e-mail string
17 dated February 17, 2011 between Leena
18 Varughese and Patrick Lento, marked for
19 identification, this date.)
20      Q.     Have you had a chance to look at that?
21      A.     Yes.
22      Q.     And it's an e-mail from Dr. Lento to
23 you dated February 17, 2011 at 2:53 p.m. saying
24 "Leena, I need to meet with you tomorrow.  Please
25 let me know of potential available times," signed

Computer Reporting NYC Inc.
(212) 986-1344

283

Varughese

1
2 "Pat."
3             You responded the same day at 3:47
4 p.m. saying "I can meet with you at 5:30 p.m.
5 tomorrow.  May I ask you what is the meeting
6 regarding?"
7             And Dr. Lento e-mails you back at 4:56
8 p.m. on the same day, saying, "Well, 2 things:  I
9 was hoping we could look at one of your autopsy
10 cases that we have together and also follow up on
11 the academic advisement stuff."
12            Did you meet with Dr. Lento on
13 February 18th?
14      A.     The -- we may have met.  I'm not sure.
15      Q.     So you don't recall whether the
16 meeting took place or not.
17      A.     Well, I did meet with him several
18 times.
19      Q.     No, February 18th.
20      A.     February 18th I may not have met with
21 him.
22      Q.     Other than Dr. Lento did you meet with
23 anybody else during that three-month period to
24 talk about your academic advisement?
25            And by anybody else, did you meet with

Computer Reporting NYC Inc.
(212) 986-1344

284

Varughese

1      Varughese
2  Dr. Pessin?  Did you meet with Dr. Bleiweiss?  Did
3  you meet with anybody other than Dr. Lento?
4      A.    No.
5      Q.    Now, in the spring of 2011 did the
6  chair of the department change?
7      A.    Yes.
8      Q.    And was there a new incoming chair?
9      A.    Right, I believe Dr. Pessin was the
10 interim chair and she left.
11     Q.    And who replaced her?
12     A.    Cordon-Cardo, Carlos Cordon-Cardo.
13     Q.    When did Dr. Cordon-Cardo become the
14 chair of the pathology department?
15     A.    I'm not sure.  Like I think April,
16 April 1st, 2011.
17     Q.    And before Dr. Cordon-Cardo came to
18 Mount Sinai did you know him?
19     A.    No.
20     Q.    Had you ever met him?
21     A.    Well, he gave several lectures.
22     Q.    Gave several lectures when?
23     A.    I believe February and March of 2011.
24     Q.    Where were those lectures?
25     A.    They were in the conference room.

Computer Reporting NYC Inc.
(212) 986-1344

285

Varughese

1
2      Q.    And when did you learn that
3  Dr. Cordon-Cardo was going to become the chair?
4      A.    I believe after those lectures they
5  decided to hire him.  I'm not sure.  I'm not sure
6  that's the story.  I don't know.
7      Q.    And prior to Dr. Cordon-Cardo
8  officially becoming the chair at the beginning of
9  April of 2011 did you speak to him at all?
10     A.    No.
11     Q.    Did you ever have any conversations
12 with him prior to then?
13     A.    No.
14     Q.    When was the first time that you spoke
15 to Dr. Cordon-Cardo?
16     A.    When did I speak to him first?  I
17 spoke to him May 3rd or -- believe it was May 3rd
18 or 4th of 2011.
19     Q.    Where did that conversation take
20 place?
21     A.    In his office.
22     Q.    Who was present?
23     A.    It was Dr. Lento and Mr. Castaldi.
24     Q.    Who is Mr. Castaldi?
25     A.    Andrew Castaldi I believe was interim

Computer Reporting NYC Inc.
(212) 986-1344

286

Varughese

1  chair.  I'm sorry, he was interim department
2  administrator or the hospital administrator.  I
3  believe he used to work for the department of
4  genetics before.
5      Q.    And how did that meeting come about?
6      A.    Because I got an e-mail from Dr. Lento
7  saying that he would like to meet with me and the
8  period of academic advisement ended and then I
9  believe Mr. Castaldi e-mailed me stating that they
10 would also like to meet with me, meaning
11 Cordon-Cardo and Castaldi.  So that's what
12 happened.
13     Q.    Now, when you submitted the
14 self-reflection essay on March 30th of 2011, had
15 you had any communications with Dr. Cordon-Cardo
16 about that?
17     A.    No.
18         MR. WRONKO:  Do you need a moment?
19         THE WITNESS:  No.
20     Q.    I show you a document.
21         MR. McEVOY:  Mark this is as Exhibit
22 23.
23         (Defendants' Exhibit 23, e-mail chain,
24 May 2011, to Leena Varughese from Castaldi

Computer Reporting NYC Inc.
(212) 986-1344

287

Varughese

1
2  and Cordon-Cardo, marked for identification,
3  this date.)
4      Q.    Have you had a chance to look at that
5  document?
6      A.    Yes.
7      Q.    And can you tell me what it is?
8      A.    It's an e-mail chain from Cordon-Cardo
9  to me May 9th and another e-mail from Andrew
10 Castaldi May 17th.
11     Q.    So the first e-mail from
12 Dr. Cordon-Cardo to you, the May 9th one, says,
13 "Dear Leena:  As a follow-up to the message below,
14 we would like to confirm that we will be meeting
15 on the agreed May 24th at noon.  In preparation
16 for this meeting, you should send us the written
17 'reflection' by May 23rd so we have time to review
18 it."
19         Do you see that?
20     A.    Right.
21     Q.    Had there come a point where you had
22 been asked to rewrite the written reflection, the
23 self-reflection?
24     A.    Yes.
25     Q.    Who asked you to do that?

Computer Reporting NYC Inc.
(212) 986-1344

288

Varughese

1       A.    Castaldi, Lento and Cordon-Cardo.
2       Q.    When did they ask you to rewrite the
3   self-reflection?
4       A.    When I met with them on May 3rd.
5       Q.    And did they tell you why they wanted
6   to you review the self-reflection?
7       A.    Yes.  They said it just didn't -- it
8   wasn't what they wanted and --
9       Q.    Who said that?
10      A.    Mr. Castaldi.
11      Q.    And what else happened at that May
12  4th, I think you said?  May 4th meeting?
13              MR. WRONKO:  May 3rd.
14      Q.    I'm sorry.
15      A.    May 3rd or 4th.  I'm not sure.
16      Q.    Either one, May 3rd or 4th.  What else
17  happened?  They talked about the self-reflection.
18      A.    Right, they talked about the
19  self-reflection.  I mean, they were just very
20  aggressive and rude and unprofessional towards me.
21      Q.    Again, Dr. Varughese, I'm not
22  interested so much in your conclusions about their
23  behavior.  I'm interested in what they said to you
24  at the moment.

289

Varughese

2       So what else did they say to you other
3   than that they wanted you to rewrite the
4   self-reflection essay?
5       A.    Right, they were -- gosh, I have to
6   think about this for a minute.
7       Q.    Take your time.
8       A.    OK.  Right.  I mean, what I remember
9   now is they asked me if I had met the requirements
10  and I told them that I thought I met the
11  requirements for academic advisement and the
12  reflection and they said I did not.
13      And they said they didn't want to know
14  what my point of view was because they already
15  knew and it wasn't essentially relevant.  And
16  which was what I was told all along.  And just
17  they continued reiterating that point.
18      Q.    What did you say during the meeting on
19  May 4th?
20      A.    Well, I just said that I thought I
21  had, um, did what I was asked to do and I wrote
22  the reflection and I thought that it reflected
23  that adequately.  And that's -- let me see what
24  else I said.
25      Well, I mean, I really didn't say

290

Varughese

1   much.  Really that's all.  I just thought I had
2   met the requirements and I did what I was supposed
3   to do.
4       Q.    Let me show you another document.
5              MR. McEVOY:  Mark 24 as Exhibit 24.
6              (Defendants' Exhibit 24, e-mail from
7   Cordon-Cardo to Varughese dated May 4, 2011.
8   Bates Nos. P1119 and 1120, marked for
9   identification, this date.)
10      Q.    Did you have a chance to look at that
11  document?
12      A.    Yes.
13      Q.    It's an e-mail to you from
14  Dr. Cordon-Cardo dated May 4, 2011, with copies to
15  Dr. Lento and Mr. Castaldi, correct?
16      A.    Right.  Yeah.
17      Q.    Now, when did Mr. Castaldi come to
18  Mount Sinai?
19      A.    I don't know.  He may have been
20  working there for a very long time, but I didn't
21  know him though.  I just met him.
22      Q.    So prior to the May 4th meeting you
23  hadn't met Mr. Castaldi?
24      A.    No.

291

Varughese

2       Q.    The e-mail says, "Dear Leena:  Thank
3   you for your time yesterday.  I believe we had a
4   productive discussion.  As per our agreement, you
5   will be reading the assigned book and re-write the
6   assigned personal reflection essay modeling into
7   future constructive developments.  We also agreed
8   that you would be able to do such exercises during
9   the upcoming two to three weeks.  You should
10  purchase the book, and the Department will
11  reimburse you.  We look forward to meeting with
12  you again on May 24th, at noon.  Please, let me
13  know if this is a convenient date and time for
14  you, and do not hesitate to contact my office if
15  you need further information."
16      So as of May 3rd when you met with
17  Dr. Cordon-Cardo had you read the book that you
18  had been assigned?
19      A.    Yes.
20      Q.    So then was there some reason that you
21  know of that Dr. Cordon-Cardo was under the
22  impression that you hadn't read the assigned book?
23      A.    Well, that was a conclusion that they
24  made even though I said I had read the book.
25      Q.    So you told them you read the book.

292

Varughese

1
2    **A.**    Right.
3    **Q.**    And they said you hadn't.
4    **A.**    Right.  I mean, it seems to be the
5    theme.
6    **Q.**    Did anybody say anything as to why
7    they thought you hadn't read the book?
8    **A.**    Right, they wanted to know who the
9    author was and I couldn't remember at that time.
10   **Q.**    Did they ask you any other questions
11   about the content of the book?
12   **A.**    Right, they asked me what, you know,
13   what do I think it's about.  And I said, well, I
14   mean, the book is rather broad.  It goes into
15   various different aspects, including a primary
16   care perspective of interacting with patients and
17   the business model and also like working with your
18   colleagues and, you know, professionalism in terms
19   of these various different areas of medicine and
20   general or primary practice.
21       So I wasn't sure what they were
22   looking for in terms of, um, in way of assessing
23   if I had read the book.  So I asked them to be
24   more specific and they didn't want to get more
25   specific about what I should have read or what

*Computer Reporting NYC Inc.*
*(212) 986-1344*

293

Varughese

1
2    point they wanted me to expand on.
3    **Q.**    During did this meeting on May 3rd,
4    did Dr. Cordon-Cardo say to you that because he
5    was new to the department -- Dr. Varughese, what
6    are you doing?
7    **A.**    Go ahead.
8        MR. McEVOY:  Mr. Wronko, would you ask
9        your client to put her phone away or else
10       take a break and do whatever she needs to
11       do.  I have no objection to doing that.
12       MR. WRONKO:  I said the same thing.
13       Do you need a break.
14       THE WITNESS:  Yes, I do need a break
15       actually.
16       MR. McEVOY:  Let's take a few-minute
17       break.  Dr. Varughese, do whatever you need
18       to do with your phone and then when you come
19       back let's put it away.
20       THE WITNESS:  OK, great.  Sounds good.
21       (A recess was taken from 12:32 to
22       12:38.)
23   BY MR. McEVOY:
24   **Q.**    Dr. Varughese, at the May 3rd meeting
25   did Dr. Cordon-Cardo say to you that because he

*Computer Reporting NYC Inc.*
*(212) 986-1344*

294

Varughese

1
2    was new to the department and the new chair that
3    he wanted to give you a clean slate, go forward
4    based on a clean slate?
5    **A.**    Well, I wasn't at odds with him, so I
6    didn't know what he was referring to.
7    **Q.**    Did he say that?
8    **A.**    I believe he did.
9    **Q.**    What did you understand that to mean?
10   **A.**    I thought that was a threat.
11   **Q.**    Why did you think it was a threat?
12   **A.**    Because I had no difference of opinion
13   with him.  There was no issues there.  Whatever he
14   thought I had done, he doesn't even know what it
15   was.  I mean, he made some, I mean, for him to
16   make such a statement seems rather odd to me.
17   **Q.**    And you said before that, and I may
18   not remember the exact words, but you said before
19   that you thought that Dr. Cordon-Cardo and
20   Mr. Castaldi during this meeting were -- we can go
21   back and look, but let me just ask you.
22       How would you characterize their
23   attitude towards you during that time?
24   **A.**    It was just very, um, their attitude
25   was arrogant, chauvinistic, misogynistic.  That's

*Computer Reporting NYC Inc.*
*(212) 986-1344*

295

Varughese

1
2    what I got from them.
3    **Q.**    What is the basis of your belief that
4    it was antagonistic?
5    **A.**    Antagonistic by misogyny and
6    chauvinism?
7    **Q.**    Yes.
8    **A.**    Just the tone of the way they spoke to
9    me and they're not happy.  We feel like you didn't
10   satisfy -- I don't know.  I just felt like it was
11   really demeaning and sexist.
12   **Q.**    Was there some particular words that
13   they used?  Was it their tone of voice?  What was
14   it?
15   **A.**    It was a tone of voice, but they also
16   said that, Dr. Lento also said that we spoke to,
17   what is it?  We spoke to Sam, but we decided to do
18   something with you.  You know, that kind of
19   language and that comparison, direct comparison
20   between me and him to say, well, we only find you
21   at fault.  We just spoke to him.
22       It basically confirmed my suspicion
23   that they were not taking any sort of disciplinary
24   action or any sort of action against Sam McCash.
25   **Q.**    Leaving Dr. Lento aside for a second,

*Computer Reporting NYC Inc.*
*(212) 986-1344*

296

Varughese

1
2  we're talking about Dr. Cordon-Cardo and
3  Mr. Castaldi.  So you said it was their tone of
4  voice?
5      A.    Right, Mr. Castaldi said, We feel
6  like, I mean, he immediately put himself into
7  that, into this group with Dr. Lento and
8  Cordon-Cardo.  He said, We feel like that you
9  didn't do this.  I mean, he was speaking for the
10 group.
11     Q.    When he said we feel this, what did he
12 say?  You didn't do what?
13     A.    We feel like you didn't address what
14 you were supposed to address in this.  We're going
15 to give you another chance.
16     Q.    Are you talking about the
17 self-reflection essay?
18     A.    Right.
19     Q.    Anything else that he said,
20 Mr. Castaldi, that he thought you didn't do?
21     A.    Well, I mean, I believe he submitted a
22 tape into evidence at this point or as part of
23 discovery.
24         MR. WRONKO:  You have to answer his
25 question.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

297

Varughese

1
2      A.    So what did he say?  Like it was just
3  everything that he said.  I just felt like he
4  became overly, you know, became extremely
5  confrontational as the meeting went on and said I
6  could be terminated or fired from the program if I
7  didn't do this.  We're just giving you a chance.
8  Just I'll write intimidating, harassing language.
9  Just --
10     Q.    Is this one of the conversations that
11 you taped?
12     A.    Yes.
13     Q.    We'll get to that.
14         And what did Dr. Cordon-Cardo say
15 other than his tone of voice that made you think
16 that he was being antagonistic, misogynist and
17 whatever other words you used?
18     A.    Chauvinistic.
19     Q.    Chauvinistic, there you go.
20     A.    Dr. Cordon-Cardo?
21     Q.    Yes.
22     A.    Well, he wasn't really interested in
23 the reflection.  He was like it doesn't matter.
24 He said he was like we want some future
25 constructive, like he said in his e-mail.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

298

Varughese

1
2      I feel like I'm not at odds with
3  having future constructive developments.  So I
4  mean, what the academic advisement was about, was
5  it about future constructive developments?  It was
6  about what occurred on December 8th and he wasn't
7  interested in me discussing my account of what had
8  happened and my reflection on it and how I had
9  approached things differently.
10     Q.    So Dr. Varughese, if as you say you
11 didn't know Dr. Cordon-Cardo or Mr. Castaldi
12 before this meeting in May, if Dr. Cordon-Cardo
13 was new to the institution having just become the
14 chair, why do you believe that they had this
15 attitude towards you that you just described?
16     A.    Well, because Dr. Lento was extremely
17 familiar with them.  He seemed to be friends with
18 them.  And I think Dr. Cordon-Cardo and
19 Mr. Castaldi they had a relationship with the
20 hospital leadership as well.  Scott Barnett.  And
21 it seemed like they all knew each other very well.
22     Q.    So do you think that Dr. Barnett and
23 Dr. Lento and whoever else in the hospital
24 leadership you're referring to somehow spoke to
25 Dr. Cordon-Cardo about you and --

*Computer Reporting NYC Inc.*
*(212) 986-1344*

299

Varughese

1
2      A.    Yes.
3      Q.    -- said negative things about you?
4      A.    Yes, absolutely.
5      Q.    Do you know that happened for a fact
6  or is that just your belief?  Because they were
7  friends and whatever else you just described.
8      A.    Well, there was no reason for me to
9  believe that until I met with Dr. Cordon-Cardo and
10 then since then I've reached that conclusion
11 that --
12     Q.    I don't doubt you believe it.  My
13 question is, did anybody ever tell you?
14     A.    No, but, you know what?  I did see
15 Dr. Barnett and Paul Johnson in Dr. Cordon-Cardo's
16 office on several occasions.  I mean, I didn't
17 make the assumption it was about me.
18     Q.    And it could very well have been about
19 something else, right?
20     A.    Right, it could very well have been
21 about something else, there is no question about
22 it.  But given that they didn't know what was
23 going on and given my reflection should be taken
24 at face value by Dr. Cordon-Cardo since he doesn't
25 know me, he didn't do that.  He wanted me to

*Computer Reporting NYC Inc.*
*(212) 986-1344*

300

Varughese

1  change my story.  They wanted to force me to write
2  something else that I didn't believe to be true.
3      Q.    So other than the fact that the
4  individuals you described were friendly with
5  Carlos Cordon-Cardo or with Mr. Castaldi and the
6  fact that you saw them talking to each other in
7  one another's office, is there any other basis for
8  your belief that hospital leadership or
9  Dr. Barnett or Dr. Lento or someone else said
10  negative things about you to Carlos and
11  Mr. Castaldi?
12      MR. WRONKO:  Form objection.
13      A.    Is there any form for that belief,
14  basis for that belief?  Well, OK, I remember
15  Dr. Barnett and Caryn Tiger-Paillex in June, and
16  Dr. Barnett said, you know, Dr. Cordon-Cardo
17  doesn't, you know, he has an opinion of you or
18  doesn't like me, something along those lines.  And
19  it bewildered me because --
20      Q.    Assuming for a second, Dr. Varughese,
21  that that's what they said to you at this meeting
22  and assuming it's true, that Dr. Cordon-Cardo
23  didn't like you, why do you believe he didn't like
24  you because of what someone else told him about

*Computer Reporting NYC Inc.*
*(212) 986-1344*

301

Varughese

1  you?
2      A.    Right.  I was --
3      MR. WRONKO:  Form objection.  You can
4  answer.
5      A.    I mean, why did I believe that?  I did
6  not have that belief initially.  And even after I
7  submitted my reflection, second reflection, I
8  didn't have that belief.  I just assumed, I mean,
9  I knew he had a negative attitude towards me and
10  he wanted me to change the reflection, but I
11  certainly did not see it as being a like or not
12  like thing till Dr. Barnett said, oh, he has an
13  opinion or he doesn't like you or something.
14      And I said, Are you kidding me?  This
15  is a professional environment.  Why should I be
16  concerned about being liked or not liked?  This is
17  insane.
18      Q.    We're off the track a little bit.  My
19  question to you was did you believe that
20  Dr. Lento, Dr. Barnett or others had said negative
21  things about you to Dr. Cordon-Cardo and
22  Dr. Castaldi prior to the meeting on May 3rd which
23  explained their chauvinistic, misogynistic and
24  antagonistic attitude towards you and you said

*Computer Reporting NYC Inc.*
*(212) 986-1344*

302

Varughese

1  they did.  And when I asked you what the basis for
2  that belief was, you said they were friends and
3  you saw Dr. Barnett in Dr. Cordon-Cardo's office.
4      So my question is, other than that, is
5  there any other basis for your belief that prior
6  to the May 3rd meeting people said negative things
7  about you to Carlos Cordon-Cardo and Andrew
8  Castaldi?
9      A.    Well, I believe Dr. Lento also
10  influences the new chairman, Cordon-Cardo, because
11  he is not a -- what is it?  He is not really a
12  pathologist.  He's a researcher, and I don't know.
13  I mean, it is surprising that he is chairman of a
14  department, of pathology, where there are
15  residents.
16      And I believe Dr. Cordon-Cardo
17  probably looked to the program director,
18  Dr. Lento, for advice.  And Dr. Lento probably
19  said all those derogatory and negative things
20  about me to him.
21      Q.    And that's your guess, right?
22      A.    Well --
23      Q.    You don't know that to be a fact, do
24  you?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

303

Varughese

1      A.    No.  I don't know that to be a fact.
2      Q.    You said something about Dr. -- I want
3  to be sure I understood you.  You said something
4  about somebody wasn't really a pathologist.  Who
5  are you referring to?
6      A.    Cordon-Cardo.
7      Q.    What is your understanding of what
8  Dr. Cordon-Cardo's --
9      A.    Well, he's an MD Ph.D. and he is a
10  researcher and he never did a residency in
11  pathology.
12      Q.    So did you think he was unqualified to
13  be the chair of the department?
14      A.    Well, that's not really my decision to
15  make.  It's the hospital's decision.  I don't have
16  an opinion one way or the other about it.
17      Q.    So let me show you another document.
18  Again, this is a document that you produced to me.
19      MR. McEVOY:  We'll mark this as
20  Exhibit 25.
21      (Defendants' Exhibit 25, memo dated
22  May 3, 2011, to Personnel File of Leena
23  Varughese from Andrew Castaldi, marked for
24  identification, this date.)

*Computer Reporting NYC Inc.*
*(212) 986-1344*

304

Varughese

1
2    A.    OK.
3    Q.    Have you had chance to look at that?
4    A.    Yes.
5    Q.    And what is it?
6    A.    It appears to be a memo written by
7  Mr. Castaldi.
8    Q.    Dated May 3rd and it's to your
9  personnel file. And it's "Re: Actions Prior and
10  During Academic Advisement Meeting."
11         Correct?
12   A.    Yes.
13   Q.    And the first paragraph says: "Carlos
14  Cordon-Cardo M.D., Ph.D., Chairman of the
15  Department of Pathology, Andrew Castaldi, CPA,
16  MBA, administrative Director, Department of
17  Pathology, and Patrick Lento, M.D., Residency
18  Program Director, Department of Pathology were
19  scheduled to meet with Leena Varughese M.D.,
20  PGY-3S, at 11:00 a," I believe it is 11 a.m., "on
21  May 3, 2011, to discuss her Period of Academic
22  Advisement and the requirements which she was
23  asked to complete."
24         The second paragraph says: "It should
25  be noted that Dr. Varughese showed up thirty

Computer Reporting NYC Inc.
(212) 986-1344

305

Varughese

1
2  minutes prior to the scheduled meeting and
3  interrupted a very important meeting between
4  Dr. Cordon-Cardon," again, a typo, "and myself.
5  In addition, during the meeting she constantly
6  rolled her eyes and in general had a very poor
7  attitude, even though all involved were willing to
8  give her a 'fresh' start, since both
9  Dr. Cordon-Cordon and myself are new to the
10  Department."
11         Do you see that?
12   A.    Correct.
13   Q.    How did you get this document?
14   A.    It was in my file. I think it was
15  submitted to me. It was given to me by the
16  hospital.
17   Q.    Given to you by the hospital when?
18   A.    At the first hearing.
19   Q.    In connection with the medical staff
20  hearing?
21   A.    Right.
22   Q.    So in this memo Mr. Castaldi said that
23  you showed up 30 minutes early to the meeting,
24  interrupted a meeting between him and
25  Dr. Cordon-Cardo.

Computer Reporting NYC Inc.
(212) 986-1344

306

Varughese

1
2         Is that correct or no?
3    A.    No, it's not correct.
4    Q.    Did you show up early for the meeting?
5    A.    I did show up early, yes.
6    Q.    What happened when you showed up
7  early, if you did?
8    A.    I spoke to one of the secretaries
9  there and I asked them if they were there and if I
10  could speak to them. Because I had not been
11  introduced to Dr. Cordon-Cardo or Mr. Castaldi, so
12  I just wanted to say hello and....
13   Q.    And what happened?
14   A.    They were busy. They were discussing
15  something. So I just waited outside. In fact,
16  then Alan Schiller walked by and interrupted them
17  and went into the office and had this talk and
18  chat, then left. That's not mentioned here.
19   Q.    And so while they were meeting, they
20  being Mr. Castaldi and Dr. Cordon-Cardo,
21  Dr. Schiller went in to talk to them before your
22  meeting.
23   A.    Right.
24   Q.    Do you know what Dr. Schiller was
25  going in there to talk to them about?

Computer Reporting NYC Inc.
(212) 986-1344

307

Varughese

1
2    A.    I wasn't eavesdropping. I don't know.
3    Q.    Do you know whether Dr. Schiller went
4  in there because he had been invited to go into
5  that meeting?
6    A.    No.
7         MR. WRONKO:  Form objection.
8    A.    Not at all. There was no indication
9  that he was invited to any meeting.
10   Q.    Do you know? Did anybody tell you
11  anything about Dr. Schiller going into that
12  meeting or why he went into that meeting?
13   A.    Right, the secretary was there and he
14  was surprised that Dr. Schiller showed up.
15   Q.    How do you know that the secretary was
16  surprised?
17   A.    Because he indicated as such to me.
18   Q.    What did he say?
19   A.    He said, um, he asked Dr. Schiller
20  what he was he doing there, and I asked him like
21  what's going on? And he's like, I don't know.
22   Q.    Then it goes on to say in
23  Mr. Castaldi's memo that you "constantly rolled
24  your eyes and in general had a very poor
25  attitude."

Computer Reporting NYC Inc.
(212) 986-1344

308

Varughese

1    Varughese
2        Did you constantly roll your eyes?
3    A.    Not that I'm aware of.
4    Q.    And I take it you don't think you had
5    a poor attitude during the meeting.
6    A.    No, I don't think so.  I think I was
7    very friendly and open minded.
8    Q.    Now, you said that you had been asked
9    to rewrite your self-reflections, correct?
10   A.    Right.
11   Q.    And had you been given a deadline by
12   which to submit it?
13   A.    Right. I was given a deadline.
14   Q.    And what was that deadline?
15   A.    It was, I believe it was before the
16   previous, um, the next meeting.
17   Q.    And the next meek was scheduled for
18   May 24th.
19   A.    Right.
20   Q.    And in the e-mail that we looked at
21   from Mr. Castaldi to you it said:  Please also be
22   sure to e-mail us your essay by May 23rd to have
23   ample time to read it before our meeting.
24   A.    Yes.
25   Q.    Did you submit it to Dr. Cordon-Cardo

Computer Reporting NYC Inc.
(212) 986-1344

309

Varughese

1    Varughese
2    and Mr. Castaldi on May 23rd?
3    A.    No.
4    Q.    Why not?
5    A.    Because I was experiencing an
6    increased sense of anxiety and fear and I didn't
7    think my opinion or my reflection would be
8    welcome.
9    Q.    Did you ever submit the
10   self-reflection essay, the second one?
11   A.    Yes, I did.
12   Q.    When did you submit it?
13   A.    I submitted it at the meeting.
14   Q.    So on the 23rd you were unable to
15   submit it because of fear and anxiety, but on the
16   morning of the 24th you had overcome your fear and
17   anxiety?
18   A.    Well, I did not have a choice in the
19   meeting with the department leadership, so -- and
20   I enjoyed my work, so I also have other
21   engagements and work where I am responsible to the
22   patients.  So I had multiple things going on
23   during all this time between like December and,
24   you know, June and July and August.
25   Q.    The meeting takes place, the first

Computer Reporting NYC Inc.
(212) 986-1344

310

Varughese

1    one, on May 3rd, correct?
2    one, on May 3rd, correct?
3    A.    Yes.
4    Q.    And on May 3rd you're asked to rewrite
5    the essay.
6    A.    Uh-huh.
7    Q.    And on May 17th Mr. Castaldi says be
8    sure we have it by May 23rd.
9        So did you think, Dr. Varughese, that
10   you had a choice?  You said you didn't have a
11   choice whether to meet with them.  Did you have a
12   choice as to the deadline for submitting the essay?
13   A.    Well, I was afraid to submit an essay.
14   I felt like they would probably take some actions
15   against me or -- I wasn't sure what the course of
16   action would be and I was afraid.
17   Q.    But you submitted it on the 24th.
18   A.    Right.
19   Q.    Let me show you a document and ask you
20   to take a look at it.
21        MR. McEVOY:  Mark it Defendants' 26.
22        (Defendants' Exhibit 26, document
23   bearing title "Reflection #2 and an addendum
24   to Reflection #1," marked for
25   identification, this date.)

Computer Reporting NYC Inc.
(212) 986-1344

311

Varughese

1    Varughese
2    Q.    Did you have a chance to look at that
3    document?
4    A.    Yes.
5    Q.    It's entitled "Reflection #2 and
6    addendum to Reflection #1."
7    A.    Yes.
8    Q.    Is this the, I'll just call it the
9    second self-reflection essay that you submitted?
10   A.    Yes.
11   Q.    And this is the one you submitted to
12   Dr. Cordon-Cardo and Mr. Castaldi at the May 24th
13   meeting?
14   A.    Yes.
15   Q.    And again, do you believe that this
16   essay, self-reflection essay, complies with the
17   terms of the academic advisement?
18   A.    I think at this point the terms of the
19   academic advisement didn't apply as far as I knew.
20   Q.    And why didn't they apply?
21   A.    Because they said it's a fresh start.
22   It's a fresh start, so -- I don't know what that
23   meant.  That's what their opinion was.
24   Q.    When they asked you to rewrite the
25   essay at the meeting, did they tell you why they

Computer Reporting NYC Inc.
(212) 986-1344

312

Varughese

1  wanted you to rewrite it or what they thought was
2  wrong with the first one?
3
4  　　A.　Right, it's in the tape.  They said
5  they didn't agree.
6  　　Q.　They didn't agree with what?
7  　　A.　It wasn't what they wanted.
8  　　Q.　Did they tell you in what respect it
9  wasn't what they wanted?
10  　　A.　They said I just rehashed what had
11  occurred.  They don't want to know about what
12  happened.
13  　　　　Essentially they didn't want my
14  account, which is what they said at the academic
15  advisement, they wanted my account of the
16  situation and how I would approach things
17  differently, which is what I did in my first
18  reflection, and so they were not happy with that.
19  　　Q.　And when they told you that they
20  wanted you, they being Dr. Carlos Cordon-Cardo and
21  Mr. Castaldi, when they told you they wanted you
22  to write a second one or revised one, did they
23  tell you in what way they wanted that one to be
24  different from the first one?
25  　　A.　Not very specifically.

Computer Reporting NYC Inc.
(212) 986-1344

313

Varughese

1
2  　　Q.　Generally?
3  　　A.　Well, I sent the e-mail to Dr. Lento
4  asking him if there is any particular way I should
5  direct my self-reflection, the next one.  But he
6  didn't e-mail me back.  Instead Dr. Cordon-Cardo
7  e-mailed me whatever this e-mail was.  But that's
8  it.  So that's all the....
9  　　Q.　So going back to my original question,
10  did this second reflection, self-reflection essay,
11  comply with the requirement of the academic
12  advisement regarding your preparing such an essay?
13  　　　　MR. WRONKO:  Form objection.  You can
14  　　answer.
15  　　A.　In my opinion it did.
16  　　Q.　Then you said that you thought somehow
17  the requirements of the academic advisement no
18  longer applied by the time you met with
19  Dr. Cordon-Cardo and Mr. Castaldi in May because
20  they said it was a fresh start?
21  　　A.　Well, they said, Dr. Lento had said
22  the period of academic advisement had ended and
23  then, um, yeah, they kept making statements about
24  fresh start and what not.
25  　　Q.　Did you think, Dr. Varughese, that

Computer Reporting NYC Inc.
(212) 986-1344

314

Varughese

1  because the three-month period, the academic
2  advisement had ended that you were then relieved
3  of your obligation to comply with whatever the
4  terms of the academic advisement were?
5
6  　　A.　Well, the academic advisement is a
7  series -- as we already went over the document, I
8  mean, I didn't believe that.  I was told that
9  period had ended, which led me to assume that it
10  had ended.
11  　　Q.　I understand that it ended, but you
12  were told to read a book, right?
13  　　A.　Right.
14  　　Q.　And if you were told to read the book
15  in the three-month period, and I know you said
16  that you did --
17  　　A.　Right.
18  　　Q.　But if you hadn't read the book in the
19  three-month period do you think it was simply
20  because the academic advisement had ended and you
21  wouldn't have to read the book?
22  　　　　MR. WRONKO:  Form objection.
23  　　A.　Well, I did read the book.
24  　　Q.　I understand that.  I'm asking if you
25  thought that you had to comply with the terms of

Computer Reporting NYC Inc.
(212) 986-1344

315

Varughese

1
2  the academic advisement.
3  　　A.　I complied with terms of the academic
4  advisement.
5  　　　　MR. McEVOY:  Fine.  Break for lunch.
6  　　　　(A luncheon recess was taken at
7  　　1 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Computer Reporting NYC Inc.
(212) 986-1344

316

Varughese

1
2      A F T E R N O O N   S E S S I O N
3           (Time noted: 2:02 p.m.)
4    L E E N A   V A R U G H E S E,  resumed and
5           testified further as follows:
6    EXAMINATION BY (Cont'd.)
7    MR. McEVOY:
8      Q.    Dr. Varughese, when you met with
9    Dr. Cordon-Cardo and Mr. Castaldi on May 24th did
10   you bring the book with you that you were supposed
11   to read?
12     A.    Yes, I did.
13     Q.    And during that meeting did
14   Dr. Cordon-Cardo ask you whether you had read the
15   book?
16     A.    Yes.
17     Q.    And what did you say?
18     A.    I said I read the book.
19     Q.    Did you toss the book on the table in
20   front of you?
21     A.    No.
22     Q.    Did you put the book on the table in
23   any way?
24     A.    Yes, I placed the book on the table.
25     Q.    In front of you or --

317

Varughese

1
2      A.    Yes.
3      Q.    -- in front of him?
4      A.    In front of me.
5      Q.    In front of you.  All right.
6            Now, did there come a time when you
7    were placed on final warning?
8      A.    Yes.
9      Q.    When was that?
10     A.    On July 14, 2011.
11     Q.    I will show you a document we are
12   going to mark.
13           MR. McEVOY:  Mark this as Defendants'
14   Exhibit 27.
15           (Defendants' Exhibit 27, so called
16   "Final warning" letter dated July 1, 2011,
17   to Dr. Varughese from Dr. Cordon-Cardo,
18   Bates Nos. P859 through P861, marked for
19   identification, this date.)
20     Q.    Did you have a chance to look at that?
21     A.    Yes.
22     Q.    Can you tell me what it is?
23     A.    This is as you described earlier, the
24   final warning.
25     Q.    And it's dated July 1st, 2011?

318

Varughese

1
2      A.    That's the date on this document, yes.
3      Q.    And you said you received it on
4    July 14th?
5      A.    Yes.
6      Q.    How did you receive it?
7      A.    I was asked to meet with
8    Dr. Cordon-Cardo on July 13th by Allene Carter.
9      Q.    Who is Allene Carter?
10     A.    He is a program coordinator.
11     Q.    And did you meet with Dr. Cordon-Cardo
12   on July 14th?
13     A.    Yes.
14     Q.    Was anyone else present?
15     A.    Yes.
16     Q.    Who else was present?
17     A.    Shema Patel.
18     Q.    And who is Ms. Patel?
19     A.    Shema Patel is, she was an interim
20   department administrator.
21     Q.    Anyone else present?
22     A.    Anyone else present?  No.
23     Q.    And where did the meeting take place?
24     A.    In Dr. Cordon-Cardo's office.
25     Q.    And who spoke first at the meeting?

319

Varughese

1
2      A.    I'm sorry?
3      Q.    Who spoke first at the meeting?
4      A.    I'm not sure.
5      Q.    What did Dr. Cordon-Cardo say during
6    the meeting?
7      A.    What did he say during the meeting?
8    He said, um, he said, Here's a letter, and it was
9    in an envelope and he just gave me the envelope.
10           And I said, What is in it?
11           He said, You'll find out when you read
12   it.
13           And I said, Well, I have legal counsel
14   that has contacted the hospital previously.  I
15   think it would be more prudent for him to, you
16   know, approach my attorney regarding the matter at
17   hand, especially if it pertains to what has
18   occurred in the past six, seven months.
19           And he said, No, I don't think so, and
20   he didn't want to do that.  He just said, You read
21   it at your time, at your leisure.
22     Q.    Did you read it during the meeting?
23     A.    No.
24     Q.    Did Ms. Patel say anything?
25     A.    I believe she didn't say much, no.

320

Varughese

2    Q.   And other than what you described is
3 there any other conversation at this meeting of
4 14th of July?
5    A.   I don't know how to quite describe.
6 Um, right, I was wondering why he had showed up to
7 the Bronx VA the day before, and -- I believe he
8 showed up there the day before or something.
9    Q.   Who is he?
10    A.   Cordon-Cardo showed up at the Bronx
11 VA, and so I just asked him why he didn't just
12 think to hand me the letter.  Because I had to,
13 you know, go out of my way to go to Mount Sinai
14 Medical Center.
15    Q.   Because at this time I take it you
16 were doing your rotation at the VA?
17    A.   Right, I was doing a surgical
18 pathology rotation at the VA, which was pretty
19 intensive.
20    Q.   And what did he say?
21    A.   What did he say?  That's -- I just
22 described to you what --
23    Q.   No.  What did he say when you said why
24 didn't you give me this at the VA when you were
25 there yesterday?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

321

Varughese

2    A.   Oh, he said, Don't worry about it.
3 It's -- I'm giving you this letter or this
4 document now.  I asked him what it was and he
5 didn't really describe it.
6    Q.   How long did this --
7    A.   Very strange.
8    Q.   How long did the meeting last?
9    A.   The meeting lasted about like ten
10 minutes.
11    Q.   Did you read the letter at some point?
12    A.   Right, I eventually -- well, I
13 contacted my attorney.
14    MR. WRONKO:  And let me instruct you
15 not to disclose anything that you discussed
16 with your attorney.
17    MR. McEVOY:  I agree.
18    Q.   I'm not interested in conversations
19 with your attorney.
20    A.   Right, I consulted with my attorney
21 and told him about this matter and I also
22 contacted Dr. Cordon-Cardo and informed him about
23 my attorney as well.
24    Q.   My question was did you read the
25 letter.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

322

Varughese

2    A.   Yes, I eventually did read the letter.
3    Q.   And eventually when?
4    A.   When I met with my attorney.
5    Q.   When was that?
6    A.   The following day.
7    Q.   So that would be July 15th.
8    A.   Right.
9    Q.   Now, the final warning says that you
10 were placed on final warning for two reasons.  If
11 you look at the second sentence, it says failure
12 to perform the requirements of your December 21,
13 2010 academic advisement and your behavior at the
14 follow-up meeting on May 24th.
15    Right?  Is that what it says?
16    A.   Right.
17    Q.   And it says:  The academic advisement
18 required you:  To prepare a written
19 self-reflection essay by January 18, 2011, to meet
20 with me periodically to assess your progress, to
21 read Practice in Excellence:  A Physician's Manual
22 to Exceptional Health Care.
23    And much of this you have already
24 testified about, so I'm not going to ask you about
25 it again.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

323

Varughese

2    But if you look at the third paragraph
3 that starts "Throughout the period of Academic
4 Advisement," there's a sentence that says:  "When
5 I asked you on March 22, 2011 when you would be
6 submitting the essay, you responded you were
7 'really swamped' that week; did not know when you
8 would have time to write the reflection, and asked
9 to submit it the following week."
10    Do you recall having that conversation
11 with someone?
12    A.   With someone.  I think this is written
13 from the first person narrative, the program
14 director who was Patrick Lento at that time.
15    Q.   So did you have a conversation with
16 Dr. Lento on or about March 22nd when he asked you
17 about what happened, what's described here took
18 place?
19    A.   I'm not sure.  There may have been an
20 e-mail that I wrote.
21    Q.   And we talked about this a little bit
22 this morning, and I can show you the e-mail again
23 if you want.  Actually, we can't find it.
24    So take a look at this which you have
25 already seen.  OK?  And this is the meeting that

*Computer Reporting NYC Inc.*
*(212) 986-1344*

324

Varughese

1  was scheduled for February 18th with Dr. Lento and
2  I asked you whether you had met with him and you
3  said you didn't recall, but you didn't think you
4  did.
5         Now, in this final warning it says:
6  Second, you failed to meet with me -- and I'm on
7  the second page of the warning, Dr. Varughese.
8         A.   OK.
9         Q.   It starts with, first full paragraph:
10  Second, you failed to meet with me as required by
11  the advisement.  On February 17, 2011 I e-mailed
12  you that we need to meet on the following day and
13  asked that you propose potential times.  Your
14  e-mail response to me indicated you could meet at
15  5:30 p.m. on February 18, 2011.  On the day in
16  question you did not show up to the meeting or
17  contact me to let me know that you would not be
18  coming.  When I questioned this you said that I
19  did not confirm the time.  Despite this purported
20  "miscommunication," you made no effort to contact
21  me, your supervisor, to clarify any
22  misunderstanding regarding whether we were
23  meeting.
24         Do you see that?

325

Varughese

1
2         A.   Right.
3         Q.   So did you not show up for the meeting
4  on February 18th?
5         A.   Right.  Did I show up?  I don't think
6  I did.  Because that's what he's saying here.
7         Q.   Why didn't you show up for the
8  meeting?
9         A.   Well, for one, I was at a different
10  institution at that time.  I was at the Elmhurst
11  Hospital Center.  That's in Queens, New York.  So
12  I had to get all the way there from Queens, and
13  for me to get there on time I would have to leave
14  at some, you know, much earlier than 5 p.m.
15         And two, this meeting was taking place
16  after an incident at Elmhurst where I was
17  essentially asked to leave work, but not my
18  coworker, for not having -- and excuse me.  And we
19  both did not have the certification, mask fit
20  certification, neither of us had it, mask fit
21  test, and they asked me to leave and they didn't
22  ask him to leave.
23         And I had complained about that, and
24  then a few days later he wanted me to meet.  I
25  don't know, I just wasn't sure why he wanted to

326

Varughese

1  meet with me, and he, I don't know, I just thought
2  they were going to take some action against me
3  again.
4
5         Q.   If you look at the document that's
6  been marked as Defendants' Exhibit 22, you sent an
7  e-mail to Dr. Lento on February 17th --
8         A.   Right.
9         Q.   -- at 3:47 p.m.  It says.  "I can meet
10  with you at 5:30 p.m. tomorrow," correct?
11         A.   Right.  Anyway, I was like I'll meet
12  with him the next day, and then I couldn't meet
13  with him.  I mean, for various reasons.  One of
14  which was I was at Elmhurst.
15         Q.   I take it you were at Elmhurst when
16  you sent this e-mail on February 17th.
17         A.   I was, and I was hoping that I could
18  leave early enough to meet with Dr. Lento.
19  Actually, when I went to take the train that day
20  on the 17th, there was some problem with the train
21  track and I couldn't get on the train because
22  there was some incidents and the trains were all
23  delayed for about thirty minutes or so.
24         Q.   That was the 17th.
25         A.   No, on the 18th.  Then I didn't get

327

Varughese

1  back to my apartment till like, I don't know, like
2  6 p.m. or so, and Dr. Lento had not said that, you
3  know, he can meet at 5:30 either.  He didn't
4  confirm the 5:30 p.m. time either.
5         I wasn't sure if he was going to wait
6  for me, because I didn't get out of the train
7  till, I don't know, it was like six something.
8         Q.   And did you make any effort to contact
9  Dr. Lento?
10         A.   I did.  I think I called him.  I
11  should have the call.  I think I made an effort to
12  call him.
13         Q.   It says in the final warning:  "You
14  did not show up to the meeting or contact me to
15  let me know you would not be coming."
16         A.   Right.  He probably just didn't pick
17  up his phone.
18         Q.   "When I questioned this you said I did
19  not confirm the time."
20         Dr. Varughese, I want to understand
21  what your thought process was.  When you said, "I
22  can meet with you at 5:30 p.m. tomorrow.  May I
23  asked what is the meeting regarding?  And he says,
24  "Well, 2 things:  I was hoping we can look at one

328

Varughese

1
2  of your autopsy cases we have together and also
3  follow up on the academic advisement stuff."
4          Did you have any confusion or doubt
5  that the meeting was going to take place at 5:30,
6  because you didn't say, OK, I'll see you at 5:30?
7      A.   Right.
8      Q.   So you thought Dr. Lento needed to
9  confirm that time.
10     A.   Well, it seemed like --
11          MR. WRONKO:  Form objection.
12     A.   I don't know.  He didn't confirm that
13  time, yeah.
14     Q.   So you thought because he didn't
15  confirm the time the 5:30 meeting was somehow not
16  going to take place or you weren't sure it was
17  going to take place.
18     A.   I wasn't sure, but I wasn't actually
19  going to see if he was there.  And I tried calling
20  him once I got there and he didn't pick up his
21  phone, so I assumed he left.
22     Q.   When you got there was it around 6
23  o'clock?
24     A.   When I got to my apartment, you know,
25  which is like four blocks from the hospital.

Computer Reporting NYC Inc.
(212) 986-1344

329

Varughese

1
2      Q.   Where were you living at the time?
3      A.   Like a few blocks from the hospital at
4  Mount Sinai housing.
5      Q.   So when you got to your apartment, you
6  said around 6 o'clock, you tried to call Dr. Lento
7  and there was no answer.
8      A.   Yes.
9      Q.   Now, the final warning in the next to
10  last paragraph says:  "You will be required to
11  meet biweekly for three months with Dr. Adolfo
12  Firpo, Director For Educational Activities, to
13  review your performance."
14          Who is Dr. Firpo?
15     A.   It's somebody they hired, the hospital
16  hired.
17     Q.   Anything more about Dr. Firpo than
18  somebody they hired?
19     A.   Well, it says here he's the director
20  of educational activities.
21     Q.   When did Dr. Firpo start working with
22  the hospital?
23     A.   I believe it was July 1st or
24  something.
25     Q.   How did you find out that Dr. Firpo

Computer Reporting NYC Inc.
(212) 986-1344

330

Varughese

1
2  was going to become, was going to start working at
3  the hospital?
4      A.   Well, there was talk about him
5  starting or he's going to be hired.  There was
6  some talk that he would be hired.
7      Q.   Was that some talk among the residents
8  or was that some sort of more formal
9  communication?
10     A.   Well, I mean, it was like in the
11  resident meeting when there's some discussion
12  about him being hired.  But then after he was
13  hired it wasn't very clear about what his position
14  was.  Because according to the ACGME guidelines
15  there's only supposed to be one program director
16  who oversees residency training programs.  So like
17  we just did not know what his role was.
18     Q.   Who's we?
19     A.   The residents.
20     Q.   What residents other than you were
21  confused about Dr. Firpo's role in the department?
22     A.   Everyone I spoke to.
23     Q.   Who did you speak to?
24     A.   Well, I spoke to Jonathan Chow and my
25  classmates, I spoke to them.  They weren't sure

Computer Reporting NYC Inc.
(212) 986-1344

331

Varughese

1
2  what his role was either.
3      Q.   Who did you speak to?  Dr. Chow?  Who
4  else?
5      A.   Dr. Chow, Dr. Martinez, Dr. Azar,
6  Dr. Roman, Dr. Morency, because it's the director
7  of educational activities, which we didn't know
8  what that meant.  He was not program director.  It
9  was a different position.
10     Q.   Did you know Dr. Firpo before he
11  joined Mount Sinai?
12     A.   Well, he came for an interview and I
13  went to that.  There was an interview or some sort
14  of discussion he had with the residents.  In the
15  morning I went to that.  Then in the afternoon he
16  actually approached me and said he wanted to speak
17  to me.
18     Q.   When was that?
19     A.   That was when he came for the
20  interview.
21     Q.   And that I take it that was before
22  July 1st?
23     A.   Yes.
24     Q.   How long before July 1st did he come
25  for this interview?

Computer Reporting NYC Inc.
(212) 986-1344

332

Varughese

2    A.    I don't know.  I have to look at the
3 hospital records.
4    Q.    Did you meet with Dr. Firpo?
5    A.    Right.  Well, he didn't give me a
6 choice because he approached me and then he just
7 sat down next to me and then he wanted to talk to
8 me.
9    Q.    So you talked to Dr. Firpo?
10   A.    Yes.
11   Q.    And this was during the same day that
12 he showed up for this interview?
13   A.    Yes.
14   Q.    Before he started.
15   A.    Yes.
16   Q.    So where did this meeting take place?
17   A.    In the resident work area.
18   Q.    Anybody else present besides you and
19 Dr. Firpo?
20   A.    There was some residents there.
21   Q.    Anybody else who was part of the
22 meeting?
23   A.    No, it was just me and him.
24   Q.    What did he say to you, what did you
25 say to him?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

333

Varughese

2    A.    He just asked me, you know, he just
3 wanted to meet with me and assess the situation
4 here, and so on.
5         Frankly I was really confused by his
6 approaching me, because I wasn't chosen as the
7 chief resident.  I wasn't given any sort of
8 leadership position in that program.  So it was
9 odd that he would approach me and talk to me.
10   Q.    Whether it's odd or not and whether
11 you thought it was strange or not, what did
12 Dr. Firpo say to you?
13         MR. WRONKO:  Form objection.
14   A.    What he said to me?
15   Q.    Yes.
16   A.    He talked to me about the residency
17 and how the program was going and what the issues
18 were.  He wanted to get my perspective on what was
19 the problem with the residency program, the
20 teaching issues.  He said, What do you think would
21 make this program better for people?  So I gave
22 him some suggestions as to improve the program.
23   Q.    What suggestions did you give him?
24   A.    Well, I talked to him about Osler and
25 I suggested to him that he should consider

*Computer Reporting NYC Inc.*
*(212) 986-1344*

334

Varughese

2 providing Osler review for senior residents to
3 sort of make up for any didactic or any
4 educational deficiencies that there were.  I
5 suggested -- I mean, I made several suggestions to
6 him.
7         I said, you know, at the end of the
8 day the program isn't so terrible, because it gets
9 you from point A to point B, which is essentially
10 what you need to do.  I mean, that's sort of a
11 requirement to get out of this program to like
12 practice my pathology.
13         At the end of the day that's really
14 what I think, we need to get from point A to point
15 B.  We don't need to have a Lexus.  We just need
16 to have a regular car that gets us the job.  I was
17 just using that as an analogy.
18   Q.    Do you know whether Dr. Firpo spoke to
19 other residents on that day or on other days
20 before he started?
21   A.    Well, that day I didn't observe him
22 speaking to anybody else.
23   Q.    Do you know whether he spoke to other
24 residents?
25         MR. WRONKO:  Form objection.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

335

Varughese

2    A.    That day?
3    Q.    Yes.
4    A.    I didn't see him speaking to any other
5 residents other than at the morning meeting.  At
6 the morning meeting I was also there.  It was a
7 required meeting that we all had to attend, so....
8    Q.    The final warning required you to meet
9 with Dr. Firpo biweekly for three months.  Did you
10 meet with Dr. Firpo biweekly for three months?
11   A.    I met with him formally twice.  Then I
12 met with him maybe one or two more times.
13   Q.    When was the first time you met with
14 him formally?
15   A.    August 2nd I got an e-mail.  So I just
16 wrote him back and I said, I would like to meet
17 with you right away.  So I met with him.
18   Q.    You said you got an e-mail August 2nd.
19 When did you meet with Dr. Firpo?
20   A.    I met with him like 1 p.m. I believe.
21   Q.    On August 2nd.
22   A.    August 2nd or 3rd.  One of those days,
23 yes.
24   Q.    Where did that meeting take place?
25   A.    In the east, you know, in his office

*Computer Reporting NYC Inc.*
*(212) 986-1344*

336

Varughese

1  at that time.
2      Q.   Was anyone else present?
3      A.   I believe Shema Patel was present.
4      Q.   What did you say to Dr. Firpo, what
5  did he say to you during this meeting on
6  August 2nd or 3rd?
7      A.   Right.  So this meeting was about, you
8  know, I had told him that I didn't agree with this
9  particular document and, you know, I had grave
10  concerns about --
11     Q.   You're referring to the final warning?
12     A.   Right.  I told him I didn't agree with
13  it.  And he said for me to keep my job at that
14  point I would have to agree with it or I would be
15  fired.
16          And he made some phone calls to the
17  GME office.  They said if I don't agree then I
18  would be fired.  And Dr. Firpo reiterated my
19  feeling that I was being treated disparately and
20  unfairly and there was no real reason for me to be
21  on any further disciplinary action given that I
22  had thought I had met all the requirements.
23     Q.   When you say, Dr. Varughese, that
24  Dr. Firpo told you and he said that the GME office

*Computer Reporting NYC Inc.*
*(212) 986-1344*

337

Varughese

1  had told him that unless you agreed with the final
2  warning you could be terminated, what did you
3  understand or what do you mean by the word
4  "agree"?
5      A.   Meaning I had to comply with this.
6      Q.   And by "this," you mean the terms of
7  the final warning?
8      A.   Well, they said I have to agree to
9  this.  I didn't have any other option.  And they
10  didn't offer the, what is this?  This appeal
11  course of action.  They didn't offer that to me at
12  that time.  They didn't say this is an option you
13  have and you can appeal.
14     Q.   Dr. Varughese, let's talk about that.
15  The last sentence, the last paragraph says:  "You
16  have a right to appeal this disciplinary action by
17  requesting, in writing, a hearing before the House
18  Staff Affairs Committee of the Medical Board
19  within ten days of receiving this notice.
20  Requests should be directed to Michael Harris,
21  M.D., President of the Mount Sinai Hospital
22  Medical Board, in care of the Medical Staff Office
23  at Box 1116.  If you do not appeal this action, it
24  will become final at the end of the appeal

*Computer Reporting NYC Inc.*
*(212) 986-1344*

338

Varughese

1  period."
2      Q.   Do you see that?
3      A.   Right.
4      Q.   You said that you took this letter to
5  your lawyer's office and you read it in your
6  lawyer's office.
7      A.   Right.
8      Q.   So you knew that you had a right to
9  appeal.
10     A.   Right.  That was sort of a decision
11  that my lawyer and I --
12          MR. WRONKO:  No, no, no.
13  Don't disclose --
14     Q.   You knew you had a right to appeal.
15          MR. WRONKO:  Don't disclose any
16  communications with your attorney.
17          MR. McEVOY:  I agree with Mr. Wronko.
18     Q.   You knew you had a right to appeal.
19          MR. WRONKO:  So you have to answer
20  that question in a way that doesn't divulge
21  your communication with counsel.
22     Q.   Dr. Varughese, that's what it says,
23  correct?
24     A.   That's what it says.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

339

Varughese

1      Q.   And you read it, correct?
2      A.   Correct, I did read this document.
3  Yes.
4      Q.   And so you knew regardless of what
5  advice you got from anybody else, who else you
6  talked to, which I'm not interested in, you knew
7  that you had a right to appeal the final warning
8  because that's what the document says in the last
9  paragraph, correct?
10          MR. WRONKO:  Form objection.  You can
11  answer.
12     A.   Right, you read what the document
13  says.
14     Q.   And you understood, didn't you, that
15  you had a right to appeal?
16     A.   Oh, um, I knew I had ten days, within
17  ten days of receiving this notice, and I was going
18  on vacation and I was out of the hospital for ten
19  days.  It's very convenient that I was given this
20  final warning --
21     Q.   I don't really --
22          MR. WRONKO:  Let her finish.
23          MR. McEVOY:  No, I'm not going to let
24  her finish.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

340

Varughese

1    Q.    I don't care about your vacation
2  plans.  I asked you a question.
3    A.    Excuse me?  That wasn't my vacation
4  plan.
5    Q.    Did you know that you had the right to
6  appeal the final warning?
7         MR. WRONKO:  Form objection.  She
8         already answered it.
9    Q.    And you understood that you had the
10 right to appeal, didn't you?
11        MR. WRONKO:  Form objection.  Answer.
12   Q.    Did you understand?
13   A.    The question was already answered.
14   Q.    Well, answer it again.  Your lawyer
15 just told you could.
16   A.    I was told in this letter, in writing
17 it says, "hearing before the House Staff Affairs
18 Committee of the medical board within ten days of
19 receiving this notice."  I was not at the hospital
20 for the following two weeks.
21   Q.    And --
22   A.    Then the next meeting was with Adolfo
23 Firpo on August 2nd or 3rd and they did not renew
24 that offer to me again.  It was either/or.  Either

*Computer Reporting NYC Inc.*
*(212) 986-1344*

341

Varughese

1  you're on this morning and you get this or you're
2  fired today.  That was the two choices that were
3  offered to me.
4    Q.    And you took this letter and you met
5  with your attorney about it and you reviewed the
6  letter with your attorney, correct?  I don't want
7  to know what you said, but you reviewed the
8  letter.
9    A.    I did, yes, because I was represented
10 by an attorney.
11        MR. WRONKO:  Hold on.
12   Q.    I don't want to hear about what you
13 talked about with your lawyer.
14        MR. WRONKO:  Instruction again, don't
15        disclose anything that you discussed with
16        your counsel.
17   Q.    And your lawyer at that point was your
18 legal representative, correct?
19   A.    Correct.
20   Q.    And I take it, Dr. Varughese, that
21 while you went off on vacation your lawyer did not
22 file an appeal on your behalf, correct?
23   A.    Correct.  But my lawyer did contact
24 the hospital.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

342

Varughese

1    Q.    I understand that.  But no appeal was
2  filed on your behalf either by your lawyer or by
3  you.
4    A.    Well, my lawyer did contact the
5  hospital.
6    Q.    I understand that.  No appeal was
7  filed.  I don't care if your lawyer stood in front
8  of the hospital with a sandwich board.  Did your
9  lawyer file an appeal on your behalf challenging
10 the final warning?
11   A.    As far as I know, no.
12   Q.    And you didn't, because you say you
13 were on vacation, correct?
14   A.    Right.  I wasn't here for the period
15 of ten days and it seems the hospital conveniently
16 presented me with the letter just before two weeks
17 of vacation.  I mean, it's not --
18   Q.    When you met with Dr. Firpo on
19 August 2nd, the ten-day period provided for in
20 this letter had expired, correct?
21   A.    That's correct.
22   Q.    So do you think, Dr. Varughese, that
23 they should have given you another chance to file
24 an appeal?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

343

Varughese

1    A.    They should have, yes.  Because I was
2  on vacation.
3    Q.    Now, anything else happen at the
4  August 2nd meeting with Dr. Firpo?
5    A.    Yes.
6    Q.    What else happened?
7    A.    This person, Adolfo Firpo is extremely
8  inflammatory and just a sexist pig for lack of a
9  better term.  He said he has to figure out the
10 politics of the institution before he can assist
11 me.
12        He made, you know, he led me to
13 believe that I can attend conferences as I saw fit
14 because I was a fourth year resident or, you know,
15 senior resident in a residency program that allows
16 the senior residents to manage their own education
17 at this point.  And as a licensed physician in
18 New York, I felt that I was perfectly capable of
19 doing so.
20        And he led me to believe that was my
21 right and I had the right to, you know, see to my
22 own education, see to the conferences that were
23 necessary.  He led me to believe that he will try
24 to work, you know, look at my schedule, ensure

*Computer Reporting NYC Inc.*
*(212) 986-1344*

344

Varughese

2 that all my requirements with the board of
3 pathology will be met in a timely manner and in a
4 comprehensive manner.
5          And then the whole, you know, he said
6 he had to figure out the politics of the
7 situation. Then when I was leaving outside of his
8 office he like, you know, told me that, Oh, I'm
9 going to try to help you, Dr. Varughese. Don't
10 worry. Just sort of, you know, trying to just
11 reassure me or something that wasn't like
12 completely formal.
13          It was just a very strange experience
14 for me personally because that to me is just
15 unprofessional. Unprofessional behavior.
16     Q.    What's unprofessional?
17     A.    To tell me he has to figure out the
18 politics of the situation and then pull me aside
19 and say that, Oh, I'm going to help you,
20 Dr. Varughese.
21     Q.    And what's unprofessional about that?
22     A.    Because the connotation was like if
23 he wanted to help me, he could have said at the
24 meeting, I'm going to help you, Dr. Varughese, you
25 know, I'm going to work with you, just plain and

*Computer Reporting NYC Inc.*
*(212) 986-1344*

345

Varughese

2 clear, instead of why wait until, you know, I'm
3 out in the hallway to pull me aside to
4 say something. I'm not his friend.
5          This is like really just the first or
6 second time I'm meeting and they want me to agree
7 to something that I essentially disagreed with
8 even though I had not appealed. And they didn't
9 give me a due process option at that time because
10 ten days had expired because I was on vacation. I
11 don't know, this whole thing was just
12 unprofessional.
13     Q.    You had met Dr. Firpo back before he
14 started and the day he came for the interview.
15     A.    Right, which I wasn't very happy about
16 either.
17     Q.    I got that part. Then you told me
18 that you met with him on August 2nd. Did you meet
19 with him at all between the first meeting, I'll
20 call the interview day, and August 2nd?
21     A.    No.
22     Q.    This is the second time you're
meeting.
24     A.    Right.
25     Q.    So what's the basis for you saying

*Computer Reporting NYC Inc.*
*(212) 986-1344*

346

Varughese

2 that Dr. Firpo is a sexist pig?
3     A.    Because he was, um, I had to learn the
4 politics of the situation before I'll help you.
5 Just, you know, his dismissive way of saying
6 things and I felt like if I weren't a woman he
7 would not be talking to me like that.
8     Q.    Other than the fact that you're a
9 woman and that's your feeling, do you have any
10 basis for that belief?
11     A.    Right. My suspicions were confirmed
12 at follow-up meetings with him.
13     Q.    Right now you said to me at this
14 meeting you recognized Dr. Firpo as a sexist pig
15 and you told me that because he told you he had to
16 figure out the politics of the institution, right?
17          MR. WRONKO: Form.
18     Q.    What else did Dr. Firpo say, if
19 anything, that led you to that conclusion on
20 August 2nd or 3rd of 2012?
21          MR. WRONKO: Form objection.
22 Mischaracterizes her testimony. You can
23 answer.
24     A.    Right, so my concern was that if he
25 was trying to be fair and ensure that whatever

*Computer Reporting NYC Inc.*
*(212) 986-1344*

347

Varughese

2 concerns were here about professionalism and
3 whatever else and he wanted me to improve and
4 essentially become a better physician in this
5 regard, he would approach it in an even handed
6 matter. He wouldn't say I have to rely on the
7 politics of the institution to come to my
8 conclusion or he wouldn't -- he would think of it
9 as being his duty to do the right thing in the
10 context of what his assessment was, but not to be
11 influenced by politics.
12     Q.    What did you interpret his saying I
13 need to know or find out what the politics are?
14 What did you interpret that to mean?
15     A.    Well, you would have to ask Dr. Firpo.
16 He testified to that again at the House Affairs
17 Committee hearing.
18     Q.    I understand that Dr. Firpo is
19 perfectly capable of saying what he meant by
20 whatever it is he said, but I want to know what
21 you interpreted the -- you agree with me --
22     A.    Right, which my assessment --
23          MR. WRONKO: Hold on, one person at a
24 time.
25     Q.    Am I correct, Dr. Varughese, that you

*Computer Reporting NYC Inc.*
*(212) 986-1344*

348

Varughese

1 took the statement "I have to find out what the
2 politics are here" to be a negative towards you in
3 some respect?
4    A.    Well, he was --
5    Q.    Yes?  Did you?
6    A.    Yes, this was a conversation I was
7 having with him.
8    Q.    Tell me why, not what Dr. Firpo thinks
9 or knows, tell me why you thought his saying "I
10 have to find out what the politics are here," why
11 you thought that was somehow a negative statement
12 about you or illustrated that he was sexist in
13 some way.  Tell me how you interpreted that
14 statement.
15    A.    Well, I interpreted that statement as
16 being sort of an overarching theme of
17 institutional male discrimination and retaliation
18 and I just came to the conclusion it was more of
19 the same after this discussion with him.
20    Q.    Then you said in the answer to one of
21 my questions that you thought you could manage
22 your own education as a senior resident.
23        What does that mean?
24    A.    It just means what ACGME and the

*Computer Reporting NYC Inc.*
*(212) 986-1344*

349

Varughese

1 contract essentially says such as that as a senior
2 resident I'm responsible for attending to my
3 educational needs.
4    Q.    What does that mean?
5    A.    That just means attending the
6 appropriate conferences, making sure I'm in step
7 with all the requirements, whether it's
8 maintenance of certification or preparing for the
9 board exam, which I brought up with the hospital
10 leadership which is that I need to have certain
11 rotations, certain exposure to various variety of
12 fields in clinical pathology for me to graduate
13 and become a well rounded pathologist.  I mean,
14 those are areas I feel, you know, those are ways
15 you can be responsible for your own education.
16    Q.    Did you think that you could decide
17 what conferences you went to?
18    A.    Yes, I thought so.
19    Q.    Did you think that the program
20 director or Dr. Firpo, the director of pathology
21 educational activities, could tell you which
22 conferences you should or shouldn't go to?
23    A.    I thought they could tell me too and
24 they could refer me to conferences that were

*Computer Reporting NYC Inc.*
*(212) 986-1344*

350

Varughese

1 available in the hospital, which they didn't do.
2    Q.    Similarly with regard to what
3 rotations and what exposures you got to the
4 various areas of pathology did you think that the
5 program director and the director of educational
6 activities or the chair of the department could
7 direct you as to what rotations you should go to,
8 what rotations you shouldn't go to?
9    A.    Well, the chair of the department is a
10 different story.  Now, he's a Ph.D., not a medical
11 doctor, practicing pathologist in technical terms,
12 but in terms of the program director, of course,
13 that's his -- it's duty and his role to have a
14 curriculum that is similar and not disparate among
15 different individuals in the program.
16        It would be extremely uneven to have
17 Samuel McCash or Adrienne Jordan attend or be
18 assigned to three months of hematology, three
19 months of blood bank, and so on and so forth, when
20 he is not providing me with the same
21 opportunities.
22    Q.    When did Dr. McCash graduate from the
23 program?
24    A.    2011.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

351

Varughese

1    Q.    And when is graduation?  When does the
2 program end?
3    A.    I believe June.
4    Q.    So when Dr. Firpo joined Mount Sinai,
5 that was after Dr. McCash graduated, correct?
6    A.    Correct.
7    Q.    And Dr. Cordon-Cardo arrived three
8 months before Dr. McCash graduated, correct?
9    A.    Correct, yes.
10    Q.    You said you met with Dr. Firpo
11 formally twice.  You told me about the meeting on
12 or about August 2nd.  When was the second time you
13 met with Dr. Firpo formally?
14    A.    August 17th.
15    Q.    And how did that meeting come about?
16    A.    That was the second meeting of, you
17 know, biweekly three-month meetings with Adolfo
18 Firpo.
19    Q.    Where did that meeting take place?
20    A.    In his office.
21    Q.    Was anyone else present?
22    A.    Shema Patel.
23    Q.    What was discussed at that meeting?
24 What did Dr. Firpo say, what did you say?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

352

1      Varughese
2      A.   That meeting I discussed cytogenetics.
3   I was just on a two-week assignment of
4   cytogenetics. So Dr. Firpo I believe asked me
5   what did you think of this rotation and I
6   explained that I had some concerns regarding my
7   experience during cytogenetics.
8          I felt that, you know, I was being
9   asked to cover for a number of residents because
10  they were not -- they were out sick. And I felt
11  that I didn't, you know, I didn't get as much time
12  as I should on that rotation.
13         And I believe I told him that I was, I
14  felt like I was being sort of harassed or
15  intimidated by Dr. Najfeld.
16     Q.   And did you say anything else during
17  this meeting?
18     A.   Right, so I, I mean, I discussed my
19  experience on cytogenetics which was pretty
20  negative. I felt it was pretty negative on
21  August 17th.
22     Q.   And what did Dr. Firpo say during this
23  meeting?
24     A.   Dr. Firpo, he was all over the place
25  at this meeting. He had, I mean, he was

*Computer Reporting NYC Inc.*
*(212) 986-1344*

353

1      Varughese
2   discussing the program and how it was in all sorts
3   of mess and when he came here he had all these
4   other fires to put out, and then he told me that
5   as a female resident I shouldn't just say no.
6      Q.   I don't know what that means.
7      A.   That means he said -- he didn't say it
8   as part of, you know, he is like as part of the
9   team as a female resident, you should not say, you
10  cannot just say no, which was rather strange
11  because why would you say female? Wouldn't you
12  just say as part of the team just try to do your
13  best and get along and get the work done, which
14  seems more appropriate, but he said as a female
15  resident you should not say no.
16     Q.   What else did he say, if anything?
17     A.   He said a lot of things. This was an
18  hour meeting.
19     Q.   So what I would like you to do is if
20  you need time to think take time to think and tell
21  me everything you recall what Dr. Firpo said at
22  this meeting other than what you've already told
23  me.
24     A.   Right, and I was concerned about my
25  rotations and being able to change my schedule.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

354

1      Varughese
2   So we discussed that at some length and he gave me
3   some very conflicting information.
4      Q.   What conflicting information?
5      A.   One minute he said, Oh, Dr. Burgess
6   said, yes, I can switch. Then some other doctor
7   didn't say yes. That meeting was so like all over
8   the place. It was just one minute it was talking
9   about how the program is this and there are all
10  these fires here and all these residents are
11  complaining. Other residents are complaining
12  about some requirements that we're making them,
13  having them do, and therefore because they
14  complained we cannot have these same requirements
15  anymore.
16         And I was -- which was all news to me
17  because I was at the Bronx VA for the past several
18  months at that time, so....
19     Q.   Was there anything else that Dr. Firpo
20  discussed with you at this meeting?
21     A.   Right, he told me several residents
22  were on FMLA, on leave for some reason or another
23  because they were in hospitals and ill. So there
24  were several people who were ill in the residency
25  program.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

355

1      Varughese
2          And what else? He said a variety of
3   things.
4      Q.   All I'm asking is to tell me the ones
5   you remember. So is there anything else you
6   remember about Dr. Firpo's conversation with you
7   and the meeting on August 17th?
8      A.   Right. Yeah, I do.
9          You know what? Can I run to the
10  bathroom really quick?
11     Q.   As soon as you finish answering the
12  question.
13         MR. WRONKO:  You have to finish the
14  question.
15     A.   Very good.  OK.
16     Q.   Is that all you remember?
17     A.   No, I have to think about it actually.
18  This is like extremely traumatizing for me. Being
19  that somebody like this would be responsible for
20  my career in assessing me, like this person is so
21  unprofessional. I mean, he said a variety of
22  unprofessional things that were really disturbing.
23         He said, Oh, this is Shema Patel.
24  She's from the office of the president. She's
25  here and she's here to help me. I was like OK. I

*Computer Reporting NYC Inc.*
*(212) 986-1344*

356

Varughese

1  don't know.
2     **Q.**   What did you find disturbing about
3  that?
4     **A.**   Well, you know what? It was just the
5  entire conversation.
6     **Q.**   No, no, no, Dr. Varughese. You don't
7  get to say I found it very disturbing that
8  Dr. Firpo introduced Dr. Shema Patel as somebody
9  from the office of the president and then when I
10 asked you, well, what did you find disturbing
11 about that --
12    **A.**   What I found disturbing about that --
13    **Q.**   That's what I want to know.
14    **A.**   -- I found like the institution was
15 sanctioning whatever actions. This is not like a
16 department thing anymore. This was like the
17 entire institution was out to like sanction the
18 department's actions and whatever actions that had
19 been taken against me throughout this period and
20 completely ignoring my perspective, not just
21 perspective, what happened to me. I mean, there's
22 no question that McCash harassed me.
23    **Q.**   So you have told me many times. So my
24 question is, what else did Dr. Firpo talk about at

357

Varughese

1  this meeting on August 17th other than what you've
2  already told me?
3     **A.**   He said that he wasn't really in --
4  yeah, he said he worked on policy, health care
5  policy. He didn't really, it seemed like he
6  wasn't practicing pathology per se and he was just
7  working on health care policy for the past ten
8  years and he worked in Washington and he said he
9  knew everything about, you know, essentially like
10 health care policy and rules and regulations.
11          He said that one minute. Then the
12 next minute he said, Oh, I don't know about
13 New York State administrative law. Then he
14 said -- I was concerned that the modifications
15 that they were doing to my contract and such by
16 stipulating that we agreed to like all these new
17 policies in the department were not really legal.
18 And he said, Well, I think it is legal. And he
19 thought all that stuff was legal, which I don't
20 know. I don't think he's an expert on all that.
21    **Q.**   What else, if anything, did he talk
22 about at that meeting on August 17th?
23    **A.**   That's all I can recall right now.
24    MR. McEVOY: So then why don't we take

358

Varughese

1  a break.
2          (A recess was taken.)
3  BY MR. McEVOY:
4     **Q.**   So you said, Dr. Varughese, that at
5  this August 17th meeting you thought that
6  Dr. Firpo was unprofessional, right?
7     **A.**   Yes.
8     **Q.**   And why do you say that he was
9  unprofessional? What do you base that conclusion
10 on?
11    **A.**   Well, you know, he, I mean, just the
12 whole like entire meeting I just got the sense
13 that he was extremely unprofessional and a
14 chauvinist, sexist chauvinist.
15          And, I mean, he told me like he would
16 pay out of his pocket for a late fee if I could
17 not meet my requirements for board of pathology.
18 And essentially my concern was that, you know, I
19 needed to have a certain number of autopsies and I
20 wanted to do the medical examiner rotation I
21 believe just like a little bit earlier, like a
22 week earlier than January 15th because the due
23 date for the form was January 15th of 2011. After
24 that you had to pay a $2,000 late fee. It's

359

Varughese

1  pretty significant and I was concerned about that.
2          He said, Oh, I promise to pay you.
3  Shema Patel is right here and I make this
4  statement in front of her and I'll pay this. I'm
5  like, this is ridiculous. So unprofessional.
6     **Q.**   And why is Dr. Firpo's offer to pay a
7  late fee should you incur one unprofessional,
8  chauvinist, sexist, whatever it is you said?
9     **A.**   Because he said he will pay it out of
10 his pocket. It's extremely patronizing because he
11 offered to pay this out of his own pocket.
12    **Q.**   What else, if anything, did Dr. Firpo
13 do or say at this meeting that leads you to the
14 conclusion that he was unprofessional, sexist, et
15 cetera?
16    **A.**   Well, he said that, um, he refers to
17 leadership positions and that he, you know, what
18 is it? Instead of she he uses he. He said, Oh,
19 he's the pathology executive. He makes the
20 decisions. I was like, ooh -- I don't know. And
21 he just has like a preferential language that he
22 uses for men or "males," but, you know, when it
23 comes to female he is like, oh, as a female you
24 have to -- you just can't say no.

360

Varughese

1
2     Q.    So are you drawing the distinction
3  between the pronoun "he" and the word "female"?
4     A.    Just the gender-specific terminology
5  of he, she, female, male.
6     Q.    So it's his --
7     A.    Chief can be -- a woman can be a chief
8  or a man.
9     Q.    And so can a chair.
10    A.    Yes, or a chair in this day and age.
11  It's not really that specific.
12    Q.    So I'm confused.  What language or
13  gender specific language did Dr. Firpo use other
14  than referring to men as he and you as a female
15  that leads you to the conclusion that he is
16  sexist?
17    A.    Right, he said that, you know, he said
18  that, oh, he referred to the chief.  He wasn't
19  referring to Cordon-Cardo in general.  He was
20  saying just leadership tends to be he.  Like that
21  was what he was conveying.  And then he was
22  conveying that as a female I should not say no.
23    Q.    I take it from what you just said that
24  he didn't say to you leadership tends to be male.
25  That was the conclusion that you drew.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

361

Varughese

1
2     A.    Right.  When he said chief, which is
3  like the chair leadership position.  Like not
4  being an attending pathologist is technically --
5  when there's a hierarchy it's not a leadership
6  position when you are just....
7     Q.    At the time that you had this meeting
8  with Dr. Firpo the chair or the chief of the
9  department was Dr. Cordon-Cardo, correct?
10    A.    The chairman of the department, yes.
11    Q.    The chair, which is gender neutral,
12  the chair of the department.
13    A.    Right.
14    Q.    And Dr. Cordon-Cardo is a he.
15    A.    Right, but he wasn't referring to
16  Dr. Cordon-Cardo.
17    Q.    Who was he referring to?
18    A.    Just general.  He was making a
19  statement directed at me.
20    Q.    Anything else that Dr. Firpo did or
21  said during this meeting that led you to the
22  conclusion that he was unprofessional, sexist, et
23  cetera?
24    A.    Right, the patronizing comment that he
25  made saying "I'll pay out of my pocket," he

*Computer Reporting NYC Inc.*
*(212) 986-1344*

362

Varughese

1
2  repeated that.  He wasn't as if he said it once.
3  He repeated it again, and I was completely just
4  disgusted and at this point I was frankly
5  terrified of him.
6     Q.    You were terrified of him.
7     A.    Right, because that's the, I mean, as
8  a young woman in this profession where I want some
9  sort of disciplinary reaction and my supervisor
10  speaks to me this way, it makes me really question
11  my position in the organization and it makes me
12  question how can I go about reporting something
13  like this when any actions that are taken against
14  or reported about me being treated poorly has been
15  completely ignored, to actions that were taken
16  against me, and I felt like this would be more of
17  the same.
18          Because I felt like this was, I don't
19  know if it's normal for him to say that, but it
20  was just sort of a, you know, assertion of power
21  to show that he's a guy, he's a boss here, he can
22  say whatever he wants and technically he is, you
23  know, chosen by Cordon-Cardo.  I had nowhere to
24  go.
25    Q.    Did you go to labor relations to

*Computer Reporting NYC Inc.*
*(212) 986-1344*

363

Varughese

1
2  express your concerns?
3          MR. WRONKO:  Form objection.
4     A.    I had contacted Caryn Tiger.
5     Q.    No, you just told me you just had a
6  meeting where Dr. Firpo, one on August 2nd, one on
7  August 17th.  You described that meeting in which
8  came to the conclusion that he was a sexist
9  pig, that he was chauvinistic, that he was a
10  number of other things and you were terrified of
11  him.
12    A.    Right.
13    Q.    So after that meeting on August 17th
14  did you go to labor relations and say:  You know?
15  I want to make a complaint.  I have these
16  concerns.  This just happened.
17          Did you do that?
18    A.    No, I didn't.
19    Q.    Did you complain to anybody in the
20  institution?
21    A.    Well, I talked to my colleagues.
22    Q.    No, somebody in a position of
23  authority.
24    A.    Right.
25          MR. WRONKO:  Form objection.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

364

Varughese

1 A.   I felt like there was like nowhere I
2 could really go.  Because I'd already exhausted
3 the route, leadership route before with Scott
4 Barnett, Caryn Tiger, the department.  I didn't
5 think like I had really any options, and if I did
6 make a complaint it would just be very futile.
7 Q.   Now, you were supposed to meet with
8 Dr. Firpo biweekly for three months, which would
9 suggest that there should have been at least six
10 meetings with Dr. Firpo.  You said you had two
11 formal meetings.
12        Why did you not have more formal
13 meetings with Dr. Firpo?
14 A.   Well, I would not have had that many
15 meetings.
16        MR. WRONKO:  Form objection.
17 A.   I think I would have had at most four
18 meetings, not six.
19 Q.   Wait a minute, Dr. Varughese.  Three
20 months.
21 A.   Three months, yes.
22 Q.   Biweekly is every two weeks, correct?
23 A.   Correct.
24 Q.   How many weeks are there in three

365

Varughese

1 months?
2 A.   Well, I was fired on September 21st
3 and I met with him for the first time on
4 August 2nd.  So that gives me about a month and a
5 half, which would be about, what?  How many weeks
6 is that?  Five, six weeks.  So that would be like
7 three weeks.
8 Q.   July 14th to September 21st is a
9 little over two months.
10 A.   I was on vacation for two weeks after
11 July 14th.
12 Q.   My question is, you had two meetings.
13 Would you agree with me that there should have
14 been more than two meetings, whether it is four,
15 five or six?
16 A.   Well, I had concerns about my
17 interactions with Adolfo Firpo.  So I was trying
18 to figure out what the best course of action was
19 with that, and that being one reason.  I had a
20 meeting with, that was arranged.  I was arranged
21 to meet or I had an appointment with him to meet
22 with him on September 7th, I believe, which I
23 didn't go to.  I didn't go to that meeting.
24        But I called him to let him know that

366

Varughese

1 I would like to reschedule at some point.
2        And what happened after that?  Let's
3 see.  So I called him and I wanted to reschedule
4 that meeting with him and he did not pick up his
5 phone or he picked up his phone, but then he hung
6 up the phone on me several times, which was very
7 strange.
8 Q.   I agree with you there.  So wait a
9 minute.  I want to understand.  You called
10 Dr. Firpo.  Dr. Firpo picked up his phone and then
11 hung up on you?
12 A.   Right.
13 Q.   Tell me how that came about.  What
14 happened there?  You called and he answered the
15 phone?
16 A.   I was like, Hi, it's Leena.  I'm
17 sorry, I'm not going to make this meeting.  Can I
18 reschedule?  And he would just hang up.
19 Q.   How many times did that happen?
20 A.   Like four or five times.
21 Q.   In the same day?
22 A.   Same like ten-minute period.
23 Q.   So you would call Dr. Firpo, say what
24 you just said.  He would hang up on you.  You

367

Varughese

1 would call back, repeat what you just said.  He
2 would hang up on you?
3 A.   Right, because I wanted to make sure
4 it wasn't like a connection problem, because I was
5 trying to make sure that I could get my point
6 across without having to e-mail or just --
7 Q.   Why did you want to reschedule this
8 September 7th meeting?
9 A.   Because I wanted to, because I did not
10 know what my options were at that point in terms
11 of Adolfo Firpo.  So I just thought probably the
12 best thing I should do was continue to have these
13 meetings, because they were stipulated according
14 to this document I guess.
15 Q.   So why didn't you go to the
16 September 7th meeting?
17 A.   Why didn't I go?  Why didn't I go?  I
18 don't know for now why I didn't go.
19 Q.   You mentioned before, Dr. Varughese,
20 that you were on a tumor cytogenetics rotation in
21 August of 2011?
22 A.   Yes.
23 Q.   What is tumor cytogenetics?
24 A.   Tumor cytogenetics is --

368

Varughese

2    MR. WRONKO:  Form objection.
3       A.    What is it?  It's essentially a field
of pathology where you characterize tumors based
on cytogenetic rearrangements that can be
6    visualized at a microscopic level.
7       Q.    Had you been on a rotation in tumor
8    cytogenetics prior to August 2011?
9       A.    Right, I was on a two-week rotation
10   prior to the rotation in August.
11      Q.    I think you may not have heard my
12   question.  How long was the tumor cytogenetics
13   rotation for?
14      A.    Oh, two weeks.
15      Q.    And it started on August 1st of 2011,
16   correct?
17      A.    Correct.
18      Q.    Had you done a rotation in tumor
19   cytogenetics prior to August 1st of 2011?
20      A.    Yes.
21      Q.    When did you start a rotation before?
22      A.    I don't recall what the date is
23   exactly now, but it was probably a year prior.
24      Q.    Was that at Mount Sinai or was that
25   one of the affiliates?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

369

Varughese

2       A.    It was the same laboratory,
3    Dr. Najfeld.
4       Q.    So you had worked with Dr. Najfeld
5    before?
6       A.    No, I hadn't worked with her because
7    at that time she was working on a grant and she
8    did not want to spend any time with me.
9       Q.    So when you had the rotation the year
10   before you had not worked with Dr. Najfeld.
11      A.    No.
12      Q.    During the rotation in August of 2011,
13   the one that started on August 1st, who was your
14   supervisor during that rotation?
15      A.    Well, Dr. Najfeld is the supervisor,
16   but she didn't want to work with me.
17      Q.    When you say that she didn't want to
18   work with you, why do you say that?
19      A.    Because she said she was working on a
20   grant and she couldn't work with me.  That's what
21   she said to me.
22      Q.    When did she say that?
23      A.    During the first week of that
24   rotation.
25      Q.    Did Dr. Najfeld work with you during

*Computer Reporting NYC Inc.*
*(212) 986-1344*

370

Varughese

2    the rotation?
3       A.    No.
4       Q.    Were you scheduled during that
5    rotation to give a clinical case presentation?
6       A.    During that rotation, no.
7       Q.    No?
8       A.    The first two-week rotation?
9       Q.    Between August 1st of 2011 and August
10   12th of 2011.
11      A.    The second part --
12      Q.    That's what we're talking about now.
13      A.    OK.
14      Q.    So during that rotation, were you
15   scheduled to give a clinical case presentation?
16      A.    Yes.
17      Q.    Who assigned that presentation to you?
18      A.    Who assigned the presentation?  It was
19   Dr. Najfeld.
20      Q.    How did she assign it to you?
21      A.    She told me that I should do a
22   presentation on, what is it?  CML, I believe.
23      Q.    What is CML?
24      A.    Chronic myelocytic leukemia.  Or
25   chronic myeloid leukemia.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

371

Varughese

2       Q.    When did she assign that to you?
3       A.    I believe it was Thursday.
4       Q.    Thursday?
5       A.    The 4th.
6       Q.    The 4th?
7       A.    Right.
8       Q.    And after she assigned the case
9    presentation to you, what did you do to prepare
10   the presentation?
11      A.    I just looked up background data.  I
12   looked up the basic information, and that's it.
13      Q.    Did you prepare a presentation?
14      A.    I did.
15      Q.    When was the presentation due to be
16   presented?
17      A.    It was due to be presented on Tuesday,
18   the following week.
19      Q.    That was August 9th?
20      A.    Correct.  If that's a Tuesday.
21      Q.    And when did you send the presentation
22   to Dr. Najfeld for her review?
23      A.    I went to her office.  She wasn't
24   there.  So I was prepared to discuss the
25   presentation in person with her.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

372

Varughese

1     Q.    When you say --
2     A.    On Monday.
3     Q.    Monday, August 8th.
4     A.    Right, she wasn't there on Friday,
5 August 5th.  She was working from home she said
6 and she was not to be bothered.
7     Q.    So you went to her office on August --
8 when did you complete the presentation?
9     A.    I completed the presentation on --
10      MR. WRONKO:  Form objection.
11     A.    I'm not sure now.
12     Q.    It was assigned to you on the 4th.
13     A.    Right.
14     Q.    Did you complete it by the 5th?
15     A.    Did I?  I probably did, yes.  It
16 wasn't that complicated.
17     Q.    And then you said you went to see
18 Dr. Najfeld on Monday, the 8th, but she wasn't in
19 her office.
20     A.    Right, she wasn't in her office.  She
21 wasn't in her office for a good period of time.
22     Q.    What time did you go to see
23 Dr. Najfeld?
24     A.    I believe around 1 p.m.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

373

Varughese

1     Q.    When she wasn't in her office what did
2 you do, if anything, to get in touch with
3 Dr. Najfeld?
4     A.    I spoke to her, one of her, you know,
5 one of the people who worked there and I just told
6 her I'll be back.  So I came back an hour or two
7 later and at that point she still had not
8 returned.  So I left a message with, you know, the
9 employee there and then I left.
10     I mean, I came back again I believe
11 around like 4 and she wasn't there.  So after that
12 I, um, that's it.  I believe I e-mailed her at
13 that time.  I e-mailed her the presentation at
14 that time.
15     Q.    When you say you left, you left to go
16 where?
17     A.    Nowhere, just back to the residents'
18 office space or work area.
19     Q.    And you said you sent an e-mail.  So
20 let me show you a document.
21      MR. McEVOY:  Mark as Exhibit 28.
22      (Defendants' Exhibit 28, e-mail from
23 Leena Varughese to Vesta Najfeld dated
24 August 8, 2011, Bates No. D-882, marked for

*Computer Reporting NYC Inc.*
*(212) 986-1344*

374

Varughese

1 identification, this date.)
2     Q.    Have you had a chance to look at that?
3     A.    Yes.
4     Q.    Is this the e-mail that you sent to
5 Dr. Najfeld on August 8th?
6     A.    Right.
7     Q.    At 4:18 p.m., correct?
8     A.    Correct.
9     Q.    It says:  "Dr. Najfeld, I am including
10 a CML presentation for CP case conference."
11     A.    I think we can read.
12     Q.    Good, I'm glad you can read.
13     "It is pretty much complete but I will
14 have to polish it up a bit before tomorrow
15 morning.  Please let me know if you want to change
16 anything in any major way.  Thank you."
17     Did you mention in this e-mail that
18 you had tried to see Dr. Najfeld on several
19 occasions that afternoon?
20     A.    No, I did not mention that.
21     Q.    What time was the presentation
22 scheduled for the next day?
23     A.    9 a.m.
24     Q.    And did you think that sending

*Computer Reporting NYC Inc.*
*(212) 986-1344*

375

Varughese

1 Dr. Najfeld the presentation at 4:18 on August 8th
2 gave her sufficient time to review it and to give
3 comments to you to make it by 9 o'clock the next
4 morning?
5     A.    Well, the only reason I'm even sending
6 this to her is because she requested that I do so.
7 There's numerous occasions where I do write up a
8 presentation.  It's not reviewed by the attending
9 pathologist.
10     So, I mean, Dr. Najfeld wanted to see
11 this presentation, so I sent it to her, and I felt
12 that perhaps if there's anything that needs to be
13 polished up she would give me some sort of advice
14 on it.
15     And from the time I made this
16 presentation to, you know, what was submitted to
17 her to what I presented, it was not changed in any
18 major significant -- The content was not changed
19 in any significant manner.
20     Q.    When did Dr. Najfeld tell you that she
21 wanted to see it before you gave the presentation?
22     A.    She didn't give me a specific time.
23     Q.    Not when she told you that she wanted
24 you.  When did she first say to you,

*Computer Reporting NYC Inc.*
*(212) 986-1344*

376

Varughese

1    Dr. Varughese, I want to see this presentation?
2        A.    I don't remember when she said that.
3        Q.    Now, you sent this e-mail to
4    Dr. Najfeld at 4:18 p.m., correct?
5        A.    Correct.
6        Q.    Where were you when you sent this
7    e-mail?
8        A.    Where was I?  I was -- I'm not sure
9    where I was.
10       Q.    Were you in the hospital?
11       A.    Probably, yes.  I mean, I would have
12   to attach my presentation and then send it, so I
13   would have to be at a computer terminal.
14       Q.    Let me show you another document.
15       MR. McEVOY:  Mark this as Exhibit 29.
16       (Defendants' Exhibit 29, e-mail from
17   Dr. Najfeld to Dr. Varughese dated August 8,
18   2011, Bates No. D-883, marked for
19   identification, this date.)
20       Q.    Have you had a chance to look at that?
21       A.    Yes.
22       Q.    This is an e-mail from Dr. Najfeld to
23   you which says, "Can you come over now?"
24       A.    Right.

Computer Reporting NYC Inc.
(212) 986-1344

377

Varughese

1        Q.    And did you come over now?
2        A.    No, I didn't.
3        Q.    Why not?
4        A.    Because I didn't get this e-mail.
5        Q.    Why didn't you get it?
6        A.    Why?  Because I logged out of my
7    computer, that's why.
8        Q.    So you sent this e-mail at 4:18.
9        A.    Right, and I logged out within the
10   next five minutes.  That's not a crime.
11       Q.    I didn't say it was.  But as you
12   correctly point out, Dr. Najfeld sent you a
13   response five minutes later at 4:23.
14       A.    Well, I eventually noted that she did.
15       Q.    So why did you log out of your
16   computer when you sent her the presentation?
17       A.    Why would I not log out of my
18   computer?
19       Q.    I don't know.  You tell me.
20       A.    What are you suggesting here?  I'm
21   sorry.  I fail to see a big plan of --
22       Q.    I'm not suggesting anything.
23       MR. WRONKO:  Form objection.  Just
24   listen to his question and answer his

Computer Reporting NYC Inc.
(212) 986-1344

378

Varughese

1    question.
2        Q.    Why did you log out of your computer
3    after you sent the presentation to Dr. Najfeld?
4        A.    I logged out of my e-mail most likely
5    because I had sent the e-mail and I was probably
6    doing something else.
7        Q.    In the e-mail that you sent to
8    Dr. Najfeld at 4:18 when you say "Please let me
9    know if you want me to change anything in any
10   major way," how did you expect Dr. Najfeld to get
11   in touch with you if she had suggestions or wanted
12   to make changes if you logged out of your e-mail
13   as soon as you sent it?
14       A.    Right, she could have just sent me an
15   e-mail, like a letter.
16       Q.    But you wouldn't have gotten it,
17   Dr. Varughese, because you just told me you logged
18   out of your e-mail account.
19       A.    Right, she could have just said, Oh, I
20   want you to change X, Y and Z.  She didn't do
21   that.  She didn't make any effort here.  She just
22   said, "Can you come over now?"
23       Q.    No, no, Dr. Varughese.  You said to
24   me, you said in your e-mail, "Please let me know

Computer Reporting NYC Inc.
(212) 986-1344

379

Varughese

1    if you want me to change anything in any major
2    way," correct?
3        A.    Right.  She didn't say that in this
4    e-mail.  She doesn't say come over now.
5        MR. WRONKO:  Hold on.  You've got to
6    let him ask the question.
7        Q.    And the presentation is 9 o'clock
8    tomorrow morning, right?  It's 9 o'clock the next
9    morning, right?
10       A.    Yes, the presentation is at 9 a.m.
11       Q.    So regardless of what she said in the
12   e-mail you never got or didn't get at the time,
13   how did you expect Dr. Najfeld to get in touch
14   with you if you logged out of your e-mail account
15   as soon as you sent the e-mail at 4:18?
16       MR. WRONKO:  Form objection.  You can
17   answer.
18       A.    I'm sorry, this is beyond ridiculous.
19       OK, let me tell you something.
20       Q.    Dr. Varughese, could you do me a
21   favor.  Editorial comments are not appropriate at
22   the deposition.  I ask the questions; you answer
23   the questions.  Your lawyer gives you whatever
24   direction you want.

Computer Reporting NYC Inc.
(212) 986-1344

380

Varughese

2  My question is, how did you expect
3  Dr. Najfeld to get in touch with you in response
4  to your e-mail if you logged out of your e-mail
5  account?
6  A.  Like she got in touch with me later,
7  by calling me and sending me a page.
8  Q.  So she could have called --
9  A.  Which she has alternative methods of
10  contacting me.
11  Q.  I show you another document.
12  MR. McEVOY:  Mark this as Exhibit 30.
13  (Defendants' Exhibit 30, e-mail dated
14  August 8, 2011, from Dr. Najfeld to
15  Dr. Varughese, Bates No. D-884, marked for
16  identification, this date.)
17  Q.  You can take a look at it.
18  A.  OK.
19  Q.  Have you had a chance to look at that?
20  A.  Yes.
21  Q.  This is an e-mail from Dr. Najfeld to
22  you at 4:28 p.m. on August 8th, which is five
23  minutes after the one we just looked at.
24  It says: "There are some major
25  problems with your presentation.  Please come over

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

381

Varughese

2  asap."
3  Did you get this e-mail?
4  A.  Eventually I did, yes.
5  Q.  Did you get it --
6  A.  At 4:28 p.m.?  No.
7  Q.  Is that because you had logged out of
8  your system?
9  A.  Yes.
10  Q.  Were you still in the hospital at
11  4:28?
12  A.  I believe that I was, yes.
13  Q.  I show you another document.
14  MR. McEVOY:  Mark this as Exhibit 31.
15  (Defendants' Exhibit 31, e-mail dated
16  August 8, 2011, from Dr. Najfeld to
17  Dr. Varughese, Bates No. D-885, marked for
18  identification, this date.)
19  Q.  Have you had a chance to look at it?
20  A.  Yes.
21  Q.  And this is an e-mail from Dr. Najfeld
22  to you, also dated Monday, August 8, 2011, at 4:49
23  p.m. which is 21 minutes after the one we just
24  looked at that says, "Please call me.  This
25  presentation cannot go as is."

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

382

Varughese

2  A.  Yes.
3  Q.  Did you get this e-mail on or around
4  4:49 p.m.?
5  A.  No, I believe I got this e-mail much
6  later.  I think I didn't get any of these e-mails
7  till like 6 p.m.
8  Q.  Why did you get them at 6 p.m.?
9  A.  Because I probably logged into my
10  computer and into the e-mail account.
11  Q.  So why would you log out at 4:18 or
12  thereabouts and log back in at 6 p.m.?
13  A.  Because I was working on something
14  else after I sent the e-mail and I didn't get any
15  pages or calls and then I went home at like 4 -- I
16  probably started walking to the train like around
17  five.  So I was underground after that for like --
18  Q.  Did you think it likely,
19  Dr. Varughese, if you e-mailed Dr. Najfeld that
20  she would respond by e-mail?
21  A.  I wasn't sure if she would or not.
22  Q.  Did you think that since you weren't
23  sure whether she should or not, you should have
24  not logged out of your e-mail account so you would
25  get an e-mail if she sent you one?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

383

Varughese

2  MR. WRONKO:  Form objection.  You can
3  answer.
4  A.  No.  I mean, if I'm just going to not
5  log out of computer system, you know, paralyzed to
6  my desk because I expect somebody to e-mail me,
7  that's ridiculous.  I cannot do my work.  That's
8  imposing undue requirements on me that's not
9  imposed on everybody else there.  There were
10  people who were not even at the hospital.
11  Q.  And part of your work that day was to
12  prepare a presentation for the next morning,
13  correct?
14  MR. WRONKO:  Form objection.
15  A.  No, it wasn't part of my work that
16  day.  No.
17  Q.  I show you another e-mail, another
18  document.
19  MR. McEVOY:  Mark this as Exhibit 32.
20  (Defendants' Exhibit 32, e-mail dated
21  August 8, 2011, from Dr. Najfeld to
22  Dr. Varughese, Bates No. D-886, marked for
23  identification, this date.)
24  Q.  Have you had a chance to look at that?
25  A.  Right.  So --

*Computer Reporting NYC Inc.*
*(212) 986-1344*

384

Varughese

2   Q.   Let's identify what it is first.  It's
3   another e-mail from Dr. Najfeld to you, again on
4   August 8th, this one at 5:42 p.m., a little less
5   than an hour after the one we just looked at.
6   And I don't want to characterize the
7   e-mail, but suffice it to say that Dr. Najfeld now
8   says that this presentation is not ready for
9   tomorrow, correct?
10   A.   She doesn't make that statement until
11   this e-mail, right?
12   Q.   Sure.
13   A.   She actually makes that statement
14   before.  But then she actually explains herself,
15   which she did not explain at 4:23 p.m., which is
16   shocking to me.  I mean, if you really thought
17   that from the git-go, why didn't you just say, you
18   know, these are my concerns.
19   Q.   Maybe because she thought you would
20   call her back or e-mail her.
21   A.   I can't read her mind.
22   Q.   And I can't read hers either.
23   MR. WRONKO:  Now everybody is making
24   editorial remarks.  Let's see if we can keep
25   it question/answer.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

385

Varughese

2   MR. McEVOY:  I agree with you.
3   Q.   "Leena, the presentation I received at
4   4pm today by e mail is not really ready for
5   tomorrow.
6   "You were supposed to take the
7   patients' images on Friday from my staff and you
8   had the whole day today and never came to take the
9   images.  The reason we present cases is for
10   educational purpose and the patient's images are
11   presented as a part of this learning experience.
12   "If I was not here at 3 p.m. when you
13   stopped by, you should have write me a note and I
14   would have called you the moment I came in.
15   Meanwhile I left since 4:18 pm a number of e mails
16   and messages only to find that you left at 5pm and
17   would not return to Sinai to work with me on this
18   presentation.  I was willing to work with you
19   until 6 p.m.
20   "I think a lot more work needs to go
21   into this presentation and let's try for the next
22   week."
23   Dr. Najfeld says in there that she
24   sent you a number of e-mails which she looked at
25   and messages which suggests that she attempted to

*Computer Reporting NYC Inc.*
*(212) 986-1344*

386

Varughese

2   communicate with you in some way other than
3   e-mail.
4   To your knowledge did she attempt to
5   communicate with you by page or phone call or some
6   method other than e-mail?  And we're talking about
7   this time period, between 4 and 5 p.m. on August 8th.
8   A.   Well, I called her at like 5:40 or
9   5:45 p.m.  As soon as I got her e-mails I called
10   her.
11   Q.   I understand that.  But she says here,
12   I left you "a number of e-mails and messages."
13   A.   I didn't get any messages.  I think
14   she is referring to the e-mails, and she doesn't
15   say that she paged me either.  She didn't page.  I
16   don't think she paged me.
17   Q.   You said when you finally got finally
18   these e-mails.  You said around 6 o'clock you got
19   them; is that right?
20   A.   Like 5:40, 5:45, that's when I saw
21   these e-mails.
22   Q.   And so this e-mail that we're looking
23   at, the one that's dated August 8 th, 5:42 p.m.,
24   you saw this one at around 5:45 as well as the
25   others that we've looked at?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

387

Varughese

2   A.   I may have gotten other e-mails first
3   and I called her and I think she sent me this
4   e-mail after I spoke to her.
5   Q.   It certainly doesn't appear that way
6   from the face of the document.  So do you know
7   whether you received this e-mail, and by this
8   e-mail, I mean the one dated August 8th, 5:42
9   p.m., do you know whether you got this e-mail
10   before or after you spoke to Dr. Najfeld?
11   A.   I think it may not have been -- I
12   think I got this e-mail after I spoke to her.
13   Q.   And when you spoke to her, you called
14   her?
15   A.   Right, I called her office like the
16   number that's right here, 241-8801.  So I called
17   that number and I spoke to her.  I said, you know,
18   what the problem is with them.
19   Q.   And what did she tell you?
20   A.   With the presentation she said, Oh,
21   it's not the patient -- I mean, she said it's not
22   ready.  You know, you're discussing the patient.
23   I think she had a problem with the way
24   I structured the presentation.  She wanted me to
25   discuss either the background information or --

*Computer Reporting NYC Inc.*
*(212) 986-1344*

388

Varughese

1  oh, no, she wanted me to discuss the patient
2  first, then discuss the diagnosis.  I went into
3  the background information about CML and the
4  presenting diagnosis to sort of kind of present it
5  as sort of, well, could this really be CML kind of
6  thing.  That was my stylistic preference.  She
7  didn't like that.  That's what she said to me.
8  
9  Q.    Did she also talk to you about what
10  she says in the e-mail, that "you were supposed to
11  take the patient images on Friday from my staff
12  and you had the whole day today and never came to
13  take the images"?
14  A.    Did I talk to?  I don't know if I --
15  when I was on the phone with her I had that
16  discussion with her.  But for all intents and
17  purpose I knew the case and I knew the patient's
18  cytogenetics finding and I used a comparable image
19  because I did not have access to the computers
20  that they utilized for cytogenetics.  Because
21  that's like a different system and I don't have a
22  password to sign in for that system.
23  And the technician that I worked with
24  she left.  She went on vacation on Thursday and
25  something.  Wednesday or Thursday she went on

*Computer Reporting NYC Inc.*
*(212) 986-1344*

389

Varughese

1  
2  vacation.  So I had worked on this case prior to
3  that.  I didn't have an image of the cytogenetics
4  findings.  So I just used a comparable image.
5  Q.    It says, "You were supposed to take to
6  take the patient images on Friday from my staff
7  and you had the whole day today and you never came
8  to take the images."
9  So is what you just told me the reason
10  why you didn't take the images?
11  A.    What?
12  Q.    It says, the first sentence of the
13  second paragraph, "You were supposed to take the
14  patient's image on Friday from my staff and you
15  had the whole day today" --
16  A.    Oh, that's not true.  She wouldn't
17  know about that because she wasn't there that day.
18  So I don't know why she is making these assertions
19  when she wasn't even at work on Friday.
20  Q.    So she's wrong when she says that.
21  A.    Right, she wasn't at work on Friday.
22  Q.    When Dr. Najfeld told you that the
23  presentation needed to be changed in the way you
24  just described, did you agree with Dr. Najfeld or
25  not?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

390

Varughese

1  A.    Well, if she wanted me to present it
2  that way that was fine with me.  I agreed to
3  change it immediately.  It's not a problem for me.
4  
5  Q.    Did Dr. Najfeld when you spoke to her
6  tell you that she was willing to stay late and ask
7  you to come back to the hospital to work on the
8  presentation?
9  A.    Right, she gave me an ultimatum that I
10  had to get there before 6 p.m.  and I told her
11  there's no way I can come back to New York City,
12  Upper East Side, in 20 minutes from downtown
13  Brooklyn.  It's impossible.
14  Q.    And you were living in downtown
15  Brooklyn at the time?
16  A.    Right.  And not only that, my coworker
17  also did a presentation on CML the following week.
18  He did the histology aspect because he was also
19  working on the same case.  I was working on the
20  cytogenetics component and he was working on just
21  the histology, which is regular, you know,
22  histology stuff.
23  So he also presented the following
24  week and it was a team effort really.  It was an
25  effort between, you know, that involved me and my

*Computer Reporting NYC Inc.*
*(212) 986-1344*

391

Varughese

1  
2  co-resident.
3  Q.    Was the presentation that was
4  scheduled for August 9th cancelled?
5  A.    Correct.
6  Q.    By you.  Your presentation.
7  A.    My presentation was cancelled and
8  apparently my co-resident did not have to cancel
9  or anything, but it was understood that his
10  presentation was cancelled without him doing
11  anything.
12  Q.    Did Dr. Najfeld tell you to let the
13  people who were going to attend the meeting to
14  know that the presentation was cancelled?
15  A.    Right, she did.
16  Q.    I show you a document.
17  MR. McEVOY:  Mark this as Exhibit 33.
18  (Defendants' Exhibit 33, e-mail dated
19  August 9, 2011, from Dr. Najfeld to
20  Dr. Varughese, Bates No. D-890, marked for
21  identification, this date.)
22  Q.    Did you have a chance to look at that,
23  Dr. Varughese?
24  A.    Yes.
25  Q.    Is this the communication you were

*Computer Reporting NYC Inc.*
*(212) 986-1344*

392

Varughese

1           Varughese
2   just referring to, the e-mail from Dr. Najfeld to
3   you dated August 9th at 6:21 a.m.? It says,
4   "Please send an e mail that the conference will
5   not be held."
6        A.    Yes.
7        Q.    You got this e-mail?
8        A.    Yes, I got that like when I was in
9   conference.
10       Q.    And what did you understand
11  Dr. Najfeld wanted you to do?
12       A.    Right, so this is all she said. So I
13  e-mailed her back and I said, Of course, I'm not
14  going to hold the presentation anymore as per
15  discussion yesterday.
16       Q.    Did you understand that either from
17  this e-mail or from your conversation with
18  Dr. Najfeld that she wanted you to tell the people
19  who were attending the conference that it was
20  being cancelled?
21       A.    Well, you know, I didn't make that
22  connection at that time. So I just thought she
23  wanted me to just confirm with her that I won't be
24  presenting.
25            And then the other thing is, on

Computer Reporting NYC Inc.
(212) 986-1344

393

Varughese

1   Tuesdays at 9 a.m. when they have these CP call or
2   follow-up conferences, there are multiple
3   conferences. These are very informal events.
4   It's not e-mail everyone, let them know what the
5   presentation is, what the topic is. It's a very
6   informal event where people bring questions or
7   have questions or discuss any issues that came up
8   in CP or is there anything interesting that
9   happened that week in clinical pathology.
10           So it's a time for people to bring all
11  sorts of relevant issues to the table. This is
12  not about just making a presentation. So aside
13  from my presentation there could have been other
14  presentations that week. Like the following week
15  I presented, you know, cytogenetics on CML with a
16  co-resident who also presented histology on CML.
17       Q.    When Dr. Najfeld spoke to you by phone
18  and when you received the e-mail at 5:42 that
19  basically said in her view this presentation
20  couldn't be made tomorrow, right?
21            MR. WRONKO: You're referring to
22  Defendant's Exhibit 32.
23            MR. McEVOY: I am.
24       Q.    Did you have any doubt that

Computer Reporting NYC Inc.
(212) 986-1344

394

Varughese

1   Dr. Najfeld knew that this presentation wasn't
2   going to take place tomorrow?
3            MR. WRONKO: Form objection. You can
4   answer.
5        A.    She said it needs a lot more work.
6        Q.    And "let's try for next week."
7        A.    Yes.
8        Q.    So you knew that she knew that she
9   didn't want you to present this tomorrow.
10       A.    Right. Well, that didn't stop me from
11  working on my presentation.
12       Q.    I didn't say it did. And then she
13  sends you an e-mail the next morning. It says,
14  "Please send an e mail that the conference will
15  not be held."
16            Given the conversation you had with
17  her and the e-mail you got from her the previous
18  day, you really thought that the response to this
19  was to tell her that you knew that the thing
20  wasn't going to be presented? Is that how you
21  interpreted her e-mail?
22            MR. WRONKO: Hold on. Form objection.
23  I think you're arguing with the witness.
24            MR. McEVOY: No.

Computer Reporting NYC Inc.
(212) 986-1344

395

Varughese

1            MR. WRONKO: She already asked and
2   answered that.
3            MR. McEVOY: I am asking her whether,
4   now having looked at the e-mail at 5:42 and
5   what it says, that her interpretation of the
6   e-mail on August 9th at 6:21 a.m. from
7   Dr. Najfeld was to confirm with Dr. Najfeld
8   that you weren't going to present. That's
9   all I want to know.
10           MR. WRONKO: Form objection. You're
11  asking whether or not today she has a
12  different viewpoint on it?
13           MR. McEVOY: No, what she thought when
14  she got this e-mail on August 9th. I am not
15  really interested in what she thinks today.
16           MR. WRONKO: Form objection.
17       A.    Initially I thought she just wanted me
18  to confirm that I won't be presenting.
19       Q.    Confirm to who?
20       A.    Confirm to her. Because I wasn't sure
21  there would be other conferences that morning
22  either.
23       Q.    Let me show you another document.
24           MR. McEVOY: Mark this as Exhibit 34.

Computer Reporting NYC Inc.
(212) 986-1344

396

Varughese

1
2       (Defendants' Exhibit 34, e-mail dated
3       August 9,20111, from Dr. Varughese to
4       Dr. Najfeld, Bates No. D-891, marked for
5       identification, this date.)
6       Q.    Have you had a chance to look at that?
7       A.    Yes.
8       Q.    Is this the e-mail you sent in
9   response to the e-mail from Dr. Najfeld that you
10  received at 6:21 on August 9th?
11      A.    Right. I think I -- I don't know, it
12  says, you know, her name and information, but
13  yeah, "I won't be doing the cytogenetics
14  presentation until next week."
15      Q.    It's an e-mail from you to her dated
16  August 9th at 829 a.m. It says, "I won't be doing
17  the cytogenetics presentation until next week."
18      A.    Right.
19      Q.    And did you notify anybody else other
20  than Dr. Najfeld that you wouldn't be doing the
21  presentation on August 9th?
22      A.    No. I just informed her, confirmed
23  that I won't be doing the cytogenetics
24  presentation until the following week.
25      Q.    Let me show you another document.

397

Varughese

1
2       MR. McEVOY: Mark this as Exhibit 35.
3       (Defendants' Exhibit 35, e-mail dated
4       August 9, 2011, from Dr. Najfeld to
5       Dr. Varughese, Bates No. D-892, marked for
6       identification, this date.)
7       Q.    Have you had a chance to look at that?
8       A.    Yes.
9       Q.    Did you receive this e-mail from
10  Dr. Najfeld?
11      A.    Yes.
12      Q.    Did you send your presentation or the
13  revised presentation to her the next day on
14  August 10th as she had requested?
15      A.    Actually I met with her Tuesday
16  afternoon and I went over my presentation and we
17  agreed on how it should be presented. So she was
18  aware of my, she knew exactly what was my
19  presentation at that time.
20      Q.    When you met with her and you
21  discussed it with her, she approved the
22  presentation?
23      A.    Yes.
24      Q.    And did you notify faculty and chief
25  residents as well as the educational director of

398

Varughese

1
2   your upcoming presentation next week?
3       A.    Yes. I mean, I don't know if the same
4   requirements were placed on Jonathan Chow. He did
5   a presentation as well that week. I don't know
6   exactly what requirements were placed on him to
7   inform, and so on. I don't think any of those
8   requirements were placed on him.
9       Q.    Do you know what, if any, requirements
10  were placed on him?
11      A.    No, he was just allowed to come in
12  with the presentation that he wanted and present
13  whatever he wanted.
14      Q.    During the tumor cytogenetics rotation
15  with Dr. Najfeld, was she critical of your time in
16  attendance?
17      A.    She wasn't very critical of my time in
18  attendance, no. But she did berate me in front of
19  her employees or the employees of the hospital and
20  they thought she was being extremely aggressive
21  and unprofessional towards me.
22      Q.    When did she berate you?
23      A.    She berated me several times over the
24  second week. The first week she was very benign.
25  She didn't have much to say to me. She was

399

Varughese

1
2   working on some equipment and what not.
3       Then she got an e-mail from Firpo
4   about cytogenetics requirements and what she has
5   to do. Then after that she became very, um, she
6   started having a different attitude towards me.
7   Started becoming very aggressive, very mean,
8   berating me wherever she saw an opportunity, just
9   being frankly unprofessional despite the fact that
10  I am a licensed medical doctor in New York and she
11  should really watch how she speaks to me. But she
12  would have none of that.
13      Q.    You say she received an e-mail from
14  Dr. Firpo.
15      A.    Yes.
16      Q.    When did she receive an e-mail from
17  Dr. Firpo?
18      A.    I believe it was Thursday.
19      Q.    How do you know she received an e-mail
20  from Dr. Firpo?
21      A.    Because she told me and I think I was
22  cc'd on some e-mails.
23      Q.    What did the e-mail that she told you
24  about or that you saw say?
25      A.    It just said that she was to meet with

400

Varughese

1  Varughese
2  me and discuss the requirements of cytogenetics.
3      Q.  Anything else that he said?
4      A.  That's all I can recall right now.
5      Q.  Did you attribute some negative or
6  sinister motive to Dr. Firpo sending that to you?
7          MR. WRONKO:  Form objection.  You can
8      answer.
9      A.  Yes.
10     Q.  How did you interpret Dr. Firpo's
11  motive in sending that e-mail, why he sent it?
12     A.  I think it plays to her on some, you
13  know, on some notice about what her duties are and
14  I felt -- I think that after that she didn't -- I
15  don't think anybody likes being scrutinized and
16  perhaps she thought that she was being scrutinized
17  by the hospital or this new person that they hired
18  and she started taking it out on me.
19     Q.  So --
20     A.  I mean, I personally don't have a
21  problem with him sending e-mails to Dr. Najfeld or
22  even to me.  I personally don't mind.  If he
23  wanted to send me an e-mail saying these are the
24  requirements, these are what we expect you to
25  learn every month or every time I start a new

*Computer Reporting NYC Inc.*
*(212) 986-1344*

401

Varughese

1  rotation, I personally don't find anything wrong
2  with that.
3      Q.  So you think that Dr. Firpo sent this
4  e-mail to Dr. Najfeld.  She may have thought that
5  he was somehow scrutinizing what she was doing.
6      A.  Right.  Because she seemed surprised
7  by it and she didn't seem to appreciate this
8  management of her duties, her responsibilities.
9      Q.  Did she say something about that to
10  you?
11     A.  Yeah, she just mentioned that she was
12  being asked to do something.
13     Q.  Did she say that she was offended by
14  it, that she didn't like it?
15     A.  Here's someone who's worked at that
16  institution whatever time she said she worked
17  there and perhaps she's never had to deal with
18  this before, she never had to deal with somebody
19  who started telling her how to do her job.
20     Q.  Do you know that for a fact or is this
21  just kind of like your supposition about how you
22  think she would react having been at Mount Sinai
23  for 30 years?
24     A.  Well, every time I was in a rotation

*Computer Reporting NYC Inc.*
*(212) 986-1344*

402

Varughese

1  Varughese
2  my supervisors felt that they were being
3  intimidated by the hospital's administration in
4  one form or another.  To say negative things about
5  me, derogatory things about me, saying that I have
6  to meet X requirements, they said, you know what?
7  We don't have to do this with anybody else, any
8  other resident.  They're not on a checklist of
9  saying, Oh, X is met, Y is met, Z is met.  This
10  just doesn't happen in the residency training
11  program.
12         This is a program where most of the
13  residents failed their board exams for multiple
14  years running.  Nobody is scrutinizing the
15  residents to see if they are meeting any
16  requirements.  But they are putting this
17  requirement, these undue, you know, requirements
18  on me that they are not placing on anybody else,
19  whether it's like, you know, asking me to always
20  e-mail everybody else when it's quite possible
21  there could have been five other presentations at
22  9 in the morning.
23     Q.  A lot of things are possible.  What I
24  want to know is what you know.
25     A.  That's what I know.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

403

Varughese

1      Q.  That's what you think you know.
2      A.  No, that's what I was told.
3      Q.  So let's go back to Dr. Firpo.  Was
4  there anything in Dr. Firpo's e-mail that had
5  anything to do with you specifically?
6      A.  I'm sorry, what e-mail are you talking
7  about now?
8      Q.  The one you're talking about, the one
9  that Dr. Firpo sent to Dr. Najfeld telling her
10  about what she needed to do in terms of the
11  rotation.  Did it refer to you specifically?
12     A.  Right, because I was the person who
13  was on cytogenetics.
14     Q.  Did the e-mail refer to you
15  specifically?  Do you know whether it referred to
16  you specifically?
17     A.  Well, I was cc'd on the e-mail.  I
18  don't know if any other resident was cc'd on that
19  e-mail.  So it refers to me specifically.
20     Q.  So you said Dr. Najfeld berated you in
21  front of other employees during the second week of
22  the rotation.
23     A.  Right.
24     Q.  When was the first time she berated

*Computer Reporting NYC Inc.*
*(212) 986-1344*

404

Varughese

2  you?

3      A.    Well, she -- well, you know, when I
4  went to meet with her on Monday or Tuesday for the
5  presentation. Monday I met with her in the
6  afternoon. She just went on this long, you know,
7  she seemed like she was upset and she was saying a
8  number of derogatory things to me.

9      Q.    Like what?

10     A.    What did she say at that point? She
11  just said -- actually, I don't remember. I would
12  have to like jog my memory. It was so long ago.
13  It was like two years ago.

14     Q.    I understand. So what else did
15  Dr. Najfeld do on, I think you said, Monday or
16  Tuesday that you interpreted as being berating?

17     A.    Right. And she was sort of, um, she
18  was placing all these requirements on me now
19  because she felt that's what she had to do it
20  seems, and she was saying this presentation --
21  even with the presentation it's like so terrible.
22  I mean, it wasn't that terrible. It just needed
23  to be reordered a little bit and that's it. It
24  took me maybe half an hour to change the
25  presentation and I got the patient's cytogenetics

*Computer Reporting NYC Inc.*
*(212) 986-1344*

405

Varughese

2  image from one of the technicians who worked
3  there. He just simply e-mailed the image. There
4  was no, you know, it wasn't like a difficult
5  situation here.

6          But the response was just, you know,
7  exaggerated to the point where it's like you
8  didn't do this, you didn't do that or everything
9  is wrong here.

10         Then she would yell at me in front of
11  the other technicians even though I'm the licensed
12  doctor there, not her. She would literally shout
13  at me at the top of her lungs in this environment
14  and it was disturbing and she was like making fun
15  of me. And there were people there and they would
16  like, What did you do to her? What did you do to
17  her for her to like treat you like this when
18  you're in this lab? They never saw her treat
19  anybody else like that.

20     Q.    Is it possible, I mean, can you
21  contemplate the possibility that the reason
22  Dr. Najfeld was angry with you or berated you,
23  if that's what she did, on Monday or Tuesday
24  August 8th or 9th is because she was genuinely
25  displeased with your performance regarding the

*Computer Reporting NYC Inc.*
*(212) 986-1344*

406

Varughese

2  presentation?

3          MR. WRONKO: Form objection. You can
4      answer.

5      A.    Was she displeased?

6      Q.    Yes.

7      A.    I mean, to be displeased with the
8  presentation is one thing, but to berate me in
9  front of her, you know, the employees at the
10  hospital, no. I don't think that's why. I think
11  she was berating me because she was being managed
12  by some new hire who probably doesn't know
13  anything about cytogenetics. She feels like she's
14  an expert. She has been doing this thirty years.
15  She didn't like it and she was taking it out on me
16  because I was there.

17         This is what they do to all my
18  supervisors. Every time I'm on a rotation they go
19  to them tell them they had to say derogatory
20  things about me, find a way to say something
21  negative about me. That's what I heard. This is
22  what people have told me.

23     Q.    So you are the victim of this giant
24  conspiracy.

25         MR. WRONKO: Form objection.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

407

Varughese

2      Q.    Do you believe that you were the
3  victim of a conspiracy by the management at Mount
4  Sinai to influence everybody who supervised you on
5  every rotation to say and do negative things
6  towards you?

7          MR. WRONKO: Form objection.

8      A.    You're saying it's a conspiracy and
9  you mentioned this previously as well. And, you
10  know, I did not believe it, but I do believe that
11  now. I do believe that it's true. I believe that
12  the management was trying to influence my
13  supervisors to say derogatory things about me to
14  insert, you know, things into the record to make
15  me look a certain way, to paint an image of me as
16  being unprofessional or having interpersonal
17  communications skills or patient care related
18  lapse, whatever. Everything they would find they
19  would try to put in there. I have no doubt about
20  it.

21         (A recess was taken.)

22  BY MR. McEVOY:

23     Q.    Dr. Varughese, when Dr. Najfeld, to
24  use your word, berated you on August 8th or 9th
25  about the presentation, was that in front of other

*Computer Reporting NYC Inc.*
*(212) 986-1344*

408

Varughese

1
2  people?
3      A.    Well, it wasn't the 8th because that
4  was the date that they sent me those e-mails.  It
5  was probably the 9th or the 10th.
6      Q.    All right, on the 9th or the 10th.
7      A.    It wasn't in front of -- yeah, there
8  were other people there.
9      Q.    Who else was there?
10     A.    The technicians.
11     Q.    Did the technicians have names?
12     A.    I don't really remember all their
13  names now.  I just remember several of the people
14  I worked with.  There was Tara, Maria, Izza and a
15  few other people who I would know.
16     Q.    After this incident on the 9th or the
17  10th did Dr. Najfeld berate you on any other
18  occasions during the rotation?
19     A.    Well, she sought opportunity to berate
20  me I feel like.
21     Q.    I'm not sure what that answer means.
22  Did berate you?
23     A.    Yes, she did.
24     Q.    When?
25     A.    When did she?  Well, she wanted me to,

*Computer Reporting NYC Inc.*
*(212) 986-1344*

409

Varughese

1
2  what was it?  On Friday I came into work and I
3  was -- I was expecting that I would have to like
4  have some sort of exit interview with her, and so
5  I was basically reading up just to, you know,
6  going through the points that were the
7  requirements for cytogenetics and just sort of
8  getting a sense of like what could she ask me,
9  because it was an incident review.  And so when I
10  arrived she was just, you know, she was up in arms
11  about some e-mails and....
12     Q.    What e-mails?
13     A.    Apparently some e-mails she had gotten
14  from Pat Lento and Adrienne Jordan.
15     Q.    About what?
16     A.    About coverage, coverage for a
17  resident who was out sick that day.
18     Q.    So Dr. Varughese, on the last day of
19  your rotation you didn't work in the cytogenetics
20  area that afternoon because you were asked to
21  cover in another area for a sick resident; isn't
22  that right?
23     A.    Well, I was expected to report to work
24  in cytogenetics.
25     Q.    And you did that, right?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

410

Varughese

1
2      A.    Right, I did that.  And then I left
3  cytogenetics at noon and I went to cover for the
4  resident.
5      Q.    And is that what you believe
6  Dr. Najfeld was upset because Dr. Lento and
7  Dr. Jordan had communicated with her about the
8  need for you to leave the cytogenetics lab and go
9  cover for this resident?
10     A.    No, I think she was being called by
11  Pat Lento about something.  And I think she was
12  told that I didn't do something or I think she was
13  informed that I had done something or -- so when I
14  got there she, you know, I spoke to her for a
15  minute and asked her what I needed to do.
16         She wanted me to complete some
17  cytogenetics, you know, karyotyping, which is
18  something I normally don't do, because as a
19  medical doctor you don't do that kind of work.  It
20  is more technician-type work.  I mean, I just
21  needed to learn how to interpret the findings, not
22  necessarily arrange the chromosomes according to
23  their size from one to 23.  So, you know, I knew
24  how to do it, so I did it.
25         While I'm having this conversation

*Computer Reporting NYC Inc.*
*(212) 986-1344*

411

Varughese

1
2  with her about the importance of cytogenetics and
3  trying to like explain to her what I had learned
4  and what my readings were, she was getting phone
5  calls and then Pat Lento calls and he is like, Oh,
6  I need to talk to Leena right away.  As if there's
7  some fire to put out.
8          I picked up the phone and said, What's
9  going on?  And he said, Well, aren't you covering
10  for some resident who was out sick today?  I said,
11  Of course I am.  I was informed that I'm to cover.
12  So I am covering.
13         There's no discussion on it because I
14  had a discussion on this issue just the week
15  prior.
16     Q.    So we'll get to the coverage issue.
17  My question is, to get back to where you started,
18  was that Dr. Najfeld was upset the last day that
19  you were on that rotation because you were,
20  because she got phone calls or communications
21  from Lento and Jordan, right?
22     A.    The last day yes, she was getting
23  bombarded with e-mails and phone calls.
24     Q.    Leaving aside bombarded, to your
25  understanding was the subject matter of those

*Computer Reporting NYC Inc.*
*(212) 986-1344*

412

Varughese

1  communications the need for you to leave the
2  cytogenetics lab and cover?
3  **A.**    Right.
4  **Q.**    So did you ever have an exit
5  interview?
6  **A.**    Well, I spoke to her for about an hour
7  or two hours.
8  **Q.**    When was that?
9  **A.**    That Friday.
10  **Q.**    Friday morning.
11  **A.**    Right. So I assumed that was the exit
12  interview, but she said that I did not have an
13  exit interview with Dr. Najfeld.
14  **Q.**    So were there any other occasions on
15  which Dr. Najfeld berated you during this
16  cytogenetics rotation?
17  **A.**    Right, she berated me like on
18  Wednesday. She started shouting at me about
19  something. I don't remember what. It was pretty
20  disturbing. I just -- I was willing to, you know,
21  I was shocked, but I just thought, you know, I
22  don't know what's going on. Maybe that's how she
23  is, maybe that's her personality or something.
24  Then the technicians who work there

413

Varughese

1  approached me and said, Well, this is definitely
2  not normal. I have never seen her be so
3  disrespectful towards a resident when they're
4  here. It seems like they felt like she was going
5  out of her way to berate me and antagonize me.
6  **Q.**    Did you show up late for work during
7  that rotation?
8  **A.**    No.
9  **Q.**    Did you leave early during that
10  rotation?
11  **A.**    There's no leaving early in
12  cytogenetics.
13  **Q.**    Well --
14  **A.**    I had to find a technician that I can
15  work with and tag along.
16  **Q.**    Was there a normal quitting time?
17  **A.**    For cytogenetics? No.
18  **Q.**    So when did you know it's time to go
19  home?
20  **A.**    Well, I usually work with the
21  technicians and we discuss like what they are
22  going to do, what their work is going to be for
23  the day and I usually just observe whatever
24  procedures or techniques that they are doing and

414

Varughese

1  the results that they get and I just discuss, you
2  know, troubleshooting or laboratory techniques.
3  They usually have some questions for me about what
4  it means and I'll look up some information for
5  them.
6  That's about it. That's the nature of
7  the work. There's no quitting time. There's no
8  coming early or leaving early. It's whose
9  available.
10  **Q.**    So it's your understanding there are
11  no regular hours that you were supposed to be in
12  the cytogenetics lab during that rotation.
13  **A.**    Well, I was there when the technicians
14  were available.
15  **Q.**    I understand that. My question is --
16  you were just explaining that to me and understood
17  what you said.
18  Dr. Najfeld as I think you may recall
19  said that you came in late and left early. That
20  implies that there was a time you were supposed to
21  be there --
22  **A.**    No.
23  **Q.**    -- and a time you were supposed to
24  leave, and you say that's not correct.

415

Varughese

1  **A.**    That's not correct.
2  **Q.**    OK. During the rotation, OK? did you
3  take off the 5th and the 8th to prepare the
4  clinical presentation?
5  **A.**    No, I did not take off the 5th and the
6  8th. Like I mentioned before, on the 5th she was
7  not at work. So I don't know. She's making these
8  assertions from wherever she is. So I don't know
9  what she's talking about.
10  On the 8th I was there. That's the
11  Monday. We had like these e-mails back and forth.
12  **Q.**    Specifically, did you take off doing
13  bench work to prepare --
14  **A.**    No, I didn't. I talked to some the
15  technicians there. We went over a few things
16  about their new equipment. And I had already
17  reviewed the standard operating protocols for all
18  their tissue and everything. I mean, this is not
19  like rocket science for me. I look at it, I get
20  it and move on with my life.
21  There's so many other things I need to
22  learn about cytogenetics that's not available in
23  that particular laboratory. I had to go to the
24  library. I had to go to my desk. I had to access

416

Varughese

1
2  the required information about cytogenetics. It's
3  not available in that laboratory.
4      Q.   So did you think that rotation was a
5  waste of your time?
6      A.   No, I don't think it was a waste of my
7  time. I enjoyed cytogenetics. I enjoyed my two
8  weeks. I did not know about this evaluation that
9  you're looking at. I'm sure you will present it
10  to me at some point. But I did not know about
11  this evaluation until the house staff affairs
12  hearing. Nobody informed me that this was the
13  evaluation that was submitted.
14      Q.   Did you call in sick on August 11th?
15      A.   Yes, I did.
16      Q.   Did there come a time when Dr. Najfeld
17  asked you to stop using your BlackBerry during
18  tutorials?
19      A.   Right. I don't have a BlackBerry.
20      Q.   Was there some other device you were
21  using?
22      A.   Right, I did have a phone, a smart
23  phone.
24      Q.   So did there come a time when
25  Dr. Najfeld asked you to stop using your smart

*Computer Reporting NYC Inc.*
*(212) 986-1344*

417

Varughese

1
2  phone during the tutorial?
3      A.   Right, she did, because I was taking
4  notes. She wanted me to look up certain
5  cytogenetic rearrangements. She was being very
6  specific and picky about the tumor rearrangements
7  and such, which, you know, takes some time to
8  memorize and learn about. So I was taking notes
9  to remind myself that this is what I needed to
10  know.
11      Q.   And then did she tell you to stop
12  using the smart phone?
13      A.   Right, she wanted me to stop using it.
14  She just wanted me to listen to her.
15      Q.   And did you stop using it?
16      A.   Right, I did.
17      Q.   And did you start using it again
18  despite being told not to use it?
19      A.   I may have tried to use it again on a
20  different day to take some notes, but not to, you
21  know, not to specifically spite her or whatever
22  she thinks that I was doing.
23      Q.   Did the technologist also tell you
24  that you shouldn't use the smart phone --
25      A.   No, not at all. I did not have any

*Computer Reporting NYC Inc.*
*(212) 986-1344*

418

Varughese

1
2  such discussion with any technologist. They are
3  all young, they all have their own smart phones
4  too.
5      Q.   Did Dr. Najfeld ever tell you, and I'm
6  not talking about what she said at the medical
7  staff hearing or what you learned later, but
8  during the rotation between August 1st and
9  probably closer to August 12th did Dr. Najfeld
10  ever tell you what her overall assessment of your
11  performance during the rotation was?
12      A.   No.
13      Q.   Was there a policy, Dr. Varughese,
14  about coverage for residents who are out sick or
15  otherwise unavailable?
16      A.   Yes, there is a policy.
17      Q.   What is your understanding of that
18  policy?
19      A.   It's just some --
20          MR. WRONKO:  Form objection.  You can
21  answer.
22      A.   So it was some sort of revolving list,
23  I believe, which nobody had access to except for
24  the chief resident, I believe.
25      Q.   And when you say a revolving list,

*Computer Reporting NYC Inc.*
*(212) 986-1344*

419

Varughese

1
2  what do you mean?
3      A.   Well, they said that we're going to
4  take people from different rotations and I guess
5  circulate the pool that's available to cover.
6      Q.   Was it a list of residents so that
7  everybody would in essence be required to cover
8  and so that the burden wouldn't fall too heavily
9  on some residents while others didn't cover?
10      A.   Well, I don't know if that's really
11  the reason for having a policy. I think it was
12  just more to ensure that the work gets done and
13  there's no, you know.
14      Q.   In August, particularly August 4th of
15  2011, did Dr. Jordan contact you about covering
16  the frozen section room on August 5th?
17      A.   Yeah, she e-mailed me on August 4th, I
18  believe.
19      Q.   What did she tell you?
20      A.   She wanted me to cover.
21      Q.   She wanted you to cover what?
22      A.   Frozen sections.
23      Q.   Did she say why?
24      A.   She said the resident who was on
25  service was going to be out sick.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

420

Varughese

1  Q.   Let me show you a document.
2      MR. McEOY:  Mark this as Exhibit 36.
3      (Defendants' Exhibit 36, multipage
4  e-mail string, Bates Nos. D-896 through
5  D-901, marked for identification, this
6  date.)
7  Q.   Have you had a chance to look at that?
8  A.   Yes.
9  Q.   It's an e-mail string.  The first
10 e-mail is on page D-901 from Sarah Blowe to
11 Dr. Bleiweiss, Dr. Lento, D. Firpo, Dr. Jordan
12 dated 8/4/2011 at 4:18 p.m.  The last e-mail,
13 which is page 896, is from Dr. Jordan to you with
14 copies to several folks on August 6, 2011 at
15 10:47, correct?
16 A.   Yes.
17 Q.   The first e-mail from Dr. Blowe says
18 she's "not feeling well and will be out sick
19 tomorrow."
20     And the second e-mail, which is from
21 Dr. Jordan to Dr. Morency with a number of people
22 copied on it, including you, "Sarah will be out
23 sick tomorrow.  Julie and Justin were pulled today
24 to help out.  So moving down the list of residents

*Computer Reporting NYC Inc.*
*(212) 986-1344*

421

Varughese

1  who can cover, tomorrow I need Leena to cover
2  frozens in the afternoon.  So that I do not have
3  to pool another resident from their rotation, I am
4  asking that the attendings sign out biopsies on
5  their own in the morning.  I want to thank
6  everyone (especially the attendings who will be
7  signing out on their own and Leena who will be
8  giving up her time) for their patience and
9  understanding."
10     And then you respond to that e-mail,
11 also on August 4th at 9:23 p.m., saying, "Sorry, I
12 can't cover frozen sections tomorrow afternoon."
13     Do you see that?
14 A.   Yes.
15 Q.   Why couldn't you cover frozen sections
16 on August 5th?
17 A.   I just had an arm injury and I had
18 numbness down my arm.  That's why I couldn't cover
19 it.
20 Q.   And then Dr. Jordan responds on August
21 5th at 9:20 in the morning and it says, and I
22 won't read the whole thing, but it basically says
23 that she understands your situation, but she
24 expects that you will cover.  Right?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

422

Varughese

1  A.   Right.  I don't know why she said
2  that, but I guess that's what she wrote.
3  Q.   And you write back, saying a little
4  later that morning, 10:28 a.m., "You did not ask
5  me to cover because if you had, then you would
6  have known that I had injured my left arm.
7  Additionally, I have responsibilities on other
8  rotations that I may not be able to drop off at
9  the very last minute.  I was courteous enough to
10 let you know via email last night that I could not
11 cover, thereby enabling you to find the adequate
12 amount of time to find a replacement.  Please be
13 considerate of others time and prior commitments
14 before you send out an email assuming coverage.
15 All right, Adrienne good luck on your away
16 rotation."
17     Then Dr. Jordan e-mails back to you a
18 few minutes later, 10:49 a.m. on August 5th.  It
19 says:  "The new policy was in the packet of
20 information I put into your mailbox since you were
21 unable to attend the resident meeting due to
22 vacation."
23     And then it says "you would know what
24 the policy is," that "Liz and I," referring to

*Computer Reporting NYC Inc.*
*(212) 986-1344*

423

Varughese

1  Dr. Morency, "are not required to 'ask' residents
2  to cover."
3      It goes on to explain the policy and
4  then asks you, "Does your injury preclude you from
5  doing frozen sections?  If so, we need a note from
6  a doctor indicating how long you will be unable to
7  perform this task so that we can make alternate
8  arrangements for coverage today as well as an AP
9  call you may have.  Otherwise you are expected to
10 comply with department policy and cover frozens
11 this afternoon."
12     So did you provide a -- well, let's
13 finish the e-mail string first.  Then you e-mail
14 back, "I cannot cover frozen sections this
15 afternoon.  If I cannot cover call next week, I
16 will find coverage."
17     And then you say about the policy and
18 if you didn't have the wrist/hand injury you would
19 be happy to oblige the request for coverage.
20     Then Dr. Jordan e-mails you and says,
21 again, talking about the policy, that was put in
22 the mailbox, the acknowledgment, and then you
23 e-mail her saying, "Why don't you email all the
24 residents who could possibly cover for another

*Computer Reporting NYC Inc.*
*(212) 986-1344*

424

Varughese

2 resident calling out sick? This was what was done
3 in the past and it would be much more practical."
4           You go on to further discuss I guess
5 your view of how that coverage issue should be
6 done. And then Dr. Jordan e-mails you again on
7 August 6th, the next day, again talking about the
8 policies and how things should be done.
9           So did you cover the frozen sections
10 on August 5th?
11      Q.   No.
12      Q.   Did you ever bring a doctor's note
13 regarding the arm injury you said you had?
14      A.   No, I didn't.
15      Q.   Why not?
16      A.   Because I was at work and I could not
17 go out and find a doctor to examine a neuroinjury,
18 numbness. I mean, what is he going to say? I
19 believe you that you have this injury? It seems
20 outrageous.
21           I mean, the hospital policy also is
22 that if you cannot cover a call and you miss it I
23 think at the last minute or something, I think
24 you're supposed to bring in a doctor's note to
25 show that you had a good reason to miss call. But

425

Varughese

2 for everything else it's not that specific.
3           And this new policy was not going to
4 go into effect until August 15th. It wasn't due
5 until August 15th.
6      Q.   Well, was it not in effect by
7 August 15th or did you have to sign and return the
8 acknowledgement by August 15th?
9      A.   Right. Well, I was on vacation again
10 for two weeks before this whole thing took place.
11 I wasn't part of any of the discussions of the new
12 policy. I wasn't at any of these residents
13 meetings for the past like three months, and
14 suddenly they have not one policy, but five or six
15 new policies in excess my contract. That is
16 just outrageous.
17      Q.   So Dr. Varughese, did you think --
18      A.   No, no. I didn't have any opinion
19 about it.
20           MR. WRONKO: Hold on. You have to let
21      him ask the question.
22      Q.   Did you think it was outrageous for
23 the hospital to implement new policies that you
24 were required to follow?
25      A.   My contract is by the board of

426

Varughese

2 trustees. So it's one thing if the board of
3 trustees decided to implement new policy for the
4 department.
5      Q.   Wait, wait, stop. I want to
6 understand. Is it your view that the only changes
7 that could be made to the policies that applied to
8 you because you had a resident's contract had to
9 be approved by the board of trustees?
10      A.   Well, if I felt --
11      Q.   No, no. Is that Your belief? That's
12 the answer I want. Because you just told me that
13 your contract is with the board of trustees. So
14 if they approved policies/changes it was OK.
15           I really want to know, Dr. Varughese,
16 whether you think that the only changes to
17 policies in the department of pathology that you
18 were obliged to follow pursuant to your contract
19 was ones that were improved and implemented by the
20 board of trustees of the hospital. Is that what
21 you think?
22           MR. WRONKO: Form objection.
23      A.   What I think is that --
24      Q.   Is that what you think, that only the
25 board --

427

Varughese

2      A.   Let me answer.
3      Q.   Answer it. The answer to that
4 question Dr. Varughese, is yes you think it --
5      A.   If you've going to intimidate me and
6 shout at me I cannot answer your question.
7      Q.   I have not intimidated or shouted at
8 you once.
9      A.   You're shouting at me right now.
10      Q.   -- because you won't answer the
11 question. And the question --
12           MR. WRONKO: Hold on.
13           MR. McEOY: No, wait.
14      Q.   And the answer to the question --
15           MR. WRONKO: Counsel, first of all,
16 don't lean towards my clients.
17           MR. McEOY: I am leaning to look --
18           MR. WRONKO: Sit back. It's been a
19 long day.
20           MR. McEOY: You can't tell me where to
21 sit or how to sit.
22           MR. WRONKO: You will. You're a
23 better attorney than this, Mr. McEvoy. You
24 don't have to lean forward in order to make
25 your point. So I'd appreciate it if you

428

Varughese

1  Varughese
2  would sit back.
3      MR. McEOY:  Would you direct your
4  witness to answer the question?
5      MR. WRONKO:  I would be happy to.
6      MR. McEOY:  Good, then why don't you
7  do that.
8      MR. WRONKO:  I am trying to
9  reestablish decorum.
10     MR. McEOY:  Then do it.
11     MR. WRONKO:  Now, let's have the poor
12  beleaguered court reporter read back the
13  question.  Please answer the question.
14     (A portion of the record was read.)
15     MR. McEOY:  I'll rephrase.
16  Q.    Do you believe, Dr. Varughese, that
17  the only changes to your residency contract
18  through the implementation of new policies that
19  you're obliged to follow are those that are
20  implemented by the board of trustees of the
21  hospital?
22     MR. WRONKO:  Objection to form.  You
23  can answer it.
24  A.    Well, I don't think I said that
25  anywhere and even when I was responding I was just

Computer Reporting NYC Inc.
(212) 986-1344

429

Varughese

1  saying what, who the contract was from.  It was
2  from the board of trustees to the house staff.
3  That's usually how it's presented.  My employment
4  contract.
5      Two, in terms of having, implementing
6  policy within the department, that affects the
7  employment and the terms of the employment, I do
8  believe to some degree it has to be approved by
9  the hospital and its leadership.  It shouldn't be
10  implemented by residents or chief residents.  I
11  mean, that's my opinion.  I had concerns about it.
12  I did bring this up with D. Firpo at the second
13  meeting on August 17th.
14      At any rate, this issue was about them
15  asking me to cover and I had an arm injury that
16  prevented me from covering.  And I simply told her
17  that I couldn't cover because of that.  I mean, if
18  she had a list of, she or whoever the person was
19  arranging the coverage had a list, it was easy
20  enough to just go to the next person and ask them
21  to do it and come back to me at a later date.
22      It was not as if that was the last
23  time a resident would call out.  It didn't mean
24  anything more than I couldn't cover that day.  It

Computer Reporting NYC Inc.
(212) 986-1344

430

Varughese

1  wasn't, you know, I don't know.
2      I don't think I made the situation
3  what it was.  It was Adrienne Jordan who made the
4  situation what it was.  She's a junior resident.
5  She's a third year to my fourth year, and I don't
6  know why, but they chose to make her the chief
7  resident.
8  Q.    Whether or not she was a third year
9  and you were a fourth year, she was at the time
10  the co-chief resident along with Dr. Morency,
11  correct?
12  A.    Well, yes, she had been the co-chief
13  resident along with Dr. Morency since April or May
14  of 2011.
15  Q.    Let me show you another document.
16     MR. McEOY:  Mark this Exhibit 37.
17     (Defendants' Exhibit 37, document
18  headed "Acknowledgement of Department
19  Policies," purportedly signed by Leena
20  Varughese on 8/15/2011, marked for
21  identification, this date.)
22  Q.    Have you had a chance to look at that?
23  A.    Yes.
24  Q.    Is this the acknowledgment of

Computer Reporting NYC Inc.
(212) 986-1344

431

Varughese

1  department policies that you signed on August 15,
2  2011?
3  A.    Right.
4  Q.    And I take it these were the six
5  policies you were referring to?
6  A.    Right.
7  Q.    So did you understand that you were
8  required to follow these policies once they went
9  into effect, whatever date that may be?
10  A.    Right, I wasn't sure what date it went
11  into effect.  I think it was 8/15, because that's
12  when the policy acknowledgement was due.
13      I was on vacation for two weeks.  I
14  came back.  I received a packet of the printout of
15  these policies and what not in my e-mail box along
16  with a sheet which I signed and submitted back.
17  Q.    Whatever date they went into effect,
18  whether it was 8/15 or some date prior, and
19  regardless of who approved them, who implemented
20  them, was it your understanding that you were
21  obliged to comply with them and follow them?
22  A.    Right, my understanding was that I did
23  not have any say so about what was the policy and
24  whether or not it should be implemented, if it's

Computer Reporting NYC Inc.
(212) 986-1344

432

Varughese

1
2 fair, if it changes the terms of my contract with
3 the hospital. I just did not have any way of
4 addressing these concerns.
5      Q.   Did you understand that you were
6 required to follow the policy?
7      A.   Right, so I followed the policies,
8 8/15. There hasn't been any issues.
9      Q.   That's all I want to know.
10           I show you another document.
11           MR. McEOY:  Mark this is as
12 Defendants' Exhibit 38.
13           (Defendant's Exhibit 38, document
14 headed "Policy for Absence/Service
15 Coverage," Bates No. D-904, marked for
16 identification, this date.)
17      Q.   Have you had a chance to look at that?
18      A.   Yes.
19      Q.   Do you recognize it?
20      A.   Yeah, I'm reviewing it as we speak.
21      Q.   Let me know when you've had a chance
22 to do that.
23      A.   OK.
24      Q.   Do you recognize it?
25      A.   Yes.

Computer Reporting NYC Inc.
(212) 986-1344

433

Varughese

1
2      Q.   Is it the policy for absence/service
3 coverage?
4      A.   Yes.
5      Q.   Is that the policy that is one of the
6 six policies referred to in the acknowledgement of
7 department policies that you signed on 8/15/2011?
8      A.   I believe it is.
9      Q.   Did you ever tell anyone that you felt
10 it was unfair for the department to pull you from
11 a clinical pathology rotation to cover anatomic
12 pathology service?
13      A.   I don't know if I said that, but I do
14 believe that's true.
15      Q.   Why do you think that's true?
16      A.   Because -- you know why it's true?
17 Because I only had 18 months of clinical
18 pathology. My minimum requirements for American
19 Board of Pathology is 18 months. Of these 18
20 months, two of these months were at a hospital
21 where I was not even doing clinical pathology. I
22 had one month of hematology. I barely had one
23 month of cytogenetics. I barely had -- my
24 exposure to clinical pathology was almost nil as
25 far as my expectations go for clinical pathology

Computer Reporting NYC Inc.
(212) 986-1344

434

Varughese

1
2 training at Mount Sinai Medical Center. The
3 program description promises X, Y and Z. I was
4 getting not any of that.
5      Q.   Did you think being pulled off
6 clinical pathology to do an anatomic pathology
7 coverage for an afternoon was going to jeopardize
8 the requirements that you needed to fulfill?
9      A.   Well, I felt that it decreased the
10 amount of time I can spend on clinical pathology,
11 because I'm on cytogenetics and I wanted to read
12 up on cytogenetics for two weeks. I mean, that's
13 my time that's allotted to cytogenetics.
14           I would have to find time elsewhere to
15 take and read up about cytogenetics if I missed
16 that opportunity. So I do believe that it was
17 unfair.
18      Q.   When did you sustain the arm injury
19 that you --
20      A.   I sustained the arm injury earlier in
21 the week, like Tuesday or Wednesday.
22      Q.   So that would be the 2nd or 3rd?
23      A.   Right.
24      Q.   How did you sustain the injury?
25      A.   I don't remember now.

Computer Reporting NYC Inc.
(212) 986-1344

435

Varughese

1
2      Q.   And what was the injury?
3      A.   It was just my arm was numb, like I
4 did not have any sensation.
5      Q.   In your entire arm?
6      A.   Right. It was just a transient injury
7 where I just did not have any sensation in my arm.
8      Q.   How long did that last?
9      A.   Just a few days.
10      Q.   How did that affect your ability to
11 perform the work in the cytogenetics lab?
12      A.   It's like, you know, since I couldn't
13 feel it, I just don't want to put myself at risk
14 for injury when I was performing the frozen
15 sections which involved cutting frozen blocks and
16 cutting tissue. I did not want to put myself at
17 risk.
18      Q.   No, I understand that. But did the
19 injury affect your ability to perform the work you
20 were doing in cytogenetics, the tumor cytogenetics
21 rotation?
22      A.   No, because I wasn't involved in
23 cutting or, you know, operating a scalpel or saw
24 or any of that, which is a real possibility when
25 you're in frozen sections or surgical pathology.

Computer Reporting NYC Inc.
(212) 986-1344

Errata Sheet

Subject: Transcript of deposition day #2 of plaintiff, Dr. Leena Varughese, which was conducted on June 11, 2013

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 206 | 16 | Add "a number of questions they asked me regarding moonlighters, moonlighting policies, requesting moonlighters, and its' effect on the department's finances and interests because of payment made to moonlighters." in place of "..." |
| 208 | 3 | Correct "intimating" to "intimidating" |
| 210 | 10 | Correct "would send them" to "was sent an" |
| 211 | 7 | Add "I believe that led to further actions to be taken against me." in place of "..." |
| 211 | 11 | Insert "that" after "saying" |
| 211 | 24 | Add "because I was being held to a different standard by the department when I moonlighted compared to Jordan, and McCash." after "deal" |
| 212 | 12 | Add "observed favorable treatment of males by McCash while being discriminatory to women especially colored women." in place of "--" |
| 214 | 21 | Correct "draw" to "drew" |
| 215 | 19 | Add "they said it was because of the complaint, which I thought meant about the written that I had submitted to HR and the spoken reports to Dr. Stimmel, Pessin-Minsely, Lento, and the Caryn Tiger-Paillex about Samuel McCash's dicscriminatory harassment and the following day about Alan Schiller's derogatory and discriminatory commentary and treatment of myself on December 09, 2010." in place of "--" |
| 216 | 13 | Add "after I mentioned drinking at work by McCash and Jordan." in place of "..." |
| 222 | 13 | Add "and there was an in incident at Elmhurst Hospital where I was being harassed and treated differently than my male coworker." after "e-mail" |

| PAGE | LINE | CORRECTION |
|------|------|-----------|
| 231 | 17 | Add "had been fabricated and misrepresented by Pessin, McCash, Schiller, Jordan, and Lento to the Dr. Figur." in place of "--" |
| 231 | 25 | Correct "was" to "was not" |
| 239 | 11 | Add "departmental leadership towards me." after "and" |
| 243 | 13 | Correct "No" to "Yes, essentially," |
| 244 | 8 | Correct "would be" to "work" |
| 244 | 9 | Delete "ask" |
| 244 | 11 | Correct "special" to "specific" |
| 244 | 14-15 | Correct "about like just more reaction" to "such as disciplinary actions, threats of termination," |
| 245 | 23 | Correct "That's all really. Those two." to "Force disciplinary psychiatry and no response to my concerns regarding McCash, despite the fact that I was the one who was attacked while doing my work as is dictated by policy." |
| 246 | 3 | Correct "you" to "we" |
| 252 | 6 | Insert "if" after "that" |
| 252 | 7 | Insert "if it" after "um," |
| 252 | 8 | Remove "." and insert "," |
| 252 | 20 | Delete "This is, you know, it's untrue," |
| 253 | 25 | Correct "McClausovitch" to "Mikulasovich" |
| 257 | 4 | Correct "residence" to "resident" |
| 269 | 12 | Correct "assess" to "access" |
| 273 | 15 | Add "me regarding the as needed meetings with Program Director, interim chair/chair, or others in authority, as stated in the Academic Advisement. In fact, I met with numerous authorities in the department and hospital over the period of Academic Advisement, often, at the request of Patrick Lento, who was the program director." in place of "--" |

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 276 | 15 | Add "and pretext for termination." after "document" |
| 277 | 16 | Correct "for --" with "that was decided by Melissa Pessin-Minsely and Patrick Lento." |
| 288 | 9 | Add "was expected from me." in place of "--" |
| 296 | 21 | Correct "he" to "I" |
| 297 | 7-8 | Correct ". Just I'll write" to ", very" |
| 300 | 18 | Correct ", you" to "know" |
| 300 | 20 | Add "Cordon-Cardo didn't like me according to Barnett." in place of "--" |
| 313 | 8 | Add "response that I received. In addition, Dr. Lento stated that it's my responsibility to see if I met the goals of Academic Advisement." in place of "..." |
| 318 | 10 | Correct "He" to "She" |
| 332 | 2 | Correct "I" to "You" |
| 334 | 4 | Correct "there were" to "were there with the residency program." |
| 334 | 12 | Correct "my pathology" to "as a pathologist" |
| 335 | 7 | Add "that appeared to be the extend of his meeting. Then, he sought me out to meet with him and he said that he had just met with Drs. Cordon-Cardo and Lento." |
| 335 | 25 | Add "building" after "east" |
| 336 | 11 | Add "being treated fairly and like my coworkers, the same concerns that I have had about the discriminatory and disparate treatment, and retaliation based on my gender and factors related to my national origin including race and color." in place "--" |
| 339 | 21 | Add "but as soon as I had the opportunity to appeal the decision when I met with Adolfo Firpo-Betancourt, I made my concerns very clear and that I would like to appeal. However, I was told that the GME office said that I have to agree to the final warning or be fired at that time." in place of "--" |
| 341 | 2 | Correct "morning" to "final warning" |

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 341 | 3 | Correct "That was" to "These were" |
| 342 | 18 | Add "fair. I know that they wrote it up to be punitive and in further retaliation of my protected complaints of discrimination by McCash, Schiller, Lento, and Pessin-Minsely by the Mount Sinai Medical Center, which in light of national origin and skin color add up to racist and sexist hateful acts of retaliation and discrimination" in place of "--" |
| 344 | 7 | Correct "situation" to "institution" |
| 346 | 3 | Correct "I" to "he" |
| 346 | 4 | Correct "I" to "he" |
| 348 | 18 | Delete "male" and insert "patter of" |
| 354 | 5 | Correct "Burgess" to "Birge" |
| 361 | 6 | Add "a female pathologist or doctor." in place of "..." |
| 362 | 2 | Correct "He" to "It" |
| 362 | 8 | Correct "want some" to "am on" |
| 362 | 9 | Correct "reaction" to "action" |
| 363 | 24 | Correct "Right." to "I spoke to Scott Barnett." |
| 371 | 24 | Correct "So" to ", but" |
| 382 | 15 | Correct "4" to "5" |
| 387 | 18 | Correct "them" to "the presentation" |
| 400 | 12 | Correct "plays to" to "puts" |
| 409 | 9 | Correct "an incident" to "cytogenetics" |
| 411 | 411 | Correct "she" to "Dr. Najfeld" |
| 412 | 13 | Correct "she" to "Dr. Najfeld" |
| 412 | 14 | Correct "with Dr. Najfeld" to "with her at the hearing." |
| 414 | 9 | Correct "whose" to "who is" |
| 415 | 2 | Correct "That's not correct" to "That's not a question." |

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 437 | 7 | Correct "Cole" to Ko" |
| 437 | 9 | Correct "Cole |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

436

Varughese

Q.    Did you tell Dr. Najfeld that you had
suffered this injury?

A.    Dr. Najfeld was not at work that day.

Q.    Well, you said it lasted for several
days.

A.    Oh, like Wednesday or Thursday.

Q.    Did you tell Dr. Najfeld at any point
in time that you had suffered this injury?

A.    No, I did not say anything to her.

Q.    Did you tell any of the technicians in
the cytogenetics lab that you had suffered this
injury?

A.    No.  Why would I?

Q.    I don't know.  Did you tell anybody
that you had suffered this injury before you told
Dr. Jordan you couldn't cover because of the
injury?

A.    Yes, I told people that I normally
speak to about my personal health issues, yes.
My family.

Q.    Other than your family and your
friends and whoever else, did you tell anybody at
Mount Sinai, any coworker, any supervisor, anybody
in GME, anybody, that you had suffered this

437

Varughese

injury?

A.    Yeah, I may have told some of my
coworkers.

Q.    Who?

A.    I believe I told the coworker who was
sitting next to me, Mabel Cole and probably
Jonathan Chow and....

Q.    Other than Mabel Cole and Jonathan
Chow, anybody else that you remember that you
told?

A.    No, I didn't tell anybody else,
because Adrien Jordan wasn't there.  She was in an
away elective in Pennsylvania without a working
pager or a cell phone or whatever she did not
have.  Who knows?

MR. McEOY:  So it is close to twenty
to five or thereabouts.  We had agreed
previously that we would stop around 4:30 to
accommodate Mr. Wronko's travel back to
New Jersey and I guess Dr. Varughese's
travel back to New Jersey.

As I told Mr. Wronko before we started
today, unfortunately we can't go forward
tomorrow because some judge has commanded my

438

Varughese

appearance.  So we'll resume on Thursday.
Thank you.

(Time noted:  4:35 p.m.)

_____
LEENA VARUGHESE

Subscribed and sworn to before me
this ____ day of _____, 2013.

_____

439

C E R T I F I C A T E

STATE OF NEW YORK    )
                     : ss.
COUNTY OF SUFFOLK    )

        I, THOMAS R. NICHOLS, a Notary Public
within and for the State of New York, do
hereby certify:

        That LEENA VARUGHESE, the witness
whose deposition is hereinbefore set forth,
was previously duly sworn and that such
deposition is a true record of the testimony
given by the witness.

        I further certify that I am not
related to any of the parties to this action
by blood or marriage, and that I am in no way
interested in the outcome of this matter.

        IN WITNESS WHEREOF, I have hereunto
set my hand this 25th day of June, 2013.

_____
THOMAS R. NICHOLS

447

Varughese

1      Varughese
2      Did you e-mail Dr. Lento, Dr. Jordan
3  and Dr. Morency that you were going to be out on
4  August 11th?
5      A.    I probably did, yes.
6      Q.    And when you say you probably did, why
7  do you say you probably did?
8      A.    Well, I don't recall now, it was so
9  long ago.
10     Q.    Were you aware that the policy
11  required you to e-mail the individuals that
12  Dr. Jordan identifies in her e-mail?
13     A.    Well, yes, the policy that's in
14  defectus (phon) of 15, then some -- which she
15  attached here it seems.
16     Q.    There's an e-mail at the top of the
17  page dated five days later, August 16th at 1:54,
18  and that's an e-mail that you sent?  Is that
19  correct?
20     A.    Yes.
21     Q.    Why did you send this e-mail?
22     A.    Why did I send this e-mail?  Because I
23  was being harassed at work with this e-mail.  Even
24  though she claims that I hadn't informed X, Y and
25  Z people, which she thinks is Dr. Lento, herself

*Computer Reporting NYC Inc.*
*(212) 986-1344*

448

Varughese

1  and Morency, that's what this e-mail implies.  But
2  it seems that they have been informed nonetheless.
3  And it seems she's just sending this e-mail
4  because she doesn't have anything better to do
5  with her time or something along those lines or be
6  malicious towards me.
7
8      Because, I mean, this e-mail does not
9  really obtain any sort of meaningful purpose or
10  anything other than to intimidate me and further
11  marginalize me within the program by a junior
12  resident, Adrienne.  So I e-mailed the GME because
13  I was concerned about this behavior, being a
14  fourth-year resident to her third year.  And I
15  just let them know what was going on.
16      Because she refers to both program
17  directors.  According to the ACGME guidelines
18  we're only supposed to have one program director
19  that the residents are informed about and we know
20  who to go to regarding issues.  Now she is
21  referring to two program directors, which has been
22  sort of mentioned here and there.  The GME says
23  there are no two program directors, there's only
24  one.  Adrienne Jordan insists there are two
25  program directors, and so on and so forth.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

449

Varughese

1      Varughese
2      I mean, this program is in complete
3  disarray.  It's completely disorganized.  On top
4  of that they are going out of their way to harass
5  me with this nonsense even though everyone seem
6  informed about whether or not I'm there or not
7  that day.
8      And then so I sent this e-mail.  And I
9  just informed them what was going on.  Then I, you
10  know, stated what my understanding was for the
11  guidelines for a program, residency program in
12  pathology, and also I was concerned about
13  instituting new policies and I said, "How can I
14  access the department policy?"
15      What I meant by that was how can I
16  access the policy when changing policy within the
17  department, which I think I clarified to the GME
18  at some point as well.  Because there hasn't been
19  any oversight.  It just seems willy-nilly.  People
20  are changing policies.  One e-mail said you can do
21  this.  The next e-mail a few days later said
22  something else.  This has been going on since the
23  beginning of third year really, and a lot of it, I
24  don't know who was changing the policy.
25      Adrienne Jordan was sending these

*Computer Reporting NYC Inc.*
*(212) 986-1344*

450

Varughese

1      Varughese
2  e-mails out.  Nobody else was really sending those
3  e-mails out.  So it was just very concerning that
4  a third year or second-year resident at that time
5  and then a third-year resident would have such
6  freedom to do whatever she wanted.  It seemed
7  really really strange frankly.
8      Q.    In the e-mail, your e-mail, you say in
9  the third sentence: "Also, I and many of the
10  residents in the program are concerned regarding a
11  policy for instituting new policies --
12     A.    Right.
13     Q.    -- "in addition to those already
14  existing within the hospital and the department."
15     A.    Right.
16     Q.    What residents other than you were
17  concerned about policies?
18     A.    Well, I for a fact, this was in June
19  and July.  So I was working at the VA and I
20  believe Amanda Blevin was there and Paul Azar was
21  working with me for some time, and also my
22  colleagues, Jonathan Chow, and we were all deeply
23  disturbed by the newly instituted policies and
24  such.  And the junior residents also, Diane
25  Crewness, Mabel Ko.  I mean, we had some concerns.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

451

Varughese

1
2  We talked amongst each other and we thought this
3  was strange.
4      Q.   Did you get a response to your e-mail
   of August 16th?
6      A.   We did eventually, I did eventually
7  get a response, yes.
8      Q.   I will show you a document.
9          MR. McEVOY:  Let's mark this as
10     Exhibit 40.
11     A.   (Continuing) To note, also this e-mail
12  further, you know, reiterates my concern that I'm
13  not getting the minimum CP training time, which
14  whether or not whoever feels that's the case, that
15  wasn't the case.  I was not getting the minimum CP
16  time, clinical pathology training time.
17     Q.   What is the minimum CP time?
18     A.   It's minimum is 18, but it can be
19  more.
20     Q.   18 what?
21     A.   18 months and it can be more than 18
22  months with electives, and so on.  But that wasn't
23  an option that was offered to me at any point.  In
24  fact, beginning with my third year I constantly
25  had to struggle to make sure I was being educated

*Computer Reporting NYC Inc.*
*(212) 986-1344*

452

Varughese

1
2  in a similar fashion to my comparators, such as
3  Jordan and McCash.
4      Q.   How much CP time had you had by August
5  of 2011?  How many months?
6      A.   I believe it may have been nine and a
7  half months.
8      Q.   Did you know what the plan was or what
9  your schedule was going to be to have additional
10  CP training during the coming year?
11     A.   Yes, I did.
12     Q.   How much?
13     A.   Well, I was not satisfied with the
14  schedule.  I was not satisfied with the
15  assignments I was given, which were excess months
16  of microbiology at the VA and excess months of
17  Englewood Hospital, which wasn't technically
18  clinical pathology.  I mean, it just isn't.  It
19  wasn't clinical pathology.
20     Q.   Was it clinical pathology in the eyes
21  of the -- did the program consider it to be
22  clinical pathology?
23     A.   The program considered it as elective
24  time and one month of the two months that we spent there
25  required as for this elective that we spent there

*Computer Reporting NYC Inc.*
*(212) 986-1344*

453

Varughese

1
2  to be counted as clinical pathology, but not
3  beyond the one month.  I had already done one
4  month of clinical pathology elective at Englewood.
5  So that was done.
6      Q.   So I understand that you were unhappy
7  with your schedule, but with the schedule that you
8  were assigned at the end of your fourth year would
9  you have had 18 months of clinical pathology in
10  the view of the program?
11     A.   In the view of the program?  No.
12     Q.   And why do you say that?
13     A.   Because it did not meet the minimum
14  requirements.  Englewood is not clinical
15  pathology.  And to have excess months of
16  microbiology, which I have already completed at
17  the VA, and to have excess months of whatever else
18  that they assigned me at that time, which may have
19  been -- which I don't even recall anymore, but
20  they were not really in keeping with the
21  curriculum that was promised when I started this
22  residency program in 2008.
23     Q.   So if you look at this document, which
24  we'll mark Exhibit 40.  Let me know when you're
25  done.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

454

Varughese

1
2      (Defendants' Exhibit 40, e-mail dated
3      August 16, 2011, from Paul Johnson to Leena
4      Varughese, Bates Nos. D-1176 and 1177,
5      marked for identification, this date.)
6      Q.   Have you had a chance to look at it?
7      A.   Yes.
8      Q.   So this is an e-mail from Paul Johnson
9  to you with copies to several other individuals
10  dated August 16, 2011 at 7:28 p.m.
11          Did you get this e-mail,
12  Dr. Varughese?
13     A.   Yes.
14     Q.   In this e-mail Mr. Johnson says,
15  "Dr. Lento is the Program Director and Dr. Firpo
16  is the Director of Educational Activities.  Both
17  have responsibilities in overseeing residency
18  education."
19          Did that address your concern about
20  there being two program directors?
21     A.   No, not at all.
22     Q.   Why not?
23     A.   Because it doesn't explain what the
24  role of Dr. Firpo is.  It's a made up position,
25  Director of Educational Activities.  I never heard

*Computer Reporting NYC Inc.*
*(212) 986-1344*

455

Varughese

1  of anything before Dr. Firpo was hired for this
2  position. It did not exist before that as far as
3  I knew. It's simply made up by the institution.
4  **Q.** Who made it up?
5  **A.** I don't know. You have to ask them.
6  **Q.** And are you saying that Mount Sinai
7  can't create new positions?
8  **A.** Did I say that?
9  **Q.** Well, you said it was made up and
10  you'd never heard of it before.
11  **A.** I haven't, yes.
12  **Q.** So do you have any --
13  **A.** I defer that I am not going to answer
14  that question.
15  **Q.** Of course you're going to answer that
16  question?
17  **A.** No, I'm not. That's not what I am
18  saying. I'm saying they probably made it up.
19  That's my position. I have no opinion on whether
20  or not they can make a position or not. That's
21  not within my jurisdiction or my authority to say
22  or do. But I am of that opinion that they made it
23  up that year.
24  **Q.** When you say made it up, what do you

*Computer Reporting NYC Inc.*
*(212) 986-1344*

456

Varughese

1  mean by made it up?
2  **A.** That was a position that did not exist
3  before as far as I knew.
4  **Q.** Did you communicate with Mr. Johnson
5  in any way after you received his e-mail to get a
6  further clarification of the respective duties of
7  Dr. Lento as the program director and Dr. Firpo as
8  the director of educational activities?
9  **A.** Did I? I may have. I'm not sure at
10  this point. But clearly this e-mail does not
11  answer my concerns in any significant way. I
12  mean, it just says that Dr. Lento is program
13  director which we still figured he was. It
14  doesn't say that Dr. Firpo is not. I mean, that
15  would be an appropriate way of going about things.
16  Then it doesn't really address my
17  policy, I mean, my concern about policies being
18  changed by the department and the chief residents.
19  It doesn't go into that at all. Then it
20  doesn't -- then it says that if I was out sick
21  during a call assignment, then I had to bring in
22  proof, which wasn't the case either.
23  **Q.** What wasn't the case?
24  **A.** I wasn't out ill when I was on a call

*Computer Reporting NYC Inc.*
*(212) 986-1344*

457

Varughese

1  assignment.
2  **Q.** What's your definition of a call
3  assignment?
4  **A.** Call assignment is when you're
5  scheduled for anatomic pathology or clinical
6  pathology call and you don't -- they call you,
7  they page you and you don't come in to perform the
8  work.
9  **Q.** On August 11th you were still on the
10  cytogenetics rotation, correct?
11  **A.** Correct.
12  **Q.** And your calling in sick that day
13  prevented you from working in that rotation that
14  day, correct?
15  **A.** However do you mean?
16  **Q.** If you were sick and not at work you
17  weren't at work in the cytogenetics rotation,
18  correct? You weren't at the hospital that day.
19  **A.** Well, that's one way of looking at
20  things.
21  **Q.** Well, what's your way of looking at
22  things?
23  MR. WRONKO: Form objection. You can
24  answer.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

458

Varughese

1  **A.** My way of looking at things is that I
2  was ill and I could not make it to work.
3  **Q.** And the fact that you were ill and
4  couldn't make it to work, did that prevent you
5  from taking a call assignment?
6  **A.** No, it did not prevent me from taking
7  a call assignment.
8  **Q.** Why not?
9  **A.** I was not on call on August 2011.
10  **Q.** Then the e-mail talks about "Dr. Firpo
11  and Dr. Lento have been carefully monitoring all
12  residents' CP experience and are taking pains to
13  ensure that everyone receives the necessary 18
14  months."
15  Then it goes on to say that "Any
16  concerns about meeting this requirement or any
17  others should first be brought to the program
18  leadership for resolution. If the program has not
19  addressed your concerns, you can always bring them
20  to Scott," referring to Dr. Barnett I assume,
21  "Dr. Stimmel, or me, and we will work with you and
22  the program to find the best way forward."
23  After you received Mr. Johnson's
24  e-mail August 16th did you communicate in any way

*Computer Reporting NYC Inc.*
*(212) 986-1344*

475

Varughese

1
2 options in terms of changing my electives and such
3 because of the overt negativity and antagonism
4 that I was experiencing, and then I also
5 experienced a great deal of maliciousness from
6 Adrienne Jordan, and frankly my only option was to
7 speak to Dr. Firpo. I felt that was my only
8 option.
9    Q.   I understand that. But are you aware
10 of a procedure or a process that you were supposed
11 to follow to change an elective?
12    A.   Do you mean some futile procedure that
13 I am supposed to follow that doesn't yield any
14 results?
15    Q.   Whether it's futile or not, Dr.
16 Varughese, are you aware of a policy or procedure
17 that you're obliged to follow?
18       MR. WRONKO: Objection, form.
19    A.   Dr. Firpo eventually informed me that,
20 you know, on August 24th or so he sent this e-mail
21 and said that, you know, sent an e-mail to the
22 chief resident saying, well, we understand,
23 there's a policy now, and so on and so forth.
24       I thought since I had concerns about
25 meeting requirements and getting a similar

476

Varughese

1
2 training that would be on par with my peers, and
3 that would be acceptable to the American Board of
4 Pathology, not some arbitrary decision made by the
5 program director who clearly was not acting in my
6 best interest.
7       So I did do what I thought was the
8 best way to approach this problem, which was to
9 speak to Dr. Firpo, who apparently was the
10 Director of Educational Activities as confirmed by
11 Graduate Medical Education in Exhibit 40 here.
12    Q.   So had you elected GI pathology as one
13 of your rotations for your fourth year?
14    A.   Well, in January or February I had
15 indicated that would be an area that I should have
16 the same degree of training as my peers.
17 Therefore, I said I should do that. Not as an
18 elective, but just even as a rotation I should
19 have done that.
20    Q.   When you received your schedule for
21 your fourth year was GI pathology on your
22 schedule?
23    A.   Yes, it was.
24    Q.   And did there come a time when you
25 wanted to change from the GI pathology elective to

477

Varughese

1
2 dermatopathology.
3    A.   Yes, I wanted to change my elective to
4 dermatopathology.
5    Q.   When did you first communicate your
6 desire to make that change? You said you spoke to
7 Dr. Firpo. When did you first speak to Dr. Firpo
8 about that?
9    A.   August 17th and perhaps even
10 August 2nd. I believe I told him on August 2nd as
11 well that I would like to change my elective to
12 dermatopathology.
13    Q.   Where did you have that conversation
14 with Dr. Firpo?
15    A.   In his office.
16    Q.   Anybody else present?
17    A.   Shema Patel.
18    Q.   What did you say to Dr. Firpo, what
19 did he say to you during that meeting about your
20 wanting to change your elective from GI pathology
21 to dermatopathology?
22    A.   He said he's going to speak to the
23 appropriate supervisors for those rotations and to
24 follow up.
25    Q.   Do you know who the supervisors were

478

Varughese

1
2 that he was intending to talk to?
3    A.   Right, so eventually he stated that he
4 spoke to Dr. Berzhai, and then he was going to
5 speak to Dr. Harpaz.
6    Q.   Did he say anything else during this
7 meeting?
8    A.   Well, he indicated it shouldn't be
9 such a problem, and so on.
10    Q.   And what did you say?
11    A.   I said, Great. So I look forward to
12 having my schedule and assignments that I need to
13 complete my training.
14    Q.   And did Ms. Patel say anything during
15 the meeting?
16    A.   I don't recall what she said or may
17 not have said.
18    Q.   Did Dr. Firpo communicate with you
19 about your request to change your elective after
20 this meeting?
21    A.   Right. After August 17th I did not
22 hear from him at all. So I eventually called him
23 roundabout I guess, around, um, excuse me,
24 roundabout, around August 23rd, 24th, that time.
25 And I had a phone conversation with him regarding

459

Varughese

1
2 with either Dr. Lento, Dr. Firpo, Mr. Johnson,
3 Dr. Barnett or Dr. Stimmel about your concerns
4 about having a sufficient number of CP experience?
      A.   Yes, I communicated to Dr. Firpo.
6     Q.   Any of the others or just Dr. Firpo?
7     A.   Well, I communicated to Dr. Firpo
8 because I was told Dr. Lento was not technically
9 allowed to interact with me.
10    Q.   So when did you speak to Dr. Firpo
11 that about your concerns about the CP experience?
12    A.   About the CP?  I spoke to him the next
13 day, August 17th.
14    Q.   Where did that meeting take place?
15    A.   In Dr. Firpo's office.
16    Q.   Anybody else present?
17    A.   Shema Patel.
18    Q.   Tell me what you said and what
19 Dr. Firpo said and what Ms. Patel said at this
20 meeting.
21    A.   Well, I just brought up my concern
22 about me not meeting 18 months and what
23 specifically were my concerns about that in terms
24 of the breakdown of the CP clinical pathology
25 rotations that I was assigned and what I would

*Computer Reporting NYC Inc.*
*(212) 986-1344*

460

Varughese

1
2 like to see be addressed and changed in order for
3 me to be satisfied with my clinical pathology
4 training at Mount Sinai Medical Center.
5     Q.   And what changes did you want to make?
6     A.   Well, I would have liked some
7 additional months of hematology and less months of
8 microbiology at the VA.
9     Q.   What did Dr. Firpo say?
10    A.   Dr. Firpo said he has to look at the
11 schedule again.  I'm bringing up a serious
12 concern.  He has to look at the schedule.  He has
13 to talk to Dr. Lento, but he has been told that my
14 training requirements were being met.  He said
15 that's what he was informed at some point.
16    Q.   Anything else discussed at this
17 meeting?
18    A.   Yes.  We went over some of those
19 things yesterday.
20    Q.   Oh, that was the meeting you talked
21 about yesterday.
22    A.   Yes.
23    Q.   Was your schedule changed?
24    A.   Was my schedule changed?  No, it was
25 not changed.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

461

Varughese

1
2     Q.   So the concerns that you raised about
3 wanting more hematology and less microbiology,
4 were the schedules changed in any way to
5 accommodate your concerns?
6     A.   No, the schedule was not changed in
7 any way to accommodate my request.
8     Q.   Dr. Varughese, I think you were
9 telling me why it is that you thought this e-mail
10 did not address the concerns you raised in your
11 August 16th e-mail and I wanted to be sure that
12 you had finished telling me what you wanted to
13 about your reaction to Mr. Johnson's e-mail.
14    A.   Correct, I had went to an authority
15 figure within the institution outside of the
16 department at this point, and that's technically
17 the course of action that we are supposed to take
18 according to the ACGME guidelines even.  You go to
19 the program director and then you have to go to
20 someone within the institution before you take any
21 further action.
22    Q.   And who had you gone to?
23    A.   Well, I e-mailed Mr. Paul Johnson and
24 Dr. Barnett.  So I would imagine if they would be
25 able to address this issue without me having to

*Computer Reporting NYC Inc.*
*(212) 986-1344*

462

Varughese

1
2 return to Dr. Firpo or Lento or whoever else.
3     Q.   When Mr. Johnson says in this e-mail
4 that "Dr. Firpo is the Director of Educational
5 Activities," you said a few minutes ago it doesn't
6 say that he's not the program director.
7          After you got this e-mail were you
8 still uncertain about whether Dr. Firpo was or
9 wasn't a program director?
10    A.   Frankly, I was certain that he wasn't
11 the program director, because according to the
12 guidelines there can be only one program director
13 that oversees the residency program.  Particularly
14 residency programs such as pathology, there can
15 only be one.
16          And Dr. Firpo being the director of
17 educational activities I wasn't sure what his
18 responsibilities were.  As far as I knew I was the
19 only person who was meeting with him and having to
20 confer with him on a biweekly basis, and so on.
21    Q.   Now, on August 12, 2011, did
22 Dr. Jordan ask you to cover for Dr. Blau?
23    A.   August what?
24    Q.   12, 2011.
25    A.   Right, I believe she sent me e-mail

*Computer Reporting NYC Inc.*
*(212) 986-1344*

463

Varughese

1  that day, the night before, the evening before
2  asking me to -- telling me to cover it.
3      Q.   I'm sorry, Dr. Varughese, so
4  Dr. Jordan e-mailed you to tell you that she
5  wanted you to cover for Dr. Blau?
6      A.   Correct.
7      Q.   And when did she do that?
8      A.   The evening prior to August 12th.  So
9  that would be August 11th.
10     Q.   And did you respond to that e-mail?
11     A.   Yes.  Oh, no, I did not respond to
12 that e-mail.  It just said "please cover."  So I
13 just assumed that I was going to cover for
14 Dr. Blau.
15     Q.   Did you receive any additional
16 communications or further e-mails from Dr. Jordan
17 regarding covering for Dr. Blau on August 12th?
18     A.   Not on August 12th.  I'm sorry, on
19 August 12th I did receive some e-mails in the
20 afternoon at some point.
21     Q.   Did you respond to those e-mails?
22     A.   I am not sure.
23     Q.   I will show you a document.
24          MR. McEVOY:  Mark this as Exhibit 41.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

464

Varughese

1          (Defendants' Exhibit 41, e-mail string
2          dated August 12, 2011, Bates Nos. D-908
3          through 910, marked for identification, this
4          date.)
5      Q.   Have you had a chance to look at it?
6      A.   Yes.
7      Q.   The first e-mail in the string, the
8  earliest e-mail in the string, is to you and a
9  number of others from Dr. Jordan dated August 12,
10 2011 at 8:50 a.m., and a portion of the e-mail is
11 addressed to you and asks you to cover for
12 Dr. Blau on the surgical service that day; is that
13 correct?
14     A.   Yes.  So she was on surgical service,
15 yes.
16     Q.   Is this the first e-mail that you
17 received from Dr. Jordan asking you to cover?
18     A.   Right, this is the e-mail I received,
19 yes.
20     Q.   And you said you didn't respond to it.
21 Then there's another e-mail from Dr. Jordan on the
22 same day at 10:31 a.m., an hour and 40 minutes
23 later.  It says:  "Leena, it is 10:30am.  Please
24 verify that you are in receipt of this e-mail so

*Computer Reporting NYC Inc.*
*(212) 986-1344*

465

Varughese

1  that I know coverage is taken care of and I can
2  focus on my own rotation as well as let the rest
3  of the surgical team know."
4      Q.   Did you respond to this e-mail?
5      A.   No.
6      Q.   Why not?
7      A.   Well, I was in this midst of my own
8  duties and I simply could not respond to her
9  e-mail at that time.
10     Q.   Did you ever respond to it?
11     A.   Did I ever?  Well, I was being
12 bombarded by pages, phone calls, various other
13 duty responsibilities, and so on.  I did not have
14 the time to respond to her that day.
15     Q.   Did --
16     A.   I mean, I'm a doctor in my own right
17 as is Dr. Jordan.  She wants to focus on her own
18 rotation and whatever, whatever, and she's in
19 Pennsylvania somewhere, OK, great.  But you know
20 what?  I have work to do too.  It is simply
21 impossible for me to deal with this kind of
22 harassment every single day.  When I arrive at
23 work this is what I have to deal with.
24     Q.   I want to be sure I understand.  So

*Computer Reporting NYC Inc.*
*(212) 986-1344*

466

Varughese

1  you think that Dr. Jordan asking you to confirm
2  that you're going to cover for an absent resident
3  is harassment.
4          MR. WRONKO:  Form objection.
5      A.   In this manner, yes.  Constant
6  bombardment of e-mails, and so on.  I mean, what
7  is she really going to do even if -- first of all,
8  there's a chief resident who gets paid in excess
9  of three grand every year to simply be chief
10 resident.  What are her duties?  Simply making
11 administrative, you know, e-mailing a few things
12 here and there.  Instead, I have this new, you
13 know, responsibilities added to her.  She is
14 giving us verbal warnings and -- it's outrageous.
15 It's -- it's -- I'm at a loss of words to describe
16 this.  It's outrageous.  It's a travesty.
17     Q.   Did Dr. Lento attempt to page you on
18 the morning of August 12th?
19     A.   Yes, and I returned his page.
20     Q.   Did you also speak to him by phone?
21     A.   I did.
22     Q.   Do you see the next e-mail in the
23 chain which is dated August 12, 11:33?  It says:
24 "I spoke to Dr. Najfeld who said Leena is there

*Computer Reporting NYC Inc.*
*(212) 986-1344*

467

Varughese

1  and would be released at noon.  I tried paging
2  Leena to confirm with her that she was to help
3  cover on surgicals today since Sarah was out sick,
4  but she has not returned my page yet."
6      So did you not return Dr. Lento's
7  page?
8      A.    Clearly I had already spoken to him.
9  I have no idea what he's speaking about.  He's
10  once again exaggerating beyond belief.  Like I
11  spoke to him already.  He confirms that I had
12  spoken to him.  Now he is saying that I haven't
13  returned his page yet?  It doesn't make any sense
14  on its face, come on.
15      Q.    Well, if Dr. Lento paged you and you
16  didn't respond to his page and then he called the
17  cytogenetics lab because he knew you were there
18  and spoke to you by phone --
19      A.    Right, because he know I was doing
20  my work.
21      MR. WRONKO:  Hold on.  Let him finish
22  his question.
23      Q.    -- and he spoke to you by phone, then
24  he called you because you didn't respond to his
25  page, right?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

468

Varughese

1
2      A.    No, I responded to his page.  He
3  probably did not pick up his phone and then he
4  found me in cytogenetics and I spoke to him.  And
5  he was on the phone with Dr. Najfeld.  When I
6  arrived there she said, I'm on the phone with
7  Dr. Lento.  I said, OK, I'll give you a minute to
8  finish up your conversation and then we'll
9  continue.
10      It's not my fault he was otherwise
11  occupied on his phone line.  There's no way he
12  could have received my call even if I -- even when
13  I did call him.
14      And this e-mail is ridiculous.  "I
15  tried paging Leena to confirm"?  And then she
16  said, um, she said, well, "to help cover on
17  surgicals today."  But then he says that I haven't
18  returned his page.  Come on.  It's farcical at
19  best.
20      Q.    Do you know why --
21      A.    Ridiculous.
22      Q.    Are you done?
23      A.    It's ridiculous.
24      Q.    Are you done?
25      Do you know why Dr. Lento was calling

*Computer Reporting NYC Inc.*
*(212) 986-1344*

469

Varughese

1
2  Dr. Najfeld?  You said when you walked in they
3  were on the phone.  Do you know why he called him?
4      A.    Well, it seemed like the
5  administration was intent on my, you know, intent
6  on, you know, creating a story having some context
7  for pretextual termination at some point and they
8  were frankly harassing my supervisors.  Like I
9  already mentioned yesterday, and I'm going to
10  mention it again, this has been going on for some
11  time and this was more of the same.
12      Q.    When you spoke to Dr. Lento on the
13  morning of August 12th did Dr. Lento tell you to
14  call Dr. Jordan to let her know that you were
15  going to cover surgicals?
16      A.    I don't recall.
17      Q.    Did you call Dr. Jordan?
18      A.    No.
19      Q.    Dr. Varughese, how are elective
20  rotations -- I'll put it this way.  How do you go
21  about selecting your electives?  What's the
22  process?
23      A.    Selecting the electives?
24      Q.    An elective rotation.
25      A.    Well, that process has changed over

*Computer Reporting NYC Inc.*
*(212) 986-1344*

470

Varughese

1
2  the past three, four years I was there.  The
3  process has changed --
4      Q.    So you know what time frame we're
5  talking about, in the beginning of your fourth
6  year.  So in that August 2011 period going
7  forward.  So it would have been your PGY-4 year.
8  How were elective rotations selected?
9      A.    Well, I don't know what happened in my
10  PGY-4 year as to elective selection at that time,
11  but what I do recall was one e-mail from Dr. Lento
12  saying that we have to confirm that we still want
13  to be on that particular elective rotation within
14  a 60-day period, otherwise we're going to lose the
15  elective time.
16      I mean, I don't know.  It was all
17  sorts of ridiculousness.  The entire program was
18  chaotic and disorganized.  It was being run by a
19  second year and Dr. Lento it seems like along with
20  Dr. McCash.  It was --
21      Q.    Dr. Varughese --
22      A.    It was purely --
23      Q.    Here's the problem.  Let me tell you
24  what the problem is.  The problem is, trust me, I
25  understand how you feel about this.  You've told

*Computer Reporting NYC Inc.*
*(212) 986-1344*

471

Varughese

1     me this repeatedly now. I'm not asking you what
2     you think about whether the program was chaotic or
3     run by a second year or whether it was ridiculous,
4     absurd, chaotic, farcical, all the words you've
5     used. Trust me, I got it.
6          What I'm really trying to ask you, and
7     it will go faster for all of us, is not how you
8     feel, but what happened. So my question to you
9     is, did you select an elective rotation at the
10    beginning of your fourth year or for your fourth
11    year?
12        A.    Well, I did submit a form stating the
13    particular elective rotations that I would be
14    interested in. This included in no particular
15    order a variety of subject matter.
16        Q.    Do you remember what the electives
17    were that you selected?
18        A.    Right, I indicated an interest or a
19    potential elective in soft tissue, bone and soft
20    tissue pathology, hemepath cytology and perhaps
21    even GI.
22        Q.    And I assume your co-residents also
23    submitted their selections for their electives,
24    correct?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

472

Varughese

1     A.    Well, I mean, I'm not completely a
2     hundred percent sure about my elective choices at
3     that time, which was in I believe sometime in
4     January or February of my third year, which is
5     halfway into the third year of the residency.
6          So I selected a few things that I
7     thought would be interesting for me to, you know,
8     explore further and I was only given an option of
9     doing one elective, allegedly an elective, which
10    was GI, which in my opinion was never an elective
11    as far as I knew, because all my colleagues had
12    GI, gastrointestinal pathology rotations, the year
13    prior and I was not offered that. I was not
14    offered the elective to be on GI rotation during
15    my third year.
16        Q.    Does there come a point in time when
17    the schedule for, everybody's schedule is
18    finalized?
19        A.    · Not -- in my opinion it does not get
20    completely finalized because there are issues that
21    arise and people have to be rescheduled.
22        Q.    I understand that changes may be made,
23    but is there a point in time, Dr. Varughese, when
24    you get your schedule for PGY-4 year? "Here's

*Computer Reporting NYC Inc.*
*(212) 986-1344*

473

Varughese

1     your schedule for the final year."
2          A.    Right, I received my, quote unquote,
3     final schedule numerous times during my third year
4     and my fourth year.
5          Q.    Do other residents get their schedule
6     at some point during either the last part of their
7     PGY-3 year, the beginning of their PGY-4 year?
8          A.    Well, the schedule is sent to everyone
9     at the same time, or at least that's my
10    understanding.
11        Q.    Is it also your understanding that you
12    can request changes to your elective rotations
13    before the schedule is final, but that after the
14    schedule is final changes are not permitted absent
15    extenuating circumstances?
16        A.    Frankly --
17        MR. WRONKO: Form objection. You can
18    answer.
19        A.    -- that is not completely true.
20    Because the schedule is allegedly finalized
21    numerous times and people's schedules are changed.
22        Q.    So then what is your understanding of
23    the circumstances under which a resident, you, can
24    change an elective, can decide to change from one

*Computer Reporting NYC Inc.*
*(212) 986-1344*

474

Varughese

1     elective to another elective? How does that work?
2     What's your understanding of that?
3          A.    Well, my understanding is that by
4     default the elective would not be offered if we
5     did not confirm that we wanted that elective
6     according to Dr. Lento's e-mail. So that was
7     understanding.
8          So in all fairness, perhaps my
9     elective should have been removed as is because I
10    never confirmed that I was going to be on this
11    elective. It appeared as though this choice was
12    up to the resident to decide whether or not they
13    still wanted the elective.
14        Q.    So I don't think you answered my
15    question. If you have elected a rotation, what's
16    the process by which you can go about changing
17    that elective? I don't think it's any more
18    complicated than I elected this rotation, now I've
19    changed my mind and I want that rotation. How do
20    you do that? What is the process you have to
21    follow to get that change?
22        MR. WRONKO: Form objection. You can
23    answer.
24        A.    Well, I mean, I did not have many

*Computer Reporting NYC Inc.*
*(212) 986-1344*

479

Varughese

1
2 what he was doing to accommodate my request.
3     Q.    What did he say?
4     A.    He essentially said that he still has
5 not spoken to the appropriate personnel and he is
6 not going to or he will eventually. He wasn't
7 very clear and he seemed very -- seemed to be
8 sidestepping as much as possible this issue that I
9 had brought forward. If for no reason other than
10 to just, you know, be malicious towards me.
11    Q.    And did Dr. Firpo get back to you at
12 some point to let you know whether your request
13 had been granted or denied?
14    A.    Right. So after that day he sent me
15 an e-mail, you know, that was cc'd. The chief
16 residents were cc'd on it. And then after that I
17 didn't hear from him. But I did speak to
18 Dr. Harpaz at that time.
19          I was on call I believe on August 24th
20 and I spoke to Dr. Harpaz very briefly about
21 possibly changing my schedule so that I'm not on
22 his rotation. He seemed OK with it. He didn't
23 seem to think it was a big issue because he had
24 said that he already thought that I had done GI
25 rotation and he wasn't particularly concerned that

*Computer Reporting NYC Inc.*
*(212) 986-1344*

480

Varughese

1
2 I didn't have training in that area or not.
3          And at this time, you know, this is
4 like six, seven months later since the initial
5 elective request, I did obtain a decent amount of
6 exposure to GI, gastrointestinal pathology, at
7 that time through various lectures, meetings and
8 conferences, as well as my own experience at the
9 Bronx VA and Elmhurst Medical Center.
10         So I felt it was OK for me to get out
11 of this, you know, not be on gastrointestinal
12 pathology as an elective, and Dr. Harpaz didn't
13 seem to mind. He said it should not be a problem
14 as long as there is enough adequate personnel.
15    Q.    Let me show you a document.
16    MR. McEVOY: Mark this as Exhibit 42.
17         (Defendants' Exhibit 42, e-mail string
18         dated September 7, 2011, Bates Nos. D-1172
19         through 1174, marked for identification,
20         this date.)
21    Q.    So Dr. Varughese, this is an e-mail
22 string consisting of two e-mails. There's an
23 e-mail from Dr. Firpo to you dated September 7,
24 2011 at 12:07 p.m., and among other things, it
25 says in number 3: "I must also inform you that

*Computer Reporting NYC Inc.*
*(212) 986-1344*

481

Varughese

1
2 your request for dropping off the elective GI
3 rotation with Dr. Harpaz was denied. You will
4 report to begin that rotation as scheduled."
5          And then there's an e-mail from you,
6 the same day, about an hour and 45 minutes later
7 at 1:46 p.m., that responds to Dr. Firpo's e-mail.
8          When you received the e-mail from
9 Dr. Firpo dated September 7th it said your request
10 to drop the GI rotation was denied. Was this the
11 first time that Dr. Firpo had told you that the
12 request was denied?
13    A.    Yes.
14    Q.    And had you spoken to Dr. Harpaz prior
15 to September 7th?
16    A.    Yes, I had spoken to him at least once
17 regarding the rotation that I am scheduled for.
18    Q.    In any of your communications with
19 Dr. Firpo prior to September 7th, before
20 September 7th, did you tell him that you had
21 arranged for another resident to cover the GI
22 pathology rotation?
23    A.    I believe I did not say that to him at
24 all, no.
25    Q.    Did you try to find a resident who

*Computer Reporting NYC Inc.*
*(212) 986-1344*

482

Varughese

1
2 would do the GI pathology rotation?
3    A.    Right. So I spoke to the fellow who
4 was the GI pathology fellow at that time and I
5 spoke to her regarding, you know, my interest in
6 dropping the GI rotation or even staying on but
7 being able to attend to some of the educational
8 needs that I had. And we discussed this for a
9 while and she thought that it should not be a
10 problem, because she said that she was going to be
11 on the GI rotation that month and it should not be
12 an issue.
13         So if you want to drop it, it should
14 not be a problem, because we do have some medical
15 students and residents and herself who was going
16 to be there, and she said, you know, I should not
17 concern myself with finding coverage, and so on.
18         And she also said if I needed to go to
19 the Osler review course in Tampa for a week or so
20 it should not be a problem as well, because she
21 was going to be there and she didn't foresee any
22 issues.
23         As far as she could tell, she didn't
24 foresee any issues and I find that interesting
25 because she was a former chief resident. We're

*Computer Reporting NYC Inc.*
*(212) 986-1344*

483

Varughese

1  talking about Yvelisse Suarez.  She was a chief
2  resident for a year.  I mean, she clearly knows
3  what she's talking about.
4      Q.    You said you had spoke to "her" and
5  "she" a number of times.  Who are you referring
6  to?
7      A.    Yvelisse Suarez.
8      Q.    Did you ever talk to Dr. Mabel Ko
9  about covering the GI pathology rotation?
10     A.    Well, that is an interesting question,
11  because Dr. Firpo e-mailed some accusatory e-mail
12  saying that she had agreed to something, and so
13  on, which was just shocking to me, but I did
14  speak to Mabel at a resident meeting.  There were,
15  you know, I don't know how many people were there
16  at that meeting, perhaps about ten of us.
17          And Mabel -- my schedule indicated
18  that I was on GI elective or rotation period two
19  or something along those lines.  And at that time
20  I indicated, Well, I don't want to do GI elective.
21  Is it a possibility that I can drop this elective
22  at this point?  That was sometime in May 2011.
23          And Mabel volunteered and said, Well,
24  I would like GI elective.  What I didn't realize

484

Varughese

1  was that she was actually on GI elective already
2  for that year, but she was assigned a few months
3  later.  What she wanted was to jump into my slot
4  that I had already elected, I had already chosen.
5  So what they did was essentially to put Mabel into
6  my slot and put me into Mabel's GI slot.
7          So that's basically what happened and
8  it can be proven through the schedule changes.
9  Easily proven.
10     Q.    After you received the e-mail from
11  Dr. Firpo on September 7th that denied your
12  request to drop the GI rotation and then you
13  e-mailed him back, did you have any further
14  meetings, discussion s, communications with
15  Dr. Firpo about the elective rotation issue?
16     A.    After August 24th and then --
17     Q.    No, after the September 7th meeting.
18     A.    After September 7th?
19     Q.    Yes.
20     A.    Did I have any further communications?
21  Yes, I did speak to him.
22     Q.    When did you speak to him?
23     A.    I spoke to him I believe like an hour
24  or so after I received this e-mail.

485

Varughese

1      Q.    So on September 7th.
2      A.    Correct.
3      Q.    And where did you speak to Dr. Firpo?
4      A.    I spoke to him in his office.
5      Q.    Did you go to his office?
6      A.    Right.
7      Q.    And did you meet with Dr. Firpo?
8      A.    Yes.
9      Q.    Was anybody present other than you and
10  Dr. Firpo?
11     A.    No.
12     Q.    Tell me what happened at this meeting.
13  What did you say to him, what did he say to you in
14  particular about the elective rotation issue?
15     A.    I just asked him why, you know, like
16  why he was informing me at this late date
17  regarding not dropping the elective rotation
18  and/or, you know, not allowing me to switch out of
19  this rotation even though Dr. Harpaz indicated it
20  shouldn't be a problem.  I had spoken to Yvelisse
21  Suarez.
22          And then I went on to talk about, you
23  know, the very other issues that were addressed
24  here, hemepath, and what my responsibilities were

486

Varughese

1  and what I was doing and how I was working with
2  Dr. Petersen who I've already worked with and who
3  was also my advisor.  So, I mean, we discussed a
4  variety of things.
5      Q.    What did Dr. Firpo say?
6      A.    Dr. Firpo said, Well, OK.  I don't
7  know, he didn't say -- he said a few things.  What
8  did he say?  He said, Oh, this is what they want
9  to do.  I talked with Dr. Harpaz.  He accused me
10  of going above him and contacting Dr. Harpaz right
11  away.  He indicated that I'm not allowed to speak
12  to my mentors or my supervisors, potential
13  supervisors without consulting him first.
14          It was outrageous and unprofessional,
15  just more of the same.
16     Q.    Let's take a step back.  Did you tell
17  Dr. Firpo at this meeting that even though the
18  request had been denied that you intended to
19  contact other residents directly to see if someone
20  else was willing to take your place in the GI
21  elective?
22     A.    No.  I said, you know, normally if
23  there is somebody who is interested in doing the
24  GI elective and they would like to switch in,

487

Varughese

1  that's a possibility to accommodate my request.
2  So that I can do derm path, which I was interested
3  in, or something else like hematology or clinical
4  pathology rotation that I was interested in.
5      Q.   But did you tell Dr. Firpo that you
6  intended even after you had received his e-mail to
7  go and talk to residents to get them to --
8      A.   No, I didn't want to do that. And I
9  simply told him that's a possibility that can be,
10 that's an approach to see if anybody else was
11 interested. But he -- I didn't say that I was
12 going to do that, no.
13     Q.   Did Dr. Firpo tell you it would be
14 inappropriate to do that because your request had
15 already been denied?
16     A.   No. That wasn't -- I did not say that
17 I would do that. So if he had said that, I don't
18 know. He was making some assumptions. That's
19 not....
20     Q.   Did you tell Dr. Firpo that it's your
21 right to seek a change in your schedule?
22     A.   Was it my right?
23     Q.   Yes.
24     A.   Well, I can seek a change in my

*Computer Reporting NYC Inc.*
*(212) 986-1344*

488

Varughese

1  schedule, yes.
2      Q.   But I take it, Dr. Varughese, that you
3  were not permitted to change your elective.
4      A.   Well, this went on to become sort of
5  like yes, you're allowed to change if you can get
6  a certain individual to agree and you may have
7  hematology perhaps. Yes, this has evolved into
8  something else at that point. But that's -- it
9  wasn't a, you know, eventually it came out that I
10 may be allowed to change my schedule.
11     Q.   You say eventually it came out that
12 you might be allowed to change your schedule. How
13 did it eventually come out?
14     A.   Well, it was that I was told to e-mail
15 or approach certain residents or what not.
16     Q.   Who told you that?
17     A.   Adrienne Jordan.
18     Q.   Was this before or after you spoke to
19 Dr. Firpo on September 7th?
20     A.   Yes, after I spoke to Firpo.
21     Q.   Did Dr. Jordan know that your request
22 had been denied?
23     A.   I'm not sure --
24     MR. WRONKO: Form objection.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

489

Varughese

1      A.   -- what she is informed of or not
2  informed of.
3      Q.   Did Dr. Jordan in your view, not in
4  your view, but did Dr. Jordan have the authority
5  to override a decision made by Dr. Firpo regarding
6  your elective?
7      MR. WRONKO: Form objection. You can
8  answer.
9      A.   No, she did not have that authority.
10 I mean, technically chief residents should not
11 have that authority at all to make decisions about
12 another resident's education. It should be left
13 to the discretion of the program director and --
14 not left to the discretion, but it should be
15 determined by the resident who is in training and
16 the residency program.
17     Q.   After you spoke to Dr. Firpo in his
18 office on September 7th about your request to drop
19 the GI elective, did you have any further
20 discussions with Dr. Firpo about that request?
21     A.   Not after August 7th --
22     Q.   September 7th.
23     A.   September 7th, no, I did not speak to
24 him any further.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

490

Varughese

1      Q.   Did you have any further conversations
2  with Dr. Harpaz?
3      A.   No.
4      Q.   With anybody in the GME office?
5      A.   No. I said, well, if I have to do a
6  GI elective, GI as a rotation it's not the end of
7  the world. I'll do it. I mean, I had my concerns
8  about it, but, you know, if the program needed me
9  to cover for a particular month for a rotation, I
10 was open to doing it even though it wasn't what I
11 was interested in.
12     Q.   Dr. Varughese, is there a policy
13 regarding poor conference attendance?
14     A.   Yes, there was a policy instituted
15 regarding poor attendance, conference attendance.
16     Q.   What was the conference attendance
17 requirement?
18     A.   Conference attendance requirements had
19 changed over the years significantly.
20     Q.   We're talking now about your PGY-4
21 year.
22     A.   PGY-4 year I believe it was a google
23 of 80 percent attendance required.
24     Q.   What conferences counted towards the

*Computer Reporting NYC Inc.*
*(212) 986-1344*

515

Varughese

1  between your e-mail of September 13th at 9:41 in
2  the morning and the next day when the presentation
3  was due to prepare it?
4        MR. WRONKO: Form objection. You can
5  answer.
6     A.   Well, I mean, it shouldn't be that
7  complicated, but probably not. I probably did not
8  have enough time. But, I mean, I was willing to
9  make the effort.
10    Q.   Dr. Varughese, if you go back to the
11 document that I think is Exhibit 44, and we had
12 looked at the e-mail that you sent offering to do
13 the hodgepodge of the lectures that you missed,
14 the next e-mail in this string is an e-mail from
15 Dr. Firpo to you, also dated September 13th at
16 9:56 a.m., fifteen minutes after your e-mail.
17       And in that e-mail he addressed to you
18 he says: "You are welcome to attend as many
19 conferences as you want and are able to
20 attend without interference to your
21 responsibilities on each rotation. However, the
22 requirement for attendance to all core pathology
23 lectures stands. Please do as other residents
24 have done and comply with this request one and for

*Computer Reporting NYC Inc.*
*(212) 986-1344*

517

Varughese

1  little, I mean, it just kind of shows how
2  unprofessional Dr. Firpo is. Because here I am
3  trying to work with everybody just to appease him
4  even though it's an allegation that I did not
5  attend the conferences, no evidence that has not
6  been substantiated in any way, and I'm trying to
7  comply here and here I go, I get yet another
8  e-mail citing me and just antagonizing. It's
9  extremely malicious. Cordon-Cardo is cc'd on
10 this.
11       For all intents and purposes,
12 Elizabeth Morency and Adrienne Jordan are my
13 coworkers and peers. They're not my supervisors
14 and/or, you know, they're on the same level as I
15 am pretty much. In fact, Adrienne Jordan is a
16 year below me. I mean, this just seems very
17 unprofessional and intimidating.
18    Q.   And then the next e-mail in this
19 string is an e-mail I believe from you.
20    A.   Oh, one more thing. It says here
21 "comply with this request one and for all." I
22 don't even know what that is implying or trying to
23 allege. I don't -- I don't know. It's very
24 disturbing.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

516

Varughese

1  all."
2       Did you get that e-mail?
3     A.   Yes.
4     Q.   What was you reaction to this e-mail?
5     A.   Well, my reaction now. I don't know
6  what my reaction was at that time.
7     Q.   So you don't recall your reaction at
8  the time you got it.
9     A.   No.
10    Q.   So what's your reaction to it as you
11 sit here today?
12    A.   Well, it's just -- I'd rather not
13 comment on that actually.
14    Q.   You don't get to make that choice. So
15 what's your reaction to that e-mail as you sit
16 here today?
17    A.   I take the Fifth on that.
18       MR. WRONKO: You can't take the Fifth
19 Amendment. You have to respond to the
20 question.
21    Q.   No one is going to prosecute you for a
22 crime. So that's the only way you get to take the
23 Fifth. So what's your reaction to this e-mail?
24    A.   My reaction right now, I'm just a

*Computer Reporting NYC Inc.*
*(212) 986-1344*

518

Varughese

1     Q.   And you send an e-mail to Dr. Firpo
2  and a number of other folks at 11:44 a.m., a
3  little less than two hours later, which says: "I
4  don't feel well. I won't be able to present
5  tomorrow. As you well know, I am not qualified to
6  give any real core lectures as such because I am a
7  resident in training. What happened to the
8  cytology lecture that should be scheduled for
9  tomorrow?"
10       So let's take this in pieces. So what
11 happened between 9:56 and 11:44 that made you
12 unable to present the lecture? What happened to
13 you?
14    A.   First of all, I had to prepare this
15 lecture.
16    Q.   You said you don't feel well, so
17 that's what I want to know about.
18    A.   I wasn't feeling well. I was out that
19 day. I get this e-mail, you know, going on about
20 how I have to present or else.
21       I mean, I was basically afraid of what
22 they were alleging, you know, on and on. And I
23 just said that I couldn't present the lecture
24 tomorrow, so....

*Computer Reporting NYC Inc.*
*(212) 986-1344*

519

Varughese

Q.   So when you said you didn't feel well, is that what you meant, what you just said, you were afraid to go and present the lecture?

A.   No, that's not, I mean, I wasn't feeling well. That's a different story, but....

Q.   Then it says: "As you well know, I'm not qualified to give any real core lectures as such because I am a resident in training."

What did you mean by that?

A.   What did I mean by that? I don't know. I mean, it just means that I'm not an attending pathologist at this point. I'm basically learning along with everybody else and I -- I don't know, I think that's essentially what I was trying to·convey.

Q.   And then it says: "What happened to the cytology lecture that should be scheduled for tomorrow?"

A.   Correct.

Q.   What cytology lecture are you referring to?

A.   Usually it's Wednesday mornings that are scheduled for cytology conferences, which are cytology didactic lectures that are usually

*Computer Reporting NYC Inc.*
*(212) 986-1344*

520

Varughese

presented by the cytology fellow. I mean, I don't know why that was being ignored and a lecture wasn't scheduled at that time.

Q.   Did you come to work on September 14th?

A.   13th, 14th, no, I didn't.

Q.   The next e-mail in this string is from Dr. Jordan to you, Dr. Peterson, Dr. Firpo, Ms. Carter, Dr. Morency at 2:02 on the afternoon of September 13th, which says simply: "Leena will be out sick tomorrow. Please see her e-mail below."

A.   Right.

Q.   That then results or that e-mail results in your sending an e-mail to Dr. Jordan that evening at 8:56 and Dr. Jordan responding to your e-mail about an hour and a half or so later.

Why did you respond to Dr. Jordan's e-mail? Why did you say what you said? Rather than go through this line by line, just tell me, Dr. Varughese, how you reacted to Dr. Jordan's e-mail and why you sent the e-mail you sent.

MR. WRONKO: Form objection. You can answer.

A.   Why did I -- first of all, I never

*Computer Reporting NYC Inc.*
*(212) 986-1344*

521

Varughese

said I was going to be out sick tomorrow. I mean, this is Tuesday, September 13th at 2:02 p.m. I never claimed I wasn't going to come to work. I said I don't feel like I should do this conference. I'm just expressing that I don't feel well. I don't know if I'm going to be able to do this presentation for tomorrow. I mean, that's really all I'm saying here. I didn't say I was going to be out sick tomorrow.

Adrienne Jordan goes out of her way to make this decision for me and says that I'm going to be out sick the next day. Based on what? I'm not sure. She has her own imaginings about what I'm saying and she tends to make these decisions. I don't know if she's making the decisions or Dr. Lento is. I'm not sure.

But the fact of the matter is, I didn't call out sick. But she states that I'm calling out sick and she writes to the program coordinator Allene Carter stating as such.

Q.   So in response to that you send an e-mail and in that e-mail you say, after you say, Why are you stating I will be calling out tomorrow? Two, you weren't here for period 2,

*Computer Reporting NYC Inc.*
*(212) 986-1344*

522

Varughese

which means as the chief resident in service you were not available to the residents who may need you for any reason."

And I take it this is the time that Dr. Jordan was on the away rotation?

A.   Correct, she was in Pennsylvania somewhere without a working pager or cell phone or e-mail, and so on, for a month.

Q.   When you say that because you weren't here as the chief resident "you were not available to the residents who may need you for any reason," was that because she didn't have a pager or working cell phone?

A.   Correct, I mean, she wasn't also on site. Coverage for absent residents, and so on, it is sort of the duty of the chief resident to step in and cover.

Frankly, if I was given chief resident position my fourth year that's what I would do. If a resident wasn't there and I could not find somebody else to cover, I would probably end up doing the work. I mean, I do get paid extra, you get paid extra. That's the kind of stuff you have to do when you're a chief resident. That's

*Computer Reporting NYC Inc.*
*(212) 986-1344*

523

Varughese

1 usually the reason you get elected as a chief
2 resident because you show that you're reliable and
3 you are able to do such things.
4     Q.   So were you saying here you thought
6 Dr. Jordan was somehow being neglectful of her
7 duties or unreliable?
8     A.   Absolutely.
9     Q.   And why you say "absolutely," why do
10 you say that?
11     A.   Well, she wasn't there.  The program
12 did not make arrangements to have an alternate
13 chief resident who was on duty there during that
14 time.  I mean, that's the kind of decisions you
15 should make as a program director when you are
16 allowing schedules, you know, scheduled elective
17 times, away times for chief residents.
18     Q.   So do you think that when a chief
19 resident is on an away elective for example that
20 the program should appoint a chief resident to
21 serve in that person's absence until they return?
22     A.   They should --
23     MR. WRONKO:  Form objection.  You can
24 answer.
25     A.   Well, they -- I mean, I am sure if

*Computer Reporting NYC Inc.*
*(212) 986-1344*

524

Varughese

1
2 they need somebody to do that administrative work,
3 yes, they should have somebody who was there.  If
4 not, they should, I mean, they should do whatever
5 they think they should do.
6     I mean, I don't work there anymore.  I
7 have no opinion about how they should operate or
8 not operate.  I can only speak to what happened
9 when I was there, which was that Adrienne Jordan
10 was not there.
11     The program is disorganized.  It's in
12 disarray.  Certain people are favored.  They get
13 what they want, such as Dr. Jordan or Dr. McCash,
14 they can do whatever they want and it's perfectly
15 legit and fine.
16     Q.   Was Dr. Morency there during this
17 period of time?
18     A.   No, she was not.  She was on vacation.
19     Q.   When was Dr. Morency on vacation?
20     A.   I believe she said that she was on
21 vacation for the first half of the rotation, that
22 period.  Period two she was on vacation for two
23 weeks.
24     Q.   In this e-mail you also say:  "I
25 understand you are the chief this year, but the

*Computer Reporting NYC Inc.*
*(212) 986-1344*

525

Varughese

1 extent to which you are attempting to dictate to
2 me who I should speak to or who I can ask to cover
3 significantly limits my ability to do my work and
4 places an undue amount of stress on me."
5
6     What did Dr. Jordan do that in your
7 view attempted to dictate to you who you could
8 talk to?
9     A.   Right, she sent me e-mails stating
10 that I can only speak to Dr. Yao about schedule
11 changes.  She was, you know, essentially ever
12 since May or so she has been, her or Dr. Lento, I
13 mean, I don't want to say if it is Adrienne Jordan
14 or not, because there are e-mails that she sends
15 out that she speaks for herself in the third
16 person narrative.
17     I am not quite sure where a lot of
18 these e-mails are even coming from.  I'm not even
19 sure if it's Adrienne Jordan writing these or
20 Dr. Lento is writing these, who has access to each
21 other's e-mails.  It's --
22     Q.   My only question --
23     A.   You know what?  I have experienced a
24 significant amount of obstruction in my ability to
25 do my work.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

526

Varughese

1     Q.   That's what I'm trying to find out.
2 Because you say in here that Dr. Jordan was
3 attempting to dictate to you who you should speak
4 to.  You told me about talking to Dr. Yao about
5 scheduling changes.
6     A.   Scheduling changes of course, and also
7 in terms of my schedule changes I had e-mailed her
8 and she said, no, you may not change your schedule
9 in --
10     Q.   Now we're talking now about dictating
11 who you can speak to, not about scheduling
12 changes.
13     So other than Dr. Yao was there anyone
14 else that Dr. Jordan told you you couldn't speak
15 to?
16     A.   Other than that?
17     Q.   Yes.
18     A.   Well, she told me I cannot speak to
19 her at some point over the year.  And who else has
20 she told me not to speak to?
21     I mean, that's all I can recall right
22 now.  If I recall any more I would like to correct
23 or add to that.
24     Q.   And it says that she's attempting to

*Computer Reporting NYC Inc.*
*(212) 986-1344*

527

Varughese

1  dictate who I can ask to cover.
2         Who did she tell you that you could or
3  couldn't talk to about obtaining coverage?
4     A.   Obtaining coverage.  Where does it say
5  this?
6     Q.   It says: "The extent to which you are
7  attempting to dictate to me...who I can ask to
8  cover significantly limits my ability to do my
9  work."
10        MR. WRONKO:  Form objection.
11    A.   OK.
12    Q.   So I want to know who Dr. Jordan told
13 you you could or couldn't ask to speak to about
14 coverage.
15    A.   Well, right, that's Dr. Yao.  I mean,
16 that being one of them.  I mean, she was
17 specifying that I can only speak to this one
18 resident in a 24-resident program regarding a
19 schedule change.  It seemed really ridiculous, but
20 for some reason she had decided I have to speak to
21 him only.  It doesn't make any sense to me.
22    Q.   Then you go on to say: "I have tried
23 to be supportive of you despite the fact that you
24 have emailed me to say that I cannot have certain

*Computer Reporting NYC Inc.*
*(212) 986-1344*

528

Varughese

1  rotations when the schedule first came out,
2  changed any rotation of interest to me to a
3  significant degree since the initial schedule,
4  refused an elective (my one elective in 4 years),
5  reproached me about switching call and so on so
6  on."
7         What did Dr. Jordan say or do or
8  e-mail otherwise that you could not have certain
9  rotations when the schedule first came out?
10    A.   Correct, so she made all these -- I
11 mean, that sentence is self-explanatory.  And so
12 on so on, meaning, you know, I did not understand
13 why a junior resident who was a third-year
14 resident has this degree of authority or license
15 to treat me like trash.  I mean, this is like a
16 really a superiority license.  I don't know if
17 it's something about being a Caucasian female
18 or -- I frankly don't understand it.
19        I don't even understand where this is
20 coming from.  Frankly, there is a program director
21 who is supposed to oversee these things and
22 instead I'm dealing with a middleman, middle
23 woman, whatever, who makes these claims,
24 assertions, just out of nowhere it seems to me.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

529

Varughese

1         And I'm not allowed to approach
2  Dr. Lento.  I mean, I mean, not that I want to
3  like speak to him even, but I'm left in this
4  situation where I cannot do anything about my
5  educational requirements or interests in a
6  residency training program at Mount Sinai Medical
7  Center.
8     Q.   Assuming that the things you say in
9  this sentence happened, do you have any knowledge
10 as to whether these were decisions made by
11 Dr. Jordan or made by someone else that she really
12 communicated to you?
13    A.   Right.  That was not made clear.  I
14 mean, to some degree it was.  It says Dr. Lento
15 doesn't agree.  But often these e-mails are sent
16 within five minutes.
17        So it begs the question.  Where is she
18 getting the time to contact Dr. Lento, write this
19 e-mail, and so on and so forth, which is why I
20 want to suggest that perhaps Dr. Lento had access
21 to her e-mails and he was writing them, not her.
22    Q.   You don't know that, do you?
23    A.   Well, I have to come to that
24 conclusion at this point, because otherwise she is

*Computer Reporting NYC Inc.*
*(212) 986-1344*

530

Varughese

1  making the decisions unilaterally without, you
2  know, input from Dr. Lento.
3         And on top of that Dr. Jordan --
4     Q.   I want to understand something first.
5     A.   Can I complete my sentence?
6     Q.   You can complete anything you want to
7  say.  I just want to understand one thing before
8  you do that.
9         No, go ahead, finish.
10    A.   Well, in addition to my, you know,
11 suspicions that may be happening was that a lot of
12 Dr. Jordan's e-mails were in the third person
13 narrative.  It says Dr. Jordan feels this way.  I
14 mean, this whole thing doesn't add up, doesn't
15 make any sense.
16    Q.   So the conclusion that you come to
17 that Dr. Lento had access to Dr. Jordan's e-mail
18 is based on the timing of the e-mails?  Because I
19 think you said the responses came like within five
20 minutes.
21        So is that the basis for that
22 conclusion, the speed with which Dr. Jordan
23 responded to your e-mails?
24        MR. WRONKO:  Form objection.  You can

*Computer Reporting NYC Inc.*
*(212) 986-1344*

531

Varughese

1
2    answer.
3        A.    Not just that.  It was just a number
4    of different things.
6        Q.    What else other than --
7        A.    Just the decisions that were being
8    made, you know, and Dr. Jordan is saying that
9    she's making these decisions and allegedly
10   Dr. Lento is somehow involved peripherally.  Just
11   a number of things in addition to the referring to
12   herself in the third person, and so on.
13       Q.    You say in that sentence that
14   Dr. Jordan "refused an elective (my one elective
15   in 4 years)."  What elective are you referring to?
16       A.    I'm speaking about the change in the
17   elective from GI to dermatic pathology.
18       Q.    We looked a little while ago,
19   Dr. Varughese, at the communications you had and
20   the conversations you had with Dr. Firpo about
21   that.
22       A.    Right.  And I also had a discussion
23   with the Graduate Medical Education Dr. Barnett
24   and Dr., I'm sorry, Paul Johnson.
25       Q.    So do you have any doubt that
     Dr. Firpo or Dr. Barnett or Mr. Johnson is the

*Computer Reporting NYC Inc.*
*(212) 986-1344*

532

Varughese

1    individual or individuals who decided to deny your
2    request to change your elective?
3        A.    No, I actually know now it was
4    Dr. Lento who had made that decision it seems.
5        Q.    So whoever it was it wasn't
6    Dr. Jordan.
7        A.    Well, Dr. Jordan -- how was Dr. Jordan
8    involved?  I believe Dr. Jordan e-mailed me on
9    February, I mean, I'm sorry, September sometime
10   saying that I can talk to Dr. Yao only.  Don't
11   approach any other residents.  This is the only
12   resident you can speak to, so on and so forth.
13       Q.    You told me that.  But what role does
14   Dr. Jordan play in the decision to not permit you
15   to change your GI elective?
16       A.    What role does she play?
17       Q.    Yes.
18       A.    Well, it seems like she is an agent of
19   Dr. Lento.
20       Q.    Did you get any communication from
21   her, Dr. Varughese, from Dr. Jordan, that talked
22   specifically about your request to change your
23   elective?
24       A.    I can't recall right now.  But in

*Computer Reporting NYC Inc.*
*(212) 986-1344*

533

Varughese

1    addition to all of this, this is all true.  "All
2    the same, I have tried to be supportive of you
3    despite the fact that you have emailed me to say
4    that I cannot have certain rotations when the
5    schedule first came out, changed any rotation of
6    interest to me to a significant degree since the
7    initial schedule, refused an elective...reproached
8    me about switching call and so on so on."
9        Q.    So even though we just had this
10   testimony about --
11       A.    Then I said:  Whether you realize it
12   or not you're making it a hostile work environment
13   for me and I would like you to stop, I would like
14   for you to stop targeting me.
15       Q.    My question is, even though we just
16   had a conversation or rather question and answer
17   and your testimony was that you now know that
18   Dr. Lento is the, at least according to you,
19   Dr. Lento is the one who decided not to let you
20   change your elective, you still think Dr. Jordan
21   made that decision.  Because you just told me what
22   you just read to me is true.
23       A.    Well, Dr. Jordan, I didn't know what
24   role Dr. Dr. Jordan had played in all of this.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

534

Varughese

1        Q.    You did or did not?
2        A.    I did not.  I mean, I only knew in
3    retrospect that Dr. Lento may have made this
4    decision based on some e-mails that were submitted
5    for the House Staff Affairs Committee hearing.
6        Q.    So at least this part, that she
7    refused an elective, my one elective in four
8    years, may not have been true, right?
9        A.    Refused an elective.  She may have had
10   the -- she may have made the decision with
11   Dr. Lento.  That's definitely a possibility.
12       Q.    But you don't know that, do you?
13       A.    No.  I mean, I'm not privy to these
14   conversations and I'm not involved in some ways.
15       Q.    At the end of this e-mail you say:  "I
16   would suggest that you ask Dr. Firpo to email me
17   or dictate any specifics and decrease your burden
18   of administrative responsibilities as such.  I
19   will comply and respond to him promptly, whether
20   it is about giving a lecture or call or rotations
21   and so forth."
22       Do you see that?
23       A.    Right.
24       Q.    Dr. Varughese, I read this, but you

*Computer Reporting NYC Inc.*
*(212) 986-1344*

535

Varughese

1  wrote it.  Was it your intention or your
2  suggestion that you not have to deal with
3  Dr. Jordan going forward, that you deal directly
4  with Dr. Firpo?
5      A.   Right, I wanted to deal with just, you
6  know, because I'm getting bombarded by these
7  e-mails.  She is here calling out sick for me even
8  though she has no idea whether or not I'm going to
9  be out sick or not the next day.  I mean, she is
10  overstepping her boundaries.
11          Frankly, like this is not a decision
12  for her to make.  She's a third-year resident who
13  for some reason was made chief resident.  It is
14  beyond me why.  And then she goes on to like I
15  felt constantly berate me, intimidate me, be
16  malicious towards me.  And I was frankly becoming
17  afraid to be at work and be around her.
18          I mean, this goes to hemepath.  When
19  I'm there she will go out of her way to pick up
20  paperwork or my cases and say, This is yours.  Do
21  you realize this is yours?  What are you doing?
22          Like, would you stop?  Like I'm doing
23  my work.  I'm perfectly capable of getting
24  whatever paperwork, and so on, that I need.  I'm

*Computer Reporting NYC Inc.*
*(212) 986-1344*

536

Varughese

1  getting my work done.  But she was imposing
2  herself on me at work.
3      Q.   So your preference was to deal with
4  Dr. Firpo.
5      A.   Well, I did not have many choices.  If
6  I went to the GME, Graduate Medical Education,
7  they would say, Well, you have to work with
8  Dr. Firpo.  You have to make things work with him.
9  It's between you and him and this program.
10          It was a very bad situation for me.  I
11  mean, they put me on all these disciplinary
12  actions, and so on and so forth, and they put me
13  in a very bad situation where I did not have a lot
14  of options and I could not appeal even in a
15  logical manner or in a reasonable manner to the
16  powers that be and get some results.
17      Q.   So I think you testified,
18  Dr. Varughese, that you did not come to work on
19  September 14th, correct?
20      A.   Correct.
21      Q.   Now, with regard to the presentation
22  that you were supposed to make, was that
23  presentation rescheduled for September 15th?
24      A.   Correct, I was told on the 14th that

*Computer Reporting NYC Inc.*
*(212) 986-1344*

537

Varughese

1  it would be rescheduled for the following day, on
2  the 15th.
3      Q.   Who told you that?
4      A.   I believe this e-mail, this
5  September 13th e-mail.
6      Q.   Let's look.  In the e-mail that
7  Dr. Jordan sent to you on September 13th at 10:38
8  p.m. responding to the e-mail that, your e-mail
9  that we were just discussing, in number 10 of that
10  e-mail she says:  "Your lecture is rescheduled for
11  this Thursday morning."  Correct?
12      A.   Right.
13      Q.   And so did you present the lecture,
14  make the presentation rather, on September 15th?
15      A.   September 15th, no, I did not.  I did
16  not make the presentation on September 15th.
17      Q.   Why not?
18      A.   Why not?  It was still not adequate
19  time for me to present, one.  Two, I felt like I
20  was being continued to be targeted.  It was
21  illogical to really reassign a presentation from
22  Wednesday to Thursday when in fact there was a
23  person who was already scheduled to present on
24  Thursday morning, which was Robert Guarino, a

*Computer Reporting NYC Inc.*
*(212) 986-1344*

538

Varughese

1  white male.
2          And guess what?  No actions was taken
3  against him when he cancelled the presentation.
4  Apparently he was allowed to cancel his
5  presentation on Tuesday at 10:30 p.m. it seems.
6      Q.   How do you know that?
7      A.   That's what it says here.  Because as
8  of Monday morning he was still scheduled to
9  present on Thursday.  And as of Tuesday he is no
10  longer presenting and I'm supposed to make a
11  presentation at this grand rounds no less of
12  pathology, and grand rounds according to
13  Dr. Lento's own words.
14          I mean, I don't know if that's to
15  humiliate me.  It seems like it was to humiliate
16  me, that they want to reassign this presentation
17  for me on Thursday when it's a grand rounds
18  quality presentation.
19      Q.   Did you communicate to anybody after
20  you got Dr. Jordan's e-mail that you would be
21  unable to present on September 15th?
22      A.   Did I communicate to anybody?  Well,
23  don't know when I got this e-mail.  I may have
24  gotten this at some point later.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

539

Varughese

2  Q.    Did you get it, Dr. Varughese,
3  sometime before September 15th?
4      A.    Right.  I may have gotten it.  I'm not
5  sure now.  The thing is I -- ah, just scratch
6  that.
7      Q.    So my question is, did you communicate
8  with anybody about the fact that you would be
9  unable to present on September 15th?
10      A.    Did I communicate with anybody?  I am
11  not sure.
12      Q.    You said that a Dr. Guarino was also
13  scheduled to present.
14      A.    Yes.
15      Q.    And that that presentation was
16  cancelled?
17      A.    Correct.
18      Q.    Do you know why it was cancelled?
19      A.    I do not know, because how would I
20  know?  I'm not privy to that information.
21      Q.    But when you arrived at work, and were
22  you at work on September 15th?
23      A.    Right, I did arrive at work on
24  September 15th and I went to the conference that
25  was being held and I saw Dr. Guarino there.

540

Varughese

2      Q.    When you went to the conference, did
3  you know -- you knew that you were supposed to
4  present at the conference; is that right?
5      A.    I am not sure if I knew at that point.
6      Q.    What happened at the conference?
7      A.    What happened?  Nothing happened.  I
8  went to the conference.  I heard Dr. Jeremy
9  Clapper give his presentation.
10      Q.    Did you stay for the whole conference?
11      A.    Right.  I had to run to the bathroom,
12  so I left.  Because I had a stomach virus.
13      Q.    So does that mean you did or didn't
14  stay for the whole conference?
15      A.    Well, I had to leave because I had to
16  run to the bathroom.
17      Q.    Once you left to go to the bathroom
18  did you come back?
19      A.    Did I come back?  I did, but there was
20  no one in the conference room at that time.
21      Q.    So the conference was over.
22  Presumably.
23      A.    I presume it was over at that time,
24  yes.
25      Q.    Now, on September 15th, Dr. Varughese,

541

Varughese

2  after you left the conference that morning, did
3  you remain at work for the rest of the day?
4      A.    Yes.
5      Q.    And during the day did you see and
6  speak to Dr. Firpo?
7      A.    Right.  I did speak to him because he
8  came to my desk.
9      Q.    And what time did he come to your
10  desk?
11      A.    I don't recall now.
12      Q.    When he came to your desk was anyone
13  else present other than you and Dr. Firpo?
14      A.    I don't recall right now.
15      Q.    When he came to your desk, what, if
16  anything, did Dr. Firpo say to you?
17      A.    What did he say to me?  I just
18  remember him saying that Dr. Jordan or somebody
19  was very upset and he wanted to know what was
20  going on.
21          And I said, Well, this is what's going
22  on.  I'm here.  I wasn't feeling well and now I'm
23  feeling a little better.  So, you know, work.
24  That's what I said.
25      Q.    Did you tell Dr. Firpo that you didn't

542

Varughese

2  make the presentation because you were unwell,
3  unable to fulfill your duties and you needed to
4  take a leave of absence?
5      A.    No, that's not what I said.  I felt
6  that I was being harassed at work and antagonized
7  and intimidated by my coworker who seems to have a
8  free pass to say or do whatever she wanted, and I
9  felt it was the program director who was also
10  condoning these actions and I felt harassed.
11  That's what I told him.
12      Q.    Did you say anything to Dr. Firpo
13  during this meeting about that you needed to take
14  a leave of absence?
15      A.    Yes, I said I would like to consider
16  taking a leave of absence through FMLA if it can
17  be approved by my treating physician.
18      Q.    What did Dr. Firpo say about that?
19      A.    He said that's something I have to go
20  through a request from I believe it's HR or
21  administration and get the form.
22      Q.    And that same day, September 15th, did
23  you meet with Dr. Firpo again?
24      A.    I believe I spoke to him again, yes.
25  I think I did.

543

Varughese

2  Q.   When did you speak to Dr. Firpo the
3  second time on September 15th?
4  A.   Well, I believe Shema Patel had
5  arrived at that time and it was with Shema Patel.
6  Q.   You said the first meeting was at your
7  desk because he approached you.
8  A.   Right, it's like a common area.  There
9  are about twenty plus, 23 desks, I don't know.
10  Maybe even 30 desks.  It is a very common area.
11  Anybody can hear the conversation.
12  Q.   And the second conversation that you
13  said you had with Dr. Firpo, now I gather
14  Ms. Patel was present.  Where was that
15  conversation?
16  A.   That was also in the same area.
17  Q.   During the second conversation with
18  Dr. Firpo and Ms. Patel how long after the first
19  discussion was the second discussion?
20  A.   I believe not long after.  Maybe half
21  an hour, 40 minutes or so.
22  Q.   What happened during the second
23  conversation with Dr. Firpo and now Ms. Patel?
24  What did you say, what did they say?
25  A.   I didn't -- I don't think I said that

544

Varughese

2  much.  I just said, you know, I'd like to take
3  this leave as I had requested and I needed to
4  speak to my physicians and I need some forms to
5  fill out.
6  Q.   At this meeting did Ms. Patel give you
7  the paperwork that you needed to complete?
8  A.   No, she did not.
9  Q.   Did you ever get the paperwork you
10  needed to complete from anyone at Mount Sinai?
11  A.   That afternoon Shema Patel delivered
12  some paperwork to me.
13  Q.   And was that paperwork paperwork that
14  needed to be completed in connection with your
15  request to take an FMLA leave?
16  A.   Right, it was in connection with FMLA.
17  Q.   I will show you a document.
18  MR. McEVOY:  Mark this is as Exhibit
19  47.
20  (Defendants' Exhibit 47, e-mail dated
21  September 15, 2011, from Adolfo Firpo to
22  Dr. Varughese, Bates No. P426, marked for
23  identification, this date.)
24  Q.   Have you had a chance to look at that?
25  A.   Right.

545

Varughese

2  Q.   Do you recognize it?
3  A.   Right.
4  Q.   Tell me what it is.
5  A.   It's an e-mail to myself from Adolfo
6  Firpo.
7  Q.   Did you receive this e-mail?
8  A.   Yes.
9  Q.   And what was your reaction to this
10  e-mail?
11  A.   I don't know what my reaction to this
12  e-mail was now.
13  Q.   Well, it says in here that "I am glad
14  you felt well enough to come to work today.  I am
15  also very glad we had an opportunity to discuss
16  your concerns openly and with candor.  I was
17  delighted to hear that you had decided to request
18  a leave of absence from the program as I myself
19  had become concerned over the obvious high stress
20  levels that you are experiencing.
21  "As I promised to do, I discussed your
22  concerns with Ms. Patel and we together consulted
23  Ms. Tiger-Paillex at the HR office, Dr. Scott
24  Barnett and [Mr.] Paul [Johnson] of the GME
25  office, to find information about the appropriate

546

Varughese

2  process to follow.
3  "I reiterate to you that everyone's
4  primary concern in our Department and at Mount
5  Sinai is your well-being and health.  We wish you
6  well.  Ms. Patel obtained the information packet
7  to apply for the leave of absence and she will be
8  happy to go over it with you at your convenience.
9  We also talked with Dr. Bruce Petersen, you[r]
10  faculty mentor and current rotation supervisor at
11  hematopathology who also expressed his concern and
12  willingness to excuse from the rotation for health
13  reasons.  I am sorry you could not get an
14  appointment with your physician sooner than next
15  week since your health is paramount to all of us.
16  Please meet with Dr. Petersen and discuss this
17  situation candidly.  As your Advisor he should be
18  able to provide valuable counsel and guidance at
19  this difficult and stressful time.  As you asked
20  of me I will wait to instruct the chief residents
21  to remove [you from] the rotation schedule until
22  you obtain and provide your doctor's note.
23  Please, keep in mind that you may be excused from
24  your duties at any time you feel it necessary for
25  your health and well-being, please keep

547

Varughese

1  Dr. Petersen informed of your activities and
2  decisions so he may make the necessary adjustments
3  in his service responsibilities.
       "Please take care of yourself and be
6  well." Signed by Dr. Firpo.
7       MR. WRONKO: I want to note for the
8  record that counsel adjusted the reading to
9  make everything grammatically correct.
10      MR. McEVOY: I did.
11      MR. WRONKO: There are some typos.
12      MR. McEVOY: There are. Mr. Johnson
13  is Ms. Johston for example. You are
14  correct, I did.
15      Q.   So Dr. Varughese, when you received
16  this from Dr. Firpo did you think he was being
17  sincere in his expressed concern for you?
18      A.   Did I? I don't know if I thought
19  that.
20      Q.   On September 15th when you had these
21  two conversations with Dr. Firpo and then one with
22  Ms. Patel did Dr. Firpo change or adjust your
23  responsibilities that day?
24      A.   Dr. Firpo?
25      Q.   Yes.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

548

Varughese

2       A.   No.
3       Q.   Did anyone?
4       A.   No.
5       Q.   Did Dr. Firpo tell you during either
6  of those conversations that he didn't want you to
7  come to work until you had resolved the issues
8  regarding your request for a leave?
9       A.   No.
10      Q.   Did Dr. Firpo tell you either during
11  one of these discussions or in this e-mail that
12  you could be excused from your duties if you so
13  wanted, if you so requested?
14      A.   He may have expressed that I can be
15  excused if I wanted to be.
16      Q.   Did you indicate or say to Dr. Firpo
17  whether you wanted to be excused or whether you
18  wanted to continue to work?
19      A.   I did not express any such, any
20  affirmative or negative response to any of those
21  questions.
22      Q.   Did you make a doctor's appointment to
       seek certification for your FMLA leave?
24      A.   Did I seek a doctor's? Yes, I did, I
25  did speak to my treating physicians, right.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

549

Varughese

2       Well, anyway, that's assuming this
3  FMLA leave is for myself. At this point all that
4  was not very clear.
5       Q.   Dr. Varughese, you said you wanted to
6  take a leave.
7       A.   Right. It could be for myself or
8  somebody else.
9       Q.   Were you seeking, did you express an
10  interest in taking a leave for somebody else?
11      A.   I didn't make any specific --
12      Q.   I understand that. I'm asking you
13  now --
14      A.   -- reasons for my request at that
15  time.
16      Q.   I understand that. I understand
17  that's what you said. When you asked Dr. Firpo or
18  told Dr. Firpo that you wanted to take a FMLA
19  leave, was the leave intended for you or for
20  someone else regardless of what you said to
21  Dr. Firpo?
22      A.   Well, now I can tell you that the
23  leave was intended for me, for some personal FMLA.
24      Q.   And that was your intent back in
25  September of 2012, to take a leave for you.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

550

Varughese

2       A.   Correct, which Adolfo Firpo did not
3  really know of, right? Because it is my --
4       Q.   Only Dr. Firpo can tell you what he
5  knew or didn't know.
6       A.   Well, he would only know what I told
7  him also, so....
8       MR. WRONKO: Wait.
9       Q.   Let's go back to the questions and
10  answers. You made an appointment you said with
11  your treating physicians.
12      Did you make an appointment with one
13  doctor or more than one doctor?
14      A.   Well, I made an appointment with at
15  least two doctors.
16      Q.   Were they both medical doctors or was
17  one a psychiatrist?
18      A.   Right, they are both medical doctors
19  and my one appointment I could not keep with my
20  medical doctor because we could not be -- we had
21  some concerns and the second doctor I could not
22  meet with until the following week.
23      Q.   When you say you couldn't keep your
24  appointment because we had some concerns, what
25  concerns are you talking about?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**551**

Varughese

2   **A.**   Concerns is just, um, what concerns?
3  The concerns we had was there was no appointment
4  slot that I could fill that was available.
5      **Q.**   So did you ever see a physician,
6  whether a medical doctor or a psychiatrist --
7      **A.**   Well, psychiatrists are medical
8  doctors.
9      **Q.**   I understand that. -- to seek that
10  physician's approval for your FMLA leave?
11      **A.**   Right. I sought my primary care
12  physician regarding my request.
13      **Q.**   And was your primary care physician
14  willing to certify or willing to certify that you
15  needed FMLA leave?
16      **A.**   My primary care physician, I met with
17  him on September 20th of 2011 following a meeting
18  with HR and Paul Johnson that morning, and he was,
19  um, my primary care physician thought that I
20  should not go on leave at that time.
21      **Q.**   So were you able to obtain a medical
22  certification from any physician that you --
23      **A.**   And also --
24      **Q.**   Let me finish the question. -- that
25  you needed FMLA leave?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**552**

Varughese

2      **A.**   Right. So the meeting, the reason for
3  me meeting with my primary care physician was
4  twofold. One was the Family Medical Leave Act,
5  you know, absence certification form. The other
6  was just a certified need to come back to work and
7  state that I was in good enough health to be
8  there.
9          So when I met with my primary care
10  physician we had a long discussion. I hadn't been
11  to my primary care physician in over a year, a
12  year and a half I believe at that time. So we
13  had, you know, a long discussion about what was
14  going on and what I -- what was going on with my
15  health and my residency and me being a doctor, you
16  know, we would discuss medicine and residency, so
17  on, whenever I do go for a checkup or whatever.
18          So we had this discussion. He had
19  expressed some concerns regarding what was going
20  on with my residency program, what I felt was
21  going on and what his opinion was, being that he
22  is a mentor to numerous residents as a physician
23  and who oversaw other residency programs in
24  New York.
25          So given what I had told him, he was

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**553**

Varughese

2  concerned and he thought, well, you're clearly fit
3  to work. So he gave me a fit-to-return-to-work
4  certification and he gave me some reasons for why
5  I should not go on a leave of absence.
6      **Q.**   So I take it that you never completed
7  the FMLA forms or paperwork and you never provided
8  medical certification of a need for an FMLA
9  approved leave.
10      **A.**   Well, I didn't get the opportunity to
11  do so completely, because I spoke to my primary
12  care physician and he said, well, you know, these
13  are issues that if you have you should follow up
14  with a treating psychiatrist, medical doctor
15  rather than myself, given, one, I haven't seen you
16  like in a year and a half.
17          Two, I have some concerns about you
18  going on leave at this point, especially if there
19  are other issues, back issues going on with the
20  residency program.
21          Three, I think you should go to work.
22  There's nothing wrong with you. You're fit to
23  report to duty.
24          And, four, follow up with your
25  treating psychiatrist, medical doctor, regarding

*Computer Reporting NYC Inc.*
*(212) 986-1344*

**554**

Varughese

2  any issues you may have or you may be experiencing
3  due to your work environment.
4      **Q.**   So now answer my question. Did you
5  ever complete the FMLA paperwork?
6      **A.**   Right, which I did not get the
7  opportunity to complete it.
8      **Q.**   It was given to you on September 15th,
9  correct?
10      **A.**   Correct.
11      **Q.**   And you were terminated on
12  September 21st, correct?
13      **A.**   Correct.
14      **Q.**   During those six days did you complete
15  the paperwork?
16      **A.**   I did not get an opportunity to
17  complete the paperwork.
18      **Q.**   So the answer is no, you didn't
19  complete the paperwork, right?
20      **A.**   Right, the hospital did not allow me
21  the opportunity to follow up as I needed.
22      **Q.**   How did they not allow you to follow
23  up?
24      **A.**   Because I needed time to make
25  appointment with my treating psychiatrist and that

*Computer Reporting NYC Inc.*
*(212) 986-1344*

555

Varughese

1    did not occur.

3         Q.   Because you were terminated before you

4    could make the appointment.

5         A.   Correct.

6         Q.   Did you ever obtain medical

7    certification for FMLA leave?

8         MR. WRONKO:  Form objection.

9         A.   Excuse me?

10        Q.   Did you ever obtain medical

11   certification for an FMLA leave in September of

12   2011?

13        A.   I was terminated before I could

14   completely follow up on my FMLA leave request.

15        Q.   Did anybody at Mount Sinai offer to

16   make a doctor's appointment for you with a

17   physician who could provide medical certification?

18        A.   No.

19        Q.   I will show you another document.

20        MR. McEVOY:  Mark this as Exhibit 48.

21        (Defendants' Exhibit 48, e-mail dated

22   September 16, 2011, from Adolfo Firpo to

23   Leena Varughese, Bates Nos. D934 and 935,

24   marked for identification, this date.)

25        Q.   Have you had a chance to look at that?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

556

Varughese

2         A.   Correct.

3         Q.   This is an e-mail from Dr. Firpo to

4    you, copied to several other people, dated

5    September 16, 2011, correct?

6         A.   Yes.

7         Q.   Finish reading.  Let me know when

8    you're done.

9         A.   OK.

10        Q.   This e-mail says a number of things,

11   but the thing that I want to direct your attention

12   to is towards the bottom of the first page.

13        The last little sentence says:  "I

14   must also ask you not to return without the

15   doctor's note and assessment for the leave of

16   absence."

17        Do you see that?

18        A.   Right.

19        Q.   And the doctor's note that Dr. Firpo

20   is referring to is mentioned in the sentence that

21   says, the second sentence of that paragraph that

22   says:  "The fact is that you are required to

23   provide proof of illness for the absences of

24   Monday and Tuesday since they prevented you" --

25   again, it says "form," it should be from -- from

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

557

Varughese

2    "fulfilling a professional and academic

3    responsibility of the residency program."

4         The next sentence says:  "You must

5    also provide a medical note to proceed with the

6    application for leave of absence you are

7    requesting."

8         Do you see that?

9         So Dr. Varughese, in this e-mail did

10   you understand that Dr. Firpo was telling you not

11   to come to work until you had provided the note

12   for your absence and completed the paperwork

13   necessary for the FMLA?

14        A.   Right, this is an e-mail that is sent

15   to me at noontime on Friday after I had already

16   showed up to work saying that I should not be

17   there.  It seemed really outrageous.  I don't know

18   where it's coming from.  It just seemed it's the

19   institution's determination to retaliate against

20   me.

21        Q.   Regardless of how you interpret it,

22   the motive behind it --

23        A.   It didn't make any sense to me on its

24   face.

25        Q.   What doesn't make sense to you,

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

558

Varughese

2    Dr. Varughese, when your boss basically says don't

3    come back to work without a doctor's note or an

4    assessment for your leave of absence?  What

5    doesn't make sense to you?

6         A.   Well, it doesn't make any sense

7    because, first, I was already at work on Thursday.

8    There weren't any issues.  I don't know what

9    the performance expectations of the chief

10   resident, but in terms of my performance it was

11   quite adequate.  I worked with Dr. Petersen who is

12   my mentor and advisor and I did not have any

13   problems.  I worked with Dr. Strauchen as well.

14   We did not have any issues.

15        It seems as if this is a fabrication

16   by Adolfo Firpo and the leadership of the hospital

17   to insinuate such defamatory statements and state

18   that I should not, you know, be at work, and also

19   the hospital policy technically is how -- you have

20   to explain your leave, you know, absence if you

21   are out for three days or if you miss a call

22   assignment.

23        So I don't know, I mean, given that

24   I'd spoken to Dr. Firpo the day before, he had

25   already sent me an e-mail that was put in as

*Computer Reporting NYC Inc.*
*(212) 986-1344*

559

Varughese

1 Exhibit 47, you know, it just seemed sort of at
2 odds with what he was saying to me from the day
3 before to the following day.
4     Q.    If you look at the first sentence of
5 that last paragraph it says: "After our last
6 encounter yesterday afternoon I followed up
7 with" -- again, it should be GME, not GEM -- "the
8 [GME] office about your situation and asked for
9 guidance on the best way to proceed in conformity
10 with federal laws, programmatic and institutional
11 regulations."
12     Do you see that?
13     A.    Correct.
14     Q.    Regardless of what Dr. Firpo did or
15 didn't say to you when you spoke to him on the
16 15th, he is saying here that after you met and
17 spoke he talked to the people in the GME office,
18 right?
19     A.    Right, that implicates them as being
20 involved in this.
21     Q.    Clearly they are involved in it. So
22 do you understand, Dr. Varughese, that Dr. Firpo
23 is saying something different than you say he said
24 the day before because he spoke to people who gave

560

Varughese

1 him guidance as to what should happen going
2 forward?
3     MR. WRONKO:  Form objection.
4     A.    I don't know if that's really what
5 he's saying.
6     Q.    What don't you understand about "I
7 followed up with the [GME] office about your
8 situation and asked for guidance on the best way
9 to proceed"?  What's unclear to you about those
10 words?
11     MR. WRONKO:  Form objection.
12     A.    He is just merely saying that -- what
13 is he saying?  He is merely saying that he
14 inquired with the GME office.  Then he is claiming
15 that I was absent on Monday and Tuesday, which was
16 clearly false because I was present at work on
17 Monday and absent Tuesday and Wednesday.
18     Q.    So he's mistaken about the days of the
19 week, but not --
20     A.    Correct.  And then --
21     Q.    Let me finish.  -- but not the number
22 of days you were absent, correct?
23     A.    Well, if he doesn't claim the number
24 of days here --

561

Varughese

1     Q.    Monday and Tuesday is two.  Would you
2 agree with me about that?
3     A.    Yes, it is two.
4     Q.    And Tuesday and Wednesday is two?
5     A.    Yes, I agree with that too.
6     Q.    I'm glad we agree about something.  So
7 going back to this, OK?  I'm trying to understand,
8 Dr. Varughese, what your perception of your role
9 is and the role of the people who are above you in
10 the program.
11     Dr. Firpo told you in this e-mail
12 pretty clear, I think, "I must also ask you not to
13 return without the doctor's note and assessment
14 for the leave of absence."
15     Now, leaving aside whether you
16 interpreted that to mean whether you should leave
17 on the 16th, did you leave work on the 16th after
18 you got this e-mail --
19     A.    No.
20     Q.    -- at 11:20?  OK.
21     Did you work on Saturday and Sunday?
22     A.    No, I was not on call, so no.
23     Q.    So your next day of work would have
24 been Monday, the 19th?

562

Varughese

1     A.    Correct.
2     Q.    And then I take it you would have
3 worked Monday, Tuesday, Wednesday, Thursday,
4 Friday of the following week, that was your
5 schedule?
6     A.    Correct.  And I was working with Bruce
7 Petersen who was also cc'd on this e-mail and he
8 did not say that I should not be here nor do my
9 work.  He said he was overseeing my duties and my
10 responsibilities and he was perfectly fine with me
11 working with him.  He did not say I was having a
12 conniption fit, I was not throwing tantrums or
13 whatever.  I don't know what the claim is here.
14 It's illogical.
15     Q.    One of the heads of the pathology
16 department, right?  Dr. Firpo, we talked about his
17 title, right?  You are a resident in the pathology
18 department.  Dr. Firpo told you don't come back to
19 work until you bring a doctor's note and until you
20 bring in the note regarding your leave of absence,
21 right?
22     Did you feel that you could just
23 disregard what he said and come to work anyway?
24     MR. WRONKO:  Form objection.

563

Varughese

1
2     A.    I felt that he was treating me
3  differently from others in the program and he was
4  stipulating to me that I do something that was not
5  regularly done, and I was concerned and
6  Dr. Petersen was also concerned, and we had a
7  discussion regarding this e-mail.
8     Q.    I'll get to that in a second. So I
9  accept that you felt about it how you say you felt
10  about it, but that's not my question.
11     A.    Which my mentor agreed about.
12     Q.    Well, we'll get to that. My question
13  is, did you feel that you could disregard
14  Dr. Firpo's direction not to return to work
15  because you disagreed with it or felt that it was
16  unfair in some way?
17          MR. WRONKO:  Form objection. You can
18     answer.
19     A.    Did I feel like I can disregard
20  Dr. Firpo's e-mails?
21     Q.    Not his e-mails, his instruction to
22  you to not to return to work without the doctors'
23  notes that he mentions.
24     A.    Right. Because it was completely
25  opposite of the day before and I did not know what

*Computer Reporting NYC Inc.*
*(212) 986-1344*

564

Varughese

1
2  the -- what the issue was here. It was not really
3  being explained to me. You know, if -- I mean, I
4  don't know why he was insisting that I should not
5  be at work. It seems very irregular.
6     Q.    Whether it was irregular, whether you
7  understood why, I take it you understood that he
8  told you not to come back to work.
9     A.    Well, I'm a contracted employee. He
10  has to provide me with a logical explanation as to
11  why.
12     Q.    Where do you get that from, that he
13  has to provide with you a logical explanation for
14  instructing you not to return to work? What's the
15  basis of that?
16     A.    Otherwise it's simply retaliation
17  against me and treating me differently and
18  marginalizing me and this is in keeping with the
19  institution's attitude and actions towards me in
20  the past.
21     Q.    So based on all that you have said in
22  response to my questions about this direction from
23  Dr. Firpo, I take it from what you said you feel
24  that you were free to disregard it because you
25  didn't agree with it for the reasons that you've

*Computer Reporting NYC Inc.*
*(212) 986-1344*

565

Varughese

1
2  stated.
3          MR. WRONKO:  Form objection. You can
4     answer.
5     A.    I felt that this was further
6  retaliation.
7     Q.    It's not my question. Let me ask you
8  this. Well, let me ask you this. You knew that
9  you were told not to return. Did you come to work
10  on September 19th, on Monday?
11     A.    Yes, I did come to work on
12  September 19th.
13     Q.    So Dr. Firpo told you not to come to
14  work, but you came to work anyway, correct?
15     A.    Well, it says in the first paragraph
16  that, you know, I'm working with Dr. Petersen. I
17  had already spoken to him and we were managing our
18  work.
19          So then the second paragraph goes on
20  to explain more of, um, more of something. Then
21  he makes a claim that I have severe depression and
22  anxiety response to work demands, which I don't
23  know where he got that from.
24          Then he says I'm not meeting the
25  performance expectations of the chief residents,

*Computer Reporting NYC Inc.*
*(212) 986-1344*

566

Varughese

1
2  who are simply my coworkers. They're not my
3  bosses by any means of the word. And in fact,
4  they are not any more qualified than me. So it
5  just seems just outlandish.
6     Q.    You may think so. It goes back to the
7  sentence, "I must also ask," the next to last
8  sentence in the document, "I must also ask you not
9  to return without the doctor's note and assessment
10  for the leave of absence."
11          And despite that instruction you came
12  to work on your next scheduled workday, which was
13  Monday, September 19th, correct?
14     A.    Right.
15          MR. WRONKO:  Form objection. Asked
16     and answered.
17     A.    I did come into work the next Monday
18  and I felt this e-mail was extremely harassing and
19  threatening.
20     Q.    So you ignored it.
21     A.    I don't know if I ignored it.
22     Q.    You didn't follow Dr. Firpo's
23  direction.
24     A.    I believe this was an extremely....
25     Q.    You've answered the question.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

567

Varughese

1

2     Now, you said something about a
3  conversation with Dr. Petersen.
4        A.    I could not complete my sentence.
5        Q.    Feel free.  I didn't mean to interrupt
6  you.  Finish your sentence.
7        A.    I felt this was an extremely harassing
8  e-mail that did not -- that made up facts, that
9  made claims, that was contrary to the established
10  policies and frankly infringes on my rights as a
11  citizen of this country as well as employee of the
12  hospital.
13       Q.    So what right as a citizen of the --
14       A.    My family medical leave rights, my
15  rights to not be harassed, my civil rights for
16  that matter.
17       Q.    If you'd let me finish the question.
18       A.    To be treated with dignity and respect
19  despite the fact that I'm a colored Indian woman.
20       Q.    I was going to ask you what right you
21  have as a citizen of the United States --
22       A.    Well, those are my rights, I think.
23       Q.    Don't interrupt me again.  I am going
24  to ask you, what is the right you have as a
25  citizen of the United States to ignore the

*Computer Reporting NYC Inc.*
*(212) 986-1344*

568

Varughese

1

2  direction of your employer?
3        MR. WRONKO:  Form objection.
4        MR. McEVOY:  She told me she had
5     rights to ignore her employer.
6        MR. WRONKO:  And it calls for a legal
7     conclusion.
8        MR. McEVOY:  She's the one who said
9     she had rights.  Fine, I withdraw it.
10       Q.    You told me that you had a
11  conversation with Dr. Petersen about this e-mail;
12  is that right?
13       A.    Well, I had been speaking to my
14  mentor.  He's my mentor.  I speak to him on a
15  regular basis.
16       Q.    Did you have a conversation with
17  Dr. Petersen about this e-mail?
18       A.    About this e-mail?  We spoke about a
19  variety of concerns including Dr. Firpo's
20  behavior.
21       Q.    I'll try one more time.  You got this
22  e-mail on September 16th, 2011 from Dr. Firpo that
23  we have been talking about, correct?
24       A.    Right.  I'm not sure we specifically
25  went over this e-mail sentence by sentence.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

569

Varughese

1

2        Q.    Whether you went over it sentence by
3  sentence, did you have any conversation with
4  Dr. Petersen in which you said to Dr. Petersen,
5  Dr. Firpo has told me not to come back to work.
6  What do you think about that or I want to talk to
7  you about that?
8        MR. WRONKO:  Form objection.  You can
9     answer.
10       A.    Right, well, what happened was
11  Dr. Petersen approached me and asked me what's
12  going on.  Is there something going on?  Should I
13  know something?  Why is he making all these
14  statements?
15       That's the extent of the reference
16  that we had to this e-mail.  Beyond that, no, we
17  did not discuss this e-mail point by point,
18  sentence by sentence.
19       Q.    Whether you discussed it point by
20  point or sentence by sentence, did you discuss
21  with Dr. Petersen on September 16th Dr. Firpo's
22  instruction to you not to return to work till you
23  provided a doctor's note?
24       A.    No, we did not.
25       MR. McEVOY:  Lunch?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

570

Varughese

1

2        MR. WRONKO:  Sure.
3        (A luncheon recess was taken at
4     12:55 p.m.)

*Computer Reporting NYC Inc.*
*(212) 986-1344*

571

Varughese

1
2      A F T E R N O O N   S E S S I O N
3      (Time noted:  2:05 p.m.)
4  L E E N A   V A R U G H E S E , resumed and
       testified further as follows:
6  EXAMINATION BY (Cont'd.)
7  MR. McEVOY:
8      Q.    So Dr. Varughese, before the lunch
9  break we were talking about the time period around
10 September 16th and September 19th.
11      After you received the e-mail from
12 Dr. Firpo on September 16th, did you receive any
13 communications from Dr. Hughes?
14      A.    Dr. Hughes, yes, I did eventually.
15      Q.    And what communications did you
16 receive from Dr. Hughes on September 16th?
17      A.    I had received a page.  I didn't know
18 who it was from.  I called it and they said
19 everyone went home for the day or something.
20 Nobody answered there.  So that was the
21 communication I received on Friday.
22      Q.    Let me show you a document.
23      MR. McEVOY:  Mark this as Exhibit 49.
24      (Defendants' Exhibit 49, two e-mails
25      dated September 16, 2011 from Dan Hughes to

Computer Reporting NYC Inc.
(212) 986-1344

572

Varughese

1
2      Leena Varughese, Bates Nos. P430 and P431,
3      marked for identification, this date.)
4      Q.    Have you had a chance to look at that?
5      A.    Yes.
6      Q.    So these are two e-mails from
7  Dr. Hughes to you.  The first is dated
8  September 16, 2011 at 5:38 p.m. and the second is
9  dated September 16, 2011 at 6:07 p.m.
10      Did you receive these e-mails?
11      A.    Yes.
12      Q.    Now, before you received these e-mails
13 from Dr. Hughes, had anyone told you that you were
14 going to be referred to the Physician Wellness
15 Committee?
16      A.    No.
17      Q.    Do you know who referred you to the
18 Physician Wellness Committee?
19      A.    At that time, no.
20      Q.    Do you know now who referred you to
21 the Physician Wellness Committee?
22      A.    It's not completely clear to me.
23      Q.    So when you received these e-mails
24 from Dr. Hughes what was your reaction to them?
25      A.    I don't know what my reaction to them

Computer Reporting NYC Inc.
(212) 986-1344

573

Varughese

1
2  was.
3      Q.    Did you respond to these e-mails?
4      A.    Did I respond to these e-mails?  No.
5  I didn't respond.
6      Q.    Why not?
7      A.    I don't know.  I didn't have time to
8  respond to them.
9      Q.    Why not?
10      A.    I did not have time.
11      Q.    You did not have time to respond to
12 them before what?
13      A.    Before what do you mean?  It says here
14 "promptly see your primary care physician for
15 appropriate care."  That's the e-mail that I saw.
16 The second one I did not receive until much later.
17      Q.    Did you interpret these e-mails as
18 requiring a response from you to Dr. Hughes?
19      A.    I interpreted these e-mails as being
20 retaliatory and further punitive actions being
21 taken against me by the hospital.
22      Q.    Why did you interpret them as being
23 retaliatory?
24      A.    Because I had just requested an FMLA
25 leave and I was working with my mentor.  There

Computer Reporting NYC Inc.
(212) 986-1344

574

Varughese

1
2  weren't any other issues and it seemed as if there
3  was no real reason for such an e-mail to me.  And
4  too, Robert Guarino was also scheduled to present
5  and he had cancelled his presentation and I doubt
6  that he was sent the same e-mail.
7      Q.    Do you know if Dr. Guarino requested
8  FMLA leave?
9      A.    Well, requesting FMLA leave does not
10 automatically lead to a referral to Physician
11 Wellness Committee.
12      Q.    That wasn't my question.  Do you know
13 if Dr. Guarino requested FMLA leave?
14      A.    I'm not privy to such information.
15      Q.    In addition to Dr. Hughes, on
16 September 16th did Dr. Firpo attempt to contact
17 you other than by the e-mail that we looked at?
18      A.    No.
19      Q.    On September 16th did Ms. Patel
20 attempt to contact you?
21      A.    No.
22      Q.    On September 19th did Dr. Hughes
23 attempt to contact you?
24      A.    No.
25      Q.    And on September 19th did Dr. Firpo

Computer Reporting NYC Inc.
(212) 986-1344

575

Varughese

1
2  attempt to contact you?
3     A.   No.
4     Q.   And on September 19th did Ms. Patel
5  attempt to contact you?
6     A.   I believe she did contact me in the
7  afternoon.
8     Q.   Now, you said this morning that on
9  September 19th, which was that Monday, you were
10 planning to go to work.
11    A.   I was at work on Monday,
12 September 19th.
13    Q.   Did you work the entire day?
14    A.   Yes.
15    Q.   And when did Ms. Patel contact you on
16 the 19th?
17    A.   At 4, 4:30 p.m.
18    Q.   How did she contact you?
19    A.   I don't recall now.
20    Q.   What did she say when she contacted
21 you?
22    A.   She said she needed to certify the
23 FMLA forms because she had not done so.
24    Q.   What did you say?
25    A.   I said, well, I assumed she should

*Computer Reporting NYC Inc.*
*(212) 986-1344*

576

Varughese

1
2  have done so when she gave me the forms.
3     Q.   Did you have any other conversation
4  with Ms. Patel during that conversation?  Did you
5  say anything else to her, did she say anything to
6  you?
7     A.   No, I just went over and she wanted to
8  meet with me to certify the forms.
9     Q.   And did you go meet with her?
10    A.   Yes.
11    Q.   And did you certify the forms?
12    A.   Right.  She dated it, certified the
13 forms the way she thought she should.
14    Q.   And did you plan to go to work on
15 September 20th?
16    A.   Yes.
17    Q.   And did you in fact go to work that
18 day?
19    A.   I did.
20    Q.   And on your way to work did you see or
21 meet Ms. Patel?
22    A.   I did.
23    Q.   Where did that happen?
24    A.   I met her like on 96th Street and
25 Lexington.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

577

Varughese

1
2     Q.   Did you meet her in a Starbucks?
3     A.   Right, there's a Starbucks at the
4  corner.  I was just getting some coffee.
5     Q.   And when you saw Ms. Patel in the
6  Starbucks did you speak to her, did she speak to
7  you?
8     A.   Right, just said hello and then that's
9  it.
10    Q.   Did Ms. Patel ask you why you were at
11 or near the hospital?
12    A.   I'm not a criminal, by the way, to ask
13 why am I at or near the hospital.
14    Q.   I didn't say you were a criminal.
15    A.   I am perfectly entitled to be at
16 Starbucks.
17    Q.   Did Ms. Patel --
18    A.   At 96th and Lexington.
19    Q.   -- ask you why you were there?
20    A.   At Starbucks?
21    Q.   Yes.
22    A.   No.
23    Q.   Did she ask you whether you were
24 planning to go to work?
25    A.   No.  I informed her that I was on my

*Computer Reporting NYC Inc.*
*(212) 986-1344*

578

Varughese

1
2  way to a conference.
3     Q.   When you told Ms. Patel that you were
4  on your way to a conference did Ms. Patel say
5  anything to you about Dr. Firpo's instruction that
6  you weren't supposed to return to work?
7     A.   No.  She just frantically started
8  making phone calls on her BlackBerry.
9     Q.   While you were still in the Starbucks?
10    A.   Right, right in front of me while I
11 was obtaining my coffee and I tried to leave.
12 Then she followed me.
13    Q.   She followed you from where to where?
14    A.   While I was outside of Starbucks.  I
15 was walking and she insisted that she walk with me
16 and she followed me.
17    Q.   Did Ms. Patel say anything to you
18 while she was following you or walking with you?
19    A.   She said I cannot be here.  I cannot
20 go to work, and so on and so forth.
21    Q.   And did she say anything else?
22    A.   Right, so I asked her why she was
23 saying as such and what her rationale was
24 insisting that I not attend work.
25    Q.   And --

*Computer Reporting NYC Inc.*
*(212) 986-1344*

579

Varughese

1
2     A.   Or attend this conference.
3     Q.   What did Ms. Patel say?
4     A.   She was making phone calls to figure
5  out what she should say to me.
6     Q.   Did she ultimately say something to
7  you?
8     A.   She ultimately told me that I cannot
9  attend conference and I had to wait with her in
10  her office.
11     Q.   So Ms. Patel wanted you to go with her
12  to her office; is that right?
13     A.   Right.
14     Q.   Did you go there?
15     A.   I did.  I felt like I had no choice.
16     Q.   Did you meet with anybody at
17  Ms. Patel's office?
18     A.   While I was in that office, and I
19  spoke with her for a few minutes, she was
20  frantically making phone calls.  It seemed like
21  she couldn't get in touch with whoever she was
22  trying to call.
23          So I said, Well, let me just go to
24  conference and I will come back later and meet
25  with you later at a later time, and she decided

*Computer Reporting NYC Inc.*
*(212) 986-1344*

580

Varughese

1
2  against it and she wanted me to wait there and
3  essentially detained me in her office for an
4  extended period of time.
5     Q.   How long were you in Ms. Patel's
6  office?
7     A.   I believe an hour, maybe more.
8     Q.   At some point did Ms. Patel step out
9  of her office to assist a visitor?
10     A.   Right, there was a person who was
11  allegedly lost in the small office space.
12     Q.   Do you find that funny?
13     A.   I'm not -- I don't find it funny.  I
14  find it a little unbelievable.
15     Q.   So you don't think there was a person
16  who was actually lost?
17     A.   Well, the person who was lost was -- I
18  don't understand how they could be lost.  They
19  wanted to go to Dr. Davis's office, which I wasn't
20  sure it was even on that, in that space.  I mean,
21  I don't even know if it was in that office space
22  area and I'm not even sure if Mrs. Patel's office
23  is really in the Icahn building on that first
24  floor.
25     Q.   But you were in an office that

*Computer Reporting NYC Inc.*
*(212) 986-1344*

581

Varughese

1
2  Ms. Patel said was her office, correct?
3     A.   Well, she alleged that was her office,
4  yes.  She said that was her office, yes.
5     Q.   Did you think she was not telling you
6  the truth about that?
7     A.   Well, there is like nothing in that
8  office.  It is not as if there are any files or
9  anything there.  All the cabinets and everything
10  was empty.  There wasn't much of anything in
11  there.
12     Q.   So you said that Ms. Patel stepped out
13  of the office to assist the visitor, right?
14     A.   Right.  She said, right, that's right.
15  She did step out.
16     Q.   What did she say to you, if anything,
17  when she was leaving the office?
18     A.   What did she say?  She didn't say
19  anything to me.  She insisted that I stay there, I
20  stay in her office.
21     Q.   How long was Ms. Patel out of her
22  office?
23     A.   How long?  I don't know.
24     Q.   And were there files on Ms. Patel's
25  desk?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

582

Varughese

1
2     A.   No, there were no files.
3     Q.   Was there anything on Ms. Patel's
4  desk?
5     A.   There was one folder I believe.
6     Q.   And while Ms. Patel was out of the
7  office did you look through that folder?
8     A.   I picked it up, but I didn't really
9  look through it.
10     Q.   Did you open it?
11     A.   Yes, I did open it.
12     Q.   Did you look through the pages?
13     A.   Yes.
14     Q.   Did you think it was appropriate for
15  you to open a file on someone else's desk?
16     A.   No, I don't think it's appropriate.
17     Q.   Did Ms. Patel come back to the office
18  at some point?
19     A.   Yes, she did.
20     Q.   What happened after she came back?
21     A.   She accused me of opening her file and
22  her folder.
23     Q.   What did Ms. Patel say about you
24  looking at or through the folder?
25     A.   Well, I was concerned that I was being

*Computer Reporting NYC Inc.*
*(212) 986-1344*

583

Varughese

1
2  detained against my will and I wanted to leave.
3  She said, well, I had opened her folder and I
4  apologized for it, and I said I would like to
5  leave at this point.
6      Q.    Did you say to Ms. Patel when she
7  asked you about looking through the folder, did
8  you say to her that she should chill out?
9      A.    I don't recall now if I said that.
10     Q.    Did you say to her what's your
11  problem?
12     A.    Did I say that? I don't recall saying
13  that either.
14     Q.    So did you eventually leave
15  Ms. Patel's office?
16     A.    Did I eventually? Yes, I was forced
17  to leave her office when she wanted me to leave
18  her office.
19     Q.    When you left her office where did you
20  go?
21     A.    I mean, she left me in her office for
22  an extended period of time. Then she wanted me to
23  leave her office. This is an administrator who
24  frankly I've never met. All I know is that she
25  works for either Dr. Charney or Dr. Davis and I

Computer Reporting NYC Inc.
(212) 986-1344

584

Varughese

1
2  believe she was just placed in a position in the
3  department of pathology so that there would not be
4  any, you know, any appearance of discrimination.
5      Q.    Why do you say she was placed in the
6  department so there wouldn't be any appearance of
7  discrimination?
8      A.    Because she is also a woman of Indian
9  descent as I am. So it would seem as though she
10  was acting in whatever capacity. Doesn't seem as
11  if it's discriminatory.
12     Q.    Are you saying, Dr. Varughese, that
13  you think that Ms. Patel was placed in that
14  position to somehow conceal or make it appear as
15  if you weren't being discriminated against because
16  you're an Indian woman?
17     A.    Yes.
18     Q.    What's the basis for that belief?
19     A.    Because she was in all these meetings
20  since July 14th or so and she did not, she never
21  really said anything. She never made any
22  comments. She did not even acknowledge that she
23  was there technically. She had to be introduced
24  by the person who would be there, which is either
25  Cordon-Cardo or Firpo, and yes, she did not really

Computer Reporting NYC Inc.
(212) 986-1344

585

Varughese

1
2  serve in any other role than to, as a second woman
3  of Indian descent.
4      Q.    And other than the fact that she
5  attended the meetings that you just described, any
6  other reason for your belief that Ms. Patel was
7  placed in that position to conceal or make it
8  appear nondiscriminatory in the treatment of you
9  because she was a woman of Indian descent?
10     A.    Right.
11          MR. WRONKO: Form objection.
12     Mischaracterizes her testimony. You can
13     answer.
14     A.    Right, because she could also testify
15  to what happened there and she can directly
16  contradict me, thereby allowing the hospital to
17  make whatever claim they want and say that I'm
18  falsifying something even if I were not.
19     Q.    Any other reason that you --
20     A.    So it would become two against one and
21  one of those individuals would be an woman of
22  Indian descent.
23     Q.    Any other reason you believe that
24  Ms. Patel was placed in that reason for the
25  reasons you've described?

Computer Reporting NYC Inc.
(212) 986-1344

586

Varughese

1
2      A.    Those two reasons.
3      Q.    While you were in Ms. Patel's office
4  did you have any discussion with her? Did you
5  talk to her at all?
6      A.    Not very much, just insisting that I
7  be allowed to attend to what I wanted to attend
8  to.
9      Q.    Did you discuss with Ms. Patel at all
10  the scheduling of doctors' appointments?
11     A.    Just mentioned that I am in the
12  process of scheduling or have scheduled. That's
13  it.
14     Q.    Did you tell her when your doctor's
15  appointment was scheduled for?
16     A.    Yes, I believe I did. I mean, I had
17  no reason to hide that fact, by the way.
18     Q.    I didn't say you did.
19          Did you have a meeting with
20  Ms. Tiger-Paillex and Mr. Johnson?
21     A.    I did.
22     Q.    When was that meeting?
23     A.    That was the same morning.
24     Q.    So after you met with Ms. Patel in her
25  office, then you had a meeting with Mr. Johnson?

Computer Reporting NYC Inc.
(212) 986-1344

587

Varughese

A.   Yes, she chaperoned me or walked me
over to the HR office.

Q.   Where did that meeting take place?

A.   In Caryn Tiger's office.

Q.   Other than you and Ms. Tiger-Paillex
and Mr. Johnson was anybody else present?

A.   Not that I'm aware of.

Q.   Why?  Would you think there was
somebody --

A.   I mean, if there was a conference call
or something like that.

Q.   What was discussed at this meeting?
What did you say, what did Mr. Johnson say, what
did Ms. Tiger-Paillex say?

A.   Well, we discussed a variety of
things.  It was a very long meeting.  Amongst the
discussed items were my requests for FMLA, my
interest in continuing to work, my concerns about
how I was being treated.  And I mean, I don't
know.  You must have that tape.

Q.   Is that another one of the meetings
that you taped?

A.   Right, right.

Q.   And the tape will say obviously

588

Varughese

whatever it says, but did Mr. Johnson or
Ms. Tiger-Paillex ask you why you hadn't responded
to e-mails from Dr. Firpo or Dr. Hughes or
Ms. Patel?

A.   Did they say that?  Were they
wondering why I did not?  I just needed to respond
or something, what not.  I don't know.

Q.   Do you remember saying that you didn't
feel the need to respond to e-mails, that, quote,
only stated facts, unquote?

A.   Did I say that when I was in that
meeting?

Q.   Yes.

A.   I may have.

Q.   Did you say in response to a question
as to why you had not responded to Dr. Hughes, did
you say that you hadn't responded because you had
not found the PWC to be helpful in the past?

A.   In fact, should I elaborate?  I found
the PWC to be retaliatory, an action that was
taken in retaliation to my complaints of
discrimination by the pathology and its
leadership, by the pathology department and its
leadership.  Meanwhile, the PWC was not utilized

589

Varughese

against Adrienne Jordan or Samuel McCash.

Q.   Dr. Varughese, you told me that
before.  What I'm interested in is what you said
at this meeting with Mr. Johnson and
Ms. Tiger-Paillex.
     Did you say that you had not found the
PWC to be helpful in the past?  Did you say you
found it to be retaliatory?

A.   I found it to be retaliatory and it
wasn't helpful to me.  It made me feel like I was
being antagonized and being discriminated against.

Q.   Did Mr. Johnson remind you that
cooperation with the PWC was mandatory?

A.   Correct, I believe that is the --
that's what he said.

Q.   And how long did this meeting last?
You said it was a long meeting.

A.   It lasted about 40 minutes, 45
minutes.

Q.   And what did Ms. Tiger-Paillex say
during this meeting?

A.   She said, you know, I don't even know
why you requested FMLA and it could be for
yourself.  It could be for somebody else.  It

590

Varughese

could be, you know, given all that, we don't know,
we don't know what the reason is, but, you know,
just follow up and -- so I was concerned about the
request for a doctor's note after only being out
for two days.
     She said, Oh, that's not why we want a
doctor's note now, which was sort of contradictory
to what Adolfo Firpo had said.
     So I was getting a lot of conflicting
information from the hospital and I felt that the
continued actions, whether it's referral to PWC or
being detained in Ms. Patel's office or being
forced to meet with Caryn Tiger or Paul Johnson,
it's all very extremely punitive and intended to
retaliate against me.  I mean, I had only
requested FMLA a few days before and already so
many actions were being taken against me.

Q.   During this meeting did Mr. Johnson
say anything about Dr. Firpo's instruction to you,
that you were supposed to not to return to work
until you had provided doctors' notes?

A.   So now I was concerned.  Dr. Firpo I
had already spoken to on Thursday.  I had a
discussion with him.  He clearly knew I was fine.

591

Varughese

1  Varughese
2  He sent me an e-mail that day reiterating as such.
3  And then the following day his tune and tone and
4  whatever had changed.
5          And I assumed he just wanted me to
6  verify that I was out ill or something, and then I
7  came in and I had to make an appointment with my
8  doctor, and which I did, and I assumed the
9  doctor's note would simply verify that I was fit
10 for duty because I could not speak to what had
11 happened a week prior.
12     Q.   My question is, did Mr. Johnson during
13 the meeting on September 20th with you and
14 Ms. Tiger-Paillex, did he say anything to you
15 about the fact that you had been told not to
16 return to work?
17     A.   Did he say anything to me?  I cannot
18 remember off the top of my head.
19     Q.   Did Ms. Tiger-Paillex say anything to
20 you about the fact that you had been told not to
21 return to work?
22     A.   Right, she said that the doctor's note
23 was just to say that I was OK to work and, I mean,
24 she didn't think it was -- it was like an excuse
25 for me being out the week before.  So she thought

*Computer Reporting NYC Inc.*
*(212) 986-1344*

592

Varughese

1  Varughese
2  it was a separate issue and --
3      Q.   Sorry?
4      A.   She thought -- I mean, my
5  understanding was she thought it was separate
6  from, you know, things.
7      Q.   You said that when you went to see
8  your primary care physician, I think you said, on
9  September 20th was it?
10     A.   Right, that was the appointment that I
11 could get.
12     Q.   Right.  That at the end of that visit
13 he or she gave you a note to clear you to return
14 to work; is that right?  Did I mishear you or no?
15     A.   No.
16     Q.   He did not give you a note?
17     A.   He gave me a note.
18     Q.   Did you give that note to anybody at
19 Mount Sinai?
20     A.   Right, I went to HR and I met with HR
21 people and I tried to hand in the doctor's note to
22 the HR person and he told me to -- he told me to
23 just hold on to it.
24     Q.   Who did you speak to in HR?
25     A.   One of the secretaries.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

593

Varughese

1  Varughese
2      Q.   Do you know his name?
3      A.   I believe it was Robert.
4      Q.   So did he tell you why you should hold
5  on to it?
6      A.   I think Caryn Tiger wasn't there.  So
7  I just e-mailed her and let her know that I had
8  the doctor's note that was clearing me.
9      Q.   Did you ever give that note to
10 Ms. Tiger-Paillex?
11     A.   Well, I didn't have an opportunity
12 because the next day they fired me.
13     Q.   Now, after you met with
14 Ms. Tiger-Paillex and Mr. Johnson -- before I ask
15 that, anything else happen at this meeting?  By
16 happen at this meeting, any other conversation
17 between -- anything else you said and what they
18 said during this meeting?  Other than what you've
19 already told me.
20     A.   At that meeting?  No, it seemed like
21 they already had made their decision to fire me at
22 that time.
23     Q.   Were you fired during that meeting?
24     A.   No, I wasn't fired during that meeting
25 but it seemed like that and they said that the

*Computer Reporting NYC Inc.*
*(212) 986-1344*

594

Varughese

1  Varughese
2  Department doesn't expect you to return to work
3  and these are their expectations without even
4  explaining why their position was such.
5      Q.   What was said to you by either
6  Mr. Johnson or Ms. Tiger-Paillex at this meeting
7  that led you to draw the conclusion that it seemed
8  as if they had already decided to fire you?
9      A.   Because they said that the decision,
10 the department's -- the department is not, expects
11 that you not be at work.
12          Even though I was not told that they
13 had arranged, I don't know.  Well, scratch that.
14     Q.   After the meeting did you send an
15 e-mail to Mr. Johnson and Ms. Tiger-Paillex?
16     A.   After this meeting?
17     Q.   Yes.
18     A.   Yes, eventually I did.  After I went
19 to my doctor I sent a letter to them.
20     Q.   Let me show you a document.
21          MR. McEVOY:  Let's mark this as
22 Exhibit 50.
23          (Defendants' Exhibit 50, e-mail dated
24 September 20, 2011, to Paul Johnson and
25 Caryn Tiger-Paillex from Leena Varughese,

*Computer Reporting NYC Inc.*
*(212) 986-1344*

595

Varughese

Bates No. P432, marked for identification, this date.)

Q. Have you had a chance to look at that?

A. Yes.

Q. Why did you send this e-mail to Mr. Johnson and Ms. Tiger-Paillex?

A. Just to confer to them that I had done what was expected of me.

Q. The last sentence says: "I hope this is satisfactory to you."

A. Right.

Q. Did you say that because they had asked you to send them an e-mail or is it just -- why did you write that sentence?

A. Well, I explained what happened and what I had done and I hoped that HR and Paul Johnson would find that to be adequate.

Q. After you met with Mr. Johnson and Ms. Tiger-Paillex on September 20th, did you go to work?

A. Right, I returned after my doctor's appointment with the doctor's note.

Q. I'm just trying to understand the sequence. You're on your way to work. You run

596

Varughese

into Ms. Patel. You go to her office. Then she, you said she walked you or escorted you to a meeting with Mr. Johnson and Ms. Tiger-Paillex.

Am I right about that? Is that the sequence?

A. Right.

Q. So after the meeting with Mr. Johnson and Ms. Tiger-Paillex what did you do next that day?

A. I went to the doctor's appointment at noon.

Q. And then after the doctor's appointment you said did you come back to the hospital to give them the note?

A. Yes.

Q. And you gave them, and that's when you described you went to HR, tried to give it to the secretary.

A. Right, that was like around 2 or 2:30 maybe.

Q. So after you tried to give the doctor's note to the secretary in HR, what did you do next that day?

A. Then I, I think I tried to go to my

597

Varughese

desk or -- I wrote this e-mail, then I went to my desk.

Q. The time of the e-mail looks to be 3:15. So you wrote this e-mail and then you said you went to your desk?

A. Yes, right.

Q. This is the desk you described before as being where?

A. On 15th floor of the Annenberg building.

Q. Is that the room you said there were twenty or so desks?

A. Yes, there are like thirty desks or so.

Q. What did you do when you went to your desk after you sent this e-mail?

A. Nothing. I mean, I was just sitting there, just looking through whatever cases were coming up that day or having signed out. Just the usual stuff.

Q. So you performed what would be your normal work duties?

A. Well, I don't know if it's normal. I just wanted to know what was taking place on

598

Varughese

hemepath.

Q. What time did you leave the hospital that day to go home?

A. Oh, I didn't leave till I believe, I don't know, 8 or 9 p.m.

Q. Between the time you went to your desk in the residents' room and the time you left at 8 or 9 o'clock, did you see anybody?

A. Right. When I was at my desk Dr. Firpo virtually accosted me and charged at me. He didn't charge at me. But he did approach me and he said, Well, Leena, you cannot be here. You're not supposed to be.

I was like, What are you talking about? I already have the doctor's note. I have everything. Just leave me alone.

And then Paul Johnson appeared and he said, No, you cannot be here. Because I think Dr. Firpo said, Oh, let me call Paul Johnson. Let me call Paul Johnson. So Paul Johnson appears and he said, Well, you cannot be here. Then I was like why not? Literally why not.

Q. What did they say?

A. They said because you cannot be here.

599

Varughese
1  They didn't give me a good reason.  They did not
2  give me a reason at all why I shouldn't be there.
3      Q.    Were they there at the same time?
4      A.    Eventually Paul Johnson appeared, yes.
5  First it was just Dr. Firpo who approached me and
6  he came to my desk.  I think I was even in the
7  bathroom for a minute and came out and he started
8  like approaching me and just being just very odd
9  and threatening.
10      Q.    And in response to their saying that
11  you couldn't be here, you shouldn't be here, did
12  you leave?
13      A.    Did I leave?  Yeah, they were -- I had
14  lost my jacket somewhere.  So I wanted to find my
15  jacket.  So I thought perhaps I had left it
16  downstairs in the cafe.
17      So I explained to them like I would
18  speak to them later, I'll approach them later,
19  like I just need to run some errand or what not,
20  so I tried to do that.
21      And despite me asking them to not
22  follow me around and such, both these men chose to
23  follow me around literally all over the hospital.
24      Q.    Let's see if I understand.  So during

600

Varughese
1  this conversation with Dr. Firpo and Mr. Johnson
2  they tell you you shouldn't be there.  Did they
3  ask you to leave?
4      A.    Did they ask me to leave?  They said,
5  Well, you cannot -- they told me I cannot be in
6  the residents' room.
7      Q.    And you said that you wanted to go
8  find your jacket that you had misplaced.
9      A.    Right.
10      Q.    And you said you thought you left it
11  in the cafeteria?
12      A.    Right, I thought I left it somewhere
13  in the cafeteria or in the cafe downstairs.
14      Q.    And you went to look for it?
15      A.    Right.  Then I had Dr. Firpo follow me
16  for some time telling me -- I don't even remember
17  what he said to me now, but it was -- then Paul
18  Johnson took over and he said, OK, let me just
19  walk, you know, he wanted to walk me.  I told him
20  I would come meet him later, but he didn't want me
21  to do that.  He insisted on following me
22  everywhere.  Then he ended up following me
23  everywhere throughout the hospital.
24      Q.    So when you say that Dr. Firpo and

601

Varughese
1  Mr. Johnson followed you are you saying that from
2  the time you left to go look for your jacket they
3  followed you around?
4      A.    Well, Dr. Firpo was following me
5  around the residents' room.  He was saying, what
6  do you say?  He was like, You cannot be here,
7  Dr. Varughese.  You cannot be here.  Leave.
8  Leave.
9      Just being very, you know, no
10  explanation, just that he wants me to leave.
11      Q.    Do know whether on September 20th or
12  September 21st a resident had been assigned to
13  cover for you?
14      A.    No, they didn't inform me that they
15  had assigned somebody else to cover for me.
16      They didn't inform me of anything.
17  There was no clear communication here with me
18  about what they were doing in my absence, nothing.
19  There was no -- you know, technically if somebody
20  covers for me I'm supposed to at some point cover
21  for them or do something along those lines, but
22  there was no such courtesy given to me.
23      Q.    So after you found your jacket, and
24  we're still talking about September 20th, did you

602

Varughese
1  leave the hospital?
2      A.    Did I leave the hospital?
3      Q.    First of all, did you find your
4  jacket?
5      A.    I did find my jacket.
6      Q.    And then did you leave?
7      A.    No, I didn't leave the hospital.  Paul
8  Johnson wanted to speak to me.  So I was like, Do
9  you mind not following me around and speaking to
10  me in the middle of the library?  Why don't we
11  just go to your office or something and you can
12  tell me what is going on.
13      Q.    Did you meet with Mr. Johnson
14  somewhere?
15      A.    Right, so, yes, I went to his office.
16  I was like, So what is it that you wanted to tell
17  me at this point?
18      Q.    This is on September 20th.  At what
19  time?
20      A.    This is around I guess after I sent
21  this e-mail.  Around 4.
22      Q.    I just want to get the sequence.  Was
23  this before Dr. Firpo and Mr. Johnson came to your
24  desk and say you couldn't be there or was it

603

Varughese

1  after that conversation and the hunt for your
2  jacket?
3       MR. WRONKO:  Form objection.
4       A.    That I spoke to Paul Johnson?
6       Q.    In his office.
7       A.    Oh, after I sent this e-mail, after I
8  found my jacket, then I asked Paul Johnson just
9  please like, you know, stop following me around.
10 Please go to your office. I'll meet with you
11 there.
12      Q.    Who was at this meeting?
13      A.    As far as -- it was just me and him.
14 I mean, somebody could have been on the phone or
15 something to be sure.
16      Q.    What did you say to Mr. Johnson, what
17 did he say to you during this meeting?
18      A.    He just said that they don't want you
19 to come in. I asked him who. He said, well, he
20 didn't really have a clear explanation as to who
21 didn't want me to come in. He said that's all he
22 was told and that's what he expected of me at this
23 point.
24          I said, Well, can you give me a reason
25 or at least give me a letter or something stating

604

Varughese

1  what I should do or what is expected of me and
2  why? And that wasn't done.
3       Q.    Did he say who had told him that you
4  weren't supposed to come in?
6       A.    No, he didn't tell me.
7       Q.    Did you ask him?
8       A.    Did I ask? Yes, I asked him. I asked
9  him why this decision was made and who made the
10 decision. But there was no response as to who and
11 why.
12      Q.    How long did this meeting last?
13      A.    About five, ten minutes perhaps.
14      Q.    After the meeting was over what did
15 you do next?
16      A.    Well, I told him I was going to go to
17 the convocation that evening, because I ended up
18 going to it anyway. He said, OK, go. I wasn't
19 told you should not go. So you're allowed to go
20 if you want to.
21      Q.    On September 21st, which is the
22 Wednesday, did you go to work?
23      A.    On September 21st, yes, I did.
24      Q.    Did you go to work intending to
25 perform your duties and responsibilities as a

605

Varughese

1  pathology resident?
2       A.    Well, I went there according to what
3  was, you know, as my duties -- no, I don't know.
4  I don't know if I went there expecting to do my
5  work, especially when I was experiencing so much
6  obstruction and disparate treatment. Of course
7  not.
8          Did I expect to be treated the same
9  way and expect to do my duties at work and be
10 treated with some respect and dignity? No. I had
11 no expectation of that.
12      Q.    That wasn't my question. Why did you
13 go to the hospital on September 21st?
14      A.    Because that's where I work, and you
15 know what? Nobody gave me an explanation as to
16 why I shouldn't be there. Who told so-and-so for
17 me not to be there. None of these things were
18 being explained to me. It was just this arbitrary
19 and capricious manner of conducting themselves
20 that I was really perturbed at.
21      Q.    So even though you had met with Paul
22 Johnson and he told that they, whoever they are,
23 they don't want you to come to work, you went to
24 work the next day.

606

Varughese

1       A.    Well, they wanted me to come to work
2  at 3 p.m.
3       Q.    I understand that. Did you go to work
4  before 3 p.m.?
6       A.    Yes, I did.
7       Q.    What time did you go?
8       A.    I got there at I believe maybe 8.
9       Q.    That was your usual starting time?
10      A.    Well, I start when -- yeah, that's
11 usually supposed to be my starting time. There
12 are times I get to work at 5 or 6 in the morning.
13      Q.    So again, even though they told you to
14 get there at 3, we'll get to that in a minute, you
15 went in there earlier than that even though they
16 told you not to come in.
17      A.    Right, they didn't tell me not to come
18 in. They told me to come in.
19      Q.    They told you to come in at 3.
20      A.    3 p.m., right, with no explanation.
21      Q.    I understand that. You went in you
22 said 8 or 9.
23      A.    Right, I went in at 8, I believe.
24      Q.    At 8. So why did you go at 8 if you
25 had been told to come in at 3?

607

Varughese

MR. WRONKO: Form objection. Asked
and answered.

A.    Because I felt it was in my best
interest to go to work at 8. Because this work
was important to me, my career is important to me,
I enjoy pathology and that's what I thought I
should do. I mean, there did not seem to be any
really good explanation as to why I should not
come in to work.

Q.    Whether there was in your mind a good
explanation or not, you understood, didn't you,
that you were not supposed to come to work until 3
o'clock?

MR. WRONKO: Form objection.

A.    I mean, you're their attorney, you can
tell me why.

Q.    That's not how this works. My only
question for you is, you said that you met with
Mr. Johnson. He told you that you weren't
supposed to come to work, right?

A.    It's highly irregular.

Q.    Is that what he told you?

A.    What?

Q.    That you weren't supposed to come in.

608

Varughese

A.    He said, I was told as such.

Q.    Fair enough. Then you were told I
presume by Mr. Johnson to come in at 3?

A.    He said he was told, informed me that
I should come in at 3 p.m.

Q.    So you understood, didn't you, that
you weren't supposed to come in until 3 o'clock
for whatever purpose you were coming in at 3
o'clock?

A.    Well, I asked for an explanation as to
why and none was provided to me.

Q.    Dr. Varughese, if Mr. Johnson didn't
give you an explanation or didn't give you an
explanation that satisfied you, did you think you
were just free to ignore whatever Mr. Johnson told
you to do?

MR. WRONKO: Form objection. You can
answer.

A.    That's not what I'm saying here.

Q.    That's what I am trying to find out
what you are saying. Because you have now told me
several times that Mr. Johnson told you that they
told him to tell you not to come into work.

On September 20th you also told me

609

Varughese

that Dr. Firpo and Mr. Johnson came to your desk
and told you that you shouldn't be there. Then
Mr. Johnson told you to come in at 3 o'clock on
September 21st.

What I am trying to understand is why
you came into work at 8 o'clock on September 21st
when you were told repeatedly the day before that
you shouldn't be at work. That's all I want to
understand. So tell me why.

MR. WRONKO: Form objection. You can
answer.

A.    Tell you why? That's privileged
communication between me and my attorney.

Q.    It's not a privileged communication as
to why you came to work when you were told not to.

MR. WRONKO: If you can't answer the
question because it would divulge an
attorney-client communication, then you
shouldn't answer it. To the extent you can
answer it without divulging attorney-client
communications then you should.

Q.    So what's the answer?

A.    I can't divulge such information.

Q.    So we'll do it this way. After you

610

Varughese

met with Mr. Johnson and he told you not to come
in till 3 o'clock and you left it, did you talk to
a lawyer after that on that day?

MR. WRONKO: You're not to divulge the
substance of any communications.

MR. McEVOY: I am not asking what you
said.

MR. WRONKO: I understand. I am just
giving a caution.

But keep your answer confined to the
scope of his question which is just simply
whether you spoke to a lawyer that day.

A.    I did speak to an attorney.

Q.    Did you speak, and again, I don't want
to know what was said, did you speak to an
attorney generally about the issue of whether or
not you should go to work?

MR. WRONKO: Don't answer that. That
goes directly to the substance. That's
attorney-client communication.

MR. McEVOY: I disagree with you.

MR. WRONKO: You're asking about what
the substance of the meeting was.

MR. McEVOY: I am asking about whether

611

Varughese

1 or not -- you know, I can ask the question
2 about did you meet with somebody, did you
3 review documents, did you prepare for this,
4 did you do all those things? So I can ask
5 her whether or not -- I didn't ask her what
6 was said, what advice she got. I can
7 certainly ask what the topic was that was
8 discussed. That doesn't go to the substance
9 of the conversation.
10       MR. WRONKO: It is sort of a back door
11 way to get to the substance.
12       MR. McEVOY: I can draw the inference
13 from what Dr. Varughese had said and it's
14 not worth arguing about at the moment, so
15 anyway.
16       Off the record.
17       (A recess was taken from 11:49 to
18 11:55.)
19 BY MR. McEVOY:
20       Q.   So Dr. Varughese, just because we
21 mentioned off the record if for some reason
22 between now and the time we stop around 4:30, if
23 you develop some sort of a headache, you said you
24 get migraines, please let me know. Because I

*Computer Reporting NYC Inc.*
*(212) 986-1344*

612

Varughese

1 don't want you to have to answer questions if
2 you're not able to.
3       You said that Mr. Johnson wanted you
4 to come at 3 o'clock on September 21st. Did he
5 tell you why or where you were supposed to go?
6       A.   Not sure.
7       Q.   I know you said you came in earlier in
8 the day. But at 3 o'clock did you go somewhere or
9 meet with someone?
10       A.   No, I had been fired at that time.
11       Q.   Let me show you another document.
12       MR. McEVOY: Mark that as Exhibit 51.
13       (Defendants' Exhibit 51, e-mail dated
14 September 21, 2011, from Paul Johnson to
15 Leena Varughese, and e-mail dated September
16 20, 2011, from Leena Varughese to Paul
17 Johnson, Bates No. P427, marked for
18 identification, this date.)
19       Q.   Have you had a chance to look at that?
20       A.   Yes.
21       Q.   So this is an e-mail from you to Paul
22 Johnson on September 20th at 7:56 p.m.
23       Why did you write this e-mail?
24       A.   Why did I write it? I just wrote it

*Computer Reporting NYC Inc.*
*(212) 986-1344*

613

Varughese

1 to summarize what had happened from my
2 perspective.
3       Q.   In the last full paragraph it says:
4 "Finally, I will meet with Dr. Firpo as he had
5 requested at 3 p.m."
6       A.   Right.
7       Q.   And I take it that since it says you
8 will meet, you're talking about 3 p.m. the next
9 day?
10       A.   Right.
11       Q.   How did it come about that Dr. Firpo
12 requested to meet with you at 3 p.m. on
13 September 21st?
14       A.   Paul Johnson said that I'm to meet
15 with Firpo at 3 p.m. the following day.
16       Q.   Is that the 3 p.m. meeting that was
17 discussed at the meeting in Mr. Johnson's office?
18       A.   Yes, that was the meeting. I mean,
19 that's what we discussed at that brief meeting
20 that I asked him to have in his office as opposed
21 to the library or the hallway or the resident
22 office or following me around.
23       Q.   If you look at the beginning of the
24 e-mail string, the e-mail from Mr. Johnson to you,

*Computer Reporting NYC Inc.*
*(212) 986-1344*

614

Varughese

1 at 9:54 on September 21st, so the following
2 morning, it says: "In regard to today's meeting
3 who did you intend to bring as a witness?"
4       Had you indicated to Mr. Johnson or
5 someone else that you were planning to bring a
6 witness to the meeting?
7       A.   Yes, I thought I should bring somebody
8 with me.
9       Q.   Mr. Johnson asks you to identify who
10 the witness is and says: "We must know in advance
11 who the witness will be. It must be a Mount Sinai
12 employee."
13       Did you tell Mr. Johnson who the
14 witness was?
15       A.   No.
16       Q.   Did you bring a witness to the
17 meeting?
18       A.   Well, the meeting took place several
19 hours earlier, so no.
20       Q.   Now, on the morning of September 21st
21 when you say that you went to work around 8
22 o'clock, did you speak to Dr. Petersen that
23 morning?
24       A.   Yes.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

615

Varughese

2  Q.   And when did you speak to
3  Dr. Petersen?
4  A.   I spoke to Dr. Petersen that morning
5  when I was being accosted by security, hospital
6  security.
7  Q.   And we'll get to that in a second, but
8  where did the conversation with Dr. Petersen take
9  place?
10  A.   In his office.
11  Q.   Was anybody else present?
12  A.   Well, his office is part of a larger
13  cluster of offices.
14  Q.   Do you know whether anyone else could
15  hear what you were saying?
16  A.   Possibly.
17  Q.   What did you say to Dr. Petersen, what
18  did he say to you on the morning of September 21,
19  2011?
20  A.   I just told him that I was being
21  treated differently, I was being retaliated
22  against. I felt that my rights were being
23  violated. I was being asked to do things that
24  weren't usual protocol for the employees at Mount
25  Sinai Medical Center and that I shouldn't be

*Computer Reporting NYC Inc.*
*(212) 986-1344*

616

Varughese

2  treated this way. I should be treated fairly.
3  Q.   What did Dr. Petersen say?
4  A.   He said -- what did he say? He just
5  said he agreed with me.
6  Q.   Did Dr. Petersen say anything to you
7  about the fact that, about whether you should or
8  shouldn't be at work that day?
9  A.   Should I be? No, he didn't say
10  anything about that.
11  Q.   When you went that morning on
12  September 21st did you refuse or tell anyone that
13  you were refusing to let the assigned resident
14  cover for you today?
15  A.   No, I did not have any opinion about
16  the assigned resident covering for me at all. I
17  mean, why would I? I mean, I would like to do my
18  work, but the hospital was obstructing me from
19  doing my work and taking away opportunities from
20  me that they provided to everybody else in that
21  program, especially, you know, Adrienne Jordan at
22  that time, McCash.
23         The only difference between me and
24  them was that I had complained about McCash
25  harassing me and since then a series of actions

*Computer Reporting NYC Inc.*
*(212) 986-1344*

617

Varughese

2  had ensued against me that was taken upon me by
3  the hospital leadership.
4         I had an attorney who had sent in a
5  letter June 10th or thereabouts, which was
6  completely ignored by the hospital. We did not
7  get any response. And further action was taken
8  against me and it just ensued into this "take
9  action against Leena Varughese."
10  Q.   You said a minute ago that you were,
11  quote, accosted, unquote, by security. When did
12  that happen?
13  A.   That happened that morning,
14  September 21st.
15  Q.   At what time?
16  A.   Around 9, 9:15.
17  Q.   What happened?
18  A.   They approached my desk and they said
19  that they were told that I was to leave, and I
20  informed them I'm a contracted employee of this
21  hospital. If they want me to leave, they have to
22  give me something in writing, because I'm not a
23  threat to anyone or haven't done anything in any
24  way to anybody to warrant such irregular treatment
25  that was directed at me without any explanation at

*Computer Reporting NYC Inc.*
*(212) 986-1344*

618

Varughese

2  all.
3  Q.   And when you say they approached you,
4  who approached you?
5  A.   Well, the security guard.
6  Q.   One? Two?
7  A.   There were several.
8  Q.   How many?
9  A.   I believe it was at least two and they
10  may even have changed and some new person may have
11  come in.
12  Q.   So you wee approached by maybe two
13  security guards who told you that you had to
14  leave, correct?
15  A.   Right.
16  Q.   And you said what you just said. What
17  happened next with the security guards?
18  A.   It seemed like they agreed and they
19  chose not to accost me any further.
20  Q.   So did they leave at that point?
21  A.   No.
22  Q.   What did they do?
23  A.   At least one person stayed.
24  Q.   So what happened next with the
25  security guards, if anything? As I understand it,

*Computer Reporting NYC Inc.*
*(212) 986-1344*

619

Varughese

1
2 they come and tell you you have to leave. You say
3 you're not leaving without something in writing.
4 They stop accosting you. One of them stays where?
5 Near where you are?
6     A.    Right. They were in that area.
7     Q.    So what happened next with the
8 security guards?
9     A.    Nothing. I just -- I mean, I was on
10 the phone for a while and they asked me to get off
11 the phone.
12    Q.    Who were they?
13    A.    The security guard.
14    Q.    So what happened next? I'm trying to
15 understand. You're sitting at your desk. The
16 security guard is standing nearby. What happened
17 with the security guard? Did he or she stay,
18 leave, speak to you again? What happened?
19    A.    I think they stayed there.
20    Q.    Until when?
21    A.    Until I was fired and I was escorted
22 out by security from the hospital, the hospital,
23 yes. The hospital premises.
24    Q.    And how did you learn that you were
25 being terminated from the program?

620

Varughese

1
2     A.    How did I learn? Because I was
3 presented with a letter at a meeting with Firpo
4 and Cordon-Cardo.
5     Q.    When did the meeting with Dr. Firpo
6 and Dr. Cordon-Cardo take place?
7     A.    It took place at 11 or noon or
8 sometime thereabouts.
9     Q.    Where did the meeting take place?
10    A.    It took place in some office space.
11    Q.    Was it Dr. Cordon-Cardo's office? Was
12 it Dr. Firpo's office, somewhere else?
13    A.    It was neither of those as I knew it.
14 It was a new office.
15    Q.    Anybody else present other than you
16 and Drs. Firpo and Cordon-Cardo?
17    A.    Right, apparently the entire hospital
18 administration was invited.
19    Q.    How do you define the entire hospital
20 administration?
21    A.    Well, Caryn Tiger was there, Fersch,
22 Madeleine Fersch, the psychiatrist, numerous
   security personnel. A variety of individuals.
24    Q.    So we have Dr. Cordon-Cardo. We have
25 Dr. Firpo, Ms. Tiger-Paillex, Dr. Fersch and some

621

Varughese

1
2 number of people from security.
3     A.    Right, there was a long line of people
4 that was outside in the hallway.
5     Q.    How many?
6     A.    How many? Perhaps like six, seven,
7 maybe more.
8     Q.    And other than the people you've
9 identified anyone else that you can tell me their
10 name or identify them in some other way?
11    A.    I'm not sure if Paul Johnson was
12 there. But, I mean, no, I cannot really -- it
13 seems like a lot of security personnel was there
14 or perhaps even nurses or nurse practitioners it
15 seemed.
16    Q.    And did any of those individuals
17 attend the meeting between you and Drs. Firpo and
18 Cordon-Cardo?
19    A.    No, when I was there Dr. Fersch said
20 hello. I said, well, what are you doing here,
21 frankly?
22    Q.    So my question is --
23    A.    No, I went into his office and I had a
24 meeting and I asked him what was going on.
25    Q.    When you went into the office to have

622

Varughese

1
2 the meeting was it you, Dr. Firpo and
3 Dr. Cordon-Cardo?
4     A.    Yes.
5     Q.    There was nobody else in the meeting?
6     A.    Not in the room.
7     Q.    Not in the room, fair enough. OK. So
8 when you -- and you started telling me. So you go
9 into the room with Dr. Cordon-Cardo and Dr. Firpo.
10 What happens at the meeting? What did you say,
11 what did they say?
12    A.    I didn't say much. They just said
13 they have a letter for me and I have to read it.
14 Just in a very sexist, chauvinistic patronizing
15 manner.
16    Q.    So what did Dr. Cordon-Cardo say or do
17 that you interpreted as being a sexist,
18 chauvinistic and condescending manner?
19    A.    He said, Read, read this letter. It
20 was just -- frankly, there are times when
21 Cordon-Cardo will say something and it's almost
22 impossible to understand what he's saying. It
23 seems like he has marbles or something in his
24 mouth. He doesn't speak or enunciate himself very
25 clearly. It's very hard to understand him

623

Varughese

1  sometimes.
2         And he said that, you know, this is a
3  decision that was made and, you know, along those
4  lines.
5     Q.    So leaving aside your perception of
6  Dr. Cordon-Cardo's English language skills and
7  enunciation skills, what did he say or do that
8  leads you to make the statement you just made that
9  he behaved in a sexist, chauvinistic and
10 condescending way?  That's all I want to know.
11    A.    Well, he was not interested in what I
12 had to say or hearing my opinion about what was
13 going on, and, you know, he had his own -- and he
14 said read it, and I was trying to read and make
15 comment on the document and they didn't want to
16 hear it.  It was....
17    Q.    What did Dr. Firpo do or say that
18 leads you to the conclusion that he was behaving
19 in a sexist, chauvinistic and condescending way at
20 this meeting?
21    A.    Well, I didn't say Firpo was being
22 chauvinistic.
23    Q.    Just Dr. Cordon-Cardo?
24    A.    No, I mean, I think it's just the

*Computer Reporting NYC Inc.*
*(212) 986-1344*

624

Varughese

1  overall attitude and behavior of this institution
2  and its leadership.
3     Q.    I am not talking about the overall
4  attitude --
5         (Cross-talk.)
6     A.    I think I'm trying to answer this
7  question and you're interrupting me.
8     Q.    I won't interrupt you and I'll let you
9  finish, but I am asking you about what happened at
10 this meeting.  Not about the overall atmosphere at
11 the institution.
12        So I would appreciate if you would
13 answer the question about what happened at the
14 meeting.  So go ahead.
15    A.    I mean, just the, you know, obtaining
16 ten different individuals from a variety of
17 departments and administrative levels of the
18 hospital and obtaining Madeleine Fersch.  It's all
19 making a lot of presumptions and being very
20 presumptive about me as a woman.
21        I feel like they were trying to paint
22 a picture of hysteria or some sort of, you know,
23 mental illness or something that just wasn't
24 frankly there.  And it's just I found it, as a

*Computer Reporting NYC Inc.*
*(212) 986-1344*

625

Varughese

1  physician and a caregiver, I found it very
2  troubling, the course of action that they were
3  taking to be extremely troubling and not in line
4  with the professionalism that I have come to
5  believe in, exemplify and practice.
6     Q.    Anything else said by you or Dr. Firpo
7  or Dr. Cordon-Cardo at the meeting on
8  September 21st, 2011?
9     A.    I mean, that's all I recall right now.
10    Q.    Let me show you a document.
11        MR. McEVOY:  Mark this is as Exhibit
12 52.
13        (Defendants' Exhibit 52, letter dated
14 September 21, 2011 to Leena Varughese from
15 Carlos Cordon-Cardo and Adolfo Firpo, Bates
16 Nos. P853 through P858, marked for
17 identification, this date.)
18    Q.    Take a look at it and let me know when
19 you're done.
20        Have you had a chance to look at that?
21    A.    Yes.
22    Q.    Is this the letter that
23 Drs. Cordon-Cardo and Firpo gave to you on
24 September 21, 2011 during the meeting we've been

*Computer Reporting NYC Inc.*
*(212) 986-1344*

626

Varughese

1  talking about?
2     A.    Yes.
3     Q.    And this is the letter I take it that
4  put you on notice that you had been summarily
5  suspended and terminated from the residency
6  program.
7     A.    Right, summary suspension and
8  termination.
9     Q.    So Dr. Varughese, with regard to the
10 tumor cytogenetics rotation, do you think that
11 during that rotation you did anything wrong or
12 anything unprofessional during your time in that
13 rotation?
14        MR. WRONKO:  Form objection.  You can
15 answer.
16    A.    No, I do not.
17    Q.    And during the two times on August 5th
18 and August 12th of 2011 that you were asked to
19 provide coverage for a sick resident, do you think
20 that you did anything wrong or unprofessional with
21 regard to either, on either of those two
22 occasions?
23    A.    No.
24        MR. WRONKO:  Form objection.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

627

Varughese

2    Q.    And with regard to your request to
3  change your elective from GI pathology to
4  dermatopathology, do you think you did anything
5  wrong or unprofessional in connection with your
6  request to change your elective?
7        MR. WRONKO:  Form objection.
8    A.    No.
9    Q.    With regard to the conference
10 attendance policy and the request that you make a
11 presentation, do you think that you did anything
12 wrong or unprofessional with regard to those
13 issues?
14   A.    No.
15   Q.    With regard to the communications
16 about your leave of absence or your request for
17 leave of absence in September of 2011, do you
18 think that you did anything wrong or
19 unprofessional regarding your request for a leave?
20   A.    No.
21       MR. WRONKO:  Form objection.
22   Q.    Do you think that you could have been
23 more professional or behaved any differently
24 during any of your meetings with Dr. Firpo?
25       MR. WRONKO:  Form objection.

Computer Reporting NYC Inc.
(212) 986-1344

628

Varughese

2    A.    I was professional in my meetings with
3  Dr. Firpo.  He wasn't professional.
4    Q.    The same question, do you think that
5  you could have been more professional or behaved
6  in some different manner during any of your
7  meetings with Dr. Cordon-Cardo?
8        MR. WRONKO:  Form objection.  You can
9    answer.
10   A.    I was very professional in my meetings
11 with Dr. Cordon-Cardo.
12   Q.    Same question with regard to
13 Dr. Lento.
14   A.    I was very --
15       MR. WRONKO:  Form objection.
16   A.    I was very professional in all my
17 meetings with all of the representatives of the
18 hospital at all times, including Dr. Barnett.
19   Q.    I take it that also means Mr. Johnson,
20 Ms. Caryn Tiger, and Dr. Jordan and whoever else?
21   A.    Absolutely, yes.
22       MR. WRONKO:  Form objection.
23   Q.    And last question on that line.  Do
24 you think that with regard to Dr. Firpo's
25 instruction that you not return to work on

Computer Reporting NYC Inc.
(212) 986-1344

629

Varughese

2  September -- the instruction he gave you on
3  September 16th that you weren't to return to work,
4  do you think that you did anything wrong or
5  behaved unprofessionally with regard to that
6  instruction or what happened or what you did
7  thereafter?
8        MR. WRONKO:  Form objection.  You can
9    answer.
10   A.    No.
11   Q.    In the termination letter that we just
12 looked at, the last paragraph says that "You have
13 a right to appeal your summary suspension and
14 termination by requesting, in writing, a hearing
15 before the House Staff Affairs Committee of the
16 Medical Board within ten days of receiving this
17 notice."
18       Do you see that?
19   A.    Yes.
20   Q.    Did you appeal the summary suspension
21 and termination?
22   A.    Yes, I sent a letter to Dr. Michael
23 Harris and I found some hindrance in terms of
24 obtaining this hearing even.
25   Q.    I'm sorry?  I didn't hear what you

Computer Reporting NYC Inc.
(212) 986-1344

630

Varughese

2  said.
3    A.    Hindrance.  There was some hindrance
4  in obtaining the hearing, because Dr. Harris
5  apparently did not get the letter and I had to
6  resend the letter.  I mean, just to get this
7  hearing it was very difficult.
8    Q.    Let me show you a document.
9        MR. McEVOY:  Mark this as Exhibit 53.
10   A.    (Continuing) It seemed as though the
11 hospital did not want me to appeal.  Although they
12 do say that's a due process right that I have.
13       (Defendants' Exhibit 53, letter dated
14       September 28, 2011, to Dr. Michael T.
15       Harris, from Leena Varughese, MD, Bates No.
16       D-1407, marked for identification, this
17       date.)
18   Q.    Have you had a chance to look at that?
19   A.    Right.
20   Q.    Is this the letter that you sent to
21 Dr. Harris requesting a hearing to appeal the
22 decision of summary suspension and termination?
23   A.    Yes.
24       MR. McEVOY:  We need to get a
25   document.  So let's take a couple of

Computer Reporting NYC Inc.
(212) 986-1344

631

Varughese

1   minutes.
2       MR. WRONKO: OK.
3       (A recess was taken from 3:25 to
4   3:35.)
5   BY MR. McEVOY:
6       Q.   So Dr. Varughese, we just identified
7   that letter and that letter is the one dated
8   September 28th from you to Dr. Harris requesting a
9   hearing.
10       Was a hearing scheduled?
11       A.   Eventually.
12       Q.   When was the hearing scheduled for?
13       A.   It was scheduled for November 14th.
14       Q.   Did it take place on November 14th?
15       A.   Yes, it did.
16       Q.   In front of what body was the hearing
17   held?
18       A.   It was supposed to be an ad hoc
19   committee consisting of a variety of individuals,
20   physicians who were hired in the hospital.
21       Q.   And it's called the House Staff
22   Affairs Committee?
23       A.   Right.
24       Q.   Did there come a point in time when
25

*Computer Reporting NYC Inc.*
*(212) 986-1344*

632

Varughese

1   you received the decision of the committee?
2       A.   Yes.
3       Q.   When did you receive the decision?
4       A.   December sometime.
5       Q.   I show you a document.
6       MR. McEVOY: Mark this as Exhibit 54.
7       (Defendants' Exhibit 54, letter dated
8   December 2, 2011, from Steven Weinfeld,
9   M.D., to Dr. Leena Varughese, marked for
10   identification, this date.)
11       Q.   Take a look at it and let me know when
12   you've had a chance to do that.
13       A.   OK.
14       Q.   Have you had a chance to look at that?
15       A.   Yes.
16       Q.   Is this the decision of the House
17   Staff Affairs Committee that you received in
18   December of 2011?
19       A.   Yes.
20       Q.   And it says what it says, but the
21   committee found that the Department of Pathology's
22   actions to suspend and terminate you were
23   supported by the testimony and other evidence and
24   were not arbitrary and capricious, correct?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

633

Varughese

1       MR. WRONKO: Objection to form.
2       Q.   Is that what it says?
3       A.   What it says?
4       Q.   Look at page 7 of the document. It's
5   not there. It's on page 7.
6       A.   Right, but it doesn't say that on the
7   cover letter.
8       Page 7? Let's see.
9       MR. WRONKO: I just want to put a
10   general objection on the record. I know my
11   substantive objections are preserved to
12   trial, but just to the extent that I'll make
13   an objection that this document ultimately I
14   don't think would be admissible given the
15   fact that it's a different body making a
16   substantive determination about the issues
17   in dispute.
18       But with that being said, that's
19   reserved till trial. I just wanted to make
20   a note on the record.
21       MR. McEVOY: Suffice it to say, I
22   disagree with you.
23       Q.   So on page 7 it says: "In sum, as
24   indicated above" -- it's the last paragraph on
25

*Computer Reporting NYC Inc.*
*(212) 986-1344*

634

Varughese

1   page 7, Dr. Varughese. That's where we're
2   looking. Not on that page.
3       A.   OK, yes, yes.
4       Q.   OK? -- "based on the testimony and
5   evidence presented, the Committee unanimously
6   finds and concludes that the Department's actions
7   to suspend and terminate Dr. Varughese from the
8   pathology residency program were clearly supported
9   by the testimony and other evidence and were
10   clearly not arbitrary and capricious."
11       Is that what that says?
12       MR. WRONKO: Objection to form. You
13   can answer.
14       A.   Yes.
15       Q.   Before the hearing took place were you
16   notified as to who the members of the committee
17   would be?
18       A.   Yes, at some point I was, but I was
19   not given a date, but I was notified as to what
20   members would be.
21       Q.   In that same communication that
22   notified you as to who the members of the
23   committee would be, did it also tell you that if
24   you objected to any of the members of the

*Computer Reporting NYC Inc.*
*(212) 986-1344*

635

Varughese

1
2    committee serving on the committee you could voice
3    that objection?
4        A.    Right.
5        Q.    Did you object to any of the committee
6    members?
7        A.    Well, I didn't object to a specific
8    committee member, but I did object to it being
9    overly represented by surgeons.
10       Q.    Were any changes to the committee made
11   as a result of your objection to being overly
12   represented by surgeons?
13       A.    I believe they added at least one
14   woman or several females, but I don't really see
15   any minorities here.
16       Q.    Now we're talking about surgeons.
17       A.    Yes, but they did add -- I believe the
18   surgeon here really is Dr. Martin and Weinfeld,
19   the chairmen of the committee, and Dr. Michael
20   Marin, he's the chairman of the Department of
21   Surgery.
22       Q.    So --
23       A.    I believe my objections were not
24   really heard.
25       Q.    Other than objecting to the fact that

637

Varughese

1
2        A.    It wasn't changed technically. I
3    mean, OK, it was changed so that Dr. Weinfeld -- I
4    think Dr. Harris was initially supposed to oversee
5    the committee.
6        Q.    But Dr. Harris is a surgeon, correct?
7        A.    Right, and then there was the chief
8    resident in surgery who was supposed to be there,
9    Dr. Lowe I believe, and Dr. Genden who is also a
10   surgeon who I worked with a lot.
11       Q.    Dr. Genden is the chair of
12   otolanryngology, correct?
13       A.    Right, he's an ENT, a head, ear and
14   nose and throat surgeon who I worked with also.
15       Q.    So let me understand. So Dr. Harris
16   was originally on the committee and then was
17   removed from the committee.
18       A.    Right. I believe he was no longer
19   the, you know, overseeing the House Staff Affairs
20   Committee at that time.
21       Q.    When you got the notice of who was on
22   the committee, was Dr. Harris one of the members
23   of the committee?
24       A.    Yes, I believe he was.
25       Q.    Was the chief resident in surgery who

636

Varughese

1
2    you thought there were too many surgeons and they
3    made changes to add non-surgeons, what other
4    objection did you voice or did you make to the
5    composition of the committee?
6        A.    I think I was interested in having it
7    be represented by a bunch of different fields, not
8    just surgery and anesthesiology.
9        Q.    So were you notified as to the
10   reconstituted composition of the committee?
11       A.    Right. They reconstituted it very
12   minorly.
13       Q.    Let me be sure you understand what I'm
14   saying. You get a letter or an e-mail or some
15   communication from the hospital. It says these
16   are the members who have been appointed to the
17   committee, right? The first committee. Right?
18   You've got to say yes or no.
19       A.    Yes.
20       Q.    Then you made the objection to the
21   composition of the committee that you just
22   described, correct?
23       A.    Yes.
24       Q.    And then the committee was changed as
25   you just described, correct?

638

Varughese

1
2    you just identified, was he or she a member of the
3    committee?
4        A.    Right, she was a member of the
5    committee and Dr. Genden was a member of the
6    committee, and they changed it so that
7    Dr. Weinfeld and Dr. Michael Marin would be on
8    this committee.
9        Q.    I just want to stay with it. So you
10   objected to there being that many surgeons on the
11   committee.
12       A.    Right, they were like half the
13   committee members were surgeons who worked closely
14   with each other all the time and also Melissa
15   Rocco, she's an anesthesiologist, she also works
16   very closely with the surgeons.
17             So I thought it would be better if it
18   was more representative of the physicians that
19   practice medicine in the hospital.
20       Q.    So after you made that objection,
21   Dr. Harris, Dr. Genden and the chief resident of
22   surgery were removed from the committee, correct?
23       A.    I'm not sure if they were removed or
24   if they decided they did not want to do the
25   hearing.

639

Varughese

2  Q.   Well, they were on the original
3  committee.  You made an objection and then they
4  weren't on the next list of committee members that
5  you got, correct?
6  A.   Right.  There was a new list of people
7  who was overseeing the committee and -- yes.
8  Q.   So the committee is now constituted
9  by, when you got the new or the reconstituted
10  committee, it was Dr. Weinfeld, right?
11  And what is Dr. Weinfeld's area of
12  practice?
13  A.   I believe it's orthopedic surgery.
14  Q.   And Dr. Bronheim?  What's
15  Dr. Bronheim's area of practice?
16  A.   He's a psychiatrist.
17  Q.   And Dr. Marin?
18  A.   He is a surgeon, vascular surgeon.
19  Q.   Dr. Gila Leiter?
20  A.   She's an OB/GYN doctor.
21  Q.   And Dr. Marissa Raymond-Flesch?
22  A.   She's peds and internal medicine.
23  Q.   And Dr. Melissa Rocco?
24  A.   She's an anesthesiologist.
25  Q.   So were you notified before the

640

Varughese

2  hearing that these were now the members of the
3  committee?
4  A.   Right.  I was notified very shortly
5  before the hearing that these were to be the new
6  committee members and also I was not given an
7  adequate time or notice for the hearing.
8  Q.   But that's not what we're talking
9  about here.  Did you make any objection to the
10  reconstituted committee, the members that we were
11  just talking about?
12  A.   It was too late at that time and I did
13  not really have time to object.
14  Q.   Did you make any objections to the
15  members of the committee at the hearing?
16  A.   No, I did not.  I didn't think that
17  was an option available to me.
18  Q.   When you say you weren't given enough
19  notice of the hearing, when were you given notice
20  of the hearing?
21  A.   I believe just a few days prior to the
22  hearing.
23  Q.   Did you ask for the hearing to be
24  adjourned because you didn't have adequate notice?
25  A.   No.  Because I had been insisting that

641

Varughese

2  the hearing take place as soon as possible so it
3  can be determined whether or not they were
4  interested in rehiring me or not.
5  Q.   Dr. Varughese, after you got the
6  decision of the committee, did you appeal that
7  decision?
8  A.   This decision?  Yes, I appealed the
9  decision.
10  Q.   Who did you appeal it to?
11  A.   Whoever is listed in this letter as
12  being the individual to direct the appeal to,
13  Dr. Reich.
14  Q.   And I will tell you that it's the
15  cleverly named Appeal Committee.
16  Did you have a hearing in front of the
17  Appeal Committee?
18  A.   Right.  There was a hearing.
19  Q.   And did you attend the hearing?
20  A.   Yes.
21  Q.   Were you represented by counsel at the
22  hearing?
23  A.   Yes.
24  Q.   And did the Appeal Committee render a
25  decision on your appeal?

642

Varughese

2  A.   Yes.
3  Q.   Before the hearing were you notified
4  as to who would serve on the committee?
5  A.   Yes.
6  Q.   And did you make any objection to the
7  members of the Appeal Committee?
8  A.   No, I don't think I did.
9  Q.   Let me show you a document.
10  MR. McEVOY:  Mark this as Exhibit 55.
11  (Defendants' Exhibit 55, cover letter
12  dated March 7, 2012, from Amelie Trahant to
13  Leena Varughese, Bates No. D-971, marked for
14  identification, this date.)
15  Q.   Again, Dr. Varughese, if you would
16  take a look at that document and let me know when
17  you've completed doing so.
18  MR. WRONKO:  Same objection I put on
19  the record to Defendants' Exhibit 55 as I
20  made on 54 without elaborating.
21  A.   OK.
22  Q.   Can you tell me what this document is?
23  A.   This is the decision from the Appeal
24  Committee.
25  Q.   The decision of the Appeal Committee

643

Varughese

1 upheld the House Staff Affairs Committee's
2 decision, correct?
3            MR. WRONKO:  Form objection.  You can
4 answer.
5    **A.**    Yes.
6    **Q.**    Who is Dr. Nash?
7    **A.**    Dr. Nash?  Ira Nash?  He's one of the
8 doctors there.  I believe he's a medical officer
9 of the hospital.
10    **Q.**    Do you know what his area of practice
11 is?
12    **A.**    I thought it was internal medicine.
13 I'm not completely sure.
14    **Q.**    Susan Bernstein?
15    **A.**    I'd say that she's a licensed clinical
16 social worker.
17    **Q.**    And Dr. Jagoda?
18    **A.**    He's an emergency medicine physician.
19    **Q.**    Dr. Varughese, are you familiar with a
20 document called a Summative Evaluation?
21    **A.**    Yes.
22    **Q.**    What is a Summative Evaluation?
23    **A.**    Well, I became familiar with this
24 document as of I believe January/February of 2011,

*Computer Reporting NYC Inc.*
*(212) 986-1344*

644

Varughese

1 2012 actually, January or February of 2012,
2 following an interview with Robert Wood Johnson
3 Medical Center, medical school or medical center,
4 for a position, a fourth-year residency position
5 that was going to begin in July of 2012.
6            So when I was at this interview they
7 were interested in hiring me and they said that
8 they would like verification of my years of
9 completed training by the former employer, which
10 was Mount Sinai Medical Center at that time.  And
11 then I became aware of the Summative Evaluation
12 document at that time.
13    **Q.**    So prior to January or February of
14 2012 when you interviewed at Robert Wood Johnson
15 Medical Center were you aware that a document
16 called a Summative Evaluation existed?
17    **A.**    No, I didn't know.
18    **Q.**    After you had the interview at Robert
19 Wood Johnson that you just described, what, if
20 anything, did you do or what communication did you
21 have with Mount Sinai?
22            MR. WRONKO:  Form objection.  You can
23 answer.
24    **A.**    Well, at that time I was interested in

*Computer Reporting NYC Inc.*
*(212) 986-1344*

645

Varughese

1 obtaining this position and the program director
2 there, Dr. Billie Fyfe, had informed me that she
3 was interested in hiring me because this position
4 was essentially a match made in heaven.  They
5 thought I would be a great fit for them, and I
6 essentially needed this job because it would allow
7 me to complete my clinical pathology training and
8 also what remaining anatomic pathology training I
9 needed.
10            So along those lines I was interested
11 in obtaining this position, but when she called
12 the hospital to request that my records and
13 everything be transferred over to their program,
14 it was stated that they would not do such a thing.
15 They flat out refused.
16            Dr. Fyfe asked me what is going on.
17 Why would they do that?  I said, well, I do not
18 know.  So she called them again.  And they said I
19 had filed a lawsuit against the hospital at that
20 time.
21            And I said, I informed her that I did
22 not file a lawsuit against the hospital at that
23 time.  Only complained.  There was a complaint
24 that was filed with the EEOC regarding what had

*Computer Reporting NYC Inc.*
*(212) 986-1344*

646

Varughese

1 occurred since my complaint of gender description
2 and harassment and retaliation at Mount Sinai
3 Medical Center.  And they told, I believe they
4 told Dr. Fyfe that I was to drop the complaint if
5 I wanted my records.
6    **Q.**    And who did Dr. Fyfe speak to at Mount
7 Sinai?
8    **A.**    She said she was speaking to
9 Dr. Firpo.
10    **Q.**    Did she say that she spoke to anybody
11 at Mount Sinai other than Dr. Firpo?
12    **A.**    She said she -- no, she said she spoke
13 to Dr. Firpo because he was at that time the
14 program director.  He had been promoted to the
15 program director position.
16    **Q.**    What did you do after Dr. Fyfe
17 informed you of her conversation with Dr. Firpo?
18    **A.**    I said, well, there is no lawsuit.  I
19 informed her there wasn't a lawsuit.  There was a
20 complaint that can be mediated through the EEOC.
21 It was an offer that was put forward by the EEOC
22 to mediate this complaint at that time.
23            And I'm not at liberty to simply
24 remove my complaint without a formal mediation

*Computer Reporting NYC Inc.*
*(212) 986-1344*

647

Varughese

1
2  process because I was represented by an attorney
3  at that time. And I was shocked that this would
4  be conveyed to a third party as such for a simple
5  request of records of work that I had completed
6  satisfactorily.
7      Q.   So did you take any steps to inquire
8  as to getting your records to be sent Robert Wood
9  Johnson?
10     A.   Yes.
11     Q.   What did you do?
12     A.   I spoke to my attorney immediately. I
13  sent him a letter.
14     Q.   Just remember, to --
15         MR. WRONKO: You have to be careful.
16     Q.   -- repeat Mr. Wronko's wise counsel.
17  Go ahead.
18     A.   I sent a letter to my attorney
19  asking --
20         MR. WRONKO: No, no. Don't divulge.
21     Let me stop you again just to counsel you.
22     You shouldn't divulge any communications
23     that you've had with your attorney.
24     Q.   So here is what I'm interested in,
25  Dr. Varughese, and it may solve the problem. I'm

648

Varughese

1
2  not interested in what you may have spoken to your
3  attorney about in connection with efforts to get
4  your records.
5         If your attorney sent a letter to
6  Mount Sinai or if he or she communicated with
7  Mount Sinai, that's not privileged. So you can
8  tell me that my attorney did X, Y or Z to try and
9  get the hospital to release my records. You can
10  tell me I made a phone call to somebody, I sent an
11  e-mail to somebody, I went to visit somebody.
12  Those things you should tell me.
13         Don't tell me about what happened
14  between you and your attorney that resulted in any
15  of those things, because that's not something that
16  I need to know or should know.
17         Do you understand what I just told
18  you?
19     A.   Yes.
20     Q.   So what, if any, efforts did you make
21  to obtain your records so that they could be sent
22  to the Robert Wood Johnson Medical Center?
23     A.   So I informed -- simply I contacted my
24  attorney, told him what had happened and what the
25  circumstances were. And he sent a letter to the

649

Varughese

1
2  attorney at Mount Sinai Medical Center.
3      Q.   And did your lawyer receive a response
4  to that letter?
5      A.   We did not -- I did not get a response
6  to that letter for at least a week, perhaps more,
7  longer, and I had also e-mailed the leadership of
8  the hospital requesting that my records be
9  released.
10     Q.   Who did you e-mail?
11     A.   Well, I e-mailed Dr. Reich who was now
12  the interim president of the House Staff Affairs
13  Committee. I believe I e-mailed Dr. Charney and
14  Dr. Davis and other individuals who I thought were
15  in positions of leadership at the hospital who can
16  intervene, because they're physicians and I
17  understand their work is important to them and
18  their careers are important to them as much as
19  mine is to me, and I thought they would be
20  understanding of that.
21     Q.   Did your lawyer ever receive a
22  response to his or her letter?
23     A.   A very delayed response, yes.
24     Q.   What response was it? Was your lawyer
25  a man or a woman, so I can avoid saying he or she?

650

Varughese

1
2      A.   It was a man.
3      Q.   So what response did he receive from
4  Mount Sinai?
5      A.   He received a response simply stating
6  that they will not send the records.
7      Q.   Who did he receive the response from?
8      A.   I believe one of the associate general
9  counsel.
10     Q.   And did you receive a response to any
11  of your e-mails from the various individuals you
12  just identified?
13     A.   Right, Dr. Reich said he would forward
14  my e-mail to the general counsel.
15     Q.   Do you know what the hospital's policy
16  is regarding providing a resident's records to
17  another institution?
18     A.   Well, it's not really explained
19  anywhere.
20     Q.   To come back to kind of where we
21  started, I think, how did you learn that there was
22  a document called a Summative Evaluation?
23     A.   I learned about this document as I
24  have informed you from Dr. Fyfe who said, you
25  know, I need a verification of the records and

651

Varughese

1  some sort of transfer from the former program.
2      Q.   And that's where I got confused.
3  Because you said that, but then what I thought you
4  said was Dr. Fyfe made a request to Dr. Firpo for
5  your records.
6
7      A.   Right. So she got on the phone. She
8  said, let me call them right now. We want to hire
9  you.
10         It was a delayed date at that time and
11 for us to go through the, um, what is it? The
12 match process or the ERAS matching process, that
13 matching process we had to, um, they had to put me
14 in the system, that date itself, because it was
15 rather late that I was interviewing with them and
16 they wanted to put me in the system because they
17 were a hundred percent confident that they were
18 going to hire me and they were a hundred percent
19 interested in hiring me.
20         So they simply needed a good faith
21 effort from the former employer, Mount Sinai
22 Medical Center, given that they had already said
23 that they did not want to rehire me, that I am
24 allowed to continue with my residency in another
25 institution.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

652

Varughese

2      Q.   So when did you first hear the term
3  "Summative Evaluation"?
4      A.   That was then.
5      Q.   So did you or someone on your behalf
6  make a request for a copy of the Summative
7  Evaluation?
8      A.   My attorney made a request.
9      Q.   And was a copy of the Summative
10 Evaluation provided to you?
11     A.   It was provided to my attorney who
12 then eventually forwarded it to me.
13     Q.   Let me show you a document.
14         MR. McEVOY: Mark this as Exhibit 56.
15         (Defendants' Exhibit 56, cover letter
16     dated March 15, 2012, from Amelie Trahant to
17     Leena Varughese and Russell Moriarty, Bates
18     No. P938, marked for identification, this
19     date.)
20     Q.   Have you had a chance to look at that?
21     A.   Yes.
22     Q.   And do you recognize it?
23     A.   It appears to be a cover letter.
24     Q.   It's a letter to you at your address
25 in Brooklyn and a letter to Russell Moriarty, who

*Computer Reporting NYC Inc.*
*(212) 986-1344*

653

Varughese

1  I take it was your lawyer at the time. It's from
2  Amelie Trahant, Assistant General Counsel, and it
3  says: "Please find attached the Summative
4  Evaluation of Dr. Varughese's performance during
5  her period of residency at Mount Sinai," correct?
6
7      A.   Yes.
8      Q.   You received that letter?
9      A.   Yes.
10     Q.   Let me show you another document.
11         MR. McEVOY: Mark this as Exhibit 57.
12         (Defendants' Exhibit 57, document
13     headed "Verification and Summative
14     Evaluation of Graduate Medical
15     Education/Training," Bates Nos. P989 and
16     P990, marked for identification, this date.)
17     Q.   Take a look at that, Dr. Varughese,
18 and let me know when you're done.
19     A.   OK.
20     Q.   Have you had a chance to look at it?
21     A.   Yes.
22     Q.   Do you recognize it?
23     A.   Yes.
24     Q.   Tell me what it is.
25     A.   This is the Summative Evaluation.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

654

Varughese

2      Q.   Is this the Summative Evaluation that
3  accompanied Ms. Trahant's letter of March 15,
4  2012?
5      A.   Yes, this was forwarded to me by my
6  attorney at some point.
7      Q.   Before it was forwarded to you by your
8  attorney had you ever seen this document?
9      A.   No.
10     Q.   Did you know that summative
11 evaluations were prepared for residents?
12     A.   No, I did not know until then. That's
13 how it....
14     Q.   Do you know whether this document was
15 ever provided to the Robert Wood Johnson Medical
16 Center?
17     A.   No, I believe it was not.
18     Q.   And what happened to your application
19 for a position at Robert Wood Johnson? I take it
20 you didn't get it.
21     A.   Well, what happened was they said that
22 they needed my records and because of interference
23 they could not hire me.
24     Q.   Who told you that? Dr. Fyfe?
25     A.   Well, Dr. Fyfe indicated as much, that

*Computer Reporting NYC Inc.*
*(212) 986-1344*

655

Varughese

1  she could not enter me into the system for the
2  ERAS match because of the obstruction that was
3  going on with Mount Sinai Medical Center and their
4  refusal to make that good faith effort, and then
5  too -- so technically they could not hire me
6  because of that. That's what they said.
7        And they said my residency records
8  were not verified by Mount Sinai Medical Center
9  and that was impressed upon me by Dr. Cadoff.
10     Q.   Who is Dr. Cadoff?
11     A.   He is the chairman of the Department
12 of Pathology at Robert Wood Johnson Medical
13 Center.
14     Q.   What did Dr. Cadoff tell you?
15     A.   He just simply said that I couldn't be
16 hired because of Mount Sinai Medical Center's
17 actions.
18     Q.   And what you say Dr. Cadoff told you
19 and Dr. Fyfe told you, did they tell you that
20 orally or in writing?
21     A.   Well, my communication with Dr. Fyfe
22 on the day of the interview was orally. She did
23 leave me a voice mail eventually that evening
24 informing me that she had yet again attempted to

656

Varughese

1  contact Mount Sinai Medical Center and it did not,
2  you know, she could not get the required documents
3  for me.
4        And then I e-mailed Dr. Cadoff and --
5  I actually e-mail Dr. Fyfe again several months
6  later because I was still in the process of
7  obtaining or attempting to obtain a residency at
8  this time, and this was -- I think the match ran
9  from like the 12th onwards or something along
10 those lines. So I had contacted her again to find
11 out if there was any way she could still, you
12 know, they could reconsider the position and still
13 hire me. So....
14     Q.   Did you ever get anything in writing
15 from anyone at Robert Wood Johnson Medical Center
16 telling you why they couldn't hire you into a
17 position in their pathology residency program?
18     A.   Right. They said it was because the
19 records were not --
20     Q.   Not what they said. Did you ever get
21 something in writing?
22     A.   Yes, I got something in writing that
23 said, yes.
24     Q.   What did you get in writing?

657

Varughese

1     A.   Just a short e-mail saying my records
2  were not being verified by Mount Sinai Medical
3  Center.
4     Q.   Who did that e-mail come from?
5     A.   Dr. Cadoff.
6     Q.   Dr. Varughese, if you look at the
7  Summative Evaluation, do you agree with it?
8     A.   I think this has already been
9  discussed ostensibly as part of this litigation
10 and I think you know about my position.
11       MR. WRONKO: No, just answer the
12 question.
13     A.   I can assure you, Dr. Varughese, that
14 I have never asked you anything about this during
15 this deposition. So I don't know what you're
16 talking about. But this is the time to talk about
17 it during your deposition.
18       So do you think that this Summative
19 Evaluation is fair or accurate?
20     A.   No, it's not fair, it's not accurate.
21 It's punitive and it's intended to destroy my
22 prospects as a physician, whether it's in
23 pathology or in any other field.
24       In fact, it's intended to prevent me

658

Varughese

1  from being hired by practically any company or
2  having any -- holding any job in the medical
3  field.
4     Q.   I understand that. Do you think that
5  this Summative Evaluation was prepared, signed by
6  Dr. Firpo, because of the complaint you made about
7  Dr. McCash in December of 2010?
8     A.   Yes.
9     Q.   Do you think it was prepared for any
10 other reason other than because you made that
11 complaint?
12     A.   No.
13       MR. McEVOY: Why don't we take a
14 few-minute break and we'll see what else, if
15 anything, we can accomplish today.
16       (A recess was taken.)
17 BY MR. McEVOY:
18     Q.   Dr. Varughese, did there come a time
19 when you reported that other residents in
20 pathology were bringing alcohol to the hospital
21 and consuming it at the hospital?
22     A.   Yes, I did report that.
23     Q.   And when did you report that?
24     A.   I reported that sometime in January.

659

Varughese

1  
2   Q.   Of 2012?
3   A.   Right.
4   Q.   And who did you report it to?
5   A.   I reported that to Paul Johnson.
6   Q.   Anybody else?
7   A.   Art Figur.
8   Q.   Anyone else?
9   A.   Then I made the same complaint again
10 to Dr. Fowkes.
11   Q.   When did you complain to Dr. Fowkes?
12   A.   April.
13   Q.   Well, not complaint.  When did you
14 report it to Dr. Fowkes?
15   A.   April of 2011.
16   Q.   So was it January 2012 or 2011?
17   A.   2011, and prior to that I may have,
18 you know, complained to my supervisors about it.
19   Q.   You told me to Mr. Johnson and
20 Dr. Figur in January of 2011, Dr. Fowkes in April
21 of 2011.
22   A.   And within the department I have
23 complained about it to, um, I think I discussed it
24 with my mentor.
25   Q.   That would be Dr. Petersen?

Computer Reporting NYC Inc.
(212) 986-1344

660

Varughese

1  
2   A.   Right.
3   Q.   Anybody else that you discussed or
4 reported, I'll call it, drinking on the job other
5 than those individuals -- Johnson, Figur, Fowkes
6 and Petersen?
7   A.   No, it was so widespread.
8   Q.   I didn't ask you if it was widespread.
9 I asked you who you reported it to.
10   A.   That's it.
11   Q.   So in January 2011 what did you tell
12 Mr. Johnson about alcohol on the job, drinking on
13 the job?
14   A.   I just reported that, you know, there
15 was drinking on the job and it was sort of, you
16 know, whenever people wanted to drink they had a
17 drink at work even though they were involved in
18 patient care or patient-care-related duties, and I
19 reported it in the context that I was concerned
20 that perhaps McCash was consuming alcohol on the
21 date that he was attacking me.
22   Q.   That would be December 8th you're
23 talking about, 2010.
24   A.   Right, even perhaps the September
25 event.  I know that was really early in the

Computer Reporting NYC Inc.
(212) 986-1344

661

Varughese

1 morning, but I wasn't, I mean, his response and
2 his anger and his behavior was out of context to
3 the given situation.
4     So I wondered if he was consuming
5 alcohol at work which was disinhibiting him and
6 making him behave in a way that was
7 unprofessional.
8   Q.   Did you tell Mr. Johnson who you had
9 observed drinking at the hospital?
10   A.   Right, it was -- well, I had observed
11 Adrienne Jordan drinking at the hospital around 5
12 p.m. while still involved in patient care duties
13 for the day.  And I believe she had offered to
14 oversee a junior resident at that time as well on
15 the day I observed her drinking and I was
16 concerned about it and I spoke to her about it,
17 and I believe another resident also discussed this
18 issue with her.
19   Q.   Who was that?
20   A.   Jacqueline Hechtman.  And Diane Grunis
21 was a junior resident.  She was supposed to assist
22 that day and she was also concerned and she
23 approached me and I offered to help her if she
24 needed to instead of Dr. Jordan.

Computer Reporting NYC Inc.
(212) 986-1344

662

Varughese

1   Q.   When you say that you saw Dr. Jordan
2 drinking at 5 p.m. while she was still involved in
3 patient care activities, what patient care
4 responsibilities or activities did Dr. Jordan
5 still have at 5 p.m.?
6   A.   I mean, I don't even think it was 5
7 p.m.  It was much earlier than that.  It was like
8 around 4:30, because she had left and she arrived
9 back with a bottle of rum.
10   Q.   My question is, what patient care
11 responsibilities did Dr. Jordan have at 4:30 or 5
12 p.m.
13   A.   I'm not sure what service she was on,
14 but I would imagine if you're at work, I mean, you
15 should not be drinking.  That's basically Mount
16 Sinai's hospital policy, code of conduct.
17 Drinking is prohibited on the hospital premises
18 and it is something that is informed to all
19 residents when they arrive at the hospital, that
20 there's to be no drinking at the hospital.
21   Q.   When you reported to Mr. Johnson in
22 January of 2011 that you had seen Dr. Jordan
23 drinking on this occasion, did you report to
24 Mr. Johnson that you had seen Dr. Jordan drink on

Computer Reporting NYC Inc.
(212) 986-1344

663

Varughese

1  any other occasion or just this occasion?
2      A.    That was the occasion where I
3  personally observed her and I also knew she wanted
4  to assist Dr. Grunis with some work that day.
5      Q.    Did you ever observe Dr. Jordan
6  drinking on the job on any other occasion other
7  than the one you just described?
8      A.    No, I have not personally observed her
9  drinking any....
10     Q.    Did anyone tell you that they had seen
11 Dr. Jordan drinking on other occasions?
12     A.    Yes, people have said that.
13     Q.    Who hold you that?
14     A.    Other residents.
15     Q.    What were their names, what are their
16 names?
17     A.    I don't remember now, but I remember
18 being distinctly told by several people that she
19 was drinking at work.
20     Q.    Other than Dr. Jordan did you tell
21 Mr. Johnson that you had seen any other resident
22 drinking on the job?
23     A.    Well, I told him I was concerned about
24 Sam McCash.
25

*Computer Reporting NYC Inc.*
*(212) 986-1344*

664

Varughese

1      Q.    I know, you told me that.  But other
2  than your concern that Dr. McCash might have been
3  drinking on December 8th and that you had seen
4  Dr. Jordan drinking on this occasion --
5      A.    It was like two weeks before in
6  November of -- I don't know if it was 23rd or
7  something.  It was a few days before Thanksgiving
8  holiday that I observed her drinking too.  And she
9  said she was very stressed out and she had stopped
10 to drink at work.
11     Q.    You're talking about Dr. Jordan?
12     A.    Yes.
13     Q.    So my question is, other than
14 Dr. Jordan and your concern about Dr. McCash, did
15 you tell Mr. Johnson that you observed any other
16 resident drinking at the hospital?
17     A.    No, I mean, I really haven't.  And
18 even Dr. McCash I have not directly observed him
19 drinking, because I don't often participate in
20 these, you know, dementia rounds or their drinking
21 rounds.  I don't really get involved in any of
22 that.
23     Q.    Now talking about January 2011, had
24 you observed anybody other than Dr. Jordan
25

*Computer Reporting NYC Inc.*
*(212) 986-1344*

665

Varughese

1  drinking at the hospital?
2      A.    Other than that?  Well, there was a
3  holiday party on December -- I'm not sure what
4  date it was now.  But following my rotation there
5  was a holiday party where residents were
6  encouraged to bring alcohol by Dr. McCash again to
7  have this party.  I believe there was a list of
8  beverages such as vodka and, I mean, the list just
9  went on about, you know.
10     Q.    Where was this party held?
11     A.    It was in the residents' room,
12 residents' area.
13     Q.    Did you attend the party?
14     A.    Well, I went in because -- I was on
15 autopsy and I was there because Dr. Travino had,
16 you know, me and Dr. Travino were working
17 together, so I went in.  And so I thought
18 it would -- because of what had happened just two
19 weeks before, I thought it was important for me to
20 not feel alienated from my cohorts.  Because there
21 was a party the weekend before that was abruptly
22 changed from a local pub or something down the
23 street to where I lived to McCash's house or
24 apartment or whatever.  And I felt like they were
25

*Computer Reporting NYC Inc.*
*(212) 986-1344*

666

Varughese

1  already marginalizing me and excluding me from a
2  variety of events.
3      Q.    Were you invited to the party at
4  Dr. McCash, Dr. McCash's apartment?
5      A.    No, I didn't know they had a party at
6  his apartment.
7      Q.    Were you invited to the event when it
8  was scheduled for a local pub?
9      A.    Yes, I was.
10     Q.    How did you learn that it had been
11 changed?
12     A.    Because one of the other residents who
13 was arranging the event said it was cancelled.
14     Q.    So do you believe that it was changed
15 from the pub to Dr. McCash's apartment so as to
16 exclude you from attending?
17     A.    Yes.
18     Q.    What's the basis for that belief?
19     A.    Well, I would most certainly not -- I
20 mean, first I was not invited to this party.
21     Q.    Were all of the other residents in
22 pathology invited to the party?
23     A.    Yes.
24     Q.    How do you know that?
25

*Computer Reporting NYC Inc.*
*(212) 986-1344*

667

Varughese

2    **A.**    Because they informed me that they
3    were.
4    **Q.**    So every resident in the pathology
5    department, PGY-1, -2, -3, -4, all told you I was
6    invited to Dr. McCash's party in his apartment.
7    **A.**    Right, and I think one of my friends
8    or somebody told me that they were invited.  I
9    mean, I can't go there.  This is a person who is
10   clearly abusive towards me.  I'm not going to go
11   to somebody's, you know.
12   **Q.**    I understand.  So you went, you
13   attended the holiday party that you were talking
14   about.
15   **A.**    Right, I tried to attend the holiday
16   party, but Dr. McCash was being extremely
17   aggressive towards me.
18   **Q.**    What was he doing?
19   **A.**    I came in with some snacks and chips
20   and whatever for the party, because I thought, you
21   know, it was going to be, you know, a nice time.
22   It wasn't going to be ridiculous or crazy or
23   whatever, and McCash was being extremely
24   aggressive.  He was sitting in the low resident's
25   room and he started saying, Oh, you decided to

*Computer Reporting NYC Inc.*
*(212) 986-1344*

668

Varughese

2    come.  Huh?  You decided to come.  Huh?  What did
3    you bring?  Is that food?  Is that food?  What are
4    you doing here?  And I was like, what is your
5    problem?
6        So then, I mean, I was just trying to
7    be friendly towards, you know, there were a bunch
8    of people in my class such as Jessica French who
9    wanted to have this party, and Morency was there I
10   believe.  So I was just trying to chat with
11   Jessica French who now works at the medical
12   examiner's office I believe.
13       So this was what was being directed at
14   me.  What are you doing here?  What is that?  And
15   then I tried to ignore him because I was like this
16   is really, you know, rude and, you know, malicious
17   and aggressive and intimidating towards me.  So I
18   was feeling like he was trying to exclude me from
19   the group and my coworkers, and I was like, I need
20   to leave.
21       So Edward Travino, he told me to just
22   step out with him, and then I left briefly after
23   that because Dr. McCash was stomping his feet,
24   walking around slamming doors.  So I left.
25   **Q.**    How many people were at the party?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

669

Varughese

2    **A.**    There were a few people at the party.
3    Quite a few, like maybe 15, 20 people.
4    **Q.**    Did you have anything to drink while
5    you were at the party?  By drink I mean of an
6    alcoholic nature.
7    **A.**    Right, I went to get some -- I think
8    Diane was having, what was it?  Jack and Coke.
9    And she offered to make one for me, so I said OK.
10   And I was going to drink it, but I didn't.  I just
11   left.
12   **Q.**    You mentioned before that -- was
13   Dr. Jordan at the Christmas party?
14   **A.**    I don't remember her being there.
15   **Q.**    You said earlier that you saw
16   Dr. Jordan or Dr. Jordan told you she had brought
17   a bottle of Captain Morgan Rum to the hospital?
18   **A.**    Right.
19   **Q.**    Was that something you saw or
20   something she told you?
21   **A.**    Yes, that's something I saw, because I
22   was there and she was having a drink and she
23   offered to give me something.  I just said no.  I
24   didn't think it was appropriate.
25   **Q.**    Did you observe any other bottles of

*Computer Reporting NYC Inc.*
*(212) 986-1344*

670

Varughese

2    liquor other than the Captain Morgan Rum?
3    **A.**    At that time that was the only bottle
4    of rum that was there for a long time.  But then I
5    believe after the Christmas party there may have
6    been some leftover wine or something that was left
7    over.
8    **Q.**    Where was the bottle of Captain Morgan
9    Rum kept?
10       MR. WRONKO:  Form objection.
11   **A.**    I think in one of the cabinets.
12   **Q.**    And where was the leftover wine from
13   the Christmas party kept?
14   **A.**    The same place.
15   **Q.**    And then you mentioned something about
16   dementia rounds.  What are you talking about when
17   you talk about dementia rounds?
18   **A.**    Right, these are, I mean, basically,
19   you know, like we'll get together in the hospital
20   conference or in the residents' work area with
21   beer or wine or some other alcohol, just call it
22   "dementia."  That's where the party gets it
23   reference to dementia, dementia rounds.
24   **Q.**    You say in your complaint that
25   Dr. McCash solicited by e-mail other residents to

*Computer Reporting NYC Inc.*
*(212) 986-1344*

671

Varughese

1 participate in dementia rounds during which
2 residents would drink hard alcohol and beer during
3 work hours on hospital premises.
4     A.     Right.
5     Q.     So how many e-mails did you see
6 personally from Dr. McCash making reference to
7 dementia rounds?
8     A.     Numerous.
9     Q.     Was that one, two, ten, a hundred?
10    A.     Maybe like four or five.
11    Q.     Were you a recipient of those e-mails?
12 Were they e-mailed to you or were you copied on
13 the e-mail?
14    A.     Yes.
15    Q.     Were other residents, I take it,
16 copied or sent that e-mail as well?
17    A.     Yes, I believe that e-mail was
18 directed at all the residents in the program,
19 whoever was on the pathology residents' e-mail
20 list, as well as the attendings, such as
21 Dr. Bleiweiss, were all cc'd on that particular
22 e-mail list.
23        So I believe everybody was informed as
24 to the dementia rounds and as to, you know, last

673

Varughese

1 uropathology had asked me to join her because --
2 so I went with her. I didn't drink anything and I
3 left and I did not attend following that, I
4 believe.
5     Q.     At the one dementia round that you did
6 attend, how many people were present?
7     A.     There was about four or five people.
8     Q.     Was Dr. Bleiweiss there?
9     A.     No, he was not there.
10    Q.     Was Dr. Jordan there?
11    A.     No, Dr. Jordan was not there. I think
12 it was before she joined as a resident at Mount
13 Sinai Medical Center.
14    Q.     How long did you stay?
15    A.     I think I stayed for ten, fifteen
16 minutes and then I left.
17    Q.     Did you observe any of the other four
18 or five people who were there drinking?
19    A.     Yes.
20    Q.     Who did you see drinking?
21    A.     I mean, the fellow had a beer.
22 Dr. Fowkes had a beer and --
23    Q.     Who is Dr. Fowkes again?
24    A.     She's the neuropathologist.

672

Varughese

1 minute calls for dementia rounds, and so on and so
2 forth.
3     Q.     You said Dr. Bleiweiss was cc'd. Were
4 there any other nonresident physicians who were
5 copied or on those e-mails?
6     A.     Not that I'm aware of.
7     Q.     Where were the dementia rounds going
8 to be held?
9     A.     I think --
10        MR. WRONKO: Form objection. You can
11 answer.
12    A.     I think they were held at either the
13 conference room that we were using on the 16th
14 floor or in the resident work area. Oftentimes
15 these rounds migrated into resident work area and
16 continued, you know, but --
17    Q.     Did the e-mail indicate what time the
18 dementia rounds were to take place?
19    A.     I think they took place at like 6, 6
20 p.m. or so.
21    Q.     Did you ever attend any of the
22 dementia rounds?
23    A.     Did I? I did attend one of the very
24 first ones. I went because the fellow who was on

674

Varughese

1     Q.     Anybody else that you observed
2 drinking at the dementia round that you attended?
3     A.     The one that I attended? Yes.
4     Q.     And when was that?
5     A.     That was during my first year.
6     Q.     Your PGY-1 year?
7     A.     Right.
8     Q.     So when you say there were maybe four
9 e-mails for dementia rounds, was that during the
10 entire time that you were in the residency
11 program?
12    A.     No, the entire time in the residency
13 program there were numerous e-mails, but they were
14 all very sort of not very aggressive e-mails about
15 dementia rounds. They were sort of --
16    Q.     All I am trying to figure out --
17    A.     I mean nobody e-mailed the day before
18 or the day of and said let's have a dementia round
19 today at 5 p.m. I mean, the only person who did
20 such things was Dr. McCash.
21    Q.     What I'm saying is you say in the
22 complaint Dr. McCash solicited by e-mail other
23 residents to participate in dementia rounds.
24        And before I asked you how many

675

Varughese

1  e-mails did you get or were you copied on that was
2  referring to dementia rounds and you said you
3  thought it was about four.
4          So my question is, four over what
5  period of time?
6      A.   Right.  Over the period of time from
7  during my third year as a resident, which was
8  2000 -- or even the late, you know, second year,
9  third year.  Actually, there may have been more.
10  There may have been like ten or maybe even more.
11  I'm not sure.  I wasn't keeping track of each and
12  every e-mail and, I mean, I wasn't attending them.
13  I had no interest in attending these dementia
14  rounds at the hospital when easily I could go out
15  with my coworkers to the local bar on the weekend.
16      Q.   When you say in your complaint, he,
17  referring to Dr. McCash, even admitted to taking
18  a, quote, break, unquote, from grossing specimens
19  to drink alcohol, when did Dr. McCash admit to
20  taking a break from grossing specimens to drink
21  alcohol?
22      A.   It wasn't an e-mail.  I may have
23  submitted that as part of discovery.  It was, um,
24  when he was grossing, he said I'll take a break

676

Varughese

1  from grossing to attend dementia rounds.  That's
2  what he said.
3      Q.   You said that's an e-mail from
4  Dr. McCash?
5      A.   Right.
6      Q.   That you were copied on?
7      A.   Yes, I think I was copied on that.
8      Q.   So to be sure I understand it, so the
9  source of your knowledge about that allegation
10  comes from this e-mail that Dr. McCash sent.
11      A.   The e-mail and then from what I've
12  heard about people drinking beer, and so on.
13      Q.   We're talking now about Dr. McCash
14  admitting to taking a break from grossing
15  specimens to drink alcohol.
16          You told me you know that because it
17  was in an e-mail that he sent that --
18      A.   Right, he didn't say he was going to
19  drink alcohol at this meeting, but he did say he
20  was going to take a break to go to dementia
21  rounds, which included beer and other forms of
22  alcohol.  So I assumed that he was going to drink.
23      Q.   I understand.  But do you have any
24  other source of knowledge that that is what

677

Varughese

1  Dr. McCash was going to do other than what you saw
2  in that e-mail?
3      A.   Well, I have -- I've been told by
4  other residents that he does drink at these
5  things, and I know for a fact that he drinks a
6  lot.
7      Q.   How do you know for a fact that he
8  drinks a lot?
9      A.   Because I think, you know, several
10  social occasions that I went to he was drinking.
11  And I think he was drinking at work.
12      Q.   Why do you think that?
13      A.   Because like his behavior is just out
14  of -- extremely aggressive, you know, uninhibited.
15      Q.   Did you ever smell alcohol on his
16  breath?
17      A.   I never tried to get that close to
18  him.
19      Q.   Did you ever report Dr. McCash to the
20  Physician Wellness Committee that you thought he
21  might be impaired?
22      A.   Well, I informed the Physician
23  Wellness Committee, which is Dr. Figur, regarding
24  my concerns.

678

Varughese

1      Q.   What did you tell Dr. Figur?  You told
2  me what you told Mr. Johnson.  Did you tell
3  Dr. Figur the same things that you told Mr. Johnson
4  or something different?
5      A.   Well, they were both at the same
6  meeting.
7      Q.   So it was one meeting with the two of
8  them.
9      A.   Yes.
10      Q.   After you met with Dr. Figur and
11  Mr. Johnson, do you know what, if anything, they
12  did to investigate your report about drinking at
13  the hospital?
14      A.   I believe they came up to the 15th
15  floor to observe for themselves whether or not a
16  bottle of alcohol I mentioned was there.
17      Q.   And do you know whether they
18  discovered the bottle of alcohol you were talking
19  about?
20      A.   Right, there was like nearly an empty
21  bottle of Captain Morgan rum, and I didn't know
22  about the bottle of wine, but that was also there.
23      Q.   Were you there when Dr. Figur and
24  Mr. Johnson came to the 15th floor?

679

Varughese

1
2    A.    Right, I was at my desk.  Then I took
3  a picture of the bottle and I sent it to them.
4    Q.    And then what did they do?
5    A.    I believe they did nothing.  They took
6  no actions against the people who were consuming
7  alcohol, but chose to take actions against me for
8  professionalism.
9    Q.    When they discovered, as you say they
10  did, the bottle of Captain Morgan's rum and the
11  bottle of wine, what did they to about the
12  presence of alcohol in the cabinet?
13    A.    Nothing, they didn't take any actions.
14  They left it there.
15    Q.    They just left it there.
16    A.    Yes.  That's the prerogative of the
17  Physician Wellness Committee at this hospital.
18    Q.    Did you observe the bottle of rum and
19  the bottle of wine remaining in the cabinet for
20  some period of time thereafter?
21    A.    I don't know.  I wasn't checking.
22    Q.    Now, when you say that no action was
23  taken against Dr. McCash or Dr. Jordan, what's the
24  basis for that belief?
25    A.    Well, they were being unprofessional

*Computer Reporting NYC Inc.*
*(212) 986-1344*

680

Varughese

1
2  and they were, you know, technically or
3  potentially consuming alcohol during work hours
4  and there was no reprimand given to them.
5    Q.    How do you know that?
6    A.    I know that because they told me that
7  they did not take any actions.
8    Q.    Who told you?
9    A.    Dr. Barnett said if he thought he
10  needed to be slapped around we would slap him
11  around too.
12    Q.    Who is the he Dr. Barnett was
13  referring to?
14    A.    I think he was referring to
15  Dr. McCash.  And then Dr. Figur also confirmed to
16  me that they did not take any actions against
17  Dr. McCash.
18          At the Physician Wellness Committee,
19  the second meeting, when I went to do the urine
20  toxicology screen, ironically I was the only one
21  who had to do a urine toxicology screen, not
22  Dr. McCash, not Dr. Jordan.
23    Q.    So let me understand.  You went to the
24  Physician Wellness Committee to take your
25  toxicology screen and Dr. Figur shared with you

*Computer Reporting NYC Inc.*
*(212) 986-1344*

681

Varughese

1
2  the fact that there had been no action taken
3  against Dr. McCash.
4    A.    Yes.
5          MR. WRONKO:  Form objection.  You c
6  answer.
7    Q.    How did that topic come up?
8    A.    Well, I asked him what was being done
9  about Dr. McCash and his behavior towards me and
10  if any actions or if he is going to be placed on
11  any reprimand.
12    Q.    Well, just so you're clear, we're not
13  talking about Dr. McCash's actions towards you
14  about which --
15    A.    Towards me and his unprofessional
16  behavior and also his loud yelling and screaming
17  at me.
18    Q.    And now what I'm talking about is,
19  we're talking about drinking on the job and having
20  alcohol on the job, and you said to me that no
21  action was taken against Dr. McCash or Dr. Jordan
22  as a result of having alcohol at work or drinking
23  at work.
24    A.    Right.
25    Q.    And I want to know how it is you know

*Computer Reporting NYC Inc.*
*(212) 986-1344*

682

Varughese

1
2  that no action was taken or no reprimand was given
3  to Dr. McCash.
4    A.    Because Dr. Figur told me that that
5  was the case.
6    Q.    Did Dr. Figur tell you that no action
7  had been taken against Dr. McCash based on your
8  complaint about him or no action had been taken
9  against him because of your report of drinking on
10  the job?
11          MR. WRONKO:  Form objection.
12    A.    No, he didn't specify, but he said
13  there was no action taken against him, period.
14    Q.    You said that Dr. Barnett made some
15  comment about Dr. McCash or reprimanding
16  Dr. McCash.  Was that in connection with your
17  complaint about Dr. McCash or in connection with
18  your report of his using alcohol at work?
19          MR. WRONKO:  Form objection.
20    A.    I mean, I have a feeling that they may
21  be intrinsically linked.
22    Q.    You also said that Dr. Jordan wasn't
23  reprimanded for having alcohol at work or drinkin
24  at work.  How do you know that she wasn't
25  reprimanded?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

683

Varughese

1

2    A.    I'm sorry?

3    Q.    How do you know that Dr. Jordan wasn't

4    reprimanded, to use your word, for having alcohol

5    at work or drinking at the hospital?

6    A.    How do I know?  Well, she was promoted

7    in fact shortly after I reported this incident,

8    she was promoted within a day by Dr. Lento to the

9    chief resident position.  She was not reprimanded.

10   Q.    So do you draw the conclusion that

11   because Dr. Jordan was promoted to chief resident

12   she wasn't reprimanded about having alcohol at

13   work?

14   A.    Right.  As soon as I reported this

15   incident, somehow Dr. Lento chose to promote her

16   to chief resident.

17   Q.    Do you think there's some connection

18   between your reporting Dr. Jordan having alcohol

19   at work and her being promoted to chief resident?

20   A.    Right, I think they did that to

21   protect her, her career and her future, unlike

22   what was done to me which was to discipline me on

23   some premise that I was -- patient (phon) care

24   related lab, which we have already proven to be

25   false.

**Computer Reporting NYC Inc.**
**(212) 986-1344**

---

684

Varughese

1

2    Q.    So what's the basis for your belief

3    that Dr. Lento promoted Dr. Jordan chief resident

4    to protect her career?  To protect her career from

5    what?

6    A.    Well, to enable her to advance.

7    Q.    Did anybody ever tell you that that's

8    why?  I mean, I know that's what you think.  Did

9    anybody ever tell you Dr. Jordan was promoted for

10   the reason that you just articulated?

11   A.    I believe Dr. Jordan was promoted for

12   a lot of wrong reasons.

13   Q.    What are the wrong reasons you believe

14   that she was promoted?

15   A.    For one, she was being unprofessional

16   and she played a key role in the incidents of

17   December 8th.  She was not involved in the one of

18   September 14th.

19         I don't place any great degree of

20   blame on her, but I think she played a role in

21   what had happened.  And, you know, and she had

22   clearly lied about her responsibilities, you know,

23   moonlighting.  She was not the primary

24   moonlighter, Paul Azar was, as noted in the

25   schedule, and so on.

**Computer Reporting NYC Inc.**
**(212) 986-1344**

---

685

Varughese

1

2          So when you already know that somebody

3    is not capable of completely being honest and they

4    essentially choose to promote her and reprimand me

5    knowing full well that's the case.

6    Q.    I take it, Dr. Varughese, that you did

7    not agree with the decision to promote Dr. Jordan

8    to chief resident.

9    A.    No, I did not.  Yes, I had my

10   concerns.

11   Q.    And you say in your complaint that

12   there were four other qualified coworkers with

13   seniority over her, and you identified Dr. Chow,

14   Dr. Martinez, Dr. Azar and Dr. Roman as those who

15   are more qualified people.

16   A.    And myself as well.

17   Q.    And you.

18   A.    Yes.

19   Q.    So do you think that either you or one

20   of the coworkers you've identified should have

21   been promoted to chief resident instead of

22   Dr. Jordan?

23   A.    Absolutely.

24   Q.    Was that a position you would have

25   been interested in having?

**Computer Reporting NYC Inc.**
**(212) 986-1344**

---

686

Varughese

1

2    A.    It was never offered to me.  Although

3    Dr. Morency suggested that perhaps it would be a

4    good idea for me to be chief resident with her,

5    and she informed me that other residents were

6    having issues in the program as well and she

7    didn't seem to be aware of, you know, she thought

8    it would be a good idea for me to be the chief

9    resident with her.

10         So yes, I considered it and I would

11   have liked to have that position if that was ever

12   available to me, but that wasn't an option that

13   was offered to me and it seems like it wasn't

14   offered to several other people in my class, my

15   cohorts.  For what reason I do not other than

16   favoritism towards Adrienne Jordan by Dr. Lento.

17         MR. WRONKO:  We're now at 4:45.

18         MR. McEVOY:  I'm almost done.

19   Q.    You said that you reported the

20   drinking on the job to Dr. Fowkes in April.

21   A.    Right.

22   Q.    Tell me the circumstances in which you

23   did that.

24   A.    Well, I felt that the drinking at work

25   was getting out of hand and it was becoming

**Computer Reporting NYC Inc.**
**(212) 986-1344**

687

Varughese

1
2  disruptive to my work. I worked right by the
3  residents' room over there. And they wanted to
4  move the party from the 16th floor back to the
5  15th floor where people had work to do. It seems
6  reasonable that I would not want to be in that
7  situation where I have to deal with loud
8  boisterous fellow residents.
9        MR. McEVOY: I have more questions
10       about this, but in light of the time, since
11       it's 4:45 we will adjourn for the day to
12       accommodate travel schedules and we will
13       resume on June 19th.
14           (Time noted: 4:47 p.m.)
15
16       ----------------------
17            LEENA VARUGHESE
18
19  Subscribed and sworn to before me
20  this ___ day of _____, 2013.
21
22  ----------------------------------
23
24
25

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

688

C E R T I F I C A T E

STATE OF NEW YORK   )
                    : ss.
COUNTY OF SUFFOLK   )

       I, THOMAS R. NICHOLS, a Notary Public
within and for the State of New York, do
hereby certify:
       That LEENA VARUGHESE, the witness
whose deposition is hereinbefore set forth,
was previously duly sworn and that such
deposition is a true record of the testimony
given by the witness.
       I further certify that I am not
related to any of the parties to this action
by blood or marriage, and that I am in no way
interested in the outcome of this matter.
       IN WITNESS WHEREOF, I have hereunto
set my hand this 27th day of June, 2013.


       ----------------------
       THOMAS R. NICHOLS


*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

689

THE WITNESS:       EXAMINATION BY:   PAGE:
LEENA VARUGHESE       MR. McEVOY       445

DEFENDANTS' EXHIBITS FOR ID:      PAGE:   LINE:
    Exhibit 39, two e-mails    445    25
dated August 2011, Bates Nos.
D-1177 and 1178

    Exhibit 40, e-mail dated   454    2
August 16, 2011, from Paul
Johnson to Leena Varughese,
Bates Nos. D-1176 and 1177

    Exhibit 41, e-mail string   464    2
dated August 12, 2011, Bates
Nos. D-908 through 910

    Exhibit 42, e-mail string   480    17
dated September 7, 2011,
Bates Nos. D-1172 through
1174

    Exhibit 43, document titled  491   19
"Policy for Morning
Conference Attendance," Bates
No. D-1185

    Exhibit 44, series of   498    2
e-mails

    Exhibit 45, series of   499    24
e-mails, Bates Nos. D1151
through 1154

    Exhibit 46, e-mail string   510    24
between Adrienne Jordan and
Leena Varughese, dated
September 12, 2011, Bates
Nos. D1378 and 1379

    Exhibit 47, e-mail dated   544    20
September 15, 2011, from
Adolfo Firpo to
Dr. Varughese, Bates No. P426

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

690

    Exhibit 48, e-mail dated   555    21
September 16, 2011, from
Adolfo Firpo to Leena
Varughese, Bates Nos. D934
and 935

    Exhibit 49, two e-mails   571    24
dated September 16, 2011 from
Dan Hughes to Leena
Varughese, Bates Nos. P430
and P431

    Exhibit 50, e-mail dated   594    23
September 20, 2011, to Paul
Johnson and Caryn
Tiger-Paillex from Leena
Varughese, Bates No. P432

    Exhibit 51, e-mail dated   612    14
September 21, 2011, from Paul
Johnson to Leena Varughese,
and e-mail dated September
20, 2011, from Leena
Varughese to Paul Johnson,
Bates No. P427

    Exhibit 52, letter dated   625    14
September 21, 2011 to Leena
Varughese from Carlos
Cordon-Cardo and Adolfo
Firpo, Bates Nos. P853
through P858

    Exhibit 53, letter dated   630    13
September 28, 2011, to Dr.
Michael T. Harris, from Leena
Varughese, MD, Bates No.
D-1407

    Exhibit 54, letter dated   632    8
December 2, 2011, from Steven
Weinfeld, M.D., to Dr. Leena
Varughese

    Exhibit 55, cover letter   642    11
dated March 7, 2012, from
Amelle Trahant to Leena
Varughese, Bates No. D-971

*Computer Reporting NYC Inc.*
*(212) 986-1344*

Errata Sheet

Subject: Transcript of day #3 of deposition of plaintiff, Dr. Leena Varughese, which was conducted on June 13, 2013

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 447 | 13-14 | Correct "that's in defectus (phon) of 15, then some --" to "that went into effect on August 15th 2011," |
| 448 | 17 | Change "." to "," |
| 450 | 20 | Correct "Blevin" to "Blouin" |
| 450 | 25 | Correct "Crewness" to "Grunes" |
| 455 | 21 | Correct "of a" to "up a" |
| 458 | 10 | Correct "August 2011" to "August 11, 2011" |
| 462 | 22 | Correct "Blau" to "Blowe" |
| 463 | 6 | Correct "Blau" to "Blowe" |
| 463 | 15 | Correct "Blau" to "Blowe" |
| 464 | 13 | Correct "Blau" to "Blowe" |
| 467 | 19 | Correct "know" to "knew" |
| 468 | 15 | Correct "she" to "he" |
| 468 | 16 | Correct "she" to "he" |
| 478 | 4 | Correct "Berzhai" to "Birge" |
| 484 | 5 | Correct "I had already elected, I had already chosen" to "had been scheduled for me" |
| 485 | 24 | Delete "very" |

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 487 | 20 | Add "what happened? Firpo-Betancourt is a lying, untrustworthy, unprofessional, unethical, racist, and sexist bigot who should not have been the director of educational activities or the program director of a residency program that oversees the education of future pathologists, which is what I thought of Patrick Lento when he failed to intervene on my behalf to prevent harassing and discriminating actions against me, but supported and participated in retaliation and further discrimination and marginalization." |
| 489 | 15 | Insert "another resident coworker" after "discretion" |
| 489 | 15 | Correct "but" to "and" |
| 490 | 23 | Correct "google" to "new policy" |
| 517 | 6-7 | Correct "that has not been substantiated" to "had been produced to substantiate their false allegations" |
| 519 | 6 | Add "I had reasons to be concerned about my well-being when I worked at Mount Sinai Medical Center." in place of "..." |
| 531 | 16 | Correct 'dermati" to "dermato-" |
| 541 | 23 | Correct "so, you know, work" to "so, I was at work" |
| 552 | 6 | Correct "a" to "to be" |
| 566 | 24 | Add "threatening to my future and career that I worked towards because of the defamatory and false allegations and claims being made and expectations placed on me that was not placed on my coworkers such as Jordan and McCash or those that did not engage in protected activities." in place of "..." |
| 574 | 4 | Correct "too" to "two" |
| 582 | 16 | Delete "not" |
| 583 | 16 | Correct "forced" to "only allowed" |
| 583 | 24 | Correct "I have never met" to "I have met few times" |
| 620 | 22 | Correct "Fersch" to "Fersh" |
| 620 | 25 | Correct "Fersch" to "Fersh" |
| 624 | 19 | Correct "Fersch" to "Fersh" |

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 646 | 2 | Correct "description" to "discrimination" |
| 652 | 11-12 | Change to "Not at that time when the opportunity for employment remained available to me." |
| 657 | 10 | Correct "ostensibly" to "already" |
| 661 | 21 | Correct "Grunis" to "Grunes" |
| 661 | 25 | Correct "to" to "," |
| 664 | 19 | Delete "not" |
| 665 | 16-19 | Correct to "autopsy, so I had went to work only to check out if one of my cases was properly signed out. While I was there, I noticed Ted Trevino and I spoke to him briefly" |
| 667 | 24 | Correct "low" to "sofa" |
| 669 | 9 | Correct "OK" to "no" |
| 669 | 10-11 | Correct "And I was going to drink it, but I didn't" to "I didn't want to drink anything alcoholic beverage. I saw McCash stomping his feet and slamming doors around me when I was talking to Grunes, and soon after, I just left with Ted Trevino." |
| 670 | 19 | Correct "we'll" to "they" |
| 671 | 11 | Correct "four or five" to "twenty or more" |
| 673 | 2 | Correct "uropathology" to "neuropathology" |
| 674 | 15 | Delete "not" |
| 675 | 23 | Correct "wasn't" to "was" |
| 683 | 23 | Correct "I was" to "there was" |
| 683 | 24 | Correct "labs" to "lapse" |
|  |  |  |
|  |  |  |
|  |  |  |

692

```
 1
 2      UNITED STATES DISTRICT COURT
 3      SOUTHERN DISTRICT OF NEW YORK
 4      -----------------------------X
 5      LEENA VARUGHESE, M.D.,
 6              Plaintiff,
 7          vs.            12 Civ. 8812(CM)
 8      MOUNT SINAI MEDICAL CENTER,
        PATRICK LENTO, M.D., CARLOS
 9      CORDON-CARDO, M.D., ADOLFO
        FIRPO, M.D., IRA J. BLEIWEISS,
10      M.D. and ABC CORP. 1-10, and
        JOHN DOES 1-10,
11
                Defendants.
12      -----------------------------X
13
14
15                 July 8, 2013
16                 10:07 a.m.
17                 Volume IV
18
19           Continued deposition of LEENA
20      VARUGHESE, held at the offices of Edwards
21      Wildman Palmer LLP, 750 Lexington Avenue, New
22      York, New York, pursuant to Notice, before
23      Thomas R. Nichols, a Registered Professional
24      Reporter and a Notary Public of the State of
25      New York.
```

693

APPEARANCES:

    LAW OFFICES OF RONALD J. WRONKO, LLC
    Attorneys for Plaintiff
        134 Columbia Turnpike
        Florham Park, New Jersey 07932
    BY:  RONALD J. WRONKO, ESQ.

    EDWARDS WILDMAN PALMER LLP
    Attorneys for Defendants
        750 Lexington Avenue
        New York, New York 10022
    BY:  RORY J. McEVOY, ESQ.
        JULIE L. SAUER, ESQ.

ALSO PRESENT:
    RAJIT MALLIAH

694

```
 1                   Varughese
 2      L E E N A  V A R U G H E S E,  called as a
 3          witness, having been duly sworn by a Notary
 4          Public, was examined and continued to
 5          testify as follows:
 6      EXAMINATION BY (CONT'D.)
 7      MR. McELROY:
 8          Q.   Dr. Varughese, just to ask you the
 9      questions that we always ask you in a deposition,
10      are you taking any medication prescribed,
11      unprescribed, that would prevent you from
12      remembering and answering my questions?
13          A.   No.
14          Q.   Any other reason you can't answer the
15      questions I'm about to ask?
16          A.   No.
17          Q.   We left off the last day with my
18      asking you when you reported the drinking on the
19      job, as we've come to call it, to Dr. Fowkes and
20      you had started to tell me those circumstances.
21               So when did you report the drinking on
22      the job to Dr. Fowkes?
23          A.   That was April of 2011.
24          Q.   Where did you have that conversation
25      with Dr. Fowkes?
```

695

```
 1                   Varughese
 2          A.   I was on a rotation with her.  I was
 3      on neuropathology at that time and I had spoken to
 4      her while I was on that rotation.
 5          Q.   What did you tell her?
 6          A.   Well, I just told her that, you know,
 7      it was getting more boisterous and interfering
 8      with work on the 15th floor and pathology work in
 9      terms of it being moved downstairs to where others
10      were working and it was very disruptive.
11          Q.   Was anyone else present when you had
12      this conversation with Dr. Fowkes?
13          A.   No.  And I also sent her an e-mail as
14      well as, you know, so there were multiple
15      communications with her.
16          Q.   Did you ask Dr. Fowkes to do anything
17      about the drinking problem?
18          A.   Right.  I had asked her to request
19      that, you know, either it not take place anymore
20      or take it to, you know, an outside, you know,
21      venue such as the local bar or something or
22      something along those lines.  You know, or even
23      rather than it be at work, so....
24          Q.   Do you know whether Dr. Fowkes did
25      anything in response to your telling her about the
```

696

Varughese

1    drinking on the job?
2        A.    In April of 2011?  Well, we had
3    several discussions about it and she explained to
4    me that she didn't think it was really a problem
5    because she had done this before.  She thought
6    that it was done regularly in hospitals.  Her
7    understanding was this is a normal social event
8    and it should take place.  And, I mean, she just
9    thought it was a normal part of being social at
10   work, to drink at work as well.
11
12       Q.    And you also said that you talked to
13   Dr. Petersen about the drinking on the job.  When
14   did you talk to Dr. Petersen about it?
15       A.    Dr. Petersen, I believe I just briefly
16   mentioned it to him.  I didn't really have
17   extended conversation with him because he wasn't
18   really -- as far as I knew, he wasn't really
19   involved in the drinking activities or he didn't
20   attend any of those.  It was sort of something
21   that Dr. Fowkes did.
22             She was sort of like, she was supposed
23   to be there, but I don't think she always attended
24   these rounds.  But she was supposed to be like
25   sort of overseeing or....

*Computer Reporting NYC Inc.*
*(212) 986-1344*

697

Varughese

1
2        Q.    I'm sorry, when you say that
3    Dr. Fowkes was supposed to be there or overseeing,
4    what are you referring to?
5        A.    I mean, like in terms of the, I don't
6    know, this drinking thing, she was -- I think it
7    was sort of something she started or she thought
8    it was like a good idea to start this, like way
9    back when.
10            But then it was something that became
11   more problematic as it went along because people
12   started just abusing it in the sense that it
13   became like sort of like, oh, you'll get an e-mail
14   the day of or the day prior which would simply
15   state, oh, let's have a dementia round and let's
16   drink some drinks because we're having a hard day
17   at work today 'or yesterday or wherever it was and
18   we're all going to drink at work and vent.
19            These e-mails were mostly sent out by
20   McCash or I think before that maybe McClosevich
21   (phon) had sent this out before.  So it was just
22   sort of sent out by certain people who I think
23   felt like they needed to vent or drink at work.
24       Q.    Did you ask Dr. Petersen to do
25   anything about the drinking on the job?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

698

Varughese

1        A.    Dr. Petersen, no, I don't think I
2    asked Dr. Petersen to do anything about drinking
3    on the job.
4        Q.    Other than the people you've
5    identified, Dr. Fowkes, Dr. Petersen, Dr. Figur
6    and Dr. Lento, I think, did you discuss the
7    drinking on the job issue with anybody else at
8    Mount Sinai other than your coworkers?
9        A.    No, this was not even a discussion
10   just with my coworkers.  I discussed this with Art
11   Figur, who is a hospital administrator.  He wears
12   many hats in the hospital, including a hat that
13   has a label saying Physician Wellness Committee on
14   it, in addition to I think sort of like acting as
15   an ombudsman when Barry Stimmel is not there.
16       Q.    No, I know that, and you told me about
17   your conversations with Dr. Figur last time and --
18       A.    Right.  So I'm going to elaborate on
19   my question.  You didn't allow me to finish my
20   answer.
21       Q.    I just wanted to know if there was
22   anybody else.  Go ahead.
23       A.    So to complete my answer, it was Paul
24   Johnson as well who was director of human
25

*Computer Reporting NYC Inc.*
*(212) 986-1344*

699

Varughese

1
2    resources.  You know, he is sort of a liaison
3    between graduate medical education and human
4    resources.  And he was officially given that title
5    as of April 2011 where they gave him a new title
6    saying he is a director of, I mean, he is
7    associate or whatever between GME and HR.
8             So those were at least two people who
9    I spoke to regarding this issue outside of the
10   department because within the department I think
11   it was common knowledge that this was occurring
12   and I don't think anybody thought to intervene or
13   put an end to it despite the fact there's a
14   hospital policy saying that alcohol is not allowed
15   on the premises.
16       Q.    So other than Mr. Johnson and
17   Dr. Figur and Dr. Fowkes and Dr. Petersen, did you
18   have any conversations with anybody at the
19   hospital about drinking on the job?
20       A.    Well, I think Dr. Petersen, I don't
21   know when I mentioned that I spoke to him about
22   drinking on the job.  I never had this like
23   extensive discussion with Dr. Petersen about
24   drinking on the job, because he is not directly
25   involved in that.  So the person I had the most

*Computer Reporting NYC Inc.*
*(212) 986-1344*

700

Varughese

1  extensive discussions regarding drinking on the
2  job was with Dr. Fowkes, Dr. Figur, Paul Johnson.
3      Q.    In your complaint, Dr. Varughese, it
4  says, referring to paragraph 41, it says "at a
5  follow-up meeting relating to the self-reflection
6  exercise Dr. Cordon-Cardo explicitly requested
7  that Dr. Varughese refrain from making complaints
8  about doctors drinking on the job."
9      Did that happen?
10     A.    Yes.
11     Q.    Tell me the circumstances in which
12  that happened.
13
14     A.    Well, essentially this was, I think at
15  the first meeting I'm not sure, because there were
16  like about four meetings with Cordon-Cardo.  The
17  first meeting was on May 3rd, the second meeting
18  was on May 24th and the third meeting was on
19  July 14th and the next meeting was when I was
20  terminated from the residency program on
21  September 21st.  So I met with him four times.
22     At the first meeting I believe he was
23  in, I am not sure if he discussed drinking at the
24  moment.  But the second meeting he definitely, on
25  May 24, 2011, he definitely did state that he is

*Computer Reporting NYC Inc.*
*(212) 986-1344*

701

Varughese

1  not interested in people drinking this or that.  I
2  think that was -- he said "this or that" as being
3  very dismissive about this issue.  And he didn't
4  want to, you know, he was not interested in that.
5      Q.    How did it come up?
6      A.    How did it come up?  Because, well, I
7  had submitted a second reflection and, well, I
8  mean, I was just basically defending myself.  My
9  second reflection, you know, elaborated on my
10 point of view regarding what was occurring and as
11 both my reflections are accurate account of what
12 had happened, and the second reflection also was
13 an accurate account of my perception of what was
14 going on and what had happened to me.
15
16     And I discussed, you know, drinking as
17 being an issue and I compared myself or I said,
18 well, you know, these people are doing X, Y and Z
19 which is, one, against hospital policy and, two,
20 it's likely, I mean, it's highly unprofessional
21 and he was not interested in that.  He was more
22 focused on, you know, what I was writing and how
23 he wasn't happy with what I had written, which was
24 largely unjustified.  I mean, you can't really be
25 that critical of someone's self-reflection.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

702

Varughese

1      Q.    So Dr. Varughese, what I want to do
2  now is ask you some questions about your
3  interrogatory responses.  And again, I'm not
4  interested in conversations you had with
5  Mr. Wronko, but do you recall that there were
6  interrogatory -- let me show them to you.  It's
7  just as easy.
8      (Defendants' Exhibit 58, Plaintiff's
9  Answers to Interrogatories, marked for
10 identification, this date.)
11     Q.    Dr. Varughese, do you recognize the
12 document I've just handed you?
13     A.    Yes.
14     Q.    If you look at the last page, it's
15 your signature?
16     A.    Right.
17     Q.    So one of the interrogatories that you
18 were asked was to, it's actually number 5, is to
19 identify the individuals who you believe
20 retaliated against you for, and there are three
21 different things, but you're alleged, one,
22 complaints of discrimination; two, complaints
23 under the Whistleblower Law and three, exercise of
24 your rights under the FMLA.  OK?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

703

Varughese

1      And the response, with regard to one,
2  which is your complaints of discrimination, is all
3  the named defendants.
4      So what I would like you to do is tell
5  me everything that you believe Dr. Lento did to
6  retaliate against you because you complained about
7  discrimination.
8      A.    That Dr. Lento did?
9      Q.    Yes.
10     A.    Well, Dr. Lento, I mean, this is sort
11 of an ongoing issue with Dr. Lento where I
12 reported that I was being, you know, harassed at
13 work by McCash.  I mean, there's no reason for me
14 to believe that his motivation, you know, I was
15 convinced that his motivation for directing that
16 harassment at me was based on my gender and now I
17 have come to believe that it may also have been
18 based on my race or the fact that I'm a woman of
19 Indian descent.
20     And I reported this issue of, you
21 know, harassment at work to Dr. Lento who
22 immediately sought to protect Dr. McCash without
23 thinking twice, well, you know, should I intervene
24 at this point?  What would possibly prevent this

*Computer Reporting NYC Inc.*
*(212) 986-1344*

704

Varughese

1
2 from happening again?
3          He did not do any of that. Instead he
4 just sought to say, well, you know, I don't know
5 if this happened or not. You're saying this
6 happened, but I don't know.
7          But then Kruti Maniar, a coworker but
8 also a chief resident at that time, also a woman
9 of Indian descent, corroborated what I was saying,
10 which was that McCash was harassing me and McCash
11 also had admitted that his behavior was, you know,
12 essentially harassing towards me and he recognized
13 that as being a problem.
14          But Lento immediately stated that
15 that -- I don't even know if that occurred.
16 Despite being corroborated by another woman of
17 Indian descent.
18          Then my follow-up with Dr. Lento for
19 the next month, two months, did not yield any
20 positive results. In fact, he continued to defend
21 McCash, state that he doesn't know if it occurred.
22 You know, then blamed me, stating that, you know,
23 you deserved to be yelled at. Sometimes people
24 deserve to be yelled at.
25          I mean, it just, that just went on and

*Computer Reporting NYC Inc.*
*(212) 986-1344*

705

Varughese

1
2 he was not willing to intervene in any way to
3 facilitate a transfer out of a particular rotation
4 to a different institution to just avoid, you
5 know, interacting with this person that I felt
6 like was becoming more and more problematic, and
7 this involved just like I had mentioned McCash's
8 behavior of stomping his feet, slamming the doors
9 and just his general attitude and, you know,
10 negative, you know, intimidation, intimidating
11 behavior that was directed at me when I was at
12 work.
13          Then in December, although I was doing
14 my work as is done by everybody else, which is the
15 utilization of the moonlighter and the per diem PA
16 to complete my work for the day, which is why they
17 are there, and McCash, you know, intervenes,
18 harasses me again and he threatens me, he
19 intimidates me. It's not just a simple like, oh,
20 you didn't do it, so I'm going to report you to
21 someone. It's you're doing something I disagree
22 with. I'm going to say something to somebody.
23 But that's not what he did.
24          He took it upon himself to harass me,
25 follow me around, intimidate me and just go on

*Computer Reporting NYC Inc.*
*(212) 986-1344*

706

Varughese

1
2 this rampage essentially which led me to have to
3 leave my work area and report him to somebody who,
4 like Dr. Bleiweiss who I reported him to,
5 reporting McCash to Dr. Bleiweiss in that same,
6 you know, moment essentially, within a few moments
7 of that time I reported to him.
8          Despite me reporting this and
9 reporting this to the hospital as having occurred
10 and reporting this to Dr. Lento as having
11 occurred, because I sent him an e-mail that same
12 day, but he wasn't there. He was on vacation or
13 whatever it was. Then on Monday, the 13th, that
14 was the first time I saw him after the McCash
15 incident, December 8th, and he already knew there
16 was a history and a pattern of behavior with
17 McCash that I already complained about.
18          Like at least before with the first
19 instance in September and then again following
20 that incident and then the second incident he knew
21 there was a pattern. And Dr. Lento did not think
22 to say that, well, you know, I believe you. I
23 understand that this is a problem and I'm going
24 to, you know, intervene or do what you think
25 should be done, what he wants to intervene, mediate

*Computer Reporting NYC Inc.*
*(212) 986-1344*

707

Varughese

1
2 and prevent this from going any further. And he
3 didn't take those actions.
4          And then he put me on academic
5 advisement while excusing McCash's behavior yet
6 again. And that was treating me differently, and
7 that's, you know, I considered that to be
8 discriminatory based on my gender and race,
9 because I look at McCash and I see why he is being
10 treated better, which is because he is a male
11 Caucasian or white doctor and, you know, I'm a
12 minority Indian physician who, I mean, who
13 Dr. Lento does not feel compelled to support.
14      Q.    Anything else Dr. Lento did that you
15 believe was retaliatory or in retaliation for your
16 making complaints of discrimination?
17      A.    Well, this went on for the rest of the
18 year. So that was like, academic advisement was
19 only the start of, I mean, not even academic
20 advisement, a letter from legal that Melissa
21 Pessin and Patrick Lento, like they signed this
22 letter and they gave me that letter and I don't
23 think they took any actions against McCash and
24 Jordan at that time either. They didn't give them
25 a letter from legal saying don't confront

*Computer Reporting NYC Inc.*
*(212) 986-1344*

708

Varughese

1   Dr. Varughese about anything or don't confront any
2   of your other residents about anything.  I mean,
3   it was a blanket statement that was sent to me
4   from legal saying that if I spoke to any of my
5   colleagues that I was going to be terminated.
6          I mean, then after that this just went
7   on and on.  Following that there was the academic
8   advisement, which they knew there was reason to
9   believe that what I was saying was true, and given
10  the circumstances, you know, where McCash was also
11  being unprofessional, they didn't take any actions
12  again him.  And they chose to take actions
13  against me.  And this went on with the Physician
14  Wellness Committee, which they referred me to like
15  in December, because I think they knew Art Figur
16  was on the committee even.
17         I think that was one of the reasons
18  that they referred me to that committee, because
19  somehow I think Melissa Pessin has some sort of
20  relationship with Art Figur.  I'm not their
21  friend, so whatever it is.  So they referred me to
22  Art Figur for whatever those reasons and he, you
23  know, like and then they would all write e-mails
24  about me behind my back, where I was not cc'd on

709

Varughese

1   the e-mails.
2          Kruti Maniar who was also a chief
3   resident there was not cc'd on those e-mails
4   either.  So, you know, we were not, I mean, they
5   were not -- she was not cc'd on the e-mail.  I was
6   not cc'd on these e-mails.
7          And there was all this like back talk
8   that was going on behind my back which I wasn't
9   aware of even with Art Figur.  Like there were
10  like ten or twenty e-mails forwarded to Art Figur
11  regarding how terrible I was as an individual and
12  I'm not a doctor or, I don't know, I don't know
13  what the imaginings and delusions were, but that's
14  what was going on.
15         And this is all because like I
16  reported McCash as harassing me and I'm trying to
17  defend myself and have a work environment that is
18  like conducive to what I need too as a, you know,
19  person in a residency program at Mount Sinai
20  Medical Center.
21         And Lento went out of his way to
22  obstruct me from being able to do my work as well.
23  The same, you know, as well as like other people.
24  And if Pat Lento had, as the program director, if

710

Varughese

1   he had gotten involved then and taken some sort of
2   corrective action I feel like this would not have
3   been an issue.  Like, you know, none of this would
4   have occurred.
5          And that's why, I mean, and then going
6   on with following that after PWC there was like
7   the meeting with Cordon-Cardo and Castaldi.  That
8   was also very -- Pat Lento is like we don't really
9   care what happened.  This is not what we wanted
10  you to write, and so on.  I mean, he didn't like
11  my self-reflection.
12      Q.     Who is he?  I'm sorry.
13      A.     Patrick Lento.  He didn't like my
14  self-reflection.  He thought that I can't -- that
15  was not what they needed me to write, and so on,
16  which was to me that was discriminatory and I
17  think that's -- they didn't like it because I
18  spoke about what actually happened.
19      Q.     Anything else Dr. Lento did to
20  retaliate against you for making complaints of
21  discrimination?
22      A.     Right.  He said that I was like not on
23  academic advisement anymore and then he was like
24  you're on academic advisement because we didn't

711

Varughese

1   like your self-reflection.  Then he was supposed
2   to follow up with me for like, I don't know,
3   several months.
4          And when I did follow up with him he
5   told me that according to everyone I was doing my
6   work and I was being very professional and
7   everyone was satisfied with the work that I was
8   doing.  There weren't any problems.  And he claims
9   that I didn't follow up with him, which is
10  ridiculous, when I know that I followed up with
11  him several times over the period of academic
12  advisement, and he had informed me that I was
13  according to everyone who he had spoken to that I
14  was doing my work and satisfactorily and there
15  weren't any complaints.
16         And then he changes that story.  As
17  soon as he is with Cordon-Cardo and Castaldi that
18  day, he is like, no, you're not doing your work.
19  You didn't follow up with me.  It was up to you to
20  follow up, and so on and so forth, which are all
21  lies because I had already followed up with him
22  regarding a lot of these issues.  And he was
23  basically, you know, telling me that it's up to me
24  to decide if the academic advisement is over.

712

Varughese

1   And then I was like, well, it's over
2  in my mind, and he said it wasn't over, and, I
3  mean, he was giving me like not -- he was not
4  acting as a professional who knew what he was
5  doing in terms of like the ACGME requirements and
6  in terms of educational requirements. He was sort
7  of like all over the place. He had different
8  standards for me. Then he had a different
9  standard for McCash and Adrienne Jordan. I mean,
10  I use these two people as comparators because they
11  were the ones who were directly involved in this
12  incident. And I noticed like he repeatedly, you
13  know, would favor, you know, make favorable
14  decision in their favor while making decisions
15  that were very detrimental to me and my career as
16  a physician.
17  And this goes on to even scheduling
18  issues. I mean, ever since he became program
19  director I found that for me to get the same type
20  of education as McCash or Jordan I would have to
21  make, you know, about ten different requests. I
22  would have to explicitly state that this is what
23  I'm missing. Even though there was a tally and a
24  list of all the different rotations I had, I would

*Computer Reporting NYC Inc.*
*(212) 986-1344*

713

1  have to repeatedly write e-mails, you know, break
2  down the lists and say this is what I'm missing,
3  this is what I need, this is what needs to happen
4  for me to obtain X, Y and Z before I graduate.
5  And I felt like Pat Lento was going
6  out of his way to make sure that I'm not getting
7  the requisite requirements even for pathology
8  training.
9  And then that went on into my fourth
10  year. So that's third year and fourth year I had
11  these problems with Pat Lento, which is pretty
12  disparate if you compared my schedule, and that
13  compared to Adrienne Jordan who was getting all
14  sorts of electives and she was being promoted to
15  chief resident status even though everyone knew
16  she was drinking on the job and she had other
17  problems, you know. So they still promoted her
18  and they were using a different standard for me
19  because if I had done any of those things I would
20  have been fired.
21  Q.   Dr. Varughese, just so -- I want you
22  to understand the questions. I will ask you about
23  why you thought you were being discriminated
24  against, which is some of what you're telling me

*Computer Reporting NYC Inc.*
*(212) 986-1344*

714

Varughese

1  now.
2  What I'm asking you is why you think
3  you were being retaliated against for making
4  complaints of discrimination. I've asked you
5  about Dr. Lento. You may not be finished with
6  your answer about Dr. Lento. I am going to ask
7  you about the other individuals that you've
8  identified as retaliating against you for one
9  reason or another. And I'm not going to interrupt
10  you. I mean, you can tell me whatever it is and
11  testify to whatever you think, but I want you to
12  tell me everything that you believe that Dr. Lento
13  and the others I will ask you about did to
14  retaliate against you for making complaints of
15  discrimination or for some other reason that we'll
16  come to. And you say whatever you want to say
17  about that and then just let me know when you're
18  finished, OK?
19  A.   OK.
20  Q.   So if you're finished with Dr. Lento,
21  tell me. If not, continue.
22  A.   No, I'm not done yet.
23  Q.   OK. Go ahead.
24  A.   So then after this whole, you know,

*Computer Reporting NYC Inc.*
*(212) 986-1344*

715

Varughese

1  like with the scheduling, that was another aspect
2  of discrimination and retaliation I felt was
3  occurring. Well, at least fourth year with the
4  scheduling I thought that was somewhat
5  retaliatory, that I was not getting the
6  appropriate assignments for my year.
7  Then in terms of further retaliation,
8  the decision to place me on disciplinary action I
9  felt was further retaliation from Dr. Lento,
10  because that letter is written in his first person
11  narrative which says I as so-and-so, as program
12  director, and it's written sort of like, you know,
13  sort of from his perspective, then it's signed by
14  Cordon-Cardo. So, I mean, that's clearly
15  retaliatory.
16  And then he makes all these statements
17  in there which I know to be false because I had
18  followed up with him several times over the course
19  of the academic advisement period. I have
20  e-mails, text messages, et cetera, from Pat Lento.
21  I have notes from him that he left on my desk to
22  call him at his home phone number no less in the
23  middle of the day. I mean, I was in
24  communications with him. There was never -- there

*Computer Reporting NYC Inc.*
*(212) 986-1344*

716

Varughese

1
2  was one miscommunication between me and Pat Lento
3  which was essentially -- what was it? He wanted
4  me to appear to his office just before his
5  vacation. And he had e-mailed me the day prior or
6  something and said I need you to come here. I
7  need to have a meeting with you. And I couldn't,
8  you know, I wasn't sure he wanted to confirm it or
9  not, the meeting. And so there was some issues
10  with that particular meeting. But it was
11  essentially cleared up.
12          Like, I mean, he went on vacation the
13  following week and after he came back he said, oh,
14  OK, like, we were going to meet after he came back
15  from his vacation and I met with him and it wasn't
16  that -- there was really like no big issue there.
17  But he is like making it into this like massive,
18  you know, exaggerating beyond belief about how
19  important that one meeting was when easily the
20  meeting was rescheduled the week after.
21          So but this is the kind of, you know,
22  that's basically the disciplinary action. The
23  disciplinary action just goes on for, you know, I
24  don't even know. It just goes on for like four
25  pages or something about whatever they thought.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

717

Varughese

1
2          I mean, that was all substantiated in
3  my opinion. And it was really retaliatory. I
4  mean, it was unsubstantiated that I feel like it
5  was completely retaliatory, and that was like in
6  July of 2011.
7          And then after that I found out that
8  he was writing all these e-mails behind my back
9  about me taking advantage of a leave of absence
10  through FMLA to go on some conference or
11  something. And he didn't want my conference paid
12  for because if I'm on leave, so on and so forth.
13  I mean, this is really outrageous. Like, I can't
14  believe this is a professional.
15          If you're professional, you don't
16  conduct yourself like that. You can't sit around
17  and say this person is going to go on leave and
18  take advantage of us.
19          Meanwhile, in my three, four years
20  there I've never asked for a penny from them.
21  I've never asked them to support me on any of my
22  conferences that I attended. I have not asked
23  them to support me monetarily in any other
24  educational ventures.
25          But I know for a fact Adrienne Jordan

*Computer Reporting NYC Inc.*
*(212) 986-1344*

718

Varughese

1
2  and McCash have been supported to the tune of like
3  maybe ten, $10,000, maybe even 15, $20,000, with
4  their conference attendances, hotel stays and a
5  variety of other issues, and this is my one
6  educational conference in four years where it's
7  essentially a review course that's supposed to
8  remediate material that I've not learned in my
9  residency program because of this disorganization
10  and other problems, and he's acting like, oh, I'm
11  trying to take advantage of them.
12          I mean, that's clearly -- to even make
13  that statement it's retaliatory and, I mean, it
14  just speaks volumes about his professionalism
15  which is like nonexistent.
16          And then with the firing/termination
17  thing, he wanted to have me fired. And
18  essentially because, I mean, I don't even know
19  why. Because I -- he writes some e-mails. I
20  mean, not I don't know why. I mean, I know why.
21  Because he is retaliating against me based on his
22  prejudices against me which is that I am a woman
23  of Indian descent.
24          And he, you know, what does he say?
25  He like, there was some e-mail that Adrienne

*Computer Reporting NYC Inc.*
*(212) 986-1344*

719

Varughese

1
2  Jordan wrote about how she is afraid of me or
3  something. And next thing I know Pat Lento
4  substantiates that. He immediately substantiates
5  that and says there are intimidation issues here.
6          OK, I was talking about harassed at
7  work which has been corroborated and substantiated
8  by several people and he doesn't think it's
9  serious. I am not even there, not even speaking
10  directly to Adrienne Jordan and he thinks there is
11  some fear and intimidation issues that he's like
12  deluded himself to believe as being true. And
13  then he supports that statement and he encourages,
14  he substantiates it. He probably encourages
15  Adrienne Jordan to say these things, and next
16  thing I know I'm fired.
17          I mean, that's retaliatory. For even
18  to substantiate something so outlandish it is
19  retaliation and extremely defamatory and it's not
20  something anybody ever mentioned to me as her
21  being intimidated by me or terrified of me or
22  threatened by me at work. I mean, I had no idea.
23          And these are all like substantiated
24  by Pat Lento. Even though meanwhile I'm basically
25  being, you know, pretexturally terminated from my

*Computer Reporting NYC Inc.*
*(212) 986-1344*

720

Varughese

1
2  employment and that's being done by him to a large
3  degree.
4    Q.   Are you done yet?
5    A.   No, I'm not done yet.  Actually, I
6  just remembered something.
7    Q.   Go ahead.
8    A.   Then at the first hearing he was, what
9  do you say?  He said that I never answered his
10  pages and all this nonsense.  Like that's all
11  completely defamatory.  I've been on call with him
12  for autopsies and a variety of issues over the
13  years.  He would page me even though I'm not even
14  the resident who was on call and ask me to do work
15  for like other male residents there.  I received
16  at least two or three pages from him when I was
17  working with a number of male residents.
18        This never occurs when I'm partnered
19  with a female resident.  I was partnered with the
20  male resident Lanjing Zheng, and he's, I mean, I
21  believe he graduated two years before me from the
22  residency program.  And I was partnered with him
23  on some autopsy rotation, and I believe he lives
24  in Westfield, New Jersey.  He lived in Westfield,
25  New Jersey at that time.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

721

Varughese

1
2        And I think Dr. Lento knew that or
3  something, and he knew that the case was coming in
4  because a friend of his said, Oh, my patient died
5  and I -- she died at home or something from
6  metastatic breast cancer, and Pat Lento wanted me
7  to come in and do this case.
8        First, this is a patient who died at
9  home.  We shouldn't be doing this case at the
10  hospital.  If it needs to be done, it should be
11  referred to the appropriate third party unless we
12  were doing this as a private case.  He didn't want
13  to do that.
14        Then he wanted to page me, and I'm
15  like I'm not even on call today.  Like you have to
16  call Dr. Lanjing Zheng, and he's like, Well, you
17  know, I want you to do this case.  Like why don't
18  you go in.
19        So I like drive myself in.  I get
20  there and it's like this case or this woman who
21  died at home and I meet her doctor who is like a
22  friend of, personal friend of Dr. Lento's and he's
23  like, Yes, we need this case done.  It's a woman
24  who died of metastatic cancer.
25        I was like, well, clearly it's a woman

*Computer Reporting NYC Inc.*
*(212) 986-1344*

722

Varughese

1
2  who died of metastatic cancer.  Like what do you
3  really want me to like diagnose her with at this
4  point?
5        Then, two, I'm not even on call and
6  then, three, I call my attending who's on
7  surgical, I mean, autopsy that day and I talk to
8  him and he's like, Why are we even doing this
9  case?  And I'm like, and then I'm like I'm telling
10  him I'm not even on call for this case, but
11  Dr. Lento is like essentially forcing me to do
12  this case because I guess he doesn't want to call
13  Lanjing Zheng in for whatever reason.
14        And then I have to finally call
15  Lanjing Zheng to come in and both Lanjing Zheng
16  and the attending physician are like, Well, we
17  should not do this case, because this is not a
18  case that probably should be referred to us at
19  this point.  But this kind of stuff happened all
20  the time with Pat Lento.
21        Oh, there was another time where he
22  wanted me to do, um, take samples of tissue for
23  McCash.  He is like, Oh, Dr. McCash is doing some
24  project and I would like you to like just start
25  taking tissue for him to assist him with this

*Computer Reporting NYC Inc.*
*(212) 986-1344*

723

Varughese

1
2  project.
3        I said, well -- and that was a week
4  when actually McCash was not even at work that
5  week.  I was like, well, even if I do it, he is
6  not even at work.  McCash has never mentioned to
7  me that he wants me to do any extra work for his
8  project.  McCash never mentioned it.  But Lento
9  was coming to me and approaching me and asking me
10  to do work for McCash.
11        The same thing with Zheng, me to work
12  for Zheng.  Like he wants me to do work for other
13  people, especially like other male residents when
14  I'm on call with them.  I mean, he's, you know,
15  like this is just like just the tip of the iceberg
16  with him.  Like he just does this kind of cover
17  for male residents, do this for other people.
18        And meanwhile if I make a mention of
19  like me having an issue, he doesn't even intervene
20  or try to find a way to resolve the issue.  He
21  finds ways to blame me for something that I didn't
22  even really do.
23    Q.   Are you done with Dr. Lento?
24    A.   Um, OK.
25    Q.   Is that a yes?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

724

Varughese

1
2      A.    Yes.
3      Q.    What did Dr. Cordon-Cardo do to
4  retaliate against you because you complained about
5  discrimination?
6          MR. WRONKO:  Form objection.  You can
7  answer.
8      Q.    Or actually I will accept that.  What
9  do you believe Dr. Cordon-Cardo did in retaliation
10 for your complaints of discrimination?
11     A.    Cordon-Cardo?  Well, I mean, he had
12 just started as I guess the chairman of the
13 department of pathology at Mount Sinai Medical
14 Center on April, in April 2011.  And I, my first
15 meeting with him was on May 3rd, 2011, and, I
16 mean, frankly, he should have tried to figure out
17 what the situation was.
18         I mean, he didn't ask me for my
19 perspective at all.  He was more interested in
20 that I didn't do, I mean, I didn't write a
21 self-reflection that was acceptable to them,
22 without really exploring my concerns.
23         Then he, after that he essentially was
24 actively involved in my termination.  He had
25 written a number of e-mails stating, making

*Computer Reporting NYC Inc.*
*(212) 986-1344*

725

Varughese

1
2  statements that I should be fired for things that
3  everybody else did too.
4          I mean, to draw an example is, here is
5  the, you know, what is it?  Updating duty hours in
6  New Innovations about, you know, there are about
7  twenty residents in the program.  There are about
8  like six or seven fellows, you know, fellowship
9  programs in residency there.
10         So about 80 percent of the people
11 there don't update duty hours until they have to.
12 That's essentially how it's done.  And he thought
13 I should be fired for that.  I mean, he thought I
14 should not be a doctor anymore because I allegedly
15 did not update my duty hour.
16         Meanwhile I did update my duty hour in
17 a timely manner.  But he thought that was a
18 fireable offense.  I mean, this is like the
19 chairman of the department.  Like come on.
20         Then he, you know, he did not want me
21 to speak about, you know, issues such as drinking
22 on the job or even harassment or retaliation.  He
23 did not want to discuss any of those issues.
24         So he facilitated me being terminated
25 from the residency program.  Even with the

*Computer Reporting NYC Inc.*
*(212) 986-1344*

726

Varughese

1
2  termination letter, he signed that letter.  I
3  mean, it was written by Pat Lento, Patrick Lento,
4  but it was signed by Cordon-Cardo who was chairman
5  of the department.  And he must have read the
6  letter before he signed it.  And, I mean, that was
7  clearly like, you know, aiding and abetting in the
8  discrimination and retaliation there.
9      Q.    Anything else?
10     A.    Right.  And then when, um, then on
11 July 14th when he gave me the letter he had
12 alleged that he had informed me that I can get
13 some sort of, you know, I can go into the, I guess
14 the committee.
15     Q.    Which letter are you referring to?
16     A.    July 14th.  Disciplinary action, final
17 warning or disciplinary action letter.  He said I
18 can use the committee.
19         But he never made that statement
20 explicitly.  He just gave me the letter.  He said,
21 Oh, it's in the envelope and you can read it when
22 you read it, and so on.
23         I was like, you know what?  I have
24 legal counsel who has already written to the
25 hospital at this point.  I believe they sent a

*Computer Reporting NYC Inc.*
*(212) 986-1344*

727

Varughese

1
2  letter on June 9th or wherever it was and they had
3  explicitly stated that they felt that I was being
4  discriminated against and that was my concern and
5  we would like that to stop and we would like some
6  communication with legal counsel regarding this
7  matter rather than engaging me directly.
8          And they refused to respect those, you
9  know, requests from my attorney at that time to
10 engage them in any issues that related to what I
11 had already had alleged was discrimination.
12         So Cordon-Cardo knew about that and he
13 did not comply.  And this went on into the
14 termination event.  He didn't, you know, he said
15 Oh, they said they were going to provide me with
16 some, you know, excerpts from the house staff
17 manual and some other manuals regarding my rights,
18 my rights to appeal the termination, but they
19 never did.  They just gave me the termination
20 letter without any other information even though
21 they claimed that they were going to do that.
22         And then after I was terminated they,
23 you know, he made all these statements that were
24 really defamatory and untrue.  And I think that
25 was all retaliatory.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

728

Varughese

1
2    Q.    Anything else about Dr. Cordon-Cardo?
3    A.    Well, I mean, he is not, you know,
4    he's not a practicing pathologist. He never did a
5    residency like I was doing my residency in
6    anatomic and clinical pathology. He does not have
7    that background or that experience as a physician
8    who has done a residency. So largely he doesn't
9    even know what that entails.
10        And as a director of, I mean, he is
11   the chairman of a program that essentially trains
12   20 plus people every year to be a physician and he
13   is essentially for all intents and purposes a
14   researcher or venture capitalist or -- not a
15   venture capitalist. He is an entrepreneur I
16   think, whatever that is. But he's one of those
17   people who -- I don't know if he really
18   understands the clinical significance of pathology
19   as is and its, you know, application to treating
20   and diagnosing disease.
21        Because, I mean, he seemed like I
22   don't know. Like he was just not very, like, I
23   mean, he doesn't -- he seemed pretty cool as to
24   what my work was and what I was doing. And, I
25   mean, not cool, but he didn't seem very educated

*Computer Reporting NYC Inc.*
*(212) 986-1344*

730

Varughese

1
2    Q.    Anything else about Dr. Cordon-Cardo?
3    A.    If I remember anything I'll add to
4    that.
5    Q.    Just so you know, the time to do that
6    is now. So if you want to think about it, take
7    your time, but this is the appropriate time to
8    tell me whatever it is you believe
9    Dr. Cordon-Cardo did that was in retaliation for
10   you making complaints of discrimination.
11        MR. WRONKO:  You mean while the
12        deposition is still open.
13        MR. McEVOY:  Sure.
14        MR. WRONKO:  Right.
15   Q.    So let's move on. What did Dr. Firpo
16   do that you believe was in retaliation for your
17   complaints of discrimination?
18        MR. WRONKO:  Form objection.
19   A.    Adolfo Firpo, he was hired I guess in
20   July or whatever, July 2011, and he was supposed
21   to, you know, I don't know. He was supposed to
22   like -- he was giving me misinformation regarding
23   how I could approach a variety of issues within
24   the residency and he changed, you know, he would
25   one minute tell me I could do things a certain way

*Computer Reporting NYC Inc.*
*(212) 986-1344*

729

Varughese

1
2    about a lot of aspects of medical residency.
3    Q.    Anything else that you believe
4    Dr. Cordon-Cardo did to retaliate against you for
5    making complaints of discrimination?
6    A.    Well, I mean, as the chairman of the
7    department he should be aware of all these things
8    and he should be aware of like being able to apply
9    those same standards across the board.
10        Like he was basically stipulating that
11   these different standards to me versus Adrienne
12   Jordan or McCash were OK. Like, I mean, even with
13   the whole drinking thing, the drinking issue, he
14   essentially was making a statement that that was
15   OK, but for me to complain about McCash was not
16   OK.
17        So that is really, you know, I mean,
18   that's retaliatory. Why would you take actions
19   against me only and not want to take actions
20   against something like Adrienne Jordan or McCash
21   or other people who were not presenting? There
22   were a lot of people who did not present their
23   conferences or who did not attend lectures. Why
24   would you not take actions against those people
25   too? Like, why only take actions against me?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

731

Varughese

1
2    and then meaning I could -- for instance, he told
3    me or indicated to me that I could attend other
4    conferences and make a note of them and have them
5    count towards my conferences. And then he
6    essentially changed his mind on that.
7        Then in terms of, what is it? The
8    FMLA issue, we had a discussion and he had told me
9    that I could come to work. He was going to
10   accommodate my schedule and, you know, make sure
11   that I wasn't being bothered by or being too
12   harassed by Adrienne Jordan and whatever on one
13   day. The following day he completely changed his
14   story.
15        And I believe that change of opinion
16   from, you know, Thursday to Friday is retaliatory.
17   I mean, if they were not retaliating against me
18   based on my protected complaints, protected
19   activity, he would not have had such a change of
20   an opinion about from one day to the next about
21   how I should conduct myself with FMLA.
22        This is just, you know, these are just
23   like two incidents, but this occurred, I mean, I
24   met with Dr. Firpo like three, you know, like, I
25   don't know. He was only there since like July to

*Computer Reporting NYC Inc.*
*(212) 986-1344*

732

Varughese

1
2 September and that was the time period I was
3 there. And that's like a very brief period of
4 time, you know, he was employed by Mount Sinai
5 Medical Center and I had to interact with him as a
6 supervisor.
7       And he did so many things in that
8 short time period that was clearly unfair and I
9 felt were, you know, put me in a, um, not put me.
10 What is it? That treated me differently from like
11 my coworkers and that was unfair toward me.
12       What was the other stuff that he did?
13 In terms of the elective schedule change, he said
14 I could change it and then -- and it should not be
15 an issue because he already had approval from at
16 least one of the two people involved, and then it
17 seemed like the second person who was involved in
18 the approval also wanted me to change the
19 schedule. So I was not on that particular, you
20 know, so it would accommodate my request.
21       But Firpo was a limiting issue in
22 this. He was a limiting factor. Him and Pat
23 Lento were limiting factors in this and they both
24 decided not to do it. And that's a way to punish
25 me. Because it wouldn't, I mean, it seemed like

733

1 it didn't matter to anybody else but the two of
2 them.
3       So these kind of situations occurred
4 over and over again that led me to believe that I
5 was being retaliated against.
6
7    Q.   Anything else that Dr. Firpo did that
8 you believe was in retaliation for your complaints
9 of discrimination?
10   A.   Right, so this goes on into, you know,
11 where I was, you know, with the cytogenetics
12 rotation. I had informed him that I had problems
13 with the cytogenetics rotation and I wasn't happy
14 with my experience on that rotation and it was,
15 you know, I found that I was being harassed when I
16 was on the rotation.
17       There were incidents that occurred
18 during the rotation that was concerning to me and
19 he completely ignored it. That's clearly
20 retaliatory in my mind.
21       Then following this whole thing he,
22 you know, with the FMLA like I already mentioned,
23 I felt that was retaliatory, how I should be at
24 work. They were forcing me to change my schedule,
25 change my work, everything, because I had merely

734

Varughese

1
2 requested FMLA. That's highly irregular and
3 retaliatory.
4       Then he said that I was having petit
5 mal seizures and making all these defamatory
6 statements about me, which is completely false. I
7 have never had a petit mal seizure. That's a --
8 those are symptoms. That's a symptom. Petit mal
9 seizure is a symptom of very serious medical
10 diagnoses.
11       You can't make statements like that
12 about somebody, especially when you're a
13 physician, without thinking that those have severe
14 consequences. It's extremely defamatory and it's
15 retaliatory.
16       You can't -- I would never make a
17 statement like that about someone. Because I know
18 those carry, you know, those are consequential
19 statements. Especially when you're a physician.
20 But that's the kind of statement that he made at
21 the house staff hearing. Then he made these
22 other, you know, further defamatory statements
23 about me at the House Staff Affairs Committee
24 hearing that were false and fabricated.
25       So those were -- that's retaliation

735

Varughese

1
2 for protective complaints. I mean, then, you
3 know, paying out of his pocket for a late fee as
4 opposed to just changing my schedule very
5 slightly. I mean, this is the kind of, you know,
6 I mean, that's not just retaliatory. That's
7 outright discrimination. I found that to be
8 extremely, concerning comment as a professional,
9 and like he makes these sort of statements that
10 are really concerning.
11       Then with the summative evaluation,
12 his signature is on it, and I have never worked
13 with him to that capacity of patient care, the
14 patient care and everything else. I never signed
15 out a case with Adolfo Firpo. I had very minimal
16 interaction with him in terms of pathology work
17 actually. I don't even know if he does pathology
18 work. Like that's how very little I know about
19 his background.
20       So for him to say that I'm
21 unsatisfactory in patient care, that's clearly
22 fabricated and that's one of his delusions. Like,
23 I can't, that's retaliatory. Why would he make
24 those statements up if he wasn't like trying to
25 harm me in some severe manner and cause me severe

736

Varughese

1 injury with my professional career? Why would he
2 do that? There's no other reason. Because he
3 just made it up. And that's all retaliation.
4     Q.    Anything else about Dr. Firpo?
5     A.    Nothing. No.
6     Q.    What do you believe Dr. Bleiweiss did
7 to retaliate against you for your complaints of
8 discrimination?
9     A.    Dr. Bleiweiss, I feel like he did not
10 do anything.
11         I'm sorry, I don't want to put that
12 in.
13         THE WITNESS: Can you correct that?
14     Q.    He has to take down everything that's
15 said, but you can correct it.
16     A.    I need a break actually. I need to
17 gather my thoughts.
18     Q.    You can't take a break while there's a
19 question pending. You have to answer the
20 question, then you can take a break.
21     MR. WRONKO: Take your time to gather
22     your thoughts.
23     Q.    But you take a minute.
24     A.    I just need a minute to gather my

*Computer Reporting NYC Inc.*
*(212) 986-1344*

737

Varughese

1 thoughts here.
2     Q.    Fine.
3     MR. WRONKO: Take a minute.
4     A.    (After a pause) So with Dr. Bleiweiss,
5 what he did do was, he didn't follow up
6 appropriately to my complaint of harassment when I
7 was on -- when I requested that he assist me, he
8 did not follow up appropriately at that time.
9         Then he -- I thought he had reported
10 me to Dr. Schiller for asking that I be, my
11 schedule be slightly changed to accommodate, you
12 know, my concerns of, regarding what had occurred
13 when I was at, you know, on December 8, 2010.
14         And then following that, he, you know,
15 reviewed me negatively that month. I believe he
16 reviewed me negatively after the rotation was
17 over. And it was, um, so I thought that was
18 largely due to this incident and also because
19 there weren't any other patient care related
20 issues that month.
21     Q.    When you say this incident, what are
22 you referring to?
23     A.    December 8, 2010.
24     Q.    OK.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

738

Varughese

1     A.    And he had reviewed me negatively for
2 that month when everybody else had reviewed me
3 favorably. Actually, that work for that month was
4 going fairly well. I didn't have any issues with
5 any of my supervisors. I mean, I worked with
6 like, I don't know, like, when I was at Mount
7 Sinai Medical Center I worked with like it must be
8 like at least 40 plus supervisors.
9         So, I mean, I didn't have -- all the
10 supervisors that I was working with reviewed me
11 favorably for my work that month and Dr. Bleiweiss
12 did not review me favorably, and then his
13 commentary was that, like, you know, sort of
14 diminishing the significance of what had occurred
15 to say that I'm not getting along with my
16 colleagues when in fact that wasn't the problem.
17 I was actually being harassed by my colleagues.
18 And I was requesting that I have some sort of, you
19 know, mediation relating to that or some sort of
20 intervention by a supervisor.
21         And he was a supervisor who was there.
22 And he didn't really intervene and he didn't try
23 to, you know, going forward, he didn't try to
24 assure that that wouldn't occur again.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

739

Varughese

1     Q.    Is there anything else about
2 Dr. Bleiweiss?
3     A.    Right, so then, going forward, I do
4 suspect that he was actually trying to, um, trying
5 to, I don't know, railroad me. Meaning there were
6 e-mails and stuff he was writing that -- well, at
7 least I only know of the e-mails that I have seen
8 from discovery, but it appears that he has been,
9 you know, pretty involved in like with certain,
10 you know, issues that occurred and that I was
11 cited for, such as the Robert Guarino issue, where
12 Robert Guarino who was working with Dr. Bleiweiss
13 cancels his presentation and it was perfectly
14 fine.
15         I mean, there was no reason why he
16 should have cancelled his presentation. It was
17 something he knew about for like at least a month
18 and it was OK for him to cancel his presentation
19 and I was assigned in his place the day before to
20 present.
21         And then Dr. Bleiweiss, you know,
22 thinks that it was really, you know, he said
23 something about me not presenting. But he never
24 mentioned anything about Robert Guarino not

*Computer Reporting NYC Inc.*
*(212) 986-1344*

740

Varughese

1 presenting at the last minute. Like he is
2 definitely applying a different standard to me.
3    Q.   And other than the e-mail you just
4 referred to or e-mails you just referred to is
5 there any other reason why you suspect
6 Dr. Bleiweiss was trying to, to use your word,
7 railroad you?
8        MR. WRONKO:  Form objection.  You can
9 answer.
10   A.   Right, so he was, um, well, he was at
11 that, I don't know, what was it?  Let me think
12 about this for a minute.
13   Q.   Take your time.
14   A.   (After a pause) Dr. Bleiweiss was also
15 involved in the whole GYN -- when I was in GYN
16 rotation in May 2011, he was involved in that
17 incident where he was accosting my supervisor.
18       Yes, Dr. Bleiweiss is my supervisor,
19 but the physicians that, you know, the attending
20 pathologists, board certified pathologists that
21 I'm working with, they are also my supervisors.
22 He does breast pathology.  They do GYN pathology,
23 and essentially at Mount Sinai Medical Center
24 these are separated now.  So it doesn't really

Computer Reporting NYC Inc.
(212) 986-1344

741

Varughese

1 overlap much at all.
2        And Dr. Bleiweiss was going and, you
3 know, accosting my GYN supervisors with claims
4 that I wasn't doing my work and, you know, they
5 had better write a negative evaluation of me.  He
6 was -- he was like actively telling them to write
7 negative evaluations about me, to, you know,
8 informing them that I'm not doing my work.  All of
9 which was false.
10       I mean, but he was creating this
11 environment for me where it was becoming very
12 hostile, where I had one supervisor on one end
13 going to my other supervisor who was doing -- but
14 I'm on a different rotation, merely because I'm in
15 the same hospital to say negative things about me
16 and reporting that I'm not doing my work when I'm
17 already communicating with the GYN people about
18 the work that I'm doing.
19       And there weren't any problems until
20 Dr. Bleiweiss got involved.  Before that we didn't
21 have any issues.  As soon as Dr. Bleiweiss got
22 involved I started having problems on the
23 rotation, with people saying I'm not doing my work or whether
24 alleging that I'm not doing my work or whether

Computer Reporting NYC Inc.
(212) 986-1344

742

Varughese

1 it's, you know, allegations that I'm not doing my
2 work or whether my supervisor is crying at work
3 saying I'm being told to write negative
4 evaluations, that I'm really stressed out and I
5 can't do this.
6        I mean, this is not a good work
7 environment for anyone and Dr. Bleiweiss was
8 causing all these problems.
9    Q.   How do you know that Dr. Bleiweiss
10 asked your supervisors during your GYN rotation to
11 write negative evaluations of you?
12   A.   How do I know?  I was told.  I was
13 told that Dr. Bleiweiss had -- Dr. Kalir told me
14 that Dr. Bleiweiss had approached her when she was
15 at work to, you know, tell her that I didn't do my
16 work one day.
17       And she said, like, Is that true?  I
18 was like, No, of course not.  Because we had
19 already discussed all the work we should do that
20 day.  There was no issue of me not doing any work.
21 And he had said that I hadn't done my work even
22 though he has no clue what goes on in GYN.  He's a
23 breast pathologist.  He doesn't know what goes on
24 in GYN.  And he is like just making up stuff and

Computer Reporting NYC Inc.
(212) 986-1344

743

Varughese

1 going and bothering her.
2        Then she's crying, and then -- what
3 else did he do?  He was very disruptive that
4 month.
5    Q.   My only question, Dr. Varughese, is
6 how do you know that Dr. Bleiweiss instructed your
7 supervisors in the GYN rotation to write negative
8 evaluations about you and you told me that Dr. Kalir told
9 you that.
10       Other than Dr. Kalir, did anybody else
11 tell you that Dr. Bleiweiss had asked them or
12 others to write a negative evaluation about you?
13   A.   Well, Dr. Kalir was one person
14 definitely.  Are there other people?
15   Q.   Right.
16   A.   Let me see.
17       (After a pause) Um, well, with
18 Dr. Bleiweiss, I've seen him like, what is it?
19 You know, gossiping with Adrienne Jordan on
20 occasion or even with McCash.
21   Q.   I take it that Dr. Jordan and
22 Dr. McCash were not your supervisors in the GYN
23 rotation.
24   A.   Right.  I mean, they're not my

Computer Reporting NYC Inc.
(212) 986-1344

744

Varughese

1  supervisors, but I know that he was, I mean,
2  especially after this incident, after
3  December 8th, like that following week he was, I
4  would constantly find him chitchatting with
5  Adrienne Jordan who is like not even on -- she's
6  not on surgical pathology. She was on neuropath
7  and derm path, I believe. OK? Like and she was
8  moonlighting.
9      Q.    So let me ask the question again,
10 Dr. Varughese, so I'm sure I get the answer.
11 Other than Dr. Kalir did anybody tell you that
12 Dr. Bleiweiss had told them or others to write
13 negative evaluations about you while you were on
14 your GYN rotation?
15     A.    Right. Well, I mean, well, the only
16 two people, other people on GYN rotation was
17 Dr. Deligdish and Dr. Elisen. So, I mean, did
18 they say anything?  No. I didn't even know
19 Dr. Elisen was going to do the evaluation. I was
20 by told Dr. Kalir was the Dr. Bleiweiss also told her and
21 administration and Dr. Bleiweiss also told her and
22 all I know is she was very upset and she was
23 crying at work.
24
25     Q.    Is this Dr. Kalir?

745

Varughese

1
2      A.    Yes.
3      Q.    So Dr. Kalir and the other two
4  physicians you just mentioned, they were your
5  supervisors during GYN rotation?
6      A.    GYN rotation. Yes.
7      Q.    Just those three.
8      A.    Yes, and then after GYN rotation I
9  wasn't even at Mount Sinai Medical Center. I went
10 to the VA, Bronx Veterans Administrative Affairs
11 Hospital. So I was even at the VA. So I was
12 actually off site for two months.
13         Then when I returned was when in
14 August I was working with Dr. Najfeld on
15 cytogenetics rotation. That was the two weeks
16 when I was back at Mount Sinai Medical Center. So
17 I did not have a lot of supervisors following that
18 GYN rotation.
19         MR. WRONKO: I'm sorry to interrupt,
20 but she did ask for a break.
21         MR. McEVOY: Do you want to take a
22 break?
23         THE WITNESS: Yes.
24         MR. McEVOY: OK.
25         (A recess was taken from 11:15 a.m. to

746

Varughese

1
2      11:23 a.m.)
3  BY MR. McEVOY:
4      Q.    Dr. Varughese, before the break I
5  asked you to tell me what you believed
6  Dr. Bleiweiss did to retaliate against you for
7  making complaints of discrimination.
8          Is there anything else other than what
9  you already told me?
10     A.    Right. With the, I mean, what I'm
11 really aware of are the evaluation that he
12 submitted, you know, accosting my supervisors on a
13 different rotation, supervisor anyway, Dr. Kalir,
14 and then the third thing was with the presentation
15 where his fellow Robert Guarino who was scheduled
16 to present for over a month was allowed to cancel
17 at the last minute without any consequences and I
18 was asked to present in his place. Those three
19 things.
20         Oh, then the fourth thing was he was
21 writing e-mails about, you know, me that were
22 pretty defamatory to Dr. Lento. It was like
23 e-mails amongst themselves -- Firpo, Lento,
24 Bleiweiss.
25     Q.    Anything else?

747

Varughese

1
2      A.    No. That's I think it.
3      Q.    Let me show you a document.
4          (Defendants' Exhibit 59, document
5  headed "Faculty Evaluation of Pathology A
6  Resident/Fellow," marked for identification,
7  this date.)
8      Q.    Have you had a chance to look at that?
9      A.    Yes.
10     Q.    Can you tell he what this is,
11 Dr. Varughese?
12     A.    This is a faculty evaluation of a
13 pathology resident or a fellow. This was
14 evaluated by Ira Bleiweiss and I was the subject.
15     Q.    And is this the, again to use your
16 word, the negative evaluation that you were just
17 referring to?
18     A.    Yes.
19     Q.    So now, Dr. Varughese, would you tell
20 me everything that you believe Dr. Lento did to
21 retaliate against you for making complaints about
22 drinking on the job?
23     A.    Dr. Lento?
24     Q.    Yes.
25     A.    Well, what Dr. Lento did, I mean, I am

748

Varughese

1  not, I mean, I think the problem here is that a
2  lot of the retaliation was related to my
3  complaints of or me engaging in protective
4  activity.
5
6         I think drinking on the job was sort
7  of something where my white colleagues were being
8  incriminated, and I think they went out of their
9  way to protect them and treat me. You know, that
10  is the real issue here. It's not that is it
11  retaliation because I complained about people
12  drinking on the job. I don't see it as
13  retaliation for a complaint about people drinking
14  on the job. I see that this like retaliation for
15  engaging in protected activity.
16         And that when I did discuss people
17  drinking on the job, the first knee jerk reaction
18  from them was to protect my white coworkers, not
19  to take actions against them. I mean, this
20  extends to drinking, unprofessionalism, repeat
21  instances of harassment. So it's about how I'm
22  being treated differently than my white
23  colleagues.
24      Q.   Is what you just said, Dr. Varughese,
25  also true with regard to Dr. Cordon-Cardo and

*Computer Reporting NYC Inc.*
*(212) 986-1344*

749

Varughese

1
2  Dr. Figur and Mr. Johnson?
3         MR. WRONKO: Form objection. You can
4  answer.
5      A.   Is that true for them as well that
6  they did not retaliate against me for -- I mean, I
7  think when it comes to Dr. Cordon-Cardo or
8  Dr. Firpo, um....
9      Q.   Dr. Firpo is not somebody who you
10  identified in response to that part of the
11  interrogatory. So let me make it easier for you.
12      A.   No, no, I can answer that question.
13  Let me just. I will answer that question.
14      Q.   OK. Go ahead.
15      A.   Right. So with Dr. Figur I mentioned
16  the drinking on the job to him in January of 2011.
17  And, I mean, I'm not sure if he thought to himself
18  he needs to intervene as part of Physician
19  Wellness Committee to see if they should enforce
20  this policy that's within the hospital. There's
21  no alcohol to be brought onto hospital premises.
22         If I were the administrator what I
23  would do probably would be to send, you know,
24  request that this kind of activity no longer take
25  place and probably confiscate whatever was there

*Computer Reporting NYC Inc.*
*(212) 986-1344*

750

Varughese

1
2  and, you know, so there wasn't any confusion about
3  what was going to happen going forward.
4         I didn't see that happen. And I also
5  noted that following those issues Adrienne Jordan
6  was promoted to chief resident position and there
7  was no, you know, there was no disciplinary
8  actions taken against any of these people.
9      Q.   But the question, Dr. Varughese, is,
10  what did Dr. Figur do, if anything, that you
11  believe was in retaliation against you for your
12  reporting to him that these folks were drinking on
13  the job?
14      A.   Right. And I think they were focused
15  on finding me at fault here. I mean, in terms of,
16  you know, the drug tests and all that, I mean, if
17  I'm being drug tested, like I think, you know,
18  McCash should also be drug tested. I think that
19  was retaliatory.
20      Q.   Anything else that you think Dr. Figur
21  did that was in retaliation for your reporting the
22  drinking on the job?
23      A.   Right. Because, I mean, he is the
24  Physician Wellness, he is like heading the
25  Physician Wellness Committee. I would imagine

*Computer Reporting NYC Inc.*
*(212) 986-1344*

751

Varughese

1
2  that he would want to as a head of that -- they're
3  really involved with physician impairment, drug
4  abuse, those kind of issues generally, they
5  probably would want to test, have McCash and them
6  tested, but they didn't ask them to test.
7      Q.   Right. You told me that now three
8  times. Is there anything else that Dr. Figur did
9  that you think is in retaliation for your --
10      A.   Right. So I was --
11      Q.   Let me finish. Retaliation means
12  something that he did to you. Not what you think
13  he should have done with other people. What he
14  did to you because you reported drinking on the
15  job. Anything else other than making you undergo
16  a drug test?
17      A.   Right, mandating a drug test would be
18  one. The second thing would be like mandating
19  some sort of psychological evaluation at the
20  hospital itself. That was the second thing. I
21  don't think Jordan, I mean, Jordan or McCash or
22  anybody else who was involved in this whole
23  situation were mandated to do so.
24         Then going forward, let's see. I
25  think the protective measures that were taken for

*Computer Reporting NYC Inc.*
*(212) 986-1344*

752

Varughese

1  my, these coworkers, I think that, I would
2  consider that as, you know, part of retaliation.
3      Q.    Anything else that Dr. Figur did that
4  you think was in retaliation for your reporting
5  drinking on the job?
6      A.    Right. I mean, I was initially
7  referred to Dr. Figur for insubordination or
8  whatever in December. So I think, you know, the
9  hospital was sort of intent on treating me
10 differently and retaliating against me.
11     Q.    But we're talking about Dr. Figur now,
12 not about the hospital.
13     A.    Well, Dr. Figur is really
14 representative of the hospital.
15     Q.    So all I want to know is what
16 Dr. Figur did other than what you told me that you
17 think is in retaliation for you reporting drinking
18 on the job.
19     A.    Yeah, I mean, I find most of what was
20 done to be also retaliation for bringing forward a
21 complaint against, I mean, engaging in protective
22 activity.
23     Q.    Dr. Varughese, that's a legal term.
24 OK? And I don't know what you mean by it. What

753

Varughese

1  I'm asking you is, what else, if anything,
2  Dr. Figur did to you in retaliation for your
3  reporting drinking on the job?
4      MR. WRONKO: Just listen to his
5      question. Is there anything else that
6      Dr. Figur did?
7      A.    Well, I believe, at the House Staff
8  Affairs Committee, he did reveal like, you know,
9  he disclosed what I thought should be like HIPAA
10 protected information regarding my, you know,
11 medical care possibly.
12     I mean, I think he did that to make a
13 point that, make some sort of, you know, statement
14 or point about, I mean, it wasn't really for him
15 to disclose technically to like perfect strangers.
16     Q.    Anything else Dr. Figur did in
17 retaliation for your reporting drinking on the
18 job?
19     A.    Like, I mean, I really can't think of
20 anything else right now.
21     Q.    OK. What did Dr. Cordon-Cardo do, if
22 anything, in retaliation because you reported
23 drinking on the job?
24     A.    Well, he didn't want me to bring the

754

Varughese

1  complaint. He didn't want me to discuss people
2  drinking on the job. Then he didn't, you know,
3  with the -- he actively tried to fine me, fire me
4  from the department. I mean, is it because I
5  complained of, I mean, it is because I complained
6  of discrimination. I'm not sure it's because I
7  reported drinking on the job. But, I mean, the
8  drinking on the job shows that while that's a
9  really serious matter, he was not interested in
10 discussing it.
11     Q.    Anything else that Dr. Cordon-Cardo
12 did in retaliation, that you believe he did in
13 retaliation for your reporting drinking on the
14 job?
15     A.    I think he tried to help them cover it
16 up. He helped, you know, he wanted to help
17 Adrienne Jordan and McCash, help the department
18 cover up this stuff.
19     Q.    Anything else?
20     A.    That's all I can remember.
21     Q.    What did Paul Johnson do, what you
22 believe rather Paul Johnson did to you in
23 retaliation for your reporting drinking on the
24 job?

755

Varughese

1      A.    Paul Johnson, I mean, he's part of the
2  hospital administration I believe and, I mean, as
3  such he knows -- well, he allegedly knows all the
4  hospital policies and everything. He didn't take
5  any action.
6      Q.    But what, if anything, did he do to
7  you as a result of your reporting drinking on the
8  job, if anything?
9      A.    Yeah, I can't, I don't really know.
10     Q.    Now, turning to the FMLA, and you
11 mentioned something about this before, so if you
12 want to repeat it you can, but you don't have to.
13 What did Dr. Firpo do in retaliation for your
14 exercise of rights under the FMLA?
15     A.    Who?
16     Q.    Firpo.
17     MR. WRONKO: I'm sorry, I am just
18     directing her back to 5 (iii).
19     Q.    So just so you know, Dr. Varughese,
20 and the record is clear, the response to number 5
21 (iii) are the four people that you identified as
22 people who you believe retaliated against you for
23 your alleged exercise of your rights under the
24 FMLA.

756

Varughese

2   Do you see that?

3       A.   Right.  Under the FMLA, OK.  Yes.

4       Q.   What I'm going to ask you, the same

5   way I asked you about the discrimination and the

6   drinking on the job, is I'm going to ask you about

7   each of those people.

8       And starting with Dr. Firpo, who is

9   listed first, what did Dr. Firpo do that you

10  believe was in retaliation for your attempt to

11  exercise your rights under the FMLA?

12      A.   Right.  Now, who are we talking about?

13  Who is the person you said?

14      Q.   Dr. Firpo.

15      A.   Firpo, OK.  Under the FMLA?

16      Q.   Yes.

17      A.   Well, essentially I had requested FMLA

18  and he had informed me that I can -- initially he

19  had informed me that, you know, I'm going to be at

20  work and I'm not going to be out until -- I'm

21  going to be taking off from work until -- I was

22  going to inform him and that was the initial

23  understanding.

24      But then he changed this understanding

25  to say that I should not be at work at all and I'm

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

757

Varughese

2   not allowed to be at work for just requesting the

3   leave.  And he did not explain to me why he

4   thought that was the case.

5       And this essentially went into Monday,

6   Tuesday where I was being told not to be at work,

7   but I was not informed of why I should not be at

8   work when there was no rhyme or reason to that.

9   And I believe that was retaliation against me

10  because that was preventing me from doing my job

11  and it was retaliatory.

12      And then they fired me and he was

13  involved in my firing.  He approved the

14  termination letter and then they said that one of

15  the reasons for my termination was my

16  communications regarding the leave of absence

17  through FMLA.  I mean, that's retaliatory.

18      Q.   Anything else that Dr. Firpo did that

19  you believe was in retaliation for your attempt to

20  exercise your rights under the FMLA?

21      A.   Well, those are all the reasons.  I

22  mean, as I just mentioned.

23      Q.   What did Ms. Patel, rather, what do

24  you believe Ms. Patel did in retaliation for your

25  attempts to exercise your rights under the FMLA?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

758

Varughese

2       A.   OK, Ms. Patel was working with

3   Dr. Firpo and she was in contact with

4   administration such as, you know, Caryn

5   Tiger-Paillex, Paul Johnson, Firpo and probably

6   higher ups, because I think she used to work for

7   either Dr. Charney or Dr. Davis.

8       So I mean, she definitely was involved

9   in this whole thing.  And she was e-mailing.  I

10  mean, she was seemingly confused about how to even

11  proceed with leave.  Then she was telling me that

12  I shouldn't be at work.  She was also telling me

13  the same thing that Dr. Firpo was stating.

14      Q.   So regardless of her involvement in

15  this, what did she do that you believe was in

16  retaliation for your attempt to exercise your

17  rights under the FMLA?

18      MR. WRONKO:  Form objection.  You can

19  answer.

20      A.   She was doing the same that Dr. Firpo

21  was stating, which was stating that I should (sic)

22  be at work.

23      She was detaining me in my office

24  against my will on September 20th.  She was, you

25  know, she was involved in this whole incident in

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

759

Varughese

2   that way.

3       Q.   Anything else that Ms. Patel did that

4   you believe was in retaliation for your attempt to

5   exercise your rights under the FMLA?

6       A.   That's all I can think of right now.

7       Q.   What did Ms. Tiger-Paillex do or you

8   believe that she did in retaliation for your

9   alleged exercise of your rights under the FMLA?

10      A.   Right.  Well, I spoke to Caryn

11  Tiger-Paillex on September 20th, 2011 after I was

12  detained in Shema Patel's office and I had

13  informed her regarding what I was trying to do to

14  follow up on the leave of absence.  And she, you

15  know, she basically -- after that they made a

16  decision to fire me.  Even before I could, you

17  know, go see my doctor they made a decision to

18  fire me that day.  Even though she knew that I was

19  doing what I should do to follow up.

20      And then she wanted me to be not at

21  work, which was, you know, I don't know why.  I

22  mean, I didn't -- like just because I requested

23  family medical leave doesn't mean I cannot show up

24  to work the next day or I should be requested that

25  I not show up to work.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

760

Varughese

1
2      Q.    Anything else that Ms. Tiger-Paillex
3  did that you believe was in retaliation for your
4  exercise of your rights under the FMLA?
5      A.    Well, that's what I can think of right
6  now.
7      Q.    Lastly, you identified Marina Lowy.
8  Who is Ms. Lowy?
9      A.    She is one of the in-house counsel.
10     Q.    At Mount Sinai?
11     A.    Right.
12     Q.    What did Ms. Lowy do that you believe
13  was in retaliation for your attempts to exercise
14  your rights under the FMLA?
15     A.    I think she was, well, I assumed she
16  was involved because on Friday -- the Thursday
17  e-mail from Adolfo Firpo said this is what you're
18  supposed to do. You're supposed to work with your
19  mentor Dr. Petersen who is also your supervisor
20  right now and you shouldn't change your work
21  schedule, so on, on Thursday.
22          On Friday it was a different story and
23  Marina Lowy was cc'd on all these e-mails. So I
24  assumed she had something to do with the decisions
25  that were being made.

761

Varughese

1
2      Q.    Anything else you believe Ms. Lowy did
3  in retaliation for your efforts to exercise your
4  rights under the FMLA?
5      A.    Well, she is in-house counsel, so, you
6  know.
7      Q.    You told me that. Anything else that
8  you believe she did that was in retaliation for
9  your attempts to exercise your rights under the
10  FMLA?
11     A.    That's all I can think of right now.
12     Q.    So now, Dr. Varughese, if you'd look
13  at what is now number 4 on the same page I think
14  you're on, that interrogatory asks you to identify
15  the individuals who you believe discriminated
16  against you based upon your race, national origin
17  and gender, and I think you've talked about your
18  being an Indian woman a number of times.
19          Just so I understand before I ask you
20  the question, is that the basis on which you
21  believe you were discriminated against, because
22  you were an Indian woman?
23     A.    Yes, woman of Indian descent.
24     Q.    I just wanted to make the questions
25  easier. If you look at number 4, on the page

762

Varughese

1
2  here, those are the individuals who you identified
3  who you believed discriminated against you based
4  on the fact that you're a woman of Indian descent.
5  I'm going to ask you the same question I just
6  asked you about retaliation.
7          What did Dr. Lento do or you believe
8  that he did to discriminate against you because
9  you're a woman of Indian descent?
10     A.    Dr. Lento?
11     Q.    Dr. Lento.
12     A.    Dr. Lento, he was treating me
13  differently than he was treating Dr. McCash and
14  Dr. Jordan who were receiving much more favorable
15  treatment in terms of the residency aspects in
16  terms of aspects related to my complaints. In
17  terms of discipline, I was being disciplined for
18  the same thing, you know, things that they were
19  also guilty of. I mean, they were definitely
20  guilty of, and for violating various policies,
21  they were not, you know, McCash and Jordan were
22  not disciplined and I was being disciplined. So I
23  think that has to do with the fact that I'm a
24  woman of Indian descent.
25     Q.    Anything else that Dr. Lento did that

763

Varughese

1
2  you believe was discriminatory towards you because
3  you're a woman of Indian descent?
4          MR. WRONKO: Form objection. You can
5  answer.
6      A.    Yes. I think that academic
7  advisement, that was discriminatory. Because that
8  highlights disparate treatment compared to how
9  Dr. McCash was treated where he wasn't disciplined
10  at all.
11          It also states that Dr. Jordan feels
12  something or, you know, feels a certain way and it
13  defends Dr. Jordan's statements without ever
14  addressing them with me. I mean, that's disparate
15  treatment. That has to do with the fact that
16  they're white doctors and I'm a doctor of Indian,
17  a woman doctor of Indian descent. And this sort
18  of treatment continued throughout the next year.
19  And I had also mentioned some other incidents in
20  one of the questions previously. I mean, I think
21  those apply to this question as well.
22     Q.    Dr. Varughese, I know you did make
23  reference to that before.
24     A.    Right.
25     Q.    I'm not asking you nor do I really

764

Varughese

1
2 want you to repeat what you told me before. But
3 anything you've said previously that was
4 discrimination as opposed to retaliation is on the
5 record, you've said it, and because you don't say
6 it again doesn't mean you haven't already said it.
7 So it's on the record. You've said it. So it's
8 really anything else about Dr. Lento that you
9 haven't already told me either in response to this
10 question or in response to a previous question.
11          I just want to have your testimony
12 complete about what it is you believe Dr. Lento
13 did to discriminate against you because you're a
14 woman of Indian descent, OK?
15     A.    OK.
16     Q.    So we're done with Dr. Lento or not?
17     A.    (After a pause) OK.
18     Q.    I'm sorry?
19     A.    I think we're done for now.
20     Q.    What did Dr. Cordon-Cardo do that you
21 believe was discriminatory because you're a woman
22 of Indian descent?
23     A.    I think what I mentioned previously.
24     Q.    Anything else or is that it for the
25 moment?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

765

Varughese

1
2     A.    I think that's it.
3     Q.    What did Dr. Firpo do that you believe
4 was discriminary against you because of the fact
5 that you're a woman of Indian descent?
6     A.    I mean, same things as I mentioned
7 previously.
8     Q.    And what did Dr. Bleiweiss do that you
9 believe was discriminary against you because
10 you're a woman of Indian descent?
11     A.    Well, the evaluations and then, I
12 mean, what I had mentioned previously and that's
13 all I can think of right now.
14     Q.    What did Dr. Schiller do that you
15 believe discriminated against you because you're a
16 woman of Indian descent?
17     A.    Well, he did make, you know, he made
18 commentary on India, and he said that, Oh, you
19 don't know the type of things you'll find in India
20 or the crazy things you'll find in India.
21          He basically said that almost every
22 time I made an autopsy -- I was involved in
23 autopsy presentation. He would say something like
24 that. Even though like none of my cases had to do
25 with India or any patients from India. I don't

*Computer Reporting NYC Inc.*
*(212) 986-1344*

766

Varughese

1
2 think I even had a single patient from India on
3 any single autopsy, and he would make this
4 commentary. It is really derogatory and
5 discriminatory and racist and I actually had
6 several medical students who I was working with at
7 the time approach me and say they were offended
8 because it was racist.
9     Q.    And who were they?
10     A.    They were medical students who were
11 working with me on autopsy service.
12     Q.    And what were their names?
13     A.    Their names? They're long gone now.
14     Q.    That may be, but do you remember their
15 names?
16     A.    I think it was a Dr. Klein and I
17 remember Dr. Dickinson, Andrew, and several other
18 medical students.
19     Q.    You told me that there were medical
20 students of Indian descent who were offended.
21     A.    No, no, it wasn't medical students --
22     Q.    Just medical students.
23     A.    No, medical students were not of
24 Indian decent, would be offended.
25          (Cross-talk.)

*Computer Reporting NYC Inc.*
*(212) 986-1344*

767

Varughese

1
2     Q.    I got you.
3     A.    Medical students of Indian decent
4 probably may not be as clued in.
5     Q.    In your complaint in paragraph 23 you
6 say "Dr. Schiller remarked to Dr. Varughese during
7 a conference presentation in random fashion and
8 without any benefit to the presentation, 'you
9 don't know the crazy things you find in India.'"
10 All right?
11     A.    Right.
12     Q.    When was that? When was that
13 conference?
14     A.    That was over the -- he didn't just
15 say that once. He said that repeatedly over the
16 number of years that I was there and I was
17 involved in autopsies.
18     Q.    Because in the complaint it refers to
19 a conference. Not multiple times. I am just
20 trying to understand whether he said this once or
21 as I think I just heard you say more than once.
22     A.    Yeah, he definitely did say that more
23 than once. I remember him saying that like as
24 early as my first year of residency and I thought
25 maybe that's just like a random one time thing,

*Computer Reporting NYC Inc.*
*(212) 986-1344*

768

Varughese

1   he's going to say it just because he is trying to
2   be humorous.
3           But then he would say that every time
4   at a conference and he would essentially say that
5   to the point where I, you know, people thought,
6   people assumed that he sort of had some sort of
7   prejudice or bigotry issues.
8       Q.   So how many times would you estimate
9   that Dr. Schiller made a comment, either this
10  comment or similar comment, "you don't know the
11  crazy things you find in India"?
12      A.   I was on autopsy for six months to
13  seven months in a period of three years.  So he
14  must have made that comment.  I mean, I think I was
15  working with Eric and -- what's his name?  And
16  Andrew.  That must have been like my junior year.
17  So that's my third year in working with them.
18      Q.   So how many times would you estimate
19  he made that comment during the times you were
20  working with Dr. --
21      A.   So he must have made this comment at
22  least like four, maybe more times over the
23  three-year period.
24      Q.   And where would he make that comment?

769

Varughese

1   By that would he make it during a conference?  Did
2   he make it while he was talking with people in the
3   hallway?  Where would he make that comment?
4       A.   No, this was actually in a follow-up
5   conference.  It was like a small classroom-like
6   room.  And there would be the pathology residents,
7   some doctors who may have had a patient who had
8   autopsy, and, you know, a few medical students and
9   I would -- since it was an informal event, I would
10  just bring the case and everything for review and
11  Dr. Schiller would, you know, so he made these
12  comments when he was, when I was presenting and he
13  was, you know, overseeing the conference.
14      Q.   So during these conferences, these
15  four or more conferences when he made the
16  statements you attribute to him, you said he made
17  them while you were making a presentation?
18      A.   Right.
19      Q.   Did he always make them when you were
20  presenting?
21      A.   Right, but I also think he would make,
22  if I was there, like he would see me or whatever,
23  I think he would like make a comment on Indians or
24  India.  He did that like, I mean, I think I wasn't

770

Varughese

1   even presenting once and he saw me and he was
2   like, Oh, you know, India, you know.  Just the
3   crazy stuff you see in India.  Just those general
4   like racist-type comments.
5       Q.   Other than "you don't know the crazy
6   things you find in India," what, if any, comments
7   did he make about India other than "you don't know
8   the crazy things you find in India"?
9       A.   That was like his line.  Like he has
10  the same line.  He has a routine that he does.  So
11  he doesn't do like much out of his routine.  He
12  sticks to one or two racist commentary.  He is not
13  a -- he doesn't have a large array of commentary
14  about anything.
15          Like, every conference he would like
16  stick a scalpel in the spine, of the autopsy case,
17  like, say, well, this person does or doesn't have
18  osteoporosis.  He does that with every case.  It
19  is sort of like that's what he does.
20      Q.   I just want to understand.  So in
21  these four or more conferences either when you
22  were presenting or when he would see you and talk
23  to you on four or more occasions, he made the
24  comment about "you don't know the crazy stuff you

771

Varughese

1   find in India."
2       A.   Right.
3       Q.   Did Dr. Schiller make any other
4   comments about India or about your being a woman
5   of Indian descent?
6       A.   Well, I think the whole DNA thing.
7       Q.   You told me about that on a previous
8   day.
9           MR. WRONKO:  Form objection.  You can
10  answer.
11      Q.   But you can tell me again.
12      A.   The whole DNA thing, I felt that was
13  sort of, you know, also ties in with the India
14  thing.  Because DNA is intrinsically part of who
15  you are and I think to make disparaging remarks
16  about or statements about someone's DNA having to
17  do with anything I think is, especially in a
18  negative context, I think that has something to do
19  with being a woman of Indian descent.
20      Q.   Other than the comment about your DNA
21  and the comment about crazy things you find in
22  India, did Dr. Schiller say anything else that you
23  believed or interpreted to be a comment about the
24  fact that you're a woman of Indian descent?

772

1  Varughese
2      A.    Right, then I mean, he didn't really
3  want to know about what happened.  I mean, he
4  didn't want to know about my version of my side of
5  the story.
6      Q.    Now we're talking about comments that
7  he made that you interpreted as being about --
8      A.    Well, I think to say that I'm not --
9      Q.    Go ahead, I'm sorry.
10     A.    He is not interested in talking or
11 hearing about what happened from my point of view.
12 I think that all has to do with something to do
13 with me being a woman of Indian descent.  Because
14 that's not what he said to Adrienne Jordan and
15 Samuel McCash.
16     Q.    Anything else that Dr. Schiller said
17 that you interpreted or believed was a comment
18 about your being a woman of Indian descent?
19     A.    That's all I can think of right now.
20     Q.    Other than Dr. Schiller,
21 Dr. Varughese, did anybody else at Mount Sinai,
22 and by anyone else, I mean supervisors, members of
23 administration, the people we have been talking
24 about, did anyone else make any comments about the
25 fact that you're a woman of Indian descent?

773

1  Varughese
2      A.    Did anybody else?  No, I can't think
3  of anything right now.
4      Q.    And just to complete the question,
5  anything else that Dr. Schiller did other than
6  these comments you have just told me about?
7  Anything else that Dr. Schiller did that you
8  believe discriminated against you because you're a
9  woman of Indian descent?
10     A.    Dr. Schiller?
11     Q.    I'm sorry?
12     A.    Dr. Schiller?
13     Q.    Dr. Schiller, yes.
14     A.    I mean, that whole incident was, I
15 mean, his commentary, running commentary and --
16 what else?  I mean, I did see him at a conference
17 in October of 2011.  I saw him at a conference in
18 Las Vegas.  He was a presenter, whatever, and I
19 just saw him once and he gave me the middle
20 finger.
21     Q.    Did you interpret that or believe that
22 to be because you were a woman of Indian descent,
23 that he did that because you're a woman of Indian
24 descent?
25     A.    Yes.

774

1  Varughese
2      Q.    Why did you believe that?
3      A.    Well, I mean, I worked in that
4  department for like three years.  I did all my
5  work.  There were never any like patient-related
6  issues.  I did what I was supposed to do.  Look,
7  I'm like basically fired and he must have known
8  like they are not going to rehire me back or
9  whatever.  It seemed like they all knew I was not
10 going to get my job back there and he sees me at a
11 conference and he gives me a middle finger.  Like,
12 I mean....
13     Q.    I'm sorry.  Was that before or after
14 you were terminated?
15     A.    After I was terminated.
16     Q.    Anything else that Dr. Schiller did
17 that you believe was discriminatory because you're
18 a woman of Indian descent?
19     A.    Right.  I mean, I think he was trying
20 to influence, I mean, I don't know what degree of
21 influence he has, but I was told that he was fired
22 from the hospital as the chairman, former
23 chairman, he was essentially fired.  He didn't
24 resign or anything.  But he was still like, you
25 know, allowed to be actively involved in patient

775

1  Varughese
2  care and stuff at the hospital it seems like.
3          And I mean, I directly observed him
4  just before my first meeting on May 3rd, 2011.  He
5  went and had a discussion with Cordon-Cardo and
6  Castaldi.
7      Q.    And do you know if he was talking
8  about you?
9      A.    Well, he didn't have a scheduled
10 appointment and I assumed he was talking about me
11 because he gave me this intimidating, I guess like
12 his demeanor was intimidating towards me.
13     Q.    Anything else that Dr. Schiller did
14 that you believe was discriminatory against you
15 because you're a woman of Indian descent?
16     A.    I can't think of anything else right
17 now.
18     Q.    What did Dr. Pessin-Minsley do that
19 you believe was discriminatory against you because
20 you're a woman of Indian descent?
21     A.    Well, Dr. Pessin-Minsley did not take
22 into account my side of the issue or incidents.
23     Q.    We're talking about December of 2011?
24     A.    Yes, December of 2011, and she was, I
25 think she was present for the September 14, 2011

776

Varughese

1  incident as well.  She was like right outside.  So
2  she knew what occurred and she sought to protect
3  McCash at any cost.
4
5           And I've come to learn that he is
6  essentially working with her currently.  Well, I
7  don't know if today he is working with her, but he
8  was working with her on some laboratory medicine
9  fellowship at Memorial Sloan-Kettering.
10          So like she went out of her way to
11  like support McCash even though she knew that what
12  I was saying was true.
13      Q.      Anything else that Dr. Pessin-Minsley
14  did that you believe was discriminatory against
15  you because you're a woman of Indian descent?
16      A.      Right, and then this continued on with
17  academic advisement, that letter on December 13th,
18  you know, threatening to terminate me from the
19  residency program, onwards to the insubordination
20  claim, which is like completely false obviously,
21  to on and on.  She was actively involved in all of
22  this until she left Mount Sinai Medical Center I
23  believe sometime in March of 2011.
24      Q.      And what did Dr. Barnett do that you
25  believe was discriminatory toward you because

777

Varughese

1  you're a woman of Indian descent?
2      A.      Well, Dr. Barnett was involved in this
3  whole series of events for actions against me, and
4  he is the DIO, which is like designated
5  institutional official for ACGME purposes, and he
6  is also an associate dean of the medical, of
7  graduate medical education, and he knew that I had
8  serious concerns how I was being treated by the
9  hospital, how I was being treated by the
10  department.  You know, I reported to him on a
11  variety of issues and he didn't think to intervene
12  on my behalf ever even though he should have.
13          Like, I mean, after the permanent
14  director, Patrick Lento, like he is the next
15  person to go to in this whole hospital hierarchy
16  and he didn't -- even though he knew like I was
17  telling him the truth, like he still did not
18  intervene on my behalf.  If it was Adrienne Jordan
19  or McCash he would intervene on their behalf.
20      Q.      Why do you believe that he didn't
21  intervene on your behalf?
22      A.      Because I'm a woman of Indian descent.
23      Q.      What's the basis for your belief,
24  other than the fact that you are a woman of Indian

778

Varughese

1  descent, what's the basis for your belief that he
2  didn't intervene because you are a woman of Indian
3  descent?
4      A.      What is my basis for that belief?
5      Q.      Yes.
6      A.      Well, just his -- well, his attitude
7  towards me, which is, you know, which I can say he
8  has verbalized, which is like we're not going
9  to -- if he thought to slap around McCash we would
10  have.  And by default that's saying we're slapping
11  you around because we can.
12          And that's essentially his attitude.
13  His attitude has been that we're going to take
14  actions against you because we can.  Not because
15  we need to substantiate it.  Not because we need
16  to have reason, but because we can.
17          Why is that?  Because I am a woman of
18  Indian descent.  Would they do this to Julie
19  Chepovetsky or Jacqueline Hechtman or Adrienne
20  Jordan?  No, not in a million years.  Because they
21  would get slapped around, and they know that that
22  would happen.  Because I am a minority and a woman
23  of Indian descent they think they can do this and
24  get away with it.

779

Varughese

1      Q.      Do you know whether Dr. Jordan or
2  Dr. McCash or any of the other people you just
3  mentioned ever went to Dr. Barnett to make a
4  complaint similar to the one you made about how
5  you were treated by Dr. McCash?
6      A.      No, they never -- they have never
7  complained of harassment.  I think what separated
8  me out from them is that I -- we all complained
9  about residency.  We all complained about a
10  variety of issues.  I don't know who else had
11  complained about drinking on the job, and so on.
12  But I'm the one person who is making complaint now
13  about, you know, essentially discrimination and
14  engaging in activities protected by Title VII and
15  other laws in New York and the city.
16          And I know a lot of this is happening
17  to me because I am doing that.  Not because I'm
18  complaining about residency or other issues.
19  Because I know that they are also doing the same
20  thing.
21      Q.      So if Dr. Jordan and Dr. McCash to
22  your knowledge never complained about harassment
23  how do you know that if they had complained about
24  harassment Dr. Barnett would have treated them

780

Varughese

1
2 differently than he treated you?
3          MR. WRONKO:  Form objection.  You can
   answer.
   A.    I don't know.
6   Q.    Anything else that Dr. Barnett did
7 that you believe is discriminatory against you
8 because you're a woman of Indian descent?
9   A.    Right.  He also made statements about
10 how, you know, like I'm a threat, and I don't know
11 why he thought I was a threat.  To me like all
12 that stuff is like I'm basically asking him to
13 intervene on my behalf to make my work environment
14 better for me so I can essentially finish my year
15 of residency and get on with my life.
16          And he was like you're a threat.  Stop
17 being a threat.  That's what the answer is.
18          And like what does that even mean?
19 Like I don't know.  I don't know what that means.
20 This is like crazy.  I feel like that's racist.
21 If I wasn't a woman of Indian descent he wouldn't
22 be saying those things to me.
23   Q.    Anything else that Dr. Barnett did
24 that you believe is discriminatory against you
25 because you've a woman of Indian descent?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

781

Varughese

2   A.    Yeah, and I think supporting my
3 termination and interference with Family Medical
4 Leave Act.  All that stuff, yeah, I think he did
5 that because I'm a woman of Indian descent.
6   Q.    How did Dr. Barnett interfere with
7 your request for FMLA leave?
8   A.    How did he?  Well, he supported my
9 termination.
10   Q.    Other than supporting your
11 termination, assuming he did so, is there any
12 other reason you think that --
13   A.    Yeah.
14   Q.    Wait, let me finish.  -- that he
15 interfered with your request for FMLA leave?
16   A.    Yes, because you know what?  He was
17 cc'd on all those e-mails and he should have known
18 better and he should have gotten involved and put
19 a stop to this, because he is in that position to
20 do so.  And he didn't.
21   Q.    Anything else Dr. Barnett did that you
   believe is discriminatory against you because
   you're a woman of Indian descent?
24   A.    That's all I can think of.
25   Q.    What did Dr. McCash do that you

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

782

Varughese

2 believe was discriminatory toward you because
3 you're a woman of Indian descent?
4   A.    I believe his actions, you know, the
5 shouting, you know, the schedule issues.  There's,
6 what is it?  What else?  The December 8th
7 incident.  Then the forwarding of all the e-mails
8 to Figur and Caryn Tiger.  I think that was all
9 motivated by the fact that I'm a woman of Indian
10 descent.
11   Q.    Why do you think that?
12   A.    Why?
13   Q.    Yes.
14   A.    Well, because it's to paint me in a
15 negative light, you know, say that, I mean, he was
16 not, some of those e-mails that he was forwarding,
17 he was not even involved in any of those issues.
18 I mean, essentially it is complete hearsay and he
19 thinks it's appropriate to forward it to Art Figur
20 who is completely removed from the department of
21 pathology and who didn't even understand the day
22 to day goings on in pathology.  So, yeah, I think
23 he did that because I am a woman of Indian
24 descent.
25   Q.    In your complaint, Dr. Varughese, you

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

783

Varughese

2 said that, in paragraph 16, in part, "In fact,
3 upon information and belief, Dr. McCash regularly
4 harassed and directed hostile treatment towards
5 not only Dr. Varughese, but other female staff, as
6 well, while treating male staff at all times with
7 professionalism and courtesy."
8          And when, in those interrogatories
9 we've been looking at, when you were asked to
10 identify the other female staff you were referring
11 to, if you want to look, it's number 7, you
12 identified Rafaela Morotti, a pediatric
13 pathologist.
14   A.    Right.
15   Q.    What's the basis for you belief that
16 Dr. McCash harassed or regularly harassed and
17 directed hostile treatment toward Ms. Morotti?
18   A.    Well, Dr. Morotti had requested that
19 he do something for her, which, I don't know, they
20 are supposed to send out schedules and updates on
21 schedules.  I think that's one of their jobs as a
22 chief resident, and he didn't want to do it.
23          So he started shouting at her and
24 berating her and this went on for a good few days.
25 Where he was, you know, when I was in the

*Computer Reporting NYC Inc.*
*(212) 986-1344*

784

Varughese

1
2 residents room he was complaining about her and
3 berating her in front of, you know, the other
4 residents.
5        Q.    So this behavior you observed
6 personally?
7        A.    Yes.
8        Q.    And other than Ms. Morotti were there
9 any other female staff that you were aware of
10 either from your personal knowledge or because
11 somebody told you that Dr. McCash harassed and
12 directed hostile treatment toward you?
13        A.    I can't think of.
14        Q.    Is Dr. Morrotti a woman of Indian
15 descent?
16        A.    No, she is not.  I believe she is of
17 Italian descent.
18        Q.    And then in your complaint you,
19 paragraph 18, you talk about "Upon information and
20 belief, Dr. McCash never treated Dr. Varughese's
21 male colleagues in a similar fashion.  In fact,
22 Dr. McCash would go out of his way to cover for
23 male staff, often at the expense of
24 Dr. Varughese."
25        In response to Interrogatory Number 9,

*Computer Reporting NYC Inc.*
*(212) 986-1344*

785

Varughese

1
2 which asked you to identify those male colleagues
3 and male staff, you identified four individuals.
4        A.    Right.
5        Q.    And so how did Dr. McCash treat
6 Dr. Chow differently than he treated you and go
7 out of his way to cover for Dr. Chow?
8        MR. WRONKO:  Form objection.  You can
9 answer.
10        A.    Sure.  Dr. Chow, well, he was, um, let
11 me see.  For instance, like Dr. Chow was assigned
12 to some rotations when third year schedule came
13 out and he didn't want to be on some, I think it
14 was an autopsy rotation at Mount Sinai Medical
15 Center, and he had merely requested that he be
16 changed and Dr. McCash immediately accommodated
17 the request without thinking twice about it.
18        I was on surgical pathology rotation
19 with Dr. Chow during December of 2010.  Dr. Chow
20 was given moonlighting assistance without
21 Dr. McCash ever interfering or obstructing his
22 ability to use moonlighters or use a per diem PA.
23 That month there was no obstruction to Dr. Chow's
24 work at all.  But my work, there was all this
25 obstruction from Dr. McCash that month.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

786

Varughese

1
2        Q.    When you talk about obstruction of
3 your work by Dr. McCash, what are you referring
4 to?
5        A.    Meaning, I could not utilize the
6 moonlighter as I saw fit, which was to gross
7 lumpectomy margins.
8        Q.    Are you talking about the incident on
9 December 8th or are you talking about other days
10 as well?
11        A.    Well, those -- not on December 8th per
12 se for that, you know, Dr. Chow was given
13 assistance without any interference from
14 Dr. McCash that entire month.
15        Q.    When you refer to your situation, I
16 know what you told me happened on December 8th.
17 But were there other days on which you're saying
18 Dr. McCash interfered with your use of
19 moonlighters or just on that day?
20        A.    Well, on that day, and then when I was
21 on GYN rotation, I continued to experience, you
22 know, interference with my ability to utilize the
23 moonlighters.
24        Q.    When you were on GYN rotation was that
25 interference in your view from Dr. McCash?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

787

Varughese

1
2        A.    Yes, in my view it was from
3 Dr. McCash, because Dr. McCash was assigned to
4 moonlight during two days during that, those, um,
5 when I was on GYN, and he refused to do the
6 moonlighting work.
7        Q.    He was the moonlighter.
8        A.    He was the moonlighter, and he refused
9 to do moonlighting work that would in any way
10 assist me with my work.
11        Q.    Got you.  Anything else that
12 Dr. McCash did regarding Dr. Chow that you believe
13 treated Dr. Chow better than you were treated by
14 Dr. McCash?
15        A.    Well, those are the few things I can
16 think of right now.
17        Q.    What did Dr. McCash or how did
18 Dr. McCash treat Dr. Azar in a manner better than
19 he treated you?
20        A.    Well, in terms of Dr. Azar, there were
21 several incidents where I was on, what was it?  I
22 was on autopsy service with Dr. Azar, and we had
23 an issue with, you know, work being either
24 Dr. Azar's responsibility or my responsibility,
25 and it was Dr. Azar's responsibility actually and

*Computer Reporting NYC Inc.*
*(212) 986-1344*

788

Varughese

1  Dr. McCash wanted me to do Dr. Azar's work for
2  Dr. Azar, and he cited that was to facilitate
3  patient care.
4         But Dr. Azar was at work. It wasn't
6  like he wasn't there or anything. He was there.
7  And Dr. McCash still insisted that I do Dr. Azar's
8  work for Dr. Azar.
9         Q.    What work are you talking about?
10        A.    This is just I think grossing
11 responsibilities.
12        Q.    Any other way in which Dr. McCash
13 treated Dr. Azar better than he treated you?
14        A.    Right. So he, Dr. Azar I think had to
15 go to, go somewhere for a week when he was on
16 surgical pathology service and he was going to be
17 absent for an entire week and Dr. McCash covered
18 for Dr. Azar.
19        And I think Dr. McCash recruited
20 Dr. Trevino also to cover for Dr. Azar, because I
21 guess Dr. McCash could not cover the whole week,
22 so he actually recruited Dr. Trevino to assist him
23 covering for Dr. Azar, because Dr. Azar wanted,
24 you know, to go somewhere for a week when he was
25 in surgical pathology rotation. And that's

*Computer Reporting NYC Inc.*
*(212) 986-1344*

789

Varughese

2  essentially being absent for four days straight.
3         So that was covered for him. There
4  was no problem. But I noted that he was
5  complaining about me saying that I'm not doing my
6  work and it was merely me delineating some work,
7  you know, to, what is it? Doctor, I mean, to the
8  moonlighters, the PA. That wasn't me not being
9  there for four days. It was just, you know, assigning
10 some work to the moonlighters.
11        Q.    Anything else that you believe
12 Dr. McCash did to treat Dr. Azar better than he
13 treated you?
14        A.    Right. Well, in terms of
15 moonlighting, I was told by Dr. McCash that I
16 wasn't doing my work. Or I wasn't, I don't know,
17 he wrote me this long letter about how I wasn't
18 doing my work or there was some allegation that
19 people -- I wasn't grossing as I should. But
20 nobody ever approached me regarding it and nobody
21 ever said what the cases were, but he made all
22 these allegations and I thought that was
23 discriminatory.
24        Q.    Anything else that Dr. McCash or any
25 other way in which Dr. McCash treated Dr. Azar

*Computer Reporting NYC Inc.*
*(212) 986-1344*

790

Varughese

2  better than he treated you?
3         A.    I think that's all I can think of
4  right now.
5         Q.    And what did Dr. McCash do with regard
6  to Dr. Trevino that was better treatment than you
7  received from Dr. McCash?
8         A.    Well, Dr. Trevino was out a lot too.
9  I think he was out on surgical pathology. He got
10 ill and he wasn't there for, I don't know, like
11 three days, four days. And there was no complaint
12 from Dr. McCash regarding that.
13        Q.    Anything else?
14        A.    Well, that's all I can think of right
15 now.
16        Q.    How did Dr. McCash treat Dr. Guarino
17 in a manner better than he treated you?
18        A.    Well, with Dr. Guarino, he was, let's
19 see. He was allowed to utilize the moonlighters
20 and the PAs, pathology assistants, as he saw fit.
21 There were a lot of e-mails from Dr. Guarino about
22 how he needs moonlighters and Dr. McCash wrote
23 also on behalf of Dr. Guarino to request
24 moonlighters to come in so Dr. Guarino doesn't
25 have to do all the work himself.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

791

Varughese

2         And Dr. Guarino was being provided a
3  lot of assistance by Dr. McCash who was also
4  advocating for him to handle moonlighters, to
5  utilize the PAs, which it seemed like I couldn't
6  do. I couldn't do that, and that was essentially
7  a problem in Dr. McCash's eyes that if I used the
8  moonlighters, a different issue, a different story
9  than Dr. Guarino utilizing the moonlighters and
10 McCash's e-mails requesting people, you know,
11 people moonlight so Dr. Guarino has assistance.
12        Q.    Any other way in which you believe
13 Dr. McCash treated Dr. Guarino better than he
14 treated you?
15        A.    That's all I can think of right now.
16        Q.    What did Dr. Jordan do that you
17 believe was discriminatory against you because
18 you're a woman of Indian descent?
19        A.    Dr. Jordan was -- what was she doing?
20 She, I mean, I think she said that she was afraid
21 of me. I think that was because I'm a woman of
22 Indian descent. Because there's like nothing --
23 I've never had any interaction with her where she
24 should be afraid of me in the least. I have
25 always been nice to her. And she makes these

*Computer Reporting NYC Inc.*
*(212) 986-1344*

792

Varughese

1
2 statements about me, which are frankly racist,
3 because --
4      Q.    Are you referring to the statement she
5 made about you in the e-mail where she said she
6 was afraid of you or some other statement?
7      A.    She said, you know, she insinuated
8 that I have a variety of mental health issues by
9 saying that I have a flight of ideas which is, you
10 know, that's a symptom of a very serious mental
11 illness such as schizophrenia or bipolar disease.
12 To make such statements about your colleague is
13 outright defamatory and that's racist.
14      Q.    Anything else that you believe
15 Dr. Jordan did that was discriminatory against you
16 because you are a woman of Indian descent?
17      A.    I mean, I think she made a variety of
18 statements.  She alleged false, you know, she made
19 up stuff.
20      Q.    Like what?
21      A.    I think she said that I had made
22 certain statements to her, which were all false.
23 Then she said that I had cursed at her or
24 something at some point.  I have never cursed at
25 Dr. Jordan ever in my entire -- as long as I've

Computer Reporting NYC Inc.
(212) 986-1344

793

Varughese

1
2 known her I've never said a single cuss word to
3 her ever and she said that I did.
4      Q.    OK.
5      A.    Which is false.  And she had -- what
6 else did she do?  She, I mean, with the McCash
7 incident she was, you know, involved in that.  She
8 was one of the moonlighters and she didn't want
9 to, you know, she didn't want to do certain work,
10 which is fine, but if there's a second
11 moonlighter, I mean, I'm utilizing them to do the
12 work.
13      I mean, I don't -- it's really not her
14 business in any way to be, you know, be involved
15 in that and she has time and time again interfered
16 or obstructed my ability to do my work.
17      Q.    How did she do that other than on the
18 one occasion of December 8th?
19      A.    December 8th she did that.  Then I was
20 on service with her and there was some allegations
21 that I was not doing my biopsies and such.  I was
22 on that rotation.  She was on the same assignment
23 with me, and it's quite possible she was taking
24 those cases and signing them out without my
25 knowledge.

Computer Reporting NYC Inc.
(212) 986-1344

794

Varughese

1
2      Q.    Do you know that for a fact or is that
3 your assumption?
4      A.    Well, I do know that for a fact
5 because when I looked into the system on the day
6 they said I hadn't done my cases and they were
7 signed out by her.  Some of the cases were signed
8 out by her on the same day.
9      And that's essentially because I
10 didn't get an opportunity to take those cases and
11 sign them out.  Not because I wasn't trying to do
12 my work.  It was simply that she picked up the
13 paperwork on the cases because she got them
14 somehow and she decided to sign them out.
15      Q.    Anything else that Dr. Jordan did that
16 you thought was discriminatory because you're a
17 woman of Indian descent?
18      A.    Let's see.  I mean, with the
19 scheduling she said that Dr. Jordan, I mean,
20 Dr. Lento and I believe, I mean, I don't know.  I
21 think she was -- she may have been motivated by
22 some racist belief.
23      Q.    Anything else that Dr. Jordan did that
24 you believe was discriminatory because you're a
25 woman of Indian descent?

Computer Reporting NYC Inc.
(212) 986-1344

795

Varughese

1
2      A.    Well, I can't think of anything right
3 now.
4      Q.    Let's assume for a second,
5 Dr. Varughese, that all the things you just said
6 about Dr. Jordan's behavior is true, that she
7 signed out cases that were your cases, she made
8 the statements about you that weren't true,
9 whatever she did with scheduling.
10      Why do you think that she did those
11 things or said those things because you're a woman
12 of Indian descent?
13      A.    Why do I think that?
14      Q.    Yes.
15      A.    Why do I think it's motivated by
16 racism?
17      Q.    Well, that's your conclusion.  Why do
18 you think she said or did those things because
19 you're a woman of Indian descent?
20      A.    Well, I think they were motivated by
21 racism.  I mean, why would you say somebody is,
22 you know, somebody has mental health issues or a
23 variety of things?  I mean, I never said anything
24 like that about her, even though there was talk
25 that she has some mental health issues and it was

Computer Reporting NYC Inc.
(212) 986-1344

796

Varughese

1  well-known in the residency program.
2
3        And like I've never made any of those
4  allegations to her face or to anybody else behind
5  her back, I mean, until today. But because it's
6  not appropriate to, you know, it's not
7  professional, it's not right to make statements
8  like that about someone. And here she goes making
9  all these statements about me that are extremely
10  defamatory.
11      Q.   So you think that, do you think that
12  Dr. Jordan -- withdraw that.
13      A.   Actually, let me finish my thought
14  actually.
15      Q.   Go ahead, finish. I thought you were
16  finished.
17      A.   I think she was doing that to support
18  Dr. McCash as well because, you know, she probably
19  identified with him because he is like also white
20  and, you know.
21      Q.   So Dr. Varughese, is it fair to say
22  that you can't think of any other reason why
23  Dr. Jordan would make those statements about you
24  or do those things other than the fact that you're
25  a woman of Indian descent?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

797

Varughese

1
2      MR. WRONKO:  Form objection.
3      A.   Right. Frankly, I mean, she also
4  mentioned a lot of the statements that she was
5  making was based on her fear that I was going to
6  report her to the State for drinking, which I
7  don't even know how she knew I reported her for
8  drinking because I never told her. I don't
9  remember updating Adrienne Jordan saying, hey,
10  Adrienne, I'm going to go report you for drinking.
11      For all she knows, someone else
12  reported her. But somehow she knew that and she
13  assumed that I had made a complaint against or I
14  was going to report her or something, she thought
15  that for some reason, even though I've never said
16  anything like that to her and I never said to her
17  I'm going to report you for anything. I never
18  said anything like that to her.
19      Because she is still a colleague.
20  Like I obviously want her to do well. I am not
21  going to sit there and make derogatory statements
22  about her so that she doesn't get out of her
23  residency.
24      But she for some reason thinks that
25  I'm going to do all these things to her which are

*Computer Reporting NYC Inc.*
*(212) 986-1344*

798

Varughese

1
2  completely unfounded and she had said that to HR
3  that she thought I was going to report her, and
4  then she thought other people are afraid of me and
5  such, which is completely false, because nobody
6  was afraid of me.
7      Q.   So I come back to the question, or
8  rather put it a different way, can you think of
9  any other reason that Dr. Jordan would have said
10  or done the things you say that she did and said
11  other than the fact that you're a woman of Indian
12  descent?
13      MR. WRONKO:  Objection, asked and
14  answered.
15      MR. McEVOY:  I don't think she
16  answered it.
17      MR. WRONKO:  She gave another
18  potential reason.
19      A.   Yes, I gave another potential reason.
20      MR. WRONKO:  Beyond whatever you
21  already testified to.
22      Q.   So either because you're a woman of
23  Indian descent or because she was concerned that
24  you were going to report her to the State for
25  drinking on the job.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

799

Varughese

1
2      Any other reason you can think of that
3  she would have made the statement, done the things
4  that you said she said?
5      A.   I mean, I can't read Dr. Jordan's
6  mind. My assumption is that she's doing that
7  because she is racist or she's afraid of being
8  reported. Those are the two reasons I can think
9  of.
10      Q.   And you said that you never told
11  Dr. Jordan that you reported her for drinking on
12  the job, correct?
13      A.   Not to the State.
14      Q.   Did you ever tell Dr. Jordan, I'm the
15  one who reported you?
16      A.   No, I never told her that and I had no
17  intention of telling her that.
18      Q.   Did you ever tell Dr. McCash that you
19  were the one who had reported him for drinking on
20  the job?
21      A.   No.
22      Q.   So if they knew that you were the
23  person who reported them, do you know how they
24  found out?
25      A.   Right, and the thing is, I don't even

*Computer Reporting NYC Inc.*
*(212) 986-1344*

800

Varughese

1  think I reported Dr. Jordan to, you know, like I
2  wrote the self-reflection. In that I had said
3  that Dr. McCash may have been drinking on the job
4  and I thought that his behavior may have been
5  influenced by alcohol, because like I know when he
6  drinks he acts a certain way.
7        I mean, I thought there might be some
8  aggression may have come out that, not necessarily
9  his attitude and such. But the aggression may
10  have been related to drinking.
11     Q.    My question, Dr. Varughese, is if
12  Dr. Jordan or Dr. McCash knew that you were the
13  person who reported drinking on the job, do you
14  know how they found out?
15     A.    Oh, they probably found out --
16        MR. WRONKO: Form objection.
17     A.    -- because Dr. Lento probably told
18  them.
19     Q.    Probably is different than do you
20  know. Do you know --
21     A.    Do I know?
22        MR. WRONKO: Hold on. Let me hear the
23  question.
24     Q.    Do you know, assuming they knew, how

*Computer Reporting NYC Inc.*
*(212) 986-1344*

801

Varughese

1  they found out?
2        MR. WRONKO: Form objection.
3     A.    Right. I think Dr. McCash was told by
4  Dr. Lento because, you know, they, Dr. Lento and
5  Dr. McCash, Dr. Jordan, they, you know, they're
6  essentially friends.
7     Q.    So your belief is based on the fact
8  that you think that Dr. Lento, Dr. McCash and
9  Dr. Jordan are friends; is that correct?
10     A.    Well, right. I mean, it was like more
11  than just some professional like, you know. I
12  mean, my relationship with my supervisors are
13  essentially like, hello, hi, good-bye. I'm not
14  sitting there having coffee or drinks with them.
15        So, I mean, their relationship was,
16  you know, Dr. Jordan was always, you know, on the
17  phone with Dr. Lento or always in his office and
18  Dr. McCash I'm sure was told. I'm sure they were
19  told by Dr. Lento.
20     Q.    I understand. You say in your
21  complaint that, paragraph 19 in part, that
22  "Dr. Lento made excuses for Dr. McCash's behavior
23  despite confirmation from other house staff of
24  Dr. McCash's actions towards Dr. Varughese."

*Computer Reporting NYC Inc.*
*(212) 986-1344*

802

Varughese

1        And I think here you are referring to
2  the incident in September. September 14th?
3     A.    Right.
4     Q.    And in the interrogatory responses
5  number 10 you identified the other house staff as
6  Kruti Maniar.
7     A.    Right.
8     Q.    And what's the basis for your
9  allegation that Dr. McCash's behavior on
10  September 14th was confirmed by Dr. Maniar?
11     A.    Right, Dr. Maniar, I was there to hear
12  what Dr. Maniar said, Dr. McCash recognizes that
13  his behavior was inappropriate. And it was
14  confirmed by Dr. Maniar, who is the other chief
15  resident who is also a woman of Indian decent.
16     Q.    When you say that you were present
17  when she said that Dr. McCash recognizes his
18  behavior was inappropriate, who did she say that
19  to?
20     A.    Dr. Lento.
21     Q.    When did that conversation take place?
22     A.    That took place on September 15, 2010.
23     Q.    Who was present during that
24  conversation?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

803

Varughese

1     A.    Dr. Maniar, myself and Dr. Lento.
2     Q.    Where did that conversation take
3  place?
4     A.    At Mount Sinai Medical Center.
5     Q.    But where in Mount Sinai did it take
6  place?
7     A.    In the autopsy area, suite/area.
8     Q.    How did it come about that Dr. Maniar
9  said what you said she said?
10     A.    Well, it came about when we were
11  discussing Dr. McCash, his verbal outburst.
12     Q.    What, if anything, did Dr. Lento say
13  in response to Dr. Maniar's statement that you
14  just testified about?
15     A.    Dr. Lento said, Oh, I don't know. I
16  didn't hear about it. But Dr. Maniar confirmed
17  that they had actually already had a meeting
18  regarding it and Dr. Lento had been aware. But
19  Dr. Lento was trying to act like he didn't know.
20        MR. McEVOY: Let's take a couple of
21  minute break.
22        MR. WRONKO: Sure.
23        (A recess was taken from 12:38 p.m. to
24  12:43 p.m.)

*Computer Reporting NYC Inc.*
*(212) 986-1344*

804

Varughese

1
2  BY MR. McEVOY:
3      Q.    Dr. Varughese, what I would like to do
4  before the lunch break is to ask you some
5  questions about a few of the factual allegations
6  in your complaint that we haven't, I don't think
7  we've talked about before.
8          In paragraph 25 of the complaint you
9  say, and I'll read the whole thing, "Only about
10  four days after her official complaint of
11  discrimination, Dr. Varughese received a hostile
12  and threatening letter from Drs. Pessin-Minsley
13  and Lento. Rather than properly responding to
14  Dr. Varughese's protective complaints, the
15  Hospital began engaging in an institutional
16  practice of retaliation against Dr. Varughese for
17  her complaints. In the letter, Dr. Varughese was
18  told by Dr. Pessin-Minsley and Dr. Lento that they
19  were in the 'process' of investigating her
20  complaints, but that should she confront anyone
21  regarding her discrimination complaint, that she,"
22  in italics, "would suffer, 'removal from service,
23  possibly including termination.'"
24          We had a fair amount of testimony
25  about that letter. And then it goes on in

*Computer Reporting NYC Inc.*
*(212) 986-1344*

805

Varughese

1
2  paragraph 25, to say, "Meanwhile, Dr. Varughese
3  continued to experience increased obstruction such
4  as missing materials necessary to perform
5  Dr. Varughese's duties."
6          And it is that last sentence I would
7  like to ask you about.
8          What are you referring to when you
9  allege that you were experiencing increased
10  obstruction such as missing materials?
11          What materials were you missing
12  necessary to perform your duties in or about
13  December of 2010?
14      A.    Missing materials. Well, for
15  instance, on December 9th I was on, I think I was
16  doing biopsies. I was in the biopsy service in
17  the morning and then I was on frozen sections in
18  the afternoon.
19          So the morning, you know, usually you
20  get a page or, you know, like you check the --
21  check for the slides, the biopsy slides, and/or
22  you get a page from the attending. They get it
23  first.
24          There's no -- like whoever gets the
25  slides first basically informs the other person of

*Computer Reporting NYC inc.*
*(212) 986-1344*

806

Varughese

1
2  the cases, you know, that have come in that day
3  and the number of cases you want to sign out or
4  work on versus the number of cases you want them
5  to work on.
6          So, I mean, I didn't hear anything
7  like that day. I wasn't getting any pages from
8  anybody regarding cases that I should be working
9  on or I didn't get the slides. Like I checked
10  every thirty minutes or so. The slides, they
11  didn't, you know, essentially I didn't get them.
12          And then going forward, in terms of
13  things like even though immunohistochemistry,
14  stains for more complicated cases, I wasn't
15  getting any of those slides to review.
16          I mean, preview, if it's like a case
17  that needs to be signed out immediately, you know,
18  it's sometimes difficult to coordinate. But even
19  to review afterwards I wasn't getting any of these
20  cases going forward.
21          And when I was on hemepath, you know,
22  I talked to my coworkers. Like, I was on, what is
23  it? Surgical pathology with Jonathan Chow. He
24  wasn't having any of these problems that I was
25  experiencing.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

807

Varughese

1
2          Then on hemepath I continued to have
3  these problems with slides, paperwork, materials
4  relating to flow cytometry. Like, I wasn't
5  getting those same materials as other people were.
6      Q.    Where do those materials come from?
7      A.    I usually just request -- either it's
8  just submitted into my, you know, if I order them,
9  it's submitted into my box.
10      Q.    You order them from where?
11      A.    From the lab. You had to order them
12  from the lab and the lab is supposed to, you know,
13  if you put your initial or put your initial next
14  to those cases, the lab is supposed to like
15  forward the slides to you once it's processed.
16      Q.    On the occasions that you just
17  described, did you order the slides?
18      A.    Right.
19      Q.    And you said you didn't get them.
20      A.    Right, I wasn't getting the slides. I
21  wasn't getting the immunohistochemistry, and
22  oftentimes even blocks I had submitted that were
23  validated as having been submitted, the slides
24  would not be available to me. Even though they
25  were there and a lot of times it was, oh, the

*Computer Reporting NYC Inc.*
*(212) 986-1344*

808

Varughese

1 blocks went missing, the paraffin blocks.
2
3           And it's impossible for so many blocks
4 from one person to go missing while everybody
5 else's blocks are not going missing.  It was my
6 blocks that were going missing.
7      Q.    So the slides, the blocks, et cetera,
8 when you didn't get them or you were told they
9 went missing, did you inquire as to what had
10 happened to them?
11      A.    Yes, I inquired extensively as to what
12 had occurred.
13      Q.    Who did you ask?
14      A.    I followed up with the supervisor for
15 histology laboratories.
16      Q.    Who was that?
17      A.    At that time it was Jonathan Troung,
18 and so he followed up and he reviewed, because
19 every time you submitted blocks, every day they
20 take pictures, Polaroid or digital photographs, of
21 everything that's submitted into the system and
22 everything they have, so they had a record of all
23 the blocks that were submitted.
24           So he then reviewed all the things
25 that were submitted and he says, well, your stuff

*Computer Reporting NYC Inc.*
*(212) 986-1344*

810

Varughese

1
2      Q.    When you say there was foul play
3 there what do you mean?
4      A.    Meaning somebody was removing them or
5 actively, you know, obstructing my, obstructing me
6 from being able to do my work.
7      Q.    Do you have any belief as to who that
8 person or persons were who were --
9      A.    I think it was like Ira Bleiweiss.
10      Q.    What's the basis for your belief that
11 it was Dr. Bleiweiss?
12      A.    Because he's the one who is like
13 always there and he has access to all the stuff.
14      Q.    Where you say always there, where?
15 The lab?
16      A.    Yes, I think he comes in early.
17      Q.    Anybody else who you think was
18 responsible for your not getting the materials you
19 needed other than Dr. Bleiweiss?
20      A.    Well, I think he was doing that
21 because he was also telling my, you know, other
22 supervisors that I'm not doing my work.
23           I think he was trying to like create a
24 really disorganized environment where I'm always
25 showing up to my supervisors telling them, Hey,

*Computer Reporting NYC Inc.*
*(212) 986-1344*

809

Varughese

1 is, I mean, there were times when I made a mistake
2 and I obviously had to follow up on that.
3
4           But more often than not the blocks
5 were there.  Everything was submitted or the
6 stains were ordered and my initials were, you
7 know, it was known it was to be assigned to me.
8 But they just were not being given to me or being
9 processed appropriately.
10      Q.    Did the supervisor who you spoke to or
11 anyone else give you an explanation as to why they
12 had gone missing or you weren't getting the things
13 you had ordered?
14      A.    Well, we could not get to the bottom
15 of this because it wasn't, you know, there was no
16 reason they should go missing.
17           It wasn't as if the labels were being,
18 you know, rubbed off or something, because I'm
19 working with very fatty tissue.  When I'm on GYN
20 rotation I'm not really working with tissues
21 that's very fatty.
22           So the labels were there.  You could
23 clearly identify the labels and everything.  They
24 were going missing because somebody -- there was
25 foul play there.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

811

Varughese

1 listen, like I submitted like five cases, five
2 major surgeries today for processing, and out of
3 the five surgeries four of my cases are missing
4 slides that are relevant to our signing out the
5 case on time.
6
7           So essentially all our cases when I
8 was on that service was being delayed at least
9 like a day, two days by the simple fact there were
10 slides missing even though it was all submitted.
11 And I think it just becomes aggravation for
12 everyone involved and it just makes me, you know,
13 and I'm the one who is working on the service.
14           It reflects negatively on me.  Even
15 though I had nothing to do with it and it's not
16 something I can control, it still reflects
17 negatively on me.
18      Q.    Is there any other reason that you
19 believe Dr. Bleiweiss was the person who was
20 preventing you from getting materials that you
21 needed?
22           MR. WRONKO:  Form objection.  You can
23      answer.
24      A.    Well, that combined with his
25 complaining to my supervisors, I think I assumed

*Computer Reporting NYC Inc.*
*(212) 986-1344*

812

Varughese

1  that he was doing that.
2     Q.   Anything else?
3     A.   No.
4        MR. McEVOY:  Why don't we break for
5  lunch?  It's about five to 1.
6        (A luncheon recess was taken at
7  12:55 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

813

Varughese

1
2     A F T E R N O O N   S E S S I O N
3        (Time noted:  2:03 p.m.)
4  L E E N A   V A R U G H E S E ,    resumed and
5        testified further as follows:
6  EXAMINATION BY (Cont'd.)
7  BY MR. McEVOY:
8     Q.   Dr. Varughese, in paragraph 30 of the
9  complaint you say, "Following her report of
10  harassment," and there I think you are referring
11  to the December 2010 incident.  So if you look at
12  paragraph 30 of the complaint, it's on page 10, it
13  says, "Following her report of harassment," and
14  again that's referring to the December 2010
15  incident, "Dr. Varughese continued to be subjected
16  to a hostile work environment, including by the
17  department's refusal to provide work materials and
18  support required for Dr. Varughese to perform her
19  work in pathology.  Often, the slides, paperwork
20  and necessary follow-up studies would not be
21  available to Dr. Varughese."
22        Dr. Varughese, is this allegation
23  regarding the same materials that you testified to
24  before the lunch break or does this refer to
25  something different?

814

Varughese

1
2     A.   Right, this is referring to the same.
3     Q.   And it says that the department
4  refused to provide these materials.
5        Who in the department refused to
6  provide the materials and support that you
7  required to perform your work?
8     A.   Well, this is the residency program.
9  I'm going to say that's Dr. Patrick Lento.  He is
10  supposed to make sure that residency-related
11  materials are supposed to be available.
12     Q.   So anybody other than Dr. Lento who
13  you --
14     A.   I think the chairman of the department
15  should also, I mean, they're responsible, the
16  hospital is responsible.
17     Q.   Just so I understand, is it your
18  testimony that when you say that the department,
19  the hospital, Dr. Cordon-Cardo, Dr. Lento refused
20  to provide work materials and support to you, are
21  you saying they should have because of the
22  positions they held at the hospital?
23     A.   Well, I think what I'm just saying is
24  that, you know, these problems occurred following
25  my complaints and it was to a higher degree than

815

Varughese

1
2  before.  I mean, there was problems within the
3  residency program where materials and, you know, I
4  mean, in every meeting minute or resident meeting
5  minute or memo there were discussions about how
6  materials, you know, there were problems with
7  materials and disorganization in general.
8        But I'm specifically referring to my
9  experience where I would order the appropriate
10  slides or studies and they would not arrive ever
11  for me.  I mean, I don't think that was a problem
12  for other people.
13     Q.   Dr. Varughese, if you look at those
14  interrogatory responses we were talking about
15  before, interrogatory number 13 asked you to
16  "Identify the individuals who 'refused to provide
17  work materials and support required for
18  Dr. Varughese to perform her work in pathology'
19  and who 'refused to credit you for the work you
20  performed' and 'removed and tampered with' your
21  'data' referred to in paragraphs 30 and 42 of the
22  Complaint."
23        And you say in that response, after
24  Mr. Wronko makes prior objections, "plaintiff does
25  not know who in the department took such actions."

816

Varughese

2   Do you see that?
3   A.   Right.
4   Q.   So --
5   A.   Yeah, like I mean, I testified before
6   I thought that Dr. Bleiweiss was responsible, and,
7   I mean....
8   Q.   I understand that, but on March 28,
9   2013, when you signed these, you said, you
10  certified that "The foregoing answers and
11  interrogatories are true and correct to the best
12  of my knowledge, information and belief. I am
13  aware that if any of the foregoing statements made
14  by me are willfully false I may be subject to
15  punishment."
16          So I guess my question is, in March
17  you didn't know who had refused to provide you the
18  information. Now are you guessing or do you know?
19  A.   Well, I mean, I didn't write that
20  there, but, I mean, I do believe it was likely
21  Dr. Bleiweiss because, I mean, I cannot imagine
22  anyone else doing that unless it's Adrienne Jordan
23  or McCash.
24  Q.   Dr. Varughese, this is not really the
25  time for you to sort of speculate about it could

*Computer Reporting NYC Inc.*
*(212) 986-1344*

817

Varughese

2   have been Dr. Jordan, it could have been
3   Dr. Bleiweiss, it could have been Dr. Lento. The
4   answer you gave to the question was you don't
5   know.
6          So if you do know, then tell me that
7   you know. If it's your assumption, supposition,
8   guess, that's different.
9          So with that understanding, do you
10  know who refused to provide you with information
11  or materials that you needed to do your job?
12  A.   Given the circumstances that I
13  testified to, I mean, they are rather unusual, so,
14  I mean, somebody has to actively do that. I mean,
15  I don't know who would do it, but I'm going to
16  assume that it's going to be Dr. Bleiweiss,
17  Adrienne Jordan or Lento or McCash. I can't
18  imagine anyone else who would do that.
19  Q.   And then that paragraph of the
20  complaint goes on to say, "Dr. Varughese reported
21  these instances to hospital administration and
22  appropriate individuals, but no assistance was
23  ever provided to Dr. Varughese."
24          And there, that's interrogatory
25  number 14, which asked you to identify the

*Computer Reporting NYC Inc.*
*(212) 986-1344*

818

Varughese

2   hospital, members of the hospital administration,
3   appropriate individuals to whom you reported,
4   instances when slides, paperwork and necessary
5   follow-up studies would not be available, you
6   identified Dr. Lento, Dr. Barnett and New
7   Innovations.
8          So when did you tell Dr. Lento that
9   you were not being provided with slides, paperwork
10  and necessary follow-up studies?
11  A.   Dr. Lento, I informed him -- I
12  informed him early on. Like, he would know. I
13  mean, I talked to Dr. Barnett, informed him about
14  the issues, and Dr. Barnett was aware of a variety
15  of all the issues in the department I think, and I
16  informed him early on, and I know Dr. Barnett
17  usually informs Patrick Lento immediately of any
18  issues. If anybody brings any issues to
19  Dr. Barnett, he will inform Dr. Lento.
20  Q.   Did you tell Dr. Lento or do you
21  assume that Dr. Barnett told Dr. Lento?
22  A.   No, I had spoken to Dr. Lento like in
23  beginning of the year and I did talk to him about
24  these issues. But in September 2010 I had talked
25  to him about these issues and I had told him like

*Computer Reporting NYC Inc.*
*(212) 986-1344*

819

Varughese

2   what the problems were in terms of the, you know,
3   residency. Like after the McCash incident
4   occurred, I had spoken to him about all the stuff
5   and then I talked to him again.
6   Q.   Right now we're talking about the
7   slides, paperwork and necessary follow-up studies
8   that would not be available to you.
9   A.   Right.
10  Q.   When was the first time that you
11  didn't receive slides, paperwork or necessary
12  follow-up studies?
13  A.   When was the first time? I don't
14  know.
15  Q.   Had it happened before September of
16  2010?
17  A.   Had it? No. There was an ongoing
18  problem with like paperwork and issues from the
19  department. But in terms of it being sort of a
20  problem for me that was in excess of other
21  people's issues, that didn't happen until after
22  like September 2010.
23          Like before it was like everyone.
24  Like there was a degree of disorganization and a
25  number of issues within the department that

*Computer Reporting NYC Inc.*
*(212) 986-1344*

820

Varughese

1  seemed, it seemed like it wasn't just my problem.
2  Then after September 2010 I know what cases were,
3  I was doing. I knew where the blocks were. Like
4  I know what was submitted. I know what was
5
6  ordered in the system, and in terms of the
7  material that should have been given to me, given
8  all that, there was a lot of issues producing
9  those materials from them, which doesn't make any
10 sense.
11        Because if somebody else in my same
12 situation, same line of work, and they identified,
13 put X, Y and Z blocks and they have all the cases,
14 I mean, all the slides, not the cases, all the
15 slides for that particular case, they're only
16 missing one or two slides from each case. That
17 was occurring to me a lot. And there was really
18 no explanation to it because, I mean, there
19 wasn't. There just wasn't any explanation for any
20 of that.
21     Q.   So before September of 2010 you said
22 it was an ongoing problem that all the residents
23 experienced?
24     A.   Right. There was, I don't know what
25 they were doing, but, I mean, this is like the lab

*Computer Reporting NYC Inc.*
*(212) 986-1344*

821

Varughese

1
2  part that processes all the tissues. There were
3  some things going on where they were not producing
4  the materials on time.
5        But then for instance, like May, when
6  I was on GYN rotation --
7     Q.   When was that?
8     A.   May 2011. This is like after
9  September and December. So, I mean, September
10 2010 and December 2011. I mean, excuse me.
11 December 2010. So in May 2011 I was on GYN
12 rotation.
13        I mean, all the cases should have been
14 processed the way it was submitted. But
15 oftentimes I would not receive, like I explained
16 before, like I would submit five different cases.
17 All the blocks and everything would be submitted
18 appropriately. And it's all like representative
19 sections. There's nothing different from one
20 block to the next block really in terms of the
21 tissue that's being processed, but I would not get
22 certain slides from that block, I mean, from those
23 cases.
24        That's not happening -- that's not a
25 happening out of nowhere. That's like somebody

*Computer Reporting NYC Inc.*
*(212) 986-1344*

822

Varughese

1
2  actively obstructing and actively removing those
3  blocks and not, you know, so that I would not get
4  the slides and the materials.
5        The same thing with the
6  immunohistochemistry, when I was on hemepath, I
7  was not getting a lot of the slides,
8  immunohistochemistry slides. And I talked to my
9  coworkers like Dr. Chow or Martinez, and they said
10 no, we're getting the immunohistochemistry slides.
11 Like, you should be reviewing them because that's
12 what we do and that's part of hemepath. It's not
13 something that's reserved for, you know, the
14 attending pathologist to do only. It's something
15 that I should be doing as well and I should also
16 be reviewing some other studies relating to all my
17 cases.
18     Q.   Dr. Varughese, you told me much about
19 this morning. The question I asked you was prior
20 to September of 2010 were all of the residents
21 experiencing problems with paperwork and with
22 slides and follow-up studies?
23        MR. WRONKO: Form objection. You can
24     answer.
25     A.   I mean, I don't know what all the

*Computer Reporting NYC Inc.*
*(212) 986-1344*

823

Varughese

1
2  residents were doing.
3     Q.   Were you aware of at least some of the
4  other pathology residents --
5     A.   Well, if you --
6     Q.   Let me finish the question. Were you
7  aware, you personally aware of other pathology
8  residents prior to September 2010 who were having
9  problems receiving necessary slides, paperwork and
10 follow-up studies?
11     A.   Well, I know what's in the meeting
12 minutes of the residents' meeting, and it appears
13 that some people were having issues getting, I
14 mean, there were complaints regarding that.
15     Q.   And after September 2010 are you
16 saying that the frequency with which you
17 encountered those problems increased?
18        MR. WRONKO: Form objection. You can
19     answer.
20     A.   Yes.
21     Q.   And you told me about when you were in
22 the GYN rotation and you were in hemo pathology.
23 Any other occasions after September 2010 when you
24 encountered problems getting slides, paperwork,
25 follow-up studies other than on those two

*Computer Reporting NYC Inc.*
*(212) 986-1344*

824

Varughese

1
2 rotations that you've already told me about?
3    A.    Right, when I was on surgical
4 pathology, it depends on the case that I did.  If
5 I did a case that had a lot of, I mean, this is a
6 technical thing.  If it had a lot of fatty tissue,
7 they would not process the block.  It required
8 longer processing because it doesn't process as
9 easily.  So they would process the block for like
10 an extra day or something.  So there was an
11 explanation as to why I'm not getting the cases or
12 the slides on time.
13        Beyond like that, those were the
14 situations when I didn't get the slides on time.
15 Otherwise my slides never used to go missing.
16 Like, I don't know if it happened to other people,
17 but before that in my experience my slides just
18 didn't like come out or just go missing.
19        But after I started, I reported this
20 harassment and such, my slides and everything
21 would just go missing randomly, even though it was
22 all accounted for.
23    Q.    I'm sorry, and that started in
24 September 2010?
25    A.    Right.  Before that that didn't

*Computer Reporting NYC Inc.*
*(212) 986-1344*

825

Varughese

1
2 happen.
3    Q.    After September 2010 other than the
4 two physicians you mentioned who weren't having
5 the same problems you were having, do you know
6 whether any other pathology residents were having
7 problems getting slides, paperwork, follow-up
8 studies?
9    A.    Well, it was reported to me people, I
10 mean, in terms of the certain type, I mean, people
11 reported to me that they were not having the same
12 issues when they were on certain rotations.  Like
13 when they was on GYN rotation or hemepath rotation
14 they were not having those same issues.  But
15 people in surgical pathology rotation, I think
16 people were having similar issues with missing
17 slides and all that stuff.
18    Q.    And when you say people reported to
19 you, are those the two doctors you mentioned a
20 couple of minutes ago?
21    A.    Who were the two doctors?
22    Q.    You said -- I don't remember their
23 names off the top of my head, but you said --
24    A.    Oh, Martinez and Chow?
25    Q.    Yes.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

826

Varughese

1
2    A.    Right.
3    Q.    OK.  Now, going back to your reporting
4 these problems to Dr. -- let's go back to
5 Dr. Lento.  You said you spoke to him in September
6 2010?
7    A.    To who?
8    Q.    Lento.
9    A.    Yes, I did.
10    Q.    Where did you talk to Dr. Lento?
11    A.    At the hospital.
12    Q.    Where at the hospital?
13    A.    In his office.
14    Q.    Was anybody else present other than
15 you and Dr. Lento?
16    A.    No.
17    Q.    Tell me what you said to Dr. Lento and
18 he said to you about the problems with your not
19 receiving slides, paperwork, necessary to follow
20 up.
21    A.    I think he said that they were trying
22 to fix these problems or they were trying to do
23 something to fix the issues.  I think they were
24 going to hire more people.  I don't know.  Like
25 they changed their approach to this issue.  I

*Computer Reporting NYC Inc.*
*(212) 986-1344*

827

Varughese

1
2 mean, they were always trying to hire somebody
3 new.  I don't know.  I think that's what they were
4 going to do.
5    Q.    After this September 2010 conversation
6 with Dr. Lento about missing slides, paperwork,
7 and follow-up studies, did you talk to Dr. Lento
8 again about that subject?
9    A.    Yeah, I mean, I did report these
10 issues.  I wrote evaluations regarding the
11 problems that were there.  I mean, I think he knew
12 it was me because like New Innovations, those
13 things were not confidential.  We were told they
14 were anonymous and confidential, but they were
15 not.  So like apparently our names showed up on
16 all the evaluations and stuff.
17        And so yeah, I mean, Dr. Lento had
18 access to that.  So he definitely knew what my
19 complaints were and I was complaining about it.
20    Q.    And he knew about that because you had
21 submitted them in writing through New Innovations?
22    A.    Right.
23    Q.    But did you ever speak to Dr. Lento in
24 person again after September 2010?
25    A.    Yes, I spoke to him like as follow-up

*Computer Reporting NYC Inc.*
*(212) 986-1344*

828

Varughese

1  and then he accused me of writing a diatribe,
2  evaluation with New Innovations and submitting it
3  and I'm the only person with such a negative
4  attitude and perception.
5  **Q.**   Are you referring to your comments
6  about missing slides, paperwork and follow-up
7  studies?
8  **A.**   Right, yeah, all that stuff.  He said
9  I'm the only person who has a negative perception
10  about, you know, the residency program.  I'm the
11  only person who would write something like that
12  and I'm writing a diatribe.
13  **Q.**   Did he say that to you in person or
14  did he --
15  **A.**   Yes, he said that to me in person.
16  And I was asking him if he was going to follow up
17  at all with McCash, and he said -- that's what he
18  said to me.  He didn't say that he is going to
19  follow up.  He just started accusing me of
20  doing all this stuff of writing.
21  **Q.**   I'm sorry.  What does Dr. McCash have
22  to do with missing slides, paperwork and followup
23  studies?
24  **A.**   Right, I had this conversation because

*Computer Reporting NYC Inc.*
*(212) 986-1344*

829

Varughese

1  I was following up with him, if he was going to
2  talk to Dr. McCash about his attitude, I mean, his
3  verbal outburst and harassment.  And Dr. Lento
4  then accuses me of having a negative attitude and
5  perception of, you know, surgical pathology
6  rotation, which was like completely unrelated.
7  I'm like talking about discrimination here and he
8  wants to talk about some supposed evaluation that
9  I thought was supposed to be anonymous and
10  confidential.
11  And he said I'm the only person who
12  has such a negative attitude.  And I know that a
13  lot of residents in that program were unhappy with
14  the program and the teaching and the way, you
15  know, they felt things were going there.  So, I
16  mean, I don't know why he would think I have such
17  a negative attitude or I'm the only person who has
18  a negative attitude.
19  I think he thinks that because, you
20  know, he is discriminating against me and treating
21  me differently.  Like he would probably want to
22  say that everybody does have a negative attitude.
23  But he doesn't say that.  He says I'm the only
24  person.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

830

Varughese

1  **Q.**   Did you have any other communications
2  either in writing or in person with Dr. Lento
3  about missing slides, paperwork, follow-up
4  studies?
5  **A.**   Yes, so I had that conversation with
6  Dr. Lento and that's what he said to me.  Then I
7  think I had discussed this with him again at some
8  point.
9  **Q.**   Do you remember when?
10  **A.**   (After pause) Right, I was on autopsy
11  rotation in December to January of 2011, December
12  2010 to January 2011, and I would submit, you
13  know, blocks to be processed from autopsies and I
14  wouldn't receive them for like weeks.  I mean, it
15  would just sit there.  I would, you know, submit
16  something and I would expect it within a few days.
17  I mean, autopsy cases, they are not
18  going to process them the next day because they
19  are considered low priority for the laboratory,
20  but they are supposed to be processed within a few
21  days though, and there would be weeks where I
22  would not get the slides back.
23  **Q.**   Did you talk to Dr. Lento about that?
24  **A.**   Yes, I did.  I reported that like it's

*Computer Reporting NYC Inc.*
*(212) 986-1344*

831

Varughese

1  not because I didn't submit the slides.  It's just
2  simply because the lab hasn't processed it yet.
3  **Q.**   And what did he say?
4  **A.**   I don't know.  I think he's supposed
5  to follow up with the laboratory.
6  **Q.**   And do you know whether he did or he
7  didn't?
8  **A.**   Yeah, I think he did.
9  **Q.**   When is the first time that you spoke
10  to Dr. Barnett about missing slides, paperwork and
11  follow-up studies?
12  **A.**   Well, I spoke to Dr. Barnett in
13  January.
14  **Q.**   Of what year?
15  **A.**   January 2011.
16  **Q.**   Where did you talk to Dr. Barnett?
17  **A.**   I talked to him in his office.
18  **Q.**   Was anybody else present?
19  **A.**   No.
20  **Q.**   What conversation did you have with
21  Dr. Barnett about missing slides, paperwork and
22  follow-up studies?
23  **A.**   I just like informed him that I did
24  not get the slides and paperwork like I should in

*Computer Reporting NYC Inc.*
*(212) 986-1344*

832

Varughese

1
2  a timely manner and it was becoming a problem.
3      Again, in like February of 2011 I
4  spoke to him again about it and I think, what's
5  his name? Paul Johnson was there at that time.
6  He was there during that conversation. And I had
7  informed them like my paperwork, my cases were not
8  being given to me anymore.
9      And it's a problem because like, you
10 know, it's preventing -- like I'm on a service.
11 All I do is like, you know, there's no grossing.
12 There's no grossing on this rotation. And the
13 only thing I had to do was like review cases and
14 come up with diagnoses and do research and I
15 couldn't do it because I didn't have the work
16 materials that I needed.
17     Q.   Is that what you told Dr. Barnett and
18 Mr. Johnson?
19     A.   Yes.
20     Q.   What did they say?
21     A.   They didn't say anything. They were
22 like, well, they just thought I had to go back and
23 talk to somebody else about it. They wanted me to
24 go talk to like Dr. Strauchen or some, you know,
25 they wanted me to go back to the department and

*Computer Reporting NYC Inc.*
*(212) 986-1344*

833

Varughese

1
2  talk to Dr. Lento and Dr. Strauchen and all these
3  other people in the department where it was a
4  departmental issues, like where I was not getting
5  this material. Him as the associate dean of
6  graduate medical education, it's his job to
7  intervene at that point.
8      Q.   That's Dr. Barnett.
9      A.   Yes.
10     Q.   Why do you think it was his job as
11 associate dean to intervene at that point?
12     A.   Because he is the associate dean of
13 graduate medical education. He is supposed to
14 ensure that education that the hospital promises
15 to provide to anybody who is enrolled in their
16 residency program occurs in a nondisparate manner.
17     And here I am complaining to him, that
18 since I complained, all of these things are
19 happening to me in the department and it's frankly
20 disturbing and, I mean, I felt really sad about
21 it. And I'm telling him about it and he just
22 wants me to go back and talk to the same people
23 who I'm saying is probably creating this issue
24 here.
25     Q.   What's your understanding of New

*Computer Reporting NYC Inc.*
*(212) 986-1344*

834

Varughese

1
2  Innovations? What is it?
3      A.   New Innovations is, I mean they called
4  themselves the residency management software. But
5  it's an on-line Internet-based or cloud-based
6  program where you can input the duty hours, your
7  work hours, your conferences, your call.
8      You can review your information
9  regarding, you know, where you stand as personnel,
10 like the postgraduate year of training, or any
11 notes people made regarding licensing, and so on.
12 I mean, and you can compare yourself to other
13 people in your class or other classes on how
14 you're doing in different aspects of your, you
15 know, the six competencies. You can actually
16 compare yourself. So it's like one of those
17 management software for the program.
18     Q.   Was there any information that you
19 were required to enter into New Innovations?
20     A.   Yes, I think we were required to enter
21 into New Innovations the duty hours.
22     Q.   You said in response to interrogatory
23 13 that you were "advised by a representative of
24 New Innovations that only an administrator of the
25 system could delete information."

*Computer Reporting NYC Inc.*
*(212) 986-1344*

835

Varughese

1
2      Who was the representative of New
3  Innovations that you spoke to?
4      A.   I have her name, but I don't have it.
5  I have to find out what her name is. But, yeah,
6  so I spoke to a friend of mine who is in a
7  residency at another hospital who was the chief
8  resident. And he had informed me that I can call
9  up New Innovations and talk to the people there to
10 figure out, you know, if the information is still
11 in the system.
12     Because I knew they had deleted some
13 of my evaluations and stuff. Like the one
14 Dr. Lento accused me of writing a diatribe, they
15 had deleted all that stuff from New Innovations.
16     Q.   You're getting ahead of me. So wait a
17 minute. So you know who the representative is
18 that you spoke to, but you don't have her name
19 here.
20     A.   Right. I do know who that is, but I
21 don't have it here.
22     Q.   Did she tell you that only an
23 administrator of the system could delete
24 information?
25     A.   Right.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

836

Varughese

2    Q.    What is your understanding of what an
3 administrator is?  Who are the administrators of
4 New Innovations?
5    A.    They are basically superusers who can,
6 you know.  Like I have to have a password to go
7 into my system and that's it.  I'm limited to my
8 account.  If you're an administrator you're going
9 to have blanket access to all different accounts
10 and you can probably change the information in
11 there.
12    Q.    Do you know who the administrators
13 were who had access to New Innovations who were
14 the superusers as you describe it?
15    A.    Well, Dr. Lento and Dr. Barnett were
16 two people who were superusers of New Innovations.
17    Q.    Anybody else that you know was a
18 superuser?
19    A.    No.
20    Q.    And then it says, "The representative
21 confirmed that information had been deleted on the
22 system."
23        Did the representative you spoke to
24 tell you what information had been deleted from
25 the system?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

837

Varughese

2    A.    Right.  I had told her it was these
3 evaluations that were submitted, and she confirmed
4 that they were no longer there.  They were
5 definitely deleted.
6    Q.    Wait.  You said to her an evaluation
7 from Dr. Smith, a name I'm making it up, from
8 Dr. Smith was submitted and should be in New
9 Innovations.
10    A.    Right.
11    Q.    And she said it's not there.
12    A.    Right.
13    Q.    So you told her what information you
14 thought should be in there and she confirmed that
15 it wasn't there.
16    A.    She confirmed to me that it wasn't
17 there.  Then I called up my coworkers and I talked
18 to them whether or not the evaluations they had
19 submitted to New Innovations had been missing at
20 all from that particular year.  Because from my
21 first and second year all the evaluations that I
22 submitted are still there.  The only evaluations
23 that have gone missing are the ones from third
24 year.
25    Q.    Are those evaluations that you

*Computer Reporting NYC Inc.*
*(212) 986-1344*

838

Varughese

2 submitted, that you personally submitted to New
3 Innovations?
4    A.    Right.
5    Q.    They weren't submitted by the
6 evaluator, but they were submitted by you.
7    A.    Right, I was the evaluator of that
8 particular rotation, yes.
9    Q.    So were these evaluations of you by
10 others?
11    A.    No, it was evaluations of me --
12    Q.    I see.  Evaluations that you had done.
13    A.    I had done of the rotation.  Not of --
14 like surgical pathology rotation.  Not of
15 individuals.  I never evaluated another doctor.
16 Some people had the right to evaluate other
17 doctors.  I was never given that right.  But I
18 know people did evaluate other -- their
19 supervisors.  I never evaluated my supervisors.
20    Q.    Who were the coworkers you spoke to
21 who said they didn't have any problems with
22 missing evaluations that they submitted?
23    A.    Well, I talked to Sara Frost and she
24 confirmed to me that none of her evaluations that
25 she submitted for the year 2010 to 2011 were

*Computer Reporting NYC Inc.*
*(212) 986-1344*

839

Varughese

2 missing.
3    Q.    Anybody else other than Dr. Frost?
4    A.    Right, I talked to Paul Azar and a few
5 other people and they all said that, I mean, they
6 said it was all there.
7    Q.    Other than Dr. Frost and Dr. Azar, do
8 you remember the names of any of the other
9 physicians/coworkers that you spoke to?
10    A.    No, there were a few people.  I don't
11 remember now who else I spoke to.
12    Q.    In the same paragraph of the complaint
13 30 that we're looking at on page 10, the last
14 sentence, that "Dr. Varughese was repeatedly
15 humiliated on several instances with comments was
16 regarding her intelligence, and asked if she was,
17 quote, special needs, unquote, when she made the
18 same requests that were routinely made by other
19 residents."
20        In response to the interrogatory
21 number 15 that asked you to identify the
22 individual who asked you if you had special needs,
23 you said that Dr. Kalir advised plaintiff that,
24 quote, people are saying you are, quote unquote,
25 special needs, unquote.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

840

Varughese

2          Do you see that?

3    **A.**    Yes.

4    **Q.**    So how did this conversation with
5 Dr. Kalir come about?

6    **A.**    How did this come about? This is
7 after she was being -- she said that Dr. Bleiweiss
8 was, you know, was saying that she should write
9 negative evaluations about me and she said that he
10 was saying that I wasn't doing my work. And she
11 was, she said I'm crying at work and all this.

12          Then a day or two later she, you know,
13 we were having a chat and she said, well, because
14 I think -- I didn't know what was going on. I
15 don't know what the back story is or was at that
16 time. But now through discovery I discovered that
17 there were some e-mails being written about, you
18 know, grossing or gross room issues that I didn't
19 know about. And she said, and I guess that's in
20 that context where she said that, you know, people
21 are going, people are saying that you're special
22 needs.

23    **Q.**    Did she tell you what people were
24 saying that?

25    **A.**    No, she was referring to like the

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

841

Varughese

2 residents and the residency program and, you know.

3    **Q.**    The quote that you attribute to her is
4 "people are saying you are special needs." So did
5 she tell you the names of the people who she said
6 were saying that?

7    **A.**    Right. So the context of this
8 conversation was, you know, the people, I mean,
9 the people meaning like Cordon-Cardo, you know,
10 and I don't know what was being e-mailed because I
11 wasn't part of that e-mail, you know,
12 conversations. But I know that Ms. Morency had
13 sent out e-mails stating something or other about
14 grossing certain specimens that are supposed to be
15 grossed by PAs and the PAs didn't want to do it
16 for some reason and they were trying to force me
17 to do it.

18          I think this got back to her at some
19 point and then she said, you know, Do you want
20 people to say you're special needs? I think she
21 was referring to like the coworkers who were
22 there, which is, you know.

23    **Q.**    Dr. Varughese, I'm not asking you
24 about e-mails that you read at some point later in
25 time. I'm not asking you about how you connect

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

842

Varughese

2 the dots.

3          What I'm asking you is, when you had
4 this conversation with Dr. Kalir did she tell you
5 the names of the people who were saying you are
6 special needs?

7    **A.**    I am trying to think of one right now.

8    **Q.**    Take your time.

9    **A.**    I mean, she didn't say any names. I
10 think she mentioned like Dr. Bleiweiss. But she
11 didn't really say any names.

12    **Q.**    Did she tell you what these people
13 meant by the words "special needs"?

14    **A.**    Yeah. I mean, she didn't tell me, but
15 I knew, I know what she meant.

16    **Q.**    So she didn't tell you. What did you
17 interpret her to mean? What was your
18 understanding?

19    **A.**    She said, Are you special needs? And
20 I said, what are you, like, you know, what's the
21 problem here?

22          And she said, well, you know, like Why
23 do you need help with grossing or assistance with
24 grossing?

25          And I said because I have a lot of

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

843

Varughese

2 work to do and you routinely use the PAs and
3 moonlighters to perform some of the work because
4 that's what they're for.

5          And I had implied she was saying that
6 I was slow or that I was, you know, like retarded,
7 mentally retarded or something.

8    **Q.**    Who said that?

9    **A.**    She never said that, but I think
10 that's what she was implying by people are saying
11 special needs. I think that's what was being
12 implied.

13    **Q.**    So that's what you understood her to
14 mean when she used the words "special needs."

15    **A.**    Usually "special needs" in a
16 derogatory term, when it's said, that's what it
17 means to anyone, OK?

18    **Q.**    That's what it meant to you anyway.

19    **A.**    That's what it was meant to be, yes.

20    **Q.**    And then it goes on to say that,
21 "asked if she was 'special needs' when she made
22 the same requests," she being you, "when she made
23 the same requests that were routinely made by
24 other residents."

25          What requests did you make that were

*Computer Reporting NYC Inc.*
*(212) 986-1344*

844

Varughese

1 routinely made by other residents that resulted in
2 people referring to you as having special needs?
3     A.    Yes, routinely made requests was, you
4 know, obtaining assistance from the PAs, the
5 moonlighters, to do some of the work, you know, to
6 assign some of the work to them, which is done by
7 all the residents and all the fellows.  Like, I
8 see that happening all the time.
9         There are mass e-mails being sent out
10 to the department on any given day about how much
11 work there is to be done and how everybody wants
12 help.  Whether it's Adrienne Jordan, Elizabeth
13 Morency, Robert Grenowe (phon), Jacqueline
14 Hechtman, there's a constant barrage of e-mails.
15 Please help.  I'm too busy today.  Please help.  I
16 need to go to a party and I need work to be done.
17 Please help.  So-and-so is out again today.  So we
18 need help with performing our work.
19         This happens all the time in this
20 residency.  The minute I need to get some help
21 finishing my work, it just becomes this
22 large-scale issue where I'm being talked in this
23 way by my supervisor and being asked if I'm
24 special needs.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

845

Varughese

1     Q.    Then if you look at paragraph 32,
2 which also starts on page 10, it says
3 "Dr. Varughese was treated differently by the
4 Hospital than her similarly situated peers and in
5 retaliatory fashion.  As for her work in the
6 pathology department, much of Dr. Varughese's work
7 entailed the analysis of slides.  Dr. Varughese
8 would often, for no reason, be delayed by the
9 hospital in receiving slides, and additional
10 studies necessary to perform her work.  Also,
11 Dr. Varughese would oftentimes order special
12 stains which were critical to her research and
13 work.  For no justification, the Hospital refused
14 to provide the necessary stains, intrinsic to
15 making a final diagnosis in pathology.  When
16 Dr. Varughese reported the issues and level of
17 obstruction that she was experiencing on a daily
18 basis to her colleagues, the colleagues denied
19 having similar problems on similar assignments."
20     I assume, but correct me if I'm wrong,
21 that the slides, additional studies, are the ones
22 we have been talking about.
23     A.    Right.
24     Q.    And then are the necessary stains the

*Computer Reporting NYC Inc.*
*(212) 986-1344*

846

Varughese

1 same ones that you talked about before?
2     A.    Yes.
3     Q.    And it says "the Hospital would refuse
4 to provide the necessary stains."
5         What's the basis for your belief that
6 the hospital refused to provide the stains?
7     A.    OK, when I was on GYN the special
8 studies that I had ordered, they did not arrive at
9 all.
10     Q.    Well, I understand that you said --
11     A.    And then somebody went in there and
12 changed, you know, stuff that I had assigned to my
13 initials to the fellow's initials.  And I was the
14 one who was on the service and they should have
15 been sending all those cases to me.  But there
16 were changes.  Somebody was going in there
17 changing everything to the fellow's initials.
18     Q.    So assuming all that's true, what's
19 the basis for your belief that the hospital
20 refused to provide you with these necessary
21 stains?
22     A.    That's refusing to provide.  If they
23 obliged and provided the studies I would not be
24 changed to somebody else's name, and so on and so

*Computer Reporting NYC Inc.*
*(212) 986-1344*

847

Varughese

1 forth.
2     Q.    Who is it at the hospital that you
3 believe refused or didn't provide you with the
4 necessary stains?
5     A.    Who at the hospital?  Well, probably
6 Dr. Bleiweiss and the powers that be.
7     Q.    Then when you said in the beginning of
8 that paragraph that you were treated differently
9 by the hospital than your similarly situated
10 peers, and in interrogatory 16 you were asked to
11 identify the similarly situated peers and
12 colleagues, you identified Dr. Chow, Dr. Martinez,
13 Dr. Azar, Dr. Roman, Dr. Morency, Dr. Jordan and
14 Dr. McCash.
15     And while I'm happy to ask you about
16 each of those people individually, let me ask you
17 a question that hopefully will cover them all.
18     Are you saying here that these people
19 didn't encounter those problems in obtaining
20 slides, additional studies, necessary stains that
21 you say you encountered?
22     A.    Right, I'm saying they didn't
23 encounter the degree of obstruction that I
24 encountered with work materials.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

848

Varughese

2      Q.      In paragraph 36 of the complaint,
3   which is on page 12, you say "Dr. Jordan was given
4   further preferential treatment such as being
5   permitted to take an elective in Pennsylvania even
6   though she had the duty of being a chief resident
7   at the New York City based hospital."
8          Was there something inappropriate in
9   your view about her being allowed to take I think
10  what's called an away elective?
11         MR. WRONKO:  Form objection.  You can
12  answer.
13     A.      I think there was something disparate
14  about her being allowed to a going-away elective in
15  Pennsylvania.
16     Q.      What was disparate about Dr. Jordan
17  being allowed to take an away elective in
18  Pennsylvania?
19     A.      Well, she was -- she had chief
20  resident duties at Mount Sinai Medical Center in
21  New York City and she, I believe she was in, I
22  don't know where in Pennsylvania, but I'm pretty
23  sure it was like in the middle of Pennsylvania
24  somewhere, and she could not, she did not have a
25  working pager.  She did not have cell phone

*Computer Reporting NYC Inc.*
*(212) 986-1344*

849

Varughese

2   reception at times and she still had chief
3   resident duties at Mount Sinai Medical Center and
4   she was being paid for it.  And I think that was a
5   problem.
6      Q.      So is it your view that a chief
7   resident shouldn't be allowed to take an away
8   elective because they had chief resident
9   responsibility at the hospital?
10     A.      Yeah, that's my opinion.
11     Q.      It says, that same paragraph goes on
12  to say, "In contrast, plaintiff," you, "did not
13  receive comparable treatment and, instead, was the
14  subject of repeated discipline over the course of
15  a period of a year and termination for alleged
16  offenses that were commonplace for other coworkers
17  including Drs. Jordan and McCash."
18         What offenses are you referring to in
19  this paragraph that were commonplace?
20     A.      OK, so, why do they say that?  When I
21  was terminated they said I wasn't covering for
22  people or what not.  I mean, clearly Dr. Jordan
23  wasn't covering for people either because she
24  wasn't there at the hospital.  So if you did need
25  coverage, I mean, clearly she couldn't do it.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

850

Varughese

2      Q.      When you say she wasn't there, that's
3   during the period of time she was in Pennsylvania?
4      A.      Sure, she was in Pennsylvania, but she
5   had, you know, the hospital was still paying her
6   extra money to be chief resident.
7          What else?  I mean, there's so many
8   events or incidents that occurred over the years.
9      Q.      You're talking about commonplace
10  offenses.  I just want to know what commonplace
11  offenses you're referring to.
12     A.      OK, well, for instance, there was,
13  what is it?  Duty hours thing.  They were accusing
14  me of not filling out the duty hours on time at
15  some point.  I mean, this is something that
16  Drs. Jordan and McCash both didn't do on time on
17  several occasions.  But Dr. Cordon-Cardo thought I
18  should be fired for that.
19         Then what else?  Let's see.
20         (After pause) In terms of
21  unprofessionalism or professionalism issues.
22     Q.      It is your complaint.  It says --
23     A.      Right, I'm going to --
24     Q.      So tell me.
25     A.      I mean, Dr. McCash was known to have

*Computer Reporting NYC Inc.*
*(212) 986-1344*

851

Varughese

2   shouted at me at least once in September 2010.
3   That was corroborated.  Then again in December.
4   Nobody ever put him on academic advisement for
5   that and that's clearly unprofessional behavior.
6          But here, like one incident where I
7   allegedly, you know, responded to being attacked
8   at work simply because I'm trying to do my work,
9   get my work done for the day, I am placed on
10  academic advisement and then it goes into this
11  major issue that went on to essentially
12  substantiate, essentially explain or substantiate
13  why I should be fired eventually.  I mean, that's
14  the rationale for me being fired, because I was on
15  academic advisement and I didn't satisfy those
16  requirements over a period of like a year and then
17  I'm basically fired after that.
18         Like, that's completely pretextual,
19  especially because as I have testified before, at
20  least like half of the rationale for that.  I
21  mean, I had contended that that entire thing was
22  false and it was wrong to put me on academic
23  advisement from the start.
24         But, I mean, for a fact there was no
25  patient care related labs in that particular, as

*Computer Reporting NYC Inc.*
*(212) 986-1344*

852

Varughese

1  stated in that document. There was never any
2  issue regarding that. But they still said there
3  was some and they placed me on this academic
4  advisement that led to my termination a year
5  later.
6      Q.   Coming back to my question, what other
7  commonplace offenses were committed by your
8  coworkers?
9      A.   Yeah, that shouting thing, that was a
10  coworker who did that. There was no actions taken
11  against him.
12      Q.   Right. You told me that.
13      A.   In terms of Dr. Jordan, she went and
14  alleged that, you know, I was having flight of
15  ideas, that I had, you know, allegedly -- she was
16  allegedly, I mean, she was afraid of me, not
17  allegedly. She was afraid of me. She was making
18  all these statements about me that are extremely
19  defamatory and unprofessional and nobody cited her
20  or placed her on any sort of academic advisement
21  even though that's clearly unprofessional.
22      Q.   Any other commonplace offenses
23  committed by Drs. Jordan or McCash?
24      A.   In terms of conferences, presenting at

*Computer Reporting NYC Inc.*
*(212) 986-1344*

853

Varughese

1  conferences, these two, they have oftentimes
2  cancelled their conferences or not have presented
3  what they were supposed to present, and no action
4  was ever taken against them. They never got fired
5  for it. If you want to fire, you can just fire
6  the entire hospital if somebody didn't present
7  when they're supposed to present.
8      In terms of, you know, issues such as,
9  you know, going through my stuff, like Dr. Jordan
10  went through my stuff the day I was fired, she
11  somehow obtained the key to my locked desk and
12  drawers and she went through all those items even
13  though I was, I mean, I was fired from the
14  hospital, but there was a hearing that was pending
15  and I was never -- I requested the key that day
16  when I was leaving and nobody gave me the key so
17  that I could take whatever was my material and go
18  home with it. I never had that opportunity to do
19  that. That same day Dr. Jordan essentially goes
20  through all my stuff and -- this is after claiming
21  that she was terrified of me.
22      I mean, I never even did any of these
23  things, but I was still fired. Then they said
24  that I was fired because I didn't do well in

*Computer Reporting NYC Inc.*
*(212) 986-1344*

854

Varughese

1  cytogenetics, a two-week rotation. Meanwhile, did
2  everybody else in that department pass
3  cytogenetics? Did every resident pass
4  cytogenetics? I assume they did, but did all
5  those residents also go on to pass the anatomic
6  pathology and cytopathology board examinations?
7  No, they didn't. All these guys, they go and they
8  fail these exams multiple times.
9      I mean, eventually they are given
10  every single opportunity, but they are not
11  succeeding. They are not getting what they are
12  supposed to get out of it, but they are being
13  passed by the hospital as being competent doctors.
14  But they can go out there and pass a board
15  examination and get on with their life for like
16  years and years.
17      Q.   Who failed the boards that you're
18  aware of?
19      A.   Just about everyone in that program
20  failed the boards.
21      Q.   Who failed the boards?
22      A.   The only person who I know that passed
23  the boards was Mark Smothers (phon), and from my
24  knowledge, he was really the only person who

*Computer Reporting NYC Inc.*
*(212) 986-1344*

855

Varughese

1  really passed the boards, and Lanjing Zheng passed
2  the boards on his second try I believe. Everybody
3  else has failed and that is a program of like over
4  20 people. All of these people have repeatedly
5  failed, but nobody has ever been cited by the
6  hospital as having academic issues.
7      It begs the question. Why are they
8  citing me for it? It's because I complained about
9  harassment at work, about these particular doctors
10  who were being problematic.
11      Q.   So any other commonplace offenses that
12  Dr. Jordan and McCash committed?
13      A.   What else? Let's see. I mean, they
14  did take off from work a lot too. Dr. McCash and
15  Dr. Jordan both took numerous sick days and they
16  attended numerous courses, conferences that were
17  all paid for by the hospital, and --
18      Q.   Let me understand. Is it your view
19  that if Dr. Jordan and Dr. McCash took time off to
20  attend a conference that was paid for by the
21  hospital that's an offense?
22      A.   Well, when I'm not getting the same
23  sort of privileges, it's offensive to me.
24      Q.   It's offensive to you.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

856

Varughese

1  A.   Is that an offense?  You know what?
2  If they have work to do at the hospital and other
3  people have to cover for them, it is.  It's a
4  problem.  But is it like a terrible negative
5  thing?  No.  And the hospital should probably find
6  a way to accommodate these circumstances.
7      But, I mean, my problem really is
8  their absenteeism, like they were out of work
9  numerous times.  There was a time when Dr. Jordan
10  was taken off surgical pathology service for a
11  week or two because of some incident that
12  occurred.
13  Q.   When you say some incident that
14  occurred, what do you mean?
15  A.   I think she had injured herself, and
16  she tended to do that a lot.  I must have heard
17  her say she injured herself about like at least
18  three or four times the times I was around her
19  even, which is like not the entire three years, a
20  few months here and there, and she had reported
21  being injured numerous times.  I mean, in my
22  entire three years I reported being injured once.
23  And that was a total freak accident.
24  Q.   Do you believe that Dr. Jordan was

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

857

Varughese

1  somehow not being honest about her injuries?
2  A.   I mean, I don't know.  I mean, do I
3  believe that?  I suspect some of it may have been
4  fabricated.  I mean, some of them may have been
5  real.  I have injured myself at least once and
6  which I had to report, so....
7  Q.   Any other common offenses that
8  Dr. Jordan or McCash committed that you are
9  referring to in paragraph 6 of the letter?
10  A.   Well, Dr. McCash definitely drank
11  regularly at work.  I mean, these dementia rounds
12  by him, his requests for these dementia rounds
13  began sometime before he became chief resident and
14  it continued onwards till sometime in 2011.
15      And I mean, these were requests that
16  were made at the last minute often.  Like he would
17  send in a request on December 1st for a December
18  2nd.  Dementia round.  This happened all the time.
19  And it was completely condoned by the department,
20  which is Dr. Lento, Dr. Bleiweiss, Dr. Schiller.
21  Q.   Any other commonplace offenses that
22  you believe Drs. Jordan and McCash committed?
23  A.   Hmmm.
24  MR. WRONKO:  Can we take a short break

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

858

Varughese

1  after she is done with her response?
2  MR. McEVOY:  Absolutely.
3  A.   (After a pause) Like in terms of cases
4  that, you know, that were delayed, Dr. Jordan and
5  Dr. McCash, you know, delayed cases on a regular
6  basis.  They said that I was, you know, I'm not
7  the only person who has ever done that.  I know
8  for a fact that they did that all the time.  They
9  delayed cases all the time.
10      Sometimes it's in the best interest of
11  patient care to delay a case.  Sometimes it's, you
12  know, you delay a case for, because, you know, you
13  prioritize the case, you manage a case a certain
14  way.  That's not really a problem with patient
15  care.  There is no patient care related lapse
16  related to that and it was very commonplace.
17      But I was accused of doing that as if
18  it was some sort of like occurrence that only I'm
19  guilty of, when in fact appropriate patient
20  management sometimes, you know, calls for delaying
21  a case for appropriate management.
22  Q.   What is delaying a case?
23  A.   It's not delaying a case.  It's just
24  simply like fixing the case or waiting to process

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

859

Varughese

1  the case till the next day.  Everybody does that.
2  And I was accused of doing that as something that
3  I should be terminated for.
4      I mean, that was clearly pretextual to
5  say that that's patient care.  I mean, I think
6  that's what they were saying was a patient care
7  related lapse, some case being processed a day
8  later.  That's not a patient care related lapse
9  when everybody else does it and nobody gets cited
10  for it and I get cited for something like that.
11  It's complete pretext.
12  Q.   Before we take the break, any other
13  commonplace offenses?
14  A.   That's all I can think of at the
15  moment.
16  MR. McEVOY:  Let's take a break.
17      (A recess was taken from 3:03 p.m. to
18  3:10 p.m.)
19  BY MR. McELROY:
20  Q.   So Dr. Varughese, what commonplace
21  offenses did Dr. Guarino commit that you're
22  referring to in paragraph 36 in the complaint?
23  A.   Well, he requested moonlighters and
24  assistants, pathology assistants all the time.  If

*Computer Reporting NYC Inc.*
*(212) 986-1344*

860

Varughese

1  they were out the he would send, regularly send mass
2  e-mails requesting assistance with grossing or
3  moonlighting, because there came a point when they
4  weren't a lot of moonlighters available because
6  they were systematically told by Adrienne Jordan
7  that they were not allowed to moonlight.
8        So if Adrienne Jordan was out, there
9  was no one to moonlight really, and people were
10  constantly e-mailed asking to moonlight because
11  they didn't have enough people to moonlight. And
12  Guarino was one of those people who constantly
13  requested moonlighting and assistants.
14        Then he did not present his, you know,
15  he was scheduled to present on September 15, 2011,
16  and he decided to cancel his presentation at the
17  last minute on September 14th or 13th, or whenever
18  it was, of 2011 and I was expected to present
19  instead of him. And, I mean, that's, he just
20  cancelled last minute and there was no consequence
21  to him.
22        And this happened all the time with
23  other residents too, such as Adrienne Jordan who
24  insists she is going to make a presentation and
25  then she would just cancel it at the very last

*Computer Reporting NYC Inc.*
*(212) 986-1344*

861

Varughese

2  minute.
3        Q.   What other, if any, commonplace
4  offenses did Dr. Guarino commit that you're
5  referring to in paragraph 36 of the complaint?
6        A.   I mean, in terms of professionalism, I
7  think like he used to, I don't know, he used to
8  make all this commentary about like I guess, you
9  know, jokes. He would joke around about women and
10  just off putting jokes he would make about women
11  or people of different races and stuff. And like
12  nobody ever cited him for any of that.
13        Q.   Any other commonplace occurrences,
14  offenses rather, committed by Dr. Guarino?
15        A.   That's all I can think of right now.
16        Q.   In response to interrogatory number
17  18, Dr. Varughese, you identified Dr. Jordan,
18  Dr. McCash and Dr. Guarino who we just had
19  testimony about, and then you say "and others."
20        Are there any others, and by other, I
21  mean other coworkers, who committed commonplace
22  offenses?
23        A.   Right, I mean, I think this is really
24  referring to like the termination letter and also
25  to, I mean, the commonplace occurrences that --

*Computer Reporting NYC Inc.*
*(212) 986-1344*

862

Varughese

2        Q.   Offenses, not occurrences.
3        A.   Right, which is like, you know, I
4  mean, I was essentially terminated for like these
5  six reasons. I mean, this is like, for instance,
6  poor conference attendance, a lot of people did
7  not attend these conferences. But, I mean, nobody
8  has been fired or even cited for them.
9        But I was essentially fired. Some of
10  the reasons for me being fired was because I
11  didn't like attend all these -- allegedly I did
12  not attend 80 percent of the conferences.
13        Q.   So other than whoever else you said
14  did the same thing you did regarding conference
15  attendance, whatever that might be, were any
16  others, and others again referring to your
17  coworkers, other pathology residents who committed
18  commonplace offenses?
19        A.   Yeah, like almost everybody did it.
20  Everybody. Like you cannot, you know, it was
21  impossible to, you know, things that they are
22  citing me for, like it's impossible to work there
23  and not occasionally, you know.
24        Q.   Occasionally what?
25        A.   Violate or, you know, occasionally

*Computer Reporting NYC Inc.*
*(212) 986-1344*

863

Varughese

2  have an issue where you don't receive a page
3  or you -- I don't know. There were like six
4  policies. I mean, I don't know. Occasionally
5  not, you know, I don't even remember what all the
6  policies were, but I'm sure other people violated
7  those policies as well. And....
8        Q.   Before you testified about
9  Dr. Bleiweiss telling your superiors to write
10  negative evaluations about them and you mentioned
11  Dr. Kalir and two others. In interrogatory number
12  19 you also identify Dr. Petersen.
13        So was Dr. Petersen another one of
14  your supervisors who Dr. Bleiweiss asked or told
15  to write a negative evaluation about you?
16        A.   Which one was that?
17        Q.   Do you mean which interrogatory
18  number?
19        A.   Yes.
20        Q.   19.
21        A.   19. Um, yeah. I guess. I mean, I
22  thought he was. Because, I mean, he told me that,
23  I mean, at this point this was not even referring
24  to Dr. Bleiweiss. It was referring to Dr. Firpo.
25        Q.   Interrogatory 19 says "Identify the

*Computer Reporting NYC Inc.*
*(212) 986-1344*

864

Varughese

1  superiors who Dr. Bleiweiss requested to write
2  negative evaluations about you referred to in
3  paragraph 46 of the Complaint."
4          So this doesn't refer to Dr. Firpo or
5  anyone other than Dr. Bleiweiss.
6      A.   OK, Dr. Bleiweiss, I'm not sure if he
7  had said anything to Dr. Petersen.
8      Q.   OK.  In paragraph 42 of the complaint,
9  you say that "Additional actions taken against"
10  (you) "included refusal to credit (you) for the
11  work (you) performed and removal of and tampering
12  with (your) data from the residency management
13  software known as New Innovations."
14          So with regard to the removal of and
15  tampering with the data from the residency
16  management software known as New Innovations, is
17  that what you told me about before, about the
18  evaluations that you say were deleted from the
19  system?
20      A.   Yes.  My evaluations were deleted.
21      Q.   And what work was not credited to you?
22  It says "refusal to credit Dr. Varughese for the
23  work she performed."  What work were you referring
24  to?

865

Varughese

1      A.   The work, it was essentially in terms
2  of just giving me credit for the work that I have
3  performed, which is like signing out cases.
4  Instead of putting my name on the case, they would
5  put somebody else's name on the case.  This would
6  happen a lot.  I mean, even with the autopsies
7  that I had done over the years.
8          I think I actually did a recalculation
9  of all my cases and went through all the paperwork
10  for it and I think I have done like over 60 cases
11  in three years.  I had initially thought maybe I
12  did like, you know, like 40 something cases based
13  on my work at Elmhurst, the VA and Mount Sinai
14  Medical Center.  But I failed to count certain
15  types of cases.
16          So in fact I actually ended up like
17  doing like 60 cases, and I wasn't -- the hospital
18  was insisting that I had only done like 20 cases,
19  which is a gross underestimation of the work that
20  I had done, when in fact I actually did like 60.
21  Like they are willing to give me credit for a
22  third of the work I did.
23      Q.   Was there any other work that you
24  allege you were not given credit for that you

866

Varughese

1  think you completed other than the work you just
2  described?
3      A.   Yes.  They would oftentimes ask me to
4  like gross cases and not sign out the cases.  Like
5  let somebody else sign out the cases.  Like a
6  resident or a fellow would take credit for the
7  work that I did.
8      Q.   Did anybody tell you why they wanted
9  you to do that?
10      A.   There is no good reason why I should
11  do that.
12      Q.   I didn't ask you that.  Did anybody
13  tell you why?
14      A.   No, nobody told me why.
15      Q.   Did you ever ask anybody why?
16      A.   I just chalked it up to
17  discrimination, racism, sexism, national origin.
18      Q.   Sorry, what was that?
19      A.   National origin, discrimination and
20  disparate treatment.
21      Q.   So despite your various conclusions
22  did you ask anybody why you were being asked to
23  allow other residents to sign out work that you
24  had done?

867

Varughese

1      A.   Right, I did.  I had a discussion
2  about this with Dr. Strauchen and Dr. Maniar who
3  got involved on this issue and e-mailed people
4  within the department and requested that that not
5  be the case.
6      Q.   Who e-mailed and asked that that not
7  be the case?
8      A.   Dr. Maniar.
9      Q.   After Dr. Maniar sent out this e-mail
10  did the practice change?
11      A.   Well, I mean, I think Dr. Strauchen
12  also, you know, was informed about that at that
13  time and I think he tried to change the situation
14  so that that would not take place anymore.
15      Q.   Did it change going forward after
16  that?
17      A.   Right.  Whenever I had a concern, if I
18  brought it to Dr. Strauchen and I discussed
19  something with him, he immediately changed the
20  situation so that, you know, it would be, I would
21  be accommodated.  There wouldn't be any more
22  problems.
23      Q.   So then is the answer to my question
24  yes, that after you spoke to --

868

Varughese

1
2      A.     Yes, Dr. Strauchen was very responsive
3  to any concerns that I had when he was the program
4  director.
5      Q.     In paragraph 31 of the complaint you
6  say "On February 15th, 2011, only Dr. Varughese
7  was required to leave her assigned work post
8  despite the fact that she and her male colleague
9  did not have the requisite clearance known as a
10  mask fit test."
11         You mentioned that briefly on one of
12  the earlier days of the deposition.  But who was
13  the male colleague who you referred to in
14  paragraph 31 of the complaint?
15      A.     Dr. Chow.
16      Q.     Is there anything else you would like
17  to tell me about that incident other than what you
18  already testified to?
19      A.     Well, I think I had already testified
20  that Dr. Chow was asked to remain and I was asked
21  to leave, and this is a department that's run by
22  Mount Sinai Medical Center.
23      Q.     What department are we talking about?
24      A.     Department of pathology.
25      Q.     What is a mask fit test?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

869

Varughese

1
2      A.     It's just simply a test that, I mean,
3  it's simply fitting.  I think I testified to this
4  before as well.
5      Q.     Then don't repeat yourself.  And who
6  asked you to leave?
7      A.     Who asked me to leave?  It was the --
8  I don't remember now.  It was one of the staff
9  there, staff members there.
10      Q.     Was it another physician?
11      A.     No.  It wasn't a physician.
12      Q.     So a staff member.  What staff member,
13  not by name, but by title could have asked you to
14  leave?
15      A.     Well, Dr. Blaisero (phon) who was like
16  the -- he oversees that department there.  He was
17  there, but he didn't have physically come out and
18  ask me to leave.  But I think he told the
19  secretaries to tell me to leave.
20      Q.     So you think he told the secretaries
21  to tell you to leave.
22      A.     Right.  And they insisted that Chow
23  should stay.
24      Q.     Did they say why?
25      A.     Well, I think it was discriminatory

*Computer Reporting NYC Inc.*
*(212) 986-1344*

870

Varughese

1
2  because, you know.
3      Q.     I have no doubt you think that.  My
4  question is, did they say why?
5      A.     Did they say why?  No, they didn't
6  explain themselves.  They were trying to say that
7  he had his test.  And he said, No, I didn't have
8  my test.
9      Q.     As part of the discovery process you
10  or Mr. Wronko were required to provide what are
11  known as Rule 26 disclosures.  One of the things
12  that is required to be disclosed are the names of
13  individuals who are likely to have discoverable
14  information relevant to disputed facts alleged in
15  the operative pleadings, and that's just kind of a
16  fancy way of saying you have to identify people
17  who know something about your case.
18         And 52 people.  52.  Well, really,
19  more like 49 names were disclosed.  So what I am
20  going to do is ask you about some of these people,
21  not all of these people, because I am going to
22  assume that you have told me, and tell me if I'm
23  wrong, that you have told me for example
24  everything, at least so far that I've asked you,
25  everything that Dr. Lento knows about your claims

*Computer Reporting NYC Inc.*
*(212) 986-1344*

871

Varughese

1
2  in your case.
3         Is that a fair statement?
4      A.     Um --
5         MR. WRONKO:  Form objection.  You can
6      answer.
7      A.     I mean, I'm not sure about that.
8      Q.     Because here are the two choices and
9  I'm happy to do either one.  I can ask you what
10  Dr. Lento knows about the facts alleged in the
11  complaint for example, and you've obviously told
12  me a lot about Dr. Lento over the last number of
13  sessions that we've had.
14         And so I would ask you to tell me
15  anything that you haven't already told me.  So we
16  can proceed that way if it's easier for you.
17         MR. WRONKO:  No, I have to object to
18      the form of that question, because that
19      question, asking her what Dr. Lento knows,
20      how could she possibly know or be inside of
21      his brain to know what exactly he knows?
22         I mean, if you want to ask her has she
23      told you everything about what she observed
24      about Dr. Lento, you know, that I think is a
25      fair question.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

872

Varughese

1
2    MR. McEVOY:  Fine.  I will be guided
3  by that.
4    Q.    Have you told me everything that you
5  know about your conversations with Dr. Lento, your
6  communications with Dr. Lento, your observations
7  with Dr. Dr. Lento, et cetera?  Not about what
8  Dr. Lento knows or doesn't know, because I agree
9  with Mr. Wronko, you can't possibly know what he
10  knows.
11    So with that qualification, have you
12  told me everything about Dr. Lento?
13    MR. WRONKO:  Form objection.  Again,
14    within the confines of the questions you've
15    asked.
16    MR. McEVOY:  Absolutely.
17    A.    Well, I mean, I didn't mention that
18  following my complaint in December 2010 I was
19  working with Dr. Lento on autopsy rotation and, I
20  mean, he has a way of being aggressive and
21  intimidating towards you, and when I was working
22  on autopsies he would often be very careless with
23  the scalpel.
24    I performed like several autopsies
25  with him that month, and he would be very cavalier

*Computer Reporting NYC Inc.*
*(212) 986-1344*

873

Varughese

1
2  with the scalpel, and this is like a long-handled
3  scalpel with a blade.  The long handle is about
4  like, I don't know, you know, it's like about the
5  length of this paper.
6    Q.    Which is eleven inches.
7    A.    Right.  Oh, I think it's more like
8  eight.  So it is more like the width of this
9  paper.
10    Q.    Eight inches.
11    A.    Right, with the scalpel, I mean, the
12  blade end, and he would just be very careless not
13  minding where I am working.  I never experienced
14  that with him when I worked with him before, and I
15  worked with him for over two and a half years at
16  that time, and he never was outright intimidating
17  towards me or aggressive towards me ever.
18    After December 2010 he started doings
19  things like that where I was, you know, I was
20  actually pretty afraid to be around him when I was
21  working with him with the scalpel or on a case,
22  because he was becoming very aggressive and
23  extremely careless about my safety.
24    Q.    So do you attribute that behavior to
25  the fact that you had complained?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

874

Varughese

1
2    A.    Yes.
3    Q.    Anything else that you saw, observed,
4  spoke to or interacted with Dr. Lento about other
5  than what you've already told me in response to
6  questions that Dr. Lento has information about
7  regarding the claims in your case?
8    A.    I think I testified to all the stuff
9  so far.
10    Q.    The same question with regard to
11  Dr. Cordon-Cardo.  Other than what you've already
12  testified to in response to my questions, is there
13  any other information that you know or believe
14  Dr. Cordon-Cardo has relevant to the claims in
15  your lawsuit?
16    A.    No, I think I testified to.
17    Q.    The same question with regard to
18  Dr. Firpo.
19    A.    Well, Dr. Firpo had information
20  regarding what other residents were doing and
21  their issues or circumstances or how they were
22  violating policies and such.
23    But he was only treating me
24  differently when it came to like taking actions
25  against me.  They were using it to take actions

*Computer Reporting NYC Inc.*
*(212) 986-1344*

875

Varughese

1
2  against me and I believe those actions have not
3  been taken against anybody else with that same
4  information.
5    Q.    Anything else about Dr. Firpo?
6    A.    That's all I can think of.
7    Q.    The same question regarding
8  Dr. Bleiweiss.
9    A.    I can't think of anything other than
10  what I already testified to.
11    Q.    The same question regarding Dr. Figur.
12    A.    I mean, I think I already testified to
13  Dr. Figur's involvement.
14    Q.    The same question regarding
15  Dr. Hughes.
16    A.    I also testified to Dr. Hughes's
17  involvement.
18    Q.    The same question regarding
19  Dr. Fersch.
20    A.    I think I testified to that too.
21    Q.    The same question regarding
22  Dr. Schiller.
23    A.    I think I testified to that too.
24    Q.    The same question regarding
25  Dr. McCash.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

876

Varughese

1
2      A.    Yeah, I think I testified too.
3      Q.    The same question regarding
Dr. Jordan.
5      A.    I think I've already testified to a
6  degree about all her involvement.
7      Q.    The same question regarding
8  Dr. Barnett.
9      A.    Dr. Barnett, I think he probably has
10  more information regarding my termination and
11  disciplinary action.
12      Q.    You say he has more information.  What
13  do you mean?
14      A.    Meaning he is the DIO and according to
15  Melissa Pessin she had involved him as of December
16  2010.  So I don't know what he was told by the
17  department at that time, but I'm sure he has been
18  informed about, I mean, he has been more informed
19  and I'm pretty sure he has more information.
20            And he also knows, you know, I
21  requested him to intervene at several points and
22  he did not.  And he basically testified that, you
23  know, Alan Schiller was fired from the department
24  for some financial issues.
25      Q.    Who told you this?

877

Varughese

1
2      A.    Scott Barnett.
3      Q.    Scott Barnett told you that.
4      A.    Yes.
5      Q.    Anything else about Dr. Barnett that
6  you haven't already testified to?
7      A.    Right.  I mean, he told me that, you
8  know, he said that like, you know, he doesn't even
9  know, like he said, I don't know if you did
10  something wrong.  No, that's not what he said.
11            He actually said this is sort of like
12  a crazy situation.  You're not, like you probably
13  didn't do anything or they didn't do anything or
14  maybe both of, both parties are to blame to some
15  degree.
16            But I was the only one who was being
17  disciplined.  Like, there was no discipline being
18  taken against McCash at all.  So, I mean, he
19  really confirmed that to me after I met with him.
20  He definitely confirmed that that was the case.
21      Q.    Anything else about Dr. Barnett?
22      A.    I think that's all I can think of
right now.
24      Q.    And the same question regarding
25  Dr. Stimmel.  Just in case we've lost track of

878

Varughese

1
2  that question, other than what you've already
3  testified to in response to my questions, is there
4  anything else that you believe Dr. Stimmel knows
5  about the allegations in your complaint or the
6  claims in your complaint other than what you
7  already testified to?
8      A.    Yes.  Well, I mean I spoke to
9  Dr. Stimmel on December 9th and even before that I
10  had met with him like earlier in that year at some
11  point.  I had met with him because there were some
12  issues where the department was blaming me for
13  something and I thought it was getting out of
14  hand.  So I met with Dr. Stimmel to discuss it.
15            So and then, when this incident
16  occurred, I had actually talked to him on
17  December 9th about Alan Schiller, you know, about
18  everything that occurred in that meeting with Alan
19  Schiller and Dr. Bleiweiss, and I believe
20  Dr. Stimmel was supposed to intervene or get
21  involved in some way to prevent this from
22  happening.  But, I mean, he did not.
23            But he also told me when I submitted
24  my self-reflection that it was accurate and it was
25  what I had reported to him and he had said that it

879

Varughese

1
2  was fine that I submitted a reflection.  He never
3  said that it was unacceptable as ombudsman, but
4  the hospital said it was unacceptable and the
5  hospital administrators said it was unacceptable.
6      Q.    Anything else that Dr. Stimmel knows
7  about the claims in your complaint?
8            MR. WRONKO:  Form objection.  You can
9  answer.
10      A.    That's all I can think of right now.
11      Q.    The same question regarding
12  Mr. Johnson.
13      A.    I mean, I think I testified to a lot
14  at this point.  But, I mean, my complaint, to the
15  degree that we went through my complaint at this
16  point.
17      Q.    The same question regarding
18  Dr. Najfeld.
19      A.    I think I testified to that earlier.
20      Q.    The same question regarding
21  Dr. Pessin-Minsley.
22      A.    I think I testified to her
23  involvement.
24      Q.    The same question regarding
25  Ms. Tiger-Paillex.

880

Varughese

1

2    A.    Right, I mean, I have reported to her,
3    to Caryn Tiger-Paillex, all the issues in terms of
4    what had occurred and what the department's
5    actions were and how I felt that was wrong.  And
6    going forward, I had -- like she had interviewed
7    other people in the hospital in the department and
8    it seems like she had gotten testimony or evidence
9    that my side was being corroborated to a degree
10   and she still went along with the actions of the
11   department that eventually became termination
12   reasons even though she knew a lot of what they
13   were doing was wrong.
14   Q.    Anything else about Ms. Tiger-Paillex?
15   A.    Right, and she said that she, I mean,
16   as HR director what she said to me was that she
17   thought McCash doesn't feel like he has done
18   anything wrong and he's not capable of apologizing
19   to you.  And she's the HR director and she found
20   that acceptable, which I felt was largely
21   discriminatory given that I was concerned that
22   there was gender discrimination.
23   Q.    Anything else about Ms. Tiger-Paillex?
24   A.    That's all I can think of.
25   Q.    The next person that you identify is

*Computer Reporting NYC Inc.*
*(212) 986-1344*

881

Varughese

1

2    Marina Lowy.  And with regard to Ms. Lowy, you say
3    "Ms. Lowy has knowledge of the lack of remedial
4    action in response to Plaintiff's complaint."
5          What does Ms. Lowy know about the lack
6    of remedial action?
7    A.    Marina Lowy, she, I mean, I knew that
8    legal department was involved on December 13th
9    because Melissa Pessin just so.  But then after I
10   wrote my self-reflection and I e-mailed the
11   self-reflection I guess to Dr. Barnett, who had
12   said that he wanted to have the mediation meeting,
13   because in my self-reflection I had said that I
14   would like some sort of resolution to this issue
15   and some sort of mediation relating to having a
16   meeting just discussing how this incident was
17   going to not occur again and also understanding my
18   position about like how I feel like I'm being
19   harassed and treated differently from McCash and
20   being discriminated against, and he e-mailed that
21   to her and I believe she advised him not to do
22   that.
23   Q.    Not to do what?
24   A.    Not to have this mediatory meeting or
25   to resolve the issues relating to my complaints of

*Computer Reporting NYC Inc.*
*(212) 986-1344*

882

Varughese

1

2    harassment and discrimination.
3    Q.    And what's the basis for that belief?
4    A.    Because she was the only person from
5    legal counsel who was forwarded on that e-mail and
6    I think -- so I know that she probably advised
7    against it.
8    Q.    Who is Michael McDonald?
9    A.    He is the, how do I say it?  He is one
10   of the general counsel.
11   Q.    He is the general counsel.
12   A.    He is the general counsel, but he is
13   like also the president or vice president of the
14   hospital or something.
15   Q.    And you say that Mr. McDonald has
16   knowledge of remedial action taken in response to
17   your complaint.
18         What knowledge do you believe
19   Mr. McDonald has about remedial action taken in
20   response to your complaint?
21   A.    Well, he was involved with the House
22   Staff Affairs Committee.  I mean, in that, like in
23   the decision of the House Staff Affairs Committee
24   they had written that I was somehow argumentative
25   towards Melissa Rocco.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

883

Varughese

1

2          I mean, they created a new rationale
3    for why I was terminated, even after I was
4    terminated, which was like never discussed, and
5    they created more rationale and they said that I
6    was argumentative towards Melissa Rocco, and I was
7    not argumentative towards her.  I had simply asked
8    her to clarify a question that she asked me and
9    that was construed as being argumentative.
10   Q.    So other than the fact that
11   Mr. McDonald was counsel to the House Staff
12   Affairs Committee during your hearing, is there
13   any other knowledge you believe he has about
14   remedial action taken in response to your
15   complaint or anything else having to do with your
16   complaint?
17   A.    Right, I had concerns that I was
18   terminated on pretext.
19   Q.    Let me stop you.  Is there any other
20   information you believe Mr. McDonald has about
21   remedial action taken in response to your
22   complaint or anything else to do with your
23   complaint other than the fact that he was the
24   counsel to the House Staff Affairs Committee?
25   A.    Right, he was a counsel to them and

*Computer Reporting NYC Inc.*
*(212) 986-1344*

884

Varughese

1 that's what they wrote up.  He must have reviewed
2 the decision.
3     Q.    OK.  So again, other than the fact
4 that he was involved with the House Staff Affairs
5 Committee hearing, do you believe he has any other
6 knowledge about you, your claims, remedial action,
7 anything else?
8     A.    Yeah, I mean, I have reason to believe
9 that he was informed, and then he misled me about
10 a lot of things too.
11     Q.    He was informed about what?
12     A.    I mean, he was there at that hearing.
13 So he knows what took place.
14     Q.    All of us who were there at the
15 hearing know what took place.  So is that what
16 you're saying, that he was informed about what
17 happened at the hearing because he was there?
18     A.    Well, he is a, I don't know,
19 general -- I think he is like the general counsel
20 in charge or whatever, so....
21     Q.    I will tell you, Dr. Varughese, that
22 Mike McDonald is the general counsel at Mount
23 Sinai.
24     A.    Right.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

885

Varughese

1     Q.    So you can have any sort of doubts
2 about that allayed.  That's who Mr. McDonald is.
3     A.    Right, I'm sure Marina Lowy consulted
4 with him or something at some point.
5     Q.    So do you know any of this,
6 Dr. Varughese, or is this just sort of like you
7 just guessing, just assuming that it must have
8 been?
9     A.    Well, I would know more if you were
10 willing to comply with discovery.
11     Q.    Thank you.  Dr. Varughese, do you want
12 to answer my questions?
13     A.    I'm answering your questions.  That's
14 all I know.
15     Q.    So you don't know, do you,
16 Dr. Varughese, what Mr. McDonald spoke to to
17 Ms. Lowy, Ms. Lowy spoke to to him, what they said
18 to anyone else involved in this case.  You don't
19 know what was said, do you?
20     MR. WRONKO:  Counsel --
21     A.    I don't know how to answer the
22 question.
23     MR. WRONKO:  Hold on.  Counsel, you're
24 now in the fourth day of deposition.  She

*Computer Reporting NYC Inc.*
*(212) 986-1344*

886

Varughese

1 has given you the knowledge with regard to
2 this particular individual.
3     Obviously these communications are
4 attorney-client privilege.  You understand
5 that.  You're choosing now at a quarter to 4
6 to argue with the witness.
7     MR. McEVOY:  I am not arguing with her
8 at all.
9     MR. WRONKO:  Yes, you are.  You're
10 getting contentious, you're arguing, you're
11 wasting time.  Move on.
12     MR. McEVOY:  Mr. Wronko, I'm not going
13 to move on.  Unless you're going to direct
14 her not to answer, then we can ask the
15 magistrate on Thursday.
16     MR. WRONKO:  No, you can waste as much
17 time as you like, but that doesn't mean that
18 by dragging this deposition on or by arguing
19 with the witness that you're going to get
20 endless days to continue this deposition.
21 This is coming to an end shortly,
22 Mr. McEvoy.
23     MR. McEVOY:  So you think.
24     MR. WRONKO:  No, I do.  Because if

*Computer Reporting NYC Inc.*
*(212) 986-1344*

887

Varughese

1 this is the way you're going to interact
2 with the witness where you're going to egg
3 the witness on and then the two of you are
4 going to get into these types of contentious
5 arguments over a witness who has marginal
6 relevance --
7     MR. McEVOY:  Then why did you identify
8 him?  If he has marginal relevance why did
9 you identify the general counsel at Mount
10 Sinai?
11     MR. WRONKO:  Because he was at the
12 house staff affairs meeting and that's it
13 and you know that.
14     MR. McEVOY:  No, I don't know that.
15     MR. WRONKO:  You were just told that.
16 Can we move on?
17     MR. McEVOY:  And I asked the witness
18 whether or not she had any other information
19 or believed that Mr. McDonald had any other
20 information about the House Staff Affairs
21 Committee.
22     So if you're now representing that's
23 all she know, I will move on.
24     MR. WRONKO:  Thank you.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

888

Varughese

1
2 BY MR. McEVOY:
3       Q.    You then identified Dr. Morency. And
4 you said that "Dr. Morency has knowledge of her
5 own whereabouts during the events in plaintiff's
6 complaint."
7             What is the significance to you of
8 Dr. Morency's knowledge of her own whereabouts
9 during the events alleged in the complaint?
10      A.    For instance, on September 15, 2011,
11 she was not at that conference. She wasn't
12 present at that conference because she was at the
13 dean's office that morning. So they were saying
14 that the residents were saying a variety of things
15 about me.
16            I mean, now I'm convinced that the
17 only resident that was saying anything about me
18 was Adrienne Jordan, because Dr. Morency was not
19 there and Dr. Firpo was saying the chief residents
20 are saying X, Y and Z and Dr. Morency is telling
21 me she's not even there and she hasn't been saying
22 anything.
23      Q.    Anything else of significance to you
24 about Dr. Morency's knowledge of her own
25 whereabouts during the events in your complaint?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

889

Varughese

1
2       A.    I mean, that's all I can think of at
3 the moment.
4       Q.    OK. And then you identify Dr. Azar
5 and you say "Dr. Azar has knowledge of the McCash
6 incident and his own attendance issues."
7             The same question regarding Dr. Azar.
8 And by same question, I mean anything else that
9 you have already told me in response to my
10 questions.
11      A.    No, that's all.
12      Q.    Then you identify Dr. Chow. "Dr. Chow
13 has knowledge of plaintiff's work performance."
14            And what does Dr. Chow know or you
15 believe he knows about your work performance?
16      A.    Well, I worked with him on numerous
17 rotations over the years, even in, I mean, I was
18 at Elmhurst in February of 2011 and he has always,
19 um, I was on surgical pathology when Dr. Chow was
20 also on surgical pathology. We were on some
21 autopsy rotations together. And he has always
22 complimented me on my work and my work ethic.
23 I've covered for him several times when he
24 couldn't come in for whatever reason. You know,
25 so....

*Computer Reporting NYC Inc.*
*(212) 986-1344*

890

Varughese

1
2       Q.    Then you identified Dr. Roman. What
3 does Dr. Roman know or do you believe Dr. Roman
4 knows about your work performance?
5       A.    Right, Dr. Roman, same thing. We
6 worked together very often on a variety of
7 rotations and we always had discussions about our
8 careers, and so on. And, I mean, she can tell you
9 that she probably has never observed any sort of
10 delinquency on my part of patient care related
11 labs.
12      Q.    Then you identify Dr. Martinez. What
13 does Dr. Martinez know or you believe Dr. Martinez
14 knows about your work performance?
15      A.    I mean, the same thing as Dr. Roman
16 and Dr. Chow.
17      Q.    Then you identify Dr. Grooms, I
18 believe it's pronounced, and you said that
19 Dr. Grooms has knowledge of Dr. Jordan's drinking
20 on the job.
21            Other than what you've already
22 testified to in response to my questions, is there
23 anything else that Dr. Grooms knows or you believe
24 she knows about Dr. Jordan's drinking on the job?
25      A.    Well, she knows about the drinking on

*Computer Reporting NYC Inc.*
*(212) 986-1344*

891

Varughese

1
2 the job and, what else? I mean, I worked with her
3 on autopsies. She's oftentimes asked me for
4 assistance with her cases or, you know, advice on
5 what to refer to the medical examiners.
6             And as a junior resident I have always
7 tried to assist her and inform her of the correct
8 process and I was always very supportive of the
9 junior residents that were, you know, training in
10 the same program.
11      Q.    And then you identify Dr. Kalir. You
12 say Dr. Kalir has knowledge of your work
13 performance.
14            Other than what you already
15 testified to does Dr. Kalir have any other
16 knowledge, do you believe she has any other
17 knowledge about your work performance?
18      A.    I mean, she's always, I mean,
19 Dr. Kalir despite what had occurred on GYN and
20 going forward, after, I mean, before I was
21 terminated even, but later on she has tried to be
22 supportive of me and tried to find ways to help me
23 with employment or finding employment and she
24 stated that she would serve as a positive, you
25 know, reference and she has tried to provide a

*Computer Reporting NYC Inc.*
*(212) 986-1344*

892

Varughese

1
2  positive reference for me so that I can obtain
3  employment, and so....
4      Q.   Anything else about Dr. Kalir?
5      A.   That's all.
6      Q.   I'm sorry?
7      A.   No, that's all I can think of right
8  now.
9      Q.   Then you identify Andrew Castaldi, and
10  you say "Mr. Castaldi has knowledge of meeting
11  with Dr. Cordon-Cardo and Dr. Lento with
12  plaintiff." I know you testified about that
13  meeting and Mr. Castaldi's presence there.
14         Other than what you already testified
15  to about that meeting, anything else that
16  Mr. Castaldi knows or you believe he knows about
17  the meeting with Dr. Cordon-Cardo and Dr. Lento?
18      A.   He was at those two meetings, and I
19  think I already testified to that.
20      Q.   Then you identify a Ms. Patel. And
21  you say "Ms. Patel sat in on meetings between
22  plaintiff and Dr. Firpo."
23         Other than what you've already
24  testified to, is there anything else that you
25  believe Ms. Patel knows about those meetings or

*Computer Reporting NYC Inc.*
*(212) 986-1344*

893

Varughese

1
2  anything else having to do with your complaint?
3      A.   I mean, she was actively involved in
4  FMLA issues as I have testified to before, and the
5  termination, she was actually involved in that.
6  And also in terms of my, I guess telling payroll
7  to not pay me anymore, she was involved in all of
8  that.
9         And I think she was the one who called
10  security. I mean, she was involved, but, I mean,
11  she represents to me like the hospital
12  administration that's essentially like Dr. Charney
13  and Dr. Davis, because she works for them.
14      Q.   Then you identified Dr. Petersen. You
15  said "Dr. Petersen has knowledge of plaintiff's
16  job performance."
17         Other than what you've already
18  testified to in response to my questions, what
19  does Dr. Petersen know or you believe he knows
20  about your job performance?
21      A.   With, I mean, that was my advisor and,
22  I mean, he had given me positive work evaluations.
23  And we worked, you know, we had a good working
24  relationship and he thought it was odd or, you
25  know, strange that Dr. Firpo was approaching me

*Computer Reporting NYC Inc.*
*(212) 986-1344*

894

Varughese

1
2  regarding hemepath rotations that I was already on
3  for a month before. And he was concerned that
4  Dr. Firpo was overstepping his boundaries as a
5  board certified hematopathologist, how he should
6  evaluate me and conduct his work.
7      Q.   Then you identified Dr. Guarino. You
8  say that "Dr. Guarino has knowledge of the
9  cancellation of his presentation on September 15,
10  2011," and we've had testimony about that.
11      A.   Right.
12      Q.   Anything else you think Dr. Guarino
13  knows about the cancellation of his presentation
14  other than what you already testified to?
15      A.   I already testified that he cancelled
16  and there were no consequences.
17      Q.   Then you identified Renato Valentin
18  and you say that Dr. Valentin has knowledge of
19  Dr. McCash's treatment of plaintiff.
20         And the same question. Other than
21  what you already testified to does Dr. Valentin
22  know anything or do you think he knows anything
23  else about Dr. McCash's treatment of you?
24      A.   Right, because Renato was there -- he
25  was the per diem PA who works that evening shift

*Computer Reporting NYC Inc.*
*(212) 986-1344*

895

Varughese

1
2  and he was there when Dr. McCash was harassing me.
3  And he had witnessed the event, but he was never
4  interviewed by the hospital or the department.
5         I mean, that was, you know, going in
6  May, I was working with him on GYN. He was out
7  for some time because his father was ill, but he
8  had told me nobody ever approached him or talked
9  to him about the incident at all.
10      Q.   Anything else that you think
11  Dr. Valentin, Mr. Valentin knows about your
12  complaint of Dr. McCash's treatment of you?
13      A.   I mean, he has eyewitness knowledge of
14  what occurred at that time. The hospital did not
15  interview him.
16      Q.   And Dr. Morotti. You say "Dr. Morotti
17  has knowledge of specific incidents in the
18  complaint."
19         Other than what you've already
20  testified to in response to my questions, did
21  Dr. Morotti have knowledge about specific
22  incidents in the complaint?
23      A.   Well, she told me that she -- she told
24  me she had decided to leave shortly after they
25  fired me because she had witnessed some of the

*Computer Reporting NYC Inc.*
*(212) 986-1344*

896

Varughese

1    goings-on with security and security being called
2    to my desk.
3         I mean, this is someone who knows me
4    for three plus years and, you know, she was
5    concerned about it and after that she decided to
6    leave because she didn't agree with the way they
7    were treating me.
8         Q.    So I just want to try and understand.
9    Dr. Morotti told you that she left the program?
10        A.    She, she resigned.
11        Q.    From the program.
12        A.    From employment at Mount Sinai Medical
13   Center.
14        Q.    What was her position there?
15        A.    She was a pediatric pathologist.
16        Q.    And she resigned from her position as
17   a pediatric physician at Mount Sinai because of
18   the way you were treated.
19        A.    Right.
20        Q.    Who is Lakshmi Ramanathan?
21        A.    She is a clinical chemistry -- she's a
22   clinical chemistry clinical pathologist.
23        Q.    And you say that Dr. Ramanathan has
24   knowledge of remarks made about you in the
25
*Computer Reporting NYC Inc.*
*(212) 986-1344*

897

Varughese

1    workplace after termination.
2         A.    Yes.
3         Q.    To your knowledge what does she know
4    about remarks made about you at the workplace
5    after you were terminated?
6         A.    I had spoken to her and she said that,
7    um, she said that people were saying something
8    about me.  She said, Oh, you're so young.  You can
9    do something else with your life.  You don't know
10   what people are saying about you, and it's not
11   good.
12        I asked her what they were saying
13   about me and she said, you know, It doesn't
14   matter, but people are saying derogatory things
15   about you.
16        And that's what she said to me.
17        Q.    Did she tell you, did she provide you
18   with the names of any of the people who were
19   supposedly saying these things about you?
20        A.    I assumed it would be Dr. Cordon-Cardo
21   and Dr. Lento, because, I mean, she's not going to
22   take, I mean, why would she take anything that
23   Dr. Jordan, you know, she's not going to take the
24   resident's opinions or comments and say that
25
*Computer Reporting NYC Inc.*
*(212) 986-1344*

898

Varughese

1    that's reason to fire someone.
2         But if Dr. Firpo is saying that I'm
3    having petit mal seizures and making defamatory
4    statements and he has been making those statements
5    to my supervisors, yes, it's defamatory and it's
6    going to make people say, well, this is what, you
7    know, this is ridiculous.  Like I don't want to
8    repeat what they're saying to me to you, but....
9         Q.    Did Dr. Ramanathan tell you the names
10   of any of the people who she said were making
11   derogatory remarks about you?
12        A.    No, she didn't tell me who they were.
13        Q.    Then you identified Dr. Hechtman and
14   you said "Dr. Hechtman has knowledge about the
15   incidents in the complaint."
16        Other than you've what already
17   testified to in response to my questions about
18   Dr. Hechtman, do you believe she has any other
19   knowledge about the incidents in the complaint?
20        A.    I mean, she did, I mean, she does have
21   some knowledge regarding....
22        Q.    I understand that and you testified
23   about Dr. Hechtman.
24        A.    Right, I had already testified about
25
*Computer Reporting NYC Inc.*
*(212) 986-1344*

899

Varughese

1    that, yeah.
2         Q.    So I just wondered if there was
3    anything else other than what you already
4    testified to.
5         A.    No, I can't think of anything else.
6         Q.    And the same question with regard to
7    Dr. Ko.
8         A.    I had also testified regarding what
9    Dr. Ko knows.
10        Q.    And the same question regarding
11   Dr. Maniar.
12        A.    I also testified regarding that.
13        Q.    Then you identified Michael Marin.
14   And you said Dr. Marin is on the House Staff
15   Affairs Committee and has knowledge regarding
16   defendants' treatment of plaintiff.
17        So other than what Dr. Marin may have
18   learned in the course of his being on the House
19   Staff Affairs Committee, is there any other
20   knowledge that you believe Dr. Marin has about the
21   treatment of you at Mount Sinai?
22        A.    Yes.  Dr. Marin, I had worked with
23   Dr. Marin once before and that was when I was a
24   first-year resident.  And I was working on a case
25
*Computer Reporting NYC Inc.*
*(212) 986-1344*

900

Varughese

1
2  where his patient had died after a long period of
3  illness.
4           But it was a patient who had multiple
5  stents, metal stents within the body and he had
6  some sort of aortic duodenal fistula that was
7  bleeding from the duodenum that they had to fix.
8  I mean, I got this whole sob story from, you know,
9  Dr. Marin -- well, actually, can I scratch that?
10 Not a sob story. I mean, I --
11      Q.   No, you can't, but you can correct it.
12      A.   OK, whatever, like I would like to
13 redact that.
14          So he had told me that he had this
15 patient and I had to meet with him because his
16 patient, like it was a case that I had to do.
17 Because Dr. Zheng was there, the same Dr. Zheng
18 that I mentioned earlier, and he said, Well, I'm
19 not going to do this case, because it was my case.
20 He wasn't going to do the case because it was a
21 case that I was going to do.
22          Anyway, so I met with Dr. Marin and he
23 said, Oh, I'm the chief of the Department of
24 Surgery and this is my patient. He's such a nice
25 old man. He's wonderful. He has like 15

*Computer Reporting NYC Inc.*
*(212) 986-1344*

901

Varughese

1
2  grandkids and what not.
3           I said, OK, that's great.
4           But he completely failed to mention
5  that this patient had metal stents, was filled
6  with metal stents, had all these other
7  comorbidities that he didn't mention. And he
8  completely misled me regarding this patient.
9           Then I go and do this case. Just
10 before I start the case a different attending --
11 he was working on a book, he was working on a
12 textbook, he was writing a textbook and was taking
13 pictures of all the different cases that come in,
14 that came in.
15          And he approached me and he said,
16 Well, Leena, I would like you to be very careful
17 with this patient because there are certain, you
18 know, tattoos and such that. Even though he seems
19 to be a nice old man who died after a chronic
20 illness, there may be something in his history
21 you're not really aware of and you need to be vary
22 careful.
23      Q.   You said this happened when you were a
24 first year.
25      A.   Yes, I was a first-year resident.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

902

Varughese

1
2      Q.   So what does any of that have to do
3  with Dr. Marin's knowledge regarding defendants'
4  treatment of you?
5      A.   Right, then I was doing the autopsy on
6  this case. And I ended up getting injured because
7  there were metal stents in there and then I ended
8  up getting injured. This is like the one injury I
9  ever had in this hospital. And I sent the blood
10 for testing, infectious disease testing, and the
11 patient had hepatitis C.
12          And Michael Marin had done numerous
13 surgeries on him, inserted numerous stents in him,
14 even for the aortic duodenal fistula. He must
15 have known about his hepatitis C status and he
16 didn't inform me. And I ended up getting injured
17 in this case.
18          I only found out in retrospect that
19 this patient had hepatitis C. You know, I mean,
20 that failure to inform there, that's pretty
21 serious for another physician at the hospital, and
22 this is Michael Marin, the chief of surgery we're
23 talking about at Mount Sinai Medical Center.
24 That's my experience with him before.
25          And then he is on the House Staff

*Computer Reporting NYC Inc.*
*(212) 986-1344*

903

Varughese

1
2  Affairs Committee and he is very, you know, being
3  very aggressive sort of, you know, being very
4  short with me.
5      Q.   I'm sorry, do you think that during
6  the conduct of the hearing Dr. Marin treated you
7  unfairly?
8      A.   Well, he was being very short and
9  abrupt at times.
10     Q.   And why do you think he was being
11 short and abrupt?
12     A.   Why do I think that? I mean, I don't
13 know why he didn't inform me that his patient had
14 hepatitis C.
15     Q.   We're not talking about that. We're
16 talking about the House Staff Affairs Committee.
17     A.   Why? Because he's probably biased.
18 He probably has some sort of biases that....
19     Q.   What biases do you think Dr. Marin has
20 toward you?
21          MR. WRONKO:  Form objection.
22     A.   The biases he has towards me at this
23 point, you know, is he going to support the
24 hospital's claims and support the pretext and fire
25 me for these things? Yes, he is going to do that.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

904

Varughese

1  Q.    So then did you think the entire House
2  Staff Affairs Committee proceeding was somehow
3  biased against you and unfair?
4      MR. WRONKO:  Form objection.  You can
5  answer.
6  A.    Yes.
7  Q.    Why do you think that?
8  A.    I mean, they created like new reasons
9  for my termination.
10  Q.    And by they, who are you referring to?
11  A.    The House Staff Affairs Committee, and
12  they thought that me simply clarifying a question
13  that Melissa Rocco was asking me was considered
14  argumentative.  It's outrageous.
15  Q.    Any other new reasons that you think
16  they created to support your termination?
17  A.    Any other things?
18  Q.    Yes.
19  A.    Well, they said that I was absentee.
20  I had absenteeism, which was never an issue.  I
21  did not have absenteeism.  Even Dr. Morency
22  testified to that fact, that I wasn't any more
23  absent than any other resident in that department.
24  Q.    OK.  Anything else about Dr. Marin?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

905

Varughese

1  A.    No, that's it.
2  Q.    And then you identify Kenneth Davis.
3  Who is Dr. Davis?
4  A.    Dr. Davis is the, I don't know, is he
5  the chairman of the hospital?  The president of
6  the hospital.
7  Q.    You say that "Dr. Davis has knowledge
8  of and participated in the decisions taken against
9  plaintiff."
10      What's the basis for your assertion
11  that Dr. Davis has knowledge about the decisions
12  taken against you?
13  A.    Well, Shema Patel used to work for him
14  and I think by extension I assumed that he was
15  informed.
16  Q.    I'm sorry, I didn't hear what you just
17  said.
18  A.    By extension I assumed that he was
19  informed.  Because Shema Patel is the interim
20  administrator and a direct link to Dr. Davis, and
21  I'm sure she was placed in that position so she
22  can report to Dr. Davis what was going on within
23  the department.
24  Q.    Did Ms. Patel ever tell you that she

*Computer Reporting NYC Inc.*
*(212) 986-1344*

906

Varughese

1  was reporting to Dr. Davis about anything
2  regarding you?
3  A.    She said that she works for the Office
4  of the President.
5  Q.    I understand that.  Did she ever tell
6  you that she had told Dr. Davis anything about
7  you?
8  A.    Has she said that?
9  Q.    Yes.
10  A.    No, she has not said that to me.
11  Q.    Then you say that Dr. Davis
12  participated in the decisions taken against you.
13      What's the basis for your assertion
14  that Dr. Davis participated in decisions taken
15  against you?
16  A.    Dr. Who?
17  Q.    Davis.
18  A.    What's my -- well, because a decision
19  had to be made by someone and I think it was made
20  by probably Dr. Davis.
21  Q.    Why do you say it was probably made by
22  Dr. Davis?
23  A.    Because why would HR -- like HR is not
24  going to unilaterally decide to fire me.  I mean,

*Computer Reporting NYC Inc.*
*(212) 986-1344*

907

Varughese

1  they had said that I can go to the doctor's
2  appointment, come back with a note.  But in fact I
3  was fired even before I got that note.
4      Like they didn't tell me that I was
5  fired.  But I was essentially fired as of like
6  Tuesday morning.  But they only informed me
7  Wednesday, but I was already fired, so....
8  Q.    Even assuming that's true, why do you
9  think Dr. Davis had anything to do with the
10  decision to terminate you?
11  A.    I don't know.  He's the president of
12  the hospital.  He probably knows about decisions
13  to terminate.  How many house staff did they
14  terminate that year?
15      I was probably the only person they
16  terminated as of September of that year.  I was
17  probably the only person who was terminated
18  between late July and end of September.
19  Q.    Did anybody ever tell you that
20  Dr. Davis participated in the decision to
21  terminate you?
22  A.    No, but I have a sense that he knows
23  or he participated.
24  Q.    Did anybody ever tell you that

*Computer Reporting NYC Inc.*
*(212) 986-1344*

908

Varughese

1 Dr. Davis participated in the decision to issue a
2 final warning?
3        A.   Did anybody tell me that?
4        Q.   Yes.
5        A.   No.  But I was told that they're going
6 to, you know, send my concerns to higher-ups and
7 the legal department.
8        Q.   And when somebody said higher-ups, did
9 anybody say we're sending this to Dr. Davis?
10       A.   No, but if you're the chairman of the
11 department you basically answer to the president
12 of the hospital and dean of graduate medical
13 education.  Those are the only two people you
14 really answer to.  You don't answer to anybody
15 else above that.
16       Q.   What's the basis for your belief that
17 Dr. Davis was involved in issuing even academic
18 advisement?
19       A.   I don't think I ever said that.
20       Q.   Fair enough.  Any other decisions
21 taken against you other than issuing you the final
22 warning and your termination that you think
23 Dr. Davis was involved with or participated in?
24       A.   Well, to my knowledge, I mean, what I

*Computer Reporting NYC Inc.*
*(212) 986-1344*

909

Varughese

1 can, I mean, what I know really is that Paul
2 Johnson told me I shouldn't be at work.  He said
3 certain people told him.
4        I mean, he works for HR and GME.  He
5 is only going to take advice from either some
6 legal counsel, in-house counsel, Dr. Davis or
7 Dr. Charney or Dr. Barnett.  He is not going to do
8 things unilaterally to tell me to do something.
9 Any of these decisions have to be approved by the
10 hospital's president or dean.
11       Q.   What's the basis for that belief?
12       A.   Well, it's how I know they work.
13       Q.   How do you know how they work?
14       A.   Because Dr. Barnett said that that's
15 how they do it.
16       Q.   Dr. Barnett said what?
17       A.   He said that Dr., the president of the
18 hospital is always on the phone with
19 Dr. Cordon-Cardo.
20       Q.   When did Dr. Barnett tell you that?
21            Did he say he was on the phone with
22 Dr. Cordon-Cardo about you?
23       A.   They said that various fires to put
24 out and he said that I was one of the fires.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

910

Varughese

1        Q.   When did Dr. Barnett tell you that?
2        A.   September 12, 2011.
3        Q.   Tell me how that came about.
4        A.   What came about?
5        Q.   That Dr. Barnett told you that
6 Dr. Davis was always on the phone with
7 Dr. Cordon-Cardo about fires to be put out and you
8 were one of the fires.
9        A.   Well, he said that there were many
10 fires to be put out in that department, there were
11 all these problems, and he implied that I was one
12 of the problems that the department had.
13       Q.   Let me be, so that there's no
14 confusion, Dr. Varughese, my question is I think
15 fairly straightforward.
16            Did Dr. Barnett tell you on September
17 12th that Dr. Davis had spoken to Dr. Cordon-Cardo
18 about you?
19       A.   No, he didn't say it in those words,
20 no.  He didn't say that.
21       Q.   Any other decisions that you believe
22 Dr. Davis participated in or was involved in
23 regarding you other than the final warning and the
24 termination?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

911

Varughese

1        A.   Probably the House Staff Affairs
2 Committee.  I'm not sure.  I'm not sure of what
3 other decisions.  I don't have privileges to find
4 all this information out and then -- what is it?
5 You know, with my former attorneys who had sent a
6 letter to the hospital, you know, specifically
7 stating what the concerns were and asking the
8 hospital to respond to them.  The hospital never
9 did so.  The hospital never responded to my
10 attorneys.
11           Like once I'm represented by an
12 attorney, I think the hospital has to respect that
13 as a professional I have some legal counsel here
14 and they have a duty to like respond to them.  But
15 they didn't do that.  They took actions against
16 me, completely ignored my attorneys.
17       Q.   Anything else about Dr. Davis?
18       A.   No, I can't really think of any.
19       Q.   Who is Chandandeep Nagi?
20       A.   He is one of the attending
21 pathologists.
22       Q.   You say that Dr. Nagi has knowledge of
23 plaintiff's job performance.  What do you believe
24 Dr. Nagi knows about your job performance?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

912

Varughese

1
2     A.     Right, I worked with Dr. Nagi on I
3  think it was September 7th or 6th or something. I
4  was on call and I was working with him during
5  call. And we had a number of cases that came in,
6  arrived late or whatever, and he, you know, I
7  called him up and I told him like what my
8  impression was of the case.
9           And he was like of course. I was
10  like, Do I need to send this picture to you? He
11  was like, No, no. Of course I trust your opinion.
12          You know, I'm a fourth-year resident.
13  By that time all my supervisors already knew that
14  I was very capable. I knew what I was doing and I
15  was doing well in terms of my training in the
16  pathology residency program and I was going to be
17  very successful if I were to complete the
18  residency and go forward to employment in
19  pathology.
20     Q.     Who is Dr. Steven Ward?
21     A.     Dr. Steven Ward is also one of the
22  pathologists there. He is GI and liver,
23  specializes in GI and liver pathology.
24     Q.     And you said that Dr. Ward has
25  knowledge about your job performance?

913

Varughese

1
2          What do you believe Dr. Ward knows
3  about your job performance?
4     A.     I worked with Dr. Ward extensively
5  over the three years. He had just come out of
6  fellowship when I started my residency in 2008.
7  So as professionals we sort of like learned a lot
8  from each other over three years and we diagnosed
9  a lot of very difficult cases, transplant cases
10  that even fellows would refuse to work on that I
11  worked on with him and he was really impressed
12  with how I diagnosed things or how I managed my
13  cases and we never had any issues.
14     Q.     And who is Mary Beth Beasley?
15     A.     Dr. Beasley is a pulmonary pathologist
16  and I also worked with her in December of 2010 and
17  she's one of the more critical people when it
18  comes to training requirements and what she
19  expects of other physicians and their competency.
20          And by December 2010 she thought that
21  I was doing quite well in terms of my progress as
22  a pathology resident, in terms of the work I was
23  doing, in terms of my diagnostics and grossing
24  capabilities, you know.
25     Q.     Anything else that you believe

914

Varughese

1
2  Dr. Beasley knows about your job performance?
3     A.     I think that's all I can testify to.
4     Q.     Who is Roberto Garcia?
5     A.     Another attending pathologist there.
6     Q.     And you said that Dr. Garcia has
7  knowledge of your job performance.
8           What do you believe Dr. Garcia knows
9  about your job performance?
10     A.     Dr. Garcia joined Mount Sinai the same
11  year that I joined in 2008 and we worked, you
12  know, over the course of three plus years and, you
13  know, I'm sure he had a chance to observe that I
14  was getting better and becoming a better doctor
15  over the years as a pathologist as I was working
16  there. So I think that's reflected in the
17  evaluation he submitted in December 2010.
18     Q.     Anything else about Dr. Garcia?
19     A.     That's all I can testify to.
20     Q.     Then you identify Alexandros
21  Polydorides. Who is Dr. Polydorides?
22     A.     He is yet another attending
23  pathologist who I worked with. There was some
24  question about me working on a case of his that
25  was, you know, being managed and how it was being

915

Varughese

1
2  managed, but I sent out all the cases with him in
3  December 2010 without any sort of incident.
4           We did not even have to follow up on a
5  lot of cases. Everything was signed out
6  appropriately. All the cases were managed
7  appropriately. I'm sure he can testify to that.
8     Q.     Who is Shabnam Jaffer? Who is
9  Dr. Jaffer?
10     A.     She's also another attending
11  pathologist there who primarily specializes in
12  cytopathology and breast pathology.
13     Q.     And what do you believe Dr. Jaffer
14  knows about your job performance?
15     A.     I mean, I've worked with her over the
16  years and she knows I'm capable and I've done my
17  work and she's never had any problems with me.
18  She's never complained about a single patient care
19  case that I've worked on.
20     Q.     Who is Irini Scordi-Bello?
21     A.     She's another attending pathologist.
22  She used to work there. She currently works with
23  the medical examiner's office in New York City and
24  she has knowledge of, you know, my work, my work
25  ethic when I was -- I was on autopsy, worked on

916

Varughese

1  autopsy with her, the autopsy rotation in January
2  of 2011 and I also worked on surgical pathology
3  with her. She also used to do breast pathology at
4  Mount Sinai Medical Center, and we always, you
5  know, like, I mean, we sent out all our cases.
6  I'm sure she can testify that I haven't mismanaged
7  any of her cases.
8      Q.   And who is Anatoly Leytin?
9      A.   He is another attending pathologist,
10  but he works at the Elmhurst Hospital and he, um,
11  I was on Elmhurst rotation. He had actually told
12  me that I was doing very well, but then there was
13  some evaluation submitted at some point that
14  basically stated that I didn't do well on his
15  rotation.
16      Q.   An evaluation submitted by who? By
17  Dr. Leytin?
18      A.   Yes, which was contrary to what he had
19  informed me when I was at the hospital. And then
20  it was also contrary to what I was told by
21  Dr. Lento on March 10 or 11 or something of 2011.
22  And Dr. Lento had told me that I was doing very
23  well, I had done very well at the Elmhurst
24  rotation. All the attendings had told him,
25

917

Varughese

1  because he had inquired as to how I was doing
2  while I was at Elmhurst, and they had told him
3  that I was doing very well.
4      They were satisfied with my work and
5  they weren't getting complaints. That's what
6  Dr. Lento told me. And Dr. Leytin had also said
7  the same thing to me when I was there, and I was
8  working with him for a month. I think he was off
9  for like a week or something when I was there.
10     I mean, he wanted me to go to all his,
11  like, conferences. He was doing several
12  presentations for I guess grand rounds or whatever
13  at the hospital. And he wanted me to go to all of
14  them and I had been to all the conferences and
15  stuff. And he had told me that I had done very
16  well, and then he submitted an evaluation in
17  December of 2011 after I was fired saying that I
18  was, you know, it wasn't a good evaluation. It
19  was actually very negative.
20     Q.   And did Dr. Nagi ever submit a written
21  evaluation of you?
22     A.   Dr. Nagi? No, he has not submitted
23  it.
24     Q.   Did Dr. Ward ever submit a written

918

Varughese

1  evaluation of you?
2      A.   No, Dr. Ward never did either.
3      Q.   Dr. Beasley?
4      A.   Yes, Dr. Beasley did.
5      Q.   Written evaluation?
6      A.   Yes.
7      Q.   Dr. Garcia?
8      A.   Yes.
9      Q.   Dr. Polydorides?
10     A.   No, I don't think he had.
11     Q.   And Dr. Jaffer?
12     A.   Dr. Jaffer had, yes.
13     Q.   And were those evaluations positive?
14     A.   Yes, they were positive.
15     Q.   And you had seen them.
16     A.   Right, I had seen them because they
17  were submitted and I can review them. I mean, I
18  personally, you know, like a critical comment to
19  me is not overly negative. You know, especially
20  in a residency, because it is an opportunity to
21  really learn and train over the years.
22     So, I mean, even if they said
23  something, they had said that you had to improve
24  certain elements of your diagnostics or whatever
25

919

Varughese

1  in an evaluation, I just thought that I should
2  work on those points, and I had if they submitted
3  any comments.
4      Q.   Did Dr. Scordi-Bello submit written
5  evaluation of you?
6      A.   Yes.
7      Q.   And you saw that evaluation?
8      A.   Yes.
9      Q.   Was it positive?
10     A.   Yes.
11     Q.   And Dr. Leytin submitted a negative
12  evaluation of you. Did anyone ever tell you or
13  did you ever ask anybody why Dr. Leytin submitted
14  a negative evaluation after you were told that you
15  were doing well?
16     A.   Right. I don't know why he submitted
17  that. I was concerned about it. Because I mean I
18  was already fired at that time, and so I don't
19  know why he would submit something negative about
20  me after I was already fired.
21     Q.   Who is Dr. -- who is James Strauchen?
22     A.   Strauchen? He's a former program
23  director.
24     Q.   Before Dr. Lento?

920

Varughese

2  **A.**   Right.
3  **Q.**   And what knowledge do you believe
4  Dr. Strauchen has about your complaint about
5  Dr. McCash other than what you've already
6  testified to?
7  **A.**   Well, I think he just has knowledge of
8  what I testified to already.
9  **Q.**   And Yvelisse Suarez, who is
10  Dr. Suarez?
11  **A.**   She was a resident there.
12  **Q.**   You say "Dr. Suarez has knowledge of
13  covered issues of the GI rotation."
14       So other than what you have already
15  testified to on that topic, what knowledge does
16  Dr. Suarez have or do you believe she has about
17  coverage issues on the GI rotation?
18  **A.**   Yeah, I think I already testified to
19  that.
20  **Q.**   OK. Who is Noam Harpaz?
21  **A.**   He is an attending pathologist, GI
22  pathologist there.
23  **Q.**   You say that "Dr. Harpaz has knowledge
24  of plaintiff's termination."
25       Other than what you've already

*Computer Reporting NYC Inc.*
*(212) 986-1344*

921

Varughese

2  testified to, what knowledge do you believe
3  Dr. Harpaz has about your termination?
4  **A.**   Dr. Harpaz, I think he, I mean, I
5  think he knew that they made a decision before
6  Wednesday. I think he was informed like Tuesday
7  or something that I was going to be terminated
8  from the program.
9  **Q.**   Why do you believe that Dr. Harpaz was
10  informed prior to Wednesday that the decision had
11  been made to terminate you?
12  **A.**   Because I was at this conference on
13  Wednesday morning, September 21st, the day I was
14  fired and he came upstairs and he, you know,
15  stared at me and then he left. And I was
16  wondering what he was doing.
17       But then again, this occurred all the
18  time at Mount Sinai Medical Center where Dr. Firpo
19  would stop at my desk at all hours of the day and
20  not tell anyone what he was doing at my desk.
21  **Q.**   So going back to Dr. Harpaz, any other
22  reason you think that Dr. Harpaz knew about on
23  Tuesday of the decision to terminate?
24  **A.**   Well, I'm assuming that he knew.
25       MR. McEVOY: So it is now 4:28.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

922

Varughese

2  Right? You agree with me?
3       MR. WRONKO: I do.
4       MR. McEVOY: So we have to this point
5  to accommodate Mr. Wronko's travel agreed
6  stop at 4:30. So I will continue to
7  accommodate Mr. Wronko and we will stop.
8       And I guess we will address the issue
9  about the continuation of Dr. Varughese's
10  deposition on Thursday.
11       MR. WRONKO: OK.
12       (Time noted: 4:30 p.m.)
13
14  _____
15       LEENA VARUGHESE
16
17  Subscribed and sworn to before me
18  this ____ day of _____, 2013.
19
20  _____
21
22
23
24
25

*Computer Reporting NYC Inc.*
*(212) 986-1344*

923

2       C E R T I F I C A T E
3  STATE OF NEW YORK   )
4              : ss.
5  COUNTY OF SUFFOLK   )
6
7       I, THOMAS R. NICHOLS, a Notary Public
8  within and for the State of New York, do
9  hereby certify:
10       That LEENA VARUGHESE, the witness
11  whose deposition is hereinbefore set forth,
12  was previously duly sworn and that such
13  deposition is a true record of the testimony
14  given by the witness.
15       I further certify that I am not
16  related to any of the parties to this action
17  by blood or marriage, and that I am in no way
18  interested in the outcome of this matter.
19       IN WITNESS WHEREOF, I have hereunto
20  set my hand this 23rd day of July, 2013.
21
22  _____
23       THOMAS R. NICHOLS
24
25

*Computer Reporting NYC Inc.*
*(212) 986-1344*

Errata sheet

Subject: Transcript of day #4 of deposition of plaintiff, Dr. Leena Varughese, which was conducted on July 8, 2013

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 696 | 25 | Correct "or…" to "but people were drinking at work while involved in patient care." |
| 697 | 20 | Change "McClosevich" to "Mikulosovich" |
| 698 | 20 | Correct "my" to "the" |
| 698 | 25 | Correct "director" to "associate" |
| 705 | 21 | Correct ". It's" to "-" |
| 705 | 22 | Correct "." to "and" |
| 706 | 3 -7 | Correct "and report him to somebody who, like Dr. Bleiweiss who I reported him to, reporting McCash to Dr. Bleiweiss in that same, you know, moment essentially within a few moments of that time I reported to him." to "I reported the harassment of Dr. McCash to Dr. Bleiweiss immediately following the attack against me in the grossing room and I asked Dr. Bleiweiss to intervene." |
| 706 | 12 | Correct ", but he wasn't there. He was on vacation or whatever it was." to "." |
| 706 | 14 | Correct "him" to "Dr. Bleiweiss" |
| 706 | 13 | Correct "him" to "Dr. Lento" |
| 706 | 19 | Correct "," to "on" |
| 709 | 4 | Correct "there" to "in pathology and she" |
| 709 | 23 | Insert "," before "as well" |
| 709 | 24 | Correct "The same, you know, as well as like other people." to "in the same way as other coworker physician residents did their work." |
| 717 | 2 | Correct "all substantiated" to "unsubstantiated" |

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 718 | 9 | Correct "this" to "their" |
| 719 | 6 | Correct "was talking about" to "was" |
| 719 | 20 | Insert "-" after "to me" |
| 720 | 20 | Correct "Zheng" to "Zhang" |
| 721 | 16 | Correct "Zheng" to "Zhang" |
| 722 | 13 | Correct "Zheng" to "Zhang" |
| 722 | 15 | Correct "Zheng" to "Zhang" |
| 723 | 11 | Correct "Zheng" to "Zhang" |
| 723 | 12 | Correct "Zheng" to "Zhang" |
| 723 | 22 | Delete "even really" |
| 726 | 10 | Correct "And then when, um, then on July 14th when he gave me the letter he had alleged that he had informed that I can get some sort of , you know, I can go into the, I guess the committee." to "On July 14th, I was given a letter in sealed envelope around 8:30 am, without any explanation of the contents of the letter or consequences of the contents of the letter." |
| 726 | 17 | Correct "He said I can use the committee." to "He falsely stated to the house staff affairs committee that he had informed me verbally of my right to appeal." |
| 726 | 22 | Correct ", and so on." to ". During this meeting, I also asked him why he did not produce the letter at the Veteran Administrative Affairs Hospital the previous day (July 13th) and he said that he wanted to see if there were developments that would bring it all the more together, which meant that he showed up at the VA to fish for information to use against me." |

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 728 | 21 | Correct "Because, I mean, he seemed like I don't know. Like he was just not very, like, I mean, he doesn't -- he seemed pretty cool as to what my work was and what I was doing. And, I menan, not cool, but he didn't seem very educated about a lot of aspects of medical residency." to "Dr. Cordon-Cardo appeared generally uneducated and uninformed about what my work was and what I was doing, especially about aspects of the pathology residency." |
| 729 | 10 | Correct "Like he was basically stipulating that these" to "He stipulated" |
| 732 | 19 | Correct "So I was not on that particular, you know, so it would accomodate my request" to "So the change in schedule was acceptable to the rotation supervisors and myself." |
| 733 | 23 | Correct "should be" to "should not be" |
| 734 | 6 | Correct "is" to "were" |
| 735 | 8 | Correct "extremely," to "an extremely" |
| 735 | 22-23 | Correct "Like, I can't, that's retaliatory" to "That both retaliation and discrimination against me." |
| 736 | 10-13 | Delete the sentences, misspoke due to fatigue. |
| 741 | 13 | Correct "on one end" to ", Dr. Bleweiss" |
| 741 | 14-15 | Correct "who was doing -- but I'am on a different rotation," to "that I was working with" |
| 744 | 21 | Correct "by told" to "told by" |
| 748 | 4 | Correct to "protective" to "protected" |
| 748 | 7-8 | Correct "was sort of something where my white colleagues were being incriminated" to "was incriminating to my white colleagues" |
| 748 | 9 | Correct "treat me" to "threaten my future." |
| 752 | 22 | Correct "protective" to "protected" |

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 756 | 18 | Correct "I can -- initially he had informed me that, you know, I'm going to at work and I'm not going to beout until -- I'm going ot be taking off from work until -- I was going to inform him and that was the initial understanding." to "I should be at work ." |
| 757 | 8 | Correct "to" to "for" |
| 758 | 21 | Correct "should" to "should not" |
| 758 | 23 | Correct "my" to "her" |
| 759 | 24 | Delete "or I should be requested that I not show up to work." |
| 760 | 21 | Correct "schedule, " to "schedule and" |
| 762 | 20 | Correct "of, and for violating various policies, they were not, you know, McCash and Jordan were not disciplined and I was being disciplined." to "of violating various policies. There were not, McCash and jOrdan were not disciplined and I was being disciplined." |
| 766 | 17 | Correct "Dickinson" to "Dikman" |
| 766 | 21 | Correct "it wasn't medical students --" to "I didn't say that." |
| 766 | 24 | Delete ", would be offended." |
| 771 | 19 | Correct "has something" to "has everything" |
| 772 | 12 | Delete "something to do" |
| 777 | 4 | Correct "for" to "supporting" |
| 777 | 9 | Insert "regarding" after "concerns" |
| 777 | 14 | Correct "permanent" to "program" |
| 780 | 16 | Correct "Stop being a threat." to "Talmud says stop being a threat." |
| 800 | 9 | Insert "that" after "aggression" |
| 801 | 12 | Correct "like, you know." to "relationship." |
| 805 | 16 | Correct "in" to "on" |
| 806 | 14 | Correct "cases," to "cases were ordered," |

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 807 | 4 | Correct "flow cytometry" to "patient cases." |
| 820 | 3 | Correct "know what cases were," to "knew what cases that" |
| 821 | 15 | Insert "the slides" before "," |
| 822 | 3 | Correct "and not" to "and slides" |
| 825 | 13 | Correct "was" to "were" |
| 833 | 4 | Correct "issues" to "issue" |
| 837 | 22 | Correct "are" to "were" |
| 837 | 23 | Correct "are" to "were" |
| 838 | 11 | Correct "me --" to "my rotations." |
| 838 | 13-14 | Correct ". Not of --" to "," |
| 841 | 12 | Correct "Ms." to "Dr." |
| 844 | 9 | Correct "see" to "saw" |
| 844 | 14 | Correct "Grenowe" to "Guarino" |
| 846 | 24 | Correct "I" to "it" |
| 849 | 20 | Delete "OK, so, why do they say that?" |
| 851 | 19-20 | Correct ", at least like half of the rationale for that." to "over the past 3 days of deposition and to the hospital leadership and human resources in December 2010." |
| 851 | 25 | Correct "labs" to "lapse" |
| 852 | 10-11 | Correct "that was a coworker who did that." to "there were coworkers who did that." |
| 852 | 11 | Correct "was" to "were" |
| 854 | 24 | Correct "Smothers" to "Smethurst" |
| 855 | 2 | Correct "Zheng" to "Zhang" |
| 859 | 6 | Insert "lapse" before "." |
| 869 | 15 | Correct "Blaisero" to "Glezerov" |

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 875 | 19 | Correct "Fersch" to "Fersh" |
| 882 | 8 | Correct "McDonald" to "MacDonald" |
| 882 | 15 | Correct "McDonald" to "MacDonald" |
| 882 | 19 | Correct "McDonald" to "MacDonald" |
| 883 | 11 | Correct "McDonald" to "MacDonald" |
| 883 | 20 | Correct "McDonald" to "MacDonald" |
| 884 | 23 | Correct "McDonald" to "MacDonald" |
| 885 | 3 | Correct "McDonald" to "MacDonald" |
| 890 | 10 | Correct "of" to "or" |
| 890 | 11 | Correct "labs" to "lapse" |
| 890 | 17 | Correct "Grooms" to "Grunes" |
| 890 | 19 | Correct "Grooms" to "Grunes" |
| 890 | 23 | Correct "Grooms" to "Grunes" |
| 894 | 3-6 | Correct "And he was concerned that Dr. Firpo was overstepping his boundaries as a board certifies hematopathologist, how he should evaluate me and conduct his work." to "Dr. Petersen was concerned that Dr. Fipro was overstepping his boundaries to tell Dr. Petersen how Dr. Petersen should evaluate me." |
| 915 | 2 | Correct "sent" to "signed" |
| 916 | 6 | Correct "sent" to "signed" |
| | | |
| | | |

925

```
 1
 2     UNITED STATES DISTRICT COURT
 3     SOUTHERN DISTRICT OF NEW YORK
 4     ------------------------------X
 5     LEENA VARUGHESE, M.D.,
 6                 Plaintiff,
 7           vs.            12 Civ. 8812(CM)
 8     MOUNT SINAI MEDICAL CENTER,
       PATRICK LENTO, M.D., CARLOS
 9     CORDON-CARDO, M.D., ADOLFO
       FIRPO, M.D., IRA J. BLEIWEISS,
10     M.D. and ABC CORP. 1-10, and
       JOHN DOES 1-10,
11
                 Defendants.
12     ------------------------------X
13
14
15                 August 7, 2013
16                 10:01 a.m.
17                 Volume V
18
19           Continued deposition of LEENA
20     VARUGHESE, held at the offices of Edwards
21     Wildman Palmer LLP, 750 Lexington Avenue, New
22     York, New York, pursuant to Notice, before
23     Thomas R. Nichols, a Registered Professional
24     Reporter and a Notary Public of the State of
25     New York.
```

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

926

```
 1
 2     A P P E A R A N C E S :
 3
 4     LAW OFFICES OF RONALD J. WRONKO, LLC
 5     Attorneys for Plaintiff
 6           134 Columbia Turnpike
 7           Florham Park, New Jersey 07932
 8     BY:   RONALD J. WRONKO, ESQ.
 9
10     EDWARDS WILDMAN PALMER LLP
11     Attorneys for Defendants
12           750 Lexington Avenue
13           New York, New York 10022
14     BY:   RORY J. McEVOY, ESQ.
15           JULIE L. SAUER, ESQ.
16
17     ALSO PRESENT:
18     RAJIT MALLIAH
19
20
21
22
24
25
```

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

927

```
 1                    Varughese
 2     L E E N A   V A R U G H E S E, called as a
 3        witness, having been duly sworn by a Notary
 4        Public, resumed as a witness, was examined
 5        and testified further as follows:
 6     EXAMINATION BY (CONT'D.)
 7     MR. McEVOY:
 8        Q.    So Dr. Varughese, to ask the question
 9     I always ask, are you taking any medication,
10     consumed any drugs or alcohol that will impair
11     your ability to answer the questions that I'm
12     going to ask you today?
13        A.    Well, I did take Benadryl last night
14     for my allergies and I did take something for
15     gastritis as well.
16        Q.    Does either of the things you took
17     affect your memory or --
18        A.    Well, the Benadryl does.  The Benadryl
19     may have some effect.  It makes you tired and
20     groggy.  But I took it last night.  It should have
21     worn off by now.
22        Q.    OK, good.  So Dr. Varughese, I show
23     you a document that has previously been marked as
24     Defendants' Exhibit Number 4.  It is the
25     resident's contract that you signed in March of
```

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

928

```
 1                    Varughese
 2     2011.
 3              Just confirm for me, if you would,
 4     that that in fact is your resident's contract for
 5     the PGY year 7/1/2011 to 6/30/2012.
 6        A.    Yes.
 7        Q.    Yes?
 8        A.    Yes.
 9        Q.    If you look at paragraph 12, which is
10     on page -- the Bates stamp number P-997.  Do you
11     see that?
12        A.    What is it?
13        Q.    Paragraph 12?
14        A.    Right.
15              MR. WRONKO:  He is referring to the
16     bottom page which is 997.  Go to the next
17     page.  There it is.  See paragraph 12.
18        A.    OK.
19        Q.    It says: "The parties have entered
20     this Agreement in good faith and acknowledge their
21     respective ethical and legal obligations to
22     fulfill this Agreement until its expiration date.
23     This Agreement may be terminated and other
24     disciplinary action may be imposed in accordance
25     with the House Staff Manual.  The policies and
```

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

929

Varughese

1
2 procedures concerning disciplinary actions,
3 hearings and appeals are as outlined in the House
4 Staff Manual."
5        Do you see that?  And then it says
6 "see pages 29 to 31."
7    A.   Correct.
8    Q.   I'll show you another document.
9        MR. McEVOY:  Mark this as Defendants'
10 Exhibit 60.
11        (Defendants' Exhibit 60, document
12 entitled "House Staff Manual," marked for
13 identification, this date.)
14   Q.   Dr. Varughese, do you recognize the
15 document that was given to you?
16   A.   Yes.
17   Q.   Can you tell me what it is?
18   A.   It's pages 20, the -- I guess -- what
19 is it?  Table of contents and pages 29 to 33 of
20 the house staff manual.
21   Q.   On page 29 there is a section near the
22 bottom of the page entitled "Disciplinary Action."
23        Do you see that?
24   A.   Yes.
25   Q.   Then there's a Roman numeral I that

931

Varughese

1
2 are a threat to the welfare or safety of patients,
3 employees, other physicians, or the hospital" and
4 E says "Falsifies any Mount Sinai document, or
5 falsifies or misrepresents prior training or
6 educational experience."
7        That's what C, D and E say, correct?
8    A.   That's what it says.
9    Q.   OK.  Now, if you go to page 33, which
10 talks about job retention, right?  Underneath that
11 there is, again, a Roman numeral I and that says:
12        "A House Staff Officer may be
13 terminated from his or her residency program for
14 failure to abide by the By-laws, Rules and
15 Regulations, or policies of the Medical Center or
16 of the medical staff, for falsification of any
17 Medical Center document; for any activity that may
18 threaten the safety or welfare of a patient,
19 employee, or other physician; or for any action
20 that may be detrimental to Medical Center
21 operations.
22        "As stated above in 'Disciplinary
23 Action,' that's in quotes, a House Staff Officer
24 may be disciplined up to, and including
25 termination of his or her residency program for

930

Varughese

1
2 says: "Disciplinary action: The Program
3 Director, the Department Chair, the President of
4 the Mount Sinai Hospital or the Medical Director
5 of the Mount Sinai Hospital of Queens may take
6 disciplinary action, including termination for
7 cause, against any House Staff Officer who:
8        "A. Fails to demonstrate an
9 acceptable level of professional competence,
10 clinical judgment in the treatment of patients, or
11 professionalism."
12        Do you see that?
13   A.   Yes.
14   Q.   And then if you turn the page, it
15 enumerates four other bases on which disciplinary
16 action can be imposed.
17        B talks about professional misconduct.
18   A.   It says "Commits an act that
19 constitutes professional misconduct under the
20 New York State Education Law or breach of
21 professional ethics."
22   Q.   Correct.  C says "Fails to abide by
23 the By-laws, Rules and Regulations or policies of
24 the hospital or the Medical Staff."
25        D says "Engages in any activities that

932

Varughese

1
2 failure to abide by the House Staff Manual,
3 By-laws, Rules and Regulations, or policies of the
4 Medical Center; for falsification of any medical
5 center document; any conduct that may threaten the
6 safety or welfare of a patient, employee, other
7 physician, or visitor; or any other conduct that
8 may be detrimental to Medical Center Operations."
9        Did I read that correctly?
10   A.   Yes, and it's part II that you have
11 not read.
12   Q.   "II.  Mount Sinai will notify each
13 affected House Staff Officer immediately:
14        "A. Of a decision to discontinue any
15 training program for any reason; and/or.
16        "B. Upon receipt from the
17 Accreditation Council for Graduate Medical
18 Education or the Commission on Dental
19 Accreditation of any notification regarding
20 non-accreditation or probationary status of any
21 training program."
22        That's what 2-A and B say, correct?
23   A.   Right.
24   Q.   Now, in your complaint, and I'm
25 talking about your breach of contract claim at the

933

Varughese

1 moment, you allege that, in paragraph 14, "In each
2 of her years as an employee, Dr. Varughese and the
3 Hospital were parties to an ACGME Resident
4 employment contract (the 'Contract') governing
5 their relationship. The Contract incorporated by
6 reference the Mount Sinai Medical Center house
7 Staff Manual including a section entitled, 'job
8 retention.'"
9          Paragraph 15 says, "Through her date
10 of termination, Dr. Varughese did not commit any
11 acts defined under the 'Job Retention' section for
12 her to have been suspended or terminated from her
13 position in the pathology residency program.
14 Dr. Varughese's contracted employment to Mount
15 Sinai Medical Center could be terminated only if
16 the 'house staff' failed to abide by the By-laws,
17 Rules and Regulations, or policies of the Hospital
18 or of the medical staff, falsified a Hospital
19 document, threatened the safety or welfare of a
20 patient, employee or other physician or for any
21 action that may be detrimental to the Hospital
22 operations."
23          That's what those two paragraphs say.
24          So Dr. Varughese, I'm just trying to
25
          Computer Reporting NYC Inc.
          (212) 986-1344

934

Varughese

1 understand, is the basis for your claim that Mount
2 Sinai breached its resident's contract with you
3 that the house staff manual provision dealing with
4 job retention, you did not in your view commit any
5 of the acts that are enumerated in that section?
6 You can look at it again obviously.
7      A.   No.
8      Q.   I'm sorry, no, you did not commit any
9 of those acts?
10     A.   No, I did not.
11     Q.   And the house staff manual also
12 contains obviously the section on disciplinary
13 action that we looked at.
14     A.   Right.
15     Q.   And that also is incorporated into the
16 contract, correct?
17     A.   Right.
18     Q.   And the job retention section makes
19 specific reference to the disciplinary action
20 section.
21     A.   Right.
22     Q.   Is there any other provision of either
23 the resident's contract or the house staff manual
24 that you believe was breached by Mount Sinai other
25
          Computer Reporting NYC Inc.
          (212) 986-1344

935

Varughese

1 than the job retention provision that you refer to
2 in the complaint?
3      A.   Yes. I believe that the hospital
4 breached its responsibility to me to provide
5 references and allowed me to move on with my
6 career in terms of acting in good faith with the
7 work that I had completed absolutely
8 satisfactorily for three years.
9      Q.   So you have the contract.
10     A.   Sure, I have the contract right here.
11 In fact, I will point out which one I'm speaking
12 of in a second.
13     Q.   Please. Take your time.
14     A.   This is page 996, paragraph 9. It
15 says here: "If a training program is discontinued
16 his or her program director will assist the house
17 staff officer in obtaining placement in another
18 approved program."
19     Q.   Sorry, what are you reading from?
20     A.   Page 996, paragraph 9.
21     Q.   I'm not deaf, doctor. Go ahead.
22     A.   It says, the last sentence of
23 paragraph .9 or paragraph 9 states: "If a
24 training program is discontinued his or her
25
          Computer Reporting NYC Inc.
          (212) 986-1344

936

Varughese

1 program director will assist the house staff
2 officer in obtaining placement in another approved
3 program."
4          Then it also says: "House staff
5 officers will be notified in writing at least four
6 months before their expiration of their employment
7 if their contracts are not to be renewed for the
8 next year of a given residency program or if they
9 will not be approved for the next postgraduate
10 year of training."
11         They didn't give me my contract for my
12 final year of residency until the end of March.
13 They should have, you know, if they did not want
14 me to be in that program any more, which they
15 really did not, and they were constantly harassing
16 me every day when I was at work, they did not
17 indicate to me that they were not interested in me
18 being there, I could have sought out another
19 residency program elsewhere. They really did not
20 want me to complete my residency there.
21         Instead of constantly creating
22 pretextual reasons and harassing me at work every
23 day, I could have gone to another residency
24 program. There were plenty of programs that are
25
          Computer Reporting NYC Inc.
          (212) 986-1344

937

Varughese

1  willing to accept me as a resident there.  So this
2  is a breach of contract and breach of good faith
3  and fair dealing.
4       Q.   So the contract was signed by you on
5  March 24th, correct?
6       A.   Right.  And I understand it says here
7  that if the training program is discontinued,
8  which may mean the program is shut down, but in my
9  opinion, you know, my training program was
10  discontinued for me abruptly because I was
11  pretextually terminated from the residency program
12  where I did all of my work without any problem.
13  There was no performance issues.  Even you had
14  stated that at the -- recently even to
15  Judge Francis.  So....
16       Q.   Dr. Varughese, you understand, don't
17  you, that the sentence "if a training program is
18  discontinued," it doesn't mean if an individual
19  resident is terminated.  It means if the program
20  is shut down, to use your expression.
21       MR. WRONKO:  Form objection.
22       A.   Yes, but it also means that if I'm not
23  working there anymore and they decide to fire me,
24  they have a duty to provide appropriate references

*Computer Reporting NYC Inc.*
*(212) 986-1344*

938

Varughese

1  that's in keeping with my work record.
2       Q.   Is there --
3       A.   Not something that is arbitrarily and
4  pretextually made up to prevent me from obtaining
5  employment anywhere else and practice going
6  forward.
7       Q.   Is there anything in this contract
8  that talks about the obligation on the part of the
9  hospital to provide you with references?
10       A.   Well, you know, I have not, you know,
11  been able -- I didn't read it right now, so I
12  cannot tell you, answer that question at the
13  moment.
14       Q.   And you signed the contract on
15  March 24th, right?  Last page, Dr. Varughese.
16       A.   Right.  At the end of --
17       Q.   When did you get it?
18       A.   I got it at that time.
19       Q.   So that --
20       A.   They didn't provide me with this
21  contract till after March 1st.
22       Q.   So any other provisions of the
23  resident's contract that you believe were breached
24  by Mount Sinai?  And if you want to take five

*Computer Reporting NYC Inc.*
*(212) 986-1344*

939

Varughese

1  minutes to read the agreement, be my guest, or ten
2  minutes.
3       A.   Yes, I would like to take five minutes
4  to read the contract.
5       Q.   Be my guest.
6       MR. McEVOY:  Why don't we take a five-
7  or ten-minute break so Dr. Varughese can do
8  that.
9       (A recess was taken from 10:16 a.m. to
10  10:22 a.m.)
11       A.   All right.
12       Q.   Have you had a chance to read it?
13       A.   Yes.
14       Q.   Any other provisions of the resident's
15  contract that you believe the hospital breached?
16       A.   Yes.
17       Q.   What are those?
18       A.   For instance, Bates number 992, it
19  says: "The house staff officer agrees to comply
20  faithfully with and be subject to the policies,
21  rules and regulations of the hospital and the
22  Mount Sinai School of Medicine of New York
23  University, (hereinafter 'Mount Sinai').  These
24  include, but are not limited to, the policies

*Computer Reporting NYC Inc.*
*(212) 986-1344*

940

Varughese

1  found in the house staff manual which maybe
2  changed from time to time.  The house staff
3  officer also agrees to accept the following
4  responsibilities."  And it lists from A to J, I
5  believe.
6       Essentially, this contract is what I'm
7  stipulated to work under.  The department of
8  pathology had changed the stipulations of my
9  contract by instituting new policies that we had
10  to sign under the threat of discipline or
11  termination from the program, which was not from
12  the hospital, the board of trustees.  It was
13  rather from some arbitrarily created provisions,
14  which I don't even know where it came from.
15       And there were five different things
16  that were listed, five different policies that
17  were created, newly created policies, and there
18  was also a variety of other policies in regards to
19  disciplinary action that were newly instituted by
20  the department as well, which are not in keeping
21  with the house staff manual and also not in
22  keeping with this contract.  And that was a beach
23  of my contract to do so.
24       Q.   So when you talk about, I think you

*Computer Reporting NYC Inc.*
*(212) 986-1344*

941

Varughese

1
2   said there were -- was it five policies that you
3   said?
4       A.   Five or six policies. I'm not sure.
5       Q.   Were those the policies that were
6   instituted in I think August of 2011 that we've
7   had testimony about?
8       A.   August 15, 2011 was when it was due
9   and it was instituted at that time. I believe
10  there was a meeting, there was a verbal meeting
11  regarding this policy. I was not at this meeting
12  and I had complained about these things, the
13  institution of these new policies at that time
14  because I found them to be in excess of my
15  contract. And I had voiced my concerns regarding
16  those new policies.
17      And I believe that was a breach of my
18  contract to institute such new policies after
19  the -- after signing this contract and after me
20  having worked there for over three years, for me
21  to be stipulated to new sets of rules that were
22  very well in excess of my understanding of how the
23  department worked, how it had been working in
24  terms of education, in terms of requirements for
25  senior residents. That was all changed that year.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

942

Varughese

1
2   That's not how it worked before.
3       I thought that was a breach of my
4   contract in terms of adherence to ACGME
5   institutional and program requirements, which is
6   also on Bates page number 992, part two. That's
7   point I. And it says -- I believe the hospital
8   breached that agreement with me when they did not
9   provide me with the adequate educational
10  requirements that I needed to meet my American
11  Board of Pathology board exam.
12      And also they breached -- the program
13  was also cited 19 times or for 19 violations by
14  ACGME as well. And I believe they, you know, that
15  was a breach in terms of good faith and fair
16  dealing, adherence to the contract to what my
17  understanding was was going to be the education
18  that I was going to get there and the training
19  that I was going to get there, because the
20  hospital did not comply with ACGME requirements.
21      Then the hospital -- then in terms of
22  paragraph four, it says here: "House staff
23  officer agrees to abide by Mount Sinai's drug-free
24  workplace policy and statement. Mount Sinai has a
25  written policy of addressing physician impairment,

*Computer Reporting NYC Inc.*
*(212) 986-1344*

943

Varughese

1
2   including impairment due to substance abuse. (See
3   house staff manual page 34 through 36.)"
4       And while I complied with this policy
5   and while McCash and Jordan both did not follow
6   this policy and also Dr. Fowkes who apparently
7   still works there did not follow this policy, they
8   still had their job there and that's a clear
9   breach of contract and there was no punishment for
10  them. There was no discipline for them.
11      In fact, all the discipline or any
12  action that was taken in regards to that has been
13  provided already according to you for discovery.
14  So it's largely concerning that there was no
15  action taken against them even though they clearly
16  breached the contract and I reported them for
17  breaching this particular rule.
18      Q.   I assume you're talking about the
19  drinking on the job.
20      A.   Right, drinking on the job, you know,
21  during work hours and while supervising another
22  resident, by Dr. Jordan, and by Samuel McCash who
23  regularly called for dementia rounds at the
24  hospital. I mean, it's largely concerning.
25      Q.   Any other provisions of your

*Computer Reporting NYC Inc.*
*(212) 986-1344*

944

Varughese

1
2   resident's contract that you believe was breached?
3       A.   Yes, this is paragraph 5, part G. It
4   says here: Leaves of absence (sick leave,
5   personal leave, other leave circumstances. Leaves
6   of absence and effective leave time on the
7   completion of house staff training and/or
8   eligibility for specialty board examinations will
9   be determined by the provisions of the house staff
10  manual currently in effect and the policies and
11  procedures of the hospital and training program.
12      Then it says: While educational leave
13  may be granted, payment for expenses for attending
14  conferences, if any, will be decided by the
15  program director.
16      In terms of my leave, requests for
17  leave of absence, I complied with the house staff
18  manual and the provisions of the hospital and the
19  provisions of the law itself. But I was still,
20  you know, prevented from attending work just for
21  requesting a leave.
22      And there was this fabrication of all
23  this, you know, issues regarding my health, my
24  mental health actually, which was extremely
25  defamatory, which I had no idea was occurring at

*Computer Reporting NYC Inc.*
*(212) 986-1344*

945

Varughese

1 that time until now, and the hospital never
2 approached me regarding any of these issues, did
3 not tell me what was going on, did not tell me
4 people were making these allegations and defaming
5 me, and they were acting on it.
6 That's breach of contract. While I'm
7 following this policy to a T, they're preventing
8 me from being able to follow the policy. That's a
9 breach of contract and a breach of good faith and
10 fair dealing.
11 I'm a professional. I have certain
12 expectations of what is going to take place. I
13 know what the rule is and I know what the law is.
14 I read it and I know what my rights are. And
15 here's the hospital that's intent on breaking the
16 law and breaching my contract while breaking the
17 law.
18 And then there is, um, what is this
19 now? Paragraph 7, part D. It says here that
20 before commencement of the term hereof, the house
21 staff officer shall have sustained no disciplinary
22 action, nor have any pending disciplinary action
23 in connection with any medical training program or
24 have any malpractice action commenced against him
25

*Computer Reporting NYC Inc.*
*(212) 986-1344*

946

Varughese

1 or her as disclosed in writing to the hospital.
2 I believe when I was placed on
3 disciplinary action the reason for me being placed
4 on disciplinary action for the one event that
5 occurred in December 2010 was pretextual. I had
6 met the requirements. I had done everything that
7 I was supposed to do and they still placed me on
8 disciplinary action because it was pretextual and
9 it was meant to harm my career and my future
10 prospects.
11 Because what happens when you're put
12 on disciplinary action? It's something you had to
13 report to the state going forward. It's a mark on
14 your career and your future. It was malicious, it
15 was punitive, it was discriminatory, it was
16 retaliatory and all motivated by racism and
17 sexism.
18 So this was clearly a breach of my
19 contract again. You know, it was a lack of good
20 faith and fair dealing.
21 Then moving on to point, you know,
22 paragraph 8, part C, it says here that he or she
23 has the sole responsibility for guaranteeing
24 compliance with the institutional policies and
25

*Computer Reporting NYC Inc.*
*(212) 986-1344*

947

Varughese

1 procedures governing resident duty hours worked,
2 in compliance with New York State hospital, part
3 405; and with the ACGME common program
4 requirements part 6, semicolon.
5 I complied with everything, but the
6 hospital had requested that we not violate or
7 breach duty hour rules under pressure and under
8 threat, saying that we cannot have a duty hour
9 violation even if we worked and we had to lie
10 about our work hours. The hospital repeatedly
11 said that.
12 And that's a breach of my contract.
13 It's not specific to me because it happened to
14 everybody else and we had group meetings about how
15 we're not allowed to report duty hours honestly.
16 Then we in terms of ACGME common
17 program part 6, I complied with that. That has to
18 do with insuring that as a senior resident I'm
19 allowed to like manage my own duties. The ACGME
20 common contract that I had access to was from when
21 I started my residency, which had said that as a
22 senior resident when you're in your final years of
23 your training you are responsible for your
24 education and overseeing that you meet, you know,
25

*Computer Reporting NYC Inc.*
*(212) 986-1344*

948

Varughese

1 you meet the needed, you know, didactics and
2 training to be able to pass the board exam and
3 practice as an independent physician, which is
4 what I was doing. And I'm being penalized by it
5 by this hospital.
6 Once again, that's a breach of my
7 contract and a breach of good faith and fair
8 dealing.
9 And we already mentioned how I was not
10 given the contract before March 1st of 2011.
11 And then in terms of, wait a second,
12 next paragraph, paragraph 13, it says: Mount
13 Sinai shall comply with comprehensive, fair, and
14 reasonable policies regarding grievance procedures
15 and due process, where applicable. Then it says
16 (see house staff manual pages 13, 29 to 31 and 36
17 to 40.)
18 These policies minimize conflict of
19 interest and adjudication of grievances and
20 include, but are not limited to, grievance
21 procedures and due process for disciplinary
22 actions taken against residents, for resident
23 complaints and grievances related to work
24 environment, sexual and other harassment,
25

*Computer Reporting NYC Inc.*
*(212) 986-1344*

949

Varughese

2 discrimination, and accommodation, of house staff
3 officers with disabilities.
4        I mean, in terms of this particular
5 promise to me, this contract, this was breached.
6 You know, I complained about somebody who was
7 harassing me nonstop and creating a very hostile
8 work environment for me and no action was taken
9 against this individual, and the person who
10 corroborated the evidence was, you know, left out
11 of the discussion and I was continuously harassed.
12 And, you know, they have policies, but they don't
13 follow their policies.
14        This is their house staff manual
15 policy for a variety of things.  It says page 13,
16 29 to 31, 36 to 40.  I read those policies.  I
17 thought those were my rights, and I had the right
18 to bring forward a compliant if something was
19 happening to me that was really obstructing my
20 ability to work and preventing me from my doing my
21 work like anybody else is doing.
22        And guess what?  The hospital did not
23 do anything.  They did not step in and take an
24 action against Samuel McCash.  Instead they took
25 actions again me.  And they allowed McCash to

*Computer Reporting NYC Inc.*
*(212) 986-1344*

950

Varughese

2 defame me, lie about me, make all these false
3 statements without ever asking me, Leena, did you
4 delegate "all your cases" to the moonlighters?
5        McCash says in one e-mail that he
6 delegated all my cases to other people and I
7 didn't do my work, which was completely false.  If
8 Pessin tells me I have looked through the case
9 work, I saw all the work that you did, I know what
10 you did and you didn't do that much work today.
11        I'm like, What are you talking about?
12   Q.   Right now we're talking about the
13 breach of your contract.
14   A.   This is the dialogue.  You know, I'm
15 telling you --
16   Q.   We'll talk about your --
17   A.   Don't interrupt me, OK?  Because I'm
18 trying to tell you like --
19        MR. WRONKO:  You are interrupting her
20 and you're completely misconstruing what she
21 was saying.  She was explaining the
22 rationale for why they didn't follow their
23 policies.  So your interruption isn't
24 appreciated.
25        You can finish your answer.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

951

Varughese

2   Q.   Go ahead.
3   A.   Dr. Pessin did not tell me, she did
4 not ask me, Did you just give all your cases to
5 somebody else to do?  I would have told her I
6 didn't do that.
7        But she took McCash at face value and
8 she believed him even though she can go into the
9 system and she said she looked at the records and
10 she would know that he was telling a lie.  He was
11 a liar.  She would know that, but she still
12 believed him and she took actions against me, not
13 anybody else.
14        How discriminatory like racist, sexist
15 agenda is that?  It is protectionism for the
16 Caucasian white doctor while, you know what?
17 Let's push the Indian woman to the side because we
18 can.  That's clearly a breach of my contract.  I
19 mean, the hospital did not uphold this.
20        You know, Art Figur, he wears many
21 hats, in his own words.  I reported what happened
22 to me to him.  Did he do anything to step in?  No.
23 The hospital did not.  The hospital systematically
24 harassed me and retaliated against me and
25 continued this racist sexist agenda and

*Computer Reporting NYC Inc.*
*(212) 986-1344*

952

Varughese

2 discrimination against me.
3        And then they created all this other
4 stuff going forward that I wasn't even told were
5 problems.  They just made stuff up even though
6 there's testimony from other people saying that,
7 no, Dr. Varughese is not any more absent than
8 anybody else.
9        You know, there's a high degree of
10 people who get ill at work and don't come into
11 work for a variety of reasons.  It wasn't
12 something that had to do with me.  And they, you
13 know, the hospital accuses me of being absent.
14        Then in terms of, you know, they just
15 make up more and more reasons.  I don't know who
16 is responsible there, but it's really concerning
17 as a minority to see what has happened to me.  It
18 really is concerning to me when I know like a lot
19 of minorities who work there.
20   Q.   Any other provision of this contract?
21   A.   Yes, other provisions are here too.
22 Paragraph 16, it says here:  House staff officer
23 shall at all times comply with all applicable
24 federal, state, and local laws, rules and
25 regulations.  In addition, the house staff officer

*Computer Reporting NYC Inc.*
*(212) 986-1344*

953

Varughese

1   shall at all times comply with the policies and
2   procedures of the institution in which -- which
3   such individual is providing services. I did all
4   that. But the hospital I don't think did its fair
5   share in doing that.
6
7           Then it says, paragraph 18, it says
8   again this agreement is complete, is a complete
9   understanding between the parties and may not be
10  changed orally.
11          It is a complete understanding. So
12  why is my contract being changed after my contract
13  is signed? Why is it being changed by the
14  department?
15          There's a board of trustees. Where
16  does it say here? It says here, some paragraph
17  here, that this -- well, this contract used to say
18  that it was written and provided by the board of
19  trustees. But anyway, it may say that somewhere
20  or not in there anymore. But that's besides the
21  point. But the fact is paragraph 18 clearly
22  states this cannot be changed.
23      Q.   Orally.
24      A.   Right. And the thing is a lot of this
25  contract I had disagreements with it and I was

954

Varughese

1   told if I didn't sign the new policies I would be
2   terminated from the program. Like I had no
3   options.
4
5           This is the problem. There is no due
6   process or due diligence and the contract promises
7   due process and due diligence on a variety of
8   issues, but there isn't any. If the department is
9   going to go and change contracts willy-nilly,
10  what's the point of having a contract then?
11      Q.   Is that it? Are those all the
12  provisions in the contract you believe were
13  violated or breached?
14      A.   Well, I do believe those provisions
15  that I have just stated previously have been
16  breached.
17      Q.   So let's go back and talk about those.
18          Paragraph 16, which you just read,
19  that paragraph imposes obligations on you as the
20  house staff officer, correct?
21      A.   Right. And which I complied with. I
22  complied with all applicable federal, state, and
23  local rules, laws, and regulations. I've complied
24  with everything. But when did I come into the
25  hospital with a bottle of Captain Morgan rum and

955

Varughese

1   complete, drink nearly the entire rum at work?
2   And the procedure --
3      Q.   So you complied with paragraph 16,
4   correct?
5      A.   Of course I did. Do you have a point
6   that I'm saying that I did not?
7      Q.   I didn't say that.
8           Paragraph 13, Dr. Varughese, does
9   paragraph 13 anywhere say that the complaint will
10  sort of turn out the way you would like it to?
11  And by that I mean you say that, what I heard you
12  say was that you were unhappy with the fact that
13  after you complained about Dr. McCash no action
14  was taken against him, right?
15          MR. WRONKO: Form objection. What's
16  the question?
17          MR. McEVOY: Would you like it read
18  back? I said, Dr. Varughese was unhappy
19  with the fact that after she complained
20  about Dr. McCash no action was taken against
21  him; is that correct?
22          MR. WRONKO: Form objection. You can
23  answer. It mischaracterizes her testimony,
24  but you can answer.

956

Varughese

1          MR. McEVOY: I think we've heard her
2   say that many times, but whatever.
3      Q.   Go ahead.
4      A.   That's not what I said. This
5   paragraph states that there will be a
6   comprehensive fair reasonable policy regarding
7   grievance procedures and due process where
8   applicable. Then it says minimizes conflicts of
9   interest and adjudication of grievances.
10          That did not happen. I know for a
11  fact Arthur Figur and Melissa Pessin had some sort
12  of, you know, cordial relationship. She sought
13  him out. She didn't go to Barry Stimmel initially
14  because she knew he probably would say, Well,
15  let's look at the facts here. However are we
16  going to proceed on this?
17          She went to Art Figur because she
18  knows that he's going to do what she wants.
19          MR. McEVOY: Mr. Reporter, would you
20  go back and read the answer that
21  Dr. Varughese gave when she identified
22  paragraph 13 as having been violated the
23  first time.
24          (A portion of the record was read.)

957

Varughese

1
2      MR. WRONKO: Mr. McEvoy just told me
3  he has all the time in the world to do this
4  deposition. The first part of this
5  deposition he spent wasting time reading
6  large swaths of documents that we can read
7  for ourselves. Now he's wasting about 15
8  minutes having the reporter go back to try
9  to find a piece of testimony rather than
10  just moving on and questioning the witness
11  or seeking clarification.
12      I'm of course going to make objection
13  to any further continuation of this
14  deposition after today because this is
15  absolutely harassing.
16      MR. McEVOY: Are you done?
17      MR. WRONKO: Yes, I'm done.
18      MR. McEVOY: First of all, first of
19  all, OK? I did not spend 15 minutes reading
20  into the record. The witness actually asked
21  me to read additional portions that I tried
22  to summarize. The witness has read
23  substantial portions into the record.
24      More importantly, OK? the witness is
25  nonresponsive. I understand Mr. Wronko has

*Computer Reporting NYC Inc.*
*(212) 986-1344*

958

Varughese

1
2  a need to protect his witness, but the
3  witness gives long narrative responses to
4  simple straightforward questions.
5      I don't interrupt the witness usually,
6  because quite frankly what's the point of
7  arguing with the witness --
8      MR. WRONKO: You asked how the
9  contract was breached.
10      MR. McEVOY: I didn't interrupt you.
11      MR. WRONKO: That's fine, but you're
12  completely misconstruing the record. You
13  asked how was the contract breached and she
14  answered your question.
15      MR. McEVOY: If you bang your fists on
16  the table one more time we can have a chat
17  with the magistrate.
18      MR. WRONKO: That's fine, counsel.
19      MR. McEVOY: Good, fine. What I said
20  was, since the witness is in my view not
21  responding to the questions, I said to you,
22  I have all the time in the world to complete
23  this deposition.
24      What I mean by that is, I was hoping
25  to finish it within another day or less. If

*Computer Reporting NYC Inc.*
*(212) 986-1344*

959

Varughese

1
2  this is what we're going to do, the
3  deposition, I can take as many days of this
4  deposition as it takes to be completed, and
5  if Mr. Wronko want to raise an objection
6  with Magistrate Judge Francis he is
7  perfectly free to do that.
8      My suggestion is if you want to do
9  that, do it. Be my guest. Would you like
10  to do that now?
11      MR. WRONKO: Do what now?
12      MR. McEVOY: Whatever it is you want
13  to do.
14      MR. WRONKO: I want to move on.
15  That's what I want to do.
16      MR. McEVOY: Good, let's try and do
17  that.
18      THE WITNESS: Oh, I also noticed
19  something else that was breached.
20  BY MR. McEVOY:
21      Q.  Tell me what that is.
22      A.  Paragraph 12 says: The parties have
23  entered into this agreement in good faith and
24  acknowledge their respective ethical and legal
25  obligations to fulfill this agreement until its

*Computer Reporting NYC Inc.*
*(212) 986-1344*

960

Varughese

1
2  expiration date.
3      I believe what had occurred over the
4  course of the year from September 2010 to
5  September 2011 was not in good faith and did not
6  acknowledge their respective ethical and legal
7  obligations to fulfill this agreement until its
8  expiration date.
9      Q.  OK. With regard to paragraph 8-C,
10  Dr. Varughese, you said, I believe, that under the
11  ACGME common program requirements part 6 that as a
12  senior resident you were responsible for your own
13  education; is that right?
14      A.  I'm sorry, which one? Paragraph what?
15      Q.  8-C.
16      A.  8-C. Right. The ACGME common program
17  requirements part 6, it was revised in July of
18  2011. But prior to that I believe it included a
19  part that said that senior residents are
20  responsible for their education and attending
21  conferences. I am not sure exactly how it was
22  worded, but it did stipulate that.
23      But that, the ACGME requirement was
24  changed at some point. I didn't realize it had
25  been changed until July or something, you know,

*Computer Reporting NYC Inc.*
*(212) 986-1344*

961

Varughese

1  like until later on when I looked at the ACGME
2  program requirements.
3     Q.    What was your understanding of being
4  responsible for your own education?
5     A.    Well, in terms of the didactic
6  conferences that the pathology department used to
7  have on Mondays to Thursdays really, at 8 a.m.,
8  since I have been there for three years and I
9  completed all my work satisfactorily, I actually
10 went to all those conferences, and every year it's
11 the same conference. They don't change it much.
12 In fact, it's the same PowerPoint presentation
13 that gets presented over and over again year after
14 year.
15     By my third year -- by my fourth year
16 actually I had went through all the presentations.
17 I already knew what everything was, and my
18 education in terms of as a developing professional
19 required that I attend other conferences such as
20 tumor boards, multidisciplinary conferences, a
21 variety of other like more advanced surgical
22 pathology conferences.
23     That's my understanding and that's
24 what I thought I was supposed to do. That's what

962

Varughese

1  I had seen people before me do in terms of, let's
2  see, people who had graduated prior, like Claudia
3  Reck Warren (phon), these are people who I know
4  had graduated from the program. This is what they
5  did. And Christine Moung. Who else was there?
6     Mark Smothers. If he wasn't
7  presenting a conference, he rarely attended a
8  conference in his fourth year. Yes, first, second
9  and third year they did attend them, but fourth
10 year they did not really attend any of these
11 conferences.
12     Lanjing Zheng, even him, he did not
13 attend the conferences when he was a fourth year
14 resident. He had stuff going on. He was living
15 in western New Jersey and he rarely ever attended
16 didactics as a fourth year resident.
17     This applies to everybody else too.
18 Like Edward Trevino, the year before, he rarely
19 attended pathology conferences.
20     I mean, I think this kind of applies
21 to like across the board with people.
22     Q.    Who told you not to report your duty
23 hours honestly?
24     A.    This was my first and second year

963

Varughese

1  mostly. And third and fourth year it was just
2  sort of e-mails from Allene Carter. But before
3  that John Fallon. He had said not to report duty
4  hours honestly. And Allene Carter also, she was
5  program coordinator at that time, and she said do
6  not report duty hours honestly because there's
7  some sort of major fine from the state if there's
8  a violation of the 80-hour rule.
9     We were told that we can stay and do
10 the work, but we are not supposed to talk about,
11 report it, and if we did need time to, like more
12 time to do our work because of all the
13 disorganization and issues within the department,
14 we were told not to report that or come to work
15 unprepared.
16     Q.    Who is John Fallon?
17     A.    John Fallon is, um, he used to work at
18 Mount Sinai Medical Center. He is best friends
19 with Allen Schiller and he's another pathologist.
20     Q.    You said that when the new policies
21 were implemented on August 15, 2011 you complained
22 about them. Who did you complain to?
23     A.    While I worked at the graduate medical
24 education office, Dr. Barnett and Paul Johnson.

964

Varughese

1     Q.    I thought you also said,
2  Dr. Varughese, in addition to the policies, those
3  five policies, there was also a change in
4  disciplinary policy. Did you say that?
5     A.    Yes. Right.
6     Q.    What was that change?
7     A.    Right. The disciplinary policy, I
8  believe the chief residents were given now
9  authority to discipline coworkers. I mean,
10 they're not supervisors by any means of the word.
11 Essentially they are given some administrative
12 duties to e-mail and make schedules to some
13 degree, and they're supposed to step in for
14 certain types of situations, but they are not my
15 supervisors.
16     For instance, Adrienne Jordan is, you
17 know, she was a junior when I was -- in my fourth
18 year she was a PGY-3 year. I mean, for her to
19 discipline me it seems ludicrous on its face,
20 because she's a junior resident. She's not my
21 supervisor. She does not have any better
22 understanding of pathology or medicine than I do.
23     But to give that kind of ability to a
24 junior resident or even a coworker seems sort of

965

Varughese

1
2  in excess of my contract and not in keeping with
3  medicine and medical hierarchy that was so touted
4  by Scott Barnett.
5       Q.   And what's the basis for your belief
6  that the disciplinary policies changed to permit
7  chief residents to discipline other residents?
8       A.   Excuse me?
9       Q.   You said that you thought the
10 disciplinary policy was changed so that chief
11 residents had authority to discipline other
12 residents, right?
13      A.   Right.  I think that's what that
14 policy --
15      Q.   I'm sorry, you think it's one of the
16 five policies that came into effect in August of
17 2011?
18      A.   August 15th, right.  I understand like
19 in terms of the rest of the hospital there is
20 administration that's an outside-of-residency
21 program, such as nurses and, you know, supervision
22 of nurses and supervision of other employees.
23          But in terms of professionals, MDs,
24 different rules apply for the code of conduct,
25 professionalism, discipline.  Chief residents

*Computer Reporting NYC Inc.*
*(212) 986-1344*

966

Varughese

1
2  should not have any say in any of that.
3       Q.   In paragraph 60 of your complaint --
4  do you have the complaint?
5       A.   Yes.
6          MR. WRONKO:  I think it's been marked.
7          MR. McEVOY:  It is not an exhibit, but
8     I wonder if she has it.
9       A.   Yes, I have it.
10      Q.   So would you read that to yourself and
11 let me know when you're done.
12      A.   OK.
13      Q.   Tell me where it says in the
14 resident's contract that you are to be given, and
15 I'm quoting, notice of any and each failure in a
16 timely manner not in a final write-up or after
17 termination?
18      A.   I mean, that's basically, you know,
19 stipulated.  There's supposed to be a four-month
20 notification of -- this is paragraph 9 of the
21 resident contract.  It says notification of --
22 notifications of nonrenewal or nonpromotion will
23 include the reason for the action and are subject
24 to the hearing rights found in the house staff
25 manual.  Then it says "(see pages 29 to 31)."

*Computer Reporting NYC Inc.*
*(212) 986-1344*

967

Varughese

1
2          It says that here in my contract.
3  Then it says like they're supposed to tell me four
4  months before the expiration of their appointment
5  about the contract.  OK, forget that.  Don't write
6  that.  Anyway, it says that there in terms of like
7  reasons for action, all this stuff.
8       Q.   I'm sorry, where are you looking?
9       A.   This is paragraph 9 of the contract.
10 It says notification of nonrenewal, so on, I just
11 said that.  Like I'm supposed to be told that in a
12 timely manner.
13          Anyway, this is a residency program.
14 It is an educational venture to a large degree and
15 the hospital and the residency program has a duty
16 to inform me of my failure as it comes up.
17      Q.   And that was my question.  Where does
18 it say that in your contract, and I'm just
19 beginning quoting from the complaint, that you are
20 to be given notice of any and each failure in a
21 timely manner, not in a final write-up or after
22 termination?
23          If you've already told me what you
24 think the basis of that is, that's fine.  If
25 there's something else, tell me.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

968

Varughese

1
2       A.   Well, it says here it's guided by
3  ACGME policies.  And I believe ACGME says that in
4  terms of educational requirements it's supposed to
5  be constructive criticism, not to be -- you're
6  supposed to inform people of what the issues are
7  as you go along, not, you know, not to be
8  blindsided or pretextually terminated from a
9  program for something that everybody else does.
10          I mean, you want me to point to the
11 contract where it says that?  In the contract?  Is
12 that what you're asking?
13      Q.   Or any source that you think.  Well,
14 what the provision says is --
15      A.   Right, that's based on the ACGME
16 resident contract.  It says here on my contract
17 ACGME resident.  And I believe there are
18 provisions within the ACGME guidelines that say
19 that's how it's supposed to be.
20      Q.   So now, Dr. Varughese, let me turn to
21 your defamation claim.  In the complaint if you
22 look at paragraph 143 --
23      A.   43?
24      Q.   143.  And if you read 143 and then
25 also read 144 to yourself and let me know when you

*Computer Reporting NYC Inc.*
*(212) 986-1344*

969

Varughese

1
2    are done.
3        A.    OK.
4        Q.    So other than Dr. Firpo, did anyone
5    else prepare or was involved in preparing the
6    summative evaluation?
7        A.    I don't know.
8        Q.    Who did Dr. Firpo send or give this
9    summative evaluation to?
10       A.    Well, he sent this to -- I was trying
11   to get my medical license from New Jersey and
12   Pennsylvania to increase opportunities for
13   completing my residency in pathology with the
14   final year of residency in pathology and to make
15   myself a better candidate for residency and he
16   sent this to the FCVS. It's an acronym for
17   something.
18       Q.    What is it the acronym for?
19       A.    It is a medical licensing facilitating
20   agency. They facilitate doctors to get their
21   medical licenses from a variety of states.
22       Q.    Where is it located?
23       A.    I'm not sure where it's located.
24       Q.    All right. And how do you know he
25   sent it there?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

970

Varughese

1
2        A.    Because I got a copy of the record of
3    all the information that they received and they
4    sent it to me and they showed me that this was
5    what they received and they were concerned about
6    what it said.
7              In fact, when I went through this
8    process with FCVS, the hospital did not, would not
9    submit the forms. They would not submit the form
10   that was being requested for my licensing. It was
11   constantly interfering with my ability to obtain,
12   you know, further my career and obtain appropriate
13   employment. And it took three months. I have
14   these e-mails going back and forth with FCVS about
15   what's going on? Why are you not getting this
16   information.
17             And then they had forged Allene
18   Carter's name no less on a form and sent it to
19   them. And they said, Allene Carter, is she a
20   physician? Because ACGME clearly states only a
21   physician can sign these forms. And FCVS also has
22   rules stating that physicians are supposed to sign
23   this form. Their forms say physicians are
24   supposed to sign this form, MD program director or
25   something.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

971

Varughese

1
2              And Allene Carter's name is clearly
3    forged on it and then she submits this form that
4    is allegedly the summative evaluation and then
5    this goes on and on back and forth for months.
6        Q.    So when you're referring to a form,
7    Dr. Varughese, are you talking about the summative
8    evaluation or some other form?
9        A.    This is the summative evaluation form
10   that has to be submitted to the FCVS for dispersal
11   to the state licensing boards.
12       Q.    And did FCVS also require other
13   documentation about your time as a resident in
14   addition to the summative evaluation?
15       A.    I'm not sure right now.
16       Q.    And so as I understand it, I just want
17   to make sure I understand, that when you saw what
18   had been submitted to FCVS by Mount Sinai you saw
19   your summative evaluation.
20       A.    Correct.
21       Q.    Where else did Dr. Firpo or anyone
22   else at Mount Sinai send your summative evaluation
23   other than to FCVS?
24       A.    Well, in terms of providing references
25   in a timely manner for Robert Wood Johnson

*Computer Reporting NYC Inc.*
*(212) 986-1344*

972

Varughese

1
2    employment opportunity, Mount Sinai Medical did
3    not do that in good faith. And that was a lack of
4    good faith and fair dealing. They did not inform
5    Robert Wood Johnson that I had finished three
6    years of my residency satisfactorily and I should
7    be allowed to do my fourth year residency at
8    Robert Wood Johnson where they wanted to hire me
9    as a fourth-year resident.
10             They did not show that good faith and
11   fair dealing in that, um, to give an appropriate
12   reference at that time to allow me to complete my
13   residency. They interfered with my employment
14   opportunity there.
15             Then again with, I believe Oregon
16   State, or someone called, and once again this was
17   after March 8th, and they did not provide
18   appropriate references.
19       Q.    So with regard to Robert Wood Johnson,
20   I take it from what you said that Mount Sinai or
21   Dr. Firpo did not provide the summative evaluation
22   to them, correct?
23       A.    They did not provide summative
24   evaluation to them at that time. When they called
25   for a reference they did not provide the

*Computer Reporting NYC Inc.*
*(212) 986-1344*

973

Varughese

1 reference.
2
3        In terms of summative evaluation it
4 was not done until March 8th or 7th or whatever it
5 was, and it was much later.  And....
6        Q.    So my only question, Dr. Varughese,
7 is, to your knowledge did Mount Sinai or Dr. Firpo
8 provide at any time the summative evaluation to
9 Robert Wood Johnson?
10        A.    Oh, I don't know about that,
11 because -- I'm not sure, because they knew that I
12 was interested in this employment they should have
13 provided it.  It was required.
14        Q.    And it was the same question with regard to
15 Oregon State I think you said.  Do you know
16 whether Dr. Firpo or anybody at Mount Sinai ever
17 provided the summative evaluation to anyone at
18 Oregon State?
19        A.    I would not know.  I mean, I'm sure as
20 we go on with discovery we may find more
21 documentation relating to this issue.
22        Q.    I understand.  So again, other than
23 FCVS, where else, if anywhere, did Mount Sinai or
24 Dr. Firpo send or give the summative evaluation?
25        A.    Well, this punitively created

*Computer Reporting NYC Inc.*
*(212) 986-1344*

974

Varughese

1
2 summative evaluation that's largely false, it was
3 sent to my attorney.  And it was sent to, you
4 know, it was also sent to me to disperse as a
5 record of my work, as a record of my work that I
6 completed over three years, and obviously it's not
7 something that can be used.
8        I mean, which is essentially I cannot
9 further my career and I cannot have any
10 professional opportunities if this is still in
11 existence.  But it's so blatantly false, it's
12 punitive and malicious.
13        I never had issues with patient care.
14 My interpersonal communication skills are very
15 good.  I'm very competent at that.  And
16 professionalism, I also am extremely professional.
17        Q.    Anyplace or anyone else to whom the
18 hospital or Dr. Firpo gave a summative evaluation?
19        A.    I did apply to a position at the
20 University of Pennsylvania and I met with the
21 program director there.  I'm not certain if you,
22 know, if this was sent there or not.
23        Q.    The question is, do you know of
24 anywhere else that it was sent or anyone else to
25 whom it was given?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

975

Varughese

1
2        A.    Well, I would not have information
3 regarding that.
4        Q.    Now, Dr. Varughese, in the complaint
5 that is the only allegation in support of your
6 defamation claim.
7        So my question to you is, other than
8 the summative evaluation that we just had
9 testimony about, is there any other statements or
10 documents that were made by anybody at Mount Sinai
11 about you that you believe are defamatory?
12        A.    Yes.
13        Q.    OK. So here's my question.  So I
14 would like you to tell me who made the statements
15 you believe are defamatory, when they were made,
16 and who they were made to.
17        OK? Can you do that?
18        A.    Right.  Let me start with --
19        Q.    I'm going to let you start and I'm not
20 going to stop you.  Bit I just want to make sure
21 you to understand what I'm asking you to do.  Who,
22 when and to whom?  Who made them, what they said,
23 when they said them and to whom they said it.
24 That's what I would like you to do.
25        A.    Let me write that down.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

976

Varughese

1
2        Q.    Sure.  Who made the statement you
3 believe is defamatory or who authored the document
4 you believe is defamatory; what they said, when
5 they said it and who they said it to.
6        A.    OK.
7        Q.    OK?
8        A.    So in terms of the first house staff
9 affairs committee meeting, Adolfo Firpo made
10 statements regarding my mental health to the
11 committee and the audience that was there
12 regarding -- made a variety of defamatory
13 statements regarding my mental health, which was
14 extremely defamatory.  It was intended to create
15 and cause harm, extremely malicious and it was
16 meant to prevent me from, you know, being able to
17 argue my point effectively.
18        And the statements were made and it
19 had the intended consequences, which you know it
20 really affected me because I knew those were
21 false.  He was making these false statements and
22 it really affected me.
23        What's his name?  Patrick Lento at
24 that same hearing, he made statements regarding --
25 he said I never answered a page, I never did

*Computer Reporting NYC Inc.*
*(212) 986-1344*

977

Varughese
1
2  things, which clearly was false.  I answered
3  pages.  I did my work.  I worked there for over
4  three years.
5           There hasn't been -- there wasn't a
6  single incident where I did not really answer his
7  page, but he made that up.  And he said that and
8  he's been saying that as if that's the reality.
9  It's not reality.  He just made it up.
10          And that was made to the House Staff
11 Affairs Committee and the audience at large, and
12 that really prevented me from really honestly
13 testifying to the work that I did and being able
14 to, you know, make my case and really move on with
15 my career.
16          If they did not want me at Mount Sinai
17 Medical Center I had the opportunity to start the
18 residency a year later at Robert Wood Johnson or
19 even U Penn.  If these statements were not being
20 made about me, I could easily get a job.  But this
21 is the kind of statements that are being made
22 about me.
23          Then in terms of, let's see.  Well, in
24 terms of Samuel McCash, he made defamatory
25 statements about me.  He said all these lies and

979

Varughese
1
2  and there's no consequences.
3           And they're doctors themselves.  They
4  should know better.  When you're a physician, when
5  you're a professional, you have an MD next to your
6  name, you cannot make those statements and make
7  them lightly.  They have serious consequences and
8  these people don't seem to understand that.
9  They're so unprofessional and frankly malignant.
10          And I question whether they should
11 even be in this medical field.  Because you cannot
12 go around making these statements about people and
13 this is what she did.  She made these statements
14 about me.  And nobody ever told me that she was
15 saying this.  Nobody ever told that they're making
16 their decisions based on these crazy statements
17 made by a crazy person, which is Dr. Jordan.
18          I mean, why would you call somebody
19 crazy if you yourself did not know how to behave?
20 And this is what she was doing ever since December
21 of 2010.  She is writing these e-mails, making
22 these statements, alleging things about my mental
23 health and then she goes on to do that over the
24 course of the year.  She makes these same
25 statements again.  Come June, July, August, she

978

Varughese
1
2  he wrote the lies and he sent it to hospital
3  leadership, and they believed him.  Even though it
4  wasn't brought to me and said, Well, is this true?
5  It was just taken at face value because he was
6  saying it.
7           That was, you know, that was -- that
8  really, you know, led to issues down the line,
9  where, you know -- of course I didn't know any of
10 this was happening because I didn't have, you
11 know, information regarding what was going on.
12 The only thing I know was like actions were being
13 taken against me based on these defamatory
14 statements that in the long run cost me my job
15 really.
16          In terms of Adrienne Jordan, she made
17 a variety of defamatory statements about me.  She
18 said that I had flight of ideas, you know, some
19 other things.  All relating to some sort of like
20 serious mental illness, which I did not have a
21 history of.  I don't have anything wrong with me
22 or my mental health.  I've never been diagnosed
23 with anything.  I'm perfectly sane and completely
24 capable and completely competent, but I have
25 coworkers who say these things about me and write

980

Varughese
1
2  says the same things about me again.
3           And what happens to me?  I have to go
4  through disciplinary psychiatry.  I have to go
5  through Mount Sinai Medical Center's psychiatric
6  evaluation no less.  I'm subjected to this kind of
7  treatment by the hospital based on the words of
8  Adrienne Jordan, Samuel McCash.
9      Q.    Any other statements or --
10     A.    Right, and then Adrienne Jordan goes
11 on to say that she's terrified of me at some
12 point.  Clearly defamatory.  I have never been
13 anything but cordial to her.  I've had discussions
14 with her, I've talked to her.  I never made a
15 threat to her.  I never threatened her.  I never
16 said anything to her face.
17          All my communications to her are very
18 limited.  In fact, it's a few e-mails here and
19 there.  I don't even try to approach her.  I don't
20 even -- I don't go to her and say like anything.
21 She's the one who approaches me and bothers me at
22 work all the time.
23          And then she says that she's terrified
24 of me in an e-mail on September 14th or -- 13th or
25 14th and Adolfo Firpo responds, Oh, things are

981

Varughese

1   getting hot now.
2           And I suppose they thought I was
3   trying to come into work that day and they can say
4   I'm doing something or other.  And they fabricated
5   all this stuff.  It's so defamatory and so
6
7   unprofessional.
8       Q.    Any other defamatory statements or
9   writings?
10          MR. WRONKO:  Form objection.
11      A.    Right, in terms of, um....
12      Q.    Dr. Varughese, it may help you, it may
13  not, but paragraph 142 of the complaint says, it's
14  only one sentence:  "Defendant has made false and
15  defamatory statements about plaintiff of a nature
16  that would negatively impact plaintiff's
17  reputation in her chosen profession."
18          Do you see that?
19      A.    Yes.
20      Q.    And that is what the following
21  paragraph refers to and the testimony you've given
22  so far about Dr. Firpo and Dr. Lento at the House
23  Staff Affairs Committee about McCash and Jordan.
24          So the question is, are there other
25  statements orf writings that were made that you

*Computer Reporting NYC Inc.*
*(212) 986-1344*

982

Varughese

1   believe are false and defamatory about you as
2   alleged in paragraph 142 of the complaint?
3
4           MR. WRONKO:  Form objection.
5       A.    Right.  Well, Arthur Figur wrote this
6   whole thing about, you know, wrote up something
7   about me saying I had all these issues.  Then he
8   made a list of it.  I mean, it's part of the
9   discovery.  And clearly that's defamatory.
10          I had two discussions with him and I
11  met with him, like total four times I met with him
12  and I had face-to-face discussions with him.  He
13  knows there's no basis for that.  I have discussed
14  a variety of issues that he wanted to know about
15  and he knew what my perspective was, but he wrote
16  this derogatory, defamatory, you know, document
17  stating that as if that's true.  And that's really
18  defamatory.
19          When you're a physician you cannot
20  have some hospital administrator make willy-nilly
21  without thought to the consequences write
22  something like that and then subject me to
23  psychiatric evaluation by the hospital, who was
24  also my employer.  Like as if that's not a
25  conflict of interest.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

983

Varughese

1       Q.    What document are you referring to,
2   that Dr. Figur authored?
3       A.    Dr. Figur authored this, I don't know,
4   it's, um, I have to look.  I'm not sure what it
5   was called, but....
6
7       Q.    Any other defamatory statements or
8   writings as alleged in paragraph 142 in the
9   complaint?
10          MR. WRONKO:  Form objection.
11      A.    Right, and Dr. Najfeld, when she wrote
12  that evaluation, which I did not see that
13  evaluation until after I was terminated from the
14  residency program, I only saw that I guess the day
15  before the House Staff Affairs Committee hearing,
16  and it was a total surprise to me because I didn't
17  know there was an evaluation written about me that
18  made all these allegations, but it was written by
19  her and it was false.  It was defamatory and it
20  was false.  That was not the case.
21          You know, she wasn't even at work on
22  the days stipulated in that document.  It was
23  clearly defamatory.
24          I mean, what is it?  The academic
25  advisement?  That was also defamatory.  It states

*Computer Reporting NYC Inc.*
*(212) 986-1344*

984

Varughese

1   that there was patient care related lapse and
2   there was no patient care related lapse related to
3   my work in December.  There wasn't a single case
4   where the hospital can say, Well, you made a
5   mistake with this case.  If there was, they would
6   have told me.  It's a due diligence for them to
7   inform me if that was the case and they have not,
8   because there was not a single thing.
9
10          In my entire years that I worked at
11  Mount Sinai Medical Center, I did not make any
12  egregious mistakes, not once.  Why?  Because I'm
13  meticulous.  I'm sane.  I'm competent.  I'm
14  professional.  That's why.  And the organization
15  has the audacity to say that I'm not any of these
16  things after working there for three years and
17  requiring my services and asking me to cover for
18  residents who weren't there because my services,
19  you know, I'm very professional.  I do a good job.
20      Q.    Any other false, defamatory statements
21  or writings made about you as alleged in paragraph
22  142 of the complaint?
23          MR. WRONKO:  Form objection.
24      A.    Right, Ira Bleiweiss with his
25  evaluation in December of 2010, what he wrote was

*Computer Reporting NYC Inc.*
*(212) 986-1344*

985

Varughese

1  defamatory.  He said sometimes I'm getting along
2  with people, sometimes I'm not.
3         That's not the case at all.  I get
4  along with people all the time.  I don't have any
5  conflicts with anybody.
6         When I'm being harassed at work,
7  that's not me not getting along with people.
8  That's when somebody who has already harassed me
9  repeatedly harasses me again.  And that's
10  considered not getting along with people?
11        I mean, where is his sense of
12  fairness?  Where is his sense of what's right and
13  wrong?  I don't think he has one.  He thinks, he
14  merely thinks that I'm not getting along.  No.
15  Getting along?  No, I'm being harassed at work.
16  I'm trying to do my work like everybody else does,
17  which is utilizing the moonlighter and the PA to
18  do small cases.
19        There is no patient care related issue
20  with doing that.  In fact, that's appropriate
21  management of my time and the work that's there.
22  And I am being punished for that and I'm being
23  harassed for that by McCash and then that being
24  substantiated by the hospital as being OK.  It's

986

Varughese

1  OK to do that to a minority.  It's OK to treat a
2  minority Indian woman as such.
3     Q.   Any other false defamatory statements
4  about you as alleged in paragraph 142 of the
5  complaint?
6         MR. WRONKO:  Form objection.
7     A.   Bleiweiss also stated that my work
8  wasn't organized all the time when in fact the
9  residency program was completely disorganized.
10  Slides were not processed in a timely manner.
11  There wasn't a day where I got all my work in a
12  timely manner so I can proceed to the next step.
13  It was always all over the place.
14        I constantly had to follow up with the
15  lab.  I had to go searching for things because it
16  was misplaced by the lab.  Which Ira Bleiweiss
17  ran.  He ran that lab and that's how he ran it.
18  He's disorganized.  He's the one who is not doing
19  the appropriate job.  And is anybody taking any
20  actions against him for any of this, for the
21  program getting 19 citations from ACGME?  Is any
22  action taken against Ira Bleiweiss for running a
23  lab so poorly?  None.
24        There's definitely a double standard

987

Varughese

1  here.  There want to claim that I'm not doing my
2  work in an organized manner, but the hospital
3  failed to provide me material in an organized
4  manner.  They failed to support me.  They failed
5  to allow me to educate myself.  They prevented me
6  from being able to attend conferences that are
7  valuable to me as a senior resident, a fourth-year
8  resident after having attended all those
9  conferences over the past three years, and then
10  they make a statement about me being disorganized
11  when that's clearly bunk.  I mean, especially when
12  we know that the program is so disorganized and
13  the slides are not coming out in time, the
14  paperwork is not coming out in time.
15     Q.   Any other false and defamatory
16  statements about you as alleged in paragraph 142
17  of the complaint?
18     A.   I believe I've stated the disciplinary
19  academic advisement was false and defamatory.
20  Going forward, you know, a lot of the e-mails by
21  Samuel McCash have been false and defamatory.
22     Q.   Just to remind you, what I asked you
23  to tell me, you wrote it down, was who made the
24  statement, when they made the statement, what they

988

Varughese

1  said and who they said it to.  That's what I'd
2  like you to tell me.
3         Other than what you've already told
4  me, are there any other false and defamatory
5  statements that form the basis of the allegation
6  in paragraph 142 of the complaint?
7     A.   Well, this was just pervasive and it
8  was relentless.  I experienced this defamation
9  throughout my --
10        MR. WRONKO:  He's asking for any other
11        specific examples.  If there are any other
12        specific examples, let's put them on the
13        record and move on.
14     A.   Well, in terms of, what is it?  The
15  final warning letter?  That was false and
16  defamatory.  I complied with all the requirements.
17  You know, they have a due diligence to follow up
18  with me to see if I read everything.  If I'm, you
19  know, on time for a variety of issues and matters.
20        I've done my part.  I've complied.  I
21  went through all the meetings.  I abided by my
22  ethical and legal obligations to the hospital and
23  as a professional.  And they state that I did not.
24  That was false and defamatory.  When, you know,

989

Varughese

1  the impetus is on them to do that, to do the right
2  thing, and they are trying to say that it's on me.
3  It's not on me.
4           I'm doing my work, I'm trying to do my
5  work the best I can. I'm trying to follow up with
6  everything the best I can and I'm doing so. And
7  they're preventing me from doing that and they're
8  claiming that I did not follow up when clearly
9  that's false. It's a lie.
10     Q.    Any other specific examples?
11     A.    Well, the disciplinary action letter,
12  that was hugely problematic and that was reported
13  to the state eventually, but not in the time when
14  it was submitted, because I knew the state would
15  investigate something like this and they would
16  find that there is no reason or basis for what's
17  happened, and they did not report it until after I
18  was terminated. Why is that? Why is the hospital
19  trying to cover this stuff up?
20     Q.    Any other specific examples of false
21  and defamatory statements about you that form the
22  basis of the allegation in paragraph 142 of the
23  complaint?
24           MR. WRONKO:  Form objection.
25

990

Varughese

1
2      A.    And the termination letter once again,
3  that was also based on false and defamatory
4  premises and it was written from that perspective.
5  I mean, did I -- I had an opportunity to do,
6  correct the record eventually at the House Staff
7  Affairs Committee hearing, and I tried my best to
8  do so. But that was false and defamatory and I
9  was terminated based on those six reasons.
10     Q.    Any other specific examples?
11           MR. WRONKO:  Form objection.
12     A.    Right, and going forward, what the
13  House Staff Affairs Committee submitted as a
14  reason to uphold my termination, there was a lot
15  of things that were false and defamatory there.
16     Q.    Are you referring to the decision of
17  the House Staff Affairs Committee?
18     A.    The decision of the House Staff
19  Affairs Committee where Melissa Rocco says that me
20  merely asking her to clarify her statement for a
21  question that she asked was deemed as being
22  argumentative when it was not argumentative.
23  There was no argument there. It was a mere
24  request to clarify a question. That was false. I
25  mean, that's on its face defamation.

991

Varughese

1
2      Q.    Any other specific examples?
3           MR. WRONKO:  Form objection.
4      A.    This --
5           MR. McEVOY:  You can have that
6  standing objection.
7           MR. WRONKO:  Yes, thank you.
8           To this whole line of questioning.
9      A.    When they stated that there was
10  absenteeism, which was false and defamatory, when
11  they know there was no absenteeism. I abided by
12  the confines of the sick days. I only took sick
13  days when I was ill. It's not the same thing as
14  being absent. Even though there are other
15  residents who also had the same practices with
16  their sick days, they were not called absentee,
17  but I was by the House Staff Affairs Committee.
18     Q.    Any other specific examples of false
19  and defamatory statements made about you that form
20  the basis of the allegation in paragraph 142 of
21  the complaint?
22     A.    That's all I can think of right now.
23           MR. WRONKO:  Can we take a break?
24           MR. McEVOY:  Sure.
25           (A recess was taken from 11:33 a.m. to

992

Varughese

1  11:44 a.m.)
2  BY MR. McEVOY:
3
4      Q.    So Dr. Varughese, paragraph 64 of the
5  complaint, I ask you to take a look at that. Have
6  you had a chance to look at that?
7      A.    Yes.
8      Q.    And then in the interrogatory
9  responses, which we can look at if you'd like,
10  when you were asked to identify the name of the
11  potential employer referred to in paragraph 64
12  you identified that, I think it is interrogatory
13  number 22, it was --
14           MR. WRONKO:  -- Robert Wood Johnson?
15           MR. McEVOY:  Correct.
16     Q.    So did you apply for a position at
17  Robert Wood Johnson?
18     A.    Yes.
19     Q.    What position did you apply for?
20     A.    There was a PGY-4 opening that they
21  listed on a residency opportunity or residency
22  employment web site, and so I applied to that
23  position.
24     Q.    And how did that application process
25  work?

993

Varughese

A.     Well, I e-mailed Dr. Fife when I saw the application and it said contact so-and-so.  So I e-mailed the contact person who was listed on that employment notice.

Q.     Who was the contact person?

A.     I don't remember now, but -- so I e-mailed that person and they told me to e-mail or I e-mailed directly.  I don't remember exactly how it happened now.  But I was asked to send in my references and an application, and that's what I did.

Q.     When did you apply to this position at Robert Wood Johnson?

A.     When did I apply?  I applied in January of 2011.

Q.     Before or after you were terminated?

A.     This was after I was terminated from employment.

Q.     So it would have been January of 2012?

A.     Right, January 2012.  I stand corrected.

Q.     OK.  And you say in the complaint that Robert Wood Johnson requested Mount Sinai and Dr. Firpo to forward certain records about your

*Computer Reporting NYC Inc.*
*(212) 986-1344*

994

Varughese

years of work at Mount Sinai.

Who made that request?

A.     Dr. Fife made that request.  I was in person with her.  She picked up the phone and she made a phone call.

Q.     Do you know who she called?

A.     She asked me for Dr. Firpo's phone number at the hospital and she dialed that number.

Q.     What did you hear Dr. Fife say to Dr. Firpo, assuming that's who she spoke to?

A.     Right, she asked for the record and she said, you know, is there someone you can refer me to so that I can get the records.

Q.     And I take it you don't know what the person on the other end of the phone said.

A.     No.  It wasn't on the speakerphone, so of course not.

Q.     After the call was completed did Dr. Fife tell you what the person she had spoken to had said?

A.     I think she said that she wasn't or they were not willing to give me -- give information regarding my residency that I completed and, I mean, she said something along

*Computer Reporting NYC Inc.*
*(212) 986-1344*

995

Varughese

those lines.

And she told me, you know, she was flabbergasted and she also talked to Dr. Kalir, Tamara Kalir, she's a doctor at Mount Sinai Medical Center, who also said, you know, I mean, she recommended me to the job as well.  And Dr. Fife had also done a GYN fellowship at Mount Sinai Medical Center, which she informed me of as well, and she told me that Dr. Kalir had recommended me and she felt comfortable with Dr. Kalir's recommendation and she wanted to go ahead and get these references.

And then she informed me about Summative Evaluation, that she needed to according to ACGME guidelines to enroll me in the program as a resident for the fourth year.  Because they were also ACGME accredited at that time and I think that's how they worked.

So those were the guidelines they followed, and she said that she needed this record because it was an ACGME accredited program.  So she needed this record to like enroll me in the program and that was an absolute must.

Q.     And so what was your understanding of

*Computer Reporting NYC Inc.*
*(212) 986-1344*

996

Varughese

what records or documents that Robert Wood Johnson needed from Mount Sinai for them to continue with your application for a position?

A.     Essentially ACGME has a template for what this should look like.  Since this was for a PGY-4 year, I think they should have said, well, this person had completed three years and one or two months of residency at this institution and was terminated on this date, so on and so forth.

They could have said something like that and made a good faith effort to do that.  But Mount Sinai Medical Center did not do that.

Q.     No, I understand that.  But my question is, what was your understanding or what did Dr. Fife tell you that Robert Wood Johnson needed from Mount Sinai to process?

Did they say for example, I think you may have said this, that they need a copy of a Summative Evaluation?

A.     She said that she needed a record of what I had completed and what the training that was completed and what, you know, basically she needed to know what going forward I needed to be assigned to.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

997

Varughese

1
2    So she essentially needed something
3  that said OK, three years of residency. There
4  wasn't any patient care related issues, and so on
5  and so forth. But that's all she needed. That's
6  what my understanding of what she was telling me
7  that she needed and they called it Summative
8  Evaluation.
9    Q.   You say in the complaint that Mount
10  Sinai refused to provide the information requested
11  by Robert Wood Johnson. How do you know that they
12  refused?
13    A.   Because Dr. Fife told me that they
14  were not going to provide the reference and the
15  Summative Evaluation. Then I, you know, I'm not
16  going to disclose any attorney --
17    Q.   Please don't.
18    A.   -- you know, communication with my
19  attorney, but, you know, I did speak to my
20  attorney at that time the same day after this
21  interview and I informed him what had happened.
22    MR. WRONKO:  Well, now you're
23  disclosing attorney-client information.
24    THE WITNESS:  I'm not going to
25  disclose any content.

998

Varughese

1
2    A.   I asked him to intervene at this point
3  because I had an attorney, which the hospital
4  fails to respect. So anyway, I told him that --
5    MR. WRONKO:  You can't say what you
6  told.
7    A.   I told him to please write a letter.
8    Q.   I got that.
9    A.   I'm not going to disclose the content
10  of my conversation.
11    Q.   Wait, let me stop you, because I share
12  the same concern. I understand that after you
13  found out or after Fife said that Mount Sinai was
14  refusing to provide the information, you spoke to
15  your attorney about this and he or she wrote a
16  letter to the hospital; is that right?
17    A.   Correct. I'm not trying to get my
18  attorney as a witness, but, you know.
19    Q.   Well, you couldn't do that anyway, but
20  I understand you.
21    A.   But I'm saying --
22    MR. WRONKO:  Hold on. One at a time.
   But you want to preserve the privilege. So
23  simply indicating the action that your
24  attorney took as opposed to what you said to
25

999

Varughese

1
2    him or didn't say to him is the way to
3  testify.
4    Q.   Go ahead.
5    A.   And he wrote a letter the following
6  day and it was addressed to the Mount Sinai
7  Medical Center's general counsel.
8    And the idea was just to show that we
9  were, you know, I was interested in the position,
10  I had been offered this position contingent on
11  simply providing this reference, and that's all we
12  really needed from them.
13    Of course my attorney was excited
14  about this because they thought that --
15    MR. WRONKO:  Again, you can't disclose
16  this.
17    THE WITNESS:  It doesn't matter. I'm
18  not divulging anything. But the
19  rationale --
20    A.   My feeling was --
21    MR. WRONKO:  I have to give an
22  instruction.
23    MR. McEVOY:  Ron, do you want to like
24  take her outside and explain?
25    Because I don't want to hear what your

1000

Varughese

1
2  attorney said or didn't say to you.
3    THE WITNESS:  Fine, I'm not going to
4  say anything my attorney said.
5    MR. WRONKO:  Hold on, let me speak.
6  You should not disclose even what your
7  attorney was thinking or anything about your
8  communications with the attorney, what he
9  said to you or what he expressed to you.
10  Instead, you have to only disclose what
11  occurred outside of your private
12  communications with the lawyer.
13    A.   Right, so the letter was sent and it
14  specifically stated what the reason for the letter
15  was and what the expectations were on my part, and
16  there was no response.
17    You know, there was the phone call
18  when I was there at, you know, Robert Wood Johnson
19  and with Fife and people at the hospital at Mount
20  Sinai Medical Center. She wanted to get the DIO
21  involved of Mount Sinai Medical Center and also of
22  Robert Wood Johnson in this issue because she
23  thought that that should facilitate getting the
24  Summative Evaluation. She seemed very, you know,
25  sort of strongly wanting me to get this job and

1001

Varughese

1  getting on with my career, and she was pushing for
2  that.
3
4       Q.    And who's the she you're referring to?
5       A.    Dr. Fife.  And --
6       Q.    What does DIO stand for?
7       A.    Designated institutional official.
8       Q.    OK, go ahead.
9       A.    And, you know, then following that she
10  told me that she's going -- when I left that
11  interview that day what she told me was that she's
12  going to put my name.  Because she said I'm going
13  to go through the match algorithm and she's going
14  to put my name in the computer and reserve that
15  fourth-year position for me so nobody else gets
16  that position and I get that position.
17        And that's where I left it that day.
18  And she was like OK, I'll make this work.  That's
19  essentially what she said to me.  She's going to
20  get this reference and she's going to make this
21  work.  That's where I left it when I ended the
22  interview that day with Dr. Fife.
23       Q.    What happened next in connection with
24  your application for this position at Robert Wood
25  Johnson?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1002

Varughese

2       A.    The letter was sent to the hospital
3  requesting the reference or the Summative
4  Evaluation.
5       Q.    This is the letter from your lawyer?
6       A.    Right.  That was sent.  We didn't get
7  a response for seven days and/or more than that.
8  And the only response was that the hospital cannot
9  provide the reference.
10        And it was mind boggling because the
11  hospital already told me that they did not want to
12  rehire me.  They had terminated my contract.  They
13  were not interested in rehiring me.  They had made
14  that statement explicitly.
15        At this point, you know, this is three
16  months later.  This is a very complicated time,
17  very delicate, sensitive time in terms of
18  residency.  This is when I had to apply for the
19  board of pathology examination.  I had all these
20  other responsibilities as a professional to follow
21  up on my career essentially and I couldn't do any
22  of that because of these things that were going
23  on, the termination, the hearing.
24        My hope was I could continue with the
25  process once they had made their decision and I

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1003

Varughese

1  can, you know, get on with my career, but the
2  hospital was essentially like no, we're not going
3  to do that.  We're not going to assist you in this
4  transfer.  In fact, we're going to go out of our
5  way to obstruct you from transferring despite the
6  fact that we told you we're not going to hire you
7  and made up lies about me.
8
9       Q.    So what happened next with Robert Wood
10  Johnson?
11       A.    What happened next was essentially I
12  lost this position.  I had nothing to go back and
13  report to them.  I could not tell them that --
14  well, I think I did tell them I could not get the
15  Summative Evaluation because the hospital was
16  refusing to provide it.
17       Q.    Did you have conversations -- let me
18  just set the time.  You said that you left this
19  interview.  Dr. Fife said that she was in going to
20  reserve this position for you.
21        Did you have conversations with
22  Dr. Fife after that day?
23       A.    I think I did, yes.  I think I called
24  her and spoke her.  I just said, listen, like, you
25  know, I did all my work.  There's some references

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1004

Varughese

1  that I have.  People can vouch for me and, you
2  know, she should meanwhile this thing is pending
3  to keep considering me for this job and like keep
4  that position for me because I really want this
5  job.
6
7       Q.    Did you speak to anybody else at
8  Robert Wood Johnson about your application for the
9  position other than the person you said you didn't
10  remember their name when you first applied?
11       A.    Well, I talked to Dr. Cadoff (pron.
12  Kad-doff) or Cadoff (pron. Kay-doff).
13       Q.    Who is Dr. Cadoff?
14       A.    He is the chairman of the department
15  there.
16       Q.    Of pathology?
17       A.    Pathology, right.  And so I had spoken
18  to him as well.  And then I spoke to the residents
19  there.  Like all the residents who were there.  I
20  interviewed with them and I interviewed with a few
21  other people.  So I spoke to all the different
22  people that I interviewed with.  And those were
23  all the people I spoke to at Robert Wood Johnson
24  regarding....
25       Q.    So when you met with Dr. Cadoff and

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1005

Varughese

1 the other residents, was that in connection with
2 interviewing for the position?
3
4    A.    Interviewing for the position and then
5 later on as a follow-up I had -- my contact person
6 was Dr. Fife. So I had e-mailed her regarding the
7 position again. And she forwarded the e-mail to
8 Dr. Cadoff who told me that, who e-mailed me and
9 stated that I didn't, since we did not get this
10 reference, we cannot give you this job now.
11    Q.    So is that how you learned that you
12 weren't getting the position from this e-mail from
13 Dr. Cadoff?
14    A.    Yes. That's -- I mean, that was like
15 sort of the final, you know, communication that I
16 had with them regarding this job and after that I
17 was, you know, it seemed pretty futile for me to
18 keep insisting on giving me this job and they said
19 that they don't have these references, they don't
20 have the Summative and they cannot give me this
21 job.
22        And then the following day I got the
23 Summative, or eventually I did get the Summative,
24 it was March, but it was after I wrote this e-mail
25 and it was so derogatory and defamatory. And it

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1006

Varughese

1
2 made me realize, like I can't use this to get a
3 job even. Like it was just so blatantly
4 problematic and false and defamatory and written
5 by somebody I never even worked with in a
6 professional capacity as a doctor.
7    Q.    And did you talk to Dr. Fife at all
8 about the decision not to offer you the position
9 or the reasons not to offer you the position?
10    A.    Oh, her only reason was that she was
11 not getting the Summative. She wanted me to have
12 this job. She said, I want you to have this job.
13 It's a good job for you, and she said, We do this
14 kind of stuff all the time. We have residents who
15 are nontraditional or residents who have been out
16 of the residency program for five years who need
17 to meet a certain requirement, just take their
18 boards again.
19        She routinely offers these positions
20 to more mature and more nontraditional residents.
21    Q.    Where is Robert Wood Johnson located?
22    A.    That's in New Brunswick, New Jersey.
23 Or is it in Piscataway, New Jersey? I'm not sure.
24    Q.    In New Jersey.
25    A.    New Jersey, yes.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1007

Varughese

1
2    Q.    I will even take the representation
3 from Mr. Wronko if it solves the problem. You
4 have a claim, cause of action for interference
5 with business relations, and all it says is the
6 actions of defendant give rise to a violation of
7 interference with business relations, and I take
8 it from the complaint and from your interrogatory
9 responses that what we're talking about is your
10 application for employment at Robert Wood Johnson;
11 is that right?
12    A.    Yes, that's one aspect of this issue.
13 The second aspect is the FCVS, medical licensure
14 issues. That's the second aspect of this.
15    Q.    What business relationship would you
16 have with FCVS?
17    A.    Simply their intermediate -- well,
18 this is like in terms of going forward, I do need
19 these references to be able to get my medical
20 licensure in New Jersey, Pennsylvania, and I
21 cannot use it. So the mere existence of such a
22 defamatory and false Summative Evaluation is
23 interference with prospective business relations
24 going forward into infinity.
25    Q.    Any other entity who you believe Mount

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1008

Varughese

1
2 Sinai interfered with your business relations or
3 prospective economic advantage? It's phrased two
4 different ways in the complaint. You've told me
5 about Robert Wood Johnson, you've told me about
6 FCVS.
7    A.    Right, I had applied to several other
8 jobs over the years, other residencies, one at
9 U Penn, University of Pennsylvania. I'm not sure
10 what reference they provided. Then with Oregon
11 State. There were several other residencies that
12 I had applied to and fellowship positions that I
13 applied to which I would be qualified for by the
14 mere fact that I completed three years of anatomic
15 and clinical pathology residency satisfactorily.
16        And I did not have -- my former
17 employer, Mount Sinai Medical Center, is not
18 willing to act as a reference. This has gone on
19 for all this time. That's preventing me from
20 obtaining appropriate employment. And this is not
21 just for medical jobs. This is for every other
22 job. They refuse to speak to people who seek
23 references.
24    Q.    You said you applied for a job at U
25 Penn and at Oregon State. Where else have you

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1009

Varughese

1  applied for work?
2      A.    I applied for a tech job with I
3  believe NovoPath, which is merely sales, technical
4  analyst specialist type of thing.  I applied for
5  that job.  They wouldn't hire me because of this
6  reference and this issue with my work record and
7  me being too qualified even for that job.
8            Then there is an issue with medical
9  writing jobs.
10     Q.    I need for you to tell me the names of
11 the companies/entities/institutions that you
12 applied to.
13     A.    I don't remember what the medical
14 writing -- maybe Novartis.  I think I applied
15 there for some medical writing job.  I applied to,
16 I must have applied to like ten or fifteen
17 different residencies and fellowships.
18           Even this year I applied to Kansas
19 State pediatric fellowship.  Like, I feel like I
20 have to do whatever I can to obtain like
21 appropriate employment and mitigate my losses, and
22 I've done my best to apply far and wide.  I've
23 applied to Oregon, which is on the other side of
24 the country.  I've applied to California.  I've

1010

Varughese

1  applied all over.
2      Q.    So again, you've told me about U Penn,
3  Oregon State, Kansas State and the tech job and
4  the medical writing job.  Where else did you apply
5  for a residency or a fellowship?
6      A.    Residency and fellowship I applied, I
7  mean, I must have applied to like fifteen, ten,
8  fifteen different residencies as part of the ERAS
9  application system in 2012.  But then going
10 forward, I knew that would be a waste of my money
11 and time.  So I did not do that.  I only applied
12 to fellowship positions and I applied widely.
13           Like I've sent applications to, let's
14 see, NYU, Beth Israel Medical Center.  Where else?
15 A variety of other places, local, variety of local
16 hospitals, Nassau County.  I applied not even as a
17 fellow, but as a pathology assistant, which is
18 really a job that I'm overqualified for.  But I
19 thought, you know what?  Let me mitigate my
20 loss and I'll do that.
21           So I applied to pathology assistant
22 positions even though that's not a job that I
23 should be doing.  I should be diagnosing and
24 evaluating patient cases as a pathologist, as a

1011

Varughese

1  doctor, as a medical doctor, which I was trained
2  to do, which a degree that I got after years of
3  hard work.
4      Q.    So other than NYU and BIMC, did you
5  apply for fellowships anywhere else?
6      A.    I think I applied to SUNY Stony Brook,
7  SUNY Downstate.  I've talked to fellows, residents
8  and fellows from SUNY Stony Brook who thought, you
9  know, it's a possibility you can get the job.  I
10 talked to their program director and education
11 coordinator.  I forget his name now.
12           But I talked to all these people.  I
13 know a variety of program directors now.  Like
14 there's like 150 programs in this country.  I've
15 been in communication with like at least ten of
16 these program directors and fellowship directors
17 who are advising me as to what I should do, how I
18 should go about this.
19     Q.    So let me go back for a second.  You
20 applied for a position at U Penn?
21     A.    Right.
22     Q.    And what position did you apply for?
23     A.    Well, I applied for a residency
24 position there.  The year that they had stated was

1012

Varughese

1  PGY-3, but my hope was obviously given that I had
2  already completed three years of residency
3  satisfactorily, they would allow me to do PGY-4 in
4  return for a few months of whatever coverage they
5  are needed.
6      Q.    Were you interviewed for that
7  position?
8      A.    Yes.
9      Q.    And I take it you didn't get the
10 position.
11     A.    No, I didn't.
12     Q.    What was the reason that they gave you
13 for not offering you the position?
14     A.    They -- I don't know if they gave me a
15 reason.
16     Q.    Do you know whether U Penn had any
17 communication with Mount Sinai about you?
18     A.    Well, I imagine they would, because
19 that was my former employer.  I had like no one
20 else to reference to for a residency.
21     Q.    You applied for a position at Oregon
22 State?
23     A.    Yes.
24     Q.    What position did you apply for?

1013

Varughese

2    A.    It was a fellowship position for
3  neuropathology.
4    Q.    Were you interviewed for that
5  position?
6    A.    I spoke to someone on the phone who
7  said that they're going to call me after they
8  called the hospital, Mount Sinai Medical Center.
9    Q.    Who did you speak to?
10    A.    I believe it was a program
11  coordinator.
12    Q.    Did the program coordinator or someone
13  else call you back?
14    A.    No. They never called me back and I
15  followed up with them and they said, I think they
16  said that they called the hospital and they said
17  something. And Dr. Kalir also said that there had
18  been several calls inquiring for my references.
19    Q.    We're talking about Oregon State at
20  the moment.
21    A.    Oregon State and some other
22  institutions. I am not sure exactly which ones
23  she was referring to. She said, I'm going to see
24  what's going on.
25    Q.    This is Dr. Kalir.

Computer Reporting NYC Inc.
(212) 986-1344

1014

Varughese

2    A.    Right.
3    Q.    And did Oregon State ever provide you
4  with a reason for why you didn't get the
5  fellowship position?
6    A.    No, they did not.
7    Q.    And then did you apply for a position
8  at Kansas State?
9    A.    Right, I applied for a pediatric
10  pathology fellowship this year, for this year that
11  would have started in July, and, I mean, I
12  technically could not even apply because I did not
13  have a letter from the program director and the
14  Summative Evaluation I have is essentially, cannot
15  be used as a reference because it's blatantly
16  defamatory and it states that I'm unsatisfactory
17  in a variety of issues, which I'm not
18  unsatisfactory at.
19       Why I don't I use that document to try
20  to obtain a job? It's impossible to obtain a job
21  with that document.
22    Q.    So when you said you didn't have a
23  letter from the program director, you mean the
24  program director at Mount Sinai?
25    A.    Right. Like if I could just have a

Computer Reporting NYC Inc.
(212) 986-1344

1015

Varughese

2  Summative Evaluation that's like accurate and not
3  defamatory would be fine.
4    Q.    So I'm just trying to understand. Did
5  you actually apply for a position at Kansas State
6  or did you decide not to apply for it?
7    A.    I think I did apply, sent in my
8  information, the application, so on.
9    Q.    Were you interviewed for the job?
10    A.    Right, I talked to the program
11  director and they said if I can -- if they can
12  verify -- oh, they said that they would need a
13  verification from the residency that you were at
14  for us to be able to hire you and they said for me
15  to even -- I did speak to the program director at
16  length, but he said that they would only like have
17  me come in for an interview if that was given.
18  There was no problem going forward with that.
19  Because otherwise they said it's not useful for me
20  to go in, because I had to fly all the way to
21  Kansas City.
22    Q.    Did you apply for a position at NYU?
23    A.    Right, I did apply to several
24  different positions. I applied to a GYN
25  fellowship and a neuropathology or something

Computer Reporting NYC Inc.
(212) 986-1344

1016

Varughese

2  fellowship, and I think I also applied for some
3  bone and soft tissue fellowship.
4    Q.    Were you interviewed for any of those
5  positions?
6    A.    I think I spoke to someone very
7  briefly on the phone and I think they said that
8  they hired somebody else or something.
9    Q.    Did you apply for a position at Beth
10  Israel Medical Center?
11    A.    Right.
12    Q.    Who did you speak to?
13    A.    I spoke to the coordinator there and
14  then I interviewed there with the hematology
15  department.
16    Q.    What position were you applying for?
17    A.    It was like hematology/
18  hematopathology fellowship.
19    Q.    What happened to that? I take it you
20  didn't get it. Did they give you a reason why you
21  didn't get it?
22    A.    Right. I didn't get that position
23  and, yeah.
24    Q.    Were you given a reason as to why you
25  weren't hired for that position?

Computer Reporting NYC Inc.
(212) 986-1344

1017

Varughese

1  
2      A.    No, I have not been in communication
3  with them since my interview.
4      Q.    And then you said you applied for, I
5  think you said fellowships at Stony Brook?
6      A.    Yes.
7      Q.    What position did you apply for a
8  fellowship in particular?
9      A.    I think it was just a surgical
10  pathology fellowship.
11      Q.    Were you interviewed for that job?
12      A.    No.
13      Q.    Did you receive any communication from
14  Stony Brook as to how your application was handled
15  or rejected?
16      A.    No.
17      Q.    So you applied to Stony Brook for a --
18      A.    I don't know if I applied there
19  actually. I'm not sure if I applied. Oh, you
20  know what? I applied to Staten Island University
21  for sure. Because they were starting a residency
22  program there for the first time, like last year
23  or this year. And they were looking to fill
24  first, second, third and fourth year slots.
25           So I applied for like I guess the

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1018

Varughese

1  
2  fourth year slot, if they had any. And I got into
3  this like back and forth communication with their
4  people, which who knows? I didn't even know what
5  was going on there. Because they would e-mail me
6  every other week telling me that they were
7  interested in me as a candidate, then I would not
8  hear from them.
9           Then I talked to, I think the director
10  there is Simpkins (phon) or -- I'm not sure. But
11  he, I think he e-mailed me or something once and
12  he said, Oh, yes, we're interested, and then I
13  didn't hear anything. Like, I don't know.
14      Q.    Did you ever hear from Staten Island
15  University regarding your application?
16      A.    Right. They told me that they wanted
17  to interview me and then they backed out at the
18  last minute.
19      Q.    Again, I take it you didn't get the
20  job. Did they give you a reason as to why you
21  didn't get it?
22      A.    No, I have not in been communications
23  with them since then. They were the ones who were
24  e-mailing me telling me they were interested in
25  hiring me and asking me for my references and such

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1019

Varughese

1  
2  and then they give me interview date and then they
3  choose not to interview.
4           I mean, I don't know. I have to
5  assume Mount Sinai Medical Center is interfering
6  here.
7      Q.    When was the last time you were in
8  communication with somebody at Staten Island?
9      A.    I don't remember now.
10      Q.    This year?
11      A.    This is 2013. No, I think it's 2012.
12      Q.    Did you apply for a position at SUNY
13  Downstate?
14      A.    I'm not sure actually. I'm not sure.
15      Q.    You said that you applied for a
16  pathology assistant position at Nassau County
17  Medical Center?
18      A.    Right, pathology assistant.
19      Q.    Were you interviewed for that job?
20      A.    No, I spoke to the program director,
21  someone on the phone, and they thought I was too
22  qualified for the job.
23      Q.    Then there were the tech job and the
24  medical writing position. I think you thought
25  one, if I've got them right, NovoPath and

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1020

Varughese

1  
2  Novartis.
3      A.    Right.
4      Q.    NovoPath was the tech job?
5      A.    Yes.
6      Q.    What was tech job?
7      A.    It was just sales and IT. Just IT
8  sales of their like NovoPath platform to pathology
9  practices.
10      Q.    And you applied for the position?
11      A.    Yes.
12      Q.    Were you interviewed?
13      A.    Yes, I spoke to the person who was
14  coordinating the, you know, search.
15      Q.    And were you offered the job?
16      A.    They were considering it, but then
17  they didn't offer me the job.
18      Q.    Were you given a reason as to why you
19  didn't get the job?
20      A.    No.
21      Q.    How did you find out you weren't
22  getting the job?
23      A.    Oh, I just called them.
24      Q.    They didn't give you a reason.
25      A.    I mean, no. I mean, I told them what

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1021

Varughese

1  happened with the Mount Sinai Medical Center.
2  They were like, why are you looking for this job?
3  I mean, you're a doctor. Why would you want to do
4  this job instead of being a physician?
6         I said, well, I'm in this situation
7  right now and I'm just trying to mitigate, you
8  know, I'm looking for a job because I need money
9  to pay for my bills and, you know, I was willing
10 to work with them and travel, whatever, and that's
11 what I told them.
12      Q.   What medical writing job did you apply
13 for at Novartis? What was that job, the job
14 duties?
15      A.   Novartis, this is just like regular
16 medical scientific writing.
17      Q.   Were you interviewed for that
18 position?
19      A.   No.
20      Q.   Did you get any response to your
21 application?
22      A.   No, it was just nothing. I just
23 applied.
24      Q.   So you submitted an application.
25      A.   Right.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1022

Varughese

2       Q.   And you never heard from them.
3       A.   No.
4       Q.   Dr. Varughese, other than, let me just
5  run through them, University of Pennsylvania,
6  Oregon State, Kansas State, NYU, Beth Israel
7  Medical Center, Nassau County, Staten Island
8  University, NovoPath and Novartis, is there
9  anyplace else that you've applied for a position?
10      MR. WRONKO: She also testified to the
11 use of ERAS --
12      MR. McEVOY: Correct.
13      Q.   And your use of ERAS.
14      A.   Yes. So I applied -- where did I
15 apply? So I applied to Planned Parenthood just as
16 like I guess sort of -- I don't even know what the
17 position is now. But they said that it was no
18 longer available. That's all they said. And I
19 mean, I just got an e-mail response back.
20      And let's see. Right, I applied to
21 this position, hematology or something in Florida.
22 And I think it was University of Florida or
23 University of Miami or something. And what did
24 they say? I mean, that lady was just really mean.
25 I forgot what her name was, but it was a program

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1023

Varughese

1  director and she was really mean and rude to me
2  and she said that like, I don't even remember. I
3  mean, I do remember. She was just extremely rude
4  and mean to me.
6       She led me on to believe that she
7  would be interested in me applying for this job.
8  She got all my information and she calls me within
9  like an hour and says that she's not interested in
10 hiring me.
11      And I was like, Well, OK, that's fine.
12 Do you have a reason? And she was very rude to me
13 when I asked her for the reason as to why she was
14 not following up on the reference. And she didn't
15 tell me she was hiring somebody else for the job.
16 She just said we don't want you working here kind
17 of thing. And --
18      Q.   Before you go on to the next one, what
19 information did you send to the University of
20 Florida?
21      A.   Just my like general application and a
22 bunch of references and....
23      Q.   References from physicians?
24 References from --
25      A.   Yeah, from physicians, right. Then I

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1024

Varughese

2  applied to a, what is it? forensic pathology
3  fellowship in Virginia, University of Virginia, in
4  the DC area or something.
5       Q.   Where did you apply?
6       A.   The University of Virginia. I think
7  it was Virginia.
8       Q.   No, I understand the state. But what
9  was the name of the --
10      A.   I can't think of it off the top of my
11 head right now. I had a long conversation with
12 the program director for that position. And she
13 was very nice to me and she just said that, you
14 know, because of what had happened it would be
15 hard for her to like hire me.
16      Q.   When you say "what had happened," did
17 she say --
18      A.   Basically being pretextually
19 terminated from my residency program. And they
20 had give the Summative Evaluation, I discussed the
21 Summative Evaluation with her.
22      Q.   With the program director.
23      A.   With the program director, and she
24 didn't think she could hire me.
25      And then the other thing was, I did

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1025

Varughese

1  not have my forensics rotation like at Mount Sinai
2  Medical Center, and so I didn't have more
3  experience in the field either.  So she was
4  thinking like, you know, it would be hard for her
5  to -- difficult for her to hire me at that point.
6       Q.    Anywhere else that you applied for a
7  job since you were terminated at Mount Sinai?
8       A.    Right.  But I applied for like
9  forensics again in, where is it?  LA.  That didn't
10 pan out either.
11      Q.    I'm sorry?  I didn't hear you.
12      A.    That didn't pan out.
13      Q.    When you say it didn't pan out, what
14 happened?
15      A.    They weren't -- I think they had
16 already hired someone or they told me to reapply
17 the following year or something.
18      Q.    Anywhere else that you applied for a
19 job?
20      A.    That's all I can think of right now.
21      Q.    Now, Dr. Varughese, you told me that
22 in connection with the application to Robert Wood
23 Johnson that Dr. Fife had told you that she spoke
24 to somebody at Mount Sinai and they refused to

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1026

Varughese

1  provide references or information about you, and
2  I'm not talking about ERAS so much.
3           But with regard to all of the other
4  places that you've identified, and I'll try to
5  avoid going through them one at a time, and I know
6  you thought at various times that Mount Sinai may
7  have or you imagine that they would have talked to
8  these institutions, did anybody at any of these
9  institutions ever tell you they had spoken to
10 somebody at Mount Sinai?
11      A.    Well, I was told by Dr. Kalir, the
12 people at Mount Sinai Medical Center, that they
13 had received phone calls for references for me and
14 they were refusing to provide them.
15      Q.    So did Dr. Kalir tell you that she had
16 received phone calls?
17      A.    Yes, and she had also told me she had
18 received several phone calls from a variety of
19 people that I applied to.
20      Q.    Did she tell you who she had received
21 phone calls from?
22      A.    She did tell me at that time who it
23 was, but I don't remember right now from all the
24 people she said.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1027

Varughese

1       Q.    Other than Dr. Kalir telling you that
2  she had received phone calls from some of the
3  places you applied to, did she tell you that other
4  people at Mount Sinai had received phone calls
5  about you?
6       A.    Other people at Mount Sinai Medical
7  Center had received phone calls?  Well, right.
8  Dr. Lemp, she's at the VA, Azra Lemp.  She told me
9  she got phone calls from several different places.
10      Q.    Wait.  Who's the she now?  Is that
11 Dr. Lemp?
12      A.    Dr. Lemp.
13      Q.    So Dr. Lemp told you --
14      A.    Right.
15      Q.    -- that she had gotten phone calls
16 from several places.
17      A.    Right.
18      Q.    Did Dr. Lemp tell you what she had
19 said in response to those phone calls about you?
20      A.    She just said, I put in a good word
21 for you.  Hopefully you will get this job.  Good
22 luck.
23      Q.    What did Dr. Kalir say she had said in
24 response to these phone calls?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1028

Varughese

1       A.    Same thing, that she had put in a good
2  word for me.
3       Q.    So is there anybody else at Mount
4  Sinai that you know received phone calls from any
5  of these institutions about your application for
6  employment?
7       A.    Well, I don't know if I used anybody
8  else as a reference.  But I do know that Dr. Figur
9  and the department leadership in the hospital had
10 received phone calls and they had not responded.
11      Q.    Other than Robert Wood Johnson how do
12 you know that Dr. Figur and others had
13 received phone calls?
14      A.    Not Dr. Figur, Dr. Firpo.
15      Q.    Oh, I'm sorry, I thought you said
16 Dr. Figur, that Dr. Firpo and others had received
17 phone calls about you?
18      A.    Because I was informed as such and
19 they were being given the runaround for like weeks
20 and weeks without getting the appropriate
21 reference.
22      Q.    Other than what happened at Robert
23 Wood Johnson, what other institutions do you know
24 called Dr. Firpo and others and, to use your word,

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1029

Varughese

1  were given the runaround?
2
3  A.   There's this one job I applied to and
4  they called and they did not get the needed
5  references.
6  Q.   What job was that?
7  A.   Well, you know, there were several
8  jobs that happened with.  And that was verified,
9  that was sort of inferred to me over the time
10 period that this was happening.  Then, yeah.
11 Q.   My question is, which of these
12 institutions or employers, potential employers
13 that you identified --
14 A.   I don't know which one exactly, but
15 this is like happening, you know.
16 Q.   Who verified to you that some of these
17 institutions were calling Dr. Firpo and others
18 about you?
19 A.   Well, like I said, Dr. Kalir told me
20 that she received a phone call and then Dr. Lemp
21 told me she had received phone calls and people
22 who I put as references informed me they had
23 gotten calls back regarding the reference.
24       So I assume Dr. Firpo being the
25 program director, newly made program director for

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1030

Varughese

1
2  this pathology department would also receive the
3  phone calls, because he was on the Summative
4  Evaluations.
5  Q.   So that's your assumption, that they
6  would have called him --
7  A.   Well, program directors --
8  Q.   Let me finish the question.  So you
9  know that Dr. Kalir received calls, Dr. Lemp
10 received calls because you gave them as references
11 and they told you they had received calls.
12 A.   Right.
13 Q.   I take it Dr. Firpo never told you he
14 received a call about you.
15 A.   No, he didn't.  But people said
16 that -- I was informed that he was called and he
17 was supposed to respond to the requests.
18 Q.   And who informed you of that?
19 A.   Well, for instance, Dr. Fife told me
20 that she had called and she tried to speak to him
21 and he would not respond to her.
22 Q.   And I said to you, other than Robert
23 Wood Johnson.  I know that you were there and
24 Dr. Fife called --
25 A.   Oregon State, health, university,

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1031

Varughese

1
2  whatever, they made the same phone calls and they
3  were going to speak to Dr. Firpo because he's a
4  program director.  He is the one person who these
5  programs call.
6  Q.   So I'm just trying to understand.  Is
7  it your belief that the University of
8  Pennsylvania, Oregon State, for example, called
9  Dr. Firpo because they told you they were going to
10 call Dr. Firpo or the program director or because
11 you believed that that's the person they would
12 have called to get a reference on you?
13 A.   Because by default he's the program
14 director and they are called.  Like it doesn't
15 matter.  Like five years from now, like they would
16 still call this program director.
17 Q.   So that's your understanding of how
18 the process works.
19 A.   That's how it works, yes.  That's
20 absolutely how it works.
21 Q.   Dr. Varughese, we've had a fair amount
22 of testimony about your interest in taking an FMLA
23 leave at various times, sometime in September and
24 I think sometime earlier, and I don't want to ask
25 you to repeat that testimony.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1032

Varughese

1
2       But there is a claim that Mount Sinai,
3  the individual defendants, interfered with your
4  efforts to exercise your rights under the FMLA.
5       And in the complaint in paragraph 56,
6  if you would like to take a look at that.  Have
7  you had a chance to read that paragraph?
8  A.   Yes.
9  Q.   It says that barring you from the
10 workplace, and we've had testimony about that,
11 that barring you from the workplace and asking you
12 to provide a doctor's note are the allegations
13 that support the claim that they were done to
14 interfere with -- I'll quote it, they were, quote,
15 taken to interfere with Dr. Varughese's attempts
16 to exercise her rights under FMLA, unquote.
17       So other than barring you from the
18 workplace and asking for the doctor's note, is
19 there any anything else that the hospital did to
20 interfere with your attempts to exercise your
21 rights under the FMLA?
22 A.   Well, they fired me even before I
23 brought in the doctor's note.  They fired me.  I
24 met with HR and they decided to fire me and they
25 told me to go and get this doctor's note and they

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1033

Varughese

1  fired me even before I brought in the doctor's
2  note. They told me to come back with a doctor's
3  note even though they had fired me already. They
4  had made that decision that morning.
5      Q.   Anything else? And the anything else,
6  just so that we're clear, is there anything else
7  that you believe that Mount Sinai or the other
8  defendants did to interfere with your efforts to
9  or attempts to exercise your rights under the
10 FMLA?
11     A.   Right they changed my duties without
12 me -- without knowing, according to HR, according
13 to Caryn Tiger-Paillex, she does not know why I
14 want to take this leave, if it's for me or
15 somebody else. She doesn't know. But the
16 hospital in the meantime decided to tell me not to
17 be at work.
18     Q.   So that's barring you from the
19 workplace. But other than barring you from the
20 workplace, asking you for a doctor's note and
21 terminating you, any other way in which or
22 anything else that you believe the hospital did to
23 interfere with your attempts to exercise your
24 rights under the FMLA?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1034

Varughese

1      A.   Right, and then they had Shema Patel
2  detain me in her office and prevent me from, you
3  know, being able to do what I need to do. Whether
4  it's like going to get coffee or even going to a
5  conference, she was preventing me from doing that.
6  She was physically telling me that I had to
7  physically be in this office space and not go
8  anywhere.
9      Q.   Anything else?
10     A.   I mean, that's clearly counter to like
11 me being able to like exercise my rights.
12     Q.   Anything else in terms of the FMLA?
13     A.   Yes.
14     Q.   Well, with the FMLA they said that,
15 you know, I was trying to take the FMLA to pull
16 one off. Lento said that, in some e-mail, that I
17 was trying to take advantage of them by going on
18 FMLA. It wasn't like they didn't even -- they
19 weren't taking me seriously on one level. They
20 were saying I was trying to take advantage of them
21 by going on FMLA.
22     And I was going to take advantage of a
23 conference, Osler conference, which they were not
24 going to pay for me anyway. They had already

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1035

Varughese

1  clearly given me indications they weren't going to
2  pay for my Osler conference. My only hope was
3  that I would get that time to actually attend the
4  conference since I had already paid for it and
5  everything. It would have been a complete
6  financial and monetary waste for me. So I was
7  just simply hoping I could go.
8      And they were saying that, oh, I'm
9  going to take this leave. Then they are going to
10 pay for my conference and it's going to be me
11 taking advantage of them. Because I'm on leave.
12     I mean, this is the kind of, you know,
13 defamatory harassing abusive stuff that I've had
14 to deal with there every single day.
15     Q.   I understand that and right now we're
16 talking about the FMLA, not about defamation.
17     Can you tell me if there is any other
18 way in which you think the hospital interfered
19 with your efforts or attempts to exercise your
20 rights under the FMLA?
21     A.   Right, and then they made me do, you
22 know, they started taking actions against me again
23 with PWC. They were referring me to PWC because I
24 requested FMLA essentially. Because I don't know

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1036

Varughese

1  what the real reason was because I wasn't doing
2  anything wrong. I was there at work. I didn't do
3  anything wrong.
4      I mean, Robert Guarino cancelled his
5  presentation on Wednesday. Was there any action
6  taken against Robert Guarino, the white male
7  resident?
8      Q.   Dr. Varughese, just answer this
9  question. What does Dr. Guarino cancelling his
10 presentation in September have to do with --
11     A.   On September 13, 2011.
12     Q.   I understand that. What does
13 Dr. Guarino's cancelling his presentation have to
14 do with your efforts or attempts to exercise your
15 rights under the FMLA?
16     A.   On September 14, 2011, Robert Guarino
17 cancelled his presentation that he was scheduled
18 to present on September 15, 2011. He was not
19 referred to Physician Wellness Committee for such
20 a late cancellation. Nothing. No actions were
21 taken against them. No consequences for his
22 behavior.
23     Once again, he's a Caucasian doctor
24 being treated completely differently by, within

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1037

Varughese

1 the hierarchy and by the hospital and by the
2 administration. And here I am, I simply do not
3 present and then I'm being constantly harassed at
4 work nonstop and my character being defamed, and I
5 can't even take a leave of absence. I can't even
6 request a leave of absence and follow up because
7 the hospital is going to interfere with it and
8 then tell me that I'm not fit for duty and, you
9 know.
10          They didn't even say that actually.
11 They didn't say I was unfit for duty. They just
12 made me not come in to work. They gave me no
13 reason at all. They just said don't come into
14 work. That's interfering with my ability to take
15 FMLA leave.
16          I mean, that's enough discouragement
17 for anybody asking for a leave of absence to know
18 that their employer is going to go out of his way
19 to defame you, make up all this stuff, refer you
20 to disciplinary psychiatry or Physician Wellness
21 Committee without you requesting any assistance.
22 It's completely defamatory and completely, you
23 know, obstructive of the process of taking FMLA
24 leave.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

1039

Varughese

1
2     A.    Yes.
3     Q.    Can you tell me what it is?
4     A.    This is the doctor's note that I
5 provided.
6     Q.    And this is the doctor's note dated
7 9/20/11.
8     A.    Right.
9     Q.    Signed by Jose Barbizon-Silva?
10    A.    Yes.
11    Q.    And who did you give the doctor's note
12 to?
13    A.    I gave it to Roberto who is like Caryn
14 Tiger's personal assistant, administrative
15 assistant or personal assistant.
16    Q.    Did you give it to Roberto on
17 September 20th?
18    A.    Right. Yeah, and -- yeah.
19    Q.    What time of day did you give it to
20 him?
21    A.    This was like around noon.
22          I also e-mailed Caryn Tiger telling
23 her that I had the note. I e-mailed Graduate
24 Medical Education also telling them that I had the
25 note.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

1038

Varughese

1
2     Q.    Anything else?
3     A.    Right. I mean, they changed my duties
4 and I felt like my duties would be changed if I
5 did take a leave. They were going to like, you
6 know, defame me and, you know, change my, um,
7 change basically my work and place different
8 requirements on me than others. So that was a
9 threat.
10          I mean, they told me I cannot come
11 into work when I asked for FMLA and I felt they
12 were threatening me and I could not really process
13 the FMLA leave request. I could not follow up
14 with my physicians. Because I was fired even
15 before I could even do any of these things for
16 simply making a request.
17    Q.    Anything else?
18    A.    That's all I can think of now.
19    Q.    Let me show you a document.
20          MR. McEVOY: Mark this as Exhibit 61.
21          (Defendants' Exhibit 61, note from
22 Dr. Jose Barbazan-Silva, dated 9/20/11,
23 Bates No. P883, marked for identification,
24 this date.)
25    Q.    Do you recognize that?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

---

1040

Varughese

1
2          But of course they had already made
3 the decision to fire me well before this note ever
4 arrived, so....
5          MR. McEVOY: Just take a two-minute
6 break.
7          (A recess was taken at 12:41 p.m.)
8          MR. McEVOY: This would be a good time
9 to take our lunch break.)
10          (A luncheon recess was taken at
11 12:48 p.m.)

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1041

Varughese

1    A F T E R N O O N   S E S S I O N
2         (Time noted:  2:04 p.m.)
3    L E E N A   V A R U G H E S E ,   resumed and
4        testified further as follows:
5    EXAMINATION BY (Cont'd.)
6    MR. McEVOY:
7         Q.    Dr. Varughese, after you were
8    terminated at Mount Sinai when did you first start
9    looking for a new job?
10        A.    Immediately afterwards.
11        Q.    And immediately as in when?  Next day?
12        A.    Well, after November.
13        Q.    I'm sorry?
14        A.    After the hearing.
15        Q.    After the hearing or after you got the
16   decision from the hearing?
17        A.    No, actually after the hearing, maybe
18   even before the hearing, because the ERAS process
19   was in place at that time.  So I had to write to
20   people to obtain all my documents, and so on.
21        Q.    So the record is complete, could you
22   explain what the ERAS process is?
23        A.    It's just Electronic Residency --
24   Algorithm System?  I don't know.  But anyway, it's

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1042

Varughese

1    basically where you interview with a variety of
2    programs and you basically put the programs into
3    order preference and if the program ranks you,
4    depending on the highest preferences, the program
5    ranks the different people who they interviewed,
6    and if it happens to like be high enough, then you
7    go to that program.
8         Q.    Did you get any interviews out of the
9    ERAS system?
10        A.    Did I?  I spoke to several programs,
11   yeah.  But I don't know.  I don't think I did a
12   formal interview, no.  Because it's usually for
13   first-year residents.  They don't do the ERAS
14   traditionally for fourth years, but I put an
15   explanatory note regarding my situation.
16        Q.    Was there any period of time after you
17   were terminated from the program at Mount Sinai
18   that you weren't able to work for a medical reason
19   or any other reason?
20        A.    No.
21        Q.    And are there any areas of work or any
22   jobs that you're qualified for or that you were
23   overqualified for that you didn't look for work
24   in?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1043

Varughese

1         MR. WRONKO:  Form objection.  You can
2    answer.
3         A.    Well -- what is the question?
4         Q.    The question is, let me put the
5    question a different way.  What types of jobs did
6    you apply for or look for?
7         A.    Jobs that required a medical degree
8    and jobs that did not require a medical degree as
9    well.
10        Q.    So what jobs that required a medical
11   degree did you look for?  You told me about
12   residency programs and fellowships.
13        A.    Right.  I had applied to a research
14   position at Eli Lilly.  Actually, they contacted
15   me about the Eli Lilly position, and, you know,
16   obviously I had explained that, I had been fired
17   from the residency program, and, you know, and
18   then they were not interested.
19        Q.    Any other job that you applied for
20   that required a medical degree?  Or looked into,
21   you didn't have to actually apply, but what you
22   were looking for.
23        A.    Right, I mean, I wanted to do the
24   research position because I thought I would be

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1044

Varughese

1    very qualified for it because I have research
2    experience and I know how to read and analyze the
3    scientific papers.  It's not that complicated for
4    me.  So I applied to that.
5         And they actually wanted to know the
6    details of why I got fired and I said it was
7    discriminatory and I'm in the process of, you
8    know, filing the complaint and going through the
9    process of, you know, I guess adjudicating the
10   matter, but I was looking for employment in the
11   meantime and even considering it possibly
12   eventually for like a couple of years to get some
13   experience.  And they were not interested in
14   hiring me because of my employment history with
15   this whole situation.
16        Then what else?
17        Q.    Any other positions that you looked
18   for that required a medical degree in addition to
19   the position at Eli Lilly, fellowships and the
20   residency program?
21        A.    No, I think that's it.
22        Q.    With regard to jobs that didn't
23   require a medical degree, and this morning you
24   told me about the writing job, the tech job.  Any

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1045

Varughese

2  others?
3      A.   Yes, the pathology assistant job, the,
4  you know, I guess I tried to apply to internships
   in a variety of different fields such as like
6  journalism and such.  But nothing panned out.  It
7  didn't work out.
8      Q.   How did you go about looking for work?
9      A.   Just applied on line.
10     Q.   How did you go about identifying that
11 there were available positions?
12     A.   I just did a search or, you know, I
13 heard about it through e-mails that were sent to
14 me from different places.
15     Q.   When you said you did it through a
16 search, do you mean an on-line Web search?
17     A.   Right.  Like most of these companies
18 have a job search thing and you can put in your
19 e-mail address and your specific qualifications
20 and they will send you something if they think
21 that it's a suitable job.  I mean, I get e-mails
22 from work and some other companies.
23     Q.   Did you look at newspapers or
24 professional magazines for jobs?
25     A.   Not really.

1046

Varughese

2      Q.   And were the applications that you
3  made on line or were they in hard copy, if I can
4  use that expression?
5      A.   Some of the jobs were just on the
6  website itself for the organization.  For
7  instance, like Merck has its own application
8  process.  You can just apply with them directly.
9  So I've done that.  Some other hospitals, like
10 Valley Hospital in New Jersey, I think they were
11 looking for a pathology assistant job and I just
12 applied on their website and I submitted.
13     Q.   And when you did an on-line
14 application did you print out a copy of the
15 application?
16     A.   Not always.
17     Q.   What kind of responses did you get?
18 In what form did you get responses?  Did people
19 send you letters, send you e-mails, respond on
20 line?  How did they do it?
21     A.   I mean, I didn't really hear back much
22 from a lot of the jobs.
23     Q.   And have you received any job offers
24 since you were terminated at Mount Sinai?
25     A.   Well, other than Robert Wood Johnson

1047

Varughese

2  and potentially like the Kansas State, Kansas City
3  or, I mean, I just got like, you know, people
4  interested in hiring me, but not being able to
5  hire me.
6      Q.   So you never actually received a job
7  offer.
8           MR. WRONKO:  Form objection.
9      Q.   By that I mean an actual offer.  I
10 understand what you said about Robert Wood Johnson
11 and the others, but did anybody ever actually
12 offer you a job?  Here's the offer.  We would like
13 you to start at this salary on this date at this
14 position?
15     A.   Right, that's what I mean.  Like with
16 Robert Wood Johnson they did offer to do that in
17 July of 2011.  So that was an offer.
18     Q.   Any other jobs that you were offered?
19     A.   No, I don't think I was offered.
20     Q.   Since you say you were offered a job
21 at Robert Wood Johnson why didn't you take the
22 offer?
23     A.   It wasn't that I didn't take the
24 offer.  We discussed this just a few minutes ago.
25     Q.   So it's what you said this morning

1048

Varughese

2  about what happened at Robert Wood Johnson.
3      A.   Right.
4      Q.   OK.  Did you can use any search firms
5  or headhunters in your job search?
6      A.   No.  Oh, I did.  I did talk to some
7  headhunters and -- yeah.  I mean, I couldn't do it
8  because I don't have my board certification.
9      Q.   So did you actually work with any
10 headhunters or search firms to get any job?
11     A.   Right, I spoke to several headhunters
12 over the years.  I refer them to people who are
13 looking for a job in pathology.  But I couldn't
14 utilize them because there is no possibility for
15 me to do the board exam as of right now even
16 though I met all my requirements and I have over
17 60 autopsies, and for some reason I'm not allowed
18 to take my board exams with the American Board of
19 Pathology.
20     Q.   I will show you a group of documents.
21          MR. McEVOY:  Mark this as Exhibit 62.
22          (Defendants' Exhibit 62, document
23 headed "Leena Varughese, M.D., Interview
24 Schedule, Wednesday, March 06, 2013," Bates
25 Nos. P827 to P852, marked for

1049

Varughese

1    identification, this date.)
2    Q.    Take a look at that, Dr. Varughese,
3    and let me know when you've had a chance to do
4    that.
5    A.    OK.
6    Q.    Dr. Varughese, these are the
7    documents, and they are Bates stamped numbered
8    P-827 to P-852 consecutively, these are the
9    documents that were produced by you, by
10   Mr. Wronko, in response to a request for documents
11   reflecting your efforts to find a job after you
12   were terminated at Mount Sinai.
13         Are these all of the documents that
14   you have in your possession about your job search?
15   A.    As I described you, obviously I
16   applied to more jobs than the number that, you
17   know, is documented through these.
18   Q.    Do you have any documents regarding
19   those jobs that you applied to other than what's
20   here?
21   A.    I mean, I probably just have e-mails
22   and just....
23   RQ    MR. McEVOY:  So if I need to, I will
24   make the follow-up request to produce

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1050

Varughese

1    whatever other documents, whether e-mail
2    form or whatever form they're in, about
3    Dr. Varughese's job search.
4    Q.    Now, since your termination in
5    September of 2011 what, if any, sources of income
6    have you had?
7    A.    I've just had unemployment.
8    Q.    And during what period of time did you
9    collect unemployment?
10   A.    I don't know.
11   Q.    What was your weekly benefit rate?
12   A.    Like $400.
13   Q.    So other than unemployment you haven't
14   had income from any source, not from employment --
15   A.    Yeah.
16         MR. WRONKO:  Let him finish the
17   question.
18   Q.    From any other source.
19   A.    Like from my friends, family.
20   Q.    Any other source?  Any income from
21   investments?
22   A.    Investments?
23         MR. WRONKO:  Form objection.  I don't
24   know what the relevance would be of that.  I

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1051

Varughese

1    mean, that goes into an area that's
2    confidential I believe because income from
3    investments would not be mitigation income.
4         MR. McEVOY:  It may or may not
5    depending on where it comes from.
6    Q.    So without going into the details,
7    just answer my general question, have you had
8    income from investments?  And we'll worry about it
9    later if we need to.
10   A.    I don't know.
11   Q.    Have you applied for Workers'
12   Compensation benefits?
13   A.    No.
14   Q.    Any form of disability benefits?
15   A.    No.
16   Q.    Social Security benefits?
17   A.    No.
18   Q.    Let me show you a document.
19         MR. McEVOY:  Mark this as Exhibit 63.
20         (Defendants' Exhibit 63, Form W-2,
21   Wage and Tax Statement, 2011, for Leena
22   Varughese, marked for identification, this
23   date.)
24   Q.    Do you recognize the document I've

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1052

Varughese

1    just shown you?
2    A.    Yes.
3    Q.    Tell me what it is.
4    A.    A wage and tax statement for 2011.
5    Q.    It's the W-2 form you received from
6    Mount Sinai?
7    A.    No.
8         MR. WRONKO:  Form objection.
9    A.    I don't think so.
10   Q.    Who did you receive this document
11   from?
12   A.    I don't know.
13   Q.    In any event, does this document show
14   the amount of wages or other compensation that you
15   earned in 2011?  The number is $44,702.41.
16   A.    I don't know.  I don't think it does.
17   Q.    Sorry?
18   A.    It may show, I mean, I don't know if I
19   received unemployment that year.  I think that's
20   going to be added to that.
21   Q.    OK.
22         Let me show you another document.
23         (Defendants' Exhibit 64, 1040 U.S.
24   Individual Tax Return for 2102 for Leena

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1053

Varughese

1  Varughese
2  Varughese, marked for identification, this
3  date.)
4      MR. WRONKO:  I just want to note for
5  the record that this document does not bear
6  a confidential stamp.
7      MR. McEVOY:  Would you like to
8  designate it as such?
9      MR. WRONKO:  I would like to designate
10  it confidential.
11      MR. McEVOY:  Fine.  I would have
12  treated it that way anyway.
13      MR. WRONKO:  Thank you.
14      Q.    Do you recognize this document,
15  Dr. Varughese?
16      A.    Yes.
17      Q.    Can you tell me what it is?
18      A.    It's a 1040 tax form.
19      Q.    Is this your 1040 tax form for the tax
20  year 2012?
21      A.    Yes.
22      Q.    And if you look on the first page it
23  shows on line 19 unemployment compensation of
24  $17,415?
25      A.    Yes.
*Computer Reporting NYC Inc.*
*(212) 986-1344*

1054

Varughese

1
2      Q.    Does that refresh your recollection as
3  to how much unemployment insurance benefits you
4  received?
5      A.    Yes, that's probably it.
6      Q.    And you earned no wages or salaries in
7  2012.
8      A.    No.
9      Q.    Is that correct?
10      MR. McEVOY:  Off the record.
11      (Discussion off the record.)
12      MR. McEVOY:  May I speak to you
13  outside for a minute?
14      (A recess was taken.)
15  BY MR. McEVOY:
16      Q.    Just so that the record is complete,
17  I'm not going to ask you, Dr. Varughese, about
18  damages.  But since Mr. Wronko has provided me
19  with your economic expert's report calculating
20  your actual damages and since that is what will be
21  relied on at the time of trial, I'm not going to
22  ask you questions about your actual damages
23  because that would seem more appropriate for me to
24  ask your expert.  So I'm not going to ask you
25  about your actual damages, but we'll simply
*Computer Reporting NYC Inc.*
*(212) 986-1344*

1055

Varughese

1
2  address that issue to the expert.
3      In your complaint, Dr. Varughese, you
4  make a demand for emotional distress damages,
5  which are generally understood to be damages for
6  humiliation, mental anguish, things of that sort.
7      And I think as you also know recently
8  you withdrew your claim for intentional emotional
9  distress and Mr. Wronko represented to the court
10  and the court approved that at trial you would be
11  limited to what they call garden variety emotional
12  distress damages which come from really the
13  plaintiff in this case, you, your own testimony.
14      So what I would like to ask you now
15  is, tell me how it is you believe that you
16  suffered emotional distress damages or emotional
17  distress as the result of what you allege was done
18  to you at Mount Sinai in terms of retaliation,
19  discrimination and the other claims that you
20  assert?
21      A.    Well, it was very pervasive
22  discrimination and retaliation where I experienced
23  a lot of anxiety, fear to be at my workplace even.
24  I experienced a lot of, um, you know,
25  depression-type symptoms, of feeling helpless, you
*Computer Reporting NYC Inc.*
*(212) 986-1344*

1056

Varughese

1
2  know, being, you know, being emotionally crying,
3  you know, when I'm going home from work every day
4  because of the treatment that I was receiving at
5  Mount Sinai Medical Center.
6      I was being constantly harassed by the
7  department, by the leadership, being subjected to
8  a standard that was not expected for anybody else
9  but me since I made a complaint about being
10  harassed at work.
11      Q.    Any other way in which you experienced
12  mental anguish?
13      A.    Right, I experienced sleeplessness,
14  you know, I had an increased sense of anxiety and
15  fear.  I have experienced, you know, not being
16  able to do my work like I normally would because
17  I'm being distracted from my job and my career by
18  an organization that's intent on, you know,
19  forcing me to quit almost with all the harassment
20  every day.
21      So I felt more, you know, as this went
22  on I felt more distracted.  You know, I tried to
23  stay focused on my job and I did stay focused on
24  my job, but it took an extra effort for me because
25  of everything that was happening.
*Computer Reporting NYC Inc.*
*(212) 986-1344*

1057

1    Varughese
2    Q.   And just so that I'm sure you
3  understand my question, I'm not limiting how you
4  experienced mental anguish or mental distress
5  while you were still employed at Mount Sinai.
6         I'm also asking you whether you've
7  experienced mental anguish or mental distress or
8  emotional distress since you were terminated at
9  Mount Sinai.  So after you left the program.
10   A.   Yes, I continued to experience
11 anxiety, a lot, you know, I mean, I'm a highly
12 qualified, highly trained individual who like --
13 essentially I worked really hard and I was sort of
14 set for success.  I mean, I've given it a lot of
15 efforts and energy.  I consider my career to be
16 essentially my child.  I forgo my opportunity to
17 get married or whatever when I was 20 something in
18 order to pursue a career and advance myself both
19 economically and professionally.  And that's being
20 derailed actually by an organization.  I've felt
21 that that's the case and I've been very
22 distraught.
23        I, you know, I've had to get help for
24 it.  I've had to get therapy.  I had to get into
25 meditation and, you know, alternative therapies

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1058

1    Varughese
2  and such for me to feel like I can cope with
3  what's happening.
4         I have lost sleep, you know, obviously
5  lack of sleep, being unable to sleep.  You know,
6  being so despondent that I can't -- I just feel
7  tremendously sad about what's happening and, you
8  know, sad about the extent of animosity directed
9  at me that in my opinion is really without basis
10 as it's just like to be hated for no reason at all
11 by an organization.
12        It doesn't, you know, to me it doesn't
13 make any sense and something I've had to live
14 with.  I've had to live with the idea that I'm
15 being harassed for no reason by an organization
16 that's intent on destroying my career.
17        And I have to constantly tell my
18 family and friends what I'm going through to allow
19 them to understand what's happening with me.  I
20 don't want them to think like, you know, I'm upset
21 or sad for no reason.  So I have had to explain my
22 situation to all these people.  You know, my
23 friends think that.
24        You know, it's been hard for me.  Like
25 it's hard to go from being, you know, being or

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1059

1    Varughese
2  having some of the opportunities that I really
3  worked at to not really having that for no reason
4  at all.
5         And, I mean, I have not done anything
6  wrong.  I've never, you know, harassed anybody.
7  It's everyday issues in residency.  Everybody else
8  does it.  But I'm the one who gets fired for
9  something that everybody does.
10        I mean, I'm treated very differently.
11 I feel like there is rules for everyone and I'm
12 segregated to the colored women's line and not
13 allowed to interact with everybody else.  Like I'm
14 being cornered off and segregated to, you know,
15 nobody and while everybody else is having this
16 buffet of whatever, and I don't have the same
17 rights because this organization can say that I
18 don't have the same rights as everybody.
19   Q.   So any other way in which you
20 experienced emotional distress or mental anguish?
21 Other than what you already told me.
22   A.   Right, I mean, I felt very sad about
23 all this and I experienced a very, you know, a lot
24 of anxieties, a lot of depression.  I've had to
25 obtain therapy.  I've had to seek out help because

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1060

1    Varughese
2  I really felt that like if I didn't get help I
3  didn't know if I would get through the situation.
4    Q.   Anything else?
5    A.   Well, I think, you know, I mean, over
6  the years I've lost, you know, as this was going
7  on and even now like in terms of me being able to
8  enjoy my life the same way as before, I can't.
9  Like knowing that my opportunities are infinitely
10 less than Adrienne Jordan or Samuel McCash or even
11 Patrick Lento or any of the defendants, it's, you
12 know, to me it's really wrong and to me I don't
13 deserve that and it prevents me from being able to
14 enjoy my life the way I should.
15        It prevents me from being able to
16 really plan my life out.  You know, I'm 33 years
17 old and I was in residency, like I thought I was
18 going to graduate, you know, settle down, have a
19 child.  I thought I would be a mom by now.  Like
20 I'm 33 years old.  I don't have infinite, you
21 know, for fertility and such, and I can't start
22 with my life until it seems like this is really
23 settled for me, because I have no financial
24 stability.  God forbid something happens.  I
25 cannot take care of myself.  Right now I cannot

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1061

Varughese

1  take care of myself. I really have no income. My
2  unemployment was really the only income that I had
3  that was really my own. I don't have that. Now I
4  have to rely on others.
5
6       MR. McEVOY: Excuse me one second.
7       (Telephonic interruption.)
8   **Q.**  Go ahead.
9   **A.**  I have to rely on others for income.
10  I have to rely on others for just about
11  everything.
12       Now, even though like technically I'm
13  highly qualified, I can get a job, I'm good at a
14  lot of different things. I can pick up a lot of
15  different things.
16       Essentially a lot of doctors are the
17  top one percent of the population, and to me it's
18  sad that despite all my qualifications, my
19  capabilities, how intelligent I am, I can't really
20  utilize it the way that I want to and it prevents
21  me from enjoying my life.
22       This whole situation also prevents me
23  from being able to really like, you know, settle
24  down, sort of be respected in the community as a
25  doctor. Like right now it's like people don't see

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1062

Varughese

1  me as, you know, as having a good reputation or
2  take me seriously simply because of the actions of
3  this hospital.
4
5       Did I do anything wrong? Did I ever
6  harm a patient in this process? No. I stood up
7  for patients over the years. I vouched for cases.
8  I fought for my cases. I fought for my patients.
9  I fought for my diagnoses.
10       I have done the right things over the
11  years and, I mean, this hospital doesn't value it.
12  That's not my problem. But, for me I know as a
13  doctor what's important and I've always tried to
14  do the right thing by everybody, whether it's the
15  hospital or my patients. And I know how to do
16  that and it saddens me that I cannot use my skills
17  to better society, to really advance myself, to
18  advance my future and, you know, have a child that
19  I can really support on my own.
20       I mean, it's really sad to me and I
21  really think if this hadn't happened I would have
22  done all of those things.
23   **Q.**  Anything else?
24   **A.**  Yeah, like I mean, like all the
25  things that were said over the years with, I don't

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1063

Varughese

1  know, the hearings and the decisions, and, you
2  know, I find that, like I found those things to be
3  extremely, you know, like problematic and
4  saddening for me because, I mean, a lot of it
5  wasn't true, but because Mount Sinai Medical
6  Center has its reputation, they can say that and
7  get away with it.
8
9       And to me that was, you know, it just
10  made me feel sort of very damaged by this process
11  because like I just felt like I was the sort of
12  person who wouldn't do something like that. I
13  feel like just because there are people like that
14  out there, like I'm being damaged by this, you
15  know, like dragging me into all of this
16  mudslinging that's directed at me. Like I have
17  never done anything to harm the hospital or its
18  operations. I never did that. But they said all
19  these things and it made me really sad and just
20  anxious and really depressed.
21   **Q.**  Anything else?
22   **A.**  No, that's it.
23   **Q.**  Dr. Varughese, you said that at some
24  point you sought out therapy for the problems
25  you've just described. When did you first see

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1064

Varughese

1  somebody, a therapist or psychiatrist?
2   **A.**  Well, I mean, over the years in terms
3  of the residency I was, you know, I spoke to
4  Dr. Berkman, Kathy Berkman. She used to be the
5  resident mental health liaison, because Allen
6  Schiller said there was something wrong with me in
7  my DNA and I was forced to go see her even though
8  like I was doing all my work.
9       It was like October 2009. There was
10  no issues. I testified to that before. I was on
11  autopsy and surgical pathology. There wasn't a
12  single problem there. But he wanted me to go see
13  somebody, and he didn't even say who or what, and
14  I of course I was concerned about it. I think I
15  went to speak to Dr. Stimmel and I think I spoke
16  to Dr. Berkman and I complained about it.
17   **Q.**  You may have misunderstood my
18  question. I'm not asking you when you went to see
19  a therapist or psychiatrist because someone else
20  told you to go. I'm asking you when you went to
21  seek therapy because you thought --
22   **A.**  Oh, because I wanted to.
23   **Q.**  Because you wanted to.
24   **A.**  I felt like I had already done that

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1065

Varughese

1  after the McCash incident. Like I felt, you know,
2  I felt so distressed by the situation and the
3  effects it was having on me. I felt so sick.
4         Like there were times when I couldn't
5  even get out of bed, like I was so like depressed
6  at that time. Like, I mean, it wasn't for a long
7  period, but it was for, you know, like even the
8  weekend, I just felt so tired all the time, just
9  really depressed. So I talked to someone and they
10  referred me to like a psychiatrist, a medical
11  doctor. So I went and spoke to her.
12     Q.    When was that?
13     A.    That was in January of 2011.
14     Q.    And who was the psychiatrist that you
15  were referred to?
16     A.    Well, I'm not going to answer that.
17  I'm not going to go into this whole, like my
18  psychiatrist or whatever. Because they don't want
19  to be involved in this. They already told me they
20  don't want to be involved in this. They are
21  professional doctors. I am not going to involve
22  like, you know --
23         MR. WRONKO: But you have to identify
24  them.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1066

Varughese

1         THE WITNESS: Yes. I've already
2  identified them to you.
3         MR. WRONKO: You can say the name on
4  the record. You have to.
5         Can you give me a moment?
6         MR. McEVOY: Sure.
7         (Witness and her attorney left the
8  room and returned.)
9         MR. WRONKO: We can pick up. You can
10  answer that question.
11     A.    It was Dr. Dent.
12     Q.    Dent?
13     A.    Yes.
14     Q.    What was Dr. Dent's first name?
15     A.    Katherine.
16     Q.    Where was Dr. Dent's office?
17     A.    She works in New York City.
18     Q.    In Manhattan?
19     A.    Yes.
20     Q.    And how long did you see Dr. Dent?
21     A.    For a year.
22     Q.    How frequently did you see her?
23     A.    Like once a month.
24     Q.    And that was from roughly January 2012

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1067

Varughese

1  to January 2013?
2     A.    Right.
3     Q.    And other than Dr. Dent have you seen
4  again, at your own initiation, not because someone
5  else told you that they thought you needed to,
6  have you seen any other psychologist,
7  psychiatrist, mental health professional other
8  than Dr. Dent?
9     A.    Right, then I -- after -- well, I
10  mean, I saw Dr. Knobler like I already mentioned.
11     Q.    And is Dr. Knobler a psychiatrist?
12     A.    Yes, she's also M.D. psychiatrist.
13     Q.    What is her first name?
14     A.    Joanne.
15     Q.    Where is Dr. Knobler's office?
16     A.    She is in Brooklyn.
17     Q.    When did you first see Dr. Knobler?
18     A.    In January 2013. I mean, 2012.
19     Q.    So at the same time you were seeing
20  Dr. Dent?
21     A.    No, after -- I stopped seeing Dr. Dent
22  in January or so. Then I started seeing
23  Dr. Knobler.
24     Q.    January of this year?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1068

Varughese

1     A.    Last year, 2012. January 2011 to
2  2012, then like January 2013 to like June or July
3  2013.
4     Q.    Wait a minute. Let's get the dates
5  right. Dr. Dent was January 2011 to January 2012.
6     A.    Right.
7     Q.    And Dr. Knobler was January 2012?
8     A.    Yes.
9     Q.    Till?
10     A.    Like July or June. I mean, I don't
11  know.
12     Q.    This year or last year?
13     A.    Last year.
14     Q.    How frequently did you see
15  Dr. Knobler?
16     A.    Just saw her like once a month.
17     Q.    Since June or July of 2012 have you
18  seen any psychiatrist or psychologist or mental
19  health professional?
20     A.    After that I didn't really see anyone
21  till like, I don't know. Like, I mean, I started
22  seeing a social worker specializing in, you know,
23  mental health.
24     Q.    When did you start seeing her?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1069

Varughese

1   A.   I started seeing her in, what is it?
2   I don't know, maybe January or December of 2012,
3   2013.  January 2013 or December 2012, I'm not
4   sure.
5   Q.   What's the name the social worker?
6   A.   Khetarpal.
7   Q.   First name?
8   A.   First name is Rupa.  R-u-p-a
9   K-h-e-t-a-r-p-a-l.
10  Q.   And are you still seeing?
11  A.   Yes.  We are ongoing.
12  Q.   How often do you see?
13  A.   Like once a week to once every other
14  week.
15  Q.   Dr. Varughese, during the time that
16  you were employed at Mount Sinai did you
17  tape-record some conversations you had?
18  A.   Yes.
19  Q.   How many did you tape-record?
20  A.   Well, I tape-recorded several
21  conversations.
22  Q.   Two, three, four, five?  How many?
23  A.   Maybe like -- well, all the ones I
24  submitted to you.  I don't know how many.

Computer Reporting NYC Inc.
(212) 986-1344

1070

Varughese

1   Q.   When you were tape-recording these
2   conversations did the people who you were talking
3   to know that you were tape-recording?
4   A.   No.
5   Q.   Why did you tape-record them?
6   A.   I tape-recorded the conversations
7   because of what was happening, and I felt that the
8   actions that were being taken against me were
9   punitive and malicious and I wanted to protect
10  myself and my reputation.
11       Because even Scott Barnett had said to
12  me, you know, it's going to be our word against
13  yours.  Like no one is ever going to believe you.
14  So that's why.
15  Q.   I take it that at some point you had
16  the recordings transcribed?
17  A.   Right.  I hired some services and I
18  had it transcribed, but they, I don't know, I
19  mean, I think they did their best.
20  Q.   And let me show you a document.
21       MR. McEVOY:  We can mark as 65.
22       (Defendants' Exhibit 65, some 95 pages
23  of transcripts of the conversations that the
24  witness purportedly tape-recorded while at

Computer Reporting NYC Inc.
(212) 986-1344

1071

Varughese

1   Mount Sinai, marked for identification, this
2   date.)
3   Q.   If you would look through those and
4   then I will ask you a few questions about them,
5   and while you're doing that I will take a quick
6   break.
7        (A recess was taken from 2:52 p.m. to
8        2:57 p.m.)
9   BY MR. McEVOY:
10  Q.   You're free to read all 95 pages if
11  you like, but do you recognize what these are?
12  A.   Yes.
13  Q.   Tell me what this document is.
14  A.   These were just some transcriptions of
15  the recordings.
16  Q.   So these are the transcripts that you
17  had prepared of the conversations that you
18  tape-recorded while you were at Mount Sinai.
19  A.   Yes.
20  Q.   Now, if you look at them, like if you
21  compare the first group, say from pages 1261 to
22  1281, they're kind of in one font and one point
23  size and then we get to 1282, the point size and
24  the font changes, and that's true kind of

Computer Reporting NYC Inc.
(212) 986-1344

1072

Varughese

1   throughout the document.
2        Were all these transcripts prepared by
3   the same transcription service?
4   A.   No.
5   Q.   Were they prepared by different
6   transcription services?
7   A.   Yes, several different.
8   Q.   And is that the explanation for why
9   they appear to be different in terms of format?
10  A.   Yes, I think so.
11  Q.   OK.  Dr. Varughese, if you flip
12  through them, if you look at the first page, where
13  it says, the third time Ms. Tiger-Pailtex's name
14  appears, there is a section there that's bolded
15  and underlined.  Do you see that?  First page.  Do
16  you see it?
17  A.   Yes.
18  Q.   Who did that bolding and the
19  underlining?  Was that the transcription service
20  or was that you?
21  A.   No, I did that when I was reading the
22  transcription.
23  Q.   What I'm trying to understand is, I
24  take it that you received the transcript from the

Computer Reporting NYC Inc.
(212) 986-1344

1073

Varughese

1 transcription company without any bolding and
2 underlining.
3     A.   Right.
4     Q.   How did you go about bolding and
5 underlining it?
6     A.   Oh, I was reviewing it and I just
7 bolded it and underlined it.
8     Q.   Did they send it to you in some format
9 that lets you go in and make changes to it?
10     A.   Well, they sent it to me in Word.
11 Yes.
12     Q.   So you had a Word document that you
13 could put up on your computer and you went through
14 it and bolded and highlighted certain portions of
15 it.
16     A.   Yes.
17     Q.   Why did you bold and underline various
18 portions of these transcripts?
19     A.   For emphasis.
20     Q.   What were you emphasizing?
21     A.   Just the various variety of points
22 that I had been making all along and just to point
23 out that I wasn't lying and being honest.
24     Q.   I'm sorry?

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1074

Varughese

1     A.   I wasn't lying and I was being honest
2 about what I was saying.
3     Q.   Any other reason why you bolded and
4 underlined certain portions of this?
5     A.   For emphasis.
6     Q.   Yes, that's what bolding and
7 underlining is, emphasis. I'm asking you what it
8 is you were trying to emphasize other than what
9 you've already told me.
10     A.   Simply what was said, what the
11 response was, or what the commentary was made to
12 me or what my response was.
13     Q.   Are the parts that you didn't bold,
14 did you consider them sort of less important than
15 the parts that you did bold?
16     MR. WRONKO:   Form objection.
17     A.   Um, it's the conversation. I mean,
18 you can take what you want out of it.
19     Q.   I want to know what you took out of
20 it.
21     A.   What I took out of it? Well, I mean,
22 I don't bold certain things. I don't bold when
23 people are explaining, you know, what it is
24 they're talking about. But I bolded something

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1075

Varughese

1 that said that it would be somewhat relevant to
2 the case. I bolded. I think maybe if I thought
3 it was relevant in that situation I bolded it.
4     Q.   So let me ask you just a couple of
5 examples so I understand. Do you see on the first
6 page?
7     A.   Yes.
8     Q.   If you go down towards the bottom. If
9 you go up four from the bottom where it says
10 "Caryn Tiger-Paillex" it starts with "Then
11 yesterday"?
12     A.   Yes.
13     Q.   You bolded "Shema" twice. Right?
14     A.   Oh, I didn't -- I think maybe they
15 bolded, I mean, I don't know if I bolded it or
16 if -- that may have been like just bolded -- I
17 don't know if I bolded it or....
18     Q.   If you turn to page 1291, Bates stamp
19 number 1291.
20     A.   OK.
21     Q.   Do you have that page?
22     A.   Yes.
23     Q.   Do you see there's the long quote of
24 Dr. Firpo. The beginning of the second paragraph

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1076

Varughese

1 it says, "I came to Washington. I've been there
2 10 years," is Dr. Firpo speaking. Bolded, "I came
3 to Washington. I've been there 10 years."
4     Why did you want to emphasize that
5 Dr. Firpo said that?
6     A.   Well, he had said that he wasn't
7 working with residents or residency program for
8 over ten years since I guess he left his -- or he
9 got fired from his former job. So he said that he
10 was working on policy and stuff to me before. And
11 he reiterates how he has all this experience, he
12 knows all the guidelines, then he says he doesn't
13 know all the guidelines and then he quotes
14 parliamentary procedure. I mean, it makes me
15 question his mental health frankly.
16     Q.   And then go to page 1330. Are you
17 there?
18     A.   And you see towards the bottom bolded
19 Scott Barnett saying, "No, I mean, no, it's all
20 right to -- all I'm saying is there's a hierarchy
21 in the world and sometimes you hit [indiscernible]
22 there but sometimes you get yelled at by your
23 boss."
24     You bolded that. Why did you want to

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1077

1 Varughese
2 emphasize that statement by Dr. Barnett?
3 A. Because this is just, I mean, I'm
4 discussing the problems I'm having with the
5 department and them not treating me fairly and he
6 wants to go on about how you get yelled at by
7 bosses and hierarchy and that's not even what I'm
8 talking about.
9 I mean, he has a certain perspective
10 and world view that's sort of highlighted there.
11 You know.
12 Q. And you also highlighted,
13 Dr. Varughese, things that you said. So if you
14 look at page 1283, sort of in the middle of the
15 page you highlight, or not highlight, you bolded:
16 Actually, it was initially very abrupt because she
17 only got that requirement list like three days in
18 or four days in.
19 Then there's an exchange between you
20 and Dr. Firpo and then you say: OK, well, I
21 wasn't aware of that particular document. I just
22 thought that, I mean, she had it, but she didn't
23 give it to me till Thursday. Then she took off
24 Friday and she was working, but she wasn't there.
25 First of all, why did you highlight

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1078

1 Varughese
2 anything that you said? Why did you want to
3 emphasize things that you said?
4 A. Because this is what I've been saying
5 all along. People think that I'm just, you know,
6 making up stuff, but I'm not. Like I've been
7 saying this since August -- when was this meeting?
8 August 17th of 2011, and I'm telling him the
9 problems I'm having with Dr. Najfeld and what had
10 occurred on that rotation.
11 And Dr. Firpo is aware that she did
12 not go over the requirements for cytogenetics
13 until nearly halfway through this two-week
14 rotation.
15 Q. I notice that in some places, like
16 here, you've bolded it, but didn't underline it.
17 But in other places you bolded and underlined.
18 Was there any reason for that or was it just sort
19 of --
20 A. Well, I received all these things at
21 different times.
22 Q. So there's no significance to the fact
23 that some are underlined and some are not. OK.
24 Two more things, Dr. Varughese, and
25 then I think we're done for today.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1079

1 Varughese
2 You may remember that I think on the
3 last day of your deposition there were questions I
4 asked you, I think about what information people
5 had or knew about your case. And I said to you,
6 if there's something new, tell me. But if you've
7 already testified to it, don't repeat it because
8 it's already in the record.
9 And I would ask you to do the same
10 thing with what I'm about to ask you. Mr. Wronko
11 may want to chime in on that.
12 You have a claim in your case for a
13 hostile work environment. And you have obviously
14 testified at some length about what happened to
15 you and how you felt about it, who did it, et
16 cetera.
17 So if you've told me everything that
18 you believe forms the basis of your claim for a
19 hostile work environment, then just tell me that
20 you've already told me everything and you will
21 have answered the question. If there's things
22 that you haven't told me that happened, that you
23 think contributed to a hostile work environment,
24 then tell me that. But I don't want you to have
25 to repeat things you have already said.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1080

1 Varughese
2 MR. WRONKO: So in answering the
3 question about hostile work environment you
4 can reference your prior testimony over the
5 numbers of days you have been here.
6 Mr. McEvoy is really just looking for
7 anything else that you have not testified to
8 that you would be asserting a claim under
9 hostile work environment forward.
10 A. I think I testified to various issues
11 that I thought also comprise the hostile work
12 environment.
13 Q. In the same question you also have a
14 claim for what's known as aiding and abetting
15 liability. And that's a legal term for what
16 Dr. Cordon-Cardo, Dr. Firpo, Dr. Lento did that
17 sort of aided and assisted Mount Sinai in the
18 discrimination and retaliation, breach of
19 contract, the claims you have against them.
20 And again, we've had a lot of
21 testimony about Dr. Firpo, Dr. Cordon-Cardo and
22 Dr. Lento. So again, if you have already
23 testified, and consistent with Mr. Wronko's
24 direction, if you have already told me everything
25 that those individuals did to assist the hospital

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1081

Varughese

1  or aid the hospital in discriminating against you
2  or retaliating against you, just tell me that.
3
4          If there's other things that they did
5  that you haven't told me about, then you should
6  tell me those now. So is there anything new that
7  you haven't already told?
8          MR. WRONKO: And I reference the same
9      instruction I gave.
10     A.   Well, I think Scott Barnett and Ira
11 Bleiweiss both solicited negative evaluations of
12 me and I think they were forcing people to say and
13 write things about me.
14     Q.   I remember your telling me that.
15     A.   Well....
16         MR. WRONKO: Just to repeat my
17     instruction, you're not being asked to
18     repeat everything that you've already
19     testified to. You're just being asked
20     whether there's anything else that you have
21     not already testified to.
22     A.   OK. That's it.
23         MR. McEVOY: Let me just mark a few
24     documents as exhibits.
25         (Defendants' Exhibit 66, first amended

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1082

Varughese

2  complaint and jury demand, marked for
3  identification, this date.)
4      Q.   Is this a copy of the first amended
5  complaint in this case?
6      A.   Yes.
7          MR. McEVOY: Let's mark this as
8      Exhibit 67.
9          (Defendants' Exhibit 67, copy of Rule
10     26 disclosures, marked for identification,
11     this date.)
12     Q.   Dr. Varughese, is this a copy of the
13 Rule 26 disclosures that Mr. Wronko provided in
14 this case?
15     A.   Yes.
16         MR. McEVOY: And this is the
17     interrogatory responses. I don't have an
18     extra copy of that.
19     Q.   Take a look at that, Dr. Varughese.
20         MR. WRONKO: I think you marked it
21     already.
22         MR. McEVOY: Did I?
23         MR. WRONKO: Yes.
24         MR. McEVOY: Never mind. Give it back
25     to me. My mistake.

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1083

Varughese

1          MS. SAUER: It's Exhibit 58.
2          MR. McEVOY: Dr. Varughese, I don't
4  have any more questions for you. But I
5  can't close the deposition yet because we
6  are still waiting to get your medical
7  records which Mr. Wronko is endeavoring to
8  do, I gather has had some success and
9  encountered some problems. So once he gets
10 those and produces them, then I may or may
11 not have questions for you about them.
12         But pending that potential -- right,
13 Mr. Wronko? Correct?
14         MR. WRONKO: Well, that's correct in
15 terms of what your position is.
16         MR. McEVOY: Do you have any different
17 view about that?
18         MR. WRONKO: I have to see the medical
19 records. As I've already represented to
20 you, I've seen Mount Sinai's medical
21 records, one of which is a drug test, which
22 indicates that it came back negative.
23 Another is when Dr. Varughese was pricked
24 and had to go I think for a tetanus shot.
25         So if it's medical records like that,

*Computer Reporting NYC Inc.*
*(212) 986-1344*

1084

Varughese

1  I really don't see a basis to come back here
2  because it's not -- I have to see the
3  records.
4          MR. McEVOY: OK, so just --
5          MR. WRONKO: Because I think it abides
6  the event.
7          MR. McEVOY: Here is the issue.
8  Normally the authorization for the release
9  of medical records would be given to me and
10 I will retain the records. Mr. Wronko asked
11 me if I would agree to allow him to retain
12 the records to address certain concerns that
13 Dr. Varughese had about what those records
14 might contain and I agreed to follow that
15 procedure.
16         True? Right? That's what we've
17 agreed to do?
18         MR. WRONKO: Correct. I've sent out
19 authorizations. I've indicated that I have
20 had some problems with some providers that
21 will likely ultimately lead to me having to
22 issue subpoenas to get those records.
23         MR. McEVOY: I need to review I guess
24 just what has been revealed in the

*Computer Reporting NYC Inc.*
*(212) 986-1344*

Errata Sheet

Subject: Transcript of deposition day #5 of plaintiff, Dr. Leena Varughese, which was
conducted on August 7, 2013

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 934 | 8 | Correct "No." to "Yes." |
| 948 | 5 | Correct "by" to "for" |
| 949 | 23 | Correct "an" to "any" |
| 962 | 4 | Correct "Reck Warrren" to "Recavarren" |
| 962 | 7 | Correct "Smothers" to "Smethurst" |
| 962 | 13 | Correct "Zheng" to "Zhang" |
| 962 | 16 | Correct "western" to "Westfield" |
| 963 | 20 | Correct "Allen" to "Alan" |
| 963 | 24 | Correct "at" to "to" |
| 978 | 12 | Correct "know" to "knew" |
| 977 | 21 | Correct "is" to "are" |
| 982 | 20 | Correct "willy nilly wothout" to "willy-nilly statements without" |
| 983 | 20 | Correct "That was not the case."  to "Dr. Najfeld statements were not the case." |
| 984 | 18 | Correct "because my services" to "at work" |
| 988 | 19 | Correct " |
| 993 | 2 | Correct "Fife" to "Fyfe" |
| 994 | 4 | Correct "Fife" to "Fyfe" |
| 994 | 10 | Correct "Fife" to "Fyfe" |
| 994 | 20 | Correct "Fife" to "Fyfe" |
| 995 | 8 | Correct "Fife" to "Fyfe" |
| 996 | 16 | Correct "Fife" to "Fyfe" |