Lento Tr.

1              PATRICK LENTO, M.D.

2    job responsibilities as an attending?

3         A.    To direct the autopsy service

4    and to oversee the education of the

5    residents, specifically with regard to the

6    autopsy service.

7         Q.    Would you evaluate residents who

8    would rotate through the autopsy service?

9         A.    Yes, of course.

10        Q.    What would be the purpose of

11   evaluations that you would prepare for

12   residents?

13        A.    Monthly evaluations are standard

14   procedure for the residency program, to

15   provide an indication to the program how a

16   resident was doing and to provide

17   information to the resident how they were

18   doing.

19        Q.    With regard to the rotations, is

20   there a set number of rotations that a

21   resident has to complete each year in

22   order to graduate successfully from the

23   program?

24        A.    The requirement is that they

25   perform X number of months over the time

Page 12

1          PATRICK LENTO, M.D.

2    period of their program, whether it's a

3    three-year or four-year program.

4        Q.    Dr. Lento, with regard to when

5    you say that they would have to do X

6    number of months of rotations, would

7    residents -- if a resident was either

8    marked as marginal or below average on an

9    evaluation on a rotation, and we are

10   talking just one rotation, would that

11   prevent a graduation from the program?

12       A.    Not necessarily, no.

13       Q.    At what point would poor

14   performance in rotations lead to

15   ultimately preventing a resident from

16   graduating from the program?

17       A.    That would depend upon the

18   circumstances of an individual resident

19   and a decision by the program director and

20   department.

21       Q.    What would be the factors that

22   would be considered?

23       A.    Well, we look at certain

24   competencies.

25       Q.    Such as?

1              PATRICK LENTO, M.D.

2        A.    Medical knowledge, patient care,

3    professionalism, as a few examples.

4        Q.    So as an attending, you would

5    certainly evaluate the residents who would

6    rotate when you were the director of

7    autopsy in the autopsy service on all of

8    those different competencies; is that

9    correct?

10       A.    Yes.

11       Q.    For how long were you the director

12   of autopsy?

13       A.    Until I left in 2011.

14       Q.    Did you assume any additional

15   administrative responsibilities in

16   addition to being the director of autopsy?

17       A.    Yes, I did.

18       Q.    What other administrative

19   responsibilities did you assume, taking

20   them in order chronologically?

21       A.    I became program director.

22       Q.    When did you become the program

23   director?  That would be the program

24   director of the residency program?

25       A.    That's correct.

Page 14

1           PATRICK LENTO, M.D.

2      Q.    When did you assume that

3  responsibility?

4      A.    That would be July 2010.

5      Q.    Who did you succeed in the

6  position?

7      A.    The prior program director was

8  James Strauchen.

9      Q.    When is it that you left Mount

10 Sinai?

11     A.    In 2011.

12     Q.    Why is it that you left?

13     A.    I got another job.

14     Q.    Were you encouraged to leave by

15 someone?

16     A.    No, sir.

17     Q.    Where did you get another job?

18     A.    At New York Medical College.

19     Q.    What position did you assume?

20     A.    Director of pathology education

21 at the medical school.

22     Q.    Was there a residency program at

23 New York Medical College in pathology?

24     A.    There is a residency at the

25 affiliated Westchester Medical Center.

1              PATRICK LENTO, M.D.

2      Q.      Were you the director of that

3   program at Westchester Medical Center?

4      A.      No, sir.

5      Q.      What were your job responsibilities

6   as program director of the residency program?

7      A.      At Mount Sinai?

8      Q.      Yes.

9      A.      My job was to oversee the

10   educational program for the residents.

11      Q.      So what did you have to do to

12   oversee the educational program?

13      A.      Responsibilities would be to

14   include the hiring of new residents,

15   schedules, organization of the educational

16   conferences, oversight of evaluation

17   process, and as needed, the day-to-day

18   operation.

19      Q.      What did you do with regard to

20   scheduling?

21      A.      There are certain requirements

22   that residents need to fulfill in order to

23   be able to graduate.  So our job is to

24   assure that they are able to fulfill those

25   requirements.

1        PATRICK LENTO, M.D.

2        Q.    What are the requirements to

3    graduate?  Now we are just focusing only

4    on the pathology residency program.

5        A.    Yes.  So in a four-year program,

6    they are required to complete X number of

7    months.  There is a minimum number of

8    autopsies that they are supposed to

9    perform.  And there are recommendations

10   about potential areas of focus.

11       Q.    With regard to the minimum

12   number of autopsies, during the time

13   period that the plaintiff was a resident

14   at Mount Sinai Medical Center, how many

15   autopsies were required in order to

16   complete the program?

17       A.    At the time, I believe it was 40

18   or 50.

19       Q.    Who would be tasked with the

20   responsibilities of keeping track of

21   whether or not the residents enrolled in

22   the program would meet that minimum

23   number?

24       A.    It's the residents' job to track

25   their cases and record them with the ACGME

```
 1            PATRICK LENTO, M.D.
 2    software program.
 3        Q.    So that task falls directly on
 4    the resident and not on any administrator
 5    to keep track of that?
 6        A.    That's the residents'
 7    responsibility.
 8        Q.    With regard to scheduling, you
 9    had said that you would have to ensure
10    that residents would fulfill the
11    requirements in order to complete the
12    program.  What would you do in order to --
13    in terms of your day-to-day
14    responsibilities, what tasks would you do
15    to fulfill that obligation?
16        A.    Specifically with regard to
17    autopsies?
18        Q.    Well, with regard to each one of
19    these things that the residents would have
20    to complete in order to graduate from the
21    program.
22        A.    I understand.  Well, at the end
23    of the year, you would assess each
24    resident's let's say rotations and compare
25    them to prior years to make sure that they
```

Page 18

1          PATRICK LENTO, M.D.
2     are able to fulfill the requirements.
3          Q.    In the rotations, would residents
4     have electives?
5          A.    Possibly.
6          Q.    When you say possibly, when was
7     it possible that residents would have
8     electives in terms of rotation selection?
9          A.    Sometimes if they chose a
10    particular field of interest and wanted to
11    investigate that further.
12         Q.    Under what circumstances could
13    there be a change in schedule where a
14    resident could change from one elective to
15    another after an elective was initially
16    selected?
17         A.    Well, in general, during the
18    year that I was program director, we
19    didn't really allow changes unless there
20    were certain extenuating circumstances.
21         Q.    What would be the extenuating
22    circumstances?
23         A.    If there was an illness, perhaps
24    death in the family.
25         Q.    Is it your testimony that there

1          PATRICK LENTO, M.D.

2     were no other circumstances beyond the

3     extenuating circumstances that you

4     identified that would have warranted a

5     change in an elective once it was

6     selected?

7          A.     We would take each request as it

8     was presented.  And in general, we tried

9     to maintain the schedule once it was

10    completed and distributed.  So there was a

11    time period where we would allow residents

12    to potentially make requests.

13         Q.     What was that time period?

14         A.     In general, that was June,

15    before the start of the academic year in

16    July.

17         Q.     So let's deal first with the

18    year that you were program director and in

19    the June 2011 into July 2011 time period.

20    Were there any residents who had requested

21    a change in a rotation, in other words, to

22    change out of one rotation to switch into

23    a different rotation?

24         A.     I guess I would answer that

25    maybe in two parts.  The first is I

Page 20

```
1              PATRICK LENTO, M.D.
2    started in July.  So at that point --
3         Q.    Well, I'm talking 2011, not
4    2010.
5         A.    My apologies.  Thank you for
6    correcting that.
7              In 2011, I don't recall
8    specifically, no.
9         Q.    Let's talk about your entire
10   tenure as program director.  Excluding the
11   plaintiff, was there anyone who switched
12   rotations?
13        A.    I don't recall.
14        Q.    How many sick days would a
15   resident be permitted?  And this is,
16   again, all these questions are during your
17   time period as program director.
18        A.    I believe there is a hospital
19   policy concerning sick days.  Approximately
20   I think it's eight.
21        Q.    During your tenure, do you know
22   of any residents who exceeded the allotted
23   eight number of sick days?
24        A.    No, I don't know off the top of
25   my head.
```

Page 21

1          PATRICK LENTO, M.D.
2     Q.    Do you know whether or not there
3  were residents who exceeded the allotted
4  number of sick days?
5     A.    I do not know.
6     Q.    Was there anyone who was tasked
7  with keeping track of who exceeded the
8  allotted number of sick days?
9     A.    The person who typically tracked
10  sick days was the program coordinator.
11     Q.    During your tenure as program
12  director, who was the program coordinator?
13     A.    That was a woman named Allene
14  Carter.
15     Q.    Was Ms. Carter there during the
16  entire duration of your tenure?
17     A.    Yes, she was.
18     Q.    As the program director, did you
19  receive training with regard to Mount
20  Sinai policies, human resources policies?
21     A.    I'm sure I did at one point.
22     Q.    What is the basis for that
23  answer?
24     A.    I believe that it's standard
25  policy to educate all staff on policies of

Page 22

```
 1              PATRICK LENTO, M.D.
 2   the staff.
 3       Q.    I'm talking about in your
 4   particular situation, do you have a
 5   specific recollection of someone from
 6   human resources sitting down with you and
 7   training you with regard to Mount Sinai's
 8   human resources policies?
 9       A.    I understand.  No, I do not
10   recall.
11       Q.    Do you know whether or not there
12   was any in-service training with regard to
13   human resources policies when you were
14   program director?
15       A.    I don't recall any in-services.
16       Q.    Did you have access to Mount
17   Sinai's policies?
18       A.    Yes.
19       Q.    How would you be able to access
20   them?
21       A.    They could be accessed via the
22   electronic version on the Mount Sinai
23   intranet service.  And I guess if I had a
24   question, then it could be referred to the
25   human resources office.
```

Page 23

```
 1              PATRICK LENTO, M.D.
 2         Q.     Was there any effort by the
 3   administration at Mount Sinai to track
 4   whether or not you actually logged into
 5   the intranet in order to review the
 6   policies?
 7         A.     I don't know that.
 8         Q.     Do you recall if you ever
 9   accessed the -- did you ever access the
10   intranet to review the policies?
11         A.     Yes.  As a resident, I remember
12   accessing policies, yes.
13         Q.     How about as the program
14   director?  Did you ever access the
15   intranet to access any policies?
16         A.     Yes.
17         Q.     Do you recall what policies you
18   logged on when you were program director
19   to access?
20         A.     Policies related to the autopsy
21   service or I should say policies related
22   to hospital autopsies.
23         Q.     Can you recall any other
24   policies that you recall logging on to the
25   intranet to review?
```

1              PATRICK LENTO, M.D.

2        A.    That's all that comes to mind

3    right now.

4        Q.    Do you know whether or not Mount

5    Sinai had a human resources policy with

6    regard to anti-discrimination?

7        A.    I'm sure that they did.

8        Q.    Well, I'm not asking for you to

9    assume.  I'm asking whether or not you

10   have a specific recollection whether or

11   not Mount Sinai does or does not.  And I

12   should say this was during the period when

13   you were program director.

14       A.    I don't recall seeing the policy,

15   no.

16       Q.    How about an anti-harassment

17   policy?  Did Mount Sinai Medical Center

18   when you were program director have an

19   anti-harassment policy?

20       A.    Yes, I believe they did.

21       Q.    Do you recall seeing it?

22       A.    I do not.

23       Q.    How about an anti-retaliation

24   policy?  Do you recall whether or not

25   Mount Sinai Medical Center had a specific

Page 25

1            PATRICK LENTO, M.D.
2    anti-retaliation policy for reports under
3    either the harassment or the discrimination
4    policy?
5          A.    I don't recall.
6          Q.    Are you familiar with the
7    document called a House Staff Manual?
8          A.    Yes.
9          Q.    When you were program director,
10   did you have any involvement in the
11   drafting of the House Staff Manual?
12         A.    No, sir.
13         Q.    Who drafted the House Staff
14   Manual?
15         A.    Can you clarify, please.
16         Q.    I'm just talking about who wrote
17   it.  Do you know who wrote it?
18         A.    Can I ask you a question?
19               MR. McEVOY:  No.
20         Q.    If you need a clarification, you
21   certainly can.  Go ahead.
22         A.    I don't know who wrote it.
23         Q.    Okay.  When you were program
24   director, were there any revisions to the
25   House Staff Manual where you provided any

```
 1              PATRICK LENTO, M.D.
 2    input with regard to any revisions?
 3         A.    Again, I don't understand what
 4    you are specifically referencing.
 5         Q.    Well, let me take a step back.
 6    Are you familiar with a House Staff Manual
 7    for residents?
 8         A.    Yes.
 9         Q.    So what is your understanding of
10    the House Staff Manual?
11         A.    There is a hospital-based House
12    Staff Manual.
13         Q.    What is the purpose of it?
14         A.    To provide guidance to the
15    residents based upon their responsibilities
16    and their role.
17         Q.    Do you know whether or not there
18    were any provisions within the House Staff
19    Manual with regard to professionalism?
20         A.    Yes, I believe there is.
21         Q.    What is expected of residents
22    with regard to standards of
23    professionalism?  Again, I'm using the
24    present tense.  But these questions just
25    go to your time period as the program
```

Page 27

```
 1              PATRICK LENTO, M.D.

 2   director.

 3        A.    I can't enunciate specifically

 4   what would have been written there, no.

 5        Q.    What was your understanding of

 6   what you as the program director expected

 7   of residents in terms of professionalism?

 8        A.    Yes.  Professionalism would

 9   entail, I guess, a number of things,

10   including your conduct or behavior,

11   attitude and commitment to your position

12   and to the hospital and to your patients.

13   That would include personal responsibilities

14   and your performance, specifically with

15   regard to striving for excellence.

16        Q.    Excluding the plaintiff, do you

17   know whether or not there were any

18   residents during your tenure as program

19   director who received any form of

20   discipline for a lack of professionalism?

21        A.    No, sir.

22        Q.    Let's talk about discipline for

23   a moment.  When you were program director,

24   what was your understanding of the

25   disciplinary procedure that was in place
```

1            PATRICK LENTO, M.D.

2    governing residents?

3        A.    I think it has several levels.

4    There is the individualized approach to a

5    particular resident let's say where they

6    might be spoken to.  And then in general,

7    there are much more formal ways of

8    approaching discipline if it were to reach

9    a certain level.

10       Q.    Let's talk about the individualized

11   approach.  Who would determine whether or

12   not the individualized approach would be

13   utilized or the more formal ways of approach?

14       A.    It depends upon the individuals

15   involved in the circumstance or situation.

16       Q.    Is the individualized approach

17   articulated in writing anywhere that you

18   are aware of for the period during which

19   you were program director?

20       A.    No, I don't believe so.  You

21   would speak with a resident if there were

22   a particular issue, standard practice.

23       Q.    When you would speak with a

24   resident if you were taking the

25   individualized approach, would you

```
 1                PATRICK  LENTO,  M.D.
 2    document that step or would it remain
 3    undocumented?
 4         A.     Personally?  Not generally.
 5         Q.     Why is it that you would not
 6    document speaking to an individual using
 7    that approach?
 8         A.     If it were a first offense.  If
 9    it were a relatively minor issue.  We are
10    there to train and educate the residents.
11    And there are always missteps along the
12    way.  Our job is to try to guide the
13    resident appropriately.  So you would not
14    document any misstep along what I just
15    described.  At least I wouldn't.
16         Q.     Do you recall taking the
17    individualized approach with any resident,
18    and I'm going to exclude the plaintiff
19    from this question, during your tenure as
20    program director?
21         A.     Yes, I'm sure that I did.
22         Q.     Do you recall any specific
23    circumstances where you used the
24    individualized approach that you just
25    described?
```

1              PATRICK LENTO, M.D.

2       A.    I spoke with Dr. McCash after

3   his altercation with Dr. Varughese.

4       Q.    Anyone else?

5       A.    You are asking me to recall

6   specific instances?

7       Q.    Yes.

8       A.    At the current moment, I don't

9   have an example.

10      Q.    Besides Dr. McCash?

11      A.    At the current moment.

12      Q.    Going to the more formal way of

13  approaching it, what was your

14  understanding as program director as to

15  the procedures?

16      A.    If there was an issue that went

17  beyond our ability to reconcile with the

18  resident in the circumstances that we just

19  discussed?  Is that correct?

20      Q.    Well, I'm just asking -- you had

21  delineated that there were two different

22  approaches to discipline.  One was the

23  individualized approach and one was the

24  more formal way of approach.  I'm asking

25  about the more formal way of approach.

Page 31

1           PATRICK LENTO, M.D.

2   What was your understanding as program

3   direct of the formal way that you would

4   approach discipline?

5           A.     Thank you.  A resident could be

6   placed under academic advisement.  And I

7   believe a resident could be formally

8   disciplined, which was different than an

9   academic advisement.  And potentially a

10  resident could be dismissed.

11          Q.     Now, you draw a distinction

12  between academic advisement and formal

13  discipline.  With regard to formal

14  discipline, what were the steps of formal

15  discipline when you were program director?

16          A.     A resident would receive a

17  formal warning, generally in written

18  format.

19          Q.     Would there be any steps, in

20  other words, an initial written warning, a

21  second written warning?  Or does it skip

22  straight to suspension or probation or

23  would it skip to termination?  Were there

24  any steps?

25          A.     I don't believe that there was a

Page 32

```
 1          PATRICK LENTO, M.D.
 2   requirement with regard specifically to
 3   going through individualized steps.
 4      Q.    But do you know whether or not
 5   individual steps were available?
 6      A.    Well, yes.  As I outlined, the
 7   first would be to try to do something
 8   informal.  And if you were to reach the
 9   point where you decided to move into a
10   more formal situation, in my mind, it
11   would require a referral to the graduate
12   medical education office and consultation
13   from them before proceeding.
14      Q.    Right.  But then after you would
15   initiate formal discipline, what would be
16   the steps that would be available after
17   the initiation of formal discipline?
18      A.    Well, I had never formally
19   disciplined a resident beforehand.  So I
20   don't know that I can answer a question
21   about specific steps.
22      Q.    So you are making reference to
23   the plaintiff, right, when you say
24   "beforehand"?
25      A.    No, sir.
```

1          PATRICK LENTO, M.D.

2     Q.     What do you mean by beforehand?

3     A.     Academic advisement is not a

4  formal form of discipline.  A discipline,

5  in my mind, would be a resident who would

6  be put on notice for potential probation.

7     Q.     So let's talk about academic

8  advisement for a moment.  In your mind,

9  academic advisement was not a form of

10 discipline?

11    A.     I didn't consider it discipline,

12 no.

13    Q.     Could a resident be expelled

14 from the program if they did not comply

15 with academic advisement?

16    A.     Possibly, yes.

17    Q.     So if academic advisement could,

18 if there was noncompliance, result in

19 termination from the program, why was it

20 not considered discipline in your mind as

21 the program director?

22    A.     I saw it more as an educational

23 experience for the resident.

24    Q.     But an educational experience

25 that could result in termination and end

Page 34

1              PATRICK LENTO, M.D.

2    of the resident's career, correct?

3         A.    Possibly.

4         Q.    So back to my question.  Why

5    didn't you consider that to be

6    disciplinary, then, if it could result in

7    such drastic outcome if there was

8    noncompliance?

9              MR. McEVOY:  Objection.  Asked

10   and answered.  You can answer it one more

11   time.

12        A.    Again, I considered it to be a

13   form of education.  What I anticipated

14   would be if a resident did not completely

15   satisfy the criteria of the academic

16   advisement, that that could then lead to

17   more formal disciplinary action, and that

18   that could lead to termination.

19        Q.    In all of the time that you were

20   at Mount Sinai Medical Center, whether it

21   be as a resident, as a fellow, as an

22   attending or ultimately, and I understand

23   you were still an attending when you were

24   the program director, but upon your

25   assumption of administrative

```
 1              PATRICK LENTO, M.D.
 2    responsibilities, do you know of anyone
 3    besides the plaintiff who was ever placed
 4    on academic advisement?
 5         A.    I'm not aware, no.  I wouldn't
 6    have access to that information anyway.
 7         Q.    Well, I'm just asking whether
 8    you have personal knowledge of anyone.
 9         A.    I understand.
10              MR. WRONKO:  Off the record.
11              (Discussion off the record.)
12         Q.    We were talking about academic
13    advisement before we left the record for a
14    moment.  Do you know whether or not there
15    was any right of appeal from academic
16    advisement?
17         A.    I think a resident could challenge
18    it.
19         Q.    How so?
20         A.    Verbally.
21         Q.    Were there any formal appeal
22    rights to an academic advisement?
23         A.    I'm not aware off the top of my
24    head.
25         Q.    Could academic advisement be
```

Page 36

1          PATRICK LENTO, M.D.
2   utilized as the first step in a disciplinary
3   program?  Strike that.
4          Was academic advisement utilized
5   as the first step in a disciplinary
6   program at Mount Sinai when you were
7   program director?
8      A.    I'm not aware of academic
9   advisement as being a step in any process
10  of discipline.
11     Q.    When you were program director,
12  were you aware of any problems in the
13  gross room involving residents?
14         MR. McEVOY:  Objection to the
15  form.  You can answer.
16     A.    Can you clarify problems.
17     Q.    Sure.  How about residents
18  pushing work off on other residents?
19     A.    Specific individuals?
20     Q.    Do you recall there being issues
21  with regard to the gross room where
22  residents would push work off on other
23  residents?
24     A.    The only specific instance I'm
25  aware of is when Dr. Varughese had another

Page 37

```
 1              PATRICK LENTO, M.D.
 2    resident perform the examination of
 3    specimens related to her incident in
 4    December 2010.
 5         Q.    As the program director, you
 6    were not aware of residents who would
 7    leave early from grossing?
 8         A.    No, sir.
 9         Q.    Were you aware of residents who
10    would leave samples from one day to the
11    next?
12         A.    Not specific instances, no.
13         Q.    Even if you weren't aware of
14    specific instances, were you aware that
15    that conduct was going on in the gross
16    room?
17              MR. McEVOY:  Objection to the
18    form.  You can answer.
19         A.    That may have happened, yes.
20         Q.    Were you aware of whether
21    residents and gross room staff were at
22    each other's throats at any point during
23    the time that you were program director?
24              MR. McEVOY:  Objection to the
25    form.  You can answer.
```

Page 38

1              PATRICK LENTO, M.D.

2      A.    That's an unusual way of

3   phrasing something.

4      Q.    Sure.  Are you aware of anything

5   like that?

6      A.    No, sir.

7      Q.    In August of 2010, were you the

8   program director at that point?

9      A.    Yes, I was.  Although I had

10   already accepted my new position.

11              MR. McEVOY:  We are talking

12   about August 2010.

13              THE WITNESS:  My apologies.

14      A.    August 2010.  Yes, I was the

15   program director.  As I stated earlier, I

16   started in July 2010.

17      Q.    Are you familiar with an

18   individual by the name of Roma Rosario?

19      A.    Yes, sir.

20      Q.    Who was Roma?

21      A.    A physician's assistant.

22      Q.    Did Roma work in the gross room?

23      A.    Yes, she did.

24      Q.    Were there any issues with

25   Roma's work performance in the gross room?

1             PATRICK LENTO, M.D.

2        A.    Not that I was aware of.

3        Q.    Did you expect your chief

4    residents to keep you up to speed with

5    regard to performance issues with regard

6    to physicians assistants?

7        A.    I didn't oversee the physicians

8    assistants, so no.

9        Q.    Did you expect your chief

10   residents to keep you apprised of whether

11   there were performance issues?

12             MR. McEVOY:  The witness just

13   said no.

14             MR. WRONKO:  I think he

15   misunderstood my question.

16       Q.    Do you understand my question

17   now?

18       A.    My expectation was that the

19   chief residents would report to me about

20   problems with regard to the residents.

21       Q.    Who would supervise the physician

22   assistants?

23       A.    There was an attending in the

24   department who oversaw the physician

25   assistants.

Page 40

1             PATRICK LENTO, M.D.

2        Q.    In August of 2010, who was that?

3        A.    I believe that was Dr. Nagi.

4        Q.    Were you aware in August of

5    2010 -- did you know a resident at that

6    point whose first name was Jessica?

7    Jessica French?

8        A.    I did know Jessica French.

9        Q.    Did you know whether Jessica

10   French left early without properly

11   communicating with the gross staff and

12   wound up leaving a number of specimens for

13   other people to gross?

14       A.    No, sir.

15       Q.    Let me show you what was marked

16   as Pessin 1.

17             (Witness reviews document.)

18       Q.    Do you recall ever seeing this

19   email chain prior to today?

20       A.    I do not.

21       Q.    Just turning to the second page,

22   Adrienne Jordan wrote an email, dated

23   August 13, 2010, at 9:18 p.m.  Was

24   Adrienne Jordan at that point a PGY-2?

25       A.    I believe she was.

Page 41

1           PATRICK LENTO, M.D.

2      Q.    Did you know Adrienne Jordan in

3  August 2010?

4      A.    She was a resident in our program.

5  So yes.

6      Q.    What interaction had you had

7  with Adrienne Jordan leading up to August

8  2010?

9      A.    She was a resident in the

10 program.  So my interactions would have

11 been related to the program, the education

12 of the residents' rotations through our

13 service.

14     Q.    What was your perception of her

15 as a resident?

16     A.    I thought she was an intelligent,

17 focused, disciplined resident.

18     Q.    How is it that Adrienne Jordan

19 became the head of moonlighting in the

20 2010 year?

21     A.    Can you say the question.

22     Q.    How is it that Adrienne Jordan

23 became the head of moonlighting as a

24 PGY-2?

25           MR. McEVOY:  I object to the

1          PATRICK LENTO, M.D.

2   form of the question.  It presumes that

3   she did.

4        Q.    Did Adrienne Jordan become the

5   head of moonlighting in her PGY-2 year?

6        A.    Adrienne did organize the

7   moonlighting service in conjunction with

8   myself, the chief residents, the chairman

9   of the department.

10       Q.    But how did it come about that

11   she was playing that role as a PGY-2?

12       A.    I don't recall specifically.

13   She may have volunteered.

14            MR. McEVOY:  Don't guess.

15       Q.    Going back to your email, which

16   is on the second page, August 13, 2010,

17   which was her email, she writes, "Yes, I

18   do love work, but I also like sleep and

19   getting home in time to puke my guts out

20   so I can go to bed and get up tomorrow and

21   do it over again."

22            Do you consider that type of

23   email professional?

24       A.    I think it was a joke.

25       Q.    She goes on to write "I am going

1              PATRICK LENTO, M.D.

2     to try and cut through the BS.  That's

3     just me complaining and giving you guys

4     the serious infractions that led to

5     today's events."

6              Was Adrienne Jordan a complainer?

7        A.    I didn't find her to be a

8     complainer, no.

9        Q.    Were you ever made aware of what

10    she perceived to be serious infractions

11    that she outlines in this email?

12       A.    I do not recall this, no.

13       Q.    I would assume you read what she

14    wrote about Jessica French.  Did you

15    believe that Jessica French had acted

16    inappropriately in the way that she had

17    communicated with regard to her grossing

18    shift?

19       A.    I wasn't there.  So this is

20    based simply on the information that

21    Adrienne is providing.  It does sound like

22    she spoke with several people on the team

23    at the location at the time.  One person

24    was left out.

25       Q.    Who was left out?

Page 44

1              PATRICK LENTO, M.D.

2       A.      One of the other residents.

3       Q.      Do you know whether or not

4   Jessica French was ever disciplined,

5   whether it be informally or formally, with

6   regard to this situation?

7       A.      I do not believe that she was

8   disciplined by me.  No.

9       Q.      Dr. Jordan goes on to write

10  about Roma and that Roma was not dictating

11  as she was moving along with her

12  responsibilities.  Had you ever been

13  notified about that problem with Roma?

14      A.      Can you repeat the question.

15              (The question was read.)

16      A.      I don't recall being

17  specifically notified about that problem.

18      Q.      How about any other problem with

19  Roma?  Were there any problems with Roma

20  from a job performance standpoint or a

21  professionalism standpoint?

22      A.      There were issues, I believe,

23  with all of the individuals in the gross

24  room.

25      Q.      Such as?

1              PATRICK LENTO, M.D.

2       A.     At different times.  You are

3  dealing with humans who are working

4  closely together on a daily basis under

5  high-stress situations.  And so on

6  occasion there might be an argument

7  perhaps.  But, again, I did not oversee

8  the physician assistants specifically.

9       Q.     Excluding anything that might

10  have involved the plaintiff in this

11  situation, were you aware of anyone who

12  had complaints with Roma?

13      A.     I don't recall a specific

14  complaint, no.

15      Q.     You indicated that it's a

16  high-stress environment.  What makes it a

17  high-stress environment?

18      A.     We are dealing with patients,

19  patient samples.  This is patient care on

20  a very busy service.  We want to provide

21  the best possible care that we can.

22  Again, striving for excellence in our

23  performance.

24      Q.     How frequently would there be

25  arguments in the gross room?

Page 46

1              PATRICK LENTO, M.D.

2         A.    I have no idea.  That was not my

3    service.

4         Q.    Do you know whether or not it

5    was commonplace for there to be arguments?

6         A.    I'm not aware of it being

7    commonplace, no.

8         Q.    But would it happen on occasion?

9         A.    I'm sure that it did.

10        Q.    Do you have any knowledge as to

11   what people would argue about in the gross

12   room?

13        A.    It could vary.  I imagine --

14             MR. McEVOY:  Don't guess.

15        Q.    I've given you that instruction.

16   Now you have had it three times.  I expect

17   it won't be given again.

18             MR. McEVOY:  I will give that

19   instruction every he tries to guess.

20             MR. WRONKO:  You are feeding the

21   witness.  If you are going to do that, we

22   will get the magistrate on the phone.

23   That was a specific and tactical

24   instruction you have given.  If the

25   instruction is given again, we are getting

1              PATRICK LENTO, M.D.

2   the magistrate on the phone.  He knows not

3   to guess.

4        Q.    Do you understand not to guess?

5              MR. McEVOY:  Stop shouting.

6        A.    My apologies.

7              MR. McEVOY:  Stop shouting.

8        Q.    You can proceed.  Do you need

9   the question read back?

10       A.    Yes, please.

11             (The pending question was read.)

12       A.    I can't give you a specific

13   situation.

14       Q.    Sure you can.

15             Let me ask you a question.  With

16   regard to the frozen and gross room

17   fridges, do you know whether or not there

18   were situations where there were misplaced

19   specimens?

20       A.    I don't recall an incident

21   specifically.

22       Q.    I'm not asking for you to

23   identify a specific incident.  But were

24   there situations where there were

25   specimens from flow cytometry being

1              PATRICK LENTO, M.D.

2    misplaced in the frozen gross room

3    fridges?

4        A.    The only thing that comes to

5    mind is an incident involving Dr. Varughese.

6        Q.    What was that incident?

7        A.    To the best of my recollection,

8    it was an incident in September 2010.  I

9    believe Dr. Varughese was on call for the

10   frozen room.  And there was an oncology

11   specimen that she was involved with.

12       Q.    Is that the extent of your

13   knowledge?

14       A.    I'm not aware of a specimen

15   being misplaced.  I know that there were

16   issues about the specimen.

17       Q.    What were the issues about the

18   specimen?

19       A.    My understanding was that the

20   specimen may not have been appropriately

21   handled.

22       Q.    Who advised you of that?

23       A.    Dr. Pessin.

24       Q.    Did Dr. Pessin advise you as to

25   what her basis of knowledge was for that

Page 49

1              PATRICK LENTO, M.D.
2    statement?
3        A.    She had received a complaint
4    from a clinician related specifically to
5    that specimen.
6        Q.    Who was the clinician?
7        A.    I have no idea.
8        Q.    Do you know whether or not that
9    complaint was ever verified?
10       A.    I did investigate.
11       Q.    What did you do to investigate?
12       A.    I met with and spoke to
13   Dr. Varughese.  And I met with and spoke
14   to one of the attendings that she had
15   spoken with or dealt with that prior night
16   while on call.
17       Q.    Who was the attending?
18       A.    Dr. Morotti.
19       Q.    Tell me what Dr. Varughese told
20   you.
21       A.    She said it was a situation that
22   her attending that she was paired with
23   didn't necessarily appreciate how best to
24   handle.  I believe she was asked to speak
25   with another attending.

1              PATRICK LENTO, M.D.

2        Q.    What did Dr. Morotti tell you?

3        A.    Dr. Morotti told me that Leena

4    had spoken with her about the specimen.

5    And it was my conclusion that although the

6    specimen hadn't been ideally handled, that

7    whatever the problem was was not solely

8    the responsibility of Dr. Varughese.

9        Q.    Let me show you what was marked

10   as Pessin 2 at a prior deposition.  I'll

11   give you a moment to review that.

12             (Witness reviews document.)

13       Q.    Who was Kruti Maniar?

14       A.    Kruti was one of the chief

15   residents during the academic year that

16   this email was sent.  She worked with the

17   second chief resident.

18       Q.    Did this chief resident ever

19   advise you of the fact that there were

20   specimens for flow cytometry being

21   misplaced in the frozen gross room

22   fridges?

23       A.    I don't recall Dr. Maniar

24   specifically telling me that.

25       Q.    Did she advise you that there

1              PATRICK LENTO, M.D.

2    was a specimen that became too old to be

3    used for flow because it had been

4    misplaced?

5         A.    I don't recall being notified of

6    that.

7         Q.    Would that be a concern for

8    patient care?

9         A.    Of course.

10        Q.    Why?

11        A.    The patient specimens are in a

12   sense patients.  And our objective is to

13   provide diagnoses based on those specimens

14   so that the patients can be cared for

15   appropriately.

16        Q.    Do you know whether or not

17   residents in the gross room would store

18   specimens under grossing stations?

19        A.    Yes, sir.  They would.

20        Q.    Under what circumstances would

21   they store specimens under grossing

22   stations?

23        A.    I believe two circumstances

24   would be a specimen that has already been

25   examined that might need to be further

```
 1              PATRICK LENTO, M.D.
 2    examined after the fact.  Can I correct
 3    myself, please?
 4         Q.    Sure.
 5         A.    Three that really come to mind.
 6    One is a specimen that has been examined
 7    that might need to be examined again.  A
 8    specimen that is being fixed so that the
 9    examination can occur much more
10    appropriately at a later time.  And a
11    third is perhaps a specimen that might
12    have some teaching value that would be
13    used to educate others.
14         Q.    When you say "fixed," are you
15    referring to leaving a specimen in
16    formalin?
17         A.    Yes, sir.
18         Q.    Would a breast sample typically,
19    if it had significant fatty tissue, be
20    left in formalin to be fixed?
21         A.    It might be, yes.
22         Q.    Was it typical to leave that
23    type of a specimen in formalin overnight
24    for it to be fixed?
25         A.    It would depend on the
```

Page 53

1              PATRICK LENTO, M.D.
2     circumstances of the specimen.
3         Q.    Such as?
4         A.    As one example, if you had a
5     mastectomy for a breast tumor mass, then
6     in general, no, you would not fix it and
7     wait, because the tumor, it would
8     generally be obvious at the time of
9     examination.  Again, that's an example.
10        Q.    But if the tumor were not
11    obvious at the time of examination, then
12    it would be appropriate to fix it overnight
13    in formalin?
14        A.    In general, the sample would
15    still be sampled at the time of
16    examination.  And if there were specific
17    reasons to hold something over, then one
18    might.  But that would be based generally
19    on the direction of the specific
20    attendings who oversaw what I'll call the
21    breast service.
22        Q.    Not being a pathologist, what
23    does fixing something in formalin do to a
24    specimen?  What is the purpose of fixing
25    it in formal?

1          PATRICK LENTO, M.D.

2     A.     It crosslinks the tissue.  It

3  makes it harder.  And it allows for

4  processing so that the slides can be made

5  for examination on the microscope.

6     Q.     What does it mean to gross a

7  breast margin?

8     A.     A margin is on a patient sample

9  in a sense where a surgeon has made a cut.

10 So in order to remove a piece of tissue,

11 wherever the surgeon's scalpel had gone

12 would be considered a margin.

13    Q.     Would grossing a breast margin

14 be considered complex work or would that

15 be considered simple work in the world of

16 grossing?

17    A.     In general, relatively simple.

18    Q.     For a PGY-3, is there much

19 educational value in terms of grossing

20 breast margins?

21    A.     Yes, I believe there is.  Of

22 course.  I think there is educational

23 value in essentially everything that we do

24 with regard to grossing.

25    Q.     But aren't there gradients of

```
 1              PATRICK LENTO, M.D.
 2   educational value?  At some point when you
 3   have someone who is more experienced in
 4   grossing, is there less educational value
 5   in terms of grossing breast margins?
 6        A.   One could make that argument.
 7   But again, I would say that it might
 8   depend on the individual you are asking
 9   that question of.
10        Q.   Fair enough.  Now, during the
11   time that you were the program director,
12   were moonlighters allowed to gross breast
13   margins?
14        A.   I don't know offhand.
15        Q.   Who would know?
16        A.   I guess I would say the director
17   of the breast service.
18        Q.   Who was that at the time?
19        A.   Dr. Bleiweiss.
20        Q.   When did you first have interaction
21   with Dr. Varughese?
22        A.   Her first month of residency.
23        Q.   Was she in a rotation of yours?
24        A.   Yes.
25        Q.   What rotation was it?
```

1          PATRICK LENTO, M.D.

2     A.    It was the autopsy service.

3     Q.    How long was that service?

4     A.    One month.

5     Q.    Do you recall how she had

6   performed in that service?

7     A.    I think that she performed

8   satisfactorily.

9     Q.    After that autopsy service was

10  completed, when was your next interaction

11  with Dr. Varughese?  I should say substantial

12  interaction.

13    A.    I would imagine it would be on

14  my service at another time.

15    Q.    Do you know whether or not she

16  came through your service again during her

17  first year of residency?

18    A.    I'm sure she would have, yes.

19    Q.    How many times would she have

20  come through your service during her first

21  year of residency?

22    A.    That I don't know.

23    Q.    Would it have been more than

24  twice?

25    A.    It may have been.

1          PATRICK LENTO, M.D.

2      Q.    During the first year of her

3  residency, did you come away with any

4  impressions about Dr. Varughese?

5      A.    Yes.

6          MR. McEVOY:  Objection.

7  Impressions about what?

8      Q.    Impressions about her

9  performance, her job performance as a

10  resident.

11          MR. McEVOY:  Fair enough.

12          THE WITNESS:  Thank you.

13      A.    From what I recall, I remember

14  July of her first year of residency, Leena

15  was obviously very intelligent.  I thought

16  that she was pleasant to work with.  And I

17  remember she often had a smile on her

18  face.

19      Q.    How about the second year of her

20  residency?  Did you have any interaction

21  with her?

22      A.    I may have.

23      Q.    Sitting here today, do you have

24  any recollection of any interaction with

25  her during the second year of her

1          PATRICK LENTO, M.D.

2     residency?

3          A.    I do not recall.

4          Q.    Regardless of any interactions,

5     do you recall any change in your

6     perceptions of Dr. Varughese's work

7     performance by the end of her second year

8     of residency?

9          A.    From what I recall, Dr. Varughese

10    had some trouble following up on her cases

11    on the autopsy service.

12         Q.    Anything else?

13         A.    That's all.

14         Q.    Did any other residents have any

15    problem similar to that in terms of

16    following up on cases on autopsy?

17         A.    Yes, there were.  I can't give

18    you a specific name.  Not because I won't

19    do it, but because I don't recall.

20         Q.    Were Dr. Varughese's issues with

21    regard to following up on cases on autopsy

22    any more severe than any of her fellow

23    residents or were they less severe or were

24    they the same?

25         A.    That I don't recall.

1          PATRICK LENTO, M.D.

2      Q.    Do you have any recollection of

3  giving her below satisfactory on any

4  evaluations that you prepared for her

5  during her second year?

6      A.    I believe I may have, yes.

7      Q.    But do you believe that any of

8  the issues that she had on the autopsy

9  service were serious enough to threaten

10  her continuation in the program?

11      A.    Perhaps if persistent, yes.

12      Q.    Were those issues on the autopsy

13  service persistent?  Did they ever reach

14  the point of being persistent?

15      A.    I believe even in her third

16  year, I was still trying to catch up on

17  autopsy with her.

18      Q.    Dealing only with the PGY-2s in

19  Dr. Varughese's class, were there any

20  other residents who you had to catch up on

21  autopsy with?

22      A.    I'm sure there were.

23      Q.    Do you know whether or not Paul

24  Azar was someone you had to catch up on

25  autopsies with?

1          PATRICK LENTO, M.D.

2     A.     That I don't recall.

3     Q.     Do you know whether or not there

4 was anything in your interactions with

5 Dr. Varughese in her first or second year

6 that would lead you to conclude that she

7 needed to see a psychiatrist?

8     A.     Referring back to my prior

9 comment about her demeanor in July of her

10 first year residency, I noticed a change

11 in her demeanor.  I don't know that that

12 necessarily required referral to a

13 psychiatrist.

14     Q.     When did you notice a change in

15 her demeanor?

16     A.     It was probably a couple of

17 months into first year.

18     Q.     What was the change that you

19 noticed?

20     A.     She never seemed to smile anymore.

21     Q.     Didn't you just testify that by

22 the end of the first year, you had noted

23 that she often had a smile on her face?

24     A.     No.  That was specifically

25 during her first rotation.

1          PATRICK LENTO, M.D.

2     Q.    So was that at all disturbing to

3    you that she wasn't smiling?

4     A.    Of course it would be upsetting.

5     Q.    Did all of the other residents

6    always smile in your presence?

7     A.    That seems an odd question.

8    Maybe I didn't phrase appropriately my

9    description of her not smiling.  She

10   seemed distracted.  When I would address

11   her to say "Hello, Leena," she would not

12   respond, which I thought was odd.

13    Q.    Let's talk about the residency

14   program for a moment for pathologists.

15   How many hours a week would pathologists

16   be expected to work?

17    A.    Probably somewhere between 40

18   and 60 hours.

19    Q.    Was it a stressful residency for

20   residents to have to go through?

21    A.    Yes.  I believe any residency is

22   stressful.

23    Q.    Why is it, as someone who has

24   never, fortunately, gone through a

25   residency, why would it be considered

1          PATRICK LENTO, M.D.

2   stressful for somebody to go through a

3   pathology residency?

4       A.    Well, I think first you have

5   your own personal stress as an individual

6   who is perhaps striving for excellence.

7   You also have the stresses of the

8   environment that you are in.  Again, you

9   are dealing with patients.  And that's a

10  very high-stress situation.  Whether you

11  are a pathologist or you are a surgeon,

12  you are directly dealing with patients and

13  their samples.  And patient samples are

14  not any different than having a patient in

15  front of you, as far as I'm concerned.

16      Q.    What about workload for a

17  pathology resident?  Was there a substantial

18  workload?

19          MR. McEVOY:  Objection to the

20  form.  You can answer.

21      A.    We had a busy service.  Yes.

22  That was a good thing.

23      Q.    How about the information that

24  pathologists were required to retain in

25  order to perform their job duties?  There

Page 63

1              PATRICK LENTO, M.D.

2    were a number of different specimens that

3    they would have to analyze?

4         A.    Yes, sir.

5         Q.    Do you believe it's fair to say

6    that there were a number of stresses that

7    would arise out of the amount of information

8    that would have to be retained?

9         A.    Yes, sir.

10        Q.    Did there ever come a point

11   where you became aware that Dr. Varughese

12   had written a negative evaluation with

13   regard to either the program or about a

14   rotation that she had gone through?

15        A.    Yes.

16        Q.    When did you first become aware

17   that she had written a negative

18   evaluation?

19        A.    I don't recall the date.

20        Q.    What do you recall of the

21   evaluation?

22        A.    I don't recall the evaluation

23   itself.

24        Q.    How did you become aware of the

25   fact that she had written a negative

Page 64

1              PATRICK LENTO, M.D.

2    evaluation?

3         A.    Our program coordinator had

4    indicated to me.

5         Q.    Who was the program coordinator?

6         A.    That was the program coordinator

7    we referred to earlier, Allene Carter.

8         Q.    Was she a doctor?

9         A.    No, she was not.

10        Q.    Did Ms. Carter -- when was it

11   that Ms. Carter -- you don't recall when

12   Ms. Carter brought that to your attention?

13        A.    No, I do not.

14        Q.    Was it close in time to when the

15   evaluation was written by Dr. Varughese?

16        A.    That I don't recall.

17        Q.    And did Ms. Carter show you a

18   copy of the evaluation?

19        A.    I don't recall seeing a copy.

20              MR. WRONKO:  Let's mark this.

21              (Plaintiff's Lento Exhibit 1

22   marked for identification.)

23        Q.    I've shown you what has been

24   marked as Lento Exhibit 1.  Do you have

25   any recollection of having seen what

1            PATRICK LENTO, M.D.

2    appears at the bottom of the first page,

3    carrying over to the second page?

4            MR. McEVOY:  Are you referring

5    to the evaluation?

6            MR. WRONKO:  Correct.

7       Q.    To the evaluation that appears

8    on that document?

9       A.    I don't recall.

10       Q.    Did you discuss with

11   Dr. Varughese the issue of her preparing a

12   negative evaluation of a rotation after

13   Ms. Carter brought it to your attention?

14       A.    Yes.

15       Q.    When did you discuss it with

16   her?

17       A.    I don't recall the date.

18       Q.    This particular evaluation was

19   for the period of August 2, 2010, to

20   August 29, 2010.  Does that refresh your

21   recollection as to the general time period

22   as to when you had a conversation with her

23   about her evaluation?

24       A.    Obviously it would have had to

25   have been after the evaluation was

Page 66

```
 1              PATRICK LENTO, M.D.
 2   completed.
 3        Q.    How long after the evaluation
 4   was completed?
 5        A.    I'm going to assume that it was
 6   within the six-month period of the
 7   evaluation.
 8        Q.    Why is it that Ms. Carter
 9   brought it to your attention?  Do you have
10   any knowledge as to why she brought it to
11   your attention?
12        A.    No.  I think you would have to
13   ask Ms. Carter a question about that.
14        Q.    Okay.  Were these evaluations
15   supposed to be anonymous?
16        A.    It is my understanding that yes,
17   they should have been anonymous.
18        Q.    So why in this particular
19   instance was the anonymity not preserved?
20        A.    It wasn't in this particular
21   instance.
22        Q.    Right.  But do you know why it
23   wasn't preserved in this instance?
24        A.    I do not know why.  This program
25   was in place before I took over as program
```

Page 67

1              PATRICK LENTO, M.D.
2    director.  I didn't set up the program.  I
3    didn't even know that they were not
4    anonymous.
5         Q.    Were you upset with Dr. Varughese
6    for having written a negative evaluation?
7         A.    No, I wasn't upset with her.  I
8    asked her if she had given a negative
9    evaluation and was curious to know why, so
10   that we could try to work on improving
11   things.
12        Q.    What is a diatribe?
13        A.    How do I define diatribe?
14        Q.    Yes.
15        A.    I guess it depends on the
16   context.  A diatribe is somebody who
17   expounds on a circumstance perhaps more
18   than might be necessary.
19        Q.    Did you use that term in
20   discussing the evaluation with
21   Dr. Varughese in terms of asking her why
22   she wrote a diatribe of an evaluation?
23        A.    I don't recall saying that
24   specifically, no.
25        Q.    Had you ever followed up with

Page 68

1              PATRICK LENTO, M.D.
2    any other resident about an evaluation
3    that they had written about a rotation?
4         A.    I don't recall, no.
5         Q.    Do you recall there being a
6    situation where Dr. Varughese had reported
7    in September 2010 that she was berated and
8    yelled at by Dr. McCash?
9         A.    I do remember the incident, yes.
10        Q.    What do you recall?
11        A.    I was informed by Kruti Maniar,
12   who was the female chief resident at the
13   time, that there had been a problem with
14   Leena.  She, I believe, emailed me
15   specifically about an incident and asked
16   if she could meet with me and discuss it.
17        Q.    When you say that Dr. Maniar
18   said that there was a problem with Leena,
19   was it that Leena had a problem or was
20   there a problem with her?  Do you understand
21   the distinction?
22        A.    Yes.  I'm thinking.
23        Q.    Sure.
24        A.    I believe the problem was related
25   to Dr. Varughese.

1              PATRICK LENTO, M.D.

2       Q.      What did Dr. Maniar specifically

3    tell you?

4       A.      Leena had been asked in advance

5    to help cover for another resident.   And

6    she refused to do so.

7       Q.      Help cover what?

8       A.      A service.

9       Q.      Do you know whether every,

10   excluding Dr. Varughese, every time a

11   resident was asked to help cover another

12   resident on a service whether there was

13   100 percent compliance with requests?

14      A.      I didn't make those requests.

15   So I wouldn't know.

16      Q.      The chief residents would know,

17   correct?

18      A.      In general, yes.

19      Q.      So did you receive an email from

20   Dr. Varughese about the incident?

21      A.      If I recall correctly, maybe

22   that night.

23      Q.      So you were made aware of a

24   situation by Dr. Maniar before you got an

25   email from Dr. Varughese?

1             PATRICK LENTO, M.D.

2      A.    Yes.

3      Q.    Did Dr. Maniar report to you any

4  interaction between Dr. Varughese and

5  Dr. McCash prior to you receiving an email

6  from Dr. Varughese?

7      A.    Yes.

8      Q.    So what did Dr. Maniar tell you

9  about the interaction between Dr. Varughese

10 and Dr. McCash?

11     A.    Dr. Maniar emailed me about what

12 had happened and asked if we could meet.

13 And I said yes.  So we met maybe late

14 morning to discuss what happened.

15     Q.    Do you recall anything about

16 Dr. Maniar's email?

17     A.    All I recall is that she said

18 that there was an issue and that she

19 wanted to meet to discuss it.

20           MR. WRONKO:  There has been a

21 lot of paper in this case.  I don't know

22 whether that email has been produced.  I

23 don't recall seeing it.  If it has been

24 produced, I would just ask for a Bates

25 reference.  If it has not, I would just

```
 1                PATRICK LENTO, M.D.
 2    ask that it be produced.
 3                MR. McEVOY:  As I've said
 4    before, put whatever requests you have in
 5    writing.
 6                MR. WRONKO:  Sure.
 7        Q.    With regard to the late morning
 8    meeting, who was present for that?
 9        A.    Just myself and Dr. Maniar.
10        Q.    Tell me what was said.
11        A.    I can't tell you verbatim.
12        Q.    Okay.  Give me an approximation
13    of what was said.
14        A.    Kruti indicated that Dr. Varughese
15    had been asked to cover for another
16    resident a couple of weeks down the road
17    from the time, and she had refused.
18        Q.    What did she say, if anything,
19    about the interaction between Dr. Varughese
20    and Dr. McCash?
21        A.    At that time, I don't believe
22    she said anything.
23        Q.    What do you recall of the email
24    from Dr. Varughese?
25        A.    I believe Leena said that Sam
```

Page 72

1              PATRICK LENTO, M.D.

2    had been inappropriate.  I think she also

3    asked to meet with me.

4         Q.    Did you respond to her request?

5         A.    Yes.

6         Q.    How soon after she initially

7    emailed did you respond to her?

8         A.    I don't recall if I spoke with

9    her or if I emailed her.  My recollection

10   is that the email came late.  And I ended

11   up meeting with Dr. Varughese I believe it

12   was the following day.

13        Q.    Let me show you what was

14   previously marked as Defendant's Exhibit

15   5.  I'll give you a moment to review that.

16   My question is whether or not this was the

17   email that you were referring to from

18   Dr. Varughese on September 14, 2010, at

19   10:34 p.m.

20              (Witness reviews document.)

21        A.    I don't know if this was the

22   specific email she had sent to me.

23   Obviously, my name is on it.  I don't know

24   if this is the specific one that you are

25   referring to.

Page 73

1              PATRICK LENTO, M.D.

2       Q.    Do you recall any other emails

3   that differed in content that Dr. Varughese

4   had sent regarding this incident at the

5   very -- immediately after -- not

6   immediately after but in terms of her

7   first communication after the incident had

8   occurred?

9       A.    No.  She obviously iterates in

10  this email her concern.

11      Q.    Did this email raise any

12  concerns in your mind about the violation

13  of any policies that Mount Sinai had on

14  the books with regard to resident conduct?

15      A.    Any time anything is raised by a

16  resident of this nature or any other

17  serious nature, certainly would be a

18  concern, yes.  And that's why I asked to

19  meet with Dr. Varughese.

20      Q.    What specific policies do you

21  believe that the allegations that

22  Dr. Varughese made in the September 14,

23  2010, email were implicated?

24            MR. McEVOY:  Objection.  You can

25  answer.

```
 1            PATRICK LENTO, M.D.
 2       A.    Well, it would be more of a
 3   professionalism or conduct issue.
 4       Q.    Is there ever a situation where
 5   it would be acceptable for a chief
 6   resident to speak to another resident to
 7   say "Shut up, shut up, shut up, Leena.
 8   Shut your mouth"?
 9       A.    No.
10       Q.    Had you received any prior
11   notification about any situation between
12   Dr. Varughese and the PA Rob?
13       A.    My recollection is that they had
14   an altercation.
15       Q.    When did you first become aware
16   of that altercation?
17       A.    I do not know.
18       Q.    Did you become aware at the time
19   that the altercation took place or was it
20   sometime thereafter?
21       A.    What I've told you is really all
22   that I recall.
23       Q.    Okay.  Did you have any
24   communications with Dr. Pessin-Minsley
25   with regard to this complaint that
```

Page 75

```
1              PATRICK LENTO, M.D.
2   Dr. Varughese had raised?
3        A.    Yes.
4        Q.    What was your first communication
5   with Dr. Pessin-Minsley with regard to
6   this situation?
7        A.    So my recollection is that I met
8   with Leena the following day.  I had
9   already met with Dr. Maniar on the day in
10  question.  The following day, I met with
11  Dr. Varughese and Dr. Maniar together to
12  discuss the situation.  There was an
13  additional issue that was raised related
14  to the cytology specimen we discussed
15  earlier.
16       Q.    Let's just focus for a moment on
17  that meeting with Dr. Varughese and
18  Dr. Maniar.  Can you tell me what
19  Dr. Varughese said at the meeting?
20       A.    She said that Sam yelled at her,
21  embarrassed her.
22       Q.    Anything else?
23       A.    I don't have any written recording
24  of the conversation specifically, no.
25       Q.    Was she specific about what Sam
```

Page 76

1              PATRICK LENTO, M.D.
2    was saying to her when they had that
3    incident?
4         A.    It was my understanding that Sam
5    was frustrated with Dr. Varughese because
6    she refused to cover when she was being
7    asked to do so.
8         Q.    Did Dr. Varughese report to you
9    that Dr. McCash had said to her that she
10   would never be successful?
11        A.    I don't recall that specifically.
12        Q.    Do you recall Dr. Varughese
13   telling you that Dr. McCash said to her
14   that no one liked her?
15        A.    I don't recall that specifically.
16        Q.    Would it ever be appropriate for
17   a chief resident to say to a resident that
18   they are going to be unsuccessful?
19        A.    I don't think that that would be
20   appropriate, no.
21        Q.    How about saying that "No one
22   likes you"?  Would that ever be
23   appropriate to say that?
24        A.    I would not say that that would
25   be appropriate.

1              PATRICK LENTO, M.D.

2         Q.    What did Dr. Maniar say at the

3    meeting?

4         A.    You would have to ask Dr. Maniar

5    specifically what she said.  But I asked

6    Dr. Maniar to be present because she was

7    present at the time of the altercation.

8         Q.    The time may come where I speak

9    to Dr. Maniar.  But right now you are

10   here.  I'd like to know your recollection

11   of what Dr. Maniar said.

12        A.    Yes, sir.  Leena had said that

13   Sam had yelled at her and embarrassed her.

14   If I recall correctly, she may have said

15   he screamed at her.  And I said okay.

16              I asked Dr. Maniar if she agreed

17   with that.  And she did not corroborate

18   that account.  Again, my recollection is I

19   asked -- Dr. Varughese had told me that it

20   was so loud that obviously Dr. Pessin

21   would have heard because her office was

22   right next door and everybody out in the

23   antechamber would have heard as well.

24        Q.    Where was this incident that had

25   occurred?

Page 78

1              PATRICK LENTO, M.D.

2       A.     Based on my understanding, it

3    was a conference room on the eighth floor

4    of the Icahn Building.

5       Q.     Was Dr. Maniar there for the

6    incident?

7       A.     I believe she was, yes.

8       Q.     What time of day did the meeting

9    between yourself, Dr. Maniar and

10   Dr. Varughese take place?

11      A.     I don't recall the specific

12   time.  It was the following day.

13      Q.     Let me show you what was

14   previously marked as Defendant's Exhibit

15   6.  I'll give you a moment to review that.

16   I'll represent to you it's an email, dated

17   September 16, 2010, from Dr. Varughese to

18   you.

19              (Witness reviews document.)

20      Q.     Do you recall seeing this email?

21      A.     No, sir.

22      Q.     In it, Dr. Varughese writes the

23   next day after she had sent the email as

24   of 4:08 p.m. that she had not heard back

25   from you, again raising the issue of a

Page 79

1              PATRICK LENTO, M.D.

2    joint meeting with you and Dr. McCash.

3    Does this email refresh your recollection

4    as to the timing of when you met with

5    Dr. Varughese and Dr. Maniar?

6         A.    No, not necessarily.

7         Q.    Do you know whether or not the

8    meeting occurred on the evening of

9    September 16 or was it sometime after

10   that?

11        A.    My recollection was that it was

12   a Tuesday morning that the incident

13   occurred.  I could be wrong.

14        Q.    Going back to -- actually going

15   back to Defendant's Exhibit 5.  If you

16   could put that before you.  This was an

17   email, dated Tuesday, September 14, at

18   10:34 p.m., when Dr. Varughese writes that

19   she was yelled at this morning by

20   Dr. McCash.  So you are correct it was a

21   Tuesday.

22              But going to Defendant's Exhibit

23   6, it's two days later on Thursday,

24   September 16, when Dr. Varughese was

25   following up.

Page 80

```
1            PATRICK LENTO, M.D.

2            Do you know why there was a

3    delay between you reaching out to

4    Dr. Varughese and her email on Defendant's

5    Exhibit 5?

6            MR. McEVOY:  Defendant's Exhibit

7    5 or Defendant's Exhibit 6?

8            MR. WRONKO:  Let me rephrase

9    that.

10       Q.    Do you know why there was a

11   delay in terms of responding to

12   Dr. Varughese's initial email on

13   Defendant's Exhibit 5 all the way through

14   Thursday, September 16 as of 4:08 p.m.?

15           MR. McEVOY:  Objection to the

16   form.  The witness said he met with them

17   on the next day after the email.

18       Q.    If in fact you had met with

19   Dr. Varughese the next day, that would

20   have been September the 15th.  Why is it

21   that Dr. Varughese would have written you

22   "I haven't heard back regarding my

23   complaint on Sam about his shouting and

24   inappropriate comments"?

25       A.    That would be for Dr. Varughese
```

Page 81

1              PATRICK LENTO, M.D.

2     to answer.

3         Q.    Does that refresh your

4     recollection that the meeting did not, in

5     fact, take place on September 15?

6         A.    No.  Again, I do not believe

7     that this helps clarify.

8         Q.    Was this email on Defendant's

9     Exhibit 6 an attempt by Dr. Varughese to

10    follow up after the meeting?

11        A.    It may have been, yes.

12        Q.    Because I do see in the re line

13    "Meeting follow-up."  So I apologize for

14    that.

15        A.    No problem.

16        Q.    Did you, in fact, follow up with

17    Dr. Varughese after the meeting in

18    accordance with this email, dated

19    September 16th?

20        A.    Specifically, I don't recall.

21        Q.    Take me through whatever steps

22    you had taken with regard to this incident

23    in addition to meeting with Dr. Maniar and

24    Dr. Varughese.  Did you do anything else?

25        A.    So Leena made an assertion

1              PATRICK LENTO, M.D.

2      during the meeting I had with her and

3      Dr. Maniar that obviously, as we

4      discussed, Sam had yelled at her.

5      Something to the effect that she was being

6      perhaps singled out for coverage.

7              My recollection is that she said

8      something about everyone being against

9      her.  And I remember telling Leena that if

10     she thought everybody was against her,

11     that it's possible, then, that the problem

12     wasn't necessarily everyone else.  Perhaps

13     it was her.  And she might want to

14     consider reflecting on the situation and

15     consider that, you know, maybe she would

16     bear some of the responsibility.

17             I also told Dr. Varughese at

18     that time of the meeting that I would meet

19     and speak with Dr. McCash.  But I don't

20     recall specifically indicating to

21     Dr. Varughese that I would get back to her

22     about anything in particular.

23        Q.    Did you tell her at that meeting

24     that sometimes people yell?

25        A.    I don't recall using that

Page 83

1            PATRICK LENTO, M.D.

2    phraseology specifically.

3        Q.    Let's go beyond this particular

4    meeting.  Did you ever tell Dr. Varughese

5    in response to any complaint that she had

6    made that sometimes people yell?

7        A.    I would have indicated that a

8    resident may have been reprimanded.  And

9    it's possible that I said might have been

10   yelled at.

11       Q.    Well, that's not my question.

12   My question is whether or not you ever

13   said with regard to someone who had raised

14   their voice at Dr. Varughese that sometimes

15   people yell.

16       A.    Again, I think that that's

17   asking me to specifically remember every

18   word that I said.  And I just can't

19   confirm that.

20       Q.    Did you ever tell Dr. Varughese

21   that the residency program is a dysfunctional

22   family?

23       A.    That's not an analogy I would

24   make.  I may have referenced it.  But

25   that's not an analogy I would have made.

Page 84

1              PATRICK LENTO, M.D.

2         Q.    You specifically recall

3    Dr. Varughese indicating that she felt she

4    was being singled out?

5         A.    She just said that everyone was

6    against her.

7         Q.    She didn't say that she was

8    being singled out for coverage?

9         A.    No.  That wasn't the impression

10   I got.  And I don't believe that was what

11   she intended.

12        Q.    But I thought that you had just

13   previously testified that she had said

14   that she felt she was being singled out

15   for coverage.  She didn't say that?

16             MR. McEVOY:  Objection.  That's

17   not what the witness said.

18             MR. WRONKO:  We can go back to

19   the transcript.

20             MR. McEVOY:  We can.

21             MR. WRONKO:  I'm not hallucinating.

22        A.    I don't recall that she was

23   specifically saying that she was being

24   singled out for coverage.

25        Q.    Did you speak with anyone from

Page 85

1          PATRICK LENTO, M.D.

2    GME with regard to this incident?

3          A.    I don't recall doing that, no.

4          Q.    Did you speak with Dr. Barnett?

5          A.    I don't recall speaking to

6    Dr. Barnett about this, no.

7          Q.    Let me show you what was marked

8    as Pessin Exhibit 3.

9               (Witness reviews document.)

10         Q.    Do you recall receiving this

11   email from Dr. Pessin-Minsley as of

12   September 15, 2010?

13         A.    I do recall communication with

14   Dr. Pessin-Minsley.  I'm not sure if it

15   was an email or not.  Because I did speak

16   with her as well.

17         Q.    She writes "This whole thing

18   needs to be brought to Scott's attention."

19               Did you have any communications

20   with Dr. Pessin-Minsley about involving

21   Scott Barnett in this particular situation?

22         A.    I did speak with her.  She is

23   referring, I believe, specifically to the

24   incident regarding the mishandled cytology

25   specimen that she references here.

Page 86

1                PATRICK LENTO, M.D.

2        Q.     Did you speak with Dr. Barnett

3    about the mishandled cytology specimen?

4        A.     I do not recall speaking with

5    Dr. Barnett.  At that time, I did not

6    think that Dr. Barnett needed to be

7    involved.

8        Q.     Do you know whether or not

9    anyone from GME was involved with this

10   incident?

11       A.     I don't know.

12       Q.     When was it that you spoke with

13   Dr. McCash or did you speak with

14   Dr. McCash about this incident?

15       A.     Yes.  I don't know specifically

16   when.  But I did speak with Dr. McCash.

17       Q.     Who was present when you met

18   with Dr. McCash?

19       A.     Just Dr. McCash.

20       Q.     Did you maintain any notes from

21   your meeting with Dr. McCash?

22       A.     Not at the time, no.

23       Q.     What do you mean not at the

24   time?  Did you ever generate any notes

25   about that meeting?

1            PATRICK LENTO, M.D.

2       A.    Yes, I did.  I generated some

3    notes from the meeting with Dr. Varughese

4    and Dr. Maniar.  I jotted down some things

5    that were in a sense a reminder to me

6    about, you know, speaking with Sam.

7       Q.    Did you retain those notes?

8       A.    Yes.

9            MR. WRONKO:  I'll follow up with

10   a letter to make sure those notes were

11   produced.

12      Q.    Tell me what was said at your

13   meeting with Dr. McCash.

14      A.    I don't think I can give you

15   specifically what happened.  We are

16   talking about a number of years ago.

17      Q.    Your best recollection.

18      A.    Sure.  Dr. McCash was chief

19   resident with Dr. Maniar.  He had started

20   officially in July of that year, which was

21   2010.  This incident had happened the

22   beginning of September.  So he was

23   relatively new to the position.  The

24   purpose of the meeting was in a sense to

25   educate Dr. McCash about how to

Page 88

1               PATRICK LENTO, M.D.

2    potentially address, you know, similar

3    situations.

4         Q.    Tell me what was said at the

5    meeting.  Do you recall Dr. McCash saying

6    anything to you at the meeting?

7         A.    I don't recall what he said, no.

8         Q.    Did you believe at that point

9    that Dr. McCash had mishandled his

10   interactions with Dr. Varughese?

11        A.    It was his job as the chief

12   resident to oversee the resident pool.  If

13   he did, in fact, yell, that may not have

14   been appropriate.  And my job I felt at

15   that point was to educate Dr. McCash about

16   how to handle similar situations in the

17   future.

18        Q.    Would you consider your

19   conversation with Dr. McCash as being an

20   informal disciplinary meeting, akin to

21   what you had previously described as being

22   an informal process, versus a formal

23   process of discipline?

24        A.    Well, my recollection was that

25   based on my investigation, the facts did

Page 89

1              PATRICK LENTO, M.D.

2     not corroborate with what Dr. Varughese

3     had said about the screaming such that it

4     was heard obviously throughout the area.

5     I spoke with Dr. Pessin-Minsley and she

6     said she heard nothing.  She spoke with

7     her staff.  They all said they heard

8     nothing.

9              So it was my feeling at the time

10    that while he may not have had the best

11    interaction with Dr. Varughese that this

12    was an educational point, whether or not

13    it had specifically been as Dr. Varughese

14    had laid out.  Again, I thought it was an

15    educational opportunity.

16              So yes, it was a one-on-one

17    interaction.

18        Q.    Did you ask Dr. McCash to write

19    a self-reflection?

20        A.    No, sir.

21        Q.    Did you ask Dr. McCash to read a

22    book on professionalism?

23        A.    No, sir.  Nor did I ask

24    Dr. Varughese based on the incident to do

25    the same.

Page 90

1          PATRICK LENTO, M.D.

2     Q.    Why is it with regard to his

3    interaction with Dr. Varughese that you

4    did not ask Dr. McCash to write a

5    self-reflection?

6     A.    Again, based on my investigation,

7    it didn't seem to corroborate Dr. Varughese's

8    account of the story.  So under those

9    circumstances, I felt that the best course

10   of action was to speak with Sam and

11   educate him about how best to handle

12   himself in future situations.

13    Q.    When you were investigating the

14   situation, were you solely trying to find

15   out whether or not Dr. McCash's voice had

16   carried beyond the conference room or were

17   you actually trying to find out whether he

18   had raised his voice, regardless of

19   whether it was heard down the hall?

20    A.    I was trying to find an account

21   of what had happened from the people who

22   were apparently involved.  And I asked

23   Dr. Maniar at the meeting with Dr. Varughese

24   if she agreed with what Dr. Varughese was

25   saying.  And she said no.  She pointedly

Page 91

1           PATRICK LENTO, M.D.

2    said to Dr. Maniar.

3        Q.   Did you attempt to speak with

4    any other witnesses from that particular

5    incident?

6        A.   I wasn't aware that there were

7    other witnesses.

8        Q.   Did you ask any of the people

9    who you spoke to how many people were in

10   the room and who was there?

11       A.   I don't recall.

12           MR. McEVOY:  When you are done

13   with this line, can we take a break?

14           MR. WRONKO:  Let's take a break

15   now.  That's fine.

16           (Recess:  11:48 to 11:59 a.m.)

17   BY MR. WRONKO:

18       Q.   We are back on the record.  You

19   are still under oath.

20           Did you expect all female residents

21   to smile all the time?

22       A.   No, sir.

23       Q.   Did Dr. Maniar say at the

24   meeting with Dr. Varughese about that

25   incident in September 2010 with Dr. McCash

Page 92

1              PATRICK LENTO, M.D.

2    that Dr. McCash was out of line or acted

3    inappropriately?

4         A.    I don't recall her saying that,

5    no.

6         Q.    After that incident leading up

7    to December the 8th, do you have any

8    knowledge of Dr. Varughese's job performance?

9         A.    No, sir.

10        Q.    What was expected at that point

11   with regard to conference attendance of

12   residents?  We are talking late 2010.

13        A.    Conferences?  There are

14   educational conferences that are part of

15   the residency.  I assume that's what you

16   are referring to.

17        Q.    Yes.

18        A.    Residents were expected to

19   attend conference.  It is part of their

20   educational program.

21        Q.    Do you know whether or not

22   Dr. McCash had to send out a resident-wide

23   email with regard to poor attendance by

24   residents at the conferences during that

25   period of 2010?

1              PATRICK LENTO, M.D.

2      A.    I don't have a recollection of

3   that, no.

4      Q.    Do you recall there being a

5   problem with resident attendance at those

6   conferences?

7      A.    Yes.

8      Q.    What was the problem that you

9   recall?

10      A.    Attendance issue.  That's the

11   problem.

12      Q.    Did you do anything at that time

13   to address that issue?

14      A.    Yes.

15      Q.    What did you do?

16      A.    We reinforced the policy,

17   unwritten policy that the residents were

18   required to attend their educational

19   conference.

20      Q.    Was anyone disciplined because

21   of failure to attend conference from that

22   period of 2010 through June 2011?

23      A.    No formal discipline.

24      Q.    Any informal discipline?

25      A.    I'm sure that there was, yes.

1          PATRICK LENTO, M.D.

2     Q.    Do you recall who received

3  informal discipline?

4     A.    No, sir.

5     Q.    Do you know who administered

6  that informal discipline?

7     A.    It would have been a reminder

8  from the chief residents and a referral to

9  me if it were persistent.

10    Q.    Did you receive any complaints

11 about Dr. Varughese from anyone between

12 September 15, 2010, and December 7, 2010?

13    A.    I don't recall.

14    Q.    Where were you during the week

15 of December 8, 2010?  Were you at the

16 hospital or were you elsewhere?

17    A.    During the week?

18    Q.    Yes.  Let's just keep it

19 December 8 through December 10th, 2010.

20    A.    I was away at a meeting.

21    Q.    Where was your meeting?

22    A.    I believe it was in California.

23    Q.    At that point in 2010, were you

24 able to check emails when you were away?

25    A.    I don't recall at that particular

Page 95

1           PATRICK LENTO, M.D.

2    time.

3        Q.    Do you recall on that particular

4    trip reviewing any emails that had come

5    in?

6        A.    I don't remember.

7        Q.    When was the very first time

8    that you had heard that there was an

9    incident between Dr. Varughese and

10   Dr. McCash on December 8?

11       A.    I don't remember the specific

12   day.

13       Q.    Do you recall whether it was on

14   the same day of the incident or some day

15   after that?

16       A.    I believe it was some day after

17   the actual incident.

18       Q.    How did you find out about it?

19       A.    I believe it was by email.

20       Q.    Whose email?

21       A.    Well, there were several emails.

22   I don't recall who sent the first email.

23       Q.    When you returned to the

24   hospital, did you meet with anybody about

25   the incident that had occurred on December

1              PATRICK LENTO, M.D.

2      the 8th?

3           A.     Yes, sir.

4           Q.     Who did you meet with?

5           A.     I met with Dr. Pessin.

6           Q.     Was anyone else present?

7           A.     I don't believe so at the time,

8      no.

9           Q.     Tell me what the two of you

10     discussed.

11          A.     We discussed the incident that

12     had occurred that you referred the prior

13     week.  Melissa had -- Dr. Pessin had

14     indicated to me that she had already been

15     investigating.

16          Q.     Anything else?

17          A.     I believe she indicated that she

18     had already spoken to the GME office and

19     legal.

20          Q.     Did she tell you why she had

21     already spoken with the GME office?

22          A.     I don't recall her giving me a

23     specific explanation.

24          Q.     Who did she speak to at the GME

25     office?

```
 1              PATRICK LENTO, M.D.
 2        A.    I don't know.
 3        Q.    When she said that she had
 4   already spoken to legal, was she explicit
 5   about who she had spoken to?
 6        A.    No, sir.
 7        Q.    Subsequent to that conversation,
 8   did you learn who was involved from the
 9   GME office?
10        A.    I don't recall.
11        Q.    What did Dr. Pessin say that she
12   had done to investigate the situation?
13        A.    I think the details would have
14   to come directly from Dr. Pessin.
15        Q.    So you have no recollection of
16   her advising you about what she had
17   already done to investigate the situation?
18        A.    I don't remember the specific
19   details at this time.
20        Q.    Do you know who it was who she
21   had interviewed at that time?
22              MR. McEVOY:  Objection to the
23   form.  You can answer.
24        A.    I believe she had met with
25   Dr. Varughese.  I don't know if she met
```

1               PATRICK LENTO, M.D.

2     with any of the others at that point.

3          Q.    At that point in time, what

4     position did Dr. Pessin-Minsley hold?

5          A.    She was the chairwoman of the

6     department, interim chairwoman.

7          Q.    Who did she succeed in that

8     position?

9          A.    Dr. Schiller.

10         Q.    When did that change occur from

11    Dr. Schiller to Dr. Pessin-Minsley?

12         A.    I don't remember the specific

13    month.

14         Q.    Do you have any knowledge as to

15    why Dr. Schiller was no longer the chair

16    of the department?

17         A.    He stepped down.

18         Q.    Do you know any of the

19    circumstances of why he stepped down?

20         A.    I don't have any details.

21         Q.    Did Dr. Pessin-Minsley share any

22    of her notes with you from any of the

23    interviews that she had conducted in your

24    absence?

25         A.    I don't remember reading notes.

Page 99

1              PATRICK LENTO, M.D.

2      Q.     After you met with Dr. Pessin-

3   Minsley was there any further investigation

4   beyond what she had done?

5      A.     Yes.

6      Q.     What further investigation was

7   there?

8      A.     She had indicated she had

9   already started the investigation.  And

10   she asked me to interview some of the

11   people who were present at the time of the

12   altercation.

13      Q.     Had Dr. Pessin-Minsley shared

14   any initial thoughts with you as to who

15   was right or who was wrong in that

16   particular incident?

17              MR. McEVOY:  Objection to the

18   form.  You can answer.

19      A.     I don't recall her having a

20   conclusion at that time, no.

21      Q.     What was your understanding of

22   what you were investigating?

23      A.     An altercation that occurred on

24   the surgical service during the time

25   period that I was away involving Leena and

Page 100

1              PATRICK LENTO, M.D.

2     Dr. McCash and several other people.

3         Q.    At the time that you began the

4     investigation, what was your understanding

5     of what happened during the altercation?

6         A.    My understanding was that Leena

7     was on the surgical service.  Dr. McCash

8     had spoken with her about certain samples

9     that needed to be done.  There was a

10    request from Dr. McCash to Dr. Varughese

11    not to let anybody else, such as a

12    moonlighter, to handle the samples.  And

13    that subsequent to that, Dr. Varughese had

14    apparently given samples that were

15    discussed to the moonlighter.  Dr. McCash

16    had become aware and confronted Dr. Varughese

17    about it.

18        Q.    At the outset of your

19    investigation, did you know what types of

20    samples were in question?

21        A.    The only thing that I recall

22    specifically was a breast type of sample.

23    I don't know if there were others.

24        Q.    Do you know whether or not the

25    samples that were delegated by Leena

```
 1              PATRICK LENTO, M.D.
 2    Varughese were breast margins?
 3         A.    That I don't know offhand, no.
 4         Q.    Did you ever find out during the
 5    course of your investigation whether they
 6    were breast margins?
 7         A.    I don't recall, no.
 8         Q.    Wouldn't it have been important
 9    in terms of your investigation to find out
10    specifically what types of samples they
11    were?
12         A.    I don't think so, no.
13         Q.    Wouldn't you agree that, depending
14    on the sample, the level of complexity
15    would certainly vary?
16         A.    But the decision about what
17    needed to be done was indicated from the
18    chief resident to the resident.  So there
19    was a very specific communication about
20    what needed to be done and how it should
21    be approached, regardless of any
22    presumption of what should be done.  There
23    was a specification about it.
24         Q.    Let's talk about that for a
25    moment.  You, of course, went through your
```

Page 102

1          PATRICK LENTO, M.D.

2     own residency?

3          A.    Yes, sir.

4          Q.    You were a fellow.  And then you

5     ultimately became an attending physician

6     and then became the director of the

7     program.  During the course of all of that

8     experience, did you develop any opinions

9     as to whether or not chief residents

10    should micromanage residents in the way

11    that they perform their responsibilities?

12         A.    I don't know that that's

13    necessarily micromanaging them.

14         Q.    Well, do you know whether or not

15    Dr. McCash gave on any other occasions

16    very specific instructions as to which

17    samples could or could not be grossed by a

18    resident who was doing grossing who also

19    had moonlighters available?

20         A.    I'm not aware.

21         Q.    Do you know whether at that

22    point in time there was any change in

23    terms of the -- I'm sorry.

24              Do you know whether or not at

25    that time, December 8, 2010, whether or

1             PATRICK LENTO, M.D.

2    not there was a change in grossing where

3    the residents were not to be receiving

4    samples from attendings to perform

5    grossing on?  In other words, was there a

6    change to an attending-only program?  Do

7    you understand that?

8        A.    I understand the question.  I

9    don't remember when that system was put

10   into place.

11       Q.    Did you investigate whether or

12   not that system was in place at the time

13   of that incident?

14       A.    No, sir.

15       Q.    How about a situation -- how

16   about a change of procedure in terms of

17   whether or not residents were permitted to

18   split samples?  Was there ever a change

19   away from residents being permitted to

20   split samples with other people who were

21   grossing, such as moonlighters?

22       A.    There may have been.

23       Q.    Did you investigate that as part

24   of your investigation?

25       A.    I did not.

Page 104

1          PATRICK LENTO, M.D.

2     Q.     Isn't it your responsibility as

3     the program director to know what specific

4     procedures for grossing were in place,

5     whether or not the attending-only program

6     was in place, whether residents were

7     permitted to split samples or not?

8     A.     I just don't recall.

9     Q.     Now, what was your understanding

10    at the beginning of your investigation as

11    to what occurred when Dr. McCash had

12    confronted Dr. Varughese?

13    A.     My understanding was that

14    Dr. Varughese became very loud,

15    inappropriate, and threatening to those in

16    the immediate area, and then subsequently

17    outside the immediate area.

18    Q.     Did you have any understanding

19    of the manner in which Dr. McCash had

20    raised his concerns with Dr. Varughese

21    prior to Dr. Varughese becoming very loud,

22    inappropriate and threatening?

23    A.     My understanding was that

24    Dr. McCash was firm and explicit, but not

25    inappropriate.

1              PATRICK LENTO, M.D.

2        Q.     How did you develop that

3    understanding at the time of the beginning

4    of your investigation?

5        A.     Through a combination of email

6    accounts of what had happened that were

7    sent, as well as my direct interview, if

8    you will, of some of those either involved

9    or in the area.

10        Q.     My question, though, goes to

11    before you began conducting interviews.

12    Did you have that understanding that

13    Dr. McCash was firm and explicit but not

14    inappropriate prior to conducting your own

15    interviews?

16        A.     That was my understanding.

17        Q.     Did you believe, coming into

18    this incident to investigate it, that

19    Dr. McCash and Dr. Jordan had greater

20    credibility in your mind than Dr. Varughese?

21        A.     No, sir.

22        Q.     So why is it that you would have

23    an understanding that Dr. McCash was firm

24    and explicit but not inappropriate prior

25    to you conducting your own interviews?

```
 1              PATRICK LENTO, M.D.
 2       A.    Based upon emails I had received
 3   and my conversation with Dr. Pessin, who
 4   had indicated that she had already started
 5   the investigation.
 6       Q.    Was that Dr. Pessin's viewpoint,
 7   that Dr. McCash was firm and explicit but
 8   not inappropriate?
 9       A.    I don't recall her specifically
10   telling me that.
11       Q.    But in terms of email accounts,
12   had you received an email account from
13   Dr. Varughese?
14       A.    Yes, sir.
15       Q.    So are you telling me that you
16   believed certain email accounts but not
17   other email accounts at the point in time
18   that you began your own investigation?
19       A.    That was my understanding.  The
20   point of the investigation was to try to
21   hash out the facts and make a determination.
22       Q.    So had you prejudged this
23   investigation prior to conducting
24   interviews?
25       A.    Not a prejudgment.
```

1            PATRICK LENTO, M.D.

2      Q.    Let me show you what was marked

3   as Pessin Exhibit 7.  I'll give you a

4   moment to read that.

5            (Witness reviews document.)

6      Q.    Are you ready?

7      A.    Yes.

8      Q.    I've shown you what has been

9   marked as Pessin Exhibit 7.  I want to

10  focus on the top email on the first page

11  where Dr. Pessin-Minsley, even though it's

12  directed to Dr. Bleiweiss your carbon

13  copy, says, "Actually Pat, you need to

14  speak with me first when you get back."

15  She says, "This is actually a very big

16  deal from a number of perspectives and I

17  need to provide you with all of the

18  implications of the situation."

19            Did she explain to you why she

20  believed it was a very big deal?

21      A.    Yes, I believe she did.

22      Q.    What was her explanation?

23      A.    To summarize, there was a

24  behavioral outburst by Dr. Varughese.  And

25  she had subsequently left the area without

```
 1              PATRICK LENTO, M.D.
 2   finishing her duties as a resident.
 3       Q.    Did she tell you what she felt
 4   were all of the implications of the
 5   situation?
 6              MR. McEVOY:  She being Dr. Pessin-
 7   Minsley?
 8              MR. WRONKO:  Correct.
 9       A.    No, sir.
10       Q.    Let me show you what was marked
11   as Pessin Exhibit 4.  I'd like to draw
12   your attention specifically to the email,
13   dated December 8, 2010, 8:17 p.m., from
14   Samuel McCash, to you, Dr. Pessin-Minsley
15   and a number of other individuals.
16              MR. McEVOY:  I would instruct
17   you to read the entire exhibit.
18              (Witness reviews document.)
19       Q.    Is this email that appears on
20   December 8, 2010, one of the emails that
21   you had previously testified to that
22   advised you of the fact that an incident
23   had occurred?
24       A.    Can you repeat that question.
25       Q.    Sure.  Is this one of the emails
```

1              PATRICK LENTO, M.D.

2    that you had previously testified to that

3    had apprised you of the fact that there

4    was a confrontation between Dr. McCash and

5    Dr. Varughese?

6         A.    Thank you.  Yes.

7         Q.    Now, if you look at the

8    distribution of this email, it was sent to

9    you, Dr. Pessin-Minsley, Dr. Schiller as

10   well as to a number of cc's, Dr. Bleiweiss

11   whom you have testified was the attending

12   for the breast service.

13        A.    Yes.

14        Q.    Who is Eileen Hauptman?

15        A.    Eileen is one of the

16   departmental administrators who oversaw

17   the grossing room.

18        Q.    Who is Jonathan Truong?

19        A.    He was the direct supervisor of

20   that lab.

21        Q.    Who is Shabnam Jaffer?

22        A.    She is another breast attending.

23        Q.    Who is Freda Burstyn?

24        A.    She was the administrator of the

25   department at the time.

Page 110

1          PATRICK LENTO, M.D.

2      Q.    Do you have any knowledge or

3  know why the other chief resident was not

4  copied on this email from Samuel McCash?

5      A.    I do not, no.

6      Q.    Do you know whether in any of

7  the emails involving this situation why

8  Dr. Maniar was not included in them?

9      A.    I do not know why.

10     Q.    Did you have any communications

11  with Dr. Maniar about this incident?

12     A.    I don't recall.

13     Q.    Was there any type of a

14  concerted effort to exclude Dr. Maniar,

15  given the fact that she was a female of an

16  Indian descent?

17     A.    No, sir.

18     Q.    Do you know whether there was

19  any effort to exclude her from being

20  copied with regard to this situation

21  because she had previously supported

22  Dr. Varughese in telling you that

23  Dr. McCash had acted inappropriately back

24  in September of 2010?

25     A.    I don't believe I said that

```
 1              PATRICK LENTO, M.D.
 2    Dr. Maniar had told me he had acted
 3    inappropriately.
 4              To answer your question, no, I'm
 5    not aware of a reason to have excluded
 6    Dr. Maniar.  Nor would I say she was
 7    intentionally excluded.
 8         Q.   Do you think it was appropriate
 9    for Dr. McCash to have included all of
10    these people on the email, Ira Bleiweiss,
11    Ms. Hauptman, all of the cc's?
12         A.   Yes, I do.
13         Q.   Why do you believe that?
14         A.   Well, again, Dr. Bleiweiss and
15    Dr. Jaffer were the two breast attendings.
16    And, having read through the email, the
17    specimens referred to as Dr. Varughese
18    having handed off to the moonlighter she
19    gave all the Goldfarb cases, that's the
20    attending surgeon.  As I mentioned
21    earlier, Mr. Truong and Ms. Hauptman were
22    the supervisory people for that particular
23    area.  Mrs. Burstyn was the departmental
24    administrator.  So I don't see that as
25    unusual.
```

Page 112

1                 PATRICK LENTO, M.D.

2       Q.    What are Goldfarb cases?

3       A.    Those are typically breast

4   cancer cases.  Dr. Goldfarb is the

5   attending surgeon.  She is a prominent or

6   was a prominent surgeon at the time.  I

7   don't know where she is now.

8       Q.    But with regard to the Goldfarb

9   cases, Dr. McCash had reported that

10  Dr. Varughese wanted to give margins of

11  the Goldfarb cases to the moonlighters; is

12  that accurate?

13      A.    What he indicated here is she

14  gave all the Goldfarb cases.  He doesn't

15  say that it was margins or anything.  All

16  to me might suggest that it was all parts

17  of the case.

18      Q.    Was that your understanding by

19  the end of the investigation, that she had

20  given all of the Goldfarb cases to the

21  moonlighter to do?

22      A.    I think it's irrelevant.

23      Q.    Well, why would that be

24  irrelevant?  Isn't it significant to know

25  whether it was simply a margin versus more

1              PATRICK LENTO, M.D.

2    substantial breast cases?

3              MR. McEVOY:  Objection.  Asked

4    and answered.  You can answer again.

5         A.    No, sir.

6         Q.    So even if it was a simple

7    margin, it would have been appropriate, in

8    your eyes?

9         A.    You are calling it a simple

10   margin.

11        Q.    Well, is there no such thing?

12        A.    There is no such thing.

13        Q.    With regard to your steps in the

14   investigation, who did you interview?

15        A.    I spoke with Dr. Bleiweiss.  I

16   spoke with Dr. Jaffer.  I spoke with

17   Dr. Azar.  I spoke with Dr. Grunes.

18        Q.    Did you maintain notes of your

19   interview with Dr. Jaffer?

20        A.    No, sir.

21        Q.    Why didn't you maintain any

22   notes of your interview with Dr. Jaffer?

23        A.    I don't have a reason.

24        Q.    What did you ask Dr. Jaffer?

25        A.    I asked her what happened.

1            PATRICK LENTO, M.D.

2       Q.    What did she tell you?

3       A.    She wasn't present at the

4   initial part of the altercation.  She

5   indicated that she came in and Leena was

6   yelling.  And I believe she tried to calm

7   the situation, if I recall correctly.

8       Q.    Did she make any commentary

9   about what Dr. McCash was doing when she

10   arrived on the scene?

11       A.    I don't recall.

12       Q.    Did you ask her?

13       A.    I asked her to tell me what

14   happened.

15       Q.    Did she say anything about

16   Dr. McCash?

17       A.    I don't recall.

18       Q.    Do you recall asking about what

19   she observed of Dr. McCash's behavior?

20            MR. McEVOY:  Objection.  Asked

21   and answered one more time.

22       Q.    You can answer.

23       A.    Can you repeat the question,

24   please.

25       Q.    Do you recall asking her

 1              PATRICK LENTO, M.D.

 2    specifically about anything that she

 3    observed about Dr. McCash's behavior?

 4         A.    Thank you.  No, sir.

 5         Q.    Did Dr. Jaffer advise you that

 6    Dr. McCash had used profanity?

 7         A.    I don't recall.

 8         Q.    Would it have been appropriate

 9    for Dr. McCash to use profanity?

10         A.    No.

11         Q.    Did you ultimately conclude that

12    Dr. McCash was administering verbal

13    discipline to Dr. Varughese by speaking to

14    her in the gross room?

15         A.    Yes.  He was following up on his

16    initial discussion with Dr. Varughese.

17         Q.    What was Dr. Varughese doing

18    when Dr. McCash first entered the room

19    right before the confrontation began?

20              MR. McEVOY:  Wait.  Are you

21    asking the witness to tell you about

22    something that he wasn't there for?

23              MR. WRONKO:  Fair enough.

24         Q.    What did your investigation

25    conclude that Dr. Varughese was doing when

                    PATRICK LENTO, M.D.

1    Dr. McCash first entered the room?

2         A.    I don't know.  I don't know what

3    she was doing.

4         Q.    You don't know whether or not

5    she was grossing a specimen?

6         A.    I would have to make a presumption.

7         Q.    If you had conducted a thorough

8    investigation, wouldn't you have known

9    what was going on when Dr. McCash

10   initially approached Dr. Varughese?

11              MR. McEVOY:  Objection to the

12   form.  You can answer.

13        A.    An account doesn't specify

14   specifically every minor detail, if she

15   was washing her hands at the time or she

16   was standing by the computer.

17        Q.    So from your perspective, it

18   would have been a minor detail to know

19   what Dr. Varughese was doing in the gross

20   room when Dr. McCash came in?

21        A.    I can tell you I would presume

22   she was grossing.

23        Q.    But isn't that very significant

24   to know whether she was administering

1           PATRICK LENTO, M.D.

2    patient care at the time that Dr. McCash

3    chose to confront her?

4        A.    I don't believe so.

5        Q.    Okay.  Is it standard procedure

6    at Mount Sinai Medical Center in the

7    residency program to administer discipline

8    when residents are in the middle of

9    administering patient care?

10           MR. McEVOY:  Objection to the

11   form.  You can answer.

12       A.    He asked her why she hadn't

13   performed the examination of the specimens

14   that he had requested.

15       Q.    But answer my question.  Is it

16   your position that it would be appropriate

17   to confront a resident while they are in

18   the middle of administering patient care?

19           MR. McEVOY:  Same objection.

20   You can answer.

21       A.    If needed, yes.

22       Q.    So in your mind, is it

23   irrelevant whether or not patient care is

24   being administered as to whether or not

25   someone is sparking a confrontation?

Page 118

1              PATRICK LENTO, M.D.

2              MR. McEVOY:  Objection to the

3     form.  You can answer one more time.

4          A.    The confrontation was

5     specifically related to patient care.  He

6     was trying to correct the situation.

7          Q.    How was it related specifically

8     to patient care as opposed to simply

9     delegation of responsibility?

10         A.    Because a margin -- my

11    understanding from reading the email and

12    being a pathologist, the involvement of

13    the margins are included as a very

14    important part of the case, whether there

15    is one part or 20 parts.  And the

16    rationale behind that is because

17    ultimately the person who is going to be

18    signing it out needs to have an

19    understanding about what was done with the

20    specimen in certain circumstances.

21         Q.    But hadn't it been in the case

22    in the gross room that specimens,

23    including breast specimens, had been split

24    all the time by residents and that as of

25    December 8 there had been no change in

```
 1              PATRICK LENTO, M.D.
 2    that procedure?
 3         A.    I'm not aware.
 4         Q.    As the program director who was
 5    administering academic advisement arising
 6    out of this situation, didn't you have a
 7    duty to find that out?
 8         A.    No, sir.
 9         Q.    Why didn't you have a duty to
10    find that out?
11         A.    Because there was a direct
12    request from Dr. McCash that Leena include
13    the margins as part of her examination of
14    the specimens.
15         Q.    So it just comes down to the
16    fact that the chief resident said to do
17    it.  And in your mind, Dr. Varughese
18    didn't follow that instruction, correct?
19         A.    Dr. McCash had made the request
20    of Dr. Varughese.  And she did not follow
21    her responsibility in that circumstance.
22         Q.    Do you know whether or not this
23    chief resident, Samuel McCash, was keeping
24    a list specific to Dr. Varughese about why
25    he felt she was a troubled resident?
```

 1                  PATRICK LENTO, M.D.

 2        A.     I'm not aware of that at all.

 3        Q.     Do you know whether or not he

 4   just kept that list to himself about why

 5   he felt Dr. Varughese was a troubled

 6   resident?

 7        A.     I'm not aware of any list.

 8        Q.     So you never saw a list?

 9        A.     I'm not aware of any list.

10        Q.     Did Dr. Pessin ever show you a

11   list that Dr. McCash had been keeping?

12        A.     No, sir.

13        Q.     Let me show you what was marked

14   as Pessin Exhibit 6.  Have you had an

15   opportunity to review Pessin 6?

16        A.     Yes.

17        Q.     This is an email from Dr. McCash

18   to Dr. Pessin-Minsley, dated December 9,

19   2010, 1:13 p.m. after the situation

20   wherein Dr. McCash makes reference to his

21   Leena list.  Did you ever see this email

22   exchange?

23                  MR. McEVOY:  Objection.  There

24   is no reference to a Leena list.

25                  MR. WRONKO:  In the subject line

Page 121

PATRICK LENTO, M.D.

1                    PATRICK LENTO, M.D.
2     there is.
3                    MR. McEVOY:   That is the subject.
4     Correct.
5          Q.    Did you ever see this email
6     exchange?
7          A.    I do not recall ever seeing
8     this, no.
9          Q.    Do you ever recall being apprised
10    that there was a Leena list?
11         A.    No, sir.
12         Q.    Do you think it was appropriate
13    for this chief resident to be keeping for
14    himself a list of the reasons why Leena
15    has been a troubled resident?
16         A.    It's the job of the chief resident
17    to oversee the residents.
18         Q.    Do you know whether or not
19    Dr. McCash kept a list for any other
20    resident besides Leena?
21         A.    You have to ask Dr. McCash.
22         Q.    Would this email have raised any
23    concerns in your mind that Dr. McCash,
24    after having an incident with
25    Dr. Varughese back in September when he

1              PATRICK LENTO, M.D.

2      was alleged to have been raising his voice

3      and speaking inappropriately to her, was

4      singling her out?

5              MR. McEVOY:  Objection to the

6      form.  You can answer.

7          A.    I don't believe he was singling

8      her out.

9          Q.    As of December 9, 2010, did you

10     form your own belief that Leena had been a

11     troubled resident?

12         A.    Leena had performed satisfactorily

13     on rotations, except in my understanding

14     those evaluations that I had given her

15     where she was marginal.  But I wasn't

16     necessarily aware of all of her evaluations.

17         Q.    Given the fact that you had

18     previously counseled in an academic

19     setting Dr. McCash about how he should be

20     appropriately behaving with a resident,

21     why is it that you would immediately

22     assume that his directions to

23     Dr. Varughese were correct and should be

24     followed?

25             MR. McEVOY:  Objection to the

1          PATRICK LENTO, M.D.

2    form.  Mischaracterization of his

3    testimony.  But you can answer the

4    question.

5          A.    Can you repeat the question.

6                (The question was read.)

7          A.    Dr. McCash had been selected as

8    the chief resident by the former program

9    director.  Such a selection generally

10   implies certain qualities of an

11   individual.  And the prior incident that

12   you refer to had been already dealt with.

13         Q.    Coming into your investigation,

14   did you have any concerns that this might,

15   in fact, be a pattern by Dr. McCash in

16   terms of the way that he would be

17   approaching this particular resident?

18         A.    The purpose of the investigation

19   was to try to flesh out the details about

20   what had happened, to make a determination.

21         Q.    And you don't have any

22   recollection, sitting here today, of any

23   specific inquiries about Dr. McCash to

24   Dr. Jaffer, do you?

25         A.    No, sir.

1              PATRICK LENTO, M.D.

2      Q.     Would it surprise you that in

3   Dr. Figur's investigation, it was

4   disclosed that Dr. McCash had used

5   profanity?

6      A.     Yes.

7      Q.     If his investigation turned that

8   up and yours didn't, do you believe that

9   your investigation was completely thorough?

10     A.     That's one point that you are

11  bringing up.

12     Q.     Isn't it an important point?

13     A.     It might be.  But that's one

14  point that you are bringing up.

15     Q.     Is it ever appropriate for a

16  chief resident to use profanity when

17  dealing with another resident?

18     A.     No, sir.

19     Q.     Are you aware of a physician at

20  Mount Sinai Medical Center who was put on

21  final written warning for cursing out a

22  subordinate?

23     A.     No.

24     Q.     Dr. Pessin-Minsley testified

25  that she could not recall the name, but

Page 125

1                    PATRICK LENTO, M.D.

2      there was a physician who cursed out one

3      of the members of her staff.  You are

4      unaware of that?

5           A.    Yes.

6           Q.    Do you know whether or not

7      Dr. Adrienne Jordan was sending out emails

8      about her accounts with Dr. Varughese?

9           A.    Yes, I believe Dr. Jordan also

10     sent out an email.

11          Q.    Wasn't it multiple emails?

12          A.    My recollection is she sent out

13     two emails.

14          Q.    Let me show you what was marked

15     as Pessin Exhibit 10.

16                Have you ever seen this email

17     chain before?

18          A.    Not in the chain.  I'm not on.

19          Q.    How about the email on the final

20     page?

21          A.    Right.  Well, I'm indicated in

22     the address.

23          Q.    Okay.  Dr. Jordan wrote an

24     email, dated December 10, 2010, at 5:35

25     p.m.  Do you know why Kruti Maniar was

1           PATRICK LENTO, M.D.

2    excluded from this email?

3        A.    I do not know.

4           MR. McEVOY:  Objection to the

5    form.

6        Q.    Dr. Jordan describes a

7    conversation she had with Dr. Varughese.

8    Did you view it as inappropriate for

9    Dr. Jordan to have engaged Dr. Varughese

10   in this conversation?

11          MR. McEVOY:  Objection to the

12   form.  You can answer.

13       A.    My understanding from reading

14   the email is that Dr. Varughese is the one

15   who engaged Dr. Jordan.

16       Q.    Isn't it also the case that

17   Dr. Jordan entertained that engagement?

18          MR. McEVOY:  Objection to the

19   form.  You can answer.

20       A.    Yes.

21       Q.    Was there anything inappropriate

22   about her entertaining that engagement?

23          MR. McEVOY:  Same objection.

24       A.    I'm not sure that it was

25   inappropriate.

1          PATRICK LENTO, M.D.

2     Q.    Now, Dr. Jordan writes "While

3  she never yelled or raised her voice, I am

4  once again concerned about her illogical

5  placement of blame on myself and her

6  consistent 'flight of ideas.'"  And in

7  parentheses "(Yes.  I realize the irony in

8  that statement)."

9        What was your understanding of

10  what that means, flight of ideas?

11     A.    I'm not sure what she meant.

12     Q.    Do you know whether or not there

13  is any -- she is making reference to any

14  type of a medical diagnosis there?

15     A.    I think you would have to ask

16  Dr. Jordan.  I don't know.

17     Q.    As a PGY-2, do you think it was

18  appropriate for Dr. Jordan to be writing

19  about another resident that she has flights

20  of ideas?

21     A.    I'm not sure that it's

22  appropriate for me to comment necessarily,

23  because I was not part of the investigation

24  at that point.  So I don't know if they

25  were verbal communications between

```
 1            PATRICK LENTO, M.D.
 2   Dr. Pessin and Dr. Jordan or others about
 3   appropriateness of conversations and so
 4   on.
 5        Q.    I'm asking you as the program
 6   director, do you believe that it was
 7   appropriate for this particular resident
 8   to be making these types of allegations?
 9            MR. McEVOY:  Objection to the
10   form.  You can answer.
11        Q.    Making specific reference to
12   flight of ideas.
13        A.    That's her opinion.
14        Q.    Okay.  So as the program
15   director December 2010, you saw nothing
16   inappropriate about a PGY-2 expressing
17   that particular opinion about another
18   resident?
19        A.    Again, that was her opinion.
20        Q.    But I'm not asking whether it
21   was her opinion or not.  I'm asking
22   whether you as the program director felt
23   that it was appropriate for her to be
24   utilizing or expressing her opinion as she
25   did her, making reference to the quoted
```

1              PATRICK LENTO, M.D.

2    remarks of flight of ideas.

3         A.    I'm not sure.

4         Q.    Do you know whether or not

5    Dr. Pessin and Dr. Jordan were close?

6         A.    I have no idea.

7         Q.    Do you know why as of

8    December 11, 2010, Dr. Jordan was writing

9    an email like on the first page in essence

10   lobbying Dr. Pessin to see her point of

11   view?

12             MR. McEVOY:   Objection to the

13   form.  Rephrase.

14        Q.    Did Dr. Jordan lobby you to see

15   her point of view during your investigation?

16        A.    Not that I recall.

17        Q.    Now, do you know whether or not

18   Dr. Jordan also circulated any emails to a

19   large distribution list?

20        A.    I have no idea.

21        Q.    Let me show you what was marked

22   as Pessin Exhibit 11.

23             (Witness reviews document.)

24        Q.    I want to take you away from

25   that document for a moment and bring you

1          PATRICK LENTO, M.D.

2   back to Pessin 10.  If you could go back

3   to Dr. Jordan's email on the second page.

4   Go to that email on the second page.

5   Dr. Jordan had written "I explained to her

6   that there was an investigation going on

7   into what happened and she would be able

8   to tell her side of the story.  But I

9   didn't want to talk to her about it

10  anymore and in fact I was advised not to

11  speak with her."

12          From your reading of this email,

13  did Dr. Jordan disregard an instruction

14  that she had been given by Dr. Pessin-Minsley

15  not to speak with Dr. Varughese?

16      A.    From reading this email, I don't

17  know when that advisement was made, before

18  or after the email.

19      Q.    Was Dr. Jordan -- did you advise

20  Dr. Jordan or Dr. McCash not to be

21  speaking with anyone about the investigation?

22      A.    I did not.

23      Q.    Did you advise them that if they

24  spoke with anyone about the investigation

25  that they could be subject to termination?

1           PATRICK LENTO, M.D.

2      A.    I did not.

3      Q.    So returning now to that email,

4  which is Pessin 11, I'll give you a moment

5  to finish reviewing it.  And tell me when

6  you are ready.

7           (Witness reviews document.)

8      Q.    Have you ever seen Pessin 11

9  before?

10      A.    My name is on it.  So...

11      Q.    Do you believe it was

12  appropriate for Dr. Jordan to have sent

13  this email to the entire list of people

14  there?

15      A.    Well, she was asked to do so.

16      Q.    Do you know whether she was

17  asked to send it to everyone on that list?

18      A.    I can't answer that question for

19  you.

20      Q.    Okay.  Now, with regard to

21  Dr. Jordan's final remark in that email

22  where she says, "I agree with Sam and that

23  very serious punitive consequences are

24  called for in this situation," do you

25  think it was appropriate for this PGY-2 to

1            PATRICK LENTO, M.D.

2    be calling for another resident to be

3    disciplined?

4         A.    I don't think it's unreasonable.

5    But it's not her decision.

6         Q.    You had previously indicated in

7    response to an email where Dr. Jordan had

8    said that she was going home to puke her

9    brains out that it was a joke.  In

10   response to a prior email, you had said

11   that it was her opinion.  Now in reference

12   to this email, you said it's not

13   unreasonable.  Are you making excuses for

14   Dr. Jordan's unprofessional behavior?

15              MR. McEVOY:  Objection to the

16   form.  You can answer.

17        A.    No, sir.

18        Q.    If Dr. Varughese had been making

19   these types of remarks, would you have

20   viewed it as lacking professionalism?

21        A.    Isn't that making a conjecture

22   in a theoretical situation?

23        Q.    It is.  But I'd like to know

24   your opinion.

25              MR. McEVOY:  Note my objection

1              PATRICK LENTO, M.D.

2    to the form.  But you can answer the

3    question.

4         A.    I don't want to speculate.

5         Q.    Okay.  Fair enough.

6              MR. McEVOY:  By the way, it is

7    one o'clock.  So whenever you want to

8    break for lunch.  Actually it's two

9    minutes or three minutes to one.

10             MR. WRONKO:  Let's go another

11   five or ten minutes and then we will take

12   a break.

13             MR. McEVOY:  Fine.

14        Q.    Did you have a meeting with

15   Dr. Varughese in which you had threatened

16   her with possible termination if she had

17   spoken to or confronted colleagues about

18   the accusations that had arisen from the

19   December 8th incident?

20        A.    I don't recall telling Leena

21   that myself, no.

22        Q.    Do you recall having a meeting

23   in which you issued her a memo about her

24   confronting colleagues?

25        A.    Yes.

Page 134

1              PATRICK LENTO, M.D.

2      Q.     When did that meeting take

3    place?

4      A.     I don't recall.  But it may be

5    dated on a letter.

6      Q.     Okay.  Tell me what occurred at

7    the meeting.

8      A.     Dr. Pessin had convened the

9    meeting in her office, this was after my

10   return from my meeting in California, to

11   talk with Leena.

12     Q.     What did Dr. Pessin say during

13   the meeting?

14     A.     My recollection is that we

15   indicated that there was an ongoing

16   investigation.  We talked with Leena about

17   what had happened.  And Dr. Pessin issued

18   the letter.

19     Q.     When you say you had discussed

20   what had happened, what specifically were

21   you referring to?  Were you referring to

22   the December 8th incident or something

23   else?

24     A.     Leena recounted her summary of

25   what had happened.

1           PATRICK LENTO, M.D.

2      Q.    But what did you say to her with

3  regard to the notice that was issued?

4      A.    I don't recall saying anything

5  specific to her.

6      Q.    Do you recall Dr. Pessin-Minsley

7  saying anything specific to her?

8      A.    I believe that Dr. Pessin in a

9  sense reiterated or summarized what is

10  written in the letter.

11      Q.    I'm going to show you what has

12  been marked as Defendant's Exhibit 7.  Is

13  this the notice that you were referring to

14  that was issued to Dr. Varughese?

15           (Witness reviews document.)

16      A.    Yes.

17      Q.    Now, I'm aware, of course, of

18  the interaction that Dr. Varughese had

19  with Dr. Jordan.  And we had looked at

20  that email.  But were there any other

21  colleagues that Dr. Varughese had

22  confronted after December 8th that you

23  were aware of?

24      A.    Confrontation?  I don't recall

25  any other confrontations.

1          PATRICK LENTO, M.D.

2      Q.    In this notice it says "making

3  various accusations."  Were those solely

4  limited to the accusations that she has

5  attributed to have made by Dr. Jordan in

6  her email or were there any other

7  accusations that this is making reference

8  to?

9      A.    I didn't write up this letter.

10     Q.    Okay.  But I'm asking for your

11  understanding.

12     A.    I'm not sure.

13     Q.    And that is your signature on

14  the letter, correct?

15     A.    Yes, it is.

16     Q.    What departmental operations had

17  been disrupted during the course of the

18  investigation by Dr. Varughese?

19     A.    I don't recall.

20     Q.    Why is it that the final line

21  was concluded that "Any additional

22  confrontations may result in disciplinary

23  action, up to and including your removal

24  from service, possibly including

25  termination"?

Page 137

1          PATRICK LENTO, M.D.

2      A.    Perhaps so that Leena would

3  understand the seriousness of the

4  situation.

5      Q.    Why did you feel because --

6  strike that.

7          I understand that Dr. Varughese

8  had spoken with Dr. Jordan.  Why did you

9  feel that it was necessary to threaten her

10  with termination at this particular

11  juncture point because of that one

12  conversation with Dr. Jordan?

13          MR. McEVOY:  Objection to the

14  form.  You can answer.

15      A.    We didn't want to see a pattern

16  of misconduct.

17      Q.    Did this notice fall within the

18  disciplinary structure, either

19  disciplinary structure that you had

20  described earlier in your deposition?

21      A.    No, I don't believe so.

22      Q.    Did Dr. Varughese have any right

23  of appeal, even though there was a threat

24  here of termination from this notice?

25      A.    Residents can always potentially

1          PATRICK LENTO, M.D.

2  appeal a decision.  But this wasn't a

3  decision.  This was an indication of an

4  ongoing investigation.

5      Q.    So was this considered a warning

6  or wasn't it considered a warning?

7      A.    I guess this was a warning to

8  her.

9      Q.    So did this in fact fall within

10 the formal disciplinary structure or was

11 it part of the informal structure that you

12 had described to me?

13     A.    Well, as I said earlier, the

14 informal is more of a conversation between

15 one individual and another individual.

16     Q.    Isn't it true that as to

17 Dr. Varughese, that in essence the

18 department was making it up as they went

19 along in terms of the way that they

20 handled the situation and disciplined her?

21          MR. McEVOY:  Objection to the

22 form.  I direct the witness not to answer.

23          MR. WRONKO:  He can answer.

24          MR. McEVOY:  No, he can't.  I

25 told him he can't.  It's an improper

1              PATRICK LENTO, M.D.

2     question.

3              MR. WRONKO:  I want to know

4     whether or not they were following a

5     formal structure or whether or not they

6     were making it up as they went along.

7     That's a fair question.

8              MR. McEVOY:  No, it's not.

9     Making it up as they went along is

10    improper and you know it.  If you want to

11    know if they were following the procedure,

12    you can ask him that.

13        Q.   Did they follow any set-forth

14    procedure as to Dr. Varughese?

15        A.   My understanding is that this

16    occurred after consultation between

17    Dr. Pessin and the GME office.

18        Q.   That doesn't answer my question.

19    Was this pursuant to any formal

20    disciplinary structure that was in place?

21        A.   I'm not sure I can answer that.

22        Q.   In your investigation, did you

23    find out how many specimens Dr. Varughese

24    had grossed?

25              MR. McEVOY:  On any particular

1              PATRICK LENTO, M.D.

2    occasion?

3              MR. WRONKO:  Yes.  December 8th.

4         A.    Not me personally.

5         Q.    Who made the decision to put

6    Dr. Varughese on academic advisement?

7         A.    Dr. Pessin and I.

8         Q.    Was anyone else involved in that

9    decision?

10        A.    Of course.

11        Q.    Who else?

12        A.    At that time, it would have

13   included the Graduate Medical Education

14   office.

15        Q.    Who there?

16        A.    Dr. Barnett is the director of

17   that office.

18        Q.    Anyone else besides yourself,

19   Dr. Pessin and Dr. Barnett?

20        A.    I know that Dr. Pessin had

21   spoken with legal.

22        Q.    Was it Maria Lowery who she

23   spoke with?

24        A.    I don't know.  You would have to

25   ask Dr. Pessin.

```
 1              PATRICK LENTO, M.D.
 2         Q.    Anyone else?
 3         A.    That would be it.
 4         Q.    Do you know whether there was
 5    any precedent for academic advisement
 6    prior to the issuance of the December 21,
 7    2010, academic advisement to Dr. Varughese?
 8              MR. McEVOY:  Objection to the
 9    form.  You can answer.
10         A.    Can you rephrase the question.
11         Q.    In the course of issuing the
12    academic advisement, were you made aware
13    of any prior occasion where academic
14    advisement had been given to anyone at
15    Mount Sinai?
16         A.    Yes.
17         Q.    Okay.  Who?
18         A.    No particular names.
19         Q.    Who advised you that academic
20    advisement had been given to someone in
21    the past?
22         A.    Mrs. Burstyn.
23         Q.    Freda Burstyn?
24         A.    Yes.
25         Q.    In what context did she tell you
```

Page 142

                    PATRICK LENTO, M.D.

1    that?

2         A.    She recommended a book that had

3    been utilized in another resident's

4    situation.

5         Q.    Was that "Practicing Excellence:

6    A Physician's Manual to Exceptional Health

7    Care"?

8         A.    Yes, sir.

9         Q.    Did you ever read that book?

10        A.    I read through it, yes.  Not

11   entirely.

12        Q.    How much of it did you read?

13        A.    I don't know.  I can't tell you.

14        Q.    When do you recall reading the

15   book?

16        A.    I read it around the time that

17   we gave the advisement, so that I could be

18   aware of what Leena was going to be

19   reading.

20        Q.    Who authored the book?

21        A.    I believe a physician.  Dr. Beeson.

22        Q.    What did it talk about?

23        A.    Excellence in patient care and

24   the role that a physician has in that

Page 143

```
 1              PATRICK LENTO, M.D.
 2    situation.
 3         Q.    Did the book address any issues
 4    with regard to interaction between
 5    physicians?
 6         A.    I don't recall specifically.
 7              MR. McEVOY:  Ten after.
 8              MR. WRONKO:  Let me ask you this.
 9         Q.    Who was present when
10    Dr. Varughese was given the academic
11    advisement?
12         A.    I believe that was just myself
13    and Dr. Pessin.
14         Q.    Tell me what was said at that
15    meeting.
16         A.    We basically reviewed the
17    letter.  It was an account of the incident
18    and a summary of what we had come to
19    conclude, as well as the specific details
20    about what was expected of her as part of
21    the academic advisement.
22         Q.    Did you conclude that this
23    entire situation was Dr. Varughese's fault?
24              MR. McEVOY:  Objection to the
25    form.  You can answer.
```

Page 144

1              PATRICK LENTO, M.D.

2        A.    It was irrelevant if it was only

3    Dr. Varughese's fault.  The academic

4    advisement was being addressed

5    specifically to Dr. Varughese based on her

6    conduct and performance.

7        Q.    Did your investigation disclose

8    that Dr. McCash had done anything

9    inappropriate?

10       A.    Nothing that required a formal

11   disciplinary action.

12       Q.    Was there any informal

13   discipline administered to Dr. McCash?

14       A.    I don't recall.

15             MR. WRONKO:  Okay.  Let's take a

16   lunch break.

17             (Lunch recess:  1:11 p.m.)

18

19

20

21

22

23

24

25

Page 145

1              PATRICK LENTO, M.D.

2          A F T E R N O O N   S E S S I O N

3                  2:16 p.m.

4    P A T R I C K   L E N T O,  M. D.,

5    having been previously duly sworn,

6    testified further as follows:

7    CONTINUED EXAMINATION

8    BY MR. WRONKO:

9         Q.   Good afternoon, Dr. Lento.  I'll

10   remind you that you are still under oath.

11   I had follow-up questions from my morning

12   session.

13              Were you ever reprimanded by

14   Mount Sinai?

15        A.   No, sir.

16        Q.   During the course of your

17   investigation into the December 8th

18   incident, did you interview Renato

19   Valentin?

20        A.   No, sir.

21        Q.   Who was Renato Valentin?

22        A.   I believe he was a physicians

23   assistant.

24        Q.   Do you know whether or not he

25   was present on December 8?

1                PATRICK LENTO, M.D.

2        A.     I don't know.

3        Q.     During an autopsy service

4    following the December 8th incident, did

5    you have the occasion to swing the scalpel

6    close to Dr. Varughese where someone else

7    on the autopsy service had to caution you

8    about the way that you were handling a

9    scalpel?

10       A.     I'm not aware of any such

11   incident.

12       Q.     Do you know of a neuropath

13   resident who was disciplined in 2010 or

14   2011?

15       A.     No, sir.

16       Q.     What job title did Freda Burstyn

17   have?

18       A.     She was, I guess, interim

19   administrator for the Department of

20   Pathology.

21       Q.     What were her job responsibilities?

22       A.     You would have to ask her.

23       Q.     What role did you observe her

24   playing, if any?

25       A.     She was department administrator.

1          PATRICK LENTO, M.D.

2     Q.    So what exactly did you observe

3  her doing or not doing in the department?

4     A.    My job wasn't to observe her

5  doing anything.

6     Q.    Did you make any observations as

7  to what she did as an administrator for

8  the department?

9     A.    She would oversee the general

10  workings of the department with the

11  chairman.

12          (Plaintiff's Lento Exhibit 2

13  marked for identification.)

14     Q.    I'm going to show you what has

15  been marked as Lento Exhibit 2.  I'll give

16  you a moment to review the document.

17          (Witness reviews document.)

18     Q.    Can you identify the document

19  itself, excluding the handwritten notes on

20  the second page?

21     A.    The document is labeled "Notice

22  of Academic Advisement."

23     Q.    Is this in fact a true and

24  correct copy of the December 21, 2010,

25  notice of academic advisement?

1                PATRICK LENTO, M.D.

2        A.      Yes.

3        Q.      Who drafted it?

4        A.      I drafted it in consultation

5   with Dr. Pessin, GME office and the legal

6   department.

7        Q.      Did anybody redline your draft

8   or change your draft or in any way alter

9   it?

10       A.      I don't recall any.

11       Q.      This process of academic

12  advisement with Dr. Varughese, did you

13  consider it to be a confidential process?

14       A.      Yes.

15       Q.      By confidential, who was

16  supposed to be involved with the process

17  of academic advisement for Dr. Varughese?

18  Who would be privy to it?

19       A.      Dr. Pessin and I.

20       Q.      Anyone else?

21       A.      In the department, that may have

22  been it actually.

23       Q.      Do you know whether or not

24  during the course of the academic

25  advisement period whether or not that

 1                PATRICK LENTO, M.D.
 2    confidentiality was strictly maintained?
 3         A.    I'm not aware of any breaches.
 4         Q.    Do you know whether or not
 5    Dr. McCash was permitted to review
 6    Dr. Varughese's self-reflection?
 7         A.    I don't know.
 8         Q.    Do you know whether or not
 9    Dr. McCash was told about the contents of
10    Dr. Varughese's self-reflection?
11         A.    I did not speak to him.  I do
12    not know if he was spoken to.
13         Q.    Looking at this document, in the
14    very first two sentences it says "One of
15    the chief residents had specifically
16    discussed with you the need for you to
17    gross specific specimen."  And in
18    parentheses S.  "Instead you had one of
19    the moonlighters handle the specimen."  In
20    parentheses S.
21                At the time you drafted the
22    notice of academic advisement, did you
23    know how many specimens in particular were
24    asked to be grossed by Dr. Varughese?
25         A.    I don't know the answer to that.

1            PATRICK LENTO, M.D.

2       Q.    You go on to write "This

3    altercation was upsetting to those

4    present."  And in parentheses "including

5    other residents in the gross room, an

6    attending (Dr. Jaffer), and a medical

7    student who felt she needed to leave the

8    area as a direct result of the

9    altercation."

10            Had you spoken with the medical

11   student?

12       A.    I did not.

13       Q.    What was the medical student's

14   name?

15       A.    I think her last -- it was a

16   woman.  Her last name I believe was

17   Fernandez.  I don't recall her first name.

18       Q.    Who were the other residents in

19   the gross room?

20       A.    Dr. Azar, who was the

21   moonlighter; Dr. Grunes, who was working

22   with the medical student; and I believe

23   Dr. Jordan.

24       Q.    Who was the head moonlighter on

25   that particular service that day?

1          PATRICK LENTO, M.D.

2     A.    I believe Dr. Azar was the

3  moonlighter.

4     Q.    You write that it was noted that

5  you had failed to appropriately gross in

6  cases that should have been taken care of

7  that day.

8          How many cases did you mean to

9  refer to that Dr. Varughese should have

10  taken care of that day?

11     A.    Well, there is no set number of

12  cases.  It's whatever presents itself on a

13  particular day.  She did not complete her

14  day's work after the altercation.

15     Q.    Now, is that something that is

16  unusual in the gross room for some

17  specimens to be carried over to the next

18  day of work?

19     A.    Well, this is not a question of

20  being carried over.  This is a question of

21  just being left there.

22     Q.    Okay.  So how many specimens

23  were just left there?

24     A.    I don't have that number.

25     Q.    Was it more than one?

1          PATRICK LENTO, M.D.

2      A.    I can't speculate.

3      Q.    Even though you don't recall the

4  exact number, did you reach any

5  conclusions in your investigation as to

6  how many specimens were just left there?

7      A.    My understanding was that the

8  residents, Dr. Azar, Dr. Jordan and

9  Dr. McCash, were the ones who completed

10  the work, including the paperwork.

11      Q.    How did you arrive at that

12  understanding?

13      A.    That's what they indicated,

14  either in an email or verbally.

15      Q.    I'm going to show you what has

16  been marked as Defendant's Exhibit 14.  Do

17  you know whether or not Dr. Varughese had

18  grossed the list of specimens that are

19  listed under her name as of December 8,

20  2010?

21      A.    I don't know.

22      Q.    In arriving at your conclusions

23  in your investigation, had you referred to

24  any chart summarizing the specimens that

25  Dr. Varughese had grossed?

1              PATRICK LENTO, M.D.

2         A.    No.

3         Q.    Under "Problematic areas

4    identified," referring back to the notice

5    of academic advisement, it states "Failure

6    to demonstrate an appropriate level of

7    professionalism and patient care-related

8    lapse (grossing-related responsibilities.)"

9              What precisely was the patient

10   care-related lapse?

11        A.    Leaving her specimens, the cases

12   she was responsible for.

13        Q.    When you say she just left them

14   there, what was your understanding of what

15   that meant?

16        A.    That she left the gross room and

17   didn't complete her work.

18        Q.    Was there anything else -- had

19   she left the specimens in any type of an

20   unsafe way?  Was there anything else to

21   the patient care-related lapse beyond what

22   you have testified to?

23        A.    Not that I can add.

24        Q.    And is it your understanding as

25   a result of your investigation that the

1          PATRICK LENTO, M.D.

2    remaining samples that Dr. Varughese had

3    left were all performed by the moonlighters

4    and Dr. McCash?

5        A.    The other residents who were

6    there, my understanding was that they were

7    the ones who completed the work.

8        Q.    Okay.  Now, under "Plan of

9    Action" it says "Meeting with the program

10   director or as needed interim chair/chair

11   or others in authority within the

12   Department of Pathology every three to

13   four weeks for continued assessment and

14   advisement."

15           Was it contemplated that more

16   administrators beyond yourself would be

17   involved in this process of academic

18   advisement?

19       A.    I wouldn't say it was anticipated,

20   no.

21       Q.    Was the intent at the outset or

22   was it your intent at the outset that you

23   would be the primary contact with

24   Dr. Varughese moving forward, as opposed

25   to the chair of the Department of Pathology

1              PATRICK LENTO, M.D.

2    or any other administrator?

3         A.    Yes.

4         Q.    Under "Self-reflection

5    exercise," it says "You are expected to

6    write down your account of the situation

7    and describe how you could have approached

8    things in a better fashion, including

9    commentary on physician professionalism

10   and its role in the circumstance."

11             Why was Dr. Varughese being

12   asked to write down her account of the

13   situation?

14        A.    This was an educational

15   exercise, as I mentioned earlier.  The

16   idea there was that she would read the

17   book on professionalism by Dr. Beeson and

18   potentially learn from the information

19   provided and from her experience and see

20   if she could provide a better way of

21   approaching a similar circumstance down

22   the road.

23        Q.    The focus of my question,

24   though, is not on the second part of that

25   sentence, which you just addressed, but is

1              PATRICK LENTO, M.D.

2     instead focused on having her write down

3     her account of the situation.

4              Is it fair to say that there was

5     substantial disagreement between you,

6     having conducted an investigation, and

7     Dr. Varughese's versions of events?

8         A.    Yes.

9         Q.    So why is it, given the fact

10    that there were substantial differences

11    between you and Dr. Varughese about what

12    had occurred, would you have asked her to

13    write down her account of the situation?

14    Hadn't you already received that?

15        A.    It was in the context of an

16    educational exercise, summarize in her

17    words what had happened.  Obviously she

18    couldn't provide anyone else's account of

19    the events.  And in an educational format,

20    address how things could have been more

21    appropriately handled should a similar

22    situation arise in the future.

23        Q.    Did you in essence want

24    Dr. Varughese to simply adopt the summary

25    of events contained in the notice of

1              PATRICK LENTO, M.D.

2    academic advisement and disregard her

3    beliefs about what occurred during the

4    incident?

5        A.    No, sir.  That's not indicated

6    here.

7        Q.    So you didn't want her to adopt

8    the department's view of what the

9    department claimed happened that day, as

10   opposed to what Dr. Varughese believed had

11   occurred?

12            MR. McEVOY:  Objection.  Asked

13   and answered one more time.

14       A.    No, sir.  We asked for her

15   account.

16       Q.    When you met with Dr. Varughese

17   to discuss the academic advisement, what

18   did Dr. Varughese say during the meeting?

19       A.    What I recall is she wanted to

20   speak with Dr. Stimmel before, I guess,

21   agreeing.  And, of course, we allowed her

22   the time to meet and/or speak with

23   Dr. Stimmel, depending upon how she chose

24   to do it.

25       Q.    Who is Dr. Stimmel?

1              PATRICK LENTO, M.D.

2      A.    Dr. Stimmel was the ombudsman

3    for the institution.

4      Q.    During the course of that

5    meeting, had Dr. Varughese advised you

6    that she felt that she had been abused by

7    Samuel McCash?

8      A.    I don't recall her saying she

9    was abused, no.

10      Q.    Did she tell you that Sam McCash

11    had berated her?

12      A.    She told me that or she said at

13    the meeting that -- she basically

14    recounted the events as she had previously.

15      Q.    But did she tell you that Sam

16    McCash had berated her?

17      A.    I don't recall the word "berated"

18    specifically.

19      Q.    Did she mention that she

20    perceived Sam McCash to pose a physical

21    threat to her?

22      A.    I don't recall her stating that.

23      Q.    Did she tell you that Sam McCash

24    had intruded upon her personal space?

25      A.    I don't recall her stating that.

1           PATRICK LENTO, M.D.

2      Q.    Are you aware of the fact that

3   Sam McCash ultimately apologized to Caryn

4   Tiger-Paillex of human resources about the

5   way he handled the situation on December 8?

6      A.    That would be a confidential

7   communication between Dr. McCash and human

8   resources.

9      Q.    Do you have any knowledge as to

10   why Sam McCash would apologize for the way

11   he had behaved if you believed that he had

12   done nothing wrong?

13           MR. McEVOY:  Objection to the

14   form of the question.  Mischaracterizes

15   the witness's testimony.  You can answer.

16      A.    I didn't say he did nothing

17   wrong.  He did.

18      Q.    So what did he do wrong?

19           MR. McEVOY:  I assume you are

20   referring to December 8?

21           MR. WRONKO:  Correct.

22      A.    I think Sam could have handled

23   the situation differently.

24      Q.    How could he have handled it

25   differently?

Page 160

1              PATRICK LENTO, M.D.

2        A.    I think there is maybe a number

3    of ways.  You would like an example?

4        Q.    Sure.  Since there are a number

5    of ways, I'd like a number of examples.

6        A.    He could have not raised his

7    voice, if that were the case.  Although by

8    all indications my understanding was that

9    he was firm but not overly inappropriate.

10             He could have pulled Leena,

11   Dr. Varughese, aside and counseled her in

12   private, as opposed to in the presence of

13   others.

14       Q.    Any other things that he could

15   have done differently?

16       A.    Those are the things that come

17   to mind right now.

18       Q.    You used the phrase "he wasn't

19   overly inappropriate."  What is the

20   distinction between being inappropriate

21   and overly inappropriate?

22       A.    I would maybe make a comparison

23   perhaps between himself and Dr. Varughese's

24   behavior.

25       Q.    How so?

1              PATRICK LENTO, M.D.

2      A.     The incident was confined to the

3  particular area, whereas Dr. Varughese

4  escalated it and involved two other

5  attendings actually having to leave the

6  area specifically to involve the second

7  attending.

8      Q.     With regard to pulling

9  Dr. Varughese aside as being a suggested

10 alternative course of action that

11 Dr. McCash could have taken, would the

12 purpose of that have been to avoid

13 publicly humiliating a resident?

14         MR. McEVOY:  Objection to the

15 form.  You can answer.

16     A.     No, I think that it would be

17 more of a confidential nature.  The

18 resident might need to be reprimanded.

19 And he could have done that in a more

20 private setting.

21     Q.     Again, doesn't that also go to

22 potentially humiliating that resident in

23 front of co-workers, members of the staff

24 and the like?

25         MR. McEVOY:  Objection to the

1            PATRICK LENTO, M.D.

2    form.  Asked and answered one more time.

3            MR. WRONKO:  He didn't answer

4    it.

5            MR. McEVOY:  He did actually.

6    But I'm not going to argue with you.  He

7    can answer.

8        Q.    You can answer.

9        A.    I think it was more of a

10   confidentiality issue.  And any sensation

11   of humiliation is based upon the

12   individual's assessment of the scenario,

13   whether true or not.

14       Q.    So let me understand your

15   answer.  It would not be your concern as

16   the chair of the department whether or not

17   a resident felt that they were humiliated

18   by being spoken to about an issue in front

19   of their colleagues?

20       A.    Of course it would concern me.

21       Q.    But in this instance, did it

22   concern you at all?

23       A.    Yes, I was concerned.

24       Q.    So did you ever speak with

25   Dr. McCash to make some of these

1            PATRICK LENTO, M.D.

2    suggestions that you just testified to?

3        A.    I did speak with Dr. McCash

4    after the incident.  I don't recall the

5    details of the conversation.

6        Q.    There is a handwritten note that

7    appears on the second page of the

8    document.  Is that your handwriting?

9        A.    Yes, sir.

10        Q.    Did you write this note?

11        A.    Yes, I did.

12        Q.    You also indicated that

13    Dr. Varughese needed to respond by this

14    Thursday, December 23, 2010.  Respond with

15    regard to what?

16        A.    That she would acknowledge the

17    academic advisement.

18        Q.    So what do you mean by acknowledge

19    the academic advisement?  What did she

20    have to do?

21        A.    That she understood what was

22    expected of her.

23        Q.    Did she really have a choice in

24    that matter?  She would have to adhere to

25    it, would she not?

Page 164

1              PATRICK LENTO, M.D.
2      A.    Yes.  It wasn't a question of
3  choice.
4      Q.    Did she get back to you by the
5  23rd of December?
6      A.    She did not.
7      Q.    Did she send you an email on
8  December 23, 2010, with regard to the
9  academic advisement?
10     A.    Yes, she did.
11     Q.    Did you consider that to be a
12 response?
13     A.    No, sir.
14     Q.    Let me show you Defendant's
15 Exhibit 16.  I'll give you a moment to
16 review it.  When you are ready, let me
17 know.
18             (Witness reviews document.)
19     Q.    You just testified that
20 Dr. Varughese did not respond to the
21 notice of academic advisement.  Why would
22 you consider Defendant's Exhibit 16 not to
23 be a response to the notice of academic
24 advisement?
25     A.    The intention was that we would

1            PATRICK LENTO, M.D.

2   meet to discuss the events -- pardon me.

3   Correction.  To discuss the academic

4   advisement after her meeting with

5   Dr. Stimmel.  What is not included here is

6   that she called out sick on the day in

7   question.  And I emailed her to say Leena,

8   you were supposed to get back to me, in a

9   sense to go over the academic advisement.

10           I guess she subsequently

11   submitted this after the fact.

12       Q.    After what fact?

13       A.    After I had indicated that it

14   was decided at the prior meeting that she

15   would speak with Dr. Stimmel and then get

16   back to us on the day in question.  She

17   subsequently called in sick.  And it

18   wasn't until I followed up with her about

19   it that she subsequently submitted this.

20       Q.    How did you follow up with her

21   about it?

22       A.    I emailed her.  That's the only

23   way I could.  She called out sick.

24       Q.    You did receive this email on

25   December 23, 2010?

1              PATRICK LENTO, M.D.

2        A.    Yes, I did.

3        Q.    And are you suggesting that

4   Dr. Varughese's calling out sick was just

5   a ploy and that she was not actually sick?

6        A.    I don't know why she called out

7   sick.

8        Q.    But did you view it negatively,

9   given the fact that she had called out

10  sick?

11       A.    People are allowed to get sick

12  and are allowed to call out sick.  Given

13  that she was under the understanding of

14  the responsibility for that particular

15  day, I would have appreciated that she

16  handled it differently.

17       Q.    So even if she were sick, she

18  was expected to come to work?

19       A.    No.  I would have appreciated a

20  phone call or a specific email saying "I

21  apologize, Dr. Lento.  I recognize that I

22  was supposed to get back to you on this

23  day.  But I'm sick and unable to handle it

24  at this point."

25       Q.    Is the issue with Defendant's

1              PATRICK LENTO, M.D.

2     Exhibit 16 that you wanted to sit down and

3     have a conversation with Dr. Varughese or

4     is it the contents of Defendant's Exhibit

5     16 that was the problem?

6          A.    It's not the contents.

7          Q.    It was the fact that you were

8     supposed to have a meeting and there

9     wasn't a meeting?

10         A.    Yes.

11         Q.    Was there ever a meeting

12    subsequent to Defendant's Exhibit 16 with

13    Dr. Varughese to accomplish the task that

14    you were hoping to accomplish on December

15    23?

16         A.    Yes.  Not until maybe two weeks

17    later.

18         Q.    Two weeks later.  Why was it two

19    weeks later?

20         A.    It was the holiday season.  I

21    was going to be away on vacation.

22         Q.    Let's take a look at the email.

23    Dr. Varughese states in the email "I would

24    like the situation would be mediated as

25    soon as possible and would have even

1          PATRICK LENTO, M.D.

2    agreed to academic advisement if not for

3    the brief summary of events as stated in

4    the notice of academic advisement."

5          Did you ever consider having a

6    mediation between Dr. Varughese and

7    Dr. McCash?

8       A.    No, I did not.

9       Q.    Why not?

10      A.    I didn't feel that it was

11   warranted.

12      Q.    You were aware as of December 23,

13   2010, of two situations where Dr. McCash

14   and Dr. Varughese had had confrontations,

15   were you not?

16      A.    Yes.

17      Q.    So why, given the fact that

18   there had been two prior confrontations,

19   did you not believe that it would be

20   useful for the department to put these two

21   professionals in the same room together

22   and try to iron out the differences?

23      A.    Well, for one, we had already

24   dealt with the prior circumstance.  At

25   this point, after the holidays, both the

1          PATRICK LENTO, M.D.

2    GME office and human resources were

3    involved at that point.  And I didn't

4    think that mediation would accomplish much

5    at that point.

6         Q.    In September 2010 when the first

7    incident occurred, there wasn't mediation.

8    And these doctors were not put in the same

9    room to iron out their differences.

10   Following this incident, that did not

11   occur.  Did you have any concerns that the

12   department was encouraging a rift between

13   these two doctors rather than sitting them

14   down and trying to work them through the

15   rift?

16        A.    No, sir.

17        Q.    Because by this point the

18   department was taking sides in the

19   dispute.  Isn't that fair to say?

20             MR. McEVOY:  Objection to the

21   form of the question.  You can answer.

22        A.    I don't think this is taking

23   sides.  We were addressing Leena's

24   behavior and her performance lapse, if you

25   will, with the academic advisement.

1                 PATRICK LENTO, M.D.

2        Q.      Turning to the second page, you

3   have had an opportunity to review it.   Is

4   there anything that you believe to be

5   legitimate in what she wrote?

6                 MR. McEVOY:   Objection to the

7   form.   You can answer.

8        A.      Based on my understanding, he

9   shouted at her.   I would agree.

10       Q.      Anything else?

11       A.      And I believe that shouting at

12   her was also unprofessional.

13       Q.      Anything else that you believe

14   was legitimate or supported in this?

15                MR. McEVOY:   Same objection.

16       A.      I'm not sure that I have anything

17   to add.

18       Q.      Okay.   You had previously

19   testified that Dr. Varughese was perceived

20   as being a physical threat to people who

21   were there.   What exactly was the physical

22   threat that Dr. Varughese posed to anyone

23   on December 8th, as you may or may not

24   have concluded from your investigation?

25                MR. McEVOY:   Objection to the

```
 1              PATRICK LENTO, M.D.
 2    form.  You may answer.
 3         A.    My apologies.  I don't recall
 4    saying that she was a physical threat.
 5         Q.    Was she threatening to anyone
 6    there, regardless of whether it was
 7    physical or not?
 8         A.    I believe so.  The medical
 9    student apparently felt the need to leave
10    the area, given the situation.
11         Q.    Was it ever clarified with that
12    student whether she was specifically
13    threatened by Dr. Varughese or simply the
14    fact that there was a conflict between
15    Dr. Varughese and someone else?
16         A.    I didn't speak directly to the
17    student.
18         Q.    Did you ever become aware that
19    Caryn Tiger-Paillex of human resources
20    became involved to conduct an investigation?
21         A.    Yes.
22         Q.    When did you first become aware?
23         A.    I don't recall.
24         Q.    Do you know how soon after the
25    completion of your investigation you
```

Page 172

1            PATRICK LENTO, M.D.

2   became aware?

3         A.    No, sir.

4         Q.    Did you have any involvement

5   with the human resources investigation

6   into the incident?

7         A.    Yes, sir.

8         Q.    What involvement did you have?

9         A.    I was interviewed by Ms. Tiger-

10  Paillex.

11        Q.    Was anyone present besides

12  yourself and Ms. Tiger-Paillex?

13        A.    I don't recall anyone else at

14  the meeting.

15        Q.    Tell me what was said during the

16  meeting.

17        A.    I don't recall the specifics of

18  that meeting.

19        Q.    When were you interviewed?

20        A.    I don't have the date.

21        Q.    Did you have any other further

22  involvement besides being interviewed

23  yourself with the human resources

24  investigation?

25        A.    I do not believe so.

1          PATRICK LENTO, M.D.

2     Q.     Did anyone from human resources

3  ever advise you about the outcome of the

4  investigation?

5     A.     I think yes.

6     Q.     Who advised you?

7     A.     I believe there was a meeting

8  with human resources.

9     Q.     Who was present at the meeting?

10    A.     I believe it was myself,

11  Dr. Pessin, Dr. Barnett, Mr. Johnson from

12  the GME office, and Caryn from human

13  resources.

14    Q.     Tell me what was said during

15  that meeting.

16    A.     I don't recall the details of

17  the meeting.

18    Q.     Who spoke at the meeting?

19    A.     I don't recall the details of

20  the meeting.

21    Q.     I'm sorry.  You may have said

22  this.  Was Caryn Tiger-Paillex at the

23  meeting?

24    A.     Yes.

25    Q.     And this was regarding her

1              PATRICK LENTO, M.D.

2     investigation, this meeting?

3          A.    I don't recall the specific

4     reason for the meeting.

5          Q.    When you first found out that

6     human resources was involved -- strike

7     that.

8              You don't recall how you found

9     out that there was a human resources

10    investigation?

11         A.    I don't remember.

12         Q.    But when you did find out, did

13    you have any concerns about the fact that

14    now dirty laundry from the Department of

15    Pathology and the residency program was

16    now going out to human resources?

17             MR. McEVOY:   Objection to the

18    form.  You can answer.

19         A.    Can you repeat that, please.

20         Q.    Sure.  Did you have any concerns

21    that a matter that was internal to the

22    Department of Pathology's residency

23    program was now part of a human resources

24    investigation?

25         A.    No.  That was an important part

1              PATRICK LENTO, M.D.

2     of the investigation.

3          Q.    Did you welcome that investigation

4     by human resources?

5          A.    If Dr. Varughese felt it was

6     necessary and so did human resources, then

7     sure.

8          Q.    Was there any other investigation

9     that you knew about going on at the same

10    time as human resources was investigating?

11         A.    Yes.

12         Q.    What other investigation was

13    ongoing?

14         A.    The GME office was also performing

15    their own investigation.

16         Q.    Why was the GME office conducting

17    a separate investigation from human

18    resources?

19         A.    You would have to ask GME

20    specifically to answer that question.

21         Q.    Did you make any referral to the

22    GME office of Dr. Varughese?

23         A.    She had already been referred by

24    Dr. Pessin at the time of the initial

25    incident.

1            PATRICK LENTO, M.D.

2       Q.     Did you have any involvement

3   with GME's investigation?

4       A.     I'm sure that they interviewed

5   me as well.

6       Q.     Who was "they"?

7       A.     That would have been Mr. Johnson.

8       Q.     Did Art Figur have any involvement?

9            MR. McEVOY:   Involvement in

10   what?

11       Q.     In the interview of you for the

12   GME investigation.

13       A.     I don't recall.

14       Q.     What is the Physician Wellness

15   Committee?

16       A.     Well, Physician Wellness is

17   obviously there to ensure the physical and

18   mental health of physicians, whether they

19   are residents or attendings, et cetera, in

20   a confidential manner.

21       Q.     Do you know whether or not there

22   was a separate investigation conducted by

23   members of the PDC from the investigation

24   that was conducted by the GME?

25       A.     I believe yes.

Page 177

1          PATRICK LENTO, M.D.

2      Q.    So there were in fact three

3   investigations that went on?

4      A.    Well, I'm not sure if the third

5   one would be considered an investigation.

6   I know the Physician Wellness was

7   involved.  Whether you want to consider

8   that an investigation or not, you have to

9   ask them specifically.

10      Q.    Were you interviewed for the

11   Physician Wellness Committee?

12      A.    I don't recall being interviewed.

13      Q.    And would it be fair to say that

14   Mr. Johnson had conducted the interview

15   for GME, but that it was Art Figur who was

16   doing the investigation for PWC?

17          MR. McEVOY:  Objection to the

18   form.  You can answer.

19      A.    Dr. Figur was the head of the

20   Physician Wellness.

21      Q.    Do you know whether or not Scott

22   Barnett was involved in the GME

23   investigation?

24      A.    Well, he is the director of the

25   GME office.  I would imagine he was

Page 178

1              PATRICK LENTO, M.D.

2    involved.

3         Q.    Did you have any conversations

4    with Dr. Barnett about whether he needed

5    to speak with Dr. Varughese at the turn of

6    the year in 2011?

7         A.    Yes.

8         Q.    And what were those discussions

9    about?

10         A.    That was as a follow-up to our

11    meeting following our initial presentation

12    of the academic advisement.

13         Q.    What did the two of you discuss?

14         A.    I let Dr. Barnett know that

15    Leena had called out sick on the day we

16    were supposed to meet and that I was going

17    to schedule another meeting with her at

18    that time or at that point.  I did so with

19    Ms. Burstyn or Mrs. Burstyn.  And

20    Dr. Barnett had indicated that he would

21    also speak with Leena if necessary.

22         Q.    In January of 2011, did you

23    notice whether Dr. Varughese's attitude

24    had improved?

25         A.    Yes, I did.

1          PATRICK LENTO, M.D.

2      Q.    What did you observe in that

3   regard?

4      A.    It was not so much an

5   observation.  But if I recall correctly,

6   she was at an outside institution, one of

7   our affiliates, on a rotation.  And I just

8   followed up with the site director to see

9   how things were going.  And he said that

10  there were no major problems.  So I

11  actually believe that I let Dr. Varughese

12  know that.

13     Q.    Did you have the occasion to

14  review any of her evaluations from her

15  rotations during the period of the

16  academic advisement?

17     A.    No, I did not.

18     Q.    When would you as the program

19  director have the occasion to review

20  evaluations of a resident?

21     A.    In general, we would do that

22  twice a year, often in November or

23  December and again toward the end of the

24  year.  However, residents were in fact

25  assigned to a mentor who was the primary

1              PATRICK LENTO, M.D.

2     person who would do that.

3         Q.    Is there a reason why you would

4     not have made it a point to take a look at

5     the evaluations that were being generated

6     for Dr. Varughese by attendings in

7     rotations to determine whether or not

8     these attendings who had regular

9     interaction with her felt that she was

10    maintaining levels of professionalism?

11        A.    Without recollecting her

12    particular rotations, that's hard for me

13    to answer.

14        Q.    What rotation would Dr. Fowkes

15    have been on?

16        A.    She could have been involved in

17    the autopsy service in one of two

18    capacities.  Or she could have been in her

19    primary role as a neuropathologist.

20        Q.    Were you aware of the fact that

21    in evaluations for the period of March 14,

22    2011, to March 31, 2011, as well as

23    April 1, 2011, to April 10, 2011, that she

24    had given Dr. Varughese sevens in

25    professionalism?

Page 181

1                    PATRICK LENTO, M.D.

2         A.      No, I was not aware of that.

3         Q.      How about Dr. Petersen?  Do you

4    know what rotation Dr. Varughese had with

5    Dr. Petersen from January 17, 2011 to

6    February 13, 2011?

7         A.      No, sir.

8         Q.      Were you aware of the fact that

9    he had graded her a seven in

10   professionalism during that period of

11   time?

12        A.      No, sir.

13        Q.      Is a seven close to being at the

14   top of the scale in terms of adhering to

15   what is expected?

16        A.      Yes.

17        Q.      How about Lakshmi Ramanathan?

18   What area of rotation did Dr. Ramanathan

19   have in the period of in April 25, 2011 to

20   May 8, 2011?

21        A.      Dr. Ramanathan was the director

22   of the clinical chemistry rotation for the

23   residents.

24        Q.      Were you aware during that time

25   period that this doctor had graded

Page 182

1           PATRICK LENTO, M.D.

2    Dr. Varughese as a seven for professionalism?

3        A.    No, sir.

4        Q.    How about Dr. Irini Scordibello?

5    What area would Dr. Varughese have been

6    rotating through?

7        A.    Most likely the autopsy service.

8        Q.    Dr. Scordibello from January 1,

9    2011 to January 16, 2011, were you aware

10   of the fact that she had graded her an

11   eight in professionalism?

12       A.    No, I don't recall.

13       Q.    Were any of those scores at all

14   relevant in the way that you were

15   perceiving Dr. Varughese and the way she

16   was conducting herself at Mount Sinai

17   Medical Center?

18            MR. McEVOY:  Objection to the

19   form.  You can answer.

20       A.    We had asked her as a follow-up

21   to the incident to conduct herself in a

22   professional manner.  And these

23   individuals felt as they did and indicated

24   so on the evaluation.

25       Q.    Putting aside the issue of the

1            PATRICK LENTO, M.D.

2    self-assessment and whether that was

3    timely with Dr. Varughese, were you aware

4    of any incidents during the period of

5    academic advisement with regard to

6    Dr. Varughese that would have warranted

7    any further discipline?

8            MR. McEVOY:   During what time

9    period?

10           MR. WRONKO:   This is the period

11   of the academic advisement.

12           MR. McEVOY:   Okay.

13      A.    No, sir.

14      Q.    Did you meet with Dr. Varughese

15   during the period of academic advisement?

16      A.    Yes.

17      Q.    On how many occasions?

18      A.    I only recall one.

19      Q.    What was the one that you

20   recall?

21      A.    It was in February.  I believe

22   it was February.

23      Q.    Tell me what you recall of that

24   meeting.

25      A.    So I had tried to set up

1          PATRICK LENTO, M.D.

2    appointments with Dr. Varughese prior and

3    was unsuccessful.  I let her know that we

4    needed to meet for the academic

5    advisement.  We also needed to follow up

6    on an autopsy that was outstanding.  And

7    so rather than have the situation be

8    solely about the academic advisement, I

9    thought it would be better, better for

10   Leena in a less threatening manner to meet

11   and do some work and then we could follow

12   up on the academic advisement.

13        Q.    Did you believe that the

14   academic advisement was threatening?

15        A.    No.  But that the situation of

16   the meeting might have been perceived as

17   threatening.

18        Q.    Why is that?

19        A.    Because she wasn't in agreement

20   with the academic advisement.

21        Q.    If the point of academic

22   advisement was academic in order to try to

23   encourage this particular resident to

24   learn from perceived mistakes, why did you

25   feel the need, along with your cohorts in

1          PATRICK LENTO, M.D.

2     the administration to include threats of

3     termination with it?

4          MR. McEVOY:   Objection to the

5     form of the question.   You can answer.

6       A.     Those are to put someone on

7     notice that there are potential consequences

8     of someone's actions.

9       Q.     Tell me about this meeting that

10    you had with Dr. Varughese.

11      A.     So what I recall is I had --

12    since Leena did not answer my pages

13    generally, I actually emailed her.   And I

14    said that I needed to meet with her on a

15    specific date.   I believe it was a Friday.

16    And I asked her for the time that would be

17    most convenient for her.

18      Q.     Did you in fact meet on Friday?

19      A.     We did not.

20      Q.     Did you ultimately meet?

21      A.     We ultimately met after I waited

22    on the Friday for Dr. Varughese to show up

23    and she did not.   I emailed her to say

24    that "You had told me you could be here at

25    5:30, and I waited.   It's now," I don't

Page 186

1              PATRICK LENTO, M.D.

2    even know what time it was at that point.

3    Seven o'clock.  Maybe later.  "It's

4    obvious that you are not showing up."

5              And we met within the next two

6    weeks, because I was away on vacation the

7    following week.

8         Q.    Let me show you what was marked

9    as Defendant's Exhibit 22.  Do you recall

10   this email?

11        A.    Yes.

12        Q.    In this email, in the first

13   email that is sent from you to Leena, you

14   write "I need to meet with you tomorrow.

15   Please let me know of potential available

16   times."

17        A.    Mm-hmm.

18        Q.    And then Dr. Varughese responds

19   "I can meet with you at 5:30 p.m.

20   tomorrow.  May I ask what is the meeting

21   regarding?"  You respond "Well, two

22   things.  I was hoping we could look at one

23   of your autopsy cases that we have

24   together and also follow up on the

25   academic advisement stuff."

1              PATRICK LENTO, M.D.

2          Why is it that you did not write

3    back "I'm available at 5:30.  Let's set

4    the meeting for that time"?

5        A.    Because I had already told her

6    that I needed to meet with her.  It was up

7    to her to set the time.  She told me the

8    time.  I responded to her a question what

9    it would be about.

10       Q.    But that isn't true.  If you

11   look at the email, you say "Let me know of

12   potential available times."  Wouldn't that

13   indicate to someone reading it that you

14   might potentially not be available?

15       A.    No.  I was going to meet with

16   her regardless of the time she indicated.

17   I wanted to provide her with the leverage

18   or the convenience of time.  She gave me

19   one time.

20       Q.    Why didn't you tell her that,

21   that she was in essence setting the time

22   of the meeting, as opposed to saying

23   "Please let me know of potential available

24   times," in the plural, saying in other

25   words, you are asking for a choice of

Page 188

1                  PATRICK LENTO, M.D.

2      times, which indicates that you are busy,

3      doesn't it?

4           A.    No, sir.

5           Q.    So that's not a fair reading of

6      this email?

7           A.    No, sir.

8           Q.    For how long had Dr. Varughese

9      not been responding to your pages?

10                MR. McEVOY:   Objection to the

11     form.  You can answer.

12          A.    I don't have a Leena list of

13     infractions.

14          Q.    Did it start in the first year

15     of her residency?

16          A.    I can't tell you exactly when,

17     no.

18          Q.    Did it start in the second year?

19          A.    I can't tell you exactly when,

20     no.

21          Q.    Did it happen as recent as the

22     rotation you had with Dr. Varughese in

23     December of 2010?

24          A.    I can't provide you with a

25     specific example.

1          PATRICK LENTO, M.D.

2     Q.    Isn't it true that in December

3  of 2010, when she was on your rotation,

4  you had given her a passing score of a

5  five with regard to professionalism?

6     A.    Yes.   That may be true.

7     Q.    If in fact she was not

8  responding to your pages, why would you

9  have given her a five?

10          MR. McEVOY:   Objection.   That's

11  completely mischaracterizing the witness's

12  testimony.

13     Q.    You made a broad statement she

14  never answered your pages.   Did she answer

15  your pages when she was on that rotation

16  in December 2010?

17     A.    I don't recall.

18     Q.    So on what do you base your

19  testimony that she did not answer your

20  pages?

21     A.    I don't have a documented account.

22     Q.    Was this a problem in the

23  residency program in terms of people not

24  responding to pages?

25     A.    Not that I recall, no.

1           PATRICK LENTO, M.D.

2      Q.    Was there ever a time in meeting

3  minutes of the residents that the

4  residents in the program were instructed

5  that if they did not respond to pages,

6  they would be disciplined?

7      A.    There may have been a reminder

8  to residents to respond to pages.

9      Q.    Why would there be the necessity

10  of a reminder if it wasn't a more

11  widespread problem beyond Dr. Varughese?

12      A.    We remind residents of many

13  things.

14      Q.    Regardless of whether there is a

15  problem with it?

16      A.    Of course.

17      Q.    Were you being kept abreast of

18  what the Physician Wellness Committee was

19  doing with Dr. Varughese?

20      A.    I don't recall being kept

21  abreast.

22      Q.    Were you aware of the fact that

23  Dr. Varughese was sent for a toxicology

24  screening?

25      A.    She may have been.

1                PATRICK LENTO, M.D.

2          Q.      Were you advised of the fact

3     that she was sent to Dr. Fersh, who my

4     understanding is an psychiatrist, for an

5     administrative examination?

6          A.      That may be true.

7                  (Plaintiff's Lento Exhibit 3

8     marked for identification.)

9          Q.      I'll give you a moment to review

10    Lento Exhibit 3.  Tell me when you are

11    ready.

12                 (Witness reviews document.)

13         Q.      Are you ready?

14         A.      Yes.

15         Q.      Okay.  Do you recall receiving

16    this email?

17         A.      Yes.

18         Q.      Why is it that you were being

19    kept abreast about what the Physician

20    Wellness Committee was doing with

21    Dr. Varughese?

22                 MR. McEVOY:  Objection to the

23    form.  You can answer.

24         A.      That was their decision to

25    advise me of what they have indicated.

1                PATRICK LENTO, M.D.

2          Q.     Were you ever advised about any

3    conclusions that Dr. Fersh had reached?

4          A.     No, sir.

5          Q.     Why was Dr. Varughese at work

6    during this period, when she was

7    undergoing a toxicology screen as well as

8    an examination by Dr. Fersh?

9          A.     There was no indication that she

10   needed to stop her residency to undergo

11   these things.

12         Q.     Well, here you have a resident

13   who is being examined by a psychiatrist

14   under order of the institution.  Wasn't

15   there a concern that here you have a

16   person who may have a psychiatric

17   condition engaged in patient care?

18         A.     A decision to take a leave of

19   absence or something of that nature would

20   be a decision between the resident and a

21   treating physician or the treating

22   physician.  That's not a decision for me

23   to make.

24         Q.     Wouldn't it be a decision for

25   the department to make to say to

1              PATRICK LENTO, M.D.

2     Dr. Varughese "Hey, you are going for a

3     toxicology screen.  You are being examined

4     by a psychiatrist.  Take the week off.  We

5     don't want you handling any patient care

6     related issues"?

7          A.    No, I don't believe that that

8     would be appropriate.

9          Q.    Why wouldn't that be appropriate?

10         A.    My understanding of a toxicology

11    test is it's either a urine test or blood

12    test.  And I don't know the details of the

13    evaluation that you are referring to.

14         Q.    But was there a perception that

15    Dr. Varughese needed to be examined by a

16    psychiatrist?

17              MR. McEVOY:  Perception by who?

18         Q.    Did you have a perception that

19    Dr. Varughese needed to be examined by a

20    psychiatrist?

21         A.    This was not my decision to

22    make.

23         Q.    Okay.  Whose decision was it to

24    make?

25         A.    This was based upon Dr. Figur's

1          PATRICK LENTO, M.D.

2    evaluation as the head of the Physician

3    Wellness Committee.

4          Q.    And did Dr. Figur express to you

5    whether he believed that, based on his

6    dealings with Dr. Varughese, that a

7    psychiatric examination would be

8    appropriate?

9          A.    Obviously he felt it was

10   appropriate if he made the referral.

11         Q.    So did you understand as of

12   April 12, 2011, who Dr. Fersh was?

13         A.    I only know what you have

14   discussed with me right now.

15         Q.    Well, listen to my question.   As

16   of April 12, 2011, did you know who

17   Dr. Fersh was?

18         A.    Yes.

19         Q.    You knew her to be a psychiatrist,

20   right?

21         A.    She was a physician that Dr. Figur

22   had referred her to.

23         Q.    But did you know her area of

24   expertise?

25         A.    I don't recall specifically.

1              PATRICK LENTO, M.D.

2        Q.    Let me show you what was

3    previously marked as Cardo 10.  I'm not

4    going to ask you to read all these meeting

5    minutes.  My question only goes to number

6    7 on the first page.  Tell me when you are

7    ready.

8              (Witness reviews document.)

9        Q.    Resident meeting minutes for

10   June 7, 2011, indicates the residents were

11   being instructed that their pagers must be

12   on you at all times during the workday.

13   It states that if they fail to carry the

14   pager or respond to pagers throughout the

15   day, it would result in a letter of

16   reprimand.  Were you aware of this

17   instruction given to your residents?

18       A.    I think I was, yes.

19       Q.    Did you request that that

20   instruction be given?

21       A.    I do not believe that I made

22   this request, no.

23       Q.    Do you know whether there were

24   any letters of reprimand placed in any

25   resident's file as a result of not

1          PATRICK LENTO, M.D.
2   carrying a pager or responding to pages?
3        A.    Not that I'm aware.
4        Q.    When did the period of academic
5   advisement end for Dr. Varughese?
6        A.    The time period was, as
7   indicated in the advisement letter, I
8   believe it was a three-month period.
9        Q.    Did you advise Dr. Varughese
10  that the academic advisement period had
11  concluded?
12       A.    That the period of three months
13  had concluded.  Correct.
14       Q.    What was supposed to happen at
15  the end of three months?
16       A.    Well, assuming that Leena had
17  completed the academic advisement, we
18  would meet and discuss how to proceed
19  further.
20       Q.    Was the process ever described
21  to Dr. Varughese as to what was going to
22  happen at the conclusion of the academic
23  advisement period and thereafter?
24            (Witness reviews documents.)
25       A.    Yes.  For one, we noted in the

1                PATRICK LENTO, M.D.

2     letter that "We will meet again in three

3     months to review your progress."

4          Q.     Prior to meeting with

5     Dr. Varughese to review her progress, had

6     you been apprised of the fact that

7     Dr. Varughese had made an allegation to

8     human resources that she was the victim of

9     gender discrimination?

10         A.     Not at that point, no.

11         Q.     At what point did you become

12    aware of that?

13         A.     I think it was maybe in April or

14    May.

15         Q.     How did you become aware of it?

16         A.     I don't recall who informed me.

17         Q.     Do you know whether Caryn

18    Tiger-Paillex informed you?

19         A.     I don't remember who informed

20    me.

21         Q.     Did you receive notification at

22    the same time that she had alleged that

23    she was being retaliated against?

24         A.     Did I receive a notification?

25         Q.     Did you become aware of the fact

1              PATRICK LENTO, M.D.

2    that she was alleging that she was being

3    retaliated against?

4         A.    I don't remember that.

5         Q.    Did Dr. Varughese prepare a

6    self-reflection?

7         A.    She prepared two self-reflections.

8         Q.    When was the first one submitted

9    to you?

10        A.    End of March.

11        Q.    I show you what was previously

12   marked as Defendant's Exhibit 21.  Is

13   Defendant's Exhibit 21 the self-reflection

14   of the plaintiff?

15        A.    I believe it is.

16        Q.    What did you do upon receipt of

17   that notice of academic advisement?  I'm

18   sorry.  The self-reflection.

19        A.    I read it.

20        Q.    Did you forward it to anyone?

21        A.    I don't recall.

22        Q.    Did you forward it to Dr. Pessin?

23        A.    I don't recall.

24        Q.    Let me show you what was marked

25   as Pessin 15.  I'll ask whether this

1              PATRICK LENTO, M.D.

2     refreshes your recollection as to whether

3     you forwarded it to Dr. Pessin.

4              (Witness reviews document.)

5        Q.    Does this document refresh your

6     recollection as to whether you forwarded

7     the self-reflection of Dr. Varughese to

8     Dr. Pessin?

9        A.    Obviously I did.

10       Q.    Did you have any conversations

11    with Dr. Pessin about her viewpoint or her

12    views upon reading the self-reflection?

13       A.    I don't recall having a

14    conversation with her.

15       Q.    Did she ever express to you that

16    Dr. Varughese twisted all the events and

17    much is blatantly not true?

18       A.    I don't recall that.  And the

19    email that specifies that was not addressed

20    to me.

21       Q.    Right.  Did she ever express to

22    you that she felt that you, Dr. McCash and

23    herself were being harassed and slandered?

24       A.    I don't recall that.

25       Q.    Dr. Pessin asks Dr. Tiger-Paillex

1            PATRICK LENTO, M.D.
2    what recourse is there now.  Did you
3    discuss the issue of recourse with
4    Dr. Pessin?
5         A.    I wasn't part of this conversation.
6         Q.    I understand that.  I'm asking
7    whether or not, separate and aside from
8    this email chain, did you have any
9    conversation with her about it?
10        A.    I do not recall having a
11   conversation about recourse.
12        Q.    When you read the self-reflection,
13   did you share in Dr. Pessin's beliefs that
14   Dr. Varughese had twisted all the events
15   and much is blatantly not true in the
16   self-reflection?
17        A.    I didn't feel that the self --
18   sorry.  Can you rephrase the question.
19        Q.    I'm asking whether or not you
20   shared in Dr. Pessin-Minsley's belief that
21   Dr. Varughese had twisted all the events
22   and that much is blatantly not true in the
23   self-reflection.
24        A.    I didn't believe that some of
25   the events as outlined may have been true.

Page 201

1                PATRICK LENTO, M.D.

2        Q.     Did you believe that you were

3   being slandered by this document, being

4   the self-reflection?

5        A.     I never said that.

6        Q.     I'm asking you whether or not

7   you believed it.

8        A.     I did not.

9        Q.     Did you believe that there was

10  anything in this document that warranted

11  Dr. Varughese to be disciplined?

12       A.     Based on the academic advisement?

13  No.  Except that she did not fulfill the

14  criteria that we had outlined in the

15  academic advisement about what the letter

16  was supposed to consist of.

17       Q.     Tell me how she did not fulfill

18  the criteria.

19       A.     The letter was intended to be an

20  educational -- the self-reflection was

21  intended to be an educational exercise

22  whereby Dr. Varughese would outline, based

23  upon her reading of the book by Dr. Beeson

24  how she could have handled the situation

25  differently.  And, if I recall correctly,

1           PATRICK LENTO, M.D.

2     the letter seemed to just recount the

3     events as she saw them happen.

4         Q.    Based on your understanding of

5     what occurred by investigating the matter,

6     how do you believe she could have handled

7     it differently?

8         A.    I think that she could have

9     acted in a similar fashion to the way I

10    described Dr. McCash may have been able to

11    handle it, in a more discrete fashion.

12             And I believe that despite the

13    altercation, that she could have completed

14    her duties as a resident or at the very

15    least asked for help.

16        Q.    How could she have asked for

17    help if she was being assailed for asking

18    for help with regard to grossing samples

19    or specimens?

20             MR. McEVOY:   Objection to the

21    form.   You can answer.

22        A.    My understanding was that she

23    didn't ask for help with regard to the

24    specimens.

25        Q.    Well, didn't she ask for help

1             PATRICK LENTO, M.D.

2    from the moonlighters that were there?

3        A.     You would have to ask the

4    moonlighter if she asked for help.  The

5    point was that after the incident, she

6    should have asked for help in completing

7    her duties.

8        Q.     Wasn't it in fact the case that

9    on that particular day, Dr. Azar came on

10   to moonlight and found that there wasn't

11   much for him to do and asked Dr. Varughese

12   for samples to work on?  I'm saying

13   samples.  I mean specimens.

14       A.     That's okay.  I don't have

15   evidence of that.  You would have to ask

16   Dr. Azar if he did that.

17       Q.     Did you interview Dr. Azar?

18       A.     I did.

19       Q.     Did he indicate to you what the

20   workload was that day for him?

21       A.     I don't recall him indicating

22   that, no.

23       Q.     Given the fact that Dr. Azar was

24   there, did you consider that in terms of

25   your analysis as to whether it was

1               PATRICK LENTO, M.D.

2    inappropriate for Dr. Varughese to give

3    him some work, since he was available?

4               MR. McEVOY:  Objection to the

5    form.  It's been asked and answered a

6    whole bunch of time.  He can answer one

7    more time.

8               MR. WRONKO:  Not with regard to

9    Dr. Azar.

10       Q.    You can answer.

11       A.    The point of the moonlighter

12   wasn't to do the work of the resident.

13   The point of the moonlighter was to assist

14   or aid in the work being done within the

15   gross room.

16       Q.    So in that case, should Dr. Azar

17   have gone home?

18       A.    If there was no work for him to

19   do?

20       Q.    Right.

21       A.    If there was no work for him to

22   do, then perhaps yes.

23       Q.    Did you meet with anyone prior

24   to meeting with Dr. Varughese about her

25   self-assessment?

1              PATRICK LENTO, M.D.

2       A.    I don't recall any meeting.

3       Q.    Did you meet with Carlos

4  Cordon-Cardo with regard to the situation

5  with Dr. Varughese?

6       A.    I don't recall meeting.

7       Q.    Did you take any steps to advise

8  Dr. Cordon-Cardo about what was going on

9  in terms of the academic advisement?

10              MR. McEVOY:  At any particular

11  point in time?

12       Q.    Prior to the May 4, 2010,

13  meeting.

14              MR. McEVOY:  What May 4, 2010,

15  meeting?  You haven't asked him anything

16  about a May 4, 2010, meeting.

17       Q.    Did you ultimately meet with

18  Dr. Varughese on May 4, 2010?

19       A.    No, sir.  It was 2011.

20       Q.    Did you meet with Dr. Varughese

21  on May 4, 2011?

22       A.    Yes, I did.

23       Q.    So prior to that May 4, 2011,

24  meeting, had you had any meetings with

25  Dr. Cordon-Cardo with regard to the

1              PATRICK LENTO, M.D.

2    situation with Dr. Varughese?

3         A.    I don't recall.

4         Q.    Do you know whether there was

5    anyone else who took the laboring oar in

6    terms of bringing Dr. Cordon-Cardo up to

7    speed on what was going on with

8    Dr. Varughese?

9         A.    Under the circumstances of the

10   transition from Dr. Pessin, who is the

11   interim chair, to the new chair, that

12   would have been the responsibility of the

13   interim chair.

14        Q.    Were you present for any of the

15   meeting between Dr. Pessin and Dr. Cordon-

16   Cardo?

17        A.    I don't believe so, no.

18        Q.    Do you have any knowledge as to

19   whether or not she expressed the views

20   that she had indicated in Pessin 15 to

21   Dr. Cordon-Cardo?

22        A.    I have no idea.

23        Q.    Tell me what happened on May 4,

24   2011.

25        A.    So that was a follow-up meeting

1            PATRICK LENTO, M.D.

2    in Dr. Cordon-Cardo's office between

3    Dr. Varughese, myself, Dr. Cordon-Cardo

4    and Mr. Castaldi, the new departmental

5    administrator.

6        Q.    When Dr. Varughese had been

7    given the notice of academic advisement,

8    it was just you and Dr. Pessin; is that

9    correct?

10       A.    That's correct.

11       Q.    Why is it that Mr. Castaldi was

12   then part of this meeting?

13       A.    Dr. Cordon-Cardo had asked for

14   his presence.

15       Q.    Did he explain to you why he had

16   asked for Mr. Castaldi to be there?

17       A.    I do not believe so.

18       Q.    Did you invite Dr. Cordon-Cardo

19   to be a part of this meeting?

20       A.    I don't believe I was the one

21   who set up the meeting.

22       Q.    Who was the person who set up

23   the meeting?

24       A.    I believe it was Dr. Cordon-Cardo.

25       Q.    Do you recall any of your

1           PATRICK LENTO, M.D.

2    communications with Dr. Cordon-Cardo prior

3    to or leading up to this meeting being set

4    up?

5           A.    No, sir.

6           Q.    What happened prior to the

7    meeting?  Did anything happen prior to the

8    meeting on that day, May 4, 2011?

9           MR. McEVOY:  Did anything happen

10   about what?

11          MR. WRONKO:  Fair enough.

12          Q.    Did Dr. Varughese arrive early

13   to the meeting?

14          A.    That I don't recall.

15          Q.    Do you know whether she was ever

16   criticized for arriving early to the

17   meeting?

18          A.    I don't recall that.

19          Q.    Did she interrupt any very

20   important meeting that was taking place by

21   arriving early?

22          A.    I don't recall.

23          Q.    How about on May 24, 2011, at

24   the follow-up meeting?  Had she arrived

25   early and interrupted any type of a

1               PATRICK LENTO, M.D.

2     meeting?

3          A.     Not that I recall.

4          Q.     Tell me what happened at the

5     May 4, 2011, meeting with Dr. Varughese.

6          A.     I actually asked Dr. Varughese

7     if she had read the book.  I indicated

8     that her academic advisement reflection

9     essay didn't meet the standard that we had

10    expected, based upon our discussions and

11    what was indicated in the academic

12    advisement.

13               Dr. Varughese told me she had

14    read the book.  So I asked her to give me

15    some information about what she may have

16    read.  And she said it was about

17    professionalism, which to me was pretty

18    obvious.  Didn't expound much on that.  So

19    like you did not too long ago, asked her

20    the author of the book, and she was unable

21    to give the name.  So it was apparent that

22    she hadn't read the book.

23               Interestingly, Dr. Cordon-Cardo

24    at that point nicely said, "Listen," this

25    was to Dr. Varughese, that he was new to

1              PATRICK LENTO, M.D.

2    the department and it was obvious that she

3    hadn't read the book.  But, given the

4    circumstances and their new relationship,

5    he was willing to allow her some

6    additional time to work on a more

7    appropriate reflection essay, and in a

8    sense offered her an olive branch, you

9    know, to proceed.

10        Q.    Were you concerned, as you were

11   during your February meeting, that the

12   meeting would appear threatening to

13   Dr. Varughese by having three people there

14   at the meeting?

15        A.    No, I didn't think about it

16   being threatening.

17        Q.    At the very beginning of the

18   meeting, had you begun by in essence

19   cross-examining Dr. Varughese about her

20   self-reflection and whether or not she had

21   read the book?

22              MR. McEVOY:  Objection to the

23   form.  You can answer.

24        A.    First we would have said hello

25   to Leena.  So we wouldn't have started off

1              PATRICK LENTO, M.D.

2    just by engaging in questions.

3         Q.    But after the pleasantries,

4    isn't it fair to say that you immediately

5    began engaging in questions?

6         A.    Right.  So the purpose of the

7    meeting was to follow up, as was outlined

8    in the academic advisement.  Based on, as

9    I mentioned, the academic advisement, we

10   discussed it.

11        Q.    Was it really a discussion or

12   you asking her questions and trying to pin

13   her down to establish that she had not

14   done what you wanted with regard to the

15   self-reflection and had not read the book?

16             MR. McEVOY:  Objection to the

17   form.  You can answer.

18        A.    I had indicated to Dr. Varughese

19   that I didn't think the academic

20   advisement had met the criteria that we

21   had outlined and discussed regarding

22   academic advisement.

23        Q.    Had you thought that it was

24   unprofessional for Dr. Varughese to have

25   made allegations that she was the victim

1          PATRICK LENTO, M.D.

2    of gender discrimination?

3         A.    Inappropriate?  No.

4         Q.    Unprofessional?

5         A.    Why would that be unprofessional?

6               MR. McEVOY:  No, you are being

7    asked the question.

8         A.    No.

9         Q.    Following the meeting, were you

10   made aware by Dr. Cordon-Cardo that

11   Dr. Varughese had reiterated her complaint

12   that she was the victim of gender

13   discrimination and retaliation?

14        A.    I don't recall that.

15        Q.    When you first became aware that

16   Dr. Varughese had made the allegation of

17   gender discrimination, did you do anything

18   to institute an investigation into that

19   particular allegation or to follow up with

20   anyone?

21        A.    That would not have been my

22   responsibility.

23        Q.    Why wouldn't it have been your

24   responsibility upon learning that, to

25   ensure that Mount Sinai's anti-discrimination

```
 1              PATRICK LENTO, M.D.
 2    policy procedures were followed?
 3        A.    I believe that would be the
 4    responsibility of whomever Dr. Varughese
 5    spoke about it.  I believe it was human
 6    resources.
 7        Q.    Is it your testimony that when
 8    you found out, you knew that human
 9    resources had already been apprised of
10    that particular allegation?
11        A.    Well, this meeting was in May.
12    I believe, based on our prior
13    conversation, that I was under the
14    understanding of an allegation sometime in
15    April.
16        Q.    Did Dr. Cordon-Cardo advise you
17    that Dr. Varughese had reiterated that
18    allegation following the May 4th meeting?
19        A.    I don't recall that.
20        Q.    Did you believe that Dr. Varughese
21    should have been further disciplined or
22    terminated following the May 4th meeting?
23        A.    Dr. Cordon-Cardo decided that
24    she would not be; that she would be given
25    the opportunity to --
```

1          PATRICK LENTO, M.D.

2     Q.    Right.  I understand that

3   Dr. Cordon-Cardo made that decision.  But

4   what I'm asking you is whether or not you

5   believe as the program director that

6   Dr. Varughese should have been further

7   disciplined and/or terminated as a result

8   of the issues that you brought to her

9   attention at that May 4th meeting.

10    A.    Should have been implies a

11  decision already made.  At that point, we

12  hadn't or I had not made a decision about

13  what to do.

14    Q.    Now, between that first meeting

15  and the second meeting, had you received

16  any reports about any incidents involving

17  Dr. Varughese in the performance of her

18  job responsibilities or anything about

19  poor performance?

20          MR. McEVOY:  That's between May

21  4 and May 24?

22          MR. WRONKO:  Correct.

23    A.    I don't recall.

24    Q.    Had anyone during that time --

25  had you spoken with anyone during that

Page 215

1            PATRICK LENTO, M.D.

2    time period in the residency program to

3    tell them to keep tabs on Dr. Varughese to

4    see whether or not she was making mistakes

5    anywhere?

6        A.    Tabs?  No, I don't recall doing

7    that.

8        Q.    Okay.  So tell me what happened

9    at the May 24th meeting.

10        A.    So again, Dr. Cordon-Cardo

11    arranged for a meeting on May 24th based

12    on the outcome of the May 4th meeting.

13    The expectation was that Leena would

14    provide us with a reworking of her

15    reflection essay.  I believe Dr. Cordon-Cardo

16    had indicated to Leena that, you know, she

17    needed to provide it within a certain

18    period of time so that we could review it

19    in advance of the meeting so we could have

20    a meaningful discussion.

21            And at the meeting, which was

22    relatively brief, it was essentially run

23    by Dr. Cordon-Cardo, who noted that

24    Dr. Varughese's academic advisement did

25    not come in within the time period he had

1              PATRICK LENTO, M.D.

2      requested.  If I recall correctly, she

3      submitted it perhaps that morning or at

4      the meeting.  So he didn't really have a

5      chance to go over it.

6              He did ask her if she had read

7      the book, which apparently she had maybe

8      on her lap.  And at that point she kind of

9      threw it up on the table and said "What?

10     This book?"

11        Q.    Anything else?

12        A.    Well, it was at that point that

13     Dr. Cordon-Cardo was upset.  And he

14     basically ended the meeting.  He told

15     Dr. Varughese that she had to leave.

16        Q.    So had you reviewed -- I think

17     you had indicated you had not reviewed the

18     amendment to the second reflection prior

19     to that meeting.

20        A.    Right.  I think we may have

21     looked at it during the meeting, but I'm

22     not 100 percent sure.

23        Q.    Did there come a point when you

24     read the second reflection?

25        A.    Yes.

1              PATRICK LENTO, M.D.

2        Q.     When did you read it?

3        A.     That I don't recall.

4        Q.     At the meeting with regard to

5    the second reflection, did Dr. Varughese

6    raise the issue that she was being

7    retaliated against?

8        A.     I don't recall that being

9    raised.

10        Q.     Did Dr. Cordon-Cardo at that

11    second meeting say to Dr. Varughese that

12    she should stop making complaints about

13    members of the residency program drinking

14    on the premises?

15        A.     I don't recall that, no.

16        Q.     Did Dr. Varughese say to

17    Dr. Cordon-Cardo that that's a very

18    important issue, to which Dr. Cordon-Cardo

19    then withdrew his instruction to her that

20    she should stop complaining about it?

21        A.     I don't recall the question.  So

22    there is no way I would recall the

23    follow-up answer.

24        Q.     Had you at all been aware of the

25    fact that there were meetings called

1              PATRICK LENTO, M.D.

2    dementia rounds where residents were

3    meeting on hospital premises to drink

4    alcohol?

5         A.    No, sir.

6         Q.    Do you know whether or not any

7    resident had taken a break from grossing

8    in order to ingest alcohol?

9         A.    I was not aware of that.

10         Q.    Were you aware of the fact that

11    earlier in May there was a directive sent

12    out by Dr. Jordan that, in fact it was on

13    May 4th, that alcohol was no longer

14    allowed on hospital grounds?

15         A.    I don't recall that.

16         Q.    Were you involved in that

17    decision to have alcohol removed from the

18    hospital premises?  Drinking alcohol that

19    is.  Not rubbing alcohol.

20         A.    I understand.  Removed.  I don't

21    recall being involved in the decision to

22    remove alcohol.

23         Q.    Let me rephrase.  In terms of

24    residents drinking on the premises, were

25    you at all involved in the decision in

1           PATRICK LENTO, M.D.

2    order to have residents stop drinking on

3    the premises?

4        A.    I became aware of the

5    allegation.  And I let the chief residents

6    know that, of course, that could not

7    happen.

8        Q.    How did you become aware of the

9    allegation with regard to the residents

10   drinking on the premises?

11       A.    Somebody informed me.

12       Q.    Let me show you what has been

13   marked as Defendant's Exhibit 26.  Do you

14   remember this document to be the second

15   reflection that Dr. Varughese had

16   submitted?

17       A.    It does appear to be so.

18       Q.    In this amendment to her initial

19   reflection, Dr. Varughese raises the issue

20   that she was being treated differently

21   based on her gender.  Does she not?

22       A.    Can you tell me which line that

23   is?

24             (Witness reviews document.)

25       Q.    I'll withdraw that question.

Page 220

1           PATRICK LENTO, M.D.

2    Let me ask you a different question.

3           During the period of time of May

4    2011, was Samuel McCash working at the

5    same time at the VA as Dr. Varughese?

6        A.    I don't know.

7        Q.    Do you know whether there was

8    any effort to ensure that the two of them

9    would not be working together?

10       A.    I don't know if this is the

11   particular month.  But I did speak to Sam

12   during a rotation when he was going to be

13   in the same hospital as Dr. Varughese,

14   yes.

15       Q.    Now, in the third paragraph, it

16   states here "After the issuance of

17   academic advisement, I also chose to take

18   a stand to defend myself by filing an

19   official complaint."

20           Did you know what Dr. Varughese

21   was referring to there by way of the

22   official complaint?

23       A.    I assume that was referring to

24   her complaint to human resources.

25       Q.    Did you have any concerns about

1           PATRICK LENTO, M.D.

2    her in the remainder of that paragraph

3    raising the issue of residents drinking

4    alcohol, specifically Dr. Jordan and

5    Dr. McCash?

6        A.    Well, my concern was that this

7    was irrelevant to the reflection essay, as

8    outlined in the academic advisement and

9    based on our discussions.  This was

10   irrelevant to what was expected of the

11   reflection essay.

12           Was I concerned about this

13   specific thing?  Of course.

14       Q.    How about in the next paragraph

15   where Dr. Varughese says that she

16   perceived this as being discrimination,

17   the fact of what Dr. McCash had done?  Had

18   done meaning verbal punishment and

19   harassment by Dr. McCash of her.

20       A.    I didn't personally believe that

21   to be the case.  But that would be up to

22   HR to determine, based on their

23   investigation.

24       Q.    Had you communicated with HR

25   after reading this second reflection to

1           PATRICK LENTO, M.D.

2    advise HR that Dr. Varughese raised the

3    issue of discrimination in her second

4    self-reflection?

5         A.    I don't recall doing that.

6         Q.    How about with regard to her

7    allegation later in that paragraph that

8    she wished for all retaliatory actions

9    against her to come to an end?

10        A.    I don't recall communicating

11   that to human resources.

12        Q.    Did you believe at the conclusion

13   of that second meeting on May 24th that

14   Dr. Varughese needed to be terminated as

15   of May 24th?

16        A.    That was a distinct possibility.

17   She could have been, I think.

18        Q.    Did you discuss that with anyone?

19        A.    No, not at that time.  No.

20        Q.    Was that a feeling that you held

21   on May 24th or is that a feeling you hold

22   looking back in retrospect?

23        A.    No.  In fact, from the May 24th

24   meeting onward, in fact, Dr. Cordon-Cardo

25   had specifically asked me to, in a sense,

Page 223

1          PATRICK LENTO, M.D.

2    remove myself from the situation with

3    Dr. Varughese, so that he could, as he had

4    stated previously, try to work with her on

5    improving and subsequently assigned her to

6    Dr. Firpo.

7          Q.    But was anybody working with

8    Dr. Varughese in the time period between

9    May 24th and when Dr. Firpo eventually

10   started working with her in August 2011?

11         A.    In what way?

12         Q.    Was anybody communicating with

13   her during that time period?

14         A.    That I can't answer.  I don't

15   know the answer.

16         Q.    Did Dr. Cordon-Cardo and you

17   discuss you removing yourself?

18         A.    He asked me.

19         Q.    Did he feel that you were too

20   close to the situation?

21         A.    It was not my impression that

22   that is what he felt, no.

23         Q.    Had you expressed any anger

24   about Dr. Varughese to Dr. Cordon-Cardo

25   where he felt that you shouldn't have

1              PATRICK LENTO, M.D.

2     interaction with her?

3        A.    Not at all.  I think it was his

4     putting out a hand to Dr. Varughese in an

5     attempt to allow her to continue in the

6     residency program.

7        Q.    In terms of putting a hand out

8     to Dr. Varughese, did you have any

9     understanding as to why Dr. Cordon-Cardo

10    felt it was necessary for you as the

11    program director to in essence step aside

12    from the situation?

13       A.    That would be something

14    Dr. Cordon-Cardo would have to answer.

15       Q.    On May 24th, did you have any

16    communications with Elizabeth Morency?

17       A.    Not that I recall.

18       Q.    Did you have any communications

19    after May 24th or on May 24th forward --

20    let me try that again.

21            Did you have any communications

22    with anyone on May 24th forward,

23    instructing them to keep you or the

24    department advised about any missteps that

25    Dr. Varughese had moving forward?

1          PATRICK LENTO, M.D.

2     A.     I don't recall.

3     Q.     Do you know whether it be you or

4   anybody else in the department put out in

5   essence that request that the staff of the

6   department keep an eye out for issues with

7   Dr. Varughese?

8     A.     I don't recall.

9     Q.     Did you have that type of

10   communication with Elizabeth Morency?

11          MR. McEVOY:  Asked and answered.

12   You can answer one more time.

13     A.     I don't recall.

14     Q.     Did you have that type of a

15   communication with Dr. Najfeld?

16     A.     No, sir.

17     Q.     Let me show you what was marked

18   as Cardo 14.  I'll give you a moment to

19   review that.

20          (Witness reviews document.)

21     Q.     Do you recall receiving the

22   email that is marked as Cardo Exhibit 14?

23     A.     My name is on the email.

24     Q.     Does that mean that you don't

25   have any recollection sitting here today?

1                PATRICK LENTO, M.D.

2        A.    I don't recall receiving this

3    email.

4        Q.    Okay.  Do you recall conducting

5    any form of investigation with regard to

6    it?

7        A.    Yes.

8        Q.    What did you do to investigate

9    it?

10        A.    So this appears to be the same

11    day of the meeting with Dr. Cordon-Cardo.

12    Leena was on a service.  The GYN service,

13    the gynecology pathology service.  And she

14    basically left without completing her

15    duties for that particular day.

16        Q.    But was it your understanding

17    that Dr. Morency was referring to an

18    incident that had occurred on May 24th or

19    on some prior date?

20        A.    I don't recall.  I would be

21    speculating, I think.

22        Q.    So Dr. Morency writes about

23    ongoing problems with Dr. Varughese and

24    then makes reference to her having gotten

25    into arguments with both Bassel and Roma

1              PATRICK LENTO, M.D.

2     about helping her grow specimens.  Did you

3     ever determine any specific dates that

4     were being referenced here by Dr. Morency?

5          A.    No, sir.

6          Q.    Was it merely coincidental that

7     on the evening of the meeting on May 24

8     that Dr. Morency would suddenly bring this

9     ongoing problem to the forefront?

10             MR. McEVOY:  Objection to the

11     form.  You can answer.

12          A.    I think you would have to ask

13     Dr. Morency that question.

14          Q.    Do you know whether anyone who

15     was at the May 24th meeting, of course

16     excluding the plaintiff, had solicited

17     this account from Dr. Morency?

18          A.    Not that I recall, no.

19             MR. McEVOY:  When you get a

20     chance, can we take a break?

21             MR. WRONKO:  Let's take it now.

22             (Plaintiff's Exhibits 4 and 5

23     marked for identification.)

24             (Recess:  4:05 to 4:13 p.m.)

25     BY MR. WRONKO:

1          PATRICK LENTO, M.D.
2      Q.    Prior to May 24th, had Caryn
3  Tiger-Paillex been involved in any
4  decisions as to handle Dr. Varughese?
5      A.    I don't recall.
6      Q.    Did there come a point when
7  Caryn Tiger-Paillex became involved in
8  terms of investigating any issue involving
9  Dr. Varughese?  Let me rephrase that.
10          Did there come a point when
11  Caryn Tiger-Paillex became involved in
12  investigating any work performance issues
13  alleged by the department?
14      A.    I don't know.
15      Q.    Let me show you what has been
16  marked as Lento Exhibit 4.  I'll give you
17  a moment to review that.
18          (Witness reviews document.)
19      Q.    Do you recall sending this
20  email, dated June 2nd, 2011?
21      A.    I don't.
22      Q.    Do you know, sitting here today,
23  why you had included Caryn Tiger-Paillex
24  on this email?
25      A.    I do not recall.

1         PATRICK LENTO, M.D.

2      Q.    Is it true that prior to June 2,

3   2011, Caryn Tiger-Paillex's only

4   involvement was to investigate allegations

5   that Dr. Varughese had made?

6      A.    Can you repeat that, please.

7            (The question was read.)

8      A.    I believe that may be true, yes.

9      Q.    Did you believe that her role

10  was now changing as of June 2, 2011, to

11  now investigate performance issues with

12  Dr. Varughese?

13     A.    I don't recall the email.  So I

14  don't recall the circumstances that it

15  relates to.

16     Q.    Were there any meetings with

17  Caryn Tiger-Paillex between May 24th and

18  June 2, 2011, between you and Caryn

19  Tiger-Paillex?

20     A.    Not that I'm aware of or recall.

21     Q.    Were you referring Dr. Varughese

22  to human resources because of this issue

23  involving the PA, chief resident and the

24  members of the GYN staff?

25     A.    Well, obviously she was included

Page 230

1              PATRICK LENTO, M.D.
2    on the email.
3         Q.    But sitting here today, you
4    don't know why?
5         A.    I don't recall, no.
6         Q.    What other involvement besides
7    this email chain did you have, if any, in
8    terms of investigating this incident?
9         A.    When you refer to this incident?
10        Q.    The Morency complaint.
11        A.    I did speak with Dr. Kalir, who
12   was the chief of the GYN service.
13        Q.    What did Dr. Kalir tell you?
14        A.    From what I recall, and I don't
15   remember when this meeting, discussion
16   took place, Dr. Kalir indicated that there
17   were some issues with Dr. Varughese on the
18   service.
19        Q.    What were the issues that
20   Dr. Kalir identified?
21        A.    I believe there were grossing
22   issues.
23        Q.    Was she any more specific about
24   what those issues were?
25        A.    Well, for one, as we discussed

1                PATRICK LENTO, M.D.

2    previously, Dr. Varughese just left the

3    service.  Dr. Kalir had to find someone

4    else to complete Dr. Varughese's duties.

5    And from what I recall, there were other

6    issues regarding the turnaround time of

7    the evaluation of specimens.

8        Q.    Do you know whether or not those

9    problems were unique to Dr. Varughese or

10   whether or not that was a common problem

11   on that service?

12       A.    The discussion did not entail

13   other residents.

14       Q.    But I'm not asking whether the

15   discussion entailed other residents.  I'm

16   asking as to your knowledge as to whether

17   other residents who had grossing

18   responsibilities had done similar things.

19       A.    I'm not aware of a resident who

20   left during the day and had others

21   complete their responsibilities while on

22   the GYN service.

23       Q.    Let me show you what has been

24   marked as Lento Exhibit 5.  I'll give you

25   a moment to review this.

1          PATRICK LENTO, M.D.

2          (Witness reviews document.)

3     Q.    Do you recognize this chart?

4     A.    No.

5     Q.    On this chart, there is an

6  indication that on the 16th of this

7  particular month involving period ten

8  moonlighting that there were several small

9  and large specimens left.  And it says "No

10  Bassel."  Do you know whether or not

11  Adrienne Jordan had ever left several

12  small and large specimens incomplete?

13     A.    No.

14     Q.    How about looking at this chart

15  at the bottom row.  It has the number 7.

16  It says "Adrienne Jordan three hours."  I

17  would assume that means three hours of

18  moonlighting.  It says "Specimens left

19  several large."  Do you know whether or

20  not Dr. Jordan had left several specimens

21  incomplete?

22     A.    I'm not aware of that fact.  I'm

23  also not aware that this refers specifically

24  to Dr. Jordan.

25     Q.    Let me show you what was

1              PATRICK LENTO, M.D.

2    previously marked as Cardo Exhibit 22.

3    I'll give you a moment to review that.

4              (Witness reviews document.)

5         Q.    Did anyone ever advise you,

6    whether it be Dr. Grunes or anyone else,

7    that people were at each other's throats

8    in the gross room?

9         A.    I don't recall being advised of

10   that.

11        Q.    Did you have any knowledge to

12   believe that there were in fact arguments

13   or confrontations in the gross room?

14        A.    No, sir.

15        Q.    How about bickering in the gross

16   room?  Were you ever advised of that?

17        A.    I don't recall being advised of

18   bickering.

19        Q.    With regard to this complaint by

20   Dr. Morency, what was the outcome of that

21   complaint?  Did it result in any discipline

22   for Dr. Varughese?

23        A.    No.  I actually asked Dr. Kalir

24   to document what she was telling me

25   verbally.  But she did not.  There was no

1          PATRICK LENTO, M.D.

2    disciplinary action.  However, at that

3    particular time, again, Dr. Cordon-Cardo

4    had asked me to step away from the

5    situation with Dr. Varughese.

6          Q.    If that's, in fact, the case,

7    why did you involve yourself in terms of

8    reporting the incident as well as

9    partaking in the investigation?

10         A.    I was still the program

11   director.  And the emails that you are

12   referring to was on the day of the meeting

13   with Dr. Varughese.

14         Q.    Was it at a later point that you

15   were no longer involved with Dr. Varughese?

16         A.    That was a conversation that I

17   had with Dr. Kalir.  And that was basically

18   it.

19         Q.    What do you mean that was

20   basically it?  That was the end of your

21   involvement with Dr. Varughese?

22         A.    Direct involvement with

23   Dr. Varughese, yes.

24         Q.    Okay.  Who is Jaclyn Hechtman?

25         A.    She was a resident.

1          PATRICK LENTO, M.D.

2      Q.     Did you have any involvement in

3  terms of a discipline-related issue with

4  her in July 2011?

5      A.     Dr. Hechtman was not disciplined.

6      Q.     Was there any allegation that

7  she was refusing to wear protective gear,

8  as required by department policy, in the

9  gross room?

10     A.     That may have been true.

11     Q.     Was there any allegation about

12 Jaclyn Hechtman that she felt that

13 covering senior autopsy during the week or

14 grossing placentas was not part of her

15 job?

16     A.     That may have also been true.

17     Q.     Did she also have an attitude

18 that it was beneath her to track down

19 missing slides?

20     A.     That I don't know.

21     Q.     Were allegations made that she

22 was making frequent comments, such as "I'm

23 just not doing that"?

24     A.     I don't recall that.

25     Q.     Do you know whether or not

1          PATRICK LENTO, M.D.

2   Dr. Jordan wanted to give her a notice of

3   improvement?

4          A.    I believe that she did want to

5   do that.

6          Q.    I show you what has been marked

7   as Cardo Exhibit 7.  Did you receive or

8   ever see these emails?

9          A.    My name is on the top of one of

10  them.

11         Q.    Sitting here today, do you

12  recall having received this email chain as

13  being forwarded by Mary Beasley?

14         A.    I must have received it, yes.

15         Q.    Was the notice of improvement

16  attached ever issued to Jaclyn Hechtman?

17         A.    I do not believe so.

18         Q.    Why not?

19         A.    Because I believe that

20  Dr. Hechtman had not been spoken to as an

21  initial educational way of handling the

22  situation.

23         Q.    Okay.  And with regard to this

24  particular notice, do you know why

25  Dr. Jordan circulated it to her to give

```
1              PATRICK LENTO, M.D.
2    Dr. Hechtman an opportunity to revise it?
3         A.    I would have no idea why.  You
4    would have to ask Dr. Jordan.
5         Q.    I'd like to show you what has
6    been marked as Cardo 21.
7               (Witness reviews document.)
8         Q.    Do you recall receiving this
9    email from Dr. Beasley?
10        A.    I do not recall this email.
11        Q.    Dr. Beasley, who is she?
12        A.    Dr. Beasley is an attending in
13   the department.
14        Q.    In this email, Dr. Beasley
15   states that Adrienne Jordan felt that
16   Jaclyn Hechtman had already been given a
17   verbal warning.  Had you had any
18   communications with Dr. Jordan about her
19   feelings that a verbal warning had already
20   been given to Jaclyn Hechtman?
21        A.    No, I don't recall speaking with
22   her.
23        Q.    And that it was Jaclyn Hechtman's
24   position that a verbal warning had not
25   been given.  Since the allegations were
```

1          PATRICK LENTO, M.D.

2    being made by Jaclyn Hechtman, why was

3    deference being given to Jaclyn Hechtman's

4    version over Adrienne Jordan?

5          MR. McEVOY:  Objection to the

6    form of the question.  You can answer.

7       A.    I think this was a mediation by

8    the attending to handle the situation in a

9    verbal manner, much like we had discussed

10   in other incidents.

11      Q.    Why was mediation appropriate in

12   this instance?

13      A.    As I mentioned earlier, the

14   initial response to an infraction might be

15   a verbal communication to the resident in

16   an effort to educate the resident.

17      Q.    But this went beyond just

18   communicating with Jaclyn Hechtman, to the

19   point of being mediated by the attending.

20   Was why was the mediation with the attending

21   appropriate?

22      A.    I don't know.  I don't know.

23      Q.    At the end of this email,

24   Dr. Beasley writes "Thanks again for your

25   input.  At least I haven't had to bail

Page 239

1              PATRICK LENTO, M.D.

2    another resident out of jail.  Still

3    haven't told you that story, have I?  Did

4    you notice what the lottery prize money is

5    up to by chance?"

6            Did she ever tell you that story

7    about what happened with the resident who

8    she had to bail out of jail?

9        A.    Not that I recall.

10       Q.    Do you know that there was a

11   resident who had to be bailed out of jail?

12       A.    Not that I'm aware of.

13       Q.    Okay.  Did there come a point

14   when Dr. Varughese retained legal counsel,

15   to your knowledge?

16       A.    Yes.

17       Q.    When did she retain legal counsel,

18   to your best recollection?

19       A.    I don't know.

20       Q.    Were you ever made aware that

21   her legal counsel had written a letter

22   alleging that there were violations of

23   Title VII of the Civil Rights Act that

24   were being committed?

25       A.    I may have been.

1           PATRICK LENTO, M.D.

2      Q.    Did Caryn Tiger-Paillex advise

3   you of that?

4      A.    I do not know.

5      Q.    Did you ever receive a copy of

6   the letter from Dr. Varughese's counsel?

7      A.    That I don't recall.

8      Q.    Let me show you what has been

9   marked as Cardo 15.

10           (Witness reviews document.)

11      Q.    Did you ever see what has been

12   marked as Cardo Exhibit 15?

13      A.    I believe I did, yes.

14      Q.    When was the first time that you

15   saw this document?

16      A.    I believe it was in the fall of

17   2011.

18      Q.    Had you been made aware of the

19   existence of this letter prior to the fall

20   of 2011?

21      A.    I do not believe so, no.

22      Q.    Were you advised that

23   Dr. Varughese had counsel prior to the

24   fall of 2011?

25      A.    I don't recall that she had

```
 1              PATRICK LENTO, M.D.
 2    counsel.
 3         Q.    Was there any correlation
 4    between the involvement of Caryn
 5    Tiger-Paillex in this situation and
 6    Dr. Varughese's retention of counsel in or
 7    around June of 2011?
 8         A.    I have no idea.
 9         Q.    But as of June 10, 2011, is it
10    your testimony that you had removed
11    yourself in terms of dealing with
12    Dr. Varughese?
13         A.    Yes.
14         Q.    What are duty hour requirements
15    for residents?
16         A.    That refers to resident tracking
17    of hours, hours worked.
18         Q.    How would residents have to
19    track their hours worked?
20         A.    Using a software system, a
21    computerized software system.
22         Q.    What was the requirement in
23    terms of frequency of entering hours?
24         A.    They needed to be in within the
25    time frame of a particular audit.  That
```

1          PATRICK LENTO, M.D.

2    was the requirement.

3          Q.    Do you know whether or not

4    Dr. Varughese at the end of June 2011 had

5    entered all of her duty hours?

6          A.    I'm not sure.

7          Q.    Were there any disciplinary

8    steps that would be associated with a

9    failure to enter duty hours in June 2011?

10         A.    No, I don't believe it was

11   disciplinary.

12         Q.    Let me show you what was marked

13   as Cardo Exhibit 16.  I'll give you a

14   moment to review that.

15              (Witness reviews document.)

16         Q.    All set?

17         A.    Yes.

18         Q.    Do you recall this email chain

19   marked as Cardo 16?

20         A.    I do not.

21         Q.    Okay.  Do you know why

22   Dr. Cordon-Cardo -- strike that.

23              Turning to the second page,

24   Dr. Cordon-Cardo responds to Allene

25   Carter's email about Dr. Varughese not

Page 243

```
 1            PATRICK LENTO, M.D.
 2   having entered her duty hours by saying
 3   "Dear Sheema, I have discussed possible
 4   termination with HR.  I believe it's time
 5   to make decisions.  Can you share this
 6   message with HR.  Let's discuss tomorrow.
 7   Thank you.  Carlos."
 8            First of all, who is Sheema
 9   Patel?
10       A.    Sheema was the new department
11   administrator.
12       Q.    Did you know what her job
13   responsibilities were as the department
14   administrator?
15       A.    I assume they were the same as
16   every other department administrator.
17       Q.    Did she have job responsibilities
18   over discipline of residents?
19       A.    I can't answer that.
20       Q.    Were you part of any discussions
21   about a possible termination with HR of
22   Dr. Varughese?
23       A.    No.  At this point, I was not
24   involved in discussions.  This was
25   Dr. Cordon-Cardo.
```

Page 244

1           PATRICK LENTO, M.D.

2        Q.     Okay.  But then later on, on the

3    first page, you write to Caryn Tiger-Paillex

4    "I have a few saved general emails about

5    duty hours to the residents from Allene in

6    the past two or three months as well as a

7    specific one to her in June," her being

8    Dr. Varughese.

9              If you had removed yourself from

10   the situation, why were you participating

11   in this inquiry about duty hours?

12       A.     This is obviously a response to

13   an inquiry from Ms. Tiger-Paillex.

14       Q.     Were you attempting to support

15   your department chair in order to provide

16   additional evidence so that Dr. Varughese

17   could be terminated because of this?

18       A.     I was providing information

19   responding to the inquiry by human

20   resources.

21       Q.     Did you believe that this

22   particular offense, not entering duty

23   hours, was a proper basis to further

24   discipline Dr. Varughese up to and perhaps

25   including termination?

1           PATRICK LENTO, M.D.

2      A.    As an isolated situation?  No.

3      Q.    Do you know whether or not this

4  problem was common to many other residents

5  in terms of getting their duty hours in?

6      A.    I believe that there were, based

7  on my email, saying that sometimes they

8  require prodding, yes.

9      Q.    If you would refer to Cardo

10  Exhibit 17, the email from Allene Carter

11  on June 21, 2011, in fact went to a large

12  number of residents, did it not, following

13  up on their obligation to enter all of

14  their duty hours?

15           MR. McEVOY:  Objection to the

16  form.  You can answer.

17      A.    Yes.

18      Q.    So do you think that Dr. Cordon-

19  Cardo was jumping the gun by trying to

20  take advantage of this particular issue

21  with regard to Dr. Varughese in order to

22  have her terminated?

23           MR. McEVOY:  Objection to the

24  form of the question.  Rephrase it or I

25  won't let him answer.

Page 246

```
1            PATRICK LENTO, M.D.
2            MR. WRONKO:  There is nothing
3   wrong with the question.
4            MR. McEVOY:  Read the question
5   back, please.
6            MR. WRONKO:  I'll rephrase.
7      Q.    Do you believe that Dr. Cordon-
8   Cardo appropriately viewed this as --
9   strike that.
10           Do you think that Dr. Cordon-
11  Cardo was acting too quickly in terms of
12  suggesting that this was an offense for
13  which Dr. Varughese should be terminated?
14           MR. McEVOY:  Objection to the
15  form.  You can answer.
16      A.    I think that requires me to
17  speculate about what he was thinking.  And
18  I can't do that.
19      Q.    Well, when you were supplying
20  information, did you have an understanding
21  from his earlier email, where he had
22  stated that he had discussed termination
23  and now was the time to make decisions,
24  that termination was certainly an option
25  at that point?
```

1              PATRICK LENTO, M.D.

2      A.    It certainly may have been.

3  That was his decision.

4      Q.    So as the program director, did

5  you think that that would have been an

6  appropriate decision, to terminate

7  Dr. Varughese for not entering duty hours?

8              MR. McEVOY:  Objection.  Asked

9  and answered.  You can answer it one more

10  time.

11      A.    As an isolated offense, entering

12  duty hours I don't believe is an offense

13  to be terminated.

14      Q.    What about let's take it out of

15  isolation.  At that particular moment

16  where Dr. Varughese stood with the

17  department, was it an offense that

18  warranted termination, put into the

19  context with Dr. Varughese?

20              MR. McEVOY:  Are you asking

21  Dr. Lento whether he thought it was

22  appropriate or whether Dr. Cordon-Cardo

23  thought it was appropriate?

24              MR. WRONKO:  Dr. Lento.

25              MR. McEVOY:  Fine.

1              PATRICK LENTO, M.D.

2      A.    I'm not sure that entering duty

3  hours is a terminatable offense.

4      Q.    Did you have any involvement

5  with preparing Dr. Varughese's final

6  written warning that was issued in July?

7      A.    That was not prepared by me.

8      Q.    Is that because you had removed

9  yourself from your dealings with

10  Dr. Varughese?

11      A.    I was asked by Dr. Cordon-Cardo.

12  Yes.

13          MR. WRONKO:  Let's mark this.

14          (Plaintiff's Lento Exhibit 6

15  marked for identification.)

16      Q.    Dr. Lento, I'll give you a

17  moment to review that.

18          (Witness reviews document.)

19      Q.    Do you recall this email that

20  you had sent to Paul Johnson, Carlos

21  Cordon-Cardo, Adolfo Firpo, with copies to

22  Marina Lowy, Caryn Tiger-Paillex and Scott

23  Barnett?

24      A.    I do not recall this specific

25  exchange.

1            PATRICK LENTO, M.D.

2      Q.    Does this email refresh your

3  recollection as to any involvement you had

4  with the preparation of the final written

5  warning that was issued to Dr. Varughese?

6      A.    Yes.  I provided some suggestions.

7      Q.    And that's indicated in your

8  email by track changes?

9      A.    It appears so, yes.

10     Q.    Did you prepare a redlined

11  version of the written warning?

12     A.    Track changes.

13           MR. WRONKO:  Let's mark this.

14           (Plaintiff's Lento Exhibit 7

15  marked for identification.)

16     Q.    I'm showing you Lento 7.  These

17  are various drafts of the final written

18  warning letter contained within this

19  exhibit.  My question to you as you review

20  the exhibit is did you have involvement

21  with any of these various drafts?

22           (Witness reviews document.)

23     A.    I can't tell by looking at them.

24     Q.    Is it true the initial draft,

25  which appears on the first two pages, was

1              PATRICK LENTO, M.D.

2    written for your signature?

3         A.    It appears to be true.

4         Q.    Did you write this initial draft

5    contained on page 1 and 2 of the exhibit?

6         A.    I did not.

7         Q.    Do you know why it was written

8    for your signature?

9         A.    I do not.

10        Q.    Did you ever write an email to

11   Dr. Cordon-Cardo forwarding the written

12   warning for his signature because he had

13   directed to you that he wanted to do it

14   from an administrative standpoint?

15        A.    Dr. Cordon-Cardo had indicated

16   that he wanted to deal with Dr. Varughese

17   and that I was not to be involved

18   directly.

19        Q.    Was the reason why you weren't

20   to be involved directly an effort to make

21   it appear that you had nothing to do with

22   this and instead it was the new guy on the

23   block who was doing this?

24             MR. McEVOY:  Objection to the

25   form.  You can answer.

Page 251

1              PATRICK LENTO, M.D.

2       A.    That would be speculative based

3    on Dr. Cordon-Cardo.  And I don't believe

4    that that was the case.

5       Q.    Why is it that you would be

6    involved in the drafting of the final

7    written warning if you had removed

8    yourself from your involvement with

9    Dr. Varughese?

10      A.    Obviously I was asked for my

11   suggestions.

12      Q.    Did you have any involvement

13   with regard to giving the final written

14   warning to Dr. Varughese?

15      A.    No, sir.

16      Q.    Let me show you what was marked

17   as Cardo Exhibit 18.

18            (Witness reviews document.)

19      Q.    Do you recall this email, sir?

20      A.    Only because I'm reading it.

21      Q.    Okay.  Was there an issue with

22   regard to the timing of when the final

23   written warning was going to be issued to

24   Dr. Varughese?

25      A.    I'm not sure.

1          PATRICK LENTO, M.D.

2      Q.    In the email that you had

3   written to Carlos Cordon-Cardo, you

4   indicated "Leena is scheduled to go on

5   vacation for two weeks beginning next

6   Monday, so we appear to have no choice but

7   to get it done this week.  She is

8   currently at the VA and would have to come

9   here one morning before heading to the VA

10  or would have to come back to Sinai after

11  completing her duties at the VA (since she

12  could probably get here by 6 p.m.).  I

13  have attached the letter draft which you

14  may edit as you like since you indicated

15  you wanted to do this from an

16  administrative standpoint."

17          Why was there a push to get the

18  final written warning to Dr. Varughese

19  before she went on vacation?

20      A.    I think Dr. Cordon-Cardo would

21  have to answer that.  I don't recall.

22      Q.    Do you know whether or not the

23  attachment to this particular email, which

24  was a draft according to what you had

25  written, was any different from the

1          PATRICK LENTO, M.D.

2    redline changes that you had previously

3    circulated?

4         A.    I don't know.

5         Q.    How long did you work on the

6    draft?

7         A.    I have no idea.

8         Q.    How many different versions of

9    the draft did you yourself circulate?

10        A.    I was asked to provide

11   suggestions.  I don't recall circulating

12   the draft per se.

13        Q.    Even with regard to Cardo 18

14   where you say "I have attached the letter

15   draft"?  This doesn't refresh your

16   recollection to having done that?

17        A.    Obviously I sent it to

18   Dr. Cordon-Cardo based upon a request from

19   him.

20        Q.    Okay.  But sitting here today,

21   I'm just asking whether you have any

22   specific recollection of that.

23        A.    No, I don't.

24        Q.    Okay.  Were you involved in the

25   meeting when Dr. Varughese was given the

1              PATRICK LENTO, M.D.

2    written warning?

3              MR. McEVOY:   The final warning?

4              MR. WRONKO:   The final written

5    warning.   Thank you.

6         A.    No, sir.

7         Q.    Did anyone advise you what

8    occurred at the final written warning

9    meeting?

10        A.    I don't recall being advised.

11        Q.    Let me show you what has been

12   marked as Defendant's Exhibit 27.

13             (Witness reviews document.)

14        Q.    You have had a moment to review

15   what has been previously marked Defendant's

16   Exhibit 27?

17        A.    Yes.

18        Q.    Are you able to, in reviewing

19   this document, identify what information

20   you supplied for this document?

21        A.    No, sir.

22        Q.    Do you know whether or not you

23   had drafted the paragraph on page 2 that

24   begins "Dr. Carlos Cordon-Cardo, who was

25   appointed department chair" and it goes on

```
1                PATRICK LENTO, M.D.
2    and on?  Did you write that paragraph?
3        A.    I don't believe so.
4        Q.    Wouldn't you agree with me that
5    it's a little unusual that since
6    Dr. Cordon-Cardo had actually signed this
7    that he is referring to himself in the
8    third person in this letter?
9        A.    Perhaps.
10       Q.    Okay.
11             MR. WRONKO:  Let's mark this.
12             (Plaintiff's Exhibit 8 marked
13    for identification.)
14       Q.    I'm showing you what is Lento 8
15    which is a policy for resident misconduct
16    updated on July 6, 2011.  I'll give you a
17    moment to review that.  Tell me when you
18    are ready.
19             (Witness reviews document.)
20       Q.    Have you ever seen this document
21    before?
22       A.    I don't recall seeing it before.
23       Q.    Were you involved in the
24    updating of this policy for resident
25    misconduct?
```

1          PATRICK LENTO, M.D.

2     A.     I don't recall.

3     Q.     Do you know where the final

4  written warning for Dr. Varughese fell in

5  terms of this policy for resident

6  misconduct?  I see that there were

7  multiple warning steps.  Do you have any

8  idea as to where it would fall on this

9  step or which step it would fall on?

10     A.     I'm not sure that they are

11  related.

12     Q.     Why would discipline of

13  Dr. Varughese be unrelated to the policy

14  of resident misconduct that was updated on

15  July 6, 2011?

16     A.     I don't recall the policy

17  myself.  And I don't know who issued this.

18     Q.     Was it the case that this policy

19  applied to all residents except for the

20  plaintiff?

21     A.     I don't believe that to be the

22  case.

23     Q.     But sitting here today, you are

24  unable to identify where exactly the final

25  written warning falls within this

```
 1              PATRICK LENTO, M.D.
 2    particular disciplinary policy.  Is that
 3    fair to say?
 4         A.    I don't see where in this
 5    particular policy.
 6         Q.    Who made the decision to place
 7    Dr. Varughese on the final written
 8    warning?
 9         A.    I believe that was Dr. Cordon-
10    Cardo and Dr. Firpo.
11         Q.    Did you have any input in that
12    decision?
13         A.    That decision was made by
14    Dr. Cordon-Cardo and Dr. Firpo.
15         Q.    How was Dr. Firpo in a position
16    to make a decision about the final written
17    warning if he was just starting with the
18    institution in or around that time?
19         A.    You would have to ask
20    Dr. Cordon-Cardo.
21         Q.    How do you know that Dr. Firpo
22    was involved in making that decision?
23         A.    Dr. Firpo became the director of
24    resident education upon his arrival.  And
25    after the request for me to step away from
```

1           PATRICK LENTO, M.D.

2    Dr. Varughese's situation, Dr. Cordon-

3    Cardo assigned Dr. Firpo -- assigned

4    Dr. Varughese to Dr. Firpo.

5           Q.    Did you have any role to play in

6    terms of bringing Dr. Firpo up to speed in

7    terms of the department's history with

8    Dr. Varughese?

9           A.    I don't recall specifically

10   doing that.

11          Q.    Were you involved in the ultimate

12   decision to terminate Dr. Varughese?

13          A.    I did not make that decision.

14          Q.    Who made that decision?

15          A.    Dr. Cordon-Cardo.

16          Q.    Did he make that decision all by

17   himself?

18          A.    You would have to ask Dr. Cordon-

19   Cardo.

20          Q.    Let me show you what was

21   previously marked as Cardo Exhibit 19.

22   I'll give you a moment to review that.

23   I'd like to bring your attention, feel

24   free to review the email chain, but I'd

25   like to bring your attention to the email

1           PATRICK LENTO, M.D.

2    on the second page sent by Scott Barnett

3    on August 4, 2011, wherein he writes

4    "Stick with the plan.  That should be able

5    to help with whether she will meet the

6    requirements.  Scott."

7                I'm going to ask you about that

8    email in particular.  But take your time

9    to review the document.

10               (Witness reviews document.)

11        Q.    Were you party to any

12   conversations where a plan was put

13   together in terms of how to deal with

14   Dr. Varughese moving forward after the

15   final written warning?

16        A.    I don't recall being included,

17   no.

18        Q.    So when Dr. Barnett makes

19   reference to stick with the plan, you

20   don't know what the plan was?

21        A.    I don't.

22        Q.    At the first page of this email,

23   there is reference to you pulling or

24   having Allene Carter pull Dr. Varughese's

25   file so you could have a meeting with

1              PATRICK LENTO, M.D.

2    Dr. Firpo?

3         A.    Yes.

4         Q.    Do you recall having a meeting

5    with Dr. Firpo to review Dr. Varughese's

6    file?

7         A.    I don't remember, no.

8         Q.    Do you know whether there were

9    any issues with regard to the number of

10   autopsies Dr. Varughese had completed by

11   that point being a new PGY-4?

12        A.    She was concerned that she

13   wouldn't fulfill the requirement.

14        Q.    Did you feel at that time that

15   that was a legitimate concern?

16        A.    Possible, yes.

17        Q.    Why was it a legitimate concern?

18        A.    I don't remember how many cases

19   she had.  Let me see if I actually said

20   it.

21              (Witness reviews document.)

22        A.    I don't see it listed here.

23        Q.    Okay.

24        A.    But obviously she had a concern.

25   So we would be concerned as well.

1              PATRICK LENTO, M.D.

2      Q.    Did you take any steps to address

3  her concern?

4      A.    Yes, I did.

5      Q.    What steps did you take?

6      A.    I believe I spoke with the

7  medical examiner's office to see if they

8  could help accommodate her.  And they said

9  yes.

10      Q.    How were they going to accommodate

11  her?

12      A.    They were going to allow her to

13  achieve the number of autopsies that were

14  required to fulfill the requirement.

15      Q.    Had she expressed any concerns

16  that autopsies that she had worked on she

17  had not received any credit for?

18      A.    I don't recall that, no.

19      Q.    Do you know whether or not she

20  received credit for all autopsies on which

21  she worked?

22      A.    I would assume so, yes.

23      Q.    Now, did you have any knowledge

24  or involvement with Dr. Varughese's

25  rotation in tumor cytogenetics?

1              PATRICK LENTO, M.D.
2      A.     I had no involvement in that
3    rotation, no.
4      Q.     Did you keep tabs as to how
5    Dr. Varughese was performing with
6    Dr. Najfeld in that rotation in August of
7    2011?
8      A.     I don't recall doing so, no.
9      Q.     Did you hear anything from
10   anyone about how she was performing in
11   that particular rotation?
12             MR. McEVOY:  During the rotation?
13   After the rotation?
14             MR. WRONKO:  During or after.
15     A.     I believe yes.  It was
16   subsequent to an incident involving Leena
17   on the cytogenetics rotation.
18     Q.     Tell me what your knowledge is
19   with regard to that.
20     A.     The chief residents had asked
21   Leena or tried to ask Leena to cover a
22   sick call, I believe it was.  Apparently
23   they had tried to email or page her, and
24   they were unable to reach her.  So I was
25   asked at some point to see if I could

```
 1              PATRICK LENTO, M.D.
 2    track her down.
 3         Q.    Did you track her down?
 4         A.    I did.  I called the
 5    cytogenetics lab.  I spoke with
 6    Dr. Najfeld.  I asked if Dr. Varughese was
 7    there.  She said, "Yes, she is right
 8    here."  I said, "Can I speak with her?"
 9         Q.    Do you think that it was
10    inappropriate of Dr. Varughese not to have
11    gotten back to those people who were
12    looking for her?
13         A.    Yes, sure.
14         Q.    Do you know that Dr. Najfeld had
15    criticized Dr. Varughese for being on her
16    handheld during the course of that
17    rotation?
18         A.    She may have.
19         Q.    Do you know that Dr. Najfeld
20    gave her an express instruction not to be
21    on her electronics during that rotation?
22         A.    I'm not aware.
23         Q.    So if in fact Dr. Najfeld had
24    given her that instruction, why then would
25    she be criticized by giving Dr. Najfeld
```

1          PATRICK LENTO, M.D.

2   her undivided attention?

3       A.    Because she was paged.  So it

4   wasn't an email.  If she was getting a

5   text on an email, perhaps one could argue

6   that she was forbidden.  But she was paged

7   and she did not respond to her page or

8   pages.

9       Q.    A page by who?

10      A.    By the chief residents, it was

11  my understanding.

12      Q.    But do you have personal knowledge

13  that she was in fact paged?

14      A.    No.  You would have to ask the

15  chief residents.  But that's what they

16  indicated to me when they tried to track

17  her down.

18      Q.    You had also indicated an email.

19  Was it an email?  Was it a page?  Was it

20  both?

21      A.    It was both, yes.

22      Q.    With regard to a page, would a

23  resident be expected to immediately

24  respond to a page if she is in the middle

25  of a rotation, especially with a

1              PATRICK LENTO, M.D.

2    Dr. Najfeld who seemed very concerned

3    about having Dr. Varughese's undivided

4    attention?

5              MR. McEVOY:  Objection to the

6    form.  You can answer.

7         A.    I wasn't there.  So I don't know

8    what Leena was doing -- Dr. Varughese, my

9    apologies -- at the time.  So yes,

10   appropriate response to a page would be to

11   answer it.

12        Q.    Isn't this in fact a case of the

13   department trying to have it both ways,

14   where they are criticizing Dr. Varughese

15   for not giving Dr. Najfeld undivided

16   attention, but then expecting her to drop

17   Dr. Najfeld immediately upon someone else

18   calling?

19             MR. McEVOY:  Objection to the

20   form.  You can answer.

21        A.    I don't believe that's the case.

22   If you were to receive a phone call and

23   you needed to answer, you would say to

24   whoever is in the room "Excuse me.  I'd

25   like to answer this" or "I need to answer

1              PATRICK LENTO, M.D.

2    this."  I think that a similar approach

3    could have been taken by Dr. Varughese

4    under those circumstances.

5         Q.    But at the risk that Dr. Najfeld

6    would have criticized her for being on her

7    handheld, right?

8         A.    Not if she said to Dr. Najfeld

9    "I need to answer this page."

10        Q.    Who is Julie Chepovetsky?  Was

11   there ever a disciplinary issue with Julie

12   Chepovetsky?

13             MR. McEVOY:  Objection to the

14   form.  You can answer.

15        A.    No.

16        Q.    Did Julie Chepovetsky ever whine

17   about having to present a case twice?

18        A.    She may have.

19        Q.    Did Dr. Beasley ever express to

20   you that Julie Chepovetsky had fallen off

21   the wagon?

22        A.    I don't recall that.

23        Q.    Did she ever express to you that

24   Julie seemed overwhelmed?

25        A.    Perhaps.

1              PATRICK LENTO, M.D.

2        Q.     Did she ever express to you that

3    Julie was missing diagnoses?

4        A.     Perhaps.

5        Q.     Did she ever express to you that

6    Julie was having problems with differential

7    diagnoses?

8        A.     Perhaps.

9        Q.     I want to show you what was

10   marked as Cardo Exhibit 5.  Does this

11   refresh your recollection as to a

12   situation with Julie Chepovetsky?

13       A.     Yes.

14       Q.     Do you know whether or not

15   Dr. Beasley passed her on this rotation

16   where she seemed overwhelmed and was

17   whining about everything and missing

18   diagnoses?

19       A.     I do not know.

20       Q.     Dr. Beasley also wrote "Plus her

21   last presentation at chest conference was

22   really subpar and she sounded like a

23   valley girl."

24              Given the fact that she gave an

25   obviously inadequate presentation, do you

Page 268

1            PATRICK LENTO, M.D.

2   know whether any disciplinary action was

3   taken against her?

4        A.    There was not.

5        Q.    Was she given a second chance at

6   that presentation?

7        A.    I have no idea.

8        Q.    Here it says "Hopefully, she

9   will do a better job this time since she

10  has to do the case for CPC also."

11       A.    You are referring to a different

12  conference.

13       Q.    Okay.  Was she given more bites

14  at the apple, so to speak, in terms of her

15  presentations?

16            MR. McEVOY:  Objection to the

17  form.  You can answer.

18       A.    Not because she had had subpar

19  performance prior.  No, that was not the

20  reason for this.

21       Q.    Okay.  But at the very beginning

22  of the email, it says Julie is whining

23  about having to present the case twice.

24            So do you know whether she

25  presented a case twice?

 1                PATRICK LENTO, M.D.

 2        A.    No, I don't know.

 3        Q.    Was any action taken as to Julie

 4    Chepovetsky after this email on May 26,

 5    2011?

 6        A.    No, sir.

 7        Q.    Now, were you made aware in June

 8    of 2011 that Julie Chepovetsky had 15

 9    cases from the middle to end of May 2011

10    that had yet to be signed out?

11        A.    I don't recall being aware, no.

12        Q.    Let me show you what was marked

13    as Cardo Exhibit 4.

14              (Witness reviews document.)

15        Q.    Does this refresh your recollection

16    to the fact that Julie Chepovetsky had 15

17    cases from the middle to end of May that

18    have yet to be signed out as of June 10,

19    2011?

20        A.    I see what it says, yes.

21        Q.    Does it refresh your recollection?

22        A.    No.

23        Q.    Did you take any action against

24    Julie Chepovetsky?

25        A.    No.  This is not an actionable

1               PATRICK LENTO, M.D.

2      offense.

3           Q.    Subsequent to that in the next

4      month, do you know whether Julie

5      Chepovetsky had failed to respond to a

6      page of Dr. Jordan?

7           A.    I don't recall.

8           Q.    Do you know whether or not

9      Dr. Chepovetsky had failed to return a

10     telephone call with Dr. Jordan?

11          A.    I don't know.

12          Q.    Do you know whether or not she

13     had left a biopsy, a liver biopsy sitting

14     in the frozen room?

15          A.    I don't recall.

16          Q.    Do you know whether or not she

17     left chucks and other grossing tools

18     soaking in water?

19          A.    I don't recall.

20          Q.    Do you know whether or not she

21     left a cryostat blade sitting on top of a

22     cryostat, raising a safety concern?

23          A.    I don't recall.

24          Q.    Let me show you what was marked

25     as Cardo Exhibit 6.  I'll give you a

1                PATRICK LENTO, M.D.

2     moment to review that.

3                (Witness reviews document.)

4          Q.    Were you made aware of

5     Dr. Jordan's concerns with regard to

6     Dr. Chepovetsky?

7          A.    I was cc'd on an email.

8          Q.    Do you know whether or not

9     Dr. Chepovetsky was, in fact, disciplined

10    in any way as a result of this series of

11    items identified by Dr. Jordan on July 12,

12    2011?

13         A.    No, I'm not aware.

14         Q.    Did you ultimately prepare a

15    summative evaluation for Julie Chepovetsky

16    before you departed Mount Sinai Medical

17    Center?

18         A.    No, sir.

19         Q.    Who would have prepared the

20    summative evaluations for Julie Chepovetsky?

21         A.    I believe that would have been

22    Dr. Firpo.

23         Q.    Were summative evaluations

24    prepared for each year of a resident's

25    residency or would it be just for their

Page 272

1           PATRICK LENTO, M.D.
2    final, an overall summative evaluation?
3        A.    It was the latter.  So a
4    summative evaluation was at the end of a
5    residency.
6        Q.    Do you know why Julie Chepovetsky
7    wasn't put on academic advisement?
8             MR. McEVOY:  Objection to the
9    form.
10       A.    Based on?
11       Q.    Based on anything that occurred
12   in Cardo 5, Cardo 4 or Cardo 6.
13       A.    Well, let's see.  Whining or
14   complaining about something is not an
15   offense.
16       Q.    Let's focus on each one.  Cardo
17   Exhibit 5, we have a situation where she
18   was performing badly, would you agree, on
19   a rotation where she was missing diagnoses
20   and had delivered a subpar presentation,
21   right?
22       A.    No.  First of all, this is with
23   an isolated attending and an isolated
24   incident, where there appears to be a gap
25   in Julie's knowledge.  That's not a

1             PATRICK LENTO, M.D.

2      disciplinary situation.  That's another

3      educational opportunity.  We all have gaps

4      in our knowledge.

5          Q.    So are you telling me that the

6      inclusion of the issues that Dr. Varughese

7      had with Dr. Najfeld are somehow -- in the

8      letter of termination are in some way

9      different than this situation with

10     Dr. Beasley?

11         A.    I'm not sure I understand the

12     comparison.

13         Q.    Well, let me take a step back.

14     What is your understanding of why

15     Dr. Varughese was terminated in part

16     because of her performance on the

17     cytogenetics rotation with Dr. Najfeld?

18         A.    That decision was made by

19     Dr. Cordon-Cardo, who would have to answer

20     directly.

21         Q.    Do you have any knowledge as to

22     why that was included in the letter of

23     termination with regard to Dr. Varughese?

24         A.    No, sir.

25         Q.    Should it have been?

1              PATRICK LENTO, M.D.

2              MR. McEVOY:  Objection.  You can

3    answer.

4         Q.    If Dr. Najfeld had a problem

5    with Dr. Varughese's knowledge base, would

6    you agree, just like with Julie

7    Chepovetsky, that that's merely an

8    opportunity for Dr. Varughese to learn?

9         A.    Again, you are comparing things

10   that I don't have complete knowledge of.

11        Q.    Okay.

12        A.    This is an isolated incident.

13        Q.    So does it become less isolated

14   June, the next month, when Julie has 15

15   cases from middle to end of May that she

16   didn't sign out?

17        A.    This is a reminder that is sent

18   out on a weekly basis to all the residents

19   and all the attendings in the department.

20   So while there is -- it looks like there

21   are two residents' names here, this would

22   just happen to be that particular week.

23   And the so-called delay is not necessarily

24   due to the resident.

25        Q.    So if it wasn't due to the

1              PATRICK LENTO, M.D.

2    resident, why would the residents be

3    followed up with regard to these cases?

4         A.    Because the residents are

5    assigned to the cases so we can track them

6    and assure that appropriate patient care

7    is rendered.

8         Q.    So then why was Dr. Jordan

9    actually naming names here if it wasn't

10   the fault of the resident?

11             MR. McEVOY:  Objection to the

12   form.  That's not what the witness said.

13   But you can answer.

14        A.    She is just stating a fact.

15        Q.    Well, is it a fact that she

16   states that "In my opinion, this

17   behavior," referring to the residents,

18   "and laissez-faire attitude is not only

19   irresponsible but potentially dangerous to

20   patients"?

21             MR. McEVOY:  Are you asking is

22   that what it says?

23             MR. WRONKO:  I'm asking if it's

24   a fact.

25             MR. McEVOY:  If what is a fact?

1              PATRICK LENTO, M.D.

2              MR. WRONKO:  Her expression that

3    this behavior and laissez-faire attitude

4    of the residents is not only irresponsible

5    but potentially dangerous to the patient.

6              MR. McEVOY:  To the extent you

7    are asking him if that's what the document

8    says, fine.  To the extent you are asking

9    if that's what Dr. Jordan meant or if

10   that's what Dr. Jordan said --

11             MR. WRONKO:  I'm asking if it's

12   a fact.

13             MR. McEVOY:  What?

14             MR. WRONKO:  I just repeated and

15   I'll repeat again.  That this behavior and

16   laissez-faire attitude of the residents is

17   not only irresponsible but potentially

18   dangerous to patients.

19        Q.   You can answer.

20             MR. McEVOY:  I didn't say he

21   couldn't answer the question.

22             MR. WRONKO:  Are you instructing

23   him not to answer that question?

24             MR. McEVOY:  I said I didn't say

25   he couldn't answer the question.  Pay

1              PATRICK LENTO, M.D.

2    attention.

3         A.    She indicates in the email that

4    it's her opinion.

5         Q.    I want your opinion.  Is it a

6    fact?

7         A.    I don't know the circumstances

8    of the cases.  So no, I can't comment.

9         Q.    So certainly Dr. Jordan was

10   placing the blame on these two residents

11   as having laissez-faire attitudes, was she

12   not?

13        A.    It appears so.

14        Q.    Turning then to Cardo Exhibit 6,

15   does it stop being an isolated incident

16   when you then see the chief resident then

17   listing out all of these different

18   problems with Julie Chepovetsky, including

19   ignoring pages and calls and then having

20   all of these different issues, including

21   leaving a liver biopsy sitting in the

22   frozen room?

23        A.    Well, as specified in your

24   referral to the liver biopsy, it was a

25   specimen not to be examined at that point.

1           PATRICK LENTO, M.D.
2     So she just happened to leave it on the
3     counter, perhaps, instead of putting it
4     next to the counter.  That's not an issue.
5          Q.    You are downplaying that.  Isn't
6     that a potential patient care issue, the
7     mishandling of specimens?
8          A.    That's not a mishandling of a
9     specimen.
10          Q.    Just leaving it so that someone
11     doesn't know what it's supposed to be --
12     what is supposed to be done with the
13     specimen?
14          A.    I think you are reading into it.
15          Q.    Then why is it that Dr. Jordan
16     wrote you cannot just leave the specimen
17     sitting on the counter in the frozen room?
18          A.    You would have to ask Dr. Jordan.
19          Q.    Did you follow up with
20     Dr. Jordan with regard to her concerns
21     here?
22          A.    This was in July when Dr. Firpo
23     had basically taken over as the director
24     of the residency education.
25          Q.    Is there a reason why you would

1            PATRICK LENTO, M.D.

2    have taken Dr. Jordan's words about the

3    handling of specimens and any concerns

4    relating thereto when it came to

5    Dr. Varughese.  But when it comes to Julie

6    Chepovetsky, you are no longer taking her

7    words or her taking her concerns very

8    seriously?

9            MR. McEVOY:  Objection to the

10   form.  Completely mischaracterizes his

11   testimony.

12            MR. WRONKO:  I don't think so.

13       A.    Dr. Firpo responded to Dr. Jordan.

14       Q.    Do you know whether or not

15   Dr. Chepovetsky ultimately suffered any

16   type of discipline, whether it be academic

17   advisement, whether it be written warning,

18   any type of discipline arising out of

19   this?

20       A.    I'm not aware.

21       Q.    Do you know whether or not Paul

22   Azar was missing his rotation on blood

23   bank for significant amounts of time in

24   August of 2011?

25       A.    I believe that I was informed of

1             PATRICK LENTO, M.D.

2     the possibility and I investigated.

3         Q.    What did your investigation turn

4     up, if anything?

5         A.    I believe I communicated with

6     the director of the service, who indicated

7     that that was not the case.

8         Q.    Now, back with Julie Chepovetsky.

9     At the time you had received that email,

10    were you still acting as the director of

11    the residency program?

12        A.    I was the named program

13    director.

14        Q.    But were you just holding that

15    name or had Dr. Firpo in essence

16    supplanted you in terms of your job

17    responsibilities?

18        A.    Dr. Firpo had become the

19    director of pathology residency education.

20    It was at this time that I had accepted a

21    new position elsewhere.

22        Q.    So for how long did you remain

23    with Mount Sinai after accepting a new

24    position?

25        A.    Until December.

1          PATRICK LENTO, M.D.

2     Q.    So what job responsibilities

3 upon that occurring did you maintain, as

4 opposed to giving up to Dr. Firpo?

5     A.    I continued to oversee the

6 autopsy service and up until I believe it

7 was near the end of November, and the same

8 for the cardiovascular service.

9     Q.    What about with regard to

10 administration over the program, the

11 residency program?  Did you maintain any

12 responsibilities over that?

13     A.    Yes.  When asked to participate

14 in something, I did.

15     Q.    But did you ever do any tasks

16 where you were not asked to participate

17 and you just did so out of your own

18 initiative?

19     A.    I don't recall.

20     Q.    Do you recall a situation in

21 September of 2011 where Dr. Jordan had

22 made allegations that she was concerned to

23 be at work because of Dr. Varughese and

24 feared for her safety?

25     A.    I don't recall that.

Page 282

1            PATRICK LENTO, M.D.

2            MR. WRONKO:  Let's mark this.

3            (Plaintiff's Lento Exhibit 9

4     marked for identification.)

5         Q.    Dr. Lento, I'm showing you what

6     has been marked as Lento Exhibit 9.  I'll

7     give you a moment to review that.

8            (Witness reviews document.)

9         Q.    You have had a moment to review

10    that exhibit?

11        A.    Mm-hmm.

12        Q.    Did you ever review that

13    exhibit, that email chain, prior to today?

14        A.    I don't specifically recall.

15        Q.    Do you recall there being an

16    issue that Dr. Jordan had raised.

17        A.    Yes.  An attendance issue.

18        Q.    More to the point, with regard

19    to the issue that she had raised with

20    regard to her own personal safety.  Do you

21    recall that issue being raised?

22        A.    Well, I'm cc'd.  But she is

23    addressing her email to Dr. Firpo.

24        Q.    Did you do anything with regard

25    to that particular issue?

Page 283

1                   PATRICK LENTO, M.D.

2        A.     Not that I recall, no.

3        Q.     Why would you not have done

4    anything with regard to that issue?

5        A.     Dr. Firpo was the director of

6    the residency education.  And her email

7    was directed specifically to him.

8        Q.     Did you have any conversations

9    with Dr. Firpo about that situation?

10       A.     Not that I recall, no.

11       Q.     Did you have any communications

12   with Dr. Barnett's office?

13       A.     Not that I recall, no.

14              MR. WRONKO:  Let's mark this.

15              (Plaintiff's Lento Exhibit 10

16   marked for identification.)

17       Q.     I'm showing you what has been

18   marked as Lento Exhibit 10.  Do you recall

19   sending the email that is marked as Lento

20   Exhibit 10 to Dr. Firpo?

21       A.     I don't recall sending this.

22       Q.     Do you recall having any

23   conversations with Dr. Firpo about that

24   situation?  Does this refresh your

25   recollection?

Page 284

1                PATRICK LENTO, M.D.

2          A.    No, sir, it does not.

3          Q.    Does this refresh your

4    recollection of any communications with

5    Dr. Barnett?

6          A.    No.

7          Q.    Do you know why you would have

8    been sending this email to Dr. Firpo if

9    you had relinquished your responsibilities,

10   as you had described?

11         A.    This is a suggestion.  I don't

12   know if this is in response to a question

13   or not.

14         Q.    Were you at all involved in the

15   update of a policy on July 27, 2011, for

16   morning conference attendance?

17         A.    I don't recall.

18         Q.    Do you know whether or not --

19   first of all, do you know what I'm

20   referring to by the update in terms of the

21   morning conference attendance requirement?

22         A.    Not the details.

23              MR. WRONKO:  Let's mark this.

24              (Plaintiff's Lento Exhibit 11

25   marked for identification.)

1              PATRICK LENTO, M.D.

2       Q.    Do you recall ever seeing this

3    document before, dated July 27, 2011?

4       A.    I don't recall.

5       Q.    Does this document in any way

6    refresh your recollection as to a change

7    in policy with regard to morning conference

8    attendance?

9       A.    Dr. Firpo, again, as the new

10   director of education, wanted to formalize

11   policy regarding attendance.

12      Q.    Did he have to do that because

13   of the ACGME audit that had taken place?

14      A.    I don't recall that being a

15   stipulation of the ACGME.

16      Q.    The program was on probation at

17   this point?

18      A.    No, it was not.  We were never

19   put on probation.

20      Q.    Are you sure about that?

21      A.    We were not put on probation.

22      Q.    Wasn't the program given

23   something like 14 different citations and

24   put on probation in 2011?

25      A.    We were given citations.  But

1           PATRICK LENTO, M.D.

2    that doesn't necessarily mean we were put

3    on probation.

4         Q.    Okay.

5         A.    Citations were responded to.

6         Q.    Do you have any knowledge with

7    regard to residents who gave presentations

8    pursuant to this policy when they missed

9    the 80 percent threshold for attendance at

10   morning conferences?

11        A.    I was not involved in tracking

12   this, no.

13        Q.    Did you know whether or not a

14   resident by the name of Blouin missed a

15   presentation on August 25, 2011?

16        A.    I don't know.

17        Q.    How about Julie Chepovetsky

18   missing a presentation on August 1, 2011?

19        A.    I'm not aware.

20        Q.    How about Robert Guarino

21   canceling his presentation on

22   September 15, 2011.  Are you aware of

23   that?

24        A.    No.

25        Q.    Did there come a point when

1          PATRICK LENTO, M.D.

2    Dr. Varughese in August 2011 had attempted

3    to change her elective rotation from GI to

4    dermopath?

5          A.    I believe she did, yes.  She

6    made a request.

7          Q.    Who is Dr. Miriam Birge?

8          A.    Miriam Birge is a dermpath

9    attending in the department.

10          Q.    Do you know whether or not

11    Dr. Birge said it would be acceptable for

12    Dr. Varughese to switch into dermopath?

13          A.    That certainly may have been the

14    case.

15          Q.    Do you know whether or not

16    Dr. Varughese's request was denied?

17          A.    Yes.

18          Q.    Why was it denied?

19          A.    The decision -- well, the

20    request was made to the chief residents,

21    who ultimately denied the request.

22          Q.    Was it the chief residents who

23    denied it or was it Dr. Firpo who denied

24    it?

25          A.    Well, initial requests generally

1               PATRICK LENTO, M.D.

2    would go to the chief resident.  And if

3    there were a problem, it might have been

4    bumped up.  But I don't know.

5         Q.    What factors were considered in

6    terms of the request being denied?

7               MR. McEVOY:  Dr. Varughese's

8    request or requests in general?

9               MR. WRONKO:  Dr. Varughese's

10   request.

11        A.    I think that if the chief

12   residents had denied it, then they

13   obviously would have had their rationale

14   for it.

15        Q.    Did you know in August or

16   September of 2011 what their rationale

17   was?

18        A.    Yes.

19        Q.    What was their rationale?

20        A.    Leena was assigned to a GI

21   rotation, a rotation she had specifically

22   requested.  And now apparently she had

23   asked to be changed into a different

24   rotation, the dermpath rotation.

25        Q.    Was that an issue for -- did you

1          PATRICK LENTO, M.D.

2    view that as being an issue for

3    Dr. Varughese where it would have

4    supported a termination of her from the

5    program?

6         A.    Making a request?  No.

7         Q.    Was there anything with regard

8    to her request to be transferred from one

9    rotation to another that would have

10   supported a termination?

11        A.    Not that I considered, no.

12        Q.    Did you have communications

13   about Dr. Varughese requesting a leave of

14   absence?

15        A.    I know that she had made a

16   request.  I don't recall specific

17   communications.

18        Q.    Do you know whether or not she

19   had made a request for a leave of absence

20   in September of 2011?

21        A.    I was informed that she had made

22   a request.

23        Q.    Who advised you?

24        A.    I believe it was Dr. Firpo.

25        Q.    What did Dr. Firpo tell you

1            PATRICK LENTO, M.D.

2    about Dr. Varughese's request for a leave

3    of absence?

4        A.    From what I recall, he said that

5    Dr. Varughese had made a request.  And I

6    believe he was investigating how to go

7    about providing her with a leave of

8    absence.

9        Q.    Had Dr. Firpo ever advised you

10   about any observations he made about

11   Dr. Varughese in terms of her health that

12   ultimately led him to say that

13   Dr. Varughese should not be permitted to

14   come back to Mount Sinai until she had

15   medical clearance?

16       A.    He may have.  But I don't

17   recall.

18       Q.    Let me show you what was marked

19   as Defendant's Exhibit 48.  I'll give you

20   a moment to review that.

21            (Witness reviews document.)

22       Q.    Had you ever seen that

23   particular email marked as Defendant's

24   Exhibit 48?

25       A.    No, I don't recall seeing this.

1          PATRICK LENTO, M.D.

2      Q.    Did you have any communications

3  with any of the recipients of that email

4  about the fact that Dr. Varughese was not

5  being permitted to return to work absent

6  having a doctor's note?

7      A.    No, I don't recall.

8      Q.    Did Dr. Firpo ever express to

9  you that when he had met with

10  Dr. Varughese on September 15th that she

11  had exhibited a flattened affect, very

12  slow responses, anything along those

13  lines?

14      A.    I don't recall.

15      Q.    Did he ever tell you that she

16  gave a chaotic statement and appeared

17  unable to cope?

18      A.    I don't recall.

19      Q.    Did he ever tell you that she

20  had flickered her eyes and he thought that

21  she might be having a petit mal seizure?

22      A.    No, I don't recall.

23      Q.    Were you advised at all about

24  the basis for a request for leave of

25  absence by Dr. Varughese?

Page 292

1                    PATRICK LENTO, M.D.

2        A.     No.  She never said anything to

3    me, no.

4        Q.     Did you think that she was

5    faking?

6               MR. McEVOY:  Objection to the

7    form.  Faking what?

8        Q.     Did you think that she was

9    faking a medical condition in order to get

10   a leave of absence?

11       A.     I had no opinion on the matter.

12       Q.     Was there an upcoming conference

13   that was a review conference for board

14   examinations called the Osler Conference?

15       A.     There may have been.

16       Q.     What is the Osler Conference?

17       A.     It's the Osler Review Course for

18   residents who want to prepare for their

19   licensing examination in pathology.

20       Q.     Did you think that Dr. Varughese

21   was attempting to use a leave of absence

22   to be able to avoid doing her work but

23   then to also get to attend that conference

24   free of charge?

25       A.     I don't know.

Page 293

1           PATRICK LENTO, M.D.

2           MR. WRONKO:  Let's mark this.

3           (Plaintiff's Lento Exhibit 12

4    marked for identification.)

5       Q.    Do you recall this email?

6       A.    I do not.

7       Q.    Do you know why it is that you

8    had written this email?

9       A.    Obviously, it's in response to

10   Dr. Firpo.

11      Q.    I should say, so that the record

12   is clear, we are talking about the email

13   that is marked as Lento Exhibit 12, which

14   is a September 19, 2011, email sent by you

15   to Dr. Firpo.

16           Does this refresh your

17   recollection of being skeptical about the

18   reason why Dr. Varughese was requesting a

19   leave?

20      A.    I guess that's what I believed

21   at the time, yes.

22      Q.    Did you believe that Dr. Varughese

23   was malingering?

24      A.    I don't know what she was doing.

25      Q.    Given the fact that Dr. Firpo

1            PATRICK LENTO, M.D.

2    had testified at the hearing about his

3    perceptions of Dr. Varughese, did he

4    immediately contact you and shoot down

5    this idea that she was faking it?

6        A.    Well, it doesn't say that here.

7    And I don't recall that.

8        Q.    Okay.  Do you know what

9    Dr. Firpo was referring to when he wrote

10   "This is truly incomprehensible"?

11       A.    There is no attachment.  So I

12   don't know.

13       Q.    Much of it has been redacted for

14   privilege.  Do you have any recollection

15   of what was redacted?

16       A.    I don't know.

17       Q.    Do you know whether anyone

18   shared in your opinion that Dr. Varughese

19   was playing the institution by using her

20   leave in order to attend the review course

21   and so that she wouldn't have to perform

22   her duties?

23       A.    What was the question?

24       Q.    Do you know whether anyone else

25   shared in your belief that she was playing

1              PATRICK LENTO, M.D.

2    Mount Sinai by using her leave in order to

3    attend the review course and not have to

4    perform her duties?

5         A.    I do not know.

6         Q.    Do you know whether or not

7    Dr. Jordan had ever gone through

8    Dr. Varughese's desk?

9         A.    I don't know.

10              MR. WRONKO:  Let me show you

11   Pessin Exhibit 16.

12              (Witness reviews document.)

13        A.    I don't know what this refers

14   to.

15        Q.    Were you ever made aware of the

16   fact that Dr. Jordan on or around

17   August 13, 2010, had gone either on or

18   into Dr. Varughese's desk to assess what

19   she had in or on her desk?

20        A.    I don't recall.

21        Q.    Do you know whether it was

22   appropriate for a PGY-2 to be going

23   through a PGY-3's desk?

24        A.    I can't respond to that.  I

25   don't know the circumstances of what was

1                PATRICK LENTO, M.D.
2      going on here.
3         Q.    Let me show you what was marked
4      as Defendant's Exhibit 52.  I'll give you
5      a moment to review that.
6                (Witness reviews document.)
7         Q.    I'm going to see whether or not
8      we can try to short-circuit this a little
9      bit, because it is a long document.  I
10     want to familiarize you with the document.
11     Let me see whether or not it will be
12     necessary for you to read the entire
13     document.
14                First of all, were you involved
15     in the decision to terminate Dr. Varughese?
16        A.    No.
17        Q.    Did you have any involvement --
18     strike that.
19                Do you recognize Defendant's
20     Exhibit 52 as the September 21, 2011,
21     notice of summary suspension termination
22     of Dr. Varughese from the pathology
23     residency program?
24        A.    By looking at it, yes.  I don't
25     recall seeing this.

1          PATRICK LENTO, M.D.

2      Q.     Did you have or play any role in

3    terms of drafting this document?

4      A.     I don't believe so.

5      Q.     Were you being kept apprised of

6    developments with regard to Dr. Varughese

7    at that time in September?

8      A.     I don't recall being advised.

9      Q.     Did you know she was about to be

10   terminated on or around September 21,

11   2011?

12     A.     No.

13     Q.     Did you get word that she was

14   terminated after it occurred?

15     A.     I believe I did, yes.

16     Q.     What was your reaction to that?

17     A.     Sad.

18     Q.     Why do you say that?

19     A.     Well, this has been a long

20   process.  I think that it's sad on a

21   number of levels.  For one, you put in as

22   a department a lot of time and effort to

23   train a resident, a resident who had been

24   with us for three years.  And sad for the

25   resident who obviously lost her job.

Page 298

1             PATRICK LENTO, M.D.

2        Q.    Wouldn't you agree with me it's

3    more than losing a job when there is this

4    type of termination.  In essence, it's a

5    termination of a career?

6        A.    That's not for me to determine.

7        Q.    Okay.

8             MR. WRONKO:  Let's mark this.

9             (Plaintiff's Lento Exhibit 13

10   marked for identification.)

11       Q.    Do you recall this email

12   exchange between yourself and Dr. Firpo?

13       A.    I do not.

14       Q.    You write "Initially, I never

15   got a follow-up page to deal with Leena,

16   so I wanted to see where we were with

17   her."

18             If you no longer had

19   responsibilities with regard to

20   Dr. Varughese, why were you concerned

21   about "where we were with her"?

22       A.    Doesn't mean I wasn't interested

23   in the resident.

24       Q.    So you were just curious?

25       A.    Yes.

1          PATRICK LENTO, M.D.

2      Q.    Dr. Firpo writes back "Done"

3  exclamation point.  You write back "Good

4  news" exclamation point.

5          Were you happy about this?

6      A.    Good news for the department to

7  be able to focus moving forward.

8      Q.    So in part, you were happy about

9  this situation, that she had been

10  terminated?  Is that fair to say?

11      A.    For the residency training

12  program, yes, I think that it would have

13  had a positive impact on the residents

14  overall.

15      Q.    Is there a reason you didn't say

16  to Dr. Firpo at this point in time when

17  you are reflecting on the termination of a

18  resident "You know, it's a shame we

19  couldn't have made it work out"?

20      A.    That presumes there were no

21  other emails and that I didn't have a

22  personal conversation with him about that.

23      Q.    Was there some type of a

24  personal conversation or other emails to

25  that effect?

1                  PATRICK LENTO, M.D.

2        A.    I couldn't tell you.

3        Q.    At that point in time when

4   Dr. Varughese was terminated, were you

5   still, under ACGME rules, the head of the

6   residency program?

7        A.    I was the named program director.

8        Q.    But only in name, right?

9        A.    I was the named program director.

10       Q.    But, in fact, was Dr. Firpo

11   really acting behind the scenes in that

12   capacity?

13            MR. McEVOY:   Objection to the

14   form.   You can answer.

15       A.    Yes.   Again, I had already

16   accepted a position at another hospital.

17   The announcement had already been made.

18   And I stayed on primarily to allow for a

19   transition of sorts, rather than up and

20   leaving.   I felt it was my responsibility

21   to allow for a transition.

22       Q.    When is it that attendings are

23   supposed to complete their evaluations of

24   a particular rotation?

25       A.    When?

1             PATRICK LENTO, M.D.

2        Q.    How long after the rotation is

3    completed are they expected to hand in

4    their evaluation?

5        A.    Well, I think the hope would be

6    within a couple of weeks of the rotation.

7        Q.    Are you aware of an evaluation

8    of Dr. Varughese by an Anatoly Laytin for

9    a rotation on March 9, 2009, to May 3,

10   2009, that wasn't submitted until

11   December 1, 2011?

12       A.    No, I'm not aware.

13       Q.    Let me show you what was

14   previously marked as Defendant's Exhibit

15   57.  I'll give you a moment to review

16   that.

17             (Witness reviews document.)

18       Q.    Have you ever seen Defendant's

19   Exhibit 57 before?

20       A.    I don't recall having seen this.

21       Q.    Have you seen this type of a

22   form before?

23       A.    No, I don't recall.

24       Q.    Had you ever prepared summative

25   evaluations on behalf of anyone?

1              PATRICK LENTO, M.D.

2      A.     At the end of the residency?

3      Q.     Yes.

4      A.     Probably, yes.

5      Q.     What form did it take when you

6   were preparing it?

7      A.     I don't know if I used a form.

8   I'll be honest with you.

9      Q.     So what would you instead do?

10     A.     I don't recall exactly.

11     Q.     Do you know whether or not you

12  had prepared any summative evaluations for

13  the PGY-4 class that Dr. Varughese was a

14  part of?

15     A.     No.  I left the program in

16  December 2011.  The summative evaluations

17  would have occurred at the end of that

18  academic year, which would have been

19  somewhere between let's say March and May

20  of 2012.

21     Q.     Did you write a summative

22  evaluation for Jessica French?

23     A.     I don't remember when she

24  graduated.

25     Q.     She graduated 2011.

1               PATRICK LENTO, M.D.

2     A.     June 2011?

3     Q.     Mm-hmm.

4     A.     So probably, yes.

5     Q.     Do you recall what type of

6   evaluation you gave for Jessica French?

7     A.     No, sir.

8               MR. WRONKO:  Let's mark this.

9               (Plaintiff's Lento Exhibit 14

10  marked for identification.)

11              MR. WRONKO:  I don't have an

12  extra copy.  Show it to Mr. McEvoy.  We

13  can make a copy in a moment.

14    Q.     Have you ever seen what has been

15  marked as Lento Exhibit 14 before?

16    A.     No.

17    Q.     Does that simply -- does that

18  email confirm the fact that when you were

19  the residency program director, you had

20  prepared summative evaluations?

21    A.     Yes.

22    Q.     And to your best recollection

23  sitting here today, you did not use a

24  prepared form?  Would you do it in a

25  narrative format, like a letter of

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LEENA VARUGHESE,                                    12 Civ. 8812 (CM) (JCF)

                    Plaintiff,

        -against-                                   **ERRATA SHEET FOR**
                                                    **THE DEPOSITION OF**
MOUNT SINAI MEDICAL CENTER, PATRICK                 **DR. PATRICK LENTO**
LENTO, M.D., CARLOS CORDON-CARDO,
M.D., ADOLFO FIRPO, M.D., IRA J. BLEIWEISS,
M.D., and ABC Corp. 1-10, and JOHN DOES 1-10,

                    Defendants.

| **Page** | **Line** | **Change From** | **Change To** | **Reason** |
|---|---|---|---|---|
| 30 | 11 | At the current moment. | At the current moment, No. | Typographical error |
| 39 | 2 | Not that I was aware of. | Not that I recall. | Clarification |
| 91 | 2 | said to Dr. Maniar. | said so to Dr. Varughese | Typographical error |
| 111 | 20 | attending surgeon. | attending breast surgeon. | Typographical error |
| 186 | 17 | Mm-hmm. | Yes. | Clarification |
| 209 | 18-19 | So like you did not too long ago, asked her | So, just like you asked me not too long ago, I asked her. | Typographical error |
| 300 | 2 | I couldn't tell you. | I don't recall. | Typographical error; clarification |

_Patrick Lento, MD_
                                                    Patrick Lento

Sworn to before me this
25th day of November, 2013

_Patricia J. Travis_
    Notary Public

PATRICIA J. TRAVIS
Notary Public, State of New York
No. 4895803
Qualified in Putnam County
Term Expires August 3, 2017